UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 24 2016 ★

LONG ISLAND OFFICE

---

ULISES BONILLA,

                Petitioner,

  -against-

THOMAS GRIFFIN, SUPERINTENDENT OF
GREEN HAVEN CORRECTIONAL FACILITY,

               Respondent.

**MEMORANDUM OF LAW**

___CV___

**CV  16  3676**

---

## POINT I

BIANCO, J.
LOCKE, M. J.

THE APPELLATE DIVISION RENDERED A DECISION THAT WAS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, WHEN IT FOUND THAT IT WAS LEGALLY SUFFICIENT TO ESTABLISH PETITIONER'S GUILT. 28 U.S.C. §2254(d)(1); U.S. CONST. AMENDS. VI, XIV.

I.   The Murder Conviction Was Legally Insufficient

It has been well established that, the Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime" *In re Winship*, 397 US 358, 364 (1970).

A court reviewing a sufficiency of the evidence claim must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational Trier of fact could have found that essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

US 307, 319 (1979)(emphasis in original)(citation omitted); *see, also, Maldonado v. Scully*, 86 F.3d 32, 35 (2 Cir. 1996)("[A]ll possible inferences that may be drawn from the evidence must be construed in the prosecution's favor.")(citing cases).

To prevail, the petitioner must show that "upon the record evidence adduced at the trial no rational Trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 US at 324 (footnote omitted); accord *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2 Cir. 2002). Indeed, a habeas petitioner challenging the sufficiency of the evidence underlying his conviction, therefore, bears a "very heavy burden." *Knapp v. Leonardo*, 46 F.3d 170 178 (2 Cir. 1995)(internal quotation marks and citations omitted), *cert.* denied, 515 US 1136 (1995). Here, petitioner contends he has met that "very heavy burden."

As an initial matter, the People produced very little "direct" evidence at trial that petitioner stabbed the victim and no such evidence linked him to the knife allegedly used in the stabbing. In fact, the only arguably "direct" evidence of a stabbing consisted of a hearsay statement allegedly made to a Prosecution's witness, Misael Berrios, who, under an immunity agreement with the Prosecution, testified that petitioner said to him, "I

2

fucked up, I stabbed him, I'm done." (T: 939, 944, 951).
Significantly, however, this is not what Berrios told the
police, as the following testimony elicited on cross-
examination shows no mention of a statement about a
stabbing:

> **Q:** When you were interviewed by the police,
> didn't you say the following words to them: When
> we get to the corner, Ulises is screaming at me
> like, Yo, fuck, fuck. I fucked up, man, I fuckin'
> killed him. I know I did. Did you tell them that?

> **A:** Yes.

(*See*, T: 953-54).

It appears then that Berrios changed for the trial
what petitioner allegedly said to him as they fled the
scene: Instead of saying "killed," as he told the police,
Berrios testified at trial that petitioner said he had
"stabbed" the deceased.

In any event, with a prior criminal history (T: 947-
48, 975-83), Berrios testified under a grant of immunity
(T: 916-18, 921-23, 949) where, in exchange for his
testimony against petitioner, he was granted immunity from
prosecution "with respect to this action as described by
him in his October 13th, 2010, statement to the police" (T:
917-18).

In such testimony, however, Berrios admitted that it
was the day following the altercation that he became aware

that someone had been killed the day before (T: 991), admitting too having heard that people around that neighborhood were saying that he, Berrios, had stabbed the deceased and was concerned he might be charged with the murder (T: 992-93). Nevertheless, Berrios said nothing to the police about the statement he claims the petitioner made until weeks later when, on October 13, 2010, the police questioned him about having possessed a loaded weapon that he fired into the air one night (T: 946, 952, 986, 991-92).

Moreover, Berrios's testimony was not without contradiction. For instance, while he denied getting into the car (T: 941, 972) and denied seeing anyone else get into the car (T: 952), this testimony was contradicted by three witnesses, who saw him and others get into the car's rear seat (T: 782, 828, 1088) where blood from the deceased was found (T: 586-87, 1014, 1017). Incredibly, Berrios denied seeing petitioner get into the car (T: 959, 971-72), while admitting he told the police that petitioner had gotten into a car (T: 960). Accordingly, Berrios's testimony should be rejected as "manifestly untrue, physically impossible, contrary to experience or self-contradictory" and, hence, incredible as a matter of law.

*See, e.g., People v. Garafolo*, 44 AD2d 86, 88 (A.D. 2 Dept. 1974).

To be sure, Berrios's admission that he undertook he was "getting paid a guarantee of freedom from . . . possible jail time" (T: 990) accounts for his testimony that petitioner allegedly admitted stabbing the deceased, and, coupled with Berrios's contradictory testimony, a "logical gap" is found in the evidence.

Indeed, despite the presence of numerous individuals, none, not even Berrios, observed petitioner with a knife, let alone saw anyone being stabbed. Additionally, no forensic, latent, scientific or other physical evidence at trial connected petitioner to the stabbing or the knife later recovered near the scene. Stated differently, the People's case was effectively circumstantial.

For example, no real direct evidence that petitioner stabbed the victim and no evidence at all linking petitioner to the knife allegedly found near the scene, the People's theory of the case was that the stabbing could only have taken place while petitioner and the victim were engaged in a fist-fight.

Significantly, despite the medical examiner's testimony that the deceased sustained no less than 12 stab wounds (wounds "produced by a sharp instrument whose depth

5

is greater than its length" (T: 900) and seven "that came with [the deceased] Armando" (T: 936), not one testified to having observed the infliction of any stab wound, six of which were described as "major" (T: 556). Additionally, not one of the 15 individuals testified to having observed petitioner holding a knife, a knife described as between eight and nine inches in length with a seven-inch blade (T: 568-69).

In fact, the witnesses all described what can only be characterized as a "fist-fight," again none observing a knife (T: 484, 501, 507-08, 511, 514, 643-44, 654, 776-77, 785-86, 805, 828-29, 935-36, 940-41, 974, 1082, 1092-93).

This is consistent, of course, with testimony by the case's lead investigator (T: 1000, 1025), Detective James Cereghino: None of the 911 calls made to the police referred to a stabbing (T: 1008), several referring instead to a shooting (T: 1007). In fact, as the detective testified, the police only learned the deceased had been stabbed upon learning of the presence of stab wounds on the body, not from anything the witnesses said (T: 1008-09).

In addition, while a knife with blood on it was recovered down the street form the altercation, in front of 163 Kinkel (T: 567-69, 578, 1001), the blood was determined to be that of the deceased and no identifiable fingerprints

were found on the knife (T: 628, 1022). In fact, no forensic, latent, scientific or other physical evidence at trial connected petitioner to the stabbing or to the knife (T: 567-69, 869-70, 1001).

In contrast, physical evidence indicates that someone else may well have stabbed the victim. Witnesses testified that a number of people were fighting, including a male Hispanic with a Cincinnati Reds hat and another male wearing a Yankees cap, both said to have been involved in the altercation itself (T: 512, 513, 515, 645, 650, 657, 778-79, 786, 806-07, 823-24, 936, 975, 1081-82). Witnesses also described seeing such "weapons" as a pipe or tire iron, sticks, bats, and beer bottles (T: 775-76, 777-78, 784, 971, 1081-83), but no knife such as that found near the scene.

