"Sexual intercourse" has its ordinary meaning and occurs upon any penetration, however slight.

Penal Law § 130.00(1).

## THE ISSUE IS WHETHER THE WEIGHT OF THE TRIAL EVIDENCE PROVES BEYOND A REASONABLE DOUBT THAT DEFENDANT ENGAGED IN SEXUAL INTERCOURSE WITH THE YOUNG COMPLAINING WITNESS.

As previously noted, appellate review of whether a trial verdict is supported by the *weight* of the evidence is distinguished from review of the evidence's *legal sufficiency*.

> Although the two standards . . . are related, each requires a discrete analysis. For a court to conclude, as the Appellate Division did in this case, that a jury verdict is supported by [legally] sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial . . . [citation omitted] and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.

*Bleakley, supra* at 495, 515 N.Y.S.2d at 763.

> To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. *If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, "weigh the relative probative force of conflicting testimony*

-22-

> *and the relative strength of conflicting inferences that may*
> *be drawn from the testimony"* . . . [citations omitted]. If it
> appears that the trier of fact has failed to give the evidence
> the weight it should be accorded, then the appellate court
> may set aside the verdict . . . [citing CRIM. PROC. LAW §
> 470.20(2)].

*Bleakley, supra* at 495, 515 N.Y.S.2d at 763 (emphasis added).

As described by the United States Supreme Court, a court reviewing "the weight of the evidence" in a criminal case must engage in its own *de novo* review of the evidence, sitting as a "thirteenth juror." See *Tibbs v. Florida*, 457 U.S. 31 at 42 (1982).

> In assessing whether the verdict is against the weight of the
> evidence, we must view the evidence *in a neutral light* to
> determine whether a different conclusion would not be
> unreasonable and, upon such a finding, weigh the probative
> force of the conflicting evidence . . . [citations omitted].

*People v. Stanfield*, 7 A.D.3rd 918 at 920, 777 N.Y.S.2d 546 at 548 (3rd Dep't 2004) (emphasis added).

In essence, the intermediate appellate courts are to employ a two-step approach in its "weight of the evidence" review, first requiring a determination as to whether, based on all the credible evidence (and viewing same in a "neutral light"), a different finding would not have been unreasonable. Second, upon determining that a different finding would not have been unreasonable, then the appellate court, like the trier of

fact below, must "weigh the relative probative force of conflicting testimony and the

relative strength of conflicting inferences that may be drawn from the testimony."

## APPLYING THIS RULE TO THE FACTS IN THE CASE AT BAR WILL SHOW THAT THE SEXUAL INTERCOURSE ELEMENT OF THE CRIME OF FIRST-DEGREE RAPE WAS NOT PROVEN BEYOND A REASONABLE DOUBT.

Again, we consider first this "threshold inquiry" [*People v. Cantres*, 238 A.D.2d 56

at 60, 667 N.Y.S.2d 36 at 39 (1st Dep't 1997)]:

> *Based on all the credible evidence, would it have been unreasonable for the trier of fact to have found Defendant did not engage in sexual intercourse with the complaining witness?*

If the answer to this question is *no*, then the Court itself *must weigh the evidence to*

*determine whether the sexual intercourse element was proven beyond a reasonable*

*doubt.* Of course, if the Court finds that this element was *not* proven beyond a

reasonable doubt based on the record before it, then the first-degree rape conviction

must be set aside. *Bleakley*, *supra*; CRIM. PROC. LAW § 470.20(5).

## A FINDING THAT DEFENDANT DID NOT ENGAGE IN SEXUAL INTERCOURSE WITH THE COMPLAINING WITNESS WOULD NOT HAVE BEEN UNREASONABLE.

The People's evidence as to what happened between Defendant and young Jennifer

Villatoro on September 24, 2010 consists of questionable witness testimony as well

as equivocal medical evidence in support thereof.

**The medical evidence failed to establish the element of sexual
intercourse within the meaning of Penal Law 130.00(1).**

The People's "medical evidence" consisted of testimony by Dr. Yasmine Pompey, a physician with the Pediatric Unit of Nassau University Medical Center ("NUMC"). [T. 746-47] Dr. Pompey testified to having examined Jennifer on October 1, 2010 [T. 751, 765], one week after the alleged, September 24, 2010 rape [T. 692-93] as well as was the first time that Jennifer was brought to a medical provider for an examination [T. 527, 693, 724].

Dr. Pompey testified to her examination of Jennifer, which indicated an "annular hymen with thick edges" plus a "V-shaped cleft at the 5 o'clock position" [T. 751], and further testified that this finding was "supportive of the child's history and consistent with penetration, hymenal penetration." [T. 753] Nevertheless, she agreed that such "V-shaped cleft at the 5 o'clock position" was consistent with *digital penetration or* "partial penetration by a penis" [T. 753-54, 758, 764-65], the term *digital penetration* found in Jennifer's medical record [T. 754-55].[1] As reflected therein also, Dr. Pompey's examination of Jennifer failed to reveal any "gaping between the labia," any external trauma or tears in the vaginal area, or anything else that would not be considered normal other than the V-shaped cleft. [T. 757-60]

---

[1] Dr. Pompey confirmed that no penile penetration had been reported in Jennifer's history. [T. 763-65]

### The testimony of the complaining witness was equivocal on the question of whether she experienced sexual intercourse within the meaning of Penal Law 130.00(1).

Jennifer herself testified at trial that she and Defendant went into the ladies room at the park on September 24, 2010 where, in a handicapped stall, Defendant and she began kissing. [T. 679-83][1]

She further testified that Defendant pulled down her underclothing and put his finger in her vagina [T. 684-85], and testified to having felt too that Defendant got his penis in "a little bit" [T. 685-86]. The prosecutor elicited this latter testimony, however, in the following manner, Jennifer initially stating only that Defendant *tried to* put his penis in her vagina:

> Q. What happened with his finger?
> A. He put it in my vagina.
> Q. And what happened after that?
> A. He *tried to* put his penis in my vagina.
> Q. How did he try to do that?
> A. What do you mean?
> Q. What did he do?
> A. *I don't know.*

[T. 685 (lines 7-14; emphasis added)]

The prosecutor would begin anew and, at one point in her questioning, arguably would mischaracterize a previous answer given by the witness:

---

[1] She testified also that they had kissed on prior occasions, and that while more was involved on these occasions the contact was always through clothing. [T.674-76, 727-28]

Q. You said that he used his finger and put it in your vagina?
A. Yes.
Q. You said *he put something else in your vagina?*
A. Yes.
Q. What was that?
A. His penis.
Q. And what did he do?
A. He *tried to* put it in my vagina.

[T. 685 (lines 15-23; emphasis added)]

The prosecutor then had, again at least arguably, mischaracterized a prior answer given by the witness where the prosecutor, in subsequent questioning, employed the phrase *he put something else in* as opposed to the phrase the witness had just used prior: *he tried to put.*

In any event, the prosecutor next asked Jennifer how she knew he "tried to do that," the witness answering, "Because I felt it." [T. 685-86] The testimony at this point thus indicates nothing more than the witness feeling what she thought Defendant was doing. The next question and answers elicited then read as follows:

Q. And what happened next?
A. Hum?
Q. *Was he able to get it fully in?*
A. No.
Q. How much — what did it feel like?
A. It hurt.
Q. *Could you feel he was able to get it in a little bit?*
A. Huh?
Q. *Could you feel he was able to get it in a little bit?*
A. Yes.

