```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU:  PART 29
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                    Ind. No.
                                      202N/11
 4           -against-
                                      Hearing
 5   ULISES A. BONILLA,

 6                    Defendant.
     ----------------------------------------X
 7

 8                               August 17, 2011

 9                               Nassau County Court
                                 262 Old Country Road
10                               Mineola, NY 11501

11   B E F O R E :
               THE HONORABLE ALAN L. HONOROF,
12                               Acting Supreme Court Justice

13   A P P E A R A N C E S :
     For the People:
14        THE HONORABLE KATHLEEN M. RICE,
          District Attorney, Nassau County,
15        By:  ZEENA ABDI, ESQ.,
          Assistant District Attorney
16
     For the Defendant:
17        DANIEL MILLMAN, ESQ.

18   AIXA CRUZ-FALUM,
     REYNALDO PALANCO,
19   Official Spanish Interpreters

20                               CATHERINE R. PARKER,
                                 Official Court Reporter
21

22

23                               NASSAU COUNTY
                                 D.A.'S OFF. (M.O.)

24                               2014 AUG 18  AM 11: 26

25                               RECEIVED
```

1          THE CLERK:  Following case is on for hearing,

2     People against Ulises Bonilla under indictment 202N of

3     2011.

4          Let the record reflect the presence of the

5     Official Spanish language interpreter.  Would she give

6     her appearance, please?

7          THE INTERPRETER:  Aixa Cruz-Falum.

8          MS. ABDI:  Zeena Abdi, Assistant District

9     Attorney.

10          THE CLERK:  For the defendant?

11          MR. MILLMAN:  Daniel Millman, 316-A Main

12     Street, Roslyn, New York.

13          Good morning, your Honor.

14          THE COURT:  Good morning.

15          THE CLERK:  Sir, you're Ulises Bonilla?

16          THE DEFENDANT:  Yes.

17          THE CLERK:  People ready?

18          MS. ABDI:  Yes.

19          THE CLERK:  Defendant ready?

20          MR. MILLMAN:  Yes.

21          THE COURT:  All right.  Would you describe

22     the scope of the hearing, please, and discuss the

23     Rosario?

24          MS. ABDI:  Yes, your Honor, the People have

25     provided defense counsel with pages number 1 through

1       823 earlier this morning.  I've also given defense

2       counsel a copy of the transcript that the People have

3       prepared of the recorded video statement in this case.

4                  Today the case is on for a Huntley-Mapp

5       hearing, the substance of which are oral statements

6       made at the time of arrest, and a recorded video

7       statement that the defendant gave as well on his date

8       of arrest in the Homicide Squad.  And there was also

9       some personal property that was taken incident to

10      arrest.  That's the Mapp portion of the hearing.

11                 THE COURT:  Acknowledge receipt, counsel?

12                 MR. MILLMAN:  Yes.  I have acknowledged

13      receipt.  You know, the materials that I received were

14      I believe about 822 pages, so I've been trying to

15      review them as quickly as possible, your Honor.  Just

16      given the seriousness of the charges and everything

17      else, I want to be sure I go through everything before

18      we proceed, but, you know, I would be ready to proceed

19      certainly as discussed.

20                 THE COURT:  All right.  2 o'clock.

21                 MR. MILLMAN:  I did want to state I can't

22      speak of course for Ms. Abdi, but I think she'd

23      probably agree we could not finish the hearing in an

24      hour.

25                 THE COURT:  I'm sure we can't.  That's why

cp

1      I'm letting you know I'm available all day tomorrow.

2                  MR. MILLMAN:  Fair enough, your Honor.

3                  THE COURT:  See you at 2.

4                  L U N C H E O N   R E C E S S.

5                  AFTERNOON SESSION.

6                  THE COURT:  Good afternoon.  Ms. Abdi, call

7      your first witness.

8                  THE CLERK:  Let the record reflect attorneys

9      are present, defendant is present, but there's a new

10     Spanish language interpreter.

11                 Appearance, please.

12                 THE INTERPRETER:  Reynaldo Palanco, Spanish

13     Interpreter.

14                 THE CLERK:  Thank you.

15                 MS. ABDI:  Your Honor, the People call

16     Detective James Cereghino.

17                 MR. MILLMAN:  Actually, before we call the

18     witness, Judge, just one brief point.

19                 I did notice in my review of the materials

20     that there were certain items of Rosario that were

21     referred to that were not contained in the packet and

22     also some redactions.  In light of that time and I

23     guess the assurance that I'll have tomorrow anyway to

24     do cross-examination as well, I was going to suggest

25     that I not discuss them specifically now unless your

1       Honor indicates --

2               THE COURT:  No, you're going to have plenty

3       of time after I leave to talk to Zena.

4               MR. MILLMAN:  I thought we could resolve some

5       of the issues and I just don't want to waive any

6       issues.

7               THE COURT:  I'm not going to curtail your

8       cross-examination.  Like I said, we have all day

9       tomorrow.

10              MS. ABDI:  Detective James Cereghino.

11      J A M E S   C E R E G H I N O, Detective, a witness

12      called on behalf of the People, after having been

13      first duly sworn and having stated his shield

14      number as 561 and his command as the Homicide

15      Squad, Nassau County Police Department, took the

16      witness stand and testified as follows:

17              THE CLERK:  In a clear, loud voice, please

18      state your name with spelling, your shield number and

19      command for the record.

20              THE WITNESS:  My first name is James, my last

21      name name Cereghino, C-E-R-E-G-H-I-N-O, my shield

22      number is 561, and I'm a detective assigned to the

23      Homicide Squad of the Nassau County Police Department.

24              MS. ABDI:  May I proceed, your Honor?

25              THE COURT:  Please.

1              MS. ABDI:   Thank you.

2    DIRECT EXAMINATION

3    BY MS. ABDI:

4         Q      Good afternoon, detective.

5         A      Good afternoon, counsel.

6         Q      How long have you been a police officer in Nassau

7    County?

8         A      A little over 34 years, 34 and a-half.

9         Q      And how long have you been a detective?

10        A      I've been in the Detective Division since 1987,

11   so about 24 years.

12        Q      How long have you been assigned to the Homicide

13   Squad?

14        A      13 and a-half years.

15               THE INTERPRETER:   Your Honor, I'm sorry.   I'm

16        having trouble hearing.

17               MR. MILLMAN:   Me too, having trouble.

18               THE COURT:   Is that microphone on?

19               THE WITNESS:   Yes, I'll use it.

20               THE COURT:   He said he's been a homicide

21        detective 13 and a-half years.

22               MR. MILLMAN:   Thank you, your Honor.

23        Q      I'm going to direct your attention now to

24   September 28 of 2010.

25               Were you assigned to the Homicide Squad on that

1    date?

2         A    Yes, I was.

3         Q    And on that date, did you become involved in the

4    investigation of a stabbing that occurred in the vicinity of

5    180 Kinkel Street?

6                   THE COURT:   I'm sorry.   What?

7                   MS. ABDI:   180 Kinkel Street.

8                   THE COURT:   1-8-0?

9                   MS. ABDI:   Kinkel Street.

10        Q    And that's in Westbury, Nassau County, New York?

11        A    Yes, I did.

12        Q    How did you become involved in that

13   investigation?

14        A    I received a telephone call from Detective

15   Vacchiano, V-A-C-C-H-I-A-N-O, from the Third Squad advising

16   that there had been a stabbing at that location in the

17   street and that the victim had died.

18                  THE COURT:   Excuse me, Ms. Abdi, one second.

19                  (Pause.)

20                  THE COURT:   I'm sorry.   Please continue.

21        Q    And what was the name of the victim?

22        A    Armando Villatoro, V-I-L-L-A-T-O-R-O.

23        Q    And were you aware of his address?

24        A    Yes, he lived at 180 Kinkel.

25        Q    Did there come a time when you responded to 180

1    Kinkel Street?

2         A    I arrived at the scene at approximately 11:40

3    p.m., 11:40 p.m. on the 28th.

4         Q    And what did you do when you responded to the

5    scene?

6         A    I spoke to the detectives from the Third Squad

7    who were at the scene.  I was advised that there were some

8    witnesses there.  I took a brief overview of the scene and

9    then I did a cursory interview of Nancy Villatoro, Jocelyn

10   Gonzalez, Oscar -- and Oscar Villatoro.

11        Q    And, in general, what information did you learn

12   from speaking with those individuals?

13        A    That there had been a fight in the street between

14   my victim and Ulises Bonilla where my victim was fatally

15   stabbed.

16        Q    And with regard to the name Ulises Bonilla, how

17   did you come to arrive at that name?

18        A    I was told it by the witnesses that he was a

19   neighbor of theirs, that he lived down the block and that

20   some of the -- one of the witnesses, Jocelyn Gonzalez, had

21   known him for four years.

22        Q    And did any of the other witnesses know him?

23        A    Yes, the other witnesses, Suzanna Villatoro,

24   Oscar Villatoro and Nancy Villatoro.

25        Q    And approximately how long did those individuals

1   say that they had known Ulises Bonilla?

2        A      For a period of time either as neighbors or from

3   siblings having gone to school with him.

4        Q      And how many years did they say that they had

5   known Ulises Bonilla?

6        A      It was a few years.  I forget exactly how many.

7        Q      And where did Ulises Bonilla reside?

8        A      163 Kinkel Street.

9        Q      And is it fair to say that that is down the

10  street from 180 Kinkel Street?

11       A      I would say it's on the opposite side of the

12  street four or five houses down.

13       Q      And with respect to Ulises Bonilla, Ulises

14  Bonilla's participation in the altercation, what did the

15  witnesses tell you with regard to that?

16       A      Two of the witnesses were sitting in a car in

17  front of the 180 Kinkel Street prior to the altercation;

18  Jocelyn Gonzalez and Nancy Villatoro.

19              Nancy had observed Ulises sitting on a fence post

20  across the street in front of 179 Kinkel for approximately

21  twenty minutes before he approached the car.  He approached

22  the car and he asked -- he asked Nancy where her father was

23  and that she told him that he was at the deli.

24              Ulises then told Nancy that he wanted to fuck him

25  up, and then as they were talking, the deceased came walking

1    down southbound on Kinkel towards 180.

2        Q    And what did you learn from speaking with the

3    witnesses about what happened next?

4        A    According to witness, Jocelyn, she said Armando

5    responded to 180.  He went to turn up the driveway towards

6    his residence when Ulises, who was standing in the middle of

7    the street, said something to Armando.  Armando then went at

8    him and that they -- they started to fight.

9        Q    And what did they indicate happened to Armando?

10       A    Nancy stated that -- that Ulises had a tire iron,

11   that he swung it at Armando, that Armando was able to take

12   it away from him and that they continued to fight.

13           At some point, Ulises's sister showed up and she

14   was striking Armando on the back with her hands.  Witness

15   Suzanna Villatoro who was in 180 Kinkel was in the house

16   while this was going on, looked out the window, saw what was

17   going on.  She told her twelve-year-old-son Oscar and they

18   both exited the house.

19           As they exited the house, Ulises and Armando were

20   still engaged.  Suzanna, as Armando walked away from Ulises,

21   she went to help him.  She told -- Suzanna told -- yelled

22   that she was going to call the cops.  As she was assisting

23   her husband back towards the house, Armando collapsed on the

24   front lawn and he was bleeding extensively from the chest

25   area.

1     Q     Detective, were you aware of the injuries that

2   Armando Villatoro suffered?

3     A     Yes.

4     Q     And what were those injuries?

5     A     I believe it was twelve stab wounds in the chest

6   area.

7     Q     And at some -- some point did the witnesses that

8   you spoke with indicate where Ulises Bonilla had gone after

9   the altercation?

10    A     Two of the witnesses, Nancy and Oscar, said they

11  saw -- they saw Ulises, his sister, Dianna, and Misael

12  Berrios go southbound towards Ulises's residence at 163

13  Kinkel.  And two of them, Nancy and Ulises, saw Dianna,

14  Ulises and Misael enter a car in the driveway of 163 Kinkel,

15  saw the car back out and head southbound on Kinkel away from

16  180.

17    Q     Now were you able to -- withdrawn.

18          Did you observe during the course of your

19  examination of the scene, did you observe -- were you able

20  to observe a knife at the scene?

21    A     Yes.

22    Q     And where was that located, approximately?

23    A     It was in the street against the curb right in

24  the vicinity of 163 Kinkel.

25    Q     Now the witnesses that you spoke with indicated

 1    that Ulises Bonilla, he was known to them; is that correct?

 2         A    Yes.

 3         Q    And that was from being their neighbor; is that

 4    correct?

 5         A    Yes, with the exception of Jocelyn Gonzalez who

 6    was friends with him and had known him for at least four

 7    years.

 8         Q    And did the witnesses indicate who was the

 9    individual that was primarily engaged in the altercation

10    with Armando Villatoro?