Notably, upon the masked Misael Berrios firing his gun and the crowd dispersing, petitioner and others were seen fleeing the scene in a gray Acura Integra owned by petitioner' sister, Diana Bonilla, parked by petitioner's house (T: 489-90, 513, 781-83, 809, 824-25, 828, 1061, 1079, 1087-88). While blood from the victim was found in the Acura in two places, the back seat rest and on a white cardboard box found on the floor in front of the back seat of the Acura (T: 586-87, 1014, 1017), none of the blood

from the box was from petitioner, and one blood stain tested was determined to be from neither petitioner nor the deceased (T: 883-86, 1017, 1018-19). The identity of this third person is unknown (T: 886).

Oddly, the police never sought a DNA sample from Miseal Berrios, or others, for a comparison, the People's forensic geneticist (T: 830) testifying "no other burccal swabs from any other suspects were submitted to our laboratory for testing for comparison purposes" (T: 886). This is true despite the fact that Berrios was seen entering the back seat of the Acura, where the white cardboard box was found (T: 1088). Indeed, of the five bloodstains found on the white cardboard box, only two were analyzed even though all five had tested "presumptively positive" for blood (T: 886-88).

In addition, Nancy Villatoto Rodriguez (T: 782), Oscar Villatoro (T: 809,828), and Diana Bonilla (T: 1087-88) all testified that petitioner entered the Acura's front passenger seat. Naturally, if petitioner had just stabbed the victim, one would expect to find at least a drop of blood in that location, but none was.

In light of the foregoing, the evidence here was clearly insufficient to sustain the conviction of murder in the second degree.

8

II.  <u>The Appellate Division Rendered A Decision That Was Based On An Unreasonable Application Of Clearly Established Federal Law.</u>

The Appellate Division rejected petitioner's insufficiency claim stating:

> Contrary to the defendant's contention, viewing the evidence in the light most favorable to the prosecution (*see People v. Contes,* 60 N.Y.2d 620, 621, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt of murder in the second degree and criminal possession of a weapon in the fourth degree.

*See, People v. Bonilla*, 127 AD3d 985.

Under the circumstances of this case, and for the reasons stated *supra & infra*, it cannot be said the Appellate Division reasonably applied the standard of *Jackson v. Virginia*, 443 US 307, since the evidence presented in this case does not meet the *Jackson* standard of sufficiency and does not fully support the state court's determination that petitioner stabbed the victim or raped a minor.

III.  <u>The People Failed to Prove Petitioner's Guilt of First-Degree Rape.</u>

In regards to the rape conviction, the People's evidence as to what happened between petitioner and young Jennifer Villatoro on September 24, 2010, consists of questionable witness testimony as well as equivocal medical evidence in support thereof.

The People's "medical evidence" consisted of testimony by Dr. Yasmine Pompey, a physician with the Pediatric Unit of Nassau University Medical Center (T: 746-47). Dr. Pompey testified to having examined Jennifer on October 1, 2010, one week after the alleged, September 24, 2010 rape, as well as the first time that Jennifer was brought to a medical provider for an examination (T: 527, 692-93, 724, 751, 765).

Dr Pompey testified to her examination of Jennifer, which indicated an "annular hymen with thick edges" plus a "V-shaped cleft at the 5 o'clock position" and further testified that this finding was "supportive of the child's history and consistent with penetration, hymenal penetration." (T: 751, 753). Nevertheless, she agreed that such "V-shaped cleft at the 5 o'clock position" was consistent with digital penetration of "partial penetration by a penis", the term digital penetration found in Jennifer's medical record (T: 753-55, 758, 764-65).

Moreover, as reflected also, Dr. Pompey's examination of Jennifer failed to reveal any "gaping between the labia," any external trauma or tears in the vaginal area, or anything else that would not be considered normal other than the V-shaped cleft. Jennifer herself testified at trial that she and petitioner went into the ladies room at

the park on September 24, 2010 where, in a handicapped stall, petitioner and she began kissing (T: 757-60, 679-83).

She further testified that petitioner pulled down her underclothing and put his finger in her vagina, and testified to having felt too that petitioner got his penis in "a little bit" (T: 684-86). The prosecutor elicited this latter testimony, however, in the following manner, Jennifer initially stating only that petitioner tried to put his penis in her vagina:

> **Q.** What happened with his finger?
>
> **A.** He put it in my vagina.
>
> **Q.** And what happened after that?
>
> **A.** He tried to put his penis in my vagina.
>
> **Q.** How did he try to do that?
>
> **A.** What do you mean?
>
> **Q.** What did he do?
>
> **A.** I don't know.

(T: 685).

The prosecutor would begin anew and, at one point in her questioning, arguably would mischaracterize a previous answer given by the witness:

> **Q.** You said that he used his finger and put it in your vagina?

> **A.** Yes.
>
> **Q.** You said he put something else in your vagina?
>
> **A.** Yes.
>
> **Q.** What was that?
>
> **A.** His penis.
>
> **Q.** and what did he do?
>
> **A.** He tried to put it in my vagina.

(T: 685).

The prosecutor then had, again at least arguably, mischaracterized a prior answer given by the witness where the prosecutor, in subsequent questioning employed the phrase he put something else in as opposed to the phrase the witness had just used prior: he tried to put.

In any event, the prosecutor next asked Jennifer how she knew he "tried to do that," the witness answering, "Because I felt it." The testimony at this point thus indicates nothing more than the witness feeling what she thought petitioner was doing. The next question and answers elicited then read as follows:

> **Q.** And what happened next?
>
> **A.** Hum?
>
> **Q.** Was he able to get it fully in?
>
> **A.** No.
>
> **Q.** How much – what did it feel like?

**A.** It hurt.

**Q.** Could you feel he was able to get it in a little bit?

**A.** Huh?

**Q.** Could you feel he was able to get it in a little bit?

**A.** Yes.

(T: 686).

This affirmative response to a leading question was the only evidence as to the element of sexual intercourse under its "ordinary meaning" that "occurs upon any penetration, however slight" Penal Law §130.00(1).

However, having testified "it hurt", the complaining witness answered the same way as to the alleged digital penetration:

**Q.** And when he was touching you with his finger, how did that make you feel?

**A.** It hurt too.

**Q.** Now, how else did it make you feel when he was touching you with his finger?

**A.** Uncomfortable.

**Q.** And when he put his penis in your vagina, how did that make you feel?

**A.** Uncomfortable.

(T: 686-87).

Without unequivocal medical evidence of "penile penetration," it would not have been unreasonable for the jury to find that no sexual intercourse within the meaning of Penal Law 130.35 occurred between petitioner and the complaining witness.

IV. <u>The Appellate Division Rendered A Decision That Was Based On An Unreasonable Application Of Clearly Established Federal Law.</u>

The Appellate Division rejected petitioner's insufficiency claim stating:

> Upon reviewing the record here, we are satisfied that the verdict of guilt on those counts, as well as the count of rape in the first degree, was not against the weight of the evidence (*see People v. Romero*, 7 N.Y.3d 633, 826 N.Y.S.2d 163, 859 N.E.2d 902).

*See, People v. Bonilla*, 127 AD3d 985.