[T. 686 (lines 2-13; emphasis added)]

This affirmative response to a leading question was the only evidence as to the element of sexual intercourse under its "ordinary meaning" that "occurs upon any penetration, however slight" [Penal Law § 130.00(1)].

However, having testified "it hurt" [T. 686 (line 7)], the complaining witness answered the same way as to the alleged digital penetration:

> Q. And when he was touching you with his finger, how did that make you feel?
> A. It hurt too.
> Q. Now, how else did it make you feel when he was touching you with his finger?
> A. Uncomfortable.
> Q. And when he put his penis in your vagina, how did that make you feel?
> A. Uncomfortable.

[T. 686-87 (emphasis added)]

Both alleged acts, then, "hurt" and were "uncomfortable." It is not unreasonable then to believe the complaining witness could not know with any degree of certainty that she had experienced "penile" penetration as opposed to "digital" penetration.

Thus, without unequivocal medical evidence of "penile penetration," it would not have been unreasonable for the jury to find that no sexual intercourse within the meaning of Penal Law 130.35 occurred between Defendant and the complaining witness.

-28-

**WEIGHING THE PROBATIVE FORCE OF THE CONFLICTING EVIDENCE AND THE RELATIVE STRENGTH OF CONFLICTING INFERENCES THAT MAY BE DRAWN THEREFROM SHOWS THAT THE PEOPLE FAILED TO PROVE BEYOND A REASONABLE DOUBT THE SEXUAL INTERCOURSE ELEMENT NECESSARY TO SUSTAIN A CONVICTION FOR FIRST-DEGREE RAPE.**

Having determined that it "would not have been unreasonable" for the jury to have found Defendant did *not* engage in sexual intercourse with the complaining witness, the Court must now weigh the "probative force of the conflicting testimony [or evidence] and the relative strength of conflicting inferences that may be drawn from the testimony." *Bleakley, supra* at 495, 515 N.Y.S.2d at 763.

Instructive is testimony by the complaining witness that she pushed Defendant off her when she heard her phone ring [T. 687], which she did not answer [T. 687, 697], and then left for home [T. 687-88, 732] *where she told her mother and father nothing about what she would later testify had happened* [T. 689, 690, 729]. Indeed, she told her mother only that she and Defendant had kissed. [T. 708, 712]

Furthermore, Jennifer testified similarly that she told the police on the day of the alleged rape nothing about what had allegedly happened. [T. 690, 693][1] She also admitted during her testimony that she appeared at the police station several days later

---

[1] While, at trial, she claimed she did so because she was afraid of what her mother would do if she said what really happened, on cross-examination she acknowledged that her mother encouraged her to tell the police everything that happened, that her mother was the one who called the police and that she knew that her mother would not be mad at her if she told the police what had occurred. [T. 704-05, 712]

[T. 706-07], and gave a written report specifically stating that Defendant never placed his penis inside of her [T. 718-20]. While Jennifer testified that, in response to questioning, she told the police, "It went in a little bit" [T. 714], she later changed this, testifying that in response to the police questioning, she answered, "I don't know." [T. 716-17]

In fact, she admitted at trial that when asked about "sex" and whether that had happened, she had answered in the negative; further, that when asked what else Defendant allegedly did, she answered he had tried to pull up her skirt, but she didn't let him. [T. 719-20] Again, she told her mother nothing about what happened. [T. 689][1]

Given the conflicts in and the equivocal nature of the complaining witness's testimony, coupled with the ambiguous medical evidence, the People plainly failed to prove Defendant's guilt of at least first-degree rape beyond a reasonable doubt.

Indeed, other evidence indicates Defendant wasn't even in the park on the date in question. For instance, Defendant's sister, Diana Bonilla [T. 1054, 1103], would testify at trial that her brother was at home with her on September 24, 2010 at 4:30 p.m. [T. 1056-58] At 4:35, she and Defendant left for a tattoo shop, making no stops until they picked up a friend, Xiomara Tursio. [T. 1063-64] The three of them then

---

[1] Also, while the complaining witness testified at trial to *seeing* Defendant's penis [T. 697-98], she agreed that, a year earlier on January 19, 2011, she told the Grand Jury in sworn testimony that she did not see it [T. 702].

went on to the tattoo shop, "Tattoo You," again making no stops and arriving between 5:00 and 5:10, where they met the tattoo artist, Evan Grover. [T. 1064-68, 1095-98, 1148-50] While Mr. Grover was unable to tattoo them that day, Defendant showed him his arm and the three remained at the shop for two hours. [T. 1066-69, 1099-1100, 1107, 1150, 1152-53] The three then went to Diana Bonilla's house without making any stops along the way. [T. 1070, 1107-08][1] On its weight-of-the-evidence review then, the Court should consider also whether Defendant's guilt of the indictment's third and fourth counts, as well as the second, was established beyond a reasonable doubt.

## THE RAPE CONVICTION MUST BE REVERSED.

Because, on the record below, the weight of the evidence fails to prove beyond a reasonable doubt that Defendant engaged in sexual intercourse with the complaining witness, Defendant's conviction of rape in the first degree under the second count of the indictment must be reversed, that count of the indictment dismissed. Further, in its own "weight of the evidence" review of the testimony concerning the other sexual abuse counts, the court should consider too the aforesaid "alibi" testimony.

---

[1]Previously that same day, Defendant had been working with his girlfriend, Zeida, at Parfields Corporation in Westbury. The two left together at 4:00 to pick up Zeida's daughters in daycare, also in Westbury. Defendant remained with his girlfriend or her daughters in the car, even when stopping at the deli, until 4:30 when Zeida dropped him off at his home at 163 Kinkel Street. [T. 1134-37, 1143, 1144]

## POINT THREE

### PURSUANT TO A DEFENSE APPLICATION, THE INDICTMENT'S SEXUAL ASSAULT COUNTS SHOULD HAVE BEEN SEVERED FROM THE HOMICIDE AND WEAPONS COUNTS WHERE IMPLICATED WERE TWO SEPARATE ALLEGED INCIDENTS, ON DIFFERENT DATES WITH DIFFERENT VICTIMS, AND THE COUNTS OTHERWISE WERE NOT PROPERLY JOINABLE UNDER CPL 200.20.

As we have seen, the court denied Defendant's omnibus motion which included a request that the court sever the indictment's murder and sex-abuse counts.

> The defendant seeks an order severing the Courts related to [the] Murder from the Counts related to the Rape, because these counts stem from a distinct and separate incident. The defendant claims that he would be unduly prejudiced should the entire indictment be tried together.
>
> Several witnesses who will be called at trial on each of the incidents underlying the indictment are identical. In addition, if believed, testimony regarding the rape is both relevant and admissible regarding the motive for the murder.
>
> The arguments made in support of severance by the defendant are not sufficient to warrant separate trials based upon the record before this Court. CPL 200.20(2)b, 200.20(2)c. As such, the defendant's motion for severance is denied.

July 25, 2011 Trial Court Decision & Order, pp. 1-2.