11         A    Yes, it was Ulises Bonilla.

12         Q    Now at some point, did you make any effort to

13    locate Ulises Bonilla?

14         A    Yes, we did.

15         Q    What did you do?

16         A    We had the house under surveillance, we had

17    friends under surveillance, we found out that he had a

18    girlfriend, Zeida Bonilla, who lived at twenty-three James

19    Street in Hicksville.  We had that residence under

20    surveillance.

21              A relative of the deceased had told me that

22    Ulises had a Myspace account.  We attempted to locate him

23    there along with tracking him through his cell phone.

24         Q    And did you have to use any devices to ascertain

25    the location of Ulises Bonilla?

1       A       Yes, through his phone, we had pen register, trap

2   and trace trying to locate his phone, and as I said with the

3   Myspace account, we had him on the account up in the Boston

4   area beginning of October, October 4th or 5th.

5               We also -- I had received an anonymous phone call

6   from a Crime Stoppers tipster stating that he had gone up to

7   Boston.

8       Q       And did you also attempt to find out -- well,

9   withdrawn.

10              Did you search any other places for the

11  defendant?

12      A       Yes, we subsequently interviewed Zeida Bonilla

13  and she told us that he was back -- he was back in town;

14  that he was working at a horse farm up in Old Brookville.

15  She took us up there at night, pointed it out to us.  We

16  checked it the next day.  We spoke to the owners and the

17  owners and the workers there, no one seemed to know or had

18  ever seen Ulises Bonilla.

19              We then reinterviewed Zeida Bonilla and then she

20  then told us that she did take him up there, but then she

21  subsequently took him to another horse farm out in Fort

22  Salanga.  We responded there in the early morning hours.  We

23  hit the -- we hit the area and we knocked on the door where

24  we believed he was staying and we subsequently found out

25  that he had -- he had left the night before through other

1    interviews and the person who drove him away and dropped him
2    off at the train station.  But when he left, he left some
3    paperwork there indicating a new account with a new cell
4    phone and we used that cell phone to track him.

5        Q    And that was one of the pen registers you were
6    speaking of; correct?

7        A    Yes, ma'am.

8        Q    When you were at the scene, were you aware of
9    a -- well, withdrawn.

10        Did you ever ascertain what the reason for the
11   disturbance was between Ulises Bonilla and Armando Villatoro
12   that night?

13       A    Yes.  Nancy, who was the 15-year-old daughter of
14   the deceased, had told us -- this was the 28th, Tuesday --
15   the prior Friday night, the family had found out that Ulises
16   and Nancy's ten-year-old sister, Jennifer, had been in the
17   park together, and that there had been some sexual contact
18   and that was the reason for the problems between Ulises and
19   Armando.

20       Q    And that's information you had ascertained that
21   evening as well; correct?

22       A    Yes, at the scene, the very initial stages of the
23   investigation.

24       Q    Now did there come a time that you did locate
25   Ulises Bonilla?

1        A      Yes.

2        Q      And on what date was that?

3        A      November 26, 2010.

4        Q      And how did you come to locate him on that date?

5        A      We, with the new phone number, we -- I applied

6    for a pen register and trap and trace, and we were able to

7    track him with the phone with the assistance of our

8    Electronics Squad to Penn Station in Manhattan.

9        Q      And did you respond to Penn Station in Manhattan

10   on November 26, 2010?

11       A      Yes, ma'am.

12       Q      And who did you respond to Penn Station with?

13       A      The members of the Electronics Squad who were

14   tracking the phone, the members of the Bureau of Special

15   Operations plain clothes, Detective-Sergeant Lesmeister,

16   Detective Sulz from the Third Squad, and Detective Aponte

17   from my office.

18       Q      And can you describe the circumstances

19   surrounding your observation of Ulises Bonilla at Penn

20   Station?

21       A      When I met with Detective-Sergeant Devon Ross

22   from the Electronics Squad where we were standing in Penn

23   Station, he indicated to me through his electronic devices,

24   that the cell phone that Ulises Bonilla was in possession of

25   was within 50 feet of us.

1        I looked -- I looked around, I saw a subject

2   standing against the wall who fit the description of Ulises

3   Bonilla, I walked over to him.  He had a scarf covering his

4   neck.  He had a hood over his head.  I went up to him and I

5   asked him, se yamo.  I asked him his name in Spanish.  He

6   didn't answer me.  I asked him what is your name in English.

7   He said to me, Ulises.  I reached up, I pulled down the

8   scarf, I saw the tattoo of his mother's name, and at that

9   time, he was placed under arrest.

10       Q       And did Ulises Bonilla have any identifying marks

11  on him?

12       A       Yes.  On the left side of his neck in script, he

13  had his mother's name, Reina, R-E-I-N-A, and covering his

14  whole right arm was tattoos of either words or pictures.

15       Q       And approximately what time was he placed under

16  arrest?

17       A       11:30 p.m.

18       Q       And that's on November 26 of 2010?

19       A       Yes, ma'am.

20       Q       From Penn Station, where do you go next?

21       A       We walked him out to our cars, we put him in and

22  we transport him back to the Homicide Squad at headquarters,

23  1490 Franklin Avenue, Mineola, New York.

24       Q       And which car -- who was driving that he was

25  placed in?

1       A       I believe it was Sergeant Lesmeister.

2       Q       And was there any conversation between yourself

3   and Ulises Bonilla on the car ride to the Homicide Squad?

4       A       I just indicated to him I wanted to talk to him,

5   but we would wait until we got back to headquarters where I

6   could advise him of his rights and then I wanted to speak to

7   him.

8       Q       Did he say anything to you?

9       A       Very briefly he stated, I wanted to be out for

10  Christmas.  And then a short time later, he made a brief

11  mention that he was hungry, that he hadn't eaten in four

12  days.

13      Q       And was that in response to any questioning that

14  you had done at that time?

15      A       No, ma'am.

16      Q       And Ulises Bonilla, was he transported in the car

17  you were in; is that correct?

18      A       I was sitting in the back seat with him, yes.

19      Q       At any point during the car ride, did you make

20  any promises to Mr. Bonilla?

21      A       No, ma'am.

22      Q       At any point did you make any threats to

23  Mr. Bonilla?

24      A       No, ma'am.

25      Q       Did you hear anyone else make any threats to

1    Mr. Bonilla?

2         A    No, ma'am.

3         Q    Did you here anyone else make any promises to

4    him?

5         A    No, ma'am.

6         Q    And, detective, do you see Ulises Bonilla in the

7    courtroom today?

8         A    Yes, I do.

9         Q    Can you please point him out and identify an

10   article of clothing that he's wearing?

11        A    He's the male Hispanic at the table sitting in

12   the middle with the white collared shirt, button-down shirt.

13                   (Indicating.)

14              MS. ABDI:  Your Honor, may the record reflect

15         the witness has identified the defendant?

16                   THE COURT:  Yes.

17        Q    Now, detective, did Mr. Bonilla, has his

18   appearance changed in any way from when you encountered him

19   on November 26th of 2010?

20        A    Looks like his hair his shorter.  He looks like

21   he might have lost some weight.

22        Q    And on November 26 of 2010, had his appearance

23   changed in any way from September 28th of 2010?

24        A    Well, he did tell us that he had cut his hair

25   'cause his hair -- he had been described by Nancy Villatoro

1    has having long enough hair to have a ponytail, and that was

2    gone.

3        Q    Now approximately what time did you arrive at the

4    Homicide Squad?

5        A    About 12:30 a.m.

6        Q    And now we're talking about November 27th of

7    2010; is that correct?

8        A    The early morning hours, yes, ma'am.

9        Q    And where was Mr. Bonilla brought when he arrived

10   at the Homicide Squad?

11       A    He was brought into one of the interview rooms, I

12   believe interview room number two.

13       Q    And is there recording equipment in -- in that

14   interview room?

15       A    Yes, ma'am.

16       Q    And where does that equipment record to?

17       A    Excuse me?

18       Q    Where does that equipment record to?

19       A    Equipment in another room that memorializes the

20   interview.

21       Q    When Mr. Bonilla was brought into interview room

22   number two or whichever interview room he was brought in,

23   was the time he spent in that interview room, was that

24   recorded?

25       A    Yes, ma'am.

1      Q      Now did there come a time when you spoke with

2   Ulises Bonilla?

3      A      Yes, ma'am.

4      Q      And was there anyone present while you were

5   speaking with Ulises Bonilla?

6      A      Yes, my partner, Detective Milton Aponte.

7      Q      And was the entire substance of your conversation

8   contained within the interview room?

9      A      Yes, ma'am.

10      Q      And that conversation was recorded; is that

11   correct?

12      A      Yes, ma'am.

13      Q      Now when you were speaking with Ulises Bonilla on

14   November 27th of 2010, what language were you speaking?

15      A      English.

16      Q      And did he appear to understand you when you were

17   speaking English?

18      A      Yes, ma'am.

19      Q      And did you understand -- and what language did

20   he speak to you?

21      A      English.

22      Q      And did you understand him when he was speaking

23   to you?

24      A      Yes, ma'am.

25      Q      Now did you read Mr. Bonilla his rights?

1          A     Yes, I did.

2          Q     And how did you advise him of his rights?

3          A     I read them verbatim from departmental form 207,

4    notification of rights.

5          Q     And is that depicted on the recording that

6    evening?

7          A     Yes, ma'am.

8          Q     Now when you advised him of the rights from that

9    card, did you have him make any notations on that card?

10         A     No, ma'am.

11         Q     Did you make any notations on the card?

12         A     I believe I signed my name, I put my shield

13   number on it and I put the date and time.

14         Q     I'd like to show you what --

15               MS. ABDI:  Actually, before I do that, I'd

16         like to have this marked as People's Exhibit 1 for

17         identification.

18               THE COURT:  We'll deem it, make a photocopy

19         of it in the event that it goes into evidence.

20         Photocopy, provided Mr. Millman agrees it's an exact

21         photocopy will be the marked item.  So it's deemed now

22         People's 1.

23               (Whereupon, People's Exhibit 1 was deemed

24         marked for identification.)

25         Q     I ask if you could take a look at that.

1          (Handed to witness.)

2          A     This is the rights card that I used to advise

3    Mr. Bonilla of his rights. There's no time on the card,

4    just the date of November 27th, 2010 with my signature and

5    my print of my shield number.

6          Q     And is that the exact card that you read to

7    Mr. Bonilla on November 27th of 2010?

8          A     Yes.  Yes, ma'am.

9          Q     And you recognize it as such because of the

10   notations which are just described to the Court; is that

11   right?

12         A     Yes, ma'am.

13              MS. ABDI:  Your Honor, at this time, I offer

14         People's 1 into evidence.

15              THE COURT:  Please show it to Mr. Millman.

16              (Pause.)

17              MR. MILLMAN:  No objection.

18              THE COURT:  It's received deemed People's 1

19         in evidence.  Between now and when we resume tomorrow,

20         please make a photocopy both sides and we'll have that

21         marked into evidence.

22              MS. ABDI:  Yes, your Honor.

23              (Whereupon, People's Exhibit 1 was deemed

24         marked and received in evidence.)

25              THE COURT:  Detective, did you also read them

1    in Spanish or just in English?

2              THE WITNESS:   I just read them in English.

3         Q    And you say that Detective Aponte was also

4    present for the interview; is that correct?

5         A    Yes, ma'am.

6         Q    And does Detective Aponte speak Spanish?

7         A    Yes, he does.

8         Q    And is he fluent in Spanish?

9         A    Very fluent.

10        Q    Do you speak Spanish?

11        A    Very poor.

12        Q    Detective, I'd like to now show you what's marked

13   as -- actually, sorry.

14             MS. ABDI:   Once again, I'd like to have this

15        marked People's Exhibit 2 for identification.

16             (Whereupon, People's Exhibit 2 was marked for

17        identification.)

18             MS. ABDI:   I ask that be shown to the

19        witness.

20             (Handed to witness.)

21        Q    Detective, do you recognize what that is?

22        A    Yes.

23        Q    What is that?

24        A    This is a DVD copy of my interview with

25   Mr. Bonilla on November 27th, 2010 at the Homicide Squad.

1        Q      And how do you recognize it as such?

2        A      By my markings, my initials.  I dated it

3    yesterday when I viewed it again and I put the name of the

4    defendant, Ulises Bonilla, on it.

5        Q      And that contains the entirety of your -- of the

6    defendant's stay in the interview room on November --

7    November 27th, 2010; is that correct?

8        A      From the moment he walked in to the moment he

9    left to go down to detention, yes, ma'am.

10       Q      And that contains your -- your entire

11   conversation with him; is that correct?

12       A      Yes, ma'am.

13              MS. ABDI:  At this time, I offer People's

14        Exhibit 2 into evidence.

15              THE COURT:  Please show it to Mr. Millman.

16              (Pause.)

17              MR. MILLMAN:  I have no objection.

18              THE COURT:  It's received People's 2 in

19        evidence.