Petitioner contends the decision rendered by the Appellate Division, Second Judicial Department, resulted in a decision that was an unreasonable application of, clearly established Federal law. 28 USC §2254(d)(1); U.S. Const. amends. VI, XIV. Mr. Bonilla respectfully urges this Honorable Court to apply the correct deferential standard of review as required under 28 USC §2254(d)(1).

POINT II

THE APPELLATE DIVISION RENDERED A
DECISION THAT WAS AN UNREASONABLE
APPLICATION OF CLEARLY EXTABLISHED
FEDERAL LAW, WHEN IT FOUND THAT
PETITIONER DID NOT UNEQUIVOCALLY
REQUEST THE ASSISTANCE OF COUNSEL
BEFORE MAKING STATEMENTS TO LAW
ENFORCEMENT OFFICIALS. 28 USC
§2254(d)(1); U.S. CONST. AMENDS. VI,
XIV.

I. Motion to Dismiss

With respect to petitioner's motion to suppress

statements he made to police detectives, the trial court

ruled:

> The Court, having held a hearing on this matter
> and taking argument of counsel on this one
> particularly point that I found of some concern
> during the course of the hearing, with respect –
> first of all, I am of the opinion that the
> petitioner speaks and understands English perfectly
> well.
>
> Secondly, with respect to the statements made by
> the petitioner to detective James Cereghino, I find
> the petitioner did not make an unequivocal
> invocation of his right to counsel. His statements
> are admissible on the People's direct case.

(H: 99).

Ultimately, however, the People would choose not to

use petitioner's statements, recorded on a "digital

versatile disc" or "DVD," on their direct case at trial.

While the jury's verdict, then, could not have been

directly influenced by same, just knowing that the People

15

had been permitted to use the DVD at petitioner's trial
would have had a "chilling effect" on petitioner's decision
to testify in his own defense.

A number of opinions form no less an authority as the
United States Supreme Court indicate that the law has
evolved in this area. The majority in *Harris v. New York*,
401 US 222 (1971), for instance, held that the exclusionary
rule's deterrent function was adequately served by
excluding evidence from the prosecution's case-in-chief,
that disallowing an illegally-obtained statement's use for
"impeachment purposes" would effectively constitute "a
license to use perjury." On the other hand, the court in
*Mincey v. Arizona*, 437 US 385 (1978) indicated that
"involuntary statements could not be used for impeachment
purposes" with such factors bearing on the voluntariness
question as the suspect's isolation from family, friends,
and legal counsel.

In *People v. Maerling*, 64 NY2d 134, 140 (1984), the
New York Court of Appeals wrote "[o]ur rule permits the use
for impeachment not only of statements obtained in
violation of a defendant's Miranda rights . . . [citations
omitted], but also to those obtained in violation of his
right to counsel under the State Constitution . . ."
*unless involuntarily made. But see*, "CPL" §60.45(2)(b)(ii)

which expressly provides that a statement is "involuntarily made" by a defendant when obtained from him "in violation of such rights as the defendant may derive from the constitution of this state or of the United States."

II. <u>The Appellate Division Rendered A Decision That Was Based On An Unreasonable Application Of Clearly Established Federal Law</u>.

The Appellate Division rejected petitioner's right to counsel claim stating:

> The Supreme Court properly denied that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials. Contrary to the defendant's contention, the record supports the Supreme Court's finding that the defendant did not unequivocally request the assistance of counsel before making statements to law enforcement officials (*see People v. Pinkney,* 48 A.D.3d 707, 707–708, 852 N.Y.S.2d 306; *People v. Thompson,* 271 A.D.2d 555, 706 N.Y.S.2d 136; *People v. Dehmler,* 188 A.D.2d 1056, 1057, 591 N.Y.S.2d 918; *People v. Diaz,* 161 A.D.2d 789, 556 N.Y.S.2d 128; *People v. Sanchez,* 117 A.D.2d 685, 686, 498 N.Y.S.2d 426).

*People v. Bonilla*, 127 AD3d 985.

Petitioner challenges the decision as it being an unreasonably application of clearly established federal law.

III. <u>Petitioner Invokes His Fifth-Amendment Right To Counsel</u>

Arriving at the police Homicide Squad in the early morning hours of November 27, 2010, petitioner was brought to interview room #2, with recording equipment (T: 19). All of petitioner's time in the room was recorded. *Id.* The interview that ensued was in English, and Detective Cereghino began by reading petitioner his rights in English, doing so from a "departmental form 207 notification of rights." (H: 20-23).

The following exchanges between Detective Cereghino and petitioner occurred:

> **Q:** Ok, now that I have advised you of your rights, are you willing to answer questions?
>
> **A:** *I don't know if I could call a lawyer or something.*
>
> **Q:** I'm sorry, could you speak up?
>
> **A:** *I don't know if I can call somebody to call me a lawyer or something.*
>
> **Q:** That's up to you – whatever is that you want to do.
>
> **A:** *I can't make any phone calls?*
>
> **Q:** *Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak to me without a lawyer being present.*

(Transcript of Video Recorded Statement of Ulises Bonilla ("People's Hearing Exhibit 3") at pp.6-7 (emphasis added).

A viewing of the DVD received into evidence at the hearing (as People's Exhibits 2) confirms that after being

advised of his rights, including the right to talk to a lawyer before answering any questions and the right to have a lawyer present at any time, petitioner specifically asked about calling a lawyer or calling someone else to call a lawyer for him. People's Hearing Exhibit 3, p.7. Testifying at the hearing, however, Detective Cereghino would only acknowledge that petitioner said "something about a lawyer":

> He said *something about a lawyer*. As I said, I wasn't sure what he wanted or what he was referring to, so I addressed the issue with him about whether he was willing to speak to me without an attorney present. He thought for a moment and said yes, he would speak to me.

(H: 60).

In other words, the detective heard petitioner say "something about a lawyer," and, rather than clarify "what he wanted or what he was referring to," changed the subject. Further, Detective Cereghino recalled at the hearing that petitioner later made "reference to wanting to make a phone call" and "reference to something about a lawyer," but he could not recall petitioner saying "can I make a phone call so I can have someone get me a lawyer." (H: 62).

In any event, the record nowhere indicates the detectives ever provided petitioner with access to a phone

19

until the very end of the interview; nor did they cease their questioning or acknowledge petitioner's request for counsel. Instead, the detectives proceeded to question petitioner for more than four hours.

Plainly, a reasonable police officer would have understood that petitioner was requesting an attorney (*People v. Jones*, 21 AD3d 429 (A.D. Dept. 2005)), or, at the very lease, would have had the matter clarified before proceeding further. In fact, the New York Court of Appeals has held that once a suspect requests counsel and no additional facts exist upon which a contrary inference can be drawn, further inquiry by police is prohibited. *People v. Porter*, 9 NY3d 966, 967 (2007).

Again, where a suspect indicates "in any manner and at any stage of the process" that he wishes to consult with an attorney before speaking, there can be no questioning and the police may not immediately seek a waiver of his rights and proceed to question him. *People v. Buxton*, 44 NY2d 33, 36-37 (1978). In *People v. Esposito*, 68 NY2d 961, 962 (1986), the New York Court of Appeals held that, where a defendant in custody makes a request for counsel, any waiver thereafter obtained in the absence of counsel is ineffective, even if defendant waived the right voluntarily. Thus, any such waiver is ineffective

regardless of its voluntary nature. *People v. Clark*, 45 NY2d 432, 439 (1978).