### THE ISSUE IS WHETHER THE INDICTMENT'S COUNTS RELATING TO THE HOMICIDE WERE PROPERLY JOINABLE WITH THE COUNTS RELATING TO A NUMBER OF SEX OFFENSES INVOLVING A DIFFERENT VICTIM, A MINOR, ALLEGED TO HAVE OCCURRED FOUR DAYS EARLIER.

Whether offenses are joinable in a single indictment is governed by statute:

-32-

> An indictment must charge at least one crime and may, in addition, charge in separate counts one or more other offenses, including petty offenses, provided that all such offenses are joinable pursuant to the principles *prescribed in subdivision two [of CPL 200.20]*.

Crim. Proc. Law § 200.20(1) (emphasis added).

In turn, subdivision two of CPL 200.20 provides,

> Two offenses are "joinable" when:
> (a) They are based upon the same act or upon the same criminal transaction, as that term is defined in subdivision two of section 40.10; or
> (b) Even though based upon different criminal transactions, such offenses, or the criminal transactions underlying them, are of such nature that either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first; or
> (c) Even though based upon different criminal transactions, and even though not joinable pursuant to paragraph (b), such offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law; or
> (d) Though not directly joinable with each other pursuant to paragraph (a), (b) or (c), each is so joinable with a third offense contained in the indictment. In such case, each of the three offenses may properly be joined not only with each of the other two but also with any further offense joinable with either of the other two, and the chain of joinder may be further extended accordingly.

Crim. Proc. Law § 200.20(2).

As the Court of Appeals wrote recently,

CPL 200.20 and 200.40 [the latter concerning multiple defendants] are the general joinder provisions that determine, in all contexts, whether offenses are properly included in the same indictment or, if there are multiple indictments, whether they may be consolidated for a single trial. Joinder of charges involving a single defendant is addressed in CPL 200.20(2). Paragraph (a) of that subdivision authorizes joinder of multiple charges if they are based on the same criminal transaction. Paragraph (b) permits joinder of charges arising from different criminal transactions if proof of the first offense would be material and admissible as evidence in chief in the trial of the second offense. In this case, the People relied on paragraph (c) of the subdivision which authorizes joinder when, "[e]ven though based upon different criminal transactions, and even though not joinable pursuant to paragraph (b), such offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law" (CPL 200.20[2][c]). This is the broadest of the three categories and, for this reason, where counts are joined under CPL 200.20(2)(c), the trial court has the discretion to grant an application for severance if it determines that the offenses should be tried separately to avoid undue prejudice to the defense . . . [citing Crim. Proc. Law § 200.20(3) and *People v. Shapiro*, 50 N.Y.2d 747, 431 N.Y.S.2d 422, 409 N.E.2d 897 (1980)].

*People v. Pierce*, 14 N.Y.3rd 564 at 572-73, 904 N.Y.S.2d 255 at 261, 930 N.E.2d 176 (2010).[1]

## APPLYING THIS RULE TO THE FACTS OF THIS CASE SHOWS THAT THE COUNTS RELATED TO THE HOMICIDE SHOULD HAVE BEEN TRIED SEPARATELY FROM THE COUNTS

---

[1]Subdivision 3 of CPLR 200.20 allows that even if joinable under CPL 200.20(2)(c) the court nevertheless may, "in its discretion, order that any such offenses be tried separately from the other or others thereof."

## RELATING TO THE SEX OFFENSES.

Six of the indictment's seven counts encompass two distinct incidents involving two separate victims on two separate dates: Counts 1, 5, and 6 the homicide of September 28, 2010, the victim being Armando Villatoro; counts 2, 3, and 4 the alleged sexual assault of Mr. Villatoro's daughter, a minor, four days earlier on September 24, 2010. The indictment's seventh count alleged endangering the welfare of the same minor child over a period ranging from June 27, 2010 to September 7, 2010, a count that would be properly joinable with counts 2 through 4 involving the minor child.

In his omnibus motion, Defendant argued for severance by carefully reviewing each of the four paragraphs of CPL 200.20's subdivision (2) in light of the charges. In denying severance, however, the trial court cited only two such paragraphs, paragraphs (b) and (c), and held that the "arguments made in support of severance by the defendant are not sufficient to warrant separate trials based upon the record before this Court."

As to paragraph (b) of CPL 200.20(2), Defendant argued,

> Section 200.20(2)(b) . . . authorizes joinder where two offenses are of such a nature that proof of one of the offenses would be material and admissible as evidence in chief upon a trial of the other offense. No such situation exists here. The incidents, as noted, occurred four days apart, concerned different victims *and none of the same witnesses would be testifying in connection with these two offenses. None of the evidence that would be offered to*

-35-

> *prove one of these offenses would be material and*
> *admissible in connection with the other offense.*

February 27, 2011 Affirmation of Daniel Millman In Support, p. 9 (emphasis added).

The People's opposition to the severance request was little more than a cursory

argument consisting of mostly conclusory statements, offering nothing more on this

subject than a single paragraph in their opposition to Defendant's omnibus motion:

> The People oppose the defendant's request for
> severance. The Rape and Sexual Abuse charge and the
> subsequent reporting are the impetus for the Murder in this
> case and are relevant as to motive, identity, and intent. As
> such, the People submit that the charges were properly
> joined pursuant to CPL § 200.20(b). The charges were
> properly joined as the Rape and Sexual Abuse Charges and
> the Murder charge are interrelated. The Rape and Sexual
> Abuse charges complete the narrative on the chain of
> events that led to the Murder. The Endangering the Welfare
> Charge is properly joinable to the Rape and Sexual Abuse
> Charges . . . [citing Crim. Proc. Law § 200.20(2)(d)]. With
> respect to the Rape and Sexual Abuse charges in the
> indictment, the charges involve the same participants and
> the same family and would be material and relevant and
> admissible in the Murder Trial. The Rape and Sexual
> Abuse charges involve the victim's daughter who was also
> present at the scene of the murder and involve the
> defendant who was the perpetrator of both crimes. The
> families of the defendant and the victim are known to each
> other and both reside on the same block.

April 20, 2011 Affirmation in Opposition to Defendant's Omnibus Motion and

Response to Discovery Demands ¶ 11.

As to paragraph (c) of CPL 200.20(2), Defendant argued,

Two offenses may also be joined, under section 200.20(2)(c), where those offenses are defined by the same or similar statutory provisions and are therefore the same or similar in law. No such similarity exists between the two offenses here. The two offenses are not only charged under different statutory sections but are charged under entirely different classes of crimes. Murder is a violent crime set forth in article 125 of the Penal Law, covering homicides and related offenses. Rape is a sex offense which is contained within Article 130. None of the elements of the two charges match and they are entirely different classes of offenses. They are therefore not defined by similar statutory provisions.

February 27, 2011 Affirmation of Daniel Millman In Support, p. 9.