20              (Whereupon, People's Exhibit 2 was marked and

21        received in evidence.)

22       Q      Detective, during your conversation with

23   Mr. Bonilla that I guess early morning hours, did you ever

24   threaten him in any way in order to get him to make a

25   statement?

1          A      No, ma'am.

2          Q      Did you make any any promises in any way?

3          A      No, ma'am.

4          Q      Did you hear Detective Aponte make him any

5     promises?

6          A      No, ma'am.

7          Q      And did you hear Detective Aponte ever threaten

8     the defendant?

9          A      No, ma'am.

10         Q      Now at some point, Ulises Bonilla was brought out

11    of the interview room; is that correct?

12         A      Yes, ma'am.

13         Q      And where was he brought at that time?

14         A      Upon the completion --

15         Q      Yes.

16         A      -- of his processing?  He was brought down to

17    detention.

18         Q      And as a result of his processing, were there any

19    personal items taken from him?

20         A      Yes, ma'am.

21         Q      And do you recall what those items were?

22         A      When we arrested him, he had a bag with some

23    clothes in it, he had a leather piece around his neck, he

24    had the cell phone on him, he had a prayer book, he had I

25    believe $174.58 in assorted currency and coin, and he had a

1  few other items that were listed on his property receipt.

2       Q     Would the property receipt refresh your

3  recollection as to the sum total of those items?

4       A     Yes, ma'am.

5             MS. ABDI:  Your Honor, may I just mark this

6       People's Exhibit 3 for identification?

7             THE COURT:  To refresh his recollection, it

8       doesn't need to be marked.

9             MS. ABDI:  Okay.  I'd ask that be shown to

10      the witness.

11            (Handed to witness.).

12      A     Okay.

13      Q     Detective, does that refresh your recollection as

14 to the items that were taken as part of the arrest

15 processing of Ulises Bonilla?

16      A     Yes.

17      Q     And what were those items?

18      A     Cigarettes, a lighter, chap stick, gloves,

19 deodorant.

20      Q     And that was in addition to the other items that

21 you had already mentioned; is that correct?

22      A     Yes, ma'am.

23            MS. ABDI:  Your Honor, at this time, I'd also

24      like to have this marked as People's Exhibit 4.  I

25      guess I'm going to mark it in evidence.  It's a

1      transcript that I've prepared, transcript that I did

2      not prepare, a transcript prepared for the People,

3      which is a transcript of the recorded conversation

4      between the defendant and the detective.

5              THE COURT:  Mr. Millman, is there any

6      objection to it going directly into evidence?

7              MR. MILLMAN:  With the understanding that --

8      in part.  Let me just explain, your Honor.  The

9      transcript I have not -- I don't know who technically

10     it was prepared by.  What I do know is I already had

11     seen one portion of it.  I read something different

12     than what was in there, could have just been a matter

13     of with his accent hearing it.  I don't know.

14             However, for use as an aid, you know in terms

15     of the Court having something to refer to, I don't have

16     an objection with the understanding that I'm not

17     stipulating to the accuracy of the transcript, so that

18     if there is something I point out that I see

19     differently, I would expect that the Court could find

20     that on the video and make a finding of fact in that

21     regard.

22             With that understanding for the purpose of,

23     you know, an aid to the Court, I don't object.

24             THE COURT:  You would certainly have the same

25     opportunity if this case finds itself in front of the

cp

1    jury to do the same thing, so it is received in

2    evidence People's 3.

3              THE CLERK:  She said 4.

4              MS. ABDI:  I'm sorry, it's 3.

5              (Whereupon, People's Exhibit 3 was marked and

6    received in evidence.)

7              MS. ABDI:  Your Honor, just for clarity

8    because I know there was some confusion, I had marked

9    People's Exhibit 1 in evidence as the rights card.

10             THE COURT:  Right.

11             MS. ABDI:  People's Exhibit 2 as the video in

12   evidence.

13             THE COURT:  Right.

14             MS. ABDI:  And People's Exhibit 3, which is

15   the transcript, in evidence.

16             THE COURT:  Correct.

17             MS. ABDI:  Your Honor, now with the Court's

18   indulgence, I'd just like to play the beginning of the

19   tape which indicates the rights card.

20             THE COURT:  Can you do that in the next ten

21   minutes?

22             MS. ABDI:  Yes, I can.

23             THE COURT:  All right.  Go ahead.  Do you

24   have a copy of this, Mr. Millman?

25             MR. MILLMAN:  Yes, I do.  Thank you.

```
 1                  (Whereupon, People's Exhibit 3 in evidence,
 2         DVD, was played in open court.)
 3                  MS. ABDI:  Your Honor, I'm just going to play
 4         when the defendant was led into the room and then I'm
 5         going to skip ahead to the rights.
 6                  THE COURT:  Okay.
 7                  (Whereupon, People's Exhibit 3 in evidence,
 8         DVD, was played in open court.)
 9                  THE COURT:  Detective, does he know he's
10         being videotaped?
11                  THE WITNESS:  Ah, no, no, sir.
12                  (Whereupon, People's Exhibit 3 in evidence,
13         DVD, was played in open court.)
14                  MS. ABDI:  Judge, it's at this time that I
15         would stop and play the rights, but I know the time.
16         Would you like me to pick that up first thing tomorrow
17         morning?
18                  THE COURT:  Yes, let's do that.  10 o'clock
19         tomorrow.
20                  Sergeant, would you make sure that the
21         defendant is in court at 10 o'clock, please?
22                  THE SERGEANT:  I certainly will.
23                  THE COURT:  Detective, I'll see you tomorrow.
24         Good night, everybody.
25                  (Whereupon, the hearing was adjourned to
```



 1      August 18th, 2011.)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU:  PART 29
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                     Ind. No.
                                       202N/11
 4              -against-
                                       Hearing
 5   ULISES A. BONILLA,

 6                     Defendant.
     ----------------------------------------X
 7

 8                             August 18, 2011

 9                             Nassau County Court
                               262 Old Country Road
10                             Mineola, NY 11501

11   B E F O R E :
                THE HONORABLE ALAN L. HONOROF,
12                             Acting Supreme Court Justice

13   A P P E A R A N C E S :
     For the People:
14        THE HONORABLE KATHLEEN M. RICE,
          District Attorney, Nassau County,
15        By:  ZEENA ABDI, ESQ.,
          Assistant District Attorney
16
     For the Defendant:
17        DANIEL MILLMAN, ESQ.

18   AIXA CRUZ-FALUM,
     KIMBERLY HERNANDEZ,
19   Official Spanish Interpreters

20                            CATHERINE R. PARKER,
                              Official Court Reporter
21

22

23

24

25
```

```
 1                    THE CLERK:  Ulises Bonilla under indictment
 2         202N of 2011.
 3                    Let the record reflect both attorneys are
 4         present, defendant is present, Official Spanish
 5         language interpreter is present.
 6                    Appearance?
 7                    THE INTERPRETER:  Aixa Cruz-Falum.
 8                    THE CLERK:  Detective, you can take the
 9         stand.  You're reminded you're still under oath.
10                    THE WITNESS:  Yes, sir.
11    J A M E S   C E R E G H I N O, Detective, a witness called
12         on behalf of the People, after having been
13         previously duly sworn and having stated his shield
14         number as 561 and his command as the Homicide Squad,
15         Nassau County Police Department, resumed the witness
16         stand and testified as follows:
17                    MS. ABDI:  Your Honor, I believe we left off
18         yesterday I was about to play the portion of the video
19         that concerns the rights and I'm playing that portion
20         right now.  It's approximately 12:44 and 30 seconds on
21         the video.
22                    (Whereupon, People's Exhibit 2 in evidence,
23         DVD, was played in open court.)
24                    MS. ABDI:  Your Honor, I'm going to stop the
25         tape now.  That covers the portion of the rights.
```

1    DIRECT EXAMINATION CONTINUED

2    BY MS. ABDI:

3        Q    Now, detective, approximately what time was

4    Ulises Bonilla signed out of the Homicide Squad?

5        A    When he was taken down to detention?

6        Q    Yes.

7        A    About 5:15, I believe.  Could I see a copy of the

8    blotter to refresh my memory?

9        Q    Sure.

10            MS. ABDI:  Your Honor, may I show the witness

11        a copy of the blotter?

12            THE COURT:  Yes.

13            (Handed to witness.)

14        A    5:16 a.m.

15        Q    Now, detective, Detective Aponte was also in the

16    interview room with you; is that correct?

17        A    Yes, yes, ma'am.  He assisted me in the

18    interview.

19        Q    And Detective Aponte is fluent in Spanish; is

20    that correct?

21        A    Yes, ma'am.

22        Q    And, if necessary, Detective Aponte would have

23    been available to speak to the defendant in Spanish should

24    that need arise; is that correct?

25        A    Yes, ma'am.

1    Q    Did Detective Aponte ever have to have any

2    communications with the defendant in Spanish?

3              MR. MILLMAN:  Objection as to whether he had

4         to.  I mean that calls for a legal conclusion.

5              THE COURT:  Sustained.

6    Q    Did he Detective Aponte -- well, did the

7    defendant ever ask to speak to Detective Aponte completely

8    in Spanish?

9         A    No.

10             MS. ABDI:  Detective, I have no further

11        questions for you at this time.

12             THE COURT:  Counsel?

13   CROSS-EXAMINATION

14   BY MR. MILLMAN:

15        Q    Good morning, Detective Cereghino.

16        A    Good morning, counselor.

17        Q    You were just asked a moment ago by the Assistant

18   D.A. whether or not the defendant ever asked to speak to

19   Detective Aponte completely in Spanish and you said no.

20             Do you recall that?

21        A    What happened a moment ago?

22        Q    Yes.

23        A    Yes, sir.

24        Q    But my client did ask about a Spanish interpreter

25   during the time that the statement was being taken; correct?

1        A     Yes, sir.

2        Q     And during that time when he made reference to a

3   Spanish interpreter, didn't Detective Aponte say, you don't

4   need an interpreter.  I understand you perfectly?

5        A     Yes, sir.

6        Q     And that wasn't the only time that my client

7   talked about a Spanish interpreter that night; was it?

8        A     I believe that was the only time.  The video may

9   indicate otherwise, but I believe that was --

10       Q     Well, I'm referring to prior to the time that the

11  statement was taken.  You were in the vehicle with my client

12  when he was being transported to headquarters; right?

13       A     Yes, sir.

14       Q     And at that time, didn't a Spanish interpreter

15  come up?

16       A     No, sir.

17       Q     It was never discussed?

18       A     I spoke to him in English, he responded to my

19  questions in English, and it did not come up.

20       Q     And you never heard my client ask the driver of

21  that vehicle when he was being transported if he could have

22  a Spanish interpreter?

23       A     No, I do not recall that.  No, sir.

24       Q     You were also asked on direct examination whether

25  or not you asked witnesses about Ulises's participation in a

1    fight with the victim; right?

2         A    I asked them what they saw, yes, sir.

3         Q    Did you ask them if they ever saw a knife?

4         A    Yes, sir.

5         Q    And did any of them tell you they did?

6         A    No, sir.

7         Q    There were a number of people involved in this

8    altercation; right?

9         A    The witnesses indicated there was as many as four

10   people that were involved; two primary and two secondary.

11        Q    There were also a number of other people present

12   in the general area at that time too; right?

13        A    Yes, sir.

14        Q    And there were weapons found at the scene;

15   correct?

16        A    I guess --

17                  MS. ABDI:  Objection.

18                  THE COURT:  Overruled.  Go ahead.

19                  THE WITNESS:  I apologize.

20                  THE COURT:  No, no.

21        A    A tire iron was found, a yellow metal stick was

22   found, whoever was there to indicate there were weapons.

23        Q    Well, they weren't recovered though?

24        A    At the general area, yes, sir.

25        Q    I mean they were photographed; right?

1       A       Yes, sir.

2           Q       And they were on the street around the area in

3    which this incident occurred; right?

4       A       Yes, sir.

5           Q       And you were also asked about whether or not you

6    had inquired about who was primarily engaged in an

7    altercation with the victim; right?

8       A       Yes, sir.

9           Q       And you had concluded my client was the one

10   primarily engaged based on your investigation?

11      A       Yes, sir.

12          Q       But he wasn't the only one engaged; right?

13          A       Witnesses indicated there were two other people

14   involved; one being the sister of Ulises who was hitting the

15   victim on his back with her hands and we had one witness,

16   Nancy Villatoro, who stated there was an unidentified male

17   Hispanic who was hitting the victim on the back with a

18   yellow -- I believe yellow metal stick.

19          Q       Didn't Nancy also indicate in a statement she

20   gave that there were about eight of Ulises's friends that

21   were present at the time that got involved?

22          A       I don't recall being that many, but there were

23   friends on both sides that were present.

24          Q       Did anyone make -- did any witness make a

25   statement to you that to the effect of everyone was hitting

cp

1    Armando?

2                    MS. ABDI:  Objection.

3                    THE COURT:  Overruled.

4        A      I don't believe so.  If you have notes or a

5    statement that indicate otherwise, I'd like to review it.

6                    MR. MILLMAN:  One moment.

7                    (Pause.)

8                    MR. MILLMAN:  I'm just asking that this

9        two-page document be marked -- would be Defendant's A

10       for identification.

11                   (Whereupon, Defendant's Exhibit A was marked

12       for identification.)

13       Q      And just before you take a look at it, I'm going

14   to ask for the record, do you see stamped numbers at the

15   bottom right of each of those two pages?

16       A      Yes, sir.

17       Q      And could you just tell us what numbers are

18   indicated at the bottom of each page?

19       A      138 and 139.

20       Q      Now you can take a moment to look at it if you

21   would.

22                   (Pause.)

23       A      Okay.

24       Q      Okay.  Do you recognize that?

25       A      Yes, these are notes that I took when an

 1    anonymous caller called the Third Squad with information

 2    about the case and he provided hearsay information that he

 3    did not witness.

 4         Q    And this hearsay information you made reference

 5    to, did this person indicate where he received this

 6    information from?

 7         A    He was receiving it -- if I recall correctly, he

 8    was receiving it from Dianna.

 9         Q    And I take it you don't know to this day who the

10    caller was?

11         A    No, he subsequently called Crime Stoppers.  He

12    provided additional information about Mr. Bonilla going up

13    to Boston.  He informed -- also called me back and advised

14    me at the end of October that Mr. Bonilla was back and

15    working in a stable.

16         Q    Is it fair to say though that this individual had

17    indicated during your conversation with him that everyone

18    was hitting Armando?

19         A    That was the information that was relayed to him.

20         Q    Now as you had testified earlier, the police had

21    recovered a knife from the scene; right?

22         A    Yes, sir.

23         Q    It had blood on it; is that correct?

24         A    Yes, sir.

25         Q    That knife was found by who?

cp

1        A       I believe it was Detective Paul Pich, P-I-C-H, a

2    detective assigned to the crime scene when he did an overall

3    of the area.

4        Q       And that detective did not have to search for the

5    knife.   It was out in the open; right?

6        A       It was laying in the street abutted to the curb,

7    you know, so it wasn't on the sidewalk, it was actually on

8    the street right by the curb.

9        Q       What house was it in front of?

10       A       It was in the vicinity of 160 -- it was 163 or

11   the house to the north of 163, right around there.

12       Q       And would it be fair to say though that the house

13   that was closer to would be 163?

14       A       I believe so.

15       Q       And that's where my client lives; right?

16       A       Yes, sir.

17       Q       Now that knife was submitted to latent for

18   fingerprint analysis?

19       A       Yes, sir.

20       Q       Am I correct in stating that no identifiable

21   prints were found?

22       A       Yes, sir.

23       Q       Was it submitted for testing of the blood?

24       A       Yes, sir, it went to the DNA lab.

25       Q       And am I correct in stating that Armando's blood

1    was found on that knife?

2          A      As I recall, yes.

3          Q      Anyone else's blood found on the knife?

4          A      No, sir.

5          Q      This incident, detective, was originally called

6    into 911 as a shooting; right?

7          A      Yes, sir.

8          Q      As a matter of fact, several witnesses who were

9    there called this incident in as a shooting; correct?

10         A      Yes, sir.

11         Q      How's it that the police -- to the best of your

12   knowledge as the investigating detective on the case, how's

13   it that the police made a determination that it was a

14   stabbing as opposed to a shooting?

15                MS. ABDI:  Objection.

16                MR. MILLMAN:  This goes towards probable

17         cause, your Honor.

18                THE COURT:  All right.  I'll allow it.

19         A      Initial observations of the victim's chest and

20   that was further supported when he was transported to the

21   hospital and examined by a doctor and pronounced.

22         Q      Would it be fair to say that the conclusion that

23   he was stabbed was based completely on the fact that he had

24   stab wounds on his body?

25         A      Stab wounds, the number of stab wounds, yes, sir.