Here, when petitioner asked if he could "make any phone calls" for the purpose of obtaining counsel, Detective Cereghino responded, "Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak with me without a lawyer being present." In other words, the detective seemed to think, petitioner could eventually have his phone call to speak with a lawyer, but not until the detective had questioned petitioner further. However, as shown by the cases, as soon as petitioner raised the question with Detective Cereghino, the detective should not have proceeded further in the absence of counsel for petitioner.

In *People v. Woodard,* 64 AD2d 517, the following exchanges took place between a detective and a suspect in custody, and is directly on point with the undisputed facts in the case at bar:

> **Q:** Knowing all these rights and understanding them, do you want to talk to me about what happened that night or sometime back in March?
>
> **A:** May I have Legal Aid?
>
> **Q:** You have a right to have a lawyer present, but I'm just asking you whether or not you wish to waive that right and speak to me. You have a right to waive that right if you wish.

A: I'll speak to you.

Q: So, you will waive those rights?

A: Yes.

Q: And you understand them?

A: Yes.

Q: On March 5, 1974, do you recall where you were?

A: Yes.

*People v. Woodard*, 64 AD2d at 518

Thus, the court in *Woodard* found that the defendant's right to counsel had been violated where, having requested counsel, the detective was *prohibited from obtaining a waiver from the defendant in the absence of counsel as* well as from taking a statement. *Id.* at 518.

Here, there is no doubt that petitioner requested counsel. As a result, the detective should have ceased questioning once petitioner stated "*I don't know if I could call a lawyer or something*" . . . "*I don't know if I can call somebody to call me a lawyer or something.*"

As a result, Mr. Bonilla respectfully urges this Honorable Court to apply the correct deferential standard of review as required under 28 USC §2254(d)(1) and grant the relief sought.

<u>CONCLUSION</u>

For all of the above stated reasons, your petitioner, Ulises Bonilla, urges this Court to grant the relief sought.

DATED: JUNE 20, 2016

Respectfully submitted,

TO:

*Ulises Bonilla*
Ulises Bonilla, #12-A-2559
Green Haven Correctional Fac.
P.O. Box 4000
Stormville, N.Y. 12582

Kathleen M. Rice
Nassau County DA
Counsel for Respondent
262 Old Country Road
Mineola, N.Y. 11501

**PERFECTED BY:**

**Prestige Paralegal**
**Services, LLC**
P.O. Box 226
Bronx, N.Y. 10462

# EXHIBITS

EXHIBIT – "A":   DIRECT APPEAL, DATED APRIL 16, 2014,
FILED BY ANDREW E. MACASKILL, ESQ.


EXHIBIT – "B":   CERTIFICATE DENYING LEAVE TO APPEAL,
DATED JULY 29, 2015.



**EXHIBIT A**

To be argued by:
Andrew E. MacAskill, Esq.
(Ten minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

       Respondent,

   -against-

ULISES BONILLA,

      Defendant-Appellant.

------------------------------------------------------------------X

**CASE #2012-05037**

Nassau County
Indictment #202/2011

# BRIEF FOR DEFENDANT-APPELLANT

ANDREW E. MacASKILL, ESQ.
*Attorney for Defendant*
1400 Old Country Road, Suite 309
Westbury, New York 11590
TEL: (516) 214-4561

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,                CASE #2012-05037

                  -against-                         Nassau County
                                                  Indictment
ULISES BONILLA,                               #202/2011

                        Defendant-Appellant.

-----------------------------------------------------------------X

## <u>STATEMENT PURSUANT TO CPLR 5531</u>

1. The indictment number in the court below is 202/2011.

2. The full name of the original defendant in this criminal action is Ulises Bonilla.

3. The action commenced in County Court, Nassau County.

4. The action commenced in Nassau County Court with the filing of Indictment #202/2011 on or about February 3, 2011.

5. Indictment #202/2011 charged Defendant with murder in the second degree, rape in the first degree, two counts of sexual abuse in the first degree, two counts of criminal possession of a weapon in the fourth degree, and endangering the welfare of a child.

6. This appeal is from a judgment of conviction of the Nassau County Court rendered May 15, 2012, the defendant having been convicted after trial of murder in the second degree, rape in the first degree, two counts of sexual abuse in the first degree, one count of criminal possession of a weapon in the fourth degree, and endangering the welfare of a child, entered at the direction of Nassau County Court Judge, the Honorable George R. Peck.

7. Defendant's appeal is perfected upon the original record pursuant to the Court's decision & order on motion dated August 14, 2012 granting Defendant leave to prosecute this appeal as a poor person and assigning counsel with whom to perfect the appeal.

# TABLE OF CONTENTS

STATEMENT PURSUANT TO CPLR 5531 . . . . . . . . . . . . . . . . . . . . . . .   i

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

QUESTION(S) PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

POINT ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT DEFENDANT
OF SECOND-DEGREE MURDER AS WELL AS THE WEAPONS CHARGE
UNDER THE INDICTMENT'S COUNT 5 WHERE NO ONE TESTIFIED TO
HAVING SEEN DEFENDANT WITH A SHARP INSTRUMENT OR KNIFE AND
WHERE NO EVIDENCE CONNECTED DEFENDANT TO THE KNIFE
RECOVERED NEAR THE SCENE.

POINT TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

THE PEOPLE FAILED TO PROVE DEFENDANT GUILTY OF FIRST-DEGREE
RAPE BEYOND A REASONABLE DOUBT.

POINT THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

PURSUANT TO A DEFENSE APPLICATION, THE INDICTMENT'S SEXUAL
ASSAULT COUNTS SHOULD HAVE BEEN SEVERED FROM THE HOMICIDE
AND WEAPONS COUNTS WHERE IMPLICATED WERE TWO SEPARATE
ALLEGED INCIDENTS, ON DIFFERENT DATES WITH DIFFERENT VICTIMS,
AND THE COUNTS OTHERWISE WERE NOT PROPERLY JOINABLE UNDER
CPL 200.20.

POINT FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

DEFENDANT'S RIGHT TO A FAIR TRIAL WAS IMPERMISSIBLY
COMPROMISED BY THE TRIAL JUDGE'S FAILURE TO SUPPRESS *FOR ALL
PURPOSES* DEFENDANT'S VIDEO-RECORDED STATEMENT TO POLICE
DETECTIVES, WHO FAILED TO HONOR DEFENDANT'S REQUEST FOR
COUNSEL PRIOR TO QUESTIONING.

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

CERTIFICATION OF COMPLIANCE WITH RULE 670.10.3(f) . . . . . . . . . .   59

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

## PRELIMINARY STATEMENT[1]

This appeal is from a judgment of conviction of the County Court, Nassau County (Peck, J.), rendered May 15, 2012, Defendant having been found guilty upon a jury verdict of murder in the second degree, rape in the first degree, two counts of sexual abuse in the first degree, criminal possession of a weapon in the fourth degree, and endangering the welfare of a child, and having been sentenced to an indeterminate prison term ranging from 25 years to life on the second-degree murder conviction and a *determinate* prison term of seven and a half years to be followed by 20 years of post-release supervision for the first-degree rape conviction, these sentences to be served consecutively;[2] having been sentenced to determinate prison terms of four years for each of the two first-degree sexual abuse convictions, each to be followed by ten years of post-release supervision; and having been sentenced to one-year definite sentences in the Nassau County Correctional Center for Defendant's misdemeanor convictions of criminal possession of a weapon in the fourth degree and endangering the welfare of a minor, these sentences to be served concurrently . Defendant's notice of appeal was filed on or about May 24, 2012, with present counsel assigned to perfect the appeal on August 14, 2012.