Save a single conclusory statement concerning paragraph (b) of CPL 290.20(2), the People offered nothing to refute the defense analysis of CPL 200.20(2). Furthermore, the Court of Appeals in *Pierce, supra*, offers guidance as to the applicability of paragraph (c) of CPL 200.20(2) and what constitutes "the same or similar statutory provisions":

> CPL 200.20(2)(c) is typically relied on *when a person is alleged to have violated the same Penal Law provision on two or more occasions* [emphasis added] . . . [citing *People v. Jenkins*, 50 N.Y.2d 981, 431 N.Y.S.2d 471, 409 N.E.2d 944 (1980) (two separate robberies properly joined in single indictment)] or has been charged with comparable criminal conduct in discrete incidents, such as multiple sexual assaults . . . [citing *Shapiro, supra* (sexual assault counts properly joined but discretionary severance should have been granted where defendant unduly prejudiced by joint trial of charges); *People v. Hunt*, 39 A.D.3rd 961, 833 N.Y.S.2d 731 (3rd Dep't 2007) (sexual assault counts properly joined); *People v. Clark*, 24 A.D.3rd 225, 806

N.Y.S.2d 834 (4th Dep't 2005) (rape and sodomy charges properly joined)].

*Pierce, supra* at 573, 904 N.Y.S.2d at 182.

Furthermore,

> Offenses will not be deemed sufficiently similar to support joinder under CPL 200.20(2)(c) *if the offenses do not share any elements and the criminal conduct at the heart of each crime is not comparable* . . . [citing *Dabbs, infra* (kidnapping and coercion charges not sufficiently similar to support joinder)].

*Pierce, supra* at 573-74, 904 N.Y.S.2d at 182 (emphasis added).

Here, of course, the sex offenses share elements among themselves, each involving the same victim and all said to have occurred on September 24, 1010. Similarly, the indictment's count 1, the homicide count, shares the element of a weapon allegedly possessed by Defendant on September 28, 2010, the date of the homicide. However, the two classes of offenses share no elements and the "criminal conduct at the heart of each" can hardly be characterized as "comparable."

As set forth in defense counsel's "Reply Affirmation,"

> The People essentially seek joinder based upon its contention that the Rape helps to "complete the narrative" for the Murder and "was the impetus" for the confrontation between the defendant and victim in the Murder case. The defendant disputes this. However, even if the People's claim in this respect was true, it is irrelevant – *helping to "complete the narrative" and providing an "impetus" for a chain of events are not the standards set forth in section 200.20 or the relevant case law and do not make the*

> *offenses joinable.* The People cite no authority of any kind
> in support of its position in this respect.

May, 2011 Affirmation of Daniel Millman in Reply, p. 2 (emphasis added).

Moreover, in denying the severance request, the trial court itself noted,

> Several witnesses who will be called at trial on each
> of the incidents underlying the indictment are identical. In
> addition, if believed, testimony regarding the rape is both
> relevant and admissible regarding the motive for the
> murder.

July 25, 2011 Decision & Order, p. 2.

However, again, even if the witnesses are identical, or even if testimony

regarding the September 24, 2010 sexual assault helps to "complete the narrative" or

was the "impetus" for the September 28, 2010 confrontation, the fact remains these

factors do not come within the statutory standards for joinder found in CPL

200.20(2).[1]

Finally, even if this Court on appeal holds that the indictment's counts 1, 5, and

6 were properly joinable with the other counts, it is respectfully submitted that still

---

[1] Of the 19 witnesses the People would call at the trial, only five would have any testimony to offer in connection with the September 24, 2010 incident: 12-year-old Stevens Destina [T. 430]; 9-year-old Alex Ivan Alcantara [T. 451]; Police Officer Christopher Bendetto [T. 464]; Susan Villatoro [T. 502]; and Jennifer Villatoro [T. 668].

Of these five, only Jennifer and her mother, Susan Villatoro, had testimony to offer as to both that incident and the September 28, 2010 incident. However, as to the earlier incident, Susan Villatoro could only testify that the police came to her house [T. 515-16]; that the two boys, Ivan and Stevens, also came to her house and told her and her husband what they had seen [T. 516]; that her husband, upset, then left for the deli before the police arrived [T. 516-17], staying out late [T. 517-18]; and that she later took Jennifer to the doctor [T. 518-19]. Similarly, Jennifer Villatoro had only minimal testimony concerning the homicide, as set forth in the margin *supra*. [T. 690-92]

the Court should reverse Defendant's conviction and order separate trials, invoking the "discretionary" severance under CPL 200.20(3):

> In any case where two or more offenses or groups of offenses charged in an indictment are based upon different criminal transactions, and where their joinability rests solely upon the fact that such offenses, or as the case may be at least one offense of each group, are the same or similar in law, as prescribed in paragraph (c) of subdivision two, the court, in the interest of justice and for good cause shown, may, upon application of either a defendant or the people, in its discretion, order that any such offenses be tried separately from the other or others thereof. Good cause shall include but not be limited to situations where there is:
>
> (a) *Substantially more proof on one or more such joinable offenses than on others and there is a substantial likelihood that the jury would be unable to consider separately the proof as it relates to each offense.*
>
> *                *                *

Crim. Proc. Law § 200.20(3) (emphasis added).

As the court wrote in *People v. Negron*, 105 Misc. 2d 492 at 492-93, 432 N.Y.S.2d 348 at 349 (Sup. Ct., N.Y. County 1980), considerations of severance "must begin with the proposition that the joinder of unrelated though similar crimes is inherently prejudicial to the defendant." Here, of course, the sexual assault crimes cannot be considered "similar" to the crime of homicide in any event. More importantly, however, the sexual assault crimes involve a minor child, a little girl, the type of crimes that would inflame the passions of a jury and thus prejudice Defendant facing a homicide charge.

Given the nature of the sexual assault offenses then, justice would appear to require that the two classes of offenses be tried separately even if somehow joinable under CPL 200.20(2).

## DEFENDANT'S CONVICTION MUST BE REVERSED, THIS MATTER REMANDED FOR TWO TRIALS: ONE FOR THE INDICTMENT'S COUNTS 1, 5, & 6, THE OTHER FOR THE REMAINING COUNTS.

Because the indictment encompassed two separate alleged incidents, on different dates with different victims, with the indictment's counts otherwise not properly joinable under CPL 200.20(2), Defendant's application for a severance of the indictment's sexual assault counts from the homicide and weapons counts should have been granted and the trial court should have directed that the two classes of counts be tried separately. Moreover, further reason for a severance is found in the Court's discretionary authority to direct one where the indictment's counts charging the sexual assault on a little girl would prejudice a jury against a defendant being tried for murder.

> [W]e agree with defendant that County Court erred in denying his motion to sever the first group of charges from the second group of charges. . . . In our view, none of the counts of the first group of charges are the same as or similar in law to any of the counts of the second group of charges. Consequently, the two groups of charges were improperly joined and should have been severed for that reason, irrespective of whether good cause was shown for severance under CPL 200.20(3).

*People v. Dabbs*, 192 A.D.2d 932 at 933, 596 N.Y.S.2d 893 at 894 (3rd Dep't 1993).

*Cf. People v. Connors*, 83 A.D.2d 640, 441 N.Y.S.2d 523 (2d Dep't 1981) (separate trials ordered as to robbery and weapons possession charges).

Consequently, Defendant's judgment of conviction must be reversed, the matter remanded for separate trials of the indictment's counts 1, 5, & 6 and counts 2, 3, 4, & 7.