```
 1        Q       Okay.  It wasn't based on anything a witness told

 2   you?  The fact of the stabbing itself was not based on

 3   anything a witness told you?

 4        A       Yes, it was not.

 5        Q       Among the items that were found at the scene

 6   after the police arrived included a yellow metal pipe; is

 7   that correct?

 8        A       Yes, sir, broom handle.  It wasn't a solid piece.

 9        Q       And it also included a red metal pipe; is that

10   correct?

11        A       I believe so, yes.

12        Q       And broken glass there; right?

13        A       Yes, sir.

14        Q       And there were also droplets of blood in the area

15   which presumably the incident occurred; right?

16        A       Yes, sir.

17        Q       A tire iron was also found there; right?

18        A       Yes, sir.

19        Q       There were a couple of witnesses, correct me if

20   I'm wrong, who indicated that the tire iron was used by both

21   my client and the victim at one time or another during the

22   altercation?

23        A       I believe the only one that indicated that was

24   the fifteen-year-old daughter of the deceased, Nancy

25   Villatoro.
```

1       Q      Did she indicate that at one time or another each

2    of them at one point in time had used that tire iron?

3       A      She never indicated that -- well, by used, she

4    said that Ulises had it first, that he swung it at her

5    father.  She did not indicate that he struck him.  And then

6    she indicated her father was able to get it away from him

7    and she never indicates that her father hits Ulises with it,

8    so it was involved, but she never clearly indicates that

9    either person was struck with it.

10      Q      So would it be fair to say she indicated at one

11   time or another each one had held it?

12      A      Yes, sir.

13      Q      Was that tire iron ever submitted for fingerprint

14   analysis to latents?

15             MS. ABDI:  Objection.

16             THE COURT:  Overruled.

17      A      I'd have to look at the latent report.  I believe

18   it was.

19      Q      The police also seized an Acura in connection

20   with this investigation; right?

21      A      Yes.

22      Q      Pursuant to a search warrant?

23      A      Yes, sir.

24      Q      That Acura belonged to Dianna Bonilla?

25      A      Yes, sir.

1     Q     The sister of my client?

2     A     Yes, sir.

3     Q     And is it fair to say that part of the reason

4     that that Acura was seized was based on the fact that there

5     had been a description by one or more persons of four male

6     Hispanics leaving the scene of this incident in a gray

7     automobile?

8     A     The number of people entering the vehicle

9     differed, but there was at least one female, Dianna, leaving

10    definitely with Ulises, Misael Berrios, and possibly one or

11    two others.

12    Q     And one of those witnesses was Oscar Villatoro;

13    right?

14    A     Yes, sir.

15    Q     He's the son of the victim; right?

16    A     The twelve-year-old son, yes, sir.

17    Q     And he indicated that he saw individuals entering

18    this vehicle, this gray vehicle; is that accurate?

19    A     Yes, sir.

20    Q     And he indicated in part who he saw get into the

21    vehicle; right?

22    A     Yes, sir.

23    Q     And he indicated that he saw my client get into

24    the front passenger side?

25    A     Yes, sir.

1        Q      And he indicated that he saw Misael get into the

2   back with maybe two other people; right?

3        A      Yes, sir.

4        Q      Blood was found inside that vehicle; right?

5        A      Yes, sir.

6        Q      And the blood was tested; right?

7        A      Yes, sir.

8        Q      And what did the results of the blood analysis

9   indicate?

10       A      It was Ulises Bonilla.

11       Q      Anything else?

12       A      I don't recall.  I'd have to look at the report.

13       Q      By the way, the description of four male

14   Hispanics leaving the scene in a gray automobile, was there

15   anything more specific about that automobile that was

16   reported by anybody?

17       A      I don't recall.

18       Q      Do you recall anyone calling it in as a gray

19   Nissan?

20       A      I don't recall that, but the two witnesses that

21   recalled seeing Mr. Bonilla leave saw it backing out of the

22   driveway of 163 Kinkel.  That much I recall.

23       Q      And other than Misael, Dianna and my client, did

24   you ever learn the names of any of the other individuals

25   that were in that vehicle?

1              MS. ABDI:  Objection.

2              THE COURT:  Sustained.

3      Q     Were you ever advised the name of any particular

4  individuals that entered that vehicle at the time that my

5  client was said to have been seen leaving the scene?

6              MS. ABDI:  Objection.

7              THE COURT:  Sustained.

8      Q     Detective, when you were investigating this, my

9  client was not arrested until about two months after this

10 took place; right?

11     A     Yes, sir.

12     Q     You testified that you had been looking for him;

13 right?

14     A     Yes, sir.

15             MR. MILLMAN:  Just give me one moment, your

16     Honor.

17             THE COURT:  Take your time.

18             (Pause.)

19     Q     From your investigation, you spoke with Dianna

20 Bonilla at some point, I take it?

21     A     Yes, sir.

22     Q     And what did she indicate to you about what she

23 observed?

24             MS. ABDI:  Objection.

25             MR. MILLMAN:  Again bears on probable cause.

1          THE COURT:  I think it does too.

2          Overruled.

3     A     She stated that she came home I believe a little

4  after 10 p.m..  Mother -- she brought in some luggage.  Her

5  mother indicated to her that there was a problem down the

6  block towards 180 Kinkel.  She went down there, she saw two

7  groups in an altercation.  One group was all masked.  She

8  said one subject had a gun.  She ran back to her house and

9  she remained there for the rest of the night.  I asked her

10  if her brother was there, her brother Ulises, and she stated

11  that she had not seen her brother for over a day, day, day

12  and a-half.

13     Q     Did you take a written statement from Dianna?

14     A     No.  That interview was conducted by Detective

15  Pescatelli, and it was just reduced to notes.

16     Q     And do you know if anybody took a written

17  statement from Dianna?

18     A     No statement was taken, no, sir.

19     Q     Just the notes?

20     A     Yes, sir.

21     Q     And you reviewed those notes, I take it, from

22  your testimony?

23     A     Yes, sir.

24     Q     What about Zeida Bonilla?  Did you speak with an

25  individual named Zeida Bonilla?

1       A      Yeah.

2                    MS. ABDI:  Objection.

3                    THE COURT:  Sustained.

4                    MR. MILLMAN:  Judge, I believe this also

5       bears upon the probable cause.

6                    MS. ABDI:  Objection.

7                    THE COURT:  What is your argument?

8                    MS. ABDI:  Well, my argument is that the

9       defendant wasn't arrested for two months, so obviously,

10      the detective continued investigating into certain

11      areas including speaking with people connected to the

12      defendant.

13                   If defense counsel is now going to ask about

14      every single person the detective spoke to in the

15      event -- basically as a discovery method to get any

16      other additional notes of people whether or not they

17      had anything to do with probable cause and regardless

18      of whether or not the detective -- I'm going to object

19      to that.

20                   THE COURT:  Sustained.

21                   MR. MILLMAN:  I didn't find -- my question

22      whether or not he spoke to her anything with regard --

23                   THE COURT:  You don't have to with the date

24      and time of the incident and plays of the incident

25      only.