---

[1]Pursuant to Section 670.10(d)(2)(viii) of the Court's Rules.

[2]The remaining prison and jail terms were to be served concurrently with the indeterminate terms for the murder and rape charges.

No order under CPL 460.50 having issued, Defendant is presently serving his sentence(s) at the Great Meadow Correctional Facility in Comstock, New York.

Citations to the transcripts of the lower court proceedings are made as follows: *H* for the transcript of the hearing commencing on Aug. 17, 2011; *T* for the transcript of the trial commencing on Dec. 1, 2011; and *S* for the transcript of the May 15, 2012 sentencing.

## QUESTION(S) PRESENTED[1]

1. Was the evidence legally insufficient to convict defendant of second-degree murder as well as the weapons charge under the indictment's fifth count where no one testified to having seen defendant with a sharp instrument or knife and where no evidence connected Defendant to a knife recovered near the scene?

2. Did the People fail to prove Defendant guilty beyond a reasonable doubt of first-degree rape under Penal Law 130.35(3)?

3. Pursuant to a defense application, should the indictment's sexual assault counts have been severed from the homicide and weapons counts where implicated were two separate alleged incidents, on different dates with different victims, and the counts otherwise were not properly joinable under CPL 200.20?

---

[1]The lower court effectively answered all questions in the negative.

4. Was Defendant's right to a fair trial impermissibly compromised by the trial judge's failure to suppress for all purposes Defendant's video-recorded statement to police detectives, who refused to honor Defendant's request for counsel prior to questioning?

## STATEMENT OF FACTS

Defendant was charged by grand jury indictment — in Nassau County, #202/2011, on or about February 3, 2011 — with four felonies and three misdemeanors as set forth in the following table:

| COUNT | CHARGE | PENAL LAW SECTION |
|-------|--------|-------------------|
| 1 | second-degree murder | 125.25(1) (A-I felony) |
| 2 | first-degree rape | 130.35(3) (B felony) |
| 3 | first-degree sexual abuse | 130.65(3) (D felony) |
| 4 | first-degree sexual abuse | 130.65(3) (D felony) |
| 5 | fourth-degree criminal possession of a weapon | 265.01(2) (A misd'r) |
| 6 | fourth-degree criminal possession of a weapon | 265.01(2) (A misd'r) |
| 7 | endangering the welfare of a child | 260.10(1) (A misd'r) |

The charges stemmed from a fatal stabbing on September 28, 2010 in New Cassel, Defendant charged also with having, four days earlier, raped the homicide victim's daughter, a minor.

On August 17, 2011 a pre-trial hearing was held with respect to "Huntley" and "Mapp" issues. Defendant's jury trial commenced on December 1, 2011, the jury ultimately finding Defendant guilty of the crimes charged in all but count 6 of the

indictment's seven counts. A defense motion to set aside the verdict was denied, and

Defendant was sentenced to imprisonment on May 15, 2012 as shown in this table:

| COUNT | CONVICTION | SENTENCE | CONCURR./CONSEC. |
|-------|-----------|----------|------------------|
| 1 | 2nd-degree murder | 25 years to life | |
| 2 | 1st-degree rape | 7½ years & 20 years PRS | consecutive |
| 3 | 1st-degree sexual abuse | 4 years & 10 years PRS | concurrent |
| 4 | 1st-degree sexual abuse | 4 years & 10 years PRS | concurrent |
| 5 | 4th-degree crim'l poss'n of weapon | 1 year | concurrent |
| 7 | endangering welfare of minor | 1 year | concurrent |

## THE UNDERLYING INCIDENTS

On Friday, September 24, 2010, young Stevens Destina met young Jennifer Villatoro

and another youngster named Ivan Alcantara at Bunkyreid Park, a block from

Jennifer's home in Westbury, finding them seated on a bench by the handball court.

[T. 433-34, 453, 676-79, 816-14] At some point, Defendant hit a ball over the fence

and began speaking with Jennifer. [T. 433-34, 679-80] Stevens would testify at trial

that when he observed Defendant and Jennifer kissing "on the other side of the

bathroom," he ran to Jennifer's house to tell Jennifer's mother. [T. 434-35] Ivan

would testify he saw the two enter the bathroom. [T. 454-55][1]

---

[1] Jennifer herself would testify at trial that she and Defendant went into the ladies room at the park, though she did not want to. [T. 679-81]

-4-

Later that night of September 24 into September 25, 2010, one Angel León observed his friend, Armando Villatoro, Jennifer's father, "not doing good," upset and "drinking beer," at a Westbury deli on State Street. [T. 472-74] After Mr. Villatoro indicated he would call the police, Defendant, at the deli, allegedly began fighting with Mr. Villatoro to the point they had to be separated. [T. 475-76, 478]

Four days later, on Tuesday, September 28, 2010, Defendant approached Mr. Villatoro's older daughter, Nancy Villatoro Rodriguez [T. 767], who was then seated in a car in front of the Villatoro home, and asked Nancy where her father was. [T. 638-41, 770-72, 933, 934, 961]

Mr. Villatoro was then observed walking alone, towards his house, on Kinkel Street. [T. 641, 773] In front of the house, he and Defendant began fighting. [T. 484-85, 643-44, 648, 649, 654, 774-77, 935-36, 966][1] At some point, Nancy saw Defendant with a "little metal pipe" [T. 775] or tire iron [T. 784]. Three "other guys," male Hispanics [T. 656], were seen approaching from different locations [T. 657], one of whom was Misael Berrios, wearing a mask [T. 497, 646, 655, 656, 937-38]; another was "Johnny." [T. 644-45, 777] Seeing Johnny hit her dad on the legs with a broken broomstick, Nancy began tussling with him, but Johnny pushed and held her down. [T. 777-78]

---

[1] According to Berrios, Mr. Villatoro "got the jump" on Defendant. [T. 968]

When someone suggested the police be called, Berrios intervened, saying no one should intervene, that the fight was between Defendant and Mr. Villatoro. The masked Berrios fired a gun into the air, causing the crowd that had formed to disperse, and Mr. Villatoro's wife, Susan Villatoro, along with their son Oscar, emerged from the house. [T. 486, 497, 500, 646, 649, 655, 780, 787, 789, 806-07, 823, 824, 936-38, 963] Nancy believed Defendant had shot her father. [T. 787-88, 789, 800]

Bleeding [T. 486-87], Mr. Villatoro walked towards his wife and house, collapsing in the front yard [T. 488-89, 646, 786, 809]. Defendant and his friends fled the scene. [T. 489-90, 513, 781-83, 809, 824-25, 828, 1087-88]. The police arrived between 10 and 15 minutes later, with Mr. Villatoro taken by ambulance to the Nassau University Medical Center where he died. [T. 514, 542, 554-58, 909]

Using surveillance techniques, the police eventually tracked Defendant to Penn Station where he was arrested on November 26, 2011. [T. 1001-03, 1005]

## HEARING

Defendant appeared in the lower court on August 17, 2011 for a hearing, at least one Spanish interpreter present [H.1], characterized as involving "Huntley" and "Mapp" issues [H. 2-3].