## POINT FOUR

**DEFENDANT'S RIGHT TO A FAIR TRIAL WAS IMPERMISSIBLY COMPROMISED BY THE TRIAL JUDGE'S FAILURE TO SUPPRESS *FOR ALL PURPOSES* DEFENDANT'S VIDEO-RECORDED STATEMENT TO POLICE DETECTIVES, WHO FAILED TO HONOR DEFENDANT'S REQUEST FOR COUNSEL PRIOR TO QUESTIONING.**

With respect to Defendant's motion to suppress statements he made to police detectives, the trial court ruled,

> The Court, having held a hearing on this matter and taking argument of counsel on this one particular point that I found of some concern during the course of the hearing, with respect — first of all, I am of the opinion that the defendant speaks and understands English perfectly well.
> Secondly, with respect to the statements made by the defendant to detective James Cereghino, I find the defendant *did not make an unequivocal invocation of his right to counsel*. His statements are admissible on the People's direct case.

[H. 99 (emphasis added)]

-42-

Ultimately, however, the People would choose not to use Defendant's statements, recorded on a "digital versatile disc" or "DVD," *on their direct case at trial.* While the jury's verdict, then, cannot have been directly influenced by same, just knowing that the People had been permitted to use the DVD at Defendant's trial would have had a "chilling effect" on Defendant's decision to testify in his own defense.[1]

A number of opinions from no less an authority as the United States Supreme Court indicate that the law has evolved in this area. The majority in *Harris v. New York*, 401 U.S. 222 (1971), for instance, held that the exclusionary rule's deterrent function was adequately served by excluding evidence from the prosecution's case-in-chief, that disallowing an illegally-obtained statement's use for "impeachment purposes" would effectively constitute "a license to use perjury." On the other hand, the court in *Mincey v. Arizona*, 437 U.S. 385 (1978) indicated that "involuntary statements could not be used for impeachment purposes" with such factors bearing on the voluntariness question as the suspect's isolation from family, friends, *and legal counsel.*

Nevertheless, in *People v. Maerling*, 64 N.Y.2d 134 at 140, 485 N.Y.S.2d 23 at 25, 474 N.E.2d 231 (1984), the Court of Appeals wrote, "Our rule permits the use

---

[1] While the trial court ruled that the People could use the DVD on *their direct case* only, inferentially the People also had the option of using same against Defendant for "impeachment purposes" on cross examination.

for impeachment not only of statements obtained in violation of a defendant's *Miranda* rights . . . [citations omitted]), but also of those obtained in violation of his right to counsel under the State Constitution . . . [citations omitted]" *unless involuntarily made*. But see Crim. Proc. Law § 60.45(2)(b)(ii) which expressly provides that a statement is "involuntarily made" by a defendant when obtained from him "in violation of such rights as the defendant may derive from the constitution of this state or of the United States."

In the interests of justice, then, we ask that the Court consider the question anew, noting that available in this regard is not only the DVD itself, but a 190-page transcript of the police interview recorded thereon.[1]

## THE ISSUES ARE (1) WHETHER THE TRIAL COURT'S RULING AS TO DEFENDANT'S FIFTH AMENDMENT RIGHT TO COUNSEL WAS ERRONEOUS AND (2) WHETHER THIS ERRONEOUS RULING COMPROMISED DEFENDANT'S RIGHT TO A FAIR TRIAL.

Thus, two rules of law must be considered: First, the rule regarding a suspect's invocation of his right to counsel, and, second, a rule with respect to compromising a criminal defendant's right to testify in his own defense and, hence, a fair trial in accordance with due process.

---

[1]Present appellate counsel procured these materials from the Nassau County District Attorney's office with the assistance of Assistant District Attorney, Donald J. Berk, in December of 2013. The transcript was utilized by the trial court and received as "People's Exhibit 3" at the suppression hearing. [H. 28] The DVD itself, recently viewed by appellate counsel, was received as "People's Exhibit 2." [H. 23-24, 28]

## THE TRIAL COURT'S RULING CONCERNING
## DEFENDANT'S FIFTH AMENDMENT RIGHT TO COUNSEL

Beyond just informing a defendant of his "Miranda rights," the U.S. Supreme Court's celebrated decision in *Miranda v. Arizona*, 384 U.S. 436 (1966) imposes additional requirements on law enforcement once a suspect chooses to assert those rights. In New York State, once a suspect in custody requests an attorney, any questioning must cease and the police may not proceed anew without first obtaining counsel for the suspect. See *People v. Aponte*, 69 A.D.2d 204 at 215, 418 N.Y.S.2d 651 at 658 (2nd Dep't 1979).

In fact, the scope of the right to counsel in New York is substantially greater than that afforded criminal suspects in other jurisdictions:

> The safeguards guaranteed by this State's Right to Counsel Clause are unique (N.Y. Const., art. I, § 6). By constitutional and statutory interpretation, we have established a protective body of law in this area resting on concerns of *due process, self-incrimination and the right to counsel provisions of the State Constitution* which is substantially greater than that recognized by other State jurisdictions and "far more expansive than the Federal counterpart" . . . [citations omitted].

*People v. Harris*, 77 N.Y.2d 434 at 439, 568 N.Y.S.2d 702 at 705, 570 N.E.2d 1051 (1991) (emphasis added).

Indeed, once a defendant in custody requests counsel, custodial interrogation must cease. *People v. Burdo*, 91 N.Y.2d 146 at 149, 667 N.Y.S.2d 970 at 971, 690

N.E.2d 854 (1997); *People v. Steward*, 88 N.Y.2d 496 at 501, 646 N.Y.S.2d 974 at 977, 670 N.E.2d 214 (1996).

To be sure, the right to counsel in New York includes the right of an accused to have an attorney present while considering *just the question of whether to waive his rights. People v. Cunningham*, 49 N.Y.2d 203 at 207-08, 424 N.Y.S.2d 421 at 424, 400 N.E.2d 360 (1980); *People v. Skinner*, 52 N.Y.2d 24 at 28, 436 N.Y.S.2d 207 at 209, 417 N.E.2d 501 (1980). Accordingly, when an unrepresented suspect in custody invokes his right to counsel, a subsequent waiver of rights outside the presence of counsel can have no legal effect. *Cunningham, supra* at 209, 424 N.Y.S.2d at 425.

Thus, any statement obtained in violation of a defendant's right to counsel must be suppressed, and a heavy burden is on the People to show that a defendant knowingly and voluntarily waived that right. *People v Ramos*, 40 N.Y.2d 610 at 618, 389 N.Y.S.2d 299 at 305, 357 N.E.2d 955 (1976); *People v. Woodard*, 64 A.D.2d 517 at 518, 406 N.Y.S.2d 790 at 792 (1st Dep't 1978).

## THE TRIAL COURT'S ERRONEOUS RULING THAT COMPROMISED DEFENDANT'S RIGHT TO TESTIFY IN HIS OWN DEFENSE

The choice of whether to testify in one's own defense must be an unfettered choice, that choice being whether to exercise the constitutionally guaranteed right to so testify.

The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to *impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.* These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.

*Miranda*, *supra* at 476-77 (emphasis added).