```
 1                    MR. MILLMAN:  Okay.  Fair enough.
 2          Q    Detective, did you speak with Zeida Bonilla about
 3   whether or not she observed anything on the night of
 4   September 28th over on Kinkel Street in New Cassel?
 5          A    No, I never did.
 6          Q    Do you know if anybody from the police department
 7   did?
 8                    MS. ABDI:  Objection.
 9                    THE COURT:  Sustained.
10          Q    And, detective, what about Misael Berrios?  You
11   spoke with him about that night; right?
12          A    Yes, I did.
13          Q    As a matter of fact, you took a statement from
14   him; correct?
15          A    I did not take a written statement, but when he
16   was brought into the Homicide Squad, the interview was
17   videotaped.
18          Q    I know there were some -- a number of people were
19   spoken to in connection with this; is that fair to say?
20          A    Yes, sir.
21          Q    Some individuals had no statements taken, some
22   there were written statements taken from; yes?
23          A    Most gave statements, yes sir.
24          Q    Am I correct in stating that the only individuals
25   who gave videotaped statements was my client and Misael
```

1    Berrios?

2        A      Yes.

3        Q      Was there any particular reason Mr. Berrios was

4    videotaped in his statement and the other potential

5    witnesses were not?

6                    MS. ABDI:  Objection.

7                    THE COURT:  Sustained.

8        Q      At the time that you took this videotaped

9    statement from Mr. Berrios either prior to or after that

10   statement, you notified Mitch Benson; is that accurate?

11       A      Yes, sir.

12       Q      And is that because Mr. Berrios was considered a

13   suspect in the stabbing at that time?

14       A      No, sir.

15       Q      And what did Mr. Berrios tell you?

16                   MS. ABDI:  Objection.

17                   THE COURT:  Sustained.

18       Q      What did Misael Berrios tell you about what he

19   observed that night on Kinkel Street in New Cassel?

20       A      He was present.  He was present for the fight.

21   He stated to me that he was armed with a handgun and that as

22   the fight was progressing between Ulises and Mr. Villatoro,

23   that some of Mr. Villatoro's friends were present.

24              He said he fired one round into the air and

25   basically and told them it was mano-a-mano, one-on-one.  He

1   stated that when he ran away with Ulises, he ran down the

2   block, and at that time, Ulises told him, I fucked up, and

3   he saw -- and when as I recall, when Misael asked him about

4   what he fucked up about, he just showed him all of Armando's

5   blood on him.

6          He told me more, and I think a viewing of the

7   videotape would be more concise.

8   Q      Can you tell us what you recall about what else

9   he told you though about what he observed that night to the

10  extent you can recall?

11  A      As I stated, he was there with Ulises.  I believe

12  Ulises was waiting for Armando.  At some point, another

13  subject, I believe Ulises, directed another subject, Henry

14  Hernandez, who goes by the street name Nigger, he directed

15  him back to 163 Kinkel to recover the handgun.  He brought

16  it back to 179 Kinkel which is directly across the street

17  from the victim's house, and at some point, Misael took

18  possession of the handgun.

19  Q      Detective, you said that Misael had indicated

20  that when they were leaving the area of where this incident

21  happened, that my client said something to the effect of, I

22  fucked up, and he had blood all over him; right?

23  A      Once they ran down the block and stopped, yes.

24  Q      Did Misael indicate how much blood?

25          MS. ABDI:  Objection.

1        Q      Did he say it was a lot of blood?

2        A      I don't recall the exact words he used, but it

3    had to be noticeable.

4        Q      It wasn't just a few droplets.  It was a

5    substantial amount?

6        A      Yes, sir.

7        Q      By the way, did anybody find any blood on the

8    front passenger seat of the Acura that was seized?

9                    MS. ABDI:  Objection.

10                   THE COURT:  Sustained.

11                   MR. MILLMAN:  Well, that would go to probable

12        cause.

13                   THE COURT:  I don't think so.

14                   MR. MILLMAN:  I'll move on.

15       Q      Did you also speak with an individual named Henry

16    Hernandez about what he observed that night?

17       A      Yes, sir.

18       Q      And what did Mr. Hernandez tell you?

19                   MS. ABDI:  Objection.

20                   THE COURT:  No, same ruling.

21       A      Could I -- I believe I took -- a statement was

22    taken from him?

23       Q      A written statement was taken?

24       A      I believe it was or notes?

25       Q      And if a written statement was taken, you would

1    have reviewed that in your investigation?

2         A    I believe it's in Spanish and it hasn't been

3    translated yet.

4         Q    If it was in Spanish though, would someone from

5    the Department have translated it for you so you could see

6    what it was he was saying?

7         A    Right.

8         Q    That would be part of what you would do in

9    investigating a case is review a statement of a witness?

10        A    Yes, sir.

11        Q    That would be part of what you do in evaluating

12   probable cause to arrest?

13        A    Yes, sir.

14        Q    You would look at any witnesses who were there,

15   look at what they all had to say, consider it in the

16   totality; right?

17        A    Yes, sir.

18        Q    And do you recall what Mr. Hernandez said as you

19   sit here now?

20             THE COURT:  I'm sorry.  I missed your

21        question.

22        Q    What Mr. Hernandez said about what he observed as

23   you sit here now.  Do you recall?

24        A    I'd have to review it.

25        Q    Did you speak with someone named Jose Reyes about

cp

1    whether or not he observed anything that night?

2         A    Yes, sir.

3         Q    And what did he indicate?

4         A    He was a friend of the victim and he was present.

5    Again, a statement was taken from him.  It's in Spanish and

6    I'd have -- I would have to have it translated and review

7    it.

8         Q    What about Angel Estoban Leon?  Did you speak to

9    him about whether he saw anything that night?

10        A    Detective Aponte spoke to him, Mr. Leon,

11   Mr. Reyes.  Third subject I can't recall his name.  They

12   only speak Spanish.

13        Q    Do you recall as you sit here now what it was

14   they said or would you need to just review?

15        A    I would need to review.

16        Q    Would that be the same as Jose Ventura?

17        A    I'm sorry.  Jose?

18        Q    Ventura.

19        A    Yes, yes, he was the third subject.

20        Q    What about Jose Analene (phonetic) or I'm not

21   sure I'm saying it correctly.

22        A    Right.

23        Q    Was that the same?  It would be something you'd

24   need to review?  As you sit here now, you don't recall?

25        A    No.  I recall a statement was not taken from him

1    'cause he was not able to identify anyone, so there were

2    just some -- I believe it was one page of notes.

3                    MR. MILLMAN:  I'm going to ask this be marked

4          Defendant's B for identification.

5                    (Whereupon, Defendant's Exhibit B was marked

6          for identification.)

7                    (Handed to witness.)

8          Q     Detective, before you take a look at it, can you

9    just tell us what the stamp number on the bottom right is?

10         A     133.

11         Q     Okay.  Thank you.  You can take a look at it.

12   Just look up after you've had an opportunity to review it.

13                    (Pause.)

14         A     Okay.

15         Q     Do you recognize that?

16         A     Yes, sir.

17         Q     And what do you recognize it to be?

18         A     This is a morning report that's prepared for the

19   supervisors in the department by myself within hours upon my

20   return to the office after being at the scene.

21         Q     Now there's a section in that document entitled

22   brief details.  Do you see that?

23         A     Yes, sir.

24         Q     The information under that section, it's a

25   narrative?

1          A     Correct.

2          Q     Where did that information come from?

3          A     Just from the initial interviews with Nancy

4    Villatoro, Oscar Villatoro, Suzanna Villatoro and Jocelyn

5    Gonzalez.

6          Q     So it wasn't from any one particular witness?

7          A     No, sir.

8          Q     There was a reference in certain documentation.

9    Please let me know if you need to see any of it in which it

10   indicated that evidence submitted for DNA was rejected.

11         When they say evidence submitted for DNA is

12   rejected, do you know does that have a meaning?  Do you know

13   what that means?

14                MS. ABDI:  Objection.

15                THE COURT:  Sustained.

16         Q     Was there any evidence submitted for DNA in this

17   case that was rejected?

18                MS. ABDI:  Objection.

19                THE COURT:  Sustained.

20                MR. MILLMAN:  I'm going to ask something else

21         be marked.  Excuse me one moment, Judge.

22                (Pause.)

23                MR. MILLMAN:  I'm going to ask to have this

24         marked Defendant's C.

25                (Whereupon, Defendant's Exhibit C was marked

1           for identification.)

2        Q       Detective, before you take a look at it, is the

3    number 182 printed at the bottom right?

4        A       Yes, sir.

5        Q       Just take a look at that and when you've had an

6    opportunity to do so, just look up.

7                     (Handed to witness.)

8        A       Yes, sir.

9        Q       Now generally how is a document like this

10    created?

11       A       Anonymous call or sometimes they identify

12    themselves, call the Crime Stoppers hotline and a detective

13    who picks up the phone takes the appropriate information,

14    prepares this form.

15       Q       Are you able to determine from looking at this

16    who the detective was who had taken this call?

17       A       I just see initials GJC.  I could possibly look

18    into this, find out who took this.

19       Q       Now above the word suspect, you first see the

20    word suspect?

21       A       Yes, sir.

22       Q       And above it do you see where it indicates,

23    caller states that he heard through word of mouth that it

24    was the following suspect who killed the victim?

25       A       Yes, sir.

1     Q     After the word suspect, the name Misael was

2  added?

3     A     Yes, sir.

4     Q     There's an anonymous caller?

5     A     Yes, sir.

6     Q     Were any steps taken to follow up on this phone

7  call?

8     A     Yes, sir.

9     Q     What were those steps?

10    A     We interviewed Misael Berrios.

11    Q     Okay, other than that?

12    A     We attempted to identify the caller, but we

13  weren't able to.

14    Q     Did any other individual advise yourself or any

15  member of the police department that Misael was the one who

16  had stabbed Armando?

17    A     No one stated that Misael stabbed the deceased.

18  This states that Misael Berrios killed the victim when the

19  word was out there that he was shot to death.

20    Q     Did anyone else, to your knowledge, ever indicate

21  to any member of the police department including yourself

22  that Misael killed Armando?

23    A     I don't believe so, no, sir.

24    Q     And Misael was a member of MS-13; right?

25    A     I believe so, yes, sir, or was.

1      Q      Am I correct in stating from analyzing the knife

2   fingerprints analysis, there was no way to identify who the

3   identity of the stabber was; am I correct?

4                    MS. ABDI:  Objection.

5                    THE COURT:  Sustained.

6      Q      You stated you were able to converse with my

7   client in English?

8      A      Yes, sir.

9      Q      And he understands English?

10     A      Yes.

11     Q      You're aware he also speaks Spanish?

12     A      Yes, sir.

13     Q      You were aware at the beginning of the statement,

14  you know, at the time that you read him his rights you were

15  aware that his main dialect was Spanish?

16     A      I guess.

17                   THE CLERK:  Counsel, just let the record

18       reflect the presence of a new Spanish interpreter.

19                   THE INTERPRETER:  Kimberly Hernandez.

20                   THE CLERK:  Thank you.

21     Q      Did you have any difficulty understanding

22  anything that my client said to you at any time that night?

23     A      He was quite distraught and talked low at times,

24  but I had no problems communicating with him in English.

25     Q      And you felt he communicated to you clearly?

1      A      Yes, sir.

2      Q      After you read him his rights, my client had

3  expressed a desire to consult with counsel; correct?

4      A      He brought it up.  I asked him.  I addressed it.

5  I asked him if he wanted to speak to me without an attorney

6  being present and he said yes.

7      Q      And before though you asked him if he wanted to

8  speak with you without an attorney being present, he had

9  made a reference to attorney; right?

10      A      He said something about a lawyer.  As I said, I

11  wasn't sure what he wanted or what he was referring to, so I

12  addressed the issue with him about whether he was willing to

13  speak to me without an attorney present.  He thought for a

14  moment and said yes, he would speak to me.

15      Q      But my client did say to you after you read him

16  the rights that he wanted to know if he could have someone

17  call him a lawyer.  Didn't he say that?

18                  MS. ABDI:  Objection.

19                  THE COURT:  Overruled.

20                  MS. ABDI:  That's on the tape.  The exact --

21                  THE COURT:  It's true.  I read it.  I saw it.

22                  THE WITNESS:  I don't believe I said --

23                  THE COURT:  No, I'm sorry.  I read it.

24                  MR. MILLMAN:  I'm sorry?

25                  THE COURT:  I read it and I saw it.

1          MR. MILLMAN:  Yes, so I'm asking him.

2          THE COURT:  But I know that.  You don't have

3     to ask him.

4          MR. MILLMAN:  Okay.  Fair enough.

5     Q    And you understood at that time that he was

6     asking if he could arrange to consult an attorney; right?

7          MS. ABDI:  Objection.

8          THE COURT:  Sustained.

9          MR. MILLMAN:  This goes right to the issue of

10     right to counsel.

11          THE COURT:  I am very well aware of the

12     issue.  I'm also very well aware of exactly what was

13     said.  I saw it and I read it.

14     Q    And how much time passed from the time that --

15     withdrawn, withdrawn.

16          Now am I correct in stating that after he had

17     asked for arrangements to be made for him to speak with

18     counsel, neither you nor Detective Aponte left the room at

19     that time; right?

20     A    No, sir.

21     Q    And neither you nor Detective Aponte stopped

22     speaking to him?

23     A    I asked him a question and he responded.

24     Q    Okay.  And the question was?

25     A    I said, are you willing to speak to me without an

1    attorney being present.  We could replay it.

2        Q    Well --

3        A    Because as I recall, I don't recall him saying

4    that he wanted to make a phone call so someone could call

5    him a lawyer.  I believe he mentioned something about a

6    phone call and something about a lawyer separately.

7        Q    But the something about a phone call was said in

8    the same sentence as that something about a lawyer; right?

9                   MS. ABDI:  Objection.

10                  THE COURT:  Overruled.  I am looking at it

11        right now.  I know exactly what was said.

12       A    As I recall, he made reference to -- about making

13   a phone call and he made reference to something about a

14   lawyer, but I do not recall him saying can I make a phone

15   call so I can have someone get me a lawyer.  I do not recall

16   that.

17       Q    You don't recall him saying that?

18       A    No.

19       Q    And you do recall that he asked to make a phone

20   call?

21       A    He made reference to wanting to make a phone

22   call.

23       Q    Okay.  And that was at around 12:44 a.m.?

24       A    In the initial statement, yes, sir.  Yes, sir.

25       Q    And what time was it when my client was actually

 1    brought to a phone to make a phone call.

 2         A    4:15, 4:20.  I have notes indicating the three

 3    calls.  He attempted to make three calls.  I think he only

 4    got through with the third one.

 5         Q    My question was when was it for the first time

 6    that my client was brought to a phone where he could make a

 7    phone call following the beginning of that interview?

 8         A    As I recall it, it was around 4:15 a.m.

 9         Q    About four hours later; right?

10         A    That would be three and a-half, yeah.

11         Q    Did either you or Detective Aponte ever offer

12    yourselves to make a phone call for him?

13         A    No, sir.

14         Q    And did you ever make any attempts to assist him

15    in obtaining an attorney?

16         A    No, sir.

17         Q    When you and Detective Aponte spoke with my

18    client in the interrogation room, you knew at that time that

19    the victim, of course, was actually stabbed?

20         A    Yes.

21         Q    And you believed it was my client that had

22    stabbed him; is that fair to say?

23                   MS. ABDI:  Objection.

24                   THE COURT:  Sustained.

25         Q    Is it fair to say that you had arrested my client

                                cp

1    for stabbing Mr. Villatoro?

2         A    Yes, sir.

3         Q    And you didn't have any witnesses that put the

4    knife in my client's hands; right?

5                   MS. ABDI:  Objection.

6                   THE COURT:  Sustained.

7         Q    You needed information from my client in

8    connection with what happened that night; right?

9                   MS. ABDI:  Objection.

10                  THE COURT:  Sustained.

11        Q    By the way, at the time that my client had asked

12   initially about making a phone call on the portion of the

13   tape that we just saw, there were several telephones close

14   by; is that fair to say?

15                  MS. ABDI:  Objection.

16                  THE COURT:  Sustained.

17        Q    You could easily have taken him into the next

18   room to make phone call; is that fair to say?

19                  MS. ABDI:  Objection.

20                  THE COURT:  Sustained.

21        Q    And so you and Detective Aponte had my client in

22   that interrogation room for over four hours; correct?

23        A    Your client was brought in there at a little

24   after 12:30 a.m., he was taken out of there about four or

25   five hours later.  I believe once he went to the bathroom

1    and there was one period of time when he was left alone in

2    there for a little less than an hour, so Detective Aponte

3    and I were not in there the entire time, I would say three

4    out of the four or three and a-half out of four and a-half

5    hours.

6        Q      But during no portion of the time that you were

7    questioning was there an attorney present; right.

8        A      There was no attorney.

9        Q      There was no attorney present?

10       A      There was no attorney present, no, sir.

11       Q      There was no attorney present, I think we can

12   agree, at the time you asked him if he was willing to speak

13   to you without an attorney being present?

14       A      Yes, there were just the three of us in the room.

15       Q      And he made mention of an interpreter during the

16   course of this statement; is that right?  I think we made

17   mention -- you made mention of it before.

18                    MS. ABDI:  Objection as to form.

19                    MR. MILLMAN:  I'll rephrase it.

20                    THE COURT:  Okay.

21       Q      During the course of his statements, there was

22   discussion between him and Detective Aponte about an

23   interpreter; right?

24                    MS. ABDI:  Objection as to the form.

25                    THE COURT:  Well, tell him what page you're

 1            talking about.

 2                      MS. ABDI:  I believe it's page 68.

 3            Q      Page 68?

 4                      THE COURT:  All right.  Give me a second.

 5            You see it.

 6            Q      He had indicated at some point during the

 7       statement that he wanted someone who speaks Spanish; right?

 8            A      I believe so, yes, sir.

 9            Q      Detective Aponte told him he understood him and

10       you're talking -- and you're talking fine; right?

11            A      Yes, sir.

12            Q      He was never provided an interpreter at any time

13       during this statement; right?

14            A      No, sir.

15            Q      And so he asked -- withdrawn.

16                      Other than what you made reference to during the

17       course of your testimony, have you ever at any time learned

18       of any evidence indicating that my client had a knife in his

19       hands?

20                      MS. ABDI:  Objection.

21                      MR. MILLMAN:  At the time of this incident.

22            This would go to probable cause, your Honor.

23                      THE COURT:  Overruled.

24            A      Other than the end result?

25            Q      Yes, and what you testified about.

1        A        Well, as a result of my interview with the four

2   eyewitnesses and my interview with Ulises Bonilla, he tells

3   me that he's the one that squared off with the chest area of

4   my victim.  I have witnesses saying that someone was

5   striking him on the back, but the only one who could have

6   inflicted these injuries was Ulises Bonilla, as two of the

7   witnesses say, that the only two that were fighting was

8   Ulises and Armando and that was witnessed by Jocelyn

9   Gonzalez and Oscar Villatoro.

10       Q        Okay, but certainly the discussion that you had

11  with my client, that wasn't part of the formulation of the

12  probable cause; right?  He was already under arrest;

13  correct?

14       A        Yes, sir.

15       Q        So in terms of the formulation of your probable

16  cause, you said you took into account these statements of

17  these witnesses; right?

18       A        Yes, sir.

19       Q        There were also witnesses who said that there

20  were more than just the two of them involved in this

21  altercation; correct?

22                MS. ABDI:  Objection.

23                THE COURT:  Sustained.

24       Q        There were also witnesses who identified someone

25  with a red cap; right?

1              MS. ABDI:  Objection.

2              THE COURT:  Overruled.

3         A    At the scene?

4         Q    Actually involved in hitting Armando.

5         A    May I see the paperwork to refresh my

6    recollection?

7              MR. MILLMAN:  I just need a moment.

8              (Pause.)

9              MR. MILLMAN:  Just have this marked, I think

10        we're up to D.

11             (Whereupon, Defendant's Exhibit D was marked

12        for identification.)

13             (Handed to witness.)

14        A    The male Hispanic, light-skinned wearing a red,

15   black and white baseball cap?

16        Q    First, if you could for the record, identify the

17   printed numbers at the bottom of the pages?

18        A    818 and 819.

19        Q    And then let me just ask you, is that a statement

20   of Nancy Villatoro that was taken from her?

21        A    That I took, yes, sir.

22        Q    What I'm asking is did Nancy Villatoro indicate

23   that there was someone wearing a red, black and white

24   baseball cap that hit Armando with a yellow stick?

25        A    Yes, I testified to that earlier.