Upon both sides resting [H. 70], the court called for "letter briefs" from each, such letters to specifically address two issues: (1) whether Defendant's Fifth Amendment right to counsel had been violated where he had requested counsel prior to the administration of *Miranda*, and (2) whether his request for a Spanish interpreter should have been honored by the detectives. [H. 70-75] Ultimately, the court found Defendant "speaks and understands English perfectly well" and had not made an "unequivocal invocation of his right to counsel," ruling that Defendant's alleged statements to law enforcement would be "admissible on the People's direct case"[H. 99].

## TRIAL

Defendant's trial commenced on December 1, 2011 [T. 1] with jury selection [T. 24-53, 57-82, 84-217, 219-381] consuming three days [T. 1, 83, 218]. A People's application pursuant to CPL 50.30 would be granted [T. 922-23], and Misael Berrios would testify to having been given a grant of immunity [T. 949].

The jury found Defendant guilty of all counts save the sixth for fourth-degree weapons possession. [T. 1332-36] With the jury excused, the defense moved to set aside the verdict under CPL 330.30. [T. 1336-37] The court denied the motion, but allowed same to be resubmitted prior to a February 16th sentencing date [T. 1337-39],

the renewed application denied with a so-ordered, written decision dated April 3, 2012.

## SENTENCING

Defendant appeared back in the lower court for the imposition of sentence on May 15, 2012. [S. 1]

For his conviction of murder in the second degree under the indictment's first count, the court sentenced Defendant to an indeterminate prison term ranging from 25 years to life. [S.19-20] For his conviction of rape in the first degree, the court sentenced Defendant to a *determinate* prison term of seven and a half years to be followed by 20 years of post-release supervision, a sentence "to be served consecutively to the sentence under the murder charge." [S. 20]

The remaining prison and jail terms were to be served concurrently with the terms under the indictment's first two counts [S. 21]: For his convictions of sexual abuse in the first degree under counts 3 & 4, the court imposed determinate prison terms of four years, each to be followed by ten years of post-release supervision [S. 20-21]; for his misdemeanor convictions of criminal possession of a weapon in the fourth degree and endangering the welfare of a minor under counts 5 & 7, respectively, the court imposed one-year definite sentences in the Nassau County Correctional Center [S. 21]. Defendant was advised of his right to appeal. [S. 21-22]

## POINT ONE

**THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT
DEFENDANT OF SECOND-DEGREE MURDER AS WELL AS THE
WEAPONS CHARGE UNDER THE INDICTMENT'S COUNT 5 WHERE
NO ONE TESTIFIED TO HAVING SEEN DEFENDANT WITH A SHARP
INSTRUMENT OR KNIFE AND WHERE NO EVIDENCE CONNECTED
DEFENDANT TO THE KNIFE RECOVERED NEAR THE SCENE.**

At the close of the People's case [T. 1036], the defense moved under CPL 290.10 for

a trial order of dismissal as to the indictment's first, second-degree murder count as

well as those counts related to the sex abuse charges involving the deceased's

daughter. With respect to the killing, the defense argued that no evidence showed that

Defendant stabbed the victim, that "not a single eyewitness was able to testify to

having seen the stabbing despite many people being present." [T. 1038]

The court ruled as follows:

> Now, the answer seems to me this trial is replete
> with testimony, if credited, that the defendant and victim
> were fighting. No one else was in that particular fight. The
> ability to be mobile would be limited to roughly a minute.
> That testimony was from the medical examiner after the
> major stab wounds.
> Certainly, the People have made out a prima facie
> case, and your motion under the first count is denied.

[T. 1038-39]

Upon conclusion of all testimony, including the defense case, Defendant again requested a trial order of dismissal, and the court again denied the application. [T. 1166-68]

## THE ISSUE IS WHETHER, IN THE ABSENCE OF ANY WITNESS HAVING SEEN DEFENDANT WITH A KNIFE *AND WITH NO PHYSICAL EVIDENCE OTHERWISE CONNECTING DEFENDANT TO A STABBING,* THE TRIAL EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE DEFENDANT KILLED THE VICTIM.

Appellate review of whether a trial verdict is supported by the *weight* of the evidence is distinguished from a review of the evidence's *legal sufficiency.*

> Although the two standards . . . are related, each requires a discrete analysis. For a court to conclude, as the Appellate Division did in this case, that a jury verdict is supported by [legally] sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial . . . [citation omitted] and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.

*People v. Bleakley,* 69 N.Y.2d 490 at 495, 515 N.Y.S.2d 761 at 763, 508 N.E.2d 672 (1987).

> This deferential standard is employed because the courts' role on legal sufficiency review is simply to determine *whether enough evidence has been presented so that the resulting verdict was lawful.*

-10-

*People v. Acosta*, 80 N.Y.2d 665 at 672, 593 N.Y.S.2d 978 at 982, 609 N.E.2d 518 (1993) (emphasis added).

In the case at bar, the People produced very little "direct" evidence at trial that Defendant stabbed the victim and no such evidence linked Defendant to the knife allegedly used in the stabbing. In fact, the only arguably "direct" evidence of a stabbing consisted of a hearsay statement allegedly made to a People's witness, Misael Berrios, who, under an immunity agreement with the prosecution, testified that Defendant said to him, "I fucked up, I stabbed him, I'm done." [T. 939, 944, 951] Significantly, however, this is not what Berrios told the police, as the following testimony elicited on cross examination shows no mention of a statement about a stabbing:

> Q. When you were interviewed by the police, didn't you say the following words to them: When we get to the corner, Ulises is screaming at me like, Yo, fuck, fuck. I fucked up, man, I fuckin' killed him. I know I did. Did you tell them that?
> A. Yes.

[T. 953-54]

It appears then that Berrios changed for the trial what Defendant allegedly said to him as they fled the scene: Instead of saying "killed," as he told the police, Berrios testified at trial that Defendant said he had "stabbed" the deceased.