As pointed out with Justice Brennan's cogent dissent in *Harris v. New York*,

*supra*,

The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system. The "essential mainstay" of that system, Miranda v. Arizona, 384 U.S., at 460, is the privilege against self-incrimination, which for that reason has occupied a central place in our jurisprudence since before the Nation's birth. Moreover, "we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. . . . All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government . . . must accord to the dignity and integrity of its citizens." Ibid. *These values are plainly jeopardized if an exception against admission of tainted statements is made for those used for impeachment purposes.*

-47-

*Harris v. New York, supra* at 231-32 (Brennan, J. dis.) (emphasis added).

Justice Brennan then went on to explain how little a law enforcement official has to lose in continuing with an interrogation in derogation of a suspect's right to counsel, noting that courts should not sanction such conduct:

> Moreover, *it is monstrous that courts should aid or abet the law-breaking police officer.* It is abiding truth that "[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp v. Ohio*, 367 U.S. 643, 659 (1961). Thus, even to the extent that Miranda was aimed at deterring police practices in disregard of the Constitution, I fear that today's holding will seriously undermine the achievement of that objective. *The Court today tells the police that they may freely interrogate an accused incommunicado and without counsel and know that although any statement they obtain in violation of Miranda cannot be used on the State's direct case, it may be introduced if the defendant has the temerity to testify in his own defense.*

*Id.* at 232 (emphasis added).

As *the majority* found in *Oregon v. Hass*, 420 U.S. 714 at 723 (1975), "One might concede that when proper Miranda warnings have been given, and the officer then continues his interrogation after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material."

Plainly then, the exclusionary rule should be extended to apply to a prosecutor's use of statements for impeachment purposes as well as use on direct examination.

## APPLYING THESE RULES TO THE FACTS OF THIS CASE SHOWS THAT DEFENDANT UPON BEING READ HIS *MIRANDA* RIGHTS DID INVOKE HIS FIFTH-AMENDMENT RIGHT TO COUNSEL AND THAT THE TRIAL COURT'S ERRONEOUS ALLOWANCE OF DEFENDANT'S STATEMENTS MADE TO THE DETECTIVES IN THE ABSENCE OF COUNSEL IMPERMISSIBLY COMPROMISED DEFENDANT'S RIGHT TO TESTIFY IN HIS OWN DEFENSE.

Arriving at the police Homicide Squad in the early morning hours of November 27, 2010, Defendant was brought to interview room #2, with recording equipment. [H. 19] All of Defendant's time in the room was recorded. [H. 19] The interview that ensued was in English, and Detective Cereghino began by reading Defendant his rights in English [H. 22-23], doing so from a "departmental form 207 notification of rights." [H. 20-21][1]

Thereupon followed this exchange between Detective Cereghino and Defendant:

> Q  OK, now that I have advised you of your rights, are you willing to answer questions?
> A  *I don't know if I could call a lawyer or something.*

---

[1]On cross examination of Cereghino at the hearing, it was noted that Defendant did ask about a Spanish interpreter at some point during the interview, Detective Aponte telling Defendant he didn't need an interpreter, that he understands Defendant "perfectly." [H. 34-35]

> Q I'm sorry, could you speak up?
> A *I don't know if I can call somebody to call me a lawyer or something.*
> Q That's up to you – whatever it is that you want to do.
> A *I can't make any phone calls?*
> Q *Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak to me without a lawyer being present.*

Transcript of Videorecorded Statement of Defendant ("People's Hearing Exhibit 3") at pp. 6-7 (emphasis added).

A viewing of the DVD received into evidence at the hearing (as People's Exhibit 2) confirms that after being advised of his rights, including the right to talk to a lawyer before answering any questions and the right to have a lawyer present at any time, Defendant specifically asked about calling a lawyer or calling someone else to call a lawyer for him. People's Hearing Exhibit 3, p. 7. Testifying at the hearing, however, Detective Cereghino would only acknowledge that Defendant said "something about a lawyer":

> He said *something about a lawyer.* As I said, I wasn't sure what he wanted or what he was referring to, so I addressed the issue with him about whether he was willing to speak to me without an attorney present. He thought for a moment and said yes, he would speak to me.

[H. 60 (emphasis added)]

In other words, the detective heard Defendant say "something about a lawyer," and, rather than clarify "what he wanted or what he was referring to," changed the

subject. Further, Detective Cereghino recalled at the hearing that Defendant later made "reference to wanting to make a phone call" and "reference to something about a lawyer," but he could not recall Defendant saying "can I make a phone call so I can have someone get me a lawyer." [H. 62]

In any event, the record nowhere indicates the detectives ever provided defendant with access to a phone until the very end of the interview; nor did they cease their questioning or acknowledge defendant's request for counsel. Instead, the detectives proceeded to question Defendant for more than four hours.[1]

Plainly, a reasonable police officer would have understood that defendant was requesting an attorney [*People v. Jones*, 21 A.D.3rd 429, 799 N.Y.S.2d 783 (2nd Dep't 2005)] or, at the very lease, would have had the matter clarified before proceeding further. In fact, the Court of Appeals has held that once a suspect requests counsel and *no additional facts exist upon which a contrary inference can be drawn*, further inquiry by police is prohibited. *People v. Porter*, 9 N.Y.3d 966 at 967, 848 N.Y.S.2d 583 at 584, 878 N.E.2d 998 (2007).

Again, where a suspect indicates "in any manner and at any stage of the process" that he wishes to consult with an attorney before speaking, there can be no questioning and the police may not immediately seek a waiver of his rights and

---

[1]The record shows the foregoing transpired at 12:44 a.m., with Defendant not permitted to use the phone until 4:15 or 4:20. [H. 62-63]

proceed to question him. *People v. Buxton*, 44 N.Y.2d 33 at 36-37, 403 N.Y.S.2d 487 at 489, 374 N.E.2d 384 (1978). In *People v. Esposito*, 68 N.Y.2d 961 at 962, 510 N.Y.S.2d 542 at 542-43, 503 N.E.2d 98 (1986), the Court of Appeals held that, where a defendant in custody makes a request for counsel, any waiver thereafter obtained in the absence of counsel *is ineffective, even if defendant waived the right voluntarily.* Thus, any such waiver is ineffective *regardless of its voluntary nature. People v. Clark*, 45 N.Y.2d 432 at 439, 408 N.Y.S.2d 463 at 468, 380 N.E.2d 290 (1978).

Here, when Defendant asked if he could "make any phone calls" *for the purpose of obtaining counsel*, Detective Cereghino responded, "Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak with me without a lawyer being present." In other words, the detective seemed to think, Defendant could eventually have his phone call to speak with a lawyer, but not until the detective had questioned Defendant further.[1] However, as shown by the cases, as

---

[1] In fact, towards the end of the interview, using the phone was still on Defendant's mind, Detective Aponte having asked him, "You got to go to the bathroom or anything?" Defendant answered with a question: "I can't call nobody?" People's Hearing Exhibit 3, p. 175. In response, Detective Aponte indicated he would "talk to the detective" (presumably about Defendant's request), but switched back to the subject of the bathroom [*id.*, pp. 175-76] with no indication found in the record showing Defendant was afforded that phone call. Also at the end of the "interview," Defendant was offered "water or anything" by Detective Cereghino, and Defendant asked, yet again, if he could make a "phone call." People's Hearing Exhibit 3, p. 177. At this point, Cereghino seemed agreeable, saying, "Yeah, one second." But then he added this question: "Who do you want to call?" *Id.* While Cereghino's question seems to suggest he was fine with Defendant calling his mother, he would have been less than fine with Defendant calling someone else, such as a lawyer.

soon as Defendant raised the question with Detective Cereghino, the detective should

not have proceeded further in the absence of counsel for Defendant.