```
 1          Q      Okay.  So that was someone else that was in this
 2   altercation other than Ulises and Armando; right?
 3          A      Hitting in the back.
 4          Q      But my question is that was someone else that was
 5   involved in this altercation other than Ulises and Armando?
 6          A      And Dianna, yes, sir.
 7          Q      Right.  And did she also indicate, Nancy
 8   Villatoro, that about eight of Ulises's friends came out
 9   from across the street?
10          A      Yes, sir.
11          Q      Did anybody ever indicate to you or to anyone
12   from the Nassau County Police Department that they observed
13   my client make a motion coming over his head as if he was
14   stabbing Armando?
15                 MS. ABDI:  Objection.
16                 THE COURT:  Sustained.
17                 MR. MILLMAN:  Goes directly to probable
18          cause.
19                 THE COURT:  Sustained.
20          Q      Other than what you've told us, any information
21   that you obtained indicating that my client stabbed Armando?
22          A      I'm sorry.  Repeat the question.
23          Q      Other than what you've testified about so far,
24   any other evidence that you learned of in investigating the
25   case that indicated that my client stabbed Armando?
```

1        A    Prior to --

2                  MS. ABDI:  Objection.

3        A    Prior to arrest?

4        Q    Yes.

5                  THE COURT:  Objection is sustained.  It's

6        been asked and answered at least three times.

7                  MR. MILLMAN:  I have nothing further.  Thank

8        you.

9                  THE COURT:  Anything further?

10                 MS. ABDI:  No.

11                 THE WITNESS:  Thank you, your Honor.

12                 THE COURT:  Thank you.  You're excused.

13                 People?

14                 MS. ABDI:  The People rest, your Honor.

15                 THE COURT:  Defendant?

16                 MR. MILLMAN:  Defendant rests.

17                 THE COURT:  All right.  Both sides having

18       rested, I'll take argument, but I'm going to want to --

19       if you want to make argument now, I'll take argument

20       now, but there are two issues that I want letter

21       briefs.  I don't need a brief.  I want letter briefs

22       and I want additional arguments or argument if you're

23       not going to argue now on this point, on two points.

24                 After the rights were administered on page

25       seven, the defendant says at line four, I don't know if

1      I could call a lawyer or something.  At line eight he

2      says, I don't know if I could call somebody to call me

3      a lawyer or something.  At line twelve he says, I can't

4      make any phonecalls, question mark.  At line fourteen,

5      the detective says, ultimately, yes.  I want to know if

6      ultimately yes means no.  On page 68 at line 23,

7      defendant says, it doesn't make sense like, and then he

8      speaks in Spanish, and then for whatever the reason,

9      the court reporter quotes it or capitalized it and

10     said, it is better if I say it in Spanish.  Later on,

11     and I didn't note the page, a similar statement is made

12     where he breaks into Spanish and indicates that it's

13     clearer if he says what he wants to say, some Spanish.

14              As far as I'm concerned, the only issues

15     before me are whether or not he knowingly,

16     intelligently and voluntarily waived his rights to

17     counsel and/or needed and was not provided a Spanish

18     interpreter.

19              Do you want to argue those points now,

20     Mr. Millman, or do you want to send me a letter and

21     argue it on September 6th?  And, Ms. Abdi, I'll take a

22     letter from you as well.  If Mr. Millman argues now,

23     I'll take the argument now, but I want additional

24     argument or argue on the 6th.

25              MR. MILLMAN:  May I?  I don't know if you

1   want -- well, Judge, since -- since you will want to --

2   in any event want to hear arguments --

3               THE COURT:  I also want to review the entire

4   transcript.  I'm not going to watch the video because

5   it's clearer in the transcript.  I may watch the video

6   along while I read the transcript, but I need to read

7   the entire transcript which I haven't had an

8   opportunity to do yet.  It's a couple of hundred pages

9   long, so between now and the 6th, I intend to watch the

10   video, read the transcript, but the points that are

11   apparent to me now I've just set forth and I want law

12   on those points, so do you want to wait 'till the 6th

13   and do it then?

14               MR. MILLMAN:  Yes, I would be fine with

15   submitting a written argument and then following it up

16   with oral argument on the 6th.

17               THE COURT:  Okay.

18               MR. MILLMAN:  I'd be fine with that.

19               THE COURT:  Okay.  Case is adjourned until 10

20   o'clock.

21               MS. ABDI:  Your Honor, I'm sorry.  Just to be

22   clear, is the procedure defense counsel will submit the

23   brief to your Honor and myself and I'll submit my

24   reply?

25               THE COURT:  Yes, give her -- submit the brief

 1        back before the end of August so that by the 6th,

 2        Ms. Abdi can have her brief ready so that I can read it

 3        before I take argument, and then I'll take argument in

 4        addition to having read both of your briefs.  It

 5        doesn't have to be a brief.  It can just be a letter,

 6        not going to put you through the trouble of doing a

 7        brief.

 8                  MR. MILLMAN:  By what date?

 9                  THE COURT:  Before the end of August so she

10        has an opportunity to read your brief, read your

11        letter, read your letter and find the law to reply

12        whatever your points are.

13                  MR. MILLMAN:  All right, and submissions,

14        just so I'm not getting them on the morning of

15        argument, I mean can I obtain those, you know, a few

16        days ahead of time at the very least?

17                  THE COURT:  I don't want her to have to work

18        over Labor Day weekend.  When can you get them to her

19        by?

20                  MS. ABDI:  You know what, Judge?  I'm out the

21        week of August 29th, so --

22                  THE COURT:  All right.  Then let's just do it

23        on September 12th.  That work for both of you?

24        Mr. Millman, you'll have the brief to her before the

25        end of August.

 1                    MR. MILLMAN:  Okay.  Then if we're going to

 2      do it that way, would I be able to get hers by on the

 3      7th at least, just a few days before?

 4                    THE COURT:  You're away the week of August

 5      29th.  How long will you be gone?

 6                    MS. ABDI:  I will be gone that whole week

 7      'till the 5th.

 8                    THE COURT:  So that gives you four days to

 9      prepare.

10                    MS. ABDI:  That should be fine.

11                    THE COURT:  The case is adjourned until 10

12      o'clock on September 12.

13                    MS. ABDI:  I am sorry, Judge, I don't mean to

14      keep interrupting you.  There's just one thing I wanted

15      to point out to your Honor before we break and that's

16      just I know your Honor's obviously going to be

17      reviewing the video along with the transcript, but on

18      page 77 of the transcript toward the bottom of the

19      page, there's an indication by Mr. Bonilla that he has

20      kind of confirming that he had decided to speak with

21      the detectives without a lawyer and I believe that that

22      is relevant for the issues.

23                    THE COURT:  There's no question that it is,

24      and you can certainly point that out in your papers.

25                    MS. ABDI:  Thank you.

1               MR. MILLMAN:  And, Judge, the only thing --

2               THE COURT:  On the other hand, understand

3       that ultimately, yes, it confuses me and that happens

4       70 pages earlier in the transcript.

5               MR. MILLMAN:  And also, not that we have to

6       get into it, but law that supports having asked for

7       counsel and that any subsequent waiver of that without

8       an attorney present is not valid.  I know that's the

9       ultimate issue.

10              THE COURT:  Right.  You'll put that in your

11      papers with appropriate citations so I can look at

12      them.

13              MR. MILLMAN:  What's the day by which she

14      needs to observe?  I don't think I got that.

15              THE COURT:  Sometime during the week of

16      September 5th.

17              MR. MILLMAN:  Okay.  And, Judge, one more

18      thing.  There were some issues pertaining to Rosario

19      that I had initially raised.

20              THE COURT:  Did you work them out?

21              MR. MILLMAN:  Some of them have been worked

22      out, some of -- some of them not fully determined until

23      I questioned the detective as to whether or not he

24      relied on them, but I do think it's very clear from the

25      detective's testimony that what I'm about to raise that

cp

1          the detective did rely on in determining probable

2          cause.

3                    THE COURT:  Try and work them out with

4          Ms. Abdi.  If you can't, you let my law secretary know

5          and we'll schedule a meeting in chambers to discuss

6          that.

7                    MR. MILLMAN:  Okay.  I think we have tried to

8          work it out.  I don't believe we're in agreement on it.

9          It has to do with statements of witnesses that the

10         detective had reviewed and he had testified that he

11         reviewed those statements in determining probable cause

12         and to his investigation.

13                   THE COURT:  He testified three of the

14         statements were in Spanish and he had not had them

15         translated.

16                   MR. MILLMAN:  Agreed, agreed, but he did also

17         indicate that -- not sure if he indicated he hadn't had

18         it translated.

19                   THE COURT:  That's what I heard him say.

20                   MR. MILLMAN:  Certainly there are some

21         witnesses whose statements are clearly --

22                   THE COURT:  Try to work it out with Zena.  If

23         you can't work it out with Zena, you'll work it out

24         with Howard, the three of you.

25                   MR. MILLMAN:  All right.  Thank you, Judge.

cp

1           MS. ABDI:  Adjourned to September 12?

2           THE COURT:  September 12.

3           (Whereupon, the hearing was adjourned to

4       September 12, 2011.)

5

6                    *         *         *

7           CERTIFIED THAT THE FORGOING IS A TRUE AND
        ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC
8       MINUTES IN THIS CASE.

9

10      CATHERINE R. PARKER,
        Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

cp

1                    I - N - D - E - X

2                          DX      CX      RDX       RCX
   FOR THE PEOPLE:
3  Det. James Cereghino        6      34

4
                      E X H I B I T S
5  No.                         Id.            In Evid.
   FOR THE PEOPLE:
6  1 - rights card             21              22
   2 - DVD                     23              24
7  3 - transcript                              28
   FOR THE DEFENDANT:
8  A - notes                   38

9  B - morning report          55

10 C - Crime Stoppers          56
        report
11
   D - statement of Nancy      68
12      Villatoro

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF NEW YORK : NASSAU COUNTY

2         SUPREME COURT PART 28

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK        PROCEEDINGS

5              - against -                      IND-202N-11

6    ULISES BONILLA,

7                   Defendant.

8    ----------------------------------------X

9                              October 3, 2011
                               262 Old Country Road
10                             Mineola, New York

11
     B E F O R E :
12
                    HON. ALAN L. HONOROF
13                           Acting Supreme Court Justice

14
     A P P E A R A N C E S :
15
                 HON. KATHLEEN M. RICE
16                 Nassau County District Attorney
                   BY:  ZEENA ABDI, ESQ., of Counsel,
17                      Assistant District Attorney
                              For the People
18

19               DANIEL MILLMAN, ESQ.
                   316A Main Street.
20                 Roslyn, New York
                              For the Defendant
21

22
                              KATHLEEN PLAIA
23                            SENIOR COURT REPORTER

24

25
```

```
 1                 THE CLERK:  Remain seated, come to order.

 2                 The following case is on for continued

 3      hearing, The People against Ulises Bonilla, under

 4      Indictment 202N of 2011.

 5                 Appearances.

 6                 MS. ABDI:  For The People, Zeena Abdi,

 7      Assistant District Attorney.

 8                 Good afternoon.

 9                 THE CLERK:  Appearance for the defendant.

10                 MR. MILLMAN:  For the Defendant, Daniel

11      Millman, 316A Main Street, Roslyn, New York.

12                 Good afternoon.

13                 THE COURT:  Good afternoon.

14                 THE CLERK:  Let the record reflect the

15      presence of the official language interpreter, Julie

16      Mendoza is the Spanish interpreter.

17                 Sir, you are Ulises Bonilla?

18                 THE DEFENDANT:  Yes.

19                 THE CLERK:  Thank you.

20                 THE COURT:  All right, I'll take additional

21      evidence.

22                 MR. MILLMAN:  Your Honor, before we begin,

23      there was a matter I needed to bring to the Court's

24      attention.

25                 At the conclusion of the testimony, I had
```