-11-

In any event, with a prior criminal history [T. 947-48, 975-83], Berrios testified under a grant of immunity [T. 916-18, 921-23, 949] where, in exchange for his testimony against Defendant, he was granted immunity from prosecution "with respect to his actions as described by him in his October 13th, 2010 statement to the police" [T. 917-18].[1]

In such testimony, however, Berrios admitted that it was the day following the altercation that he became aware that someone had been killed the day before [T. 991], admitting too having heard that people around the neighborhood were saying that he, Berrios, had stabbed the deceased and was concerned he might be charged with the murder [T. 992-93]. Nevertheless, Berrios said nothing to the police about the statement he claims the defendant made until weeks later when, on October 13, 2010, the police questioned him about having possessed a loaded weapon that he fired into the air one night. [T. 946, 952, 986, 991-92]

Moreover, Berrios's testimony was not without contradiction. For instance, while he denied getting into the car [T. 941, 972] and denied seeing anyone else get into the car [T. 952], this testimony was contradicted by three witnesses, who saw him and others get into the car's rear seat [T. 782, 828, 1088] where blood from the

---

[1]Berrios admitted he had previously been convicted of numerous crimes, including offenses that are violent (including the menacing of someone with a boxcutter) as well as numerous offenses that bear directly on his honesty, including petit larceny, identity theft, and fraud. [T. 975-83]

To be sure, Misael Berrios impresses as an unusual man, donning a mask (for some reason) at the scene of the altercation. [T. 497, 646, 655, 656, 937-38] When asked on direct why he had put the mask on his face, Berrios answered, "I don"t know. It was just reflex. I don't know." [T. 938]

deceased was found [T. 586-87, 1014, 1017]. Incredibly, Berrios denied seeing

Defendant get into the car [T.959, 971-72], while admitting he told the police that

Defendant had gotten into a car [T. 960]. Accordingly, Berrios's testimony should be

rejected as "manifestly untrue, physically impossible, contrary to experience or

self-contradictory" and, hence, incredible as a matter of law. See, e.g., *People v.*

*Garafolo*, 44 A.D.2d 86 at 88, 353 N.Y.S.2d 500 at 502-03 (2d Dep't 1974).

To be sure, Berrios's admission that he understood he was "getting paid a

guarantee of freedom from . . . possible jail time" [T. 990] accounts for his testimony

that Defendant allegedly admitted stabbing the deceased, and, coupled with Berrios's

contradictory testimony, a "logical gap" is found in the evidence.

Indeed, despite the presence of numerous individuals, none, not even Berrios,

observed Defendant with a knife, let alone saw any stabbing.[1] Additionally, no

forensic, latent, scientific or other physical evidence at trial connected Defendant to

the stabbing or to the knife later recovered near the scene.

Accordingly, the People's case was effectively *circumstantial.*

> Circumstantial evidence is evidence of a collateral fact,
> that is of a fact other than a fact in issue, from which, either
> alone or with other collateral facts, the fact in issue must be
> inferred (Richardson, Evidence (Prince, 10th ed.), s 145).
> It is well settled that in order to sustain a conviction which
> is based entirely upon circumstantial evidence, the
> hypothesis of guilt should flow naturally from the facts

---

[1] Berrios testified he never saw Defendant with a knife or engage in any stabbing. [T. 974]

-13-

> proved, and be consistent with them, and the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence . . . [citations omitted].

*People v. Vitalis*, 67 A.D.2d 498 at 503, 415 N.Y.S.2d 708 at 711 (2d Dep't 1979).

See also *People v. Benzinger*, 36 N.Y.2d 29 at 32, 364 N.Y.S.2d 855 at 856, 324 N.E.2d 334 (1983).

> "The danger, therefore, with the use of circumstantial evidence is that of logical gaps that is, subjective inferential links based on probabilities of low grade or insufficient degree which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference."

*Vitalis, supra* at 503, 415 N.Y.S.2d at 711 quoting *People v. Cleague*, 22 N.Y.2d 363 at 367, 292 N.Y.S.2d 861 at 865, 239 N.E.2d 617 (1968).

> In a case based on circumstantial evidence the reasoning process of the jury is, of necessity, more complex; thus, close judicial scrutiny is necessary to ensure that the jury does not make inferences which are based not on evidence presented, but rather, on unsupported implications which are equivocal, at best.

*People v. McLean*, 107 A.D.2d 167 at 168, 485 N.Y.S.2d 1019 at 1020 (1st Dep't 1985).

> To sustain a conviction based on circumstantial evidence, the Court of Appeals has consistently held that the facts from which the inference of the defendant's guilt is drawn must (1) be established with certainty; (2) be inconsistent with his innocence; and (3) exclude to a moral certainty every other hypothesis.

*Id.*

## APPLYING THIS RULE TO THE FACTS OF THIS CASE SHOWS THAT THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT DEFENDANT OF SECOND-DEGREE MURDER AND FOURTH-DEGREE WEAPONS POSSESSION UNDER THE INDICTMENT'S FIFTH COUNT.

Again, with no real direct evidence that Defendant stabbed the victim and no evidence at all linking Defendant to the knife allegedly found near the scene, the People's theory of the case was that the stabbing could only have taken place while Defendant and the victim were engaged in a fist-fight.

Significantly, despite the medical examiner's testimony that the deceased sustained *no less than 12 stab wounds* (wounds "produced by a sharp instrument whose depth is greater than its length" [T. 900]) and despite the presence of as many as 15 bystanders (eight of Defendant's friends [T. 785] and seven "that came with [the deceased] Armando" [T. 936]), not one testified to having observed the infliction of any stab wound, six of which were described as "major" [T. 556]. And not one of the 15 individuals testified to having observed Defendant holding a knife, a knife described as between eight and nine inches in length with a seven-inch blade. [T. 568-69]

In fact, the witnesses all described what can only be characterized as a "fist-fight," again none observing a knife. [T. 484 & 501 (Angel León); 507-08, 511 & 514 (Susan Villatoro); 643-44 & 654 (Jocelyn Gonzales); 776-77 & 785-86 (Nancy

Villatoro Rodriguez); 805 & 828-29 (Oscar Villatoro); 935-36, 940-41, & 974 (Misael Berrios); 1082 & 1092-93 (Diana Bonilla)].

This is consistent, of course, with testimony by the case's lead investigator [T. 1000, 1025], Detective James Cereghino: None of the 911 calls made to the police referred to a stabbing [T. 1008], several referring instead to a shooting [T. 1007]. In fact, as the detective testified, the police only learned the deceased had been stabbed upon learning of the presence of stab wounds on the body, not from anything the witnesses said. [T. 1008-09][1]

Additionally, while a knife with blood on it was recovered down the street from the altercation, in front of 163 Kinkel [T. 567-69, 578, 1001], the blood was determined to be that of the deceased and no identifiable fingerprints were found on the knife [T. 628, 1022]. In fact, no forensic, latent, scientific or other physical evidence at trial connected Defendant to the stabbing or to the knife. [T. 567-69, 869-70, 1001]

In contrast, physical evidence indicates that someone else may well have stabbed the victim. Witnesses testified that a number of people were fighting, including a male Hispanic with a Cincinnati Reds hat and another male wearing a

---

[1]One witness, Nancy Villatoro Rodriguez, testified that the first-fight was preceded by Defendant hitting her father with a "little metal pipe" (said to be a tire iron [T. 784]) which her father wrested away and hit Defendant back with before it fell to the ground. [T. 775-76] This witness, however, also told the police that Defendant had shot her father. [T. 787-89, 800]

Yankees cap, both said to have been involved in the altercation itself. [T. 512, 513, 515, 645, 650, 657, 778-79, 786, 806-06, 823-24, 936, 975, 1081-82] Witnesses also described seeing such "weapons" as a pipe or tire iron, sticks, bats, and beer bottles [T. 775-76, 777-78, 784, 971, 1081-83], but no knife such as that found near the scene.