In *Woodard, supra,* the following exchange took place between a detective and

a suspect in custody, and is directly on point with the undisputed facts in the case at

bar:

> Q. Knowing all these rights and understanding them,
> do you want to talk to me about what happened that night
> or sometime back in March?
> A. May I have Legal Aid?
> Q. You have a right to have a lawyer present, but I'm
> just asking you whether or not you wish to waive that right
> and speak to me. You have a right to waive that right if you
> wish.
> A. I'll speak to you.
> Q. So, you will waive those rights?
> A. Yes.
> Q. And you understand them?
> A. Yes.
> Q. On March 5, 1974, do you recall where you were?
> A. Yes.

*Woodard, supra* at 517, 406 N.Y.S.2d at 791.

Thus, the court in *Woodard* found that the defendant's right to counsel had

been violated where, having requested counsel, the detective was *prohibited from*

*obtaining a waiver from the defendant in the absence of counsel* as well as from

taking a statement. *Id.* at 518.

Consider these observations of the Court of Appeals in *Cunningham, supra*:

On at least two occasions, defendant unequivocally stated his desire to consult with an attorney before speaking to the police about the crime for which he was being held in custody. Although he subsequently indicated his willingness to forego his right to counsel without prompting from the police, his decision *cannot be deemed to represent an informed choice, since it was made in the absence of requested counsel.* Having asserted his right to counsel, defendant was entitled to have the benefit of an attorney's advice before deciding whether to waive that right, and any statement obtained in violation of that principle should have been suppressed.

*Cunningham*, *supra* at 210, 424 N.Y.S.2d at 426 (emphasis added).

Particularly troubling with the trial court's ruling in the case at bar that allowed the DVD to be used for impeachment in the event Defendant testified in his own defense is certain indicia of involuntariness seen thereon showing, for example, Defendant confused and, at times, dazed and near exhaustion.[1] Additionally, when confronted by Detective Aponte (at approximately 1:27:30 on the DVD) about his story allegedly "not making sense," Defendant does indicate that he would benefit from the presence of a Spanish interpreter. [Hearing Exhibit 3, p. 68 (lines 68 & 23-25)]

Additionally, Defendant is confronted with a statement that he didn't know Jennifer Villatoro's name but later says he did know her name. [Hearing Exhibit 3,

---

[1] At least twice, when left alone, Defendant is seen sleeping, the first time from approximately 2:08 until 2:40, when he stirs, leans the other way, and appears to sleep again until 2:49:46; and the second time from approximately 5:06 until Detective Cereghino reenters the room at 5:15:28.

pp. 53-54] When he denies that anything happened with her in the park, Detective Cereghino charges that Jennifer has "been examined" and then tells Defendant that "something happened" [*Id.*, pp. 100-01], thereby suggesting, inaccurately, that the examination proved a rape.

But significant also is the prejudice that would inure to Defendant by the detectives' accusations. In fact, confronted by the detectives without counsel, a number of times Defendant says he doesn't "think" he killed the deceased. [Hearing Exhibit 3, pp. 25 ], saying also, however, that he was told by others that he had killed him [*id.*, pp. 80, 92-95].

Indeed, the numerous accusatory statements made by Detective Aponte, as seen on the DVD, also would have dissuaded Defendant from testifying in his own defense. For example, the detective is seen on the DVD saying that Defendant will "have to think through what he's telling them" [*id.*, p. 105] and that he has "got to do a better job explaining" [*id.*, pp. 109-10]; that he will be "better off saying the truth" [*id.*, p. 134]; and charges that Defendant knows whether or not he stabbed the deceased [*id.*, pp. 136-37].

In fact, no less than three times Detective Aponte is seen on the DVD charging Defendant with having contrived a "story," a "story" that "doesn't make sense" [Hearing Exhibit 3, p. 68], and charging that Defendant must know "at some point this is going to go to court" [*id.*, pp. 104-05]:

-55-

And then in court the story you're going to say is, "Maybe I stabbed him, maybe I didn't stab him. I don't remember. I know he died because he was stabbed, but I don't remember. Maybe I stabbed him. Maybe somebody gave me the knife. Maybe somebody didn't give me the" — that stuff — *that's the story you're going to go in and explain to a judge, a jury.* You got to think that through yourself, my man.

[Hearing Exhibit 3, p. 105 (emphasis added)][1]

Detective Cereghino, too, is seen on the DVD at approximately 4:07:23, asking this question twice: "Would you believe you?" [Hearing Exhibit 3, p. 180 (lines 13-17)]

These are the types of statements by unsworn witnesses that would likely dissuade a defendant from taking the stand in his own defense. Thus, it cannot be said that Defendant's decision not to testify in his own defense was an unfettered choice.

It is apparent from the record in this case that Mincey's statements were not "the product of his free and rational choice." Greenwald v. Wisconsin, 390 U.S. 519 at 521 [1968]. To the contrary, the undisputed evidence makes clear that Mincey wanted not to answer Detective Hust. But Mincey was weakened by pain and shock, *isolated from family, friends, and legal counsel* [emphasis added], and barely conscious, and his will was simply overborne. *Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial.*

*Mincey v. Arizona, supra* at 401-02.

---

[1]See also Hearing Exhibit 3, p. 133 ("And the best story you can think of is 'I don't know whether I had a knife or not'?").

## DEFENDANT'S CONVICTION MUST BE REVERSED, THIS MATTER REMANDED FOR A NEW TRIAL.

Because the record shows that Defendant's right to counsel was unequivocally violated and that the trial court wrongfully permitted the People's use at trial of Defendant's video-recorded statements to law enforcement, Defendant was denied a fair trial.

Accordingly, Defendant's judgment of conviction must be reversed, this matter remanded for a new trial at which Defendant will be afforded his right to testify in his own defense unfettered by the possible use against him of the aforesaid, illegally-obtained post-Miranda statements.

## <u>CONCLUSION</u>

Defendant's second-degree murder conviction and his conviction of the weapons charge under the indictment's fifth count must be reversed, the indictment's first and fifth counts dismissed where the evidence was legally insufficient to sustain those convictions. Similarly, where the weight of the evidence failed to prove Defendant guilty beyond a reasonable doubt of first-degree rape under Penal Law 130.35(3), Defendant's conviction of this crime must be reversed, the indictment's second count dismissed.

Alternatively, where the indictment's sexual assault and rape counts should have been severed from the homicide and weapons counts, Defendant's judgment of conviction must be reversed, this matter remanded for separate trials on the separate classes of offenses.

As a final alternative, where Defendant's right to a fair trial was impermissibly compromised by the trial judge's failure to suppress for all purposes Defendant's video-recorded statement to police detectives taken in violation of Defendant's request for counsel, Defendant's judgment of conviction must be reversed, a new trial ordered with a direction that those statements not be used *for any purpose at such trial.*

Respectfully submitted,

ANDREW E. MacASKILL
Attorney for Defendant

Westbury, New York
April 16, 2014

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

              -against-

ULISES BONILLA,

                  Defendant-Appellant.