1     advised the Court there was some issues concerning

2     certain Rosario material, that I would talk to you the

3     assistant district attorney and see if we can work out

4     those issues.

5          None of those issues -- although some of

6     those issues have been worked out, there are a number

7     of issues that we have not been able to work out, they

8     concern statements that I believe may have well been

9     part of the -- well, definitely, a part of the Rosario.

10    And according to Detective Cereghino, he reviewed

11    these, those would have been part in formulating the

12    probable cause for the arrest.

13         Without seeing them, I have no way of knowing

14    whether or not those statements, one of which, who

15    is -- was from someone who was right there in the

16    middle of everything, whether or not that could have

17    called into question the probable cause, whether or not

18    that would have given me additional grounds to

19    challenge the probable cause.

20         I understand that is not at this point one of

21    the key issues; but, again, the statement could have

22    given me reason or grounds to challenge and raise that

23    as an issue.

24         Now, you know, certainly, I may very well

25    look at it and decide that I don't need it, and I'm

1     certainly going to proceed in good faith.  Without

2     seeing it, I can't know whether or not there were

3     additional grounds to challenge that, your Honor.

4               THE COURT:  Let's find out if Miss Abdi is

5     aware of any such statements.

6               Miss Abdi.

7               MS. ABDI:  Well, I just -- I'm not sure of

8     the exact statements that defense counsel is referring

9     to.  There are other statements made during the course

10    of the investigation, it's my position that those are

11    not -- were not Rosario material for the hearing; those

12    may be items that will be turned over at trial.

13              THE COURT:  Were they prepared for Cereghino?

14              MS. ABDI:  Some -- that, I'm not sure, your

15    Honor.  Some were prepared by other detectives.

16    Some --

17              THE COURT:  Anything that was prepared by

18    another detective, I'm not worried about.  I'm worried

19    about anything that counsel has just referred to, that

20    may have been prepared by Cereghino and might arguably

21    have been Rosario material.

22              MS. ABDI:  Like I -- I just need a little bit

23    more specific information.  As I said, a lot of the

24    questioning of Detective Cereghino was done by defense

25    counsel who asked if he relied on certain things and

1          then asked for those statements.

2                    As far as --

3                    THE COURT:  Rather than bring counsel back a

4          third -- a fourth time at this point, have Miss Abdi

5          and yourself spend some time together, when it's

6          convenient for the both of you, find whatever these

7          documents are that you're looking for.  Instead of

8          coming back, you will send me letters stating your

9          position, and I'll issue a written decision, rather

10         than inconvenience you yet again.

11                   MR. MILLMAN:  Fair enough, your Honor.

12                   THE COURT:  Okay.

13                    --        --        --

14                    C E R T I F I C A T I O N

15                   I hereby certify that the foregoing is a
           true and accurate transcript of my stenographic notes.
16

17

18         _____
           Kathleen Plaia,
19         Senior Court Reporter

20

21

22

23

24

25

```
 1   STATE OF NEW YORK    :      NASSAU COUNTY
     SUPREME COURT        :      PART 29
 2   ----------------------------------------x

 3   THE PEOPLE OF THE STATE OF NEW YORK,

 4                -against-                        INDICTMENT NO.
                                                  202N/11
 5   ULISES A. BONILLA,

 6                     Defendant.

 7   ----------------------------------------x
                         262 Old Country Road
 8                       Mineola, N.Y.  11501

 9                       October 19, 2011

10                       MINUTES OF CONTINUED HUNTLEY/DUNAWAY HEARING

11

12   B E F O R E:    HON. ALAN L. HONOROF
                     Acting Supreme Court Justice
13
     A P P E A R A N C E S:
14
                     HON. KATHLEEN M. RICE
15                   District Attorney of Nassau County
                     BY:  ZEENA ABDI, ESQ.,
16                   Assistant District Attorney,
                     Of Counsel, for the People
17
                     DANIEL L. MILLMAN, ESQ.
18                   Attorney for the Defendant
                     316-A Main Street
19                   Roslyn, New York 11576

20
     ALSO PRESENT:   Kimberly Hernandez,
21                   Official Spanish Interpreter

22

23

24

25                   Cindy Kaye-Fink
                     Senior Court Reporter
```

ckf

1           THE CLERK:  Case on for continued hearing,

2      People against Ulises Bonilla, under indictment 202N of

3      2011.  Let the record reflect the presence of the

4      official Spanish language interpreter.  Will she give

5      her appearance, please.

6           THE INTERPRETER:  Kimberly Hernandez.

7           THE CLERK:  For the People?

8           MS. ABDI:  For the People, Zeena Abdi,

9      Assistant District Attorney.

10          THE CLERK:  For the defendant?

11          MR. MILLMAN:  Daniel Millman, 316-A Main

12     Street, Roslyn, New York.

13          THE CLERK:  And sir, you are Ulises Bonilla?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Somebody want to start?

16          MS. ABDI:  Your Honor, I guess the case is on

17     today for an oral argument with respect to some issues

18     that were discussed during the last hearing date.  Your

19     Honor asked defense counsel and I to submit written

20     briefs on the limited issues of whether or not the right

21     to counsel was invoked and whether or not there was any

22     significance to the defendant's statement that, I told

23     you I need somebody to speak Spanish.  And your Honor

24     asked for briefs with respect to those limited issues,

25     because I believe those were the only issues that were

1          in -- that were contested in this hearing.  And I have

2          submitted a brief to -- with respect to those issues and

3          I know defense counsel has submitted a brief, so my

4          comments today are in supplement, but are also included

5          for the most part in the written briefs.

6                    And it is the People's position in this case

7          that one, there was ample probable cause to arrest the

8          defendant for the crime of murder in the second degree.

9          He was identified by people that knew him at the scene.

10                   Going on now to the statements that he made,

11         he made some statements that were clearly pedigree and

12         voluntary to Detective Cereghino at the time of his

13         arrest.

14                   In addition, when he went back to the police

15         station, as your Honor has in evidence, he spoke with

16         the police and that conversation in its entirety was

17         recorded.  It is clear from the entire video, which is

18         in evidence, that the defendant was able to speak

19         English during the conversation with Detective

20         Cereghino, he was able to be understood.  It is quite

21         clear from watching the whole video that he did not have

22         a problem understanding the detectives.  The detectives

23         didn't have a problem understanding him.  The fact that

24         the defendant is using an interpreter during court

25         proceedings is of no moment in this case because at the

1        time of the conversation, he was clearly speaking

2        English and that is evident from just a simple watching

3        of that entire video.

4               His comment, I told you I need somebody to

5        speak Spanish, does not indicate -- which is clear from

6        the record, does not indicate that he did not indicate

7        that he didn't understand what was going on around him.

8        In fact, it was clear from the circumstances in which he

9        was read the Miranda that he did understand his rights.

10       That statement, it is the People's position that that

11       statement was self-serving and was just in response to

12       being caught up in some inconsistencies.  And with

13       respect to that issue, as I have stated in my brief, the

14       police were under no obligation to conduct the interview

15       in Spanish, especially when it was clear that the

16       defendant clearly understood his Miranda rights and was,

17       in fact, educated in the United States and had completed

18       high school.

19              And I cited cases to that effect that pretty

20       much stated that as long as the defendant understood

21       English to comprehend the immediate meaning of the

22       warning, that was sufficient, and those cases are cited

23       in my brief.

24              The next issue that your Honor asked for

25       briefs on is whether or not the defendant invoked his

1   right to counsel and it is the People's position that he

2   did not.  In order for the right to counsel to attach,

3   it must be unequivocally stated, and in this case, it is

4   clear in the video and clear from the transcript, that

5   was not an unequivocal statement for an attorney.  That

6   was merely a question.

7          In the video it is clear that Detective

8   Cereghino clarified an ambiguous response by the

9   defendant.  Detective Cereghino in no way stated that he

10  could not have a lawyer, he no way impeded him from

11  getting a lawyer.  The defendant asked him about phone

12  calls and the defendant has no immediate right to make

13  any phone calls.  He never asked for a phone call to

14  call an attorney.  From the hearing it's clear that the

15  issue of phone calls and the issue of an attorney were

16  separated in the detective's mind and the defendant

17  never, in fact, asked specifically for an attorney.