Notably, upon the masked Misael Berrios firing his gun and the crowd dispersing, Defendant and others were seen fleeing the scene in a gray Acura Integra owned by Defendant's sister, Diana Bonilla, parked by Defendant's house. [T. 489-90, 513, 781-83, 809, 824-25, 828, 1061, 1079, 1087-88] While blood from the victim was found in the Acura in two places, the back seat rest and on a white cardboard box found on the floor in front of the back seat of the Acura [T. 586-87, 1014, 1017], none of the blood from the box was from Defendant, and one blood stain tested was determined to be from neither Defendant nor the deceased. [T. 883-86, 1017, 1018-19] The identity of this third person is unknown. [T. 886]

Oddly, the police never sought a DNA sample from Misael Berrios, or others, for a comparison, the People's forensic geneticist [T. 830] testifying "no other buccal swabs from any other suspects were submitted to our laboratory for testing for comparison purposes." [T. 886] This is true despite the fact that Berrios was seen entering the back seat of the Acura, where the white cardboard box was found. [T. 1088] Indeed, of the five bloodstains found on the white cardboard box, only two

were analyzed even though all five had tested "presumptively positive" for blood. [T. 886-88]

In addition, Nancy Villatoro Rodriguez [T. 782], Oscar Villatoro [T. 809, 828], and Diana Bonilla [T. 1087-88] all testified that Defendant entered the Acura's front passenger seat. Naturally, if Defendant had just stabbed the victim, one would expect to find at least a drop of blood in that location, but none was.[1]

In light of the foregoing, the evidence here did not and could not exclude to a moral certainty every hypothesis other than guilt and, accordingly, is insufficient to sustain a conviction. *Cleague*, *supra* at 368.

In affirming a trial court's decision to set aside a jury verdict finding defendant guilty of 26 counts of murder, the Second Department in *People v. Marin*, 102 A.D.2d 14, 478 N.Y.S.2d 650 (2d Dep't 1984) wrote as follows:

> Given the totality of the trial evidence, we conclude — as did the Trial Judge — that the People did not adduce the quantum of circumstantial evidence necessary to convict. The hypothesis of defendant's guilt does not flow

---

[1] With no blood from the front of the car matched to Defendant, the People raised the question with their witness, Nancy Villatoro Rodriguez, as to whether she was "sure" that Defendant entered the front passenger side of the Acura: "Are you sure?"[T. 782 (line 10)] She was. [T. 782 (line 14) ("Yeah, I'm sure.")]

Moreover, while blood that would be matched to Defendant was found in the back of the 1999 Acura [T. 585-87, 1025, 1026, 1034-35], the presence of that blood was explained: Defendant had cut his finger earlier in the day at work, causing it to bleed, and had been seated in the back of his sister's car. [T. 925-29, 1137-39] At best then, this was "but another form of equivocal circumstantial evidence." *McLean, supra* at 169-70, 485 N.Y.S.2d at 1021. And again, while Misael Berrios denied getting into the car [T. 941, 972] (and denied seeing anyone else get into the car [T. 952]), he was contradicted in this regard by three witnesses: Nancy Villatoro Rodriguez, Oscar Villatoro, and Diana Bonilla [T. 782, 828, 1088].

-18-

naturally from the facts proved. The facts proved simply do not, as required by law, exclude to a moral certainty every reasonable hypothesis of defendant's innocence of the crimes charged . . . [citations omitted]. As the Court of Appeals stated long ago, circumstantial evidence "is of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven" . . . [quoting *People v. Suffern*, 267 N.Y. 115 at 127 (1935)].

In sum, careful analysis of the record discloses too much speculation and too many gaps in the People's proof to establish the defendant's guilt beyond a reasonable doubt . . . [citing *Jackson v. Commonwealth of Virginia*, 443 U.S. 307 at 315-20 (1979)]. The jurors in this case did precisely that which the rules governing circumstantial evidence are designed to guard against, viz.: they "leap[ed] logical gaps in the proof offered and [drew] unwarranted conclusions based on probabilities of low degree" . . . [quoting *Benzinger*, *supra* at 32].

*Marin*, *supra* at 31-32, 478 N.Y.S.2d at 661.

In the case at bar, it is certainly conceivable that the deceased was stabbed by someone other than Defendant some time after the gunshot fired by the masked Misael Berrios, as Defendant and others ran from the scene, or else that the deceased was stabbed by someone other than Defendant during the fist-fight into which others intervened. Indeed, the People's evidence does not permit of any "valid line of reasoning" or "permissible inferences" to lead a rational person to the conclusion that Defendant had actual possession of a knife. *Cf. People v. White*, 155 A.D.2d 934 at 934, 548 N.Y.S.2d 119 at 120 (4th Dep't 1989) ("no valid line of reasoning and

permissible inferences to lead a rational person to the conclusion that defendant had actual possession of a razor").

Accordingly, with a reasonable hypothesis derived from the proven facts that is consistent with innocence, the evidence of Defendant's guilt was legally *insufficient* to warrant a conviction of the second-degree murder count or the weapons charge under the indictment's fifth count.

## DEFENDANT'S CONVICTION MUST BE REVERSED,
## THE INDICTMENTS FIRST AND FIFTH COUNTS DISMISSED.

As the People failed to offer sufficient proof of defendant's use of a knife, much less proof beyond a reasonable doubt, the evidence is legally insufficient to support a verdict of guilty for murder as well as the aforesaid weapons charge.

Alternatively, the Court may, upon its own factual review of the evidence [see Crim. Proc. Law § 470.15], reverse Defendant's conviction on the ground that, while the evidence was "legally sufficient," his guilt still was *not proven beyond a reasonable doubt.*

## POINT TWO

## THE PEOPLE FAILED TO PROVE DEFENDANT GUILTY OF FIRST-DEGREE RAPE BEYOND A REASONABLE DOUBT.

Initially, we note that preservation cannot be an issue: Since trial courts are not authorized to weigh evidence [*People v. Carter*, 63 N.Y.2d 530 at 536, 483 N.Y.S.2d 654 at 657, 473 N.E.2d

-20-

6 (1984)], a defense application requesting a trial court to set aside a verdict on the basis that the weight of the evidence fails to establish a defendant's guilt beyond a reasonable doubt cannot be entertained.

Such weight-of-the-evidence review in New York State is a power unique to intermediate appellate courts.[1] Indeed, in *Bleakley*, *supra*, the Court of Appeals held "it is reversible error when the Appellate Division manifestly avoids its exclusive statutory authority to review the weight of the evidence in criminal cases."

> [T]his unique factual review power is the linchpin of our constitutional and statutory design intended to afford each litigant *at least one appellate review of the facts* . . . [citation omitted; emphasis added]."

*Bleakley* at 494, 515 N.Y.S.2d at 762.

And of course,

> It is a fundamental rule that due process of law protects an accused from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" . . . [quoting *In re Winship*, 397 U.S. 358 at 364 (1970)].

*People v. Egan*, 72 A.D.2d 239 at 242, 424 N.Y.S.2d 546 at 549 (4th Dep't 1980).

Here one of the facts necessary to constitute the crime of rape in the first degree is the act of engaging in "sexual intercourse" with another person. See Penal Law § 130.35. In turn, *sexual intercourse* has a specific definition under the Penal Law:

---

[1]In denying Defendant's motion in the case at bar to set aside the verdict under CPL 330.30(1), the trial court itself correctly observed that "the power to conduct a factual review lies with the appellate division, not the trial courts." See April 3, 2012 Decision and Order citing *People v. Garcia*, 272 A.D.2d 189, 707 N.Y.S.2d 441 (1st Dep't 2000).