-----------------------------------------------------------------X

CASE #2012-05037

Nassau County
Indictment
#202/2011

## CERTIFICATION OF COMPLIANCE WITH RULE 670.10.3(f)

This brief, was prepared on a computer in a 14-point Times New Roman typeface (12-point for footnotes), double-spaced (single-spaced for headings, block quotations, and footnotes) and, exclusive of the cover page, the statement pursuant to CPLR 5531, the table of contents, the preliminary statement, the "questions presented," this "certification of compliance," and the table of authorities which follows, consists of 13,941 words (less than 14,000) as determined by the processing system used to prepare the brief, to wit: WordPerfect 11.0.0.300.

                         Respectfully submitted,

                         ANDREW E. MacASKILL
                       *Attorney for Defendant-Appellant*

Westbury, New York
April 16, 2014

## **TABLE OF AUTHORITIES**

*Harris v. New York*, 401 U.S. 222 (1971) . . . . . . . . . . . . . . . . . . . . . . 43, 47, 48

*In re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jackson v. Commonwealth of Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . 19

*Mapp v. Ohio*, 367 U.S. 643 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Mincey v. Arizona*, 437 U.S.385 (1978) . . . . . . . . . . . . . . . . . . . . . . . 43, 56

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . 45, 47

*Oregon v. Hass*, 420 U.S. 714 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*People v Ramos*, 40 N.Y.2d 610, 389 N.Y.S.2d 299, 357 N.E.2d 955 (1976) . . . 46

*People v. Acosta*, 80 N.Y.2d 665, 593 N.Y.S.2d 978, 609 N.E.2d 518 (1993) . . 11

*People v. Aponte*, 69 A.D.2d 204, 418 N.Y.S.2d 651 (2nd Dep't 1979) . . . . . . . 45

*People v. Benzinger*, 36 N.Y.2d 29, 364 N.Y.S.2d 855, 324 N.E.2d 334 (1983)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21-24, 29

*People v. Burdo*, 91 N.Y.2d 146, 667 N.Y.S.2d 970, 690 N.E.2d 854 (1997) . . . 45

*People v. Buxton*, 44 N.Y.2d 33, 403 N.Y.S.2d 487, 374 N.E.2d 384 (1978) . . . 52

*People v. Cantres*, 238 A.D.2d 56, 667 N.Y.S.2d 36 (1st Dep't 1997) . . . . . . . 24

*People v. Carter*, 63 N.Y.2d 530, 483 N.Y.S.2d 654, 473 N.E.2d 6 (1984) . . . . 20

*People v. Clark*, 24 A.D.3rd 225, 806 N.Y.S.2d 834 (4th Dep't 2005) . . . . . . . 37

*People v. Clark*, 45 N.Y.2d 432, 408 N.Y.S.2d 463, 380 N.E.2d 290 (1978) . . . 52

*People v. Cleague*, 22 N.Y.2d 363, 292 N.Y.S.2d 861, 239 N.E.2d 617 (1968)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*People v. Connors*, 83 A.D.2d 640, 441 N.Y.S.2d 523 (2d Dep't 1981) . . . . . . . 42

*People v. Cunningham*, 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 53, 54

*People v. Dabbs*, 192 A.D.2d 932, 596 N.Y.S.2d 893 (3rd Dep't 1993) . . . . 38, 42

*People v. Egan*, 72 A.D.2d 239, 424 N.Y.S.2d 546 (4th Dep't 1980) . . . . . . . . 21

*People v. Esposito*, 68 N.Y.2d 961, 510 N.Y.S.2d 542, 503 N.E.2d 98 (1986) . . 52

*People v. Garafolo*, 44 A.D.2d 86, 353 N.Y.S.2d 500 (2d Dep't 1974) . . . . . . . 13

*People v. Garcia*, 272 A.D.2d 189, 707 N.Y.S.2d 441 (1st Dep't 2000) . . . . . . . . . . . . . 21

*People v. Harris*, 77 N.Y.2d 434, 568 N.Y.S.2d 702, 570 N.E.2d 1051 (1991)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*People v. Hunt*, 39 A.D.3rd 961, 833 N.Y.S.2d 731 (3rd Dep't 2007) . . . . . . . 37

*People v. Jenkins*, 50 N.Y.2d 981, 431 N.Y.S.2d 471, 409 N.E.2d 944 (1980) . . 37

*People v. Jones*, 21 A.D.3rd 429, 799 N.Y.S.2d 783 (2nd Dep't 2005) . . . . . . 51

*People v. Marin*, 102 A.D.2d 14, 478 N.Y.S.2d 650 (2d Dep't 1984) . . . . . . 18, 19

*People v. McLean*, 107 A.D.2d 167, 485 N.Y.S.2d 1019 (1st Dep't 1985) . . 14, 18

*People v. Negron*, 105 Misc. 2d 492, 432 N.Y.S.2d 348 (Sup. Ct., N.Y. County
1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Pierce*, 14 N.Y.3rd 564, 904 N.Y.S.2d 255, 930 N.E.2d 176 (2010) . 34,
37, 38

*People v. Porter*, 9 N.Y.3d 966, 848 N.Y.S.2d 583, 878 N.E.2d 998 (2007) . . . 51

*People v. Shapiro*, 50 N.Y.2d 747, 431 N.Y.S.2d 422, 409 N.E.2d 897 (1980)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

*People v. Skinner*, 52 N.Y.2d 24, 436 N.Y.S.2d 207, 417 N.E.2d 501 (1980) . . 46

*People v. Stanfield*, 7 A.D.3rd 918, 777 N.Y.S.2d 546 (3rd Dep't 2004) . . . . . . 23

*People v. Steward*, 88 N.Y.2d 496, 646 N.Y.S.2d 974, 670 N.E.2d 214 (1996)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Suffern*, 267 N.Y. 115 (1935) . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Vitalis*, 67 A.D.2d 498, 415 N.Y.S.2d 708 (2d Dep't 1979) . . . . . . . 14

*People v. White*, 155 A.D.2d 934, 548 N.Y.S.2d 119 (4th Dep't 1989) . . . . . . . 19

*People v. Woodard*, 64 A.D.2d 517, 406 N.Y.S.2d 790 (1st Dep't 1978) . . . 46, 53

*Tibbs v. Florida*, 457 U.S. 31 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**EXHIBIT B**



WESTLAW

View New York Official Reports version

25 N.Y.3d 1198

(The decision of the Court of Appeals of New York is referenced in the North Eastern

**People v. Bonilla**

Court of Appeals of New York | July 29, 2015 | 25 N.Y.3d 1198 | 37 N.E.3d 1164 | 16 N.Y.S.3d 521 (Table) | *(Approx. 1 page)*

Court of Appeals of New York

People

v.

Ulises Bonilla

July 29, 2015

2d Dept.: 127 A.D.3d 985, 6 N.Y.S.3d 147 (Nassau)

**Opinion**

Fahey, J.

Denied.

**All Citations**

25 N.Y.3d 1198, 37 N.E.3d 1164, 16 N.Y.S.3d 521 (Table)

---

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.