18  What the detective did do was to clarify that he asked

19  if he could make phone calls, but right now he wanted to

20  see if the defendant would talk to him without a lawyer.

21  That's proper clarification.  There's case law that

22  states that that is permissible to do.

23          The detective in no way suggested that he

24  would not be able to have a lawyer if he wanted to and

25  immediately thereafter, the defendant said, I could

1    speak to you, and he said, you will speak to me?  And he

2    said yes.  And that is all on video and with the

3    transcript.  And it is clear that that was a knowing and

4    intelligent waiver of his rights, because later in the

5    conversation with the detective, he makes reference to

6    the fact that he agreed to speak to the detectives

7    without an attorney and the significance of that later

8    statement is that he was, in fact, waiving his rights

9    knowingly, because he was able to communicate to tell

10   the detectives that yes, that's what I was doing before.

11   I agreed to speak with you without an attorney.

12            So it is People's position that in no way was

13   that an unequivocal waiver of his right to counsel.  And

14   the defendant, in his brief, cites a case, People vs.

15   Woodward, and I believe that this case can be

16   distinguished from that because in that case, there was

17   a question over the word waiver, and in that case the

18   defendant had a question about what waiver meant, but in

19   this case, that was not the situation.  The detective

20   clearly explained that what it meant was you would speak

21   to us without an attorney.  And in addition, there was

22   literacy differences with respect to the defendant in

23   that case and in this case it is clear that he stated

24   that he had gone to school, he had gone to high school

25   and he clearly understood the meaning of the warnings.

1              A waiver of Miranda warnings does not have to

2      be shrewd, it just has to be more able to understand

3      what it is that you're waiving.  And here, based on the

4      totality of the circumstances, it is clear that he did

5      understand these things.

6              So I have made -- that's a summary of my

7      arguments, your Honor, like I said.  I have submitted a

8      brief that goes a little bit more in depth, but it is

9      the People's position that one, the arrest was with

10     probable cause, the statements were completely

11     voluntary, and that there was no request for counsel in

12     this case and the defendant giving an interview in

13     English, even though English may not have been his first

14     language, that's perfectly permissible, especially since

15     it's clear from the video, because you have the whole

16     conversation on video.  It is clear that he was able to

17     hold a conversation, carry back and forth with the

18     detectives.

19             So for those reasons, your Honor, I ask that

20     you deny defense counsel's request for suppression in

21     its entirety.

22             MR. MILLMAN:  Good morning, your Honor.

23             THE COURT:  Good morning.

24             MR. MILLMAN:  Your Honor, the Second

25     Department in the case of People vs. Jones, stated the

1    standard for determining whether or not a request for

2    counsel was equivocal and the standard is whether or not

3    a reasonable police officer would know that he was

4    requesting counsel.  I'm handing up to the Court and to

5    counsel a copy of that, if I may, of that decision, that

6    is the standard in the Second Department, your Honor,

7    and the following facts are undisputed.

8            First, when Mr. Bonilla was first asked if he

9    was willing to waive his rights, he did not say yes.

10   That's right on the video and that's clear.  He said, I

11   don't know.  He asked to make a phone call.  And the

12   reason he asked to make a phone call, which he

13   indicated, was so that he could see if someone could

14   call him an attorney.  It's on the video, it's as clear

15   as day, your Honor.

16           Mr. Bonilla, this is also undisputed, was not

17   permitted to make a phone call.  He was not provided

18   with an opportunity to contact a lawyer.  And it is also

19   undisputed that after Mr. Bonilla asked for and was

20   denied an opportunity to make a phone call and to reach

21   an attorney, Detective Cereghino again asked

22   Mr. Bonilla, without the presence of counsel, if he was

23   willing to answer questions and Mr. Bonilla then said

24   yes for the first time.  Those facts are undisputed.

25           It is also undisputed that he was questioned

1        for over four hours by two detectives outside the

2        presence of counsel and that he was never brought to or

3        given an opportunity to make a phone call until after

4        four hours of questioning.

5                Your Honor, the scope of the right to counsel

6        in New York is substantially greater than that

7        recognized by other state jurisdictions and far more

8        expansive than the federal standard, and that's cited in

9        People vs. Harris, 77 NY2d 434.  The law is clear that

10       once a defendant in custody requests counsel, custodial

11       interrogation must cease.  I recognize that the question

12       is equivocation, so I'm going to focus on that, your

13       Honor.

14               The Court of Appeals has stated in People vs.

15       Buxton, 44 NY2d 33, that if a suspect indicates in any

16       manner and at any stage of the process when he wishes to

17       consult with an attorney before speaking, there could be

18       no questioning.  That means, and the courts have made it

19       clear, that they can't continue to ask him if he wants

20       to waive his rights, they have to cease questioning.

21               Moreover, several cases, and I have cited them

22       in my papers, your Honor, indicate that when there are

23       doubts about the request and whether or not it is a

24       request for counsel, they must be resolved in favor of

25       protecting the constitutional claim and the courts must

ckf

1    indulge every reasonable presumption against a waiver of

2    such a fundamental constitutional right.

3            The cases that are cited by the district

4    attorney are completely inapplicable and I think that's

5    clear upon the first cite. They involve situations in

6    which the defendant either asked the police if they

7    thought he needed a lawyer -- that's not what happened

8    here. And they also involve situations in which

9    questioning ceased upon defendant's request for counsel

10   and then the defendant thereafter voluntarily said he

11   changed his mind. That did not happen here. None of

12   those cases, not a single case cited by the district

13   attorney, involved a situation in which a defendant had

14   stated twice that he wanted to make a phone call to see

15   if someone could call him an attorney, and certainly

16   none of them involved a situation in which in addition

17   to that said, I can't make a phone call? And he was

18   told, not now. Because I submit to the Court that's the

19   only reasonable interpretation of the discussion that we

20   saw on that video.

21           If there is any question about whether

22   defendant's words about calling someone to call him an

23   attorney are equivocal, although I submit to this Court

24   that there should not be, that question could easily be

25   put to rest. Yes, the defendant used the words, I don't

ckf

1    know, maybe if I could call someone, to see if he could

2    call an attorney.  The words, I don't know, did not

3    refer to whether or not he knows that he wants to call

4    an attorney.  The words I don't know were a response to

5    the question he was just asked by Detective Cereghino.

6    The question he was just asked was whether or not he is

7    willing to speak with him and waive his rights.  His

8    response was, I don't know.  He is saying I don't know

9    if I am willing to speak with you and waive my rights.

10   He's not saying I don't know if I want an attorney.

11           And any claim to the contrary is quickly put

12   to rest by the fact that he said it twice.  He said it

13   twice.  He didn't back off of it.  And then, as if that

14   was not enough, Mr. Bonilla immediately thereafter said,

15   I can't make a phone call?  And in response, Detective

16   Cereghino doesn't say yes, you can make a phone call.

17   He doesn't bring him to a phone or otherwise do anything

18   to let him make a phone call.  He doesn't offer to make

19   the call for him.  Detective Cereghino, it is

20   undisputed, does not make a single attempt of any kind

21   to assist Mr. Bonilla in getting in touch with an

22   attorney and instead, what does Detective Cereghino do?

23   After the defendant asked if he could make a phone call,

24   he told him, ultimately yes, but right now I'm asking.

25   Okay, what does that mean, ultimately yes?  I

1     respectfully submit that everybody in this room knows

2     exactly what it means.  It means eventually, at some

3     later time and not now.  There is no other reasonable

4     interpretation.  He was told that he couldn't right now.

5            Now, that is exactly the type of conduct that

6     the Court of Appeals prohibits.  Clearly, having asked

7     if he could make a phone call and being told that he

8     could not call then but only at some later time,

9     Mr. Bonilla was essentially coerced into waiving his

10    rights, specifically what the constitution and the right

11    to counsel prohibits.

12           Additionally, he's asked, I mean, look at what

13    happened here and again, it's on the video.  He's asked

14    if he's willing to answer questions.  He doesn't say

15    yes, he says, I don't know.  Maybe I should call someone

16    to call me an attorney.  After Detective Cereghino fails

17    to provide him with the opportunity to make a phone

18    call, okay, he then asks the defendant again if you'll

19    answer questions and then Mr. Bonilla said yes.  How did

20    that happen?  Why did that happen?  I think it's clear

21    why that happened.  It happened immediately after

22    Mr. Bonilla asked if he could call someone to call him

23    an attorney and it happened immediately after Detective

24    Cereghino told him, ultimately you could make a phone

25    call, but not right now.

1           He's read his rights.  He's told he has the

2      right to counsel.  Immediately afterward, he asks to

3      make a phone call to obtain counsel, he is not provided

4      one and he's not permitted to make a phone call.

5      Instead, Detective Cereghino takes another stab at

6      securing a waiver from my client without counsel and he

7      then interrogates him for over four hours without

8      counsel present.  And now the assistant DA is going to

9      stand up and tell this Court that his right to counsel

10     wasn't violated?  That doesn't even pass the

11     straight-face test, your Honor.  If that's not a

12     violation of someone's right to counsel, then the Sixth

13     Amendment might as well not exist.  The right to counsel

14     has no practical value, your Honor.  I respectfully

15     submit to this Court, that this one is not even close.

16          As if the violation of my client's right to

17     counsel was not clear enough already, the defendant then

18     tells the detective that he needs someone who speaks

19     Spanish so he can better understand and he states

20     specifically, it is better if I say it in Spanish.  In

21     response, what do the detectives do?  They don't make

22     any arrangements to obtain an interpreter for him, they

23     don't attempt to clarify it.  They tell him, you're

24     doing fine, we think you understand it.  We don't think

25     you need an interpreter.  Interesting how that played

ckf

1       out, your Honor.

2               You know, in the end, your Honor, the

3       attorneys here could go back and forth, but the Court of

4       Appeals has spoken on this issue and has spoken quite

5       clearly.  The Court of Appeals has been adamant about

6       protecting the right to counsel and the rules of speech.

7       Court of Appeals makes no exceptions in murder cases.

8       In fact, many of the cases precluding statements prior

9       to the right to counsel are murder cases and many of

10      these involve situations in which the defendant outright

11      admitted to murder, something that clearly is not the

12      case here.  The fact that this is a murder case, your

13      Honor, and the consequences faced by my client, that's

14      that much more of a reason to carefully safeguard the

15      rights of the defendant and ensure that he's treated

16      fairly.

17              The Second Department has set forth the

18      standard for equivocation, it's whether a reasonable

19      police officer would know that the defendant was asking

20      for counsel.  The defendant asked to make a phone call.

21      The reason he wanted to make the phone call was to see

22      if someone could call him an attorney.  No reasonable

23      argument could be made that Detective Cereghino did not

24      -- that Detective Cereghino did not know that the

25      defendant wanted to make a phone call at that moment and

1    no reasonable argument could be made that Detective

2    Cereghino did not know the reason he wanted to make a

3    phone call, because my client told him why he wanted to

4    make a phone call, to obtain counsel.  So Cereghino knew

5    that my client wanted to make a phone call and he knew

6    why my client wanted to make a phone call and he didn't

7    allow him to.  Those facts are not disputed and can't

8    be.  At the very least, a reasonable person in Detective

9    Cereghino's position would certainly know that he was

10   asking to make a phone call to obtain an attorney and I

11   submit, your Honor, that once this Court concludes that

12   a reasonable person in Detective Cereghino's position

13   should have known that the defendant was requesting an

14   attorney, I respectfully submit that the Court is

15   compelled by Second Department precedent to suppress the

16   statement.  I could hardly think of a situation in which

17   a violation of defendant's right to counsel is more

18   obvious.

19           I'm therefore asking this Court to make the

20   only decision consistent with New York State's right to

21   counsel, the only decision consistent with the Sixth

22   Amendment of the United States Constitution and the only

23   decision consistent with long standing precedent

24   established by the Court of Appeals and the Second

25   Department.  I'm asking this Court to suppress the

1    videotaped statement of the defendant.  Thank you.

2              THE COURT:  The Court, having held a hearing

3    on this matter and taking argument of counsel on this

4    one particular point that I found of some concern during

5    the course of the hearing, with respect -- first of all,

6    I am of the opinion that the defendant speaks and

7    understands English perfectly well.

8              Secondly, with respect to the statements made

9    by the defendant to Detective James Cereghino, I find

10   the defendant did not make an unequivocal invocation of

11   his right to counsel.  His statements are admissible on

12   the People's direct case.

13             I would ask counsel at this point to go

14   directly to Judge Donnino for further reassignment of

15   the matter.

16             *         *         *

17        I, Cindy Kaye-Fink, Senior Court Reporter, hereby

18   certify that the foregoing is a true and correct transcript

19   of the within proceedings.

20

21

22             _____
                Cindy Kaye Fink
23              Senior Court Reporter

24

25