```
 1   STATE OF NEW YORK  :  NASSAU COUNTY

 2   SUPREME COURT        :  PART 37
     -------------------------------------X
 3   THE PEOPLE OF THE STATE OF NEW YORK,

 4
              -against-                    IND-202N-11
 5

 6   ULISES A. BONILLA,

 7                           Defendant.
     -------------------------------------X
 8   TRIAL                   December 1, 2011
     (VOIR DIRE)
 9                           262 Old Country Road
                             Mineola, New York
10

11
     B E F O R E:            HONORABLE GEORGE R. PECK
12                           Acting Supreme Court Justice

13

14   A P P E A R A N C E S :

15
     For The People:
16
     HON. KATHLEEN M. RICE
17   Nassau County District Attorney
     BY:    ZEENA ABDI, ESQ., of Counsel
18          Assistant District Attorney

19

20   For The Defendant:

21   DANIEL L. MILLMAN, ESQ.,
     316-A Main Street
22   Roslyn, New York 11576

23

24

25                       BETTY PIOURIK
                         SENIOR COURT REPORTER
```

bp

| 1  | THE CLERK:  Indictment 202N-2011, Ulises |
| 2  | Bonilla. |
| 3  | You are Ulises Bonilla? |
| 4  | THE DEFENDANT:  Yes. |
| 5  | THE CLERK:  Let the record reflect that |
| 6  | the court interpreter is required and present. |
| 7  | Give your appearance. |
| 8  | THE INTERPRETER:  Kimberly Hernandez. |
| 9  | Good morning. |
| 10 | MS. ABDI:  For the People, Zeena Abdi, |
| 11 | Assistant District Attorney.  Good morning. |
| 12 | MR. MILLMAN:  For the defendant, Daniel |
| 13 | Millman, 316-A Main Street, Roslyn, New York. |
| 14 | THE COURT:  The first thing I want to get |
| 15 | over is the interpreter question.  Mr. Millman, you |
| 16 | have informed me that your client does speak |
| 17 | English, but he does request an interpreter to be |
| 18 | here; is that correct? |
| 19 | MR. MILLMAN:  That is correct. |
| 20 | THE COURT:  In other words, there may be |
| 21 | some nuances in the English language, there may be |
| 22 | some idiomatic expressions like, it's raining cats |
| 23 | and dogs, that he may not be familiar with, and as a |
| 24 | consequence, the interpreter should be here.  Is0 |
| 25 | that not correct? |

```
 1                MR. MILLMAN:  Yes, your Honor, exactly.
 2                THE COURT:  Now, the next thing, does he
 3     want or you want the interpreter to give verbatim
 4     translations and simultaneous translations, or do
 5     you want the interpreter to only interpret that
 6     which he asks to be interpreted?  What would you
 7     like?
 8                MR. MILLMAN:  A very brief moment to
 9     confirm.
10                I would like to have her interpret
11     everything.
12                THE COURT:  So you request a simultaneous
13     interpretation.
14                MR. MILLMAN:  Yes, your Honor.
15                THE COURT:  That's fine.
16                I've ordered two panels of about sixty
17     each.  One will be here in the morning, and one will
18     be here in the afternoon.  All we're going to do
19     today is take excuses.  Is that understood?
20                MR. MILLMAN:  Yes, your Honor.
21                THE COURT:  Now, I don't know how long
22     this case is going to take, but towards the end of
23     the case I'm going to have to make a judgment as to
24     whether or not there is sufficient time before the
25     holidays to sum up and charge and deliberate.
```

1               If, in my judgment, there is not

2       sufficient time to sum up, charge and deliberate,

3       then, I understand it's by consent -- because I

4       talked to you about this off the record -- that at

5       the close of the evidence we will adjourn for the

6       Christmas holidays; reconvene on January 3rd when

7       the court is open, at which time we sum up, charge

8       and deliberate.  Agreed, People?

9               MS. ABDI:  Yes.

10              MR. MILLMAN:  Yes, your Honor.

11              THE COURT:  That's our game plan then.

12              Now, do you have any -- I know we have to

13      do some preliminary dealings and you want rulings

14      for them.  Let's start now.

15              MS. ABDI:  Your Honor, first I would like

16      to state that I gave defense counsel Rosario

17      numbered 1 through 1401.  I gave him the bulk of

18      that material through hearings in August, and then

19      the additional material I provided him yesterday.

20      I'm also giving the Court a copy of those materials.

21              I've also handed up to the Court a witness

22      list.  I am handing a copy of the witness list to

23      defense counsel.

24              I would ask if there are any defense

25      witnesses that they provide the names of those

 1    people, the names and dates of birth.

 2              THE COURT:  Do you want the jury to be

 3    aware of any potential witnesses that you have?

 4              MR. MILLMAN:  Yes, your Honor.  I could

 5    provide a witness list.  I don't have it here, but

 6    it will take a matter of minutes.

 7              THE COURT:  I'm not going to get into the

 8    witnesses today.  I just want to take the excuses

 9    today.  He said he would provide it before it's

10    necessary.

11              MS. ABDI:  With respect to preliminary

12    issues, there are medical records in this case of

13    the ten-year old victim that I know defense counsel

14    and I had spoken about that he had requested some

15    redactions.  That is something that we have.  He has

16    indicated to me that once he advises me of that,

17    that's something that we may discuss amongst

18    ourselves and see if we can work out anything with

19    respect to those redactions, and if not we would

20    come to your Honor with that.

21              I just want to put that on the record.

22    And that's the same thing for -- there's a

23    videotaped statement.  Defense counsel has provided

24    me yesterday with redactions that he was interested

25    in with respect to the video.

| 1  | Once I take a look at that, once again, I |
|----|------------------------------------------|

1          Once I take a look at that, once again, I

2     will be in contact with defense counsel.  If there

3     is anything we can agree on, then we can agree on

4     that, and we would come to you if there's any

5     disagreement with respect to redactions.

6          THE COURT:  There is a problem with that,

7     and the problem with the medical records is not as

8     profound as the problem with the videotape.

9          Now, you tell me there is a videotape in

10    this particular case which lasts five hours; is that

11    true?

12          MS. ABDI:  Yes.

13          THE COURT:  Are you going to introduce

14    that tape?

15          MS. ABDI:  I'm not sure about that yet,

16    your Honor.

17          THE COURT:  So I'm supposed to take five

18    hours of court time going through a videotape for

19    the purposes of redaction when you don't know

20    whether or not you're going to introduce it?  Is

21    that what you want me to do?

22          MS. ABDI:  There is not five hours of --

23    he's not speaking for five hours.  It's a shorter

24    amount of time.  And the redactions, if we can agree

25    on them, they may not require a watching of the

bp

1    whole tape.  They may be the sort of category your

2    Honor can make a ruling on.  I definitely do not

3    intend on wasting the Court's time.  And I would

4    only come to you if there this is something we could

5    not agree on.

6              THE COURT:  This is the time that this is

7    brought to the Court's attention.  This should have

8    been done weeks ago, but it wasn't, and we'll deal

9    with it.

10             What do you want to do with the medical

11   records?

12             MS. ABDI:  That we have to -- when I find

13   out what defense counsel wants redacted I will

14   discuss with him if we can agree on those.

15             THE COURT:  Are you going to have a doctor

16   testify as to who examined --

17             MS. ABDI:  Yes.

18             THE COURT:  If you have a doctor

19   testifying -- and of course I'm not trying the

20   case -- what do you need the medical records for?

21             MS. ABDI:  Judge, this would just be if I

22   need to put them in.  I wanted to make sure it was

23   already worked out before I would put them into

24   evidence.

25             THE COURT:  That's reasonable.

bp

1               MR. MILLMAN:  If I may also, just on that

2       issue -- while I am seeking redactions to certain

3       things regarding diagnosis and treatment and so

4       forth, I intend on introducing the medical records.

5       I just wanted to make that clear to be sure.  I'm

6       not saying the entire record itself should come in.

7       I'm just seeking redactions of it.

8               THE COURT:  If you intend to introduce the

9       medical records because you believe there is some

10      aspect of the records which are exculpatory --

11              MR. MILLMAN:  Yes, I do.

12              THE COURT:  What else do we have to do

13      now?

14              MS. ABDI:  The one thing I wanted to --

15      well, not the one -- it's not quite a Molineaux

16      application, but I'm making an application in that

17      vein to go into the altercation between the

18      defendant Ulises Bonilla and the victim of the

19      homicide Armando Villatoro.  They had a fight in a

20      deli that Friday night into Saturday which was

21      shortly after the father found out about what had

22      happened in the park.  I'm seeking to go into the

23      fact that the father was there.

24              THE COURT:  You're going to have to put

25      this in a little more detailed context.  Apparently,

1        there is an allegation that this defendant and the

2        daughter of the victim had some type of sexual

3        contact in a park; is that correct?

4                  MS. ABDI:  That's correct.

5                  THE COURT:  And a couple of days later the

6        father confronted the defendant about this.

7                  MS. ABDI:  Well, it was later that day

8        into the early morning hours of Saturday.

9                  THE COURT:  So some hours later the father

10       confronted the defendant about this.

11                 MS. ABDI:  Correct.  And they had a verbal

12       altercation and was going to get physical, but it

13       was broken up.  The defendant said to the victim,

14       let's settle this man to man; something to that

15       effect.  He then left the deli, came back to the

16       deli with friends -- talking about the defendant --

17       was looking for the victim, and was going to

18       start -- continue the altercation.  And then

19       eventually all the parties left the deli.

20                 This interaction, to me, is very relevant

21       for several reasons.  One, because it completes the

22       narrative of the four-day span between the rape and

23       the murder.  It's relevant.  It completes the

24       narrative.  It also is necessary for the jury to

25       have this accurate picture of the critical events in

1       this case.  It's relevant towards motive.  It's

2       relevant towards identity.  And it's relevant, not

3       only the state of mind of the victim, but also the

4       state of mind of the defendant.

5               In addition, there's going to be other

6       evidence elicited that the defendant made reference

7       to this encounter to another witness in this case,

8       and said words to the effect of, I'm going to get

9       him back for that.  This all leads to Tuesday, the

10      28th which is the day of the murder.

11              THE COURT:  I'm going to get him back for

12      that.  Is that quote, unquote?

13              MS. ABDI:  He was talking about the guy in

14      the deli.  And in addition, that is once again --

15      it's relevant for the motive in this case, and it's

16      also relevant to complete the picture that there was

17      this conflict between these two individuals that

18      stemmed out of what happens in the park, and the

19      fact that the father confronted him about this

20      incident in the park.  That's the incident I'm

21      seeking to get into; the interaction and the

22      altercation.

23              THE COURT:  Mr. Millman?

24              MR. MILLMAN:  This does not fall under the

25      exception to Molineaux.  Our position is that it's

1    prejudicial.  It does not go towards motive in any
2    way, your Honor, or identity.

3              THE COURT:  The statement, I'm going to
4    get him back for that, doesn't go to motive?

5              MR. MILLMAN:  The statement can be brought
6    out, but the particulars of what happened days
7    earlier I don't believe.

8              Now, counsel indicated that this is
9    relevant to identify.  There is no issue of
10   identity.  My client acknowledges he was there and
11   fought with the victim.  As far as bearing on the
12   state of mind of the victim, state of mind of the
13   victim has nothing to do with any of the elements
14   here and is not relevant.  The state of mind of the
15   defendant?  Again, it doesn't go towards the state
16   of mind of the defendant.

17             Additionally, aside from the fact that it
18   doesn't fall under any of the exceptions under
19   Molineaux, even if it does, then as your Honor knows
20   the Court is then to weigh the probative value
21   against the prejudice.  And I believe no matter how
22   you look at that, I believe this should be excluded.

23             Court of Appeals in People vs. R-E-S-E-K,
24   3 N.Y.3d 385, rejected specifically what counsel is
25   saying.  Just because something completes the

1    narrative, doesn't mean that it comes in where

2    there's prejudice and where it has a minimal -- even

3    if it has some probative value -- where it's minimal

4    and prejudicial, it should be excluded.

5         Our position is that this does not in any

6    way bear on any of the elements of the crime or any

7    of the issues that are relevant in this case.  My

8    understanding is that the District Attorney is

9    claiming that the motive for the victim confronting

10   my client had to do with what the victim believed

11   happened with his daughter.

12        First of all, if that's their position,

13   they don't need this incident to establish that.

14   And second of all, that does not provide a motive

15   for the defendant.  If anything it provides a motive

16   for the victim to confront the defendant.  So again,

17   your Honor, it's an uncharged bad act, uncharged

18   crime.  It's also highly prejudicial.  It doesn't

19   fall under Molineaux.  Even if the Court believes it

20   does, it's minimal value.

21        THE COURT:  What about the general rule

22   that you can introduce threats as part of the design

23   or scheme?

24        MR. MILLMAN:  Yes, and I'm aware of those

25   cases, your Honor.  But the threat that she referred

1   to, I believe, is a threat made at the time of the

2   incident on the 28th, at the time of the stabbing.

3   That threat wasn't made at the time; a few days

4   earlier.  So you know, that is something I

5   understand they are allowed to get into, what was

6   said at the time of the stabbing.  That doesn't air

7   on what happened days earlier.  That's my position.

8                THE COURT:  Well' I'm going to allow it

9   in.  I think it does go to the issue of identity.

10  And simply because your client admits some

11  confrontation, that does not necessarily mean he

12  admits the murder.  It goes to the rule of evidence

13  which says, threats can be introduced on the issue

14  of intent as part of the design or plan.  And the

15  reason behind the confrontation between this

16  defendant and the victim as part of the People's

17  proof is not going to be that they had an argument

18  over the proceeds of a card game.  They were

19  confronting each other -- at least the victim was

20  confronting the defendant -- because of a sexual

21  confrontation with his ten-year-old daughter.  And

22  when you put it in context like that, I believe that

23  it is extremely probative to intent, motive, and

24  identity.  The People's application is granted.

25                People?

1           MS. ABDI:  The other issue --

2           THE COURT:  Just one second.  I would

3    suggest that the ten-year-old, who I guess is now

4    eleven testify before these other pieces of proof

5    are introduced.  I know the order of the witnesses

6    is normally up to the People, but if for instance

7    something happens in her testimony that is not

8    corroborated by these statements, you might have a

9    problem.  I'm not asking you to argue it now.  I'm

10   just asking you to be aware of my suggestion.  I'm

11   not asking you to argue it now.

12          MS. ABDI:  Okay.

13          MR. MILLMAN:  Your Honor, I'm not going to

14   argue that point.  I wanted to -- while we were on

15   the subject -- I'm not waiving any arguments I may

16   have with respect to any hearsay.  I don't know

17   exactly what they are contending that the victim

18   said during the confrontation beforehand -- it may

19   be hearsay, maybe not.  I don't know if that is

20   something you want to take up now or at the time.

21          THE COURT:  Where would the hearsay come

22   in?  I assume she has a witness who says that he

23   spoke -- he or she spoke to the defendant, and this

24   is a direct conversation they had, or he or she had

25   with the defendant.  That is certainly admissible.

1           MR. MILLMAN:  Like I said, I don't know if
2      it's hearsay or not.  But if, for example, he says
3      well, these two boys said this, that and that, it
4      may be a little less clear issue.
5           THE COURT:  That's an issue.  That's a
6      different issue.
7           Anything else?
8           MS. ABDI:  Yes, Judge.  I would be seeking
9      to go into my direct case to elicit information from
10     the detective at least that the defendant fled, and
11     there was a search for him to try to find him, and
12     they had to -- he was in Boston.  They finally
13     apprehended him through use of pen registers.  That
14     they finally apprehended him two months later in
15     Penn Station.  I'm seeking to go into that as part
16     of my direct case, that he fled.
17          THE COURT:  Defendant?
18          MR. MILLMAN:  Yes, your Honor.  I object
19     to that.  I do understand that under certain
20     circumstances Courts have allowed evidence of flight
21     to be introduced, but it's certainly not an
22     all-or-nothing proposition.  The Courts are still
23     aware there has to be a weighing, going on probative
24     versus prejudicial effect.  This is very prejudicial
25     certainly.

1       The Court of Appeals has recognized the
2   ambiguity of evidence of flight and the fact that
3   sometimes it can be unduly prejudicial and have very
4   limited probative value.  The case here in
5   particular when there are also innocuous
6   explanations -- also my understanding is -- I don't
7   know that counsel concedes this, and certainly she
8   will let me know if she disagrees -- the flight they
9   are referring to, his leaving the area.

10      Our position is certainly that it did not
11  occur at the time or immediately after that fight.
12  I believe there were a couple of days that passed.
13  I haven't found any case that is indicative one way
14  or another to what extent that would interfere.  My
15  main objection is based on its prejudice, its lack
16  of probative value.  It doesn't in any way make it
17  more or less likely that my client engaged in any of
18  the conduct he is charged with.

19      THE COURT:  Certainly I will allow the
20  evidence of flight.  As far as a defendant
21  testifying as to -- I did this, I did this, I did
22  this, I did this, I did this -- what relevancy does
23  that have?  It may create a curiosity upon our jury,
24  but what relevancy does it have?  That's a
25  rhetorical question.  I certainly will say, you

1        could ask the detective, were you looking for the

2        defendant? The defendant, yes. How long were you

3        looking for the defendant? For about two months.

4        Were you continuously looking for him? Yes.

5               Certainly you can go into something like

6        that, but not the detail which I think you want to

7        do.

8               Anything else.

9               MS. ABDI: Those are all the main issues

10       that I have now. There might be other issues that

11       may be more appropriate before I'm going to enter in

12       some of the evidence.

13              MR. MILLMAN: Your Honor, just on the last

14       point, I want to be clear. So when the issue

15       arises -- when we talk about flight -- I would ask

16       the Assistant District Attorney if she could -- what

17       specifically she's talking about because there was a

18       lengthy period of time. I don't know exactly what's

19       involved. Flight is very general. If we could just

20       clarify that.

21              THE COURT: First of all, it's for the

22       jury to determine if flight exists in the first

23       place. And if flight does exist then they determine

24       what value, if any, it has. I is very, very nice

25       for a jury to hear what steps the detective took as

bp

1    a part of his investigation. But really jurors are

2    not investigators; they are fact finders. And as a

3    consequence, I will let her go into this, but not in

4    the detail which I think she wants to do.

5                Anything else?

6                MR. MILLMAN: Yes, your Honor. First of

7    all, one of the issues that I had raised at the

8    bench had to do with a witness' competence, and my

9    concern about the Rosario material I reviewed which

10   had indicated --

11               THE COURT: You indicated as part of the

12   Rosario information that you received you noticed

13   that in the Grand Jury minutes of the complainant an

14   insufficient foundation was laid to determine

15   whether or not she could appreciate the nature and

16   quality of an oath. When.

17               I started in this business, the cut off

18   point was twelve years of age. Now it's nine years

19   of age, and I believe there is a presumption

20   attached. I'm not going to make a ruling on that

21   particular matter at this particular time. We do

22   have a ways to go before she testifies. But if you

23   could provide me any authority to the contrary, I'll

24   look at it.

25               MR. MILLMAN: Certainly. And as I

bp

1      indicated, because I was just provided the Rosario,

2      I haven't had the chance to fully look into it.  I

3      wanted to make clear I wasn't waiving it.

4                  THE COURT:  No, you are not.

5                  MR. MILLMAN:  On that note, your Honor,

6      there will arise, regardless of the outcome of that

7      issue, there will arise an issue pertaining to

8      whether or not the particular children witnesses --

9      I don't know if there is one or two -- but whether

10     or not they are competent and whether or not they

11     can give unsworn testimony.

12                  I think it's very difficult for you to

13     make the decision without hearing what the witnesses

14     have to say and how they respond to the questions.

15                  THE COURT:  That's true.

16                  If someone is below the presumed age, I'm

17     going to have to question them, and I'll make a

18     judgment at that particular time.

19                  MR. MILLMAN:  And along the same line, I

20     am alerting the Court to it again.  I think it's

21     impossible to make that other ruling without seeing

22     what -- there will be photos I'm sure the DA will

23     seek to introduce of the victim.  And I know they

24     are entitled to introduce certain photos.

25                  I will also have issues pertaining to the

1    number and nature and quality, and whether or not --

2    I think at this point without having the photos, I'm

3    just alerting the Court.

4              THE COURT:  I will deal with that when

5    they are introduced.

6              MR. MILLMAN:  Another issue, your Honor,

7    will pertain to -- I'm uncomfortable even saying it

8    because the victim is eleven.  I have reason to

9    believe there may have been other sexual activity

10   that the eleven-year-old victim had engaged in.  I'm

11   aware of the rape shield laws.  I'm not talking

12   about consent.

13             THE COURT:  How is that relevant in this

14   case?

15             MR. MILLMAN:  I'll tell you how, Judge.

16             THE COURT:  Because let's just assume that

17   she was a very, very promiscuous eleven-year-old.

18   How is that relevant, when we are only dealing with

19   the issue of age?  She can consent all she wants to.

20             MR. MILLMAN:  I agree.  Consent is not an

21   issue.  The reason it is relevant is because there

22   is no DNA or other physical evidence linking my

23   client in terms of identity.  But certainly I can

24   see from the Rosario material and the records, my

25   understanding is that the DA will take the position

 1  │  that because the records show some minor signs of
 2  │  either contact or scarring --
 3  │           THE COURT:  We will get into it.  But you
 4  │  may be counter productive in your strategy if you
 5  │  show that she is a promiscuous eleven-year-old.
 6  │           MR. MILLMAN:  I considered that, your
 7  │  Honor.  My only point is, to the extent that they
 8  │  are indicating that she had no sexual activity, and
 9  │  the only reason she could have these observations in
10  │  that area would be if someone touched her down
11  │  there --
12  │           THE COURT:  This is not a defendant; this
13  │  is a witness.  And the general rule is that your
14  │  Sandoval application doesn't apply to a witness, but
15  │  we'll deal with it when it becomes apparent.
16  │           MR. MILLMAN:  Just to be clear,
17  │  Sandoval -- no offense or anything, just talking
18  │  about the fact that if any bruise that may be there
19  │  could be explained by her contact with somebody
20  │  else -- certainly that would be highly relevant.
21  │           THE COURT:  That would be relevant.
22  │           Everybody is ready?
23  │           MS. ABDI:  Yes.
24  │           MR. MILLMAN:  Yes, other than the
25  │  reservation about the issue with the minutes that

bp

1    may not be an issue.

2                  THE COURT:  What I intend to do is call

3    the jury in and take excuses.  That's the only thing

4    I'm going to do.  I don't believe that Antommarchi

5    applies to this.  But just on the safe side, have

6    you discussed the Antommarchi Rule with him?

7                  MR. MILLMAN:  Well specifically which

8    aspect?

9                  THE COURT:  In other words, that the

10   defendant has a right to be present during jury

11   qualifications.  It is the common practice of the

12   defendant to waive that particular right in my

13   experience.  I don't know what he wants to do.

14                 MR. MILLMAN:  Let me just -- it's been a

15   while.  Let me take a moment now, your Honor.

16                 (A discussion was held off the record.)

17                 (A short recess was taken.)

18                 THE CLERK:  People of the State of New

19   York vs. the defendant Ulises Bonilla,

20   Indictment 202N-2011.  All parties present including

21   the defendant and the Spanish interpreter.

22                 THE COURT:  Anything else before we bring

23   the jury in?

24                 MR. MILLMAN:  Your Honor, just for the

25   record, I have spoken with my client.  He signed the

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 23 of 913 PageID #: 323

1    Antommarchi waiver.

2              THE COURT:  Thank you.  Just one second.

3    Mr. Bonilla, do you understand that you have the

4    right to be present when we question the

5    qualifications of jurors?

6              THE DEFENDANT:  Yes.

7              THE COURT:  If an issue comes up as to the

8    qualifications of a juror, and that juror wants to

9    speak to us in private, do you waive your right to

10   be present?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And when I take the

13   preliminary excuses of jurors, do you waive your

14   right to be present?

15             THE DEFENDANT:  Yes.

16             THE COURT:  I have the Antommarchi waiver

17   allegedly signed by you.  Did you sign this piece of

18   paper?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Did you understand it?

21             THE DEFENDANT:  Yes.

22             THE COURT:  For the record it says, I have

23   been informed by the Court and advised by my counsel

24   of my fundamental right to be present during any

25   material stage of the trial, including being present

1    when and during empaneling of the jury.  And also

2    when the Court conducts sidebar discussions with

3    perspective jurors exploring their backgrounds and

4    weighing the evidence objectively.

5           Upon discussion with my counsel I will

6    knowingly waive my right to be present during

7    sidebar discussions during any material stage of the

8    trial.

9           That is Court Exhibit I.

10          (So marked.)

11          THE COURT:  Let's bring in the jury.

12          MR. MILLMAN:  I know you said we could

13   still address additional matters.  I want to make

14   clear there are other matters, but I'm fine with

15   bringing in the jury and addressing them later.

16          THE COURT:  We are going to continue jury

17   selection tomorrow.

18          MR. MILLMAN:  Okay.

19          (The prospective jurors entered the

20   courtroom.)

21          THE CLERK:  Good morning, ladies and

22   gentlemen.  I need to briefly swear you in.  If you

23   can all please rise and raise your right hands.

24          (The prospective jurors were duly sworn by

25   the Clerk.)

1           THE COURT:  Ladies and gentlemen, my name
2    is Judge George Peck.  And I will be presiding over
3    this trial.  The main charges in this particular
4    case are murder, and the sexual abuse of a
5    ten-year-old.
6           The People in this particular county are
7    represented by Kathleen Rice.  The District Attorney
8    Zeena Abdi will be the Assistant District Attorney
9    prosecuting this case.
10          MS. ABDI:  Good morning.
11          THE COURT:  The defendant is represented
12   by Daniel Millman.
13          MR. MILLMAN:  Good morning.
14          THE COURT:  Do you wish to introduce your
15   client?
16          MR. MILLMAN:  Ulises Bonilla is my client.
17   Good morning.
18          THE COURT:  Now, how long will this case
19   take?  I really don't know, but it's going to take a
20   little longer than the average case.  And therefore
21   counsel and I have arranged by consent the following
22   schedule:
23          We will proceed with the selection of the
24   jury today and tomorrow.  If we don't get one today
25   or tomorrow, we will continue on Monday.

1          After all of the evidence is in -- and

2    this is the important part -- the next thing that

3    happens is summations of counsel and the charge.  It

4    will be my judgment as to whether or not we can

5    conclude this case prior to the Christmas holidays.

6    What I don't want to happen is interrupt

7    deliberations for the Christmas holidays.  And the

8    holidays are December 26th through and including

9    January 2nd.  We would recommence on January 3rd.

10   So anybody who is selected for this jury would be

11   expected to have themselves available for the first

12   week in January, even though I don't anticipate that

13   to happen.

14          Now at this particular time, I'm going to

15   take excuses.  Now, what is an excuse?  An excuse is

16   not something that is a matter of inconvenience.  We

17   are all inconvenienced by being here.  An excuse is

18   something like this -- well, I have a planned

19   vacation.  I have to take care of an elderly parent

20   or a young child.  I never expected to be on a case

21   that might last a month.  The commissioner of jurors

22   called me, I thought it was only going to be a

23   couple of days.  I have a severe financial hardship.

24   Things like that.

25          We will now rule on your individual

bp

```
 1      excuses.  The Court officer will direct you in this

 2      regard.  Don't all stand up at once.  One at a time.

 3      Counsel approach.

 4                  The first thing I want you to do when you

 5      come up here is give your name.

 6                  PROSPECTIVE JUROR:  My name is Jeff Heath.

 7      I have a vacation scheduled for December 23rd

 8      through the 27th, and it's also my busy season at

 9      work.

10                  THE COURT:  The 23rd through 27th?

11                  We are not going to be working then.  It's

12      the 22nd --  I stand corrected.  Consent?

13                  MS. ABDI:  Yes.

14                  MR. MILLMAN:  Yes.

15                  (The prospective juror was excused.)

16                  THE COURT:  My name Jose Publish.  I'd be

17      glad to serve as a juror but December 6th I have a

18      medical procedure that's scheduled.  That's the only

19      day.

20                  What day of the week is that?

21                  PROSPECTIVE JUROR:  That's Tuesday next

22      week.

23                  THE COURT:  We will be actively engaged in

24      this particular trial on the 6th.  You said you will

25      be incapacitated for at least a day.  I don't want
```

1    to know what it is.

2              PROSPECTIVE JUROR:  Monday I have to take

3    medication, and they need me to be home and the

4    procedure is on Tuesday.  I should be fine by

5    Wednesday.

6              THE COURT:  Okay.

7              MS. ABDI:  Consent.

8              MR. MILLMAN:  Consent.

9              (The prospective juror was excused.)

10             PROSPECTIVE JUROR:  Jude Lawson.  I own my

11   own business.  I'm self-employed.  It would be a

12   really hard time to miss that much.  And I also help

13   my mother with my wheelchair-bound aunt.  She does

14   some days and I do some days.

15             MS. ABDI:  Consent.

16             MR. MILLMAN:  Consent.

17             THE COURT:  You are excused.

18             (The prospective juror was excused.)

19             THE COURT:  My name Allisa Cassarro.  I'm

20   a third grade teacher.  I have report cards next

21   week.  I am responsible for giving out report cards,

22   parent meetings, and just the age range makes me

23   very uncomfortable.  I'm teaching the same kids you

24   discussed.  You discussed the ten-year-old child.

25             That's the allegation.

1              PROSPECTIVE JUROR:  That's the same age I
2      teach.  I am a little uncomfortable.
3              THE COURT:  I am not going to get into
4      that issue now.  You'd have to get a substitute for
5      three weeks.
6              PROSPECTIVE JUROR:  In my school,
7      generally, the substitute situation is another
8      teacher is covering on their break which would mean
9      everyone in my school would be rearranged.
10             MS. ABDI:  Consent.
11             MR. MILLMAN:  Consent.
12             THE COURT:  You are excused.
13             (The prospective juror was excused.)
14             THE COURT:  My name is Robert Curbador.
15     I'm a recent college graduate.  I'm also unemployed
16     looking for a job currently, and I have a few
17     interviews set up in the next three weeks.  I kind
18     of don't want to miss just in case.
19             MS. ABDI:  Consent.
20             MR. MILLMAN:  Consent.
21             THE COURT:  You are excused.
22             (The prospective juror was excused.)
23             PROSPECTIVE JUROR:  I have childcare
24     issues.  I have my son who has to be at school at
25     8 o'clock in the morning, and I have my daughter who

bp

1       I have to take her at noon.  I don't have an

2       alternative --

3                       THE COURT:  How old are they?

4                       THE WITNESS:  They are 10 and 5.

5                       MS. ABDI:  Consent.

6                       MR. MILLMAN:  Consent.

7                       (The prospective juror was excused.)

8                       PROSPECTIVE JUROR:  Dawn Brion.

9                       MS. ABDI:  Before we call the next person,

10      if there is somebody that I think we can put back

11      for further inquiry, can I just say, further

12      inquiry?

13                      THE COURT:  I don't know what you mean.

14      If there is somebody that didn't give a reason that

15      we will consent to having them dismissed right now?

16                      Stop that conversation.

17                      What are you talking about?

18                      MS. ABDI:  Meaning, people that have come

19      up, have given reasons, we both consented to

20      dismiss.  However, if they give a reason that we

21      think right now that we want further inquiry --

22                      THE COURT:  Then make further inquiry.  If

23      you want to ask questions, go ahead.

24                      PROSPECTIVE JUROR:  Thelma Vasquez.

25                      I don't understand that much English, and

1          I have three children.

2                    THE COURT:  You have trouble with

3          conversational English?

4                    THE DEFENDANT:  Yes.

5                    MS. ABDI:  Consent.

6                    MR. MILLMAN:  Consent.

7                    (The prospective juror was excused.)

8                    PROSPECTIVE JUROR:  Donna Roman.  I have a

9          planned family vacation leaving on January 7th.  I

10         didn't realize it might be this long.  It's a time

11         share, the only weeks --

12                   THE COURT:  That's the second Monday in

13         January, right?

14                   PROSPECTIVE JUROR:  Yes, the 7th.

15                   THE COURT:  We will be through by then.

16                   PROSPECTIVE JUROR:  Okay.  I may have

17         other issues with the case, not related.  My

18         daughter's best friend was molested by her

19         boyfriend.

20                   THE COURT:  One of the things I asked was

21         is there anything about the nature of the charges

22         that would affect your ability to deliberate

23         impartially.

24                   PROSPECTIVE JUROR:  Potentially.  I've

25         seen a lot with my daughter's best friend.  It was

1    molestation by her boyfriend, sexual molestation.

2              THE COURT:  You think that would affect

3    your impartiality in this case?

4              PROSPECTIVE JUROR:  It might.

5              THE COURT:  People?

6              MS. ABDI:  Is it fair to say, right now

7    you know nothing about this case.  Obviously this

8    person is the situation is completely different than

9    the situation that happened with your daughter's

10   friend.  The real question is, can you decide this

11   case based on just the evidence you hear in this

12   courtroom?

13             PROSPECTIVE JUROR:  Probably, most likely.

14             MR. MILLMAN:  May I, Judge.

15             You said probably, most likely.  It sounds

16   like you are uncertain to some extent.

17             PROSPECTIVE JUROR:  Obviously I will

18   listen to the evidence.  Based upon the evidence,

19   not based upon my prior --

20             THE COURT:  We'll get into this in a

21   little greater detail if you are selected.  This is

22   one of the things that might necessitate an

23   independent questioning of you.  And if the lawyers

24   do that I really want to have the other jurors

25   listen to it because it might affect them also.  So

                        bp

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 33 of 913 PageID #: 333

 1        have a seat and we may go into this later on.

 2                    PROSPECTIVE JUROR:  Okay.  Thank you.

 3                    PROSPECTIVE JUROR:  J.R. Kelly.  I have a

 4        vacation scheduled the week of Christmas.  I was

 5        planning to be with my wife and kids at that time.

 6                    THE COURT:  We are not working that week.

 7        We are not working the last week in December and the

 8        first Monday in January.  Does this have any bearing

 9        to you?

10                    PROSPECTIVE JUROR:  I suppose it does.

11                    THE COURT:  I don't know what you mean.

12        You say you have a vacation planned on the period of

13        time that we are not going to be in court.

14                    PROSPECTIVE JUROR:  I wasn't aware of your

15        schedule.

16                    THE COURT:  I just mentioned it.

17                    PROSPECTIVE JUROR:  Okay.

18                    THE COURT:  Have a seat.  If you have any

19        problems come on back up.

20                    Let me mention this to you again, ladies

21        and gentlemen.  We will not be working Christmas

22        week.  That is, the week after Christmas, we will

23        not be here.  And we will not be working the first

24        Monday in January because of the holidays.  So if

25        this case is not complete we will continue the case

1        on January 3rd.  Maybe I didn't make that clear.

2        But a lot of people think we are going to be here

3        Christmas week.  We are not.

4                    PROSPECTIVE JUROR:  I do not think I would

5        be objective in a case of sexual abuse of a child.

6                    THE COURT:  Your name?

7                    PROSPECTIVE JUROR:  Louisa Alpern.

8                    THE COURT:  No one is asking you to

9        condone this alleged conduct.  I mean who likes

10       robberies and thinks like that.

11                   PROSPECTIVE JUROR:  The murder part is not

12       an issue.

13                   THE COURT:  We are asking whether or not

14       the nature of the charge would affect you?  Do you

15       agree that you would go in with a preconceived vibe?

16                   PROSPECTIVE JUROR:  I think I would.

17                   THE COURT:  Any questions by anyone?

18                   MR. MILLMAN:  No, Judge.

19                   MS. ABDI:  May I inquire, Judge?

20                   Is it something where you wouldn't be able

21       to sit here and listen to the evidence?

22                   PROSPECTIVE JUROR:  I could listen to the

23       evidence.  I don't know that I could judge it fairly

24       given -- I don't want to talk anymore.

25                   MS. ABDI:  Consent.

```
 1              THE COURT:  You are excused by consent.
 2              (The prospective juror was excused.)
 3              PROSPECTIVE JUROR:  Candy Chin.  I decide
 4    not to take this case, because I do have children.
 5    So to be fair to the party, I am choosing not to
 6    take this case.
 7              THE COURT:  How old are your children?
 8              PROSPECTIVE JUROR:  My daughter is eleven
 9    and my son is fourteen.  So it's a big consideration
10    for this case.
11              THE COURT:  You feel because of the nature
12    of the charges and the ages of your children --
13              PROSPECTIVE JUROR:  Correct.
14              THE COURT:  You could not be impartial; is
15    that true?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  People?
18              MS. ABDI:  Can you understand that the
19    defendant sits here now and there has been no
20    evidence.  Can you listen to the evidence that's
21    presented with an open mind?
22              PROSPECTIVE JUROR:  I'm afraid I can't.
23              MS. ABDI:  Okay.
24              THE COURT:  You are excused.
25              (The prospective juror was excused.)
```

1          PROSPECTIVE JUROR:  Tracy Eisenberg.  At

2     this time my husband is out of work.  I have two

3     twin five years olds two months left to work.  And

4     my job only pays me for three days if I'm out of

5     work.

6          THE COURT:  And what did you say?

7          PROSPECTIVE JUROR:  In two months I'm

8     going to --at the beginning of February I'll be out

9     of work also.

10          THE COURT:  People?

11          MS. ABDI:  Consent, Judge.

12          MR. MILLMAN:  Consent.

13          THE COURT:  You are excused.

14          (The prospective juror was excused.)

15          PROSPECTIVE JUROR:  My name is C.C.

16     Laturi.  My husband just got laid off after

17     31 years, and I'm the only one in the house working

18     right now.

19          THE COURT:  People?

20          MS. ABDI:  Consent.

21          MR. MILLMAN:  Consent.

22          THE COURT:  You are excused.

23          (The prospective juror was excused.)

24          PROSPECTIVE JUROR:  Audra Mora.  I'd like

25     to be excused because I will be on an extremely

bp

```
 1        financial situation for myself.  I'm going to be,
 2        laid off from work in January from a bank, and if I
 3        don't work this month --
 4                    THE COURT:  People?
 5                    MS. ABDI:  Consent.
 6                    MR. MILLMAN:  Consent.
 7                    THE COURT:  You are excused.
 8                    (The prospective juror was excused.)
 9                    PROSPECTIVE JUROR:  My name is Octavia
10        Presley.  In the event I am selected, will it run
11        past 5:00 p.m.?  I'm in graduate school.  I graduate
12        December 20th.
13                    THE COURT:  In the event you are selected,
14        it will not run past 5:00 p.m.  You may not know it
15        but we have union rules here and I doubt we will
16        ever go past -- we won't go past 4:30.
17                    PROSPECTIVE JUROR:  I don't want to miss
18        my graduation.
19                    THE COURT:  Okay.
20                    PROSPECTIVE JUROR:  I am Mary Lighter.
21        I'm a Latina person, and the defendant is Latina.
22        I'm also involved in the Spanish community.  I do
23        work with Latino children.  My thinking is I may be
24        a little bias, more -- I don't know how to put it.
25        I'm always for the Latino community.  That's one of
```

bp

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 38 of 913 PageID #: 338

1    the reasons.  And the other is if I'm chosen I would

2    have to take three days off.  My uncle is

3    unconscious at this point.  This is my only uncle.

4    I would have to fly to Ohio.

5             THE COURT:  You have an impending death in

6    the family.  You are excused.

7             (The prospective juror was excused.)

8             PROSPECTIVE JUROR:  My name is Gilda

9    Davis.  I have a planned vacation which requires me

10   to be out of town from December 23rd -- this is a

11   copy of my reservation.

12            THE COURT:  You came prepared.  You are

13   excused.

14            (The prospective juror was excused.)

15            PROSPECTIVE JUROR:  My niece was murdered

16   in 1986 by a fired New York City parole officer.

17   Her body has never been found.  I am anxiety-ridden

18   just thinking about a murder trial.

19            THE COURT:  Did that happen in Nassau

20   County?

21            PROSPECTIVE JUROR:  That happened in Toms

22   River, New Jersey.

23            THE COURT:  Any problem?

24            MS. ABDI:  Consent.

25            MR. MILLMAN:  Consent.

```
 1                THE COURT:  You are excused.
 2                (The prospective juror was excused.)
 3                PROSPECTIVE JUROR:  Susan A --
 4                THE COURT:  What's your problem?
 5                Do you speak English?
 6                PROSPECTIVE JUROR:  Not much.
 7                THE COURT:  You are excused.
 8                You have to understand what's going on.
 9      You don't speak English that well.
10                (The prospective juror was excused.)
11                PROSPECTIVE JUROR:  I am self-employed.  I
12      have to pick up my daughter from school every day.
13                THE COURT:  How old is your daughter?
14                PROSPECTIVE JUROR:  Eight years old.
15                THE COURT:  What time have you got to pick
16      her up?
17                PROSPECTIVE JUROR:  Three o'clock.
18                THE COURT:  Can anyone else pick her up?
19                PROSPECTIVE JUROR:  Not for that long;
20      maybe one or two days.
21                THE COURT:  What do you do for a living?
22                PROSPECTIVE JUROR:  Medical billing.
23                THE COURT:  People?
24                MS. ABDI:  I'll consent, Judge.
25                MR. MILLMAN:  Consent.
```

```
 1              THE COURT:  See that gentleman over there.
 2              (The prospective juror was excused.)
 3              PROSPECTIVE JUROR:  My name is Carolyn
 4    Orski.   I have three reasons why I shouldn't be on
 5    the case.  Number one, I'm self-employed, I don't
 6    get paid.  My husband was a captain in the Sex
 7    Crimes Division, New York City.  These are kind the
 8    kind of crimes -- and I have an eleven-year-old girl
 9    who's going to be twelve.  For me the work -- I
10    can't not go to work.
11              MS. ABDI:  Consent.
12              MR. MILLMAN:  Consent.
13              THE COURT:  You are excused.
14              (The prospective juror was excused.)
15              PROSPECTIVE JUROR:  My name is Carla
16    Patrino.  I'm a teacher, a high school math teacher.
17    There is no way I will be able to complete them in
18    less than three weeks.
19              MS. ABDI:  Consent.
20              MR. MILLMAN:  Consent.
21              THE COURT:  You are excused.
22              (The prospective juror was excused.)
23              PROSPECTIVE JUROR:  I'm Stephanie Torella.
24    I have a four-and-a-half-year-old daughter and I'm
25    the only one supporting us since my husband isn't
```

```
 1        paying for her tuition this month.
 2                 THE COURT:  So basically what you're
 3        saying --
 4                 PROSPECTIVE JUROR:  It's a financial
 5        hardship and my daughter.
 6                 MS. ABDI:  I'll consent.
 7                 MR. MILLMAN:  Consent.
 8                 (The prospective juror was excused.)
 9                 PROSPECTIVE JUROR:  My name is Jesus
10        Hadon, and my son was convicted of a felony when he
11        was 19.  I don't want to be here.
12                 MS. ABDI:  Consent.
13                 MR. MILLMAN:  Consent.
14                 THE COURT:  You are excused.
15                 (The prospective juror was excused.)
16                 PROSPECTIVE JUROR:  My name is Julian
17        Johnson.  I am the full-time caregiver, the mother
18        of three children, and I also have two elderly
19        parents.  My mother and mother-in-law are living at
20        home with us.  My husband he is the sole breadwinner
21        and usually assigned to different work sites.
22                 THE COURT:  People?
23                 PROSPECTIVE JUROR:  I am the one that has
24        to take the moms to the doctors.
25                 MS. ABDI:  Consent.
```

bp

| 1 | MR. MILLMAN: Consent. |
| 2 | (The prospective juror was excused.) |
| 3 | PROSPECTIVE JUROR: My name is Brooke |
| 4 | Gilman. I have two school-aged children, nine and |
| 5 | ten, and I have nobody after school to watch them. |
| 6 | They get out of school at 2:30. |
| 7 | MS. ABDI: Consent. |
| 8 | MR. MILLMAN: Consent. |
| 9 | THE COURT: You are excused. |
| 10 | (The prospective juror was excused.) |
| 11 | PROSPECTIVE JUROR: Hi. My name is Dana |
| 12 | Braunbein. I'm a middle school chorus teacher and |
| 13 | my holiday concerts are December 13th, 22nd, and |
| 14 | 23rd. And, we have in-school concerts. |
| 15 | THE COURT: People? |
| 16 | MS. ABDI: Consent. |
| 17 | MR. MILLMAN: Consent. |
| 18 | (The prospective juror was excused.) |
| 19 | PROSPECTIVE JUROR: My name is Roosevelt |
| 20 | Tobar. I have planned trip on January 4th for the |
| 21 | whole month of January because my mother is 95 in |
| 22 | Chile, and she's dying from cancer. |
| 23 | THE COURT: We will be probably be through |
| 24 | by then. |
| 25 | PROSPECTIVE JUROR: I work every day. |

bp

```
 1                    THE COURT:  I don't want to take the
 2          chance.  I'm going to excuse you.  I don't know if
 3          you may have to make an emergency visit to your
 4          mother.
 5                    PROSPECTIVE JUROR:  Thank you so much.
 6                    (The prospective juror was excused.)
 7                    PROSPECTIVE JUROR:  My name is Hera
 8          Juhilo.  I have two problems.  One of them is that I
 9          have seven-year-old child, grandchild that I have to
10          wait for him after he comes back from school at
11          3 o'clock.  That's my working hours, from 6:00 in
12          the morning to 3:00 so to make sure to come home to
13          wait for the kid.
14                    Another one is the place where I work is
15          very small, and if I'm not there for more than for a
16          few days actually creates problems.
17                    THE COURT:  People?
18                    MS. ABDI:  What do you do?
19                    PROSPECTIVE JUROR:  I'm a chemist.
20                    THE COURT:  Where?
21                    MS. ABDI:  Where do you work?
22                    PROSPECTIVE JUROR:  I work for Analytical
23          Chemists in Farmingdale.
24                    MS. ABDI:  How many people are there?
25                    PROSPECTIVE JUROR:  About five or six.
```

```
1              MS. ABDI:. I will consent, Judge.

2              MR. MILLMAN:  Consent.

3              THE COURT:  You are excused.

4              (The prospective juror was excused.)

5              PROSPECTIVE JUROR:  Donald McGowan.  On

6     the 20th and 21st, I have to go to -- my son just

7     graduated from Geneseo -- on the 20th and 21st of

8     December.

9              THE COURT:  What days of the week is that?

10             PROSPECTIVE JUROR:  I think it's a Tuesday

11    and Wednesday, so I have to drive up there and get

12    all his belongings.

13             MS. ABDI:  I'll consent.

14             MR. MILLMAN:  Consent.

15             (The prospective juror was excused.)

16             PROSPECTIVE JUROR:  Teresa Borner.  I have

17    a four-year-old, and he's in daycare only until

18    4:30.  If he has to stay later I have to pay more.

19             THE COURT:  Where is he in daycare?

20             PROSPECTIVE JUROR:  Kiddie Academy in

21    Hicksville.  If he stays later, it's a late charge.

22             THE COURT:  People?

23             MS. ABDI:  I will consent.

24             MR. MILLMAN:  Consent.

25             THE COURT:  You are excused.
```

1
2                    (The prospective juror was excused.)
3                    PROSPECTIVE JUROR:  My name is Jean Marie
4       Tenor.  I have a family wedding to attend in
5       Florida.  I bought my plane ticket for
6       December 16th.
7                    THE COURT:  What day of the week is that?
8                    PROSPECTIVE JUROR:  I am flying on a
9       Friday.  The wedding is on a Saturday.
10                   THE COURT:  What time is your flight?
11                   PROSPECTIVE JUROR:  In the morning,
12      probably.  I am not sure.  I think maybe 1:00, so I
13      have be there at 11:00.
14                   MS. ABDI:  So you have tickets from the
15      16th until when?
16                   PROSPECTIVE JUROR:  I return on Sunday the
17      18th.
18                   THE COURT:  She will be out Friday,
19      Saturday, Sunday.
20                   MS. ABDI:  Consent.
21                   MR. MILLMAN:  Consent.
22                   THE COURT:  Okay.
23                   (The prospective juror was excused.)
24                   PROSPECTIVE JUROR:  Gina Montana.  I was
25      having trouble hearing you.  I have hearing aids.

```
 1              THE COURT:  Are you saying that you might
 2      have difficulty hearing the testimony?
 3              PROSPECTIVE JUROR:  Yeah.
 4              THE COURT:  People?
 5              MS. ABDI:  I know that we do have an
 6      apparatus that they use that will amplify some of
 7      the testimony.  I don't know if the Court has access
 8      to this.
 9              THE COURT:  Do you feel uncomfortable
10      sitting on this particular case because of your
11      hearing difficulty.
12              PROSPECTIVE JUROR:  Yeah.
13              MS. ABDI:  Now I'll consent.
14              MR. MILLMAN:  Consent.
15              THE COURT:  You are excused.
16              (The prospective juror was excused.)
17              PROSPECTIVE JUROR:  My name is Carol
18      Gaines.  I don't have the emotional fortitude for a
19      case of this type.  I spent 18 months with my sister
20      in hearings for the sexual abuse of her daughter by
21      her ex-husband.
22              THE COURT:  The case is too much for you?
23              PROSPECTIVE JUROR:  Yeah, way too much.
24              MS. ABDI:  Consent.
25              MR. MILLMAN:  Consent.
```

```
 1                    THE COURT:  You are excused.
 2                    (The prospective juror was excused.)
 3                    PROSPECTIVE JUROR:  Hi.  Catherine
 4      Bringle.  I'm going away the 19th to the 23rd,
 5      Monday to Friday.
 6                    THE COURT:  Where are you going?
 7                    PROSPECTIVE JUROR:  Bahamas.  My Mom's
 8      50th birthday.
 9                    THE COURT:  You are excused.
10                    (The prospective juror was excused.)
11                    PROSPECTIVE JUROR:  Eva Mann.  I have a
12      problem.  I don't know very good English.  And
13      number two, my kids --
14                    THE COURT:  You don't have to go any
15      further.  It's a requirement that you must
16      understand the testimony.  If you can't do that I
17      have to excuse you.
18                    PROSPECTIVE JUROR:  Okay, thank you.
19                    (The prospective juror was excused.)
20                    PROSPECTIVE JUROR:  Marion Concette.  I'm
21      having surgery.
22                    THE COURT:  When?
23                    PROSPECTIVE JUROR:  December 13th, next
24      Tuesday.
25                    THE COURT:  You are excused.
```

```
 1                  (The prospective juror was excused.)

 2                  PROSPECTIVE JUROR:  I have a wife that's

 3       five months pregnant and it's kind of a high risk

 4       pregnancy circumstances.  We have two doctors

 5       appointments on the 15th and the 19th.

 6                  THE COURT:  You are excused.

 7                  (The prospective juror was excused.)

 8                  PROSPECTIVE JUROR:  My name is Luther

 9       Lober.  I don't think I could do this.

10                  THE COURT:  Too much for you; the nature

11       of the charge?

12                  PROSPECTIVE JUROR:  Very much too much.

13                  THE COURT:  Consent.

14                  MS. ABDI:  Consent.

15                  MR. MILLMAN:  Consent.

16                  THE COURT:  You are excused.

17                  (The prospective juror was excused.)

18                  PROSPECTIVE JUROR:  Alex Ingles.  So my

19       situation is such.  I have a one-year-old-son at

20       home that I relieve the nanny's duties on Wednesdays

21       and Thursday.  I am also in charge of a five person

22       broker-dealer in Manhattan where I'm supervising

23       manager.

24                  THE COURT:  Who cares for your son?

25                  PROSPECTIVE JUROR:  I have a nanny and my
```

bp

 1          wife is working and pregnant.

 2                      THE COURT:  People?

 3                      MS. ABDI:  How many days a week are you

 4          working?

 5                      PROSPECTIVE JUROR:  Five days a week.  I

 6          work for a European company.  There is a crisis.  I

 7          am the supervisor of the office, so I'm working

 8          could be -- I shift my hours a lot.  So normally

 9          it's 6:00 to 6:00, but on those days -- I went this

10          morning to work, 2:30 in the morning to whatever.

11                      THE COURT:  Are they going to fix that

12          crisis?  That's another issue.

13                      MS. ABDI:  Is your work situation such

14          that you are going -- are you not going to be able

15          to pay attention to what's going on in the trial?

16                      PROSPECTIVE JUROR:  To be honest, yes.

17          It's a high pressure situation.  Agents, brokers

18          dealers, and we are selling European equities.

19          There is a lot going on in Europe as you know.

20                      MS. ABDI:  Consent.

21                      MR. MILLMAN:  Consent.

22                      THE COURT:  You are excused.

23                      (The prospective juror was excused.)

24                      PROSPECTIVE JUROR:  My name is Marianna

25          Barlow.  I'm a nurse.  I'm being sued myself and my

1      trial is scheduled for January 23rd.

2              THE COURT:  So your trial is being

3      scheduled for January 23rd.  You'll be through with

4      this case by then, and you will be sued civilly.

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  For what?

7              PROSPECTIVE JUROR:  Malpractice.

8              THE COURT:  That won't have anything to do

9      with this case.

10              PROSPECTIVE JUROR:  Okay.

11              PROSPECTIVE JUROR:  My name is Susan

12      Sternberg.  I have three young children that I need

13      to be home for school.  And I also have a

14      ten-year-old son.

15              THE COURT:  Okay, you are excused.  Let me

16      ask you this.  Wouldn't you like to stay on this

17      case and have a vacation?

18              PROSPECTIVE JUROR:  I don't think so.

19              (The prospective juror was excused.)

20              PROSPECTIVE JUROR:  Diana Hussaria.  I am

21      the single mother of an autistic child, and while

22      he's in school all day, I am concerned about after

23      school care.

24              THE COURT:  People?

25              MS. ABDI:  Consent.

```
 1              MR. MILLMAN: Consent.

 2              THE COURT: You are excused.

 3              (The prospective juror was excused.)

 4              PROSPECTIVE JUROR: Shira Belsen. I'm a

 5    Sabbath observer, and I was told that court could be

 6    until 4:30. I live in Manhattan actually.

 7              THE COURT: You live in Manhattan?

 8              PROSPECTIVE JUROR: I don't even live

 9    here. So it's travel --

10              THE COURT: How long have you lived in

11    Manhattan?

12              PROSPECTIVE JUROR: The last two months.

13    I moved, and the Sabbath starts Friday at 4:00. I

14    need to be back. I'm not allowed to travel.

15              THE COURT: I'm not even sure she's

16    qualified. I'd have to check the rules on that.

17    You've moved your address, your domicile from Nassau

18    to Manhattan?

19              PROSPECTIVE JUROR: Yeah.

20              THE COURT: You are excused.

21              (The prospective juror was excused.)

22              PROSPECTIVE JUROR: My name is Michael. I

23    take medication that impairs my judgment. And I had

24    two friends that passed away over the last weekend

25    and I need time to mourn.
```

```
 1              MS. ABDI:  I'll consent.

 2              MR. MILLMAN:  I will consent.

 3              THE COURT:  You are excused by consent.

 4    See that gentleman over there.

 5              (The prospective juror was excused.)

 6              PROSPECTIVE JUROR:  This past Tuesday I

 7    got a very, very bad pathology report, and I need to

 8    make arrangements.

 9              THE COURT:  You are excused.

10              PROSPECTIVE JUROR:  Do you need the name

11    of the doctor?

12              THE COURT:  No.  I believe you.

13              PROSPECTIVE JUROR:  I wish I could tell

14    you something else.

15              THE COURT:  Ladies and gentlemen, I have

16    to go through the same thing with another panel of

17    70 which is arriving at 2 o'clock.  So I'm going to

18    excuse you until tomorrow at about quarter to ten at

19    which time we can start with the actual questioning

20    and my preliminary instructions to you.  So you are

21    excused until tomorrow.

22              Just a few things.  You don't know too

23    much about this particular case, which is good; you

24    shouldn't know anything about it.  But don't have

25    any contact or speak to any of the parties in this
```

1    particular case.  And they won't speak to you.  It's

2    not that they are rude.  We want to keep up the

3    appearance of impropriety.  So, we'll see you

4    tomorrow to start the selection process.  I should

5    have enough tomorrow whereby we can get into this

6    particular case.

7                   (The prospective jurors exited the

8    courtroom.)

9                   THE COURT:  We will see everyone at 2:00.

10                  (A lunch recess was taken. )

11

12                          *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

A F T E R N O O N   S E S S I O N

THE CLERK: Recalling case on trial. Ulises Bonilla, Indictment 202N-11. All parties present including the defendant and the Spanish interpreter.

THE COURT: Anybody have anything to put on the record before we proceed?

MS. ABDI: Yes, your Honor. Defense counsel, I believe, had asked for a subpoena for medical records -- for the medical records of Jennifer Villatoro for a period of two months before the incident, approximately two months before the incident, or before she went to the doctor in this case.

The People are objecting to that subpoena being signed at all. We believe it runs afoul of the rape shield laws that specifically allow her not to be cross-examined about prior sexual history, and I believe that would also cover needlessly subpoenaing her prior medical records to develop some soft cross-examination material.

THE COURT: I signed the subpoena, and I directed the records to be brought into court, after which I will read them. And then we'll have argument on it.

1            I'm not an expert on the rape shield laws,

2     but I also know there are exceptions to the statute.

3     Anything else?

4            MR. MILLMAN:  No, your Honor.

5            MS. ABDI:  No, your Honor.

6            THE COURT:  Did you ask for a subpoena to

7     be signed for a juvenile?

8            MR. MILLMAN:  I believe that two of them

9     were -- Oscar and Nancy are both juveniles.

10           THE COURT:  Let me see the one for Oscar.

11           We had a discussion of this off the

12    record, and it appears that the People may want to

13    call these witnesses, and the defendant may want to

14    call these witnesses.  The witnesses are not owned

15    by any particular side.  But I could see where there

16    may be concern by the People that if the witnesses

17    get dual subpoenas there may be a little bit of

18    confusion.

19           Therefore, today is December 1st.  I put

20    on the subpoena, not to be served until December 7,

21    2011.  This will give you a week to alert them as to

22    when they may be coming down.

23           You have an exception.

24           MS. ABDI:  Yes, Judge.  I just wanted to

25    clarify as to what date is on the subpoena for them

bp

1  to appear in court. I don't want them to run afoul

2  of the subpoena. If I'm still on my direct case and

3  that's not the date they are going to appear for

4  trial, that's my concern.

5      THE COURT: That's always a concern. And

6  just one second. That's always a concern. And if

7  you wish to put on your subpoenas, call your office

8  number on December 8th, that's fine too. In other

9  words, they are put on telephone alert.

10     MS. ABDI: Judge, I actually have a big

11 problem with them being in contact with the defense

12 attorney. They are under no obligation to have any

13 contact with the defense attorney at all.

14     THE COURT: They are under no obligation

15 to have any contact with you.

16     MS. ABDI: Correct. This is the defense

17 attorney of the man who is accused of killing their

18 father and harming their sister. And now you are

19 allowing a subpoena to be served on a random date

20 when they are probably going to be called during my

21 case. You are asking them to call defense counsel.

22     THE COURT: I can't believe you are making

23 this argument. I know you have concerns over it,

24 but the fact of the matter is, he has the right of

25 compulsory process, and I'm not going to interfere

```
 1        with it.  You have an exception.
 2                  MS. ABDI:  All right.
 3                  THE COURT:  Bring in the jury.
 4                  If you wish to apply for a type of
 5        protective order, do it.
 6                  MS. ABDI:  Protective order of what?
 7                  THE COURT:  I think you might be able to
 8        do that.
 9                  (The jury entered the courtroom.)
10                  THE CLERK:  Good afternoon jurors.  If you
11        could all please rise and raise your right hands.
12                  (The prospective jurors were duly sworn by
13        the Clerk.)
14                  THE CLERK:  Thank you.  Please have a
15        seat.
16                  THE COURT:  Ladies and gentlemen, my name
17        is Judge George Peck.  I'm an Acting Supreme Court
18        Judge, and I will be presiding over this particular
19        trial.
20                  This is a criminal case.  The main charges
21        in this particular case are murder, and rape of a
22        ten-year-old, sexual abuse of a ten-year-old.
23                  The People are represented by Kathleen
24        Rice.  Zeena Abdi will be presenting this case for
25        the People.
```

bp

| | |
|---|---|
| 1 | MS. ABDI: Good afternoon. |
| 2 | THE COURT: The defendant is represented |
| 3 | by Daniel Millman. Mr. Millman, you may introduce |
| 4 | yourself, and if you care to, your client. |
| 5 | MR. MILLMAN: My client is Ulises Bonilla. |
| 6 | Good afternoon. |
| 7 | THE COURT: I don't know how long this |
| 8 | case will take. So pay particular attention to what |
| 9 | I'm going to say right now. It will take longer |
| 10 | than the average case. I anticipate the evidence |
| 11 | will be in or concluded the week before Christmas. |
| 12 | I could be wrong. We are not -- I repeat -- not |
| 13 | working the last week in December which is Christmas |
| 14 | week. The courts are closed, and we will not be |
| 15 | working on January 2nd. |
| 16 | We will continue the case, if necessary, |
| 17 | on January 3rd. I, as well as counsel, don't want |
| 18 | you to be in deliberations during Christmas week. |
| 19 | That would be unfair to everyone. |
| 20 | I now am going to take excuses to see if |
| 21 | there is anything about this particular case that |
| 22 | would prevent you from sitting on it impartially. |
| 23 | For instance, if you have an excuse of another |
| 24 | matter such as you have to attend to small children, |
| 25 | or an ailing mother or father, or something like |

bp

1    that.  Or if it's going to be of an extreme

2    financial hardship for you to be involved for such a

3    period of time.

4              Bear in mind, I'm not going to excuse

5    someone for the sake of convenience.  We are all

6    inconvenienced by being here.  But if you have a

7    good reason, then we will attend to it.

8              We'll start with the excuses now.  Don't

9    everybody jump up at once; we will do this in an

10   orderly fashion.

11             PROSPECTIVE JUROR:  Good afternoon my name

12   is Nicholas Pinto.  I'm a criminal defense lawyer.

13   I am a sole practitioner, and I have appearances in

14   the Eastern District of New York next week.  I have

15   an appeal due for the Second Circuit.  It's

16   substantial --

17             MS. ABDI:  Consent.

18             MR. MILLMAN:  Consent.

19             THE COURT:  Okay, you are excused.

20             (The prospective juror was excused.)

21             PROSPECTIVE JUROR:  Oliva Gross.  I'm a

22   student teacher.  I'm finished in a couple of weeks.

23   If I miss all of those hours, I might not get credit

24   and graduate.

25             THE COURT:  You are a student?

bp

```
 1                   PROSPECTIVE JUROR:  Yes.
 2                   THE COURT:  And you have to go to school
 3        to receive the hours upon which to graduate?
 4                   PROSPECTIVE JUROR:  Yes.  I am student
 5        teaching now, so I'm in a school all day every day.
 6                   THE COURT:  You are student teaching as
 7        part of your curriculum?
 8                   PROSPECTIVE JUROR:  Yes.
 9                   THE COURT:  I understand.
10                   MS. ABDI:  Consent.
11                   MR. MILLMAN:  Consent.
12                   (The prospective juror was excused.)
13                   PROSPECTIVE JUROR:  I am Radida Shaw.
14        Next week I have to fly to Phoenix.  My daughter is
15        over there, and one year I haven't seen her.  We had
16        made the reservations to go see her.
17                   THE COURT:  You are excused.
18                   MS. ABDI:  Consent.
19                   MR. MILLMAN:  Consent.
20                   (The prospective juror was excused.)
21                   PROSPECTIVE JUROR:  I'm a full-time
22        student.
23                   THE COURT:  What's your name?
24                   PROSPECTIVE JUROR:  Rana Lapot.  And I'm a
25        full-time student.  I need to be in school.
```

bp

1 || THE COURT:  Why are you here?

2 || PROSPECTIVE JUROR:  Because I had to be

3 || here.  I was summoned; I had no choice.

4 || MS. ABDI:  Consent.

5 || MR. MILLMAN:  Consent.

6 || THE COURT:  You are excused.

7 || (The prospective juror was excused.)

8 || PROSPECTIVE JUROR:  I don't necessarily

9 || know what I'm supposed to say, but I'm a little

10 || touchy with this subject.  My sister was raped this

11 || summer.  It's really emotional for me.  I don't want

12 || to be unfair.  I'm still upset about that.

13 || MS. ABDI:  Consent.

14 || MR. MILLMAN:  Consent.

15 || THE COURT:  You are excused.

16 || (The prospective juror was excused.)

17 || PROSPECTIVE JUROR:  Angela Vaccari.

18 || PROSPECTIVE JUROR:  I have a trip

19 || scheduled for Tuesday morning at 8:00 a.m., and as

20 || such my family is going down tomorrow with my

21 || daughter.  And certainly hearing the case about a

22 || ten-year-old being raped is additionally

23 || distressful.

24 || THE COURT:  Where are you going?

25 || PROSPECTIVE JUROR:  Chicago.

bp

```
 1              THE COURT:  You are excused.

 2              (The prospective juror was excused.)

 3              PROSPECTIVE JUROR:  Marcy Kessler.  I'm an

 4    elementary school teacher, and we have testing and

 5    grades before the Christmas.

 6              THE COURT:  Where do you teach?

 7              PROSPECTIVE JUROR:  Hunter College

 8    elementary school.  And I have graduate classes

 9    three times a week.

10              MS. ABDI:  Consent.

11              MR. MILLMAN:  Consent.

12              THE COURT:  You're excused.

13              (The prospective juror was excused.)

14              PROSPECTIVE JUROR:  Balor Pari.  I got two

15    reasons not to be on this case.  I have an ailing

16    mother.  She's sick.  And like today, she had to go

17    take a heart examination, and I couldn't go.  My

18    sister went with her.  She lives with me.

19              THE COURT:  Your mother?

20              PROSPECTIVE JUROR:  Yes.

21              I have financial difficulty.  I just had a

22    modification that went through.

23              MS. ABDI:  Consent.

24              MR. MILLMAN:  Consent.

25              THE COURT:  You are excused.
```

```
 1                   (The prospective juror was excused.)
 2                   PROSPECTIVE JUROR:  Your Honor, I don't
 3      feel that I will be an impartial juror.  I was raped
 4      when I was an adolescent.  In addition, I'm a solo
 5      practitioner in Queens.  I don't have anyone
 6      covering my practice.
 7                   MS. ABDI:  Consent.
 8                   MR. MILLMAN:  Consent.
 9                   THE COURT:  You are excused.
10                   (The prospective juror was excused.)
11                   PROSPECTIVE JUROR:  Audrey Weissman.
12                   THE COURT:  You are excused.
13                   (The prospective juror was excused.)
14                   PROSPECTIVE JUROR:  Toby Ingerson.  I'm a
15      psychologist and being away from my patients would
16      be a hardship.  I am also a professor coming into
17      finals.  I also take care of my 15-year-old niece
18      and my 15-year-old son.
19                   MS. ABDI:  Consent.
20                   MR. MILLMAN:  Consent.
21                   (The prospective juror was excused.)
22                   PROSPECTIVE JUROR:  I'm not sure if it's a
23      conflict.  I do a lot of work with Nassau County
24      Police, and my sister was a special investigator
25      with Allstate --
```

bp

1           THE COURT: Is that the only reason?
2           PROSPECTIVE JUROR: I am in the marine
3    business. I've only got a couple of weeks left to
4    my season.
5           THE COURT: Because of your sister?
6           PROSPECTIVE JUROR: Like I said, we do a
7    lot of work -- my business with Nassau County.
8           THE COURT: That's not a conflict.
9           Do you have a financial problem?
10          PROSPECTIVE JUROR: I only have a couple
11   of weeks where I can actually work. We work on the
12   water, and in the middle of the winter we don't
13   work.
14          THE COURT: I don't know what you're
15   asking me to do.
16          PROSPECTIVE JUROR: I only have a couple
17   of weeks left where I can finish the work where we
18   are for the season until the winter sets in. We
19   usually close down.
20          THE COURT: I understand what are you
21   asking me to do, excuse you for a financial
22   hardship.
23          PROSPECTIVE JUROR: For my business
24   reason, if possible, yes. If not, I'll have to do
25   what I have to do. I am the only employee.

1                   THE COURT:  Just one second, I'm thinking.

2                   People?

3                   MS. ABDI:  When you do work, what is your

4       work schedule?  Do you work on the weekends?

5                   PROSPECTIVE JUROR:  We are on call

6       twenty-four-seven.  We do salvage mooring.  When the

7       weather is good this time of year we try to take

8       advantage of it.  We've been in a very good weather

9       pattern.  Once the winter comes we shut down with

10      snow and ice.

11                  MS. ABDI:  You don't have an exact date?

12                  PROSPECTIVE JUROR:  An exact date, no.

13                  MR. MILLMAN:  Do you have any regular

14      dealings with the police department and the county,

15      or is it just the county?

16                  PROSPECTIVE JUROR:  With the police

17      department, emergency response work, boating

18      accidents.

19                  MR. MILLMAN:  How closely do you work with

20      them?

21                  PROSPECTIVE JUROR:  Just about all the

22      cases, and the Marine Police in Nassau County.

23                  MR. MILLMAN:  Nassau County in addition to

24      the Marine Police?

25                  THE COURT:  They have a Marine Bureau.

1           MR. MILLMAN:  I am wondering if it's only

2      the Marine Bureau or other parts.

3           PROSPECTIVE JUROR:  Sometimes other parts

4      are involved.

5           MR. MILLMAN:  How long have you been

6      working with the Nassau County?

7           PROSPECTIVE JUROR:  Twenty years.

8           MS. ABDI:  What type of work do you do?

9           PROSPECTIVE JUROR:  We do marine

10     contracts, marine towing, mooring work.  So any

11     boating accidents --

12           MS. ABDI:  You deal primarily with the

13     boats?

14           MR. MILLMAN:  In terms of the business

15     part of it, without prying, financially difficult to

16     get by if you were to have to sit on the case?

17           PROSPECTIVE JUROR:  This time of year,

18     yes.  Again, I'll do what I have to do.

19           MR. MILLMAN:  I take no position.

20           MS. ABDI:  I think maybe further inquiry

21     if it gets to that point.

22           THE COURT:  You are not excused at this

23     particular time.  One thing I do know, you will not

24     be selected for jury today.  We are going to start

25     the selection process tomorrow, and I know that I

bp

1    gave you very, very little time to think about this.

2    So go home tonight, assess your situation, and if

3    necessary we'll revisit it tomorrow.

4              PROSPECTIVE JUROR:  MILLMAN:  Is it Monday

5    through Friday only.

6              THE COURT:  You are off on the weekend and

7    Christmas week is off.  Name?

8              PROSPECTIVE JUROR:  Gerry Gerono.  I have

9    two problems.  I have three children that I have to

10   bring to school, and pick up, at 9 o'clock and

11   3 o'clock.  I can ask my wife to do that for one

12   week because she works.

13             THE COURT:  And your second problem?

14             PROSPECTIVE JUROR:  The second problem I

15   still have difficult in understanding English.

16             MS. ABDI:  Consent, Judge.

17             MR. MILLMAN:  Based on the language alone.

18             THE COURT:  You are excused.  See that

19   gentleman over there.

20             (The prospective juror was excused.)

21             PROSPECTIVE JUROR:  Rosa Mejia.  My

22   problem no too much understand English.

23             THE COURT:  I can see that.

24             MS. ABDI:  Consent.

25             MR. MILLMAN:  Consent.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 68 of 913 PageID #: 368

```
 1              THE COURT:  You are excused.
 2              (The prospective juror was excused.)
 3              PROSPECTIVE JUROR:  Fran Sigorski.  I'm
 4    sorry.  I think I don't -- can't help -- my English.
 5              THE COURT:  You are excused.
 6              (The prospective juror was excused.)
 7              PROSPECTIVE JUROR:  My name is Jacqueline
 8    Parker, and I'm having surgery on December 7th.
 9              THE COURT:  Good luck.  You are excused.
10              (The prospective juror was excused.)
11              PROSPECTIVE JUROR:  Valerie Lindenfeld.
12    I'm a Sabbath observer.  I would have to leave early
13    on Fridays.
14              THE COURT:  What time is that?
15              PROSPECTIVE JUROR:  2:30 probably.
16    Sabbath starts at 4:11.
17              THE COURT:  I think there are going to be
18    many afternoons -- I'm trying to push this case
19    because of the time elements.  And we will be
20    working on Friday afternoon.  In view of that, would
21    you like to be excused?
22              PROSPECTIVE JUROR:  Please.
23              (The prospective juror was excused.)
24              PROSPECTIVE JUROR:  My name is Lorraine
25
```

bp

```
 1        Demedlis.  I'm a Special Ed teacher at a private
 2        high school for sexually abused teenage girls and
 3        emotionally disturbed students.
 4                   THE COURT:  Well, I'm glad you informed us
 5        about your experience in this particular area, but
 6        that in itself is not an excuse.
 7                   PROSPECTIVE JUROR:  I feel that my
 8        experience there -- I've been there 20 years.  It's
 9        in Oyster Bay East Norwich definitely has --
10                   THE COURT:  Influenced you because of your
11        experience in this particular field which obviously
12        outweighs the experience of most other people.  Do
13        you feel that that would affect your impartiality?
14                   PROSPECTIVE JUROR:  Yes.
15                   MS. ABDI:  Consent, Judge.
16                   MR. MILLMAN:  Consent.
17                   THE COURT:  You are excused.
18                   (The prospective juror was excused.)
19                   PROSPECTIVE JUROR:  Sari Infield.  My
20        husband and I have tickets in the second week in
21        January to go to Florida and make arrangements for
22        my mother-in-law who has Parkinson's, and we're not
23        sure if we need to remove her from her home or not.
24                   THE COURT:  Tell me when you are leaving.
25                   PROSPECTIVE JUROR:  We are going to be
```

bp

1    driving down.

2              THE COURT:   Tell me when you are leaving.

3              PROSPECTIVE JUROR:   I'm thinking

4    January 14.

5              THE COURT:   We'll be through by then.

6    Definitely be through by then.

7              PROSPECTIVE JUROR:   Promise -- and if

8    anything happens to my mother-in-law --

9              THE COURT:   That's a different issue.  If

10   you have to attend to an impending medical condition

11   of a loved one, just tell me.

12             PROSPECTIVE JUROR:   The condition is,

13   she's 91.  She has Parkinson's.  She also has some

14   dementia.  We typically will go down at the end of

15   January.  This year we think we have to remove her

16   from the home.

17             THE COURT:   You are not leaving until the

18   middle of January.  Is there any reason that you

19   might have that you will say, in view of an

20   emergency I have to go down December 15th?

21             PROSPECTIVE JUROR:   Not that I know of,

22   no.

23             THE COURT:   Well, we'll be through by

24   then.

25             PROSPECTIVE JUROR:   Okay.

 1                  PROSPECTIVE JUROR:  Your Honor, Richard

 2      Sobolski.  I have a medical issue.  I'm going for a

 3      knee replacement.  I have doctor appointments and

 4      have to get a schedule.  I can't function at work

 5      anymore.  So it's sorts of ASAP.  I've been treated

 6      for about ten years now.

 7                  THE COURT:  Most of the time when you

 8      become a juror you sit and listen.  Do you feel you

 9      can't do that?

10                  PROSPECTIVE JUROR:  Well, it's difficult.

11      I have arthritis.  It stiffens up.  That's part of

12      the problem.  I wear a new brace right now.  That's

13      part of the issue.

14                  THE COURT:  And you say you have doctor

15      appointments?

16                  PROSPECTIVE JUROR:  Yes.  One is

17      Wednesday, Dr. Copose.

18                  THE COURT:  That's all right.  Just tell

19      me when they are.

20                  PROSPECTIVE JUROR:  My next one is

21      December 7th; next Wednesday.

22                  THE COURT:  People?

23                  MS. ABDI:  What time is your doctor's

24      appointment.

25                  PROSPECTIVE JUROR:  10:30.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 72 of 913 PageID #: 372

1              MS. ABDI:  I think what we were just

2     trying to ascertain is, obviously part of being a

3     juror is you are going to have to be sitting for

4     long periods of time.  Obviously there are breaks,

5     including lunch breaks.  There is a lot of sitting.

6              Is the fact that you have a problem with

7     your knees, is that going to cause you too much pain

8     so that you wouldn't be able to listen to the

9     evidence?

10             PROSPECTIVE JUROR:  I go on a two-hour

11    plane flight and is discomforting.

12             THE COURT:  Let me ask you this question.

13    Suppose you weren't excused, and you were selected

14    as a juror, and you were selected as juror number 5,

15    you would be juror number 5.  This seat is

16    confining.

17             Now, I could put you in that seat over

18    there.  You'd still be juror number 5, but you'd

19    have more room.

20             PROSPECTIVE JUROR:  That would certainly

21    help.

22             THE COURT:  But what about this doctor

23    appointment that you have?

24             PROSPECTIVE JUROR:  And when I go there

25    he's going to schedule a knee replacement and --

1            THE COURT:  At this particular time I'm

2    not going to excuse you.  We will be working on

3    December 7th.  Come back tomorrow, and see if you

4    can make the arrangements with your doctor for a

5    different schedule.  If you can't, I'm not going to

6    interrupt that; okay.

7            PROSPECTIVE JUROR:  That would be great.

8            PROSPECTIVE JUROR:  Good afternoon.  My

9    name is Salim Kan.  I like to get myself excused.

10   My wife has major problem.  She cannot stand.  She

11   has pain in her whole complete leg.  I have to go

12   through the whole MRI with her.  It's hard for her

13   to walk.

14           MS. ABDI:  Consent.

15           MR. MILLMAN:  Consent.

16           (The prospective juror was excused.)

17           PROSPECTIVE JUROR:  Victoria Riolo.

18           I have a 92-year-old mother that I am the

19   primary care person to, and right now my husband is

20   watching her, but this would be a difficult time.

21           THE COURT:  You're taking care of her.

22           PROSPECTIVE JUROR:  She's going to be 93.

23           THE COURT:  You are taking care of her.

24   She's not in a nursing home.

25           MS. ABDI:  Consent.

```
 1              MR. MILLMAN:  Consent.

 2              PROSPECTIVE JUROR:  Thank you.

 3              (The prospective juror was excused.)

 4              PROSPECTIVE JUROR:  My name is Alvira

 5    Santorelli.  My issue is that I'm a home based

 6    business.  I'm a sole proprietor.  I brought my tax

 7    return for you to look at.  I have no salary.  It's

 8    just me.  To be out of reach all this time --

 9              MS. ABDI:  Consent.

10              MR. MILLMAN:  Consent.

11              THE COURT:  You are excused.

12              (The prospective juror was excused.)

13              PROSPECTIVE JUROR:  Richard Gotlieb.  My

14    son Brian fractured his calf and he's going to be

15    starting physical therapy three times a week next

16    week at Peak Performance.  I'm only one who can take

17    him for the physical therapy.

18              MS. ABDI:  Consent.

19              MR. MILLMAN:  Consent.

20              THE COURT:  You are excused.

21              (The prospective juror was excused.)

22              PROSPECTIVE JUROR:  Teto Gonzalez.  My

23    only concern that I have a scheduled trip

24    December 14th to see my mom who is having breast

25    cancer surgery.
```

```
 1              PROSPECTIVE JUROR:  I believe Wednesday.
 2              THE COURT:  I assume you are asking for an
 3       excuse.
 4              PROSPECTIVE JUROR:  I am.
 5              (The prospective juror was excused.)
 6              PROSPECTIVE JUROR:  First my English is
 7       not that good.  I am not educated here.  Shannah
 8       S-H-A-D-R-O-A-H.
 9              THE COURT:  You have to have an
10       understanding of conversational English.
11              PROSPECTIVE JUROR:  When they talk very
12       high level --
13              MS. ABDI:  Consent.
14              MR. MILLMAN:  Consent.
15              THE COURT:  You are excused.
16              (The prospective juror was excused.)
17              PROSPECTIVE JUROR:  Marjorie Delison.  I
18       am self-employed.  I won't be able to serve right
19       now.
20              THE COURT:  Financial hardship?
21              MR. MILLMAN:  Yes.
22              MS. ABDI:  Yes.
23              THE COURT:  You are excused.
24              (The prospective juror was excused.)
25              PROSPECTIVE JUROR:  Angela Dietri.  I just
```

bp

1     have some anxiety, chronic pain issues.  I feel that

2     this case is going to bother me.

3                   THE COURT:  You are a little nervous?

4                   PROSPECTIVE JUROR:  Yeah.

5                   THE COURT:  That's doesn't matter; being a

6     little nervous.

7                   PROSPECTIVE JUROR:  It's more than that.

8                   THE COURT:  A lot of people are nervous,

9     especially when they hear the nature of the charges,

10    and they are here for the first time as a juror.  So

11    that's not a reason to be excused.  If you are so

12    nervous that your impartiality would be affected,

13    that's a different story.  Which is your situation?

14                  PROSPECTIVE JUROR:  I'm like a mess right

15    now.

16                  MS. ABDI:  I can see, for the record, that

17    you are visibly upset, and this is obviously more

18    than just because you are in a courtroom.  You feel

19    because you get so nervous you can't listen to the

20    evidence and be fair in this case?

21                  PROSPECTIVE JUROR:  I guess.

22                  MR. MILLMAN:  In other words, just being

23    here and seeing this without even hearing --

24                  PROSPECTIVE JUROR:  Just hearing it.

25                  MS. ABDI:  I would consent.

```
 1              MR. MILLMAN:  I would consent.  She's not
 2    hearing evidence and she's that nervous.
 3              THE COURT:  You can thank them, because if
 4    it were up to me I wouldn't excuse you.
 5              PROSPECTIVE JUROR:  I am sorry.
 6              THE COURT:  You are excused.
 7              (The prospective juror was excused.)
 8              PROSPECTIVE JUROR:  Ed Sacks.  I'm going
 9    for cataracts surgery next week, and I have a number
10    of follow-ups.
11              THE COURT:  You are excused.
12              (The prospective juror was excused.)
13              PROSPECTIVE JUROR:  Good afternoon.
14    Newton Fellow.  I have a standing trip departing
15    this Sunday flying to Florida.
16              THE COURT:  Good luck; you are excused.
17              (The prospective juror was excused.)
18              PROSPECTIVE JUROR:  My name is Jessica
19    Cino.  My sister and aunt were both raped.  The
20    other reason is I'm a special education teacher for
21    elementary school.  For the length of the case, I
22    feel it would disrupt --
23              MR. MILLMAN:  Consent.
24              MS. ABDI:  Consent.
25              THE COURT:  You are excused.
```

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 78 of 913 PageID #: 378

1              (The prospective juror was excused.)

2              PROSPECTIVE JUROR:  Jeremiah Ammond.  I

3    work for the Nassau County Democratic Party.  I've

4    worked for Kathleen Rice on her previous campaigns,

5    as well as the fact I make a meager salary.  I could

6    hardly afford my rent these days.

7              THE COURT:  What is your normal

8    occupation?

9              PROSPECTIVE JUROR:  Nassau County Board of

10   Elections.  I split time between the two.

11             THE COURT:  I don't know about the Nassau

12   County Democratic Committee, but you get paid from

13   the Board of Elections, don't you?

14             PROSPECTIVE JUROR:  Yes, I do get paid,

15   not quite enough to be living exactly the level that

16   I have any savings.

17             THE COURT:  Well, I'm not going to excuse

18   you at this particular time.  That doesn't mean I'm

19   not going to excuse you.  Bill Diamante is an old

20   friend of mine.  He used to work in the DA's Office.

21   Speak with him and see if he'll pay you if you

22   stayed on this particular jury, and we'll see you

23   tomorrow.

24             PROSPECTIVE JUROR:  I'm a medical

25   technologist and I work at Winthrop.  I work

bp

 1      evenings, but I have a part time job during the day.

 2      If I don't work I don't get paid for the part time

 3      job.  I work in a doctor's office.  I am a medical

 4      technologist.  I run the blood tests.

 5                 THE COURT:  Your reason is financial?

 6                 PROSPECTIVE JUROR:  Financial hardship,

 7      yes.

 8                 MS. ABDI:  Consent.

 9                 MR. MILLMAN:  Consent.

10                 (The prospective juror was excused.)

11                 PROSPECTIVE JUROR:  Adrianna Gonzalez.

12                 I'm a single parent to a 14-year old.  I'm

13      not sure how the financial burden will play.  I do

14      work full time and part time to make ends meet.  I

15      don't know what time I'd finish here.

16                 THE COURT:  You'll finish here at 4:30 and

17      start at 9:00.

18                 PROSPECTIVE JUROR:  The other thing, my

19      family has already dealt with rape, including --

20                 MS. ABDI:  Consent.

21                 MR. MILLMAN:  Consent.

22                 (The prospective juror was excused.)

23                 THE COURT:  Janice Scarpelli.  I am a

24      second year high school teacher, and I'm untenured,

25      and I coach basketball after school.

1              THE COURT:  What school district?

2              PROSPECTIVE JUROR:  Sequoia.  I work at

3     Carry High School.

4              THE COURT:  You are not on tenure?

5              PROSPECTIVE JUROR:  I am untenured.

6              THE COURT:  What I want you to do is --

7     I'm not going to excuse you at this particular time.

8     Come back tomorrow at the appropriate time and make

9     an immediate phone call to your principal or your

10    boss.  Discuss it with him and then have an answer

11    for me tomorrow.

12             PROSPECTIVE JUROR:  So, come tomorrow?

13             THE COURT:  But call your boss.  And

14    ordinarily in my experience in your position that's

15    not necessarily like a special ed teacher.

16             PROSPECTIVE JUROR:  I work in special ed

17    math.

18             THE COURT:  You didn't tell me that.

19             PROSPECTIVE JUROR:  I'm sorry.

20             MS. ABDI:  I'll consent.

21             MR. MILLMAN:  I will consent.

22             THE COURT:  You are excused.

23             (The prospective juror was excused.)

24             PROSPECTIVE JUROR:  My name is John Soto.

25    I just started a new job.  I'm in the process of

1  training.

2                 THE COURT:  You are excused.

3                 (The prospective juror was excused.)

4                 PROSPECTIVE JUROR:  Nick Castel ano.  It's

5  a financial hardship.  My family left me their

6  company before they parted, and if I'm not there,

7  there is no way it's going to run.

8                 MS. ABDI:  I will consent.

9                 MR. MILLMAN:  I will certainly consent.

10                 THE COURT:  You are excused.

11                 PROSPECTIVE JUROR:  Mr. Potts.  I'm one of

12  only a three-person consulting firm in Long Beach.

13  I am the only person who does sales.  They are about

14  to come out with technology that we have been

15  developing over the last year.  I am the one

16  supposed to being pushing those sales.

17                 MS. ABDI:  I will consent.

18                 MR. MILLMAN:  I' all consent.

19                 THE COURT:  You are excused.

20                 (The prospective juror was excused.)

21                 THE COURT:  Ladies and gentlemen, I will

22  tell you where we are at.  We went through the same

23  process with another group of 60 people this

24  morning.  And out of that 60 people we have roughly

25  30 left.  Out of this particular group, maybe we

1    have 25 left.

2              So we have 55 jurors which is enough to

3    start the jury selection process in a more formal

4    way.  I've asked for more prospective jurors

5    tomorrow, and they should be arriving tomorrow

6    morning.  And then I will put them off until

7    2 o'clock for excuses.  My reason is that I really

8    want them under my control rather than floating

9    around in central Jury.  For your concern, we will

10   start tomorrow at quarter to ten.  So be back

11   tomorrow at quarter to ten.

12             You may see some of the advocates in the

13   hall.  They are not to talk to you.  Don't talk to

14   them.  It's not that they are unfriendly.  Both of

15   them are very gregarious.  We like to keep up the

16   appearance of impropriety.  We'll see you tomorrow.

17             (The prospective jurors exited the

18   courtroom.)

19             (The matter was adjourned to December 2,

20   2011.)

21                 *   *   *   *   *

22

23

24

25

bp

```
 1   STATE OF NEW YORK  :  NASSAU COUNTY

 2   SUPREME COURT       :   PART 37

 3   -------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
              -against-                         IND-202N-11
 5
     ULISES A. BONILLA,
 6
                         Defendant.
 7   -------------------------------------X
     CONTINUED TRIAL        December 2, 2011
 8   (VOIR DIRE)
                            262 Old Country Road
 9                          Mineola, New York

10

11   B E F O R E:          HONORABLE GEORGE R. PECK
                           Acting Supreme Court Justice
12

13
     A P P E A R A N C E S :
14

15              (SAME AS PREVIOUSLY NOTED.)

16

17                    *   *   *   *   *

18

19              THE COURT:  Case on trial, Indictment

20       2302N-2011, People of the State of New York vs.

21       defendant Ulises Bonilla.

22              THE CLERK:  There is no interpreter.

23              THE COURT:  When she gets here we'll go

24       through it again.

25              (The jury entered the courtroom.)
```

bp

 1                    THE CLERK:  Let the record reflect all

 2       parties are present including the defendant, Spanish

 3       Interpreter, and the prospective jurors.

 4                    THE COURT:  Counsel, yesterday after we

 5       left for the day, two prospective jurors approached

 6       the clerk, and I think we'll have to deal with those

 7       requests right now.

 8                    Why don't you come up.

 9                    PROSPECTIVE JUROR:  Feng E. Hsioo.

10                    THE COURT:  Mr. Hsioo, do you understand

11       English?

12                    PROSPECTIVE JUROR:  A little bit.

13                    THE COURT:  That's not good enough.  You

14       have to understand conversational English.  Do you

15       understand that?

16                    PROSPECTIVE JUROR:  Only a little bit.

17                    MS. ABDI:  Consent.

18                    MR. MILLMAN:  Consent.

19                    THE COURT:  You are excused.  Thank you.

20                    (The prospective juror was excused.)

21                    THE CLERK:  Robert Hatcan.

22                    THE COURT:  Did something happen yesterday

23       that you couldn't bring to our attention?

24                    PROSPECTIVE JUROR:  It happened after I

25       left.  My son was admitted to the hospital.  He is

                              bp

1        one month old.  He has pneumonia.

2               THE COURT:  I am sorry.

3               Obviously there are priorities in life.

4        You are excused.  I have the power to excuse him.

5        I'll excuse him if you want to be excused.

6               (The prospective juror was excused.)

7               THE COURT:  Ladies and gentlemen, we are

8        about to commence the trial of this particular

9        matter.  A trial is a process which determines if

10       the defendant is guilty or not guilty of the

11       charges.  In that process, those of you who are

12       selected as jurors, and I as the Judge, perform

13       separate functions.

14              Your verdict in this particular case will

15       be guilty or not guilty.  That means proven guilty

16       or not proven guilty.

17              Contrary to popular belief there is no

18       such thing as a verdict of innocence in the State of

19       New York.  Your verdict will be guilty, which is

20       proven guilty beyond a reasonable doubt; or not

21       guilty, which means not proven beyond a reasonable

22       doubt.

23              You will evaluate the evidence and

24       determine what evidence that have you heard from the

25       witnesses and seen as exhibits is credible, and what

1    it all means.  This is called findings the facts.

2    That's your function alone.

3              The attorneys will present the evidence,

4    and may suggest in their closing arguments that you

5    draw certain conclusions from the evidence.  You are

6    not bound by what the defendant says.  As the Judge

7    I will make no determination of the lack of guilt.

8    My role at the trial is to ensure that you reach

9    your verdict in accordance with the evidence and the

10   law.

11             You must accept the law as I give it to

12   you.  The fact that the action is brought in the

13   name of the People, or that evidence is presented by

14   a public official, does not in any way indicate that

15   the public wants a specific verdict.

16             You will be asked certain questions.

17   These are not meant to embarrass you or offend you.

18   The purpose is to get an impartial jury.  If any of

19   you wish to discuss the matter privately at the

20   bench, feel free to do so.  I've already told you

21   the approximate length of time and when you will be

22   not working here; during the holidays.

23             Let's call fourteen people.

24             THE CLERK:  Ladies and gentlemen, when you

25   hear your name called, please take your belongings

                              bp

1    and follow to the front to the officer and listen to

2    his directions.

3              Seat number 1, Doreen Woessner.  Seat

4    number 2, Michael McKeon.  Seat number 3, Rosemarie

5    Cuomo.  Seat number 4, Michael Murphy.  Seat

6    number 5 Tjuana Evans.  Seat number 6, Teresa Nacci.

7    Seat number 7, Sheryl Schrauw.

8              THE COURT:  Call another name.  She didn't

9    answer.

10             THE CLERK:  Seat number 7, Tony Nguyen.

11   Seat number 8, Castro Rafferty.  Seat number 9,

12   Corey Varnofsky.  Seat number 10, Dilano Boyce.

13   Seat number 11 Jenny Zmora.  Seat number 12, Gerard

14   Cooke.  Seat number 13, Mariano Burger.  Seat 14,

15   John Bucchino.

16             THE COURT:  Come up.

17             (A sidebar discussion was held off the

18   record.)

19             THE CLERK:  Seat number 14, Margaret

20   Otton.

21             THE COURT:  Ladies and gentlemen, I

22   neglected to make assurances that the juror

23   questionnaire was filled out, and obviously that was

24   not distributed to you.  But it has to be filled

25   out.  It will take about five minutes to fill out

bp

1       hopefully.  And then we will start the questioning.

2               I just want to tell you briefly a few

3       instructions before we commence.

4               The People must prove the guilt of the

5       defendant beyond a reasonable doubt.  And you must

6       make your decision upon the law as I give it to you

7       and the evidence at the trial.  Consequently, Miss

8       Woessner, if I asked you to give a verdict right

9       now, what would your verdict be?  You don't have to

10      think about it too much.  I'll give you the answer.

11      It has to be not guilty, which means not proven

12      guilty, because you haven't heard one bit of

13      evidence yet.  And the basic principle is, you must

14      decide the case based upon the evidence coupled with

15      the instructions of the Court.

16              Also, there will be police officers

17      testifying in this particular case.  I instruct you

18      that you are not to give the testimony of a police

19      officer any greater or lesser weight simply because

20      he is a police officer.  That is our rule of law.

21              Now, this does not mean you have to

22      discount job experience in evaluating the testimony

23      of a police officer.  If you wanted to know the

24      physical developmental level of a ten-year-old, you

25      might credit the testimony of a fifth grade teacher

1      more than the testimony of a house painter.  But who

2      knows?  That house painter may have been a little

3      league coach for twenty years, and he knows exactly

4      what the developmental level of a ten-year-old

5      should be for their own safety.

6              So basically those are two major

7      principles I want to talk to you about right now.

8      And now I'm going to take a few minutes and do what

9      I should have done yesterday; have you fill out the

10     juror questionnaire form.  And we'll come back in

11     about ten minutes.  Take your same seats.

12              (A ten-minute recess was taken.)

13              THE CLERK:  Recalling case on trial.  All

14     parties present including the defendant and Spanish

15     Interpreter.  Prospective jurors are being brought

16     into the courtroom.

17              (The prospective jurors entered the

18     courtroom.)

19              THE COURT:  Mrs. Boyce, there are very few

20     things I want to ask you.  One of the things is,

21     during this particular trial you are not to discuss

22     this case with anyone, not even your fellow jurors

23     and that applies only until and during your

24     deliberations.  You simply are not to discuss this

25     case with anyone.

bp

1          Now, I see you have a daughter who's a

2     paralegal. Simply because people that are close to

3     you may have some knowledge as to the law, don't

4     discuss this case with anyone. I cannot tell you

5     how important that is.

6          Now, let's just say during the course of

7     this particular trial juror number 1 and juror

8     number 2 become friendly. There is nothing wrong

9     with becoming friendly with a fellow juror.

10    Sometime ago I had a jury trial and a romance

11    developed between two jurors and they were

12    subsequently married. There is nothing wrong with

13    that.

14         But let's just say a witness testifies and

15    as you are going out the door juror number 1 says to

16    juror number 2, boy that was a good witness, wasn't

17    it. It's is that type of situation we have to

18    avoid. Don't discuss this case with anyone. Don't

19    let anyone discuss it with you.

20         Also, don't access the Internet. You may

21    say, well, I'm a very, very conscientious juror. I

22    want to bone up on the laws of murder. Don't do

23    that. I will give you all the law that you need.

24         Mr. Cooke, in your capacity as a police

25    sergeant you've seen good policemen and bad

bp

1 policemen, correct?

2    PROSPECTIVE JUROR: Yes, sir.

3    THE COURT: Your jury questionnaire, I

4 thought it was -- we'll deal with it now.

5 Consequently, would you have any problem following

6 the instructions concerning a police officer that I

7 gave?

8    PROSPECTIVE JUROR: No, sir.

9    THE COURT: You said you happen to know

10 people who are victims of crimes, witnesses to

11 crimes, lawyers. Would those things affect your

12 impartiality in this particular case?

13    PROSPECTIVE JUROR: I don't believe so,

14 Judge. I've been the victim of a crime three times

15 myself and my wife; burglary and other crimes.

16    THE COURT: You have to decide this case

17 based upon the law and the evidence. It's as simple

18 as that. Don't give anybody any greater weight or

19 lesser weight simply because he is a police officer

20 or non-police officer. Evaluate their testimony.

21 Heck, you might get a police officer on the stand

22 that has twenty years experience. Or, you might get

23 a police officer on the stand that witnessed a crime

24 and has been in the Academy for one day. The

25 experience level is different. You have to evaluate

bp

1      what you hear. Would you be able to do that?

2                    PROSPECTIVE JUROR: I believe so.

3                    THE COURT: Mr. McKeon, you checked off

4      victim of a crime, accused of a crime. Would that

5      carry over to this case to the extent it would

6      affect your impartiality?

7                    PROSPECTIVE JUROR: No.

8                    THE COURT: Whatever you learned in prior

9      jury duty experience, forget about in this

10     particular case. The facts are different and the

11     law may be different.

12                   Miss Cuomo, whatever you learned in prior

13     jury duty experience forget.

14                   Someone close to you or you know someone

15     who has been accused of a crime. Would that carry

16     over to this particular case?

17                   PROSPECTIVE JUROR: No.

18                   THE COURT: Mr. Murphy, you've had prior

19     law enforcement experience as well as a present

20     security detail. Would you have any difficulty

21     following the instructions concerning a police

22     officer that I previously gave?

23                   PROSPECTIVE JUROR: I don't think so, your

24     Honor.

25                   THE COURT: Evaluate them as they appear

1    on the stand.  See how their testimony jibes or does

2    not jibe with other witnesses in the case.  And

3    don't make a judgment that as soon as he walks in

4    that door, I'm going to give him greater

5    credibility.  Would you do that?

6              PROSPECTIVE JUROR:  I think so, sir.

7              THE COURT:  Miss Evans, whatever you

8    learned in prior jury duty experience, forget about.

9    And that's all I have to ask you based upon your

10   questionnaire.

11             Miss Narcisi, whatever you learned in

12   prior jury duty forget about.

13             You know someone in law enforcement.  Who

14   is that?

15             PROSPECTIVE JUROR:  My brother.

16             THE COURT:  Would you have any difficulty

17   following the instruction concerning the police

18   officer that I gave?

19             PROSPECTIVE JUROR:  No, sir.

20             THE COURT:  You checked off you wanted to

21   see me at the bench.  Was that a mistake?

22             PROSPECTIVE JUROR:  No; it's not a

23   mistake.

24             You mentioned yesterday that it was

25   involving a ten-year-old child.  I work with them

1    all day.  I don't know.  It seemed a little

2    overwhelming for me.

3                 THE COURT:  This case is going to take

4    some time, and at first glance it may be

5    overwhelming.  Do you have the ability to, as time

6    goes on, analyze the case impartially?  No one is

7    asking you to condone the conduct.

8                 For instance, who likes drug dealing?  Who

9    likes larceny?  Who likes burglaries or robberies?

10   We are not asking you to condone the conduct.  All

11   we are asking you is to evaluate the evidence

12   impartially and critically.  Can you do that?

13                PROSPECTIVE JUROR:  Yes.

14                THE COURT:  Thank you.

15                Mr. Nguyen, based upon your sheet, I have

16   nothing ask you.  What are your duties in your

17   position?

18                PROSPECTIVE JUROR:  Masonry.

19                THE COURT:  What do you do?  Who do you

20   work for?  Do you have any difficulty understanding

21   English?

22                PROSPECTIVE JUROR:  Yes.  I tried to

23   understand.  It's not enough.

24                THE COURT:  That's one of the things that

25   you have to be able to do.

bp

| 1  | MS. ABDI:  Consent. |
| 2  | MR. MILLMAN:  Consent. |
| 3  | THE COURT:  You are excused by consent. |
| 4  | You have to be able to understand the |
| 5  | testimony. |
| 6  | PROSPECTIVE JUROR:  I'm sorry. |
| 7  | (The prospective juror was excused.) |
| 8  | THE CLERK:  Filling seat number 7, Octavia |
| 9  | Brinson. |
| 10 | THE COURT:  While we are on the subject of |
| 11 | being conversant in the English language, you will |
| 12 | see next to the defendant an interpreter.  It is |
| 13 | agreed that the defendant does speak some English. |
| 14 | But because of the seriousness of the matter, he is |
| 15 | much more comfortable in having an interpreter |
| 16 | present explaining in his own language exactly the |
| 17 | testimony.  If a witness says, it's raining cats and |
| 18 | dogs, well you know that means something to you and |
| 19 | I.  But translate it, it may not mean that much.  So |
| 20 | these idiomatic expressions and nuances need the |
| 21 | help of an interpreter. |
| 22 | Miss Brinson, who do you know in law |
| 23 | enforcement? |
| 24 | PROSPECTIVE JUROR:  My girlfriend's |
| 25 | brother-in-law. |

bp

```
 1              THE COURT:  Would you have any problem
 2      following the instruction I gave concerning the
 3      testimony of a police officer?
 4              PROSPECTIVE JUROR:  No.
 5              THE COURT:  Miss Rafferty, I'm sorry there
 6      is nothing I have to ask you based upon your sheet.
 7              Mr. Varnofsky, there is nothing I have to
 8      ask you based on your sheet.
 9              Mr. Boyce, there is nothing on the sheet
10      that needs any further attention by me.
11              Miss Zmora, who do you know in the law
12      business?
13              PROSPECTIVE JUROR:  My aunt.
14              THE COURT:  What does she do?
15              PROSPECTIVE JUROR:  She's a paralegal.
16              THE COURT:  You said you wanted to see us.
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  Come up.
19              (The following ensued at sidebar:)
20              PROSPECTIVE JUROR:  When I was younger I
21      was victim of sexual abuse by my uncle.  As much as
22      I'd like to say that I could be impartial, I don't
23      know if I can.
24              THE COURT:  You are required to decide
25      this case on the evidence and the evidence alone.
```

bp

1       If you hear the evidence, and if you say the People

2       have not proven the defendant guilty beyond a

3       reasonable doubt, I'm going to still convict this

4       guy because I was sexually abused when I was a young

5       woman --

6                   PROSPECTIVE JUROR:  Yeah.

7                   THE COURT:  You are not allowed to do

8       that.

9                   PROSPECTIVE JUROR:  Right.

10                  THE COURT:  No one is asking you when you

11      come into court to put away your prior experiences.

12      How could you possibly forget such a thing?  No one

13      is asking you to do that.  What we are asking of you

14      and demanding of you is, will that prior experience

15      interfere with your impartiality in this case?

16                  PROSPECTIVE JUROR:  No, I guess not.

17                  THE COURT:  She says she guesses not.

18                  MR. MILLMAN:  I know this is something

19      that I'm not going to be able to question in front

20      of other people.  I did have follow-up questions.

21                  THE COURT:  Go ahead.

22                  MR. MILLMAN:  Certainly you understand

23      that the law you have to follow, that is the law

24      instructed to you by the Judge.  While we can

25      appreciate that you would never knowingly or plan to

1    disregard any of those instructions, do you think as

2    you listen to the testimony in the case, you might

3    feel rather uncomfortable?

4              PROSPECTIVE JUROR:  I think so.

5              MR. MILLMAN:  And not just a little bit

6    uncomfortable.  Do you think the discomfort that you

7    feel could possibly interfere with giving both

8    parties a fair shake here?

9              PROSPECTIVE JUROR:  I think so.

10             MR. MILLMAN:  That's why you brought it up

11   to us.

12             I ask that she be excused.  I think she is

13   a challenge for cause.

14             MS. ABDI:  I would consent.

15             THE COURT:  You are excused on consent.

16             Thank you for your candidness.

17             (The prospective juror was excused.)

18             THE CLERK:  Fill seat number 11.  Pamela

19   Kelly.

20             Miss Kelly, you heard me tell you that you

21   are not allowed to discuss this case with anyone.

22   That means anyone.  That means especially nosy

23   spouses who are lawyers.  Do you understand that?

24             PROSPECTIVE JUROR:  I do.  You know my

25   husband?

```
 1                    THE COURT:  I may.  I don't know.
 2                    You know someone whose been a victim of a
 3         crime.  Would that carry over to this case?
 4                    PROSPECTIVE JUROR:  No, sir.
 5                    THE COURT:  Mr. Cooke, we already spoke.
 6         Miss Burger, you said you wanted to come up.
 7                    PROSPECTIVE JUROR:  Yes, I did.
 8                    THE COURT:  Come up.
 9                    (The following ensued at sidebar:)
10                    PROSPECTIVE JUROR:  In my work I have
11         occasion to care for girls who have been abused
12         sexually.
13                    MR. MILLMAN:  I didn't hear.
14                    PROSPECTIVE JUROR:  I am a labor and
15         delivery room nurse, and I have occasion to take
16         care of girls that were sexually abused.  I don't
17         know how that would affect how I feel.
18                    THE COURT:  We are not asking for to
19         forget all your prior experiences.  And how could it
20         not affect you?  I mean, it's something that would
21         affect most reasonable people.  But you are required
22         to divorce yourself from those experiences in
23         impartially judging this particular case.
24                    Can you do that?
25                    PROSPECTIVE JUROR:  I think so.  I'm not
```

1    convinced though.  I'm not sure.

2                THE COURT:  You have to be.

3                If the People don't prove the case beyond

4    a reasonable doubt your verdict must be not guilty.

5    Do you understand?

6                PROSPECTIVE JUROR:  Yes, I do.

7                THE COURT:  If the People do not prove the

8    case beyond a reasonable doubt would you say I'm

9    going to find him guilty because I don't like people

10   who sexually abuse young women?

11               PROSPECTIVE JUROR:  I don't think I would

12   do that.

13               THE COURT:  I'm going to instruct you that

14   your verdict has to be impartial, free from sympathy

15   and free from emotion.  That does not mean you have

16   to be an unsympathetic person.

17               PROSPECTIVE JUROR:  Okay.

18               THE COURT:  Do you have any questions?

19               MR. MILLMAN:  I do.  In your capacity at

20   work you speak with children who've been the victims

21   of sexual abuse?

22               PROSPECTIVE JUROR:  Correct.

23               MR. MILLMAN:  And in doing so, you are

24   exposed to some of the emotional experiences and

25   have come to identify with that at times?

1              PROSPECTIVE JUROR:  Yes.

2              MR. MILLMAN:  Do you think as you listen

3         to the testimony in the case, even though you can't

4         know for sure, might that color how you look at the

5         case?

6              PROSPECTIVE JUROR:  It might.

7              MR. MILLMAN:  And might that possibly,

8         even if you don't intend it, keep you from being

9         completely fair and impartial?

10             PROSPECTIVE JUROR:  I really don't know.

11             MR. MILLMAN:  We appreciate your candor.

12        You are not sure that you'd be able to be fair.

13             I would ask that she be excused.

14             MS. ABDI:  I will consent, Judge.

15             THE COURT:  Thank you for your candor.

16             (The prospective juror was excused.)

17             THE CLERK:  Fill seat number 13.  Cary

18        Isasi.

19             THE COURT:  Whatever you learned in prior

20        jury duty experience, forget it.

21             PROSPECTIVE JUROR:  Okay.

22             THE COURT:  Ms. Otton, based upon your

23        sheet I have nothing to ask you.

24             I'm going to now read a list of people.

25        Their names may come up in this particular trial by

1    means of a name or by means of a witness.  All I
2    want to know now is if any of them are familiar to
3    any prospective juror.  And those people in the
4    audience can pay attention also.

5              Police Officer James Monroe.  Police
6    Officer Sorocco.  Police Officer Michael
7    G-N-O-L-F-O.  Police Officer Tymecki.  Police
8    Officer Keith Foster.  Police Officer Brian
9    McQueeny.  Detective Galowski.  Detective Sulz.
10   Detective Vacchiano.  AMT Michael Schwartz.  AMT
11   Daniel Jeacoma.  Detective Kenneth Mazzie.
12   Detective Scott McLaughlin.  Detective Paul Pich.
13   Detective Pat Byrne.  Detective Richard Rinaldi.

14             Did you raise your hand?  I'm sorry.

15             Sergeant Armstrong.  Erika Sima.  Ana
16   Fernandez.  Kirsten Rosmarion Tabert.  Dan Arana.
17   Alex Ivan Alcantara.  Stevens Destina.  Dr. Yasmine
18   Pompey.  Eileen McCarthy.  Detective Edwin Trujillo.
19   Dr. Gerard Catanese, the medical examiner.
20   Detective James Cereghino.  Detective Robert
21   Pescitelli.  Detective Robert Nardo.  Detective
22   James Hendry.  Detective Milton Aponte.  Detective
23   James Carroll.  Police Officer Christopher Bendetto.
24   Police Officer James Chase.  James Shanahan.  John
25   F-A-I-L-L-A.  Susanna Villatoro.  Jennifer

1    Villatoro.  Nancy Villatoro.  Oscar Villatoro.

2    Jocelyn Gonzalez.  Henry Hernandez.  Misael Berrios.

3    Jose Reyes.  Angel Esteban Leon.  Jose Santos

4    Ventura.  Lisa Schmid.  Christine Croce.  Janet

5    Gawrych.  Annemarie Courtney.  Kathleen Karageorgos.

6    Donna Weissbard.  Diana Bonilla.  Xiomara Turcillo.

7    Zeida Bonilla.  Evan Grover.  Matthew Spitzer.

8    Merlina Jatta, Alfred Sosa, Marcos Gonzalez.  Yasall

9    Henway, M.D.

10          Are any of those names familiar to anyone

11   at this particular time?

12          The District Attorney will start asking

13   you questions.

14          MS. ABDI:  Good morning ladies and

15   gentlemen of the jury, my name is Zeena Abdi, and I

16   am the Assistant District Attorney who is

17   responsible for prosecuting the defendant Ulises

18   Bonilla for the crimes for which is he charged.  And

19   at this point it's my opportunity to speak with you

20   and to ask you questions.  And my point in asking

21   you these questions is just to try to get a jury

22   that is fair and impartial.

23          My questions are definitely not designed

24   to intrude.  And they are not designed to get to

25   know everything there is to know about you, because

1      there is no way I could do that in the

2      thirty minutes I have with you.  Really my questions

3      are designed to sort of have you then look inside

4      yourself to see if whether or not this is the best

5      jury for you to be on, and whether or not you can

6      truly be fair and impartial in this case, because

7      that's what defense counsel and I are both looking

8      for.

9              I apologize because I may not get to talk

10     to everybody; please take no offense.  And I also

11     may and probably will mess up some people's names,

12     so I apologize for that in advance.

13             I also want to thank you, and this goes to

14     everyone in the back, for being here during this

15     time.  I know this is December, it's a holiday time

16     for a lot of people.  So I want to thank you for

17     coming in and potentially agreeing to serve a good

18     amount of time here.

19             To that end I'm going to start a little

20     bit out of order.  Miss Nacci, I saw -- and please

21     correct me if I'm wrong -- I see that you are a per

22     diem student teacher.

23             PROSPECTIVE JUROR:  Yes.

24             MS. ABDI:  Is that what you are still

25     doing now?

bp

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 105 of 913 PageID #: 405

1           PROSPECTIVE JUROR:  Well, not currently.

2    I make my own schedule.  Whenever they call me.

3           MS. ABDI:  So my question for you is, is

4    your work schedule kind of up in the air as far as

5    when you can take a job?

6           PROSPECTIVE JUROR:  Yes, because they

7    would call me in the morning or would use an on-line

8    system where I can get to the job the next day or

9    for a leave position.

10          MS. ABDI:  This case may go on for

11   approximately three weeks; it may be longer.  I'm

12   going to ask you to be candid.  Is the amount of

13   time that you may have to be here, specifically

14   because of your job as a per diem, not set in stone

15   every week, is that something that's going to be a

16   very big hardship for you?

17          PROSPECTIVE JUROR:  Financially, yes.

18          MS. ABDI:  In fact, if you're going to get

19   selected, would that mean that you would not be

20   getting paid for a job for that length of period?

21          PROSPECTIVE JUROR:  Yes.  I would not be

22   able to get a job to work any day.

23          MS. ABDI:  Is that something that is going

24   to prevent you from listening to the evidence in

25   this case?

bp

1           PROSPECTIVE JUROR:  No.  If I'm here, I'm

2    here.

3           MS. ABDI:  What I mean to say is, are you

4    going to be worrying about getting a job or your

5    finances if you have to spend three weeks here doing

6    jury service?  Is that something that's going to

7    affect you because then you are going to be worried

8    about it?  Would it affect your ability to listen to

9    the evidence in this case?

10          PROSPECTIVE JUROR:  It will not affect my

11   ability to listen to the evidence.

12          MS. ABDI:  So you sitting here for however

13   many days it took, you'd be able to render an

14   impartial verdict based on the evidence in this

15   case?

16          PROSPECTIVE JUROR:  Yes.

17          MS. ABDI:  Ladies and gentlemen, there are

18   certain types of evidence, and the Judge will tell

19   you what different types of evidence they are.  One

20   thing he will tell you is that testimony is

21   evidence, much like a map you might place into

22   evidence or a photo you might place into evidence.

23          Could everyone appreciate the fact that

24   what you hear on the witness stand, that's

25   considered evidence in this case.  It's called

bp

1        testimonial evidence.  Miss Woessner?

2                     PROSPECTIVE JUROR:  Yes.

3                     MS. ABDI:  Miss Woessner, can you

4        appreciate the fact that what somebody says on the

5        witness stand is considered evidence in this case?

6                     PROSPECTIVE JUROR:  Yes.

7                     MS. ABDI:  Now, what if the only evidence

8        at this trial that I produce is testimonial

9        evidence, evidence that you hear out of the witness

10       box, but when you hear that testimonial evidence it

11       convinces you beyond a reasonable doubt that the

12       defendant is guilty of the crime.  Could you convict

13       based on testimonial evidence alone?

14                    PROSPECTIVE JUROR:  From just one person?

15                    THE COURT:  If you believe that evidence

16       beyond a reasonable doubt?

17                    PROSPECTIVE JUROR:  Is that all you hear?

18       That would be the only thing?  Only one testimony?

19                    MS. ABDI:  Let's say that the only

20       evidence you heard was testimonial from witnesses or

21       witnesses.

22                    First let me start off with -- let's say

23       you heard what was just testimonial evidence from

24       witnesses, and you believed them beyond a reasonable

25       doubt.  Could you convict the defendant based solely

1    on that?

2              THE COURT:   Let me give an instruction.

3    It might clarify this to someone who's never been in

4    this situation before.

5              A fact can be proven by one witness, if

6    you credit the testimony of that witness.  Can you

7    accept that proposition?

8              PROSPECTIVE JUROR:  I don't think so.

9              THE COURT:   Why?

10             PROSPECTIVE JUROR:  Because it's coming

11   from one person, only one side.

12             THE COURT:   Who do you live with, by the

13   way?

14             PROSPECTIVE JUROR:  My husband and three

15   children.

16             THE COURT:   Suppose you were being asked

17   this question one day.  I ask you, what did you cook

18   for dinner Friday night.  And you'd say, hamburgers

19   and french fries.  That's a fact from one witness.

20             I'm telling you as a matter of law, ladies

21   and gentlemen, a fact can be proven through the

22   testimony of one witness.  It's not the number of

23   witnesses that the People call.  It's the quality of

24   the evidence given by a witness or witnesses.

25             If for example someone was asked was

1    Ulises Bonilla's trial in the month of December for

2    murder in the Nassau County Court, that could be

3    proven by any number of factors.  It could be proven

4    by me.  It could be proven by the Court Clerk who's

5    taking the record, the Court Reporter whose taking

6    the minutes, or any one of you.  You get the point?

7              PROSPECTIVE JUROR:  Yes, I do.

8              MS. ABDI:  I'm not picking on you, I just

9    want to make sure I understand what you are saying.

10              The Judge just instructed you on what the

11   law is; that it's not the quantity of the witnesses;

12   it's the quality of witnesses.  So if there was only

13   one witness to something and they testified and you

14   believed them beyond a reasonable doubt, that could

15   be enough for you to convict.  That's what the law

16   is.

17              MR. MILLMAN:  Can we just approach for a

18   moment?  I have an objection, but I'd like to state

19   it at the bench, if I may.  I would rather you use

20   proving a fact through the testimony of one witness.

21              THE COURT:  Is that your objection?

22              MR. MILLMAN:  It was part of it.

23              THE COURT:  Come up.

24              (The following ensued at sidebar:

25              MR. MILLMAN:  Just the basis of my

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 110 of 913 PageID #: 410

1    objection was the way the question was phrased.  In

2    other words, it wasn't phrased to indicate if you

3    heard from one witness, and that testimony convinced

4    beyond a reasonable doubt.  It was just phrased --

5                THE COURT:  Maybe you are technically

6    correct.  I tried to establish the rule of law.  She

7    is getting to a point, which basically what she is

8    getting to is, are you going to require more proof

9    than the law allows.

10                MR. MILLMAN:  Right.  I have no problem

11   with that.  The only issue is it depends what the

12   witness says.  The way she phrased it, if she

13   believes everything the witness says but the

14   witness' testimony doesn't satisfy all the elements

15   beyond a reasonable doubt, that's the problem I have

16   with the way it was phrased.  That is the basis for

17   my objection.

18                THE COURT:  Overruled.

19                (The following ensued in the courtroom:)

20                MS. ABDI:  Let me just back up a little.

21   The Judge told you what the law is with regard to

22   that.  Do you think that you would require more than

23   that?

24                PROSPECTIVE JUROR:  Yes.

25                MS. ABDI:  Does anyone else feel that way?

bp

1      Mr. McKeon?

2                  PROSPECTIVE JUROR: According to the

3      Judge, the definition of the credibility of a

4      witness. I would go by the credibility.

5                  THE COURT: The People must prove the

6      guilt of the defendant beyond a reasonable doubt.

7      That degree of proof can be satisfied by a single

8      witness, if you credit the witness. It's as simple

9      as that.

10                 MS. ABDI: So Mr. McKeon, and I am just

11     asking if you could speak up a little bit because

12     it's hard to hear in this courtroom.

13                 PROSPECTIVE JUROR: I'm a little nervous.

14                 MS. ABDI: Can you follow the Judge's law

15     with respect to that issue?

16                 PROSPECTIVE JUROR: Yes. According to his

17     definition, yes.

18                 MS. ABDI: Do you think that you would

19     need more than that?

20                 PROSPECTIVE JUROR: Well it would go back

21     to the credibility of one witness. Depending upon

22     the credibility of the witnesses.

23                 THE COURT: In time I will instruct you on

24     what reasonable doubt means. Suffice it to say it's

25     not all doubt, it's not beyond a shadow of a doubt.

bp

1    It's beyond a reasonable doubt.  And I will instruct
2    you on this later.

3              Proof beyond a reasonable doubt could be
4    established as to a fact through the testimony of a
5    single witness.

6              MS. ABDI:  And I believe your point was
7    Mr. McKeon, if you believe them, then you would have
8    no problem convicting the defendant beyond a
9    reasonable doubt; is that correct?

10             PROSPECTIVE JUROR:  Yes.

11             MS. ABDI:  I'm going to ask you the same
12   sort of line of questions.  Could you convict
13   somebody based on testimonial evidence alone if you
14   believed that evidence?

15             PROSPECTIVE JUROR:  Absolutely, yes.

16             MS. ABDI:  Can you follow the Judge's
17   instruction which is if there was only one witness
18   to a fact, but you believed that witness could you
19   convict the defendant beyond a reasonable doubt
20   based on the testimony of one witness.

21             THE COURT:  The witness nodded her head.

22             MS. ABDI:  Mr. Murphy --

23             THE COURT:  The reason I say that is
24   because in our business that's a nod, and that's a
25   shake.  And we are recording this.

bp

```
 1              MS. ABDI:  Mr. Murphy, would you have any
 2      problem convicting someone based on testimonial
 3      evidence alone?
 4              PROSPECTIVE JUROR:  I don't think so.
 5              MS. ABDI:  Would you have any problem
 6      convicting the defendant based on the testimony of
 7      one witness to a fact if you believed it?
 8              PROSPECTIVE JUROR:  If I believe it?
 9              MS. ABDI:  Meaning could you do that?
10              PROSPECTIVE JUROR:  I think so, yes.
11              MS. ABDI:  Ms. Evans, same question.
12              PROSPECTIVE JUROR:  Yes.
13              MS. ABDI:  Can you, if there was only one
14      witness to a fact, but you believed them could you
15      convict the defendant beyond a reasonable doubt?
16              PROSPECTIVE JUROR:  Yes.
17              MS. ABDI:  Ms. Nacci, the same question
18      that I asked Ms. Evans.  If there was only one
19      witness to a certain fact, could you convict the
20      defendant beyond a reasonable doubt if you believed
21      the testimony?
22              PROSPECTIVE JUROR:  If I believed it, yes.
23              THE COURT:  Ms. Woessner, now that you've
24      heard many questions asked of your fellow jurors, do
25      you feel the same way.
```

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  You want more than one

3       witness?

4              PROSPECTIVE JUROR:  I would like to have.

5              THE COURT:  You might like to have it.

6       That's not what I'm asking you.  I'm saying can you

7       follow my instruction to you that proof beyond a

8       reasonable doubt can be established by one witness.

9              PROSPECTIVE JUROR:  Yes.

10             MS. ABDI:  Miss Woessner, I don't want to

11      pick on you again.  Just to be clear, I don't want

12      you to just agree because of everybody else.

13             PROSPECTIVE JUROR:  I got a bigger picture

14      as this went along.

15             MS. ABDI:  It's kind of the same questions

16      I asked the first few jurors.  If there was only one

17      witness to a certain fact, could you convict the

18      defendant beyond a reasonable doubt based on the

19      testimony of that one witness if you found them to

20      be credible and believable?

21             PROSPECTIVE JUROR:  Yes.

22             MS. ABDI:  And once again, if anyone else

23      doesn't agree with that, or they think they need

24      more, then now is the time to say that, you know.

25      This is the time to be candid about these things,

1    because once you are selected as a juror it is way

2    too late to then start to have these doubts.

3              So I don't want anyone to be afraid

4    because they might be going against the grain as far

5    as what everyone is saying.  If you really feel a

6    certain way, I would just ask that you be honest

7    about it.

8              Ms. Rafferty?

9              PROSPECTIVE JUROR:  It's actually

10   Rafferty-Castro.

11             MS. ABDI:  Let me amend that.

12   Ms. Rafferty-Castro, the same question I asked the

13   previous juror.  Can you convict somebody based on

14   the testimony of one witness if you believed them?

15             PROSPECTIVE JUROR:  If I believed them.

16             MS. ABDI:  Mr. Varnofsky?

17             PROSPECTIVE JUROR:  I could, but I may

18   have trouble finding a scenario where one witness

19   would be enough.  But if I did believe them beyond a

20   reasonable doubt, then it could be.

21             MS. ABDI:  Thank you for being honest.

22             Mr. Boyce?

23             PROSPECTIVE JUROR:  Yes, I could follow

24   the Judge's instruction.  If that one witness seemed

25   credible to me I could convict on that testimony.

1   It would have to be about how I feel about that

2   witness.

3               THE COURT:  As an historical aside, the

4   only crime that requires more than one witness to be

5   proven beyond a reasonable doubt is the crime of

6   treason against the United States.  Our constitution

7   says the crime of treason need be proven by more

8   than -- not by a single witness.  That's just

9   something I just added.

10              MS. ABDI:  Miss Kelly, could you convict

11  someone based on the testimony of one witness if you

12  believed that witness to be true?

13              PROSPECTIVE JUROR:  Yes.

14              MS. ABDI:  Mr. Cooke, same question.

15              PROSPECTIVE JUROR:  Yes, I could.

16              MS. ABDI:  Ms. Isasi, same question.

17              PROSPECTIVE JUROR:  Yes, I could.

18              MS. ABDI:  And Ms. Otton?

19              PROSPECTIVE JUROR:  Yes, I believe so.

20              MS. ABDI:  Miss Otton, part of your job as

21  a juror is to make credibility determinations.  The

22  Judge will instruct you on that.  But how do you

23  feel about being asked to judge the honesty or

24  credibility of a witness?

25              PROSPECTIVE JUROR:  I hadn't thought about

1       it.   I'm not sure.   I have never been on jury duty.
2       This is all new for me.

3                 THE COURT:   Let me give you instruction on
4       that.   You judge the credibility of people every day
5       of your life.   You may not know it, but you do.   You
6       go to a car salesman and he tells you this is the
7       best used car in the lot.   Well, is he telling the
8       truth, or is he embellishing a little bit?   But you
9       use your own common sense to judge the credibility
10      of a witness.

11                I will give you a charge on this in time.
12      But there are a lot of factors which you employ.
13      One, the age of the person, the demeanor of the
14      person, whether or not the person made an
15      inconsistent statement in the past, whether or not
16      the person has a criminal record, the interest or
17      bias of the witness who is making the statement, the
18      probability or improbability of the person's story
19      in light of the evidence.   You do this every day of
20      your life.   You may not know it, but the same tests
21      you use in judging the credibility of people in your
22      everyday way of life is the same tests you use here.
23                MS. ABDI:   So do you think you could do
24      that in this case?
25                PROSPECTIVE JUROR:   I believe so.

bp

1           MS. ABDI:  Have you ever been in a

2     position where you have to decide whom to believe

3     when people have told you two conflicting stories?

4           PROSPECTIVE JUROR:  I'm a kindergarten

5     teacher, so every day of my life.

6           MS. ABDI:  And I'm sure you've been in the

7     situation where you have two kids who run up to you

8     and one says, Timmy just hit me.  Timmy says, no I

9     didn't.

10          You've have a situation where you

11    basically had to make a credibility determination

12    every day.  And that's kind of similar to --

13    basically the tools that you use every day are the

14    same ones that you're going to be using in this

15    courtroom.  Can you do that in this case?

16          PROSPECTIVE JUROR:  Yes.

17          MS. ABDI:  Does anyone else work with

18    children?

19          Ms. Nacci, how do you feel about making a

20    credibility determination in this case?

21          PROSPECTIVE JUROR:  I could probably do

22    it.

23          MS. ABDI:  And it's something that in your

24    every day job you end up having to make those

25    determinations, correct?

bp

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 119 of 913 PageID #: 419

```
 1                    PROSPECTIVE JUROR:  Yes.

 2                    MS. ABDI:  Ms. Evans?

 3                    PROSPECTIVE JUROR:  Yes.

 4                    MS. ABDI:  You also work with children.

 5                    PROSPECTIVE JUROR:  I work in a school.

 6      I'm a clerk for a school.

 7                    MS. ABDI:  And how long have you been

 8      doing that?

 9                    PROSPECTIVE JUROR:  Seventeen years.

10                    MS. ABDI:  So you deal with the children

11      every day?

12                    PROSPECTIVE JUROR:  Yes.

13                    MS. ABDI:  Have you ever been in a

14      situation where you have to decide between two

15      directly conflicting stories?

16                    PROSPECTIVE JUROR:  Yes.

17                    MS. ABDI:  And you've been able to make

18      the determination about who to believe; is that

19      correct?

20                    PROSPECTIVE JUROR:  Yes.

21                    MS. ABDI:  And what sort of factors do you

22      look at when you are doing that?

23                    THE COURT:  You don't have to get into

24      that.

25                    MS. ABDI:  You also have to deal with
```

bp

1          children as a substitute teacher.

2                    PROSPECTIVE JUROR: Yes.

3                    MS. ABDI: What do you teach, a specific

4          subject or grade?

5                    PROSPECTIVE JUROR: No -- special ed,

6          middle school.

7                    MS. ABDI: Do you have any problems making

8          credibility determinations in this case?

9                    PROSPECTIVE JUROR: No.

10                   MS. ABDI: Did anyone else raise their

11         hands.

12                   Ms. Cuomo, how do you feel about being

13         asked to judge the credibility of witnesses?

14                   PROSPECTIVE JUROR: I have no problem with

15         that.

16                   MS. ABDI: You think you can do that?

17                   PROSPECTIVE JUROR: Absolutely.

18                   MS. ABDI: Mr. Varnofsky?

19                   PROSPECTIVE JUROR: I have been a camp

20         counselor for the past six summers.

21                   MS. ABDI: So once again, you dealt with

22         children, and you would have no problem in this case

23         making a decision on who to believe and who not to

24         believe?

25                   PROSPECTIVE JUROR: No.

bp

1           MS. ABDI:  Is there anyone here that

2     thinks that they would have a problem making a

3     decision like that?  Is there anyone here who thinks

4     they might be overwhelmed by deciding who to believe

5     and who not to believe?

6           I know a lot of people here either have

7     children or work with children.  This case involves

8     a number of very serious charges, and as the Judge

9     said, we are going to get into that a little later.

10          As you know, this is a murder case.  And

11    there is also an aspect of a sexual crime; rape and

12    sexual abuse.  Just to be clear, the victim of the

13    rape and the sexual abuse is different than the

14    victim of the murder; they are not the same.  But in

15    this case there is going to be -- may be witnesses

16    who are children.

17          Now, is there anything -- and this is

18    where I really ask you to be honest.  Is there

19    anything about the fact that the witness is a child

20    that automatically makes you think, well, they must

21    be less truthful than an adult.

22          Is there anyone here that has that

23    instinctive response that because they are a child,

24    the witness is less truthful than an adult would be?

25    Mr. Varnofsky?

bp

1           PROSPECTIVE JUROR:   Maybe not

2    intentionally.   I know kids, especially at that age,

3    their stories do get mixed up a lot.  And I know

4    when they recount memories, there's a lot of

5    inconsistencies and stuff; not necessarily

6    intentionally.

7           THE COURT:   I just instructed you about

8    five minutes ago that among the factors you can

9    consider in judging the credibility of a witness are

10   the witness' age, the demeanor, the probability or

11   improbability of their story, and things like that.

12   Could you follow that instruction?

13          PROSPECTIVE JUROR:   Uh-hum, yes.

14          MS. ABDI:   And I understand what the Judge

15   has just asked you.   That's obviously something you

16   will take into account during your credibility

17   determination.

18          My question goes a little deeper.   It goes

19   into, when you know that it's a fact you can

20   consider -- what I'm trying to get at -- is there

21   something in you that automatically would make you

22   distrust what the child has to say?  Meaning they

23   would start out with a strike against them because

24   they were a child, Mr. Boyce?

25          PROSPECTIVE JUROR:   I still have to

bp

1      disagree with you.  I got three grandchildren, and I

2      live with them.  One is six; one is nine, one is

3      eleven.  And I got four frown children in the house.

4      And I find that a lot of times my grandchildren are

5      a lot more truthful than the grown ones.  And I mean

6      this seriously.

7              I have one grandson -- he knows the

8      difference even at that age -- five years old -- the

9      difference between a lie and the truth.

10             MS. ABDI: · And I thank you for bringing

11     that up.  Children are obviously individuals like

12     everyone else.  Some can be truthful, or some can

13     tell the truth or some can lie.  What I'm looking

14     for, and what you correctly pointed out Mr. Boyce,

15     is if you evaluate the child's testimony with an

16     open mind.  Can everyone do that?  Miss Kelly?

17             PROSPECTIVE JUROR:  Yes.

18             MS. ABDI:  Is that something that you can

19     do?  Do you feel like perhaps the child starts out

20     with a strike against them just because of their

21     age?

22             PROSPECTIVE JUROR:  No.

23             MS. ABDI:  Mr. Cooke?

24             PROSPECTIVE JUROR:  No, but I was

25     personally involved in an investigation in a case

bp

```
 1        with some similarities here.  I don't know if you

 2        want me to speak about it openly.

 3                  THE COURT:  Just one second.

 4                  Come up.

 5                  (The following ensued at sidebar:)

 6                  THE COURT:  Briefly tell me what you're

 7        talking about.

 8                  PROSPECTIVE JUROR:  Based on what counsel

 9        is referring to -- I was the apprehending officer a

10        number of years ago where a ten-year-old child was

11        the sole eyewitness to a homicide.

12                  THE COURT:  This is not that case.

13                  MR. MILLMAN:  Not this case.

14                  THE COURT:  Absolutely not.  This case

15        allegedly happened about a year ago, ten months ago.

16                  PROSPECTIVE JUROR:  This was a long time

17        ago, many years ago.

18                  MR. MILLMAN:  May I?

19                  THE COURT:  Yes.

20                  MR. MILLMAN:  Is this the type of thing

21        you want me to inquire about in front of the other

22        jurors?  Is there anything about that case that

23        would prevent you from being fair and impartial?

24                  PROSPECTIVE JUROR:  Of course I have to be

25        fair and impartial.  I'm just indicating to the
```

bp

1     Court that I was the arresting officer where a

2     ten-year-old child witnessed his father murder his

3     mother, and he was the only eyewitness. And I do

4     believe the eyewitness testimony of one witness.

5     I've seen the results of that.

6              MR. MILLMAN: And if were you to hear any

7     testimony that was somewhat similar in this case, do

8     you think it would color what you do with respect to

9     my client?

10             THE COURT: I didn't understand your

11    question.

12             MR. MILLMAN: If you hear testimony, for

13    example, from someone in this case whose father was

14    killed, is there anything about your dealing in your

15    prior case that would interfere with what you do

16    here in this case?

17             PROSPECTIVE JUROR: No. They are separate

18    matters.

19             MR. MILLMAN: And the other thing, I

20    noticed you put here that you wanted to speak in

21    front. Was that was this was about.

22             PROSPECTIVE JUROR: That was one thing.

23    And on the questionnaire it asked about someone

24    close to me ever accused or convicted of a crime. I

25    have an ex-brother-in-law that I have no contact

bp

 1    with for over ten years.

 2                 THE COURT:  Black sheep?

 3                 PROSPECTIVE JUROR:  Yes; convicted of a

 4    crime.

 5                 THE COURT:  Would you forget about that

 6    with regard to this case?

 7                 PROSPECTIVE JUROR:  Yes.

 8                 MR. MILLMAN:  I also wanted to ask you,

 9    because it could be personal, you marked off victim;

10    yourself or someone you know?

11                 PROSPECTIVE JUROR:  I've been the victim.

12    My wife and I have been burglarized.  We had a

13    tremendous loss.  I've been the victim of fraud

14    through employees of the bank I was doing business

15    with.  I was also the victim of a check fraud.  And

16    a lesser matter, my car has been broken into.  So

17    I've been the victim of a crime several times in my

18    lifetime.

19                 MR. MILLMAN:  With respect to the burglary

20    of your home, was the individual apprehended?

21                 PROSPECTIVE JUROR:  Yes.

22                 MR. MILLMAN:  Now, you don't have to tell

23    us the result of it, but is there anything about the

24    result of that that left you feeling that the system

25    did not adequately address it?

1           PROSPECTIVE JUROR:  Unfortunately, yes.

2           MR. MILLMAN:  Do you think that would

3       interfere with what you do here?

4           PROSPECTIVE JUROR:  I'll do my best to be

5       impartial.  I have an obligation to be impartial.

6           MR. MILLMAN:  What I'm asking, what my

7       concern would be -- if you came into the case with a

8       predisposition that sometimes people get away with

9       things and I don't want that to happen -- I wouldn't

10      want something like that to interfere with what you

11      do here in this case.

12          PROSPECTIVE JUROR:  Counselor, I will have

13      to remain professional and be honest.  I am a human

14      being as well.  I was not satisfied with the outcome

15      of that case.  Can I be impartial?  I'm going to do

16      my best to be impartial.  I have an obligation to be

17      impartial.

18          MR. MILLMAN:  If you feel that it stirs up

19      feelings as you listen to the case, can you put

20      those feelings aside?

21          THE COURT:  You are to decide this case

22      and base your verdict empirically without emotion,

23      without sympathy.  That does not mean you're an

24      unsympathetic person.

25          PROSPECTIVE JUROR:  I understand, Judge.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 128 of 913 PageID #: 428

```
 1                 THE COURT:  Start winding it down.

 2                 MR. MILLMAN:  I was going to ask if we can

 3     take a break shortly.

 4                 THE COURT:  Start winding it down.  We

 5     will take a break shortly.

 6                 (The following ensued in the courtroom:)

 7                 MS. ABDI:  I was talking about child

 8     witnesses before.  Ms. Isasi, we had gone through

 9     the fact that testimony is considered evidence.  Do

10     you agree with that?

11                 PROSPECTIVE JUROR:  Yes.

12                 MS. ABDI:  And we had gone through whether

13     or not we convict on the testimony of one witness.

14     Can you do that?

15                 PROSPECTIVE JUROR:  Yes.

16                 MS. ABDI:  Now my next question is kind

17     of -- let's say the one witness who witnessed a

18     particular fact is a child.  Can you convict beyond

19     a reasonable doubt based on the testimony of a

20     child?

21                 THE COURT:  If you credited that

22     testimony.

23                 PROSPECTIVE JUROR:  Yes.

24                 MS. ABDI:  If you credit that testimony,

25     Ms. Isasi.
```

1           PROSPECTIVE JUROR:  Yes.

2           MS. ABDI:  Ms. Otton?

3           PROSPECTIVE JUROR:  Yes.

4           MS. ABDI:  Once again, I'm going to ask

5      everybody, don't feel swayed that you have to give a

6      certain answer.  This is the time where I'd ask you

7      to be honest.  Ms. Nacci?

8           PROSPECTIVE JUROR:  Yes.

9           MS. ABDI:  Ms. Evans, would you do that?

10          PROSPECTIVE JUROR:  I believe so.

11          MS. ABDI:  Now, do you believe so, or if

12     you believed that child, and you found them to be

13     credible, and you found their testimony satisfied

14     all the elements that you have to beyond a

15     reasonable doubt, could you convict the defendant of

16     very serious crimes?

17          PROSPECTIVE JUROR:  Yes, I can.

18          THE COURT:  I want to give you a little

19     instruction at this particular time.

20          A child who will is nine or over can give

21     testimony.  They are presumed to understand or know

22     the nature of the oath.  A child who is under nine

23     can also give testimony.  If you find that they

24     understand the nature and quality of an oath -- a

25     child under nine also, under certain circumstances

bp

1     can give unsworn testimony. And we are talking

2     about a child under nine. A person cannot be

3     convicted upon the unsworn testimony of someone

4     under the age of nine alone. There must be

5     corroboration. That's a little nuance in the law.

6     I don't know whether it's going to apply in this

7     particular case. If it does, I'll give a more

8     detailed instruction later on.

9               MS. ABDI: Ms. Kelly?

10              PROSPECTIVE JUROR: I think because of the

11    serious consequences of listening to the testimony

12    personally, I would lose some sleep as to whether or

13    not I believe the credibility of a witness. It

14    would be very difficult.

15              THE COURT: We are not asking you to be

16    comfortable.

17              PROSPECTIVE JUROR: I'm being honest.

18              THE COURT: We are not asking you to be

19    comfortable. This is not a movie. You are judging

20    the facts concerning an allegation of sexual abuse

21    and murder. We are not asking you to be

22    comfortable. Do you think you can do your job?

23              PROSPECTIVE JUROR: I think I can. I'm

24    not saying the comfort ability factor is what's

25    bothering me.

1                THE COURT:  You are not happy.

2                PROSPECTIVE JUROR:  A child witness'

3    testimony alone convicting somebody of a serious

4    crime would be very hard for me.

5                MS. ABDI:  Thank you for being honest.

6                Ms. Rafferty, much like Ms. Kelly said it

7    would be difficult for her, I understand.  Well, I'm

8    not going to put words in your mouth.  Can you

9    convict someone beyond a reasonable doubt if it's

10   based on the testimony of a child?

11               PROSPECTIVE JUROR:  I think the Judge's

12   last instruction put it into a little more

13   perspective.  When you say it's a child in a broad

14   age range there is a difference between a small

15   child and a preteen.  I'm not a hundred percent

16   comfortable with it.  I don't think anyone is, but I

17   could follow the instructions.

18               MS. ABDI:  Mr. Varnofsky?

19               PROSPECTIVE JUROR:  Yes.

20               THE CLERK:  Ms. Brinson?

21               PROSPECTIVE JUROR:  Yes.

22               THE COURT:  Mr. Boyce?

23               PROSPECTIVE JUROR:  Coupled with what you

24   find out and what the Judge finds out about the

25   child, and coupled with my experience with children,

bp

1    I probably could accept the testimony of a child.

2    But it would have to be in conjunction with what you

3    find out and what the Judge finds out in terms of

4    age between five and nine. That's a gap there in

5    terms of sometimes what children say.

6              THE COURT: Start winding it down.

7              MS. ABDI: Does anyone think that?

8              Well, everyone agreed with me that it

9    might be embarrassing for a child especially to come

10   into court and testify about things of a sexual

11   nature.

12             THE COURT: Get on to another area, and

13   start winding it down.

14             MS. ABDI: Well, my question now is about

15   demeanor. Does anyone think that a child has to act

16   a certain way on the witness stand for them to

17   believe them?

18             For example, does anyone think if the

19   witness doesn't cry I might have a hard time

20   believing them? Does anyone feel that way?

21             THE COURT: You are going to have to judge

22   the credibility of the child as you would judge the

23   credibility of any other person of that particular

24   age.

25             You've been going for about forty minutes.

1    I told you I would give you half an hour. Start

2    winding it down.

3              MS. ABDI:  Then this will be my last

4    question.

5              Convicting somebody is a very difficult

6    thing to do.  If I prove my case beyond a reasonable

7    doubt, I will expect you to convict the defendant.

8              Is there anyone here that has a problem in

9    general with being able to convict the defendant if

10   I prove my case beyond a reasonable doubt?  Is there

11   anyone here that thinks they just cannot do that?

12             Thank you very much for your time.

13             THE COURT:  We'll take five minutes.

14             Before we do that I want to speak to you

15   for a moment.

16             I've ordered another seventy-five jurors

17   for this afternoon.  I want to make sure they are

18   available.  This afternoon I'm going to deal with

19   those particular jurors and take excuses.

20   Consequently, I believe we will be able to get

21   through this panel this morning.  Anybody in the

22   audience can leave now, and you are ordered back

23   Monday morning for continued jury selection.

24             Anyone who is a sworn juror here is

25   ordered back Tuesday morning, because Monday I'm

bp

| | |
|---|---|
| 1 | going to still be in jury selection.  If you are not |
| 2 | chosen you are free to go.  The sworn jurors come |
| 3 | back Tuesday.  The people in the audience come back |
| 4 | Monday morning.  There is no reason why you have to |
| 5 | sit here.  We are not going to do anything with you |
| 6 | today. |
| 7 | (The prospective jurors exited the |
| 8 | courtroom.) |
| 9 | (A recess was taken.) |
| 10 | THE COURT:  Bring in the jury. |
| 11 | (The prospective jurors entered the |
| 12 | courtroom.) |
| 13 | THE COURT:  The record should reflect that |
| 14 | we excused two prospective jurors for childcare |
| 15 | reasons.  This was by consent of counsel and their |
| 16 | names are -- |
| 17 | THE CLERK:  Christina Akhavan, and Linda |
| 18 | Y-A-B-L-A-N-S. |
| 19 | Recalling the case on trial, People of the |
| 20 | State of New York vs. Ulises Bonilla, Indictment |
| 21 | 202N-11. |
| 22 | THE COURT:  One juror is missing. |
| 23 | I guess I neglected to ask you to come up |
| 24 | Ms. Cuomo. |
| 25 | PROSPECTIVE JUROR:  That's why I spoke up. |

```
 1        I have grandchildren.  They are ten years old.
 2                    THE COURT:  So do I.
 3                    PROSPECTIVE JUROR:  Okay.  You want me to
 4        be honest?  I think I'm going to have a hard time.
 5        I'm going to have a hard time.
 6                    THE COURT:  The question is --
 7                    PROSPECTIVE JUROR:  It's not about
 8        believing them.
 9                    THE COURT:  It's not about having a hard
10        time.  The decision making of the juror is a
11        difficult job.  We don't expect it to be easy,
12        especially in a case like this.  The question is,
13        can you evaluate the testimony, listen to the
14        evidence, follow my instructions and remain
15        impartial?  Can you do that?
16                    PROSPECTIVE JUROR:  No.
17                    THE COURT:  Okay, then you are excused.
18                    MR. MILLMAN:  Thank you for your time.
19                    THE CLERK:  Is that by the Court or on
20        consent?
21                    THE COURT:  That's cause; Cuomo.
22                    THE CLERK:  Let the record reflect all
23        parties are present including the defendant and
24        Spanish interpreter.  All parties present in the
25        jury box except Rosemarie Cuomo who was excused.
```

bp

1                      THE COURT:  Counsel proceed.

2                      MR. MILLMAN:  Good morning.  Perhaps at

3        this time, good afternoon is more appropriate.  As I

4        think you know by now my name is Daniel Millman.  I

5        am an attorney and represent Ulises Bonilla,  the

6        defendant in this case.

7                      Mr. Murphy, I'm going to start off with

8        you.

9                      PROSPECTIVE JUROR:  Yes, sir.

10                     MR. MILLMAN:  You understand if you are

11       selected as a juror in this case, you'll be called

12       upon to determine facts.

13                     Just for the reporter, you need to answer

14       verbally.

15                     PROSPECTIVE JUROR:  Repeat it, please.

16                     MR. MILLMAN:  You understand if you are

17       selected as a juror in this case you'll be called

18       upon to determine facts.

19                     PROSPECTIVE JUROR:  Yes.

20                     MR. MILLMAN:  That has to be based upon

21       the evidence.

22                     PROSPECTIVE JUROR:  Yes.

23                     MR. MILLMAN:  Do you have any problem

24       doing that and applying it to the law instructed to

25       you by Judge Peck?

1           PROSPECTIVE JUROR:  I could try to my best

2      ability.

3                MR. MILLMAN:  And you'll follow his

4      instructions.

5                PROSPECTIVE JUROR:  Yes.

6                MR. MILLMAN:  I noticed you were employed

7      in the Cold Spring Harbor Lab.

8                PROSPECTIVE JUROR:  That's correct.

9                MR. MILLMAN:  What do you do there?

10                PROSPECTIVE JUROR:  Security.

11                MR. MILLMAN:  In that position do you work

12      with the police?

13                PROSPECTIVE JUROR:  On occasion, yes.

14                MR. MILLMAN:  On any sort of a regular

15      basis?  What I mean by regular, more than two times

16      a week.

17                PROSPECTIVE JUROR:  Couple of times a

18      week.  We deal with them a couple of times a week.

19                MR. MILLMAN:  Nothing about that would

20      interfere with anything that you do here, right?

21                PROSPECTIVE JUROR:  No.

22                MR. MILLMAN:  And I also see that you are

23      a retired police officer; is that correct?

24                PROSPECTIVE JUROR:  That's correct.

25                MR. MILLMAN:  How many years were you a

1    police officer for?

2               PROSPECTIVE JUROR:  Twenty years.

3               MR. MILLMAN:  Where?

4               PROSPECTIVE JUROR:  New York City.

5               MR. MILLMAN:  When you were there were you

6    involved in the investigation of any sexually

7    related offenses involving children?

8               PROSPECTIVE JUROR:  Yes.

9               MR. MILLMAN:  Would you say that happened

10   many times, or more the exception than the rule?

11              THE COURT:  Was that as a patrol officer

12   going to the scene, or were you involved in any

13   sexual investigative units?

14              PROSPECTIVE JUROR:  I was a patrolman,

15   your Honor.

16              THE COURT:  And every once in a while you

17   came to a scene or investigated a matter which

18   involved something like this?

19              PROSPECTIVE JUROR:  That's correct.

20              MR. MILLMAN:  And that's precisely what I

21   was getting to.  You weren't involved in any

22   extensive interviewing of any of the complainants in

23   that case?

24              PROSPECTIVE JUROR:  That extensive, no.

25              MR. MILLMAN:  Miss Rafferty-Castro, you

                         bp

 1 | understand that as Judge Peck had indicated my
 2 | client is presumed innocent.
 3 |            PROSPECTIVE JUROR:  Certainly.
 4 |            MR. MILLMAN:  As he sits here now he is
 5 | presumed innocent, and unless you determine that
 6 | that presumption has been overcome by proof beyond a
 7 | reasonable doubt does that the presumption go away;
 8 | do you understand?
 9 |            PROSPECTIVE JUROR:  Yes.
10 |            MR. MILLMAN:  Do you have any problem
11 | following that?
12 |            PROSPECTIVE JUROR:  No.
13 |            MR. MILLMAN:  Is there anybody here who
14 | has difficulty with the idea that my client is
15 | presumed innocent, because now would be the time to
16 | tell us.
17 |            Miss Rafferty-Castro, I'm sure you
18 | understand from what you heard here, it's a very
19 | serious case.
20 |            PROSPECTIVE JUROR:  Yes.
21 |            MR. MILLMAN:  When I say serious,
22 | prosecution, serious, for my client, it's a very
23 | serious matter, and it's going to require a lot of
24 | time and effort.  Do you have any problem putting
25 | that in?

1              PROSPECTIVE JUROR:  No.

2              MR. MILLMAN:  And being fair and impartial

3       in this case?

4              PROSPECTIVE JUROR:  I think I am pretty

5       fair in general.

6              MR. MILLMAN:  And I certainly -- while

7       there will be disagreements between the respective

8       sides -- I don't think anybody can dispute that

9       something terrible has happened here.  Is there

10      anything about that fact, hearing that something

11      terrible has happened, and the fact that my client

12      is on trial for that, is there a feeling inside of

13      you that he must be responsible?

14             PROSPECTIVE JUROR:  Not at all.  We have

15      no information.

16             MR. MILLMAN:  Does anybody here come into

17      this hearing it's a serious case, something bad has

18      happened, and they feel a need to want to attach

19      responsibility?  Is there anybody here who feels

20      that way?

21             Miss Rafferty-Castro, if you conclude that

22      the Assistant District Attorney has failed to prove

23      my client's guilt beyond a reasonable doubt, what is

24      your verdict going to be?

25             PROSPECTIVE JUROR:  Not guilty.

```
 1              MR. MILLMAN:  Would you have any
 2        hesitation doing that?
 3              PROSPECTIVE JUROR:  No.
 4              MR. MILLMAN:  And you understand that will
 5        be your responsibility if you conclude that she
 6        failed to prove the case beyond a reasonable doubt?
 7              PROSPECTIVE JUROR:  Absolutely.
 8              MR. MILLMAN:  And you'll be able to do
 9        that even if it meant that you weren't getting to
10        the bottom of what happened?
11              THE COURT:  I am sorry.  I didn't hear
12        you.
13              MR. MILLMAN:  If it meant you weren't
14        getting to the bottom of what happened.
15              MS. ABDI:  Objection.
16              THE COURT:  Sustained.
17              MR. MILLMAN:  Is there anything about the
18        fact that the allegations are serious that would
19        cause you to feel that some responsibility has to be
20        attached, and someone has to take that
21        responsibility here?
22              PROSPECTIVE JUROR:  You know what, you are
23        going to the end of the story.  We are at the
24        beginning of the story, so I have no idea.
25              MR. MILLMAN:  You'll keep an open mind?
```

1                    PROSPECTIVE JUROR:  Yes.

2                    MR. MILLMAN:  And pay close attention to

3         the evidence?

4                    PROSPECTIVE JUROR:  Yes.  I actually have

5         a question.  Are we allowed to take notes on when

6         the Judge is giving us instructions and on what we

7         hear?

8                    THE COURT:  I'm going to give an

9         instruction on that.

10                   Would you just read back the last couple

11        of lines.

12                   (The record was read by the court

13        reporter.)

14                   THE COURT:  We have a note taker.  She can

15        do it better than you can.  And any time you want

16        anything read back, you ask me, and we'll have it

17        read back.

18                   And a very, very common question.  You

19        take notes in all of your daily affairs.  I frown

20        upon it here because you may not be paying attention

21        when you are taking notes; may not be paying

22        attention to the testimony.  And also when you get

23        into the jury room if you are selected, you are

24        going to have the benefit of twelve collective

25        recollections, which is not what you ordinarily have

```
 1        in your daily life.  Okay.
 2                    MR. MILLMAN:  Miss Rafferty-Castro, I
 3        wanted to ask you about your occupation.  I see you
 4        are senior clerk of residential services.  Can you
 5        tell me what you do?
 6                    PROSPECTIVE JUROR:  I work for a
 7        not-for-profit agency, Life's WORC.  I am
 8        responsibile for running twenty-six homes for
 9        mentally disabled adults in Nassau and Suffolk.
10                    MR. MILLMAN:  Miss Kelly, are you
11        employed?
12                    PROSPECTIVE JUROR:  I am not.
13                    MR. MILLMAN:  I see that you have a law
14        degree; is that correct?
15                    PROSPECTIVE JUROR:  Yes.
16                    MR. MILLMAN:  Have you ever practiced as
17        an attorney?
18                    PROSPECTIVE JUROR:  I have.
19                    MR. MILLMAN:  When did you last practice?
20                    PROSPECTIVE JUROR:  When my son was born
21        in 1991.
22                    MR. MILLMAN:  What kind of law did you
23        practice?
24                    PROSPECTIVE JUROR:  I was a litigator.
25                    MR. MILLMAN:  Did you practice criminal
```

1       law?

2                    PROSPECTIVE JUROR:  I did not.

3                    MR. MILLMAN:  Did you work in the same

4       office with any attorneys who did?

5                    PROSPECTIVE JUROR:  No.

6                    MR. MILLMAN:  Your husband is an attorney?

7                    PROSPECTIVE JUROR:  Yes.

8                    MR. MILLMAN:  What kind of law does he do?

9                    PROSPECTIVE JUROR:  Bankruptcy.

10                   MR. MILLMAN:  No litigation?

11                   PROSPECTIVE JUROR:  Bankruptcy litigation.

12                   MR. MILLMAN:  And in the area of criminal

13      law?

14                   PROSPECTIVE JUROR:  No.

15                   MR. MILLMAN:  I saw -- and please, if you

16      feel you need to discuss it privately -- you

17      indicated either yourself or someone you know was a

18      victim of a crime.  Is that something you want to

19      talk about here or do you need privacy?

20                   PROSPECTIVE JUROR:  A close friend of mine

21      was raped about twenty years ago.

22                   MR. MILLMAN:  Your close friend, at the

23      time when she was raped, how old was she?

24                   PROSPECTIVE JUROR:  Twenty-two.

25                   MR. MILLMAN:  And you were close friends

```
 1      with her at that time?
 2                 PROSPECTIVE JUROR:  No.
 3                 MR. MILLMAN:  So there is nothing about
 4      that that would interfere with what you would do
 5      here?
 6                 PROSPECTIVE JUROR:  No.
 7                 MR. MILLMAN:  I think you had made a
 8      remark -- and correct me if I'm wrong -- earlier --
 9      that you might have some difficulty with certain
10      things given the seriousness of the allegations.
11                 When you say difficulty, do you mean that
12      it may not be easy, or do you mean that you might
13      have a hard time being fair and impartial or
14      something else?
15                 PROSPECTIVE JUROR:  No; I meant that it
16      would be difficult.
17                 MR. MILLMAN:  Would you be able to be fair
18      and impartial?
19                 PROSPECTIVE JUROR:  Ultimately.
20                 MR. MILLMAN:  And would you have no
21      problem following the Judge's charge?
22                 PROSPECTIVE JUROR:  No.
23                 THE COURT:  Now, if you are selected, I am
24      the one who gives the jury the law; not you.
25                 PROSPECTIVE JUROR:  I haven't practiced in
```

1    twenty years.

2              THE COURT:  I'm just telling you, as a

3    rule of law that I have to give -- if someone has

4    peculiar knowledge of the law -- I just have to give

5    it.

6              MR. MILLMAN:  Ms. Evans, I see on your

7    questionnaire you had indicated that you've had some

8    experience in the Grand Jury.

9              PROSPECTIVE JUROR:  Yes.

10             MR. MILLMAN:  Anything about that that

11   would interfere with what you would do here?

12             PROSPECTIVE JUROR:  No, sir.

13             MR. MILLMAN:  When was that?

14             PROSPECTIVE JUROR:  1998.

15             MR. MILLMAN:  Miss Evans, would you have

16   any problem scrutinizing the testimony of the

17   witness that is testifying here?

18             PROSPECTIVE JUROR:  No.

19             MR. MILLMAN:  And you understand that will

20   be part of what would you do as a juror in this

21   case?

22             PROSPECTIVE JUROR:  Yes.

23             MR. MILLMAN:  You understand if everyone

24   here was in agreement about what happened, we

25   wouldn't be here; there wouldn't be a trial.  You

| | |
|---|---|
| 1 | will need to make decisions about the witness and |
| 2 | the evidence which you find reliable.  Do you have |
| 3 | any problem doing that? |
| 4 | PROSPECTIVE JUROR:  No. |
| 5 | MR. MILLMAN:  Any problem doing that, |
| 6 | Mr. Varnofsky? |
| 7 | PROSPECTIVE JUROR:  No. |
| 8 | MR. MILLMAN:  Mr. Varnofsky, you |
| 9 | understand that with regard to what we do as jurors |
| 10 | is decide what the evidence indicates about what |
| 11 | took place on a certain date? |
| 12 | PROSPECTIVE JUROR:  Yes. |
| 13 | MR. MILLMAN:  Would you agree with me that |
| 14 | any feelings of sympathy that you might have as you |
| 15 | listen to evidence certainly can't change what |
| 16 | happened on that date? |
| 17 | PROSPECTIVE JUROR:  Of course. |
| 18 | MR. MILLMAN:  Do you understand that as a |
| 19 | juror that you are not permitted to allow sympathy |
| 20 | to interfere with the decisions that you make in the |
| 21 | case? |
| 22 | PROSPECTIVE JUROR:  Yes. |
| 23 | MR. MILLMAN:  It's certainly normal to |
| 24 | have those emotions, but can you give me your |
| 25 | assurance that those emotions will not interfere |

bp

```
 1        with how you decide?
 2                 PROSPECTIVE JUROR:  That will be
 3        completely set aside.
 4                 THE COURT:  For the benefit of everybody,
 5        your verdict must be free from sympathy.  That does
 6        not mean you are an unsympathetic person.
 7                 Mr. Varnofsky, I believe you indicated
 8        before when the Assistant District Attorney was
 9        questioning you that you would have some concern, or
10        at least a certain set factors with regard to
11        children.
12                 PROSPECTIVE JUROR:  I meant in my
13        experience.  I said in my experience with children,
14        they have in the past gotten mixed up or there were
15        inconsistencies with their stories.  But if I did
16        happen to believe them beyond a reasonable doubt,
17        that would not be an issue.
18                 THE COURT:  I find the same thing true
19        with lawyers at times.
20                 MR. MILLMAN:  So you could certainly be
21        fair to everybody?
22                 PROSPECTIVE JUROR:  Hundred percent, yes.
23                 MR. MILLMAN:  Mr. McKeon, did I say that
24        correctly?
25                 PROSPECTIVE JUROR:  As long as you said
```

1        it.  McKeon is much easier for me.

2                    MR. MILLMAN:  Mr. McKeon, during this

3        trial, as I think you already know, you are going to

4        hear about great loss.  No one disputes that

5        something bad has happened.  That's not what we are

6        here to decide.

7                    Can you listen to the evidence in this

8        case and make decisions about the quality of that

9        evidence based upon the instructions that the Judge

10       gives you?

11                   PROSPECTIVE JUROR:  Yes.

12                   MR. MILLMAN:  Anything in your experience

13       that would prevent you from doing so?

14                   PROSPECTIVE JUROR:  No.

15                   MR. MILLMAN:  And can you give me your

16       assurance that you can decide this case on facts and

17       evidence; not on compassion and sympathy.

18                   PROSPECTIVE JUROR:  Right.

19                   MR. MILLMAN:  Mr. McKeon, I also notice --

20       and once again, I say this again.  If you need to

21       speak about this in private -- the questionnaire

22       indicates that yourself or someone you know -- you

23       indicated convicted of a crime, accused and victim.

24       If you want to speak about each of those, that's

25       something we can talk about here.

1            PROSPECTIVE JUROR:  I'd prefer not to.

2            MR. MILLMAN:  I'd ask to approach.

3            THE COURT:  Are you going to get into

4       specifics.

5            MR. MILLMAN:  It depends.

6            THE COURT:  If you are not going to get

7       into specifics, simply ask him the question, would

8       those instances affect your impartiality in this

9       case.  If you are going to get into specifics, then

10      he has to come up.

11           MR. MILLMAN:  Mr. McKeon, let me start by

12      just asking you.  I'm going to accused.  Is it

13      either yourself or someone you are very, very close

14      with?

15           PROSPECTIVE JUROR:  Correct.

16           MR. MILLMAN:  I would ask if we can

17      approach.

18           (The following ensued at the sidebar:)

19           MR. MILLMAN:  Mr. McKeon, let me just ask,

20      who was it that was accused.

21           PROSPECTIVE JUROR:  Son.

22           MR. MILLMAN:  Can I ask what he was

23      accused of?

24           PROSPECTIVE JUROR:  General mischief, a

25      garbage can.

MR. MILLMAN: Anything about that that would interfere with what you do in this case?

PROSPECTIVE JUROR: No.

MR. MILLMAN: Two totally different situations. What about victim? Who was a victim?

PROSPECTIVE JUROR: Well, during my course of twenty years I have a lot of friends that were victims in crimes. Over the next thirty, I'll know more victims.

MR. MILLMAN: Of those victims, were they victims of any sexual offenses.

THE DEFENDANT: No.

MR. MILLMAN: Any involving children?

PROSPECTIVE JUROR: That was my father. That was thirty years ago. He was attacked in the subway.

MR. MILLMAN: Doesn't sound like there is anything about any of that that would interfere with what you do here; is that correct?

PROSPECTIVE JUROR: Yes.

MS. ABDI: My I inquire on that? You said that -- the case that you were talking about with your son, was that Nassau County?

PROSPECTIVE JUROR: Yes.

MS. ABDI: Was he ever prosecuted for

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 152 of 913 PageID #: 452

1          anything?

2                    PROSPECTIVE JUROR:  Yes.

3                    MS. ABDI:  Is that case over now, or is it

4          still pending?

5                    PROSPECTIVE JUROR:  He's on probation.

6                    MS. ABDI:  Okay.  And how long ago was

7          that?

8                    PROSPECTIVE JUROR:  Two years ago.

9                    MS. ABDI:  I wasn't the prosecutor on

10         that; is that correct?

11                   PROSPECTIVE JUROR:  I don't think so.

12                   MS. ABDI:  Do you harbor any negative

13         feelings towards the police or the DA's Office for

14         anything connected with that case?

15                   PROSPECTIVE JUROR:  No.

16                   MS. ABDI:  Would you hold that -- anything

17         that happened with your son, would you hold that

18         against the prosecution in this case?

19                   PROSPECTIVE JUROR:  Not at all.

20                   (The following ensued in the courtroom:)

21                   MR. MILLMAN:  Miss Otton, you have heard

22         over and over again that you will be called upon to

23         determine credibility.  Can you promise me that you

24         will look very closely at how the witness appears

25         and speaks as they testify?

bp

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 153 of 913 PageID #: 453

1              PROSPECTIVE JUROR:  Yes.

2              MR. MILLMAN:  And you'll listen to the

3       Judge's instructions as they concern credibility?

4              PROSPECTIVE JUROR:  Yes.

5              MR. MILLMAN:  I'm going to ask you what's

6       going to seem like a strange question.  I'm going to

7       ask you the following:  Have you ever seen a pink

8       elephant flying over a house?

9              PROSPECTIVE JUROR:  No.

10             MR. MILLMAN:  Of course the answer is no,

11      but I bet you just did picture it in your mind.  You

12      just pictured something that never happened because

13      I said it.

14             Can you promise me, as you listen to

15      witnesses on the stand, you won't just automatically

16      accept everything that is said; you will evaluate

17      their credibility.

18             PROSPECTIVE JUROR:  Yes.

19             MR. MILLMAN:  If you believe them, fine.

20      If you don't, you will consider that as well.

21             PROSPECTIVE JUROR:  Yes.

22             MR. MILLMAN:  Can you give me your

23      assurance?

24             PROSPECTIVE JUROR:  Yes.

25             MR. MILLMAN:  Can you give me your

1       assurance, Mr. Boyce?

2                PROSPECTIVE JUROR:  Yes, of course.

3       Everything here is alleged.  And by law, he is

4       innocent until proven guilty.  And I'll work with

5       that in my head.  If I hear the evidence --

6                MR. MILLMAN:  Mr. Boyce, do you have any

7       problem with the general idea that people sometimes

8       swear to tell the truth, get up on the stand and

9       don't tell the truth, right?

10               PROSPECTIVE JUROR:  Yes.

11               MR. MILLMAN:  I'm not saying that they

12      will or will not do that here; that's not for me to

13      talk to you about.  But you accept the idea that

14      just because someone takes an oath and gets on the

15      stand doesn't mean that what they are saying is

16      true.

17               PROSPECTIVE JUROR:  That's true.  I know

18      you and the prosecutors have to bring the truth out,

19      so I'll hear the truth because I know children don't

20      always tell the truth.

21               MR. MILLMAN:  Miss Nacci, do you

22      understand that as a juror you have a particular

23      role in the system?

24               PROSPECTIVE JUROR:  Yes.

25               MR. MILLMAN:  That role is determined by

                        bp

1        the instructions as given to you by the Judge.

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. MILLMAN:  Even if you disagree with

4        the instructions -- I'm not saying you are going

5        to -- but if you disagree with any of the

6        instructions you still understand you are

7        obligated -- there is nothing interfering with you

8        following them.

9                    PROSPECTIVE JUROR:  No.

10                   MR. MILLMAN:  We can agree it's unfair for

11       someone to do something bad and not be punished.

12       Can you we also agree it's unfair and injustice for

13       someone to be punished for something he didn't do.

14                   PROSPECTIVE JUROR:  Can you repeat it

15       please.

16                   MR. MILLMAN:  Can we agree that it's

17       unfair and injustice for an individual to be

18       punished for something that he did not do?

19                   THE COURT:  Let me give an instruction at

20       this particular time.  Punishment, if any, that is

21       to be meted out, is the function of the Court and

22       the Court alone.  It's a not a jury function.  And,

23       I will charge you at the appropriate time.  You are

24       not even to consider the possibility of punishment

25       when you deliberate among yourselves.

```
 1              MR. MILLMAN:  Miss Otton, there is one
 2    more question I wanted to ask you.  I noticed you
 3    are a teacher.  You work with young children.
 4              PROSPECTIVE JUROR:  Yes.
 5              MR. MILLMAN:  Anything about that that
 6    will interfere with what you do in this case knowing
 7    that there is going to be more than one child
 8    involved to testify.
 9              THE COURT:  Let me just interrupt.  You
10    deal with five years olds, correct?
11              PROSPECTIVE JUROR:  Correct.
12              THE COURT:  Who is, if you know, what is
13    the youngest age of a potential witness you may
14    call?
15              MS. ABDI:  I believe eleven.
16              MR. MILLMAN:  Miss Isasi, good afternoon.
17    I see here that you made and indication I think you
18    were a juror on a criminal case in the past.
19              PROSPECTIVE JUROR:  Yes.
20              MR. MILLMAN:  When was that?
21              PROSPECTIVE JUROR:  I believe around 2003,
22    maybe 2002.
23              MR. MILLMAN:  Can you tell me what the
24    charge was?
25              PROSPECTIVE JUROR:  It was a DWI.
```

1                  MR. MILLMAN:  So none of the charges are

2        similar to what we have, nothing about that case

3        would interfere with what we do here.

4                  PROSPECTIVE JUROR:  No.

5                  MR. MILLMAN:  Miss Isasi, you understand

6        that your role is to determine the evidence.

7                  PROSPECTIVE JUROR:  Yes.

8                  MR. MILLMAN:  And that it should not be

9        based on sympathy or how you may feel about the

10       attorneys or even my client.

11                 PROSPECTIVE JUROR:  Right.

12                 MR. MILLMAN:  You understand that you are

13       not here to decide whether or not you personally

14       like my client.

15                 PROSPECTIVE JUROR:  Right.

16                 MR. MILLMAN:  You know if the prosecution

17       fails to prove my client's guilt beyond a reasonable

18       doubt, do you have any problem finding him not

19       guilty even if you feel yourself you don't like my

20       client from what you heard?

21                 PROSPECTIVE JUROR:  I have no problem.

22                 MR. MILLMAN:  During the course of this

23       trial there may be certain things about my client

24       that you may disagree with or may not sit right with

25       you, and you may even conclude that you don't like

bp

1    him.  Would that prevent you from evaluating this

2    case and looking at the evidence?

3                    PROSPECTIVE JUROR:  No.

4                    MR. MILLMAN:  From being fair to him?

5                    PROSPECTIVE JUROR:  No.

6                    MR. MILLMAN:  Even if he you heard

7    something along the lines that he may have used

8    drugs at some time.  Would that cause you to

9    automatically conclude that he must be guilty?

10                   PROSPECTIVE JUROR:  No.

11                   MR. MILLMAN:  Is there anyone here that

12   feels that way, that if you hear something about my

13   client's conduct that he used drugs or something

14   else, yet you believe that the prosecutor has failed

15   to prove guilt beyond a reasonable doubt, is there

16   anybody here in that situation that would not be

17   able to find my client not guilty?

18                   Miss Woessner, following up on what I was

19   saying before, certainly we can agree that one thing

20   has nothing to do with the other.  There are people

21   we know that never touch drugs and go out and

22   physically hurt people.  And by the same token,

23   there are people who constantly use drugs that never

24   hurt anyone.

25                   PROSPECTIVE JUROR:  Yes.

1            MR. MILLMAN:  Miss Woessner, the fact that

2      my client is charged with more than one offense

3      here, is there anything about that that would

4      automatically cause you to conclude that he must be

5      guilty?

6            PROSPECTIVE JUROR:  No.

7            MR. MILLMAN:  Anybody here that feels that

8      way?

9            THE COURT:  I will tell you this, that you

10     will be required to render separate verdicts on each

11     of the charges that you will be deliberating on.

12           MR. MILLMAN:  Miss Brinson, the Judge will

13     charge you on the law, and it's not appropriate for

14     me to tell you what that law is.  One thing I think

15     we can all agree on is my client is not required to

16     testify in this trial.

17           If you hear the Judge instruct you that my

18     client is not required to testify at the trial and

19     you don't hear from my client, would that in and of

20     itself cause you to find him guilty?

21           PROSPECTIVE JUROR:  Would I hear from you

22     as his lawyer?

23           MR. MILLMAN:  Let me ask you the question

24     this way.  The evidence has all been presented.  The

25     Judge instructs you, and he instructs you that my

bp

1    client is not required to testify and that you may

2    not draw any inference against him as a result of

3    the fact that he did not take the stand and testify,

4    if you find though that the evidence did not

5    establish my client's guilt beyond a reasonable

6    doubt, would the fact that my client did not testify

7    cause you to find him guilty?

8              THE COURT:  Would you like me to give a

9    specific instruction on this now?

10             MR. MILLMAN:  Certainly, Judge.

11             THE COURT:  The charge in this particular

12   area is very specific.  Ordinarily it comes after

13   all the evidence is in, and then you use a past

14   tense verb.  At the request of counsel I'm giving

15   you the charge now, and I'm going to have to use a

16   future tense verb.

17             The defendant may not testify in this

18   case.  I charge you that the fact that he may not

19   testify is not a factor from which any inference

20   unfavorable to the defendant may be drawn.

21             It's very specific, and it has to be read

22   specifically.

23             MR. MILLMAN:  You heard what the Judge

24   just indicated.  Any problem following that?

25             PROSPECTIVE JUROR:  No.

bp

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 161 of 913 PageID #: 461

| | |
|---|---|
| 1 | MR. MILLMAN: Is there any part of you |
| 2 | that's going to say inside your head, well, |
| 3 | prosecution didn't prove a case beyond a reasonable |
| 4 | doubt, but it doesn't sit right with me; he didn't |
| 5 | testify. |
| 6 | Is there any part of the that will be used |
| 7 | against him? |
| 8 | PROSPECTIVE JUROR: You as his lawyer, you |
| 9 | would be speaking on behalf of him, correct? |
| 10 | MR. MILLMAN: I can't give any -- the |
| 11 | evidence comes from the witness. But what I'm |
| 12 | asking -- to put it more simply -- is whether or not |
| 13 | you would be able to follow Judge Peck's instruction |
| 14 | that you are not permitted to use it against my |
| 15 | client; the fact that he didn't testify. Do you |
| 16 | have any problem doing that? |
| 17 | I notice there is hesitation. |
| 18 | PROSPECTIVE JUROR: I think I may have a |
| 19 | problem. |
| 20 | THE COURT: Let me give the rule of law. |
| 21 | A defendant need not prove anything. It's not his |
| 22 | requirement to prove anything. It is the People's |
| 23 | burden to prove each and every element of the case |
| 24 | beyond a reasonable doubt, and that burden never |
| 25 | shifts to the defendant. That's the rule of law. |

bp

1                    Now, let me just give you -- there is a

2     little example of this.

3                    I watch TV at 12 o'clock at night.  I hear

4     a crash outside, and I look out and see a figure

5     breaking the windows of my neighbors' car across the

6     street.  He goes around the car, and for a split

7     second I see that he is an individual who lives up

8     the block.  I call the cops.  That individual is

9     charged.

10                    Now, I'm examined or cross-examined; it

11    doesn't matter, and the following testimony comes

12    out:

13                    Judge, what time of day was this?  It was

14    around midnight.  What were the lighting conditions

15    in your den?  The lighting conditions in my den were

16    bright.  There were lights on and the TV was on.

17    What were the lighting conditions outside?  The

18    lighting conditions were dim.  In other words, you

19    are looking from a lit area to a darkened area?

20    That's correct.  Quite a different situation than if

21    you were in a legitimate theater looking from a

22    dimmer area to a darker area.  That's correct.  How

23    long did you have the face of this individual under

24    observation.  I'd say less than a second.  Do you

25    wear glasses?  Yes.  Are you nearsighted or

1        farsighted?  I'm nearsighted.  What time is it?

2        Twelve-forty.  Take off your glass.  What time is

3        it?  All I see is a black blur.  Did you have your

4        glasses on that night?  No; I don't need them to

5        watch TV.  How far was the distance between you and

6        this individual?  I'd say about sixty feet.  Did you

7        have anything to drink while you were watching TV?

8        Yeah.  I had a couple of hefty scotches.  Were you

9        drunk?  No, but I had a buzz on.

10               Now, if that's the only evidence in the

11       case, you would have to make a determination whether

12       or not that evidence proves beyond a reasonable

13       doubt that I identified the right person.  I might

14       be mistaken; I might be telling the truth.  That's

15       up to you.  But the defendant need not prove

16       anything.

17               MR. MILLMAN:  Ms. Brinson, again, you

18       heard Judge Peck.  He clearly explained what the law

19       is in that regard.  But I know you said a moment ago

20       that you thought you might have a problem, and we

21       appreciate your candor.

22               Are you saying that you think even though

23       the Judge instructed you on it, when it came down to

24       it, after the evidence, you may not be able to

25       follow the instructions?

1           PROSPECTIVE JUROR:     It's the law, but

2      previously there was -- I guess all I'm hearing are

3      the People.  Let's say if he did commit the crime,

4      all I'm hearing are their stories, and no one in his

5      favor.  I don't know if I would be able to

6      conclude --

7           THE COURT:    In my little example I gave

8      you the People's evidence alone.  There may be holes

9      in it.  It may not convince you beyond a reasonable

10     doubt of the facts that the People wish you to

11     conclude in the little example that I gave you.

12          PROSPECTIVE JUROR:     I would be able to do

13     it.

14          MR. MILLMAN:    Because a moment ago you

15     said I might have a problem.  The Judge's

16     instructions cleared that up?

17          PROSPECTIVE JUROR:     Yes.

18          MR. MILLMAN:    Is there anybody else that

19     they feel might have reservations about the fact

20     that my client is not required to testify, that you

21     may not use that against him?

22          Anyone here have any concerns, because now

23     is the time to tell us.  Speak openly.

24          Anyone concerned about that at all,

25     Mr. Murphy?

1          PROSPECTIVE JUROR:  No.

2          MR. MILLMAN:  Ms. Nacci, any reservations?

3    Can you appreciate the fact there may be a number of

4    reasons someone may not choose to testify?

5          PROSPECTIVE JUROR:  Yes.

6          MR. MILLMAN:  It may not be because they

7    were hiding something; can we agree on that?

8          PROSPECTIVE JUROR:  Yes.

9          MR. MILLMAN:  Ladies and gentlemen of the

10   jury, if you are selected as jurors, you'll be

11   taking on a very important responsibility as I think

12   you all know.  If the District Attorney proves

13   defendant's guilt beyond a reasonable doubt then, as

14   the Judge indicated the appropriate verdict would be

15   guilty.  But if the District Attorney fails to prove

16   the defendant's guilt beyond a reasonable doubt, it

17   will be your responsibility to return a verdict of

18   not guilty, and that's a responsibility I ask you to

19   accept without hesitation.

20          If there is anybody here who questions

21   whether they could do that, or has reservations

22   about whether they can do that, please tell me now.

23   Don't tell me an hour from now.  Don't tell me

24   tomorrow.  And don't tell me in your verdict.  Tell

25   plea now.

1             Thank you.

2                 THE COURT:  Ladies and gentlemen, I do not

3      have enough time to do the next phase of what we are

4      going to do.  So I want you back here at 2 o'clock,

5      and those of you who are not selected are free.

6      Those of you who are selected are given Monday off.

7                 We'll see you at 2 o'clock.

8                 (The prospective jurors exited the

9      courtroom.)

10                (A lunch recess was taken. )

11

12                    *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              AFTERNOON   SESSION
 2              THE CLERK:  Case on trial, Ulises Bonilla.
 3    Indictment 202N-2011.  All parties present including
 4    defendant and Spanish interpreter.
 5              THE COURT:  Bring in the jurors.
 6              MR. MILLMAN:  I know I waived him being
 7    present.  I haven't had a chance to speak with him
 8    about this.  Could I do it quickly?
 9              THE COURT:  I thought you had.
10              MR. MILLMAN:  I am sorry.
11              THE COURT:  Just one second.  Go speak
12    with him.
13              MR. MEGARO:  I'll be quick.
14              THE COURT:  Have you had enough time?
15              MR. MILLMAN:  Thank you, Judge, I
16    appreciate it.
17              THE CLERK:  For the record, do you accept
18    the seating of the jury?
19              MR. MILLMAN:  Yes; the seating.
20              THE COURT:  People, are there any
21    challenges for cause for the entire panel?
22              MS. ABDI:  The only one would be number 7,
23    Ms. Brinson.  The reason why, Judge, I think she had
24    a little trouble with the fact the defendant should
25    not be given any negative inference if he chose not
```

bp

1    to testify.

2              THE COURT:  That was her initial reaction.

3    After she was explained, by me, the rule of law in

4    better context, I would say she gave an acceptable

5    answer.  The challenge for cause is denied.

6              Anyone else?

7              MS. ABDI:  For cause, no.

8              MR. MILLMAN:  Does it make a difference,

9    that I was consenting?  That I was consenting to the

10   cause?

11             THE COURT:  No, it doesn't make a

12   difference.

13             MR. MILLMAN:  Fair enough.

14             THE COURT:  As far as I'm concerned she

15   answered all in an acceptable manner.

16             Any other challenges for cause?

17             MR. MILLMAN:  No.

18             THE COURT:  People, peremptory?

19             MS. ABDI:  Number one.  You are not

20   talking about seat number one; you are talking about

21   the first peremptory challenge.

22             THE COURT:  No, I'm talking about seat

23   number one.

24             MS. ABDI:  No.

25             THE COURT:  Defendant, peremptory

1          number one?

2                    MR. MILLMAN:  I'm fine; no peremptory.

3                    THE COURT:  She's going to be sworn.

4                    People, peremptory seat number two?

5                    MS. ABDI:  No.

6                    THE COURT:  Defendant, peremptory seat

7          number two?

8                    MR. MILLMAN:  No.

9                    THE COURT:  People, peremptory seat

10         number four?

11                   MS. ABDI:  No.

12                   THE COURT:  Defendant?

13                   MR. MILLMAN:  Yes.

14                   THE COURT:  People, peremptory seat

15         number five?

16                   MS. ABDI:  No.

17                   THE COURT:  Defendant, peremptory seat

18         number five?

19                   MR. MILLMAN:  No.

20                   THE COURT:  People, peremptory seat

21         number six?

22                   MS. ABDI:  No.

23                   THE COURT:  Defendant, peremptory seat

24         number six?

25                   MR. MILLMAN:  Yes.

```
 1                    THE COURT:  People, peremptory seat
 2         number seven?
 3                    MS. ABDI:  No.
 4                    THE COURT:  Defendant, peremptory seat
 5         number seven?
 6                    MR. MILLMAN:  I'm going to strike.
 7                    THE COURT:  People peremptory seat
 8         number eight?
 9                    MS. ABDI:  No.
10                    THE COURT:  Defendant?
11                    MR. MILLMAN:  No.
12                    THE COURT:  People, peremptory seat
13         number nine?
14                    MS. ABDI:  Yes.
15                    THE COURT:  People peremptory seat
16         number ten?
17                    MS. ABDI:  Yes.
18                    THE COURT:  People, peremptory seat
19         number eleven?
20                    MS. ABDI:  Yes.
21                    THE COURT:  People, peremptory seat
22         number twelve?
23                    MS. ABDI:  No.
24                    THE COURT:  Defendant.
25                    MR. MEGARO:  I'm assuming we are on Cooke.
```

1            MR. MILLMAN:  Yes.

2            THE COURT:  Ladies and gentlemen, I am

3    very, very satisfied with the number of jurors that

4    we have so far in a case like this.  We will not be

5    able to get the remainder of the jurors today.  We

6    will get them tomorrow.  What time we will get them

7    tomorrow, I don't know.  So I told you, before, I'm

8    going to excuse you until Monday morning -- Tuesday

9    morning, excuse me; Tuesday morning at 9:30.

10           It's very, very important that everyone

11   arrive here on time.  If someone is late we can't

12   proceed without you.  It's as simple as that.  And

13   it's a hardship to everybody especially your fellow

14   jurors.

15           In that regard, I want to tell you a

16   little story before you go.  A son was commiserating

17   with his mother and the son says to the mother, Ma,

18   I don't want to go to school today; the kids are

19   bothering me.  The mother says you have to go to

20   school.  And then the son says, Ma, the teachers are

21   bothering me too.  And she says, that's no excuse;

22   you have to go to school.  And then finally the son

23   says, I even had a run-in with the custodian

24   yesterday.  The mother says, son, you have a

25   responsibility to go to school.  You have to go to

1        school.  You are 52 years of age.  You are the

2        principal of that school, and you have to go to

3        school.

4                    Now, we are all principals in this matter.

5        And be on time.  That's enough said.

6                    (The selected jurors were duly sworn by

7        the Clerk.)

8                    THE COURT:  We'll see you Tuesday at 9:30.

9                    (The sworn jurors exited the courtroom.)

10                   (A panel of prospective jurors entered the

11       courtroom.)

12                   THE CLERK:  Good afternoon, if you could

13       all please rise and raise your right hands.

14                   (The prospective juror were duly sworn by

15       the Clerk.)

16                   THE COURT:  Ladies and gentlemen, my name

17       is Judge George Peck.  I will be presiding over this

18       particular trial.  It is a criminal case.

19                   Criminal cases are brought by the District

20       Attorney.  The District Attorney is Kathleen Rice.

21       Zeena Abdi -- will you introduce yourself -- is the

22       Assistant District Attorney that will preside over

23       this matter.

24                   MS. ABDI:  Good afternoon.

25                   THE COURT:  The defendant is represented

bp

1        by Daniel Millman.  Introduce yourself and your

2        client.

3                 MR. MILLMAN:  My client is Ulises Bonilla.

4        Good afternoon.

5                 THE COURT:  Ladies and gentlemen of the

6        jury, this is a murder case.  The top charges in

7        this particular case are murder and the sexual

8        molestation, rape of a ten-year old.  The murder

9        victim and the ten-year old are two different

10       people.

11                We already have six jurors; we need

12       another six and a number of alternates.  We are now

13       going to take excuses.

14                What is an excuse?  An excuse is not a

15       matter of inconvenience.  It is something of

16       significance.  I have a planned vacation.  That's a

17       matter of significance.  I have tremendous financial

18       hardship.  That's a matter of significance.  I

19       didn't expect to be here this long, and I have young

20       children to care for.  That's a matter of

21       significance.  Charges are too serious and

22       emotionally upsetting that I don't think I could

23       decide this case impartially.  That might be a

24       matter of significance.

25                Now, the time; this is what everybody is

bp

1        concerned about.  The 23rd of December is the last

2        day we will be working before the holidays.  If we

3        are not through by then, the following week, the

4        courts are closed because of the holidays.  And if

5        we are still on trial by then we will start Tuesday

6        January 3rd.  The courts are closed Monday,

7        January 2nd because that's the holiday for New Years

8        Day.

9                      I am not going to allow deliberations on

10       this particular case to be interrupted by holidays.

11       So, this will be my judgment.  If say we're through

12       with the evidence on Wednesday, it may be my

13       judgment to put the case -- Wednesday would be

14       December 21st -- it may be my judgment to put the

15       case off until January 3rd for summations, charge

16       and deliberations, so that your deliberations would

17       not be interrupted.

18                      Let's take excuses.  Don't everybody stand

19       at once.  We will get to each of you in due time.  I

20       think the best thing to do is come up here.

21                      PROSPECTIVE JUROR:  Teresa Pasarella.  My

22       daughter was involved in an abusive relationship and

23       I don't know if this has anything to do with it --

24                      THE COURT:  It doesn't unless it affects

25       you so that you can't be impartial.

bp

1           PROSPECTIVE JUROR:  Okay.  I also

2       volunteer at the Coalition for Domestic Violence

3       against domestic violence, so I don't --

4           THE COURT:  That doesn't have anything to

5       do with it, unless it affects your impartiality.

6           MR. MILLMAN:  May I?  You mentioned as I

7       was just coming up here that your daughter was

8       involved in a relationship.

9           PROSPECTIVE JUROR:  She was in an abusive

10      relationship.

11          MR. MILLMAN:  Is there anything about that

12      that would interfere with your ability to be fair

13      and impartial?

14          PROSPECTIVE JUROR:  No, I don't think so,

15      as long as it's not domestic violence.

16          THE COURT:  No.

17          PROSPECTIVE JUROR:  Alexandria Lucy.

18          I have classes, and I have finals to study

19      for.  If that's not excusable, that's okay.

20          THE COURT:  Well, are you a full-time

21      student?

22          PROSPECTIVE JUROR:  Yes.

23          MS. ABDI:  I'll consent.

24          MR. MILLMAN:  I'll consent.

25          THE COURT:  You are excused by consent.

1     See that gentleman over there.

2              PROSPECTIVE JUROR:  My name is Sue Hyman,

3     and I run a small business with two other people

4     that I would have to close, and they would be --

5              THE COURT:  People.

6              MS. ABDI:  What kind of business?

7              PROSPECTIVE JUROR:  Powder coating, labor

8     intensive.  Requires me to be there and speak for --

9     I'm the voice.

10              MS. ABDI:  I'll consent.

11              MR. MILLMAN:  Consent.

12              THE COURT:  You are excused by consent.

13     See that gentleman.

14              PROSPECTIVE JUROR:  Lea Sherwin.  I'm a

15     single parent.  I have a ten-year old son.  I am the

16     primary provider.  It would be a hardship for me not

17     to be there for him after school.

18              THE COURT:  What time does he get home

19     from school?

20              PROSPECTIVE JUROR:  3:30.

21              THE COURT:  People?

22              MS. ABDI:  I'll consent.

23              MR. MILLMAN:  Consent.

24              THE COURT:  You are excused.  See that

25     gentleman over there.

1               PROSPECTIVE JUROR:  My name is Donald

2       Campbell.  My wife's cousin was molested in Florida.

3       I have a very strong emotion about child abuse.

4               THE COURT:  I think we all do.

5               PROSPECTIVE JUROR:  I'm sure we do.

6               THE COURT:  Who likes robbery?

7               PROSPECTIVE JUROR:  My personal

8       relationship --

9               THE COURT:  That's not the point.  The

10      point is, I'm going to charge you that you have to

11      decide this case upon the evidence and the evidence

12      alone, coupled with the charge of the Court.

13              Now, would that experience affect your

14      impartiality so you couldn't do that?

15              PROSPECTIVE JUROR:  I think it might.

16              MS. ABDI:  Consent.

17              MR. MILLMAN:  Consent.

18              THE COURT:  You are excused.

19              (The prospective juror was excused.)

20              PROSPECTIVE JUROR:  Lorraine Roberto.

21      Many years ago I lived in the Bronx, and a friend of

22      a boyfriend I was dating, his wife and two children

23      were murdered from a friend, a neighbor.  The girls

24      were molested and the wife was.  And he stabbed both

25      of them 40 times.  I don't know if I could be fair

bp

1      to this guy.

2                 THE COURT:  Well, the two cases are

3      completely different.

4                 PROSPECTIVE JUROR:  I understand that.

5                 I see their white little caskets.

6                 THE COURT:  This is too much for you.

7                 PROSPECTIVE JUROR:  I'm sorry.

8                 MS. ABDI:  Consent.

9                 MR. MILLMAN:  Consent.

10                THE COURT:  You are excused.

11                (The prospective juror was excused.)

12                PROSPECTIVE JUROR:  My name is Maryanne

13     Leap.  I don't know if I could be impartial.  My

14     husband is a retired New York City Police Officer.

15     I have five children.  The nature of the crime, I

16     don't know.

17                THE COURT:  No one is asking you to

18     condone this type of allegation.  Who likes this?

19     Who likes robberies?  Who likes larceny?  We are

20     only asking if you can you be objective and

21     impartial in this particular case.

22                PROSPECTIVE JUROR:  Honestly, I can't.

23     The kids come into my view with this.  Along those

24     lines --

25                MS. ABDI:  Consent.

| | |
|---|---|
| 1 | MR. MILLMAN:  Consent. |
| 2 | THE COURT:  You are excused.  . |
| 3 | (The prospective juror was excused.) |
| 4 | PROSPECTIVE JUROR:  Joseph Valente.  My |
| 5 | wife does not drive, and she has to go to the doctor |
| 6 | twice a week.  She's 70 and she doesn't drive, and I |
| 7 | have to take her. |
| 8 | THE COURT:  Okay. |
| 9 | MS. ABDI:  Consent. |
| 10 | MR. MILLMAN:  Consent. |
| 11 | (The prospective juror was excused.) |
| 12 | THE COURT:  Next person. |
| 13 | How long are you here for? |
| 14 | What is your jury service? |
| 15 | PROSPECTIVE JUROR:  I'm sorry.  I don't |
| 16 | understand. |
| 17 | THE COURT:  You'd like to be excused from |
| 18 | jury service? |
| 19 | PROSPECTIVE JUROR:  Yes. |
| 20 | (The prospective juror was excused.) |
| 21 | PROSPECTIVE JUROR:  John Lisanti.  I have |
| 22 | an injury in my lower back.  After sitting three, |
| 23 | four hours, I know the next day I have to see my |
| 24 | doctor for acupuncture.  I'm good for one day.  I |
| 25 | can do that.  More than that I'm going to have an |

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 181 of 913 PageID #: 481

 1    issue.  I have issues already.  After sitting in the

 2    plane for three or four hours, the next day,

 3    acupuncture.  I have a 16-month baby.  Every other

 4    day I got to be home at 4 o'clock, because my wife

 5    works Monday, Wednesday and Friday.

 6              MS. ABDI:  Consent.

 7              MR. MILLMAN:  You said you have to be home

 8    at 4 o'clock.

 9              THE COURT:  My wife works Monday,

10    Wednesday and Friday.

11              MR. MILLMAN:  Any circumstances you can

12    have someone cover for an hour?

13              THE COURT:  One of the problems is, I'm

14    afraid that if he's selected he is going to be at

15    the acupuncturist the next day and not be here.

16              PROSPECTIVE JUROR:  When I am working on

17    my legs all day long, when I'm sitting for more

18    than -- I am just uncomfortable.

19              THE COURT:  You are excused by consent.

20              (The prospective juror was excused.)

21              PROSPECTIVE JUROR:  Richard Smith.  I

22    don't think I'd be very good at this.  I have seven

23    grandchildren.

24              THE COURT:  I have five.

25              PROSPECTIVE JUROR:  It wouldn't fit right

```
 1    with me, as far as looking at it.
 2              THE COURT:  First of all, we are not
 3    asking you to condone the allegation here.  Just
 4    like we are not asking to you condone robbery or
 5    burglary or anything like that.  We are just asking
 6    you if you can sit here and view the evidence
 7    impartially?
 8              PROSPECTIVE JUROR:  No, I don't think so.
 9              THE COURT:  Okay.
10              MS. ABDI:  Consent.
11              MR. MILLMAN:  Consent.
12              THE COURT:  See that gentleman over there.
13              (The prospective juror was excused.)
14              PROSPECTIVE JUROR:  My name is Joe Hendry.
15    I have no problem with the case.  Mine is logistics.
16    My children, I have a one-year-old and
17    three-year-old, and a handicapped nine-year-old.  I
18    have an arrangement so I can work at home and take
19    care of them.  My concern is if it's prolonged, if
20    it were one or two weeks, I would put them in a
21    daycare and come on down here.
22              THE COURT:  Well, I told you the outer
23    limits of this particular trial.
24              PROSPECTIVE JUROR:  Understood.
25              THE COURT:  And I told you, you have
```

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 183 of 913 PageID #: 483

1    Christmas week off.  What do you want to do?

2                   PROSPECTIVE JUROR:  The concern is my

3    wife, making sure she can figure this out.

4    Otherwise I'd put them in -- three kids and a

5    handicapped child.

6                   THE COURT:  I'll either excuse you now or

7    if you want you can come back on Monday after you've

8    spoken to your wife and we will make a decision

9    then.

10                  PROSPECTIVE JUROR:  How about that?

11                  THE COURT:  You want to do that.

12                  PROSPECTIVE JUROR:  Yes.  Thanks.

13                  THE COURT:  Go back there.

14                  PROSPECTIVE JUROR:  My name is Kim Kong.

15   I'm a pharmacist.  I have two questions.  Is this

16   going to be a death penalty case?

17                  THE COURT:  No.

18                  PROSPECTIVE JUROR:  The second question.

19   I work for the New York City Department of Health.

20   They only have two pharmacists.  It would be a

21   hardship if the other person is out and I'm out.

22   They would close up the clinic.

23                  THE COURT:  People?

24                  MS. ABDI:  For whom do you work?

25                  PROSPECTIVE JUROR:  New York City

```
 1      Department of Health.  We have two pharmacists.  We
 2      cover about 15 clinics.  We supply STD drugs and TP
 3      lead cases --
 4                  MS. ABDI:  Do you work at the individual
 5      clinic?
 6                  PROSPECTIVE JUROR:  We work at
 7      headquarters but we supply to the clinics.
 8                  MS. ABDI:  You are not in a pharmacy
 9      dispensing any drugs?
10                  PROSPECTIVE JUROR:  I am in the pharmacy,
11      a central pharmacy, and I dispense stuff to the
12      clinic.
13                  THE COURT:  If you are not there, and your
14      partner is not there, is medication going to be
15      deprived to people?
16                  PROSPECTIVE JUROR:  It's possible.
17                  THE COURT:  People?
18                  PROSPECTIVE JUROR:  We also have cases --
19                  THE COURT:  We went far enough.
20                  MS. ABDI:  I will consent.
21                  MR. MILLMAN:  Based on the last sentence,
22      I'll consent.
23                  THE COURT:  You are excused.
24                  (The prospective juror was excused.)
25                  PROSPECTIVE JUROR:  Allison Antoine.  I
```

| | |
|---|---|
| 1 | had recently had someone who just break into my |
| 2 | house and tried to hurt my family. |
| 3 | MS. ABDI:  Consent. |
| 4 | MR. MILLMAN:  Consent. |
| 5 | THE COURT:  You are excused. |
| 6 | (The prospective juror was excused.) |
| 7 | PROSPECTIVE JUROR:  George Kramer.  I am |
| 8 | scheduled to be away on business three days next |
| 9 | weeks. |
| 10 | THE COURT:  You are excused. |
| 11 | I assume that's out of town. |
| 12 | PROSPECTIVE JUROR:  Out of town. |
| 13 | (The prospective juror was excused.) |
| 14 | PROSPECTIVE JUROR:  Mohamed Kanbar.  I |
| 15 | don't think I would be able to handle this.  I lost |
| 16 | my son, ten years old, and I don't think I would be |
| 17 | able to handle this case. |
| 18 | MS. ABDI:  Consent. |
| 19 | MR. MILLMAN:  Consent. |
| 20 | THE COURT:  You are excused. |
| 21 | (The prospective juror was excused.) |
| 22 | PROSPECTIVE JUROR:  Maura Corner.  I have |
| 23 | a ten-year old child.  I don't think I could be |
| 24 | impartial in this decision.  I have actually three |
| 25 | children, but one of them is ten. |

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 186 of 913 PageID #: 486

1           THE COURT:  You feel that because of your

2    children you couldn't fairly analyze the evidence in

3    this case?

4           PROSPECTIVE JUROR:  Not given the crime

5    that is alleged.

6           MS. ABDI:  I'll consent.

7           MR. MILLMAN:  Consent.

8           THE COURT:  You are excused.

9           (The prospective juror was excused.)

10          PROSPECTIVE JUROR:  Joe Lanti.  My job

11   requires me to travel, and I have a trip planned

12   starting Wednesday of next week.

13          MS. ABDI:  Is that out of state?

14          PROSPECTIVE JUROR:  Yes, in Washington,

15   D.C.

16          MS. ABDI:  Consent.

17          MR. MILLMAN:  Consent.

18          THE COURT:  You are excused.

19          (The prospective juror was excused.)

20          PROSPECTIVE JUROR:  Phil Minsbach.  I have

21   two young boys, three-and-a-half-year-old twins that

22   are constantly sick.  I'm sorry I'm a little

23   nervous.  I'm constantly taking them to doctor

24   appointments.  So I have to be available to them.

25          MS. ABDI:  Consent.

```
 1              MR. MILLMAN:  Consent.
 2              (The prospective juror was excused.)
 3              PROSPECTIVE JUROR:  Patricia Blackwell.  I
 4    would like to be excused because my son got killed,
 5    and I don't want to go through what I went through
 6    before.
 7              THE COURT:  Okay.
 8              MS. ABDI:  Consent.
 9              MR. MILLMAN:  Consent.
10              (The prospective juror was excused.)
11              PROSPECTIVE JUROR:  Wanda McGuiness.
12              I have some pending medical issues.  I am
13    going through the first round of diagnostic testing
14    Wednesday, and I'll be in the hospital for a week.
15              THE COURT:  You are excused.
16              MS. ABDI:  Consent.
17              MR. MILLMAN:  Consent.
18              (The prospective juror was excused.)
19              PROSPECTIVE JUROR:  Baronelli Mensi.  I
20    don't think I should be on the jury because I don't
21    want this case to haunt me the rest of my life.  I
22    don't want to see any pictures.  Also I have
23    grandsons, 8 and 10, and also I'm quite prejudiced.
24    I don't think I could be fair.
25              MS. ABDI:  Consent.
```

```
 1                    MR. MILLMAN:  Consent.
 2                    THE COURT:  Okay.
 3                    (The prospective juror was excused.)
 4                    PROSPECTIVE JUROR:  Julia McDonough.  I'll
 5       be out of the country for eight days December 7th to
 6       the 15th.
 7                    THE COURT:  Have a good time.
 8                    (The prospective juror was excused.)
 9                    PROSPECTIVE JUROR:  I am in graduate
10       school to be a high school teacher, and I have class
11       that starts before 5 o'clock.
12                    THE COURT:  Where?
13                    PROSPECTIVE JUROR:  Adelphi.
14                    THE COURT:  You are in a graduate program
15       right now?
16                    PROSPECTIVE JUROR:  Yes.
17                    THE COURT:  You go to school at night?
18                    PROSPECTIVE JUROR:  Starts at 4:30, yes.
19                    THE COURT:  What do you do in the day?
20                    PROSPECTIVE JUROR:  I tutor occasionally.
21       That's usually around 3:30.  That's only a couple of
22       times a week.
23                    THE COURT:  We break at 4:30.
24                    PROSPECTIVE JUROR:  Okay.
25                    THE COURT:  And we start at 9:30.  So
```

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 189 of 913 PageID #: 489

```
 1        what's your situation?
 2                    PROSPECTIVE JUROR:  Well, I'd be late to
 3        get to my classes.  And we are getting towards
 4        finals week.  I really can't afford to miss any of
 5        these classes.
 6                    THE COURT:  I could see that.  Adelphi is
 7        ten minutes away from here.
 8                    PROSPECTIVE JUROR:  It's close.
 9                    THE COURT:  You originally said --
10                    PROSPECTIVE JUROR:  I start at 4:30.
11                    MS. ABDI:  I will consent.
12                    MR. MILLMAN:  Consent.
13                    THE COURT:  You are excused.
14                    (The prospective juror was excused.)
15                    PROSPECTIVE JUROR:  My name is Joseph
16        Neri.  Due to the nature of the case -- for
17        twenty years my husband is a New York City cop.  I
18        am already prejudiced.  I'm going to be honest.
19                    MS. ABDI:  Consent.
20                    MR. MILLMAN:  Challenge for cause.
21                    THE COURT:  You are excused by consent.
22                    (The prospective juror was excused.)
23                    PROSPECTIVE JUROR:  I have a financial
24        concern.
25                    THE COURT:  Your name?
```

```
 1              PROSPECTIVE JUROR:  Victor Collucci.  I
 2    have an eighty-seven-year-old mom who lives by
 3    herself two blocks from where I live.  She has
 4    Parkinson's and has two home health care aides that
 5    I pay for.  I pay for one and my sister pays for the
 6    other.  My company will pay me for ten days if I
 7    serve jury duty.  If the case goes longer than that,
 8    I don't get a salary.
 9              THE COURT:  It may.
10              PROSPECTIVE JUROR:  Actually today is one
11    day.  I have nine days left.
12              MS. ABDI:  I'll consent.
13              MR. MILLMAN:  Consent.
14              THE COURT:  You are excused.
15              (The prospective juror was excused.)
16              PROSPECTIVE JUROR:  Myrna Devero.
17              Financial hardship.  My income.  I was
18    also a victim of a crime years ago at gunpoint.  I
19    think I would be bias.
20              MS. ABDI:  Consent.
21              MR. MILLMAN:  Consent.
22              (The prospective juror was excused.)
23              PROSPECTIVE JUROR:  Michelle Pintero.  I
24    honestly don't think I could handle -- I feel like
25    I'm going to cry just hearing about it.
```

```
1                    MS. ABDI:  Consent.

2                    MR. MILLMAN:  Consent.

3                    PROSPECTIVE JUROR:  I have a little baby

4       myself.  I can't handle this.

5                    THE COURT:  I can see.

6                    (The prospective juror was excused.)

7                    PROSPECTIVE JUROR:  Marilyn Washington.  I

8       cannot be an impartial juror.  I've had murder in

9       the family.  My sister was murdered.  My mother was

10      accosted by someone, and my nephew has been

11      murdered.

12                   MS. ABDI:  Consent.

13                   MR. MILLMAN:  Consent.

14                   THE COURT:  You are excused.

15                   (The prospective juror was excused.)

16                   PROSPECTIVE JUROR:  Christopher Lee.

17                   I have no particular problem with the

18      details of this case, but given the date range that

19      you are mentioning, I have a training program on

20      Tuesday that has been scheduled for three months now

21      and isn't going to be back in the area for another

22      six months.  I don't think it's such a dramatic

23      excuse.

24                   THE COURT:  What do you do for a living?

25                   PROSPECTIVE JUROR:  I'm a data analyst.
```

```
 1                    THE COURT:  And you are talking about this
 2          Tuesday?
 3                    PROSPECTIVE JUROR:  Yes.
 4                    THE COURT:  What kind of training is it?
 5                    PROSPECTIVE JUROR:  It is a corporate
 6          training program on managing priorities.
 7                    THE COURT:  This is what I want you to do.
 8          I want you to come back here on Monday and tell me
 9          if your boss okay's this.
10                    PROSPECTIVE JUROR:  I can him if or if I
11          should go?
12                    THE COURT:  See if you can rearrange it.
13                    I'm not going to let you go.  I'm not
14          going to break court on Tuesday.  Come back here on
15          Monday and see if it's okay with your boss to sit on
16          this jury.  If he says no, I need you, then I'm
17          going to excuse you.
18                    PROSPECTIVE JUROR:  Okay.
19                    PROSPECTIVE JUROR:  I have an
20          eight-year-old son and ten-year-old daughter.  I
21          have an elderly mom who does not live with me, but
22          she's not well -- she is 87 -- in Astoria.  And my
23          husband and I have some financial hardships.  I have
24          a job interview on Monday.
25                    MS. ABDI:  Consent.
```

bp

1                     MR. MILLMAN:  Consent.

2                     (The prospective juror was excused.)

3                     PROSPECTIVE JUROR:  Donna Vales.

4                     THE COURT:  Excused.

5                     (The prospective juror was excused.)

6                     PROSPECTIVE JUROR:  My name is Richard

7      Socker.  I'm supposed to bring my wife in for a

8      medical procedure on Monday.

9                     THE COURT:  What do you want to do?

10                    PROSPECTIVE JUROR:  That's a reasonable

11     question.

12                    THE COURT:  I'm not going to prevent your

13     wife getting this medical procedure.  I don't know

14     whether or not it can be rearranged.  That's why I'm

15     leaving it to you.

16                    PROSPECTIVE JUROR:  I want to take her for

17     the medical procedure.

18                    THE COURT:  You are excused.

19                    (The prospective juror was excused.)

20                    PROSPECTIVE JUROR:  My name is Marion

21     Nars.  I have three-and-a-half-year-old daughter,

22     and I am responsible for dropping her off and

23     picking her up.  It's from 10 to 3 o'clock.  I do

24     have my own business, but I only work it around her

25     schedule.

```
 1               THE COURT:  Are you nervous now?
 2               PROSPECTIVE JUROR:  Yes.  I can't stay
 3       here.  I have no one to watch her.
 4               THE COURT:  Don't be.
 5               MS. ABDI:  Consent.
 6               MR. MILLMAN:  Consent.
 7               (The prospective juror was excused.)
 8               PROSPECTIVE JUROR:  Peter Pinto.  I have a
 9       four-year-old and six-year-old that I care for on
10       Wednesdays and Thursday only and my parents watch
11       them the other days.
12               THE COURT:  What do you mean?  Just tell
13       me what do you mean by care for?
14               PROSPECTIVE JUROR:  My wife is a school
15       teacher, she works five days a week.
16               THE COURT:  You care for them in the
17       daytime; Wednesday and Thursday?  From what time to
18       what time?
19               PROSPECTIVE JUROR:  Till my wife gets home
20       at 5:00.
21               MS. ABDI:  Consent.
22               MR. MILLMAN:  Consent.
23               (The prospective juror was excused.)
24               PROSPECTIVE JUROR:  Amanda Geller.
25               I don't feel I'll be impartial for this
```

1        case.

2                    THE COURT:   Why?

3                    PROSPECTIVE JUROR:   Because it's just an

4        emotional subject.  My family is in law enforcement,

5        and I don't think I'll view it impartially.

6                    THE COURT:   You don't think you could sit

7        here and listen to the evidence impartially?

8                    PROSPECTIVE JUROR:   I don't believe I can.

9        I have young brothers, and I am very -- it's a

10       sketchy topic.

11                   MS. ABDI:   Consent.

12                   MR. MILLMAN:   Consent.

13                   THE COURT:   You are excused.

14                   (The prospective juror was excused.)

15                   PROSPECTIVE JUROR:   Marcia Umberg.  I'm a

16       grandmother.

17                   THE COURT:   So am I; a grandfather.

18                   PROSPECTIVE JUROR:   I have two girls and I

19       think it would be emotionally upsetting.

20                   THE COURT:   It may be.

21                   PROSPECTIVE JUROR:   I don't think that I

22       could fairly do it.

23                   THE COURT:   The fact of the matter is, it

24       may be emotionally upsetting.  The question is

25       whether or not you can put those emotions aside and

1       act impartially in this case.

2                   PROSPECTIVE JUROR:  I understand what you

3       are saying.  I can't tell you.  I don't know.  I'd

4       rather not put myself in that situation where maybe

5       I wouldn't be or not.  It's hard to say.

6                   THE COURT:  You are putting yourself in a

7       situation by your evasiveness.

8                   PROSPECTIVE JUROR:  By my evasiveness?

9                   THE COURT:  I have to have an answer with

10      a little more precision than what you've just given

11      me.

12                  MR. MILLMAN:  May I inquire?

13                  I notice that you seem a little upset

14      without even having heard the details.  Is the

15      reason you are upset because you are concerned about

16      being able to do the right thing when the moment of

17      truth comes?  When you need to make that decision,

18      are you worried about not being able to be fair to

19      both sides?

20                  PROSPECTIVE JUROR:  Absolutely.

21                  MR. MILLMAN:  You have serious questions

22      as to whether or not you can be fair?

23                  PROSPECTIVE JUROR:  Exactly.

24                  MR. MILLMAN:  I ask that she be excused.

25                  THE COURT:  You are excused.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 197 of 913 PageID #: 497

```
 1              (The prospective juror was excused.)
 2              PROSPECTIVE JUROR:  Jim Fahee.  I don't
 3    believe I could be impartial.  My father was an
 4    investigator in a child pornography case.  I don't
 5    think I could be impartial.
 6              THE COURT:  We are not asking anyone to
 7    condone the allegations here.  We are asking if you
 8    are able to sit and listen to the evidence and be
 9    impartial.
10              PROSPECTIVE JUROR:  I'm not sure I could.
11    He used to describe it; not in detail.
12              MS. ABDI:  I'll consent.
13              MR. MILLMAN:  Consent.
14              THE COURT:  You are excused.
15              (The prospective juror was excused.)
16              PROSPECTIVE JUROR:  Maria Linoise.
17              I have financial hardship.  I am the only
18    one who works in my house, and I need to work every
19    day.
20              THE COURT:  People?
21              MS. ABDI:  Consent.
22              MR. MILLMAN:  Just one question.  There is
23    no way you can make other arrangements?
24              PROSPECTIVE JUROR:  No; because I'm a
25    housekeeper.
```

```
 1                  THE COURT:  Financial hardship is what I
 2        was concerned about.
 3                      (The prospective juror was excused.)
 4                  PROSPECTIVE JUROR:  Michael Ahern.  I
 5        currently work for an insurance company.  I am
 6        currently being trained, so I'm going to school in
 7        Pennsylvania.
 8                  THE COURT:  When?
 9                  PROSPECTIVE JUROR:  I have to pass my test
10        first.  My test is scheduled for tomorrow.  Once I
11        pass my test I have to go for testing --
12                  THE COURT:  When is it?
13                  PROSPECTIVE JUROR:  It will be in the
14        coming year.
15                  THE COURT:  Basically you are only busy
16        tomorrow?
17                  PROSPECTIVE JUROR:  Assuming I pass the
18        test.
19                  THE COURT:  So you are there tomorrow.
20        You pass the test.  Then what happens?
21                  PROSPECTIVE JUROR:  Then I have to sign up
22        for the courses in Mechanicsburg.
23                  THE COURT:  When are they scheduled?
24                  PROSPECTIVE JUROR:  They have some in the
25        fall -- it would be March, April.
```

```
1              THE COURT:  So you don't have any problem.
2              PROSPECTIVE JUROR:  Okay.
3              THE COURT:  You are not excused.
4              Name, please.
5              PROSPECTIVE JUROR:  Ana Geraldo.
6              I don't think I would be able to be
7       impartial.  My uncle was murdered in 2002 in Miami.
8       He was found floating in the ocean.  His killer was
9       never found.  I also have a ten-year-old foster
10      sister that my parents just recently took in.  I
11      don't think I would be able to be fair.
12             MS. ABDI:  Consent.
13             MR. MILLMAN:  Consent.
14             THE COURT:  You are excused.
15             (The prospective juror was excused.)
16             PROSPECTIVE JUROR:  Sanford Siegel.  I'm
17      self-employed, and due to the economy I only get
18      part-time employment on weekends.  It is my only
19      income I have during the week.  I'm also this months
20      going to court in Rockland County for a wrongful
21      death case that's been pending for four years.
22             MS. ABDI:  Consent.
23             MR. MILLMAN:  Consent.
24             THE COURT:  You are excused.
25             (The prospective juror was excused.)
```

1        PROSPECTIVE JUROR:  My name is Kim
2    Cordano.  For the past two years I have been
3    baby-sitting for my neighbors' child.  She is two
4    years old.  If I'm not there, the lady can't go to
5    work.  This is a long term thing.  She can't find
6    somebody else long term on such short notice.
7               MS. ABDI:  Consent.
8               MR. MILLMAN:  Are you saying it's your
9    financial hardship, or the woman that you baby-sit
10   for would have a hardship?
11              PROSPECTIVE JUROR:  Both of us.
12              MR. MILLMAN:  In terms of your hardship,
13   is that the sole source of your income?
14              PROSPECTIVE JUROR:  I have another job at
15   night.  I have to be in the city a lot of nights by
16   5 o'clock.  It would be really hard for me.
17              MS. ABDI:  Consent.
18              MR. MILLMAN:  Consent.
19              (The prospective juror was excused.)
20              THE COURT:  Do you speak English?
21              PROSPECTIVE JUROR:  Firstly, my English is
22   not very good.
23              MS. ABDI:  Consent.
24              MR. MILLMAN:  Consent.
25              THE COURT:  You are excused.

```
 1                    (The prospective juror was excused.)
 2                    PROSPECTIVE JUROR:  Hugh Baicher.
 3                    THE COURT:  What's your excuse?
 4                    PROSPECTIVE JUROR:  I'm taking care of my
 5           daughters, and this is a murder case.  It's very
 6           disturbing, especially a murder case on a
 7           ten-year-old involved.
 8                    THE COURT:  The ten-year-old is the
 9           alleged victim of a sexual attack.  She's not the
10           murder victim.
11                    PROSPECTIVE JUROR:  Sorry.  I have two
12           babies.  I don't think I can be objective in this
13           case.
14                    MS. ABDI:  Consent.
15                    MR. MILLMAN:  Consent.
16                    THE COURT:  You are excused.
17                    (The prospective juror was excused.)
18                    PROSPECTIVE JUROR:  Jeffrey Carlton.
19                    Two reasons.  One is I've been a camp
20           counselor for ten years at Robin Hood Country Day
21           School.  The company I work for is a monitoring
22           company call LLC.  We were just approved for federal
23           funding.  We have meetings starting next Friday in
24           Washington, D.C.
25                    THE COURT:  You have to go to Washington?
```

```
 1              PROSPECTIVE JUROR:  Supposed to go to
 2    accept up a work schedule next Friday at 11:30.
 3              THE COURT:  How long will that take?
 4              PROSPECTIVE JUROR:  I will be back on
 5    Monday.  But I don't know what the follow-up will
 6    be.
 7              THE COURT:  What does being a camp
 8    counselor have to do with this?
 9              PROSPECTIVE JUROR:  I feel -- I've been a
10    camp counselor -- you mentioned ten-year-old.  Seems
11    to me, it just seems gross to me.
12              THE COURT:  I want you to come back on
13    Monday and see if you can make arrangements.  You
14    are not excused at this particular time.
15              PROSPECTIVE JUROR:  Okay.
16              PROSPECTIVE JUROR:  Steven Ecnaceous.  In
17    the Fall of 2008 my brother and me -- our best
18    friend was shot and killed attending the University
19    of Albany, and it just kind of brings up a conflict
20    of interest for me.
21              MS. ABDI:  Consent.
22              MR. MILLMAN:  Consent.
23              THE COURT:  You are excused.
24              (The prospective juror was excused.)
25              PROSPECTIVE JUROR:  Daniel Fusco.
```

bp

1              Actually two things.  I have a planned

2    vacation.  I'm going to be in Colorado the week of

3    January 11th.  I come from a long line of Federal

4    agents.  Father, brother-in-law.  I'm a retired

5    fireman.  I worked in a high crime area.  I saw a

6    lot of things that the ordinary people don't see.

7              THE COURT:  At this particular time you

8    are not excused.  We will get into it further on

9    Monday.

10             PROSPECTIVE JUROR:  Thank you.

11             THE COURT:  You may be excused, but at

12   this particular time you are not excused.

13             PROSPECTIVE JUROR:  Michelle Benevites.  I

14   am involved in a fire two nights ago.  I am supposed

15   to be meeting with the insurance adjuster and trying

16   to salvage my belongings.

17             THE COURT:  That must be a horrible

18   experience.

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  You are excused.

21             (The prospective juror was excused.)

22             PROSPECTIVE JUROR:  Clarissa Eng.  Because

23   English is my second language, I don't think I will

24   fully understand what -- because of my broken

25   English, maybe.

```
 1                    THE COURT:  You speak pretty --
 2                    PROSPECTIVE JUROR:  Like this morning, I
 3          was trying to understand.  I will not be able to
 4          fully understand.  I'm totally honest with you.
 5                    THE COURT:  Are you saying you speak it
 6          better than you understand?
 7                    PROSPECTIVE JUROR:  I think my listening
 8          is worse than my spoken English.
 9                    MR. MILLMAN:  Is it the legal terms?
10                    PROSPECTIVE JUROR:  Yes.
11                    MR. MILLMAN:  If the Judge would instruct
12          you on the legal terms.  Is it the language?
13                    PROSPECTIVE JUROR:  Yes, it is.
14                    THE COURT:  I don't want you to be
15          uncomfortable because you feel you are not
16          understanding.  You are excused.
17                    (The prospective juror was excused.)
18                    PROSPECTIVE JUROR:  Corey Donnell.
19                    I'm going away on the 7th.  I'm going to
20          Europe.
21                    THE COURT:  Have a good time.
22                    PROSPECTIVE JUROR:  Thank you.
23                    (The prospective juror was excused.)
24                    PROSPECTIVE JUROR:  Robert Brennan.
25                    I have a five-year-old daughter and a
```

 1        three-year-old son.  And my three-year-old son is

 2        non-verbal, special needs.  We won't even let him go

 3        on a bus because we feel someone might do something

 4        to him inappropriately and he wouldn't be able to

 5        tell us.  He has special needs each day.  I need to

 6        get him to school.

 7                    THE COURT:  You need to get him to school?

 8                    PROSPECTIVE JUROR:  Yes.  That's a part of

 9        it.  I have two young kids too.  Again, I feel

10        nature of this, as a father, I can't be unbiased.

11                    THE COURT:  I don't know what you are

12        asking me.  Are you asking me to be excused because

13        of the nature of the case or because your children

14        need your presence?

15                    PROSPECTIVE JUROR:  Both.  It's really two

16        parts.  Each day my son -- I have to get him at

17        school.

18                    THE COURT:  Are you married?

19                    PROSPECTIVE JUROR:  Yes.

20                    THE COURT:  What does your wife do?

21                    PROSPECTIVE JUROR:  She's a special

22        education teacher, but she works through agencies.

23        She doesn't have a set schedule.

24                    MS. ABDI:  Consent.

25                    MR. MILLMAN:  Consent.

1           THE COURT:  You are excused.  I'm sorry

2      for your situation.

3           The most thing you can pray for is healthy

4      children.

5           (The prospective juror was excused.)

6           PROSPECTIVE JUROR:  My name is Ken Silver.

7      I'm principal architect of a military technology

8      project for Cablevision.  That's a roughly 10

9      million dollar a month project.  I have not been

10     separated from communication for more than five days

11     in the past two years.  It's not due for completion

12     until June, 2013.  If I could have unlimited access

13     after 5:00 p.m. I could do this.  I really cannot

14     take a long time away from the project and stay

15     disconnected.

16          THE COURT:  You are not going to be

17     sequestered.  You are going to go home at night.

18     Second of all, we have breaks in the day, and if you

19     want to go on the Internet at that particular time,

20     feel free to do so.  The only time I do not permit

21     that is during deliberations, that you can't go on

22     the Internet during deliberations.  I don't know

23     whether or not that is any comfort to you?

24          PROSPECTIVE JUROR:  Well, I could probably

25     manage that.

```
 1              THE COURT:  You think about it over the
 2    weekend and let me know on Monday.  Come on back.
 3    If you have a real problem let me know on Monday.
 4              PROSPECTIVE JUROR:  Is there any
 5    opportunities for travel on the 12th through the
 6    14th?  I'm supposed to represent my company at a
 7    national conference.
 8              THE COURT:  No.  We will be trying this
 9    case then.  I don't know whether or not your
10    presence is mandatory.  If it is, I will excuse you.
11    Again, if you want to check this out, come on back
12    on Monday and we'll work it out, or I'll excuse you
13    now.
14              PROSPECTIVE JUROR:  Yes, I think I'll have
15    to ask for that.
16              THE COURT:  Ask for an excuse?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  You are excused.
19              (The prospective juror was excused.)
20              PROSPECTIVE JUROR:  Hello, your Honor.
21    Amanda Ramikel.  I have to pick up my kids from
22    school at least 4 o'clock.  I don't know.  Not to
23    mention I have two daughters of similar age, and
24    this whole thing is making me feel very nauseous.
25    Not only is it an issue of logistics and being able
```

```
 1        to commit, also the fact that I have a nine-year-old
 2        and twelve-year-old.
 3                    MS. ABDI:  Consent.
 4                    MR. MILLMAN:  Consent.
 5                    THE COURT:  You're not listening to
 6        anybody.  You've been excused.
 7                    (The prospective juror was excused.)
 8                    PROSPECTIVE JUROR:  Eric Smollen.  I'm
 9        requesting to be excused because I have a business
10        trip scheduled for Wednesday next week and vacation
11        later in the month.
12                    THE COURT:  All right.  You are excused.
13                    (The prospective juror was excused.)
14                    PROSPECTIVE JUROR:  Ilana Spacicol.  I
15        have two small children.  I don't want to hear this.
16                    THE COURT:  Okay.  You are excused.
17                    (The prospective juror was excused.)
18                    THE CLERK:  Abigail Bell.  I have an
19        anxiety disorder.  I am on medication, and sometimes
20        in certain situations I have to write everything
21        down.  I get flustered.  Like I'm thrown out of my
22        routine and my structure.  I had to take more
23        medication today for being here.
24                    MS. ABDI:  Consent, Judge.
25                    MR. MILLMAN:  Consent.
```

bp

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 209 of 913 PageID #: 509

1           THE COURT:  Everybody consents.  You are

2      excused.

3           (The prospective juror was excused.)

4           PROSPECTIVE JUROR:  Christine Sire.  I

5      work for myself.  When I'm not working I'm not

6      making any income.

7           THE COURT:  What do you do?

8           PROSPECTIVE JUROR:  I work with special

9      needs children with autism.

10          MS. ABDI:  Consent.

11          MR. MILLMAN:  Consent.

12          THE COURT:  You are excused.

13          (The prospective juror was excused.)

14          PROSPECTIVE JUROR:  Christopher German.

15          I'm not sure I can be impartial.  My

16     daughter was molested when she was eight.

17     Financially I can't afford to be out of work that

18     long.  I am the single income.

19          MS. ABDI:  Consent.

20          MR. MILLMAN:  Consent.

21          (The prospective juror was excused.)

22          PROSPECTIVE JUROR:  Brian Oletti.

23          I know the courtroom is quiet.  I wasn't

24     really sure what the charges were.

25          THE COURT:  The charges are murder as

 1    against one victim, and rape as against another

 2    victim who is a ten-year-old female.

 3              PROSPECTIVE JUROR:  So the defendant is

 4    being charged with both?

 5              THE COURT:  Both.

 6              PROSPECTIVE JUROR:  I don't know if I can

 7    impartially sit through this.

 8              THE COURT:  Do you think you could

 9    evaluate the evidence impartially?

10              PROSPECTIVE JUROR:  I think my feelings

11    are too strong in regards to the molestation

12    charges.

13              THE COURT:  People?

14              You haven't given me an answer.

15              MS. ABDI:  Let me just ask you this

16    question.  Obviously the charges are very serious.

17    These are not charges that anybody likes.  Just

18    because of the charges, is that going to prevent you

19    from listening to the evidence in this case and just

20    deciding whether or not he is the one that did it?

21              PROSPECTIVE JUROR:  I don't think it would

22    prevent me if the evidence presented itself that

23    way.  If it leaned that way it would be a slam dunk

24    for the prosecution.  I wasn't sure if he was

25    charged with killing the person who did the alleged

1    molestation.  I thought he was responsible for the
2    person who performed the molestation.
3                    THE COURT:  There were separate victims
4    but one defendant.
5                    MR. MILLMAN:  Are you finished asking him?
6                    MS. ABDI:  Yes.
7                    MR. MILLMAN:  And knowing what you have
8    heard about this, do you think you would be more
9    comfortable in another case?
10                   PROSPECTIVE JUROR:  Another case, yes.
11                   MR. MILLMAN:  Do you think that if the
12   prosecution had failed to prove what the Judge says
13   they have to prove, given those feelings, you might
14   still not be able to be fair to my client?  Is it
15   possible?
16                   PROSPECTIVE JUROR:  I don't like to think
17   it's possible, but it is possible.
18                   MR. MILLMAN:  I would ask that he be
19   excused.  He seems to have serious doubts about
20   whether or not he can be fair, and that's without
21   having even heard the specifics of the case.
22                   MS. ABDI:  I would ask if he could come
23   back on Monday for further inquiry.
24                   THE COURT:  I'll grant that.  You are not
25   excused at this particular time.  We will conduct a

1    further voir dire on this at that particular time.

2                  PROSPECTIVE JUROR:  What is voir dire,

3    questioning?

4                  THE COURT:  Yes.  You are not excused.

5                  PROSPECTIVE JUROR:  Sol Weisel.

6             I have a house in Florida and we are

7    leaving with our entire family and leaving on

8    December 26th.  And we'll be down there for four

9    months.

10                 THE COURT:  You may make it; you may not.

11   You are excused.

12                 (The prospective juror was excused.)

13                 PROSPECTIVE JUROR:  Jennifer Galvin.  One

14   is that I'm self-employed.  I travel constantly.

15   I'm not comfortable with being subjected to the

16   content of this trial.

17                 THE COURT:  With all due respect, whether

18   or not you are comfortable is not an issue.  It's

19   not comfortable.  It's whether or not, one, that

20   discomfort, if anything, would interfere with your

21   impartiality.  And on the other issue, is it going

22   to be a real financial hardship?

23                 PROSPECTIVE JUROR:  Financial, yes.  In

24   terms of discomfort, honestly, I think when it comes

25   to kids, I don't -- I don't know.  I don't think I'd

1     be impartial.  I have to be honest, I'm sorry.

2                  MS. ABDI:  Do you think that you could

3     listen to the evidence in this case with an open

4     mind as far as whether or not -- not as far as --

5     the charges are horrible.  Nobody is going to

6     disagree with that.

7                  Do you think you could listen to the

8     evidence with an open mind to determine whether or

9     not this defendant was in fact guilty of those

10    charges?

11                 PROSPECTIVE JUROR:  I don't think so.

12                 MS. ABDI:  Okay, consent.

13                 MR. MILLMAN:  Consent.

14                 THE COURT:  You are excused.

15                 (The prospective juror was excused.)

16                 PROSPECTIVE JUROR:  Clover Plumber.  I

17    don't think that I could do this.  I have a

18    daughter, and I'm not in the middle of all this, and

19    I'm feeling a little bit emotional about this whole

20    thing.  I just don't think I could do this.

21                 THE COURT:  It's normal to be emotional

22    about these charges.  The question is, whether or

23    not you'd be able to evaluate the evidence

24    impartially and not let your emotions take over.

25                 PROSPECTIVE JUROR:  My emotions will take

bp

```
 1    over.  I have a friend that was in a similar
 2    situation, and plus a have a planned vacation.
 3                  THE COURT:  When?
 4                  PROSPECTIVE JUROR:  December 22nd.
 5                  THE COURT:  That's a very easy one for me.
 6    You are excused.
 7                  PROSPECTIVE JUROR:  Good luck with
 8    everything.
 9                  (The prospective juror was excused.)
10                  PROSPECTIVE JUROR:  Carlos Class.  My
11    problem is my financial.  I'm a school bus driver.
12    So we guaranty only 30 hours a week.  And the only
13    way that I can get the extra money is if I'm
14    available to work the charters in the mid-day.  Take
15    the people to field trips.  I am divorced.
16                  MS. ABDI:  Consent.
17                  MR. MILLMAN:  Consent.
18                  THE COURT:  You are excused by consent.
19                  (The prospective juror was excused.)
20                  PROSPECTIVE JUROR:  Larry Robbins.  Due to
21    the nature of the charges I don't think I could be
22    impartial.
23                  THE COURT:  What makes you say that?
24                  PROSPECTIVE JUROR:  Well, they are so
25    serious.  I would think that he would probably be
```

bp

```
 1        guilty because the District Attorney --

 2                  MR. MILLMAN:  Just keep it low.

 3                  THE COURT:  You have him convicted

 4        already.

 5                  PROSPECTIVE JUROR:  Almost.

 6                  MR. MILLMAN:  Judge --

 7                  THE COURT:  You are excused.

 8                  (The prospective juror was excused.)

 9                  PROSPECTIVE JUROR:  Claudio Suant.  I work

10        with children with disabilities and I don't think I

11        could be impartial to a child that's been raped or

12        murdered.  We don't have a lot of help at the

13        school.  Our classrooms are very short.  If I can be

14        excused I would like that.

15                  MS. ABDI:  Consent.

16                  MR. MILLMAN:  Consent.

17                  THE COURT:  You are excused.

18                  (The prospective juror was excused.)

19                  PROSPECTIVE JUROR:  Brian Hartwig.  The

20        holiday period is when I make most of my overtime

21        with my job.  I'm a special events coordinator, and

22        Christmas is our special events.  If I do get

23        selected, I will make straight time but --

24                  THE COURT:  We are stopping work

25        January 3rd.
```

bp

```
 1              PROSPECTIVE JUROR:  I mean on a daily
 2      basis.  My hours are nine to five.  If I get
 3      selected I'll get paid nine to five.  Usually this
 4      time is busy.  I work until nine, ten at night and
 5      get overtime.  I do get extra pay for my time.  My
 6      job will pay me for seven point five hours a day.
 7      If I do go to work I work ten to twelve hours a day.
 8              THE COURT:  That's before December 23rd?
 9              PROSPECTIVE JUROR:  That's starting now.
10              MS. ABDI:  I think this might need further
11      inquiry.
12              THE COURT:  Come back Monday.
13              PROSPECTIVE JUROR:  I'm a student and I
14      have classes until the 15th at SUNY Farmingdale.
15              THE COURT:  Full-time student?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  What are you studying?
18              PROSPECTIVE JUROR:  Aviation
19      Administration.
20              MS. ABDI:  Consent.
21              MR. MILLMAN:  Consent.
22              (The prospective juror was excused.)
23              MR. MILLMAN:  I wanted to ask -- I have
24      tried four to five times to speak with him about
25      what we discussed.  Can I have a few minutes at some
```

1    point talk to him about what we are talking about?

2    I still do need to speak to him.  He always gets

3    rushed out.

4              THE COURT:  I'll give you a couple of

5    minutes.

6              Ladies and gentlemen, again, you may think

7    this is a slow process, I think we are proceeding

8    with deliberate speed.  We have about 30 perspective

9    jurors left over from today that are available for

10   questioning on Monday, and we have another 30 from

11   this particular group available for questioning on

12   Monday.

13             I have every expectation we will complete

14   the selection process on Monday and start with the

15   case on Tuesday, so you are excused for today.  And

16   we'll see you Monday at 9:30.

17             (The prospective jurors exited the

18   courtroom.)

19             (The matter was adjourned to 12-5-11.)

20                  *   *   *   *   *

21             CERTIFIED TO BE A TRUE AND ACCURATE
               TRANSCRIPT OF THE PROCEEDINGS HEREIN.
22

23

       BETTY POLNIK
24     SENIOR COURT REPORTER

25

                          bp

```
 1    STATE OF NEW YORK  :  NASSAU COUNTY

 2         SUPREME COURT  :  PART 39              Volume II

 3    ------------------------------------------X

 4    THE PEOPLE OF THE STATE OF NEW YORK,

 5         -against-                        Ind. No. 202N-11

 6    ULISES BONILLA,

 7                          Defendant.

 8    ------------------------------------------X

 9    JURY TRIAL

10                          December 5, 2011
                            262 Old Country Road
11                          Mineola, New York

12    B E F O R E :

13        HON. GEORGE R. PECK,
              Acting Supreme Court Justice
14

15

16    A P P E A R A N C E S :

17        HON. KATHLEEN M. RICE
              Nassau County District Attorney
18            BY:  ZEENA ABDI, ESQ., of Counsel
              Assistant District Attorney
19                    For the People

20

21        DANIEL L. MILLMAN, ESQ.
              316A Main Street
22            Roslyn, New York  11576
                  For the Defendant
23
                   JOANNE HORROCKS, CSR
24                 Senior Court Reporter

25
```

J.H.

Proceedings                    219

1           THE CLERK:  Case on trial, People of the

2     State of New York versus Ulises Bonilla, Indictment

3     202N of 2011.  All parties are present including the

4     defendant and the Spanish interpreter.

5           THE COURT:  Before we bring in the jury, does

6     anyone have anything to say?

7           MS. ABDI:  Yes, your Honor.  I would just

8     like to put on the record that I had given defense

9     counsel on Friday additional Rosario.  I have provided

10    him with a number of copies of that Rosario today, and

11    I am providing a copy to the Court numbers 1402 to

12    1502.

13          THE COURT:  All right, let's bring in the

14    jury.

15          (Whereupon, the prospective jurors enter the

16    courtroom.)

17          THE CLERK:  Ladies and gentlemen, if you did

18    not get a questionnaire or have not brought your

19    questionnaire back with you, please grab one from the

20    officer and fill it out.

21          THE COURT:  The reason why we're doing this

22    is because the prospective jurors who were brought over

23    on Friday afternoon may not have questionnaires.

24          Okay, ladies and gentlemen, just a little

25    refreshing.  We're about to continue with the actual

J.H.

Proceedings                    220

1      selection process.  All excuses have been taken, and

2      we're going to fill the box.

3                THE CLERK:  Ladies and gentlemen, if you hear

4      your name called, please come up through the door right

5      there, go to the officer with your belongings, and they

6      will direct you to a seat.

7                Seat number one, Jeremy Hammond, last name

8      H-A-M-M-O-N-D.

9                John Dong, last name is D-O-N-G, seat number

10     two.

11               Seat number three, Donald Roman, last name

12     R-O-M-A-N, seat three.

13               Seat four, Donald Mormino, last name

14     M-O-R-M-I-N-O, seat four.

15               Seat five, Peter Colaianni, last name

16     C-O-L-A-I-A-N-N-I, seat five.

17               Seat six, Mashiko Brown, last name B-R-O-W-N,

18     seat six.

19               Seat seven, Brian Sheehan, last name

20     S-H-E-E-H-A-N, seat seven.

21               Seat eight, Sari Infield, last name

22     I-N-F-I-E-L-D, seat eight.

23               Seat nine, Steven Cronin, last name

24     C-R-O-N-I-N, seat number nine.

25               Seat 10, Walter Harris, last name

1    H-A-R-R-I-S, seat number 10.

2                Seat number 11, Richard Cebulski, last name

3    C-E-B-U-L-S-K-I, seat number eleven.

4                Seat number twelve, Brian Reilly, last name

5    R-E-I-L-L-Y, seat number 12.

6                Seat Number 13, Joanne Chiaramonte, last name

7    C-H-I-A-R-A-M-O-N-T-E, seat Number 13.

8                Seat number 14, Dorothy Washington, Dorothy

9    Washington, last name W-A-S-H-I-N-G-T-O-N, seat number

10   14.

11              THE COURT:  Okay, I know that everyone called

12   today has had the opportunity to observe and review a

13   round of questioning that has happened before, so

14   you're a little bit experienced on this.

15              Mr. Hammond, you checked off some things such

16   as victim of a crime, accused of a crime, convicted of

17   a crime.  My question to you is would any of those

18   situations carry over to this case so you could not be

19   fair and impartial?

20              A PROSPECTIVE JUROR:  No, sir.

21              THE COURT:  You checked off law enforcement.

22   Would you have any difficult following the instruction

23   concerning the testimony of a police officer that I

24   gave the other day?

25              A PROSPECTIVE JUROR:  No, sir.

1              THE COURT:   Mr. Dong, you checked off victim

2        of a crime.   Would that carry over to this particular

3        case?

4              A PROSPECTIVE JUROR:   No, it wouldn't.

5              THE COURT:   And law enforcement, who is that?

6              A PROSPECTIVE JUROR:   It's a friend.

7              THE COURT:   I'm sorry?

8              A PROSPECTIVE JUROR:   It's a friend.

9              THE COURT:   Do you have any difficulty in

10       following the instruction that I gave the other day?

11             A PROSPECTIVE JUROR:   No.

12             THE COURT:   Mr. Roman, you checked off prior

13       jury duty experience.   Whatever you learned in that

14       instance forget about in this instance.   Would you do

15       that?

16             A PROSPECTIVE JUROR:   Yes.

17             THE COURT:   You checked off victim.   Would

18       that carry over to this case?

19             A PROSPECTIVE JUROR:   Yes, it might.

20             THE COURT:   Come on up here, please.

21             (The following occurs at sidebar outside of

22       the hearing of the prospective jurors.)

23             THE COURT:   Is that why you checked off yes?

24             A PROSPECTIVE JUROR:   Yes.   My daughter's

25       best friend was sexually abused and physically abused

1    as well several times.  We were close to the family.

2    We took her in.  The nature of the crime is very

3    sensitive to me.

4              THE COURT:  First of all, no one's asking you

5    to condone this alleged conduct.  We are asking you if

6    you can put aside that instance that you have in your

7    past and decide this case on the evidence coupled with

8    the instruction of the law.  If you can't do it, you

9    shouldn't be here.  If you can do it --

10             A PROSPECTIVE JUROR:  I think to be fair to

11   the defendant, I probably should have opt out or

12   request to be --

13             THE COURT:  Request?

14             A PROSPECTIVE JUROR:  Opt out.

15             THE COURT:  Do you feel you wouldn't be fair

16   to the defendant?

17             A PROSPECTIVE JUROR:  Probably not.

18             THE COURT:  People?

19             MS. ABDI:  Consent.

20             MR. MILLMAN:  Consent, your Honor.

21             THE COURT:  Okay, thank you for your

22   candidness.  Another prospective juror.

23             (The following takes place in open court.)

24             THE CLERK:  Filling seat number three,

25   Alexander Bove, last name B-O-V-E, seat number three.

Proceedings                                    224

1           THE COURT:  All right, Mr. Bove, you checked

2      off victim of a crime.  Would that carry over to this

3      case?

4                A PROSPECTIVE JUROR:  It could, yes.

5                THE COURT:  Come on up.

6                (The following occurs at sidebar outside of

7      the hearing of the prospective jurors.)

8                THE COURT:  What's your situation?

9                A PROSPECTIVE JUROR:  My uncle was one of the

10     people that was shot and killed by Collin Ferguson.

11               THE COURT:  That was 17 years ago.

12               A PROSPECTIVE JUROR:  Yeah.  I was only like

13     six at the time.

14               THE COURT:  I was the prosecutor in that

15     case.

16               A PROSPECTIVE JUROR:  You may know my aunt,

17     Joyce Gerky?

18               THE COURT:  Yes, very well.

19               A PROSPECTIVE JUROR:  That's her husband.

20               THE COURT:  Well, the two instances are

21     completely different.

22               A PROSPECTIVE JUROR:  They are different.  If

23     it's not related in any way, then it wouldn't bother

24     me.

25               THE COURT:  This is no way related to the

J.H.

1       Collin Ferguson case, okay?

2                   A PROSPECTIVE JUROR:   Yeah.

3                   THE COURT:   Okay.

4                   (The following takes place in open court.)

5                   THE COURT:   You also checked off law

6       enforcement.   Would you have any difficulty in

7       following the instruction of a police officer?

8                   A PROSPECTIVE JUROR:   No.

9                   THE COURT:   Mr. Mormino, you checked off a

10      lot of things here.   Would you have any difficulty

11      following the instruction concerning the testimony of a

12      police officer?

13                  A PROSPECTIVE JUROR:   No, I wouldn't.

14                  THE COURT:   In your field of work as a claims

15      examiner, do you work with the police at all?

16                  A PROSPECTIVE JUROR:   Sometimes.

17                  THE COURT:   Okay.   Mr. Colaianni, you checked

18      off law enforcement.   Would you have any difficulty in

19      following the instruction of a police officer?

20                  A PROSPECTIVE JUROR:   No, I would not.

21                  THE COURT:   Miss Brown?

22                  A PROSPECTIVE JUROR:   Yes.

23                  THE COURT:   You checked off victim.   Would

24      that carry over to this case?

25                  A PROSPECTIVE JUROR:   No.

1       THE COURT:  And would you have any difficulty

2    following the instruction concerning the testimony of a

3    police officer?

4              A PROSPECTIVE JUROR:  No.

5              THE COURT:  Those of you who are in the

6    audience and haven't been given this instruction yet,

7    I'm just going to tell you at this particular time you

8    are not to give the testimony of a police officer any

9    greater or lesser weight because he's a police officer.

10   That does not mean you have to discount job and

11   experience in evaluating the testimony of a police

12   officer.

13              To give you an example, if you wanted to know

14   the developmental level of an 11 year old, you might

15   give more credence to a fifth grade teacher's testimony

16   than you would that of a house painter.  But you never

17   know, that house painter may have been a little league

18   coach for 20 years, and he knows fully well how an 11

19   year old should be developed for the purposes of the

20   safety of him and the other members of the little

21   league team.  It's a question for you to decide.

22              Mr. Sheehan?

23              A PROSPECTIVE JUROR:  Yes, your Honor?

24              THE COURT:  Whatever you learned in prior

25   jury duty experience, forget about.

1              A PROSPECTIVE JUROR:  Yes, sir.

2              THE COURT:  And where were you a police

3       officer?

4              A PROSPECTIVE JUROR:  I was a peace officer

5       for the Bridge and Tunnel Authority.

6              THE COURT:  A peace officer?

7              A PROSPECTIVE JUROR:  Yes, sir.

8              THE COURT:  Would you have any difficulty

9       following the instruction of a police officer that I

10      just gave?

11             A PROSPECTIVE JUROR:  Negative.

12             THE COURT:  You wouldn't have any difficulty?

13             A PROSPECTIVE JUROR:  No, I would not, sir.

14             THE COURT:  Okay.  Miss Infield?

15             A PROSPECTIVE JUROR:  Yes.

16             THE COURT:  You checked off victim of a

17      crime.  Would that carry over to this case?

18             A PROSPECTIVE JUROR:  No, your Honor.

19             THE COURT:  You checked off two lawyers.  Who

20      are they?

21             A PROSPECTIVE JUROR:  Mr. and Mrs. Antoine.

22      They are my neighbors.  One, he works in the Supreme

23      Court across the way, and his wife works for --

24             THE COURT:  Do you talk with them about what

25      they do?

Proceedings                              228

1                   A PROSPECTIVE JUROR:  At times, yes.

2                   THE COURT:  Well, forget about it during this

3        particular case, okay?

4                   A PROSPECTIVE JUROR:  Yes, your Honor.

5                   THE COURT:  You also checked off someone who

6        is a secretary to a judge.

7                   A PROSPECTIVE JUROR:  Yes, sir.  Secretary to

8        Judge Gallon from the Supreme Court.  Caroline Dunne is

9        a very close friend of mine.

10                  THE COURT:  You checked off you wanted to see

11       me privately?

12                  A PROSPECTIVE JUROR:  Yes, sir.

13                  THE COURT:  Come on up.

14                  (The following occurs at sidebar outside of

15       the hearing of the prospective jurors.)

16                  THE COURT:  Yes, ma'am?

17                  A PROSPECTIVE JUROR:  When I was here the

18       first day, we were talking about dates and stuff like

19       that, and they were so worried about going to Florida.

20       And I got home, and my husband said, What about your

21       doctor's appointment?  I have a mammogram, sonogram

22       appointment scheduled for December 20th, and I'm a

23       cancer survivor, and I have to make them together.  I

24       believe it's a Tuesday.

25                  THE COURT:  December 20th is a Thursday --

J.H.

1          that's 2012.  What time of day is that?

2                     A PROSPECTIVE JUROR:  The appointment is the

3          at 9 o'clock in the morning.  They both go one behind

4          each other.  I could be as short as an hour-and-a-half.

5          I could be as long as two hours, and I apologize.

6                     THE COURT:  That's all right.  I think we are

7          going to be right in the midst of this particular trial

8          then.  People?

9                     MS. ABDI:  I'll consent, Judge.

10                    MR. MILLMAN:  Consent.

11                    THE COURT:  Okay, you're excused by consent.

12                    (The following takes place in open court.)

13                    THE CLERK:  Filling seat number eight, Jose

14         Palackathadom, last name is P-A-L-A-C-K-A-T-H-A-D-O-M,

15         seat number eight.

16                    THE COURT:  Sir, there is nothing in your

17         questionnaire that needs my attention at this

18         particular point.

19                    Mr. Cronin, you checked off things that don't

20         need my attention at this particular time.

21                    Mr. Harris, none of your answers need my

22         attention.

23                    As an aside, I see a lot of people whose

24         hobby is fishing, an awful lot of people whose hobby is

25         fishing.  Mine too.

Proceedings                    230

1        Mr. Cebutski, you checked off victim of a
2   crime.  Would that carry over to this case?
3             A PROSPECTIVE JUROR:  No, sir.
4             THE COURT:  You checked off yes.  Do you want
5   to speak to me or did you -- is that a mistake?
6             A PROSPECTIVE JUROR:  No, I would like to if
7   I can, please.
8             THE COURT:  Sure.
9             (The following occurs at sidebar outside of
10  the hearing of the prospective jurors.)
11            A PROSPECTIVE JUROR:  The issue is my knee.
12  I spoke to you last week about it.  My knee
13  replacement, I have an appointment on Wednesday.  What
14  I had initially done was I had rescheduled from last
15  Wednesday because that's when the jury duty fell, and I
16  figured this week we'll be out of this, but evidently
17  not.
18            THE COURT:  Refresh me about your knee.
19            A PROSPECTIVE JUROR:  I'm due for a knee
20  replacement.
21            THE COURT:  What's happening this coming
22  Wednesday?
23            A PROSPECTIVE JUROR:  I have to schedule with
24  my doctor for a knee replacement.  It's been a long
25  saga up to now.

J.H.

1          THE COURT:  Is it just a pre-surgical

2    examination?

3               A PROSPECTIVE JUROR:  Yes.

4               THE COURT:  So it's just --

5               A PROSPECTIVE JUROR:  Well, I've had all the

6    pre --

7               THE COURT:  When do you anticipate this to

8    take this?

9               A PROSPECTIVE JUROR:  March.

10              THE COURT:  What do you want to do?

11              A PROSPECTIVE JUROR:  I don't know what the

12   best thing to do is at this point.  I would like to go

13   to the appointment.  It's in the morning.

14              THE COURT:  No, we need to go ahead in the

15   morning.  I'm pushing this particular trial.  What time

16   is your appointment?

17              A PROSPECTIVE JUROR:  10 o'clock.  It's right

18   nearby.

19              THE COURT:  And it's this coming Wednesday?

20              A PROSPECTIVE JUROR:  Wednesday.

21              THE COURT:  No, I can't allow that because

22   basically it takes up a whole morning.

23              A PROSPECTIVE JUROR:  I understand.

24              THE COURT:  You're excused.

25              A PROSPECTIVE JUROR:  I'm sorry?

Proceedings                    232

1              THE COURT:  You're excused.

2              A PROSPECTIVE JUROR:  I don't go back?

3              THE COURT:  No.  You're excused.  You can't

4    be here because of a medical emergency, okay?

5              (The following takes place in open court.)

6              THE CLERK:  Filling seat number 11, Shannon

7    Lee, last name L-E-E, seat number 11.

8              THE COURT:  Miss Lee, there's nothing on this

9    particular sheet that needs my attention at this

10   particular time.  But just tell me a little bit about

11   your nursing duties.

12             A PROSPECTIVE JUROR:  I don't work in a

13   clinical setting anymore.  I work for a medical

14   malpractice insurance company.  I investigate

15   malpractice lawsuits.

16             THE COURT:  Okay, all right.

17             Mr. Reilly, you checked off victim of a

18   crime.  Would that carry over to this case?

19             A PROSPECTIVE JUROR:  I guess it has

20   potential to in this instance.

21             THE COURT:  Come on up.

22             (The following occurs at sidebar outside of

23   the hearing of the prospective jurors.)

24             A PROSPECTIVE JUROR:  What happened to me was

25   I had from my car somebody stole $3,000 worth of stuff.

J.H.

Proceedings                         233

1    What concerns me a little more is that my father's

2    cousin was murdered, and nobody was convicted of that

3    crime.

4              THE COURT:  All right, first of all, a lot of

5    people are subjected to the same situation that you

6    have been with regard to sealing stuff out of the car.

7    That won't carry over to case, will it?

8              A PROSPECTIVE JUROR:  I don't think so.  I'm

9    more concerned about the second.

10             THE COURT:  When did that occur?

11             A PROSPECTIVE JUROR:  Many years ago, 20

12   years ago.

13             THE COURT:  No one's asking you to condone

14   this type of crime.  We're asking you whether or not

15   you can sit in this particular jury, listen to the

16   evidence and evaluate the evidence, pay attention to my

17   charge and decide this case based upon what you hear

18   here and not based upon something that occurred years

19   ago.

20             A PROSPECTIVE JUROR:  Okay.

21             THE COURT:  Can you do that?

22             A PROSPECTIVE JUROR:  Yeah, I can do that.

23             THE COURT:  Okay.

24             MR. MILLMAN:  Judge, may I?  Mr. Reilly,

25   since the situation occurred in which your father's

J.H.

Proceedings                           234

1    cousin I think you said had been murdered, have you had

2    conversations with your father's side of the family or

3    anyone in your family about the fact that he had not

4    been caught?

5              A PROSPECTIVE JUROR:  No, nobody's really

6    brought that up.  I guess it's --

7              MR. MILLMAN:  Do you think as a result of

8    what happened it has caused you to perceive that

9    sometimes people get away with things and that's not

10   good and -- I mean did it color your view of the

11   justice system in any negative way?

12             A PROSPECTIVE JUROR:  That has been what my

13   concern was.

14             MR. MILLMAN:  And I notice your concern, and

15   was the reason you were concerned was you thought it

16   could maybe as you listen to the evidence in this case

17   interfere --

18             THE COURT:  Let me just give you an

19   instruction.  In the State of New York as I said to you

20   the other day, there is no such thing as a verdict of

21   innocence.  It's a verdict of guilty, which means

22   proven guilty beyond a reasonable doubt or not proven

23   guilty beyond a reasonable doubt.  The fact of the

24   matter is if someone is not proven guilty beyond a

25   reasonable doubt, he's acquitted.  Innocence has

J.H.

Proceedings                          235

1    nothing to do with it.  Do you understand that?

2              A PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Okay.

4              MR. MILLMAN:  If I could just ask a couple of

5    follow up.  Do you think that as you listen to the

6    evidence in the case that -- and some of it may be

7    emotional, I don't know, but that you might start to

8    have feelings about what happened and that it could

9    possibly interfere with what do you here as a juror?

10             A PROSPECTIVE JUROR:  I mean if anything,

11   maybe my job at NBC would affect something like that

12   because I used to work with The Geraldo Rivera Show,

13   and I've done lots of transactions for the Casey

14   Anthony trial and things like that.

15             MR. MILLMAN:  Can you tell me what it was

16   that you did in that respect?

17             A PROSPECTIVE JUROR:  I do all the

18   transactions for The Geraldo Rivera Show.  Before they

19   would have, I don't know, you know, they had police

20   evidence that would allow it to be put onto the media,

21   I would take the photographs and put it on air.

22             MR. MILLMAN:  Did you ever deal directly with

23   the victims of any of the crimes?

24             A PROSPECTIVE JUROR:  No.

25             MR. MILLMAN:  And during your position in

J.H.

 1         that capacity, did you find -- were you exposed to

 2         situations that dealt with victims of sexual abuse?

 3                    A PROSPECTIVE JUROR:  Um, well, the

 4         photographs, the evidence that they would have

 5         sometimes, they would have pictures of the police.

 6                    MR. MILLMAN:  And you said I believe a moment

 7         ago, if anything, my job with Geraldo might affect

 8         that.  What made you think that that could interfere

 9         with what you do as a juror in this case, the result of

10         that?

11                    A PROSPECTIVE JUROR:  Just in, you know,

12         experience with dealing with that.  It might be a

13         little more sensitive that type of material.

14                    THE COURT:  We are not asking you to be

15         insensitive or sensitive.  Can you decide this case on

16         the evidence and the evidence alone?

17                    A PROSPECTIVE JUROR:  Yes, I could.

18                    THE COURT:  Okay, sit down.

19                    (The following takes place in open court.)

20                    THE COURT:  And would you, Mr. Reilly, have

21         any difficulty following the instruction of a police

22         officer?

23                    A PROSPECTIVE JUROR:  No, I would not.

24                    THE COURT:  Miss Chiaramonte?

25                    A PROSPECTIVE JUROR:  Yes.

Proceedings                                237

1             THE COURT:  You checked off victim of a

2       crime.  Would that carry over to this case?

3             A PROSPECTIVE JUROR:  No, it would not.

4             THE COURT:  Whatever you learned in jury

5       service eight years ago, forget it in this case.  Is

6       that a yes?

7             A PROSPECTIVE JUROR:  Yes.

8             THE COURT:  And Miss Washington, there's

9       nothing in your sheet that needs my inquiry at this

10      particular time.

11            People?

12            MS. ABDI:  Thank you, your Honor.  Good

13      morning, ladies and gentlemen.  My name is Zeena Abdi,

14      and I'm the Assistant District Attorney who is assigned

15      to prosecute the defendant, Ulises Bonilla, for the

16      crimes with which he is charged.

17            My point here today is to ask you questions.

18      They are not designed to intrude.  They are not

19      designed to be embarrassing.  They are really just

20      designed so that defense counsel and I can pick a jury

21      that's fair and impartial.

22            My questions are also not going to be

23      designed to get to know everything there is know about

24      you.  That's impossible in the short time period I

25      have.  They are really just designed for you to look

1       inside yourself and to decide whether or not that you

2       can be fair and impartial based on the facts and

3       circumstances in this case.

4                    So I'm going to try to talk to everybody, and

5       I may mess up your names, and I apologize for that.

6                    Mr. Hammond?

7                    A PROSPECTIVE JUROR:  Yes.

8                    MS. ABDI:  Now, can you agree with the

9       concept that testimony is considered evidence, that

10      what somebody says on a witness stand is considered

11      evidence in this case, testimonial evidence; can you

12      accept that concept?

13                   A PROSPECTIVE JUROR:  Yes.

14                   MS. ABDI:  Mr. Dong?

15                   A PROSPECTIVE JUROR:  Yes.

16                   MS. ABDI:  Can you accept the concept that

17      what comes out of a witness stand is also considered

18      evidence such as a map or a photo or something like

19      that?

20                   A PROSPECTIVE JUROR:  Yes.

21                   MS. ABDI:  Mr. Bove or Bove?

22                   A PROSPECTIVE JUROR:  Bove.

23                   MS. ABDI:  Can you consider the concept that

24      what somebody says on a witness stand is considered

25      evidence in this case?

Proceedings                                239

1          A PROSPECTIVE JUROR:  Yes.

2          MS. ABDI:  Is there anyone here that has

3     difficulty with just the general proposition that what

4     somebody says on a witness stand is considered

5     evidence, is considered testimonial evidence?  Does

6     anyone here any problems with that?

7          Mr. is it Mormino?

8          A PROSPECTIVE JUROR:  Yeah.

9          MS. ABDI:  Do you have any problem with the

10    concept that when somebody takes the stand and they

11    tell you what happened that that's considered evidence

12    of what happened in this case?  Can you accept that

13    concept?

14         A PROSPECTIVE JUROR:  Yes.

15         MS. ABDI:  Now, similarly, once you have

16    somebody telling you what happened, you then have to

17    decide whether or not to believe that person or not,

18    whether or not to judge credibility.

19         Mr. Dong, how do you feel about being asked

20    to judge the honesty or the credibility of a witness?

21         A PROSPECTIVE JUROR:  I have to, I have to.

22         THE COURT:  I'm sorry?

23         A PROSPECTIVE JUROR:  I said if I have to, I

24    have to.

25         THE INTERPRETER:  Can you repeat that again?

1           A PROSPECTIVE JUROR: I have to decide, I
2     have to decide.

3           THE COURT: One of the duties of a juror is
4     to evaluate the credibility of a witness. You're a
5     fact-finding body. That's why you're here. And you
6     use the same tests in evaluating the credibility of a
7     witness as you would in your everyday affairs in
8     evaluating the truthfulness or untruthfulness of what
9     people tell you.

10          There's no magic formula in doing this. You
11    consider a person's age, demeanor, appearance, whether
12    or not he said A on the stand and said B on another
13    occasion. I will give you an instruction on this at a
14    subsequent time. But you do this every day, in
15    everyday affairs of your lives. Simply because you are
16    sitting here is no different.

17          MS. ABDI: So just as the judge said, have
18    you, Mr. Dong, been in a position in your everyday life
19    where you had to decide between two people who told you
20    completely conflicting stories? Have you had to decide
21    who to believe in a situation like that?

22          A PROSPECTIVE JUROR: Yes.

23          MS. ABDI: Now, is there anyone here who has
24    children or works with children? Okay. I'm sure if
25    you have worked with children or you have children,

Proceedings                               241

1    you've been in a situation where siblings, they both

2    run up to you, you know, Timmy did this, no, I didn't,

3    or Johnny did this, and you have to then decide who to

4    believe.

5              Miss Washington, have you been in a situation

6    similar to that?

7              A PROSPECTIVE JUROR:  Yes.

8              MS. ABDI:  Did you have any trouble deciding

9    who to believe or who not to believe?

10             A PROSPECTIVE JUROR:  Not really, no.

11             THE COURT:  All right, now --

12             THE INTERPRETER:  Judge, I'm having a

13   difficult time listening to these people.  I can't hear

14   them.

15             THE COURT:  All right, speak up a little.

16             THE INTERPRETER:  Thank you.

17             THE COURT:  And obviously when you have to

18   judge a discrepancy in the stories of two people, one

19   could be telling the truth, one could be not telling

20   the truth, or they could both not be telling truth.

21             MS. ABDI:  Now, going along back to

22   mentioning that the testimony is evidence, say,

23   Mr. Bove, that the only evidence I produce in court

24   today is -- not today, when the trial starts, is

25   testimonial evidence, what somebody says on a witness

Proceedings                    242

1      stand.  Could you convict the defendant on testimonial

2      evidence alone if you believe that testimony beyond a

3      reasonable doubt?

4                     A PROSPECTIVE JUROR:  Yes.

5                     MS. ABDI:  Mr. Mormino?

6                     A PROSPECTIVE JUROR:  Yes.

7                     MS. ABDI:  Could you convict a defendant

8      beyond a reasonable doubt based solely on testimonial

9      evidence?

10                    A PROSPECTIVE JUROR:  Yes.

11                    MS. ABDI:  Mr. Colaianni?

12                    A PROSPECTIVE JUROR:  Yes.

13                    MS. ABDI:  What about you, just testimonial

14     evidence, if you believed it, making any credibility

15     determinations that you do, could you convict the

16     defendant beyond a reasonable doubt?

17                    A PROSPECTIVE JUROR:  Yes, I can.

18                    MS. ABDI:  Miss Brown?

19                    A PROSPECTIVE JUROR:  Yes.

20                    MS. ABDI:  Same question, testimonial

21     evidence, could you convict the defendant based solely

22     on testimonial evidence alone?

23                    A PROSPECTIVE JUROR:  Yes.

24                    MS. ABDI:  Miss Washington, could you do

25     that?

J.H.

Proceedings                    243

1             A PROSPECTIVE JUROR:  Yes.

2             MS. ABDI:  Miss is it Chiaramonte?

3             A PROSPECTIVE JUROR:  Yes.

4             MS. ABDI:  And once again, I may go in a row

5        and ask people questions, but don't feel pressured just

6        to go along with everyone else.  If you -- this is the

7        time for you to be candid.  If you really don't agree

8        with something, now is the time to let me know.

9             But Miss Chiaramonte, if the only evidence I

10       produce during this case is testimonial evidence but

11       you believed it, could you convict the defendant beyond

12       a reasonable doubt?

13            A PROSPECTIVE JUROR:  Yes, I can.

14            MS. ABDI:  Mr. Reilly?

15            A PROSPECTIVE JUROR:  Yes, I can.

16            MS. ABDI:  Same question.

17            A PROSPECTIVE JUROR:  Yes.

18            MS. ABDI:  Miss Lee?

19            A PROSPECTIVE JUROR:  Yes.

20            MS. ABDI:  Mr. Harris?

21            A PROSPECTIVE JUROR:  Yes, I could.

22            MS. ABDI:  Mr. Cronin?

23            A PROSPECTIVE JUROR:  Yes.

24            MS. ABDI:  Mr. Cronin?

25            A PROSPECTIVE JUROR:  Yes.

1        MS. ABDI: And Mr. Sheehan?

2        A PROSPECTIVE JUROR: Yes, ma'am.

3        MS. ABDI: Okay. Now, in this case, you may

4     know there are some very serious charges. One is

5     murder in the second degree of one victim, and one is

6     another charge of rape in the first degree and sexual

7     abuse which concerns a 10 year old girl.

8        Now, I expect that there will be some

9     witnesses who are children in this case. Now, is there

10    anything about the fact that a witness is a child if

11    you were selected, would they start out with a strike

12    against them just because they were a child?

13       THE COURT: And as you mentioned on Friday,

14    you expect the youngest witness who is testifying to be

15    10 or to be 11 years old?

16       MS. ABDI: Correct, Judge.

17       THE COURT: I just want to let the jury know

18    what a, quote, child, unquote, is.

19       MS. ABDI: Mr. Hammond, my question is --

20    well, I'll give you a new question. Is there anything

21    about a child witness that would automatically even

22    before you heard anything, automatically believe that

23    they were less truthful than any other witness?

24       A PROSPECTIVE JUROR: Not less truthful but

25    possibly less reliable.

J.H.

Proceedings                    245

1            MS. ABDI:  So before you even heard what a

2    witness said, just because they were a child, you would

3    automatically find them less reliable?

4            A PROSPECTIVE JUROR:  Yes.

5            MS. ABDI:  Is there anyone else that feels

6    that way even before a witness takes the stand, they

7    are already starting out with this assumption in your

8    minds that they are less reliable?  Miss Brown?

9            A PROSPECTIVE JUROR:  No.

10           MS. ABDI:  Miss Washington?

11           A PROSPECTIVE JUROR:  No.

12           MS. ABDI:  Miss Chiaramonte?

13           A PROSPECTIVE JUROR:  No.

14           MS. ABDI:  Mr. Colianni?

15           A PROSPECTIVE JUROR:  No.

16           MS. ABDI:  Miss Lee?

17           A PROSPECTIVE JUROR:  No.

18           MS. ABDI:  Mr. Cronin?

19           A PROSPECTIVE JUROR:  No.

20           MS. ABDI:  Mr. Harris?

21           A PROSPECTIVE JUROR:  No.

22           MS. ABDI:  Sorry, Mr. Harris, I looked at you

23   first.

24           A PROSPECTIVE JUROR:  No.

25           MS. ABDI:  What about you, Mr. Colaianni?

J.H.

Proceedings                          246

1                      A PROSPECTIVE JUROR:  No.

2                      MS. ABDI:  Mr. Sheehan?

3                      A PROSPECTIVE JUROR:  No.

4                      MS. ABDI:  Now, would you agree that

5       especially those who work with children and have

6       children that children are individuals, and they

7       respond differently to certain situations.  Miss Brown?

8                      A PROSPECTIVE JUROR:  Yes.

9                      MS. ABDI:  You could have two children who

10      have the same thing happen to them.  One will cry, one

11      may giggle, one may have no reaction at all.  Miss

12      Brown, do you agree with that concept?

13                     A PROSPECTIVE JUROR:  Yes.

14                     MS. ABDI:  Miss Washington, I see you nodding

15      your head.

16                     A PROSPECTIVE JUROR:  Yes.

17                     MS. ABDI:  Can you agree with children

18      sometimes have completely different responses even to

19      the same incident?

20                     A PROSPECTIVE JUROR:  Yes.

21                     THE COURT:  So do adults at times.

22                     MS. ABDI:  Correct, exactly.  Adults, now,

23      may have the -- adults are individuals too.  And

24      Mr. Hammond, do you agree with that proposition

25      children can have different responses because they are

1      individuals?

2                     A PROSPECTIVE JUROR:  Yes.

3                     MS. ABDI:  Mr. Dong?

4                     A PROSPECTIVE JUROR:  Yes.

5                     MS. ABDI:  Now, can you agree that a child

6      coming to talk about something of a sexual nature, they

7      might be very embarrassed; can you agree with that

8      concept, Miss Lee?

9                     A PROSPECTIVE JUROR:  Yes.

10                    MS. ABDI:  Mr. Palackathadom?

11                    A PROSPECTIVE JUROR:  Yes.

12                    MS. ABDI:  Mr. Sheehan?

13                    A PROSPECTIVE JUROR:  Yes.

14                    MS. ABDI:  Mr. Dong?

15                    A PROSPECTIVE JUROR:  Yes.

16                    MS. ABDI:  And they may have different

17     reactions to that.  They might get nervous and giggle.

18     Mr. Mormino?

19                    A PROSPECTIVE JUROR:  Yes, I understand.

20                    MS. ABDI:  I mean they may have that

21     reaction.  They may also be too afraid to show any

22     emotion.  Mr. Mormino, do you agree with that concept?

23                    A PROSPECTIVE JUROR:  Yes.

24                    MS ABDI:  Mr. Cronin?

25                    A PROSPECTIVE JUROR:  I agree with that.

Proceedings                                248

1          MS. ABDI:  I keep looking at you, Mr. Harris.

2     But can you agree with that concept?

3                A PROSPECTIVE JUROR:  Yes.

4          MS. ABDI:  Is there anyone here, and this is

5     the time to be honest, I mean is there anyone here that

6     feels that a child has to do something specific, like

7     maybe cry before they can be believed?  I mean this is

8     the time to be honest.  Miss Chiaramonte?

9                A PROSPECTIVE JUROR:  No.

10               MS. ABDI:  Mr. Reilly?

11               A PROSPECTIVE JUROR:  No.

12               MS. ABDI:  Mr. Hammond?

13               A PROSPECTIVE JUROR:  No.

14               MS. ABDI:  Mr. Dong?

15               A PROSPECTIVE JUROR:  No.

16               MS. ABDI:  Mr. Bove?

17               A PROSPECTIVE JUROR:  No.

18          MS. ABDI:  So everyone can agree with the

19     concept that there's nothing specific about the child's

20     demeanor that they would have to do to make you

21     believe, if you believed them.

22          Now, another question is we talked about

23     testimonial evidence.  What if, Mr. Colaianni, if the

24     only witness that I had to a certain fact was a child

25     witness.  Could you convict the defendant based on

1            testimonial evidence from a child beyond a reasonable

2            doubt if you believed that witness?

3                    A PROSPECTIVE JUROR:  I would be able to,

4            yes.

5                    MS. ABDI:  Miss Brown?

6                    A PROSPECTIVE JUROR:  Yes, I would.

7                    MS. ABDI:  Miss Washington?

8                    A PROSPECTIVE JUROR:  Yes.

9                    MS. ABDI:  And my question is if that was the

10           only evidence against the defendant for that fact,

11           could you convict the defendant beyond a reasonable

12           doubt if you believed that witness, Mr. Sheehan?

13                   A PROSPECTIVE JUROR:  Yes.

14                   MS. ABDI:  Mr. Palackathadom?

15                   A PROSPECTIVE JUROR:  Yes.

16                   MS. ABDI:  Mr. Cronin?

17                   A PROSPECTIVE JUROR:  Yes.

18                   MS. ABDI:  Mr. Dong?

19                   A PROSPECTIVE JUROR:  Yes.

20                   MS. ABDI:  Mr. Hammond, I understand you may

21           have -- well, what about you?

22                   A PROSPECTIVE JUROR:  Probably not.

23                   MS. ABDI:  You cannot?

24                   A PROSPECTIVE JUROR:  No.

25                   MS. ABDI:  Mr. Mormino?

1    A PROSPECTIVE JUROR:  Yes, I could.

2    MS. ABDI:  Now, is there anyone here that

3    hasn't already come up that was the victim of a crime?

4    THE COURT:  Certainly.  Many people said that

5    they were -- knew someone who was a victim of a crime

6    and did not wish to approach.

7    MS. ABDI:  Okay.  Just because I don't have

8    time to look at all your sheets, if you have and you

9    are willing to talk about it right now, if you could

10   just raise your hand.

11   Miss Brown is sort of raising her hand.

12   Would you mind just talking about it right now?

13   A PROSPECTIVE JUROR:  I was robbed and shot

14   at.

15   MS. ABDI:  I'm sorry to hear that.  Those are

16   two extremely serious crimes.  When did this happen?

17   A PROSPECTIVE JUROR:  This happened say 10

18   years ago.

19   MS. ABDI:  And was this in Nassau County?

20   A PROSPECTIVE JUROR:  No.

21   MS. ABDI:  Was anyone ever apprehended for

22   that?

23   A PROSPECTIVE JUROR:  Yes.

24   MS. ABDI:  Did you have to go through a trial

25   or anything like that?

J.H.

Proceedings                                      251

1           A PROSPECTIVE JUROR: No.

2           MS. ABDI: And is that case resolved, or is

3     it --

4           A PROSPECTIVE JUROR: Yeah, it's done.

5           MS. ABDI: Now, is there something about that

6     case, what happened to you, those awful things that

7     happened to you, is there something about that that

8     would prevent you from being fair and impartial to the

9     defendant in this case?

10          A PROSPECTIVE JUROR: No.

11          MS. ABDI: Are you able to separate your

12    feelings concerning that case when listening to the

13    evidence in this case?

14          A PROSPECTIVE JUROR: Yes. It's different.

15          MS. ABDI: You are going to have to keep your

16    voice up.

17          A PROSPECTIVE JUROR: I said it's difficult.

18    I guess it's different. I don't know the circumstances

19    of the cases yet.

20          MS. ABDI: Okay. You understand that this

21    defendant, it sounds like a stupid question, but you

22    understand that this defendant is not the defendant

23    that was involved in your case?

24          A PROSPECTIVE JUROR: Yes.

25          MS. ABDI: And do you think you would be able

J.H.

Proceedings                              252

1    to render a verdict in this case just based on what you

2    hear in the courtroom?

3                   A PROSPECTIVE JUROR:  Yes.

4                   MS. ABDI:  And not on your personal

5    experience of what happened to you?

6                   A PROSPECTIVE JUROR:  Yes, um-hum.

7                   MS. ABDI:  Now, do you have any negative

8    feelings towards the police or the criminal justice

9    system out of anything that happened to you during the

10   pendency of that case against you?

11                  A PROSPECTIVE JUROR:  No.

12                  MS. ABDI:  Miss Chiaramonte, you or somebody

13   you know was the victim of a crime?

14                  A PROSPECTIVE JUROR:  Yes.  My daughter was

15   in a Chinese restaurant, and a fight broke out, and she

16   was cut in the head.  It's unrelated.

17                  MS. ABDI:  Was she okay?

18                  A PROSPECTIVE JUROR:  Yes, she's fine, thank

19   you.

20                  MS. ABDI:  Is there anything about that

21   circumstance that would lead you to believe that you

22   can't be fair and impartial in this case?

23                  A PROSPECTIVE JUROR:  No.

24                  MS. ABDI:  Was anyone ever apprehended for

25   that?

Proceedings                    253

1              A PROSPECTIVE JUROR:  Yes.

2              MS. ABDI:  Did your daughter have to go

3         through the court process?

4              A PROSPECTIVE JUROR:  No, she didn't.

5              MS. ABDI:  Is there anything about that

6         experience at all that would prevent you from being

7         fair and impartial in this case?

8              A PROSPECTIVE JUROR:  No.  It's unrelated.

9              MS. ABDI:  Do you have any negative feelings

10        towards the criminal justice system or the police

11        because of that?

12             A PROSPECTIVE JUROR:  No.

13             MS. ABDI:  Anyone else who either was or

14        knows the victim of a crime that has not already come

15        up?  Mr. Dong?

16             A PROSPECTIVE JUROR:  My mom got robbed,

17        mugged actually.

18             MS. ABDI:  How long ago?

19             A PROSPECTIVE JUROR:  A long time ago.

20             MS. ABDI:  Was your mom injured in that?

21             A PROSPECTIVE JUROR:  She was just shoved.

22        That's all.

23             MS. ABDI:  She was okay though?

24             A PROSPECTIVE JUROR:  Yes.

25             MS. ABDI:  Was anyone ever apprehended?

A PROSPECTIVE JUROR: No.

MS. ABDI: Is there anything about that experience that would lead you to believe that you can't be fair and impartial in this case?

A PROSPECTIVE JUROR: No.

MS. ABDI: Do you have any negative feelings towards the criminal justice system because nobody was apprehended?

A PROSPECTIVE JUROR: No.

MS. ABDI: Anyone else who either knows somebody who was the victim of a crime? Mr. Sheehan?

A PROSPECTIVE JUROR: Yes.

MS. ABDI: I see here that you said you were a peace officer for the Bridge and Tunnel?

A PROSPECTIVE JUROR: Yes.

MS. ABDI: What sort of things did you do as part of your duties of your job?

A PROSPECTIVE JUROR: We enforce the VTL, Vehicle and Traffic Law, Penal Code, make arrests. We also did traffic control. At times we took tolls. We manned the tunnels for emergencies, accidents. We extricated, first responders, extricated crash victims, respond to reckless RMPs, patrol cars, things of that nature.

THE COURT: Now, you never did that -- that

1      job never did a take police officer status?  It's still

2      a peace officer status?

3                  A PROSPECTIVE JUROR:  At one time it had

4      police, your Honor.  They gave it up contractually,

5      went to peace.  We still maintained all the powers,

6      weapons, etcetera, etcetera.

7                  THE COURT:  Okay.

8                  MS. ABDI:  Now, Mr. Sheehan, you have some

9      prior law enforcement experience, and the judge has

10     instructed you police officers can be given no more or

11     less credibility than any other witness --

12                 THE COURT:  -- simply because they are a

13     police officer.  You do not have to discount job

14     experience in evaluating that testimony.

15                 MS. ABDI:  Correct.  Can you listen to a

16     police officer's testimony with an open mind?

17                 A PROSPECTIVE JUROR:  Yes.

18                 MS. ABDI:  Mr. Plackathadom, what do you do

19     for a living?

20                 A PROSPECTIVE JUROR:  I'm a mechanic.

21                 MS. ABDI:  And how long have you been doing

22     that?

23                 A PROSPECTIVE JUROR:  Eleven years.

24                 MS. ABDI:  Did you say a road car?

25                 A PROSPECTIVE JUROR:  Subway.

1            MS. ABDI:  So you're a subway inspector?

2            A PROSPECTIVE JUROR:  Yes.

3            MS. ABDI:  Is there anything that you heard

4    today that would lead you to believe that you can't be

5    fair in this case?

6            A PROSPECTIVE JUROR:  No.

7            MS. ABDI:  Can you listen to the evidence

8    that you hear in this courtroom and render a verdict

9    just based solely on what you hear in this courtroom?

10           A PROSPECTIVE JUROR:  Yes.

11           MS. ABDI:  Miss Brown, I'm sorry, I forgot to

12   ask you do you know -- do you or somebody you know has

13   been convicted of a crime?

14           A PROSPECTIVE JUROR:  Yes.

15           MS. ABDI:  Can you tell me about that?

16           A PROSPECTIVE JUROR:  It was drug related.

17           THE COURT:  I'm sorry?

18           A PROSPECTIVE JUROR:  Drug related.

19           MS. ABDI:  And I'm sorry, who was --

20           A PROSPECTIVE JUROR:  My cousin.

21           MS. ABDI:  Do you have any negative feelings

22   towards the criminal justice system or the police that

23   apprehended him or anything like that with respect to

24   his case?

25           A PROSPECTIVE JUROR:  No.

Proceedings                                    257

1        MS. ABDI:  Do you feel like that would

2   prevent you from being fair and impartial in this case

3   to the prosecution?

4        A PROSPECTIVE JUROR:  No.

5        MS. ABDI:  And would it prevent you from

6   being fair and impartial to the defense?

7        A PROSPECTIVE JUROR:  No.

8        MS. ABDI:  You believe you could separate

9   your cousin's experiences to when you're listening to

10   things in this case?

11       A PROSPECTIVE JUROR:  Yes.

12       MS. ABDI:  Anyone else know anyone who has

13   been -- who you know or somebody you know has been

14   convicted of a crime or accused of a crime?  Okay.

15       Ladies and gentlemen, now, this is my last

16   question.  I'm going it put it out to everybody.  This

17   is the time when you really kind of have to look inside

18   yourself and see whether or not you could be fair and

19   impartial in this case.  If I prove my case beyond a

20   reasonable doubt, I will expect you to find the

21   defendant guilty.  That is not an easy thing to do

22   especially with the severity of the charges that are in

23   this case.  But I'll expect you to do that.

24       Is there anyone here that for whatever

25   reason, assuming I will prove my case beyond a

1      reasonable doubt, that cannot convict the defendant

2      even if they believe beyond a reasonable doubt that he

3      did it?  Is there anyone here that would have a problem

4      with doing that?  Okay, thank you for your time.

5                    THE COURT:  Mr. Millman?

6                    MR. MILLMAN:  Good morning, ladies and

7      gentlemen.  I guess you know, my name is Daniel

8      Millman, and I represent the defendant, Ulises Bonilla.

9      I'm going to do my best to not repeat what counsel was

10     just asking you about, but I may have some follow-up

11     questions in some areas that Miss Abdi had touched on.

12                   I just ask you, Mr. Cronin, good morning.

13                   A PROSPECTIVE JUROR:  Good morning.

14                   MR. MILLMAN:  Mr. Cronin, where do you

15     currently work?

16                   A PROSPECTIVE JUROR:  I'm retired.

17                   MR. MILLMAN:  When did you last work?

18                   A PROSPECTIVE JUROR:  Four years ago?

19                   MR. MILLMAN:  What was it that you did?

20                   A PROSPECTIVE JUROR:  Drove a sanitation

21     truck.

22                   MR. MILLMAN:  And would it be fair to say

23     that when you were working, from time to time you were

24     called upon to do certain things that you would rather

25     not do?

Proceedings                          259

1           A PROSPECTIVE JUROR:  Well, I was driving.  I
2      had two men in the back.  They had to do it.
3           MR. MILLMAN:  Sure, okay, fair enough.  And
4      you understand that if you are selected as a juror in
5      this case, you would be called upon to make some
6      difficult decisions?
7           A PROSPECTIVE JUROR:  Yes.
8           MR. MILLMAN:  Would you have any problem
9      doing that?
10          A PROSPECTIVE JUROR:  No.
11          MR. MILLMAN:  And can you give me your
12     assurance that you will listen very carefully to the
13     judge's instructions?
14          A PROSPECTIVE JUROR:  Yes, I will.
15          MR. MILLMAN:  And that you will follow them?
16          A PROSPECTIVE JUROR:  Yes.
17          MR. MILLMAN:  I believe you indicated in your
18     questionnaire that you worked at a hospital?
19          A PROSPECTIVE JUROR:  Wife works at a
20     hospital.
21          MR. MILLMAN:  What hospital?
22          A PROSPECTIVE JUROR:  Staten Island.
23          MR. MILLMAN:  Does she work at any unit?
24          A PROSPECTIVE JUROR:  Respiratory therapy.
25     She helps when children can't breathe.

J.H.

Proceedings                    260

1          MR. MILLMAN:  Is it exclusively children?
2          A PROSPECTIVE JUROR:  Exclusively children.
3          MR. MILLMAN:  Mr. Sheehan, Mr. Sheehan, good
4    morning.  You understand if you are selected as a
5    juror, one of the jobs that you will be called upon to
6    do is determine the facts?
7          A PROSPECTIVE JUROR:  Yes.
8          MR. MILLMAN:  And that determination is based
9    upon the evidence that you hear during the course of
10   this trial?
11         A PROSPECTIVE JUROR:  Yes.
12         MR. MILLMAN:  Is there anything about your
13   background that would prevent you from doing that in a
14   fair and impartial manner?
15         A PROSPECTIVE JUROR:  No.
16         MR. MILLMAN:  You understand that my client
17   is presumed innocent?
18         A PROSPECTIVE JUROR:  Yes.
19         MR. MILLMAN:  And can you give me your
20   assurance that you would afford him that presumption?
21         A PROSPECTIVE JUROR:  Until he is proven
22   guilty.
23         MR. MILLMAN:  Until and if he is proven
24   guilty.  And you've heard by now, of course, that one
25   of the charges is murder.  And one of the other charges

Proceedings                          261

1    is rape.  These are very serious and traumatic events,

2    and no one disputes that.  What I'm going to ask you is

3    the fact that of itself that something very serious has

4    happened and had a traumatic impact on individuals,

5    would that prevent you from being fair and impartial to

6    my client?

7              A PROSPECTIVE JUROR:  No.

8              MR. MILLMAN:  Is there anybody here who feels

9    that because of the seriousness of the allegations,

10   knowing and you will learn there's no question about it

11   that something very traumatic has happened, some very

12   bad things that happened, hearing that, is there

13   anybody here who feels that that would cause them to in

14   any way not be fair and impartial to my client?

15   Because now is the time to tell us.

16             THE COURT:  Let me give -- put it in a

17   different way.  The People must prove the guilt of the

18   defendant beyond a reasonable doubt.  That goes to each

19   and every element of the crime as well as the

20   defendant's commission thereof.

21             So that if you hear the evidence and you

22   believe that a crime was committed beyond a reasonable

23   doubt but you do have a reasonable doubt as to the

24   identity of the one who commits the crime, you must

25   acquit, because each and every element of the crime and

J.H.

1    the defendant's commission thereof was not proven

2    beyond a reasonable doubt.  Everybody understand that?

3    I'll give you that later on, but that's the law.

4                MR. MILLMAN:  Mr. Bove, as the judge just

5    indicated, the prosecution is required to prove my

6    client's guilt beyond a reasonable doubt.  If you

7    during the course of the trial, well, after the

8    evidence is in, you conclude that you suspect my client

9    may be responsible but you don't believe that the

10   prosecution has proven guilt beyond a reasonable doubt,

11   would you have any problem finding my client not guilty

12   under those circumstances?

13               A PROSPECTIVE JUROR:  No.

14               MR. MILLMAN:  Can you give me your assurance

15   that you'll hold the prosecution to that degree of

16   proof that the judge states they must be held to?

17               A PROSPECTIVE JUROR:  Yes.

18               MR. MILLMAN:  Would you have any reservations

19   in doing that?

20               A PROSPECTIVE JUROR:  No.

21               MR. MILLMAN:  Mr. Reilly, can you give me

22   your assurance that you would do that?

23               A PROSPECTIVE JUROR:  Yes.

24               MR. MILLMAN:  Mr. Harris?

25               A PROSPECTIVE JUROR:  Yes.

Proceedings                    263

1                MR. MILLMAN:  Can you give me your assurance?

2           A PROSPECTIVE JUROR:  Yes.

3                MR. MILLMAN:  Mr. Harris, you understand that

4      one of the things you're called upon to do if you are

5      selected as a juror in this case is to decide what took

6      place on a particular date and time in the past.  Do

7      you understand that?

8                A PROSPECTIVE JUROR:  Yes.

9                MR. MILLMAN:  You'll hear witnesses that

10     would will provide testimony.  Can we agree that any

11     feelings that you might have during the course of the

12     trial, they can't change the events that happened on

13     that particular day?

14                A PROSPECTIVE JUROR:  I agree with that, yes.

15                MR. MILLMAN:  Do you understand as a juror,

16     you are not to allow feelings of sympathy and

17     compassion to interfere with what you do as a juror in

18     this case?

19                A PROSPECTIVE JUROR:  Yes, I agree.

20                THE COURT:  That does not mean you're an

21     unsympathetic person.  It just means you have to decide

22     this case dispassionately.  It's as simple as that.

23                MR. MILLMAN:  And you understand that no one

24     is suggesting that you not have feelings but just

25     something we're asking that you not allow them to

1          interfere what you are doing here?

2                          A PROSPECTIVE JUROR:   Correct.

3                          MR. MILLMAN:   Can you promise me you will be

4          fair and impartial to my client?

5                          A PROSPECTIVE JUROR:   Yes.

6                          MR. MILLMAN:   Can you also promise me that

7          you will listen very closely to what the judge says

8          about sympathy?

9                          A PROSPECTIVE JUROR:   Yes.

10                         MR. MILLMAN:   Mr. Dong, understand that if

11         everybody agreed on what happened, you wouldn't be here

12         right now.   Do you have any problem with the fact that

13         the defendant has a right to contest the charges

14         against him?

15                         A PROSPECTIVE JUROR:   Yes.

16                         MR. MILLMAN:   You do have a problem or you

17         don't?

18                         A PROSPECTIVE JUROR:   No, I don't have a

19         problem.

20                         MR. MILLMAN:   And certainly we can all agree

21         that something terrible has happened, but understand

22         you are not here to decide whether or not something bad

23         happened?

24                         MS. ABDI:   Objection.

25                         THE COURT:   Well, it all depends upon whether

Proceedings                    265

1    or not you define rape and murder as bad.

2                MR. MILLMAN:  Certainly, certainly.

3                THE COURT:  So that's exactly what they are

4    supposed to do.

5                MR. MILLMAN:  Well, certainly.  I'll rephrase

6    that.

7                What I'm getting at more specifically,

8    Mr. Dong, is if you conclude that something very bad

9    has happened here but you also conclude that the

10   prosecution has not proven my client's guilt beyond a

11   reasonable doubt, would you have any problem finding my

12   client not guilty?

13               A PROSPECTIVE JUROR:  No.

14               MR. MILLMAN:  Mr. Hammond, any problem?

15               A PROSPECTIVE JUROR:  No.

16               MR. MILLMAN:  Mr. Hammond, I notice when the

17   prosecutor was talking about a moment ago, you had

18   indicated that you would have difficulty or could not

19   convict based upon the testimony of a child witness; is

20   that what you had said?

21               A PROSPECTIVE JUROR:  If the child witness

22   were the sole witness.

23               MS. ABDI:  Well, let me ask you this:  When

24   you say that, are you saying that at this point without

25   knowing whether you suspect that's how you would feel?

1          A PROSPECTIVE JUROR:  That as well as the

2     fact that I think that any sole witness is already

3     unreliable.

4              THE COURT:  I'm sorry?

5              A PROSPECTIVE JUROR:  I think a single

6     witness is already unreliable enough.  I think a child

7     witness just makes it more so.

8              MR. MILLMAN:  Let me ask you this --

9              THE COURT:  Let me ask you this:  Are you

10    married?

11             A PROSPECTIVE JUROR:  No, sir.

12             THE COURT:  Do you live with anyone?

13             A PROSPECTIVE JUROR:  I live with roommates.

14             THE COURT:  Now, do you work with anyone?

15             A PROSPECTIVE JUROR:  Yes.

16             THE COURT:  All right.  When do you go back

17    to work?

18             A PROSPECTIVE JUROR:  When do I go back to

19    work?

20             THE COURT:  Yes.

21             A PROSPECTIVE JUROR:  I suppose whenever I am

22    finished here.

23             THE COURT:  So when your coworkers say to you

24    where were you, and you say, I was on a murder trial,

25    and your coworker says, well, I don't believe that, I

J.H.

Proceedings                           267

1    only hear it from you, that's one witness.

2              A PROSPECTIVE JUROR:   Yes.

3              THE COURT:   I understand.

4              MR. MILLMAN:   Mr. Hammond, can you promise me

5    you will listen very careful to the judge's

6    instructions?

7              A PROSPECTIVE JUROR:   Yes.

8              MR. MILLMAN:   While you may feel now or be

9    skeptical about whether or not you could ultimately

10   convict based on the testimony of one witness, let me

11   ask you it this way:   In the event that one witness is

12   presented and it convinces you beyond a reasonable

13   doubt the defendant's guilt, would you be able to find

14   the defendant guilty if the witness's testimony

15   convinces you beyond a reasonable doubt?

16             A PROSPECTIVE JUROR:   It's a pretty big

17   hypothetical, but in that circumstance, yes.

18             MR. MILLMAN:   You are not saying that you

19   refuse to, you are saying without nothing more?

20             A PROSPECTIVE JUROR:   I know I would still

21   need necessarily that one witness can convince me

22   beyond a reasonable doubt.

23             MR. MILLMAN:   I also notice then again,

24   please, if you feel that you need to discuss it in

25   private, just let us know, but you had I think

J.H.

Proceedings                    268

1       indicated that you knew someone who is a victim of

2       crime.  Is that something you prefer to discuss at the

3       bench?

4                  A PROSPECTIVE JUROR:  Yes, I prefer not to

5       speak about it.

6                  MR. MILLMAN:  May we approach, your Honor?

7                  THE COURT:  Sure.

8                  (The following occurs at sidebar outside of

9       the hearing of the prospective jurors.)

10                  THE COURT:  Yes, sir?

11                  A PROSPECTIVE JUROR:  Do you want to know who

12       the victim of the crime was?

13                  MR. MILLMAN:  Sure.

14                  A PROSPECTIVE JUROR:  I have been the victim

15       of two gunpoint robberies as well as one home invasion.

16       I've known people who have been the victims of rape as

17       well as robbery although I don't think that that would

18       necessarily influence my ability to be fair and

19       balanced on this particular point.

20                  And as far as convictions, I know a few

21       people convicted of drug-related charges as well as

22       graffiti vandalism.

23                  I am not sure of the status of Evan Potts.

24       He was the fellow a couple years ago who killed the guy

25       in Long Beach, ran them over.  He was a friend of mine.

Proceedings                        269

1               THE COURT:   Who?

2               THE JUROR:   Evan Potts.

3               THE COURT:   The defendant or the victim?

4               A PROSPECTIVE JUROR:   The defendant.   And

5       that's all I can think of offhand.

6               MR. MILLMAN:   I didn't hear the part, you

7       said ran over?

8               A PROSPECTIVE JUROR:   It was kind of a big

9       story.   It was in Newsday and everything.   It was a

10      Long Beach road rage incident where he had run a fellow

11      over.

12              MR. MILLMAN:   Was there anything about that

13      that would influence what you would do here as a juror

14      in this case?

15              A PROSPECTIVE JUROR:   I don't think so.

16              MR. MILLMAN:   And as a result of the crimes

17      that you were a victim of -- first let me ask you were

18      the perpetrators ever caught in those instances?

19              A PROSPECTIVE JUROR:   No, sir.

20              MR. MILLMAN:   Has that colored your view of

21      the criminal justice system in anyway?

22              A PROSPECTIVE JUROR:   Not that in particular,

23      no.

24              MR. MILLMAN:   When you say not that in

25      particular --

Proceedings                    270

1          A PROSPECTIVE JUROR:  My own criticism, but

2     they have nothing to do with that particular

3     circumstance.

4              MR. MILLMAN:  Would those criticisms cause

5     you in any way not to be able to follow the judge's

6     instructions?

7              A PROSPECTIVE JUROR:  No.

8              MR. MILLMAN:  And not give my client a fair

9     shake here?

10             A PROSPECTIVE JUROR:  No, of course not.

11             THE COURT:  Thank you.

12             (The following takes place in open court.)

13             THE COURT:  I meant to tell you, ladies and

14    gentlemen, this is an all-purpose part, which means

15    along with this case, I have many, many other cases.

16    And during the course of this particular trial, you may

17    see me briefly speak with the lawyers on those other

18    matters.  Go ahead.

19             MR. MILLMAN:  Mr. Colaianni, I have a feeling

20    I pronounced that wrong?

21             A PROSPECTIVE JUROR:  Colaianni.

22             MR. MILLMAN:  Mr. Colaianni, I notice that

23    you indicated that you knew someone who was in law

24    offices, a lawyer or something to this effect?

25             A PROSPECTIVE JUROR:  My sister-in-law and my

1        son worked for a law firm.

2                    MR. MILLMAN:  And what kind of law did that

3        law firm practice; do you know?

4                    A PROSPECTIVE JUROR:  I believe it's real

5        estate, property.  Not criminal, I know that.

6                    MR. MILLMAN:  I take it from your answer

7        there's nothing about that that would influence you in

8        your duty?

9                    A PROSPECTIVE JUROR:  No.

10                   MR. MILLMAN:  What about law enforcement, you

11       put down that as well?

12                   A PROSPECTIVE JUROR:  My father-in-law is a

13       retired corrections.

14                   MR. MILLMAN:  And Mr. Colaianni, you

15       understand that you will be evaluating the credibility

16       of witnesses if you're selected as a juror here, and

17       can we agree that just because a witness says something

18       doesn't make it so?

19                   A PROSPECTIVE JUROR:  We agree.

20                   MR. MILLMAN:  If you believe a witness, then

21       you can conclude that it's accurate.  If you don't

22       believe that witness, you have that right as well.  Can

23       you promise me that you will scrutinize the testimony

24       of witnesses?

25                   A PROSPECTIVE JUROR:  Yes.

1          MR. MILLMAN:  Look very carefully at what

2     they say, not just during direct examination but during

3     cross-examination?

4               A PROSPECTIVE JUROR:  Yes.

5               MR. MILLMAN:  Can you give me your assurance

6     you will do that, Mr. Cronin?

7               A PROSPECTIVE JUROR:  Yes.

8               MR. MILLMAN:  Mr. Dong?

9               A PROSPECTIVE JUROR:  Yes.

10              MR. MILLMAN:  Mr. Colaianni, can we agree

11    with the fact that if someone gets on stand, takes the

12    oath and swears to tell the truth, that doesn't mean

13    that everything they say up there is the truth?

14              A PROSPECTIVE JUROR:  Yes, sir.

15              MR. MILLMAN:  And can you give me your

16    assurance that you'll evaluate the appearance, the

17    demeanor and anything else that the judge indicates you

18    may take into account in evaluating credibility?

19              A PROSPECTIVE JUROR:  Yes.

20              MR. MILLMAN:  Miss Lee, good morning.

21              A PROSPECTIVE JUROR:  Good morning.

22              MR. MILLMAN:  Miss Lee, I see that you worked

23    with an investigator or you indicated it was in

24    connection with medical malpractice claims?

25              A PROSPECTIVE JUROR:  Yes.

Proceedings                          273

1            MR. MILLMAN:  Is there anything about that

2    type of work that would influence what you do here?

3            A PROSPECTIVE JUROR:  No.

4            MR. MILLMAN:  And if you hear an investigator

5    testify, do you think that you are automatically

6    inclined to believe or disbelieve that person because

7    he is an investigator?

8            A PROSPECTIVE JUROR:  No.

9            MR. MILLMAN:  And do you understand any

10   decision you make as a juror in this case should be

11   based upon evidence?

12           A PROSPECTIVE JUROR:  Yes.

13           MR. MILLMAN:  Not the feeling that you may

14   have about the attorneys or even necessarily my client.

15   What I'm asking is you are not here to decide, do you

16   understand, whether or not you like my client or not?

17           A PROSPECTIVE JUROR:  Yes.

18           MR. MILLMAN:  You understand that.  You

19   understand that you are here to decide whether or not

20   the prosecution has proved guilt beyond a reasonable

21   doubt?

22           A PROSPECTIVE JUROR:  Yes.

23           MR. MILLMAN:  Because I'll tell you right

24   now, you know, you may hear during the course of this

25   trial things about my client or behavior that you might

Proceedings                    274

1       find objectionable.  You may hear that he was involved

2       in certain times in the use of drugs or something of

3       that nature.

4               Let me ask you this:  If you hear that and

5       even if you conclude that you don't like my client but

6       you find that the prosecution has failed to prove my

7       client's guilt beyond a reasonable doubt, would you

8       have a problem finding him not guilty?

9               A PROSPECTIVE JUROR:  No.

10              MR. MILLMAN:  Certainly you would agree with

11      me that there are people --

12              THE COURT:  I don't want to at this

13      particular time, I don't want to leave you with a half

14      thought.  What counsel said is totally correct.  But in

15      evaluating the credibility of a witness, if it comes to

16      pass that that is necessary whether or not they were

17      previously convicted of a crime is a factor upon which

18      you can consider in evaluating that person's

19      credibility.

20              A PROSPECTIVE JUROR:  I understand.

21              MR. MILLMAN:  And just as a followup to that,

22      Miss Lee, we agree that some people who never touched

23      drugs and did bad things and some people who do drugs

24      have never harmed everybody except themselves perhaps

25      in prior life, right?

 1              A PROSPECTIVE JUROR:  Yes.

 2              MR. MILLMAN:  And Miss Lee, you've heard

 3         certainly by now that my client is charged with more

 4         than one offense?

 5              A PROSPECTIVE JUROR:  Yes.

 6              MR. MILLMAN:  Would that fact in and of

 7         itself cause you to not be fair and impartial to him?

 8              A PROSPECTIVE JUROR:  No.

 9              MR. MILLMAN:  In other words, if you conclude

10         that the prosecutor proves guilt beyond a reasonable

11         doubt with respect to one of them but not with respect

12         to the other, will you decide each of those charges

13         separately based upon the evidence?

14              A PROSPECTIVE JUROR:  Yes.

15              THE COURT:  That's what you are required to

16         do.  You will be required to give separate verdicts on

17         each of the charges that I submit to you.

18              A PROSPECTIVE JUROR:  I understand.

19              MR. MILLMAN:  Miss Brown, good morning.

20              A PROSPECTIVE JUROR:  Good morning.

21              MR. MILLMAN:  Miss Brown, you understand that

22         my client is not required to testify during the course

23         of the trial?

24              A PROSPECTIVE JUROR:  I understand that.

25              MR. MILLMAN:  And it's inappropriate for me

1       to get into it any further as to the job of the judge,

2       but I can tell you he is not required to testify during

3       the course of this trial.  Now, if the judge instructs

4       you on that, would you have any problem following that?

5                   A PROSPECTIVE JUROR:  No.

6                   MR. MILLMAN:  In other words, if the judge

7       instructs you that the defendant's not required to

8       testify during this trial and you may not use that

9       against him, any problem following that?

10                  A PROSPECTIVE JUROR:  No.

11                  MR. MILLMAN:  Any problem following that,

12      Mr. Cronin?

13                  A PROSPECTIVE JUROR:  No.

14                  MR. MILLMAN:  Mr. Hammond?

15                  A PROSPECTIVE JUROR:  No.

16                  MR. MILLMAN:  Miss Chiaramonte, am I saying

17      that correctly?

18                  A PROSPECTIVE JUROR:  Close.

19                  MR. MILLMAN:  Miss Chiaramonte, if the judge

20      instructs you my client's not required to testify and

21      you may not use that against him if he chooses not to

22      testify, would you have any problem following that?

23                  A PROSPECTIVE JUROR:  No.

24                  MR. MILLMAN:  Is there any part of that that

25      you might say during course of the trial, well, I would

J.H.

Proceedings                    277

1     like to hear what he has to say and he didn't testify

2     that it might interfere with what you do and you might

3     use it against him?

4          A PROSPECTIVE JUROR:  No.

5          MR. MILLMAN:  Is there anybody here who feels

6     that way?  Because now is the time to tell us.  If

7     there's anybody here who feels in their gut they might

8     use it against my client or draw a negative inference

9     against him if he chooses not to testify --

10         THE COURT:  Would you like me repeat to this

11    particular group --

12         MR. MILLMAN:  Yes.

13         THE COURT:  -- the instruction I gave on

14    Friday?  Again, I'm using the future tense rather than

15    the past tense.  The defendant may not testify in this

16    case.  I charge you that the fact that the defendant

17    may not testify is not a factor from which any

18    inference unfavorable to the defendant may be drawn.

19         MR. MILLMAN:  Thank you, your Honor.

20    Mr. Mormino, good morning.

21         A PROSPECTIVE JUROR:  Good morning.

22         MR. MILLMAN:  Mr. Mormino, I notice that you

23    indicated that you knew individuals in law enforcement?

24         A PROSPECTIVE JUROR:  Yes.

25         MR. MILLMAN:  Can you tell us about that a

Proceedings                            278

1     little bit?

2                    A PROSPECTIVE JUROR:  My brother was a

3     retired detective.  I served as a fire investigator for

4     New York City Fire Department.  I dealt with them from

5     time to time as an insurance investigator with an

6     insurance company.

7                    MR. MILLMAN:  And over years, did you talk to

8     your brother about his work on a regular basis?

9                    A PROSPECTIVE JUROR:  Sometimes.

10                   MR. MILLMAN:  And do you know if any of his

11    work involved situations in which he dealt with

12    convictions of sexual abuse?

13                   A PROSPECTIVE JUROR:  Not anything about that

14    experience.

15                   MR. MILLMAN:  Or knowing people that have

16    experience would interfere with what do you here?

17                   A PROSPECTIVE JUROR:  No.

18                   MR. MILLMAN:  Of course, that has nothing to

19    do with this and you understand that?

20                   A PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  Start winding it down.

22                   MR. MILLMAN:  Certainly, your Honor.  Thank

23    you.

24                   Now, ladies and gentlemen, if you're selected

25    as jurors, you would be taking on very serious

J.H.

Proceedings                      279

1       responsibilities.  I think you all know that.  If the

2       prosecutor proves guilt beyond a reasonable doubt, the

3       judge will tell you the proper verdict is guilty.  If

4       the prosecutor fails in any way to prove guilt beyond a

5       reasonable doubt, it will equally be your

6       responsibility, your obligation to find my client not

7       guilty, and that's a responsibility I ask you to accept

8       without hesitation.  Because if you can't follow that

9       responsibility under those circumstances, you need to

10      let us know now.  Now is the time to tell us, not

11      tomorrow, not in your verdict, but now.

12                   Is there anybody here -- yes, sir?

13                   A PROSPECTIVE JUROR:  I have some difficulty

14      following --

15                   THE COURT:  I'm sorry?

16                   A PROSPECTIVE JUROR:  Some difficulty

17      following the past.  I have some difficulty to

18      understand that.

19                   THE COURT:  Are you saying that you don't

20      fully understand conversational English?

21                   A PROSPECTIVE JUROR:  I can understand

22      conversation but some people conversation, I can't

23      follow.  When he ask something, I can't follow.

24                   THE COURT:  Do you read English?

25                   A PROSPECTIVE JUROR:  Excuse me?

1              THE COURT:  Do you read English?

2              A PROSPECTIVE JUROR:  Yes, I read English, I

3      write English.

4              THE COURT:  And do you write English?  Do you

5      write English?

6              A PROSPECTIVE JUROR:  Only thing I can't --

7      sometimes I can't grasp it, that's it.

8              THE COURT:  Well, I don't know the degree of

9      handicap that you may have, and that's what I'm trying

10     to get at right now.  If you don't understand a word

11     here and there, that may not disqualify you.  But you

12     are obligated to understand the testimony.  If you

13     can't understand the testimony, you shouldn't be here.

14             A PROSPECTIVE JUROR:  Yes, sir.

15             THE COURT:  Go ahead, counsel.

16             MR. MILLMAN:  Thank you.  In closing, I think

17     you all know that we are here just trying to find out

18     that you can be fair and impartial.  And if there's

19     anything that anybody knows that would prevent you from

20     doing so, I again just ask that you let us know.

21             All right, thank you for your attention.

22             THE COURT:  Whenever you are ready, counsel.

23             (The following occurs at sidebar outside of

24     the hearing of the prospective jurors.)

25             THE CLERK:  People have used three and

Proceedings                                    281

1     defense have used four out of 20.

2              THE COURT:  People, any challenges for cause

3     as to the entire panel?

4              MS. ABDI:  Number one, Mr. Hammond.

5              THE COURT:  Defendant?

6              MR. MILLMAN:  Um, I certainly did express

7     reservation about the one witness, but I do think upon

8     questioning he indicated that he would follow your

9     instructions, and I perceived what he was saying as

10    more along the lines that right now, I question whether

11    or not I could but if a witness convinces me beyond a

12    reasonable doubt of the allegations, he could follow

13    the judge's instruction.

14             THE COURT:  He said two things.  He said

15    basically he would have tremendous reservations in

16    convicting on the testimony of one witness.  In

17    addition to that, he said a child witness by its very,

18    very nature would be unreliable.  The challenge for

19    cause is granted.

20             MS. ABDI:  I also have another challenge for

21    cause, number eight, Mr. Palackathadom.  He indicated

22    that he was --

23             THE COURT:  How do you feel about that?

24             MR. MILLMAN:  Candidly, it was close, but I

25    would like to ask him if we can further inquire as to

J.H.

1        one question I actually wanted to ask him had to

2        whether or not to this moment he's understood most of

3        what's going on.  I don't know if it was directly asked

4        of him.  It's close.  I would like to inquire more.

5                    THE COURT:  I am not going to call anybody up

6        for any further questioning.  I'll rule on the

7        challenge for cause.  What's your position?  He said he

8        doesn't completely understand conversational English.

9                    MR. MILLMAN:  I don't know that the challenge

10       for cause has been made out.  He's indicated that he

11       understood most what's going on.  He say he said there

12       were some concepts that he didn't grasp.  I'm objecting

13       to the challenge for cause.

14                    THE COURT:  At this particular time, the

15       challenge for cause is denied.

16                    MS. ABDI:  Judge, can I just -- he said

17       specifically when people talk quickly, he misses what

18       they say.  And he was saying that in reference to

19       Mr. Millman talking.  For a murder trial, if you miss

20       any concepts, that's too much.  And he said

21       specifically that he could not get -- especially when

22       people are talking quickly, he could not get what they

23       were saying, meaning not that he couldn't hear, that he

24       couldn't understand.

25                    THE COURT:  Well, that's what peremptory

1    challenges are for.  A challenge for cause is denied.

2              People, peremptory number two?

3              MS. ABDI:  You mean for --

4              THE CLERK:  For the seat.

5              MS. ABDI:  No.

6              MR. MILLMAN:  No.

7              THE COURT:  So number two is sworn.

8              People, peremptory number three?

9              THE CLERK:  Bove.

10             MS. ABDI:  Yes.

11             THE COURT:  People, peremptory number four?

12             MS. ABDI:  No.

13             THE COURT:  Defendant?

14             MR. MILLMAN:  Yes.

15             THE COURT:  People, peremptory number five?

16             MS. ABDI:  No.

17             THE COURT:  Defendant?

18             MR. MILLMAN:  Yes.

19             THE COURT:  People, peremptory number six?

20             MS. ABDI:  Yes.

21             MR. MILLMAN:  I just wanted to ask just

22   pursuant to Batson, a neutral reason, I think there's a

23   racially neutral reason.  She is black.  I know she is

24   not the same.  I still think it applies.

25             THE COURT:  Do you wish to give a racially

Proceedings                    284

1       neutral explanation for this peremptory?

2                    MS. ABDI:  Yes, your Honor.  She does state

3       that she has people who were convicted of a crime, a

4       cousin in the family.  She said it wouldn't affect her

5       to be fair and impartial.  That is my reason for the

6       peremptory challenge.

7                    THE COURT:  Okay.  People, peremptory number

8       seven?

9                    MS. ABDI:  No.

10                    THE COURT:  Defendant?

11                    MR. MILLMAN:  Yes.

12                    THE COURT:  People, peremptory number eight?

13                    MS. ABDI:  Yes.

14                    THE COURT:  People, peremptory number nine?

15                    MS. ABDI:  No.

16                    THE COURT:  Defendant?

17                    MR. MILLMAN:  Yes.

18                    THE COURT:  People, peremptory number 10?

19                    MS. ABDI:  No.

20                    THE COURT:  Defendant?

21                    MR. MILLMAN:  No.

22                    THE COURT:  People, peremptory number 11?

23                    MS. ABDI:  No.

24                    MR. MILLMAN:  Yes.

25                    THE COURT:  People, peremptory number 12?

Proceedings                    285

1             MS. ABDI:  No.

2             MR. MILLMAN:  Yes.

3             THE COURT:  People, peremptory number 13?

4             MS. ABDI:  Sorry, Judge.  No.

5             THE COURT:  People, peremptory number 13?

6             MS. ABDI:  No.

7             MR. MILLMAN:  Yes.

8             THE COURT:  People, peremptory number 14?

9             MS. ABDI:  No.

10            MR. MILLMAN:  No.

11            THE COURT:  Okay.  With regard to this

12    particular Batson issue, the record should reflect that

13    juror number 14 which no one challenged is

14    Afro-American.

15            (The following takes place in open court.)

16            THE CLERK:  Jurors, jurors in the box, if you

17    do not hear your name, you can gather your belongings

18    and step outside with the officers.  They will give you

19    instructions as to where to go.

20            For juror number seven, John Dong.

21            THE COURT:  Just one second.  Okay.  If you

22    do not hear your name, stay where you are.

23            MR. MILLMAN:  Juror number eight, Walter

24    Harris.

25            THE COURT:  I said that wrong.  The people

J.H.

Proceedings                          286

1       who we are calling out now are selected.  Mr. Dong,

2       Mr. Harris.

3                    MR. MILLMAN:  And Miss Washington, Dorothy

4       Washington.  The rest of the jurors who were not

5       called, please rise, take your belongings and step

6       outside with the officer.

7                    (Whereupon, the prospective jurors were

8       excused.)

9                    THE CLERK:  Are the remaining jurors

10      satisfactory to both sides?

11                   MS. ABDI:  Yes.

12                   MR. MILLMAN:  Yes.

13                   THE CLERK:  Ladies and gentlemen, if you

14      would please rise, raise your right hands.  Do you and

15      each of you solemnly swear that you will try this

16      action in a just and impartial manner to the best of

17      your judgment and render a verdict according to the law

18      and the evidence so help you God?

19                   Whereupon, the jurors responded

20      affirmatively.)

21                   THE CLERK:  Thank you.

22                   THE COURT:  Ladies and gentlemen, as you

23      already know, we have six sworn jurors.  You three make

24      nine sworn jurors.  We have to get three additional

25      jurors and alternates.  So you're excused until

1    tomorrow at 9:30.  And I hope we'll have the entire

2    jury by then when we will start with the trial in

3    chief.

4              (Whereupon, the jurors were excused.)

5              THE COURT:  All right, ladies and gentlemen,

6    we will resume jury selection in about 15 minutes.

7    We'll take our morning break.

8              THE CLERK:  For the record, so far the

9    defense has used 11 perempts, People are at six.

10             MR. MILLMAN:  Your Honor, we are going to

11   continue at 2 with the jury selection?

12             THE COURT:  We are going to continue until

13   about quarter to 1.

14             MR. MILLMAN:  Until a quarter to 1?

15             THE COURT:  Yes.  I have a couple of matters

16   to attend to, but we have a little time this morning.

17             (A recess was taken.)

18             THE CLERK:  Case on trial, all parties

19   present, including defendant, Spanish interpreter.

20   Jurors are not in the courtroom.

21             (Whereupon, the prospective jurors enter the

22   courtroom.)

23             THE CLERK:  Once again, if you hear your name

24   called, please gather your belongings and step up front

25   to the officer.

Proceedings                    288

1    Brian Armogan, last name A-R-M-O-G-A-N, seat

2    number one.

3    Charles Price, seat number two, last name is

4    P-R-I-C-E.

5    Seat number three, Patricia Aitagan, last

6    name is A-I-T-A-G-A-N, seat number three.

7    Seat number four, Mitchell Kramer,

8    K-R-A-M-E-R, seat number four.

9    Seat number five, Russell Youmans, last name

10   Y-O-U-M-A-N-S, seat number five.

11   Seat number six, S. J. Vernardo, last name is

12   V-E-R-N-A-R-D-O, number six.

13   Seat number seven, Joseph Micelotta,

14   M-I-C-E-L-O-T-T-A, seat number seven.

15   Seat number eight, Esther Frederick, last

16   name F-R-E-D-E-R-I-C-K, seat eight.

17   Seat number nine, Arson Arachelian, last name

18   A-R-A-C-H-E-L-I-A-N, seat number nine.

19   Seat 10, Michele White.

20   Seat 11, Zachary Pollan, P-O-L-L-A-N, seat

21   11.

22   Seat number 12, Tyler Peck, P-E-C-K.

23   Seat number 13, Diana Marchini,

24   M-A-R-C-H-I-N-I.

25   THE COURT:  All right, ladies and gentlemen,

J.H.

1    the prospective jurors in the audience are the ones

2    that came here on Friday and gave excuses.  The

3    prospective jurors in the box were here before, and

4    they have already received my preliminary instructions.

5    You have to still receive some preliminary instructions

6    by me.  Consequently, if you want to stay, you can.  If

7    you want to come back at 2 o'clock, you can also do

8    that, because I'll be working with these prospective

9    jurors for the next half hour.  You are not excused.

10   Stay or come back at 2 o'clock.

11             Okay, you've been through this two or three

12   times, so it's old hat to you.  Does anyone want to see

13   me in private?  Okay.  Okay.

14             And would anyone here not follow the

15   instruction of a police officer that I gave you?  No

16   one raises their hand.

17             And anyone here who indicates that they have

18   a friend or someone who has been convicted of a crime

19   or a victim of a crime, would that carry over into this

20   case so that you could not be impartial, anyone here?

21             Okay, I'm going to have you start right off,

22   Miss Abdi, as soon as the People come up to the bench

23   that raised their hand.  I believe number four raised

24   his hand.

25             (The following occurs at sidebar outside of

Proceedings                                      290

1        the hearing of the prospective jurors.)

2                    A PROSPECTIVE JUROR:   I spoke to you on

3        Thursday.   I own my own business.   You asked me to look

4        into it a little bit.   I have to remove all my

5        customers by the end of December according to the Town

6        of Oyster Bay.

7                    THE COURT:   People?

8                    MS. ABDI:   Consent.

9                    A PROSPECTIVE JUROR:   I have a meeting in

10       January.

11                   THE COURT:   Just one second.

12                   MR. MILLMAN:   Consent.

13                   THE COURT:   You are excused by consent.

14                   A PROSPECTIVE JUROR:   Thank you.

15                   (The following takes place in open court.)

16                   THE COURT:   I think another juror or two

17       raised their hand.   Come on up here, sir.

18                   (The following occurs at sidebar outside of

19       the hearing of the prospective jurors.)

20                   A PROSPECTIVE JUROR:   Hi.   I just want to say

21       it sounds maybe foolish, but all the things that I have

22       read, it's -- the credibility of eyewitness testimony

23       is even in the New York Times, and so I rehearsed this.

24       It doesn't come out very well.

25                   THE COURT:   The question as to the degree of

1    credibility that's placed upon eyewitness testimony of

2    people who are unknown to each other is a matter which

3    is talked about in the juris prudence.  I don't know

4    what you are telling me.  Does that mean that you could

5    not evaluate the testimony of an eyewitness and

6    determine their credibility?  Is that what you are

7    saying?

8                   A PROSPECTIVE JUROR:  I'm saying that I

9    think -- I think all is all eyewitnesses are telling

10   what they think they saw and are credible in their

11   enunciation of that, but I don't know that I could

12   convict only on having an eyewitness testify.

13                  THE COURT:  I don't know whether or not you

14   know, but in our business, a witness is telling the

15   truth when there is a consistency between the mental

16   impression and the spoken word and the mental

17   impression is accurate.  A witness is mistaken when

18   there's a consistency between the mental impression and

19   the spoken word but if for some reason the mental

20   impression is faulty.

21                  Are you saying that because in your mind a

22   person who is an eyewitness may be faulty, you couldn't

23   evaluate that testimony?

24                  A PROSPECTIVE JUROR:  I think that is what I

25   am saying, yes.

Proceedings                          292

1              THE COURT:  People?

2              MS. ABDI:  Consent.

3              MR. MILLMAN:  Consent.

4              THE COURT:  You're excused.

5              (Whereupon, the prospective juror is

6         excused.)

7              (The following takes place in open court.)

8              THE COURT:  Who else?  Come on up here.

9              (The following occurs at sidebar outside of

10        the hearing of the prospective jurors.)

11             A PROSPECTIVE JUROR:  Good afternoon.  Um, as

12        a pediatrician and a general advocate for all children,

13        the nature of these crimes challenges me because I work

14        closely with law enforcement as well as child advocates

15        and served on a number of cases on behalf of my

16        patients, the pediatric population to defend them and

17        put them in safe environments.  So I have difficulty.

18        I can follow testimony of a police officer and the

19        instructions you give.  It's just a challenge that

20        would be in my profession if there's even a suspicion

21        that there's a concern of harm or neglect to a child,

22        we don't go beyond a reasonable doubt to call Child

23        Protective Services.

24             THE COURT:  I would hope that's true.  You're

25        a mandated reporter.  You have to.

Proceedings                    293

1              A PROSPECTIVE JUROR:  Exactly, exactly.

2              THE COURT:  So you had a little more

3      experience than the average prospective juror dealing

4      with abused and neglected children under the Family

5      Court Act?

6              A PROSPECTIVE JUROR:  Yes.

7              THE COURT:  What does that mean in this

8      particular case?

9              A PROSPECTIVE JUROR:  That means that for me,

10     since usually my normal role as a physician, it would

11     be a challenge for me to think beyond a reasonable

12     doubt that a child was telling me if they disclose to

13     me or if a law enforcement disclosed to me that there's

14     evidence or possible evidence of harm, it would be

15     difficult for me not to believe them or not to just

16     take at face value.  I wouldn't challenge their

17     credibility based on age or experience.  I would

18     just -- usually in my profession, we report it to Child

19     Protective Services, and someone else does the

20     investigation.

21             THE COURT:  You're a doctor?

22             A PROSPECTIVE JUROR:  Yes.

23             THE COURT:  You are not an investigator?

24             A PROSPECTIVE JUROR:  Exactly.

25             THE COURT:  But that's -- but here you're a

Proceedings                              294

1       fact finder.  What do you want to do in this particular

2       case?

3                    A PROSPECTIVE JUROR:  I would say that it

4       would be difficult for me to --

5                    THE COURT:  It's difficult for everybody.  I

6       don't know what you mean by difficult.  Can you do it

7       or can't you do it?

8                    A PROSPECTIVE JUROR:  I cannot do it.

9                    THE COURT:  People?

10                   MS. ABDI:  Consent.

11                   MR. MILLMAN:  Consent.

12                   THE COURT:  You're excused.  Thank you.

13                   (Whereupon, the prospective juror was

14      excused.)

15                   (The following takes place in open court.)

16                   THE COURT:  I thought I saw one more hand

17      raised.  Come on up here.  I guess it's two hands

18      raised.  Okay.

19                   (The following occurs at sidebar outside of

20      the hearing of the prospective jurors.)

21                   A PROSPECTIVE JUROR:  Just a question.  Are

22      we allowed to be excused if a member of the family dies

23      to go to a funeral if it happens to fall on a court

24      date?

25                   THE COURT:  We want to avoid that which might

1          interrupt this trial.  So if you have a family member

2          in extremis, I would like to know about that.  However,

3          if obviously if we're in this particular trial and if

4          your mother suddenly drops dead of a heart attack,

5          we'll either do one of two things.  We'll either put an

6          alternate in your place or let you go to the funeral.

7          Now, do you have someone who is in extremis?

8                    A PROSPECTIVE JUROR:  Yeah.  My 96 year old

9          grandmother is having surgery today.  They have to

10         amputate.  We don't know what the results are going to

11         be.  I will find out later today or tomorrow what

12         happens.

13                   THE COURT:  You want to be excused?

14                   A PROSPECTIVE JUROR:  Yeah.  I mean I just

15         think it's the end obviously because she's 96 years

16         old.

17                   THE COURT:  And she just went through a major

18         operation?

19                   A PROSPECTIVE JUROR:  This afternoon.

20                   THE COURT:  People?

21                   MS. ABDI:  Consent.

22                   MR. MILLMAN:  Consent, your Honor.

23                   THE COURT:  You're excused.

24                   (Whereupon, the prospective juror is

25         excused.)

Proceedings                              296

1          (The following takes place in open court.)

2               THE COURT:  Anyone else?

3               (The following occurs at sidebar outside of

4     the hearing of the prospective jurors.)

5               A PROSPECTIVE JUROR:  How are you?  I first

6     want to say I understand the responsibility to be here.

7     However, I'm new to the work force.  I'm a recent

8     college graduate, and I'm up for a promotion and in

9     competition with three other people, and this is

10    already starting to almost interfere with that.

11              THE COURT:  People?

12              MS. ABDI:  Consent.

13              MR. MILLMAN:  Consent.

14              THE COURT:  You're excused.

15              A PROSPECTIVE JUROR:  Thank you.  I

16    appreciate it.

17              (Whereupon, the prospective juror was

18    excused.)

19              (The following takes place in open court.)

20              THE COURT:  There is remaining from the first

21    panel eight prospective jurors.  I don't want to work

22    with just eight.  So we'll fill the box and work with

23    the 14 at 2 o'clock and have these jurors arrange

24    themselves so that the one and number seven is placed

25    in number four after 2 o'clock and follow that

1       procedure.   We will see you at 2 o'clock.

2                        (Whereupon, a luncheon recess was taken.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

Proceedings                    298

1  A F T E R N O O N   S E S S I O N

2           THE CLERK:  Case on trial continues, People

3      of the State of New York versus Ulises Bonilla,

4      Indictment 202N of 2011.  All parties present including

5      defendant and Spanish interpreter.  There are no jurors

6      present.

7           THE COURT:  Anything before we bring in the

8      jury?

9           MS. ABDI:  No.

10           MR. MILLMAN:  No, your Honor.

11           THE COURT:  Let's bring them in.

12           (Whereupon, the prospective jurors enter the

13      courtroom.)

14           THE COURT:  All right, ladies and gentlemen,

15      as you can see, and as I had told you before, this is a

16      criminal case.  It involves as top charges murder and

17      rape.

18           The People are represented by Kathleen Rice.

19      Zeena Abdi will be presenting the case for the People.

20           MS. ABDI:  Good afternoon.

21           THE COURT:  The defendant is represented by

22      Daniel Millman.  I think we went through this somewhat

23      before on yesterday.

24           MR. MILLMAN:  Good afternoon.

25           THE COURT:  We went over the time schedule.

Proceedings                           299

1        But for the new people that are here in the audience,

2        just let me give you a few comments before we start.

3        The case was brought into this court by means of an

4        indictment.  An indictment is simply an accusation, and

5        it is no way evidence of the allegations it contains.

6        The defendant has pled not guilty to the indictment.

7        The People have the burden of proving regarding each

8        and every element of the crime charged in the

9        indictment.

10             The defendant does not have to prove

11       anything.  The defendant is presumed to be innocent of

12       the charges against him.  That presumption of innocence

13       stays with him throughout the trial until a jury

14       determines otherwise if they do so.  The presumption of

15       innocence is a rule of law.  One year ago, if a

16       defendant was tried and acquitted, he was presumed

17       innocent.  One year ago, if a defendant was tried and

18       convicted, he was still presumed innocent.  It is a

19       rule of law applicable to each criminal case.

20             Your verdict will be guilty or not guilty.

21       That means he's proven guilty or not proven guilty.

22       There is no such thing as a verdict of innocence in the

23       State of New York.  It's proven guilty or not proven

24       guilty.

25             Now, we are about to continue a selection

J.H.

Proceedings                              300

1      process that was started a couple days ago.  We have

2      eight prospective jurors that have heard these

3      instructions before, and now we will fill the box with

4      six more.

5                  THE CLERK:  Jurors, if you hear your name

6      called, please come up forward, follow the instructions

7      of the officer, and then bring your belongings with

8      you.

9                  Seat number nine, Catherine Meade, last name

10     is M-E-A-D-E, seat number nine.

11                 Seat number 10, Stella Miller, last name

12     M-I-L-L-E-R, seat 10.

13                 Seat 11, Jean Reid, R-E-I-D, seat number 11.

14                 Seat 12, Jeffrey Carleton, last name

15     C-A-R-L-E-T-O-N, seat 12.

16                 Seat 13, Arthur Amador, last name

17     A-M-A-D-O-R, seat 13.

18                 And seat 14, Theresa Passaretti,

19     P-A-S-S-A-R-E-T-T-I, seat 14.

20                 THE COURT:  All right, with regard to the

21     last six people, I'm going to ask you a general

22     question.  There will be police officers who testify in

23     this particular case.  I don't know whether I'm being

24     repetitive, but if I am, for the sake of clarity, I'll

25     be a little repetitive.  You are not to give the

1        testimony of a police officer any greater or lesser

2        weight simply because he or she is a police officer.

3        That does not mean you have to discount job experience

4        in evaluating the testimony of a police officer.

5                Will each of you accept that instruction?

6                (Whereupon, the prospective jurors answered

7        in the affirmative.)

8                THE COURT:  As I said, you evaluate the

9        witnesses while they are on the stand.  As an analogy,

10       if you wanted to find the developmental level of an 11

11       year old, you might be more persuaded if you heard the

12       testimony of a fifth or a sixth grade teacher rather

13       than a house painter.  However, you never know, that

14       house painter could have been a little league coach for

15       20 years, and he's charged with the responsibility of

16       getting relative homogeneous groups.  And if one 11

17       year old is too small or one 11 year old is perhaps too

18       large, it may be unsafe for his sake and the rest of

19       the team.  So you gather your experience in a number of

20       ways.

21               But with regard to that particular

22       instruction with regard to a police officer, I think

23       it's relatively clear.  I don't know what you are

24       doing, but I don't like it.

25               A PROSPECTIVE JUROR:  Me?

J.H.

Proceedings                              302

1          THE COURT:  No, the person behind you.

2          A PROSPECTIVE JUROR:  Me?

3          THE COURT:  Yes.  You pay attention or get

4     outside.

5          Also, a number of you have checked off

6     victims of a crime, convicted of a crime and things

7     like that.  All I want to know at this particular time

8     would those instances in your past carry over to this

9     case so that you could not be fair and impartial in

10    this case?  Yes, ma'am?

11         A PROSPECTIVE JUROR:  It may.

12         THE COURT:  Come on up.  We'll talk about it.

13         (The following occurs at sidebar outside of

14    the hearing of the prospective jurors.)

15         A PROSPECTIVE JUROR:  I, myself, was the

16    victim of a robbery.  But I have cousin who was a

17    murder victim, and that murder was never solved.

18         THE COURT:  Well, that's obviously -- I'm

19    sure that that has left a lot of nonclosure in you.

20    I'm sure you will never get over it.  But the question

21    is will that incident affect your analysis of this

22    particular case?

23         A PROSPECTIVE JUROR:  I'm not sure.

24         THE COURT:  Well, how might you be sure?

25    What do you mean by that?

Proceedings                    303

1           A PROSPECTIVE JUROR:  I just don't know if

2     two -- if I could sit here and judge him fairly.  I

3     still have a lot of anger at the fact that they never

4     found the person who did this.

5           THE COURT:  There's nothing wrong with that.

6     You should have.

7           A PROSPECTIVE JUROR:  Yes.

8           THE COURT:  So the question is if the People

9     fail to prove the guilt of the defendant beyond a

10    reasonable doubt, that's their standard, would you say,

11    well, he may be guilty, and therefore, I'm going to

12    convict him even though --

13          A PROSPECTIVE JUROR:  I would hope that I

14    wouldn't, but I'm not sure.

15          THE COURT:  People?

16          MS. ABDI:  I would consent, Judge.

17          MR. MILLMAN:  I would like to just inquire

18    further if I could.  It sounds like you have some real

19    reservations as to whether or not you could fair to my

20    client; would that be fair to say?

21          A PROSPECTIVE JUROR:  Yes.

22          MR. MILLMAN:  And you think that as you

23    listen to the testimony of some individual, it could

24    interfere what you do here?

25          A PROSPECTIVE JUROR:  Yes.

J.H.

Proceedings                         304

1              MR. MILLMAN:   Judge, I would ask that she be

2       excused.

3              THE COURT:   Everybody agrees.

4              MR. MILLMAN:   She said consent?   I didn't

5       hear that.   I'm sorry.

6              THE COURT:   Thank you for your candor, ma'am.

7              (The prospective juror was excused.)

8              (The following takes place in open court.)

9              THE COURT:   Are you hesitating?

10             A PROSPECTIVE JUROR:   Yes.

11             THE COURT:   Come on up.

12             (The following occurs at sidebar outside of

13      the hearing of the prospective jurors.)

14             A PROSPECTIVE JUROR:   I received results from

15      a mammogram, and I have something in my left breast,

16      and I have to go to breast surgeon next Tuesday.

17             THE COURT:   I hope everything is -- works out

18      all right for you, and I assume no one has an

19      objection.   People?

20             MS. ABDI:   No.

21             MR. MILLMAN:   No, consent.

22             A PROSPECTIVE JUROR:   Thank you.

23             (Whereupon, the prospective juror was

24      excused.)

25             (The following takes place in open court.)

Proceedings                    305

1           THE CLERK:  Seat number nine, Cleary, Keith
2     Cleary, C-L-E-A-R-Y, seat nine.
3           And for seat 14, Joseph Werner, last name
4     W-E-R-N-E-R, seat 14.
5           THE COURT:  Would you gentlemen have any
6     difficulty in following the instructions that I
7     previously gave?
8           A PROSPECTIVE JUROR:  No.
9           THE COURT:  Do you want to talk to me in
10    private?
11          A PROSPECTIVE JUROR:  No.
12          THE COURT:  You want to?
13          A PROSPECTIVE JUROR:  Yes.
14          THE COURT:  You weren't among those group
15    that I asked before?
16          A PROSPECTIVE JUROR:  I thought it was just
17    about a crime.
18          THE COURT:  All right, come on up sidebar.
19          (The following occurs at sidebar outside of
20    the hearing of the prospective jurors.)
21          A PROSPECTIVE JUROR:  I had requested in
22    private I had meetings with a government agency going
23    forward, and I promised the Judge I would look into
24    clearing those.
25          THE COURT:  What was your result?

Proceedings                         306

1       A PROSPECTIVE JUROR:   I cleared all of them.

2    I would like to go this Friday, if possible.  If I

3    can't, I have set up an 11:30 conference call.  That

4    would be my only commitment that I have.

5       THE COURT:  How long would that conference

6    call the last?

7       A PROSPECTIVE JUROR:   No more than an hour.

8    But it's with a lot of government officials, and it's

9    hard for me to reschedule it, from 11:30 to 12:30.

10   Other than that, I've cleared everything.  So I would

11   be happy to serve if I was picked.  If I could possibly

12   have that one-hour slot on Friday, that would be my

13   only request.

14       THE COURT:  Can you do it at 12?

15       A PROSPECTIVE JUROR:   I could try.

16       THE COURT:  Okay.  I'll -- I have some more

17   calendars.  Remind me on -- other cases.  Remind me,

18   and we'll make an effort for you.

19       (The following takes place in open court.)

20       THE COURT:  Does everybody understand the

21   concept that you must base your verdict on the evidence

22   and the evidence alone coupled with the instructions of

23   the Court?

24       That being said, if I were asked -- if you

25   were asked by me to give a verdict right now, logically

J.H.

1    it stands to follow it must be not guilty, because you

2    haven't heard one piece of evidence as yet.  Does

3    everybody understand that?

4            (Whereupon, the prospective jurors answered

5    in the affirmative.)

6            THE COURT:  People, go ahead.

7            MS. ABDI:  Thank you, Judge.  Good afternoon,

8    ladies and gentlemen.  My name is Zeena Abdi, and I

9    think all of were you sitting in the back earlier.  But

10   I just want to introduce myself again.  My name is

11   Zeena Abdi.  I'm the prosecutor who is assigned to

12   prosecute the defendant, Ulises Bonilla, for the crimes

13   with which he is charged.

14           I'm going to be asking you questions.  They

15   are designed really for you to look inside yourself and

16   figure out whether or not you would be fair and

17   impartial based on the facts and circumstances

18   surrounding this case.

19           And I know I think you were all in the back,

20   right?  So you might have heard some of this earlier.

21   So I'm not going to go as much in depth as I did

22   before, but you know kind of what I'm asking you about.

23   So I'm going to try to keep it a little bit shorter

24   this time.

25           Mr. Amador, what do you do for living, sir?

Proceedings                           308

1          A PROSPECTIVE JUROR:  The airport.

2          THE COURT:  And how long have you been doing

3     that?

4          A PROSPECTIVE JUROR:  About five years.

5          MS. ABDI:  Can you agree with the concept

6     that what somebody says on the witness stand is

7     evidence?  You have to say yes or no.

8          A PROSPECTIVE JUROR:  Yes.

9          MS. ABDI:  Now, can you convict somebody

10    based on testimonial evidence alone if you believed a

11    witness beyond a reasonable doubt?

12          A PROSPECTIVE JUROR:  Yes.

13          MS. ABDI:  And once again, ladies and

14    gentlemen, this is the time really where I ask you to

15    be honest with these things.  Even if you know the line

16    before you everyone has said yes, yes, yes, if you

17    really feel no, no, no, that this is kind of the time

18    to say it.

19          Now, Mr. Armogan, what if a witness was a

20    child, you know, age 10 or 11, could you convict the

21    defendant based on the testimony of that witness alone

22    if you believed that witness beyond a reasonable doubt?

23          A PROSPECTIVE JUROR:  Yes.

24          MS. ABDI:  You could do that?

25          A PROSPECTIVE JUROR:  Yes.

Proceedings                              309

1              MS. ABDI:  Do children witnesses start off

2       with any strikes against them in your mind because of

3       their age?

4              A PROSPECTIVE JUROR:  No.

5              MS. ABDI:  Now, do you know anyone who has

6       been the victim of a crime or anyone who has been

7       accused or convicted of a crime?

8              A PROSPECTIVE JUROR:  No.

9              MS. ABDI:  Mr. Price?

10             A PROSPECTIVE JUROR:  Yes.

11             MS. ABDI:  Do you know anyone who has been

12      the victim of a crime or accused of a crime?

13             A PROSPECTIVE JUROR:  Accused.

14             MS. ABDI:  Who was that?

15             A PROSPECTIVE JUROR:  My nephew.

16             MS. ABDI:  And was that in Nassau County?

17             A PROSPECTIVE JUROR:  No, New Jersey.

18             MS. ABDI:  What happened with that --

19             A PROSPECTIVE JUROR:  A drug related.

20             MS. ABDI:  Was anyone -- was your nephew ever

21      prosecuted for that?

22             A PROSPECTIVE JUROR:  It's pending trial.

23             MS. ABDI:  But this is in New Jersey?

24             A PROSPECTIVE JUROR:  Yes.

25             MS. ABDI:  And it's a drug-related offense?

J.H.

Proceedings                          310

1          A PROSPECTIVE JUROR:  Yes.

2          MS. ABDI:  Anything about that experience

3     that would leave you not to be fair in this case?

4          A PROSPECTIVE JUROR:  No.

5          MS. ABDI:  Do you have any -- obviously it's

6     not a pleasant experience for your nephew to be

7     arrested.  But do you have any negative feelings

8     towards the police or any of the prosecuting agencies

9     as a result of that?

10          A PROSPECTIVE JUROR:  No.

11          MS. ABDI:  That you can separate that when

12     you're evaluating the evidence in this case?

13          A PROSPECTIVE JUROR:  Yes.

14          MS. ABDI:  Now, do you agree with the concept

15     that what somebody says on a witness stand is evidence?

16          A PROSPECTIVE JUROR:  Yes.

17          MS. ABDI:  Testimonial evidence.  Now, the

18     same questions I asked the previous juror, what if that

19     witness that was testifying, what if there was one

20     witness to a certain set of facts and that witness was

21     a child.  Could you convict the defendant based on the

22     testimony of one witness who is a child if you believe

23     that witness beyond a reasonable doubt?

24          A PROSPECTIVE JUROR:  Yes.

25          MS. ABDI:  Is there anything about the fact

J.H.

1     that a witness is a child that kind of automatically

2     makes you think they might be less truthful?

3                A PROSPECTIVE JUROR:   No.

4                MS. ABDI:   And what do you do for a living?

5                A PROSPECTIVE JUROR:   Product manager.

6                MS. ABDI:   And how long have you been doing

7     that?

8                A PROSPECTIVE JUROR:   Twenty-plus years.

9                MS. ABDI:   Do you have occasion to deal

10    with -- I'm assuming you have the occasion to deal with

11    a lot of different people involved in your work?

12               A PROSPECTIVE JUROR:   Um-hum.

13               MS. ABDI:   Part of your job as jurors, this

14    goes towards everyone, is to assess the credibility of

15    witnesses, who to believe, who not to believe.

16               In your work, have you been in the position

17    of hearing basically two conflicting stories about

18    something?

19               A PROSPECTIVE JUROR:   Yes.

20               MS. ABDI:   And you've had to make a

21    determination about who to believe and who not to

22    believe?

23               A PROSPECTIVE JUROR:   That's correct.

24               THE COURT:   Now, that's commonly asked that

25    way if you have two conflicting stories, you make a

Proceedings                    312

1      judgment as to which one is right.  That's not exactly

2      the whole truth though.  They can't both be right, but

3      they could both be wrong.

4                  MS. ABDI:  Thank you, Judge.  So you would

5      have no problem in judging the credibility of

6      witnesses?

7                  A PROSPECTIVE JUROR:  No.

8                  MS. ABDI:  Miss Aitagan?

9                  A PROSPECTIVE JUROR:  Aitagan.

10                 MS. ABDI:  I just notice that you checked off

11     that you or somebody you know has been the victim of a

12     crime.

13                 A PROSPECTIVE JUROR:  Burglaries, things like

14     that.

15                 MS. ABDI:  Did that happen recently?

16                 A PROSPECTIVE JUROR:  No, not in the recent

17     five years, no.

18                 MS. ABDI:  Is that something that's going to

19     affect your ability to be fair and impartial in this

20     case?

21                 A PROSPECTIVE JUROR:  That aspect would not.

22                 MS. ABDI:  Is there some other aspect that

23     would?

24                 A PROSPECTIVE JUROR:  I do think so.  I have

25     been on our local school board for seven years, so I'm

1     very involved with children.  And therefore, given the

2     little bit that's been described about what the matter

3     of this case is, I would have difficulty being

4     impartial.

5                 MS. ABDI:  Okay.  Well --

6                 THE COURT:  Bear in mind, ma'am, we're not

7     asking you to condone this particular conduct.

8                 A PROSPECTIVE JUROR:  I understand that.

9                 THE COURT:  All we're asking you to do is

10    listen to the evidence, evaluate it.  If it meets the

11    burden of proof required, it's your duty to convict the

12    defendant.  If it doesn't, you have to acquit the

13    defendant.  And you have to be impartial.

14                A PROSPECTIVE JUROR:  Right.

15                THE COURT:  And you can't do that?

16                A PROSPECTIVE JUROR:  I don't believe so, no.

17    If I feel sitting here I have a predisposition in my

18    mind and that's not being impartial.

19                THE COURT:  Do you have a motion at this

20    particular time, defendant?

21                MR. MILLMAN:  Yes, your Honor.  I ask that

22    juror be excused based on what she said.

23                THE COURT:  That's pretty clear.  People, you

24    object?

25                MS. ABDI:  No, Judge.

1           THE COURT:  Thank you for your candor.

2                (Whereupon, the prospective juror is

3      excused.)

4           THE CLERK:  Seat number three, Anna Narcisi,

5      last name N-A-R-C-I-S-I, seat number three.

6           MS. ABDI:  May I continue?

7           THE COURT:  Yes.

8           MS. ABDI:  Miss Narcisi, you kind of heard

9      the questioning that's been going on.  Is there

10     anything about this case just in the limited amount

11     that you heard that makes you to believe you can't be

12     fair and impartial in this case?

13          A PROSPECTIVE JUROR:  No.

14          MS. ABDI:  Can you agree with the concept

15     that what somebody says on a witness stand, it's

16     considered evidence?

17          A PROSPECTIVE JUROR:  Yes.

18          MS. ABDI:  And could you convict the

19     defendant beyond a reasonable doubt from the

20     testimony -- from just testimony?

21          A PROSPECTIVE JUROR:  Yes.

22          MS. ABDI:  What if that testimony came in the

23     form of a child witness, could you convict the

24     defendant based on the testimony of a child witness if

25     you believed that testimony beyond a reasonable doubt?

1              A PROSPECTIVE JUROR:  Yes.

2              THE COURT:  I don't know whether or not this

3    last group heard Miss Abdi's statement.  I think it

4    did.  But the youngest -- the age of the youngest child

5    she may wish to present to you is 11 years old.  So you

6    are not going to have any kindergarteners testifying.

7              MS. ABDI:  The ages -- I am at not talking

8    about five or six or seven.

9              You've served on a jury before?

10             A PROSPECTIVE JUROR:  Yes, years ago.

11             MS. ABDI:  It was a civil case?

12             A PROSPECTIVE JUROR:  Yes.

13             MS. ABDI:  Is there anything about that

14   experience --

15             A PROSPECTIVE JUROR:  No.

16             MS. ABDI:  -- that would prevent you from

17   from being fair and impartial on this case?

18             A PROSPECTIVE JUROR:  No.

19             MS. ABDI:  Mr. Micelotta?  Micelotta.  What

20   do you do for a living, sir?

21             A PROSPECTIVE JUROR:  I work for the MTA.

22             MS. ABDI:  It says you are a transportation

23   superintendent.

24             A PROSPECTIVE JUROR:  Yes.

25             MS. ABDI:  What does that entail?

1           A PROSPECTIVE JUROR:  I'm involved with the

2      movement of trains.

3           MS. ABDI:  That's pretty broad.  In the

4      course of your, you know, the course of your every day

5      job activities, have you had to make credibility

6      determinations in the course of your work?

7           A PROSPECTIVE JUROR:  Yes.

8           MS. ABDI:  Would you have any problem doing

9      that in this case?

10          A PROSPECTIVE JUROR:  No.

11          MS. ABDI:  Is there -- well, is there

12     anything about the fact that I may have witnesses who

13     are children that would prevent you from being fair and

14     impartial in this case?

15          A PROSPECTIVE JUROR:  No.

16          MS. ABDI:  Child witnesses don't have to

17     start off with any strikes against them just because

18     they are a child?

19          A PROSPECTIVE JUROR:  No.

20          MS. ABDI:  And it says you -- you checked off

21     you or somebody you know has been convicted of a crime,

22     and you also know somebody who was a victim of a crime.

23          A PROSPECTIVE JUROR:  Yes.

24          MS. ABDI:  Just tell me a little bit about

25     those.

Proceedings                                  317

1            A PROSPECTIVE JUROR:  A mugging.

2            MS. ABDI:  Not yourself, somebody you know?

3            A PROSPECTIVE JUROR:  Yes.

4            MS. ABDI:  How long ago was that?

5            A PROSPECTIVE JUROR:  Ten years ago.

6            MS. ABDI:  Is there anything about that

7    experience that would prevent you from being fair and

8    impartial in this case?

9            A PROSPECTIVE JUROR:  No.

10           MS. ABDI:  Now, you also know somebody who

11   was accused of a crime.

12           A PROSPECTIVE JUROR:  Yes.

13           MS. ABDI:  Or convicted of a crime?

14           A PROSPECTIVE JUROR:  Yes.

15           MS. ABDI:  Who was that?

16           A PROSPECTIVE JUROR:  Just a friend.

17           MS. ABDI:  And was this in Nassau County?

18           A PROSPECTIVE JUROR:  Yes.

19           MS. ABDI:  What kind of case was that?

20           A PROSPECTIVE JUROR:  Drug related.

21           MS. ABDI:  Is that case still pending, or is

22   it finished?

23           A PROSPECTIVE JUROR:  It was finished.  It

24   came to a close.

25           MS. ABDI:  Was this somebody who was a close

J.H.

Proceedings                          318

1       friend of yours?

2                    A PROSPECTIVE JUROR:  No.

3                    MS. ABDI:  I mean because of the situation

4       that happened with your friend, do you have any

5       negative feelings towards either the police or the DA's

6       office for what happened to your friend?

7                    A PROSPECTIVE JUROR:  No.

8                    MS. ABDI:  Is there anything about that that

9       leads you to believe you can't be fair and impartial in

10      this case?

11                   A PROSPECTIVE JUROR:  No.

12                   MS. ABDI:  You have no problem separating

13      that out and evaluating the evidence in this case,

14      correct?

15                   A PROSPECTIVE JUROR:  Correct.

16                   MS. ABDI:  Miss Frederick?

17                   A PROSPECTIVE JUROR:  Yes.

18                   MS. ABDI:  Would you have any problem making

19      credibility determinations in this case?

20                   A PROSPECTIVE JUROR:  No.

21                   MS. ABDI:  Is there anything else that you

22      heard, even though you have heard very little, is there

23      anything about this case that, you know, you know about

24      that would lead you to believe that you can't be fair

25      and impartial?

J.H.

1               A PROSPECTIVE JUROR:  No, ma'am.

2               MS. ABDI:  Can you agree -- would you be able

3       to convict the defendant based solely on testimony

4       evidence if you believed it beyond a reasonable doubt?

5               A PROSPECTIVE JUROR:  Yes, ma'am.

6               MS. ABDI:  And what if some of that testimony

7       came from a child witness, would you still be able to

8       convict the defendant beyond a reasonable doubt if it

9       came from a child?

10              A PROSPECTIVE JUROR:  Yes, ma'am.

11              MS. ABDI:  And you work in medical billing?

12              A PROSPECTIVE JUROR:  Yes.

13              MS. ABDI:  Now, there may be some -- do you

14      know -- have you studied any medicine, or you just know

15      basically?

16              A PROSPECTIVE JUROR:  Coding and Medicare and

17      stuff like that.

18              MS. ABDI:  If there is evidence of a medical

19      nature in this case, you understand that you can't use

20      your own experience --

21              A PROSPECTIVE JUROR:  Yes.

22              MS. ABDI:  -- in the jury room if you are

23      selected?

24              A PROSPECTIVE JUROR:  No.

25              MS. ABDI:  You would have no problem not

J.H.

Proceedings                          320

1    using your experience?

2                    A PROSPECTIVE JUROR:  No.

3                    MS. ABDI:  Mr. Arcelan?

4                    A PROSPECTIVE JUROR:  Arcelan.

5                    MS. ABDI:  You are -- checked off here that

6    you or somebody you know has been the victim of a

7    crime?

8                    A PROSPECTIVE JUROR:  Yes.

9                    MS. ABDI:  Can you tell me a little bit about

10   that?

11                   A PROSPECTIVE JUROR:  It was a mugging of my

12   mother-in-law.

13                   MS. ABDI:  Would that affect your ability to

14   be fair in this case?

15                   A PROSPECTIVE JUROR:  No.

16                   MS. ABDI:  Would you agree with the concept

17   what somebody says on a witness stand is evidence?

18                   A PROSPECTIVE JUROR:  Yes.

19                   MS. ABDI:  Would you have any problem

20   convicting the defendant based solely on the

21   testimonial evidence?

22                   A PROSPECTIVE JUROR:  No.

23                   MS. ABDI:  And would you be able to convict

24   the defendant beyond a reasonable doubt if that

25   testimony came from a child?

Proceedings                    321

1          A PROSPECTIVE JUROR:  Yes, especially since

2     the seriousness of this crime.

3          MS. ABDI:  But you would be able to listen to

4     the evidence from a child witness with an open mind?

5          A PROSPECTIVE JUROR:  Sure, absolutely.

6          MS. ABDI:  Is there anything about the fact

7     that a witness is a child that would make you think

8     right away, well, they are going to be a little less

9     credible?

10         A PROSPECTIVE JUROR:  No, not at all.

11         MS. ABDI:  Mr. Werner, kind of the same

12    question.  Is there anything about a child witness that

13    kind of in your mind they start off with a strike

14    against them?

15         A PROSPECTIVE JUROR:  No.

16         MS. ABDI:  You would listen to their

17    testimony with an open mind?

18         A PROSPECTIVE JUROR:  Yes.

19         MS. ABDI:  And you work for Con Edison?

20         A PROSPECTIVE JUROR:  Yes.

21         MS. ABDI:  How long have you been doing that?

22         A PROSPECTIVE JUROR:  Four years.

23         MS. ABDI:  Would you have any problem making

24    any credibility determinations in this case?

25         A PROSPECTIVE JUROR:  No.

J.H.

Proceedings                                    322

1              THE COURT:  Try to give a verbal answer.

2              A PROSPECTIVE JUROR:  I said not at all.

3              THE COURT:  I'm sorry, I didn't hear you.

4              MS. ABDI:  Mr. Amador?

5              A PROSPECTIVE JUROR:  Yes.

6              MS. ABDI:  Can you agree with the concept

7    what somebody says on a witness stand is considered

8    evidence?

9              A PROSPECTIVE JUROR:  Yes.

10             MS. ABDI:  You would be able to convict the

11   defendant beyond a reasonable doubt from the testimony

12   of a sole witness if you believed that witness?

13             A PROSPECTIVE JUROR:  Yes.

14             MS. ABDI:  What if that witness was a child

15   and you believed them, would you still be able to

16   convict the defendant beyond a reasonable doubt from

17   that testimony?

18             A PROSPECTIVE JUROR:  Absolutely.

19             MS. ABDI:  Now, do you know anybody who has

20   been accused or victim or convicted of a crime?

21             A PROSPECTIVE JUROR:  No.

22             MS. ABDI:  And do you feel that a child has

23   to do anything specific in order for you to believe

24   them, such as like cry or something like that?

25             A PROSPECTIVE JUROR:  No.

Proceedings                              323

 1              MS. ABDI:  Do you agree with the concept that
 2      a child testifying in a courtroom might have a number
 3      of different demeanors?  Some may be, you know, some
 4      may giggle, some may not say anything at all, some may
 5      cry.  Can you agree with that concept?
 6              A PROSPECTIVE JUROR:  Yes, absolutely.
 7              MS. ABDI:  There's not going to be one
 8      specific way that somebody responds on a witness stand.
 9      Can you agree with that?
10              A PROSPECTIVE JUROR:  Yes.
11              MS. ABDI:  Mr. Carlton?
12              A PROSPECTIVE JUROR:  Yes.
13              THE COURT:  Just one second.
14              MS. ABDI:  Mr. Carleton, I know that we
15      talked a little bit on the bench, but is there anything
16      about anything you have heard here that would lead you
17      to believe that you can't be fair and impartial in this
18      case?
19              A PROSPECTIVE JUROR:  No.
20              MS. ABDI:  Would you have any problem
21      convicting someone based on testimonial evidence of a
22      child if you believe that beyond a reasonable doubt?
23              A PROSPECTIVE JUROR:  I think slight with a
24      child, give them a slight strike but not a definite
25      strike.

Proceedings                                    324

1              MS. ABDI:  So what you're saying is in the

2        back of your mind, you kind of have a little doubt as

3        to whether or not they would be telling the truth?

4              A PROSPECTIVE JUROR:  No, just that it was

5        just one child.

6              THE COURT:  And we're dealing with someone

7        who is 11 years old at a minimum.  The prosecutor is

8        using the word child, and when she says that, I

9        interrupted her many times and said 11 years old.

10             A PROSPECTIVE JUROR:  I would believe them.

11       The answer is yes, I would.

12             MS. ABDI:  Okay.  Did your answer change

13       because of the age or further reflection?

14             A PROSPECTIVE JUROR:  Further reflection.

15       It's a tough, it's tough for me, but if I believe them,

16       if they were 11 years old and they were fully credible,

17       I would believe them, yes.

18             THE COURT:  Well, if they were fully

19       credible, then they would be believable?

20             A PROSPECTIVE JUROR:  Yes, yes.

21             MS. ABDI:  And I understand that it's hard

22       to --

23             THE COURT:  And it's your job to determine

24       credibility.

25             MS. ABDI:  I mean I understand it's hard to

1    kind of assess these things now because you haven't

2    heard anything and you haven't met any witnesses.  But

3    what I'm trying to get at is sort of just a

4    preconception in your head about whether or not you

5    find -- you would find them less believable just

6    because they were a child.

7              A PROSPECTIVE JUROR:  No, I wouldn't.

8              MS. ABDI:  Miss Reid?

9              A PROSPECTIVE JUROR:  Yes.

10             MS. ABDI:  Is there anything --

11             THE COURT:  Start speeding it up a little.  I

12   know you have a few more to go, but you have been going

13   for about 20 minutes.

14             MS. ABDI:  I will try to speed it up.

15             Is there anything you have heard about the

16   case so far, which is very limited, that leads you to

17   believe you can't be fair and impartial in this case?

18             A PROSPECTIVE JUROR:  No.

19             MS. ABDI:  You wouldn't have any -- or would

20   you have a problem convicting somebody based on

21   testimonial evidence alone?

22             A PROSPECTIVE JUROR:  No.

23             MS. ABDI:  What if that evidence came from a

24   child witness?

25             A PROSPECTIVE JUROR:  I wouldn't have a

Proceedings                              326

1      problem.

2              MS. ABDI:  Assuming, of course, that you

3      believed that witness.

4              A PROSPECTIVE JUROR:  Right.

5              MS. ABDI:  Miss -- my handwriting, Miss

6      Miller?

7              A PROSPECTIVE JUROR:  Yes.

8              MS. ABDI:  Anything that I've -- anything

9      that you have heard today that leads you to believe

10     that you can't be fair and impartial in this case?

11             A PROSPECTIVE JUROR:  No.

12             MS. ABDI:  You sat on a jury before?

13             A PROSPECTIVE JUROR:  Yes.

14             MS. ABDI:  It was a civil jury?

15             A PROSPECTIVE JUROR:  Um-hum.

16             MS. ABDI:  Is there anything about that

17     experience --

18             A PROSPECTIVE JUROR:  No.

19             MS. ABDI:  -- that would prevent you from

20     being fair in this case?

21             A PROSPECTIVE JUROR:  No.

22             MS. ABDI:  Would you have any problem

23     assessing the credibility of witnesses?

24             A PROSPECTIVE JUROR:  No.

25             MS. ABDI:  Would you have any problem

J.H.

Proceedings                    327

1        assessing the credibility of a child witness?

2                    A PROSPECTIVE JUROR:  No.

3                    MS. ABDI:  Mr. Cleary?

4                    A PROSPECTIVE JUROR:  Yes.

5                    MS. ABDI:  You checked off that you or

6        somebody that you know has been convicted of a crime?

7                    A PROSPECTIVE JUROR:  It was 15 years ago.

8                    MS. ABDI:  It was in Nassau County?

9                    A PROSPECTIVE JUROR:  Yes.

10                   MS. ABDI:  Is that something that's going to

11       affect your ability in this case?

12                   A PROSPECTIVE JUROR:  No.

13                   MS. ABDI:  Do you have any problems with

14       anything you heard me ask about before as far as

15       testimonial evidence and convicting beyond a reasonable

16       doubt based on testimonial evidence?

17                   A PROSPECTIVE JUROR:  No.

18                   MS. ABDI:  You would be able to do that if

19       you believed the testimony; is that correct?

20                   A PROSPECTIVE JUROR:  Correct.

21                   MS. ABDI:  And you would be able to keep an

22       open mind with respect to a witness that's a child?

23                   A PROSPECTIVE JUROR:  Yes.

24                   MS. ABDI:  Miss Marchini, you checked off

25       that you or somebody you know has been the victim of a

Proceedings                                328

1      crime?

2                  A PROSPECTIVE JUROR:   Yes.

3                  MS. ABDI:   Can you just tell me a little bit

4      about that?

5                  A PROSPECTIVE JUROR:   My brother.

6                  MS. ABDI:   Was that in Nassau County?

7                  A PROSPECTIVE JUROR:   Yes.

8                  MS. ABDI:   Is that appending case, or is that

9      resolved?

10                 A PROSPECTIVE JUROR:   A long time ago.

11                 MS. ABDI:   Is there anything about that

12     experience that leaves you in a negative feeling

13     towards the police officers in this case or the

14     criminal justice system?

15                 A PROSPECTIVE JUROR:   No.

16                 MS. ABDI:   Would you be able to put that out

17     of your mind when you listen to the evidence in this

18     case?

19                 A PROSPECTIVE JUROR:   Yes.

20                 MS. ABDI:   Is there anything that you heard

21     so far that would lead you to believe that you can't be

22     fair and impartial in this case?

23                 A PROSPECTIVE JUROR:   No.

24                 MS. ABDI:   Miss White, last but not least,

25     are you a nurse now or you just study nursing?

1               A PROSPECTIVE JUROR:  Just study nursing.

2               MS. ABDI:  What do you do now?

3               A PROSPECTIVE JUROR:  A supervisor at a

4       welding company.

5               MS. ABDI:  And is there anything that you

6       have heard today that would lead you to believe that

7       you can't be fair and impartial in this case?

8               A PROSPECTIVE JUROR:  No.

9               MS. ABDI:  I'm assuming in your job you also

10      have to deal with a lot of people.  Do you have to make

11      credibility determinations during the course of your

12      work?

13              A PROSPECTIVE JUROR:  Yes.

14              MS. ABDI:  Do you have any problem doing

15      that?

16              A PROSPECTIVE JUROR:  No.

17              MS. ABDI:  Can you accept the concept that

18      what somebody says on the witness stand is considered

19      evidence?

20              A PROSPECTIVE JUROR:  Yes.

21              MS. ABDI:  Would you be able to convict a

22      defendant beyond a reasonable doubt based on just

23      testimonial evidence?

24              A PROSPECTIVE JUROR:  Yes.

25              MS. ABDI:  If you believed that.

Proceedings                              330

1                   A PROSPECTIVE JUROR:  Yes.

2                   MS. ABDI:  What if it was a single witness

3        and what if that witness was a child, would you be able

4        to convict the defendant beyond a reasonable doubt

5        based on that testimony?

6                   A PROSPECTIVE JUROR:  Yes.

7                   MS. ABDI:  If you believed it?

8                   A PROSPECTIVE JUROR:  Yes.

9                   MS. ABDI:  And it says also you know

10       individuals who are in the medical profession?

11                  A PROSPECTIVE JUROR:  No.

12                  MS. ABDI:  I have nothing further for these

13       jurors.

14                  THE COURT:  Mr. Millman?

15                  MR. MILLMAN:  Good afternoon, ladies and

16       gentlemen.  I think as you know, my name is Daniel

17       Millman.  I'm an attorney.  I represent the defendant,

18       Ulises Bonilla.

19                  Mr. Cleary, I'm going to start off with you.

20       Good afternoon.  Mr. Cleary, do you understand that my

21       client is presumed innocent?

22                  A PROSPECTIVE JUROR:  Yes.

23                  MR. MILLMAN:  Do you have any problem

24       affording him that presumption of innocence?

25                  A PROSPECTIVE JUROR:  No.

Proceedings                    331

1           MR. MILLMAN:  Can you give me your assurance

2      that he will be afforded that presumption of innocence

3      until and only if the jury concludes that the

4      prosecutor has proven him guilty beyond a reasonable

5      doubt?

6           A PROSPECTIVE JUROR:  Yes.

7           MR. MILLMAN:  I understand as a juror in this

8      case, you will be called upon to determine the

9      evidence.  Is there anything about your background that

10     would prevent you from doing that in a fair and

11     impartial manner?

12          A PROSPECTIVE JUROR:  I don't think so.

13          MR. MILLMAN:  Miss Reid, good afternoon.

14          A PROSPECTIVE JUROR:  Good afternoon.

15          MR. MILLMAN:  Miss Reid, you understand as a

16     juror, you will have the responsibility of scrutinizing

17     testimony of the witnesses?

18          A PROSPECTIVE JUROR:  Yes.

19          MR. MILLMAN:  Can you give your assurance

20     that you will do that?

21          A PROSPECTIVE JUROR:  Yes.

22          MR. MILLMAN:  And that you will take into

23     account any factors that you think would affect

24     credibility?

25          A PROSPECTIVE JUROR:  Yes.

1    MR. MILLMAN:  Can you also give me your

2    assurance that you'll listen carefully to what the

3    witnesses say and how they say it?

4              A PROSPECTIVE JUROR:  Yes.

5              MR. MILLMAN:  And can you give me your

6    assurance of that, Mr. Price?

7              A PROSPECTIVE JUROR:  At what?

8              MR. MILLMAN:  Of the fact that you will

9    listen to what the witnesses say and how they say it?

10             A PROSPECTIVE JUROR:  Yes.

11             MR. MILLMAN:  And would you agree with me

12   that one of the things that should be considered in

13   evaluating a witness is the particular witness's

14   ability to recall?

15             A PROSPECTIVE JUROR:  Yes.

16             MR. MILLMAN:  And, you know, I suppose a

17   developmental ability would be one factor, certainly

18   not the whole issue but one factor that you might

19   consider?

20             A PROSPECTIVE JUROR:  I'm not sure I

21   understand.

22             MR. MILLMAN:  Let me ask you this:  Miss Abdi

23   asked you about whether or not you could listen to a

24   child testifying and, you know, if you believed a

25   child, give it its fair weight.  What I'm asking you

1        would you agree with me that one factor to be

2        considered would be perhaps the witness's ability to

3        recall perhaps?

4                  A PROSPECTIVE JUROR:  Yes.

5                  MR. MILLMAN:  And their developmental

6        ability, for example, the extent to which, you know,

7        they developed, know how they explain things?

8                  A PROSPECTIVE JUROR:  I guess that would be a

9        factor.

10                 MR. MILLMAN:  Would you agree with me that

11       sometimes age can affect a person's ability to recall

12       and describe certain things?

13                 A PROSPECTIVE JUROR:  I guess, yeah.

14                 MR. MILLMAN:  Would you agree with that, Miss

15       White, that it's a fact that perhaps someone's age

16       could play a role in the ability that they may have to

17       recall and describe things?

18                 A PROSPECTIVE JUROR:  Not necessarily, just

19       anybody at any age.

20                 MR. MILLMAN:  Would you agree with me that a

21       child who is 11 years old may not have the same ability

22       to recall things as someone who is an adult?

23                 THE COURT:  May have more.

24                 A PROSPECTIVE JUROR:  That's what I was going

25       to say.

Proceedings                                334

1              MR. MILLMAN:  Well, you will listen to a
2    witness, and if you conclude based upon what you
3    observe and the witness's testimony that they are not
4    credible, would you consider that?
5              A PROSPECTIVE JUROR:  Yes.
6              MR. MILLMAN:  Would you consider all factors
7    that you think would bear on that?
8              A PROSPECTIVE JUROR:  Yes.
9              MR. MILLMAN:  And listen to the what judge
10   says about what other factors you may consider?
11             A PROSPECTIVE JUROR:  Yes.
12             MR. MILLMAN:  Mr. Frederick?
13             A PROSPECTIVE JUROR:  Miss Frederick.
14             MR. MILLMAN:  Miss Frederick, I apologize.
15   Good afternoon.
16             A PROSPECTIVE JUROR:  Good afternoon, sir.
17             MR. MILLMAN:  Miss Frederick, you understand
18   by now I think that you will be hearing about an event
19   that results in great loss?
20             A PROSPECTIVE JUROR:  Yes.
21             MR. MILLMAN:  Would that affect you from
22   being fair to my client?
23             A PROSPECTIVE JUROR:  No, sir.
24             MR. MILLMAN:  And can you give me your
25   assurance that you'll afford my client the presumption

Proceedings                          335

1    of innocence?

2              A PROSPECTIVE JUROR:  Yes, sir.

3              MR. MILLMAN:  Mr. Micelotta, one of the

4    things that you are going to hear the judge tell you

5    that my client is not going to be required to testify.

6    Do you understand that?

7              A PROSPECTIVE JUROR:  Yes.

8              MR. MILLMAN:  Do you understand you are not

9    permitted to draw any inferences from that?

10             A PROSPECTIVE JUROR:  Meaning what?

11             MR. MILLMAN:  Your Honor, I would ask

12   actually if you would the instruct what they will be

13   provided.  Thank you.

14             THE COURT:  The defendant may not testify in

15   this case.  I charge you that the fact that he may not

16   testify is not a factor from which any inference

17   unfavorable to the defendant may be drawn.  That's a

18   rule of law.  I cannot expand on that.  Would you obey

19   that rule of law?

20             A PROSPECTIVE JUROR:  Yes.

21             MR. MILLMAN:  Now, Mr. Frederick, you

22   understand that you're here to determine what happened

23   on a particular date?

24             A PROSPECTIVE JUROR:  I'm Micelotta.

25             A PROSPECTIVE JUROR:  I'm Miss Frederick.

J.H.

1          MR. MILLMAN:  My apologies, sir.  Miss

2     Mr. Micelotta, can you assure me you won't allow any

3     issues of sympathy interfere with what you do?

4                A PROSPECTIVE JUROR:  Yes.

5          MR. MILLMAN:  While we simply can appreciate

6     sympathy as a normal human emotion, you understand it

7     has no place in terms of what you would do as a juror

8     in this case?

9                A PROSPECTIVE JUROR:  Yes.

10          MR. MILLMAN:  Can you give me your assurance

11     you will base this case on the facts and not your

12     sympathy?

13                A PROSPECTIVE JUROR:  Yes.

14          MR. MILLMAN:  Can you give me your assurance

15     of that, Miss Miller?

16                A PROSPECTIVE JUROR:  Yes.

17          MR. MILLMAN:  And Miss Miller, you understand

18     that any decisions you make as a juror in this case

19     should be based upon the evidence, not the feelings

20     that you may have about either the attorneys or my

21     client?

22                A PROSPECTIVE JUROR:  Absolutely, yes.

23          MR. MILLMAN:  If you find for whatever reason

24     during the course of this trial that you do not -- you

25     find objectionable certain actions that you hear about

Proceedings                337

1    my client taking and you decide that you personally you

2    may not like him, will that interfere with your ability

3    to be fair to him?

4              A PROSPECTIVE JUROR:  No.

5              MR. MILLMAN:  Mr. Warner, I see that you had

6    indicated -- if you wish to discuss this in private,

7    please let me know, that either yourself or someone you

8    knew was a victim of a crime?

9              A PROSPECTIVE JUROR:  Yes.

10             MR. MILLMAN:  Is that something you wish to

11   discuss in private?

12             A PROSPECTIVE JUROR:  No, it doesn't matter.

13             MR. MILLMAN:  May I ask what that concerned?

14             A PROSPECTIVE JUROR:  My son.  His biological

15   mother tried to kill him at birth.

16             MR. MILLMAN:  I'm sorry to hear that.  That's

17   obviously a very different situation than what we have

18   here.

19             A PROSPECTIVE JUROR:  Yes.

20             MR. MILLMAN:  So that wouldn't interfere with

21   anything you do here as a juror, right?

22             A PROSPECTIVE JUROR:  No.

23             MR. MILLMAN:  And I also notice that you had

24   indicated convicted, I think?

25             A PROSPECTIVE JUROR:  My brother-in-law was

1    convicted of drug charges.

2            MR. MILLMAN:  How long ago was that?

3            A PROSPECTIVE JUROR:  Two years ago.

4            MR. MILLMAN:  And that won't play a role in

5    anything that you do here?

6            A PROSPECTIVE JUROR:  No.

7            MR. MILLMAN:  And you could promise me,

8    Mr. Warner, that you would be fair?

9            A PROSPECTIVE JUROR:  Yes.

10           MR. MILLMAN:  Miss Arcelan, can you give me

11   your assurance that you will -- if my client chooses

12   not to testify that you won't draw any negative

13   inference as to that?

14           A PROSPECTIVE JUROR:  Yes.

15           MR. MILLMAN:  And can you appreciate the fact

16   that there could be a number of reasons why someone may

17   choose not to testify, it doesn't necessarily mean that

18   something's hidden; would you agree with me?

19           A PROSPECTIVE JUROR:  Yes.

20           MR. MILLMAN:  Would you agree with me on

21   that, Mr. Carleton?

22           A PROSPECTIVE JUROR:  It's hard.  I would --

23   if I was innocent of something, just how I feel, I

24   would want to show, to prove that I am not.  But if

25   there are instructions --

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 339 of 913 PageID #: 639

Proceedings 339

1    THE COURT:  Apparently your verdict in this
2  particular case must be either guilty or not guilty.
3  There is no such thing as a verdict of innocence in the
4  State of New York.

5    Now, let me give you an example which I gave
6  to the jurors I think it was Friday.  I'm sitting at
7  around midnight watching a late night TV show in my
8  den.  I hear a smash, and I look out the window, and I
9  see my neighbor's kid breaking windows of my other
10  neighbor's house.  He goes around the car, breaks a
11  window, breaks a window, breaks a window.  And then he
12  turns, and I get a profile look at him for about two
13  seconds, and I know who he is.  I call the police
14  department, and they come, and I tell them what
15  happened.  So he's charged with a form of malicious
16  mischief.

17    Now we're on trial, and I'm being examined,
18  and it doesn't really matter who I am being examined
19  by, but the following testimony is elicited:  Judge,
20  what was the distance between you and the defendant
21  when you observed this?  About 60 feet.

22    Is that roughly the distance between you and
23  the door?  Roughly.

24    Judge, do you wear glasses?  Normally.

25    Are you nearsighted or farsighted?  I'm

J.H.

Proceedings                    340

1    nearsighted.

2              Were you wearing glasses that evening?  No, I

3    wasn't.  I don't need them when I watch TV.

4              What time is it now?  It's six minutes after

5    three.

6              Take off your glasses.  What time is it?  All

7    I see is a blur.

8              How long did you have this person under your

9    observation, the face?  About three seconds.

10             What was the lighting conditions?  They were

11   well lit in my TV room, but they were dim on the

12   street.

13             In other words, you were looking from a lit

14   area into a darkened area?  Yes, that's true.

15             Quite the opposite effect that you would get

16   if you were in a legitimate theater looking from a

17   darkened area into a light lighted area?  Yes, that's

18   true too.

19             Judge, did you have anything to drink before

20   you were watching -- while you were watching TV?  Yes,

21   I did.

22             What did you have?  I had a couple of hefty

23   Johnny Walkers.

24             Were you drunk?  No, but I had a little buzz

25   on, I'll be honest with you on that.

1        Now, that's what the testimony shows.  Now,

2    you have to determine whether or not that testimony

3    would prove the guilt of the defendant beyond a

4    reasonable doubt.  Or is the testimony of such quality

5    and nature that there's reasonable doubt built into it?

6    That's what we're talking about here.  We're not

7    talking about guilt or innocence.  We're talking about

8    the proof which is accused.  Go ahead.

9        MR. MILLMAN:  Mr. Carleton, you heard what

10    the judge just indicated.  If you were instructed that

11    you are not permitted to draw a negative inference

12    should my client choose not to testify, and again, this

13    is the time to let us know and be open about this,

14    please, do you think you might have a hard time with

15    that?

16        A PROSPECTIVE JUROR:  No, based on what he

17    said.

18        MR. MILLMAN:  Is there anybody here who

19    thinks they may have some difficulty doing that?  And

20    don't be afraid to tell us, because now would be the

21    time to tell us.  Is there anybody here that should my

22    client choose not to testify, you think in your mind

23    and wonder why and you may use it against him?

24        I see you nodding your head, and I appreciate

25    your candor.  You think you might have difficulty

J.H.

Proceedings                          342

1        following that?

2                    A PROSPECTIVE JUROR:  Yeah, a little bit.  It

3        certainly wouldn't help his case.

4                    THE COURT:  I still can't hear you.

5                    A PROSPECTIVE JUROR:  It certainly would not

6        help his case not hearing from him.

7                    MR. MILLMAN:  So you think even having heard

8        what the judge said and that he will instruct you can't

9        draw any negative inference, you think you would have

10       difficulty doing that?

11                   A PROSPECTIVE JUROR:  A little bit.

12                   MR. MILLMAN:  Well, I appreciate your candor.

13       Is there anybody else who feels that way?  Now is the

14       time to tell us.

15                   Miss White, you gave your assurance you will

16       scrutinize the testimony of witnesses?

17                   A PROSPECTIVE JUROR:  Yes.

18                   MR. MILLMAN:  Can you accept the idea a

19       witness could get up on the stand, swear to tell the

20       truth and not tell the truth?

21                   A PROSPECTIVE JUROR:  Yes.

22                   MR. MILLMAN:  So you'll look very carefully

23       at the testimony that each witness will testify, right?

24                   A PROSPECTIVE JUROR:  Yes.

25                   MR. MILLMAN:  Ladies and gentlemen, I think

J.H.

1    you know by now if you're selected as jurors, you will

2    be taking on a very serious responsibility.  As any

3    serious responsibility, it's not easy.  If the

4    prosecution proves my client's guilt beyond a

5    reasonable doubt, the judge will tell you your

6    appropriate verdict is guilty.  If the prosecutor fails

7    to prove my client's guilt beyond a reasonable doubt,

8    the appropriate verdict is not guilty, and that is a

9    verdict that I would ask you deliver without hesitation

10   if you find that the prosecutor has failed to prove my

11   client's guilt beyond a reasonable doubt.

12          Now, Mr. Micelotta, if the evidence is in and

13   you have determined that the prosecutor has not proven

14   my client's guilt beyond a reasonable doubt, what would

15   your verdict be?

16          A PROSPECTIVE JUROR:  Not guilty.

17          MR. MILLMAN:  What would your verdict be,

18   Miss Miller, under those circumstances?

19          A PROSPECTIVE JUROR:  Not guilty.

20          MR. MILLMAN:  Thank you.  I'm sorry, your

21   Honor.  May I, judge?  There was one more thing I did

22   want to follow up on.

23          Miss Reid, I did want to ask you I notice

24   that on your questionnaire you indicated that your

25   spouse is a Suffolk police officer?

Proceedings                    344

1                  A PROSPECTIVE JUROR:  Yes.

2                  MR. MILLMAN:  How long has he been a police

3        officer?

4                  A PROSPECTIVE JUROR:  Twenty-five years in

5        Suffolk, two years in the city.

6                  MR. MILLMAN:  Patrolman the whole time, or is

7        he a detective?

8                  A PROSPECTIVE JUROR:  No, patrolman and

9        marine bureau.  He's a Suffolk Marine Bureau cop.

10                 MR. MILLMAN:  Does he talk to you about his

11       work a lot?

12                 A PROSPECTIVE JUROR:  No.  He's one that

13       never brings it home.

14                 MR. MILLMAN:  Okay.  That's all.  Thank you.

15                 A PROSPECTIVE JUROR:  Fortunately.

16                 MR. MILLMAN:  Thank you.

17                 THE COURT:  And don't you bring anything you

18       learn here home to him.

19                 (The following occurs at sidebar outside of

20       the hearing of the prospective jurors.)

21                 THE CLERK:  Just for the record, defense has

22       used 11 perempts, people six.

23                 THE COURT:  People, as to the entire panel,

24       do you have challenges for cause?

25                 MS. ABDI:  No.

Proceedings                           345

1            THE COURT:  As to the entire panel, do you

2       have challenges for cause?

3            MR. MILLMAN:  Yes, your Honor, Mr. Arcelan,

4       number six.

5            THE COURT:  I agree.  Okay, challenge for

6       cause.  Anyone else?

7            MR. MILLMAN:  No, your Honor.

8            THE COURT:  People, peremptory number one?

9            MS. ABDI:  Yes.

10           THE COURT:  People, peremptory number two?

11           MS. ABDI:  No.

12           MR. MILLMAN:  Yes, your Honor.

13           THE COURT:  People, peremptory number three?

14           MS. ABDI:  No.

15           MR. MILLMAN:  No, your Honor.

16           THE COURT:  People, peremptory number four?

17           MS. ABDI:  No.

18           THE COURT:  Defendant?

19           MR. MILLMAN:  Yes.

20           THE COURT:  Number five, People?

21           MS. ABDI:  Yes.

22           THE COURT:  Now we're up to seat number

23       seven.  Peremptory, People?

24           MS. ABDI:  No.

25           THE COURT:  Defendant?

J.H.

Proceedings                          346

1          MR. MILLMAN:  Yes.

2          THE COURT:  Number nine, peremptory, People?

3          MS. ABDI:  Yes.

4          THE COURT:  Number 10, peremptory, People?

5          MS. ABDI:  No.

6          THE COURT:  Seat nine, peremptory, defendant?

7          MR. MILLMAN:  Yes.

8          THE COURT:  Seat 10, peremptory, People?

9          MS. ABDI:  Yes.

10         THE CLERK:  Now we're up to Reid, seat number

11    11.

12         MS. ABDI:  No.

13         MR. MILLMAN:  Yes, perempt.

14         THE CLERK:  You're up to 16.  We're up to

15    seat 12, Jeffrey Carleton.

16         MS. ABDI:  Yes.

17         THE CLERK:  You're up to 11.  We're up to 13,

18    Amador, People?

19         MS. ABDI:  No.

20         MR. MILLMAN:  Yes.

21         THE CLERK:  You're up to 17.  Final seat

22    number 14, Joseph Warner?

23         MS. ABDI:  No perempt.

24         MR. MILLMAN:  How many jurors do we have?

25         THE CLERK:  This would be 11.

J.H.

1            MR. MILLMAN:  No perempt.

2                 (The following takes place in open court.)

3                 THE CLERK:  Ladies and gentlemen in the box,

4       if you hear your name called, that means you are chosen

5       as a juror in this action.  Please remain seated.  If

6       you do not hear your name called, please gather your

7       belongings, stand up and go outside and speak with the

8       officers.  They will tell you exactly where to go.

9                 For seat number 10, Anna Narcisi.

10               THE COURT:  We already had nine jurors,

11      ma'am.  Seat number 10 would be yours.  That's why it

12      maybe confusing.

13               A PROSPECTIVE JUROR:  Oh.

14               THE CLERK:  And seat number 11 will be Joseph

15      Warner.  All other jurors, please rise, take your

16      belongings, go outside, speak to the officer.

17               (Whereupon, the prospective jurors were

18      excused.)

19               THE CLERK:  Ladies and gentlemen, please

20      rise, raise your right hand.  Do you and each of you

21      solemnly swear that you will try this action in a just

22      and impartial manner to the best of your judgment and

23      render a verdict according to the law and evidence so

24      help you God?

25               (Whereupon, the prospective juror answered in

J.H.

Proceedings                    348

1    the affirmative.)

2             THE CLERK:  You have to answer out loud, sir.

3             A PROSPECTIVE JUROR:  Yes.

4             THE COURT:  All right, ladies and gentlemen,

5    as you know, we have 11 jurors.  We need a couple of

6    alternates and one more juror.  I hope we get them in

7    the next hour.  Be back tomorrow by 9:30.  You will

8    join your other jurors.  You can tell them if you don't

9    come back into the courtroom immediately we're still in

10   this process.  We'll see you tomorrow.

11             (Whereupon, the jurors were excused.)

12             THE CLERK:  For seat number one, Christopher

13   Lee, last name is L-E-E, seat number one.

14             Seat two, James Behan, last name B-E-H-A-N,

15   seat number two.

16             Seat number three, Damien Walsh, W-A-L-S-H,

17   seat three.

18             Seat number four, Linda Kani, last name

19   K-A-N-I, seat number four.

20             Seat number five, Nicholas Yetkofsky,

21   Y-E-T-K-O-F-S-K-Y, seat five.

22             Seat six, Michael Burnhardt, last name

23   B-U-R-N-H-A-R-D-T, seat six.

24             Seat seven, Herman Garfinkel, last name

25   G-A-R-F-I-N-K-E-L, seat seven.

1              Seat eight, John Molczan, last name is

2       M-O-L-C-Z-A-N, seat eight.

3              Seat nine, Yvonne Mayne, last name M-A-Y-N-E,

4       seat nine.

5              Seat 10, Ryan Eletti, last name E-L-E-T-T-I,

6       seat 10.

7              Seat 11, Brian Otway, last name O-T-W-A-Y,

8       seat 11.

9              Seat 12, Rudolfo Lopez, last name L-O-P-E-Z.

10             COURT OFFICER:  No response.

11             THE CLERK:  Rudolfo Lopez?

12             Seat 12, Nicholas Antonelli, last name

13      A-N-T-O-N-E-L-L-I, seat 12.

14             Seat 13, Daniel Fusco, last name F-U-S-C-O,

15      seat 13.

16             And seat 14, Karen Ritter, last name

17      R-I-T-T-E-R, seat 14.

18             THE COURT:  Mr. Lee?

19             A PROSPECTIVE JUROR:  Yes.

20             MR. MILLMAN:  Do you want to speak to me?

21             A PROSPECTIVE JUROR:  Yes, please.

22             THE COURT:  Come on up.

23             (The following occurs at sidebar outside of

24      the hearing of the prospective jurors.)

25             A PROSPECTIVE JUROR:  Friday I let you know

Proceedings                              350

1        of a scheduling conflict I have for tomorrow, and you

2        said to check with my boss and come back with an

3        answer.

4                      THE COURT:  Yes.

5                      A PROSPECTIVE JUROR:  And my boss has spoke

6        to the department, and they said I absolutely can't

7        miss it.

8                      THE COURT:  Okay.  People?

9                      MS. ABDI:  Consent.

10                     MR. MILLMAN:  Consent.

11                     THE COURT:  All right, you're excused.

12                     A PROSPECTIVE JUROR:  Thank you.

13                     (Whereupon, the prospective juror was

14       excused.)

15                     THE CLERK:  Filling seat number one, Billy

16       Kouvatsos, last name is K-O-U-V-A-T-S-O-S, seat number

17       one.

18                     THE COURT:  Mr. Kouvatsos, you put down

19       something I can't read.  It says master in what?

20                     A PROSPECTIVE JUROR:  Social studies

21       education.

22                     THE COURT:  I just couldn't read one word

23       there.

24                     Miss Kani, you want to see me?

25                     A PROSPECTIVE JUROR:  Yes.

1                THE COURT:  Come on up here.

2                (The following occurs at sidebar outside of

3        the hearing of the prospective jurors.)

4                A PROSPECTIVE JUROR:  My son is a Nassau

5        County corrections officer who recently has been

6        stalked by an inmate.  I just wanted that to be known.

7                THE COURT:  Well, that doesn't carry over to

8        this case, does it?

9                A PROSPECTIVE JUROR:  No.  But I just didn't

10       want --

11               THE COURT:  So --

12               A PROSPECTIVE JUROR:  Public record.

13               THE COURT:  You can sit down.

14               MR. MILLMAN:  May I just, if I could?  Where

15       is he working?

16               A PROSPECTIVE JUROR:  Nassau County.

17               MR. MILLMAN:  But what location specifically?

18               A PROSPECTIVE JUROR:  East Meadow.

19               MR. MILLMAN:  In the East Meadow facility?

20               A PROSPECTIVE JUROR:  Yes.

21               (The following takes place in open court.)

22               THE COURT:  Mr. Otway, you want to see me?

23               A PROSPECTIVE JUROR:  Did you say Otway?

24               THE COURT:  Yes.

25               (The following occurs at sidebar outside of

J.H.

Proceedings                              352

1          the hearing of the prospective jurors.)

2                    THE COURT:  We talked to you briefly on

3          Friday.

4                    A PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  Do you have anything else to say?

6                    A PROSPECTIVE JUROR:  I just want to make

7          known that I have been treated for PTSD for eight

8          years.  I been off full-time medicines for three years

9          but still have the occasional medicine when I get a

10         panic attack.  I don't want to interfere with the

11         court.  I don't suspect that I would have one, but just

12         to give you a heads up.

13                   THE COURT:  What causes these?

14                   A PROSPECTIVE JUROR:  Anxiety.  I was

15         involved in a series of --

16                   THE COURT:  Just one second.

17                   A PROSPECTIVE JUROR:  -- fatal incidents at

18         work.  It mounted up.

19                   THE COURT:  These trials would be very

20         pressurized.

21                   A PROSPECTIVE JUROR:  I just wanted to give

22         you a heads up.

23                   THE COURT:  Okay, thank you.  Thank you.

24         Consent?

25                   MS. ABDI:  Yes.

Proceedings                         353

1              MR. MILLMAN:  Consent too, yes.

2              THE COURT:  He's excused by consent.  Thank

3      you, Mr. Otway.

4              (The following occurs in open court.)

5              THE CLERK:  Seat number 10, Donna Donlin,

6      D-O-N-L-I-N, seat number 10.

7              THE COURT:  Mr. Fusco, you wanted to

8      approach?

9              A PROSPECTIVE JUROR:  Yes, your Honor.

10             THE COURT:  Come on up, please.

11             (The following occurs at sidebar outside of

12     the hearing of the prospective jurors.)

13             THE COURT:  Yes, sir?

14             A PROSPECTIVE JUROR:  Yes, it was just a few

15     little changes over the weekend.  I went home and spoke

16     with my wife.  We have two children in college.  I

17     found out I won't be getting paid, you know, while I'm

18     on jury duty.

19             But the other thing is and it's -- I don't

20     want to talk too loud.  It's on a little more personal

21     note.  I suffered a great loss in my life.  I was

22     deeply depressed, and I drank a little too much.  My

23     wife is very upset over this, and she feels I finally

24     got my life back together, I have a good job, and she's

25     worried about my problem.

Proceedings                    354

1           THE COURT:  Okay.  Do you think you might

2     have a relapse?

3                A PROSPECTIVE JUROR:  Yes.

4                THE COURT:  People?

5                MS. ABDI:  Consent.

6                MR. MILLMAN:  Consent.

7                THE COURT:  You're excused.  I'm sorry for

8     your situation.

9                (Whereupon, the prospective juror was

10    excused.)

11               THE COURT:  Miss Donlin, come on up here.

12               MR. MILLMAN:  Seat number 13, Vivian Tapias,

13    last name T-A-P-I-A-S, seat Number 13.

14               (The following occurs at sidebar outside of

15    the hearing of the prospective jurors.)

16               THE COURT:  Okay, what's your situation?

17               A PROSPECTIVE JUROR:  What happened is I was

18    out of work for like six months and just got a new job,

19    and I looked it up because on Friday when we left here,

20    I want to be sure they would pay me if I was to go on

21    jury duty, and they said they only pay for two weeks.

22    So I'm a little concerned with the financial end.

23               THE COURT:  This will go more than two weeks.

24    It will go at least three.

25               A PROSPECTIVE JUROR:  So then I would just

Proceedings                    355

1    not be paid.
2             MS. ABDI:  Consent.
3             MR. MILLMAN:  Consent.
4             THE COURT:  You're excused.
5             A PROSPECTIVE JUROR:  Thank you.
6             (Whereupon, the prospective juror was
7    excused.)
8             (The following takes place in open court.)
9             THE CLERK:  Seat number 10, Alesandro
10   Delucia, last name is D-E-L-U-C-I-A, seat number 10.
11            THE COURT:  All right, ladies and gentlemen,
12   would each of you follow the instruction concerning the
13   testimony of a police officer that I gave?
14            And many of you have checked off things like
15   victim of a crime, know someone who is a victim of a
16   crime.  All I want to know at this particular time
17   since we've gone over this many times with other
18   prospective jurors, would those past instances carry
19   forth to this case so that you -- it would affect your
20   impartiality?
21            People?  We've been through this a long time
22   on many occasions.  You have 15 minutes.
23            MS. ABDI:  Thank you, Judge.  Good afternoon,
24   ladies and gentlemen.
25            Mr. Kouvatsos, anything that would lead you

Proceedings                          356

1      to believe that you can't be fair and impartial in this

2      case from everything you have heard sitting here in the

3      back today?

4                A PROSPECTIVE JUROR:   No.

5                MS. ABDI:   You said you know somebody who has

6      been convicted or you or somebody was convicted of a

7      crime?

8                A PROSPECTIVE JUROR:   My grandfather, heroin

9      trafficking in 1978.

10               MS. ABDI:   Is that in Nassau County?

11               A PROSPECTIVE JUROR:   City of New York.

12               MS. ABDI:   Is there anything about that that

13     would affect your ability to be fair in this case?

14               A PROSPECTIVE JUROR:   No.

15               MS. ABDI:   Would you have any problem

16     assessing the credibility of witnesses?

17               A PROSPECTIVE JUROR:   No.

18               MS. ABDI:   And you -- could you convict the

19     defendant based on testimony of a child witness if you

20     believed that testimony beyond a reasonable doubt?

21               A PROSPECTIVE JUROR:   Yes.

22               THE COURT:   Did all of other jurors hear what

23     this juror number one said?   Would any of you have a

24     different answer?   Okay.

25               MS. ABDI:   To be clear, meaning because I may

1          have asked the question, could you convict the

2          defendant beyond a reasonable doubt based on the

3          testimony of one child witness?

4                      A PROSPECTIVE JUROR:  Yes.

5                      MS. ABDI:  Does anyone else have a problem

6          with that?  Mr. Behan?

7                      A PROSPECTIVE JUROR:  Yes.

8                      MS. ABDI:  Did you have a problem with that?

9                      A PROSPECTIVE JUROR:  No.

10                     MS. ABDI:  Mr. Walsh?

11                     A PROSPECTIVE JUROR:  Walsh.

12                     MS. ABDI:  Anything about -- anything you

13         have heard today that would lead you to believe that

14         you cannot be fair and impartial in this case?

15                     A PROSPECTIVE JUROR:  No.

16                     MS. ABDI:  Miss Kani, anything you heard

17         throughout this day which would lead you to believe

18         that you can't be fair and impartial?

19                     A PROSPECTIVE JUROR:  No.

20                     MS. ABDI:  Mr. Yetkofsky?

21                     A PROSPECTIVE JUROR:  Yetkofsky.

22                     MS. ABDI:  Anything you heard today lead you

23         to believe that you can't be fair and impartial in this

24         case?

25                     A PROSPECTIVE JUROR:  No.

Proceedings                    358

1            MS. ABDI:  You would have no problem

2       convicting the defendant if you believed testimony

3       beyond a reasonable doubt?

4            A PROSPECTIVE JUROR:  No.

5            MS. ABDI:  I can't see which one you checked

6       off, but do you know people who have been accused or

7       convicted?

8            A PROSPECTIVE JUROR:  Yes, I was.  DUI.

9            MS. ABDI:  How long ago was that?

10           A PROSPECTIVE JUROR:  Ten years.

11           MS. ABDI:  Was that in Nassau County?

12           A PROSPECTIVE JUROR:  It was in Nassau

13      County, yes.

14           MS. ABDI:  Is there anything about that

15      experience that, you know, kind of you have a negative

16      experience about police or the criminal justice system?

17           A PROSPECTIVE JUROR:  No.

18           MS. ABDI:  Did you have to deal with any

19      prosecutors or -- with respect to your case?

20           A PROSPECTIVE JUROR:  Meaning what?

21           MS. ABDI:  Meaning, well, did you go to

22      trial?

23           A PROSPECTIVE JUROR:  No.  I just pleaded

24      guilty.

25           MS. ABDI:  Did you have any dealings with the

J.H.

Proceedings                                  359

1       DA's office with respect to your case at all?

2                   A PROSPECTIVE JUROR:  No.

3                   MS. ABDI:  Would the fact that you went

4       through that, would you hold it against the DA's office

5       in this case?

6                   A PROSPECTIVE JUROR:  No.

7                   MS. ABDI:  Mr. Burnhardt?

8                   A PROSPECTIVE JUROR:  Burnhardt.

9                   MS. ABDI:  Anything about -- anything that

10      you have experienced that would lead you to believe

11      that you can't be fair and impartial in this case?

12                  A PROSPECTIVE JUROR:  No.

13                  MS. ABDI:  With respect to anything in your

14      background, do you have any negative experiences

15      towards the police or District Attorney's office?

16                  A PROSPECTIVE JUROR:  No, I don't.

17                  MS. ABDI:  Would you be able to separate that

18      experience from anything you hear today in the

19      courtroom?

20                  A PROSPECTIVE JUROR:  Yes, I would.

21                  MS. ABDI:  Mr. Garfinkel?

22                  A PROSPECTIVE JUROR:  Yes.

23                  MS. ABDI:  Anything that you heard today that

24      would lead you to believe that you can't be fair and

25      impartial?

1          A PROSPECTIVE JUROR:  No, there isn't.

2          MS. ABDI:  You checked off here that you or

3     somebody you know has been the victim of a crime.

4          A PROSPECTIVE JUROR:  Yes.

5          MS. ABDI:  Can you tell me a little bit about

6     that?

7          A PROSPECTIVE JUROR:  It was night a number

8     of years ago.  It was a robbery at a credit union that

9     was involved, and they came in to rob us.

10         MS. ABDI:  Anything about that experience

11    that would lead you to believe that you can't be fair

12    and impartial in this case?

13         A PROSPECTIVE JUROR:  Not a problem.

14         MS. ABDI:  And would you be able to convict

15    the defendant beyond a reasonable doubt based on the

16    testimony of one witness if you believed that witness?

17         A PROSPECTIVE JUROR:  Yes, I could.

18         MS. ABDI:  Mr. Molczan?

19         A PROSPECTIVE JUROR:  Molczan.

20         MS. ABDI:  Anything you heard today that

21    would lead you to believe you can't be fair and

22    impartial in this case?

23         A PROSPECTIVE JUROR:  No.

24         MS. ABDI:  Can you convict the defendant

25    based on testimony if you believe that testimony beyond

Proceedings                    361

1       a reasonable doubt?

2                  A PROSPECTIVE JUROR:  Yes.

3                  MS. ABDI:  Does -- if a witness is younger, a

4       child, would they start off with sort of the idea that

5       they are less credible in your mind?

6                  A PROSPECTIVE JUROR:  No, I wouldn't say so.

7                  MS. ABDI:  You would be able to listen to

8       their testimony with an open mind?

9                  A PROSPECTIVE JUROR:  Yes, I would.

10                  MS. ABDI:  What about you, Miss Mayne?

11                  A PROSPECTIVE JUROR:  Yes.

12                  MS. ABDI:  You would be able to listen to the

13       testimony of child witnesses with an open mind?

14                  A PROSPECTIVE JUROR:  Yes.

15                  MS. ABDI:  Is there anything about anything

16       what you have heard today that would lead you to

17       believe that you can't be fair and impartial in this

18       case?

19                  A PROSPECTIVE JUROR:  No.

20                  MS. ABDI:  Would you have any problem making

21       credibility determinations in this case?

22                  A PROSPECTIVE JUROR:  No.

23                  MS. ABDI:  Mr. Delucia?

24                  A PROSPECTIVE JUROR:  Delucia.

25                  MS. ABDI:  You checked off here that you or

Proceedings                    362

1       somebody you know has been victim of a crime.

2                  A PROSPECTIVE JUROR:  Yes.

3                  MS. ABDI:  Can you tell me a little bit about

4       that?

5                  A PROSPECTIVE JUROR:  A robbery, home

6       robbery, my parents.

7                  MS. ABDI:  Your parents.  Were they home at

8       the time?

9                  A PROSPECTIVE JUROR:  Yes.

10                 MS. ABDI:  How long ago was this?

11                 A PROSPECTIVE JUROR:  Three years ago.

12                 MS. ABDI:  That was in Nassau County?

13                 A PROSPECTIVE JUROR:  Yes.

14                 MS. ABDI:  Is there anything about -- was

15      anyone apprehended?

16                 A PROSPECTIVE JUROR:  No.

17                 MS. ABDI:  Is there anything about that

18      experience that would lead you to believe that you

19      can't be fair in this case?

20                 A PROSPECTIVE JUROR:  Not at all.

21                 MS. ABDI:  Do you have any negative feelings

22      towards either the criminal justice system or the

23      police because nobody was apprehended?

24                 A PROSPECTIVE JUROR:  No.

25                 MS. ABDI:  Mr. is it Eletti or Eletti?

Proceedings                    363

1           A PROSPECTIVE JUROR:  Eletti.

2                MS. ABDI:  Anything that you've heard today

3      that would lead you to believe you can't be fair and

4      impartial in this case?

5                A PROSPECTIVE JUROR:  No.

6                MS. ABDI:  You checked off that you or

7      somebody you know has been the victim or also maybe

8      accused of a crime.  Can you just tell me little bit

9      about that?

10               A PROSPECTIVE JUROR:  It was myself with

11     destruction of property.  A real estate matter turned

12     into a civil matter.

13               MS. ABDI:  Which part was that, accused or a

14     victim?

15               A PROSPECTIVE JUROR:  Accused.

16               MS. ABDI:  So you were accused of destruction

17     of property.  Do you or somebody you know was the

18     victim of a crime as well?

19               A PROSPECTIVE JUROR:  Yes.

20               MS. ABDI:  What happened there?

21               A PROSPECTIVE JUROR:  It was a DUI, my wife's

22     sister.

23               MS. ABDI:  Now, with the accusation that

24     became a civil case, it wasn't a criminal case?

25               A PROSPECTIVE JUROR:  No.

Proceedings                    364

1           MS. ABDI:  Is that still pending, or has it
2      been resolved?
3           A PROSPECTIVE JUROR:  It's been resolved.
4           MS. ABDI:  Do you have any negative feelings
5      about the criminal justice system or lawyers because of
6      your case?
7           A PROSPECTIVE JUROR:  No.
8           MS. ABDI:  Mr. Antonelli?
9           A PROSPECTIVE JUROR:  Hello.
10          MS. ABDI:  Hi.  Anything that you have heard
11     today that you believe you can't be fair and impartial
12     in this case?
13          A PROSPECTIVE JUROR:  I will say that I think
14     I have a hard time convicting somebody on testimony --
15          THE COURT:  I'm sorry?
16          A PROSPECTIVE JUROR:  I think I would have a
17     convicting someone on testimonial evidence alone.
18          THE COURT:  All right, the great majority of
19     evidence in most cases is testimonial evidence.
20     Basically a witness tells you through his sworn
21     testimony that something happened.
22          So you would want something else other than a
23     witness's account of what happened?
24          A PROSPECTIVE JUROR:  I mean I've been led to
25     believe that there's a sole witness in the case as

1    well, and I think that I would have a hard time

2    convicting someone guilty of the crimes we have

3    discussed or that have been discussed given one

4    person's testimony regardless of they are adult or a

5    child.

6                 THE COURT:  Okay.  Go to another prospective

7    juror.

8                 MS. ABDI:  Okay, thank you, Judge.  Miss

9    Tapias, is there anything that you have heard today

10   that would lead you to believe that you can't be fair

11   and impartial in this case?

12                A PROSPECTIVE JUROR:  No.

13                MS. ABDI:  Can you convict the defendant

14   based on testimonial evidence?

15                A PROSPECTIVE JUROR:  Yes.

16                MS. ABDI:  If you believe that evidence?

17                A PROSPECTIVE JUROR:  Yes.

18                MS. ABDI:  You checked off here that you or

19   somebody close to you has testified in court before?

20                A PROSPECTIVE JUROR:  My husband.

21                MS. ABDI:  And what circumstances was that?

22                A PROSPECTIVE JUROR:  He's -- he works for

23   the city.  He is a civil engineer.

24                THE INTERPRETER:  I can't hear you.

25                A PROSPECTIVE JUROR:  He works for the City

Proceedings                                    366

1    of New York, and it was an accident, and he was called

2    to testify.

3                MS. ABDI:  So he had to testify as part of

4    his job?

5                A PROSPECTIVE JUROR:  Um-hum.

6                MS. ABDI:  Miss Ritter, anything about what

7    you've heard today that you would lead you to believe

8    that you can't be fair and impartial in this case?

9                A PROSPECTIVE JUROR:  No.

10               MS. ABDI:  Would you have any problem

11   convicting the defendant based on the testimony of a

12   child witness?

13               A PROSPECTIVE JUROR:  No, as long as can --

14   I'm sorry, can you repeat again?

15               MS. ABDI:  Sure.  Would you have any probllm

16   convicting the defendant based on the testimony of a

17   child witness as long as you believed that witness?

18               A PROSPECTIVE JUROR:  As long as I believed

19   that witness, that's what I thought, thank you.

20               MS. ABDI:  And you would have no problem

21   doing that?

22               A PROSPECTIVE JUROR:  No.

23               THE COURT:  Wind it down.

24               MS. ABDI:  Ladies and gentlemen, at the end

25   of the evidence in this case, if I prove my case beyond

1      a reasonable doubt, I'm going to ask you to convict the

2      defendant.  And if I prove my case beyond a reasonable

3      doubt, I'm going to expect that you convict the

4      defendant.

5              Is there anyone here that for whatever reason

6      they just don't think that they can do that, that they

7      just are not comfortable with that even if I prove my

8      case beyond a reasonable doubt?

9              THE COURT:  You don't have to be comfortable

10     with it.  Many people don't like to judge other people.

11     Would anyone here have any problem announcing their

12     verdict in open court?  Go ahead.

13             MS. ABDI:  Okay, thank you for your time.

14             MR. MILLMAN:  Good afternoon.  Mr. Molczan,

15     you understand if you are selected as a juror in this

16     case, you will be called upon to make a number of

17     decisions?

18             A PROSPECTIVE JUROR:  Yes.

19             MR. MILLMAN:  A number of decisions about the

20     witnesses that testify in this case?

21             A PROSPECTIVE JUROR:  Yes.

22             MR. MILLMAN:  Would you have any problem

23     paying close attention to their testimony, deciding

24     whether you believe a witness or don't and weighing how

25     much credibility you believe each witness should be

Proceedings                    368

1      afforded?

2               A PROSPECTIVE JUROR:  Shouldn't be a problem.

3               MR. MILLMAN:  Would you have any problem

4      doing that, Miss Tapias?

5               A PROSPECTIVE JUROR:  Can you repeat the

6      question?

7               MR. MILLMAN:  Sure.  Would you have any

8      problem watching the witnesses testify, making a

9      judgment about whether or not you believe that witness,

10     any problem doing that?

11              A PROSPECTIVE JUROR:  No.

12              MR. MILLMAN:  Miss Tapias, you understand

13     that my client is presumed innocent?

14              A PROSPECTIVE JUROR:  Um-hum.

15              MR. MILLMAN:  And do you have any problem

16     with that concept?

17              A PROSPECTIVE JUROR:  No.

18              MR. MILLMAN:  Mr. Molczan, I believe that you

19     indicated on your form that you or someone you know --

20              A PROSPECTIVE JUROR:  I --

21              MR. MILLMAN:  A crime.  Was that something

22     you prefer to discuss in private?

23              A PROSPECTIVE JUROR:  No.  It was about three

24     years ago.  My mother had her purse snatched.

25              MR. MILLMAN:  You understand that part of

1          your job is to determine what took place on a

2          particular day in the past.  Would you agree with me

3          that any feelings you may have as you listen to the

4          evidence in this case certainly can't change what took

5          place that day?

6                         A PROSPECTIVE JUROR:  Of course.

7                         MR. MILLMAN:  Can you give me your assurance

8          that you will decide this case based on the facts and

9          evidence, not and sympathy and compassion?

10                         A PROSPECTIVE JUROR:  Yes, I can.

11                         MR. MILLMAN:  I am not suggesting that it's

12         bad to be compassionate or have sympathy, but you

13         understand why it's not to be part of you as a juror in

14         this case?

15                         A PROSPECTIVE JUROR:  Yes.

16                         MR. MILLMAN:  Can you give me your similar

17         assurance, Miss Mayne?

18                         A PROSPECTIVE JUROR:  Yes.

19                         MR. MILLMAN:  That you will be fair and

20         impartial?

21                         A PROSPECTIVE JUROR:  Yes.

22                         MR. MILLMAN:  And Miss Mayne, you understand

23         that the judge is going to instruct you on the law that

24         has to be applied in this case.  Can you give me your

25         assurance that you'll follow that law regardless of

1        whether or not you agree with it?

2                   A PROSPECTIVE JUROR:  Yes.

3                   MR. MILLMAN:  And I'm not suggesting you will

4        disagree, but it's very important for us to inquire

5        about this, that even if you do hear something that you

6        may not fully agree with, you are going to follow the

7        instruction the judge gives you?

8                   A PROSPECTIVE JUROR:  Yes.

9                   MR. MILLMAN:  Mr. Behan, good afternoon.

10       Mr. Behan, can you accept the notion that witnesses

11       sometimes swear to tell the truth and don't always tell

12       the truth?

13                  A PROSPECTIVE JUROR:  Yes, sir.

14                  MR. MILLMAN:  And as you listen to the

15       witnesses in this case, can you give me your assurance

16       you will scrutinize their testimony, play close

17       attention to what they say and how they say it?

18                  A PROSPECTIVE JUROR:  Yes, sir.

19                  MR. MILLMAN:  Can you give me a similar

20       assurance, Mr. Burnhardt?

21                  A PROSPECTIVE JUROR:  Yes, I could.

22                  MR. MILLMAN:  Mr. Burnhardt, you understand

23       that in your capacity as a juror, your role will be

24       limited to what the judge instructs you?

25                  A PROSPECTIVE JUROR:  Yes.

J.H.

1           MR. MILLMAN:  And that you are not here to

2     decide whether or not you like or dislike my client but

3     rather to determine whether or not the prosecutor has

4     proved his guilt beyond a reasonable doubt?

5           A PROSPECTIVE JUROR:  Yes, I'm aware of that.

6           MR. MILLMAN:  So even if you hear something

7     during the course of this trial that leads you to

8     conclude that you don't like my client, whatever reason

9     that may be, is that in and of itself going to cause

10    you to find him guilty if the evidence doesn't prove

11    his guilt beyond a reasonable doubt?

12          A PROSPECTIVE JUROR:  No, it won't.

13          MR. MILLMAN:  Is there anybody here who feels

14    if they in their gut for whatever reason, if they don't

15    like my client, that's going to influence them to reach

16    a verdict of guilty even if you don't believe that the

17    prosecutor has met the burden of proof that the judge

18    has instructed you on?  Anybody here feel that way?

19          Mr. Behan, I wanted to ask you I see here

20    that you noted witness, convicted, accused.  Is it,

21    again, something that you prefer to discuss in private?

22          A PROSPECTIVE JUROR:  No, not at all.

23          MR. MILLMAN:  Can you tell me a little bit

24    about that?

25          A PROSPECTIVE JUROR:  Misguided youth.

1        MR. MILLMAN:  Many years ago, I am not

2   suggesting.  From the way you said it, I didn't imagine

3   that it was something occurred recently.  That wouldn't

4   interfere with anything?

5        A PROSPECTIVE JUROR:  No, it wouldn't.

6        MR. MILLMAN:  Mr. Walsh, if the judge

7   instructed you that my client is not required to

8   testify, that you may not draw a negative inference

9   from that, would you have any difficulty?

10        A PROSPECTIVE JUROR:  No, no problem with

11   that.

12        MR. MILLMAN:  Is there anybody here who

13   thinks they might have difficulty with that concept, if

14   you don't hear my client testify?  Yes, Mr. Garfinkel?

15        A PROSPECTIVE JUROR:  Yes, I do.

16        MR. MILLMAN:  I appreciate your candor.  So

17   you don't think that you will be able to follow that

18   instruction, you would have a difficult time?

19        A PROSPECTIVE JUROR:  I do, because I feel a

20   person should get up and defend himself.

21        MR. MILLMAN:  And I appreciate your candor.

22   Thank you.  And now is the time to tell us.  Is there

23   anybody else who feels that way?

24        THE COURT:  Do you realize based upon the

25   example I gave with regard to my looking out at the

Proceedings                          373

1       broken window incident, you realize a person may be

2       defending himself by saying nothing in certain

3       instances?  Can you envision that situation?

4                   A PROSPECTIVE JUROR:  It's tough for me, sir.

5                   THE COURT:  All right.  So you still maintain

6       that -- your original answer?

7                   A PROSPECTIVE JUROR:  Yes, I do.

8                   THE COURT:  Okay.

9                   MR. MILLMAN:  Is there anybody else here who

10      feels that way?

11                  THE COURT:  Number 12.

12                  MR. MILLMAN:  I'm sorry, your Honor?

13                  THE COURT:  Number 12.

14                  MR. MILLMAN:  Oh, I'm sorry.  Thank you,

15      Judge.  Yes, sir?  So you feel that you would have

16      difficulty --

17                  A PROSPECTIVE JUROR:  I would have a hard

18      time.  I'm sorry, it seems somewhat suspicious.

19                  MR. MILLMAN:  Fair enough.  Well, we

20      appreciate your candor, Mr. Antonelli, correct?

21                  A PROSPECTIVE JUROR:  Yes.

22                  MR. MILLMAN:  Anybody else here feels that

23      way?  Mr. Yetkofsky, did I say that correctly?

24                  A PROSPECTIVE JUROR:  Yes.

25                  MR. MILLMAN:  Can you give me your assurance

1    you will decide this case based on the facts and

2    evidence?

3                A PROSPECTIVE JUROR:  Yes.

4                MR. MILLMAN:  Any problem with not drawing a

5    negative inference should my client choose not to

6    testify?

7                A PROSPECTIVE JUROR:  No, I don't think so.

8                MR. MILLMAN:  And would you agree with me

9    that a person has a right to contest charges that are

10   filed against him?

11               A PROSPECTIVE JUROR:  Yes.

12               MR. MILLMAN:  You understand if everybody

13   agreed on what happened, we wouldn't be here?

14               A PROSPECTIVE JUROR:  Correct.

15               MR. MILLMAN:  You are going to listen very

16   carefully to the evidence presented?

17               A PROSPECTIVE JUROR:  Yes.

18               MR. MILLMAN:  And give both sides a fair

19   shake?

20               A PROSPECTIVE JUROR:  Yes.

21               MR. MILLMAN:  Ladies and gentlemen, as I

22   think you know by now, this is never something that's

23   easy, but you will be taking on a very serious

24   responsibility if you're selected as jurors in this

25   case.  And if there's anybody here who thinks they

Proceedings                          375

1       would have any reservation about finding my client not

2       guilty in the event that the District Attorney does not

3       prove his guilty beyond a reasonable doubt, now is the

4       time to let us know.  Is there anybody here who feels

5       they would not be able to find my client not guilty if

6       the prosecution fails to prove his guilt beyond a

7       reasonable doubt?  Okay, thank you.

8                   (The following occurs at sidebar outside of

9       the hearing of the prospective jurors.)

10                  THE COURT:  People, cause for the panel?

11                  MS. ABDI:  Numbers seven, Mr. Garfinkel, and

12      12, Mr. Antonelli.

13                  THE COURT:  Any objection?

14                  MR. MILLMAN:  I agree.

15                  THE COURT:  I agree too.  Okay, seat number

16      one here, peremptory, People?

17                  MS. ABDI:  No.

18                  THE COURT:  Defendant?

19                  MR. MILLMAN:  Yes.

20                  THE COURT:  Seat number two here, peremptory,

21      People?

22                  MS. ABDI:  Yes.

23                  THE COURT:  Seat number three here,

24      peremptory, People?

25                  MS. ABDI:  No.

Proceedings                                    376

1           THE COURT:  We have 12.  Alternate number

2    one, peremptory, People, seat number four?

3           MS. ABDI:  Judge, how many alternates are we

4    picking?

5           THE COURT:  I don't know yet.

6           MR. MILLMAN:  Doesn't that affect the number

7    of --

8           MS. ABDI:  You only get two per seat.

9           THE COURT:  I don't know yet.

10          MR. MILLMAN:  Okay.

11          MS. ABDI:  No.

12          MR. MILLMAN:  Yes, perempt.

13          THE COURT:  Second alternate, seat number

14   five, peremptory, People?

15          MS. ABDI:  Yes.

16          THE COURT:  First alternate, People?

17          MR. MILLMAN:  Yetkofsky.

18          THE COURT:  People?

19          MS. ABDI:  Yes.

20          MR. MILLMAN:  I'm sorry, I got confused.  I

21   thought that's Yetkofsky.  I thought you exercised a

22   perempt on that.

23          MS. ABDI:  As an alternate, yeah.

24          MR. MILLMAN:  So we're on Burnhardt.

25          THE COURT:  Number six, alternate number one?

Proceedings                      377

1                    MS. ABDI:  Yes.

2                    THE CLERK:  Perempt?

3                    MS. ABDI:  Yes.

4                    THE COURT:  Number eight, perempt for

5          alternate number one?

6                    MS. ABDI:  No.

7                    MR. MILLMAN:  One moment.  Yes.

8                    THE COURT:  Now number nine is alternate

9          number one -- number eight is alternate number one.

10         Now we are going to go to alternate number two.

11         Perempt, People?

12                   THE CLERK:  Mayne.

13                   MS. ABDI:  No.

14                   MR. MILLMAN:  No.

15                   THE COURT:  That's alternate number two.

16         Alternate number three, perempt?

17                   MS. ABDI:  No.

18                   THE COURT:  Perempt?

19                   MR. MILLMAN:  No.

20                   THE COURT:  Now alternate number four,

21         perempt, People?  That's juror number in the 13th spot.

22                   MR. MILLMAN:  I thought it was in the 11th

23         spot.

24                   THE CLERK:  Seat number 11.

25                   THE COURT:  No, we're not.  We're up to

J.H.

Proceedings                    378

1     alternate number four who now is in seat number 13.

2                 MS. ABDI:  What happened to Mr. Eletti?

3                 THE COURT:  Alternate number one is in seat

4     number nine.

5                 MS. ABDI:  I thought alternate number one was

6     Mr. Molczan in seat eight.

7                 COURT OFFICER:  That is juror 12.

8                 MS. ABDI:  I just want to be clear.

9                 THE COURT:  Alternate number one was chosen

10    by default because you both were out of challenges, and

11    she is the Afro-American woman in seat number nine.

12                MS. ABDI:  So Miss Mayne is alternate number

13    one?

14                THE COURT:  Yes.  Now, you didn't challenge

15    the other two, either of you did.

16                MS. ABDI:  I actually -- but I was mistaken.

17                MR. MILLMAN:  So was I.  I was confused.

18                MS. ABDI:  We thought that -- I thought Mr.

19    Molczan was alternate number one.

20                THE COURT:  What difference does it make?

21                MS. ABDI:  Because I am challenging

22    Mr. Molczan.

23                THE COURT:  Right now we are in seat number

24    10 for alternate number two.  Do you have a challenge,

25    peremptory challenge, People?

Proceedings                    379

1              MS. ABDI:  No.

2              MR. MILLMAN:  This is for seat number 10?

3              THE COURT:  Alternate number two.

4              MR. MILLMAN:  Yes, I do have a challenge.

5              THE COURT:  Now we are in seat number --

6       alternate number two.  Peremptory, People?

7              MS. ABDI:  For Mr. Eletti?

8              THE COURT:  Who is now in seat number 11.

9              MS. ABDI:  Yes.

10             THE COURT:  Miss Tapias is number two.  And

11      now we go to seat number 13, peremptory, People?

12             MS. ABDI:  No.

13             THE COURT:  Defendant?

14             MR. MILLMAN:  No.

15             THE COURT:  She's alternate number two.

16             MR. MILLMAN:  I don't mean to confuse things.

17      One is Miss Mayne?

18             THE COURT:  Yes.  Now we are in alternate

19      number three, peremptory, the last juror, People?

20             MS. ABDI:  No.

21             MR. MILLMAN:  No.

22             THE COURT:  She's alternate number three.  Do

23      you want to pick another one out of the excused jurors

24      for alternate number four?

25             MR. MILLMAN:  Alternate four, Molczan.

Proceedings                    380

1          MS. ABDI:  Defense counsel and I agree on

2     putting in Molczan who was previously dismissed as

3     alternate number four.

4          THE COURT:  Agreed?

5          MS. ABDI:  Yes.

6          THE COURT:  Agreed.

7          MR. MILLMAN:  Yes.

8          (The following takes place in open court.)

9          THE COURT:  Okay, ladies and gentlemen, we

10    have our jury, and we have our alternates.  Those of

11    you who are selected will return tomorrow, and we will

12    proceed with my instructions to you and opening

13    statements by the People.

14          You want to take over, Charlie?

15          THE CLERK:  Yes, sir.  Okay, ladies and

16    gentlemen, if you do not hear your name, please gather

17    your belongings, get your stuff and go see the officer

18    outside to direct you where to go.  If you do hear your

19    name, you have been selected as a juror.

20          As juror number 12, Damian Walsh.

21          Alternate number one is Yvonne Mayne.

22          Alternate number two is Vivian Tapias.

23          Alternate number three is Karen Ritter, and

24    finally alternate number four, John Molczan.  All

25    others, please gather your belongings and step outside.

Proceedings                           381

1              (Whereupon, the prospective jurors were

2        excused.)

3              THE CLERK:  Jurors, if you could please rise

4        and raise your right hands.  Do you and each of you

5        solemnly swear that you will try this action in a just

6        and impartial manner to the best of your judgment and

7        render a verdict according to the law and evidence so

8        help you God?

9              (Whereupon, the prospective jurors answered

10       in the affirmative.)

11             THE CLERK:  Thank you.

12             THE COURT:  Okay, we will see you tomorrow at

13       9:30, and then hopefully shortly thereafter, we will

14       commence the trial with my instructions to you.

15             (Whereupon, the jurors exited the courtroom.)

16             THE COURT:  We'll see you tomorrow.

17             MS. ABDI:  Can I just add something?

18             THE COURT:  On the record?

19             MS. ABDI:  Yes, on the record but at bench.

20             (The following occurs at sidebar.)

21             MS. ABDI:  Judge, I just wanted to let you

22       know that defense counsel and I have talked about this

23       before.  There is a witness that I may call, Misael

24       Berrios, that's his name.  There is a witness that I

25       may call and --

J.H.

1        THE COURT:  When are you going to call him?

2             MS. ABDI:  I don't know, Judge.  And he --

3    basically he fired a gun in the air.  He was never

4    charged with that because based on our evaluation of

5    the evidence at that time, there was no ballistic

6    evidence found at the scene.  At best, from our

7    estimation, it could have been a misdemeanor charge.

8    But he was never charged with that, and he hasn't been

9    given -- he wasn't charged with anything, hasn't been

10   given any promises at this point.

11            THE COURT:  Did he testify in the grand jury?

12            MS. ABDI:  No.  But if he does testify at

13   trial, it's our intention to give him a limited

14   immunity for that action as far as firing the gun in

15   the air.  I just wanted the Court to be aware of that

16   and defense counsel to be aware of that as far as

17   there's no written agreement.

18            THE COURT:  When is he going to testify?

19            MS. ABDI:  I don't know.

20            MR. MILLMAN:  But it's not tomorrow?

21            MS. ABDI:  It's not tomorrow.

22            THE COURT:  We'll take it --

23            MS. ABDI:  But I wanted to let the Court know

24   so that you are not surprised.

25            THE COURT:  I'm not surprised?

Proceedings                          383

1       MS. ABDI:  I want to let defense counsel

2    know.

3       MR. MILLMAN:  If it's not in writing, I'm

4    entitled to know the terms of the agreement.  Just

5    because you said it's limited immunity --

6       MS. ABDI:  There's nothing in writing.  I

7    don't know if that will change.  If it becomes in

8    writing, I will give it to you.  I am representing that

9    we're not going to charge him with firing the gun in

10    the air or telling people to, you know, back away or

11    stay out of it, make it one-on-one.  So we're not --

12       THE COURT:  Is he represented?

13       MS. ABDI:  No.

14       THE COURT:  Let me know the day before you

15    call him.  He may need a lawyer.

16       MS. ABDI:  Okay.  But that's our intention

17    not to prosecute.

18       MR. MILLMAN:  But it's not full scale, it's

19    transactional?  You said limited.

20       MS. ABDI:  I mean, you know, essentially for

21    his actions that night.

22       MR. MILLMAN:  So it's full?

23       THE COURT:  As far as I'm concerned, it's

24    transactional.

25       MR. MILLMAN:  Yes, transactional.  And also,

Proceedings                                384

1        you know, as far as tomorrow goes, obviously you

2        determine the order, I know that.  I'm just asking if

3        you know the first three.

4                    MS. ABDI:  And I'm not trying to be -- I'm

5        not stonewalling you, but I don't exactly know the

6        exact order of people because I don't know who is

7        coming in.

8                    THE COURT:  Who have you subpoenaed tomorrow?

9                    MS. ABDI:  I subpoenaed a lot of people.  Who

10       comes in and in what fashion?  But I know --

11                   THE COURT:  I have something else to do.

12       I've got to attend to that.

13                   MS. ABDI:  I will discuss it with defense

14       counsel.

15                   THE COURT:  Okay.

16                   MR. MILLMAN:  I'm not looking for the whole

17       list.

18                   MS. ABDI:  I know.

19                   MR. MILLMAN:  Usually it's not an issue.  All

20       right, thank you.

21                   (Whereupon, the trial is adjourned to

22       December 6, 2011.)

23

24

25

J.H.

```
 1   STATE OF NEW YORK  :  NASSAU COUNTY

 2       SUPREME COURT  :  PART 39

 3   ----------------------------------------X

 4   THE PEOPLE OF THE STATE OF NEW YORK,

 5           -against-                      Ind. No. 202N-11

 6   ULISES BONILLA,

 7                        Defendant.

 8   ----------------------------------------X

 9   JURY TRIAL

10                        December 6, 2011
                          262 Old Country Road
11                        Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                    For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                    For the Defendant
23
                            JOANNE HORROCKS, CSR
24                          Senior Court Reporter

25
```

J.H.

Proceedings                               386

1            THE CLERK:  Case on trial, People of the

2       State of New York versus Ulises Bonilla, Indictment

3       202N of 2011.  All parties are present, including the

4       defendant and the Spanish interpreter, Kim Hernandez.

5       There are no jurors in the courtroom.

6            THE COURT:  Let's bring them in.  Let's see

7       if anyone wants to talk on the record beforehand.

8            MR. MILLMAN:  Your Honor, just the fact that

9       there are -- I don't know if we necessarily have to be

10      resolved right now.  I want to remind the Court there

11      were still a couple of outstanding issues pertaining to

12      redactions that I was seeking with regard to my

13      client's videotaped statement.

14           THE COURT:  I have told both counsel I'm not

15      going to spend five hours going through a tape for the

16      purposes of redaction.  I understand this tape is five

17      hours long, and I hope that you can work it out before

18      it's introduced.  If there is specific areas of

19      inquiry, then we will get involved with this.

20           By way of example, during a police interview,

21      a detective may say, I have been in this business 25

22      years.  You're a Goddamn liar, and I know you did it.

23      Now, that may be a proper investigative technique, but

24      it's not going to be told to the jury.  And these

25      things have to be redacted.

Proceedings                387

1              If you have a problem, get the specific areas

2         and bring it to my attention, or else I'm precluding

3         the People from introducing the tape.  I have no

4         transcript.

5              MR. MILLMAN:  I just --

6              THE COURT:  It has to be done.

7              MR. MILLMAN:  I just wasn't sure whether or

8         not the Assistant DA planned on making any reference to

9         any of the disputed segments in the opening statement.

10             THE COURT:  She better not.  Bring in the

11        jury.

12             COURT OFFICER:  Jury entering.

13             (The jury enters the courtroom.)

14             THE CLERK:  Doreen Woessner.  Miss Woessner?

15             A JUROR:  Yes.

16             THE CLERK:  Take the first seat over.

17        Michael McKeon.  Tjuana Evans.  Castro Rafferty.  Carol

18        Isasi.

19             A JUROR:  Isasi.

20             THE CLERK:  I'm sorry.  Margaret Otton.

21        Yvonne Mayne.  Actually, I'm sorry, John Dong.  Walter

22        Harris.  Dorothy Washington.  Anna Narcici.  Joseph

23        Werner.  Damien Walsh.  Yvonne Mayne.  Vivian Tapias.

24        Alternate number three is Karen Ritter, and alternate

25        number four is John Molczan.  All the jurors seated

Proceedings                           388

1    appropriate to both sides?

2              MS. ABDI:  Yes.

3              MR. MILLMAN:  Yes.

4              THE COURT:  I have your note, juror number

5    three.  We will take it up later on this morning.

6              THE CLERK:  Swear them in?

7              THE COURT:  Yes.

8              THE CLERK:  Good morning, ladies and

9    gentlemen.  If you could all rise one more time and

10   please raise your right hands.  That is the collective

11   unit.  Do you and each of you solemnly swear that you

12   will try this action in a just and impartial manner to

13   the best of your judgment and render a verdict

14   according to the law and evidence, so help you God?

15             (Whereupon, the jurors answered in the

16   affirmative.)

17             THE CLERK:  Thank you.  Have a seat.

18             THE COURT:  All right, members of the jury,  I

19   would like once again to welcome you to the Nassau

20   County Court.  You should take a certain amount of

21   pride and satisfaction from the fact that out of many

22   prospective jurors brought into this courtroom, you

23   were selected.

24             We are about to begin the trial of this case

25   concerning which you've heard some details during the

Proceedings                                389

1    process of jury selection. The comments and

2    instructions that follow are designed to acquaint you

3    with the separate functions, duties and

4    responsibilities of Court, counsel and the jury.

5              As you know, this is a criminal case which

6    has been brought by the People upon an indictment.

7    Please keep in mind that this indictment is simply an

8    accusation, a paper writing, and is not in any way

9    evidence of the allegations it contains. It is merely

10   the device used to bring the charges against the

11   defendant.

12             The defendant has pled not guilty to the

13   indictment. According to the law, the People have the

14   burden of proving beyond a reasonable doubt each and

15   every element of the crimes charged and the defendant's

16   commission thereof. The defendant does not have to

17   prove anything. He is presumed to be innocent of the

18   charges.

19             When I have completed these preliminary

20   instructions, the case will begin with the statement by

21   the Assistant District Attorney as to what the People

22   intend to prove. This is known as opening to the jury.

23   The law requires the People to make an opening

24   statement to enable the Court and you to better

25   understand the testimony and the evidence that will

1       follow.

2              On the other hand, the defendant's attorney

3       is not required by law to make an opening statement.

4       This is because the People have the burden of proving

5       the charges beyond a reasonable doubt.  Thus, defense

6       counsel may choose not to make an opening statement

7       but may instead wait to see if the People prove their

8       case.   If the defense counsel chooses not to make an

9       opening statement, you must not draw any inference from

10      this.

11             Opening statements are not evidence.  The

12      evidence upon which you base your verdict will come

13      only from the witness box or in the form of

14      photographs, documents or other exhibits introduced and

15      admitted during trial.

16             After the witnesses have testified and all

17      the evidence has been heard or received, each of the

18      attorneys will have the opportunity to orally argue in

19      support of their case.  These closing arguments are

20      known as summations, and like the opening statements,

21      are not to be considered by you as evidence.

22             Under our system of law, counsel for the

23      defense will sum up first, and the Assistant District

24      Attorney will sum up last.

25             Following summations, I will instruct you on

Proceedings                    391

1    the law which applies to these criminal charges. You,

2    the jury, will then retire to the jury room to

3    deliberate for the sole purpose of reaching your

4    verdict. That's the outline of the trial.

5              You are the sole judges of the facts. You

6    will have the sole responsibility to find and determine

7    facts. On the other hand, when I instruct you on the

8    law either during the case or at the close of the

9    trial, you must follow my instructions on the law

10   exactly as I give them to you.

11             After the opening statement, witnesses will

12   be called to the stand, and after being sworn, will be

13   examined and cross-examined. The questioning of a

14   witness by a lawyer calling the witness is known as

15   direct examination. The questioning of that particular

16   witness by a lawyer on the opposite side is known as

17   cross-examination. Sometimes questions are objected

18   to. I will have to rule on the propriety of those

19   objections.

20             A question standing alone is not evidence.

21   Isn't it a fact that today is Tuesday? Objection.

22   Sustained. You are not to draw any inferences from an

23   unanswered question. It's the question coupled with

24   the answer that constitutes the evidence.

25             Exhibits such as photographs, documents and

J.H.

1    other tangible objects presented by either side during

2    the course of the trial will first be marked solely for

3    identification.  Such exhibits are not in evidence

4    unless they are received into evidence by the Court.

5         Now, let's just suppose the People have 10

6    exhibits that they want to mark for identification.

7    They will be marked 1 through 10.  And let's just

8    suppose the first item to be introduced in evidence is

9    that which is marked for identification as People's

10   Exhibit 5 for identification.  If that is received in

11   evidence, it is People's Exhibit 5 in evidence.  So

12   that means the evidence number corresponds with the

13   identification number even though it's the first piece

14   of evidence that you have seen.  That's the way we do

15   things.  Just accept it.

16        When during the course of this trial the

17   Court stands in recess or whenever during the course of

18   this trial you are asked to retire to the jury room

19   while we discuss matters of law, you must observe these

20   rules of conduct:  You must keep an open mind

21   throughout the trial.

22        You must reach your conclusions and your

23   ultimate decision only after you have heard all of the

24   evidence and my instructions to you on the law, and

25   then only after exchanging views and reasoning together

J.H.

1   with other members of the jury during your final

2   deliberations.

3              You must not form or express an opinion as to

4   the guilt or lack of guilt until the entire case has

5   been submitted to you.

6              Now, jurors, I may have mentioned this to

7   some of you during the voir dire.  Jurors many times

8   become friendly with one another.  I had a case years

9   ago where a romance developed between two jurors, and

10  they were subsequently married.  But what I mean by

11  that is let's just assume a witness testifies, and then

12  you take a break.  And juror number one says to juror

13  number two, Wasn't that a good witness?  Don't do that,

14  because you are discussing the case with a fellow

15  juror, and you are maybe forming an opinion with a

16  fellow juror, and you cannot do that.  I cannot

17  emphasize the importance of this.  Do not discuss this

18  case with anyone until you're back in the jury room.

19  Just don't do it.  And sometimes it's an innocent

20  mistake.  It's also contemptuous on your part.  Just

21  don't do it.

22             You must not discuss this case with anyone,

23  not even your fellow jurors, or permit anyone to speak

24  with you in your presence about any subject connected

25  with this trial.

J.H.

1           You must not converse whether in or out of

2     the courtroom with any of the parties, their attorneys,

3     or any witnesses.  People say hi, hello, nice day.

4     Both of these attorneys are very friendly, gregarious

5     people.  They are not rude.  They are following my

6     instructions that they are not to discuss this case

7     with you.

8           Do not read or listen to any accounts or

9     discussions of this case as reported by any newspaper,

10    magazines, radio or television, if that occurs.  Just

11    don't do it.

12          I was a trial attorney in this particular

13    county 20 years, and I can't tell you the number of

14    times that I read something in Newsday which was news

15    to me.  It just didn't happen in the courtroom.  So

16    just don't do it.

17          You must not visit or view the premises or

18    the place where the offenses charged were allegedly

19    committed, nor are you to visit or view any other

20    premises or places involved connected with the events

21    or scenes described in this case.

22          Prior to you being discharged, you may not

23    request, accept, agree to accept or discuss with any

24    person the receiving or accepting of any payment or

25    benefit.

Proceedings                               395

1          Don't access the internet or Google or

2     anything like that.  You may be very, very

3     conscientious and say, I want to access the internet

4     and bone up on the laws of murder.  Don't do it.  I

5     will give you all the law that you need.  And if you

6     don't understand it, ask me to re-explain it, and I

7     will re-explain it.  If you don't understand it, it's

8     not that you're not doing your job.  I'm not doing my

9     job in explaining it to you.

10         You must report -- promptly report to me any

11    attempt by any person to converse with you.  And if

12    someone does, don't tell your fellow jurors about it.

13         Now, things come up in this trial, I can't

14    think of a trial when they didn't come up, but a couple

15    of things come up.  One is the concept of refreshing

16    one's recollection.  During the course of the trial, an

17    attorney -- a witness may say, I can't remember, I

18    can't recall.  And then an attorney may show them

19    something to refresh their recollection.  Bring back a

20    memory, that's what it means, to bring back a memory.

21    Now, there are a couple of rules established on this.

22    If showing the item brings back a memory, then the

23    witness can testify to that refreshed recollection or

24    new memory.

25         It may be that a document does not bring back

J.H.

1     the memory or refresh someone's recollection.  My

2     father died a few years ago at the ripe old age of 96.

3     When I was going through his personal effects, I found

4     a Father's Day card.  It said, Dear dad, and the body

5     of the card, Love, George.  Now, I know that I wrote

6     that card.  He didn't have any other son named George.

7     It was in his personal effects, and it was in my

8     infantile handwriting.  Now, I know that I wrote that

9     card, but it just didn't refresh my recollection that I

10    did.

11          Sometimes your recollection is not refreshed.

12    That's the point.  And I want to show you this piece of

13    paper, and does that refresh your recollection of the

14    Eiffel Tower when you visited Paris?  No.  I never

15    visited Paris.  I've never had a recollection.  So in

16    order to refresh your memory, you have to have to have

17    a memory to begin with.

18          Inconsistent statements.  Sometimes a person

19    will testify, and the other side will say the

20    following:  Let's just say what color was the house?

21    And the witness says, The house was red.  And then on

22    cross-examination, someone might say, Did you not

23    testify at a prior occasion that the house was green?

24    And if the witness says, Yes, then that's an

25    inconsistent statement.  Inconsistent statements are

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 397 of 913 PageID #: 697

1   used to affect the credibility of the witness.  In

2   other words, they are used to determine whether or not

3   the witness is accurate in saying the house was red.

4   But you cannot use the inconsistent statement as proof

5   positive that the house was green.  It's not evidence

6   in the case.

7             I'm sure someone's going to ask me about

8   notes.  I've already explained this to some people but

9   not all.  We have a stenographer here that's taking

10  down all of the information.  Any time you want that

11  read back during your deliberations, you can ask for

12  it, and it will be read back, and that will be on the

13  evidence presented or on issues of law.  It seems

14  rather unusual why you shouldn't be allowed to take

15  notes.  You take notes in all of your daily affairs

16  when you go to lectures.  When you go to the store, you

17  have a shopping list and things like that.  We frown on

18  it here because when you are taking notes, you may not

19  be listening to the testimony.

20            And one very, very important thing that is

21  evident here which is not ordinarily evident in your

22  personal lives is that when you go back to the jury

23  room, you have the collective recollections and

24  memories of 12 jurors.  No one is asking you to

25  memorize all this stuff, but it will be there if you

J.H.

1    need it.

2              I spoke briefly about this the other day to

3    some.  It's important to be on time.  We cannot proceed

4    unless you are all here.  And if you are not here, it's

5    an inconvenience to me, the attorneys and your fellow

6    jurors.

7              And before the People start, I just want to

8    tell you a little story about the son commiserating

9    with his mother, and he says, Mom, I don't want to go

10   to school today.  The kids are bothering me.  And the

11   mother says, You've got to go to school.  And then the

12   son says, But the teachers are bothering me too.  And

13   the mother says, That's no excuse.  You have to go to

14   school.  Ma, yesterday I even had a run-in with a

15   custodian.  And the mother says, You have to go to

16   school.  You have a responsibility to go to school.

17   You're 52 years of age.  You're the principal of that

18   school, and you have to go to school.

19              Now, we are all principals here, and

20   sometimes I may not be able to get to you immediately

21   because this is an all-purpose part which means I have

22   many other cases besides this.  But enough said.

23   People's opening.

24              MS. ABDI:  Thank you, Judge.

25              May it please the Court, Mr. Millman, ladies

J.H.

Proceedings                                                  399

1       and gentlemen of the jury, good morning.  By now you

2       know that the defendant is charged by way of indictment

3       with the crimes of murder in the second degree, rape in

4       the first degree, two counts of sexual abuse in the

5       first degree, two counts of criminal possession of a

6       weapon in the fourth degree and endangering the welfare

7       of a child all committed in Westbury in Nassau County,

8       State of New York.

9                    And what you will learn through the evidence

10      and through witness testimony is that in the span of

11      four days in September of 2010, from a Friday to a

12      Tuesday, from September 24th to September 28th, a

13      family was destroyed.  A family was irreparably changed

14      by one man, him, the defendant, Ulises Bonilla.  The

15      family that I speak of is the Villatoro family.  They

16      live at 180 Kinkel Street in Westbury, Nassau County,

17      New York.  And in September of 2010, it consisted of

18      Armando Villatoro, the father, Susana Villatoro, the

19      mother, and three children who live there, Nancy

20      Villatoro, who was 15 at the time, Oscar Villatoro, who

21      was 13 at the time and Jennifer Villatoro, who was 10

22      years old at the time, the youngest girl.

23                   Now, the defendant, Ulises Bonilla, also

24      lived on that block.  In fact, he lived just three or

25      four houses down from them at 163 Kinkel Street in

Proceedings                                400

1   Westbury.  And the families knew each other.  He had

2   known the Villatoro family for a few years, was

3   acquainted with the children of the family, and the

4   Villatoro family knew members of his family as well.

5   These are not strangers to each other.  And, in fact,

6   Ulises Bonilla would often ride his bike down Kinkel

7   Street and pass the Villatoro's house, and he would

8   often hang out across the street from the Villatoro's

9   house at 179 Kinkel Street, and he hung out there with

10  his friends across the street.

11          Now, Ulises Bonilla took an interest in the

12  10 year old Jennifer Villatoro, gained his trust by

13  starting conversations with her, saying hello, teasing

14  her, making conversation.  This was an older person who

15  was showing Jennifer Villatoro some interest.  He was

16  being nice to her.  But over the summer of 2010,

17  approximately June 27th, 2010 until September 7th,

18  2010, the relationship became more physical.  The

19  defendant kissed Jennifer and several times --

20          MR. MILLMAN:  Your Honor, I'm going to

21  object.  I ask that we approach, your Honor.

22          THE COURT:  Is this what you expected to

23  prove?

24          MS. ABDI:  Yes.

25          THE COURT:  By what witness?

Proceedings                              401

1        MS. ABDI:  Jennifer Villatoro.

2             MR. MILLMAN:  I have an objection that's on a

3   slightly different basis, your Honor.

4             (The following occurs at sidebar outside of

5   the hearing of the jurors.)

6             MR. MILLMAN:  Your Honor, I did not object to

7   she was talking about the fact that she intended to --

8   that there was teasing and interaction.  What I do take

9   issue with is that there's been no ruling or

10  application whatsoever to introduce evidence of what is

11  really a prior crime.  The kissing and other sexual

12  contact, your Honor, is a prior crime has not charged

13  with no application made, and that's the basis of my

14  objection, your Honor.

15            THE COURT:  First of all, kissing in and of

16  itself is not a crime unless there is a sexual motive

17  to it with regard to a minor.

18            MR. MILLMAN:  But clearly that was what she

19  was suggesting, your Honor.

20            THE COURT:  What do you have to say?

21            MS. ABDI:  Judge, it's going to go further

22  into what he was doing, what he is charged with.  It's

23  in the indictment.  It's endangering the welfare of a

24  child charge.

25            MR. MILLMAN:  But that indictment does not

J.H.

1      include the facts that she's talking about now, and

2      that's the problem I have with it, your Honor.

3              MS. ABDI:  The indictment is specific as it

4      needs to be in the indictment.

5              MR. MILLMAN:  But if they wanted to include

6      this, your Honor, they should have included it.  If

7      they don't, they do so at their own risk.

8              MS. ABDI:  It is in the indictment.

9              THE COURT:  First of all, I believe the

10     indictment does cover these particular areas.  This is

11     obviously an exception to the Molineaux ruling that's

12     leading up, goes to the issue of intent and motive, and

13     it's leading up to what I assume is going to be

14     testimony concerning more profound sexual activity.

15     You have an exception.

16             MR. MILLMAN:  Your Honor, just one more thing

17     if I may.  You're saying that it's an exception to

18     Molineaux.  However, cases in Second Department are

19     very clear about the fact if they want to introduce

20     Molineaux and they claim an exception, it's their

21     responsibility to bring that up and raise that issue

22     with the Court.  That has not been raised.

23             MS. ABDI:  He's charged with the crime in the

24     indictment.

25             MR. MILLMAN:  No, he's not, your Honor.

1    That's my position.

2              THE COURT:  Molineaux does concern an

3    uncharged crime.

4              MR. MILLMAN:  But no application was made.

5    And I do have an opportunity to be heard on this.

6              THE COURT:  This is a charged crime.

7              MR. MILLMAN:  I don't believe what she's

8    discussing that took place at that time is part of the

9    charged crime.

10             THE COURT:  I disagree.  You have an

11   exception.

12             (The following takes place in open court.)

13             MS. ABDI:  And during that time period on at

14   least two occasions while he was outside his home, 163

15   Kinkel Street, he did kiss Jennifer Villatoro and touch

16   the intimate parts of her body, including her breasts,

17   her buttocks and her vagina.

18             Now, in Jennifer's mind, she may have

19   romanticized the encounter with Ulises Bonilla.  She

20   may have ignored what was happening.  But this was no

21   first crush on a schoolmate, because make no mistake,

22   ladies and gentlemen, Ulises Bonilla was no boy.  He

23   was a man.  He was 22 years old, and she was 10.  And

24   this age difference was never so clear as on September

25   24th of 2010, a Friday, when Jennifer Villatoro

Proceedings                              404

1       encountered Ulises Bonilla at the park near her house,

2       Bunkyreid Park, just a few blocks away from her house

3       and she was there with her friends.  And she

4       encountered him at the park, and he led her into the

5       ladies' bathroom at the park.  He took her into the

6       handicapped stall, and that's where he began kissing

7       her.  He began to touch her.  He tried to take down her

8       underwear and pull down her underwear, and he put his

9       finger inside her vagina.  He then also pulled out his

10      penis and attempted to penetrate her with his penis,

11      and, in fact, did he penetrate her slightly with his

12      penis.  Now, she pushed him away because it hurt and

13      because she was starting to get uncomfortable and she

14      didn't want to do this.  She pushed him away.  She left

15      the bathroom.  He followed her out.  And if Jennifer

16      have had her way, nobody would have known about it

17      because she didn't want to talk about it.  But

18      Jennifer's friends, Steven and Ivan, who she went to

19      the park with, they were also there.

20                  THE COURT:  I'm sorry?  I didn't hear that

21      last part.

22                  MS. ABDI:  But Jennifer's friends, Steven and

23      Ivan, who she went to the park with were also there at

24      the park.  And they saw Jennifer and Ulises come out of

25      the ladies' bathroom, and they saw her adjusting her

1     skirt.  And Steven and Ivan went back to 180 Kinkel

2     Street to the Villatoros, to Jennifer's parents,

3     Armando and Susana, and it was Steven and Ivan who said

4     something to the parents, not Jennifer.

5              And as soon as he found out, Armando

6     Villatoro called the police.  The police did respond.

7     No action was taken, ladies and gentlemen, because

8     Jennifer Villatoro did not admit what happened in the

9     bathroom.  She did not tell the whole story.

10             Now, Armando Villatoro was upset.  Every

11    father's nightmare.  Something had gone on with his

12    daughter with an older man in the park.  And later that

13    evening, he went to a place, a deli he hung out at

14    sometimes.  And at that deli, he went there.  He was

15    hanging out with a friend of his.  And this was Friday

16    night into early Saturday morning, the 24th into the

17    25th, the same day he had found out what happened.  And

18    when he was at the deli, he saw Ulises Bonilla at the

19    deli.  And did he what any father would do.  He

20    confronted him over his daughter, and they had a verbal

21    altercation, and they had a slight physical

22    altercation.  But it was broken up, and everyone went

23    home that night.

24             And that could have been the end of things,

25    ladies and gentlemen.  It could have been the end of

J.H.

1      things.  But it wasn't, because Ulises Bonilla was

2      upset that he was confronted by Armando Villatoro.  So

3      now Friday, four days later, now we're at Tuesday, just

4      a few days after the incident happened at the deli,

5      Ulises Bonilla is now hanging out across the street

6      from 180 Kinkel Street sometime after 10 p.m. at night

7      on September 28th, 2010.  He's hanging out across the

8      street at 180 Kinkel Street where Jennifer Villatoro

9      lives, Nancy Villatoro lives and Oscar Villatoro lives,

10     and he's hanging out there with his friends.  His

11     friend, Jocelyn Gonzalez, and one of Armando's other

12     daughters, Nancy Villatoro, are outside the house

13     getting in a car, and they are talking with each other.

14     And he goes up to the car, and he talks to Jocelyn and

15     to Nancy, and he starts making threats.  He says, Would

16     it be okay if I punch your father in the face?  Would

17     it be okay if I kill your father?  Now, Nancy will tell

18     that you she also had heard Ulises Bonilla say

19     something about wanting to fight her father.

20             Now, Armando Villatoro who was not home at

21     the time now comes home walking down Kinkel Street.  He

22     sees Ulises Bonilla waiting, and Ulises Bonilla says

23     something derogatory to him, and they start to fight.

24     Now, there were several people outside when this

25     happened, and everyone was in different locations, so

1    everyone will have a different vantage point of what

2    they saw happened that night.  And there were some

3    friends of Armando Villatoro who were outside, and

4    there were some friends of the defendant who were

5    outside.  But this was not a free-for-all, ladies and

6    gentlemen.  This was not a melee.  While there were a

7    lots of people outside, this was primarily a fight

8    between Armando Villatoro and Ulises Bonilla.

9           Nancy Villatoro will tell you that she saw

10   Ulises Bonilla grab a metal object and hit her father

11   with it.  She will also say that she saw her father

12   wrestle it away and hit or try to hit Ulises Bonilla

13   with it.  But then that object was dropped to the

14   ground and primarily a fight with hands.  Now, she will

15   tell you that they were fighting very close together,

16   that they were so close, in fact, that they were almost

17   hugging each other.  Because they were so close

18   together, nobody -- because they were fighting so close

19   together, nobody could see a knife in Ulises Bonilla's

20   hands, but they will testify that they saw punching

21   motions to the torso of Armando Villatoro by Ulises

22   Bonilla.

23           Now, you will also hear that there was an

24   individual, a Misael Berrios who is a friend of the

25   defendant.  He was at the scene, and he had a gun, and

1    he fired the gun into the air to keep the fight to

2    Ulises Bonilla and Armando Villatoro.  Now, once the

3    gunshot is heard, people separate and people scatter.

4    You will hear that when Armando Villatoro separated

5    from Ulises Bonilla, Armando Villatoro had blood on

6    him.

7              Now, originally, when the police responded to

8    the scene, they thought there was a gunshot wound

9    because people had heard a gunshot.  But what you will

10   learn is that Armando Villatoro was stabbed.  He was

11   stabbed, and he stumbled to his front lawn, and he

12   collapsed.  And he lay there dying on his front lawn in

13   front of his family and in front of his children.

14             When the shot is fired, Ulises Bonilla and

15   some of his friends run off into the direction of his

16   home, Ulises Bonilla's home.  He runs away.  Witnesses

17   will tell you that he gets into -- Ulises Bonilla, he

18   gets into his sister's car which is parked near 163

19   Kinkel Street.  He gets into his sister's car, and his

20   sister drives him away from the scene.  And, in fact,

21   he went away from the scene that night.  He did not

22   stay there.  He did not stay at the scene that night.

23   He was driven away.  In fact, he went and didn't come

24   back until the police apprehended him in Penn Station

25   two months later.  He did not stick around that night.

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 409 of 913 PageID #: 709

Proceedings                          409

1        Now, when the police, first responders,

2   respond to the scene, like I said, they originally

3   thought that there was a stabbing, but it was

4   ascertained that Armando Villatoro was not shot.  He

5   had stab wounds to his body.  He was taken to the

6   hospital, but they could not save him because his

7   injuries were too severe.  He died shortly after

8   arriving at the hospital.

9        And you will hear from the medical examiner,

10  Dr. Catanese, and Dr. Catanese will say that during an

11  autopsy, he examined Armando Villatoro, and he was able

12  to determine the cause of death to be multiple stab

13  wounds to the chest and the abdomen with perforations

14  of the heart, the stomach and the pancreas, that he was

15  stabbed so severely that it cut his internal organs,

16  and he bled to death, ladies and gentlemen, on his lawn

17  in front of his family.

18        Other detectives respond to the scene, crime

19  scene detectives, and they begin to look for evidence,

20  and they search for evidence.  And they take swabs of

21  blood from the scene.  They look for items of interest.

22  A detective also from crime scene went to Diana

23  Bonilla's car and swabbed that for items of interest,

24  blood.  And what detectives from crime scene will tell

25  you was that they found a bloody knife, a bloody knife

J.H.

Proceedings                    410

1    was found right in the vicinity of the defendant's

2    house, 163 Kinkel Street, outside on the street.  And

3    there was blood on the blade of that knife.

4              Now, Jennifer Villatoro did not speak up

5    right away.  Her father's death was the impetus for her

6    to speak up to the police.  And while she told the

7    police a little bit of what happened shortly after her

8    father's death, she did not tell them the whole story

9    until about a month later.  However, she did go to get

10   examined by a doctor.  Now, it was a week after the

11   incident of the bathroom.  It was October 1st.  But you

12   will hear from Dr. Pompey who is a pediatrician who has

13   experience with forensic examinations of this nature,

14   and she will say that she did notice injuries on

15   Jennifer Villatoro that were consistent with

16   penetration.

17             Now, remember I told you that there was a

18   knife found at the scene, that Armando Villatoro was

19   stabbed, and there was a knife found in the vicinity of

20   the defendant's home.  Well, there was a DNA testing on

21   the blood that was found on the blade of the knife, and

22   it was the victim's DNA on the handle -- sorry, it was

23   the victim's DNA on the blade of the knife.

24             I also told you that witnesses saw the

25   defendant getting into his sister's car.  Well, the

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 411 of 913 PageID #: 711

1    victim's DNA was also found in his sister's car along

2    with defendant's DNA.  Misael Berrios was an

3    individual, close friend of the defendant, and he fired

4    a shot in the air in order to keep the altercation

5    between two people.  Now, he will tell you that as he

6    fired a shot in the air to keep the altercation to

7    these two people that Ulises Bonilla ran, ran away with

8    him after he fired the shot.  Moments after he fired

9    the shot as Armando Villatoro lay dying on his front

10   lawn, moments after that, he, defendant, tells Misael

11   Berrios, I fucked up.  I killed him.  I stabbed him.

12        Now, Misael Berrios did do some actions that

13   night.  He fired a gun into the air.  And when he

14   testifies in court, he will receive immunity for firing

15   the gun in the air.  But he will tell you that that

16   night, his friend, Ulises Bonilla, said, I stabbed him.

17   I killed him.  Thus, ladies and gentlemen, I will prove

18   beyond a reasonable doubt that Ulises Bonilla acted in

19   a manner that was likely to be injurious to the moral,

20   physical or mental welfare of Jennifer Villatoro with

21   his conduct with her between June 27th, 2010 until

22   September 7th, 2010, that summer period that I told you

23   about earlier.  I will also prove to you beyond a

24   reasonable doubt that he murdered Armando Villatoro by

25   stabbing him to death with a knife on September 28th of

1  | 2010 and also prove to you beyond a reasonable doubt
2  | that on September 24th of 2010 in the bathroom at
3  | Bunkyreid Park in Westbury, Nassau County, he engaged
4  | in sexual intercourse and sexual contact with 10 year
5  | old Jennifer Villatoro. And I submit to you, ladies
6  | and gentlemen, that at the close of all the evidence in
7  | this case, you will be convinced beyond a reasonable
8  | doubt that the defendant is guilty of the crimes
9  | charged in the indictment, and at that time I will ask
10 | you in the name of the People of the State of New York
11 | to return a verdict of guilty. Thank you.

12 |          THE COURT: Counsel?

13 |          MR. MILLMAN: Good morning, ladies and
14 | gentlemen. Your Honor, counsel, on behalf of myself
15 | and my client, I would like to thank you for the time
16 | that you will be putting in during the course of this
17 | trial, and you will recognize that it is taking out a
18 | great deal of time and will take out a great deal of
19 | time, and I want to thank you. This is my first
20 | opportunity to speak to you as a jury.

21 |          Now, you heard Miss Abdi's opening statement.
22 | In that opening statement, she told you what it was she
23 | expects the evidence to show. The question is not
24 | whether or not the facts that she told you about are
25 | serious. The question is whether or not the evidence

J.H.

1     proves them beyond a reasonable doubt like she told you

2     it would.

3              I want you to think about everything that

4     Miss Abdi told you during her opening statement, and I

5     want you to hold her to it. And I also want you to

6     think about some of the things that she had talked to

7     you about, which I'm going to talk to you about. Miss

8     Abdi told you that she will prove my client's guilt of

9     murder in the second degree beyond a reasonable doubt.

10    Each of the witnesses that you are going to hear from

11    that are going to be presented by the prosecution are

12    going to tell you that they observed my client and

13    Mr. Villatoro hitting each other with fists. The

14    witnesses will tell you that several others were not

15    only present but also fighting, including fighting with

16    Mr. Villatoro.

17             You will also learn about something else that

18    Miss Abdi didn't talk to you about in her opening

19    statement. You will learn that Mr. Villatoro came to

20    this area in the front of 180 Kinkel Street with an

21    entourage, with a number of individuals armed with

22    pipes and sticks.

23             THE COURT: Pipes and what?

24             MR. MILLMAN: Sticks, your Honor, and sticks.

25    And that's supported by what the police said when they

Proceedings                                 414

1    went to the scene which we will talk about in a moment.

2    As Miss Abdi told you, an individual named Misael

3    Berrios was present there, and you'll learn that he was

4    observed by a number of witnesses that he had a gun and

5    fired it in the air.

6              You will also learn about a number of

7    additional things.  First of all, the evidence will

8    show that not a single witness will tell you that they

9    saw my client stab Mr. Villatoro, and not a single

10   witness will tell you that they ever even saw my client

11   touch a knife.

12             Now, Miss Abdi talked to you about the knife

13   itself, the blood.  No one is disputing that the victim

14   was stabbed.  That's not the issue.  I ask you to focus

15   on the issue when you listen to the evidence in this

16   case, because you are also going to learn about the

17   following facts.  You'll come to learn that when the

18   police responded to the scene, they were there for

19   hours.  They combed the entire area.  They recovered

20   numerous pipes and sticks from the area in front of

21   Mr. Villatoro's home where this occurred, but no

22   physical evidence linking my client to the stabbing

23   itself, to the knife.

24             Now, Miss Abdi told you that this was not a

25   melee.  I want you to listen closely to what the

J.H.

Proceedings                     415

1    witnesses talk about, and you decide for yourself

2    whether or not the evidence supports that statement

3    that this was not a melee.  The police did recover the

4    knife as Miss Abdi stated, and we're not disputing that

5    was the knife used to stab Mr. Villatoro.

6               Miss Abdi also told you that she would prove

7    that my client four days, three, four days after a

8    prior altercation at a deli planned on attacking

9    Mr. Villatoro and before doing so announced it to his

10   daughter and the friends who were there watching in

11   addition to many other people and then left the knife

12   right in front of his house.  You decide for yourself

13   whether or not the evidence supports that also.

14              As I stated, there will be evidence placing

15   my client at the scene and fighting with Mr. Villatoro.

16   We are not disputing that.  But you are going to hear

17   about a number of other individuals who were involved

18   in this who were fighting as well.  Their witnesses

19   will tell you that.  Listen very carefully.

20              You are also going to learn something else

21   about the knife that was recovered.  You are going to

22   learn that it was tested, and you're going to learn

23   that no physical evidence of any kind linking my client

24   to that knife was found, nothing.  They have the knife.

25   My client's blood is not on the handle.  My client's --

1    not a hair, fiber, fingerprint, skin fragment, sweat,

2    saliva, body oils of any kind despite the fact that the

3    prosecution is trying to tell you that he used that

4    knife to plunge it into Mr. Villatoro numerous times.

5              There's also something else you are going to

6    learn about.  You are going to learn that my client

7    earlier that day, just two to three hours earlier, was

8    at the hospital.  He was at the Nassau University

9    Medical Center, once she introduces the evidence, you

10   will see for yourself for a deep laceration.  And he

11   was bleeding, and that will also be supported by

12   witnesses.  His right finger was bleeding.  He had a

13   laceration two to three hours before this occurred.

14             Once again, the prosecution is telling you

15   that they are going to prove that he used that knife to

16   stab Mr. Villatoro.  I want you to listen very closely

17   to what the physical evidence indicates and also to

18   what it doesn't indicate.

19             You will also hear evidence about blood

20   samples there were taken from the car.  Now, there are

21   two blood samples that were taken from the car, and

22   there will be evidence that two of the samples were --

23   came back as being a match to Mr. Bonilla.  We don't

24   dispute that.  But you are also going to learn that

25   Mr. Bonilla was in that car in the back seat where

J.H.

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 417 of 913 PageID #: 717

1   these two samples were, Mr. Bonilla.  We'll have a

2   witness for that, and it's also supported by the

3   hospital records.  You will learn he was in the car and

4   about to go to the hospital.

5            I would also ask you to think about the

6   evidence and pay close attention, because they are

7   going to tell you that my client put the blood in the

8   back seat of this car, this Acura, right after the

9   incident, yet none of his blood was on the knife, not

10  on the handle, not on the blade.

11           Pay close attention to the issue.  It's not

12  about whether or not he was present or whether or not

13  he was behaving perfectly appropriately.  It is about

14  whether or not their evidence proves beyond a

15  reasonable doubt that my client stabbed Mr. Villatoro.

16           There were also two other blood samples that

17  were found in this Acura, and as Miss Abdi said and we

18  don't dispute it, the car belongs to my client's

19  sister.  Those two samples came back as being a match

20  to Mr. Villatoro.  Those two samples were located in

21  the back seat.  One was on the back rest, and the other

22  one was on a white cardboard box which we will talk

23  about in a moment.

24           What Miss Abdi did not tell you about is that

25  one of the People's witnesses is going to testify that

J.H.

1       my client got into the front passenger seat of this

2       car.  Let me repeat that, that my client got into the

3       front passenger seat of the car.  The victim's blood

4       was not found there.  The evidence will show that.

5              Another thing that Miss Abdi did not mention

6       to you when she talked to you about this vehicle is the

7       fact that their witnesses will testify that they saw

8       three individuals getting into the back seat where the

9       victim's blood was found.  And you know who one of

10      those individuals was?  Misael Berrios, the individual

11      that the prosecution will be offering to you who is

12      going to say that my client told him that he did this.

13      Listen very carefully when Mr. Berrios testifies.

14      Listen very carefully to how he responds to my

15      questions on cross-examination.  Because you are going

16      to learn a number of things about Mr. Berrios, and you

17      will have to decide whether or not you think he's

18      worthy of belief.  And I think you should gather from

19      what Miss Abdi said, Misael Berrios had a loaded

20      weapon, shot it in the air, and you will also hear

21      evidence that he threatened individuals at the scene to

22      back up and not call the police.  However, the evidence

23      will also show Mr. Berrios is being offered a deal.

24      He's being offered a deal so that he doesn't get

25      prosecuted.  He testifies against my client.  Again,

Proceedings                              419

1        credibility, not about whether or not the facts make

2        out something that is bad or that is upsetting or that

3        a tragedy occurred, credibility.  Again, Misael Berrios

4        was seen in the back seat of this car where the

5        victim's blood was found.

6                    There's also another piece of physical

7        evidence, their physical evidence, DNA that Miss Abdi

8        made no mention of, and I think it will become quite

9        clear why no mention was made of that.  It's a white

10       cardboard box in the back seat of this Acura.  The

11       police reports, the DNA reports reflect that on that

12       white cardboard box there is blood from two

13       contributors, two individuals.  Pay attention to that,

14       two individuals.  One of them was found to be the

15       victim, and guess what, the other one was found to be

16       unidentified, but my client was excluded as the one

17       donating that blood, as the donor of that blood, as the

18       source of that blood.  So this is a white cardboard box

19       in the back of this car that they are saying in this

20       getaway car where these three other individuals were

21       seated, not my client, these three other individuals

22       that contains blood of the victim and an unidentified

23       person.

24                    Ladies and gentlemen, you will come to learn

25       that their DNA, their physical evidence supports our

Proceedings                    420

1   case more than it does theirs, and you will see as this

2   that trial progresses.

3           Miss Abdi also talked to you about the charge

4   of rape that she intends to prove against my client.

5   The evidence will show, ladies and gentlemen, that my

6   client was not even present at the time that the victim

7   claims that this took place.  You will hear testimony

8   from Zeida Bonilla.  Even though it's the same last

9   name, it's no relation.  She does happen to be the

10  girlfriend of my client, Mr. Ulises Bonilla.  You will

11  also hear testimony from Diana Bonilla.  She is

12  related.  She is my client's sister.  And the evidence

13  will show that at 4 p.m. until 4:30, my client was with

14  Zeida Bonilla, that they had just left work in

15  Westbury, 62 Kinkel Street, went to pick up Zeida's

16  children at a daycare center in Westbury and that she

17  dropped my client off at home.  She'll testify to that.

18          You will also hear testimony from Diana

19  Bonilla who will tell you that from 4 to 5, he was home

20  and never left.

21          You are also going to hear testimony from

22  another witness, a man by the name of Evan Grover.

23  Diana Bonilla will testify that she and my client,

24  Ulises Bonilla, left at 5 o'clock p.m. and went to a

25  tattoo parlor located in Carle Place.  It's called

1    Tattoo You.  Evan Grover is an employee of Tattoo You.

2    He's not a relative of Ulises Bonilla, and he's not

3    even a friend of Ulises Bonilla.  He knows him.  He

4    will testify that Ulises Bonilla from 5 to 7 p.m. was

5    at that tattoo parlor.

6               I also ask you to listen very closely to the

7    testimony of the victim, and it's never easy, ladies

8    and gentlemen, to hear allegations like this,

9    particularly when they involve a child.  I want you to

10   listen very carefully to not only the direct

11   examination but also the cross-examination when I ask

12   her questions which she has not had an opportunity to

13   prepare with anybody for, because I think a number of

14   things will come clear to you as you listen to that

15   evidence.

16              First of all, Jennifer Villatoro, the

17   evidence will show that numerous different accounts of

18   what happened.  Well, while one can appreciate the

19   embarrassing nature of what happened and that there may

20   not be an immediate need to tell everything at first,

21   you are going to learn very quickly that we are not

22   talking about consistencies or a play on words.  She

23   gave a statement to the police five days after they

24   claim this happened, and she said that there was no

25   penile penetration at all.  She said that.  She gave

1    that statement five days after.  At first she said it

2    happened.  Five days after she gave that statement, you

3    will come to learn that she never ever said a word

4    about any penile penetration until October 26th, 2010,

5    over a month after they claim that this happened.

6              This incident is alleged to have taken place

7    on September 24th, 2010.  You will come to learn, Miss

8    Abdi made mention of it, the child, despite the fact

9    that the prosecutor is intending that the parents were

10   told that day, the child was not examined that day, the

11   child was not examined the next day or the day after.

12   The child was not examined for a week.  So you'll have

13   to evaluate credibility and determine what the

14   significance of that is.

15             Additionally, the hospital records after she

16   did get examined I submit to you do not support that

17   there is any penile penetration.  They don't say it,

18   they don't support it.

19             Significantly, the District Attorney has no

20   physical evidence whatsoever linking my client to these

21   outrageous sexual acts my client is accused of, no

22   semen, no hairs, saliva, sweat, body fluids, no DNA of

23   any kind identifying my client to support these

24   allegations.

25             And as I indicated to you, you are going to

Proceedings                                  423

1        hear testimony from witnesses who will say my client

2        was elsewhere at the time they say that this took

3        place.

4                    Miss Abdi told you that he was not arrested

5        until about two months afterwards.  That's true.  But

6        what she also didn't tell you is that after he was

7        arrested, although he was charged with murder, they

8        didn't even charge him with the rape until two months

9        later.

10                   Ladies and gentlemen, you promised me that

11       you would scrutinize the testimony of the witnesses and

12       that you would be fair and listen to the evidence.  And

13       I know that you will do that.  Because I submit to you

14       after the presentation of the evidence, you will have

15       numerous reasonable doubts with regard to all these

16       charges.  And so after all of the evidence is in, I'm

17       going to stand before you again, and I'm going to ask

18       you to return the only verdict that is consistent with

19       the competent, credible evidence, and the only verdict

20       that's consistent with justice, and that is a verdict

21       of not guilty on all counts.  Thank you.

22                   THE COURT:  All right, ladies and gentlemen,

23       we're going to take a break now.  You haven't heard any

24       evidence yet.  Remember all the admonitions I have

25       given you.  We'll be back in about 10 minutes.

1    Counsel, please remain.  Okay.

2              (Whereupon, the jury exits the courtroom.)

3              THE CLERK:  No jurors are present.

4              THE COURT:  All right, counsel, just before

5    you started giving your opening statements, I received

6    a note from juror number three.  I didn't want to

7    interrupt the normal flow of the trial, and as you will

8    see, the note does not need immediate attention.  The

9    note says, 12-6-11, Honorable Judge Peck, I'm currently

10   working two jobs.  One is in the a.m. and one is in the

11   p.m.  On Friday, 12-2, I reported to my employers that

12   I was selected for the jury.  It was made known to me

13   that my morning job would only pay me for five days of

14   jury duty and my p.m. job will only pay me upon

15   completion of the trial.  It is with regrets that I ask

16   to be excused from this jury because I cannot bear the

17   financial burden at this time.  Sincerely, Mrs. Tjuana

18   Evans.  Do you want to take a look at this, counsel?

19   And then we will mark it Court Exhibit 3.

20             MS. ABDI:  I have looked at it, your Honor.

21             THE COURT:  All right, as you recall, Miss

22   Evans was advised to come back on Tuesday which was

23   today because we didn't get all the jurors when she was

24   here.  She was number three, and she was advised to

25   skip Monday.  Now, I only wish she would have brought

1      this to our attention on Monday, but she didn't.

2              This may be a protracted trial.  It's gearing

3      up to that now.  And I hate to lose an alternate at

4      this particular time -- I hate to use an alternate at

5      this particular time when this could -- was known by

6      the juror.  At the same time, I don't want to cause any

7      undue burden to the juror.

8              So it seems to me what might be appropriate

9      is the following:  Why don't we take this issue up

10     again like on Thursday afternoon, because she's not

11     losing any money now.  I think she may be losing it

12     next week.  And if we have no other problems, we'll

13     deal with this then.  How do you like that suggestion,

14     People?

15             MS. ABDI:  Judge, I understand your

16     apprehension about using an alternate at such an early

17     stage.  I am concerned because she did say that she had

18     a financial hardship and that that would be affecting

19     her ability I think to listen to testimony.

20             THE COURT:  She didn't say that in the

21     letter.  She basically said it's simply a financial

22     burden to her.  She never said what you just said.

23             MS. ABDI:  That maybe there should be some

24     inquiry, further inquiry as far as just her as to that

25     fact.  Because my concern is that she -- we let her

Proceedings                            426

1     have more time and another juror has another problem

2     with something else.  I would rather her being removed

3     sooner rather than later.

4                THE COURT:  Counsel?

5                MR. MILLMAN:  I don't have an objection to

6     further inquiry.  I am concerned about it, and I also

7     noted while she has financial hardship, I think she

8     indicated she ultimately would be getting paid but it

9     would be after.

10               THE COURT:  That is unclear in the letter.

11    All right, when we resume, we'll talk to her privately,

12    bring her in alone.  And if you want, you can put the

13    remainder of the jurors in my ante room if you can fit

14    them in there.  If you can't, leave them in the jury

15    room.  All right, we'll see you in ten minutes.

16               MR. MILLMAN:  Your Honor, can we have 15?  Is

17    there a problem?  I'm trying to coordinate everything.

18    I'm solo, Judge.

19               THE COURT:  Fifteen.

20               MR. MILLMAN:  Thank you, Judge.

21               (A recess was taken.)

22               THE CLERK:  Recalling case on trial,

23    Indictment 202N of 2011, Ulises Bonilla.  All parties

24    present, including the defendant and Spanish

25    interpreter.  There are no jurors present.

Proceedings                              427

1                    THE COURT:  While we're waiting for juror

2       number three, counsel, throughout the jury selection

3       process, I've instructed -- is juror number three here?

4                    COURT OFFICER:  Yes.

5                    THE CLERK:  Juror entering.

6                    (A juror enters the courtroom.)

7                    THE CLERK:  Juror number three, Tjuana Evans.

8                    THE COURT:  All right, Miss Evans?

9                    A JUROR:  Yes.

10                   THE COURT:  As you remember, you were given

11      Monday off.

12                   A JUROR:  Yes.

13                   THE COURT:  Because you were already sworn

14      last week and we didn't get a jury until yesterday

15      afternoon.

16                   A JUROR:  Okay.

17                   THE COURT:  Now, is there any reason why you

18      would not have brought this to my attention yesterday?

19                   A JUROR:  Because I didn't know -- I worked

20      yesterday, and I didn't know that I would be able to

21      come here and tell someone.  I really didn't know how

22      to get to the person I needed to get to until they gave

23      us that paper on Friday, whatever it was that I had,

24      the paper that said if we were having an emergency.

25      That was how I come up with that.  But I didn't know

Proceedings                                    428

1      that I could have come here yesterday and told you.

2                    THE COURT:  Now, how long will you be paid

3      until?

4                    A JUROR:  Um, I've used two from my day job,

5      so I will be paid until -- I will be paid until

6      Thursday for my morning job, and for my evening job,

7      not until the completion of the trial.  So they will

8      pay me for like whatever days I'm on the schedule, and

9      I'm on the schedule, but they just mark jury duty.

10                   THE COURT:  Basically you don't lose any

11     money on your evening job?

12                   A JUROR:  Well, I won't lose it -- I won't

13     have it like this week coming that I need to get paid.

14                   THE COURT:  You won't lose, any but it will

15     just be delayed?

16                   A JUROR:  Yes.

17                   THE COURT:  Okay.  People, do you have any

18     questions to ask?

19                   MS. ABDI:  My question is is this something

20     that your concerns about getting paid and your

21     financial hardship, is that something that's going to

22     affect your ability to listen to the evidence in this

23     case?

24                   A JUROR:  No.

25                   MS. ABDI:  Okay.

Proceedings                             429

1          MR. MILLMAN:  Your Honor, I don't have any

2     questions.

3          THE COURT:  This is my ruling:  I don't want

4     to put an alternate in at this particular early stage

5     of the trial, yet at the same time, I don't want to

6     cause you any financial hardship.  So we're going to

7     revisit this situation Thursday afternoon.

8          A JUROR:  Okay.

9          THE COURT:  And then we'll see where we are

10    and take it from there.  Bring in the rest of the jury.

11         MR. MILLMAN:  May we approach?

12         (A discussion was held off the record at the

13    bench.)

14         COURT OFFICER:  Jury entering.

15         (The jury enters the courtroom.)

16         THE CLERK:  Let the record reflect all jurors

17    are present.  Both sides waive a reading of the roll

18    and stipulate to the seating of the jury?

19         MS. ABDI:  Yes.

20         MR. MILLMAN:  Yes.

21         THE CLERK:  Thank you.

22         THE COURT:  All right, ladies and gentlemen,

23    we are about to start this particular case.  I did want

24    to just tell you something.  During the selection

25    process, I guess you were partially under my control as

1    well as the control of the commissioner of jurors. Now

2    you're under my complete control during this particular

3    trial, and if you want to wear those tags, wear them.

4    If you don't want to wear them, don't wear them.  But

5    keep them on you for the purposes of identification.

6                    First witness.

7                    MS. ABDI:  The People call Stevens Destina.

8                    THE COURT:  How old are you?

9                    THE WITNESS:  Twelve.

10                   THE COURT:  Swear him in.

11                   THE CLERK:  Raise your right hand.

12   S T E V E N S  D E S T I N A, a witness called on behalf of

13        the People, after having been first duly sworn by the

14        Clerk of the Court, was examined and testified upon his

15        oath as follows:

16                   THE CLERK:  In a loud, clear voice, please

17        state your name.

18                   THE WITNESS:  Stevens Destina.

19                   THE CLERK:  Could you say it again?

20                   THE WITNESS:  Stevens Destina.

21                   THE CLERK:  Could you spell your last name?

22                   THE WITNESS:  D-E-S-T-I-N-A.

23                   THE CLERK:  Could you give us your county of

24        residence?  Is it Nassau, Suffolk, Queens?

25                   THE WITNESS:  Nassau.

S. Destina - People - Direct        431

1              THE COURT:  Ladies and gentlemen, you just
2         saw the witness being sworn.  He was asked a question
3         about his pedigree.  That's the first piece of evidence
4         you've heard in this case.
5              (A discussion was held off the record at the
6         bench outside of the hearing of the jury.)
7              THE COURT:  Go ahead.
8              MS. ABDI:  Thank you, Judge.
9    DIRECT EXAMINATION
10   BY MS. ABDI:
11        Q.   Good morning, Mr. Destina.
12        A.   Good morning.
13        Q.   Now, I'm just going to ask you if you could please
14   keep your voice up, and if you can, you can use the
15   microphone to speak into.  You can adjust it if you want.
16   How old are you?
17        A.   Twelve.
18        Q.   And what school do you go to?
19        A.   Westbury Middle School.
20        Q.   And what grade are you in?
21        A.   Six.
22        Q.   And do you know somebody named Jennifer Villatoro?
23        A.   Yes.
24        Q.   How do you know her?
25        A.   She my next-door neighbor, and I know her for two

1    years-and-a-half.

2              THE COURT:  Now, if any juror can't hear this

3         witness, I want you to immediately raise your hand.

4         You are going to have to speak up a little.  Get closer

5         to the microphone.

6         Q.   And is Jennifer a friend of yours?

7         A.   Yes.

8         Q.   And do you often play with her and hang out with

9    her?

10        A.   Yes.

11        Q.   Do you also know somebody named Ivan Alcantara?

12        A.   Yes.

13        Q.   And who is he?

14        A.   My next-door neighbor.

15        Q.   Is he also a friend of yours?

16        A.   Yes.

17        Q.   And how long have you known him?

18        A.   For one year-and-a-half.

19        Q.   And do you go to school with -- did you go to

20   school with Jennifer?

21        A.   Yes.

22        Q.   Did you go to school with Ivan?

23        A.   No.

24        Q.   But you're just friends with him?

25        A.   Yeah.

S. Destina - People - Direct        433

1     Q.   Now, do you know somebody named Ulises Bonilla?

2     A.   Yes.

3     Q.   And how do you know him?

4     A.   Because he lives on the block, and he would be in

5  front of Jennifer's house.

6     Q.   I'm just going to ask you to speak up a little

7  bit.  How do you know Ulises Bonilla?

8     A.   He used to live on the block, and he always used

9  to be across the street from Jennifer's house.

10     Q.   I'm going to direct your attention to September

11  24th, a Friday, 2010.  Did you go to the park that day?

12     A.   Yes.

13     Q.   Now, what park did you go to?

14     A.   Bunkyreid Park on Broadway.

15     Q.   You say Bunkyreid Park?

16     A.   Yeah.

17     Q.   Do you know where that is located?

18     A.   Yeah.

19     Q.   Where is it located?

20     A.   On Broadway.

21     Q.   I'm sorry, on -- I didn't hear what you said.

22     A.   Broadway.

23     Q.   How far is that from Jennifer's house?

24     A.   One block.

25     Q.   Did you go to the park that day?

S. Destina - People - Direct          434

1       A.    Yes.

2       Q.    And who did you go to the park with?

3       A.    Ivan and Jennifer.

4       Q.    What did you do once you got to the park?

5       A.    I went looking for them, and then I found them in

6  front of the handball court.

7                    THE INTERPRETER:  I can't hear.

8                    THE COURT:  I went looking for them and found

9       them in front of the handball court.  You can get a

10      little closer to the microphone if you want.

11      Q.    When you say them, who are you talking about?

12      A.    Ivan and Jenny.

13      Q.    And they were by the handball court?

14      A.    Yes.

15      Q.    What did you see happen when they were by the

16  handball court?

17      A.    Um, they were just sitting down on the bench.

18      Q.    And did you see what happened after they were

19  sitting down by the bench?

20      A.    Um, Ulises hit the ball over the fence, and he

21  came over, and Jenny and him started talking.

22      Q.    When you say Ulises, are you talking about Ulises

23  Bonilla?

24      A.    Yes.

25      Q.    And where was he?

S. Destina - People - Direct          435

1       A.    In the handball court.

2       Q.    And when he came over to talk to Jennifer

3    Villatoro, what happened after that?

4       A.    Him, him and her went to on the other side of the

5    girls' bathroom and sat on the other bench.

6       Q.    And what did you do?

7       A.    Me and Ivan started spying on them.

8             MR. MILLMAN:   I'm sorry?

9             THE COURT:   He and Ivan started spying on

10      them.

11      Q.    And why were you spying on them?

12      A.    Because her mom told me to take care of her

13   everywhere I go somewhere with her.

14      Q.    Did you see if they went anywhere?

15      A.    Yeah, they went in the bathroom.

16      Q.    I'm sorry, I know it's hard.

17            THE COURT:   Is there a way you can adjust the

18      volume?   I don't want to cramp his style of testifying.

19      Okay, next question.

20      Q.    Where did you see them go?

21      A.    Um, on the other side of the bathroom.

22      Q.    And what did you do next?

23      A.    I was spying on them, because that's what her mom

24   told me to do.

25      Q.    And then what did you see?

S. Destina - People - Direct        436

1        A.    They started kissing, and then I ran to the house,

2    to her house to tell her mom, but her mom wasn't there, so I

3    told her brother.

4        Q.    Then what did you do?

5        A.    And then her brother send his friends with me to

6    go show.  And then when we got there, Jenny was coming out

7    the bathroom pulling up her skirt.

8        Q.    And did you see anyone else come out of the

9    bathroom?

10       A.    Yeah, Ulises behind her.

11       Q.    Now, what did you do next?

12       A.    Um, when she saw me, she started walking back with

13   us, and then she left us on the corner of the block, and

14   then she went around the block.

15       Q.    So who got to -- and you say you went back to the

16   house.  What house did you go back to?

17       A.    Jenny's.

18       Q.    And that's at -- that's Jenny's house on Kinkel

19   Street?

20       A.    Yes.

21       Q.    Who got there first, you or Jenny?

22       A.    Me.

23       Q.    And did you tell anybody once you got to the house

24   anything that you had seen?

25       A.    Yeah, her mom.

1      Q.   Who did you tell?

2      A.   Her mom.

3      Q.   Was Jenny's father there as well?

4      A.   Yes.

5      Q.   Did you say anything to him as well?

6      A.   Yeah.

7      Q.   Now, do you know -- did the police come to the

8   house that day?

9      A.   Yes.

10      Q.   Do you know how they got there?

11             THE COURT:  What do you mean by that?

12             MS. ABDI:  Withdrawn.

13             THE COURT:  They arrived in police cars,

14   right?

15             THE WITNESS:  Yeah.

16             THE COURT:  Okay.

17      Q.   Do you know who called the police?

18      A.   Her dad.

19      Q.   Now, do you know what time that you got to the

20   park that day if you can remember?

21      A.   At 3 to 4.

22      Q.   3 or 4 p.m.?

23      A.   Yeah.

24      Q.   Now, when Jenny came out of the bathroom, did you

25   see any injury to her?

S. Destina - People - Direct        438

1        A.    Yeah, she had a bruise on her lips.

2        Q.    Did you see that bruise at all before she went

3    into the bathroom?

4        A.    No.

5        Q.    Meaning did she have that before she went into the

6    bathroom?

7        A.    No.

8              MS. ABDI:   Thank you, Mr. Destina.  I have no

9        further questions for you, but you can say there.

10             MR. MILLMAN:   Your Honor, can I?

11             THE COURT:   Just one second.  You see that

12        clock on the wall?

13             THE WITNESS:   Yeah.

14             THE COURT:   What time is it?

15             THE WITNESS:   12 -- I think it's 12:07.

16             THE COURT:   12:07, okay.

17             THE WITNESS:   I can't see it that well.

18             MR. MILLMAN:   Your Honor, may we approach?

19             THE COURT:   Sure.

20             (The following occurs at sidebar outside of

21        the hearing of the jurors.)

22             MR. MILLMAN:   Your Honor, when we had the

23        discovery, when the voluntary disclosure forms were

24        served, the DA represented that this incident occurred

25        between 4 and 7.  Now, if it's a situation, I withdraw

S. Destina - People - Cross        439

1     my objection if it's a situation where this child just

2     remembers it at that time and you are not going to be

3     claiming that it happened before 4, that's fine.  But

4     if you are going to be claim it happened before 4, we

5     were not put on notice.  We have would not have an

6     opportunity get an alibi for that.  So you tell me.

7             MS. ABDI:  This is the situation where he's

8     testifying to the best of his recollection as far as

9     the time.

10            MR. MILLMAN:  But your position is not that

11    it happened before 4?

12            MS. ABDI:  I mean this is how the evidence

13    is.  It's not my position that it happened before then,

14    but this is just his recollection.

15            MR. MILLMAN:  Okay.  I guess, you know, then

16    I'll hold it in abeyance, my objection, depending upon

17    what the proof shows.  But my concern is is that we

18    would not have had an opportunity to get an alibi

19    before 4.  That's all.

20            THE COURT:  All of these times are on or

21    about, that's what the indictment says, isn't it?

22            MS. ABDI:  Yes.

23            MR. MILLMAN:  That's fine.

24            (The following takes place in open court.)

25            MS. ABDI:  Judge, may I inquire one more

S. Destina - People - Cross        440

1        question of the witness?

2                    THE COURT:  Sure.

3    DIRECT EXAMINATION

4    BY S. ABDI:  (Continued)

5        Q.   Mr. Destina, do you see Ulises Bonilla in the

6    courtroom today?

7        A.   Yes.

8        Q.   Can you tell the jury something that he's wearing?

9        A.   A baby-bluish shirt.

10                   MS. ABDI:  Your Honor, may the record reflect

11           that the witness has identified the defendant.

12                   THE COURT:  Yes.

13                   MS. ABDI:  Thank you.  I have no further

14           questions.

15   CROSS-EXAMINATION

16   BY MR. MILLMAN:

17       Q.   Good afternoon, Mr. Destina.  Mr. Destina, at the

18   time that you saw Ulises and Jennifer outside the bathroom,

19   were there other people around in the park at that time?

20       A.   Yes.

21       Q.   A rough estimate as to how many to the best that

22   you can?

23       A.   Three.

24       Q.   Do you know if there were more than three around;

25   do you remember?

J.H.

S. Destina - People - Cross        441

1    A.    Yeah, because they were in the handball court.

2    Q.    But would they have been in view of where Ulises

3  and Jennifer were?

4    A.    No.

5    Q.    Now, where was Ivan at the time that you say that

6  you saw Ulises and Jennifer kissing?

7    A.    Um, he was with me.

8    Q.    He was next to you?

9    A.    Yeah.

10   Q.    And was anyone else in a hearing distance of you

11  at that time?

12             THE COURT:   I'm sorry?

13             MR. MILLMAN:   Was anyone else in hearing

14        distance of you at that time.

15   A.    Yeah.

16   Q.    Who was that?

17   A.    Some kid named Giovanni.

18   Q.    And how long have you known Giovanni for?

19   A.    A year.

20   Q.    And how long have you known Ivan for?

21   A.    A year-and-a-half.

22   Q.    And you are very good friends with Jennifer?

23   A.    Yes.

24   Q.    Would you consider her one of your best friends?

25   A.    Yes.

J.H.

S. Destina - People - Cross        442

1      Q.   When you spoke with -- withdrawn.

2           When you spoke with Jennifer's mother, you say

3   that Jennifer's father was also there too?

4      A.   Yes.

5      Q.   Who else was there at that time?

6           THE COURT:   This is after you went back.

7   That's what he's talking about.

8      A.   Um, her brother, um, her sister, and that was it.

9      Q.   Her brother is Oscar?

10     A.   Yes.

11     Q.   And her sister Nancy?

12     A.   Yes.

13     Q.   When you walked back from the park after you say

14  that you saw Ulises and Jennifer kissing, what direction did

15  you walk?

16     A.   I walked -- I walked -- I took a longer way

17  because I didn't want them to see me.

18     Q.   You didn't want who to see you?

19     A.   Jenny and Ulises.

20     Q.   Which road or street did you take?

21     A.   I took Broadway basically.

22     Q.   Broadway?

23     A.   Yeah.

24     Q.   And where did you take Broadway to?

25     A.   Kinkel.

S. Destina - People - Cross          443

1    Q.    And once you got to Kinkel, where did you go then?

2    A.    To Jenny's house.

3    Q.    I'm sorry?

4    A.    To Jenny's house.

5    Q.    Did you see Oscar before you got to Jenny's house?

6    A.    No.

7    Q.    Did you see anyone else while you were on the way

8  to Jenny's house?

9    A.    Yes.

10    Q.    Who was that?

11    A.    Some kid name Julio.

12    Q.    And did you talk to Julio about what you saw?

13    A.    No.

14    Q.    And your mother, is she good friends with

15  Jennifer's mother?

16    A.    Yes.

17    Q.    And would I be correct in saying that your family

18  is very close friends with Jennifer's family?

19    A.    Yes.

20    Q.    And have you spoken with Jennifer's mother since

21  that day?

22    A.    Yes.

23    Q.    About how many times would you say?

24    A.    About this?

25    Q.    Yes.

S. Destina - People - Cross        444

1        A.    Oh, no then.

2        Q.    I'm sorry?

3        A.    No.

4        Q.    You have not spoken to her about this.  Have you

5    spoken with --

6              THE COURT:  Not spoken to her about this, I

7         believe that was the witness's testimony.

8              MR. MILLMAN:  Yes.

9        Q.    Have you spoken with Jennifer's older sister Nancy

10   about this since the day that you observed this?

11       A.    No.

12       Q.    And did you talk with the Assistant District

13   Attorney before coming in here to testify?

14       A.    Who is that?

15       Q.    Miss Abdi.

16       A.    Oh, yes.

17       Q.    And when did you see Miss Abdi?

18       A.    I think about a week ago.

19       Q.    Since then, have you spoken with her?

20       A.    Yeah, I think.

21       Q.    A number of times?

22       A.    Once.

23       Q.    You have spoken to her a week ago.  And when you

24   met with her a week ago, to the best that you can tell us,

25   about how much time did you spend speaking to her?

S. Destina - People - Cross       445

1        A.    About ten minutes.

2        Q.    Ten minutes?  And when you met with her since that

3    time, about how much time did you spend speaking with her?

4        A.    Wait, what happened?

5        Q.    I'm sorry?

6        A.    What did you say?

7        Q.    What I'm asking is on the second, the most recent

8    occasion that you spoke with her, about how long did you

9    speak with her on that occasion?

10       A.    Like -- I don't know.

11       Q.    Was it a long time?

12             MS. ABDI:  Objection.

13             THE COURT:  Was it more than a half hour TV

14       show or less than a half hour TV show?

15             THE WITNESS:  Like less.

16       Q.    And did you speak with anybody else from the

17   District Attorney's office other than the young lady that's

18   here, Miss Abdi?

19       A.    No.

20       Q.    Did you speak with any police officers about this

21   other than what you told us about so far?

22       A.    Yes.  But that's when her dad call the cops.

23       Q.    How many times did you speak with police officers

24   since the time that you told us about?

25             THE COURT:  About this?

J.H.

S. Destina - People - Cross          446

1           MR. MILLMAN:   About this.

2      A.   None, only once when her dad call the cops.

3      Q.   And when you spoke with them, who else was there?

4      A.   Just Jenny, the cops, her mom and me, Ivan and her

5   sister to translate.

6      Q.   And have you spoken to Ivan about this since that

7   day?

8      A.   No.

9      Q.   You said that you saw bruising on Jenny's lips; am

10  I right?

11     A.   Yes.

12     Q.   And did you -- about two weeks later, did you see

13  Jennifer two weeks after this day?

14     A.   Yeah.

15     Q.   And did she still have that bruising on her lips?

16     A.   She did, but it wasn't like that bad.

17     Q.   So it had gone down a little bit, but it was still

18  there?

19     A.   Yeah.

20     Q.   And when you spoke to the police, did you tell

21  them that you saw Jennifer and Ulises kissing?

22     A.   Yes.

23     Q.   Did you tell them that you saw anything else?

24     A.   Yeah.

25     Q.   What else did you tell them you saw?

S. Destina - People - Cross      447

1      A.    That I saw him, him and her being up the bathroom

2    pulling up her skirt and him going behind her.

3      Q.    And you saw that?

4      A.    Yeah.

5      Q.    I'm sorry?

6      A.    Yes.

7      Q.    You told them that you saw that?

8      A.    Yes.

9      Q.    Where were they when you saw this happen?

10                THE COURT:  Who do you mean by they?

11                MR. MILLMAN:  Ulises and Jennifer.

12                THE COURT:  Didn't you say they were coming

13          out of the bathroom?

14                MR. MILLMAN:  This part I don't believe he

15          had made reference to.

16                THE COURT:  When you saw this, where were you

17          and where were them?

18                THE WITNESS:  They were in the park, and I

19          was -- I was outside the park.

20      Q.    You were outside the park?

21      A.    Yeah.

22      Q.    Where outside the park?

23      A.    Like on the corner of Urban.

24      Q.    And Broadway?

25      A.    Yeah.

S. Destina - People - Cross        448

1        Q.    And Ulises and Jennifer at that time were in the

2    park.  You said where in the park specifically?

3        A.    Like coming out the bathroom.

4        Q.    Do you remember having a conversation with Oscar

5    while you were walking on Kinkel Street but not yet at

6    Jennifer's house that day?

7        A.    No.  Oscar was just screaming at her.

8        Q.    So you never spoke to Oscar outside of Jennifer's

9    home that day?

10        A.    Yeah.

11        Q.    That's correct, or you did?

12        A.    Yes.

13        Q.    When did you spoke to Oscar outside the home that

14    day?

15        A.    The day -- um, when Jenny was -- when we were

16    looking for Jenny, me and Oscar just didn't want to look, so

17    we just sat down, and we were talking.

18              MR. MILLMAN:  I'm sorry, I didn't hear what

19         you said, I'm sorry.

20        A.    When they were looking for Jenny and me and Oscar

21    did not want to look for her because we were tired, so we

22    just sat down, and we talk about it.

23        Q.    And how many times would you say you had spoken to

24    Jennifer about this since it happened?

25        A.    Zero.

S. Destina - People - Cross          449

1      Q.   You haven't spoken to her once since that day

2  about this?

3           A.   Nope.

4           Q.   You and Jennifer are close friends, right?

5           A.   Yes.

6           Q.   And you are here to help her out?

7           A.   Yeah.

8                MR. MILLMAN:  Nothing further.

9                THE COURT:  Redirect?

10               MS. ABDI:  No.

11               THE COURT:  Okay, thank you.

12               (The witness was excused.)

13               THE COURT:  All right, ladies and gentlemen,

14        during the course of this particular trial, questions

15        may be phrased in the negative.  You didn't see that,

16        did you?  And if a person answers no to that, a

17        negative answer to a negative question is positive.

18        The trouble is no one speaks that way.  So it's you --

19        it's for you to determine what it means.  That's your

20        function.  Next witness.

21               MS. ABDI:  Judge, the People call Ivan

22        Alcantara.

23               MR. MILLMAN:  Judge, I would like to approach

24        on this one if I may.

25               (The following occurs at sidebar outside of

J.H.

S. Destina - People - Cross          450

1          the hearing of the jurors.)

2                    MR. MILLMAN:  Judge, it's my understand that

3          this witness was with Steven at the time, and I would

4          just ask for an offer of proof because I think it's

5          cumulative, and that's the basis of my objection.

6                    THE COURT:  Your objection is overruled on

7          the basis of it being cumulative.

8                    (The following takes place in open court.)

9                    MS. ABDI:  People call Alex Ivan Alcantara.

10                    THE COURT:  What is your date of birth?

11                    THE WITNESS:  Um, 12-01, October 2nd.

12                    THE COURT:  Just one second.  December 2nd,

13          2001?

14                    THE WITNESS:  No, October 2nd.

15                    THE COURT:  October 2nd, 2001.  So you're 10

16          years old?

17                    THE WITNESS:  Yeah.

18                    THE COURT:  Okay.  Swear the witness in.

19                    THE CLERK:  Stand up, raise your right hand.

20

21

22

23

24

25

A. Alcantara - People - Direct        451

1    A L E X   I V A N   A L C A N T A R A, a witness called on

2         behalf of the People, after having been first duly

3         sworn by the Clerk of the Court, was examined and

4         testified upon his oath as follows:

5              THE CLERK:  In a loud, clear voice, please

6         state your name.

7              THE WITNESS:  My name is Alex Alcantara.

8              THE CLERK:  Could you spell your last name.

9              THE WITNESS:  A-L-C-A-N-T-A-R-A.

10             THE CLERK:  Can you tell me what county that

11        you reside in?

12             THE WITNESS:  Nassau.

13             THE CLERK:  Thank you.

14             THE COURT:  Now, see that last juror over

15        there?

16             THE WITNESS:  Yeah.

17             THE COURT:  I want you to pretend he's the

18        second baseman and you are a left fielder, and you are

19        yelling at him to watch the ball, okay?

20             THE WITNESS:  Okay.

21             THE COURT:  So raise your voice a little.

22        Okay.

23   DIRECT EXAMINATION

24   BY MS. ABDI:

25        Q.   Good morning, Ivan.

A. Alcantara - People - Direct        452

1    A.   Good morning.

2    Q.   Do you go to school?

3    A.   Yes.

4    Q.   Who school do you go to?

5    A.   Powell Lane.

6    Q.   And what grade are you in?

7    A.   Fifth grade.

8    Q.   Do you know a girl named Jennifer Villatoro?

9    A.   Yes.

10   Q.   How do you know her?

11   A.   I used to live at her house.

12   Q.   And is she a friend of yours?

13   A.   Yes.

14   Q.   Do you know how long you have known her for?

15   A.   One-and-a-half years.

16   Q.   Do you also know somebody named Stevens Destina?

17   A.   Yes.

18   Q.   How do you know him?

19   A.   Because he used to live right next to the house.

20   Q.   The house you used to live in?

21   A.   Yes.

22   Q.   And you don't live there anymore, correct?

23   A.   No.

24   Q.   And do you know somebody named Ulises Bonilla?

25   A.   Yes.

J.H.

A. Alcantara - People - Direct      453

1        Q.   How do you know him?

2        A.   He used to live like, um, halfway across the

3    house.

4        Q.   Do you know what street he lived on?

5        A.   Kinkel Street.

6        Q.   And do you know how long you have known Ulises

7    Bonilla for?

8        A.   No.

9        Q.   Now, you're friends with Steven Destina as well?

10       A.   Yes.

11       Q.   You and Jennifer and Steven, you're all friends,

12   right?

13       A.   Yes.

14       Q.   And you used to play together and hang out

15   together?

16       A.   Yes.

17       Q.   Now, I'm going to direct your attention to

18   September 24th, 2010.  Did you go to the park that day?

19       A.   Yes.

20       Q.   Do you know what park you went to?

21       A.   Um, I forgot the name of it.

22       Q.   Is it near your house?

23       A.   Yes.

24       Q.   And who did you go to the park with?

25       A.   Jenny and Steven.

J.H.

A. Alcantara - People - Direct       454

1       Q.    What did you do when you got to the park?

2       A.    We went to the playground.

3       Q.    And what's near the playground?

4       A.    The handball court.

5       Q.    And did you see anyone you knew at the handball

6    court?

7       A.    Yes.

8       Q.    Who was that?

9       A.    Ulises.

10              THE COURT:  I'm sorry?  I didn't hear you.

11              THE WITNESS:  Ulises.

12              THE COURT:  The defendant?

13              THE WITNESS:  Yes.

14              THE COURT:  This person over here?

15              THE WITNESS:  Yeah.

16      Q.    And what did you see happen when you saw him at

17   the handball court?

18      A.    I saw him come and then go Jenny.  And then I saw

19   them going into a bathroom.

20      Q.    Do you know which bathroom they went into?

21      A.    The girls.

22      Q.    And who was with you?

23      A.    Steven.

24      Q.    Now, what did you do when you saw them go into the

25   bathroom?

A. Alcantara - People - Direct      455

1     A.    I went back home and told Oscar.

2     Q.    Now, you saw them go into the bathroom?

3     A.    Yeah.

4     Q.    Now, did you see them go -- did you see them come

5  out of the bathroom?

6     A.    Yeah.

7     Q.    Tell me what you saw when you saw them come out of

8  the bathroom.

9     A.    I saw Jenny pulling up her skirt.

10     Q.    And who was coming out of the bathroom?

11     A.    Jenny and Ulises.

12           THE INTERPRETER:  Can you repeat that?

13     A.    Jenny and Ulises.

14     Q.    Did you see anything on -- any injuries to Jenny?

15     A.    No.

16     Q.    What did you do when you saw them coming out of --

17     A.    I went back home.

18     Q.    -- the bathroom, okay.  And what did you do when

19  you went back home?

20     A.    What you call it, I told Jenny's parents.

21     Q.    And do you know if the police came that day?

22     A.    Yes.

23     Q.    Do you see Ulises Bonilla in the courtroom today?

24     A.    Yes.

25     Q.    Can you say something that he's wearing?

J.H.

A. Alcantara - People - Cross       456

1      A.   He's wearing something blue, a blue shirt.

2                 MS. ABDI:  Your Honor, may the record reflect

3      the witness has identified the defendant?

4                 THE COURT:  Well, I assume it's not the

5      lawyer.  Yes.

6                 MR. MILLMAN:  We'll stipulate.

7                 MS. ABDI:  I have no further questions.

8                 THE COURT:  See that clock on the wall?

9                 THE WITNESS:  Yeah.

10                THE COURT:  What time is it?

11                THE WITNESS:  It is 1:35.

12                THE COURT:  1:35?

13                THE WITNESS:  Yeah.

14                THE COURT:  Just step up a little further and

15     see if you can see if it's any different.

16                THE WITNESS:  No, oh, no, it's 12:30.

17                THE COURT:  Okay.

18     CROSS-EXAMINATION

19     BY MR. MILLMAN:

20         Q.   Would you prefer that I call you Mr. Alcantara or

21     Alex?

22         A.   Any way you want.

23         Q.   When you left the park after you say that you saw

24     Jennifer and Ulises go to the bathroom, how did you walk?

25     What street did you take?

1        A.    I took, um, what they call, I went through to,

2     what's it called?  I went through the other side of the

3     park, and I left.

4        Q.    When you say the other side of the park, is

5     that --

6        A.    There's two ways.

7        Q.    Broadway over there?

8        A.    Huh?

9              THE COURT:  You said there's two ways?

10             THE WITNESS:  Yeah, there's two ways, and

11        there's one on the other side where what's it called,

12        the bathrooms are, and there's another one on the other

13        side.

14       Q.    Do you know what street you were on when you first

15     left the park?

16       A.    Yeah, we're on -- we're on -- I forgot.

17       Q.    Do you remember about whether or not you walked up

18     Kinkel Street?

19       A.    Yeah.

20       Q.    And when you walked up Kinkel Street, where did

21     you go at that time?

22       A.    I went back home.

23       Q.    And where is home at that time?

24       A.    Kinkel Street.  It's what's it called, Kinkel.

25       Q.    What number?

A. Alcantara - People - Cross        458

1        A.    180 Kinkel.

2        Q.    So at that time you were living in the same house

3    that Jennifer was?

4        A.    Yeah.

5        Q.    And you were very close to her, I take it?

6        A.    Yes.

7        Q.    Now, when you were walking up Kinkel Street, did

8    you speak to anyone during that time?

9        A.    No.

10        Q.    Who was the first person that you spoke with after

11   you were walking up Kinkel Street?

12        A.    Steven.

13        Q.    I'm sorry?

14        A.    Steven.

15        Q.    And were you walking with him or alone?

16        A.    With him.

17        Q.    And was anybody else with you?

18        A.    No, just me and him.

19        Q.    And what did you speak with Steven about while you

20   were walking?

21        A.    We were talking about that we should tell Jenny's

22   mom.

23        Q.    What you should tell Jenny's mom?

24        A.    Yeah.

25        Q.    Did you speak with Jennifer's mom about this?

A. Alcantara - People - Cross       459

1        A.      Yes.

2        Q.      And who was there at that time?

3        A.      Jenny's mom and Jenny's dad.

4        Q.      Anybody else?

5        A.      Um, no.

6        Q.      Did you speak with Jennifer's mom about this since

7    that day?

8        A.      Yeah.

9        Q.      About how many times?

10       A.      About like two times.

11       Q.      Did you speak with Steven about this since that

12   day?

13       A.      Yes.

14       Q.      About how many times?

15       A.      Like one time.

16       Q.      What about Jennifer, did you speak with Jennifer

17   about this since that day?

18       A.      No.

19       Q.      Did you speak with the police about this since

20   that day?

21       A.      Um, yes.

22       Q.      About how many times?

23       A.      Like about three.

24       Q.      And on the first of those three occasions, who was

25   there?

A. Alcantara - People - Cross          460

1        A.    The police names?

2        Q.    You don't remember their names, right?

3        A.    No.

4        Q.    How many police officers were there on the first

5    occasion?

6        A.    Like three.

7        Q.    Was anyone else there?

8        A.    No.

9        Q.    What about the second time that you spoke with the

10   police since that day, how many police officers were there?

11       A.    There were like two.

12       Q.    Anybody else there at that time?

13       A.    No.

14       Q.    And what about the third time since that day?

15       A.    There was three.

16       Q.    Three police officers?

17       A.    Yeah.

18       Q.    And anybody else?

19       A.    No.

20       Q.    Have you spoken with the young lady here, the

21   Assistant District Attorney before --

22       A.    Yeah.

23       Q.    -- you testified?

24       A.    Yeah.

25       Q.    Ivan, how much time to the best that you can

A. Alcantara - People - Cross        461

1   recall did you spend with her talking to her?

2        A.    Like 30 minutes, I think.

3        Q.    Was anybody else around at that time?

4        A.    Yeah.  There was a cop that brought us here.

5        Q.    Anybody else there?

6        A.    No.  Oh, yeah, my mom.

7        Q.    Your mom is very good friends with Jennifer's mom?

8        A.    Yeah.

9        Q.    And was very good friends with Jennifer's father?

10       A.    Yeah.

11       Q.    Did you speak with Oscar --

12       A.    Yeah.

13       Q.    Well, let me just finish my question.  Did you

14  speak with Oscar before you got to the house at 180 after

15  you saw what you say you saw in the park?

16       A.    Yeah.

17       Q.    Where was Oscar when you spoke to him?

18       A.    At the house.

19       Q.    And you didn't speak with him beforehand?

20       A.    No.

21       Q.    Have you spoken to Oscar about this since that

22  day?

23       A.    No.

24       Q.    And when was the last time that you spoke with --

25  withdrawn.

1            MR. MILLMAN:  I have nothing further.  Thank

2       you.

3            THE COURT:  Any redirect?

4            MS. ABDI:  No.

5            THE COURT:  Okay, you can step down.

6                 (The witness was excused.)

7            THE COURT:  All right, ladies and gentlemen,

8       we will break for lunch.  We'll see you at 2 o'clock.

9            Now, you have heard some testimony, and I

10      reiterate remember the admonitions I have given you and

11      don't talk to anybody about this case.  We'll see you

12      at 2.

13                (Whereupon, the jury exits the courtroom.)

14           THE COURT:  There's going to come a time that

15      you are going to offer immunity to a witness?

16           MS. ABDI:  Yes.

17           THE COURT:  When is that witness going to

18      testify?

19           MS. ABDI:  I'm not sure yet, Judge.

20           THE COURT:  It won't be today?

21           MS. ABDI:  It's not today.

22           THE COURT:  Is it your position that this

23      must first be done outside of the presence of the jury?

24      I believe, and I could be wrong on this, that it must

25      be done first outside the presence of the jury and then

Proceedings                          463

1      reiterated before the jury.

2                  MS. ABDI:  Yes, Judge.  If there's

3      something --

4                  THE COURT:  I'm telling you.  I might be

5      wrong.  That's my belief.

6                  MS. ABDI:  I will look into it, Judge.

7                  THE COURT:  If you have something different

8      to tell me, let me know.  2 o'clock.

9                  (Whereupon, a luncheon recess was taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

Proceedings                          464

1    A F T E R N O O N   S E S S I O N

2                THE CLERK:  Case on trial recalled, People of

3         the State of New York versus Ulises Bonilla, Indictment

4         202N of 2011.  All parties present including defendant

5         and Spanish interpreter.  No jurors are present.

6                THE COURT:  All right, let's get the jury.

7                COURT OFFICER:  Jury entering.

8                (The jury enters the courtroom.)

9                THE CLERK:  Let the record reflect all jurors

10        present.  Do both sides waive a reading of the roll and

11        stipulate to the seating?

12                MS. ABDI:  Yes.

13                MR. MILLMAN:  Yes.

14                THE CLERK:  Thank you.

15                THE COURT:  Next witness.

16                MS. ABDI:  People call Christopher Bendetto.

17   P. O.  C H R I S T O P H E R   B E N D E T T O , Shield 3647,

18        a witness called on behalf of the People, after having

19        been first duly sworn by the Clerk of the Court, was

20        examined and testified upon his oath as follows:

21                THE CLERK:  In a loud, clear voice, please

22        state your name, spell your last, and give your shield

23        and command.

24                THE WITNESS:  It's Christopher Bendetto.

25        Shield is 3647.  My last name is B-E-N-D-E-T-T-O, and

P.O. C. Bendetto - People - Direct     465

1      it's the Third Precinct of Nassau.

2                  THE CLERK:   Thank you.

3      DIRECT EXAMINATION

4      BY MS. ABDI:

5          Q.   Good afternoon, Officer.

6          A.   How are you?

7          Q.   How long have you been employed as a police

8      officer in Nassau County?

9          A.   For four years.

10         Q.   And where are you currently assigned?

11         A.   I'm in the Third Precinct.

12         Q.   And what areas does that cover?

13         A.   It's the Third Precinct, covers from East Meadow,

14     Westbury all the way to Bellerose Terrace.

15         Q.   Would Westbury be part of your precinct?

16         A.   Yes.

17         Q.   I'm going to direct your attention now to

18     September 24th of 2010.  It was a Friday.

19         A.   Okay.

20         Q.   Were you working in your capacity as a police

21     officer on that date?

22         A.   Yes, I was.

23         Q.   And what precinct were you assigned on that date?

24         A.   Third Precinct.

25         Q.   And were you in uniform or plainclothes?

J.H.

P.O. C. Bendetto - People - Direct      466

1        A.    Uniform.

2        Q.    And were you in a marked or unmarked car?

3        A.    Yes, marked patrol car.

4        Q.    I'm going to direct your attention back to that

5    date, September 24th, 2010.  Did you receive a dispatch to

6    respond to 180 Kinkel Street in Westbury?

7        A.    Yes, I did.

8        Q.    Approximately what time were you dispatched to

9    respond to that location?

10       A.    It was about 7:22 p.m.

11       Q.    Were you dispatched from a 911 call?

12       A.    Yes.

13       Q.    And do you know when that 911 call was

14   transmitted?

15       A.    I believe it was 1859, 6:59 p.m. of that night.

16       Q.    And did you respond to that location?

17       A.    Yes.

18              THE COURT:   Does anyone here know what 1859

19       is?  That's 6:59 p.m.

20       Q.    When you arrive at 180 Kinkel Street, did you

21   speak with anyone at that home?

22       A.    Yes.  I walked up to the front door, and outside

23   the front door was Ivan and Steven, Ivan Alcantara and

24   Steven.

25       Q.    Those are two young boys?

P.O. C. Bendetto - People - Direct     467

1        A.    Yes.

2        Q.    Without telling us what they said --

3        A.    Okay.

4        Q.    -- you had a conversation with them; is that

5    correct?

6        A.    Yes.

7        Q.    And did you also have a conversation with Jennifer

8    Villatoro?

9        A.    Yes.

10       Q.    And did you also have a conversation with anyone

11   else at that location?

12       A.    Susana Villatoro was there also.  Her English was

13   not very good, so it was translated through Ivan.

14       Q.    Now, there was no action taken at that time; is

15   that correct?

16       A.    Can you clarify?

17       Q.    No arrests were made at that point; is that

18   correct?

19       A.    No.

20             THE COURT:  Did you initiate an investigation

21        at that time?

22             THE WITNESS:  Yes.  We were there --

23             THE COURT:  Just yes or no.

24             THE WITNESS:  Yes.

25             THE COURT:  You did initiate an

J.H.

P.O. C. Bendetto - People - Cross      468

1       investigation, okay.

2           Q.   And is it fair to say that you declined any

3       further action after speaking with Jennifer Villatoro?

4                    MR. MILLMAN:  Objection to leading.

5                    THE COURT:  No, overruled.

6           A.   We -- after a report was taken, and then we left

7       after that.

8           Q.   There were two young boys there; is that correct?

9           A.   Yes.

10          Q.   Ivan Alcantara and Stevens Destina?

11          A.   Yes.

12          Q.   And you also spoke with them; is that correct?

13          A.   Yes.

14                   MS. ABDI:  I have no further questions for

15              this witness.

16                   THE COURT:  Any cross?

17                   MR. MILLMAN:  Yes, your Honor.

18      CROSS-EXAMINATION

19      BY MR. MILLMAN:

20          Q.   The 911 call that you responded to, that was a

21      complaint from Jennifer Villatoro's father indicating that

22      kids were teasing Jennifer; isn't that accurate?

23          A.   It's not accurate as to what I received on my

24      computer.

25          Q.   Were you advised anything about teasing when you

P.O. C. Bendetto - People - Cross      469

1   were hearing this 911 call?

2        A.   No.

3        Q.   And you indicated that you did not make any

4   arrests.  Is part of the reason for that that Jennifer

5   indicated that nothing happened?

6        A.   In speaking with Jennifer, she withheld anything

7   that happened between her and Mr. Bonilla.

8        Q.   Do you have any reason to believe based on

9   anything that you saw that she was injured?

10       A.   Not anything that I saw.

11            THE COURT:  Did you notice any injuries on

12       her?

13            THE WITNESS:  I didn't notice any injuries

14       while I was there, no.

15       Q.   You didn't notice anything around her mouth, on

16  her lips?

17       A.   I didn't see anything on her lips, no.

18            MR. MILLMAN:  Nothing further.  Thank you.

19            THE COURT:  Thank you.

20            (The witness was excused.)

21            THE COURT:  Next witness.

22            MS. ABDI:  Your Honor, the People call Angel

23       Esteban Leon.  He will need the services of a

24       translator.

25            THE COURT:  When were you going to let me

J.H.

P.O. C. Bendetto - People - Cross     470

1      know?

2               MS. ABDI:  Judge, this translator can

3      translate both.

4               THE COURT:  Do you have the equipment here to

5      do that?

6               THE INTERPRETER:  It's right here.

7               THE COURT:  So you took care of it yourself?

8               MS. ABDI:  Yes.

9               THE COURT:  Okay, I apologize.  All right,

10     Mr. Millman?

11              MR. MILLMAN:  Yes.

12              THE COURT:  During the testimony of this next

13     witness, you have a right to speak to your client,

14     obviously, and if you feel it necessary that the

15     interpreter has to stop interpreting the witness and go

16     interpret that which your client wants you to know,

17     I'll make provisions for that.

18              COURT OFFICER:  Raise your right hand, face

19     the clerk.

20  A N G E L  L E O N, a witness called on behalf of the

21     People, after having been first duly sworn by the Clerk

22     of the Court, was examined and testified upon his oath

23     through the interpreter as follows:

24              THE CLERK:  In a loud, clear voice, please

25     state your name and spell your last.

A. Leon - People - Direct          471

1          THE WITNESS:  Angel Leon, A-N -- give me a

2     pen.

3          THE COURT:  Why does he want a pen?

4          THE WITNESS:  So I can show you how to spell

5     my name.

6          THE CLERK:  Just his last name.

7          THE WITNESS:  It's like this.

8          THE CLERK:  And his county of residence?

9          THE WITNESS:  It's Westbury.

10          THE CLERK:  That's Nassau County?

11          THE WITNESS:  Yes.

12          THE CLERK:  Thank you.

13          THE COURT:  Counsel, how would you like me to

14     handle this meaning that which the witness wrote down?

15     It's part of the evidence in this case.  Do you simply

16     wish me to read it into the record, or do you want it

17     as an exhibit?  Come on up here.

18          (A discussion was held off the record at the

19     bench outside of the hearing of the jury.)

20          THE COURT:  It says Angel, A-N-G-E-L, Leon,

21     L-E-O-N with an accent mark over the O.

22          MS. ABDI:  Thank you, your Honor.

23     DIRECT EXAMINATION

24     BY MS. ABDI:

25          Q.  Good afternoon, Mr. Leon.

A. Leon - People - Direct          472

1        A.    Good afternoon.

2        Q.    Did you know an individual named Armando

3   Villatoro?

4        A.    Yes.

5        Q.    And how did you know him?

6        A.    I live in his house.

7        Q.    You reside at 180 Kinkel Street?

8        A.    Yes.

9        Q.    And that's in Westbury, Nassau County?

10       A.    Yes.

11       Q.    And how long have you lived there?

12       A.    Just about four years.

13       Q.    And is it fair to say that you were friends with

14   Armando Villatoro?

15       A.    Yes.

16       Q.    And how long had you known Armando Villatoro?

17       A.    Almost five years, yes.

18       Q.    Now, I'm going to direct your attention to Friday,

19   September 24th into the early morning hours of Saturday,

20   September 25th of 2010.  Were you working anywhere at that

21   time?

22       A.    Yes, in a restaurant where I work.

23       Q.    What time did you get off of work?

24       A.    Yes, it was just about 1:30, yes.

25       Q.    Is that in the morning or in the afternoon?

1        A.    It was in the morning, yes.

2        Q.    So then I'd like to direct your attention to

3    approximately 1:30 in the morning on September 25th of 2010,

4    which is a Saturday.  Where did you go when you got off of

5    work?

6        A.    Yes, I went to the deli, yes.

7        Q.    And what kind of deli is this?

8        A.    Yes, it's a deli, 24-hour deli.

9        Q.    Do you know where it's located?

10       A.    Uh-huh.  It's on that street.  State is the name

11   of the street.

12       Q.    Do you know what other street it's also bordering?

13       A.    There's Brooklyn.

14       Q.    So you went to this deli?

15       A.    Yes.

16       Q.    Is this deli in Westbury?

17       A.    Yes, Westbury.

18       Q.    And how far is it from -- how far is the deli from

19   180 Kinkel Street?

20       A.    Yes, it's about five blocks.

21       Q.    Now, when you went to the deli that early morning,

22   who did you see there?

23       A.    Yes, Armando was there.  He was there.

24       Q.    What was Armando's mood at that time that you

25   could see?

                        A. Leon - People - Direct        474

1         A.    He was not doing good.  He was drinking beer.

2         Q.    Why was he doing that?

3                    THE COURT:  Why was he drinking beer?

4                    MR. MILLMAN:  Objection.

5                    THE COURT:  Just one second, just one second.

6                    MS. ABDI:  I'll rephrase that question.

7                    THE COURT:  I hope you don't ask me the same

8    question at 8 o'clock tonight.

9         Q.    Why did you say that he was doing at that time?

10                   MR. MILLMAN:  Objection.

11                   THE COURT:  Just one second.  You've known

12   him for five years.  What did he appear to you to be

13   suffering from, if anything?

14                   THE WITNESS:  Yes, he was upset, yes.

15        Q.    What was he upset about?

16                   MR. MILLMAN:  Objection.

17                   THE COURT:  Just one second.  Just answer

18   this question yes or no, did he tell you what he was

19   upset about; yes or no?

20                   THE WITNESS:  Yes.

21        Q.    What did he say?

22                   MR. MILLMAN:  Objection.

23                   THE COURT:  Sustained.

24                   MS. ABDI:  Judge, I'm not offering it for the

25   truth.  I'm offering it to show state of mind.

                                                            J.H.

A. Leon - People - Direct        475

1              MR. MILLMAN:  I disagree.

2              THE COURT:  Sustained.

3    Q.   Did you hear him say it?

4              THE COURT:  Sustained.

5              MR. MILLMAN:  Objection.

6    Q.   What happened next?

7    A.   I got to the deli, and he said --

8              THE COURT:  Just one second.

9              MR. MILLMAN:  Objection.

10             THE COURT:  Don't tell this jury what he said

11        at this time.

12   Q.   So --

13             THE COURT:  Ladies and gentlemen, so you

14        understand this, there are exceptions to this, but for

15        the most part, a statement made out of court is

16        hearsay.  Go ahead.

17   Q.   So what happened when you got to the deli with

18   Armando?

19   A.   He told me.

20   Q.   He told you something, correct, without getting

21   into what it was?

22   A.   Uh-huh.

23   Q.   And then what happened?

24   A.   He said, you know what, I call the police.

25             THE COURT:  We'll take that.

J.H.

A. Leon - People - Direct          476

1           MR. MILLMAN:  Just note my objection on the

2       same grounds.  It's not an exception to the hearsay

3       rule.

4           THE COURT:  Just one second.  I would agree

5       which if it were not corroborated by Bendetto.

6       Q.   So without telling us what Armando was talking

7   about, what happened next in the deli?

8       A.   Ulises arrived, and they fought, and they were

9   separated.

10      Q.   Now, when you say that --

11          THE COURT:  Just one second.  Who was

12      fighting?

13          THE WITNESS:  Ulises and Armando.

14          THE COURT:  Do you know Ulises?

15          THE WITNESS:  Yes.

16          THE COURT:  Is he in the courtroom?

17          THE WITNESS:  Yes.

18      Q.   If you see Ulises in the courtroom, can you please

19  describe an article of clothing he is wearing?

20      A.   Yes.

21      Q.   Well, can you say -- can you describe in some way

22  what Ulises Bonilla is wearing?

23      A.   Yes.  It's a blue shirt, I believe.

24          MS. ABDI:  Your Honor, may the record reflect

25      the witness has identified the defendant?

A. Leon - People - Direct          477

1          THE COURT:  Yes.

2      Q.   Now, could you hear anything about what they were

3  fighting about?

4      A.   Yes, he said --

5      Q.   What did you hear?

6          THE COURT:  All right, at this point --

7      A.   No, he said --

8          THE COURT:  At this particular time, this is

9      an exception to the hearsay rule.

10          MR. MILLMAN:  Note my objection, your Honor.

11          THE COURT:  I understand.

12      Q.   What could you hear being said at that time?

13      A.   He said, I want to fix this man-to-man.

14      Q.   Who said that?

15      A.   Ulises.

16      Q.   And who did he say it to?

17      A.   To Armando.

18      Q.   Did you hear Armando say anything else about -- at

19  that time what they were fighting about?

20          MR. MILLMAN:  Objection.

21          THE COURT:  Was there any conversation

22      between Ulises and Armando as to the subject matter of

23      the fight or argument?

24          THE WITNESS:  Yes, they were fighting.

25          THE COURT:  About what?

A. Leon - People - Direct          478

1              THE WITNESS:  Yes, because he had called the

2         police.

3         Q.   Because who had called the police?

4              MR. MILLMAN:  Just note my objection.

5         A.   Armando.

6              THE COURT:  Overruled.

7         Q.   You said Armando, correct?

8         A.   Yes.

9         Q.   Now, could you see if there were any punches

10   thrown between Armando and the defendant?

11        A.   Yes.

12        Q.   Who was punching whom?

13        A.   They were fighting, but they were quickly

14   separated.

15        Q.   What happened after that?

16        A.   Then about ten minutes later, he came back with a

17   couple of his friends.

18              THE COURT:  Who is he?

19              THE WITNESS:  Ulises.

20        Q.   Where were you at this point?

21        A.   I was inside the deli, me.

22        Q.   And where was Armando?

23        A.   No, he was behind the counter where the cashier

24   is.

25        Q.   Armando was?

A. Leon - People - Direct        479

1       A.    Uh-huh, yes.

2            Q.    Now, when Ulises came back, was there any further

3       fighting between he and Armando?

4            A.    Yes.  A friend said, watch out, they are coming in

5       through the back.  But they didn't realize that the door was

6       locked.  So since they couldn't come in through the back

7       door, they came in through the front door, the main door.

8            Q.    And when you say they, are you talking about

9       Ulises and his friends?

10           A.    Yes.

11           Q.    At that point what happened?

12           A.    No, they came in with their bats like this.

13                 THE COURT:  Like what?

14                 THE WITNESS:  They came with their bats, you

15           know, sticks.

16           Q.    And what happened next?

17           A.    Yes, another friend was in the bathroom, and he

18      thought that Armando was in the bathroom hiding out.

19                 MR. MILLMAN:  Objection as to what he

20           thought, your Honor.  It calls for speculation.

21                 THE COURT:  Just one second.  The District

22           Attorney asked you about five minutes ago was there any

23           fighting between Armando and Ulises and his friends,

24           and you said, Yes.  Was this bodily contact fighting,

25           or was it simply arguing?

A. Leon - People - Direct          480

1                    THE WITNESS:  Can I talk?

2                    THE COURT:  Sure, or both.

3                    THE WITNESS:  So since Armando was hiding

4         out, they didn't do anything to him.

5         Q.   So the second time they came back, they didn't see

6    Armando?

7         A.   No, because he was like this hiding out.

8         Q.   Now, at some point did everybody leave the deli?

9         A.   They left, but there were some people that stayed

10   behind.

11        Q.   And when did you and Armando leave the deli?

12        A.   No, after, yes, about a half hour later.  And he

13   went in a taxi.

14                   THE COURT:  Who is he?

15                   THE WITNESS:  Armando.

16        Q.   So Armando went home in a taxi?

17        A.   Yes.

18                   THE INTERPRETER:  The interpreter needs

19        clarification.

20        A.   So he got into the taxi, and he told the police,

21   he says, if I leave in taxi, they are going to be on the

22   lookout when I get home.  So the two policemen left behind

23   the taxi.

24        Q.   Now --

25                   THE COURT:  All right, just one second.

A. Leon - People - Direct        481

1    While you were at the deli, the police came to the
2    deli?
3                THE WITNESS:  Yes.
4                THE COURT:  And Armando spoke to the police?
5                THE WITNESS:  Yes.
6                THE COURT:  And to your knowledge, the police
7    followed Armando home while he was in the taxi?
8                THE WITNESS:  Yes.
9                THE COURT:  Okay.
10   Q.    And how did you get home?
11   A.    So after that, I took a taxi.
12   Q.    And where did you go?
13   A.    To Kinkel, 180 Kinkel.
14   Q.    That was back home?
15   A.    Yes.
16   Q.    Now, I'm going to direct your attention now to a
17   few days later to Tuesday, September 28th, 2010.
18   A.    Um-hum.
19   Q.    Now, on that date, I'm going to direct your
20   attention to -- were you with Armando on that date?
21   A.    Yes.
22   Q.    And I'll direct your attention to sometime a
23   little bit before 10 p.m. on this date.
24   A.    Yes.  We had been drinking.  I think I had had
25   about two beers.  After Ulises called up, and he said, I'm

J.H.

A. Leon - People - Direct          482

1    waiting for you.

2         Q.   Let me just stop you for a minute.  You were with

3    Armando at that point?

4         A.   Yeah.

5         Q.   Where were you?

6         A.   It's a deli that it belongs to the Haitians.

7    That's what we call it.

8         Q.   Do you know where the deli is located?

9         A.   Yes, it's near -- those two delis are near State.

10        Q.   That's State Street?

11        A.   Yes, it's called State.

12        Q.   And what happened at that point?

13        A.   No, Ulises called them and said --

14             THE COURT:  Just one second.  While you were

15        at this deli, was there a phone call?

16             THE WITNESS:  Yes.

17             THE COURT:  Did you answer the phone?

18             THE WITNESS:  No, Armando.

19             THE COURT:  Were you able to hear the voice

20        of the caller?

21             THE WITNESS:  No.  But he said --

22             THE COURT:  One moment.  And then you

23        assumed, did you not, that it was the defendant; is

24        that correct?

25             THE WITNESS:  Yes.

A. Leon - People - Direct        483

1           THE COURT:  Okay, go ahead.

2      Q.   What happened after that phone call?

3      A.   Yes, because he called, so then he told me, Let's

4   go home.  I want you to come with me.

5      Q.   And this was on September 28th, 2010?

6      A.   Yes.

7      Q.   And were you with anyone else at that time?

8      A.   Yes, Santos Marana and Nango.  That's what we

9   called him.

10     Q.   You were with an individual who you call Santos?

11     A.   Yes.

12     Q.   And an individual that you nicknamed Nango?

13     A.   Yes.

14     Q.   And who are these people?

15     A.   We were all Armando's friends.

16     Q.   And how do you get from the deli to Armando's

17  house?

18     A.   No, we were walking.

19     Q.   And was Armando walking with you, or was he

20  walking ahead of you?

21     A.   He was ahead of us.

22     Q.   And who were you walking with?

23     A.   It was me, Santos and Rene, his name.

24     Q.   Is Rene the same person as Nango?

25     A.   No.

A. Leon - People - Direct          484

1     Q.    Now, when you got -- what did you see happen next
2  as you were walking?
3     A.    Armando was walking ahead of us.  And when we got
4  to the driveway, he was already fighting with Ulises.
5     Q.    Now, when you say fighting with Ulises, can you
6  describe what you saw them doing?
7     A.    Yes.
8     Q.    Please describe what you saw them doing.
9     A.    They were fighting like this, everyone like this.
10  Armando would hit him, and Ulises would hit him.
11          THE COURT:  The record should reflect that
12      the witness stood and made a fist with each hand and
13      swung his left hand to the right side of his body and
14      the right hand to the left side of his body parallel to
15      the ground.
16          THE WITNESS:  Yes.
17     Q.    Could you see where on Armando's body Ulises was
18  hitting him?
19     A.    Yes.  You see, it was dark, and because they had
20  their jackets on, you could see that they were struggling.
21     Q.    They were fighting with each other, right?
22     A.    Yes.
23     Q.    Where did you see Ulises hit Armando, on what part
24  of the body?
25     A.    Right here on the left side.

A. Leon - People - Direct          485

1          THE COURT:  Left side chest area?

2          THE WITNESS:  Yes, like this.

3      Q.   And how was he -- how was Ulises hitting Armando

4  in that area, with what?

5      A.   You could see they were fighting.

6      Q.   Well --

7      A.   They were each fighting.  You could see Armando

8  with his right hand and -- but we never saw a weapon on him.

9      Q.   So how far -- withdrawn.

10         How close were Armando and Ulises to each other

11  when they were fighting?

12     A.   They were close.  They were like this close,

13  because they were struggling.

14         MS. ABDI:  Your Honor, may the record reflect

15     that the witness has made almost a hugging motion with

16     his right and left arm?

17         THE COURT:  I did not see that, I'm sorry.  I

18     am not denying it.  How close were they?

19         THE WITNESS:  Like they were this close.

20         THE COURT:  Yes, a hugging motion.

21     Q.   And at that point that you saw them, was anyone

22  else fighting with Armando?

23     A.   No.

24     Q.   Now, what happened?  What did you observe next?

25     A.   They were fighting, and then -- and then there's

A. Leon - People - Direct          486

1    this one guy. His name is Misael.

2         Q.   Do you know Misael?

3         A.   Yes.

4         Q.   How do you know him?

5         A.   You see, we are all on the same block, so we

6    really know each other.

7         Q.   What did you see Misael do?

8         A.   When they were fighting, someone wanted to call

9    the police, and he said -- he said, No. He took out a gun.

10   He said, No one should get involved. The fight is between

11   those two, so no one should butt in.

12        Q.   And then what did you see happen? What did you do

13   with the gun?

14        A.   He shot, he shot it in the air. And he had a mask

15   on, a white plastic mask that he put on.

16        Q.   Did he put the mask on after you had already seen

17   him?

18        A.   Yes, it was after.

19        Q.   Now, you saw him fire the gun in the air, correct?

20        A.   Yes.

21        Q.   After that, what happened?

22        A.   After that and Armando's wife stepped outside and

23   after that happened, you could see that Armando was already

24   hurt.

25        Q.   What did you see on Armando?

A. Leon - People - Direct          487

1        A.     You could see Armando was bleeding.

2        Q.     How far away were you from the fight between

3    Armando and Ulises?  If you could use something in the

4    courtroom as reference and just show how far away you were.

5                MR. MILLMAN:  I'm also clarifying at which

6        point.  It's beyond a reference point, your Honor.

7                THE COURT:  During the time that the two were

8        fighting, were you basically in one position?

9                THE WITNESS:  Yes.  I was behind a car.

10               THE COURT:  And were they basically in your

11       vision?

12               THE WITNESS:  Who?

13               THE COURT:  Armando and the defendant.

14               THE WITNESS:  Yes.

15               THE COURT:  What was the distance between you

16       and them?

17               THE WITNESS:  It was about a block, maybe 10

18       steps, yes.  You see the sidewalk is right here.  From

19       the driveway to the other side, to the other side of

20       the street.

21               THE COURT:  Was it further or nearer than

22       where the prosecution is standing now?

23               THE WITNESS:  It was further.  I would say to

24       the other door, the other side of the wall.

25               THE COURT:  That wall?

J.H.

A. Leon - People - Direct          488

1          THE WITNESS:  Yes, door.

2          THE COURT:  Ladies and gentlemen, the

3      distance between the witness stand and the door is 50

4      feet.

5      Q.   Now, did you ever hit Ulises?

6      A.   No.

7      Q.   Did you ever have a weapon with you in your hand?

8      A.   No.

9      Q.   Did you ever get in between Ulises, the defendant,

10     and Armando?

11     A.   No.

12     Q.   Now, could you describe -- once you heard the

13     gunshot, you said you saw Armando?

14     A.   But at that moment, I was coming back around, he

15     was already injured?

16     Q.   Okay.  When you say coming back, where did you see

17     him walk to?

18     A.   Who?

19     Q.   Armando.

20     A.   No.  He was coming from the other side of the

21     street where they had been fighting.  He was going to, you

22     know, to his house, inside his house.  And his wife, and she

23     went to hug him, but he was already injured.

24     Q.   And what did you see happen to him at that point?

25     A.   Then we realized that he was already injured.

A. Leon - People - Direct          489

1        Q.    What did he do?

2        A.    He was like on his last rites, and he -- he can't

3    make it in the inside of house.

4        Q.    Where did he stop?

5        A.    Right there in the yard.

6        Q.    And what happened to him in regard to you?

7        A.    He was already injured.  He fell there.  He was

8    already injured, so he fell there.  He fell in the yard.

9        Q.    And when you saw Armando, and you saw the blood or

10   injury to him, he was walking from the defendant?

11                   MR. MILLMAN:  Objection.  It's leading the

12             witness, your Honor.

13                   THE COURT:  Yes, sustained.

14       Q.    Who was Armando walking away from when you saw him

15   injured?

16       A.    From Ulises.

17       Q.    Did you see where Ulises, the defendant, went

18   after the gunshot?

19       A.    Yes.

20       Q.    Where did you see him go?

21       A.    With Ulises' friends, the ones that were with him.

22   They all left.

23       Q.    Did you see what direction they left?

24       A.    No.

25       Q.    Did you see whether -- how did they leave, on foot

1   or --

2       A.   No, in a car.

3       Q.   How did they get to the car?

4       A.   They ran.

5       Q.   Do you know what direction the car is parked in

6   relation to 180 Kinkel Street?

7       A.   It was almost in front of where Ulises lives.

8       Q.   And that's where you saw Ulises running to?

9       A.   Yes.

10      Q.   Now, did the police come to 180 Kinkel Street that

11  night?

12      A.   Yes.

13      Q.   And when they came, did you stay there to speak

14  with them?

15      A.   No.

16      Q.   Did there come a time when you did speak with

17  them?

18      A.   No.

19      Q.   You have spoken to the police before about what

20  happened that night, correct?

21      A.   No.

22      Q.   Do you remember speaking to the police at all?

23      A.   No.

24      Q.   Now, did you see who -- did you see how many

25  people Ulises ran with after the gunshot?

A. Leon - People - Cross          491

1          A.    Not really, but they were about -- there were a
2     couple of friends.
3                MS. ABDI:   I have no further questions for
4          this witness.
5                THE COURT:   Cross-examination.
6     CROSS-EXAMINATION
7     BY MR. MILLMAN:
8          Q.    Mr. Leon, on the night of September 28th after you
9     say that Armando got a phone call from Ulises, he said to
10    you, I want you to come with me, right?
11         A.    Yes.
12         Q.    You knew what that meant, didn't you?
13         A.    No.  He said, Come with me.
14         Q.    So you had no idea why he was asking you to come
15    with him?
16         A.    No.
17         Q.    And you had no idea that he was going to fight
18    with Ulises; is that your testimony?
19         A.    Yes.
20         Q.    And let me ask you something, did you go with him?
21         A.    Yes.  I live with him.
22         Q.    When you went with Armando, others joined you; is
23    that right?
24         A.    Yes.
25         Q.    About how many people?

J.H.

1       A.    Two more.  We were like three, with me, four.

2       Q.    So four of you?

3       A.    Yes.

4       Q.    Could it have been more?

5       A.    No.

6       Q.    So you are sure it was just four?

7       A.    Yes.

8       Q.    Let me ask you something, Mr. Leon:  When you got

9    to the vicinity of 180, what did you have in your hands?

10      A.    No, nothing.

11      Q.    You had nothing in your hands?

12      A.    No.

13      Q.    And I take it the people with you, none of them

14   had anything their hands either; is that your testimony?

15      A.    Yes.

16      Q.    And when you got there, I think you testified

17   earlier, correct me if I am wrong, that Armando went ahead

18   of where you were?

19      A.    Yes.

20      Q.    You know why he did that, right?

21            MS. ABDI:  Objection.

22      A.    Yes.

23            THE COURT:  Overruled.

24      Q.    When he did that, that's around the time he

25   started fighting with Ulises, correct?

A. Leon - People - Cross          493

1          A.    Yes.

2          Q.    What were you doing at that time?

3          A.    No, we had fallen behind, and he was ahead of us.

4          Q.    When you saw that he was fighting with Ulises,

5     there came a time when you got closer to where they were,

6     correct?

7          A.    No.

8          Q.    Okay, so you never got close to where they were.

9     What were you doing during the entire time that they were

10    fighting?

11         A.    We were just staring.

12         Q.    You were just watching?

13         A.    Yes, because they were both fighting.

14         Q.    And by the way, at the time that you were in the

15    deli a few days earlier, you say that Armando spoke with the

16    police that night?

17         A.    Yes.

18         Q.    Did you hear anything he said to them?

19         A.    Yes, because he had called the police because of

20    his daughter.

21         Q.    And he talked to them at that time about Jennifer?

22         A.    Uh-huh.

23                    THE COURT:  Is that a yes?

24                    THE WITNESS:  Yes.

25         Q.    That night at the deli, a few days before the

A. Leon - People - Cross          494

1  night where the incident at 180 Kinkel Street took place,
2  did you have anything in your hands at the time that the
3  fighting was going on then?
4              THE COURT:  What day are we talking about?
5              MR. MILLMAN:  At the deli, your Honor.
6              THE COURT:  What date?
7              MR. MILLMAN:  It would have been a few days
8        before.
9              THE COURT:  That's the 24th.
10             MR. MILLMAN:  Yes, the 24th.
11             THE COURT:  Or the early morning hours of the
12       25th.
13   A.   Yes.
14   Q.   I'm sorry?
15   A.   It was Saturday morning, the 25th.
16   Q.   And at the time that the fighting was going on at
17  the deli, you had a bottle in your hand, didn't you?
18   A.   No.  We were drinking.
19   Q.   You were drinking, okay.  And you didn't use that
20  bottle at all during the fight?
21   A.   No.
22   Q.   You know who Henry Hernandez is, Mr. Leon?
23   A.   No.
24   Q.   Never heard of him?
25   A.   Not the name.

A. Leon - People - Cross          495

1          MR. MILLMAN:  I'm going ask the Court and

2     members of the jury forgive my expression, but this is

3     my expression of what his nickname is.

4     Q.    Do you know someone with the nickname Nigger?

5     A.    No.

6     Q.    You don't know who that is?

7     A.    No.

8     Q.    And is it your testimony that on the night that

9     you were at the deli the night of the 24th, you didn't take

10    a bottle and crack it over someone's head that night?

11    A.    No.

12    Q.    Never happened?

13    A.    No.

14    Q.    Mr. Leon, you didn't see how the actual physical

15    fight between Ulises and Armando got started, did you?

16              THE COURT:  On what date?

17              MR. MILLMAN:  I'm sorry, yes, on the 28th,

18    September 28th.

19    A.    On the 28th?

20    Q.    Yes.

21    A.    I was in the deli drinking a beer, and then Ulises

22    was talking to him over the phone.  He said, I'm waiting for

23    you.

24    Q.    And that's when Armando asked you to go with him,

25    right?

A. Leon - People - Cross          496

1         A.    Yes.

2         Q.    And you didn't know why he was asking you to go

3    with him?

4         A.    No.  But he said, Come with me.

5         Q.    And you went?

6         A.    Yes, because we always hung out together, and

7    that's where I live.

8         Q.    So you didn't expect any trouble at that time?

9         A.    No.

10        Q.    And Mr. Leon, when you did get to 180 Kinkel

11   Street on the night of September 28th, did you see how

12   Armando and Ulises started to physically fight each other?

13        A.    Yes.

14        Q.    But you didn't really see that, did you?

15                   MS. ABDI:  Objection.

16                   THE COURT:  Just one second.

17        A.    No, I saw them fighting.

18                   THE COURT:  What did you initially see?

19                   THE WITNESS:  I was walking up to the

20        driveway.  When we got to the driveway, Ulises and

21        Armando were already fighting.

22        Q.    They were already fighting.  So you didn't see how

23   they began to fight, did you?

24        A.    No.  They started hitting each other like this.

25   And then they started struggling.

J.H.

A. Leon - People - Cross          497

1     Q.   My question is you didn't see how they started

2   fighting because everything happened so fast, right?

3        A.   Yes, it was fast.

4        Q.   And am I correct in saying, Mr. Leon, that you

5   never even realized that Armando was bleeding until he was

6   on the lawn of his house, right?

7        A.   Yes.

8        Q.   And that was around the time that Armando's wife

9   came to his aid, correct?

10       A.   Yes.

11       Q.   And this was also around the same time that Misael

12  took out the gun, right?

13       A.   Yes.

14       Q.   And you said that he had a mask on?

15       A.   Yes.

16       Q.   And you saw the gun?

17       A.   Yes.

18       Q.   And when he took out the gun, were you concerned

19  for your safety?

20       A.   Yes.  He threatened everyone, and he said, No one

21  should butt in.

22       Q.   So you were concerned for your safety at that

23  time, fair to say?

24       A.   Yes.

25       Q.   At that moment, were you looking at Ulises,

A. Leon - People - Cross                    498

1    weren't you?

2         A.    Yes, I was.   But when he shot the gun in the air,

3    Ulises was -- when he shot the gun, Armando was already

4    hurt.

5         Q.    Well, let me ask you this:   Misael was also at the

6    deli on the night of the 24th, correct?

7         A.    Yes.

8         Q.    Mr. Leon, did you file a complaint against Misael

9    on an unrelated incident in which he sent two friends to

10   speak with you?

11        A.    No.

12        Q.    Do you recall filing a report with the Nassau

13   County Police Department on October 24th in which you

14   advised them that you were at 1011 Prospect Avenue in New

15   Cassel and two unknown persons came up to you and said

16   Misael wants to speak to you?

17        A.    Oh, yes.

18        Q.    Is it coming back now?

19        A.    Yes.

20        Q.    And you made a complaint about the fact that

21   Misael had sent these two individuals to threaten you,

22   right?

23        A.    Yes.   He wanted me to step outside because

24   according to him, he needed to speak to me.

25        Q.    But you didn't step outside, did you?

A. Leon - People - Cross                          499

1        A.    No.   I was scared.

2        Q.    Because you knew why he was there, right?

3              MS. ABDI:   Objection.

4        A.    Yes.

5              THE COURT:   Overruled.

6        Q.    Did you see on the night of September 28th a

7   number of Ulises' friends --

8        A.    Yes.

9        Q.    -- getting involved in the fight that was going

10  on?

11             THE COURT:   And what he means -- just one

12       second.   What he means is not participating in an

13       argument but actually involved themselves with bodily

14       contact.

15       A.    No, it was only Armando and Ulises fighting.

16       Q.    So you didn't see number of Ulises' friends coming

17  into this fighting physically, did you?

18       A.    No.

19       Q.    And do you know who Nancy Villatoro is?

20       A.    Yes, Armando's daughter.

21       Q.    And I take it you didn't see her getting pushed to

22  the ground at any point?

23       A.    No.

24       Q.    I take it you didn't see an individual with a

25  Cincinnati Reds cap using yellow pipe to also hit Armando?

J.H.

A. Leon - People - Cross          500

1        A.    No.

2        Q.    You didn't see that either.  What about a guy in a

3   Yankee hat using a stick to hit Armando, did you see that?

4        A.    No.

5        Q.    And you didn't see a number of different people

6   coming out of different directions and heading towards the

7   area that Ulises and Armando were fighting?

8        A.    No.

9        Q.    The individuals that you saw running with Ulises

10  towards this car, that was near where Ulises lives, what

11  were those individuals doing at the time that Misael fired a

12  shot in the air?

13       A.    When he shot the gun, they all left quickly.

14       Q.    And these individuals were all left with you guys,

15  or is it your testimony that you were just sitting there

16  watching?

17                   MS. ABDI:  Objection.

18       A.    Yes.

19       Q.    And you were just sitting there watching?

20       A.    Well, there was just the two of them fighting.  We

21  were just --

22       Q.    You were just watching?

23       A.    Yes.

24       Q.    You didn't have a weapon in your hand?

25       A.    No.

A. Leon - People - Cross          501

1      Q.    Any one of Armando's friends had weapons in their

2      hands?

3      A.    No.

4      Q.    Did you ever see -- you never saw Ulises stab

5      Armando, did you?

6                THE COURT:  Did you ever see a knife in his

7           hand?

8                THE WITNESS:  No.  But they were all covered

9           up.  You couldn't see anything.

10     Q.    So you didn't see anything, right?

11               THE COURT:  Objection.  Just one second,

12          objection.

13               MR. MILLMAN:  I'll withdraw that.

14               THE COURT:  Did you ever see Ulises with a

15          knife?

16               THE WITNESS:  No.

17               MR. MILLMAN:  Thank you.  No more questions.

18     Thank you, Mr. Leon.  Nothing further.

19               THE COURT:  You can step down.

20               (The witness was excused.)

21               THE COURT:  Next witness.

22               MS. ABDI:  The People call Susana Villatoro.

23     She will also be needing an interpreter.

24               THE COURT:  Ladies and gentlemen, five

25          minutes.  Remember the admonitions I have given you.

J.H.

A. Leon - People - Cross          502

1        Five minutes.

2                    (Whereupon, the jury exits the courtroom.)

3                    (A recess was taken.)

4                    COURT OFFICER:   Jury entering.

5                    (The jury enters the courtroom.)

6                    THE COURT:   Party stipulate the jury's here?

7                    MS. ABDI:   Yes.

8                    MR. MILLMAN:   Yes.

9                    THE COURT:   Call your next witness.

10                   MS. ABDI:   People call Susana Villatoro.

11                   COURT OFFICER:   Just raise your right hand.

12       S U S A N A   V I L L A T O R O, a witness called on behalf

13           of the People, after having been first duly sworn by

14           the Clerk of the Court, was examined and testified upon

15           her oath through the interpreter as follows:

16                   THE CLERK:   In a loud, clear voice, please

17           state your name and spell your last.

18                   THE WITNESS:   Susana Villatoro.  I don't know

19           how to spell my name.  It's just Villatoro.

20                   THE CLERK:   County of residence?

21                   THE WITNESS:   Nassau.

22                   THE CLERK:   Thank you.

23                   THE COURT:   Do you know how to spell it in

24           Spanish?

25                   THE WITNESS:   Yes.

J.H.

S. Villatoro - People - Direct      503

1           THE COURT:  Spell it in Spanish.

2           THE WITNESS:  Can you give me a pen, please?

3      Just my last name?

4           THE COURT:  Yes.  Counsel, just read it into

5      the record, consent?

6           MR. MILLMAN:  Yes, that's fine.

7           MS. ABDI:  Yes, Judge.

8           THE COURT:  V-I-L-L-A-T-O-R-O.

9           MS. ABDI:  May I proceed, your Honor?

10          THE COURT:  Yes.

11  DIRECT EXAMINATION

12  BY MS. ABDI:

13     Q.   Good afternoon, Miss Villatoro.  I'm just going to

14  ask you if you could please keep your voice up and make sure

15  you respond so the court reporter and the jury can hear you.

16     A.   Okay.

17     Q.   How many children do you have?

18     A.   Five.

19     Q.   And where do you currently reside?

20     A.   180 Kinkel.

21     Q.   And that's in Westbury?

22     A.   Yes.

23     Q.   Nassau County?

24     A.   Yes.

25     Q.   Now, what are the names of your children?

S. Villatoro - People - Direct      504

1      A.    Jennifer Villatoro, Nancy Villatoro, Oscar

2   Villatoro, Diana Rodriguez, and Roberto Rodriguez.

3      Q.    In September of 2010, were you residing at 180

4   Kinkel Street?

5      A.    Yes.

6      Q.    And which one of your children were living with

7   you there at that time?

8      A.    Just three of them.

9      Q.    What were the names of those children?

10      A.    Nancy, Oscar and Jennifer.

11      Q.    How old are Oscar, Nancy and Jennifer?

12      A.    Oscar's going to turn 14 the 14th of this month,

13   and Jennifer is going to turn 12 on the 14th of this month

14   as well, and Nancy is 16.

15                THE COURT:  Now, the age of Jennifer is an

16           important consideration in this case.  Consequently,

17           I'm going to ask you are you the biological mother of

18           Jennifer?

19                THE WITNESS:  Yes.

20                THE COURT:  What was her date of birth?

21                THE WITNESS:  The month is the 12th, 14th of

22           '99.

23                THE COURT:  Excuse me?  12-14-99?

24                THE WITNESS:  Yes.

25                THE COURT:  So she will be 12 in about 10

S. Villatoro - People - Direct        505

1    days?

2                    THE WITNESS:  Yes.

3                    THE COURT:  Okay.

4         Q.    Currently, Jennifer Villatoro is 11 years; is that

5    correct?

6         A.    Yes.

7         Q.    And in September of 2010, she was 10 years old?

8         A.    Yes.

9         Q.    Now, I'm going to direct your attention to

10   September 28th of 2010.  That was Tuesday.  Who else was

11   living with you on that date?

12        A.    Armando.

13        Q.    And who is Armando Villatoro to you?

14        A.    My husband.

15        Q.    How long were you married to Armando Villatoro?

16        A.    About 16, 17 years.

17        Q.    Now, on that date, was Jennifer living in the

18   house?

19        A.    Yes.

20        Q.    And was Nancy living in the house?

21        A.    Also.

22        Q.    And Oscar as well?

23        A.    He too.

24        Q.    Now, I'm going to direct your attention to that

25   same date, September 28th, 2010.  I'm going to direct your

J.H.

S. Villatoro - People - Direct        506

1    attention now to a little bit after 10 p.m. in the evening.

2        A.    Okay.

3        Q.    Where were you at that time?

4        A.    Inside my room.

5        Q.    What happened at that time?

6        A.    I heard that someone was arguing outside.

7        Q.    And how did you know that somebody was arguing?

8        A.    I heard it through the window, and so I pushed the

9    curtain to the side, and I looked.

10       Q.    Where is your window?  Where did you see from your

11   window?

12       A.    I saw two men fighting.

13       Q.    And what room were you in?

14       A.    The one on the left.

15       Q.    Is that -- what do you call that room?

16       A.    That's the room where we slept.

17       Q.    What area can you see from your window?

18       A.    I look towards the right side.

19       Q.    But is it fair to say that from your window --

20       A.    I was in front of the window, in front.

21       Q.    But from your window, you can see outside; is that

22   correct?

23       A.    I can see everything on the outside, from both

24   sides.

25       Q.    And you can see Kinkel Street from that window; is

S. Villatoro - People - Direct        507

1    that correct?

2        A.   Yes.

3        Q.   Now, what did you do when you saw these two men

4    fighting?

5        A.   I didn't know what to do, so I ran, and I waited.

6    It wasn't that long, maybe five minutes before I stepped

7    outside.  And when I stepped outside, they were already

8    fighting.  One was on this side, and that's when I started

9    screaming, Someone call the police.  No one wanted to call

10   the police.  And I started marking the number on my phone,

11   but it wouldn't go through.

12                THE COURT:  When you looked out the window,

13           did you recognize anybody who was doing the fighting?

14                THE WITNESS:  Yes.

15                THE COURT:  Who did you recognize?

16                THE WITNESS:  That guy right there.

17                MS. ABDI:  Your Honor, may the record reflect

18           that the witness identified the defendant?

19                THE COURT:  Yes.  And who else?

20                THE WITNESS:  And my husband, Armando

21           Villatoro.

22        Q.   When you say that you saw your husband and the

23   defendant fighting, can you describe how they were fighting

24   with each other?

25        A.   When I got out the door and I ran outside, I saw

J.H.

S. Villatoro - People - Direct        508

1    that they were fighting.  They were both hitting each other.

2    And when I saw and I started running, there were so many

3    people around, but no one wanted to get involved.  So I ran

4    in between, and then a man stepped outside.  He had a

5    plastic white mask, and he fired a shot.  He shot at me.  He

6    said, Don't get involved, just don't.

7         Q.   Now, where was Armando at this point?

8         A.   Armando was fighting with him, and so when he

9    shot, I really didn't care if he started shooting at me.

10   And that's when I grabbed Armando, and this one was fighting

11   with him.  And he took his shirt, and he went like this and

12   then he went like that.  And next thing I saw, he was all

13   covered in blood.

14                  THE COURT:  All right.  You say he took his

15            shirt.  Who do you mean by he?

16                  THE WITNESS:  That one right there.

17                  THE COURT:  And what -- and whose shirt did

18            he take?

19                  THE WITNESS:  He took his own shirt off.

20                  THE COURT:  And you saw blood on his shirt?

21                  THE WITNESS:  No, I didn't see any blood on

22            his shirt.  I saw blood on Armando's shirt.

23                  THE COURT:  What were the circumstances under

24            which you saw blood on Armando's shirt?

25                  THE WITNESS:  All of this right here, in the

J.H.

1    back.  I didn't know what to do, so I started to

2    scream, and I started to scream and said, Someone,

3    please help me.

4            And his sister, when he was all covered in

5    blood, and that's -- and when he started swinging,

6    that's when his sister came up to him and stabbed him

7    two more times.  And that's when my husband said, You

8    also want to beat me up?

9    Q.   Okay, let me just stop you for a minute.

10           THE COURT:  Just one second.  Can I see

11   counsel for a second.

12           (A discussion was held off the record at the

13   bench outside of the hearing of the jury.)

14           THE COURT:  All right, Mrs. Villatoro,

15   obviously this is upsetting to you, but these people

16   over there must understand you.  Therefore, I want you

17   to speak more slowly so that the interpreter can

18   simultaneously translate what you say.

19           THE WITNESS:  Okay.

20           THE COURT:  Because the way it's going now,

21   you're talking too fast for her simultaneous

22   translation.

23           THE WITNESS:  Okay.

24           THE COURT:  All right, let's start in fresh.

25   Q.   Okay, I'm just going to ask you to just take a

S. Villatoro - People - Direct        510

1    deep breath and just try to speak slowly, okay?

2        A.    Okay.

3        Q.    Now, you said that sometime after 10 p.m., you

4    looked outside your window and you saw --

5        A.    Yes.

6        Q.    -- Armando and the defendant fighting?

7        A.    Yes.

8        Q.    Now, you said then that you went outside?

9        A.    Yes.

10       Q.    And when you went outside, was Armando and the

11   defendant still fighting?

12       A.    When I went outside, yes.

13       Q.    And at some point did Armando move away from the

14   defendant?

15             MR. MILLMAN:   I'm just going to object to

16       very consecutive leading questions, and it does concern

17       a critical issue in the case.

18             MS. ABDI:   I'm just trying to clarify, Judge.

19             THE COURT:   No, overruled.

20       A.    No.

21       Q.    Now, at some point did you go over to Armando?

22       A.    Yes.

23       Q.    Now, when you went over to Armando, what was

24   happening at that time between Armando and the defendant?

25       A.    They were fighting.   That's what I saw.

J.H.

S. Villatoro - People - Direct       511

1        Q.   Can you describe how they were fighting?

2        A.   I saw they were fighting like this.  It was hard.

3                  THE COURT:  Indicating hand movements.

4                  THE WITNESS:  Yes.

5        Q.   You saw them fighting with their hands?

6        A.   Yes.  And that's when I saw him take off his

7   shirt.  But he was already bleeding, and he took his shirt

8   off like this, and he went like this.  And I didn't know

9   what else he could have hit him with.

10                 THE COURT:  Who took the shirt off?

11                 THE WITNESS:  This kid right here.

12                 THE COURT:  He took off his own shirt?

13                 THE WITNESS:  Yes.

14       Q.   And when he took off his shirt, the defendant,

15  were his hands covered at that point?

16       A.   They were covered with his shirt.

17       Q.   So you couldn't see what was in his hands at that

18  point?

19       A.   No, I didn't see anything in his hands.

20       Q.   What did you see -- what did you notice about

21  Armando at that point?

22       A.   That he was all wet.  I thought he was wet because

23  it was water, but I didn't realize he was wet because he was

24  bleeding.

25       Q.   So you saw that his shirt was wet?

J.H.

S. Villatoro - People - Direct        512

1    A.   Yes.

2    Q.   And where was his shirt wet?

3    A.   All of this here and over here too.

4              MS. ABDI:   May the record reflect the witness

5         was pointing to the front of the shirt and a little bit

6         on each shoulder.

7              THE COURT:   Upper torso area.

8    Q.   Now, what did you do with Armando when you saw the

9    condition he was in?

10   A.   I ran.  I ran to grab him, and he said, Come.  I

11   didn't know what to do, so I grabbed him.  And then his

12   sister came up.

13   Q.   Let me stop you there.

14             THE COURT:   Whose sister?

15             THE WITNESS:   This kid's sister.

16   Q.   So the defendant's sister?

17   A.   Yes.

18   Q.   Do you know the defendant?

19   A.   Yes.

20   Q.   And you also know his sister?

21   A.   Yes.

22   Q.   What was his sister's name?

23   A.   Diana.

24   Q.   Now --

25             THE COURT:   What did you see the sister do,

1    if anything?

2              THE WITNESS:  I saw when I wanted grab the

3    guy, I grabbed, and she ran up.  She wanted to defend

4    her brother.  Oh, she punched him twice in the back.

5    Q.    Who did she punch in the back?

6    A.    My husband.

7    Q.    But the area in which -- she hit him on the back?

8    A.    Yes.  But I believe that he was also bleeding from

9    his back.

10   Q.    Well, now, where did Armando go?

11   A.    When she hit him, I grabbed him.  He couldn't walk

12   anymore, so he was dragging.  And I landed on the ground, on

13   the lawn with him.  I couldn't -- he couldn't get up

14   anymore.

15   Q.    And what was his condition at that time?

16   A.    I didn't know what to do, and I was crying, and I

17   was yelling.  And I said, Someone call the police, and no

18   one called the police.

19   Q.    Now, where did you see the defendant go, if

20   anywhere?

21   A.    He ran towards his house with his sister and

22   everyone that was hanging out with him.

23   Q.    Now, do you know where he went from there?  Did

24   you see him go anywhere?

25   A.    We saw that they got into a car, and they left.

S. Villatoro - People - Direct      514

1      Q.   Now, at some point the police came; is that

2   correct?

3      A.   It took them about 10 or 15 minutes before they

4   got there.

5      Q.   And was Armando taken to the hospital?

6      A.   Yes.  But at that point he couldn't really open

7   his eyes.  His eyes were like this.  And I told him, I spoke

8   to him.  He didn't answer me.

9      Q.   Now, Armando passed away in the hospital; is that

10   correct?

11     A.   I believe he did.

12     Q.   And the next day on the 29th, did you have to go

13   and make an identification of him?

14     A.   Yes.

15     Q.   And that was at the medical examiner's office?

16     A.   Yes.

17     Q.   And that was your husband, Armando Villatoro?

18     A.   Yes.

19     Q.   Now --

20          THE COURT:  I want to ask you a question.

21      Did you ever see the defendant with a knife?

22          THE WITNESS:  No.

23          THE COURT:  Did you ever see the defendant's

24      sister with a knife?

25          THE WITNESS:  No.

J.H.

S. Villatoro - People - Direct      515

1        THE COURT:  Okay.

2        Q.   And when you say that Diana Bonilla came over and

3    hit your husband on the back, he was already injured on the

4    front; is that correct?

5             MR. MILLMAN:  Objection.

6             THE COURT:  Did you see the wetness on your

7        husband's torso before the defendant's sister hit him

8        in the back?

9             THE WITNESS:  Yes, he was already.

10       Q.   And before she hit your husband on the back, who

11   was your husband fighting with?

12       A.   Just with him he was fighting.

13       Q.   With who?

14       A.   With this guy right here.

15            MS. ABDI:  Your Honor, may the record reflect

16       the witness has indicated the defendant?

17            THE COURT:  Yes.

18       Q.   Now, when you said that you saw your husband and

19   the defendant fighting each other, can you describe how

20   close they were to each other while they were fighting?

21       A.   They were very close.

22       Q.   Now, I'm now going to take you a little bit back

23   in time to that -- the Friday before this happened,

24   September 24th, 2010.  Did there come a time where the

25   police were called to the house on that date, to your house

S. Villatoro - People - Direct        516

1    on that date?

2         A.    Yes, they came.

3         Q.    And who called the police?

4         A.    My husband called them.

5         Q.    On that date, did there come a time when

6    Jennifer's friends, Ivan Alcantara and Steven Destina, came

7    back to your house?

8         A.    Yes.

9         Q.    Now, without telling us exactly what was said, did

10   they tell you about something that they saw?

11        A.    Yes.

12              THE COURT:   Did they warn you, yes or no?

13              THE WITNESS:   Yes.

14        Q.    And was your husband, Armando, was he there for

15   that as well?

16        A.    Yes.

17              THE COURT:   Ladies and gentlemen, just let me

18        give you an instruction at this particular time so it

19        makes some sense to you.   In certain instances, a

20        timely complaint is admissible in evidence.   The

21        substance of that complaint would be an out-of-court

22        statement which is hearsay if that makes sense.

23        Q.    Now, did the police get called to the house?

24        A.    Yes.   He called them, my husband.

25        Q.    Was he there when the police arrived?

J.H.

S. Villatoro - People - Direct     517

1      A.    No.

2      Q.    Had he left before the police came?

3      A.    Yes.

4      Q.    Do you know what his demeanor was when he left?

5      A.    He was upset.

6      Q.    And do you know where he went that evening?

7      A.    He went to the deli.  He did.

8      Q.    Do you know how long he was gone for?

9      A.    He was out for a long time.

10     Q.    And do you recall when he came back from the deli?

11     A.    He came back so late, because he was very upset.

12   He did call me, and he asked me what happened.  And I said,

13   The police didn't do anything.

14     Q.    Without getting into what he told you, did he come

15   back -- you said he came back very late the next day or very

16   early the next day?

17     A.    He came back very late.  He came back.

18            THE COURT:  Now, what she means is did he

19        come back late Friday night or early Saturday morning?

20            THE WITNESS:  I don't remember what time he

21        came back.  He told me he had an argument with someone,

22        but I don't remember who.

23     Q.    Suffice to say he came back very late that

24   evening?

25            THE COURT:  That's not what she has testified

S. Villatoro - People - Direct      518

1       to.  How long was he gone?

2              THE WITNESS:  He came back very late.  I

3       don't remember.  It was a long time.

4              THE COURT:  I guess that's the best you are

5       going to do.

6       Q.     Now, did there come a time where you took Jennifer

7    to the police station, to the police headquarters?

8       A.     That's when my husband called the police.

9       Q.     Now, after what happened to your husband, did you

10   take Jennifer to speak with any police?

11      A.     Yes.

12             THE COURT:  Is this after your husband's

13      death?

14             THE WITNESS:  No, it was before.  Yes.

15             THE COURT:  I'm sorry, was it before or after

16      your husband's death that you took your daughter to the

17      police, not the police coming to your house?

18             THE WITNESS:  No, the police came to the

19      house.

20             THE COURT:  That's not her question.  Did

21      there come a time that you took your daughter to the

22      police?

23             THE WITNESS:  I don't remember.

24             THE COURT:  Okay.

25      Q.     And did there come a time after your husband was

1    killed that you then took your daughter to a doctor?

2         A.    Yes, but that's a doctor where they had told me to

3    take her because he had raped her.

4                   MR. MILLMAN:  Objection, your Honor.

5                   THE COURT:  Sustained.

6                   MR. MILLMAN:  I ask for a cautionary

7         instruction, your Honor.

8                   THE COURT:  Ladies and gentlemen, that is

9         stricken.  You are to disregard it.

10                  There is a charge of rape in the indictment.

11       Whether or not the individual was raped is solely your

12       prerogative.  That's what you have to decide based upon

13       the evidence in this particular case.

14        Q.    So you did take your daughter to the doctor?

15        A.    Yes.

16                  MS. ABDI:  I have no further questions.

17                  THE COURT:  I think you will be a while?

18                  MR. MILLMAN:  I might be, yes, your Honor.

19                  THE COURT:  Ladies and gentlemen, you have

20       done an awful lot today.  So we are going to break

21       until 9:30 tomorrow.

22                  Pay attention to the admonitions I have given

23       you.  I have noticed a Newsday reporter in the

24       courtroom today.  There may be something in the media

25       which is all the more importance that you don't read or

S. Villatoro - People - Direct        520

1    listen to anything about this case.

2             So remember the admonitions I have given you

3    especially the one about the 52 year old principal, and

4    we will see you tomorrow at 9:30.

5             (Whereupon, the jury exits the courtroom.)

6             THE COURT:  You can go, ma'am.  You can go.

7             MR. MILLMAN:  Your Honor, I would just ask

8    that the witness -- I ask that the witness be

9    instructed on something while the interpreter is here.

10   I ask that she be instructed not to speak with the

11   Assistant DA or anyone else.

12            THE COURT:  I am not going to tell her that.

13   If you want me to tell her she can't speak to anybody

14   about her testimony, but I am not precluding the

15   District Attorney from talking to her.

16            Ma'am, you are not to talk to anybody about

17   your testimony because you have to come back tomorrow.

18            THE WITNESS:  Okay.

19            THE COURT:  That does not include the

20   Assistant District Attorney.

21            THE WITNESS:  What did you just say?

22            THE COURT:  That does not include the

23   prosecutor, this lady over here.

24            THE WITNESS:  Okay.

25            MR. MILLMAN:  Note my objection.

1    THE COURT:  You have an exception.  All

2    right, Mr. Millman, I've been in this business for 40

3    years, and I have had experiences where jail inmates

4    rough up other inmates when they find out they have

5    been involved in child molestation cases.  I bring this

6    to your attention especially due to the fact that I

7    anticipate something written about this case tonight or

8    tomorrow.  We talked about this a couple hours ago.

9        Do you want me to recommend protective

10   custody for your client?  I know it's a horrible thing

11   to go through, but there is a balancing test here.

12   Have you spoken to your client on this issue?

13       MR. MILLMAN:  I did speak with him briefly

14   when it was first mentioned.  If I could take just

15   another minute to revisit with him?

16       THE COURT:  Sure, absolutely.

17       (Mr. Millman and the defendant conferred.)

18       MR. MILLMAN:  Your Honor, I have revisited

19   it, and I certainly do appreciate the Court's input on

20   this.  My client indicated he is going to decline that

21   protective custody.

22       THE COURT:  All right, if he changes his

23   mind, let me know.

24       MR. MILLMAN:  Thank you, your Honor.

25       THE COURT:  See you tomorrow.

S. Villatoro - People - Direct        522

1              (Whereupon, the trial is adjourned to

2    December 7th, 2011.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF NEW YORK  :  NASSAU COUNTY

2       SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5           -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                        Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                            December 7, 2011
                              262 Old Country Road
11                            Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                    For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                      For the Defendant
23
                          JOANNE HORROCKS, CSR
24                        Senior Court Reporter

25

J.H.

 1              THE CLERK:  Case on trial, People of the

 2     State of New York versus Ulises Bonilla, Indictment

 3     202N of 2011.  All parties are present, including the

 4     defendant and the Spanish interpreter.  No jurors are

 5     present at this time.

 6              THE COURT:  Anything you want to put on the

 7     record before the jury comes in?

 8              MS. ABDI:  No, Judge.

 9              MR. MILLMAN:  No, not at this time, your

10     Honor.

11              THE COURT:  Okay.

12              COURT OFFICER:  Jury entering.

13              (The jury enters the courtroom.)

14              THE CLERK:  Let the record reflect that all

15     jurors are present.  Both do sides waive a reading of

16     the roll and consent to seating?

17              MS. ABDI:  Yes.

18              THE COURT:  Counsel?

19              MR. MILLMAN:  Yes.

20              THE CLERK:  Thank you.

21              THE COURT:  All right, ladies and gentlemen,

22     we are going to begin the cross of the witness who

23     testified on direct yesterday.

24              You will see the audience filled with

25     students.  It is common practice that is part of their

S. Villatoro - People - Cross        525

1     curriculum students come at times and observe court

2     proceedings.  They are from Jericho High School.  Do

3     not let their presence distract you from the analysis

4     of the evidence.

5                   Recall the witness.

6     S U S A N A  V I L L A T O R O, a witness called on behalf

7     of the People, after having been previously duly sworn

8     by the Clerk of the Court, was examined and testified

9     through the interpreter upon her oath as follows:

10                   THE CLERK:  Miss Villatoro, please be

11    reminded you that are still under oath.

12                   THE WITNESS:  Yes.

13                   THE CLERK:  Thank you, have a seat.

14                   THE COURT:  Have a seat.  Counsel, proceed.

15    CROSS-EXAMINATION

16    BY MR. MILLMAN:

17         Q.    Good morning, Miss Villatoro.

18         A.    Good morning.

19         Q.    Miss Villatoro, if at any time you need to take a

20    break, please don't hesitate to just let us know.  On

21    September 24th, 2010 when Steven and Ivan had told you what

22    they saw earlier that day, you were in your house, correct?

23         A.    Yes.

24         Q.    And just before that, you went to the store --

25                   THE INTERPRETER:  Can you repeat that?

J.H.

1                   MR. MILLMAN:   Sure.

2           Q.    And just before that, you had gone out to the

3      store with Armando; is that right?

4           A.    Yes.

5           Q.    How much time had passed from the time that you

6      arrived back home with Armando to the time that you first

7      spoke with either Steven or Ivan?

8           A.    We were together for about 20 minutes.   It took us

9      about 20 minutes to go to the store and get back home.

10          Q.    You were gone for 20 minutes?

11          A.    Yes.

12          Q.    How much time passed from the time that you got

13     back to the house with Armando to the time that either

14     Steven or Ivan told you what they saw in the park?

15          A.    As soon as we got home, they came running home to

16     tell us what they had seen.

17          Q.    And after that, the police came to your home in

18     connection with the conversation you had with the children;

19     is that right?

20          A.    Yes.

21          Q.    Jennifer spoke with the police?

22          A.    Yes.

23          Q.    The children spoke with the police, and I'm

24     talking about Ivan and Steven?

25          A.    Yes.

1          Q.    And you spoke with them?

2          A.    Me too.

3          Q.    And after that on that day, the police did not

4    make an arrest, correct?

5          A.    They didn't do anything.

6          Q.    You did not take Jennifer to the hospital that

7    day, right?

8          A.    No, that day.

9          Q.    And you did not take her to a doctor that day?

10         A.    No.

11         Q.    As a matter of fact, am I correct in stating that

12   the first time after that day that you sought any medical

13   care for Jennifer was on October 1st of 2010?

14         A.    Yes.

15         Q.    During the time that you were outside on September

16   28th of 2010, moving ahead to the night of the incident, you

17   stated that you saw Ulises take his shirt off; is that

18   correct?

19         A.    Yes.

20         Q.    Did you see what he did with the shirt?

21         A.    He took it off, and he went like this, and then he

22   did this.

23              THE COURT:  I'm sorry?  I have to describe

24         what this and this is, and I didn't see it.  What did

25         he do?

1                THE WITNESS:  He took his shirt, and he went

2        like this, and then he lowered his head, and he then

3        did this.

4                THE COURT:  Indicating a motion reflective of

5        pulling the shirt off of his back and then putting it

6        around the waist area.

7        Q.   At that time did you hear anything drop to the

8    ground?

9        A.   No, I didn't hear anything.

10       Q.   Did you see anything drop to the ground?

11       A.   No, I didn't see anything.

12       Q.   Tell me, Miss Villatoro, what was Ulises wearing

13   on his head at that time?

14       A.   I saw he had like a rag or something tied around

15   his head.

16       Q.   Was it a black do-rag?

17       A.   Yes, black.

18       Q.   Do you know someone named Alfredo Sosa?

19       A.   I don't know anyone by that name.  I know the one

20   that was wearing the mask.  I know his name.

21       Q.   That was Misael, correct?

22       A.   Misael.

23       Q.   During the time that you were outside on September

24   28th of 2010, did you ever see someone wearing a Cincinnati

25   Reds hat?

J.H.

S. Villatoro - People - Cross      529

1     A.    No.   I was like crazy at that point.  I didn't see
2  anyone.
3              THE COURT:   Just one second.  Do you know
4        what a Cincinnati Reds hat looks like?
5              THE WITNESS:  A cap?  No, I didn't see
6        anything.
7              THE COURT:   All right.
8     Q.    You were worried about Armando?
9     A.    Yes.
10    Q.    Would it be fair to say that you weren't looking
11 around at everything else that was going on at that time;
12 would that be fair to say?
13    A.    Yes.  I was just watching as these two were
14 fighting, Armando.  And I saw everyone just standing around,
15 but I wasn't really paying attention to what they are
16 wearing.
17    Q.    And you weren't paying attention to what they were
18 doing either, right?
19              MS. ABDI:  Objection as to who.
20              THE COURT:  Particularize it.  Sustained.
21        Particularize it.
22    Q.    Let me ask you this:  You heard a gunshot at some
23 point, correct?
24    A.    Yes.
25    Q.    Where was Nancy at that time?

J.H.

1    A.    She was outside.  She was talking to her dad.

2    Q.    Okay, at the time you heard the gunshot, Nancy was

3  talking to her dad?

4    A.    At that point he was already bleeding.

5    Q.    Well, let me ask you this:  How far would you say

6  you were from where Armando was at the time that you heard

7  the gunshot?

8    A.    He was over there, and I was over here.  And as I

9  was approaching him, someone stopped me.

10         THE COURT:  And who were you pointing to at

11      that particular time in the courtroom?

12         THE WITNESS:  I'm pointing the distance.

13      They were on that side, and I was on this side.

14         THE COURT:  Counsel asked you how far were

15      you away, and you said he was over there, and I was

16      over here.  I have to have a distance.  If you don't

17      estimate a distance, then give me a frame of reference,

18      and I will inform the jury of the distance.

19         THE WITNESS:  I think it was maybe five feet

20      away.

21    Q.    And is that the distance -- I just want to

22  clarify.  Is that the distance between you and Armando at

23  the time you heard the gunshot?

24    A.    Yes.  It's you have to understand when he shot the

25  gun in the air, he was actually aiming at me.  It was in my

1    face.

2        Q.    And Nancy, I take it, was closer to Armando than

3    you were; is that accurate?

4        A.    They had Nancy on the ground.  That's what I was

5    told.

6        Q.    Well, without getting into what you were told, did

7    you see Nancy on the ground?

8        A.    I saw her, but I wasn't really paying attention.

9    I was looking at Armando.

10        Q.    And when you say they had her on the ground, you

11    weren't paying attention who they were either; is that fair

12    to say?

13        A.    No, I didn't see.

14                  THE COURT:  Did you see Nancy on the ground?

15          That was the question of the lawyer.

16                  THE WITNESS:  Yes.

17        Q.    Now, and that's where she was at the time of the

18    gunshot?

19        A.    She was further on that side than I was.

20        Q.    And how far would you say Nancy was from where

21    Misael was at the time that you heard the gunshot?

22        A.    Nancy, I believe, was about like about seven feet

23    away.

24        Q.    And were there any obstructions between where

25    Nancy was that would have obstructed her view of Misael from

1    what you could see?

2         A.   No.   I didn't really see anything because you have

3    to understand, I wasn't really paying attention.   When

4    Misael shot the gun, I was so nervious, but I wasn't really

5    paying attention.

6         Q.   Did you talk to Nancy about --

7         A.   No, I didn't speak to her.

8         Q.   No.   My question is did you talk to Nancy about

9    the gunshot that you heard between the time that you heard

10   it and the time that the police arrived?

11        A.   No, I didn't speak to her.

12        Q.   Miss Villatoro, before you first looked out the

13   window on that night and saw Ulises and Armando fighting, am

14   I correct in stating that you heard male voices?

15        A.   Yes.

16        Q.   Am I also correct in stating that you just didn't

17   hear one male voice, you heard a number of male voices?

18        A.   There were a lot.

19             THE COURT:   Ladies and gentlemen, let me give

20        you an instruction at this particular time.   It's very,

21        very common for a lawyer to say am I correct in stating

22        or would you agree with me, but the fact of the matter

23        is the state of mind of the lawyers is not at issue

24        here.   It's what the witness testifies to is at issue.

25        And it could be a tacit way of having the lawyer be a

S. Villatoro - People - Cross        533

1    sworn witness when he is not, okay?

2        Q.   Miss Villatoro, the first time that you saw

3    Armando and Ulises fighting was when you looked out your

4    bedroom window after hearing those male voices, correct?

5        A.   Yes.

6        Q.   At that time you observed that Armando had a lot

7    of blood on his chest; is that accurate?

8        A.   No, I didn't see it at that point.  I saw that

9    they were fighting.

10       Q.   Okay.  But you saw -- you didn't see blood on his

11   chest when you first looked out the window?

12       A.   No, because when they were fighting, they were

13   more towards the other side.

14       Q.   Are you sure that you didn't see blood on

15   Armando's chest when you first looked out the window?

16       A.   No, I didn't see that out the window.  It was when

17   I opened the door.  When I opened the door and I saw him,

18   that's when I saw that he was covered in blood.

19       Q.   But isn't it true that you saw blood as soon as

20   you looked out the window?

21       A.   I didn't see that when I looked out the window.

22       Q.   Well, Miss Villatoro, let me ask you this:  You

23   testified before the grand jury on January 19th of 2011 in

24   connection with this matter?

25            THE COURT:  You testified before the grand

S. Villatoro - People - Cross      534

1    jury?

2                THE WITNESS:  I don't remember.

3                THE COURT:  Are you talking about you don't

4        remember the date, or you don't remember testifying?

5                THE WITNESS:  No.

6                THE COURT:  Which is it?

7                THE WITNESS:  I remember seeing blood on him.

8        Q.   What I'm asking now is whether or not you recall

9    testifying in the grand jury on January 19th of 2011.

10       A.   Oh, yes, yes.

11       Q.   And at that time, you were testifying under oath;

12   is that accurate?

13       A.   Yes.

14       Q.   And you swore to tell the truth?

15       A.   Yes.

16       Q.   Am I also correct in stating that that was

17   certainly closer in time to the date of this incident than

18   we are today?

19       A.   Um-hum.

20                THE COURT:  That's a yes.

21       Q.   And didn't you testify at that time that you saw

22   blood on Armando's chest as soon as you looked out the

23   window?

24                THE COURT:  Just one second.  That's

25        sustained.  Were you asked this question and did you

S. Villatoro - People - Cross        535

1     give this answer.

2          Q.   Isn't it a fact that at that time you were asked

3     the following question and gave the following answer, and

4     this is on page 38, line 14 I'm reading from.

5               "So I'm going to direct your attention now to

6          a little bit after 10 p.m. on September 28th of 2010.

7          What happened at that time?

8               "ANSWER:  I only saw that I heard some noise.

9          Somebody was talking, and that I heard the voices.  I

10         heard that somebody was kind of yelling.  And I came

11         out, and I pull the curtain.  I looked outside, and

12         from there, they were already going at each other.  And

13         he had -- he already had a lot of blood on his chest

14         like this (indicating).  I didn't see that the man had

15         a knife or anything.  I just saw him take off his

16         shirt, and I saw him do like this.  And from there,

17         when I saw that, I ran towards him, and I held him, and

18         then I said, Come on, come on."

19         A.   Yes.

20         Q.   Did you give that testimony before the grand jury?

21         A.   Yes, I did do that.

22              MS. ABDI:  Judge, I'm just going to object

23         because he did not read the complete answer.

24              MR. MILLMAN:  She had --

25              THE COURT:  Just one second.  There's also

S. Villatoro - People - Cross        536

1    two reference points in that testimony; is there not?
2    One, she was looking out the window, and two, when she
3    ran toward him.  Isn't there two temporal reference
4    points?
5              MR. MILLMAN:  Yes.  But clearly in the
6       answer --
7              THE COURT:  Is that true?
8              MR. MILLMAN:  Yes.
9              THE COURT:  All right, ladies and gentlemen,
10      I already gave you instructions concerning how you can
11      use an inconsistent statement if you wish.  You cannot
12      use it as independent proof of the facts contained,
13      only affecting credibility of a witness.  And it's your
14      job to determine if an inconsistent statement was made
15      in the first place.  Go ahead.
16      Q.    And so, Miss Villatoro, am I correct in stating
17   that you were testifying before the grand jury that as soon
18   as you looked out the window, you saw a lot of blood on
19   Armando's chest?
20             MS. ABDI:  Objection.  Mischaracterization.
21             THE COURT:  Sustained.
22             MR. MILLMAN:  Your Honor, that is
23      specifically read from the transcript.  I believe it's
24      a fair characterization and followup and exactly what
25      the witness testified to.

S. Villatoro - People - Cross        537

1            MS. ABDI:  Objection.

2            THE COURT:  Didn't you already say that that

3    is what she said in the grand jury?

4            MR. MILLMAN:  Between the -- I'm not 100

5    percent certain that she had gotten that answer in,

6    your Honor.  But if that's the case, then --

7            THE COURT:  Okay.

8            MR. MILLMAN:  I withdraw it.  That's all I

9    have.  Thank you, Miss Villatoro.

10            THE COURT:  Do you have any redirect?

11            MS. ABDI:  No.

12            THE COURT:  Thank you very much.

13            THE WITNESS:  Thank you.  Can I leave?

14            THE COURT:  Yes.

15            (The witness was excused.)

16            THE COURT:  Next witness.

17            MS. ABDI:  The People call Police Officer

18    Moore.

19            THE COURT:  Police Officer Moore?  Do you

20    mean James Monroe?

21            MS. ABDI:  I'm sorry, James Monroe.

22

23

24

25

P.O. J. Monroe - People - Direct      538

1    P. O.  J A M E S  M O N R O E , Shield 2781, a witness

2         called on behalf of the People, after having been first

3         duly sworn by the Clerk of the Court, was examined and

4         testified upon his oath as follows:

5              THE CLERK:  In a loud, clear voice, please

6         state your name, spell your last and give your shield

7         and command.

8              THE WITNESS:  My name is James Monroe,

9         M-O-N-R-O-E.  My command is the Third Precinct, and my

10        shield number is 2781.

11             MS. ABDI:  May I proceed, your Honor?

12             THE COURT:  Yes.  For the benefit of the high

13        school audience, a witness in a criminal situation with

14        very, very rare exceptions not applicable here must be

15        sworn before he gives testimony.  Go ahead.

16   DIRECT EXAMINATION

17   BY MS. ABDI:

18        Q.   Good morning, Officer.

19        A.   Good morning.

20        Q.   How long have you been employed as a police

21   officer in Nassau County?

22        A.   Seven years.

23        Q.   And what is your current assignment?

24        A.   I'm assigned to the Third Precinct.  My normal

25   post is RMP 316.

P.O. J. Monroe - People - Direct     539

1      Q.   What does RMP stand for?

2      A.   Radio motor patrol.

3      Q.   Is that a marked police car?

4      A.   It is.

5      Q.   And how long have you been patrolling the Third

6   Precinct?

7      A.   I've been in the precinct six years.

8      Q.   I'm going to direct your attention now to

9   September 28th of 2010.  Were you working in your capacity

10  as a police officer assigned to the Third Precinct on that

11  date?

12     A.   Yes, ma'am.

13     Q.   And what car were you assigned to that date?

14     A.   316.

15     Q.   And were you working alone, or did you have a

16  partner?

17     A.   I had a partner that night.

18     Q.   And what was the name of your partner?

19     A.   Officer Sorocco.

20     Q.   Were you in uniform or plainclothes?

21     A.   We were in uniform.

22     Q.   And were you in a marked car?

23     A.   Yes, we were in a marked car.

24     Q.   I'm going to direct your attention now to

25  approximately 10:27 p.m.  What happened at that time?

P.O. J. Monroe - People - Direct      540

1      A.    We received an aided call over the radio from 911

2   at 180 Kinkel Street.

3      Q.    And what did you observe -- and where did you

4   respond?

5      A.    We responded to 180 Kinkel Street.

6      Q.    And what did you observe when you arrived at 180

7   Kinkel Street?

8      A.    When we pulled up in front of 180 Kinkel Street,

9   there was debris on the ground on the street, and there was

10  a group of people on the front lawn of 180 upset, you know.

11  And there was a gentleman laying on the ground.

12     Q.    And the individual who was laying on the ground,

13  where was he laying?

14     A.    He was in the middle of the property closer to the

15  house just like off the walkway.

16     Q.    Did you learn the name of that individual to be

17  Armando Villatoro?

18     A.    Yes, ma'am.

19     Q.    And can you just describe him very briefly?

20     A.    He was laying on his side, had an injury to

21  somewhere on the side that was bleeding pretty badly.

22     Q.    What was his condition at that time that you

23  observed?

24     A.    I was trying to talk to him.  I wasn't getting any

25  response.  There was just very, very labored breathing, I

J.H.

P.O. J. Monroe - People - Direct       541

1    don't know how to describe it, like he was having a tough
2    time breathing.
3                   THE COURT:  Would gasping be a proper word?
4                   THE WITNESS:  Yes, that would probably be
5         accurate.
6         Q.   And did you notice any blood on the individual?
7         A.   Yes.
8         Q.   Where did you notice the blood?
9         A.   It was coming from I believe his right side, like
10   up somewhere in this area.
11                  THE COURT:  Indicating the right side torso
12        area about four inches below the armpit.
13        Q.   Now, did you notice any weapons in his hands?
14        A.   Not that I noticed.
15        Q.   What did you do next?
16        A.   There was some family members and friends there
17   that gave me a description of a car that the subject, the
18   person --
19                  MR. MILLMAN:  Objection.
20        Q.   Without telling us --
21        A.   I'm sorry.
22        Q.   -- what they said --
23                  THE COURT:  Just one second.  You spoke to
24        people who you believed to be family members?
25                  THE WITNESS:  Yes, sir.

1          THE COURT:  Pursuant to that discussion, did
2      you take any police action?
3          THE WITNESS:  I did.  I put out a description
4      of a vehicle that was possibly involved, that they told
5      me was involved.
6      Q.   Did you call for an ambulance?
7      A.   I did.  There was an ambulance already coming.  I
8  asked them to -- I asked for a forthwith response so that
9  they would get there as fast as possible.
10     Q.   And the people that were near Armando Villatoro at
11  that point, were they family members?
12     A.   They appeared to be.
13     Q.   Now, what happened next after you called for an
14  ambulance?
15     A.   I spoke to two young ladies who were --
16          THE COURT:  Just one second.  Don't tell us
17      the subject matter of the conversation.  Just you spoke
18      to two young ladies?
19          THE WITNESS:  Who were able to help me.  And
20      an ambulance came pretty quickly.  We were able to get
21      him in the ambulance.
22     Q.   And Armando Villatoro was transported by ambulance
23  away from the scene; is that correct?
24     A.   Yes, ma'am.
25          MS. ABDI:  I would like to have this marked

P.O. J. Monroe - People - Direct      543

1       as People's Exhibit 1 for identification.  That is a

2       crime scene photograph.

3                  (People's Exhibit 1 is marked for

4       identification.)

5                  MS. ABDI:  I would ask that be shown to the

6       witness.

7       Q.   Officer, do you recognize what that item is?

8       A.   That's the approximate location of where the

9       victim was, Mr. Villatoro was laying when I got there.

10      Q.   Is that a fair and accurate depiction of the

11      location that you observed Armando Villatoro when you

12      arrived at the scene?

13      A.   Yes, ma'am.

14                 MS. ABDI:  At this time I'd ask that that be

15      moved into evidence.

16                 THE COURT:  Any objection, counsel?

17                 MR. MILLMAN:  I would just ask to -- I don't

18      believe so, but I just ask to see it.  No objection.

19                 THE COURT:  There being no objection, it's

20      received.

21                 (People's Exhibit 1, previously marked for

22      identification, is received and marked in evidence.)

23                 THE COURT:  Ladies and gentlemen, this is the

24      first piece of non-testimonial evidence that's

25      introduced as well as testimonial evidence.  You can

P.O. J. Monroe - People - Direct      544

1    feel free during your deliberations to call for any

2    read backs of testimony, instructions on the law, and

3    you can bring any pictures, documents and paper back

4    into the jury room with you.

5              MS. ABDI:  I would ask to take that item

6    back, and with your Honor's permission, I would like to

7    display that on the presenter and have the officer step

8    down.

9              THE COURT:  Sure.

10   Q.    Officer, can you indicate on the photograph the

11   approximate location that you observed Armando Villatoro

12   when you responded to the scene that evening?

13   A.    He was right there by the number one.

14             THE COURT:  Just one second.  That's better.

15   Q.    And just for clarity, that number one was not

16   there when you first responded to the scene?

17   A.    No.

18   Q.    That was something that crime scene placed there?

19   A.    I believe so, ma'am.

20   Q.    But that photograph and the placard with number

21   one, that accurately reflects the location in which you

22   first encounter Armando Villatoro?

23   A.    Yes, ma'am.

24   Q.    You can please take a seat.  Now, Officer, when

25   you responded, can you just describe how Mr. Villatoro was

P.O. J. Monroe - People - Direct      545

1   laying at that point?

2        A.   He was lying on his side kind of curled up with

3   his head facing the driveway, I believe.

4        Q.   Now, how many years have you been working in the

5   Third Precinct?

6        A.   I've been in the precinct a little over six years.

7        Q.   Is it fair to say that you are familiar with the

8   roads and streets and geographic areas surrounding the

9   confines of the Third Precinct?

10       A.   Yes, ma'am.

11       Q.   And how often do you patrol the Third Precinct?

12       A.   Every time I come to work.

13       Q.   Now, I'd like to show you --

14            MS. ABDI:  Have this marked as People's

15       Exhibit 2.  It's a map for identification.

16            (People's Exhibit 2 is marked for

17       identification.)

18            MS. ABDI:  I'm just going to ask that that be

19       shown to the witness.

20       Q.   Officer, do you recognize that?

21       A.   Yes, ma'am.

22       Q.   And what is that?

23       A.   That's an area of 316 post and the area of

24   incident of 180 Kinkel Street.

25       Q.   So that area is an area of the post that you cover

1   as part of your typical duties assigned to that section?

2       A.   Yes, ma'am.

3       Q.   And that area is part of Westbury; is that

4   correct?

5       A.   It is.

6       Q.   And that's also part of the Third Precinct; is

7   that correct?

8       A.   Yes.

9       Q.   And that's in Nassau County, New York, correct?

10      A.   Yes, ma'am.

11      Q.   Is that item fair an accurate depiction of the

12  layout of the streets and the roads with respect to that

13  area?

14      A.   Yes, ma'am.

15           MS. ABDI:  At this time I offer People's

16      Exhibit 2 into evidence.

17           MR. MILLMAN:  No objection.

18           THE COURT:  Without objection, it's received.

19           (People's Exhibit 2, previously marked for

20      identification, is received and marked in evidence.)

21           MS. ABDI:  Your Honor, if I could just take

22      that and display it over there by the presenter.  And

23      if I just ask the witness to step down.

24           THE COURT:  Just one second.

25      Q.   Officer, can you plea stand to the corner.  Are

J.H.

P.O. J. Monroe - People - Direct      547

1    you familiar with Bunkyreid Town Park?

2         A.   I am.

3         Q.   And where is that located on the map?

4         A.   That's this big green area here.

5         Q.   And it's official name is Martin Reid Town Park?

6         A.   Right.

7         Q.   People call it Bunkyreid?

8         A.   They do.

9         Q.   Can you just point out Kinkel Street on that map?

10        A.   Kinkel Street is right here.

11        Q.   And what direction does Kinkel Street run?

12        A.   That runs north and south.

13             THE COURT:  Is it labeled on the map?  Is it

14        labeled on the map?

15             THE WITNESS:  Yes.

16        Q.   And can you just describe or can you just state

17   streets that border Martin Reid Town Park or Bunkyreid?

18        A.   It's on Broadway and Railroad are the big streets,

19   and then there's Urban is a main road that goes past it, and

20   on the other side there's Garden Street.  There's houses and

21   then the street.

22        Q.   Can you just please point out those streets on the

23   map.

24        A.   Sure.  This is going to be Railroad here, Broadway

25   is here.  This is Urban Avenue and then Garden Street.

1           THE COURT:  Are they labeled on the map?

2           THE WITNESS:  Yes, sir.

3           MS. ABDI:  Okay, Officer, thank you.  I have

4      no further questions.

5           THE COURT:  Cross-examination.

6           MR. MILLMAN:  Can I just confer with counsel?

7           THE COURT:  Sure.

8           (Mr. Millman and Miss Abdi conferred.)

9  CROSS-EXAMINATION

10  BY MR. MILLMAN:

11      Q.   Good morning, Officer.

12      A.   Good morning.

13      Q.   I don't think you can see that where you are,

14  correct?

15      A.   I can see fine.

16      Q.   Let me just ask you do you see what I'm pointing

17  to here, this red object?

18      A.   Not well.  Is it all right if I --

19           MR. MILLMAN:  May the witness step down, your

20      Honor?

21           THE COURT:  Go ahead.

22           MS. ABDI:  Judge, may I just shift myself

23      over there so I am not blocking the jury?

24           THE COURT:  His previous testimony concerned

25      a point exhibited by marker number one.

P.O. J. Monroe - People - Cross      549

1           MR. MILLMAN:  Yes, your Honor.

2           THE COURT:  This testimony has to be

3     preserved on the photograph.  So have him circle the

4     item which you want him to testify about.

5           MR. MILLMAN:  Okay.

6           THE COURT:  Do you understand what I am

7     talking about?

8           MR. MILLMAN:  Yes, your Honor.

9     Q.   All right, Officer, I'm just going to ask you to

10    take a look --

11          THE COURT:  Just one second.  He can't circle

12    that which is on the presenter.  He has to circle the

13    photograph.

14          MR. MILLMAN:  Yes, but I was going to first

15    orient him and ask him to circle it on the photograph

16    just so the jury can see that if I may, your Honor.

17          THE COURT:  All right.

18    Q.   Officer, do you see the red object?

19    A.   This one here?

20    Q.   Yes.

21    A.   Yes, sir.

22    Q.   Can you circle that on the exhibit?

23    A.   With my pen?

24          MR. MILLMAN:  Is that okay, your Honor?

25          THE COURT:  Sure.

P.O. J. Monroe - People - Cross      550

1          (The witness complied.)

2      Q.    Officer, what is that?

3      A.    I can't really tell.

4      Q.    Did you see that when you responded?

5      A.    I didn't take a notice to it.

6      Q.    You may have a seat.  Officer, can you see this

7  from where you are?

8      A.    Yes, sir.

9      Q.    I notice that you had on the number 180 marked

10 there.  Is that the location of where house 180 is on that

11 block?

12     A.    Yes, sir.

13          THE COURT:  Just one second.  Let me see

14     this.  I introduced this without objection.  There's

15     been no testimony as to what 180 is or 163 or any other

16     numbers.  Is 180 the location 180 Kinkel Street?

17          THE WITNESS:  It's the location of the

18     incident where I responded that night, yes, sir.

19     Q.    Officer, you had indicated that you are familiar

20 with Bunkyreid Park because it's on your post; is that

21 correct?

22     A.    Yes, sir.

23     Q.    How many bathrooms are located in that park if you

24 know?

25     A.    I'm not quite sure.

P.O. J. Monroe - People - Cross        551

1      Q.    Do you know where any of them are located?

2      A.    I know that there's a circular building in the

3   middle that there's bathrooms at.  Other than that, I'm not

4   sure.

5      Q.    And Officer, to the best that you can estimate,

6   about how far would you say it is from the intersection of

7   Broadway and Urban Avenue to 180 Kinkel Street?

8      A.    It's close, maybe a quarter of a mile, you know,

9   or less.  It's not far.

10              MR. MILLMAN:   Thank you.  I have no further

11        questions.

12              THE COURT:   Thank you.  You can step down.

13              (The witness was excused.)

14              THE COURT:   Next witness.

15              MS. ABDI:   The People call AMT Schwartz.

16   A.M.T.  M I C H A E L  S C H W A R T Z , Shield 150, a

17        witness called on behalf of the People, after having

18        been first duly sworn by the Clerk of the Court, was

19        examined and testified upon his oath as follows:

20              THE CLERK:   In a loud, clear voice, please

21        state your name, spell your last and give your shield

22        and command.

23              THE WITNESS:   Michael Schwartz,

24        S-C-H-W-A-R-T-Z.  My command is emergency ambulance

25        bureau, shield number 150.

A.M.T. M. Schwartz - People - Direct      552

1           THE CLERK:  Thank you.

2           MS. ABDI:  May I proceed, your Honor?

3           THE COURT:  Yes.

4    DIRECT EXAMINATION

5    BY MS. ABDI:

6        Q.   Good morning.

7        A.   Good morning.

8        Q.   How are you employed?

9        A.   I'm sorry?

10       Q.   How are you employed?

11       A.   Employed?

12       Q.   What is your job?

13       A.   Paramedic for Nassau County Police Department.

14       Q.   And what does the title -- what's your official

15   title?

16       A.   Ambulance medical technician.

17       Q.   Is that sometimes the acronym AMT is used?

18       A.   Yes.

19       Q.   How long have you been employed as an AMT?

20       A.   Since July of 2008.

21       Q.   I'm sorry?

22       A.   July of -- since July of 2008.

23           THE COURT:  Eight?

24           THE WITNESS:  Eight.

25       Q.   And are you also a paramedic?

A.M.T. M. Schwartz - People - Direct     553

1      A.    Yes.

2      Q.    Can you describe to the jury the training that you

3   have received as a paramedic and as an AMT?

4      A.    AMT actually stands for ambulance medical

5   technician which encompasses critical care AMTs and

6   paramedics.  They are the highest level of prehospital

7   emergency level care.  So we spend a lot of time on

8   ambulances learning what other paramedics do, in emergency

9   rooms, the operating room.  And like I said, we provide

10  advanced life support outside of the hospital.

11     Q.    And how long have you worked in that capacity,

12  since 2008?

13     A.    Yes.

14     Q.    I'm going to direct your attention now to

15  September 28th of 2010.  Were you working in your capacity

16  as an AMT on that date?

17     A.    Yes, I was.

18     Q.    And do you recall what ambulance number you were

19  in on that date?

20     A.    2363.

21     Q.    And what hours were you working?

22     A.    7 p.m. to 7 a.m. the next morning.

23     Q.    Were you wearing a uniform that date?

24     A.    Yes, I was.

25     Q.    Is it something that's similar to the one that you

A.M.T. M. Schwartz - People - Direct     554

1    are wearing today?

2         A.    This uniform, yes.

3         Q.    I'm going to direct your attention now to that

4    date, approximately 10:28 p.m.  What occurred at that time?

5         A.    Um, I would have to see my memo book.  I believe I

6    was called to Kinkel Street.

7         Q.    Would you like to take a look at your memo book?

8         A.    Please.

9              MS. ABDI:  Your Honor, would you like me to

10        mark this for identification, or is it sufficient to

11        show it to the witness?

12             THE COURT:  Do you want it marked?

13             MR. MILLMAN:  Yes, your Honor.

14             THE COURT:  Yes.

15             MS. ABDI:  I would like to have this document

16        marked as People's Exhibit 3 for identification.

17             (People's Exhibit 3 is marked for

18        identification.)

19             MS. ABDI:  I would ask that to be shown to

20        the witness.

21        Q.    When you are done, if you could just look up after

22   you have completed.

23        A.    At 10:28, I was called to 180 Kinkel Street.

24        Q.    Once you arrived at 180 Kinkel Street, what did

25   you observe at that point?

J.H.

A.M.T. M. Schwartz - People - Direct      555

1      A.    Um, I cared for a patient, Armando Villatoro, who
2    was stabbed multiple times.
3      Q.    Now, when you responded to the location, where did
4    you encounter Armando Villatoro?  Where was he?
5      A.    On the front lawn.
6      Q.    And can you describe his condition at that point
7    that you observed him?
8      A.    I would have to look at my report, my ambulance
9    report, prehospital care report.
10              THE COURT:  Do you have no independent
11          recollection of his condition?
12              THE WITNESS:  I remember he was unresponsive,
13          covered in blood, but I believe I documented more
14          specifically how he was laid out.
15              THE COURT:  Well, the DA is not asking you
16          those specifics as yet.
17              THE WITNESS:  Okay.
18              THE COURT:  He was covered with blood and
19          unresponsive?
20              THE WITNESS:  Yes.
21      Q.    And what did you do with him at that point?
22      A.    We immobilized him on a backboard and brought him
23    right to the ambulance.
24      Q.    At that point what did you do once you brought him
25    to the ambulance?

A.M.T. M. Schwartz - People - Direct    556

1    A.    We determined that he wasn't breathing and he did
2    not have a pulse, so we started CPR.
3         Q.    And what injuries did you notice at that point?
4         A.    Um, like I said, he was covered in blood, but from
5    what we could tell, there was at least six major stab
6    wounds.
7         Q.    Do you recall the general location of these stab
8    wounds?
9         A.    Yes, throughout his chest and abdomen.
10        Q.    And what treatment did you provide to him at that
11   point?
12        A.    I would have to refer to my PCR at this point.
13              MS. ABDI:  Your Honor, I would like to have
14        this marked --
15              THE COURT:  You performed CPR?
16              THE WITNESS:  Yes, sir.
17              THE COURT:  Did you revive him?
18              THE WITNESS:  No, sir.
19              MS. ABDI:  -- as People's Exhibit 4 for
20        identification.
21              (People's Exhibit 4 is marked for
22        identification.)
23              THE COURT:  Ladies and gentlemen, in line
24        with what I instructed you yesterday, People's 3 for
25        identification is not evidence.  It's the refreshed

J.H.

A.M.T. M. Schwartz - People - Direct     557

1       recollection of the AMT that's the evidence.

2                    MS. ABDI:   I would just ask that People's

3            Exhibit 4 for identification, which is the PCR, be

4            shown to the witness.

5            Q.     And when you are done reading through the PCR, can

6       you look up so I know you are done reading it.

7                    I may have forgotten my last question, but I'm

8       going to ask you another question.   What treatment did you

9       give him at that time?

10           A.     In addition to the CPR, what we did was inserted a

11      breathing tube because he wasn't breathing on his own.   We

12      covered the stab wound with a large multi-trauma dressing.

13      We had -- he had absent lung sounds on one side from tension

14      pneumothorax presumably, so we did a needle decompression to

15      release the pressure and trapped air from his chest and

16      continued ventilating him through the breathing tube.

17                   We attempted to put in IVs but we could not at

18      that point.

19           Q.     And what is a pneumothorax?

20           A.     It's trapped air in the chest cavity.

21           Q.     Is that commonly known as a collapsed lung?

22           A.     Yes.

23           Q.     At what time was he transported from the scene to

24      the hospital?

25           A.     We left the scene at 2240 hours, which is 10:40.

J.H.

A.M.T. M. Schwartz - People - Direct     558

1     Q.    And approximately what time did you arrive at the
2     hospital?
3     A.    We arrived at the hospital at 10:28, 2228 hours.
4     Q.    And what hospital did you go to?
5     A.    Nassau University Medical Center.
6     Q.    Who went with you with the ambulance?
7     A.    Another AMT, a coworker of mine.
8     Q.    And who was responsible for driving the ambulance?
9     A.    A police officer.
10    Q.    Now, you didn't notice any gunshot wounds?
11    A.    No --
12          THE COURT:  I'm sorry.
13    Q.    You didn't notice any gunshot wounds on Armando
14    Villatoro?
15    A.    Not at that time, no.
16    Q.    Not at any time?
17    A.    Not at any time.
18          MS. ABDI:  I have no further questions for
19    this witness.
20          THE COURT:  Do you have any cross?
21          MR. MILLMAN:  No questions.
22          THE COURT:  Thank you, Officer.
23          THE WITNESS:  Thank you.
24          (The witness was excused.)
25          THE COURT:  Next witness.

A.M.T. M. Schwartz - People - Direct     559

1           MS. ABDI:  Judge, can I have just one minute?
2       Or with the Court's indulgence, may I have a
3       five-minute break?
4               THE COURT:  Who is your next witness?
5               MS. ABDI:  That's what I am going to
6       ascertain.
7               THE COURT:  How many do you have here today?
8               MS. ABDI:  A few more, just not at this time.
9               THE COURT:  Okay, we will take five minutes
10      at this time.  Make it 10.
11               (Whereupon, the jury exits the courtroom.)
12               (A recess was taken.)
13               THE CLERK:  Recalling Indictment 202N of
14      2011, case on trial.  Let the record reflect all
15      parties are present including the defendant and Spanish
16      interpreter.  There are no jurors present.
17               THE COURT:  Let's bring in the jury.
18               COURT OFFICER:  Jury entering.
19               (Whereupon, the jury enters the courtroom.)
20               THE CLERK:  Let the record reflect that all
21      jurors are present.  Do both sides consent to the
22      seating and waive a reading of the roll?
23               MS. ABDI:  Yes.
24               MR. MILLMAN:  Yes.
25               THE COURT:  All right, ladies and gentlemen,

1           while there was a break, we had some discussion about

2           the introduction of a series of photographs.  So many

3           of these photographs have been premarked.  Have you

4           finished that?  Finish it up.

5                       (People's Exhibits 5 through 56 were received

6           and marked in evidence.)

7                       THE COURT:  Next witness.

8                       MS. ABDI:  People call Detective Kenneth

9           Mazzie.

10    D E T.  K E N N E T H  M A Z Z I E , Shield 1311, a witness

11          called on behalf of the People, after having been first

12          duly sworn by the Clerk of the Court, was examined and

13          testified upon his oath as follows:

14                      THE CLERK:  In a loud, clear voice, please

15          state your name and spell your last.

16                      THE WITNESS:  My name is Ken Mazzie, last

17          name is M-A-Z-Z-I-E.

18                      THE CLERK:  Give me your shield and command,

19          please.

20                      THE WITNESS:  Shield is 1133, and I am with

21          the Nassau County Police Department Crime Scene Unit.

22                      THE CLERK:  Thank you.

23                      MS. ABDI:  Judge, can I just approach for one

24          second with counsel?

25                      THE COURT:  Sure.

Det. K. Mazzie - People - Direct        561

1          (A discussion was held off the record at the

2    bench outside of the hearing of the jury.)

3          THE COURT:   Five through 56 is marked in

4    evidence.   To establish the foundation in short circuit

5    form, are you going to show this witness all of these

6    photographs, and is he going to testify that each of

7    them are true and accurate representations of the

8    scenes they depict?

9          MS. ABDI:   Yes.

10         THE COURT:   Okay.   Show it to him.

11         MS. ABDI:   Judge, I'm going to do that in the

12   course of my direct examination of the witness.

13         THE COURT:   That's my question to him.   Show

14   him the photographs.

15         MS. ABDI:   I'm showing him what's marked as 5

16   through 56 and also People's Exhibit 1.

17         THE COURT:   Don't show him People's Exhibit

18   1.   Just 5 through 56.   Okay, Detective Mazzie, are

19   each one of those photographs true and accurate

20   representations of the scenes depicted thereon?

21         THE WITNESS:   Yes, sir.

22         THE COURT:   Is that a yes?

23         THE WITNESS:   Yes, sir.

24         THE COURT:   Ladies and gentlemen, we have

25   just saved an hour-and-a-half's worth of time.

1         Proceed.

2    DIRECT EXAMINATION

3    BY MS. ABDI:

4         Q.    Good morning, Detective.

5         A.    Good morning.

6         Q.    How are you employed?

7         A.    I'm employed by the Nassau County Police

8    Department.

9         Q.    And where are you currently assigned?

10        A.    To the Crime Scene Unit.

11        Q.    And what is the Crime Scene Unit?

12        A.    Primarily it's a unit that responds to scenes to

13   document and collect evidence.

14        Q.    And how long have you been assigned to the crime

15   scene squad?

16        A.    It would be six years this April.

17        Q.    And how long have you been a police officer in

18   Nassau County?

19        A.    I have been with the police department for

20   19-and-a-half years.

21        Q.    How long have you been a detective?

22        A.    Approximately five-and-a-half years.

23        Q.    Can you just describe for the jury the training

24   that you received in the course of your duties as a crime

25   scene detective?

Det. K. Mazzie - People - Direct       563

1      A.    Initially training is approximately six months.
2   There's in-house training and outside schooling that you
3   will go to.  You are trained in latent fingerprint
4   processing and collection, biological evidence, trace
5   evidence, collection packaging, sketch work, video
6   photography, still photography.

7      Q.    And approximately in the course of your career,
8   how many scenes have you processed or responded to?

9      A.    At this point, well over a thousand.

10     Q.    I'm going to direct your attention now to
11  September 28th of 2010.  Were you working on that date?

12     A.    Yes.

13     Q.    Were you assigned to crime scene section on that
14  date?

15     A.    Yes.

16     Q.    Did there come a time where you responded to 180
17  Kinkel Street in Westbury, Nassau County, New York?

18     A.    Yes.

19     Q.    Do you know approximately what time you responded
20  to that location?

21     A.    I believe I arrived at approximately 2330 hours.

22              THE COURT:  11:30?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  p.m.?

25              THE WITNESS:  Yes.

J.H.

1    Q.   And what did you do when you responded to the

2    scene at that time?

3        A.   Once I respond, I normally meet with a police

4    officer that may be holding a time log.  I'll sign into the

5    time log.  I'll then meet with any detectives at the scene

6    and police officers and try to gather information as to what

7    may have taken place.

8        Q.   And is it fair to say that when you responded to

9    the scene, the scene was already secure as in it was

10   cordoned off; is that correct?

11       A.   Yes.

12       Q.   And that's with crime scene tape?

13       A.   Yes.

14       Q.   And what did you do after you spoke with those

15   individuals?

16       A.   Basically I walk through the scene, take a visual

17   survey.

18       Q.   And what does a visual survey mean?

19       A.   Again, I will walk through the scene and look for

20   various items of evidence.

21       Q.   Is there a way that you document what you observe?

22       A.   Yes.  Once I complete that, I would do a video of

23   the scene, and then I'll follow up with still photography.

24       Q.   And with respect to the photography, are there any

25   markers that you use in the course of taking photographs of

J.H.

1    things?

2         A.    Yes.    Normally I'll take scene photos as the scene

3    is.    It's pure.    Nothing added, nothing taken away.    I will

4    then place my own markers out at locations indicating items

5    of evidence or in areas that need to be depicted.    They are

6    done with either markers or cones, labels, stickers, various

7    items.

8              THE COURT:    The officer is using the term

9         evidence.    The term evidence to a Crime Scene Unit may

10        be a little different than the term evidence in a court

11        of law.    What you mean is potential evidence, correct?

12              THE WITNESS:    Yes, sir.

13              THE COURT:    Okay.

14        Q.    The judge brought up a question.    It's fair to say

15    that when you're checking evidence, you don't at that time

16    know the significance of that evidence; is that correct?

17        A.    That's correct.

18        Q.    Now, if I could, I know you were shown People's 5

19    through 56 that were in evidence.    If I could just take a

20    look at them for a moment.    With respect to People's 5

21    through 56 which you viewed, what were those items?

22        A.    They are photos of the scene.

23        Q.    Those are photos that you took?

24        A.    Yes.

25        Q.    When you responded on September 28th?

1       A.    Yes.

2       Q.    Now, in the course of photographing items -- well,

3    withdrawn.

4             After you photograph items, what do you do to

5    them?

6       A.    I collect them, and then I package them, and then

7    they are housed in an evidence locker and later transported

8    to headquarters.  And then there they are distributed to

9    different areas for testing or analysis.

10      Q.    And is a sketch of the scene prepared?

11      A.    Yes.

12      Q.    What's depicted in a sketch of the scene?

13            THE COURT:  In general.

14      Q.    In general.

15      A.    In general, the area.  So it could be from the

16   homes to the curbs to the sidewalks to the cones I place

17   out, the markers I place out, cars.  Anything that has real

18   importance to the particular assignment we are there for.

19      Q.    Is it fair to say a sketch would be made to show

20   the location of various items of the scene?

21      A.    Yes.

22      Q.    Now, I'd like to show you what is marked as

23   People's Exhibit 5.  I'm just going to -- it's already in

24   evidence.  I'm going to place this -- well, actually before

25   I do that, Detective, can you describe what items that you

1    recovered from the scene?

2         A.    There was a do-rag I recovered.  There was a

3    couple of watches, some metal pipes, wooden stick, beer

4    bottles, some clothing, numerous blood swabs.  If I didn't

5    mention a knife.

6         Q.    Just talking specifically about the scene at 180

7    Kinkel Street.

8         A.    Yes.

9         Q.    You mentioned a knife.  Where did you discover

10   this item?

11        A.    It was in the roadway adjacent to a curb I believe

12   in front of 163 Kinkel.

13              THE COURT:  Come on up.

14              (A discussion was held off the record at the

15        bench outside of the hearing of the jury.)

16        Q.    I'd like to display for you what is marked as

17   People's Exhibit 41 in evidence.

18              MS. ABDI:  Your Honor, I may have to ask the

19        witness to step down.

20              THE COURT:  Sure.  Officer Mazzie, position

21        yourself so all jurors can see.

22        Q.    Detective, looking at this is People's Exhibit 41

23   in evidence, what is depicted in this photograph?

24        A.    This is Kinkel Street.  This is a view looking

25   north.  This is marker two which I placed out.

Det. K. Mazzie - People - Direct      568

1        Q.   And what is marker two?

2        A.   That's the location where the bloody knife was

3    found.

4        Q.   I'd like to show -- I'd like to display what is

5    People's Exhibit 43 in evidence.  What is depicted in that

6    photograph?

7        A.   It's a mid-range shot of marker two and the bloody

8    knife which is just at the curb.

9        Q.   And I will display what is marked as People's

10   Exhibit 44 in evidence.

11       A.   Again, it's the same image, just another closer

12   shot of the bloody knife.

13       Q.   I am now displaying what is marked as People's

14   Exhibit 45 in evidence.  What is depicted in this

15   photograph?

16       A.   This is the bloody knife.  After I collected the

17   knife, placed it in a box which is here today, and I placed

18   the scale in the box to show you the size of the knife.  And

19   it's just a view of the knife again.

20                 THE COURT:   Those are inches, not

21        centimeters, correct?

22                 THE WITNESS:   Correct, sir.

23                 THE COURT:   The blade of which is about seven

24        inches?

25                 THE WITNESS:   Approximately eight, nine

J.H.

Det. K. Mazzie - People - Direct      569

1      inches.

2          Q.    So can you tell from this photograph how long the

3      blade is?

4          A.    The blade itself is approximately seven.  The

5      overall length is approximately eight or nine inches.

6                    THE COURT:  I asked you about the blade.

7                    THE WITNESS:  You did, sir.

8                    THE COURT:  Seven inches?

9                    THE WITNESS:  Approximately seven inches.

10         Q.    And I'm showing you what is marked as People's

11     Exhibit 46.

12         A.    Again, it's the knife, and it's just turned over

13     so you could see the other side of it.

14         Q.    I would like to show you what is marked as

15     People's Exhibit 6 in evidence.  What is depicted in this

16     photograph?

17         A.    Again, this is Kinkel Street.  These are various

18     cones I placed out, and this is the front of 180 Kinkel

19     Street.

20         Q.    And can you describe --

21                    THE COURT:  Does marker number one appear in

22              that photograph?

23                    THE WITNESS:  Yes, sir.

24                    THE COURT:  Show it to the jury.  Just point

25              to it.

1        THE WITNESS:  Oh, up on the lawn.

2        THE COURT:  Okay.

3    Q.    Can you just describe what's depicted in this

4    photograph?

5    A.    The marker one we determined is approximately the

6    area where the deceased was lying when the officers arrived.

7    The red cones are locations where I took blood swabs.

8    There's blood on the road surface or the sidewalk surface.

9        And the yellow cones are various items that are

10   potential items which I collected.  It's hard for me to see

11   cone numbers in this photo, but there's a black and red,

12   there's a watch in the area of this cone, a crowbar, a

13   couple of pipes and sticks.

14   Q.    And this was -- this is a shot that's from a

15   mid-range shot?

16   A.    Yes.

17   Q.    I would like to show you what is marked as

18   People's Exhibit 15 in evidence.  What is depicted in that

19   photograph, and what's the marker?

20   A.    This is yellow cone two which I placed in the

21   roadway.  It's approximately in front of 180 Kinkel Street.

22   And that's a black do-rag which I collected.

23       THE COURT:  For any juror that's not familiar

24   with that term, what is it, a do-rag?

25       THE WITNESS:  It's a type cap or head piece.

1           THE COURT:  Okay.

2           THE WITNESS:  Almost like a stocking-type

3       material.

4       Q.    I would like to show you what is marked as

5    People's Exhibit 16.  What is depicted in that photograph?

6       A.    This is red cone four, and this is on the walkway

7    of 180 Kinkel Street.  And these are blood droplets.

8       Q.    And displaying what is marked as People's Exhibit

9    19 in evidence.

10      A.    This is red cone one and again, this is blood, and

11   this is in the roadway in front of 180 Kinkel Street.

12      Q.    And I'm displaying what is marked as People's

13   Exhibit 20.

14      A.    Red cone two, and it's, again, these are blood

15   droplets in the roadway in front of 180 Kinkel Street.

16      Q.    And displaying what is marked as People's Exhibit

17   21 in evidence, what is depicted by that?

18      A.    This is yellow cone three.  This is the roadway

19   again in front of 180 Kinkel Street.  This is a yellow pipe,

20   metal pipe.

21      Q.    I'm showing what is marked as People's Exhibit 22

22   in evidence.

23      A.    Another close-up of the roadway with blood on it

24   at red cone three which, again, is in the roadway in front

25   of 180 Kinkel Street.

Det. K. Mazzie - People - Direct       572

1       Q.    And I'm showing what is marked as People's Exhibit

2   23.   What is depicted in that photograph?

3       A.    This is a wooden stick at yellow cone five on the

4   front lawn of 180 Kinkel Street.

5       Q.    And I'm showing you what is marked as People's

6   Exhibit 24 in evidence.

7       A.    Yellow cone six.  Again, it's on the lawn of 180

8   Kinkel Street, and this is a red metal pipe.

9       Q.    And I'm showing you what is marked as People's

10  Exhibit 25.  What is depicted there?

11      A.    Yellow cone four, which is in the roadway in front

12  of 180 Kinkel Street, and it's a black crowbar -- lug

13  wrench, pardon me.

14              THE COURT:  Just one second, tire iron?

15              THE WITNESS:  Tire iron, lug wrench.

16      Q.    I'm showing you what's marked as People's Exhibit

17  26.

18      A.    This is a grass strip between the curb and the

19  sidewalk across the street from 180 Kinkel Street.  And this

20  is yellow cone seven, I believe.  And at that cone is a

21  clear glass bottle.  I believe it was a Smirnoff bottle, I

22  believe, a liquor bottle.

23              THE COURT:  Vodka?

24              THE WITNESS:  Yes, sir.

25      Q.    And I'm showing you what is marked as People's

Det. K. Mazzie - People - Direct        573

1    Exhibit 27.

2        A.    This is a close-up of the bottle at yellow cone

3    seven.

4        Q.    I'm showing you what is marked as People's Exhibit

5    28.  What's depicted in this photograph?

6        A.    This is directly across the street from 180 Kinkel

7    Street.  I forget the number of it.  This is the front of

8    the house, and these are two cones which I placed out.  This

9    is yellow cone eight, and this is yellow cone nine.

10       Q.    I am showing you what is marked as People's

11   Exhibit 29.  What's depicted in that photograph?

12       A.    This is a mid-range shot again of yellow cone

13   eight and a Coors Light bottle and a black hoody.

14       Q.    Now, with respect to that Coors Light bottle

15   that's depicted near marker number eight, what size is that

16   bottle?

17       A.    Forty ounce.

18       Q.    With respect to People's Exhibit 30, if you could

19   just describe what's in that photograph?

20       A.    This is the front garden with the yellow cone

21   nine.  There's a bag here containing a Coors Light bottle

22   and some paper bags, and in the bushes behind is another

23   Coors Light bottle which is opened or was opened.

24       Q.    I'm showing you what is marked as People's Exhibit

25   35.

J.H.

1        A.     That's a close-up of the bottle in the garden at
2   yellow cone nine.

3        Q.     I'm showing you what is marked as People's Exhibit
4   36.   What's depicted in that photograph?

5        A.     This house is again is across the street from 180
6   Kinkel Street, diagonally across to the south.   Can't see
7   the cone number.   Anyway, it's a yellow cone in the roadway
8   with a Coors Light bottle and a broken pieces from a broken
9   bottle.

10       Q.     I'll show you what is marked as People's Exhibit
11  37.

12       A.     Okay, it's yellow cone 10, and that's a close-up
13  again of the bottle and broken pieces in the roadway.

14       Q.     And I'm showing you what's marked as People's
15  Exhibit 39.   What's depicted in that photo?

16       A.     Yellow cone 11.   It's on the front walk.   Again, I
17  don't know the address.   It's the house that's across the
18  street from 180 Kinkel Street and, again, south, and it's a
19  wristwatch.

20       Q.     And I am going to show you what is marked as
21  People's Exhibit 7.   What's depicted in this photograph?

22       A.     This is the front lawn of 180 Kinkel Street.
23  Again, you see the marker one which is the final rest of the
24  deceased, yellow cone five, which is the location of the
25  wooden stick, and yellow cone six, which is the location of

Det. K. Mazzie - People - Direct      575

1    the red pipe.

2        Q.   And that was on the lawn at 180 Kinkel Street?

3        A.   Yes.

4        Q.   I show you what is marked as People's Exhibit 13.

5    What is depicted in that photograph?

6        A.   This vehicle was parked in the roadway in front of

7    180 Kinkel Street across the street.  This is the driver's

8    side of the vehicle.  I placed this label here.  And

9    adjacent to that label, there's blood droplets.

10       Q.   Detective, I'm just going to ask you to take the

11   witness stand.

12            THE COURT:  All right, it's your job to

13       gather these items, correct?

14            THE WITNESS:  Yes, sir.

15            THE COURT:  You don't analyze them?

16            THE WITNESS:  No, sir.

17       Q.   Now, with respect to items that you collected from

18   the scene, do you give them any numerical representation

19   when you collect them?

20       A.   Yes.  They are automatically given an evidence

21   item number as you place them into the computer.

22       Q.   And did you do that in this case?

23       A.   Yes.

24       Q.   Now, do you recall without your paperwork what

25   those numbers were?

Det. K. Mazzie - People - Direct      576

1      A.    With respect to just the scene, I believe it was
2    evidence items one through 22.
3      Q.    If I were to ask you questions about specific
4    numbers, would you need your paperwork to look at?
5      A.    Just to correspond, yes, with the correct item.
6              THE COURT:  Isn't this anticipated testimony
7          duplicative of what he just testified to?
8              MS. ABDI:  It's actually slightly different.
9      Q.    The items that you were testifying to are a marker
10    that you placed at the scene, correct?
11      A.    Yes.  And they are always indicative of the
12    evidence item number.  They don't run consistently together,
13    because I could have more than one item at a cone or a
14    marker.
15      Q.    And the crime scene numbers that I was asking you
16    about the question before, those are specific item numbers
17    that you give once you collect evidence; is that correct?
18      A.    Yes.
19              MS. ABDI:  I would like to have this marked
20          as People's Exhibit 57 for identification.
21              THE COURT:  What's the relevancy of this?  Is
22          this to lay a foundation to correspond to the analyses
23          of these items?
24              MS. ABDI:  Yes.
25              THE COURT:  Okay.

Det. K. Mazzie - People - Direct       577

1              (People's Exhibit 57 is marked for

2         identification.)

3              THE COURT:  Do you have any objection if this

4         is introduced?

5              MS. ABDI:  Judge, I'm not asking that to be

6         introduced into evidence.  I'm just asking it to be

7         marked for ID for the detective to refresh his

8         recollection.

9              THE COURT:  I know.  I'm asking you is there

10         any objection if this is introduced.

11              MR. MILLMAN:  I would have to see it.

12              THE COURT:  Take a look at it.

13              MR. MILLMAN:  Yes, your Honor.

14              THE COURT:  All right, proceed in the manner

15         in which you were going.

16              MS. ABDI:  I ask that that be shown to the

17         witness.

18    DIRECT EXAMINATION

19    BY MS. ABDI:  (CONTINUED)

20         Q.   Detective, when evidence is collected with respect

21    to a case, is it collected under a police case report

22    number?

23         A.   Yes, ma'am.

24         Q.   And what was the number in this case?

25         A.   It was 210CR0082502.

Det. K. Mazzie - People - Direct       578

1        Q.    And with respect to the black handled knife that

2    you collected from the scene, did you assign a crime scene

3    number to that item?

4        A.    Yes.    That's evidence item number one.

5        Q.    And where was that item recovered again?

6        A.    In the roadway I believe in front of 163 Kinkel

7    Street at marker two.

8        Q.    And with respect to the black do-rag that was

9    recovered at marker number two, did you assign a crime scene

10   number to that item?

11       A.    Yes.    It's evidence item number four.

12       Q.    And with respect to blood swab from roadway, with

13   respect to red cone number one, did you assign -- I'm sorry,

14   with respect to, yeah, red cone number one, did you assign a

15   number to that?

16       A.    Yes.    It's evidence item number 10.

17       Q.    And with respect to the blood spot that you

18   recovered from the walkway at 180 Kinkel Street at red cone

19   number four, did you assign a crime scene number to that?

20       A.    Yes.    It's evidence item Number 13.

21       Q.    And with respect to the blood swabs that you were

22   speaking of with respect to the car that was across the

23   street, did you assign any item numbers to that?

24       A.    Yes.

25       Q.    What item numbers were those?

Det. K. Mazzie - People - Direct      579

1      A.    Those would be evidence items number 14 and 15.

2      Q.    And with respect to that 40 ounce Coors Light

3  bottle that you were speaking of at yellow cone number

4  eight, did you assign any crime scene number to that?

5      A.    Yes.  It's evidence item number 17.

6      Q.    Now, we spoke earlier about a sketch.

7            MS. ABDI:  I would like to have this marked

8      as People's Exhibit 58 for identification.

9            (People's Exhibit 58 is marked for

10     identification.)

11           MS. ABDI:  And I ask this be shown to the

12     witness.

13     Q.    Detective, you are now looking at a sketch which

14 is marked as People's Exhibit 58 for identification.  Do you

15 recognize what that is?

16     A.    Yes, ma'am.

17     Q.    What is that?

18     A.    It's a sketch of the scene as it was that night.

19 The sketch was created by Detective Rinaldi of the Crime

20 Scene Unit.

21     Q.    And that's a fair and accurate depiction of the

22 location of the items that you recovered that night; is that

23 correct?

24     A.    Yes.

25           MS. ABDI:  At this time I offer People's

J.H.

Det. K. Mazzie - People - Direct      580

1        Exhibit 58 into evidence.

2              THE COURT:  Any objection?

3              MR. MILLMAN:  I would need to see it, your

4        Honor.

5              THE COURT:  Okay.

6              MR. MILLMAN:  May I just pose some questions?

7              THE COURT:  Sure.

8    VOIR DIRE EXAMINATION

9    BY MR. MILLMAN:

10       Q.   Good morning.

11       A.   Good morning.

12       Q.   Detective, the items that are indicated in here, I

13   just want to make sure I'm right on this, they were items

14   that you, yourself, observed at the site and created markers

15   for; is that accurate?

16       A.   Yes, sir.

17       Q.   And the location of the houses and where they are

18   placed on the diagram, are they to scale?

19       A.   It's not to scale, sir.

20             MR. MILLMAN:  I have no objection as a aid

21        with the understanding it's not to scale for the

22        purpose of which he is being offered.

23             THE COURT:  Okay.  It's received

24        understanding, members of the jury, it's not a scale

25        drawing.

Det. K. Mazzie - People - Direct      581

1              (People's Exhibit 58, previously marked for
2         identification, is received and marked in evidence.)
3              MS. ABDI:  Your Honor, if I may, there's an
4         easel to the left of the door.
5    DIRECT EXAMINATION
6    BY MS. ABDI:  (CONTINUED)
7         Q.   Detective, People's Number 58 is being displayed
8    for the jury.
9              THE WITNESS:  Can I get up?
10             THE COURT:  Yes.
11        Q.   If you could just --
12        A.   That better.
13        Q.   Can you point out 180 Kinkel Street on that
14   sketch?
15        A.   Yes, this is 180 Kinkel Street.
16        Q.   And the house directly across the street, can you
17   point that out?
18        A.   This house here is 179 Kinkel Street.
19        Q.   On the sketch, can you point out the marker number
20   one which depicted the location of Armando Villatoro?
21        A.   It's the red M1 here.
22        Q.   And in that vicinity, what marker numbers are
23   there near?
24        A.   S this is red cone four, again, marker one, yellow
25   cone five, yellow cone six.

1    Q.    And can you then describe the location of the
2    other marker numbers in that sketch?

3    A.    Sure.    This is yellow cone one, yellow cone two,
4    yellow cone three, yellow cone four.    Those are all in the
5    roadway in front of 180.    Red cone one, red cone two and red
6    cone three, which is in the vicinity of 180, again, the
7    roadway.

8         The motor vehicle which you saw the photo of with
9    the label and the blood, this is the location of that
10   vehicle.    This is yellow cone 10 which was the Coors Light
11   bottle and the broken pieces.    And before we go any further,
12   yellow cone seven, I believe, was the glass Smirnoff bottle.

13        Yellow cone eight was the open Coors Light bottle,
14   a 40 ounce bottle with the black hoody draped over the
15   fence.    Yellow cone nine which is in the garden of 179
16   Kinkel Street is the location of the black plastic bag with
17   some paper bags containing a Coors Light bottle and the
18   opened Coors Light bottle which is in the garden itself.    I
19   think that's it for those cones up there.

20                   THE COURT:    What's M2?

21                   THE WITNESS:    M2 is the location of the
22        bloody knife, and that's in front of 163 Kinkel.    And
23        yellow cone 11 is the -- was on the front walk of 167
24        Kinkel Street, and that was the wristwatch.

25                   THE COURT:    Are those the items depicted in

Det. K. Mazzie - People - Direct      583

1       People's Exhibit 57 for identification?

2                   THE WITNESS:  Yes, sir.

3                   THE COURT:  Is 57 for identification a record

4       kept in the ordinary course of business?

5                   THE WITNESS:  Yes, sir.

6                   THE COURT:  Is it the ordinary course of

7       business to keep it?

8                   THE WITNESS:  Yes.

9                   THE COURT:  And were you under a duty to keep

10      it?

11                  THE WITNESS:  Yes.

12                  THE COURT:  Do you want to introduce that as

13      a business record to correspond to what he's just

14      testified to?

15                  MS. ABDI:  Yes, Judge, I can do that.

16                  THE COURT:  Any objection?

17                  MR. MILLMAN:  No, your Honor.

18                  THE COURT:  What?

19                  MR. MILLMAN:  No, your Honor, no.

20                  THE COURT:  Good.  It's received.

21                  (People's Exhibit 57, previously marked for

22      identification, is received and marked in evidence.)

23      Q.    Detective, I'm going to give you a marker, a

24      Sharpie.  If you could please write underneath marker two

25      what was depicted at marker two?

1                  (The witness complied.)

2                  THE COURT:  What did you write?

3                  THE WITNESS:  Knife.

4                  THE COURT:  I just want the record to refer

5        to it.

6                  THE WITNESS:  No, I understand, your Honor.

7        Q.    And if you could please -- do you see on that

8    sketch what was depicted at yellow cone number two?

9        A.    Yellow cone two is evidence item number four which

10   is the black do-rag.

11       Q.    Without writing over any of the other marker

12   cones, if you could please write what yellow cone two is on

13   that sketch.

14                 (The witness complied.)

15       A.    I wrote black do-rag.

16       Q.    And if you could please, the location of placard

17   number one, location of Armando Villatoro, if you could

18   write the initials A.V. for Armando Villatoro.

19                 (The witness complied.)

20       A.    A.V.

21       Q.    And if you could please indicate under the yellow

22   cone number eight what item was at that location?

23                 (The witness complied.)

24       A.    There was two items at yellow cone eight.  There

25   was the opened Coors Light bottle and the black sweat shirt.

1       Q.    Well, with respect to --

2             THE COURT:  Which you previously referred to

3       as a hoody?

4             THE WITNESS:  Yes, sir.

5             THE COURT:  Okay.

6       Q.    Well, then with respect to -- could you please

7  write Coors Light bottle at yellow cone number eight?

8             (The witness complied.)

9       A.    Coors Light bottle.

10      Q.    Thank you, Detective.  You could have a seat.

11  I'll take that marker back.  Now, I'm going to direct your

12  attention now, Detective, to the next day, September 29th of

13  2010.  Were you present at the E building in North Bellmore?

14      A.    Yes, ma'am.

15      Q.    And what's the E building?

16      A.    It's the highway building, and it's located at

17  1255 Newbridge Road in North Bellmore.

18      Q.    And at that time, did you process a car at that

19  location?

20      A.    Yes, ma'am.

21      Q.    And was that a 1999 Acura registration EWB6427?

22      A.    Yes.

23      Q.    And what did you do with respect to the car as far

24  as processing goes?

25      A.    I executed a search warrant on the vehicle, and I

Det. K. Mazzie - People - Direct     586

1    documented the vehicle with photography, and I collected

2    various items of evidence, potential evidence.

3         Q.   Did you notice any biological evidence in that

4    vehicle?

5         A.   Yes, ma'am.

6         Q.   What type of biological evidence?

7         A.   There was bloodstains in the vehicle.

8         Q.   Do you recall the location that you observed what

9    appeared to be blood?

10        A.   Yes.

11        Q.   And what were those locations?

12        A.   The passenger side rear door, the interior door

13   panel, there was a red stain on that.  The passenger side

14   rear seat back had a red stain on it, and the passenger side

15   rear seat, the headliner, above that area had blood on it.

16        Q.   When you say headliner, what area is that of the

17   car?

18        A.   The interior of the vehicle, the ceiling above

19   you.

20        Q.   So it's the ceiling?

21        A.   I guess so.

22        Q.   And did you take photographs of those items?

23        A.   Yes.

24        Q.   And did you notice blood anywhere else in the car?

25        A.   Yes.  I believed there to be blood on a white box

J.H.

1    which was on the rear seat of the vehicle.

2         Q.   So that was a separate object within the car; is

3    that correct?

4         A.   Yes, ma'am.

5              MS. ABDI:   I would like to -- if I could just

6         have the detective step down for this portion as well.

7              THE COURT:   What do you want to do?

8              MS. ABDI:   I'm going to show items on the

9         presenter, and I would like to have the detective

10        explain those items.

11             THE COURT:   Have those items been introduced

12        in evidence?

13             MS. ABDI:   Yes.

14             THE COURT:   Okay.  Go ahead.

15        Q.   Detective, I'm showing you what has been marked as

16   People's Exhibit 48 for identification -- I'm sorry, in

17   evidence.  What is depicted in this photograph?

18        A.   That's the Acura.  It's the front driver's side,

19   just a general view of the vehicle that I processed.

20        Q.   And I know it's hard to see, but that's the

21   license plate of the car that you processed; is that

22   correct?

23        A.   Yes.

24        Q.   I would like to show you what is marked as

25   People's Exhibit 49 for evidence.  What is depicted in

J.H.

Det. K. Mazzie - People - Direct       588

1    there?

2         A.    This is the interior of the vehicle, just the rear

3    seat area.  You'll see that white box which I was talking

4    about and other items, a plastic bag here, a sweat shirt,

5    another green plastic bag there.

6         Q.    This is item number 49.

7                   THE COURT:  A green plastic bag?

8                   THE WITNESS:  Yes, sir.

9                   THE COURT:  Does it appear black in that

10   photograph?

11                  THE WITNESS:  No, you can see it's green, I

12   believe.

13                  THE COURT:  Oh, I see, I'm sorry.

14        Q.    Showing you what has been marked as People's

15   Exhibit 50, what is depicted in this photograph?

16        A.    This is the white box which I removed from the

17   rear seat area and placed it for just a photo.  This is the

18   red stain.

19        Q.    And I'm showing you what's marked as People's

20   Exhibit 51 in evidence.  What is depicted in this

21   photograph?

22        A.    This is the passenger side rear door interior

23   panel which I described earlier.  This is labeled A which is

24   a label I placed there in its location of the red stain.

25        Q.    I'm showing you what is marked as People's Exhibit

Det. K. Mazzie - People - Direct      589

1    52.

2        A.    This is a close-up of that panel at A, and here

3    you could see more clearly the red stain.

4        Q.    I'm showing you what is marked as People's Exhibit

5    53 in evidence.

6        A.    This is the passenger side rear seat back with

7    label B which I placed there, and adjacent to that is a red

8    stain.

9        Q.    I'm showing you now 54 in evidence.

10       A.    And this is a close-up of the red stain on the

11   seat back at label B.

12       Q.    And I am showing you what's marked as People's

13   Exhibit 55 in evidence.

14       A.    This is the passenger side rear seat ceiling or

15   headliner of the vehicle with blood and label C which I

16   placed there.

17       Q.    And showing you what is marked as People's 56,

18   what is depicted this that photograph?

19       A.    Again, my label C with a close-up of the blood.

20       Q.    I just ask you to please take the seat again.

21             THE COURT:   I have another matters to attend

22       to this morning, so gear yourself to stop me quarter

23       after 12.   If you're finished before that, fine.

24             MS. ABDI:   I probably won't be.   Would you

25       like me to stop now and continue later?

Det. K. Mazzie - People - Direct      590

1            THE COURT:  No.

2            MS. ABDI:  Okay.

3            THE COURT:  Quarter after 12.

4       Q.   Now, I'm just going to direct your attention back

5  to the scene for one minute.  Did you recover any ballistic

6  evidence at all from the scene?

7       A.   No, ma'am.

8       Q.   I'm now going to show you --

9            THE COURT:  And ballistic evidence is

10       firearms, cartridge casings, bullets and things like

11       that?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  Okay.

14       Q.   Before I do that, with respect to the swabs that

15  you took from the car, with respect to those items, were

16  they also collected under the case report number

17  210CR0082502?

18       A.   Yes, ma'am.

19       Q.   So that's the same case report number that all the

20  evidence was collected under; is that correct?

21       A.   That's correct.

22       Q.   And with respect to the swabs, do you also assign

23  them crime scene numbers?

24       A.   Yes.  They get crime scene evidence item numbers.

25       Q.   Do you recall what is the crime scene evidence

Det. K. Mazzie - People - Direct        591

1   number that you assigned to those swabs?

2        A.    I would have to refer to my paperwork.

3              MS. ABDI:   I would like to have this two-page

4        document marked as People's Exhibit 59.  It's a crime

5        scene examination report from the car for

6        identification.

7              (People's Exhibit 59 is marked for

8        identification.)

9        Q.    Detective, if I could just have you look at that

10   item.   And if you could just take a look at and look up when

11   you are done.

12             With respect to the swabs that you spoke about

13   before that you collected from the car, can you describe the

14   crime scene numbers that you gave to those items?

15       A.    Evidence item 24 was for the blood swab at label

16   A.    Evidence item number 25 was for the blood swab at label

17   B, and evidence item number 26 was for the blood swab at

18   label C.

19       Q.    And with respect to the cardboard box and the

20   swab, what item number was that?

21       A.    That was evidence item number 27.

22             MS. ABDI:   I would like to have this marked

23       as People's Exhibit 60 for identification.

24             (People's Exhibit 60 is marked for

25       identification.)

Det. K. Mazzie - People - Direct      592

1        Q.   Detective, you are being shown what is marked as

2    People's Exhibit 60 for identification.  Do you recognize

3    what that item is?

4        A.   Yes.  This is an evidence box for knives.

5        Q.   And is that the evidence box that you packaged the

6    knife you recovered from the scene in?

7        A.   Yes, ma'am.

8        Q.   And how do you know that?

9        A.   I sealed the box up with evidence tape, and I

10   placed this blue evidence tape here, and I placed my

11   initials and the date.

12       Q.   And that is in a sealed condition; is that

13   correct?

14       A.   Yes.

15       Q.   And there are other evidence tape on that box; is

16   that correct?

17       A.   That's correct.

18       Q.   And that's from other testing that was done after

19   you received it; is that correct?

20       A.   That's correct.

21       Q.   But that original box was sealed with your

22   initials and date?

23       A.   Correct.

24       Q.   I would just ask if you can open that item at this

25   point.

J.H.

Det. K. Mazzie - People - Direct      593

1          THE COURT:  Well, I assume you don't want to

2      introduce a box.  I assume you want to introduce the

3      knife.

4          MS. ABDI:  Yes, Judge.

5          THE COURT:  Okay.

6      Q.   Detective, do you recognize that item?

7      A.   Yes.

8      Q.   And what is that item?

9      A.   This is the knife that I recovered from the

10     roadway at marker two.

11     Q.   Is it in the same or substantially the same

12     condition as when you recovered it?

13     A.   Yes.

14         MS. ABDI:  Your Honor, at this time I would

15     offer that item into evidence.

16         THE COURT:  Defendant?

17         MR. MILLMAN:  No objection.

18         THE COURT:  It's received.  Let me see.

19         (People's Exhibit 60, previously marked for

20     identification, is received and marked in evidence.)

21         THE COURT:  We're going to break at this

22     particular time.

23         Ladies and gentlemen, as you saw, the

24     detective put on gloves before he opened this

25     particular exhibit.  I'm going to put the exhibit on

Det. K. Mazzie - People - Direct       594

1       the bar now, and I'm going to ask you to look at it as

2       you leave.

3                   Then after that, follow the admonitions I

4       have given you yesterday, like don't discuss this case

5       or anything like that.   Put it on the bar, and take a

6       look at it as you leave, and we'll see you at 2.

7                   (Whereupon, the jury exits the courtroom.)

8                   THE COURT:   Okay, ladies and gentlemen, 2

9       o'clock.

10                  (Whereupon, a luncheon recess was taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A F T E R N O O N   S E S S I O N
 2                THE CLERK:  Recalling case on trial, People
 3        of the State of New York versus Ulises Bonilla,
 4        Indictment 202N of 2011.  All parties present including
 5        the defendant and the Spanish interpreter.  There are
 6        no jurors present.
 7                THE COURT:  Does anyone want to place
 8        anything on the record before we bring in the jury?
 9                MR. MILLMAN:  Yes, your Honor.  First of all,
10        I had a conversation with the Assistant DA pertaining
11        to a witness, Oscar Bonilla, and, you know, certainly I
12        have a right to subpoena him at my option as a courtesy
13        since the Assistant DA said it could cause either
14        confusion or difficulty.  The Assistant DA has
15        represented that she will definitely be calling him as
16        a witness at this trial.  I don't need to know the
17        exact time.  Based upon that representation, you know,
18        I'm not going to subpoena him.  I just wanted to have
19        the Assistant DA represent that on the record.
20                THE COURT:  All right.  And if she doesn't
21        call him?
22                MR. MILLMAN:  Well, I mean if she can't give
23        me a firm representation now, then I'm just going to
24        have a subpoena served.  I need to make sure that, you
25        know, I cover myself.
```

J.H.

Proceedings                                    596

1           THE COURT:  It would be nice if she makes

2      that representation to you.  You're not bound by it

3      obviously.

4           MR. MILLMAN:  No, I understand.

5           THE COURT:  And there are substantive issues

6      as to who calls a particular witness.  Because if the

7      People call him, unless they can show hostility, it's

8      their witness, and they can't cross-examine, and you

9      can.

10          MR. MILLMAN:  Yes.

11          THE COURT:  So there are tactics involved,

12     but at least we know them now.

13          MR. MILLMAN:  It's her right if she chooses

14     not to call.  But I would need a representation.

15          THE COURT:  We'll work with you.  I'll work

16     with you.

17          MR. MILLMAN:  Okay.

18          THE COURT:  I'll work with you.

19          MR. MILLMAN:  Okay.

20          MS. ABDI:  Judge, I just wanted the record to

21     be clear I did tell defense counsel that it was my

22     intention of calling Oscar Villatoro and that if

23     something changed, I would, of course, let him know

24     immediately, and it still remains my intention to call

25     him.

1      THE COURT:  Sometimes you change your mind.

2  I understand that.

3      MS. ABDI:  And judge, I just think there was

4  something else we had to put on the record with respect

5  to a translation issue that arose yesterday.  If could

6  I just have the interpreter place that on the record.

7      THE COURT:  All right, well, the interpreter

8  came up to me in the last ten minutes and told me what

9  happened yesterday.  And the wife of the deceased

10  testified that her daughter -- excuse me, sister of the

11  defendant, she saw her stab the deceased twice in the

12  back.  I was quite taken back by that, and at that

13  particular time, I called both counsel over, and I said

14  this is news to me.  I never heard anything like this.

15  And both you and Mr. Millman said no, she has to be

16  confused or something like that.

17      We went back, and we rehashed the whole

18  subject matter.  And she basically said that she saw

19  the sister of the deceased hit -- the sister of the

20  defendant hit the deceased in the back but did not see

21  him stab him, and she never saw a knife used by anyone.

22      MS. ABDI:  I think, Judge, that's correct.

23  However, I think that the issue that the translator had

24  mentioned to defense counsel that it wasn't an error in

25  speaking by the witness.  It was the original error was

Proceedings                            598

 1         an error in translation by the translator.  She

 2         translated incorrectly to stabbing.  I think that's the

 3         issue that she brought up to us earlier.

 4                     THE COURT:  Is that true?

 5                     THE INTERPRETER:  It is.

 6                     THE COURT:  All right, then you want that

 7         corrected?

 8                     MS. ABDI:  Well, I just want the record to be

 9         clear that it was not the witness who said that.  It

10         was just an error in translation.

11                     THE COURT:  The record's clear.  Is the jury

12         clear?

13                     MS. ABDI:  Yes, Judge, I would like that to

14         be corrected.

15                     THE COURT:  Okay.

16                     (Detective Kenneth Mazzie returned to the

17         witness stand.)

18                     THE CLERK:  Let the record reflect the

19         witness, Detective Mazzie, is returning to the stand.

20         Detective, you're reminded you are still under oath.

21                     THE WITNESS:  Yes, sir.

22                     COURT OFFICER:  Jury entering.

23                     (The jury enters the courtroom.)

24                     THE CLERK:  Let the record reflect the

25         presence of the jury.  And do both sides waive a

J.H.

Proceedings                               599

1     reading of the roll and consent to seating?

2                    MS. ABDI:   Yes.

3                    MR. MILLMAN:   Yes.

4                    THE CLERK:   Thank you.

5                    THE COURT:   All right, ladies and gentlemen,

6     yesterday when the deceased wife was testifying, she

7     was talking very, very fast, and she made a statement

8     that she saw the defendant's sister stab the deceased

9     in the back.

10                   After that, I had a conversation with the

11    lawyers, and then we came back, and I told her it was

12    necessary to slow down so that the reporter can more

13    accurately do a simultaneous transaction --

14    translation.   And then she basically said she saw the

15    defendant's sister hit the defendant in the back -- the

16    deceased in the back and didn't see any knife on

17    anyone.

18                   Now, the translator has something to tell

19    you.

20                   THE INTERPRETER:   Okay, by the interpreter,

21    yesterday when Susana Villatoro was being questioned,

22    she used the word punetazo, P-U-N-E-T-A-Z-O, which I

23    interpreted as stabbing.   The second time that she was

24    questioned, she used the word, and I asked for

25    clarification.   She indicated that she meant two fist

1       punches.  So I want that clear on the record.

2                   THE COURT:  Okay, you're telling the jury you

3       made an error in the translation, and you want to

4       correct it at this time?

5                   THE INTERPRETER:  I want to correct it

6       because it does mean both things.  But the way she

7       meant it was a fist punch and not a stabbing.

8                   THE COURT:  Okay.  Let's proceed with the

9       examination of Detective Mazzie.

10      DIRECT EXAMINATION

11      BY MS. ABDI:  (CONTINUED)

12          Q.   Detective, I would just like to hand you what is

13      already in evidence as People's Exhibit 60.  Detective, do

14      you have that in front of you?

15          A.   Yes, ma'am.

16          Q.   I would just ask if you could remove that item

17      from the box and display it for the jury.

18                   (The witness complied.)

19          Q.   Thank you, Detective.

20                   MS. ABDI:  Your Honor, I would like to have

21      these items marked I believe I'm up to 61; is that

22      correct?  I would like to have these items marked

23      People's Exhibits 61 through 70 for identification.

24                   (People's Exhibits 61 through 70 are marked

25      for identification.)

1            MS. ABDI:  I would ask that People's Exhibit

2       61 be shown to the witness.

3       Q.   Detective, do you recognize what item number 61

4  is?

5       A.   Yes.

6       Q.   What is it?

7       A.   It's the Coors Light beer bottle which was

8  recovered from the walkway.  I believe it was yellow cone

9  eight, I think.

10       Q.   Do you see your markings on that item?

11       A.   Yes my handwriting's on it.  This blue evidence

12  tape was placed on it by me, my initials and the date.

13       Q.   And is it in a sealed condition?

14       A.   Yes.

15       Q.   And I would like you now to look at People's

16  Exhibits 62 and 63.

17            THE COURT:  Other than this being a found

18       beer bottle, does that have any relevancy in this case?

19            MS. ABDI:  Yes.

20            THE COURT:  Okay.

21       Q.   What number are you looking at now?

22       A.   This is evidence item number 27, which is People's

23  Exhibit 62.

24       Q.   And do you recognize what that item is?

25       A.   Yes, contained within this bag is the cardboard

1     box which was recovered from the motor vehicle on top of the

2     seat.  This is the packaging I used for this.  This blue

3     tape was applied by me, it has my initials and has the date.

4          Q.   And is it in a sealed condition?

5          A.   Yes.

6          Q.   Now move on to Exhibit 63.

7                    THE COURT:  I assume sooner or later you are

8          going to introduce those?

9                    MS. ABDI:  Yes, your Honor.

10                   THE COURT:  Because Detective Mazzie is

11         telling this jury an assumption unless he has x-ray

12         vision.

13         Q.   63 is -- do you recognize what that item is?

14         A.   Yes.

15         Q.   And what is it?

16         A.   Contained within this bag is the black do-rag

17    which was recovered from the roadway at yellow cone two.

18    Again, it's the bag I used to place it in, and the blue tape

19    was applied by me with my initials and date on it.

20         Q.   Is that in a sealed condition?

21         A.   Yes.

22         Q.   Now, I would like you to take a look at exhibits

23    64 through 70.

24         A.   Yes.

25         Q.   And Detective, was I just correct with People's

1    exhibits numbers?

2         A.   Yes, you are correct, 64 through 70.

3         Q.   What are those small items?

4         A.   These are swabs I took from various locations.

5         Q.   And what do you mean by a swab?

6         A.   A swab basically is -- it's a large Q-Tip with a

7    cotton tip at one end. And it comes in a sterile package.

8    And we use it to collect biological evidence.  In this

9    particular case, it was to collect the blood evidence.

10        Now, the Q-Tip is dry unless you apply sterile

11   water to it.  Now, there's no need to dampen the Q-Tip if

12   the blood or the item you are touching is wet. But if it's

13   dry, you would moisten it with sterile water, and would you

14   dab the area or swab the area to collect it.  You then place

15   it in what's called a plastic swab shield, and it's placed

16   in that shield so it has an area to dry and so it doesn't

17   come into contact with anything.  And then from three, it's

18   placed into this envelope which on each one of these it's

19   sealed with blue tape with my initials and the date.

20        Q.   Now, with respect to People's Exhibits 61, 62 and

21   63, could you just open those items.

22             THE COURT:   Those are the bags?

23             MR. MILLMAN:   Your Honor, if he's going to be

24        removing something that hasn't been admitted yet, I

25        would just ask to be heard on that. None of these

J.H.

Det. K. Mazzie - People - Direct      604

1      items have been moved into evidence yet.

2                  THE COURT:  The question is would you open

3      the bag.  That's the question.

4                  MR. MILLMAN:  I thought I saw him -- okay.

5                  THE COURT:  And he's opening the bag.

6      Q.   If you could just take a look at that item.

7      A.   Just to review, this is People's Exhibit 61.

8      Q.   Just take a look at the item without removing it.

9  Do you recognize that item?

10     A.   Yes.

11     Q.   And what is that item?

12     A.   It's the 40 ounce Coors Light bottle.

13     Q.   Is it in the same or substantially the same

14  condition as when you saw it?

15     A.   Yes.

16     Q.   Can you please do the same for Exhibit 62 and 63.

17                 THE COURT:  Before we go any further, you

18     gathered these things for the purposes of testing?

19                 THE WITNESS:  Yes, sir.

20                 THE COURT:  Now, with regard to People's

21     Exhibit 61 for identification, the Coors bottle, that

22     was submitted for testing, correct?

23                 THE WITNESS:  Yes, sir.

24                 THE COURT:  And just say yes or no, was it

25     tested?

J.H.

Det. K. Mazzie - People - Direct      605

1            THE WITNESS:  Yes, sir.

2            THE COURT:  And then it was resealed by

3       someone else outside of your presence, correct?

4            THE WITNESS:  That's correct.

5            THE COURT:  Understand?  Go ahead.

6       Q.   Would you please open up item 62.  Without

7  removing it, do you recognize that item?

8       A.   Yes.

9       Q.   And what is that item?

10      A.   This is the white cardboard box from the rear of

11  the motor vehicle.

12      Q.   Is that in the same or substantially the same

13  condition as when you recovered it?

14      A.   Yes.

15      Q.   Are there any alterations to it that you could

16  see?

17      A.   Yes, there appears to be some cutouts on the box.

18            THE INTERPRETER:  I'm sorry, can you repeat

19       that?

20            THE COURT:  Cutouts on the box.

21            THE INTERPRETER:  Thank you.

22      Q.   And that was done during testing; is that correct?

23      A.   Yes.

24      Q.   And when you submitted it, it was intact as far as

25  there were no cutouts?

J.H.

Det. K. Mazzie - People - Direct        606

1        A.    That's correct.

2        Q.    And if you could please open Exhibit 63.  Do you

3    recognize that item?

4        A.    Yes.

5        Q.    What is that item?

6        A.    This is the black do-rag.

7        Q.    Were you able to see if that was in the same or

8    substantially the same condition as when you packaged it?

9        A.    Without removing it completely, it appears to be

10   in the same condition.

11       Q.    Can you see if anything was cut out of that item?

12       A.    Yeah, there appears to be a cutout in the back of

13   the item.

14       Q.    And that was pursuant to testing; is that correct?

15       A.    That's correct.

16       Q.    And when you received it -- when you recovered it,

17   it had no cutouts, correct?

18       A.    That's correct.

19       Q.    And with respect to --

20             THE COURT:  Now, is there going to come a

21        time that you are going to introduce these?

22             MS. ABDI:  Yes.

23             THE COURT:  And I assume you want a voir

24        dire?

25             MR. MILLMAN:  Very, very briefly.

1          THE COURT:  Well, I want you to do the voir

2     dire singularly, not on seven or eight exhibits.  So if

3     you are going to introduce them, start introducing it

4     now.

5     Q.    Just with respect to items 65 through 69 -- I'm

6     sorry, 65 through --

7     A.    Should be 64 through 70.

8     Q.    Detective, you have in front of you items 64

9     through 70?

10    A.    Yes.

11    Q.    And your initials appear on those items?

12    A.    Yes, ma'am.

13    Q.    And at the time you submitted those swabs for

14    testing, did you submit them in a sealed condition?

15    A.    Yes.

16    Q.    Are there any other markings on them now that were

17    different than when you submitted them?

18    A.    Yes, ma'am.  The red tape on the bottom was

19    applied by somebody else.

20    Q.    Does that --

21    A.    And it's consistent with all of these, yes.

22          MS. ABDI:  Your Honor, at this time I offer

23    Exhibit 61 into evidence through this witness.

24          THE COURT:  Any objection?

25          MR. MILLMAN:  I do have voir dire.

1            THE COURT:  Okay.

2     VOIR DIRE EXAMINATION

3     BY MR. MILLMAN:

4          Q.   Detective, good afternoon.

5          A.   Good afternoon.

6          Q.   Detective, the Exhibit 61, that bottle, did you,

7     yourself, place that bottle initially into that box before

8     sealing it?

9          A.   Yes, sir.

10         Q.   And it was submitted for testing, I think you

11    said?

12         A.   Yes, sir.

13         Q.   Who was it tested by?

14         A.   It was sent for testing for latent fingerprints

15    and for DNA testing.

16         Q.   Is there a seal on there from either latents or

17    DNA on the bag that that bottle is in?

18         A.   There may be.  But I'm really not familiar with

19    the type of seal that each one of those units uses.  For

20    instance, I don't know if DNA used the red tape or the

21    yellow or latents used the red tape or the yellow.

22         Q.   What are the tapes or sealing on that bag that you

23    yourself did not place there?

24         A.   Yes, the yellow tape was not placed by myself nor

25    was the red.  And this blue label at the top was not placed

Det. K. Mazzie – People – Direct       609

1   by myself.  However, this yellow label was placed by me.

2       Q.   But you, yourself, don't know where the seal is

3   that was placed there after it was tested?

4       A.   Again, it's sealed in these bottom corners of the

5   bag.

6       Q.   But you don't know who sealed them?

7       A.   No, I cannot read their initials.

8            MR. MILLMAN:  Your Honor, I would just

9        object.

10           THE COURT:  All right, ladies and gentlemen,

11       I will receive this item subject to connection, which

12       means it has to be connected up with other evidence

13       indicating something more than simply a discarded beer

14       bottle in the street.  If it can't be connected up, it

15       will be withdrawn from evidence.  Understand?  Okay.

16   DIRECT EXAMINATION

17   BY MS. ABDI:  (CONTINUED)

18       Q.   Well, Detective, just to be clear, that is the

19   bottle that you recovered at the scene on September 28th,

20   2010; is that correct?

21       A.   Yes, ma'am.

22       Q.   And the bottle is in the same or substantially the

23   same condition as when you recovered it; is that correct?

24       A.   Yes.

25            MS. ABDI:  Your Honor, I would still offer it

1    into evidence as it's not a fungible object.

2          THE COURT:  And I'm telling you evidence has

3    to be relevant.  Now, relevancy can come about in a

4    number of ways.  But right now, it's admitted subject

5    to connection.

6          MS. ABDI:  Okay.  I'm sorry, you mean it's

7    admitted into evidence subject to connection?

8          THE COURT:  Yes.

9          MS. ABDI:  I'm sorry, I didn't understand.

10         (People's Exhibit 61, previously marked for

11   identification, is received and marked in evidence.)

12         MS. ABDI:  Your Honor, with respect to the

13   rest of the items, items 62 through 70, then I would

14   ask that they also be admitted subject to connection.

15         THE COURT:  Do you have any problem with that

16   ruling, admitted subject to connection?

17         MR. MILLMAN:  With the understanding that the

18   basis of my objection would be the same as stated for

19   61.  If he does not know who sealed it, my position

20   would be the same.  I would have the same objection.

21         THE COURT:  Right now with regard to the beer

22   bottle, it's being admitted simply as a beer bottle.

23         MR. MILLMAN:  Certainly, your Honor.

24         THE COURT:  That's it.  Now, I don't know

25   what was tested on that particular beer bottle, and I'm

J.H.

Det. K. Mazzie - People - Direct          611

1        not saying you should speculate. But what if there's a

2        set of prints on that beer bottle? That might be

3        relevant.

4                   MR. MILLMAN: The basis --

5                   THE COURT: And if it's a set of someone

6        else's prints, that might be relevant too. But right

7        now, all it is is a beer bottle found on the street.

8                   MR. MILLMAN: I understand. The basis of my

9        objection is not on the ground of relevance but rather

10       on authentication, and that's the basis of my

11       objection.

12                  THE COURT: That part is overruled. This

13       officer authenticated it. Its relevancy in this

14       particular case is still up in the air.

15                  Now, with that backdrop in mind, can we

16       introduce the other ones subject to connection?

17                  MR. MILLMAN: I still have my objection on

18       the same ground, your Honor.

19                  THE COURT: All right. Do you wish to

20       conduct any further voir dire?

21                  MR. MILLMAN: If I may, your Honor.

22                  THE COURT: Do it singularly.

23  VOIR DIRE EXAMINATION

24  BY MR. MILLMAN:

25       Q.   Detective, with regard to Exhibit 62, there are

1    sealings on that that you, yourself, did not place there?

2         A.   Yes, sir.

3         Q.   Do you know where they came from?

4         A.   No, sir.

5         Q.   With respect to Exhibit 63, I have the same

6    question, are there sealings on that item, on the bag that

7    you did not place there?

8         A.   Yes.

9         Q.   Do you know where they came from?

10        A.   No, sir.

11        Q.   Same question, Exhibit 64.

12        A.   Yes, 64.

13        Q.   The sealings, are there some seals on there that

14   you, yourself, did not place?

15        A.   Yes.  I didn't place this red seal or this blue.

16        Q.   Do you know where either of those came from?

17        A.   No, sir.

18        Q.   Exhibit 65.

19        A.   Again, it's the same.  I placed the blue, and the

20   red and this blue sticker was not placed by me.

21        Q.   And 66.

22        A.   Again, it's the same.  I placed the blue sticker

23   on with my initials and date, and the red and this blue

24   sticker was placed by somebody else.

25        Q.   68.

1        A.    67.

2        Q.    67.

3        A.    Again, blue is by me, the red and the blue sticker

4    is by somebody else.

5        Q.    And 68.

6        A.    Same blue is placed by myself, and the red and

7    this blue sticker was placed by somebody else.

8        Q.    69.

9        A.    The blue sticker was placed by myself.  The red

10   and the blue sticker was placed by somebody else.  And 70,

11   the blue was placed by myself, but the red and this blue

12   sticker was placed by somebody else.

13       Q.    Detective, although you don't know where those

14   additional seals on each of those items came from, do they

15   look familiar as to the type of sealing that you would see

16   from one of the testing bureaus in the Nassau County Police

17   Department?

18       A.    Yes, sir.

19             MR. MILLMAN:  Your Honor, I'll withdraw the

20        objection subject to connection.

21             THE COURT:  They are received in evidence,

22        all of these items received in evidence subject to

23        connection.

24             (People's Exhibits 62 through 70, previously

25        marked for identification, are received and marked in

J.H.

Det. K. Mazzie - People - Cross        614

1      evidence.)

2                   MS. ABDI:  I have no further questions of

3            this witness.

4                   THE COURT:  Cross-examination.

5                   MR. MILLMAN:  Your Honor, before we start, I

6            just need to know the exhibits.

7      CROSS-EXAMINATION

8      BY MR. MILLMAN:

9            Q.    Good afternoon, Detective.

10           A.    Good afternoon, sir.

11           Q.    Detective, the item that's been marked as Exhibit

12     57 which I'm going to hand to you just to be sure that we

13     are on the same page, I just want to ask you does that

14     contain a list of all the items that you recovered from the

15     scene of the crime?

16                  MS. ABDI:  Objection.

17                  THE COURT:  They are talking about the scene

18           exclusive of the car which was later processed.

19                  THE WITNESS:  Correct, I understand.

20           A.    Yes, sir.

21           Q.    But you, yourself, did not remove the car from the

22     scene, right?

23           A.    No, sir.

24           Q.    Now, with regard to the items on that list, the

25     first one, the knife, where did you submit that after it was

Det. K. Mazzie - People - Cross     615

1    sealed?

2         A.    That was forwarded to the DNA lab and the latent

3    fingerprint section.

4         Q.    What about item number two, the wristwatch?

5         A.    Also sent to the lab and to the latent fingerprint

6    section.

7         Q.    When you say lab, again, the DNA lab?

8         A.    Yes.  However, it's all inclusive, so meaning

9    that -- I don't know if I can explain anymore.  In other

10   words, it's determined by them where it's going to go for

11   further testing depending on the type of testing.

12               THE COURT:  There are different functions of

13          the police laboratory, correct?

14               THE WITNESS:  Yes, sir.

15               THE COURT:  Okay.

16        Q.    And with respect to item number two, did you

17   observe blood on the face or the back of that watch?

18               THE COURT:  Of the watch?

19               MR. MILLMAN:  Of the watch.

20        A.    I don't recall, sir.

21        Q.    Would there be any document that would reflect

22   whether or not blood had been observed and collected from

23   that watch?

24        A.    Possibly the results from the DNA lab if it was

25   tested.

J.H.

Det. K. Mazzie - People - Cross        616

1          MR. MILLMAN:  I apologize for the delay, your

2     Honor.

3          THE COURT:  Take your time.  When you are

4     through, come on up here for a second.  I want to ask

5     you a question.

6          MR. MILLMAN:  Sure.  Okay.

7          (A discussion was held off the record at the

8     bench outside of the hearing of the jury.)

9          MR. MILLMAN:  Your Honor, can we just

10    approach again?

11         (A discussion was held off the record at the

12    bench outside of the hearing of the jury.)

13         THE COURT:  To your knowledge, what happened

14    to the watch after you packaged it?

15         THE WITNESS:  It's placed in an evidence

16    locker in my office, and from there, it's removed by

17    one of the detectives in my office to headquarters.

18         THE COURT:  So it's basically speculation on

19    your part at this particular time as to --

20         THE INTERPRETER:  I can't hear you.

21         THE COURT:  Basically it's speculation on

22    your part at this particular time as to whether or not

23    the watch was analyzed; is that correct?

24         THE WITNESS:  That's correct.

25

1    CROSS-EXAMINATION

2    BY MR. MILLMAN:   (CONTINUED)

3         Q.   Detective, when you were at the scene, did you

4    look for any blood splattering that you would find to either

5    photograph or videotape?

6         A.   Yes.

7         Q.   And is there a procedure that you undertake to

8    determine what types of things you would collect as evidence

9    and which other things you would consider unlikely to be

10   evidence?  How do you determine what you take from the scene

11   as evidence?

12        A.   It's usually determined on the information I

13   receive.  So depending on the circumstances of each

14   particular case, which are obviously unique onto themselves,

15   as I receive information, I then use that information to

16   determine if there's any items available to me that way to

17   support or disprove the information that I receive.

18        Q.   And as you indicated, you don't always know at

19   that moment, of course, whether or not everything will turn

20   out to be important; you're there collecting the evidence,

21   right?

22        A.   That's correct.

23        Q.   Some things though am I correct in saying are

24   usually obvious such as blood that you would want to collect

25   that?

J.H.

Det. K. Mazzie - People - Cross      618

1        A.    Yes.   I mean the most obvious thing would be

2    blood, possibly clothing, weapons.   Those are obviously

3    important items that don't get overlooked.

4        Q.    And if there are things that aren't obviously

5    important, you would use your judgment based on what you

6    know about the case and to decide on that; would that be

7    fair to say?

8        A.    Yeah.   Again, based on information that I receive.

9        Q.    Let me ask you this:   Do you recall seeing

10   anything along the lines something similar to either a gauze

11   pad or bandage anywhere on the street?

12       A.    Excuse me, just repeat that, a bandage?

13       Q.    Sure, either a bandage or a gauze pad that was

14   white, do you recall seeing anything like that?

15       A.    There may have been something like that, and if

16   there was anything like that there, because when the

17   ambulance, when it arrives, obviously they are looking to

18   administer first aid.

19       Q.    And having seen something like that, that might

20   have not been something that you would have collected,

21   right?

22       A.    Possibly not, yes.

23            THE COURT:   I just want to ask a question on

24       a previous question that Mr. Millman asked.   From a

25       technical point of view, you took samples of blood

J.H.

Det. K. Mazzie - People - Cross      619

1       droppings, correct?

2               THE WITNESS:  Yeah, from the roadway and the

3       vehicle that was there.

4               THE COURT:  Now, in your field, blood

5       spattering may be different than blood droppings,

6       correct?

7               THE WITNESS:  That's correct.

8               THE COURT:  Okay.  Did you take any -- did

9       you observe any blood spattering specifically?

10              THE WITNESS:  Um, the vehicle, you could

11      consider that a spatter.  Whether that's a spatter from

12      trauma or from bleeding out for from what's called

13      castoff where you could have blood on an object and as

14      you are swinging or moving, it could come off of you

15      and be thrown onto something else.

16              THE COURT:  Okay.

17      Q.    And Detective, how long were you at the scene that

18      night?

19      A.    I arrived at approximately 2330, and I departed at

20      0425 hours.

21      Q.    04 --

22      A.    -- 25, 0425.

23              THE COURT:  Almost five hours?

24              THE WITNESS:  Approximately five hours, yes.

25      Q.    And would it be fair to say that during that time,

Det. K. Mazzie - People - Cross       620

1    you collected as much evidence as you determined to be

2    relevant at that time?

3         A.    Yes.

4         Q.    During the time that you were at the crime scene,

5    I know it varied at different points, but can you give me an

6    idea how many other police personnel were at the scene?

7                    MS. ABDI:  Objection.

8                    THE COURT:  Overruled.  And is your question

9             in total or at one time?  Because a lot of them come

10            and go.

11                   MR. MILLMAN:  Certainly.

12        Q.    What was the largest number of police personnel

13   that you recall being present while you were there at any

14   given time that night?

15        A.    I would only be guessing, sir.  To be honest with

16   you, it's -- I don't want to say it's not important to me,

17   but it's really not of my concern.  My concern is the scene,

18   obviously, gathering information and checking evidence.

19        Q.    You are focusing on --

20        A.    -- what I have to do, yes.

21        Q.    Would I be correct though in saying that the

22   entire time that you were there, there were at least three

23   other police personnel also present at the scene?

24        A.    Yes.

25        Q.    When you looked at the car, the Acura that you

1 testified about on direct examination, did you look through

2 that by yourself?

3     A.   I was assisted by my sergeant, Detective Sergeant

4 Armstrong, and Detective Torraville, T-O-R-R-A-V-I-L-L-E.

5     Q.   And did you search the entire inside of the car

6 for blood?

7     A.   Yes, sir.

8     Q.   And the ones that you testified about, those are

9 the only parts of that vehicle in which you observed the

10 blood?

11     A.   Correct.

12     Q.   Detective, did you, based on your examination of

13 the interior of the vehicle, see any indication that

14 anything on the seats, on the material of the seats, whether

15 it's the front or the back, had been either washed away or

16 scrubbed away?

17     A.   No.

18     Q.   Do you know what forensic lighting is?

19             THE COURT:  I'm sorry?

20             MR. MILLMAN:  Forensic lighting.

21     A.   Well, I term it alternate lighting.

22     Q.   Can you tell us what that is?

23     A.   Alternate lighting is normally it's UV lighting.

24 And there's different lenses you could use, again, for -- to

25 look for or seek the type of evidence you are looking for.

Det. K. Mazzie - People - Cross        622

1   It's not just blood.  It could be a lot of times we use it

2   for semen, for sex assault cases, bodily fluids.

3        Q.   Was that done in this case?

4        A.   Alternate lighting?

5        Q.   Yes.

6        A.   No, sir.

7             THE COURT:   Whatever you learned on CSI,

8        forget about.

9             THE WITNESS:   It is used sometimes.

10            THE COURT:   If they learned something on CSI,

11       forget about it.  You're the one who is giving

12       testimony here.

13       Q.   Detective, when you arrived, do you recall who the

14   police personnel that were present at the scene when you

15   arrived were?

16       A.   Detective Saggiano of the Third Squad was there.

17   I think it's Police Officer Rocco, if I could just check.

18   He was on time log, so I spoke with him.  There was probably

19   other officers there.  Offhand, I don't know their name.

20   Oh, and some point I think Detective Cereghino of the

21   Homicide Squad, he had arrived.

22       Q.   Do you remember if he was there before you got

23   there?

24       A.   I couldn't tell you that.  To be accurate, you

25   would have to check the time log.

Det. K. Mazzie - People - Cross        623

1       Q.    I did want to ask you something about what was

2    marked into evidence as Exhibit 58.  You prepared this,

3    correct?

4       A.    Detective Rinaldi prepared it from crime scene.

5       Q.    Would I be correct in saying though that this

6    vehicle was placed in this diagram because it had some

7    significance because there was blood that was collected from

8    it, right?

9       A.    Yes.

10       Q.    But that wasn't the only vehicle that was on the

11    street certainly at the time that you were there, right?

12       A.    That's correct.

13       Q.    There were number of other vehicles parked on the

14    street?

15       A.    Yes.

16       Q.    The do-rag that you collected, did it have any

17    blood on it?

18       A.    Not that I observed, nor do I recall.

19       Q.    You would have looked for that though, right?

20       A.    Not necessarily.

21       Q.    Do you have any knowledge of any blood ever having

22    been found on it?

23       A.    That's unknown to me.

24           MR. MILLMAN:  Detective, thank you.  That's

25       all I have.

J.H.

Det. P. Byrne - People - Direct       624

1            THE COURT:  You can step down.

2            THE WITNESS:  Thank you.

3            (The witness was excused.)

4            THE COURT:  Next witness.

5            MS. ABDI:  The People call Detective Patrick

6      Byrne.

7  D E T .  P A T R I C K  B Y R N E , Shield 1172, a witness

8      called on behalf of the People, after having been first

9      duly sworn by the Clerk of the Court, was examined and

10     testified upon his oath as follows:

11           THE CLERK:  In a loud, clear voice, please

12     state your name and spell your last name.

13           THE WITNESS:  Patrick Byrne, B-Y-R-N-E.

14           THE CLERK:  And give your shield and command.

15           THE WITNESS:  Shield 1172, identification

16     section.

17           THE CLERK:  Thank you.

18           MS. ABDI:  May I inquire, your Honor?

19           THE COURT:  Sure.

20           MS. ABDI:  Thank you.

21  DIRECT EXAMINATION

22  BY MS. ABDI:

23     Q.   Good afternoon, Detective.

24     A.   Good afternoon.

25     Q.   How long have you been a detective in Nassau

J.H.

Det. P. Byrne - People - Direct      625

1    County?

2        A.   Six years.

3        Q.   And how long have you been a police officer in

4    Nassau County?

5        A.   Twenty-six years.

6        Q.   What is your current assignment?

7        A.   I work in the identification section.

8        Q.   And what do you do in the identification section?

9        A.   We intake evidence from various squads throughout

10   Nassau County looking for fingerprint evidence.

11       Q.   And describe what you do in that section.

12       A.   In that section, like I said, we will intake

13   evidence from various squads and smaller police departments,

14   take the evidence, process it looking for any kind of

15   fingerprint evidence.

16       Q.   And can you just describe your training with

17   respect to latent -- the analysis of latent fingerprints.

18       A.   In addition to my training, on-the-job training

19   with the police department, I have taken several courses

20   being levels one, two and three with the Division of

21   Criminal Justice Services, level three being the highest

22   level that you can attain in New York State.

23            I've also taken an advanced chemical latent

24   processing course sponsored by Ron Smith & Associates and

25   given by the Michigan State Police.  I took a course

Det. P. Byrne - People - Direct        626

1   sponsored by the FBI hosted by the Nassau County Police

2   Department on fingerprints and identifications.

3        Q.   Okay, Detective, now, approximately how long have

4   you been working in the field of the analysis of latent

5   fingerprints?

6        A.   I was assigned about six years ago.

7        Q.   And have you testified as an expert before in the

8   field of latent fingerprints?

9        A.   Yes, I have.

10       Q.   Approximately how many times have you testified?

11       A.   Ten or 15.

12       Q.   In what jurisdictions?

13       A.   Nassau County.

14       Q.   And approximately in the course of your career,

15   how many items have you processed for latent fingerprints?

16       A.   Hundreds, maybe into the thousands.

17            MS. ABDI:   Your Honor, I offer Detective

18       Byrne as an expert in the field of the analysis of

19       latent fingerprints.

20            THE COURT:   Any voir dire?

21            MR. MILLMAN:   No, that's all right.   No

22       objection, your Honor.

23            THE COURT:   All right, ladies and gentlemen,

24       basically a witness has to testify to facts.   There is

25       an exception if a person has a degree of expertise

J.H.

1    outside of the ken, the area of a petit jury, and then

2    he is allowed to testify as to his opinion.

3              I'm going to give you an instruction on this

4    later on, and you can accept or reject that opinion.

5    Lay people ordinarily cannot testify to opinions even

6    though they have them.  I might have an opinion as to

7    who is better, the Jets or the Giants, but I'm not

8    doing that.  I know you have an opinion.

9              THE WITNESS:  I do.

10   Q.    And Detective, just to be clear, you don't test

11   any items for the presence of blood?

12   A.    No, I do not.

13   Q.    Now, with respect to case number 210CR82502, the

14   investigation into the death of Armando Villatoro, did you

15   receive certain items of evidence for processing?

16   A.    Yes, I did.

17   Q.    Now, before I get to that, can you just tell the

18   jury what do you mean by a latent fingerprint?

19   A.    Well, latent fingerprint is usually not seen by

20   the naked eye.  It would have to be brought out by various

21   maybe chemicals or powders that we test it with.

22   Q.    And does everybody leave a latent fingerprint

23   every time they touch something?

24   A.    No, they don't.

25   Q.    What kind of factors would affect whether or not

1    you leave a latent fingerprint?

2        A.    Well, factors are types of surfaces.  A cloth

3    surface is not conducive to fingerprints.  Glass may leave

4    it, metal.  A shiny metal may or may not depending if you

5    have -- even lately, there's the new stainless steel

6    refrigerators and stoves.  They are made with fingerprint --

7    I guess they just don't leave the fingerprints there because

8    it's easier to clean that way.

9        Q.    Now, I'm going to ask you about a certain piece of

10   evidence that you received in connection with this case.

11   Did you receive a black handled knife in connection with

12   this case?

13       A.    Yes, I did.

14       Q.    And did you process that for the presence of any

15   fingerprints?

16       A.    Yes.

17       Q.    And were you able to find any fingerprints on that

18   knife?

19       A.    No, I was not.

20       Q.    Is that unusual?

21       A.    No, it's not unusual.

22       Q.    Why is that?

23       A.    Well, for two reasons.  If you look at an average

24   knife, a handle would probably be wood or plastic.  If it

25   has any kind of ridges or raised surface, it's not going to

Det. P. Byrne - People - Direct        629

1    be conducive to leaving fingerprints.  And the actual

2    surface of a blade, although metal might be conducive

3    leaving a fingerprint, it's usually very small.  That would

4    be the reason.

5         Q.   And I would just like to show you what's already

6    in evidence as People's Exhibit 60.  Do you recognize that

7    item?

8         A.   Yes, I do.

9         Q.   And what do you recognize that item to be?

10        A.   That would be the knife that I processed for

11   latent fingerprints.

12        Q.   Did you make any markings on that item?

13        A.   No, I did not.

14        Q.   Did you make any markings on the box?

15        A.   Yes, I did.

16        Q.   And can you just point out those markings?

17        A.   Several yellow labels with my initials on them,

18   and I also have my initials on the bottom of the box dated.

19        Q.   And you weren't able --

20             THE COURT:  Just pick the box up and show the

21        jury where your initials are.

22             THE WITNESS:  Sure.  Let me close this.  See,

23        right there.

24             THE COURT:  Okay.

25        Q.   Did you also test several Coors Light bottles that

Det. P. Byrne - People - Direct        630

1    were found at the scene?

2         A.   Yes, I did.

3         Q.   Were you able to get any prints from any of those?

4         A.   No fingerprints.

5         Q.   I'm just going to ask you to take a look at what's

6    marked as People's Exhibit 61 for identification.  I just

7    ask you if you recognize that item.

8         A.   Yes, one of the Coors Light bottles that I

9    processed.

10             THE COURT:  All right, I believe that is 61

11        in evidence subject to connection.  Did she say 61 for

12        identification?

13             COURT REPORTER:  Yes.

14             MS. ABDI:  I'm sorry, your Honor, 61 in

15        evidence.

16        Q.   Did you place any markings on either the packaging

17   or the bottle itself?

18        A.   Yes, I did.

19        Q.   Can you just point them out?

20        A.   You can see the patch, my initials on the yellow

21   label and also on the evidence tape label when I sealed it.

22        Q.   Thank you, Detective.  Now, did you also test --

23   I'm going to go through these all together.  Did you also

24   test items such as a wristwatch, a lug wrench, wooden stick,

25   Smirnoff bottle?

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 631 of 913 PageID #: 931

1           MR. MILLMAN:  Objection to the form, your

2     Honor.  She's having a bunch of thing all at once.

3           THE COURT:  You better separate them out.

4           MS. ABDI:  I think perhaps when the detective

5     gives his answer, it may be --

6           THE COURT:  Did you test a lug wrench?  Get

7     an answer to that.  Did you get a Smirnoff bottle?  Get

8     an answer to that.  Then you may be able to use one

9     collective question.

10    Q.    Did you test two wristwatches?

11    A.    Yes, I did.

12    Q.    Did you test a lug wrench or tire iron?

13    A.    Yes, I did.

14    Q.    Did you test a yellow metal pipe?

15    A.    Yes, I did.

16    Q.    Did you test a red metal pipe?

17    A.    Yes, I did.

18    Q.    Did you test a Smirnoff bottle?

19    A.    Yes, I did.

20    Q.    And when I say test, I mean did you process them

21    for prints?

22    A.    Yes.

23    Q.    And were you able to find any prints on any of

24    those items?

25    A.    No, I was not.

1        Q.    Detective, what sort of environmental factors may

2    affect your ability to locate prints on that?

3        A.    Well, one of the factors would be where something

4    was found.  If it's raining out, snowing, if it's cold, if

5    it's hot, all those things could affect whether or not a

6    fingerprint or an identifiable fingerprint could be left.

7             If a person is stressed or sweating or they

8    squeeze an item too hard, that could also mar what would be

9    an identifiable fingerprint.

10                 THE COURT:  Just briefly tell this jury what

11             is an identifiable fingerprint rather than say a smudge

12             or something like that.

13                 THE WITNESS:  An identifiable fingerprint or

14             an identifiable palmprint for that matter, there would

15             have to be enough information in the fingerprint or

16             palmprint for me to positively identify that print as a

17             known fingerprint or palmprint to the exclusion of any

18             others.

19                 MS. ABDI:  Thank you, Detective.  I have no

20             further questions.

21                 THE COURT:  Any cross?

22                 MR. MILLMAN:  Yes, your Honor.

23    CROSS-EXAMINATION

24    BY MR. MILLMAN:

25        Q.    Good afternoon, Detective.

Det. P. Byrne - People - Redirect      633

1          A.    Good afternoon.

2          Q.    Detective, were you also asked to analyze a print

3    obtained from an Acura vehicle in this case?

4          A.    That would be a lift, a fingerprint lift?

5          Q.    Thank you, yes, a lift.

6          A.    Yes, I was.

7          Q.    And did you analyze it?

8          A.    Yes, I did.

9          Q.    And did you compare it with any other person in

10   order to determine the identity of an individual who may

11   have left the print?

12         A.    Yes, I did.

13         Q.    And did you determine it to match anyone?

14         A.    No, I did not.

15               MR. MILLMAN:   That's all I have.   Thank you.

16               MS. ABDI:   Redirect, your Honor.

17   REDIRECT EXAMINATION

18   BY MS. ABDI:

19         Q.    With respect to that print that counsel's talking

20   about, that was a print found on the exterior of the

21   vehicle; is that correct?

22         A.    Yes, I believe so.

23         Q.    It was not interior?

24         A.    Yes.

25         Q.    Did you compare that print to the owner of the

J.H.

1  vehicle?

2      A.    I'm not sure who the owner of the vehicle is.

3      Q.    Then I'll be specific.  Did you ever test it to

4  see whether or not that print matched Diana Bonilla?

5      A.    Diana Bonilla, I would have to check my notes.

6      Q.    Sure.

7      A.    No, I did not.

8            MS. ABDI:  I have no further questions.

9            THE COURT:  Thank you.  Step down.

10           THE WITNESS:  Thank you.

11           (The witness was excused.)

12           THE COURT:  Next witness.

13           MS. ABDI:  The People call Jocelyn Gonzalez.

14  J O C E L Y N   G O N Z A L E Z, a witness called on behalf

15      of the People, after having been first duly sworn by

16      the Clerk of the Court, was examined and testified upon

17      her oath as follows:

18           THE CLERK:  In a loud, clear voice, please

19      state your name.

20           THE WITNESS:  Jocelyn Gonzalez.

21           THE CLERK:  Spell your last name.

22           THE WITNESS:  G-O-N-Z-A-L-E-Z.

23           THE CLERK:  Your county where you live?

24           THE WITNESS:  Nassau.

25           THE CLERK:  Thank you.

1          THE COURT:  Have a seat.

2     DIRECT EXAMINATION

3     BY MS. ABDI:

4          Q.   Good afternoon, Miss Gonzalez.

5          A.   Good afternoon.

6          Q.   How old are you?

7          A.   Twenty years old.

8          Q.   And do you know an individual named Armando

9     Villatoro?

10         A.   Yes.

11         Q.   And how do you know Armando -- how did you know

12    Armando Villatoro?

13         A.   I know him because of his wife and his family,

14    which is the Villatoro family.

15         Q.   And do you know an individual named Nancy

16    Villatoro?

17         A.   Yes.

18         Q.   How do you know her?

19         A.   Because of her mother.

20         Q.   And do you know an individual named Jennifer

21    Villatoro?

22         A.   Yes.

23         Q.   And you also know an individual named Oscar

24    Villatoro?

25         A.   Yes.

J. Gonzalez - People - Direct        636

1        Q.    It's fair to say that you are friends with the

2    Villatoro family?

3        A.    Yes.

4        Q.    Now, do you know an individual named Ulises

5    Bonilla?

6        A.    Yes.

7        Q.    And how long have you known Ulises Bonilla?

8        A.    Maybe for about four years.

9        Q.    At the time he was a friend of yours; is that

10   correct?

11       A.    Yes.

12       Q.    You would socialize with him?

13       A.    Yes.

14       Q.    Do you know an individual named Misael Berrios?

15       A.    Yes.

16       Q.    Were you also friends with him?

17       A.    Yes.

18       Q.    How long had you known -- withdrawn.

19             I'm going to direct your attention now to Sunday,

20   September 26th of 2010.   What, if anything, occurred on that

21   date?

22                   THE COURT:   In connection with this case.

23                   MS. ABDI:   In connection with this case,

24        correct.

25       A.    Okay, do you want to know the story that happened

1    that night?

2        Q.    I want to know on Sunday -- well, on Sunday, did

3    there come a time that you had a conversation with Ulises

4    Bonilla?

5        A.    Yes.

6        Q.    Please tell us about that conversation.

7        A.    Okay, well, that conversation was, well, I was

8    just talking to Misael Berrios, and then he just let me know

9    that --

10            THE COURT:   Try not to use pronouns if you

11        can, I, we, he, she, it.  It may sound a little

12        different, but I want this jury to understand precisely

13        who you are talking about.

14            THE WITNESS:   Okay.  Okay, so with Ulises

15        Bonilla, I just spoke to him over the phone that night.

16        And he just spoke to me and asked me --

17            THE COURT:   Ulises?

18            THE WITNESS:   Yes, Ulises Bonilla asked me

19        what was I doing.  I told him I was hanging out.  And

20        then he just said, Okay.  And he asked me if I knew

21        what had happened with Jennifer's father, which is

22        Armando, and I said, No.  And then he said to me, Oh,

23        well, I'm going to get him back for what he did to me.

24        I said, Okay.

25            Then I asked him, What are you doing?  Then

J. Gonzalez - People - Direct        638

1        he just said he was out hanging out.

2             Q.    And this was on Sunday?

3             A.    Sunday, correct.

4             Q.    What did he say specifically he was going to get

5        Armando back for?

6             A.    For jumping him at the deli.

7             Q.    Jumping is slang, correct?

8             A.    Yes.

9             Q.    What is meant by when you say jumping?

10            A.    Basically he means like fighting or revenge.

11            Q.    Now, I'm going to direct your attention now to

12       Tuesday, September 28th of 2010.

13            A.    Okay.

14            Q.    Approximately 10 p.m.

15            A.    Okay.

16            Q.    Where were you at that time?

17            A.    At that time I was sitting inside of my car with

18       Nancy Villatoro, and this was in front of the Villatoro's

19       house.

20            Q.    And what kind of car did you have at that time?

21            A.    BMW.

22            Q.    Now, what seat were you sitting in in the car?

23            A.    I was inside the driver's seat.

24                  THE COURT:   I'm sorry?

25                  THE WITNESS:   The driver's seat.

J. Gonzalez - People - Direct        639

1              THE COURT:  You were on the driver's seat?

2              THE WITNESS:  Yes.

3        Q.   And where was Nancy Villatoro sitting?

4        A.   In the passenger seat.

5              THE COURT:  Front passenger?

6              THE WITNESS:  Yes, front passenger seat.

7        Q.   And what side of the street was your car parked

8   on, the side that's closest to the house or farther away to

9   the house?

10       A.   Closest to the house.

11       Q.   And what direction was the front of your car

12  facing?

13       A.   It was facing towards Kinkel and Prospect Avenue.

14       Q.   So it was facing -- the front of the car was

15  facing Prospect?

16       A.   Correct.

17       Q.   Now, at that time did you see Ulises Bonilla?

18       A.   Afterwards, he just approached the car and said

19  hello to me and Nancy.

20       Q.   Did you see where he came from?

21       A.   He was coming like the other direction, which is

22  like from his house.

23       Q.   And did he have anything in his -- could you see

24  if he had anything in his hands?

25       A.   Yes.  It was just a bottle.

J.H.

J. Gonzalez - People - Direct          640

1          Q.    Do you know what kind of bottle?

2          A.    It was just a liquor bottle.

3          Q.    Was it -- could you tell if it was a big bottle or

4     small bottle?

5          A.    It was a big bottle.

6          Q.    Could you tell if it was a beer bottle?

7          A.    No, it was just liquor and stuff.

8          Q.    What side of the car did he approach?

9          A.    My window, the driver's seat.

10                    THE COURT:  Did the bottle have a color?

11                    THE WITNESS:  Yes.

12                    THE COURT:  Or was it clear?

13                    THE WITNESS:  It was green, a green bottle.

14                    THE COURT:  Okay.

15         Q.    Now, what happened -- well, withdrawn.

16               What side of the car did he approach?

17         A.    My side, which is the driver's seat.

18         Q.    And what happened next?

19         A.    After that, he just said hello to me and Nancy.

20    And he just asked Nancy where was her father, and she

21    answered, I don't know.  And then he said, Oh, well, when I

22    see him, I'm gonna punch him in the face.  And then she just

23    ignored it.

24               And then he said, Would it be okay if I kill your

25    father?

J. Gonzalez - People - Direct      641

1              THE COURT:   What?

2              THE WITNESS:   He said to her, Is it okay if I

3    kill your father?  And she just ignored it.

4         Q.   Do you know if she heard what he said?

5         A.   I think she might have.

6         Q.   But you don't know?

7         A.   I don't know, honestly, I don't know.

8         Q.   What happened next?

9         A.   After that, all that was said, her father was

10   coming.

11        Q.   Where was he coming from?

12        A.   He was coming from the deli, and he was coming to

13   his house.

14        Q.   When you were in your car, where did you see

15   Armando Villatoro coming from?  Where was he?

16        A.   He was coming down the block which is walking from

17   Prospect to his house.

18        Q.   Is it fair to say he was walking on Kinkel Street?

19        A.   Correct.

20        Q.   Could you see if he was with anybody else at that

21   point?

22        A.   No.

23        Q.   I think I asked that question a little bit -- did

24   you see him with anyone else at that point?

25        A.   No.

J. Gonzalez - People - Direct        642

1          Q.    What happened next once you saw him walking

2     towards down the street?

3          A.    Once Armando was coming towards his house, he was

4     in front of his house already, and that's when Ulises

5     says -- said something to him in a way like that started the

6     fight.

7          Q.    What did he say to him?

8          A.    Um, it's in a Spanish version.

9          Q.    What did he say in Spanish?

10         A.    He said something like cque perro which means --

11               THE COURT:   Can you speak fluent Spanish?

12               THE WITNESS:   Yes.

13               THE COURT:   Okay.   Translate that.

14               THE WITNESS:   Which that means, either it

15         means hello, or it also means something that like

16         basically starts a fight.

17         Q.    How is it literally translated?

18         A.    Like saying what's up.

19         Q.    According to you, is that something that's

20    disrespectful to say to somebody?

21         A.    Yes.

22         Q.    Why is that?   What does it mean?

23         A.    It just basically means like saying to somebody --

24    it basically just like starts a fight or something like

25    that.   Or if not, it's a meaning for saying hello to

J. Gonzalez - People - Direct          643

1   somebody.

2          Q.    But you in hearing that took it as a disrespectful

3   comment?

4          A.    Correct.

5                MR. MILLMAN:   Objection.

6                THE COURT:   She already testified to that.

7          It appeared to her to be a disrespectful comment.   She

8          testified to that.

9          Q.    What happened next after that?

10         A.    After that, they approach each other, Ulises and

11  Armando, and then that's when the fight began.

12         Q.    What did you see happen between Ulises and

13  Armando?

14         A.    Between them two when they were just fighting,

15  they were leaned against a car fighting.

16         Q.    Now, when you say -- where was this car they were

17  leaning --

18         A.    The house across the street from the Villatoro

19  family.

20         Q.    And that's where you saw them?

21         A.    Yes.

22         Q.    Can you describe what you saw them doing?

23         A.    With Armando, Ulises, we saw them fighting, fist

24  fighting.

25         Q.    When you say you saw them fist fighting, did you

J.H.

1    see Ulises Bonilla hit Armando Villatoro?

2         A.    Yes.

3         Q.    Did you also see Armando Villatoro hitting Ulises

4    Bonilla?

5         A.    Yes.

6         Q.    Could you see where Ulises Bonilla was hitting

7    Armando Villatoro?

8         A.    Yes, some parts and some parts, no.

9         Q.    Only the parts that you saw.

10        A.    Okay, the parts that I saw were just hits to the

11   face and hits to the stomach.

12        Q.    So you saw him hitting him in his stomach?

13        A.    Yes.

14        Q.    When I say him, you saw Ulises Bonilla hitting

15   Armando in the stomach; is that correct?

16        A.    Yes.

17        Q.    And could you see how close they were to each

18   other when they were fighting?

19        A.    Yes.

20        Q.    And can you describe how close were they?

21        A.    They were just like really close.  That's about

22   it.

23        Q.    What did you see happen next?

24        A.    After I saw them fighting, that's when I seen

25   three other guys just come out of randomly out of different

J. Gonzalez - People - Direct        645

1    places but on the same street that they live.

2        Q.   Did you know who those people were?

3        A.   Yes.

4        Q.   Who were those three people?

5        A.   Well, one is Misael.  The other one is known as

6    Johnny.  And the other one, I really don't know his name

7    because it was just a hi and bye thing between me and him.

8        Q.   But had you met those individuals before?

9        A.   Yes, I have.

10       Q.   And who were they friends with?

11       A.   They were mines and also Ulises' friends.

12       Q.   And this person that you know you said Johnny, is

13   that a nickname, or is that his real name?

14       A.   Honestly, in the beginning, I thought his real

15   name was Johnny.

16       Q.   But now you know his name is not Johnny?

17       A.   Now I know it's not.

18       Q.   This person you know as Johnny, could you see

19   anything that he was wearing?

20       A.   Yes.  He was just wearing a red and black

21   Cincinnati's cap.

22       Q.   And these were people that you had met before and

23   were friendly with, correct?

24       A.   Yes.

25       Q.   And they were also friendly with Ulises Bonilla?

1        A.    Yes.

2        Q.    Now, what happens?  What do you see happen next,

3    or what did you do next?

4        A.    Well, when they approach randomly, when Ulises and

5    Armando are fighting, well, one had a mask on, and the other

6    two had like pipes on them.

7              And from there, Nancy Villatoro which is Armando's

8    daughter, she tried defending her father somehow, but one of

9    the boys dropped her to the floor.  And then from there,

10   from there then the fight just kept going on.

11             And after the fight, Armando -- no, the mother,

12   which is Armando's wife, came -- well, before that happened,

13   there was like a gunshot in the air.  And before the

14   gunshot, we were told that if we get anywhere near the fight

15   that one of us would be shot.  So nobody came close.  And

16   when the gunshot happened, everybody, all the guys ran.

17             And that's when the mother came and grabbed her

18   husband and saw him like grabbing onto his stomach.  And you

19   could tell he's in pain.  And I saw him fine walking.  You

20   know, I just thought he was in pain.  But when he got to his

21   front lawn is when he dropped on the floor.

22       Q.    Now, who was Armando fighting with at that time?

23       A.    At that time --

24       Q.    Right after he separated and was walking --

25   withdrawn.

1        A.    After he left, the fight ended from there.

2              THE COURT:    Now, did you ever see any bodily

3    contact between any of the other people and Armando, or

4    was the bodily contact limited to this defendant and

5    Armando?

6              THE WITNESS:    No.

7              THE COURT:    Was -- was the bodily contact

8    limited to this defendant and Armando?

9              THE WITNESS:    I think it might have.

10             THE COURT:    Meaning it might have been

11   limited to those two?

12             THE WITNESS:    Yes.

13       Q.    And when you saw Armando and Ulises, Armando

14   Villatoro and Ulises Bonilla fighting, were they

15   chest-to-chest?

16       A.    They were not chest-to-chest, but they were close

17   enough.

18       Q.    I'm sorry, I meant were they face-to-face?

19       A.    Yes.

20       Q.    And they were -- now, at some point did you -- at

21   some point did you move your car?

22       A.    Yes, I did.

23       Q.    When did you move your car?

24       A.    I moved my car when the fight had already begun as

25   I didn't want my car to get damaged, so I moved it.

J. Gonzalez - People - Direct        648

1        Q.    So is it fair to say that you saw the beginning of
2    the fight between Armando and Ulises?
3        A.    Yes.
4        Q.    And then when they started fighting with each
5    other, where did you move your car?
6        A.    I moved my car to the driveway.
7        Q.    And then how far was the driveway from where you
8    were parked?
9        A.    Really wasn't that far.
10       Q.    Meaning you just had to turn into the driveway?
11       A.    Yes.
12       Q.    Now, did you get out of your car at all?
13       A.    Yes.
14       Q.    And did Nancy get out of the car?
15       A.    Yes.
16       Q.    Did Nancy get out of your car?
17       A.    Yes.
18       Q.    When you got out of your car, where were you
19   standing at that point?
20       A.    I was standing in front of the Villatoro, like in
21   the middle of the street a little further than the Villatoro
22   family's house.
23       Q.    And from that vantage point, what did you see at
24   that time you stepped out of the car?
25       A.    They were fighting.

J.H.

1          Q.   Who was fighting?

2          A.   Ulises and Armando.

3          Q.   And where were they fighting?

4          A.   Across the house of the Villatoro family.  They

5     were like leaned on a car.

6          Q.   Now, once you heard -- or who fired the shot?

7          A.   Misael.

8          Q.   And once you heard the gunshot, did you see where

9     Ulises Bonilla went?

10         A.   No.

11         Q.   Did you see where Misael went?

12         A.   No.

13         Q.   What were you focusing on at that time?

14         A.   I was just focusing on what Armando and everybody

15    else was doing.  But all I saw them do was like run towards

16    his house, like running down towards Ulises' house.

17         Q.   Who did you see run towards Ulises' house?

18         A.   Misael, Johnny, Ulises and the other guy, oh, and

19    also his sister.

20         Q.   So at some point did you see Diana Bonilla in the

21    vicinity of 180 Kinkel Street?

22         A.   Yes.

23         Q.   Did you see her do anything?

24         A.   Yes.

25         Q.   What did she do?

J. Gonzalez - People - Direct      650

1      A.   Well, after -- well, right when Ulises and Armando
2  were almost I'm guessing ending the fight is when she came,
3  and she hit Armando on his back.  She punched him on his
4  back.  But she said something like I guess to defend her
5  brother.
6      Q.   Did you see anybody get in between Armando and
7  Ulises?
8      A.   No.
9           THE COURT:  I'm sorry?
10          THE WITNESS:  No, I did not.
11     Q.   Now, after you saw Ulises and Ulises run towards
12 his house, where did you go?
13     A.   I went in front like to the lawn of in front of
14 the Villatoro family.
15     Q.   And did you wait there for the police to arrive?
16     A.   Yes.
17     Q.   And did you speak with some uniformed patrol
18 officers at the scene?
19     A.   Yes.
20     Q.   Now, do you see Ulises Bonilla in the courtroom
21 today?
22     A.   Yes.
23     Q.   Can you please identify something that he's
24 wearing?
25     A.   He's wearing a sky-blue collared shirt, long

J. Gonzalez - People - Cross        651

1    sleeve.

2              MS. ABDI:  Your Honor, may the record reflect

3         the witness has identified the defendant?

4              THE COURT:  Yes.

5         Q.   And on that date, September 28th, 2010, you

6    considered him a friend of yours?

7         A.   Yes.

8         Q.   And you would hang out with him, correct?

9         A.   Yes, I would say hi to him, and sometimes we would

10   talk and all that.

11             MS. ABDI:  I have no further questions.

12             THE COURT:  Cross-examine.

13   CROSS-EXAMINATION

14   BY MR. MILLMAN:

15        Q.   You and Nancy are very close?

16        A.   Yes.

17        Q.   Right?  You're actually more than friends; am I

18   right?

19        A.   No.

20        Q.   Well, what is your relationship with Nancy

21   Villatoro?

22        A.   Me and Nancy are really good friends.

23        Q.   You're not dating?

24        A.   No.

25        Q.   You never have?

J. Gonzalez - People - Cross       652

1        A.   No.

2        Q.   You were angry about what happened to Armando; am

3   I right?

4        A.   I wasn't angry, but I was upset.

5        Q.   And you seen the effect that it's had on Nancy, I

6   take it?

7        A.   Yes.

8        Q.   And you're very close friends with Nancy as you

9   indicated?

10       A.   Yes.

11       Q.   How long have you known Ulises for?

12       A.   I have known him for maybe about four years.

13       Q.   And am I correct in stating that Ulises has seen

14   you and Nancy talking very often, right?

15       A.   Yes.

16       Q.   In other words, he knows that the two of you are

17   close, right?

18       A.   Yes.

19       Q.   And it's your testimony that he came up to the car

20   and announced to Nancy that he was going to kill Armando?

21       A.   Correct.

22            THE COURT:  His -- her testimony is is it

23       okay if I kill your father.  That's different than what

24       you just said.

25       Q.   Let me ask you this, Miss Gonzalez:  Back in

J. Gonzalez - People - Cross        653

1    September of 2010, about how many times a week would you

2    talk to Nancy?

3         A.    Say it again?

4         Q.    Back in September of 2010, about how many times a

5    week would you talk to Nancy?

6         A.    Often.

7         Q.    I'm sorry?

8         A.    Oftenly.

9         Q.    More than daily?

10        A.    Yes.

11        Q.    You say you spoke with Ulises a couple of days

12   before this incident occurred, and he told you he was going

13   to get Armando back for jumping him; is that right?

14        A.    Yes.

15        Q.    After he said that to you, did you call the

16   police?

17        A.    No.

18        Q.    Did you call Nancy, tell her what he said?

19        A.    No.

20        Q.    And how many times did you actually talk to Nancy

21   to the best you can recall between the time that you say

22   Ulises told you he was going to get Armando back and the

23   time that this incident occurred?

24        A.    Every single day.

25        Q.    But you said nothing to her about it?

J. Gonzalez - People - Cross         654

1        A.    I mentioned it to her.  I mentioned what he said

2    on the phone, but she didn't do anything about it either.

3        Q.    I see.  And after you say that you saw Ulises and

4    Armando having words, it got physical, correct?

5        A.    Yes.

6              THE COURT:  Now we're talking about the 28th?

7              MR. MILLMAN:  Yes, on the 28th.  Thank you,

8    Judge.  My apologies.

9        Q.    On the 28th after they had words, it became

10   physical, right?

11       A.    Yes.

12       Q.    And at that time you saw that they were fist

13   fighting, correct?

14       A.    Yes.

15       Q.    Did you ever at any time see -- well, withdrawn.

16             When Ulises initially approached a car, he came to

17   the driver's side, right?

18       A.    Yes.

19       Q.    Nancy was in the passenger seat?

20       A.    Yes.

21       Q.    And so he was closer to you than he was to Nancy?

22       A.    Yes.

23       Q.    Did you ever see Ulises with a pipe or a tire iron

24   in his hand?

25       A.    No.

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 655 of 913 PageID #: 955

1      Q.   When he approached, he had you said a dark green

2      bottle in his hand?

3          A.   Yes.

4          Q.   And he put that down on the curb --

5          A.   Yes.

6          Q.   -- after?  When you pulled your car up the

7      driveway after the fighting started, am I correct in saying

8      that you were looking away from the two of them at that

9      moment?

10         A.   Yes.

11         Q.   After you pulled your car up the driveway, you

12     exited your vehicle, and this is when you saw the man

13     wearing the mask, right?

14         A.   Yes.

15         Q.   Who you know to be Misael?

16         A.   Yes.

17         Q.   And Misael pointed a gun in the air and fired it,

18     right?

19         A.   Yes.

20         Q.   And he also threatened to shoot anybody who got in

21     the way, right?

22         A.   Yes.

23         Q.   He said that, didn't he?

24         A.   Yes.

25         Q.   And he's a member of the gang MS-13, isn't he?

J. Gonzalez - People - Cross        656

1        A.      I don't know.

2        Q.      Nancy was pushed to the floor; am I correct?

3        A.      Yes.

4        Q.      And you saw that happen?

5        A.      Yes.

6        Q.      That was done by somebody other than Ulises,

7     right?

8        A.      Yes.

9        Q.      You also saw individuals with pipes at that time,

10    correct?

11       A.      Yes.

12       Q.      A number of individuals with pipes, right?

13       A.      Yes.

14       Q.      I take it they weren't just sitting there

15    watching; am I right?

16       A.      They were just standing there.

17       Q.      Oh, they weren't doing anything with those pipes,

18    they were just watching?

19       A.      Yes.

20               THE COURT:   Did you ever see a pipe used as a

21       weapon?

22               THE WITNESS:   No, I did not.

23       Q.      And these individuals that had pipes in their

24    hands, were they all male Hispanics?

25       A.      Yes.

J. Gonzalez - People - Cross          657

1       Q.   You said that there was an individual with a
2   Cincinnati cap.  Is that a Cincinnati Reds cap?
3       A.   Yes.
4       Q.   That's the person you said you know as Johnny?
5       A.   Yes.
6       Q.   Did you also see a guy with a Yankee hat there?
7       A.   Yes.
8       Q.   Is it your testimony that he was not involved in
9   the fighting?
10      A.   Yes, he wasn't fighting, but he was there.
11      Q.   But he was there?
12      A.   Yes.
13      Q.   And the individuals that you saw, they were coming
14  out of different directions, right?
15      A.   Yes.
16      Q.   These people with the pipes, they were coming from
17  different directions; am I right?
18      A.   Yes.
19      Q.   But when they got there, they just watched?
20      A.   Yes.
21      Q.   When you saw Armando walking on the lawn, he was
22  walking away from Ulises, Misael and Johnny, right?
23      A.   Yes.
24      Q.   He wasn't just walking away from Ulises, he was
25  walking away from three?

1        A.    Yes.

2        Q.    And it was only then that you noticed for the

3    first time that Armando was bleeding; am I right?

4        A.    Yes.   I saw him bleeding until he was in the front

5    of the lawn.

6        Q.    Okay.   That was the first time you saw him

7    bleeding?

8        A.    Yes.

9        Q.    But you didn't see how he got to the front of the

10   lawn, right?

11       A.    He was just walking.   You could tell he was in

12   pain because he was holding his stomach.

13       Q.    But did you see how he got to the front of the

14   lawn?

15             THE COURT:   What do you mean by that?

16       Q.    Well, did you see him enter the lawn area of the

17   residence at 180?

18             THE COURT:   You saw him walk to the lawn?

19             THE WITNESS:   Yes.

20             MR. MILLMAN:   One moment, your Honor.

21       Q.    After you observed Misael shoot the gun in the

22   air, did you speak to Nancy about that?

23             MS. ABDI:   Objection.

24             THE COURT:   At any time?

25             MR. MILLMAN:   At any time.

J.A.

J. Gonzalez - People - Cross          659

1      A.    Did I speak to her about the gunshot?

2      Q.    Yes.

3      A.    After the fight and everything.

4            THE COURT:  If you want to use the term at

5      any time or immediately after, use whatever.

6            MR. MILLMAN:  Let me clarify.

7      Q.    Miss Gonzalez, when was the first time you spoke

8      to Nancy about the gunshot that you saw being fired by

9      Misael?

10     A.    She must have seen it too because we spoke about

11     it while her father was laying on the lawn.

12     Q.    So she must have seen it?

13     A.    Yes.

14     Q.    She knew about it?

15     A.    Yes.

16           MR. MILLMAN:  Nothing further.

17           THE COURT:  No further cross?

18           MR. MILLMAN:  No further.

19           THE COURT:  Any redirect?

20           MS. ABDI:  No.

21           THE COURT:  Thank you.  You can step down.

22           (The witness was excused.)

23           THE COURT:  Okay, ladies and gentlemen, we

24     are going to break for the day.  I hope you have a

25     pleasant evening.

J. Gonzalez - People - Cross        660

1          Remember the admonitions I've given you, and
2     we'll see you tomorrow at 9:30.
3               (Whereupon, the jury exits the courtroom.)
4               THE COURT:  People, if you can tell me when
5     do you think you might conclude your case?
6               MS. ABDI:  I'm thinking, Judge, Monday or
7     Tuesday.
8               THE COURT:  Okay, all right.
9               MR. MILLMAN:  Judge, I did need an order with
10    respect to --
11              THE COURT:  Defendant allow to see lawyer
12    between --
13              MR. MILLMAN:  Can we say 6 to 10?
14              THE COURT:  Sure.  I don't know whether or
15    not they will honor it, but we can certainly put it on
16    the commitment.
17              MR. MILLMAN:  They will listen to whatever
18    you say, your Honor.  Thank you.
19              (Whereupon, the trial is adjourned to
20    December 8th, 2011.)
21
22
23
24
25

661

1    STATE OF NEW YORK  :  NASSAU COUNTY

2       SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5            -against-                      Ind. No. 202N-11

6    ULISES BONILLA,

7                       Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                          December 8, 2011
                            262 Old Country Road
11                          Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                     For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                       For the Defendant
23
                           JOANNE HORROCKS, CSR
24                         Senior Court Reporter

25

                                                J.H.

1        THE CLERK:  Case on trial, Indictment 202N of

2   2011, People of the State of New York versus Ulises

3   Bonilla.  All parties present including the defendant

4   and Spanish interpreter.  There are no jurors present

5   at this time.  Are there any applications?

6        MS. ABDI:  Judge, I just have another page

7   ever Rosario to serve.  I have served it on defense

8   counsel earlier morning.  It's page 1503.  I am handing

9   a copy to the Court.

10        COURT OFFICER:  Jury entering.

11        (The jury enters the courtroom.)

12        THE CLERK:  Both sides consent to the

13   seating, waive a reading of the roll?

14        MS. ABDI:  Yes.

15        MR. MILLMAN:  Yes.

16        THE CLERK:  Let the record reflect all jurors

17   are present.

18        THE COURT:  All right, ladies and gentlemen,

19   I'm sorry we couldn't get started before this time.  It

20   was an unavoidable situation.  However, I would

21   estimate at this particular time I will charge you on

22   Monday, the 19th rather than after the Christmas

23   holidays.  That's the good news.

24        Next witness.

25        MS. ABDI:  Your Honor, the People call

Det. S. McLaughlin - People - Direct     663

1      Detective Scott McLaughlin.

2                    THE COURT:   If anybody is wondering why I did

3          that, if you recall during the voir dire process, I

4          said we were not working during Christmas week and

5          January 2nd, and I wasn't going to charge you at the

6          end of the full week before Christmas, because I did

7          not want deliberations to go into the Christmas week.

8          But right now, I think I'll be able to charge you on

9          Monday, the 19th, which would give you three or four

10         days worth of deliberations before the Christmas

11         holidays.

12                   THE CLERK:   In a loud, clear voice, please

13         state your name and spell your last name.

14                   THE WITNESS:   Detective Scott McLaughlin, M-C

15         L-A-U-G-H-L-I-N.

16                   THE CLERK:   Please give your shield and

17         command.

18                   THE WITNESS:   1134, command is Crime Scene

19         Search Section.

20                   THE CLERK:   Thank you.

21     DIRECT EXAMINATION

22     BY MS. ABDI:

23         Q.   Good morning, Detective.

24         A.   Good morning.

25         Q.   How long have you been in the Crime Scene Search

J.H.

Det. S. McLaughlin - People - Direct      664

1   Section?

2        A.    Six years.

3        Q.    How long have you been a detective?

4        A.    Six years.

5        Q.    And how long have you been a police officer in

6   Nassau County?

7        A.    Nassau County, 14.  I had four prior years with

8   NYPD.

9        Q.    I'm going to just ask if you could just briefly

10  explain your training with respect to the Crime Scene Search

11  Section to the jury.

12       A.    I did six months of crime scene training.  The

13  last two months I drove with experienced crime scene

14  detectives to see how they do things here in Nassau County.

15             As a crime scene detective, I document scenes

16  through videography, photography, reports and sketches, and

17  then I collect evidence at that scene.

18       Q.    I'm going to direct your attention to March 15th

19  of 2011.  Were you working in your capacity as a crime scene

20  detective on that date?

21       A.    Yes, I was working a 7 a.m. to 7 p.m. tour,

22  12-hour tour.

23       Q.    And on that date, did you take a sample of DNA

24  from an individual named Ulises Bonilla?

25       A.    I did.

Det. S. McLaughlin - People - Direct    665

1    Q.   And do you see that individual in the courtroom

2  today?

3    A.   I do.

4    Q.   Could you please identify an article of clothing

5  he's wearing?

6    A.   A blue shirt.

7         THE COURT:  In the middle?

8         THE WITNESS:  In the middle.

9         MS. ABDI:  Your Honor, may the record reflect

10    the witness has identified the defendant?

11         THE COURT:  Yes.

12    Q.   How did you take a DNA sample from the defendant?

13    A.   We get a DNA kit.  It's a buccal kit.  It has two

14  swabs in it.  We usually have them give their thumb prints,

15  signature.  I take the two swabs.  I insert them in the

16  subject's mouth, roll them around in the inside of the

17  cheeks for approximately 10 seconds, and then I let them dry

18  for approximately two minutes.  They are put into the

19  envelope that is issued to me.  I seal it with evidence

20  tape.  I initial the evidence tape.  I put my label on it,

21  and I send it to the lab for testing.

22         THE COURT:  In other words, the interior

23    cheek cells are attached to this particular swab?

24         THE WITNESS:  To the swabs, the alleles, the

25    skin cells.

Det. S. McLaughlin - People - Direct     666

1           THE COURT:  And the swabs contain the DNA?

2                THE WITNESS:  Correct.

3      Q.   And you submitted that for any further testing

4  under case number 210YR82502?

5      A.   Yes, I sent it to the FEB, Forensics Evidence

6  Bureau for testing.

7                MS. ABDI:  I would like to have this item

8           marked as People's Exhibit 71 for identification,

9           buccal swab kit.

10                (People's Exhibit 71 is marked for

11           identification.)

12                MS. ABDI:  I'd ask that that be shown to the

13           witness, please.

14      Q.   Detectives, you are now being shown what is marked

15  as People's Exhibit 71 for identification.  Do you recognize

16  what that is?

17      A.   Yes.  This is the buccal swab collection kit that

18  I used that date.  It has my evidence tape on it, and these

19  are my initials across the back.

20      Q.   Are there other markings that you did not make on

21  that package?

22      A.   Yes.  You can see that it was opened on March 31st

23  of 2011 by someone in the lab.  They opened the bottom, and

24  that's how they got my evidence out of here so they could

25  test it.

J.H.

Det. S. McLaughlin - People - Direct     667

1     Q.   And when you submitted that item, it was in a

2   sealed condition; is that correct?

3     A.   Correct.  Everything was sealed, and where I

4   opened it and placed the swabs inside was then marked with

5   evidence taped and signed by me.

6              MS. ABDI:  Your Honor, at this time I offer

7         that item into evidence subject to connection.

8              MR. MILLMAN:  No objection.

9              THE COURT:  It's received without objection

10         subject to connection.

11              (People's Exhibit 71, previously marked for

12         identification, is received and marked in evidence.)

13              MS. ABDI:  I have no further questions.

14              THE COURT:  Any questions?

15              MR. MILLMAN:  No, no questions.

16              THE COURT:  Thank you.

17              (The witness was excused.)

18              THE COURT:  Next witness.

19              MS. ABDI:  The People call Jennifer

20         Villatoro.

21

22

23

24

25

J. Villatoro - People - Direct        668

1    J E N N I F E R  V I L L A T O R O, a witness called on

2        behalf of the People, after having been first duly

3        sworn by the Clerk of the Court, was examined and

4        testified upon her oath as follows:

5            THE CLERK:  In a loud, clear voice, can you

6        please state your name.

7            THE WITNESS:  Jennifer Villatoro.

8            THE CLERK:  Spell your last name.

9            THE WITNESS:  V-I-L-L-A-T-O-R-O.

10           THE CLERK:  And your county of residence?

11           THE WITNESS:  Nassau.

12           THE CLERK:  Thank you.  Have a seat.

13   DIRECT EXAMINATION

14   BY MS. ABDI:

15       Q.   Good morning, Miss Villatoro.

16       A.   Good morning.

17       Q.   How old are you?

18       A.   Ten -- no, yeah, 11.

19       Q.   Are you nervous?

20       A.   Yes.

21       Q.   What's your birthday?

22       A.   December 14, 1999.

23       Q.   And do you know an individual named Ulises

24   Bonilla?

25       A.   Yes.

J. Villatoro - People - Direct      669

1        Q.    Now, how long have you known an individual named

2    Ulises Bonilla?

3        A.    I don't know.

4        Q.    When did you --

5              THE COURT:  I'm sorry?

6              THE WITNESS:  I don't know.

7        Q.    Do you recall how long you have known him for?

8              THE COURT:  About.

9        A.    A year.

10       Q.    I'm sorry, you have to keep your voice up.

11       A.    A year.

12       Q.    Now, I'm going to direct your attention to

13   September of 2010, okay?  Where were you living in September

14   of 2010?

15       A.    180 Kinkel Street.

16       Q.    And is that in Westbury?

17       A.    Yes.

18       Q.    And do you remember when -- how long had you lived

19   at that address?

20             THE COURT:  As of that time.

21       A.    What do you mean?

22       Q.    When did you move to 180 Kinkel Street?

23       A.    In 2008.

24       Q.    In 2008?  And at that time that you moved, was --

25   did Ulises Bonilla live on that block, live on Kinkel

1    Street?

2         A.    Yes.

3         Q.    So is it fair to say that you met him when you

4    moved to the block?

5         A.    Yeah.

6         Q.    And that's when you first moved to the block in

7    2008?

8         A.    Yes.

9         Q.    And in September of 2010, who was living in your

10   house with you?

11        A.    My mom, my sister, my brother.

12        Q.    And was your dad living with you in September of

13   2010?

14        A.    Yes.

15        Q.    And is your father Armando Villatoro?

16        A.    Yes.

17        Q.    And what are the names of your -- what is the name

18   of your brother?

19        A.    Oscar Villatoro.

20        Q.    And what is the name of your sister?

21        A.    Nancy Villatoro.

22        Q.    And your mom's name is Susana Villatoro?

23        A.    Yes.

24        Q.    When you were -- do you know where Ulises Bonilla

25   lived in 2010?

J. Villatoro - People - Direct          671

1      A.    Um, down the block.

2      Q.    Down the block from where?

3      A.    Kinkel Street.

4      Q.    Down the block from where you lived?

5      A.    Yes.

6      Q.    Okay.  Now, how many times would you see him for

7   when you moved to Kinkel Street in 2008 until September of

8   2010?

9                 THE COURT:  Let me rephrase that.  How often

10           would you see him?

11                THE WITNESS:  I don't know.

12     Q.    Well, were there occasions when you would see him

13  on the block?

14     A.    Yes.

15     Q.    What kinds of occasions?  Describe the times you

16  would see him on the block.

17     A.    What do you mean?

18     Q.    What was he doing when you would see him?

19     A.    I don't know.  He would just be there.

20     Q.    And would he talk to you?

21     A.    Sometimes.

22     Q.    And what would he say when he talked to you?

23     A.    I don't remember.

24     Q.    Would you talk to him?

25     A.    Yeah.

J. Villatoro - People - Direct        672

1        Q.    Do you recall what you would talk about?

2        A.    No, I don't know.

3        Q.    Would you say hello to him?

4        A.    Yeah.

5        Q.    And would he say hello to you?

6        A.    Yes.

7        Q.    Where did he used to hang out?

8        A.    Across the street to from my house.

9        Q.    And how often would you see him across the street

10   from your house?

11       A.    Most of the time.

12       Q.    And when you were outside your house, would you

13   often see him across the street?

14       A.    What?

15       Q.    When you were outside your house at 180 Kinkel

16   Street, would you see him across the street?

17       A.    Yeah, sometimes.

18       Q.    And what was he doing when he was across the

19   street?

20       A.    Hanging out with his friends.

21       Q.    And when you would see him across the street,

22   would you say hello to him?

23       A.    Yeah.

24       Q.    Would he say hello to you?

25       A.    Yes.

J.H.

J. Villatoro - People - Direct        673

1     Q.    And on occasion, would he walk by your house?

2     A.    Sometimes.

3     Q.    And what would happen when he would walk by your

4     house?  Would you say hello to each other?

5     A.    If I was there.

6     Q.    Would you talk to him?

7     A.    Sometimes.

8     Q.    Now, did you ever walk by his house?

9     A.    Yes.

10    Q.    Why would you walk past his house?

11    A.    To go to the park.

12    Q.    And what park are you talking about?

13    A.    Bunkyreid.

14    Q.    And do you know where that park is located?

15    A.    On Swalm Street.

16    Q.    And is that in Westbury?

17    A.    Yes.

18    Q.    And how far away is that park -- well, how would

19    you get to the park?

20    A.    Walking.

21    Q.    How far -- do you recall how far away the park was

22    from your house?

23    A.    Like three blocks.

24    Q.    Now, I'm going to direct your attention to the

25    summer of 2010.  Do you recall when school ended in 2010?

J. Villatoro - People - Direct        674

1       A.   June.

2       Q.   And that's in 2010?

3       A.   Yes.

4       Q.   And do you recall when did school start in 2010?

5       A.   In September before Labor Day.

6       Q.   I'm sorry?

7       A.   On September before Labor Day.

8       Q.   And during that summer of 2010, did you and Ulises

9    Bonilla see each other?

10      A.   What?

11      Q.   Did you and you Ulises Bonilla see each other

12   during the summer of 2010?

13      A.   Yeah.

14      Q.   And what would happen when you would see each

15   other?

16      A.   We would talk.

17      Q.   And would you do anything else?

18      A.   Yes.

19      Q.   What would you do?

20      A.   Kiss.

21      Q.   Now, is there a time -- were there any times when

22   you did more than kissing, just in the summer of 2010?

23      A.   Yes.

24      Q.   And what would you do?

25      A.   I don't know.

J.H.

J. Villatoro - People - Direct        675

1       Q.    Where --

2             THE COURT:  Are you embarrassed?

3             THE WITNESS:  What?

4             THE COURT:  Are you embarrassed now?

5             THE WITNESS:  Yeah.

6             THE COURT:  You'll have to answer.

7             THE WITNESS:  I know.

8       Q.    In the summer of 2010, would you do more than

9  kissing?

10      A.    Yes.

11      Q.    What did you do?

12      A.    He would touch me.

13      Q.    And where would he touch you?

14      A.    My breasts, vagina and butt.

15      Q.    And was this while you were kissing?

16      A.    Yes.

17      Q.    Do you know where this happened?

18      A.    Not exactly.

19      Q.    I mean in the general area, where would you do

20  this?

21      A.    In front of his house.

22      Q.    Did you ever go inside his house?

23      A.    No.

24      Q.    And do you recall how many times -- withdrawn.

25            Do you recall how many occasions he would kiss you

J.H.

J. Villatoro - People - Direct        676

1     and touch you in those places?

2          A.    What?

3          Q.    Do you know how many times that happened?

4          A.    Um --

5          Q.    That you can remember.

6          A.    Like four or something.

7          Q.    I'm sorry, you have to speak up.

8          A.    Four.

9                THE COURT:   Like four.

10         Q.    And are you talking about four different times?

11         A.    Yes.

12         Q.    And during those times, what would he do during

13    the summer of 2010?

14         A.    What?

15         Q.    During those -- on those occasions that you spoke

16    about --

17         A.    Yes.

18         Q.    -- you said you remember around four times?

19         A.    Um.

20         Q.    What would he do each time while you were kissing

21    him?

22         A.    Touch my breasts and vagina and butt.

23         Q.    Was this over the clothes or under the clothes?

24         A.    Over.

25         Q.    Now, I'm going to direct your attention now to

J. Villatoro - People - Direct      677

1    after the summer of 2010 to September 24th of 2010.  This

2    was a Friday.  Did there come a time where you went to the

3    park on that date?

4         A.   Huh?

5         Q.   Did there come a time that you went to the park on

6    Friday, September 24th?

7         A.   Yes.

8         Q.   And what park did you go to?

9         A.   Bunkyreid.

10        Q.   Who did you go to the park with?

11        A.   Um, Ivan and Steven.

12        Q.   And who are Ivan and Steven?

13        A.   Steven is my next-door neighbor, and Ivan used to

14   live in my house.

15        Q.   And Ivan used to live in your house with who?

16        A.   With his mom.

17        Q.   They were renting a room from your parents?

18        A.   Yes.

19        Q.   How long -- how do you know Ivan?  How long had

20   you known Ivan for?

21        A.   I really don't know.

22        Q.   How did you meet?

23        A.   Who, Ivan?

24        Q.   Yes.

25        A.   Um, he lived at my house.

J. Villatoro - People - Direct        678

1        Q.    And how do you know Steven?

2        A.    He was my next door neighbor, and I went to school

3   with him.

4        Q.    And do you know how long you have known Steven

5   for?

6        A.    Um, since I was in second grade.

7        Q.    And would you say that Steven was a friend of

8   yours?

9        A.    Yes.

10       Q.    And would you say that Ivan was a friend of yours?

11       A.    Yes.

12       Q.    And would you guys hang out together?

13       A.    Yes.

14       Q.    And how often would you hang out together?

15       A.    Like every day.

16       Q.    On -- I take you back now to Friday, September

17  24th.  You said you went to the park with Steven and Ivan,

18  correct?

19       A.    Yes.

20       Q.    Do you recall how you got to the park?

21       A.    Huh?

22       Q.    Do you recall how you got to the park?

23       A.    Walking.

24       Q.    And how did -- which entrance did you use to get

25  into the park?

J. Villatoro - People - Direct       679

1      A.   The one on Swalm Street.

2      Q.   And what did you do once you got into the park?

3      A.   I went to the playground with Steven and Ivan.

4      Q.   And what sort of things are in the playground?

5      A.   Basketball court, a soccer field, a baseball

6   field.

7      Q.   Jennifer, I'm sorry, you are just going to have to

8   speak up because it's a very big room.

9                THE COURT:   Read that back to the

10      interpreter.  I think she had little difficulty on that

11      sentence.

12                (The requested portion was read.)

13      A.   A handball court, a tennis court and the

14   playground.

15      Q.   And when you got to the park, what did you do?

16      A.   I was on the playground.

17      Q.   And what were you doing on the playground?

18      A.   Playing with Steven and Ivan.

19      Q.   Now, at some point did you see Ulises Bonilla

20   there?

21      A.   Yes.

22      Q.   Where was he?

23      A.   In the handball court.

24      Q.   What happened when you saw him at the handball

25   court?

J.H.

J. Villatoro - People - Direct        680

1     A.    Um, he asked me to go to the bathroom with him.

2     Q.    And what did you say?

3     A.    I didn't want to.

4     Q.    Now, did you say that out loud, or was that

5  something you were thinking in your head?

6     A.    I didn't say in a screaming way, but I said it to

7  him.

8     Q.    And what happened next?

9     A.    He took me to the bathroom.

10     Q.    When you say took you, how did he -- how did you

11  get to the bathroom?

12     A.    He grabbed my wrist and took me.

13     Q.    And did you walk with him?

14     A.    Yeah.

15     Q.    You didn't try to get away?

16     A.    No.

17     Q.    Did you want to go to the bathroom with him?

18     A.    Huh?

19     Q.    Did you want to go to the bathroom with him?

20     A.    No.

21     Q.    Which bathroom did you go into?

22     A.    The ladies'.

23     Q.    And was there anyone else -- did you go into the

24  bathroom with him?

25     A.    Huh?

1    Q.   Did you go into the bathroom with him?

2    A.   Yeah.

3    Q.   Was there anyone else in the bathroom?

4    A.   No.

5    Q.   When you got -- is there a door to the bathroom?

6    A.   Yeah.

7    Q.   I mean outer door to get into the bathroom.

8    A.   Yeah.

9              MR. MILLMAN:   I couldn't hear --

10             THE COURT:   Yes.

11   Q.   Now, when you went into the bathroom, was the

12   bathroom door closed?

13   A.   No.

14   Q.   So you went through that door?

15   A.   Yes.

16   Q.   And was the door closed once you got into the

17   bathroom?

18   A.   Huh?

19   Q.   Was the door closed once you got into the

20   bathroom?

21   A.   What do you mean?

22   Q.   Once you entered the bathroom, the door to the

23   bathroom, was it open or closed?

24   A.   Yes.

25   Q.   Which one was it, opened or closed?

J. Villatoro - People - Direct        682

1       A.   Closed -- I mean open.

2            THE COURT:   This is a public bathroom,

3       correct?

4            THE WITNESS:   Yes.

5            THE COURT:   The door is normally open; is

6       that not true?

7            THE WITNESS:   Yes.

8       Q.   Was it ever closed?

9       A.   No.

10      Q.   Now, when you got into the bathroom, where did you

11      go once you were inside the ladies' room?

12      A.   We went to the stall.

13      Q.   Which stall?

14      A.   The big stall.

15      Q.   Do you know what that stall's called?

16      A.   The handicapped stall.

17      Q.   What did you do once you got into the stall?

18      A.   Huh?

19      Q.   What did you do once you got into the handicapped

20      stall?

21           THE COURT:   Are you at this particular time

22      referring to singular or plural?

23           MS. ABDI:   Plural.

24      A.   What?

25           THE COURT:   What did the both of you do at

J.H.

J. Villatoro - People - Direct        683

1       that time?

2                       THE WITNESS:  We were kissing.

3           Q.   And how were you positioned into in the stall?

4           A.   My back was against the wall of the stall.

5           Q.   And where was Ulises Bonilla?

6           A.   I don't know how to explain it.  Can --

7           Q.   Well, what part of him was facing you?

8           A.   What do you mean?

9           Q.   What part of him do you see when your back was to

10      the stall?

11          A.   His face.

12          Q.   His face was towards you, correct?

13          A.   Yes.

14          Q.   And so your back was to the stall?

15          A.   Yes.

16          Q.   And he was facing you?

17          A.   Yes.

18          Q.   How close was he to you?

19          A.   Very close.

20          Q.   Where were your hands?

21          A.   Around him.

22          Q.   Were they -- were you hugging him?

23          A.   Yeah.

24          Q.   And do you recall what you were wearing that day?

25          A.   A shirt and a skirt.

J.H.

J. Villatoro - People - Direct        684

1      Q.    When you were -- when your hands were around him,

2    I'm talking about Ulises Bonilla, what happened next?

3          A.    I don't remember.

4          Q.    Well, what did you start -- what did you do?

5          A.    I don't know.

6          Q.    Well, what did he do?

7                THE COURT:    In your own words, tell this jury

8          what happened at that time, in your own words.

9                THE WITNESS:    What was the question again?

10                THE COURT:    In your own words, tell this jury

11          what happened at that time.

12                THE WITNESS:    We were kissing.

13          Q.    And what happened next?

14          A.    He was fingering me.

15          Q.    What does that mean?

16          A.    When you put a finger in the vagina.

17          Q.    Okay.

18                MR. MILLMAN:    Can't hear.

19                THE COURT:    When you put a finger in the

20          vagina.

21          Q.    And what did he do to get to your vagina?

22          A.    He pulled down my skirt.

23          Q.    And were you wearing underwear?

24          A.    Yes.

25          Q.    And what happened to your underwear?

J. Villatoro - People - Direct      685

 1        A.    Well, he pulled it down.

 2        Q.    And when he pulled your underwear down, what did

 3    he do next?

 4        A.    After that part?

 5        Q.    No, you said something about his finger?

 6        A.    Um-hum.

 7        Q.    What happened with his finger?

 8        A.    He put it in my vagina.

 9        Q.    And what happened after that?

10        A.    He tried to put his penis in my vagina.

11        Q.    How did he try to do that?

12        A.    What do you mean?

13        Q.    What did he do?

14        A.    I don't know.

15        Q.    You said that he used his finger and put it in

16    your vagina?

17        A.    Yes.

18        Q.    You said he put something else in your vagina?

19        A.    Yes.

20        Q.    What was that?

21        A.    His penis.

22        Q.    And what did he do?

23        A.    He tried to put it in my vagina.

24        Q.    Was he able -- how do you know he tried to do

25    that?

J. Villatoro - People - Direct          686

1        A.    Because I felt it.

2        Q.    And what happened next?

3        A.    Hum?

4        Q.    Was he able to get it fully in?

5        A.    No.

6        Q.    How much -- what did it feel like?

7        A.    It hurt.

8        Q.    Could you feel he was able to get it in a little

9    bit?

10       A.    Huh?

11       Q.    Could you fee he was able to get it in a little

12   bit?

13       A.    Yes.

14             THE COURT:  Did he?

15             THE WITNESS:  Hum?

16             THE COURT:  She asked you to tell if he got

17   it in a little bit, and you stated yes?

18             THE WITNESS:  Yes.

19       Q.    What did that feel like?

20       A.    Scary.

21       Q.    And when he was touching you with his finger, how

22   did that make you feel?

23       A.    It hurt too.

24       Q.    Now, how else did it make you feel when he was

25   touching you with his finger?

J.H.

J. Villatoro - People - Direct          687

1     A.    Uncomfortable.

2     Q.    And when he put his penis in your vagina, how did

3  that make you feel?

4     A.    Uncomfortable.

5     Q.    Did you want to do that?

6     A.    No.

7     Q.    What happened after he put his penis in your

8  vagina?

9     A.    I got him off me.

10    Q.    How did you do that?

11    A.    By pushing him.

12    Q.    How did you push him?

13    A.    I don't know.

14    Q.    What did you use to push him?

15    A.    Hands.

16    Q.    And what happened next after you pushed him?

17    A.    I got a phone call from my brother.

18              MR. MILLMAN:   I can't hear, your Honor.

19              THE COURT:   I got a phone call from my

20    brother.

21    Q.    And how do you know that you got a phone call?

22    A.    Because I heard my phone ringing.

23    Q.    Did you answer it?

24    A.    No.

25    Q.    And then what happened?

J.H.

J. Villatoro - People - Direct          688

1    A.   I moved him, and I left.

2    Q.   Where did you leave?

3    A.   To my house.

4    Q.   And where did Ulises go?

5    A.   I don't know.

6    Q.   Well, you left the bathroom, correct?

7    A.   Yeah.

8    Q.   Did he also leave the bathroom?

9    A.   I guess.

10   Q.   Who left the bathroom first?

11   A.   Me.

12   Q.   Now, when you left the bathroom, where did you go?

13   A.   Home.

14   Q.   And do you know what route you took to get home?

15   Do you know which streets you used?

16   A.   What, what?

17   Q.   Do you know what streets you used to get home?

18   A.   Down Urban and then down Broadway.

19            THE COURT:   Just read that back.

20            (The requested portion was read.)

21   Q.   Now, Jennifer, when you left the bathroom, was

22   there anything on you that was hurting, any parts of your

23   body that was hurt?

24   A.   My lip.

25   Q.   And why was your lip hurting?

J.H.

J. Villatoro - People - Direct          689

1    A.   Because he bit it.

2    Q.   When did he bite it?

3    A.   While we were kissing.

4    Q.   While you were kissing in the bathroom?

5    A.   Yes.

6    Q.   Now, when you got home, did you go right home?

7    A.   Yes.

8    Q.   When you got home, who was there, if you recall?

9    A.   Hum?

10   Q.   When you got home, who do you see, if you recall?

11   A.   My dad and mom and brother and his friends.

12             THE COURT:   I want to take you back to the

13   bathroom.   And please don't be embarrassed by this.

14   Was his penis erect or limp?

15             THE WITNESS:   What do you mean?

16             THE COURT:   Was it erect like that or limp?

17             THE WITNESS:   Erect.

18             MR. MILLMAN:   I didn't hear.

19             THE COURT:   Erect.

20   Q.   Now, when you got back to the house, did you tell

21   your mom anything about what happened?

22   A.   No.

23   Q.   Did you tell your dad anything about what

24   happened?

25   A.   No.

J.H.

J. Villatoro - People - Direct        690

1    Q.   Do you know who did?

2    A.   Steven and Ivan.

3              MR. MILLMAN:  Objection.  Hearsay, your

4    Honor.

5              THE WITNESS:  What?

6              THE COURT:  Just one second.  Overruled.

7    Q.   Why didn't you tell your mom what happened?

8    A.   Huh?

9    Q.   Why didn't you tell your mom what happened?

10   A.   Because I was scared that I will get in trouble.

11   Q.   And did the police come to the house that day?

12   A.   Yes.

13   Q.   And these were police officers in uniform,

14   correct?

15   A.   Yes.

16   Q.   Did you tell them what happened?

17   A.   No.

18   Q.   Why didn't you tell them what happened?

19   A.   Because I was scared I would get in trouble.

20   Q.   Now, I'm going to direct your attention to a few

21   days later.  This is Tuesday, September 28th of 2010.  I'm

22   going to direct your attention to sometime around 10 p.m.

23   about.  Where were you at that time?

24   A.   Home.

25   Q.   And do you recall what you were doing when you

J.H.

J. Villatoro - People - Direct          691

1    were home?

2          A.    Taking a shower.

3          Q.    And what happened?

4          A.    I heard noise while I was showering, and then I

5    went outside in a towel.  And then I saw my dad on the floor

6    bleeding.

7          Q.    When you say when you went outside, you went

8    outside your house?

9          A.    Yes.

10         Q.    And where did you see your dad?

11         A.    On the ground, on the lawn.

12         Q.    Could you tell if he was injured?

13         A.    Yes.

14         Q.    And you didn't see anything about what happened to

15   your dad?

16         A.    No.

17         Q.    You were inside the house for that?

18         A.    Yes.

19         Q.    So by the time you came out, all you saw was your

20   dad lying on the lawn; is that correct?

21         A.    Yes.

22         Q.    Did you see your mom at that point?

23         A.    Yes.

24         Q.    And what was she doing?

25         A.    Crying her eyes out.

J.H.

J. Villatoro - People - Direct          692

1       Q.    When was the last time you saw your dad?

2       A.    Before he left to the store.

3       Q.    Was it that day?

4       A.    Yes.

5       Q.    And what happened when he left for the store?

6       A.    He gave me a hug and kiss, and he told me he was

7    going to be right back.

8       Q.    Now, after what happened to your father, did you

9    talk to the police again?

10      A.    No, I talk to detectives.

11      Q.    Okay, I'm sorry.  I don't mean patrol officer, the

12   ones in uniform.  I mean did you ever talk to detectives

13   after your dad died?

14      A.    Yes.

15      Q.    And do you recall how many times you talked to

16   detectives?

17      A.    Two times.

18      Q.    And do you know when the first time that you

19   talked to a detective was?

20      A.    Oh, on September 29th.

21      Q.    And do you know when the second time you talked to

22   a detective was?

23      A.    No.

24      Q.    Was it later than September 29th?

25      A.    Yeah.

J.H.

J. Villatoro - People - Direct          693

1          Q.     In the first time that you spoke to detectives on

2     September 29th, you didn't tell them everything that

3     happened in the bathroom; is that correct?

4                      MR. MILLMAN:  Objection.

5          A.     Yeah.

6                      MR. MILLMAN:  It's leading, your Honor.

7                      THE WITNESS:  What?

8                      THE COURT:  Just one second.  Overruled,

9          overruled.

10         Q.     You didn't tell them everything that happened in

11    the bathroom?

12         A.     No.

13         Q.     Then on the second time you talked to detectives,

14    did you tell them everything that happened then?

15         A.     No, wait.

16         Q.     I'm sorry, the second time you talked to them?

17         A.     The second time, no.

18         Q.     And you went to the doctor after your dad was

19    killed; is that right?

20         A.     Yes.

21         Q.     And that was to be examined?

22         A.     Yes.

23         Q.     Now, do you recall -- do you know when -- how far

24    in time -- withdrawn.

25                 Do you know how long after the first time you

J.H.

J. Villatoro - People - Direct        694

1    spoke to the police you spoke to the police again?  Do you

2    know the time period in between the first and second meeting

3    with the police was?

4         A.    It was like month later.

5              MR. MILLMAN:  I'm sorry, I can't hear.

6              THE COURT:  About a month latter.

7         Q.    So is it fair to say the second time you talked to

8    the police was a month, approximately a month after your dad

9    died?

10        A.    Yes.

11        Q.    And why did you tell them what happened the next

12   time?

13        A.    Because I had to.  I needed to.

14        Q.    And are you very nervous here today?

15        A.    Yes.

16        Q.    Do you feel embarrassed today?

17        A.    Not anymore.

18        Q.    Now you feel --

19             MR. MILLMAN:  I'm sorry?

20             THE COURT:  Not anymore.

21        Q.    Now, Jennifer, do you see Ulises Bonilla in the

22   courtroom today?

23        A.    Yeah.

24        Q.    Can you identify, meaning say something that he's

25   wearing?

J. Villatoro - People - Cross        695

1       A.   A blue shirt, light blue.

2                 MS. ABDI:   Your Honor, may the record reflect

3       the witness has identified the defendant?

4                 THE COURT:   Yes.

5                 MS. ABDI:   I have no further questions.

6                 THE COURT:   Mr. Millman, do you want to

7       start?

8                 MR. MILLMAN:   I'm sorry, your Honor?

9                 THE COURT:   Do you want to start in, or do

10      you want a little break?

11                MR. MILLMAN:   A little break.

12                THE COURT:   Do you want to take little break?

13                THE WITNESS:   Yeah.

14                THE COURT:   Okay.   About ten minutes, ladies

15      and gentlemen.

16                     (Whereupon, the jury exits the courtroom.)

17                     (A recess was taken.)

18                THE CLERK:   Recalling case on trial, Ulises

19      Bonilla, Indictment 202N of 2011.   All parties present

20      including the defendant and Spanish interpreter.   There

21      are no jurors present at this point.

22                THE COURT:   Let's seat the witness while the

23      jury is coming over.

24                     (The witness resumes the witness stand.)

25                THE CLERK:   Ma'am, please be reminded you are

J.H.

J. Villatoro - People - Cross          696

1     still under oath.

2               COURT OFFICER:   Jury entering.

3               (The jury enters the courtroom.)

4               THE CLERK:   Let the record reflect the jurors

5     are present.   Both sides consent to the seating and

6     waive a reading of the roll?

7               MS. ABDI:   Yes.

8               THE CLERK:   Counsel?

9               MR. MILLMAN:   Yes.

10              THE CLERK:   Thank you.

11              THE COURT:   Cross-examine.

12    CROSS-EXAMINATION

13    BY MR. MILLMAN:

14         Q.   Good morning, Miss Villatoro.

15         A.   Good morning.

16         Q.   Would you prefer that I call you Jennifer or Miss

17    Villatoro?

18         A.   Jennifer.

19         Q.   Jennifer, I think you stated earlier in your

20    testimony that after you used your hands to push --

21              THE COURT:   Rephrase the question.

22              MR. MILLMAN:   Sure.

23         Q.   Jennifer, after you used your hands to push Ulises

24    away, was that when you received a phone call from your

25    brother?

J.H.

J. Villatoro - People - Cross          697

1        A.    Yeah.

2        Q.    And your brother is Oscar?

3        A.    Yes.

4        Q.    And am I correct in stating that you did not

5    answer the phone?

6        A.    No.

7        Q.    And why didn't you answer the phone at that time?

8        A.    Because, um, I was with him.

9        Q.    Okay.  But you had already pushed him away?

10       A.    No.  I had -- the phone was still ringing.  It

11   didn't click or nothing.  It was just ringing.

12       Q.    So did the phone call from your brother happen

13   before or after you left the stall?

14       A.    After I left -- no, wait.  In the middle.

15       Q.    But it was still ringing when you had exited the

16   bathroom?

17       A.    When I left, it was still ringing.

18       Q.    And at that time could you have picked it up?

19       A.    No, because it had clicked when I got out.

20       Q.    While you were in the bathroom, you said that you

21   were in the stall with Ulises?

22       A.    Yes.

23       Q.    Did you ever see his penis?

24       A.    Yes.

25       Q.    You did see it?

J.H.

J. Villatoro - People - Cross      698

1       A.    Um-hum.

2       Q.    Jennifer, do you remember testifying before a

3  grand jury in connection with this?

4       A.    Yes.

5       Q.    Do you remember you were asked a number of

6  questions about what happened in front of a grand jury?

7       A.    What?

8       Q.    Do you remember being asked questions in front of

9  a grand jury?

10       A.    Yeah.

11       Q.    And that was in January of 2011; does that sound

12  about right?

13       A.    I don't remember.

14       Q.    You don't remember.

15             And at that time you were under oath; am I right?

16       A.    What?

17       Q.    Did they swear you in as a witness when you

18  testified before the grand jury?

19       A.    I don't know.

20       Q.    At that time did you tell the members of the grand

21  jury that --

22             THE COURT:  All right.

23             MR. MILLMAN:  I'll rephrase this.

24             THE COURT:  There's a way to do this.

25             MR. MILLMAN:  Certainly, your Honor.  Give me

J. Villatoro - People - Cross          699

1          one moment.  One moment.  I apologize.

2          Q.    Jennifer, do you remember being asked the

3     following question and giving the following answer?  This is

4     on page 17, as this is line 19 I am reading from.  And when

5     you say that word --

6                    "QUESTION:  And when you say that word, do

7           you mean are you talking about penis?

8                    "ANSWER:  Yes.

9                    "QUESTION:  And could you see that?  Could

10          you see his penis?

11                   "ANSWER:  No."

12                   Did you tell that to the members of the grand

13          jury?

14         A.    I don't know.

15         Q.    Do you remember being asked those questions and

16    giving those answers?

17         A.    I was asked a lot of questions.

18         Q.    Did you tell the members of the grand jury that

19    you did not see his penis?

20         A.    I don't remember.

21                   MR. MILLMAN:  Your Honor, at this time I have

22          an application to introduce just a segment of the grand

23          jury testimony that relates to --

24                   THE COURT:  Come on up here.

25                   (The following occurs at sidebar outside of

J.H.

J. Villatoro - People - Cross        700

1    the hearing of the jurors.)

2            THE COURT:  I don't know what context that's

3    in.  I don't know whether or not there is going to be

4    any explanation.  So I'm going to deny your request at

5    this time unless the People stipulate to it.  There are

6    other ways of doing it.

7            MS. ABDI:  It's improper what he's requesting

8    for because it's not an inconsistent statement.  She

9    said she didn't remember.  She was never shown it.

10           MR. MILLMAN:  The Second Department, I do

11   have cases on this as indicated by the inconsistencies

12   it need not be a direct conflict.

13           THE COURT:  I'm aware of that.  And I don't

14   know what context it's in.  You're still on the

15   cross-examination of this particular witness.

16           Now, for instance, if it were a written

17   statement, could you see is this your signature, and

18   you could introduce this at this particular time.  I'm

19   not ruling that there may not come a time that you

20   can't introduce it.  All I know is that I am not going

21   to allow it at this time based upon the foundation that

22   you laid.  Over objection.  Do you object?

23           MS. ABDI:  Yes.

24           THE COURT:  Okay.

25           (The following takes place in open court.)

J.H.

1        MR. MILLMAN:  Your Honor, could I ask to have

2    this marked as Defendant's A.

3        (Defendant's Exhibit A is marked for

4    identification.)

5        THE COURT:  Okay, ladies and gentlemen, we

6    mark People's exhibits with a number and defendant's

7    exhibit with a letter.

8        MR. MILLMAN:  Could you hand what was marked

9    as Defendant's A for identification.

10       THE COURT:  Would you like to refer her to a

11   specific page?

12       MR. MILLMAN:  You took the words right out of

13   my mouth, your Honor.

14   Q.   Jennifer, I'm going to ask you to turn to page 17.

15       THE WITNESS:  Where are the page numbers?

16   Q.   I'm just going to ask you to read the full page.

17       THE COURT:  Read to yourself.  What lines?

18       MR. MILLMAN:  The full page, your Honor.

19       THE COURT:  You can also read a little bit of

20   the next page too.  Okay, ask the witness a specific

21   question.

22       MR. MILLMAN:  Certainly.

23   Q.   Jennifer, you had a chance to take a look at that

24   page that I referred to you?

25   A.   Um.

J. Villatoro - People - Cross        702

1        Q.    I'm sorry?

2        A.    Yeah.

3        Q.    Does that refresh your recollection as to what you

4    told the members of the grand jury?

5        A.    Yeah.

6        Q.    Did you tell the members of the grand jury that

7    you did not see his penis?

8        A.    No.

9        Q.    I'm sorry?

10        A.    What?

11        Q.    Did you tell the members of the grand jury that

12    you did not see his penis?

13        A.    No.  Yes, yes.

14        Q.    So you told the members of the grand jury that you

15    did not see his penis; is that right?

16        A.    Yeah.

17        Q.    Okay.  But you just testified here that you did?

18    Withdrawn.  I'm withdrawing the question.

19              Jennifer, I wanted to ask you on September 24th of

20    2010 --

21              THE COURT:  Counsel.

22              MR. MILLMAN:  I'm sorry, your Honor.

23              THE COURT:  I don't want you to have any

24        competition with the aircraft noise.

25              MR. MILLMAN:  I'm sure I would lose that

J. Villatoro - People - Cross        703

1        competition.

2                THE COURT:   Okay.

3                MR. MILLMAN:   Thank you.

4        Q.   Jennifer, on September 24th of 2010, you do

5   remember the police coming to your home, right?

6        A.   Yeah.

7        Q.   And how many police officers were there, if you

8   remember?

9        A.   One.

10       Q.   And the police officer that was there, he asked

11  you questions about Ulises?

12       A.   Yeah.

13       Q.   And who else was there at the time that this

14  police officer was asking you these questions?

15       A.   My mom.

16       Q.   Anyone else?

17       A.   No.

18       Q.   And did the police officer tell you that it was

19  important to tell him everything that happened?

20       A.   Yes.

21       Q.   And did he tell you -- withdrawn.

22            When you were talking to the police officer, were

23  you upset about what Ulises did?

24       A.   Yeah.

25       Q.   And you were angry about it?

1        A.    Yeah.

2        Q.    And you wanted to see him punished for it; would

3    that be fair to say?

4        A.    I don't know.

5        Q.    Did the police officer tell you that in order have

6    Ulises punished in connection with this that you needed to

7    tell them what happened?

8        A.    Yeah.

9        Q.    And did they tell you that it was important to let

10   them know everything that took place that day?

11       A.    Yes.

12       Q.    And did they also tell you that you wouldn't get

13   in trouble if you told them what happened?  Did they tell

14   you that?

15       A.    Yes.

16              THE COURT:   Trouble from whom?  Did they tell

17         you you wouldn't get in trouble from the police

18         department?

19              THE WITNESS:   Yes.

20       Q.    And did your mother tell you that you would not

21   get in trouble if you just told the police officers what

22   happened?

23       A.    Yeah.

24       Q.    And your mother wanted you to tell the police

25   officers what happened, right?

1        A.    Yes.

2        Q.    And Jennifer, you indicated that when Ulises was

3    kissing you, he bit your lip?

4        A.    Huh?

5        Q.    That when Ulises was kissing you in the bathroom

6    stall, that he bit your lip; is that right?

7        A.    Yeah.

8        Q.    And that hurt?

9        A.    Yes.

10       Q.    Was that still hurting when you were talking to

11   the police?

12       A.    Yeah, because it was swollen, and I had to put ice

13   on it.

14       Q.    I'm sorry, I didn't hear that.

15       A.    I had to put ice on it.

16       Q.    Were you putting ice on it in front of the

17   policemen?

18       A.    Yes.

19       Q.    And when you say that Ulises placed his fingers in

20   your vagina, that hurt?

21       A.    Yeah.

22       Q.    Were you still in pain when you were talking to

23   the police?

24       A.    Not anymore.

25       Q.    Did you ask your mother that night to be taken to

J. Villatoro - People - Cross          706

1   the doctor?

2        A.   Huh?

3        Q.   Did you ask your mother to be taken to a doctor

4   that night?

5        A.   No.

6        Q.   Did you ask her to be taken to a doctor the next

7   day?

8        A.   No.

9        Q.   And when the police officers asked you what

10  happened, you told them that nothing happened?

11       A.   No, I told them that we kissed.  That was it.

12       Q.   You told the police officers that he you kissed?

13       A.   Yeah, because he told me, What happened to your

14  lip, and I said, We kissed.

15       Q.   And -- but you did not tell them that Ulises

16  touched you on your vagina, right?

17       A.   No.

18       Q.   And the reason for that, Jennifer, is that never

19  happened; isn't that right?

20       A.   Huh?

21       Q.   The reason that you didn't tell the policemen that

22  Ulises touched you on your vagina is that that never

23  happened?

24       A.   Yes, it did.

25       Q.   On September 29th of 2010, you were interviewed by

J.H.

1    the police at police headquarters; do you remember that?

2         A.    I don't know.

3         Q.    Well, I think you made reference to the fact that

4    you spoke to the police two times after they came to your

5    home?

6         A.    Yeah.

7         Q.    The first time that you spoke to them after they

8    came to your home, you spoke to them at a police station; do

9    you remember?

10        A.    No.

11        Q.    But you didn't speak to them at your home at that

12   time, right?

13        A.    No.

14        Q.    Do you remember where it was you spoke to them?

15        A.    I remember it was in a department, but I don't

16   know which one.

17        Q.    I'm sorry, I didn't hear.

18        A.    I remember it was in a department, but I don't

19   know which one.

20             THE COURT:    Are you saying department, police

21        department?

22             THE WITNESS:    Yeah.

23             THE COURT:    But you don't know which specific

24        one?

25             THE WITNESS:    Yeah.

1       Q.    And Jennifer, between September 24th of 2010 and

2    the next time that you spoke with the police, you had spoken

3    with your mom about what happened at the park?

4       A.    No.

5       Q.    You didn't tell her anything about what happened?

6       A.    I just told her we kissed.

7       Q.    And when you went to speak to the police that

8    first time that you spoke to them after they came to your

9    home, did you tell your mother that you were going to speak

10   to them?

11      A.    What do you mean?

12      Q.    Well, did you talk to your mother about the fact

13   that you were going to speak to the police before the next

14   time you spoke to them?

15                THE COURT:   When you spoke to the police the

16          second time, who went with you?

17                THE WITNESS:   No one.

18                THE COURT:   Did the police pick you up?

19                THE WITNESS:   Yeah.

20                THE COURT:   Okay.

21      Q.    And before the police picked you up, did you tell

22   your mother where you were going?

23      A.    Yes.

24      Q.    And did you speak to her about that at that time?

25      A.    Huh?

1    Q.   Did you speak to her about that further at that

2    time before the police picked you up?

3         A.   No.

4         Q.   So when you told her that the police were picking

5    you up, did she ask you any questions about why?

6         A.   What?

7         Q.   When you had told your mother that the police were

8    going to pick you up, did you tell your mother why?

9         A.   Why what?

10        Q.   Why the police were coming to pick you up.

11        A.   To talk to me.

12        Q.   Did you tell her what they were going to talk to

13   you about?

14        A.   About what happened at the park.

15        Q.   But at that time, correct me if I am wrong, you

16   said that you had not told your mother that anything

17   happened other than kissing?

18        A.   Yeah.

19        Q.   Did your mother ask you further questions when you

20   told her that you were going with the police to talk to them

21   about kissing?

22        A.   You got me confused.

23        Q.   Okay.  I'll rephrase it.  No problem.

24             What I'm asking, Jennifer, is whether or not you

25   told your mother anything more about what happened in the

J. Villatoro - People - Cross        710

1   park just before the police picked you up.

2              MS. ABDI:  Objection.  What dates are we

3        talking about?

4              MR. MILLMAN:  I don't know all the specific

5        dates.

6              THE COURT:  Just one second.

7              THE WITNESS:  I'm lost.

8              THE COURT:  Just one second.  Other than

9        telling your mother that you were kissing, did you tell

10       her anything else before you went to the police

11       station?

12             THE WITNESS:  Yes.

13             MR. MILLMAN:  Were you finished, your Honor?

14             THE COURT:  Yes.

15             MR. MILLMAN:  I did not want to cut you off.

16       Q.   So Jennifer, what else did you tell her?

17       A.   What?

18       Q.   What else did you tell her about what happened

19  before you went with the police on that occasion?

20       A.   All I told her was that I was going to talk to

21  them about what happened that Friday.  And she asked me why

22  didn't I want to tell her what happened, but I told her

23  because I was scared.  I didn't want to get in trouble.

24       Q.   And when you talked to your mom what happened, can

25  you tell us more specifically exactly what you said to her?

J.H.

1          MS. ABDI:  Objection.

2     A.   What?

3          THE COURT:  Just one second.  Come on up.

4          (The following occurs at sidebar outside of

5     the hearing of the jurors.)

6          THE COURT:  You want to ask her what

7     specifically she told her mother?

8          MR. MILLMAN:  Yes.  Because, you know, when

9     she went to the police station, I am seeking to show

10    she would no longer have that motive to not say things

11    because she was no longer worried about what her mother

12    would think, so the exact words are very important.

13         THE COURT:  It could be self-serving.  It

14    could be the elucidation of a complaint.

15         MR. MILLMAN:  I understand, but I want to ask

16    her.

17         THE COURT:  Go ahead, ask her.

18         (The following takes place in open court.)

19    Q.   Jennifer, before you went to speak to the police

20    that second time, and this would be the first time after

21    they came to your home, had you told your mother everything

22    that happened at the park?

23    A.   No.

24    Q.   I'm sorry?

25    A.   No.

J. Villatoro - People - Cross      712

1        Q.    What was it that you did tell her prior to the

2    time that you spoke to the police outside your home for the

3    first time?

4        A.    That we kissed.

5        Q.    Anything else?

6        A.    No.

7        Q.    Did your mother tell you at that time to make sure

8    you said everything to the police about what happened

9    between you and Ulises?

10       A.    Yes.

11       Q.    Did you speak with Nancy, your older sister, about

12   what happened in the park between September 24th of 2010 and

13   the time that the police picked you up to speak to them?

14       A.    I don't remember.

15       Q.    Did you speak with your father about it?

16       A.    No.

17       Q.    When you went to speak to the police, again, we're

18   talking about, Jennifer, the first time you spoke to them

19   after they came to your home, you went with your cousin

20   Francis, right?

21       A.    Yes.

22       Q.    And how old is Francis?

23       A.    I don't know.

24       Q.    He's older than you?

25       A.    Yes.

J.H.

J. Villatoro - People - Cross        713

1    Q.   Did you tell Francis about what happened between
2    you and Ulises?
3                    THE COURT:   Is Francis masculine -- male or
4         female?
5                    THE WITNESS:  Male.
6    Q.   Did you tell Francis about what happened in the
7    park between you and Ulises?
8    A.   No.
9    Q.   Did he ask why he was going to the police station?
10   A.   Yes.
11   Q.   And what did you tell him?
12   A.   That I had to go talk to them about what happened
13   at the park.
14   Q.   And did he ask you what you were referring to?
15   A.   What do you mean?
16   Q.   Did you tell him anything further at that time
17   about what happened at the park?
18   A.   No.
19   Q.   Was Francis with you when you were talking to the
20   police?
21   A.   No.
22   Q.   And when you spoke to the police, and again, this
23   is the first time that you spoke to them outside of your
24   home, did they also tell you at that time that it was very
25   important to tell them everything that happened?

J. Villatoro - People - Cross        714

1       A.    Yes.

2       Q.    And did they tell you that if you wanted Ulises to

3    be held accountable or punished that you needed to let them

4    know everything that happened?

5       A.    Yeah.

6       Q.    Now, at that time you indicated to -- withdrawn.

7             You were asked, Jennifer, at that time by the

8    police whether or not Ulises placed his penis inside your

9    vagina; do you remember being asked about that?

10      A.    Yeah.

11      Q.    And do you remember what you told them?

12      A.    Yeah.

13      Q.    What did you tell them?

14      A.    It went in a little bit.

15      Q.    I'm sorry?

16      A.    It went in a little bit.

17      Q.    Okay.  Well, Jennifer, didn't you tell them at

18   that time that Ulises never placed his penis inside your

19   vagina?

20            MS. ABDI:  Objection.  What time are we

21       talking about?

22            MR. MILLMAN:  I think I oriented her to the

23       time, your Honor.

24            THE COURT:  Just one second.  Can you answer

25       that question?

J. Villatoro - People - Cross        715

1                    THE WITNESS:  No.

2                    THE COURT:  Rephrase it.

3                    MR. MILLMAN:  Certainly.  Can I just have the

4          last question read back so I can rephrase it?

5                    THE COURT:  Did you tell him at that

6          particular time that he never placed his penis in your

7          vagina, that was your last question.

8                    MR. MILLMAN:  Okay.

9          Q.    Jennifer, do you remember being asked about what

10    sex is by the police?

11         A.    Yes.

12         Q.    Do you remember telling them what it was?

13         A.    Yeah.

14         Q.    And do you remember them then asking whether or

15    not he did that to you?

16         A.    What?

17                   MR. MILLMAN:  I'm going ask to have this

18         marked Defendant's B for identification.

19                   THE COURT:  You asked her a question which I

20         assume you wish to form the basis of an inconsistent

21         statement.  The witness said what?  That's what the

22         witness said.

23                   MR. MILLMAN:  The witness, I believe, had

24         denied something that specifically --

25                   THE COURT:  I am not going to prevent you

J.H.

J. Villatoro - People - Cross        716

1        from doing this, but specifically ask her what you want

2        to ask her.

3                    MR. MILLMAN:  Okay.  I'll certainly clarify

4        that.

5        Q.    Jennifer, did you tell the police at that time

6     that Ulises never placed his penis inside your vagina?

7        A.    When?

8        Q.    At any time.

9                    THE COURT:  Sustained.

10       Q.    Do you remember being asked questions by the

11    police when Francis had gone with you to the police station?

12       A.    What?

13       Q.    Let me rephrase it.  The first time you spoke with

14    the police outside of your home, do you recall that?

15       A.    Yeah.

16       Q.    And that was the time in which you went there with

17    your cousin Francis; is that right?

18       A.    Yes.

19       Q.    That is the time that I'm referring to.  At that

20    time did the police ask you questions about Ulises?

21       A.    Yes.

22       Q.    And did they ask you about what he did?

23       A.    Yes.

24       Q.    Did they ask you whether or not Ulises placed his

25    penis inside your vagina?

J.H.

J. Villatoro - People - Cross        717

1    A.    I don't know.  I don't remember.

2    Q.    You don't remember.

3          MR. MILLMAN:  I just ask the witness be

4    handed what's been marked Defendant's Exhibit B for

5    identification.

6          (Defendant's Exhibit B is marked for

7    identification.)

8          THE COURT:  What's your specific question?

9          MR. MILLMAN:  Well, first I'm going to ask --

10   Q.    Jennifer, can you just read from the point where

11   it says who is Ulises to the bottom of the page, and then

12   look up when you're finished.

13         THE COURT:  To yourself.

14         MR. MILLMAN:  Yes.

15         THE COURT:  What's your question?

16   Q.    Does that refresh your recollection about the

17   discussion you had with the police about whether or not

18   Ulises had placed his penis inside your vagina?

19   A.    What?

20   Q.    What I'm asking, Jennifer, is now having looked at

21   that, do you remember now more about the discussion you had

22   with the police about whether or not Ulises placed his penis

23   in your vagina?

24   A.    I don't know.

25   Q.    Do you understand my question?

J. Villatoro - People - Cross          718

1       A.    No.

2       Q.    Let me rephrase it.

3       A.    I don't understand you at all.

4       Q.    You have reviewed what I asked to you review,

5    correct?

6       A.    Yeah.

7       Q.    I'm going to ask you does that bring back or help

8    you remember some of the things that you spoke with the

9    police about that day?

10      A.    I'm lost. I don't know what you are saying.

11      Q.    Does reviewing that exhibit that you just looked

12   at help you -- help remind you of some of the discussion you

13   had with the police now that you looked at it?

14            THE COURT:  All right, this witness testified

15       on direct as to what happened in the bathroom.  Now, if

16       you want to ask her whether or not she told something

17       else to the police department, do it.  Get right to the

18       point.

19            MR. MILLMAN:  I did, your Honor.  She said

20       she didn't recall which is why I had the exhibit

21       marked, but she did indicate she didn't recall.

22            THE COURT:  Ask her a specific question.

23      Q.    Jennifer, did you tell the police on that occasion

24   that Ulises never placed his penis inside your vagina?

25            MS. ABDI:  Objection.

J.H.

J. Villatoro - People - Cross       719

1          THE COURT:  All right, just a second.  Let me

2     have that.  Did you -- were you asked the following

3     question by the police department:

4               "What happened Friday?

5               "Friday after school, I went to the park with

6     two friends, Ivan and Steven.  Ulises grabbed my arm

7     and pulled me into the bathroom and said he wanted to

8     do sex with me.

9               "What is sex?

10              "Sex is when the boy puts his dick in a

11    girl's pussy."

12              Were you asked -- did the police department

13    ask you that and did you give that answer?

14              THE WITNESS:  Yeah.

15              THE COURT:  "Did he do that to you?

16              "ANSWER:  No."

17              Did they ask you that and did you give that

18    answer?

19              THE WITNESS:  Yeah.

20              THE COURT:  "What did he do?

21              "He kissed me."

22              Did they ask you that, and did you give that

23    answer?

24              THE WITNESS:  Yeah.

25              THE COURT:  And then they say, "What else?"

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 720 of 913 PageID #: 1020

1          "He was rubbing by must pussy.  He tried to

2      pull up my skirt.  I didn't let him."

3          Did they ask you that, and did you give that

4      answer?

5          THE WITNESS:  Yeah.

6      Q.  And Jennifer, at that time your mother was not

7  with you, right?

8      A.  What?

9      Q.  Your mother was not with you at that time, right?

10     A.  I didn't hear you.

11     Q.  I'm sorry.  When you spoke to the police on that

12  occasion, your mother was not with you; am I right?

13     A.  My mother was not what?

14     Q.  Was your mother with you at the time that you were

15  speaking to the police when you made those statements?

16     A.  No.

17     Q.  Now, after the day that you spoke to the police

18  when you went there with Francis, did you again speak with

19  your mother about what happened at the park?

20     A.  No.

21     Q.  Did you speak with your older sister Nancy about

22  what happened in the park?

23     A.  I don't know.

24     Q.  Now, on October 26th of 2010 -- withdrawn.

25         You indicated that there were two times you spoke

J.H.

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 721 of 913 PageID #: 1021

1    to the police after they came to your home; is that right?

2        A.    Yes.

3        Q.    Now, I want to talk about the second time that you

4    spoke to the police.  Did you give them a written statement

5    at that time?

6        A.    Yeah.

7        Q.    And at that time did you tell them that Ulises

8    placed his penis inside your vagina?

9        A.    Yes.

10       Q.    Prior to that date, to that time, did you ever

11   tell anyone that Ulises placed his penis inside your vagina?

12       A.    What do you mean?

13       Q.    Well, we're talking about the second time that you

14   spoke to the police after they came to your house, right?

15       A.    Yeah.

16       Q.    And you gave a written statement at that time,

17   right?

18       A.    Yes.

19       Q.    What I'm asking now, Jennifer, is before that day,

20   did you ever at any time tell anyone that Ulises placed his

21   penis inside your vagina?

22       A.    Only the detective.

23       Q.    The detective?

24       A.    Yeah.

25       Q.    And when was that, to the best that you remember?

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 722 of 913 PageID #: 1022

1        A.    After my dad died.

2        Q.    The day after?

3        A.    No, I don't know.

4        Q.    Do you remember when you told the detective this,

5    do you remember if anyone else was there?

6        A.    I don't know.

7        Q.    Do you remember how long before it was, how long

8    before the date you gave the written statement it was; do

9    you remember?

10                THE COURT:   Rephrase that question.

11                MR. MILLMAN:   Sure.

12        Q.    Was this within the one week period before you

13    gave the written statement to the police?

14                THE COURT:   Do you, as you sit here today,

15        remember when you actually signed a written statement?

16                THE WITNESS:   Yes.

17                THE COURT:   What day was that?

18                THE WITNESS:   I don't know.

19                THE COURT:   But you remember signing a

20        written statement?

21                THE WITNESS:   Yeah.

22                THE COURT:   Okay.

23        Q.    And Jennifer, you say that Ulises went with you

24    into the ladies' room at the park on September 24th of 2010?

25        A.    Um-hum.

J. Villatoro - People - Cross       723

1    Q.    I'm sorry?

2    A.    Yes.

3    Q.    Do you know what day of the week that was?

4    A.    Friday, I think.

5    Q.    It was a Friday?

6    A.    I don't know.  I think so.

7    Q.    The park was very busy at that time, wasn't it?

8    A.    I don't know.  I think.

9    Q.    Do you remember seeing a lot of people around at

10   the park playing?

11   A.    Yeah.

12   Q.    And the bathroom that you were talking about, the

13   ladies' room, you say that has an open door that you can

14   just walk in?

15   A.    Um-hum, yes.

16   Q.    But if a person was standing outside the bathroom,

17   they wouldn't be able to see inside; is that right?  I'll

18   withdraw the question.

19         On September 24th of 2010, before you went into

20   the ladies' room with Ulises, did he kiss you at all?

21              THE COURT:  On that day.

22   Q.    Before you went into the bathroom?

23   A.    I don't remember.

24   Q.    Did Ulises ever kiss you and touch you before you

25   entered the bathroom on that day?

J.H.

J. Villatoro - People - Cross         724

1                      THE COURT:   And what he means is immediately

2          before.

3          A.    I don't remember.

4          Q.    And Jennifer, you were taken to a hospital to be

5    looked at, right?

6          A.    I was taken to a doctor.

7          Q.    Okay.  And you were taken there by your mother?

8          A.    Yeah.

9          Q.    Do you remember when that was?

10         A.    No.

11         Q.    Do you remember where you were taken?

12         A.    No.

13         Q.    Now, on September 24th of 2010, before you left

14   your house to go to the park, who was home at that time?

15         A.    I don't know.

16         Q.    Anyone else?

17         A.    My sister, my brother and his friends.

18         Q.    Did you walk down to Kinkel Street to go to the

19   park?

20         A.    Yeah.

21         Q.    Do you remember, only if you remember, do you

22   remember if you walked on the right side or left side of the

23   street?

24                     THE COURT:  What difference does it make?

25                     MR. MILLMAN:  Your Honor, I would approach

J.H.

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 725 of 913 PageID #: 1025

1          and advise you.

2                    THE COURT:  You think it has significance?

3                    MR. MILLMAN:  I do, your Honor, yes.

4                    THE COURT:  Then ask it.

5          Q.   Do you remember by any chance if you were on the

6     right or left side of the street?

7          A.   On the left side.  This is my left, right?

8                    MR. MILLMAN:  Let record reflect the witness

9          is holding up her left hand when she says that.

10                   THE WITNESS:  What?

11                   THE COURT:  That's true.  But if you're going

12         this way, your left is here.  If you're going that way,

13         your left is there.

14         Q.   Jennifer, when you arrived at the park, you went

15    over to the playground?

16         A.   Yeah.

17         Q.   And you were playing there?

18         A.   Yeah.

19         Q.   Were you playing there for a little while with

20    your friends?

21         A.   Yeah.

22         Q.   But do you remember specifically what you were

23    doing?

24         A.   Running.

25         Q.   Running.  Anything else?

J.H.

1       A.    No.

2       Q.    Were you on the playground when you were doing

3    that, or were you in a different section of the park?

4       A.    I was everywhere.

5       Q.    So you were playing for a while there?

6       A.    What?

7       Q.    You were playing for a while at the park before

8    the time that you went in the bathroom with Ulises; is that

9    fair to say?

10      A.    I guess.

11      Q.    And you were playing with Steve and Ivan, right?

12      A.    Right.

13      Q.    What you were playing with Steve and Ivan?

14      A.    Steven and Ivan.

15      Q.    And you were playing with anybody else?

16      A.    Yes.

17      Q.    Who was that?

18      A.    Some other little kid.

19      Q.    Jennifer, do you need a break?

20            MR. MILLMAN:   I have no problem if the

21    witness needs a break.

22      Q.    Are you okay?

23      A.    Yeah, I'm okay.  I want to finish.

24      Q.    You had said that there were occasions before

25    September 24th of 2010 when you and Ulises would kiss; is

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 727 of 913 PageID #: 1027

1    that what you had said?

2         A.    Yeah.

3         Q.    And on those occasions, you said that it happened

4    outside Ulises' house, right?

5         A.    Yeah.

6         Q.    In the front of his house?

7         A.    Hum?

8         Q.    In the front of his house?

9         A.    Yeah.

10        Q.    Do you remember whether there were any people

11   around any of those occasions?

12        A.    His friends.

13        Q.    His friends were there?  When you would speak to

14   Ulises, because you were asked about this by the Assistant

15   DA, would you also talk to him about things like his dog and

16   puppies that he had?  Is that something you would talk to

17   him about?

18        A.    Yeah.

19        Q.    Do you know his five year old daughter Andre?

20        A.    His what?

21        Q.    His five year old daughter Andre, do you know her?

22              THE COURT:  She shook her head from left to

23        right meaning no.

24        A.    No.

25        Q.    Do you know his girlfriend Zeida?

J. Villatoro - People - Cross        728

1        A.    No.

2        Q.    You don't know who she is?  Now --

3              THE COURT:  Just to refresh with regard to my

4        instruction, there is no testimony in this record as

5        yet that the defendant had a girlfriend or a child.

6        The question itself is not evidence.

7        Q.    Jennifer, you had testified that there were

8    occasions before September 24th, 2010 when Ulises would not

9    only kiss you but also touch you on your breasts; is that

10   your testimony?

11       A.    Yeah.

12       Q.    And he would touch you also outside your clothes

13   but on your vagina?

14       A.    Yeah.

15       Q.    When he did that, how old were you?

16       A.    Ten.

17       Q.    Would I be right in saying that you did know that

18   that was wrong when he did that?

19              MS. ABDI:  Objection.

20       A.    What?

21       Q.    Would I be right in saying that you did know that

22   that was wrong when he did that?

23              MS. ABDI:  Objection.

24              MR. MILLMAN:  I am permitted to inquire.

25              THE COURT:  Just one second.

J. Villatoro - People - Cross       729

1         MR. MILLMAN:  Certainly.

2         THE COURT:  Overruled.  You knew that was

3    wrong, correct?

4         · THE WITNESS:  Yes.

5    Q.   Did you tell your mother about it on those

6    occasions?

7    A.   Huh?

8    Q.   Did you tell your mother about it on those

9    occasions?

10   A.   Yeah.  No, wait, tell her what?

11   Q.   That Ulises had touched you on your breasts and

12   your vagina outside your clothes and kissed you.

13   A.   No.

14   Q.   Did you tell your father?

15   A.   No.

16   Q.   Did you ever tell anybody that he touched you like

17   that before September 24th of 2010?

18   A.   No.

19   Q.   Have you spoken with your mother in the last two

20   weeks about what happened at the park?

21   A.   No.

22   Q.   Have you spoken with your sister Nancy about it?

23   A.   No.

24        THE COURT:  In the last two weeks?

25        MR. MILLMAN:  Yes, thank you, your Honor.

J.H.

J. Villatoro - People - Cross        730

1        A.     I haven't even been home.

2                MR. MILLMAN: I still can't hear.

3                THE COURT: She says she hasn't been home.

4        Q.     Do you live with your mother now?

5        A.     No.

6        Q.     For how long has it been that you have not lived

7    with your mother?

8        A.     Since September.

9        Q.     And why is it that you --

10               THE COURT: September of this year or last

11       year?

12               THE WITNESS: This year.

13       Q.     And why is it you don't live with your mother

14   anymore?

15               MS. ABDI: Objection.

16               THE COURT: Sustained.

17               MR. MILLMAN: I do believe it is relevant,

18       your Honor.

19               THE COURT: If she said last September, I

20       might see the relevancy. If she said this September, I

21       don't see the relevancy. Overruled.

22       Q.     Did your mother tell you that when you come to

23   court that you should say certain things about what Ulises

24   did?

25               MS. ABDI: Objection.

J. Villatoro - People - Cross       731

1                   THE COURT:   Overruled.

2          Q.   She did, didn't she?

3                   MS. ABDI:   Objection.

4                   THE COURT:   Overruled.   Did your mother tell

5       what you to say?

6                   THE WITNESS:   No.

7          Q.   Did you meet with the Assistant DA, the young lady

8       seated here before testifying?

9          A.   Miss Abdi?

10         Q.   Yes.

11         A.   Yes.

12         Q.   When did you meet with her?

13         A.   Yesterday.

14         Q.   Was anybody else there when you met with her?

15         A.   No.

16         Q.   And how long did you meet with her for to the best

17      that you can tell us?

18         A.   I don't know.

19         Q.   Was it a number of hours?

20         A.   No.

21         Q.   But at that time you talked about the fact that

22      you will be testifying, right?

23         A.   Yes.

24         Q.   And you talked about what questions you would be

25      asked, right?

1        A.    Yes.

2              MR. MILLMAN:   One moment.

3        Q.    And just one more question.  When you left the

4   bathroom on September 24th of 2010 after you say that Ulises

5   touched you the way you said he did, did you go directly

6   home?

7        A.    Yeah.

8        Q.    And who was with you at that time?

9        A.    My brother friends.

10             MR. MILLMAN:   Nothing further.

11             THE COURT:   Any redirect?

12             MS. ABDI:   Just briefly, your Honor.

13  REDIRECT EXAMINATION

14  BY MS. ABDI:

15       Q.    Jennifer, when you were in the bathroom on

16  September 24th of 2010 with the defendant --

17       A.    Yeah.

18       Q.    -- how did you know that he tried to put his penis

19  in your vagina?

20       A.    Because I felt it.

21       Q.    And is that what you told the grand jury as well?

22             MR. MILLMAN:   Objection.

23       A.    Yes.

24             THE COURT:   Overruled.

25       Q.    Ulises Bonilla, the defendant, during that the

1    summer of 2010, did you think he was your boyfriend?

2         A.    Somewhat.

3         Q.    Somewhat?

4         A.    Yeah.

5         Q.    And you didn't want your mom to know anything

6    about what happened in that bathroom; is that correct?

7         A.    Yes.

8         Q.    And why is that?

9         A.    Because I was scared I would get in trouble.

10        Q.    Trouble from your mom?

11        A.    Yeah.

12              MS. ABDI:   I have no further questions.

13              THE COURT:   You can step down.

14              MR. MILLMAN:   Your Honor, I do have a follow

15        up.

16              THE COURT:   All right, ladies and gentlemen,

17        this is recross examination, and I'm going to restrict

18        it to what was brought up in the redirect examination.

19   RECROSS-EXAMINATION

20   BY MR. MILLMAN:

21        Q.    Jennifer, during your redirect examination, the

22   Assistant DA asked you how you knew that he placed his penis

23   in your vagina, and you said that you felt it.   Do you

24   remember that?

25        A.    Yeah.

J. Villatoro - People - Recross       734

1        Q.    Did you tell that to the police when you spoke

2    with them the first time that you went there after they came

3    to your home?

4                    THE COURT:   Sustained.

5                    MR. MILLMAN:   I believe that is directly --

6                    THE COURT:   Sustained.

7        Q.    And you were also asked by the Assistant DA about

8    why you didn't want to tell your mother what happened.   But

9    your mother wasn't with you when you went to the police

10   station with Francis, was she?

11       A.    No.

12                   MR. MILLMAN:   Nothing further.

13                   THE COURT:   You can step down.

14                   (The witness was excused.)

15                   THE COURT:   All right, ladies and gentlemen,

16          I have some other matters to attend to.   You're excused

17          until 2 o'clock.

18                   Remember the admonitions I have given you.

19                   Miss Evans, would you remain just for a

20          minute, please.

21                   (Whereupon, the jury exits the courtroom.)

22                   THE COURT:   All right, Miss Evans, on Monday

23          of this week -- no, it was Tuesday this week, we spoke

24          briefly, and at that particular time, you brought to

25          our attention for the first time that you would be

J.H.

J. Villatoro - People - Recross       735

1    losing money commencing tomorrow. And I said let's see

2    what the situation is on Wednesday -- excuse me, on

3    Thursday, today. And a lot can happen in couple of

4    days. Because of financial reasons, do you wish to be

5    excused at this time?

6              A JUROR: Yes, your Honor.

7              THE COURT: People?

8              MS. ABDI: No objection.

9              MR. MILLMAN: Can I just inquire very

10   briefly?

11             THE COURT: Sure.

12             MR. MILLMAN: Miss Evans, I think one thing I

13   was just unclear on, the money that you said that you

14   would be losing which you ultimately would be paid that

15   back?

16             A JUROR: Not unless the court was paid back.

17             MR. MILLMAN: So you will lose money as a

18   result?

19             A JUROR: Yes.

20             THE COURT: The court -- you will get a per

21   diem allowance. I believe it's $40 a day. I don't

22   know when you are going to get that. And you did say

23   on your night job you would be paid, but there would be

24   a delay in payment. So do you still wish to be

25   excused?

J.H.

J. Villatoro - People - Recross        736

1        A JUROR:  I would like to serve on the case.

2    If we were being given instructions by the 19th, I will

3    be secure in that position.  I was more worried about

4    going over into January and January's bills.

5        MR. MILLMAN:  In light of that, your Honor --

6        THE COURT:  Just one second.  At this

7    particular time, would you like to stay and we can

8    revisit this matter when I get a better idea of when

9    the case is going to close?

10        A JUROR:  Yes, your Honor.

11        THE COURT:  Would you like to stay?

12        A JUROR:  Yes, I would.

13        THE COURT:  Then we'll see you at 2 o'clock.

14        A JUROR:  Thank you.

15        (A juror exits the courtroom.)

16        (Whereupon, a luncheon recess was taken.)

17

18

19

20

21

22

23

24

25

Proceedings                           737

1    AFTERNOON SESSION

2                 THE CLERK: Recalling case on trial, People

3         of the State of New York versus Ulises Bonilla,

4         Indictment 202N of 2011. All parties are present

5         including the defendant and the Spanish interpreter.

6         There are no jurors present in the courtroom.

7                 THE COURT: Anything you want to do before we

8         bring in the jury?

9                 MS. ABDI: Yes, Judge. Defense counsel and I

10        had been speaking about Jennifer Villatoro's medical

11        records, and he had given me a list of redactions. And

12        I -- we agreed on most of the redactions except for two

13        portions of the medical records which I believe were

14        relevant for diagnostic purposes.

15                THE COURT: What are they?

16                MS. ABDI: There's one line that talks about

17        sexual activity. It states that the child denies being

18        basically touched or intimate with anybody prior to

19        Ulises. That's relevant as far as for the doctor's

20        findings, that's under the social history section of

21        the medical records.

22                And then there's another portion under

23        diagnostic impression which lines read, 10-and-a-half

24        year old girl with history of forcible kissing,

25        fondling of breasts, digital penetration by 22 year old

                                                            J.H.

Proceedings                    738

1          male.  I believe that that is relevant information that

2          the doctor learned for the purposes of her examination

3          and any treatment.

4                    As far as the other redactions that I

5          discussed with defense counsel, I have redacted the

6          records as discussed.

7                    THE COURT:  What do you say to that, counsel?

8                    MR. MILLMAN:  Well, actually with respect to

9          the 22 year old, I have to concede that there is

10         relevance to the age because of the issue that's

11         being -- I told counsel that I would actually agree on

12         that.  As far as the other one --

13                   THE COURT:  So basically there are two areas

14         of concern.  You're withdrawing your objection as to

15         one?

16                   MR. MILLMAN:  Yes.

17                   THE COURT:  Which one is that?

18                   MR. MILLMAN:  With respect to the records of

19         a 22 year old.  I think that's something that would

20         probably be a pertinent diagnosis.

21                   THE COURT:  So you are withdrawing your

22         objection to that?

23                   MR. MILLMAN:  Yes.

24                   THE COURT:  What else?

25                   MR. MILLMAN:  The other ones -- I'm sorry,

J.H.

1    your Honor, the other one, I believe, pertaining to

2    prior -- the fact that she denies any prior, you now,

3    sexual involvement, my position is that based on the

4    records, I think that's something that would be

5    pertinent the two points that she brought up by

6    talking --

7                MS. ABDI:  I'm sorry, I didn't want to --

8                THE COURT:  The victim did testify that after

9    this event, she was in pain, which is probably more

10   consistent with a virgin.

11               MR. MILLMAN:  It could be, it could be.

12               THE COURT:  And I assume the doctor's going

13   to get into that maybe.

14               MS. ABDI:  I don't know if she will get into

15   that area, your Honor.  But as far as the prior sexual

16   history, that is definitely relevant for diagnosis as

17   far as being sexually activity.

18               THE COURT:  I want to know if you have an

19   objection.

20               MR. MILLMAN:  No.  I do not object to that

21   portion, and the other one I don't object to.

22               THE COURT:  So the medical records as they

23   stand you have no objection to?

24               MR. MILLMAN:  As redacted by counsel, yes, I

25   have no objection.

J.H.

Proceedings                           740

1            THE COURT:  Then there's no issue for me to

2       resolve.

3            COURT OFFICER:  Jury entering.

4            (The jury enters the courtroom.)

5            THE CLERK:  Let the record reflect the

6       presence of the jury.  Do both sides consent to waiving

7       a reading of the roll?

8            MS. ABDI:  Yes.

9            MR. MILLMAN:  Yes.

10           THE COURT:  Mr. Millman, at this particular

11      time, do you wish to recall Detective Byrne for an

12      inquiry from yesterday?

13           MR. MILLMAN:  Yes.  It will be short.  It's

14      limited to the one issue on the document.

15           THE COURT:  That's granted.  Bring back

16      Detective Byrne.  We will be continuing on the

17      cross-examination of Detective Byrne in the People's

18      case.

19 D E T .  P A T R I C K  B Y R N E , a witness called on

20      behalf of the People, after having been previously duly

21      sworn by the Clerk of the Court, was examined and

22      testified upon his oath as follows:

23           THE CLERK:  Detective, please be reminded you

24      are still under oath.

25           MR. MILLMAN:  I just ask to have this marked

Det. P. Byrne - People - Recross       741

1        as Defendant's C for identification

2                    (Defendant's Exhibit C is marked for

3        identification.)

4    RECROSS-EXAMINATION

5    BY MR. MILLMAN:

6        Q.   Good afternoon, Detective.

7        A.   Good afternoon.

8        Q.   You have been just been shown what's been marked

9    Defendant's Exhibit C for identification.  I ask you to take

10   a look at that and look up when you are finished.

11       A.   Okay.

12       Q.   Do you recognize that?

13       A.   Yes.

14       Q.   What do you recognize that to be?

15       A.   This is PDCN form 339 that I filled out.

16       Q.   And I'm just going to direct your attention to a

17   portion in the middle of the document that makes a reference

18   to a wristwatch.  Do you see that?

19       A.   On the left side or the right side?

20       Q.   On the left side.

21       A.   Yes, sir.

22       Q.   There's a notation there --

23                    THE COURT:  Just one second.  It's not in

24       evidence.  Ask him a question you want to ask him.

25                    MR. MILLMAN:  Sure.

1    Q.   Detective, do you recall whether or not you

2    noticed what could be blood on the wristwatch that was

3    recovered?

4    A.   Yes, I do.

5    Q.   And did you notice any?

6    A.   I noticed what appeared to be blood.

7    Q.   And it was on the face and back of the watch?

8    A.   Yes, sir.

9    Q.   And that was a watch that was recovered from the

10   scene?

11   A.   I don't know where it was recovered from, sorry.

12   Q.   Fair enough.  And did you submit the wristwatch

13   for testing of what appeared to be blood?

14   A.   Yes, sir.

15   Q.   And where did you submit that?

16   A.   It was submitted to our evidence, evidence

17   assessment section.

18   Q.   And did you ever learn as to whether or not that

19   was blood?

20   A.   No, sir.

21   Q.   And do you know if the evidence assessment section

22   sends it to, if anyone?

23   A.   I would have to look at that to find who the

24   person was.

25   Q.   You have those with you?

Det. P Byrne - People - Redirect      743

1      A.   Yes, I do.

2      Q.   If you could.

3      A.   That would be P.S.A. Debra Ricciardi.

4           THE COURT:  What does P.S.A. mean?

5           THE WITNESS:  It's police service aid.

6      Q.   And did you ever learn the results of it?

7      A.   No, sir.

8           MR. MILLMAN:  Detective, thank you for your

9      time.

10          THE COURT:  Any cross?

11          MS. ABDI:  Yes.

12          THE COURT:  Redirect, excuse me.

13          MS. ABDI:  Yes.

14   REDIRECT EXAMINATION

15   BY MS. ABDI:

16     Q.   Detective, you did not do any testing as to

17   whether or not that substance was blood, correct?

18     A.   That's correct.

19     Q.   And you do not have any say in what gets tested

20   and what does not got tested?

21     A.   No, I don't.

22     Q.   Do you have any indication -- there were two

23   wristwatches that you tested, is that correct?

24     A.   Yes.

25     Q.   Do you have any indication as to which wristwatch

1  that you observed blood on?  Is there a location in your

2  notes?

3       A.   Yes, it is.

4       Q.   What was that location?

5       A.   That was on -- it was item number two, which was

6  the wristwatch.

7       Q.   A was there any indication as to where that was

8  found at the scene?

9       A.   Roadway.

10            MS. ABDI:   Thank you.

11  RECROSS-EXAMINATION

12  BY MR. MILLMAN:

13       Q.   Detective, who would make a determination as to

14  whether or not something gets tested?

15            THE COURT:   What bureau?

16            THE WITNESS:   Probably crime scene initially.

17       Q.   Anybody else?

18            THE COURT:   What about the evidence

19  assessment?

20            THE WITNESS:   Evidence assessment may also

21  secondarily do that.

22       Q.   Anyone in particular or just the bureau itself?

23       A.   I'm not sure.

24            MR. MILLMAN:   Okay, thank you, Detective.

25            THE COURT:   You are going on vacation next

J.H.

1    week?

2              THE WITNESS:  I'm home on vacation.

3              THE COURT:  But are going to be on vacation

4    next week?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Leave this case jacket with a

7    supervisor in case we have to read it during the

8    remainder of this trial.

9              THE WITNESS:  Sure.  Thank you.

10             (The witness was excused.)

11             THE COURT:  Okay, you have another witness?

12             MS. ABDI:  Yes, the People call Dr. Yasmine

13   Pompey.

14   D R .  Y A S M I N E  P O M P E Y, a witness called on

15   behalf of the People, after having been first duly

16   sworn by the Clerk of the Court, was examined and

17   testified upon her oath as follows:

18             THE CLERK:  In a loud, clear voice, please

19   state your name, spell your last.

20             THE WITNESS:  Yasmine Pompey.  Spell it?

21             THE CLERK:  Yes, the last name.

22             THE WITNESS:  Last name is P as in Peter O-M

23   as in mother P again E-Y.

24             THE CLERK:  Thank you.  And your place of

25   employment?

Dr. Y. Pompey - People - Direct      746

1        THE WITNESS:  I work at Nassau University

2    Medical Center.

3    DIRECT EXAMINATION

4    BY MS. ABDI:

5        Q.    Good afternoon, Doctor.

6        A.    Good afternoon.

7        Q.    By whom are you employed?

8        A.    I'm employed by the Department of Pediatric at

9    Nassau University Medical Center.

10        Q.    And are you a doctor licensed to practice medicine

11    in New York State?

12        A.    Yes, I am.

13        Q.    Can you please tell the jury your educational

14    background?

15        A.    I studied medicine in Haiti and did a residency in

16    pediatric as well.  I then practiced medicine privately with

17    my father.

18        And then I came to the United States.  Once again,

19    I had training in pediatrics.  Thereafter, I did a

20    fellowship in ambulatory pediatric, outpatient pediatric.

21    Thereafter, I joined the staff at Nassau University Medical

22    Center and function as the coordinator of ambulatory care

23    and a senior member of the child abuse and neglect team.

24        Q.    And how long have you been licensed to practice

25    medicine in New York?

J.H.

Dr. Y. Pompey - People - Direct        747

1        A.    1990.

2        Q.    Since 1990?

3        A.    Yes.

4        Q.    And at what location or locations do you work?

5        A.    I work at Nassau University Medical Center, and I

6    also work at the Child Advocacy Center in Bethpage.  It's a

7    child advocacy.

8        Q.    And what is the Child Advocacy Center?

9        A.    The Child Advocacy Center a child-friendly center

10   where all the agency involved with child abuse and neglect

11   work together to evaluate children that have been either

12   physically or sexually abused.

13       Q.    And what is your position there?

14       A.    I am the director of the child abuse and neglect

15   program.

16       Q.    And do you have any other titles anywhere else?

17       A.    I'm attending physician for the department of

18   pediatrics and the director of the child abuse and neglect

19   program.

20       Q.    And in your current position, what are your

21   responsibilities?

22                  THE COURT:  In what?

23       Q.    As the director of the CAC.

24       A.    I perform the evaluation of children referred to

25   Nassau University Medical Center for child abuse and

J.H.

Dr. Y. Pompey - People - Direct        748

1   neglect.

2        Q.   And how long have you been doing that?

3        A.   For a long time, about 17 years.

4        Q.   And could you put a number on how many exams you

5   have done in your position at CAC?

6        A.   Over a hundred.  I do not count, but I have been

7   doing it for a long time.

8        Q.   And where is the CAC located?

9        A.   The Child Advocacy Center is located in Bethpage.

10       Q.   And with respect to your position as attending

11   physician at Nassau University Medical Center, what are your

12   responsibilities with respect to that position?

13       A.   With respect to that position, I welcome the

14   evaluation of children that are either seen in the

15   outpatient department or the inpatient department.  I also

16   function as a consultant for the department of pediatrics

17   and will do consult in the burn unit, all the consult in the

18   psychiatric department and also in the emergency room.

19       Q.   What is a forensic examination?

20       A.   A forensic examination consists of detail

21   examination, history taking, examination and management of

22   children who have been abused.

23       Q.   And do you actually perform the forensic exams at

24   the center for child advocacy?

25       A.   I perform the examination either at the hospital

J.H.

 1   for at the CAC.

 2            MS. ABDI:  Your Honor, at this time I offer

 3        Dr. Pompey as an expert in the field of pediatrics.

 4            THE COURT:  All right, ladies and gentlemen,

 5        as I said to you before, I will let her testify as an

 6        expert bearing in mind the ultimate decision as to

 7        whether or not you accept her as an expert is yours.

 8        Q.   Doctor, when you conduct forensic pediatric exams,

 9   is there a specific protocol that you follow?

10        A.   Yes.  We usually will obtain a history of abuse

11   from the parent or whoever is the guardian that bring the

12   child to the center.  And thereafter, we obtain a complete

13   medical history from the child -- from the parent.

14            And once we obtain that history, we conduct a

15   physical examination, and we do a colposcopic examination,

16   C-O-L-P-O-S-C-O-P-Y.

17        Q.   And this a nationally accepted protocol?

18        A.   Yes, it is.

19        Q.   What is, and I'm probably going to mispronounce

20   it, what is the exam of colposcopy?  Can you describe what

21   that is?

22        A.   The colposcopic exam is done with a colposcope.  A

23   colposcope is an instrument basically that we use to

24   evaluate children who have been abused.  It's magnifying

25   instrument that allow us to see microscopic details that

Dr. Y. Pompey - People - Direct       750

1   otherwise cannot be seen with the naked eye.  It also has a

2   camera attach so that we can document the findings that we

3   see during the examination.

4          Q.    And what areas of the body do you generally

5   examine with the colposcope?

6          A.    The genitals.

7          Q.    Now --

8                    THE COURT:  Are you limited to females now?

9                    THE WITNESS:  Both male and female.

10                   THE COURT:  Well, the male would not be

11          internal, would it?

12                   THE WITNESS:  No, but we actually can see

13          microscopic details that we might not be able to see.

14         Q.    What is the clinical history?

15         A.    What is a clinical history?  In this case, if the

16  child's been abused, clinical history include the abused

17  history.  We traditionally obtain a history from the parents

18  so that we are able to understand what happened to the

19  child.  And this is actually very important in our

20  evaluation, because it allow us to determine time frames,

21  what appearance the child may have had during the abuse.  It

22  allow us to determine access to the child.

23                And also during the examination, usually the

24  details that we get allow us to determine what type, how to

25  proceed with the examination and the scope of the testing

Dr. Y. Pompey - People - Direct      751

1    after the child is evaluated.

2        Q.    Now, Doctor, I'm going to direct your attention to

3    October 1st of 2010.  In the course of your practice on that

4    day, did you have the opportunity to examine an individual

5    named Jennifer Villatoro?

6        A.    Yes, I did.

7        Q.    And where did you examine her, what location?

8        A.    I examined her at the CAC in Bethpage.

9        Q.    Do you recall who accompanied her to the

10   examination?

11       A.    She was accompanied by her mother.

12       Q.    And can you just describe the examination that you

13   performed on Jennifer Villatoro?

14       A.    We first did a complete head-to-toe examination as

15   we usually do, and then we did a genital exam.

16       Q.    How did you do the genital exam?

17       A.    With the colposcope.

18       Q.    And what were the observations that you made

19   during the exam?

20       A.    During the examination, we found that the child

21   had an annular hymen with thick edges, and we found that she

22   had a V-shaped cleft at the 5 o'clock position.

23                 THE COURT:  What does all that mean?

24                 THE WITNESS:  Um, usually when we look at the

25            hymen, we refer to any finding the hymen as if we're

J.H.

Dr. Y. Pompey - People - Direct        752

1        looking at the face of a clock so that we can document

2        where the injury is.  So a V-shape cleft either is a

3        V-shaped indentation around the edge of the hymen.  It

4        is actually an interruption of the hymenal edge at the

5        5 o'clock position.

6                   So the injury that we documented was located

7        at the 5 o'clock position as if we are looking at the

8        face of a clock.

9                   THE COURT:  Are you saying this child was a

10       virgin?

11                  THE WITNESS:  No, we do not use the term

12       virginal actually at all when we do sexual abuse

13       evaluation.  We refer to the injury.  So she had an

14       injury at the 5 o'clock position.

15                  THE COURT:  Can you exclude prior sexual

16       intercourse?

17                  THE WITNESS:  By history.

18                  THE COURT:  Okay.

19       Q.    Now, when you say V-shaped cleft, can you just

20       describe what that means?

21       A.    What it means is when you look at the hymen,

22       physically what you have are tissues that are looking at

23       you.  And so within the hymenal tissue, there is an opening

24       which is the hymenal opening.  In this case, it was annular

25       or circular, if you will.  And so if you can imagine the

J.H.

Dr. Y. Pompey - People - Direct      753

1   edge of the hymen, the opening was to the circular, and at
2   the 5 o'clock position, there was an interruption of the
3   hymenal edge that was V-shaped, and that was the finding at
4   the time.
5      Q.   Now, is that something that -- well, do you have
6   an opinion based on a reasonable degree of scientific
7   certainty and based on the clinical history that you
8   received and your examination as to whether or not that
9   injury that you observed was consistent with penetration?
10              MR. MILLMAN:  Objection.  She said scientific
11        certainty.  I'm sure it's an oversight.
12              THE COURT:  Medical certainty.
13              MR. MILLMAN:  She said scientific certainty.
14        I'm sure it's an oversight.  That's the basis of my
15        objection.
16              THE COURT:  Do you have an opinion within a
17        reasonable degree of medical certainty in your field of
18        expertise?
19              THE WITNESS:  Yes.
20     Q.   What was your opinion?
21     A.   My opinion was that the finding of a V-shaped
22   cleft at the 5 o'clock position was supportive of the
23   child's history and consistent with penetration, hymenal
24   penetration.
25     Q.   Now, could you tell from the injury whether it was

J.H.

Dr. Y. Pompey - People - Direct       754

1    consistent -- well, withdrawn.

2               The injury you observed, would that be consistent

3    with digital penetration?

4         A.    It can.

5         Q.    And the injury that you observed, could it be

6    consistent with partial penetration by a penis?

7         A.    It can.

8         Q.    And is that an injury that you could do to

9    yourself?

10        A.    No.

11              MS. ABDI:   I'd like to have these marked as

12        People's Exhibit 72.

13              THE COURT:   In evidence or for

14        identification?

15              MS. ABDI:   I believe --

16              MR. MILLMAN:   In evidence, I'll stipulate.

17              THE COURT:   Put them right into evidence.

18              (People's Exhibit 72 is received and marked

19        in evidence.)

20        Q.    Doctor, those items are already in evidence, but

21   I'm going to ask you if you recognize what those items are,

22   that item, I'm sorry.

23        A.    Sure.   This is the medical record of Jennifer

24   Villatoro.

25        Q.    And there are some redactions in that document; is

1   that correct?

2       A.   Yes.

3       Q.   But other than those redactions, those are the

4   medical records that you prepared in connection with your

5   examination of Jennifer Villatoro; is that correct?

6       A.   Yes, this is correct.

7            THE COURT:   Let me give you an instruction at

8       this particular time, ladies and gentlemen.   Medical

9       records are admissible in evidence even though they are

10      hearsay when they are made to a physician for the

11      purposes of treatment.   There are some redactions done

12      in this particular case that are done with my approval.

13           To give you an example, it may be very, very

14      valuable to a physician, and let's just assume we are

15      trying a negligence case.   It may be very, very

16      valuable to a physician that an individual was struck

17      by a car, but whether or not the car went through a red

18      light is immaterial.

19      Q.   And Doctor, in the medical records that you have

20  before you, you use the term digital penetration; is that

21  correct?

22      A.   Yes.

23      Q.   And digital means what?

24      A.   With the finger.

25      Q.   The fact that you used the term digital

Dr. Y. Pompey - People - Cross        756

1  penetration in the medical records, does that necessarily

2  exclude penetration partially by penis?

3       A.   It does not.

4            MS. ABDI:   I have no further questions for

5       this witness.

6            THE COURT:   Just one question on my behalf.

7       Are you excluding masturbation as a source of these

8       injuries?

9            THE WITNESS:   I do.

10           THE COURT:   I know that's what you said.   Can

11      you explain that to the jury?

12           THE WITNESS:   Yes.   The reason I exclude this

13      as a possibility as a cause for the injury is that the

14      hymen is very highly innovate.   And even in the course

15      of the exam just approaching the hymen and to touch it

16      are -- to do any test, the child will jump on the bed.

17      And the child will usually do to themselves to seek

18      pleasure, and certainly hymenal penetration, we will

19      not expect to see any injury to the hymen caused by

20      masturbation.

21           THE COURT:   Cross-exam.

22  CROSS-EXAMINATION

23  BY MR. MILLMAN:

24       Q.   Good afternoon, Doctor.

25       A.   Good afternoon.

Dr. Y. Pompey - People - Cross        757

1    Q.   Can you exclude to a certainty masturbation as a

2    possible cause?

3        A.   I have never seen in the years.  Nobody ever

4    mentioned that they had any cases of trauma to the hymen

5    because caused by masturbation.

6        Q.   I understand, Doctor.  I didn't ask if you had

7    seen it.  My question is can you exclude it to a medical

8    certainty that masturbation causes this?

9                 THE COURT:  In your opinion.

10                THE WITNESS:  In my opinion?

11                THE COURT:  Yes.

12                THE WITNESS:  I would.

13       Q.   Your examination reflected that there was no

14   gaping between the labia; is that correct?

15       A.   Yes.

16       Q.   So they were not separated, they were pressed

17   together?

18       A.   Yes.

19       Q.   And so in that respect, no gaping of labia, that's

20   normal?

21       A.   That's normal.

22       Q.   You also indicated in the records I want to ask

23   you, the Assistant DA didn't ask you about this, no evidence

24   of external trauma; didn't you indicate that?

25       A.   Yes.

J.H.

1     Q.   And the proportion and fossa were normal?

2     A.   Yes.

3     Q.   The vaginal mucosa lining of the vagina was pink

4  in color; is that right?

5     A.   Yes.

6     Q.   Would that be normal?

7     A.   Yes.

8     Q.   And the urethral opening, normal in size?

9     A.   It was.

10    Q.   Clitoris normal?

11    A.   The clitoris was normal in size.  Uretal opening

12  was normal.

13    Q.   The perirectal area that you examined, that was

14  normal too, right?

15    A.   That was normal.

16    Q.   There were no fissures or tears?

17    A.   No fissures.

18    Q.   In fact, would I be correct in saying the entire

19  examination was completely normal in your view except for

20  the V-shaped cleft that you took note of?

21    A.   This is correct.

22    Q.   So your conclusion of the examination consistent

23  with digital penetration is based upon the presence of the

24  V-shaped cleft that you observed?

25    A.   Yes.

J.H.

1        THE COURT:  Coupled with the history?

2        THE WITNESS:  Coupled with the history.

3    Q.   By the way, that history you take that from the

4    patient, right?

5    A.   No.  We traditionally -- and this is the standard

6    of care for the child, for the abused child we worked in the

7    Child Advocacy Center.  So by the time I see the child, the

8    child has been submitted what we call a forensic interview

9    by professionals that are trained to do this.

10       So in order to avoid re-victimizing the child, I

11   will not obtain a history from the child so that she does

12   not have to relive that history of trauma.  So

13   traditionally, we will not question the child.

14   Q.   Now, would I be correct though in saying the that

15   forensic interview, some of the information gathered will

16   come from the patient?

17   A.   Oh, yes, certainly.

18   Q.   Or the patient's mother, right?

19   A.   For the forensic interview?

20   Q.   Yes.

21   A.   The patient.

22   Q.   The patient?

23   A.   The patient.

24   Q.   Now, by the way, I noticed that you did describe

25   this as a V-shaped cleft, not a tear; is that right?

J.H.

Dr. Y. Pompey - People - Cross          760

1      A.    No, I didn't use the term tear.

2      Q.    And you didn't use the term laceration either, did

3  you?

4      A.    No.

5      Q.    You didn't say fissure either, did you?

6      A.    There was no anal fissure.

7      Q.    Now, also am I right in saying that there was no

8  evidence of any scratches or bruising or redness, right?

9      A.    There are none.

10     Q.    And -- let me ask you this:  The hymen annular

11 with thick margins that you took note of, isn't that one

12 hundred percent normal for a girl of that age?

13     A.    An annular hymen is a normal configuration of the

14 age, and the thick edges are expected at this age.  The

15 child had menstruated that year.

16     Q.    So that was normal for a girl that age who was

17 menstruating, right?

18     A.    I am not sure what the question is.

19     Q.    The question is the hymen annular with the thick

20 margins that you observed, that's normal for a girl her age?

21     A.    That is.

22     Q.    Now, the V-shaped cleft that you took note of, I

23 notice that you indicated that it was consistent with and

24 supportive of digital penetration, right?

25     A.    Right.

J.H.

Dr. Y. Pompey - People - Cross        761

1    Q.    But you didn't indicate that it demonstrated
2    digital penetration, right?

3         A.    Demonstrate?  This is a term that I will never
4    use.  There are standard terminology that we use when we do
5    this evaluation, and that will not be one that we would use,
6    demonstrate.

7              We are asked as physicians to examine these
8    children and to determine whether or not in all opening the
9    child has had any type of sexual trauma, in this case,
10   hymenal trauma.  So we do the examination.  We indicate
11   whether the findings that we have are supportive of the
12   history obtained.

13        Q.    The V-shaped cleft that you took note of, though,
14   could an entry like that be caused by something that
15   happened with the child at a playground, for example, having
16   some contact with the vaginal area?

17              MS. ABDI:  Objection.

18              MR. MILLMAN:  I am inquiring into possible --

19              THE COURT:  Just one second.  You have your
20        way of doing things in your profession.  I have to rule
21        on an objection.  Overruled.

22        Q.    You can answer.

23        A.    Answer the question?  You ask whether or not this
24   is -- that would be consistent with an injury in the
25   playground?

Dr. Y. Pompey - People - Cross       762

1      Q.    Yes.

2      A.    No.

3      Q.    Now, could it also be caused by the insertion of a

4  tampon?

5      A.    No.

6      Q.    And let me ask you this:  When you examined her, a

7  rape kit was done, right?

8      A.    No.

9            THE COURT:  Is that correct?

10            THE WITNESS:  That's correct.

11      Q.    And you are director of the center for abuse,

12  corrected?

13      A.    Suspected child abuse and neglect program.

14      Q.    Certainly rape kits are something you would do in

15  certain situations?

16      A.    In certain situation, yes.

17      Q.    And, in fact, wouldn't it be a standard practice

18  to conduct a rape kit in any situation where a medical

19  provider suspects penile penetration?

20            THE COURT:  I think --

21      A.    No.

22            THE COURT:  I think you are using the wrong

23      term.  Provided a rape kit.

24            MR. MILLMAN:  Yes, yes.

25            THE COURT:  Not conduct a rape kit.

J.H.

1        MR. MILLMAN:  Fair enough, Judge.

2        Q.    But conducting a rape kit would also be a way of

3    being more certain as to whether or not there was actually

4    penetration by a penis, wouldn't it?

5        A.    This is incorrect.

6        Q.    Okay.  Well, wouldn't it also assist in

7    determining the identity of the individual that may have

8    entered the vaginal area?

9        A.    When it was indicated.

10       Q.    But it wasn't indicated here?

11       A.    Not at all.

12       Q.    And that's what I wanted to talk about.  History

13   that you took from the patient, did she indicate at any time

14   that there was penetration by a penis?

15       A.    I obtained history from the mother.

16       Q.    I just ask you do you have the exhibit in front of

17   you, Doctor, the records?

18       A.    Sure.

19       Q.    I'm just going to ask you if you would turn to the

20   page that discusses the -- actually I think it would be page

21   six, Doctor, that has on top initial patient evaluation.  Do

22   you see that?

23       A.    Yes.

24       Q.    And I'm going to ask you also actually to turn to

25   section I believe it's 16.  I'm sorry, Doctor, I intended to

1    refer you to this section.  Do you see that at the bottom,

2    section 16?

3         A.    Sixteen?

4         Q.    Yes.  I don't think there's a page number on it.

5         A.    Pagination doesn't show from the copy.

6         Q.    Diagnostic impression.

7         A.    Diagnostic impression, sure, I'll find it.  Yes.

8         Q.    There's an indication and a notation there what

9    the history is; is that right?

10        A.    Diagnostic impression/problem?

11        Q.    Yes.

12        A.    Yes.

13        Q.    And that would be the history that was related by

14   the patient and/or the patient's mother?

15        A.    No.

16        Q.    Where would that information come from?

17        A.    The line that is -- that says impression.

18        Q.    Yes, the first two lines after diagnostic

19   impression.

20        A.    Should I read it?  It comes from the mother.  It

21   comes from the mother.

22        Q.    That indicates a history of forcible kissing,

23   fondling?

24        A.    Fondling of the breasts.

25        Q.    And digital penetration, right?

J.H.

Dr. Y. Pompey - People - Cross          765

1        A.    Yes.

2        Q.    Digital penetration meaning fingers, right?

3        A.    Yes.

4        Q.    Nothing about penetration by penis?

5        A.    Nothing.

6        Q.    And that wasn't reported, was it?

7        A.    No, that was the history obtain from the mother,

8    and she did not report penile penetration.

9                THE COURT:  And this is on October 1st,

10           correct?

11               THE WITNESS:  This is on October 1st, yes.

12        Q.    Just one more question, Doctor.  Just give me a

13    moment.  And if there had been penetration with a penis,

14    wouldn't there be a way to conduct a rape kit to determine

15    if there was any DNA that would have been left by the

16    individual who penetrated the vagina?

17        A.    No.  The guidelines for obtaining DNA from

18    patients are very strict.  It is actually determined by

19    timing of the assault.  So in this case, when I saw the

20    child was more than a week later.

21        Q.    And that's really the problem, right?

22               THE COURT:  Let her answer the question.

23               MR. MILLMAN:  I'm sorry, Judge.

24        A.    So there was no indication to do a rape kit.  The

25    guidelines for New York State and it varies according to

J.H.

1   states that you will conduct a rape kit for collection of

2   DNA 96 hours after the assault. And this also will be

3   determined by whether or not there was semen and anything

4   that could collect forensically that will determine the

5   identification of the assailant.

6          So in this case, in this particular case, there

7   was absolutely no indication to do forensic collection.

8          Q.   And a big part of the reason for that is it was a

9   week since the incident that she claimed took place, right?

10         A.   Yes.

11                MR. MILLMAN: Nothing further, Doctor. Thank

12         you.

13                THE COURT: Okay, anybody who doesn't do math

14         in a fast form, 96 hours is four days. Anything else?

15                MS. ABDI: No.

16                THE COURT: Thank you, Doctor.

17                     (The witness was excused.)

18                THE COURT: We are waiting with baited

19         breath.

20                MS. ABDI: I'm sorry, judge, I didn't know

21         you were waiting for me.

22                The People call Nancy Villatoro.

23

24

25

N. Villatoro Rodriguez - People - Direct    767

1  N A N C Y  V I L L A T O R O  R O D R I G U E Z, a witness

2      called on behalf of the People, after having been first

3      duly sworn by the Clerk of the Court, was examined and

4      testified upon her oath as follows:

5          THE CLERK:  In a loud, clear voice, please

6      state your name and spell your last.

7          THE WITNESS:  Nancy Villatoro Rodriguez.

8      What else did you ask?

9          THE CLERK:  Can you spell your last name.

10         THE WITNESS:  V-I-L-L-A-T-O-R-O.

11         THE CLERK:  And county of residence?

12         THE WITNESS:  Where I live?  180 Kinkel

13     Street.

14         THE CLERK:  Not your address, just the

15     county.

16         THE WITNESS:  Kinkel is New Cassel.

17         THE CLERK:  You live in Nassau County?

18         THE WITNESS:  Yeah.

19         THE CLERK:  Thank you.  Have a seat.

20  DIRECT EXAMINATION

21  BY MS. ABDI:

22      Q.   Good afternoon, Miss Villatoro.

23      A.   Good afternoon.

24      Q.   I'm just going to ask you if you can to please

25  keep your voice up, because it's a very big courtroom, and

J.H.

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 768 of 913 PageID #: 1068

1    if you could use the microphone if you can.

2         A.    Okay.

3         Q.    When is your birthday?

4         A.    May 17, 1995.

5         Q.    And how old are you?

6         A.    Now I'm 16.

7         Q.    And you reside at 180 Kinkel Street?

8         A.    Yes.

9         Q.    I'm going to direct your attention to September

10   28th of 2010.  How old were you on that date?

11        A.    I was 15.

12        Q.    And in September of 2010, September 28th of 2010,

13   did you know an individual named Ulises Bonilla?

14        A.    Yes, I did.

15        Q.    And how long had you known him for?

16        A.    Three years.

17        Q.    How would you know him?

18        A.    How did I know him?

19        Q.    Yes.

20        A.    When from the beginning or -- when I moved first

21   to the block, and when what do you call it, I went to a

22   school party.

23        Q.    You went to a school party?

24        A.    Um-hum.

25        Q.    What school are you talking about?

J.H.

N. Villatoro Rodriguez - People - Direct    769

1    A.    Park Avenue.  There was like -- there was, um, it
2    was like an outdoor party.  It was like for the barbecue for
3    little kids and stuff like that, and he was passing by with
4    one of his friends.

5    Q.    And is that the first time that you met him?
6    A.    That's the first time I met him.  But after that,
7    it was just a hi and bye thing.

8    Q.    And that was before you moved to 180 Kinkel
9    Street?

10   A.    Yeah.

11   Q.    Now, once you moved to 180 Kinkel Street, did you
12   also -- well, where did he live at that time?

13   A.    I used to live at 22 Dogwood Lane.

14   Q.    No, I'm sorry, where did Ulises Bonilla live?

15   A.    Where did he live?  That I don't know.

16   Q.    Well, when you moved to -- do you recall when you
17   moved to 180 Kinkel Street?

18   A.    Oh, when I moved to 180 Kinkel Street, he used to
19   live at 163 -- I mean 163 Kinkel Street.

20   Q.    Okay.  So he lived down the block?

21   A.    Yes.

22   Q.    And how often would you see him when you -- how
23   often would you see him?

24   A.    I look at him all the time because he used to live
25   down the block.

N. Villatoro Rodriguez - People - Direct    770

1    Q.    And where did he -- what were the circumstances in
2    which you would see him?
3    A.    When he used to walk towards the deli and he used
4    to pass in front of the house.  That's how I used to see
5    him.
6    Q.    And would you interact with him when he did that?
7    A.    Just a hi and bye.
8    Q.    Did he also used to -- did you also see him across
9    the street from your house?
10   A.    Yes, I used to see him there all the time.
11   Q.    And is it fair to say that was a location where he
12   hung out with his friends?
13   A.    Yes.
14   Q.    Outside the house?
15   A.    Yeah.
16   Q.    Now, I'm going to direct your attention now to
17   Tuesday, September 28th of 2010.  I'm going to direct your
18   attention to approximately 10 p.m.  Where were you at that
19   time?
20   A.    I was inside the car with Jocelyn.
21   Q.    And whose car were you inside?
22   A.    Jocelyn's dad's car.
23                  THE COURT:  Who is Jocelyn?
24                  THE WITNESS:  Jocelyn, my friend.
25   Q.    Is that Jocelyn Gonzalez?

J.H.

N. Villatoro Rodriguez - People - Direct    771

1    A.    Yes.

2    Q.    And she's a friend of yours?

3    A.    Yes.

4    Q.    And where was the car parked?

5    A.    The face of the car was headed on facing Prospect.

6    Q.    Was it parked on the street or in the driveway?

7    A.    In the street.

8    Q.    What seat were you sitting in?

9    A.    The passenger seat.

10   Q.    Of the front or the back?

11   A.    The front.

12   Q.    And what happened as you were sitting in the car?

13   A.    I was talking to Jocelyn about what happened in

14   school.

15   Q.    And then what happened?

16   A.    Then after that, Ulises showed up.

17   Q.    When you say showed up, what do you mean?

18   A.    Like he came to the window.

19   Q.    Which window did he --

20   A.    Jocelyn's side of the car window.

21   Q.    Could you hear anything that he was saying to

22   Jocelyn?

23   A.    No.  He was just saying hi.

24   Q.    What did you hear him say?

25   A.    What did I hear say to Jocelyn?

N. Villatoro Rodriguez - People - Direct    772

1    Q.   What did you hear him say to you?

2    A.   To me?  Hi.

3    Q.   Did he say anything else that you heard?

4    A.   That he was looking for my dad.

5    Q.   What did you respond?

6    A.   That he was at the deli.

7    Q.   And what else did he say?

8    A.   Hum?

9    Q.   What else did Ulises Bonilla say?

10   A.   What else when he asked for my dad?

11   Q.   Yes.

12   A.   Um, when he asked for my dad, I told him that he

13   was at the deli.  He said he had called him.

14   Q.   And what else?

15   A.   And I asked him why.

16   Q.   And what was his response?

17   A.   Because he wanted to have a one-on-one with my

18   dad.

19   Q.   What do you mean?  What is meant by one-on-one?

20   A.   Fight with one another, nobody gets in, and it's

21   just you two.

22   Q.   Do you recall what Ulises Bonilla was wearing at

23   that time?

24   A.   A black do-rag, a black shirt, dark blue jeans and

25   Nikes, I believe, black Nikes.

J.H.

N. Villatoro Rodriguez - People - Direct    773

1    Q.    And when he came over to the car, did you notice

2    if he had anything in his hands?

3        A.    Yes, he had a beer bottle.

4        Q.    What kind of beer bottle?

5        A.    Coors Light.

6        Q.    Was it --

7        A.    Glass.

8        Q.    Okay.  Was it a big bottle or small bottle?

9        A.    Big bottle.

10       Q.    What happened next?

11       A.    Next, um, my dad was coming towards us.

12       Q.    Where was your dad coming from?

13       A.    Prospect.

14       Q.    When you saw him coming, what street was he on?

15       A.    He was on like -- what street was my dad coming

16   from?

17       Q.    What street was your dad on when you saw him

18   walking?

19       A.    He was on the sidewalk.

20       Q.    Of Kinkel Street?

21       A.    Of Kinkel, yeah.

22       Q.    And what happened next?

23             THE COURT:    When you describe what happened

24       next, I don't want you to cramp your style of

25       testifying.  But try not to use pronouns.  Use proper

J.H.

N. Villatoro Rodriguez - People - Direct   774

1     names so there won't be any confusion on the jury's

2     mind as to who he is and who him was or something like

3     that, okay?  Try to do that.

4               THE WITNESS:  Okay.

5          Q.   Can you describe what you saw happen when your dad

6     walked up towards your location on Kinkel Street?

7          A.   Can you repeat yourself, please?

8          Q.   Sure.  Can you describe what you saw happen when

9     your dad approached where you were on Kinkel Street?

10         A.   Um, what had happened was that Ulises had backed

11    up into the middle of the street across from our house, and

12    then from there, he, what do you call it, my dad was walking

13    towards him, and they started arguing.

14         Q.   When you say started arguing, was it verbal?

15         A.   About my sister.  Like it's discussing, I guess.

16         Q.   I couldn't hear you.

17         A.   It's discussing.  Like -- like I don't know how to

18    pronounce it.

19              THE COURT:  They were discussing things?

20              THE WITNESS:  Yeah, discussing.

21         Q.   I didn't hear what you said.  Could you tell what

22    they were saying?

23         A.   Yeah, they were arguing about my sister.

24         Q.   Do you recall anything that you heard your dad

25    say?

J.H.

1    A.    That why would he disrespect my sister.

2    Q.    And what happened?  What -- describe what you saw

3    happen at that point.

4    A.    At that point they were arguing.  Once they stop

5    arguing, that's when they started physically fighting.

6    Q.    When you say physically fighting, describe what

7    you saw your father and Ulises doing.

8    A.    I saw them going towards each other, and I saw

9    Ulises had a little metal pipe on him and that he hit my dad

10   with it.  And my dad took it from him and then hit him with

11   it back also.

12   Q.    Did you see where Ulises hit your father with the

13   pipe?

14   A.    No, I did not.

15   Q.    And then you said your dad sort of took it away

16   from him?

17   A.    Um-hum.

18   Q.    And what did he do then?

19   A.    Hit Ulises back also.

20   Q.    Do you know where he hit him?

21   A.    No, I do not know where he hit him.

22             THE COURT:  You pay attention to pronouns

23        too.

24             MS. ABDI:  I'm sorry, Judge.  You're

25        absolutely right.

N. Villatoro Rodriquez - People - Direct     776

1    Q.   Do you know where your father hit Ulises with the
2  pipe?

3    A.   No, I do not.

4    Q.   Then what did you see happen to the pipe?

5    A.   It got dropped on the floor.

6    Q.   So when the pipe was dropped on the floor, your
7  father did not have a pipe anymore?

8    A.   No.

9    Q.   And Ulises Bonilla did not have a pipe anymore?

10   A.   No, he didn't.

11   Q.   Now, what did you see them doing at that point?
12  When I say them, I mean your father and Ulises Bonilla.

13   A.   Just fighting, fist fighting.

14   Q.   How close -- can you describe how close they were
15  to each over when they were fighting?

16   A.   Right next to each other.

17            THE COURT:  About the distance between you
18        and the reporter or closer?

19            THE WITNESS:  Closer.

20   Q.   Can you describe -- were they facing each other?

21   A.   Yes.

22   Q.   Can you describe what you saw Ulises Bonilla doing
23  with his hands?

24   A.   Hitting my dad.

25   Q.   Could you see where he was hitting your father?

J.H.

N. Villatoro Rodriguez - People - Direct    777

1       A.    On his like side of the ribs.

2       Q.    What could you see him hitting your father with?

3       A.    His fist.

4       Q.    And at the time that you saw that, how close were

5   your father and Ulises to each other?

6       A.    They were still close.

7       Q.    Now, what happened?  What did you see happen next?

8       A.    When they were done fighting?

9       Q.    Well, describe what you saw while they were

10  fighting.

11      A.    While they were fighting, Jocelyn had moved her

12  car up to the front, to the front drive, drive through.  And

13  then after that, next thing, all of his friends came back

14  from across street, across the street from our house.  All

15  of his friends came out, and they were already there when I

16  had already got out the car.

17              THE COURT:  His friends meaning who?

18              THE WITNESS:  The one I call Johnny and

19      Misael and some other guy that I don't know.

20              THE COURT:  Whose friends were these?  Were

21      they friends of your father, or were they friends of

22      Ulises?

23              THE WITNESS:  Friend of Ulises.

24      Q.    What did you see happen next?

25      A.    That the one that you said his name was -- was it

N. Villatoro Rodriguez - People - Direct    778

1    Henry?

2          Q.    Just go with what you saw.

3                THE COURT:    And heard.

4          A.    When Johnny, what you call it, Johnny had like a

5    broken broomstick, and he hit my dad with it on the legs.

6          Q.    And then what happened?

7          A.    And then from there, that's when I had tried

8    pulling Johnny away, but he had turned around and pushed me

9    and threw me on the floor.

10         Q.    And what happened next?

11         A.    And then I couldn't get back up because he had me

12   held, so I couldn't go back to help my dad.

13         Q.    Who was your dad fighting with?

14         A.    Ulises Bonilla.

15         Q.    And what happened next?

16         A.    When they were fighting?

17         Q.    What did you see happen next when you were on the

18   floor?

19         A.    When I was on the floor, I see Ulises and him just

20   still fighting.

21         Q.    Describe what you saw happen next.

22         A.    Him and my dad were still fighting in the middle

23   of the street.    And then, what do you call it, his sister,

24   they were towards in front of our front lawn.    They were

25   right there, still in the middle of the street.    And his

J.H.

1    sister had gotten in the fight.

2                  THE COURT:  Whose sister?

3                  THE WITNESS:  Ulises Bonilla's sister, Diana

4    Bonilla.

5    Q.   What did you see her do?

6    A.   Hit my dad in the back with her hand.

7    Q.   And then what happened?

8    A.   And then my mom tried getting into it.

9    Q.   And she did not?

10   A.   She tried to.

11                 MR. MILLMAN:  Objection.  Leading the

12   witness.

13                 THE WITNESS:  Huh?

14                 THE COURT:  Just one second.  Did she?

15   Q.   Did she?

16   A.   Did she?

17                 THE COURT:  Get into it?

18                 THE WITNESS:  Did my mom?

19                 THE COURT:  Yes.

20                 THE WITNESS:  Yeah, she tried getting into it

21   to help my dad.

22   Q.   And then what happened?

23   A.   And then, um, his sister, Ulises Bonilla's sister

24   says that was their fight, not hers.

25   Q.   And then what happened?

J.H.

N. Villatoro Rodriguez - People - Direct    780

1      A.    And then after that, what do you call it, my mom

2    tried grabbing Ulises -- I mean my dad away from Ulises.

3      Q.    And what happened?

4      A.    And then after that, what do you call it, that's

5    when I heard the gunshot.

6      Q.    And do you know who fired a gunshot?

7      A.    Misael Berrios.

8      Q.    Who was the one who was fighting with your father?

9      A.    Ulises Bonilla.

10      Q.    Did you ever see anyone get into the middle of

11    Ulises Bonilla and your father?

12      A.    No.

13            THE COURT:   Get in the middle has two

14      interpretations.   Did you ever see anyone help Ulises

15      Bonilla fight with your father?

16            THE WITNESS:   Besides Johnny, yeah.

17            THE COURT:   And what did Johnny do?

18            THE WITNESS:   Hit my dad with the broomstick,

19      with the end of the broomstick.

20            THE COURT:   Okay.

21      Q.    And was Ulises still fighting with your father

22    when Johnny did that?

23      A.    Yes.

24      Q.    And that was on the legs, correct?

25      A.    Yes.

1    Q.    Now, once you heard the gunshot, what did you see

2    happen next?

3    A.    That they all ran towards Broadway in Diana

4    Bonilla's car.

5                    THE COURT:  Who were they?  Who ran towards

6          Broadway?

7                    THE WITNESS:  Ulises and his friends and his

8          sister.

9                    THE COURT:  Leaving your father there?

10                   THE WITNESS:  Yeah.

11                   THE COURT:  And leaving your mother there?

12                   THE WITNESS:  Yeah.

13                   THE COURT:  And leaving you there?

14                   THE WITNESS:  Yeah.

15   Q.    And where did you see Ulises Bonilla go?

16   A.    Towards going his house but going into a car.

17   Q.    In whose car did you see him go into?

18   A.    His sister, Diana Bonilla.

19   Q.    Where were you standing when you saw him get in

20   the car?

21   A.    I was standing on the side -- the middle of the

22   street.

23   Q.    By what location in the middle of the street?

24   A.    By my house.

25   Q.    And if you can, can you -- did you see where he

N. Villatoro Rodriguez - People - Direct    782

1    got into the car?

2              THE COURT:  Who is he?

3        Q.   Ulises Bonilla, did you see where he got into the

4    car?

5        A.   Like which side of the car he got in?

6        Q.   Correct.

7        A.   The side of the driver's seat.

8              THE COURT:  Front or back?

9              THE WITNESS:  Front.

10       Q.   Are you sure?

11             MR. MILLMAN:  Objection.  The witness

12       answered, your Honor.

13             THE COURT:  Overruled.  Are you sure?

14             THE WITNESS:  Yeah, I'm sure.

15       Q.   Now, how far away were you standing when you saw

16   him get into the car?  If you could use --

17       A.   Three houses away.

18       Q.   But if you could use maybe something in this

19   courtroom as reference, from where you're seated at the

20   witness stand, where in the courtroom, if it's in the

21   courtroom, was Ulises --

22       A.   To the other side of the court.

23       Q.   Outside the courtroom?

24       A.   Um-hum.

25       Q.   How far outside the courtroom?

1      A.    Stopping at the beginning of the other two doors

2   that are just like this on the other side.

3      Q.    So across the rotunda?

4      A.    Yeah.

5      Q.    All the way back?

6      A.    Yeah.

7      Q.    Now, did you see where the car went?

8      A.    It went towards Broadway.

9            MS. ABDI:  No further questions.

10           THE COURT:  Any questions?

11           MR. MILLMAN:  Yes.

12  CROSS-EXAMINATION

13  BY MR. MILLMAN:

14     Q.    Miss Villatoro, you said that you saw Ulises and

15  his friend and his sister run on Kinkel toward Broadway?

16     A.    Yes.

17     Q.    When you say his friends, are you referring to

18  Misael and Johnny?

19     A.    Yes.

20     Q.    And you saw all of them get into the car?

21     A.    Yes.

22     Q.    With Diana driving?

23     A.    Excuse me?

24     Q.    With Diana driving?

25     A.    Yes.

J.H.

N. Villatoro Rodriguez - People - Cross    784

1    Q.    Now, is it your testimony that Ulises hit your
2    father with a tire iron?

3    A.    Excuse me?

4    Q.    Is it your testimony that Ulises hit your father
5    with a tire iron?

6    A.    Yes.

7    Q.    After he hit your father with a tire iron, what
8    did your father do?

9    A.    With the tire iron?  He took it away from him and
10   hit him back with it.

11   Q.    After your father was hit with the tire iron, did
12   it knock your father to the ground?

13   A.    No, it did not.

14   Q.    How did your father get the tire iron from Ulises?

15   A.    They were grabbing onto it.

16   Q.    When Ulises approached the car that you were in
17   with Jocelyn, did he have a tire iron in his hand at that
18   time?

19   A.    No, he did not.

20   Q.    By the way, the house that is across the street
21   from you, that's 179 Kinkel?

22   A.    Yes, it is.

23   Q.    He hangs out there all the time, right?

24   A.    Yeah.

25   Q.    When Jocelyn pulled the car up into the driveway,

J.H.

N. Villatoro Rodriguez - People - Cross    785

1   it was then that you looked back and saw Ulises and your

2   father punching each other; am I right?

3       A.   Yes, you are right.

4       Q.   Then Ulises' friends came out, right?

5       A.   Yes.

6       Q.   And they all started fighting?

7       A.   Yes.

8       Q.   And you also saw some of your father's friends

9   come out from behind another house, right?

10      A.   Yes.

11      Q.   Would it be accurate to say that you saw about

12  eight of Ulises' friends coming into this?

13      A.   Yes.

14      Q.   And that's when you didn't see your father with a

15  metal pipe anymore, right?

16      A.   Yes.

17      Q.   So this just wasn't between Ulises and your

18  father, was it?

19      A.   Yes.

20           THE COURT:  Are you saying he's correct, or

21      are you saying it was just between Ulises and your

22      father?

23           THE WITNESS:  It was just between Ulises and

24      my father.

25      Q.   And did you ever see Ulises stab your father?

J.H.

N. Villatoro Rodriguez - People - Cross    786

1      A.    Did I ever see him?  No, I did not.

2      Q.    Did you ever see Ulises ever touch a knife?

3      A.    No, I did not.

4      Q.    Did you see someone wearing a Cincinnati Reds hat

5  hitting your father with a pipe?

6      A.    Yes, I did.

7      Q.    And this is the person that threw you to the

8  ground, right?

9      A.    Yes.

10     Q.    After he threw you to the ground, were you able to

11  get up?

12     A.    No, I wasn't.

13     Q.    Why is that?

14     A.    Because Johnny had me held on the ground.

15     Q.    And when he had you held on the ground, were you

16  able to see what was going on with your father?

17     A.    No.

18     Q.    As a matter of fact, right after you got up off

19  the ground, isn't it around that time that you saw your

20  father going onto the lawn?

21     A.    Yes.

22     Q.    Isn't that around the time that you first saw

23  blood on him?

24     A.    Yes.

25     Q.    After you were on the ground, you couldn't see

J.H.

N. Villatoro Rodriguez - People - Cross    787

1    what was going on?

2         A.    After, after when I was let go, when I was let

3    free.

4         Q.    When you heard the gunshot, did you see who fired

5    it?

6         A.    Yes.

7         Q.    It's Misael, right?

8         A.    Yes.

9         Q.    So at that time when you heard the gunshot, you

10   knew that Misael fired it because you saw that?

11        A.    Excuse me?

12        Q.    When you heard the gunshot, you saw that Misael

13   was the one who fired it?

14        A.    Yes.

15        Q.    When you -- withdrawn.

16              Did you ever see Ulises with a gun?

17        A.    No, I did not see Ulises with a gun.

18        Q.    Did anyone ever tell you at any time that Ulises

19   had a gun?

20        A.    No.

21        Q.    But isn't it true, Miss Villatoro, that you called

22   the police immediately after this happened, and you told

23   them that Ulises shot your father with a gun; isn't that

24   right?

25        A.    Yes, I did.  I said I thought I heard him shoot

J.H.

N. Villatoro Rodriguez - People - Cross    788

1    him with a gun.

2         Q.   You didn't say you thought.  Isn't it a fact that

3    you told them that you knew that Ulises shot him with a gun?

4         A.   I said I heard.

5              THE COURT:  When you saw your father on the

6         ground injured, did you make the assumption he was

7         shot?

8              THE WITNESS:  Yes.

9         Q.   You made the assumption he was shot, but you had

10   no reason to think that Ulises shot your father, did you?

11             MS. ABDI:  Objection.

12        A.   I had a reason because I thought he shot my dad

13   because he was only one fighting him, and anybody would

14   think that.

15        Q.   Isn't that why you are assuming also that he might

16   have been the one who stabbed him because --

17        A.   I know there's no way in hell that he did not stab

18   him.  He was the only one fighting with him.

19        Q.   I see.  And you assume that.

20             When you called the police, you told them that you

21   knew Ulises shot him; didn't you tell them that?

22        A.   Yeah, I did tell them that.

23        Q.   But you knew that wasn't true when you told them

24   that?

25        A.   I said I thought.  Like I said.

J.H.

N. Villatoro Rodriguez - People - Cross    789

1       Q.    But you never saw Ulises with a gun, did you?

2       A.    Yeah, I know that.

3       Q.    And you saw Misael with a gun, right?

4             THE COURT:   Just one second.  Question,

5       answer, question, answer.

6       Q.    You saw Misael with a gun, right?

7       A.    Yeah.

8       Q.    You never saw Ulises with a gun?

9       A.    No.

10      Q.    You saw Misael use the gun and fire it into the

11      air, right?

12      A.    Yeah.

13      Q.    And around that time, that was when you saw blood

14      on your father, right?

15      A.    Yeah.

16      Q.    But you called the police and told them Ulises

17      shot him, didn't you?

18      A.    Yeah, I called them because I thought he did shoot

19      him up.

20            THE COURT:   What are you doing?

21            MR. MILLMAN:   Your Honor, I'm going to ask

22      the witness about the call.  I believe I have laid a

23      foundation for it.

24            THE COURT:   Just one second.  You are going

25      to play the call in front of the jury?

N. Villatoro Rodriguez - People - Cross    790

1       MR. MILLMAN:  No.  Your Honor, I was going to
2   set it up and ask to approach.

3       THE COURT:  Well, that you can do.

4       MR. MILLMAN:  We can approach now, that's
5   fine too.

6       THE COURT:  Well, it's not like a piece of
7   paper that you try to refresh a witness's recollection
8   with wherein the witness can read it to herself.  I
9   assume you want to play something to the jury which is
10   not in evidence.

11       MR. MILLMAN:  Well, as I indicated, I am
12   going to approach first and speak to the Court about
13   it.  But that's my ultimate intent.  I believe I have a
14   basis for that, your Honor.

15       THE COURT:  Any objection?

16       MS. ABDI:  No.

17       THE COURT:  There being no objection, play
18   the tape.  There being no objection, you can play the
19   tape.  But assume the jury wants to hear this
20   particular tape during their deliberations.  They are
21   limited to the evidence.  So therefore, mark it in
22   evidence.

23       MS. ABDI:  Judge, I mean I am objecting to it
24   going into evidence.  I'm allowing it to be played to
25   refresh the witness's recollection.

J.H.

N. Villatoro Rodriguez - People - Cross    791

1        THE COURT:  Well, that's the problem.  It's
2   not going to be played aloud to the jury to refresh the
3   witness's recollection.  I don't mind you doing it
4   outside the presence of the jury.  But you're going
5   to -- the jury is going to hear something which may or
6   may not be incriminating or exculpating, and it's not
7   in evidence.  I won't permit that.
8        MS. ABDI:  I have no problem with it being
9   announced outside the presence of the jury.
10       MR. MILLMAN:  I am more than willing to do
11  that, your Honor.
12       THE COURT:  Okay, ladies and gentlemen, you
13  will take your afternoon break.  We will remain here
14  working.
15            (Whereupon, the jury exits the courtroom.)
16            THE COURT:  All right, you have a DVD?
17            MR. MILLMAN:  I believe she has it ready to
18  play, your Honor.
19            THE COURT:  Mark it for identification.
20            (Defendant's Exhibit D is marked for
21  identification.)
22            MS. ABDI:  Judge, for the record, I'm playing
23  defense counsel's Exhibit D.
24            THE COURT:  For identification.
25            (Defendant's Exhibit D is played.)

N. Villatoro Rodriguez - People - Cross    792

1        THE COURT:  All right, the record should

2    reflect that D for identification was played.  Did you

3    hear that?

4        THE WITNESS:  Excuse me?

5        THE COURT:  Did you hear that?

6        THE WITNESS:  Yeah, I heard it.

7        THE COURT:  What's your next question?

8        MR. MILLMAN:  Is that you making that phone

9    call to the police?

10        THE COURT:  No, what is the next question you

11    are going to ask this person in front of the jury?

12        MR. MILLMAN:  That was going to be the next

13    question.  To lay the foundation I was going to ask it

14    now in front of your Honor.  I have two bases for it.

15        THE COURT:  Go ahead.

16        MR. MILLMAN:  Miss Villatoro, was that you

17    making that phone call?

18        THE WITNESS:  Yeah.

19        MR. MILLMAN:  Your Honor, I think it goes in

20    both as a prior inconsistent statement.  She clearly

21    said that I told him I think.  She couldn't be more

22    clear saying I know it was him.  She said it.

23        Second of all, it comes in as an excited

24    utterance.

25        MS. ABDI:  Judge, I would object.  She

J.H.

N. Villatoro Rodriguez - People - Cross    793

1    clearly can't be cross-examined on it, but she is.  As

2    putting it in as an inconsistent statement, it's

3    basically allowing extrinsic evidence proving a

4    collateral fact.

5              MR. MILLMAN:  That's a surprise to me.  First

6    of all, it can't even be collateral because itself it's

7    highly relevant.  Second of all, it goes towards bias

8    as well because my position is that this witness

9    clearly was looking to hand him over to the police.

10   She couldn't have any reason to think that he shot him.

11   So it goes towards bias.

12             There's case law indicating that bias does

13   not fall under the collateral rule of extrinsic

14   evidence, but it's relevant in its own right.

15   Certainly it's not a collateral matter by any means.

16   It goes right to the heart of the issue.

17             THE COURT:  We're using this to refresh the

18   witness's recollection.

19             Now, on that particular tape, did you tell

20   the 911 operator that the defendant shot your father?

21             THE WITNESS:  Yes.

22             THE COURT:  That's as far as it goes.

23             MR. MILLMAN:  Judge --

24             THE COURT:  Because -- just because she

25   admitted the inconsistency.  Now, if the inconsistency

J.H.

1     is used to affect the credibility of the witness on a

2     specific point, then that's been accomplished by the

3     admission to me and the expected admission before the

4     jury.

5              Now, what about the excited utterance?  The

6     excited utterance is something completely different.

7     That's evidence in chief and does not affect the

8     credibility of the witness.  Now, are you asking for

9     that to be introduced as an excited utterance?

10             MR. MILLMAN:  Yes, that, and I also wish to

11    make clear that as a prior inconsistent statement, I

12    have never sought to introduce it to refresh her

13    recollection.  The witness never said she didn't

14    remember.  She was quite -- she was quite clear in

15    saying that I told him that I think he did.  This is

16    clearly an inconsistent statement.  So I have sought to

17    refresh her recollection with it.

18             I think it's admissible as prior inconsistent

19    statement, and I think it's an admissible excited

20    utterance.  And I would object to the witness now just

21    being able to say yes, I told him that he shot him.  On

22    the tape, she is saying emphatically I know it was him.

23    This is very critical towards bias, towards

24    credibility, and it's relevant.  I think it comes in

25    under both grounds, your Honor.

1           THE COURT:  All right.

2           MS. ABDI:  And I object.

3           THE COURT:  Just one second.  I think you're

4    confusing evidentiary theories.  I'm not saying that

5    I'm not going to introduce it as an excited utterance.

6    All I'm saying the theories are completely different.

7    Excited utterance is an exception to the hearsay rule

8    which allows direct proof of the facts contained in the

9    excited utterance.  It has nothing to do with the

10   credibility of a witness.  You could have an excited

11   utterance without a witness.

12          MR. MILLMAN:  Yes.

13          THE COURT:  Now, do you want to introduce

14   this as an excited utterance?

15          MR. MILLMAN:  As both, your Honor, because I

16   think it also goes towards credibility.

17          THE COURT:  Do you want to introduce this as

18   excited utterance?

19          MR. MILLMAN:  Yes, but I still believe --

20          THE COURT:  Just one second.  People?

21          MS. ABDI:  I object.

22          THE COURT:  It seems to me that basically

23   although the witness was excited.  It seems to me that

24   she had the presence of mind to answer many questions

25   of the 911 operator.  Doesn't that take it out of the

1    excited utterance category?

2           MR. MILLMAN:  Two things on that, your Honor.

3    First of all, I don't believe it does take it out of

4    the category.

5           THE COURT:  It's a factor to be considered.

6           MR. MILLMAN:  Yes.  However, if you listen to

7    the tape, she was unable to answer certain things.  I

8    mean you could hear her right on the tape.  I think

9    clearly it meets the requirements of the excited

10   utterance, and I would ask for the opportunity to

11   submit cases if your Honor is so inclined to deny my

12   application.

13          And additionally as I indicated, it also

14   comes in as a prior inconsistent statement.  The reason

15   that's also important is because I am entitled also to

16   argue as it affects the witness's credibility.  And,

17   you know, this is critical for the jury to understand

18   that this witness at a time and I think I have

19   established that he couldn't have shot her, called and

20   said that I know he shot my father.

21          THE COURT:  This witness did not know at that

22   particular time that her father was suffering from

23   mortal stab wounds.  She assumed he was shot.

24          MR. MILLMAN:  My point is not about stabbed

25   versus shot.  My point is she saw Misael with a gun,

J.H.

N. Villatoro Rodriguez - People - Cross    797

1      never saw my client with a gun, and she is calling

2      saying Ulises shot him, I know he did.  She could not

3      have a basis for believing that, and that shows bias,

4      Judge.  I can't think of anything that would be more

5      probative.

6                  THE COURT:  Let me just --

7                  MR. MILLMAN:  Sure.

8                  THE COURT:  Do you think this is that

9      critical that you want it excluded from evidence?

10                 MS. ABDI:  No, Judge.

11                 THE COURT:  Okay.  It's going to go in.

12                 MS. ABDI:  As long as just that track.

13                 MR. MILLMAN:  Yes.

14                 MS. ABDI:  There's others on the tape.  These

15     are all recordings from that evening.  As long as that

16     track is the only one submitted.

17                 THE COURT:  Just this --

18                 MS. ABDI:  Just that track.

19                 MR. MILLMAN:  I agree.  I haven't established

20     a foundation for anything else.

21                 THE COURT:  Okay.  Bring back the jury, and

22     mark the item as Defendant's D.

23                 (Defendant's Exhibit D, previously marked for

24     identification, is received and marked in evidence.)

25                 THE COURT:  I assume the medical examiner is

N. Villatoro Rodriguez - People - Cross    798

1    going to exclude a gunshot wound as the cause of death?

2    MS. ABDI: Yes, Judge.

3    COURT OFFICER: Jury entering.

4    (The jury enters the courtroom.)

5    THE CLERK: Let the record reflect the

6    presence of the jurors. Both sides consent to the

7    seating and waive a reading of the roll?

8    MS. ABDI: Yes.

9    MR. MILLMAN: Yes, your Honor. Though it

10   wasn't formally marked yet, I would move Exhibit D into

11   evidence.

12   THE COURT: Yes, it has been.

13   MR. MILLMAN: I would ask that it be

14   played --

15   THE COURT: Ladies and gentlemen, I'm going

16   to give you an instruction right now. You are now

17   going to hear a portion of a 911 tape. Now, there are

18   two evidentiary considerations that I had to deal with

19   in the admission of this particular tape, and they are

20   completely different conceptually. This witness

21   testified before you that she thought her father was

22   shot. In the 911 tape, she says she -- he was shot.

23   Now, you can use that as an inconsistent statement if

24   you find it to be so in affecting the credibility of

25   this particular witness, or there may be another

J.H.

N. Villatoro Rodriguez - People - Cross    799

1    explanation for it.  That's one theory.  You cannot

2    find it as proof positive that her father was shot.  As

3    I told you before, what color is the house?  The house

4    is red.  Did you previously say it was green?  Answer,

5    yes.  You cannot -- you can use that to affect the

6    credibility of the witness if -- on the issue whether

7    or not the house is red.

8         Another completely evidentiary basis for the

9    introduction of this tape is what they call an excited

10   utterance.  That means a statement is made under such

11   emotional state that the likelihood of it being

12   untruthful is nil, and as a consequence, it's an

13   exception to the hearsay rule.  Now, we've admitted it

14   also on that particular basis, and as a consequence, it

15   can be admitted as proof of the facts contained in the

16   911 tape.

17        I hope that you understand that.  I've

18   explained it to you as best as I can, because a lot of

19   first year law students wouldn't understand what I just

20   said.  But why don't you just hear the tape.

21             (Whereupon, Defendant's Exhibit D is played.)

22             THE COURT:  Did anyone not hear that?  Okay,

23   all the jurors indicate they heard it.

24   CROSS-EXAMINATION

25   BY MR. MILLMAN:  (CONTINUED)

J.H.

N. Villatoro Rodriguez - People - Redirect   800

1        Q.    And so, Miss Villatoro, you called police, and you

2    told them that you knew that Ulises shot your father; isn't

3    that right?

4        A.    Yes.

5        Q.    You said I know it was him?

6        A.    Yes, I said that.

7        Q.    And at the time that you made that call, you had

8    never seen Ulises with a gun, right?

9        A.    Yes, no.

10       Q.    And did you see Misael with a gun?

11       A.    Yeah, you're right.

12       Q.    As a matter of fact, when you heard the gunshot

13   that you heard right before you first saw blood on your

14   father, you knew that that gunshot came from Misael, right?

15       A.    Yes.

16                      MR. MILLMAN:  Nothing further.

17                      THE COURT:  Do you have any redirect?

18   REDIRECT EXAMINATION

19   BY MS. ABDI:

20       Q.    Nancy, Miss Villatoro, when you made that 911

21   call, you were distraught; is that correct?

22       A.    Yes.

23       Q.    You were upset?

24       A.    Yes.

25       Q.    And you heard a gunshot?

J.H.

N. Villatoro Rodriguez - People - Reross    801

1        A.    Yes.

2        Q.    And even though you said on the 911 tape that you

3    knew your father had been shot, that's what you assumed; is

4    that correct?

5        A.    Yes.

6        Q.    And you stated you knew it was Ulises Bonilla?

7        A.    Yes.

8        Q.    And that's because he was the only one you saw

9    fighting with your father; is that true?

10        A.    Yes.

11              MS. ABDI:  I have nothing further.

12              MR. MILLMAN:  Just one question.

13    RECROSS-EXAMINATION

14    BY MR. MILLMAN:

15        Q.    But Misael was the only one you saw with a gun,

16    right?

17        A.    Yeah.

18              MR. MILLMAN:  Nothing further.

19              THE COURT:  Okay, you can step down.  Thank

20        you.

21              THE WITNESS:  You're welcome.

22              (The witness was excused.)

23              THE COURT:  Do you have another witness who

24        is short?

25              MS. ABDI:  He is short.

N. Villatoro Rodriguez - People - Reross    802

1          THE COURT:  I am talking about his testimony,
2      not his stature.
3          MS. ABDI:  I would like to at least get him
4      going.  He may not be --
5          THE COURT:  Do you want get him on the stand?
6          MS. ABDI:  Yes.
7          THE COURT:  Okay, call him.
8          MS. ABDI:  People call Oscar Villatoro.
9          THE COURT:  How old are you?
10          THE WITNESS:  Thirteen.
11          THE COURT:  Are you chewing gum?  What did
12      you swallow?  I'm going to give you an hour detention
13      starting at 4:30.
14  O S C A R  V I L L A T O R O, a witness called on behalf of
15      the People, after having been first duly sworn by the
16      Clerk of the Court, was examined and testified upon his
17      oath as follows:
18          THE CLERK:  In a loud, clear voice, please
19      state your name.
20          THE WITNESS:  Oscar Villatoro.
21          THE CLERK:  And the county in which you
22      reside.  Is that Queens, Nassau, Suffolk?
23          THE WITNESS:  Nassau.
24          THE CLERK:  Have a seat.
25

J.H.

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 803 of 913 PageID #: 1103

1    DIRECT EXAMINATION

2    BY MS. ABDI:

3         Q.   Good afternoon, Mr. Villatoro.  When is your

4    birthday?

5         A.   December 13th.

6         Q.   What year?

7         A.   1997.

8         Q.   And how old are you?

9         A.   Thirteen.

10        Q.   You have a sister, Jennifer Villatoro; is that

11   correct?

12        A.   Yes.

13        Q.   And your sister's also Nancy Villatoro?

14        A.   Yes.

15        Q.   And your mother Susana Villatoro?

16        A.   Yes.

17        Q.   And your father's name was Armando Villatoro,

18   correct?

19        A.   Yes.

20        Q.   I'm going to direct your attention to Tuesday,

21   September 28th of 2010, approximately 10:20 p.m.  Where were

22   you at that time?

23        A.   In my room watching TV.

24        Q.   And what happened at that time?

25        A.   My mom got out of her room and came and told me

O. Villatoro - People - Direct          804

1    that my dad was fighting outside.

2         Q.   What did you do next?

3         A.   I went outside to go see.

4              MR. MILLMAN:  I can't hear.

5              THE COURT:  Went outside to listen, I

6    believe.

7              COURT REPORTER:  Go see.

8              THE COURT:  I'm sorry, went out to go see.

9         Q.   Mr. Villatoro, if you could just please keep your

10   voice raised so everyone can hear you.

11        A.   Okay.

12        Q.   You said you went outside, correct?

13        A.   Yes.

14        Q.   When you went outside, what did you see?

15        A.   I saw my dad and Ulises fighting.

16        Q.   Did you know Ulises Bonilla?

17        A.   Yeah.

18        Q.   And how long had you known Ulises Bonilla?

19        A.   Since I moved to the neighborhood in 2007.

20        Q.   Do you see him in the courtroom today?

21        A.   Yes.

22        Q.   Can you please tell the jury something that he's

23   wearing?

24        A.   A blue shirt.

25             MS. ABDI:  May the record reflect the witness

J.H.

O. Villatoro - People - Direct        805

1       has identified the defendant?

2                    THE COURT:   Yes.

3         Q.   When you say you saw your dad fighting with

4    Ulises, can you describe what you saw them doing?

5         A.   It was like they were close, close to each other,

6    and they were like hitting each other on the side and like

7    the back.

8                    THE COURT:   The witness made a motion with

9            his right hand indicating the rib area approximately

10           four to five inches below the armpit.

11        Q.   And did you see Ulises Bonilla hitting your dad?

12        A.   Yeah.

13        Q.   With what?

14        A.   I guess it was the fist.  I couldn't really see

15   anything because it was in the dark.

16        Q.   You could see him hitting your father with a fist?

17        A.   Yeah.

18        Q.   Do you know where they were fighting?

19        A.   In the middle of the street.

20        Q.   Do you know what they were fighting near?

21        A.   Some yellow stick that was on the ground.

22        Q.   And they were fighting by that object?

23        A.   Yeah.

24        Q.   What did you see happen next?

25        A.   Someone that was wearing a sweater that was a

O. Villatoro - People - Direct      806

1    skeleton that had it all the way zipped up, and the only way
2    they could see is through the eyes, I saw that. And then he
3    was like in the middle saying to my mom not to do anything.
4         Q.   And then what happened?
5         A.   He raised something, looked like a gun, up.
6              MR. MILLMAN:  I can't hear.
7              THE COURT:  He raised something, like looked
8         like a gun.
9         A.   And like shot it.
10             THE COURT:  And shot it.  Get closer to it.
11             THE WITNESS:  Okay.
12             THE COURT:  That's a whole lot better.
13             THE WITNESS:  Okay.
14        Q.   Do you know who that individual was?
15        A.   I think his name is Misael.
16        Q.   Now, after the gunshot, what did you see your
17   father do?
18        A.   Like him and Ulises like stop fighting, and then
19   he was walking back to the house.  And then his sister
20   started hitting my dad in like the back with her hands.
21        Q.   And when you say his sister, whose sister are you
22   talking about?
23        A.   Ulises.
24        Q.   Now, when you hear the gunshot, you said you saw
25   your father and Ulises stop fighting?

O. Villatoro - People - Direct        807

1      A.    Yeah, like they stopped after that.

2      Q.    And at that point you saw your father walk away

3  from Ulises Bonilla?

4      A.    Yeah.

5      Q.    And at that point where did he walk?

6      A.    He was walking towards the path to go to the door.

7      Q.    Of your house?

8      A.    Yeah.

9      Q.    And you said Diana -- did you notice any injuries

10  on him at that time?

11     A.    No.  You could see some blood and the shirt

12  ripped.

13     Q.    And you noticed that on your father?

14     A.    Yeah.

15     Q.    Where did you notice the blood, on what part of

16  his body?

17     A.    Mostly around the side.

18              THE COURT:  What side?

19              THE WITNESS:  Um, I'm not sure.

20              THE COURT:  You don't remember?

21              THE WITNESS:  No.

22              THE COURT:  Okay.

23     Q.    Now, you said then that you saw Diana Bonilla

24  hitting your father on his back?

25     A.    Yeah.

J.H.

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 808 of 913 PageID #: 1108

O. Villatoro - People - Direct        808

1        Q.    Was that after you notice your father injured?

2        A.    No.    That was, um, when he was coming to the

3    house.

4        Q.    And he was already injured at that point?    You

5    already saw blood?

6                    MR. MILLMAN:    Objection.    Leading the

7              witness.

8                    THE COURT:    All right, you saw the blood,

9              correct?

10                    THE WITNESS:    Yeah.

11                    THE COURT:    And you saw the sister of the

12              defendant hit, punch your father in the back, correct?

13                    THE WITNESS:    I don't think it was like a

14              punch.    It was more like slap.

15                    THE COURT:    Which came first, the blood or

16              the slap?

17                    THE WITNESS:    The slap, then the blood.

18                    THE COURT:    Okay.

19                    THE WITNESS:    Because there was like a light

20              pole that's like in between the house, and when he was

21              walking closer, like you could see him.    That was like

22              after that.

23                    THE COURT:    Okay, but the slap came before

24              your observation of the blood?

25                    THE WITNESS:    Yeah.

J.H.

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 809 of 913 PageID #: 1109

1          THE COURT:  Okay.

2      Q.   Now, what did you see your father do next?

3      A.   Um, he just started walking and like pushed her

4  away and started walking to the house again and until he got

5  to the path where my mom got him.  And they went to like the

6  grass yard.

7      Q.   Grassy area where?

8      A.   In front of the house.

9      Q.   What happened next?  What did you see happen next?

10     A.   I was looking at Ulises and them leave.  And they

11  got into his sister's car and left.  And then when I looked

12  back, and my dad was on the ground, and my mom was telling

13  my sister to call the police.

14     Q.   Now, could you see what part of the car that

15  Ulises Bonilla got into?

16     A.   The passenger side.

17          THE COURT:  Front or rear?

18          THE WITNESS:  Front.

19     Q.   Now, did you see Diana Bonilla get in the car?

20     A.   Yeah, in the driver's seat.

21     Q.   Now, where were you standing when you saw this

22  happen?

23     A.   In the path to go in front of the house.

24     Q.   What house?

25     A.   My house.

O. Villatoro - People - Direct        810

1    Q.    And if you can, you can use something in this
2  courtroom or out of the courtroom as a reference, do you
3  know how far away, if you're using the witness stand as
4  where you were standing that night, do you know how far away
5  the car was when you saw Ulises Bonilla get into the car?
6    A.    I'm not sure, because I don't know how anything I
7  could use because -- probably the other side of the square.
8    Q.    The other side -- in this courthouse, the other
9  side of the rotunda?
10    A.    Yes.
11              MR. MILLMAN:  Objection.  Leading.
12              THE COURT:  Overruled.  It is a square
13         architectural fixture.
14    Q.    So past that; is that correct?
15    A.    Yeah.
16              THE COURT:  I think I told you yesterday or
17         the day before, ladies and gentlemen, that the distance
18         between the witness box on the front doors of this
19         courtroom are 50 feet.
20    Q.    Now, who was the person that you saw fighting with
21  your father?
22    A.    Just Ulises and -- just Ulises.
23    Q.    And when you saw them fighting, can you describe
24  how close they were to each other?
25    A.    Probably face-to-face.

1    Q.   And this was by -- you saw them fighting by the
2    yellow stick in the road?
3        A.   Yes.
4        Q.   This was in front of your house; is that correct?
5        A.   Yeah.
6        Q.   Oscar, I'm going to show you what is marked as
7    People's Exhibit 17 in evidence.  I'm just going to ask you
8    to take a look at this.  Do you recognize what that is?
9        A.   Yes.
10       Q.   What is that?
11       A.   My dad's watch.
12            MS. ABDI:  I would like to display that for
13       the jury.
14       Q.   Now, Oscar, I'm going to direct your attention now
15   to the Friday before the day your dad was killed, September
16   24th, 2010.
17            THE COURT:  Would you like to start this
18       tomorrow?
19            MS. ABDI:  Yes, Judge, actually if I could.
20            THE COURT:  Sure, absolutely.  We're ahead of
21       schedule.  You may not believe me when I say that, but
22       we are ahead of schedule, and we'll see you tomorrow at
23       9:30.
24            (Whereupon, the jury exits the courtroom.)
25            THE COURT:  Okay, anything before we leave?

O. Villatoro - People - Direct        812

1          MR. MILLMAN:  Yes.  Just two things.  First,

2     I did have subpoenas I was going to have you sign.

3               THE COURT:  Sure.  For when?

4               MR. MILLMAN:  One is for December 14th, and

5     the other is, your Honor, maybe the same day, December

6     14th, yes.

7               THE COURT:  That's a Wednesday.

8               MR. MILLMAN:  Yes.

9               THE COURT:  When do you think we will be

10    through?

11              MS. ABDI:  Probably by then.

12              THE COURT:  Well, I don't want to waste

13    Tuesday if you are going to be through Monday.

14              MS. ABDI:  I'm not sure yet, Judge.

15              MR. MILLMAN:  I was concerned.

16              THE COURT:  Actually she's not sure.

17              MR. MILLMAN:  I just didn't want to make it

18    any sooner because the process server, I want to give

19    them time to serve it in advance, and there's an issue

20    with the rush fee because they are paying out of

21    pocket.  So I want to give them enough time to serve it

22    so I don't have to pay for the rush.

23              THE COURT:  All right.

24              MR. MILLMAN:  I have copies.  The other one,

25    your Honor, is a witness I just want to let you know

O. Villatoro - People - Direct      813

1       that you had previously signed a subpoena for, but I

2       didn't get it out in time to give the guy notice, so

3       I'm just changing the date.  It wasn't served yet.

4                   THE COURT:  Okay, I have signed subpoenas.

5       Anything else?

6                   MR. MILLMAN:  I assume you have taken care of

7       the order with the jail.

8                   THE COURT:  Yes.

9                   MR. MILLMAN:  Nothing else.

10                  (Whereupon, the trial is adjourned to

11      December 9th, 2011.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

*Volume III of III*

814

```
 1    STATE OF NEW YORK  :  NASSAU COUNTY

 2       SUPREME COURT  :  PART 39              Volume III

 3    ----------------------------------------X

 4    THE PEOPLE OF THE STATE OF NEW YORK,

 5          -against-                    Ind. No. 202N-11

 6    ULISES BONILLA,

 7                     Defendant.

 8    ----------------------------------------X

 9    JURY TRIAL

10                          December 9, 2011
                            262 Old Country Road
11                          Mineola, New York

12    B E F O R E :

13       HON. GEORGE R. PECK,
            Acting Supreme Court Justice
14

15

16    A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
            Nassau County District Attorney
18       BY:   ZEENA ABDI, ESQ., of Counsel
            Assistant District Attorney
19                     For the People

20

21       DANIEL L. MILLMAN, ESQ.
            316A Main Street
22       Roslyn, New York  11576
                     For the Defendant
23
                     JOANNE HORROCKS, CSR
24                   Senior Court Reporter

25
```

NASSAU COUNTY
D.A. SEE. (M.O.)

2014 APR 18 AM 11: 30

RECEIVED

J.H.

O. Villatoro - People - Direct        815

1              THE CLERK:  This is case on trial, People of

2       the State of New York versus Ulises Bonilla, Indictment

3       202N of 2011.  All parties present including the

4       defendant and Spanish interpreter.  There are no jurors

5       present at this time.

6              Are there any applications?

7              MS. ABDI:  No.

8              MR. MILLMAN:  No.

9              THE COURT:  All right, when the jury comes,

10      we'll start in.

11             THE CLERK:  Let the record reflect the

12      witness, Oscar Villatoro, has returned to the stand.

13      You are reminded that you are still under oath.

14      O S C A R  V I L L A T O R O, a witness called on behalf of

15      the People, after having been previously duly sworn by

16      the Clerk of the Court, was examined and testified

17      upon his oath as follows:

18             COURT OFFICER:  Jury entering.

19             (The jury enters the courtroom.)

20             THE CLERK:  Let the record reflect the

21      presence of all jurors.  Do both sides consent to the

22      seating and waive a reading of the roll?

23             MS. ABDI:  Yes.

24             MR. MILLMAN:  Yes.

25             THE CLERK:  Thank you.

O. Villatoro - People - Direct       816

1           THE COURT:  All right, ladies and gentlemen,
2       we got a late start today due to a number of factors,
3       all of which were unavoidable.  That's the bad news.
4       The good news is that unless there's an unforeseen
5       snag, the People may finish up their case on Monday or
6       at the latest on Tuesday morning.  So we are proceeding
7       faster than we anticipated.  Go ahead.
8   DIRECT EXAMINATION
9   BY MS. ABDI:  (CONTINUED)
10      Q.  Good morning, Mr. Villatoro.
11      A.  Good morning.
12      Q.  When we left off last evening, I was going to talk
13  to you about now Friday, September 24th of 2010.  What
14  happened on that date?
15      A.  I was coming home from school, and I saw my sister
16  go into the park with two of her friends.
17              MR. MILLMAN:  I'm sorry?
18              THE COURT:  Yes, I had difficulty hearing him
19      myself.  Get up to the microphone and --
20              THE WITNESS:  Like this?
21              THE COURT:  Yes.
22      Q.  What happened on that date?
23      A.  I was coming home from school, and I saw my sister
24  and two friends going to the park.
25      Q.  What was the name of your sister?

J.H.

O. Villatoro - People - Cross          817

1        A.    Jennifer.

2        Q.    And what friends was she going to the park with?

3        A.    Steven and Ivan.

4        Q.    Do you recall approximately what time you saw them

5    going to the park, if you remember?

6        A.    Around 5:30.

7        Q.    And why do you think it was that time?

8        A.    Because I was coming home from soccer practice.

9        Q.    Now, you did not go to the park with them,

10   correct?

11       A.    No.

12       Q.    At some point, did you see anybody return?

13       A.    Yeah, just Steven and Ivan.

14       Q.    And without telling us what they said, did you

15   talk to them?

16       A.    Yeah.

17       Q.    And what did you tell them to do?

18       A.    To tell my dad.

19       Q.    Now, at some point, did you see your sister return

20   from the park?

21       A.    Yeah.

22       Q.    Did she come before or after they returned?

23       A.    After.

24       Q.    And when you had a conversation with Steven and

25   Ivan, did you do anything at that point?

O. Villatoro - People - Cross      818

1       A.    They were telling me that --

2       Q.    Without telling us what they told you.

3       A.    No, they were telling me I should tell my dad.

4    But I told them to tell my dad, because I wasn't there.

5       Q.    Now, did you do anything in response to what they

6    told you?

7       A.    I called my sister, but she didn't answer.

8       Q.    Do you recall how many times you called your

9    sister?

10      A.    Once or twice.

11      Q.    Did the police come to your house that day?

12      A.    Yes.

13      Q.    Do you know how many police came to the house?

14      A.    More than one.

15            MS. ABDI:  I have no further questions.

16            THE COURT:  Cross-examine.

17   CROSS-EXAMINATION

18   BY MR. MILLMAN:

19      Q.    Good morning.

20            THE COURT:  Just one second.  Off the record.

21            (A discussion was held off the record.)

22      Q.    Would you prefer that I call you Oscar or

23   Mr. Villatoro?

24      A.    It doesn't matter.

25      Q.    All right, Oscar, when you saw Jennifer, Steven

O. Villatoro - People - Cross        819

1    and Ivan walking toward the park, they were going southbound

2    on Kinkel; is that right?  Do you know when I say

3    southbound, do you know the directions?

4         A.    (Indicating).

5         Q.    They were walking toward Broadway?

6         A.    Yes.

7         Q.    You had stated that you saw Steven and Ivan later

8    just by themselves; is that right?

9         A.    They were walking with her to the park.

10        Q.    That was earlier.  But I am talking about after

11   that, I think you said you saw Steven and Ivan again, but

12   they were not with Jennifer?

13        A.    Yes.

14        Q.    Oscar, to the best that you can tell us, how much

15   time passed from the time that you saw Steven, Ivan and

16   Jennifer walking toward the park to the time that you again

17   saw Steven and Ivan without Jennifer?

18        A.    I'm not really sure on the time.

19        Q.    Would you be able to tell us if it was more than

20   15 minutes?

21              MS. ABDI:  Objection.

22              THE COURT:  Do you have a best estimate?  If

23        you don't, that's fine.  But don't guess.  I don't want

24        you to guess.  If you have a best estimate, you can

25        tell the jury what your best estimate is.  If you don't

J.H.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 820 of 913 PageID #: 1120

1     know, then you don't know.

2                THE WITNESS:  I don't know.

3                THE COURT:  You don't know, okay.

4          Q.   Oscar, when you saw Steven, Ivan and Jennifer

5     walking toward the park, where were you at that time?

6          A.   I was down the block going to my house.

7          Q.   Do you remember where on the block you were?

8          A.   Um, I was walking from Prospect to like the middle

9     of Kinkel.

10         Q.   And from the time that you saw Steven, Ivan and

11    Jennifer walking toward the park to the time that you again

12    saw Steven and Ivan by themselves, what were you doing at

13    that time?

14         A.   Nothing.  Just waiting.

15         Q.   And you said that when you saw Steven, Ivan and

16    Jennifer walking toward the park, you were walking on

17    Kinkel; is that right?

18         A.   Yes.

19         Q.   You were walking towards your house?

20         A.   Yes.

21         Q.   And did you stop anywhere before you got to your

22    house?

23         A.   Yes.  I stopped by my friend's, because like I

24    didn't want my sister to see me.

25         Q.   And where is your friend, is he on Kinkel?

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 821 of 913 PageID #: 1121

O. Villatoro - People - Cross        821

1    A.    Yes.

2    Q.    And what's your friend's name?

3    A.    Henry.

4    Q.    Henry?

5    A.    Yeah.

6    Q.    How long did you stay at Henry's?

7    A.    Not that long.

8    Q.    Do you know if it was more than five minutes?

9    A.    Not sure.

10   Q.    When you were at Henry's, what did you do there?

11   A.    I was just talking to him for a little while, and

12   then I left.

13   Q.    Anything else?

14   A.    No.

15   Q.    After you left Henry's, Oscar, did you go right

16   home?

17   A.    Yes.

18   Q.    And after you got home, what were you doing at

19   that time?

20   A.    I went to go leave my stuff inside the house, and

21   then I came out.

22   Q.    What did you do after you came out?

23   A.    I ate my food that I bought from the store.

24   Q.    And what about after that?

25   A.    I was just outside, 'cause my friend said he was

J.H.

O. Villatoro - People - Cross          822

1       going to come to my house, so I was just waiting for him.

2           Q.    And was it about that time that you --

3           A.    Yeah.

4           Q.    -- saw Steven and Ivan by themselves?

5           A.    Yeah.

6           Q.    Now, when did you next see Jennifer?

7           A.    I'm not sure about the time, but it was like

8       pretty -- from the time she left until probably around 6, I

9       think.

10          Q.    You saw her again around 6 o'clock?

11          A.    I think.  I'm not sure, because I didn't have a

12      clock or a watch.

13          Q.    In between the time that you saw Steven and Ivan

14      by themselves and the time that you next saw Jennifer, can

15      you tell me what you were doing?

16          A.    They were telling me, um, what happened.

17          Q.    I'm sorry to cut you off, but without telling us

18      what they said, were you talking to them?

19          A.    Yes.

20          Q.    And after you spoke with them, Oscar, what were

21      you doing after that?

22          A.    I called my sister on the phone.

23          Q.    And after you called your sister on the phone,

24      what were you doing after that?

25          A.    Um, I was still waiting for my other two friends

J.H.

1    to come, and I told them that they can check the park and go
2    get her.
3        Q.    And between the time that you tried to call
4    Jennifer and you next saw her, do you remember what you were
5    doing at that time?
6        A.    Just standing waiting outside.
7        Q.    I'm going to now talk about September 28th, 2010.
8    When you went outside, did you ever see Ulises remove his
9    shirt?
10       A.    No.
11       Q.    Now, am I right, Oscar, that the thing that
12   brought you outside is that your mother had told that your
13   father was fighting?
14       A.    Yes.
15       Q.    And you went outside at the same time that your
16   mother did, right?
17       A.    Yes.
18            THE COURT:    Did you ever see -- withdrawn.
19       Although you said you didn't see him remove his shirt,
20       did you ever see him shirtless?
21            THE WITNESS:    No.
22            THE COURT:    Okay.
23       Q.    Oscar, did you ever see -- withdrawn.
24            Do you know what a Cincinnati Reds cap looks like?
25       A.    Yes.

O. Villatoro - People - Cross        824

1       Q.    Did you ever see a person wearing a Cincinnati

2    Reds cap?

3       A.    Yes.

4       Q.    And what was he doing when you saw him?

5       A.    He was standing in the front of the other side of

6    our house.

7       Q.    And what was he doing?

8       A.    Just standing there.

9       Q.    Did you see if he had anything in his hands?

10      A.    I'm not sure.

11      Q.    When you went outside, where was Nancy?

12      A.    She was by the driveway.

13      Q.    Was she on the ground at that time?

14      A.    I wasn't out there when she was on ground.

15      Q.    I didn't hear you.

16      A.    I wasn't out there when she was on the ground.

17      Q.    And you heard the gunshot?

18      A.    Yes.

19      Q.    And you saw Misael?

20      A.    Yes.

21      Q.    Do you know who Misael is?

22      A.    I don't know him personally, but I've seen him.

23      Q.    You saw a tall man fire a gun into the air?

24      A.    Yes.

25      Q.    When you say that you saw individuals going down

1    the street, getting into the car, were Misael and the person

2    with the red Cincinnati Reds cap, were those two of the

3    people that you saw getting into the car?

4         A.    I'm not sure, because there was a lot of people.

5    It wasn't a lot, but it was like more than I think around

6    five or more.

7         Q.    Five or more that went into the car?

8         A.    No.   They were like with him, but I didn't see

9    exactly who else got in.

10        Q.    Oscar, do you remember being asked to speak with

11   the police about what you saw?

12        A.    Yes.

13        Q.    Do you remember being asked to give a statement as

14   to what you knew?

15        A.    Yes.

16        Q.    Did you sign a statement about what you saw?

17        A.    Yes.

18        Q.    And Oscar, this was within the next day or two

19   after it happened?

20        A.    Yeah.

21        Q.    And so you would have -- your memory certainly

22   would have been better at that time, right?

23        A.    Yes.

24              MR. MILLMAN:   I just ask to have this marked

25        for identification.

1           THE COURT:  You can have it marked, but
2      there's no predicate question for it.
3           MR. MILLMAN:  I am not seeking inconsistent.
4      I am just refreshing recollection at this point, your
5      Honor.
6           THE COURT:  Does his recollection need
7      refreshing?
8           MR. MILLMAN:  He indicated he did not recall
9      who got into the car.
10          THE COURT:  Okay, mark it for ID.
11          (Defendant's Exhibit E is marked for
12      identification.)
13          MS. ABDI:  Just for the record, he said I'm
14      not sure.
15          MR. MILLMAN:  I believe he indicated I don't
16      know.
17          THE COURT:  All right, quite frankly,
18      counsels, I don't know what specifically he said.  But
19      lay the predicate again.
20          MR. MILLMAN:  Sure.
21     Q.   Oscar, you have been handed --
22          THE COURT:  Lay the predicate.
23          MR. MILLMAN:  Okay.
24     Q.   Oscar, am I correct you don't remember as you sit
25     here now who got into the back seat of the car?

O. Villatoro - People - Cross        827

1      A.    Hum?

2      Q.    Am I right in saying that you don't remember who

3    got into the back seat of the car?

4      A.    Yeah, I don't know who got into the back seat of

5    the car outside of the driver or passenger seat.

6                THE INTERPRETER:  The interpreter can't hear.

7                THE COURT:  I ask you to speak a little more

8        loudly.  Would you repeat what he just said?

9                (The requested portion was read.)

10     Q.    Now, Oscar, when you say I don't know, is it that

11   you don't remember because of how much time has passed?

12     A.    Yeah.

13     Q.    I'm just going to ask you to take a look at the

14   last page, actually the third -- I'm sorry, second page,

15   Oscar, I apologize.  First of all, is that the statement

16   that you had given to the police?

17     A.    What?

18     Q.    I'm sorry?

19     A.    I didn't hear you.

20     Q.    I'm sorry.  Is that the statement that you gave to

21   the police?

22     A.    Yes.

23     Q.    I'm just going to ask you to look toward -- and to

24   yourself, look toward the bottom where it says --

25                THE COURT:  Just one second.

J.H.

E. Sima - People - Direct          828

1        MR. MILLMAN:  Sure.

2        THE COURT:  Just look towards the bottom.

3    Q.   Okay, I'm just going to ask you to --

4        THE COURT:  Does that refresh your

5    recollection?  Repeat the question.

6        MR. MILLMAN:  Sure.

7    Q.   Does that refresh your recollection as to who got

8    into the back seat of the car?

9    A.   Yeah, okay.

10        THE COURT:  Now, I don't care what's on the

11    paper.  All I want to know is is your memory brought

12    back after reading that?

13        THE WITNESS:  Yes.

14        THE COURT:  Okay, go ahead.

15    Q.   Who got into the back seat of the car?

16    A.   Misael and two other people.

17    Q.   Misael and two other people?

18    A.   Yeah.

19    Q.   And Ulises was in the front passenger seat, right?

20    A.   Yes.

21    Q.   And Oscar, just one more question, am I right that

22    you at any time never saw a knife that night?

23    A.   Hum?

24    Q.   Am I right saying that at any time you never saw a

25    knife that night?

E. Sima - People - Direct          829

1     A.    Yeah.

2           MR. MILLMAN:  Thank you.  I have no further

3     questions.

4           THE COURT:  Any redirect?

5           MS. ABDI:  No.

6           THE COURT:  Thank you.

7           (The witness was excused.)

8           THE COURT:  Next witness.

9           MS. ABDI:  The People call Erika Sima.

10    E R I K A  S I M A, a witness called on behalf of the

11    People, after having been first duly sworn by the Clerk

12    of the Court, was examined and testified upon her oath

13    as follows:

14          THE CLERK:  In a loud, clear voice, please

15    state your name and spell your last.

16          THE WITNESS:  It's Erika, E-R-I-K-A, Sima, S

17    as in Sam I-M-A.

18          THE CLERK:  And your county of residence?

19          THE WITNESS:  Nassau County.

20          THE CLERK:  Thank you.

21    DIRECT EXAMINATION

22    BY MS. ABDI:

23    Q.    Good morning, Miss Sima.

24    A.    Good morning.

25    Q.    Where are you employed?

E. Sima - People - Direct          830

1      A.    I work for Nassau County at the medical examiner's

2   office and the department of forensic genetics.

3      Q.    And how long have you been employed by the Nassau

4   County Medical Examiner's Office?

5      A.    I have been there over six years.  It will be

6   seven years in April of next year.

7      Q.    And what is the department of forensic genetics?

8      A.    We are responsible for doing all the DNA testing

9   in any of the criminal cases for Nassau County.

10     Q.    And where is the department located?

11     A.    We are located at the NUMC, the big hospital on

12  Hempstead Turnpike.  We are in the same building as the

13  morgue, but the morgue is in the basement, and we are

14  located on the fourth floor.

15     Q.    And what is your title within the department?

16     A.    I'm a forensic geneticist one.

17     Q.    And what are your responsibilities as a forensic

18  geneticist?

19     A.    I physically examine evidence that comes into our

20  laboratory.  I also perform analyses.  I write reports with

21  a summary of all of our findings and also testify in a court

22  of law.

23     Q.    And how long have you worked as a forensic

24  geneticist in the Nassau County Medical Examiner's Office?

25     A.    Like I said, I have been there for over six years,

E. Sima - People - Direct          831

1    and it will be seven years this coming April.

2         Q.    Now, what is your educational background?

3         A.    I have a bachelors in biology from Clarkson

4    University in upstate New York, and I'm currently enrolled

5    in the masters of forensic science program in Pace

6    University.

7         Q.    And where were you employed prior to working with

8    the Nassau County Medical Examiner's Office?

9         A.    Before coming out to Nassau County, I worked in

10   New York City at the Office of the Chief Medical Examiner,

11   and I worked there for four-and-a-half years before coming

12   out to Nassau County.

13        Q.    What were your duties there?

14        A.    I was hired as a technician, but by the time I

15   left, my duties were comparable to those I have here in

16   Nassau County.

17        Q.    And what other training have you had in the area

18   of DNA analysis?

19        A.    Both in New York City and also here again in

20   Nassau County, I underwent a training practice that's based

21   on a competency test.  You physically observe a competent

22   scientist perform a specific task.  Then a competent

23   scientist watches you perform that same task.  And then you

24   are given a test sample.  You perform the task on your own

25   and you report your results to the training supervisor.  And

J.H.

1   if your results are correct, you're deemed competent in that

2   task.  And I have a competency test for all the routine

3   testing that's done in Nassau County and also in New York

4   City when I worked there.

5                  THE COURT:  Briefly describe what DNA is as

6          some members of the jury are unaware.

7                  THE WITNESS:  DNA means deoxyribonucleic

8          acid.  It's our basic hereditary environment.  We all

9          have DNA.  We inherit half from our mothers and half

10         from our fathers.

11                 Your DNA is responsible for having one head,

12         two arms, two legs, how tall you, what hair color you

13         have, eye color you have.  No two people have the same

14         DNA which is why no two people look exactly the same,

15         except for identical twins.  They look identical

16         because they have identical DNA.

17     Q.   Have you testified before as an expert in court

18   about the results of DNA analysis before?

19     A.   Yes, I have.

20     Q.   Approximately how many times?

21     A.   I've testified over 50 times, and 17 of them were

22   in trial.

23     Q.   And how many jurisdictions have you testified in?

24     A.   I think four.  I have testified in Nassau County,

25   Suffolk County, Queens County and Bergen County, New Jersey.

J.H.

E. Sima - People - Direct          833

1          MS. ABDI:  Your Honor, I offer the witness as
2     an expert in the field of DNA analysis.

3          THE COURT:  Again, ladies and gentlemen, with
4     regard to expert testimony, I will allow this witness
5     to testify as an expert.  But in the final analysis,
6     it's you who are to determine what expertise she has
7     and what you credit.

8     Q.   Miss Sima, what does it mean to be a contributor
9     of DNA?

10    A.   To contribute DNA means that you have somehow
11    deposited your DNA on an item or in a stain of a particular
12    nature.  If we said that someone was a contributor of DNA in
13    our laboratory and we were talking about a specific item of
14    evidence, that means that that person came in contact on a
15    biological level with that item.  You deposited some sort of
16    a biological material, either blood or saliva or skin, onto
17    that item.  So you contributed essentially a part of
18    yourself to that item.

19    Q.   Now, did the Nassau County Medical Examiner's
20    Office Department of Forensic Genetics lab compile evidence
21    submitted by the Nassau County Police Department under case
22    report number 210CR82502?

23    A.   Yes, we did.

24    Q.   Did you assign any lab number to that evidence?
25    A.   Yes, we did.  We assigned it FG100346.  That's FG

J.H.

E. Sima - People - Direct          834

1   as in forensic genetics, 10 as in the year 2010 and 0346 as

2   in the 346th case we had accepted that year.

3       Q.   I would like to show you what has been marked as

4   People's Exhibits 60 through 71 which have been marked in

5   evidence.

6               THE COURT:   You are going to show them to the

7       witness all at once?  Because if you do, which is fine

8       with me, I don't know whether or not she has room.  Why

9       don't you make room on your table.

10              MS. ABDI:   Well, if your Honor would allow

11      her to step down.

12              THE COURT:   Absolutely.  Just move that stuff

13      over and have her testify from where she may have some

14      more room.

15      Q.   Miss Sima --

16              THE COURT:   Why don't you stand between the

17      rail and my bench.

18              THE WITNESS:   Okay, thank you.

19              THE COURT:   You can move that pitcher.

20      Q.   Miss Sima, if you could, you have before you what

21   is marked as items 60 through 71.  If you could please take

22   a look at each item in turn and please describe what exhibit

23   number you are looking at.  And I'm going to ask you for

24   each exhibit, if you could just state if you recognize that

25   item.

J.H.

E. Sima - People - Direct        835

1    A.    Okay.  Okay.

2         Q.    If you need to use your gloves, please do.

3         A.    People's Exhibit 63, I believe, is our item number

4    one.  It's a black do-rag that's contained inside the

5    packaging.

6              Do you want me to physically take it out of the

7    packaging?

8         Q.    I would like you to describe whatever markings you

9    recognize on that packaging and then please take a look

10   inside.

11        A.    The blue sticker is from my laboratory.  I see an

12   analyst's initials on the blue sticker from the time when

13   that item came into our laboratory.  I see my handwriting,

14   the case item number, the date and my initials.  And also I

15   see my initials and the date on the final sealing of it I

16   made when I repackaged the item and then looking as I

17   understand it to be a do-rag.

18        Q.    And when you received that item, was it in a

19   sealed condition?

20        A.    Yes, it was.  The do-rag itself, I can see my

21   purple tape at the end again saying the case number, item

22   number and my initials and the day that I examined it.

23        Q.    And what did you do with that item when you

24   received it from the lab?

25        A.    The packaging itself was documented as well as was

1    the do-rag itself.  It was photographed, and a cutting was

2    taken from the do-rag in the forehead area of the do-rag,

3    from here.  I don't know if you can see it all that well.

4              This cutting was taken out of the front section in

5    an attempt to generate a DNA profile from anyone who wore

6    the do-rag.  The do-rag would rub against the forehead area,

7    and throughout the course of the day, your skin sells and as

8    you sweat would deposit onto that particular section of the

9    do-rag.  So a cutting of the do-rag was submitted for DNA

10   testing in order to generate a DNA profile from whomever's

11   DNA was contributed to this section of the do-rag.

12       Q.   Please place that back.  You can keep your gloves

13   on.

14       A.   I'm only going to use them to touch the items, not

15   the outside.

16             The next item is People's Exhibit Number 65, which

17   is our laboratory's item number two.  This contained a swab.

18   It now contains just the swab holder.  And it is a swab from

19   roadway at RC1.  This swab appeared reddish-brown and tested

20   presumptively positive for blood indicating that

21   reddish-brown substance would, in fact, be blood.

22             A cutting was taken from that swab in an attempt

23   to attempt to find out a DNA profile, whose blood that was,

24   and we were able to do a DNA profile from that swab.

25       Q.   And do you recognize your marking?

J.H.

1        A.     I'm sorry, I also recognize my initial sticker

2    that my laboratory generated, my initials, case number, item

3    number and my initials and date on the seal when I closed it

4    up when I was through with my examination.

5        Q.     And when you received that item, it was in a

6    sealed condition?

7        A.     Yes, it was.  Again, similarly for the next one,

8    two, three, four, five, six, they are all swabs.  This item

9    is People's Exhibit Number 64.  Again, I see an initial.

10   Again, I see my handwriting.  And again, I see my initials

11   and date on the seal.

12            This also contained a swab that appeared

13   reddish-brown and tested presumptively positive.  So a

14   cutting of that swab was submitted for a DNA profile, and it

15   was generated a DNA profile from whose ever blood was on

16   that swab, and we were able to do so.

17            THE COURT:  What do you mean by that?

18            THE WITNESS:  Which part?

19            THE COURT:  You were able to generate a

20        genetic profile.  What do you mean by that?

21            THE WITNESS:  The blood itself, it contains

22        skin cells, cells from within your body.  We are able

23        to extract DNA from those cells.  We are able to burst

24        the cells open, specifically the nucleus of the cell

25        where all the DNA is contained.  We are able to isolate

J.H.

E. Sima - People - Direct          838

1     the DNA and take it out, keep it away from essentially

2     all the other junk that's found within your cells.

3     Then we are able to replicate it or rather we quantify

4     it first to find out how much DNA you have.  Then we

5     are able to replicate it essentially making a xerox

6     copy of it.

7              So we start with a small amount, and we end

8     with a very large amount, but all the exact same DNA

9     profile.  Then we are able to load the DNA into an

10    instrument and depending on how fast something migrates

11    through a media.  That tells you how each particular

12    location, a person's DNA profile is.  And we were able

13    to compile all of those locations into a long series of

14    numbers, and that long series of numbers is unique or

15    individual for each particular person.  That's what's

16    considered your DNA profile.

17             Before I said you inherit half from your

18    mother and half from your father.  You have what's

19    called alleles.  You have two alleles at every

20    location.  We do DNA typing at 13 locations in your

21    DNA.  So those two alleles at 13 locations gives you a

22    stream of numbers that's 26 numbers long, and that

23    stream of numbers is essentially a bar code or a serial

24    number that we can use and say this is this person's

25    particular genetic profile.  If that genetic profile

J.H.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 839 of 913 PageID #: 1139

1      matches another genetic profile, we know that these two

2      items came from -- or that these two substances came

3      from the same person.

4          Q.   Thank you.  If you can take a look at I believe

5      you were -- what number were you up to?

6          A.   I think I finished with our item number three.

7          Q.   Which is People's Exhibit what?

8          A.   Which is People's Exhibit 64.

9               The next item is People's Exhibit number 66, and

10     it's our laboratory's number four.  Again, I recognize the

11     initials, my handwriting and my initials and the date on the

12     seal.  This is a swab from motor vehicle driver's side rear

13     door.  Again, this swab tested or appeared reddish-brown and

14     tested positive, presumptively positive for blood indicating

15     that substance could be blood.

16              We were able to generate a DNA profile by breaking

17     up the cells and isolating the DNA.  And we were able to do

18     that with this swab and generate a DNA profile again for

19     this swab.

20         Q.   And that was in a sealed condition when you

21     received it?

22         A.   Correct.  Next is People's Exhibit Number 67.

23     Again, I see my initials, handwriting and initials on the

24     seal.  It was in a sealed condition when it was received in

25     our laboratory.

1    This is a swab from motor vehicle driver's side

2  front fender.  Again, this swab appeared reddish-brown,

3  tested presumptively positive for blood.  We were able to

4  generate a DNA profile from this swab.

5    This is People's Exhibit number 68, our item

6  number six.  This is a swab from motor vehicle passenger

7  side rear interior door panel.  Again, I recognize the

8  initials, my handwriting and my initials on the seal.  This

9  swab also appeared reddish-brown, tested presumptively

10  positive.  And we were able to generate a DNA profile from

11  this swab.

12    Q.    And it was in a sealed condition when you received

13  it?

14    A.    Yes, it was.  People's Exhibit Number 70 is our

15  lab number seven.  This is a swab from motor vehicle

16  passenger side rear seat back.  Again, I recognize the

17  initials, my handwriting and initials on the sealing.

18  Again, this swab was reddish-brown.  It tested presumptively

19  positive for blood.  And we were able to generate a DNA

20  profile from this swab, and it was in a sealed condition

21  when it was received.

22    And People's Exhibit Number 69 is our laboratory's

23  number eight.  And again, I recognize the initials.  I

24  recognize my handwriting, and I recognize my initials on the

25  seal.  This is a swab from motor vehicle passenger side rear

E. Sima - People - Direct        841

1   headliner. Again, this swab appeared reddish-brown, tested
2   presumptively positive for blood, and a DNA profile was
3   generated from this swab.

4        Q.   I'm going to ask you now just -- and I can't
5   recall if you did this or not. Did you go through People's
6   Exhibit 64?

7        A.   Yes.

8        Q.   Okay. Fair enough. I'd ask you now to look at
9   People's Exhibit 60.

10       A.   People's Exhibit 60 is our laboratory's number
11  nine. Again, I recognize the initials, my handwriting, my
12  initials and date on the seals. This is a black handled
13  knife from roadway at MK2. This knife was also documented
14  and then photographed. There was a series of photographs
15  taken from the knife.

16           The knife was swabbed in two sections. There was
17  reddish-brown staining covered the majority of the knife,
18  both the handle and the blade. Specifically speaking of the
19  blade, two swabs were used to collect the blood or the
20  positive reddish-brown staining from the blade, and a
21  cutting of one of those swabs was submitted, and we were
22  able to generate DNA profile. That swab was retained in our
23  laboratory.

24           For the handle specifically for the reddish-brown
25  staining, again, two swabs were used to swab the handle. In

J.H.

E. Sima - People - Direct          842

1    this particular case, I tried to stay towards the end of the
2    handle or the furthest point from the blade as possible.  A
3    cutting was submitted for DNA extraction from that swab, and
4    a DNA profile was obtained.

5          What I attempted to do on the handle was swab an
6    area of it that did not have any reddish-brown staining in
7    an attempt to try and gain skin cells from whoever held the
8    handle of the knife.  But there was no area on the entire
9    handle that I could swab sufficiently that did not have
10   reddish-brown staining.  In a sense, I had to swab all of
11   the reddish-brown staining.  I was not able to generate a
12   third set of swabs which would have been from the handle.
13   There was just too much blood on the item to do so.

14        Q.   So it's fair to say you could not get a clean swab
15   of the handle; is that correct?

16             MR. MILLMAN:  Objection.  It's a
17        mischaracterization.

18        Q.   Please correct me if I am wrong.

19             THE COURT:  Just one second.  Do you
20        understand the question?

21             THE WITNESS:  I understand what she means,
22        but I wouldn't use the word clean in my answer.

23             THE COURT:  You wish to rephrase the
24        question?

25             MS. ABDI:  Yes.

E. Sima - People - Direct          843

1      Q.   You were not able to get a swab of the handle

2    because there was too much blood on the handle; is that

3    correct?

4                THE COURT:   You were not able to get an

5         uncontaminated swab?

6                THE WITNESS:   Yes, that is correct.

7      Q.   Can you please open that item?

8      A.   Certainly.

9      Q.   And do you recognize that item?

10     A.   Yes, I do.   And I actually recognize my

11   handwriting on the blade of the knife stating, again, the

12   case number, the item number and my initials and date.

13     Q.   Thank you.   I'd like to now direct you to People's

14   Exhibit 61.   It should be one of the bigger bags.

15     A.   People's Exhibit Number 61 is our laboratory's

16   number 10.   That is a Coors Light bottle from walkway at

17   WC8.   I recognize the initials from an analyst at my

18   laboratory.   My handwriting appears on bag itself and also

19   on the seal when I was finished with my examination.

20     Q.   And when you received that item, it was in a

21   sealed condition; is that correct?

22     A.   Yes, it was.

23     Q.   Do you recognize that item?

24     A.   Yes, I do.   And I see my handwriting on the bottle

25   itself at the time of my examination stating the case

J.H.

1   number, the item number, my initials and the date in which I
2   examined it.

3       Q.   And what did you do with this item to determine if
4   you could get a genetic profile?

5       A.   Two swabs were used to swab the mouth area of the
6   Coors Light bottle in attempt to generate a DNA profile from
7   whoever was drinking from this bottle.

8       Q.   And were you able to develop a genetic profile?
9       A.   Yes, we were.

10      Q.   Can you take a look at People's 62?

11      A.   People's Exhibit 62 is a white cardboard box from
12  motor vehicle passenger side rear seat.  And again, I
13  recognize initials from the laboratory number, my
14  handwriting on the packaging itself and also on the seals
15  when I was through with my examination.

16      Q.   And you received that item in a sealed condition;
17  is that correct?

18      A.   That is correct.  Also, when I received this item,
19  it was intact, meaning it was three dimensional.  It was
20  photographed in its intact state, and then I actually cut it
21  so that I could flatten it out so that I can view the inside
22  of it, because while it was contained, I couldn't really see
23  into the item itself.

24          This item had five areas of presumptively positive
25  areas for blood and one area that appeared reddish-brown but

E. Sima - People - Direct          845

1   was not KM positive, indicating that could not be blood.

2   Those five areas were removed from the box itself.  You can

3   see my handwritten indications as to stain 11B, stain 11E,

4   stain 11D, stain 11C, from the inside also, stain 11A.

5           Two representative stains were taken from this

6   box.  I tried to take two stains that were in different

7   locations so that we can get a representative ID.  I took

8   stain 11A from up top and also stain 11D from the bottom on

9   the opposite side and on the outside of the box in order to

10  generate a DNA profile.

11      Q.   And were you able to generate a profile, genetic

12  profile?

13      A.   Yes.

14      Q.   Now, although you collected five stains, you only

15  tested two; is that correct?

16      A.   Correct.

17      Q.   And that was your getting a representative

18  sample -- you were getting a representative sample?

19      A.   That is correct.  Also there was a small piece of

20  the box that was in my examination came detached from the

21  box, and I indicated that in my notes and repackaged it with

22  the box.

23      Q.   Now, did there come a time when --

24      A.   Can I remove these?

25      Q.   Yes.  Did there come a time when you received an

E. Sima - People - Direct          846

1    example called a buccal swab from Ulises Bonilla?

2         A.   Yes.

3         Q.   Did you also assign a lab number to that item?

4         A.   Yes, we did.  That buccal swab came in at a

5    separate time.  It was given a separate lab number.  That is

6    FG11S034.  Again, FG forensic genetics, 11 because the year

7    2011, S034 because that was the 34th suspect file that we

8    had generated that year.

9         Q.   I'm going to ask you to take a look at People's

10   Exhibit 71.  Do you recognize that item?

11        A.   Yes, I do.  I recognize it as item one from this

12   case that I had just referenced.

13        Q.   And what is that?

14        A.   It is the buccal swab from Ulises Bonilla.  I

15   recognize the handwriting of the analyst who brought it into

16   our laboratory or signed for it, also the analyst who

17   performed the examination as well as their handwriting on

18   the seal.

19        Q.   And when you received that, it was in --

20        A.   -- it was in a sealed condition.

21        Q.   Is that correct?

22        A.   Correct.

23        Q.   And were you able to develop a genetic profile of

24   Ulises Bonilla from that swab?

25        A.   Yes, we were.  This item of evidence is completely

J.H.

E. Sima - People - Direct          847

1   different than all of these items in that we know this item

2   of evidence comes directly from Ulises Bonilla.

3          This contained a swab from the inside of his

4   cheek, and we were able to take a cutting of that swab and

5   submit it again for DNA testing to perform a DNA -- to

6   generate a DNA profile.  The only difference is that in this

7   case, we know that this DNA profile comes from Ulises

8   Bonilla, and it can be used to compare to all other DNA

9   profiles to see if any of the DNA profiles that were

10  generated from our evidence matches that of something we

11  know comes directly from him.

12         Q.    And also with respect to this case, did you

13  receive a sample of blood from Armando Villatoro?

14         A.    Yes, we did.  At autopsy, a sample of blood was

15  collected and submitted for our laboratory.  And again, that

16  DNA generated from that blood is used as a known reference

17  sample from Armando Villatoro so that we can compare his DNA

18  profile to all of the profiles generated from the evidence

19  to determine whether or not he was a contributor to those

20  stains or to those swabs.

21         Q.    And that was -- where was that stored?  I'm sorry,

22  where was the blood retrieved from?

23         A.    The blood is retrieved from down in the morgue.

24  They have a locked walk-in refrigerator that's referred to

25  as the evidence locker, and it's our job to go down and

J.H.

1    retrieve it from the evidence locker.

2         We then have a vile of liquid blood that we dispel

3    onto a bloodstain card.  It's dried, and a cutting of that

4    bloodstain is submitted for DNA analysis.  We keep the

5    remainder of that bloodstained card in our laboratory.

6              MS. ABDI:  Your Honor, at this time I offer

7         People's 60 through 71 in evidence.

8              MR. MILLMAN:  No objection.

9              THE COURT:  Are you asking me as has the

10        connection been established?

11             MS. ABDI:  It was just subject to connection.

12        I just wanted to reiterate to make sure --

13             THE COURT:  They are in evidence now without

14        restriction.

15             MS. ABDI:  Okay.

16        Q.   Miss Sima, do you have an opinion to a reasonable

17   degree of scientific certainty as to the results of the

18   testing and the comparisons that you did in this case?

19        A.   Yes.

20        Q.   Now, with respect to your opinion, did you prepare

21   a chart outlining your findings?

22        A.   Yes, at the time of the report being issued,

23   there's a chart with all of our results that indicate what

24   DNA profiles were generated from, which items.

25        Q.   And would it be helpful for you to display that

1   chart in order to describe your findings?

2        A.   Yes.

3              MS. ABDI:   I would like to have these marked

4        as People's Exhibits 73, 74 and 75.

5              THE COURT:   Okay.  Do you want to introduce

6        these?

7              MS. ABDI:   Yes.

8              THE COURT:   Any objection?

9              MR. MILLMAN:   I have to see them, your Honor.

10             THE COURT:   Show them to him.

11             MR. MILLMAN:   No objection.

12             THE COURT:   Without objection, they are

13       received directly in evidence, 73, 74, 75.

14             (People's Exhibits 73, 74 and 75 are received

15       and marked in evidence.)

16             THE COURT:   Am I in the way?

17             MS. ABDI:   I wouldn't put it that way, Judge.

18       I would like to use the presenter.

19       Q.   Miss Sima, I am now going to --

20             THE COURT:   Just one second.  Just put one up

21       there, see how it looks.  I don't think the jury can

22       see that.  I know I can't.  So either move the

23       presenter or have the witness come right here.

24             MS. ABDI:   I can have -- if you can do that.

25             THE WITNESS:   Absolutely.

E. Sima - People - Direct          850

1          THE COURT: For the purpose of this

2     testimony, if you would like to go over there, go

3     ahead.

4  DIRECT EXAMINATION

5  BY MS. ABDI:  (CONTINUED)

6     Q.    Miss Sima, I am going to ask you to display

7  People's Exhibit 73 which is in evidence. Can you explain

8  that chart to the jury?

9     A.    This is a chart that shows the genetic profile

10 that was generated from Ulises Bonilla. It shows, again, as

11 I said, all of his DNA alleles for the 13 locations that we

12 do DNA typing on. Every time that you see just one allele,

13 for instance, right here, there's just one 8, that means

14 that he has two 8s at that location, and we represent just

15 one 8.  Underneath is a summary of all of the items --

16          THE COURT: If you can, rotate that at times

17     so every juror can see.

18          THE WITNESS: I apologize. Underneath it is

19     a summary of the items from the evidence that I was

20     talking about before, the DNA profiles that were

21     generated that match those of Ulises Bonilla.

22          As you can see, the DNA profile from Ulises

23     Bonilla matches that of the do-rag, the area of wear

24     that I spoke about before, also from the Coors Light

25     bottle, the mouth area of the Coors Light bottle, item

J.H.

E. Sima - People - Direct          851

1      six which is the passenger rear door panel from the

2      motor vehicle and also item number eight which was the

3      passenger side of the rear headliner in the motor

4      vehicle.

5          Q.    So those items based on your analysis and in your

6      opinion to a reasonable degree of scientific certainty,

7      those -- those items Ulises Bonilla was the contributor of

8      DNA?

9          A.    Contributor, he was the contributor of the skin

10     cells on the do-rag, also on the skin cells from the mouth

11     area of the Coors Light bottle and of the blood on the

12     passenger side rear door panel and also of the blood on the

13     passenger side rear headliner.

14                     THE COURT:  And your testimony is

15             memorialized in writing in the last paragraph of your

16             report?

17                     THE WITNESS:  Correct.

18         Q.    Now, I'd like to show you what's marked as

19     People's Exhibit 74 in evidence.  I just ask you to explain

20     what chart and that item to the jury.

21         A.    Okay.  This chart shows up top specifically the

22     DNA profile generated from the post mortem blood from

23     Armando Villatoro.  And underneath, it lists every item of

24     evidence that matches his DNA profile.

25                 So he is the contributor of the blood on the spot

E. Sima - People - Direct          852

1   swab from the roadway at RC1, the swab from the walkway at
2   RC4, the swab from the driver's side rear door, the blood
3   from the driver's side front fender, the blood from the
4   passenger side rear seat back, the blood from the knife
5   handle stain, the blood from the knife blade stain and also
6   the box stain 11A that I showed you on the box. And again,
7   underneath, there's verbiage as to a summary of what this
8   chart is showing you, and all of those items that match and
9   what substances are on those items.

10      Q.  Now, I'm going to show you what is marked People's
11  Exhibit 75 in evidence and ask you if you could explain what
12  that chart states.

13      A.  Yes.  On this chart, again, it shows the DNA
14  profile on Armando Villatoro as well as the DNA profile that
15  was generated from the box, stain 11D. The DNA profile on
16  the box, stain 11D, was a mixture, meaning more than one
17  person contributed DNA to that sample.  In this picture, we
18  had a major contributor.  In other words, we could tell who
19  contributed the most amount of DNA to this stain.  And don't
20  forget the stain tested presumptively positive for blood.
21  The major contributor to that bloodstain is Armando
22  Villatoro.  Their DNA profiles match.

23          The minor contributor is different or not the same
24  as the contributor to the do-rag and the Coors Light can and
25  the two blood swabs, or in other words, Ulises Bonilla.

J.H.

1   He's excluded as being that second contributor.  But the
2   second contributor is so small that I'm not able to tell you
3   their entire DNA profile.  I'm only able to tell you at
4   particular locations what their DNA profile is.  So I could
5   exclude someone from this mixture, but I would never be able
6   to tell you someone is a match to this mixture because it's
7   a mixture.

8        Q.    And the major contributor to that bloodstain, the
9   major contributor to that blood taken was Armando Villatoro,
10  correct?

11       A.    Correct.

12       Q.    With respect to the minor contributor, is it
13  possible that the minor contributor could have come from
14  skin DNA from the box?

15            MR. MILLMAN:  Objection.

16            THE COURT:  Sustained.  Mainly to the word

17       possible.  If you can use another phrase, that would be

18       fine.

19       Q.    Can you tell with respect to the minor contributor
20  whether or not that came from the box?

21            THE COURT:  Do you understand the question?

22            THE WITNESS:  I think I do.

23            THE COURT:  All right.

24       A.    In this mixture, I can't tell if there was DNA
25  previously on the box from someone let's say handling it or

1    even, as a hypothetical situation, licking it or somehow
2    contributing their skin cells to it and then a bloodstain
3    was placed on top of it versus if those two components of
4    DNA were added at the same time.  There's no way for me to
5    make that conclusion.

6        Q.   Okay, thank you, Miss Sima.  If you could just
7    please take the witness stand.

8             Now, Miss Sima do you have an opinion to a
9    reasonable degree of scientific certainty as to the
10   frequency of occurrence as to the genetic profile developed
11   with respect to the items in this case?

12       A.   Yes, we do.  Statistical analysis was performed on
13   all of the DNA profiles, and with specific regard to the
14   ones that had testing done at all 13 locations, those DNA
15   profiles were found in one in greater than a trillion
16   Asians, one in greater than a trillion blacks, one in
17   greater than a trillion Hispanics and one in greater than a
18   trillion Caucasians.

19       Q.   And what does that mean?

20       A.   Since there are approximately seven billion people
21   on the planet earth, that would mean statistically that you
22   would have to search over 150 more planet earths before you
23   ever statistically saw that DNA profile again.

24       Q.   And you're talking about the profile with respect
25   to Ulises Bonilla?

E. Sima - People - Cross          855

1        A.    Correct.

2        Q.    And the profile with respect to Armando Villatoro?

3        A.    Correct.

4              MS. ABDI:  I have no further questions.

5              THE COURT:  Cross-examine.

6              MR. MILLMAN:  Yes.

7    CROSS-EXAMINATION

8    BY MR. MILLMAN:

9        Q.    Good morning.

10       A.    Good morning.

11       Q.    Detective, you had prepared, as you indicated, a

12   number -- a couple reports with respect to the work that you

13   did in analyzing the DNA?

14             THE COURT:  I don't believe it's detective.

15       A.    I am not a detective.

16       Q.    I apologize, I apologize.  But you did prepare

17   reports in connection in terms what you did in analyzing the

18   DNA?

19       A.    That's correct.  There were three reports issued

20   by my laboratory with regard to these two specific cases.

21       Q.    You had testified a moment ago, I think, that the

22   minor contributor of this stain on the white cardboard box,

23   the one that had two contributors, that it could have been

24   something that was there on the box from before; is this

25   what you had indicated?

J.H.

1     A.    Yes.  I indicated with regard to stain 11D from

2    the box, there's no way to tell whether or not there was DNA

3    on the box previous to the event in which blood came in

4    contact with the box or if the two were done at the exact

5    same time.  There's no way for me to scientifically

6    determine that.

7     Q.    You are not saying it was there on the box before,

8    you are saying you don't know?

9     A.    Correct.

10     Q.    Now, when the samples were sent to you for

11    analyzing, you were aware to some extent as to the fact that

12    you were analyzing this in connection with a murder

13    investigation?

14     A.    That is correct.

15     Q.    And I take it they gave you some of the basic

16    facts of what happened and why you were analyzing it?

17     A.    That is correct.

18     Q.    Did you indicate anywhere in your report that the

19    minor contributor of this stain where there were two

20    contributors could have been something that could have been

21    on the box beforehand?

22     A.    No.  Again, that's something that wouldn't be

23    indicated on the report.  That would be something that would

24    come up in discussion in case of perhaps a trial or even a

25    conversation with anyone involved in the case.

J.H.

E. Sima - People - Cross          857

1          Q.    But when you prepared your report, you were aware

2    of the fact that it would be relied upon in the prosecution

3    of a murder case; is that fair to say?

4          A.    Yes.

5          Q.    And you knew that was important to include any

6    details that you believed could bear on that?

7          A.    Yes, of course.

8          Q.    The fact that the second contributor could be from

9    something that was already on the box, wouldn't that be

10   important?

11         A.    No.    Obviously at time of trial, something like

12   that is deemed important.    But as far as writing a DNA

13   analysis report, all you are looking to do is report what

14   was found in each particular stain, what genetic profile was

15   there.    And again, if something's a mixture, you need to

16   identify it as a mixture, and any possible contributors need

17   to be either included in that mixture or excluded from that

18   mixture, and that was done in this case.

19         Q.    Now, would it be fair to say though that it would

20   have been important to let the detective know about the fact

21   that the minor contributor could have been from something

22   that was there in the white cardboard box before?

23                   MS. ABDI:    Objection.

24                   THE COURT:    Were you -- did you advise

25              members of the police department of this specific

J.H.

E. Sima - People - Cross          858

1    finding?

2              THE WITNESS:  That a mixture was found?

3              THE COURT:  Yes.

4              THE WITNESS:  Yes.

5              MR. MILLMAN:  I'm sorry, I didn't hear that,

6         Judge.

7              THE COURT:  The answer is yes.

8              MR. MILLMAN:  I didn't hear the question.

9              THE COURT:  Would you repeat the question and

10        the answer for Mr. Millman.

11              (The requested portion was read.)

12        Q.   You advised them of that verbally?

13        A.   No, a verbal advisement wasn't done specifically

14   in this case.  I would have to check the case contact to see

15   if that did, in fact, happen at time of review.

16              However, again, all of our results are listed

17   within our DNA report that is disseminated to the detective

18   in each case.

19        Q.   But we can agree certainly that you didn't say it

20   in your report?

21        A.   Correct.

22        Q.   And in your report, you indicated a minimum of two

23   people must have contributed to this sample?

24        A.   Correct.

25        Q.   That's what you said, right?

1       A.    Correct.

2             Q.    Were you ever asked to analyze any substances on a

3       watch that was found at the scene in connection with this

4       case?

5                   THE COURT:    Can you repeat the question?

6                   MR. MILLMAN:    Certainly.

7             Q.    Were you ever asked to analyze any substances that

8       were found on a watch that was recovered from the scene in

9       connection with this case?

10            A.    I have to clarify my -- your question when I give

11      my answer.    I need to know what you mean by asked to

12      analyze.

13            Q.    Okay.    Well, let me rephrase it then.    Were you

14      ever provided with a watch that was recovered from the scene

15      in connection with this case?

16            A.    No, a watch was never accepted in my laboratory

17      for DNA testing.

18            Q.    Now, when you say accepted into your laboratory,

19      who would have made a decision as to whether or not it would

20      be accepted?

21            A.    It would be any number of people.    I would have to

22      look specifically as to this case.

23                  But it's my understanding that a meeting was held

24      with analysts, several analysts from my laboratory as well

25      as the detective in this case, and a discussion was had as

E. Sima - People - Cross          860

1    to what items had probative value or evidentiary -- in an

2    evidentiary nature that would be most helpful for DNA

3    analyses to be done on.

4         To my indication, a watch may or may not have been

5    collected, but it was not accepted into my laboratory to

6    have DNA testing done on it.

7         Q.   So a meeting that was held, were you present at

8    that meeting?

9         A.   To be honest, I have to look at the case contact

10   to see if there was just one meeting or several and if I was

11   attending one or all of them.

12        Q.   Now, the meetings that take place in regards to

13   such a decision, I take it there's documentation created

14   from that?

15        A.   Correct.   It's within the case contact file that

16   is generated from my office.

17        Q.   What kind of document in terms of the name of the

18   document would be created that would reflect such meetings?

19        A.   Again, it's a case contact form, and it's within

20   the case file for each individual case that we accept into

21   our laboratory.

22        Q.   And so there would be a case contact form in

23   connection with the meeting in which a decision would have

24   been made as to whether or not to accept certain items in

25   this case?

1       A.    Correct.

2       Q.    Would that be something that you would have in

3   your case file?

4       A.    It is contained within the case file, correct.

5       Q.    Do you have your case file with you here today?

6       A.    I actually do have my original case file, but I

7   have provided copies of the case files.  If I take out my

8   original case file, that's fine.

9            But I can't leave it here.  I'm custodian of that

10  file.  Because of our accreditation, it has to be within my

11  custody at all times or within the laboratory.

12            THE COURT:  Or within the Court's if you're

13       ordered to.

14            THE WITNESS:  Fair enough.

15            THE COURT:  I don't know exactly if you want

16       to ask her a specific question with regard to a

17       specific piece of paper?

18            MR. MILLMAN:  Yes.  I was doing that.  May we

19       approach for a moment?

20            THE COURT:  Sure, come on up.

21            (A discussion was held off the record at the

22       bench outside of the hearing of the jury.)

23            THE COURT:  You have had an off-the-record

24       conversation in front of the witness with me and the

25       witness.  Are you satisfied now that you have copies of

E. Sima - People - Cross                   862

1    the documentation to which she refers?

2              MR. MILLMAN:  I am going to check right now,

3    but I believe I do.  But the way it had been described

4    was a little -- I wasn't sure.  So now that I see it, I

5    think I may.  But I need to double-check that, Judge.

6              THE COURT:  Okay.

7         Q.   And how many such meetings, if you know, were held

8    in connection with this particular case?

9         A.   There was only one actual meeting where we were

10   face-to-face, but there were several phone calls that were

11   made with regard to this case.

12        Q.   And I know you made general reference to it, but

13   can you tell me again who specifically would have been

14   present at that meeting?  I don't necessarily mean names but

15   positions if you have that.

16        A.   Certainly.  Detective -- the homicide detective

17   who was listed as the case detective in this case.

18        Q.   Would be that Cereghino?

19        A.   Yes, Detective Cereghino as well as myself and a

20   supervisor from my laboratory.

21        Q.   And so at that meeting, decisions are made about

22   which items of evidence are important enough to send over

23   for evaluation?

24        A.   Again, I can't say the word important enough, but

25   they were deemed to have probative nature.  They were deemed

J.H.

E. Sima - People - Cross          863

1   to be evidentially relevant, and yes, it was at this meeting

2   that some of those decisions were made.

3       Q.   And those decisions were made by the individuals

4   you just mentioned?

5       A.   Yes.

6       Q.   Now, what factors go into such a decision?

7       A.   Obviously with every case, it's different.   We

8   need to know a general framework of what happened in the

9   case and what we are looking for in the case.  And all that

10  information, again, is documented within the case contact.

11      Q.   Now, was the existence of a watch recovered from

12  the scene?  Was that discussed during this meeting?

13      A.   If I could just refresh my recollection by reading

14  the entire passage.

15      Q.   Sure.

16      A.   No, it was not.

17      Q.   The black do-rag that you made reference to on

18  your direct examination, I take it you looked over the

19  do-rag very carefully?

20      A.   I examined the do-rag as I would any other item of

21  evidence that came into our laboratory.

22      Q.   My question is did you observe any blood on it or

23  anything that could be blood?

24      A.   No, there was no reddish-brown staining indicated

25  in my notes from the do-rag.

E. Sima - People - Cross          864

1      Q.    And that was taken directly from the scene?

2            THE COURT:    To your knowledge.

3      A.    To my knowledge, it was taken from the scene.    But

4   again, it's my office who collects evidence, so I am not

5   positive about the details.

6      Q.    What are the items that -- withdrawn.

7            Were there any items that were discussed during

8   the course of the meeting that were rejected and not,

9   therefore, analyzed?

10     A.    Yes.  Any item that was collected and assigned for

11  DNA analysis that we did not accept into the laboratory to

12  perform DNA analyses on would be deemed rejected.

13           For instance, in the case contact, they indicate a

14  trail pattern of blood, meaning several droplets of blood

15  that appeared to be in a trail and appeared to be from a

16  single source.  Instead of testing every single blood

17  droplet from that trail, we just tested a representative

18  area or a representative droplet from that trail and do

19  testing on it.

20           In most cases, there are -- not in most cases, but

21  in some cases, there are hundreds of items that are

22  collected, and we, again, have a conversation with the

23  detective to determine which items would be most probative

24  to do testing on.

25     Q.    What are the items in this particular case that

J.H.

1   were rejected?

2                MS. ABDI:  Objection.

3                THE COURT:  You can answer that if you know.

4                THE WITNESS:  It's going to be very difficult

5        for me to answer, but I can do it.  It's going to take

6        some time.  I will have to look through all of the

7        items listed, see which ones were submitted for the

8        potential of DNA testing and then determine which ones

9        weren't accepted into the laboratory.  And I believe

10       that there were 40 something in this case, 47.

11               THE COURT:  Why don't you ask a specific

12       question.

13               MR. MILLMAN:  But I do believe the specific

14       question would still require a review.  I would suggest

15       to the Court perhaps if we at some point after I

16       inquire of the other areas that I want to inquire, we

17       can take a recess.  The only reason I suggest it is so

18       that if it's going to take that long, I can't ask

19       one-by-one question that's going to be the same

20       necessity or review of the documents.  So I'm just

21       looking to make this as easy for everybody as I can.

22               MS. ABDI:  Objection.

23               THE COURT:  All right, do you have other

24       areas in which you --

25               MR. MILLMAN:  I do, your Honor.

1           THE COURT:  And then we can come back to this

2      if I rule that you're entitled to it.

3   CROSS-EXAMINATION

4   BY MR. MILLMAN:

5      Q.   On the handle of the knife, did you look for

6   things other than blood and other than the skin fragments

7   that you testified about on direct examination?

8      A.   I'm not sure what you mean by things.

9      Q.   For example, saliva, did you look for any saliva?

10     A.   First, you cannot look for saliva obviously

11  because it appears clear.  A sample can be submitted for

12  amylase testing which is confirmatory for an enzyme found

13  within saliva.  No, it was not done in this case.  There was

14  no indication that the knife had been inserted in anyone's

15  mouth.

16          And specific to this case, I don't know that an

17  amylase test would be able to be performed because again,

18  the volume of blood that was on the knife would have

19  precluded it from being --

20          THE COURT:  Raised?

21          THE WITNESS:  Correct.  It would preclude it

22     from being eligible for amylase testing.

23     Q.   But you didn't try to do that; would that be fair

24  to say?

25     A.   No, again, no attempt was made.

J.H.

1    Q.    And you also made reference to the fact that there
2    was no indication that the handle of the knife had been in
3    anyone's mouth.  Can we agree that there are other ways
4    other than the handle being in someone's mouth for saliva to
5    get on the handle?

6    A.    Correct.  Of course, someone could spit onto the
7    knife.  And again, there was no indication that had
8    happened.

9        And again, even if there had been an indication,
10   being that the knife handle and blade had such a large
11   volume of blood on it, amylase testing would not have been
12   possible in this case.

13   Q.    Do you know that?

14       THE COURT:  Is that your opinion?

15       THE WITNESS:  That's my opinion.  In our
16   laboratory, it would not been performed.

17   Q.    Saliva could also get on it even if someone
18   doesn't split, just if it comes off of drops from their
19   mouth in a middle of a fight or something like that?

20   A.    There are I'm sure a million of ways which spit
21   could get onto an item other than spitting or inserting it
22   into your mouth.  But again, in our discussion with our case
23   detective, there was no reason to believe that we were
24   looking for saliva in this case.  And even if we had been,
25   the knife due to how much blood was on it would not have

E. Sima - People - Cross          868

1    been eligible or that type of testing.

2              THE COURT:  What about perspiration off of

3         the hand, would your answer be the same?

4              THE WITNESS:  I attempted to take a swab from

5         the handle from just perspiration from whoever handled

6         it, their skin cells, and again, the volume of blood

7         that was on the knife, I was unable to generate a swab

8         that didn't have reddish-brown staining on it.

9         Q.    Now, did you also look for the presence of any

10   cloth or anything like that on the handle of the knife?

11        A.    It's not that I specifically looked for it.

12   However, in looking at it, if any cloth had been present, I

13   would have documented that in my notation, and no, that

14   documentation was not done.  There was no cloth present on

15   the knife at the time of my examination.

16        Q.    And would your answer be the same with regard to

17   any material that comes from either a gauze pad or a

18   bandage, didn't see anything like that on the knife?

19        A.    That's correct, there were no fibers or any sort

20   of material present on the knife.

21        Q.    Was -- withdrawn.  Just one moment.

22              Did you analyze a tire iron in connection with

23   this case?

24        A.    No.  A tire iron was not accepted into my

25   laboratory for testing.

J.H.

E. Sima - People - Cross          869

1       Q.      That was rejected?

2       A.      I would have to, again, go through that list to

3       see if it's on the list.  But either way, it was not

4       accepted.

5       Q.      A yellow metal pipe, that was not accepted, or you

6       have to look?

7       A.      It was not accepted or analyzed by my laboratory,

8       no.

9       Q.      Am I right in stating that in analyzing the knife,

10      you, yourself, did not come across or learn of any

11      indication matching the DNA of my client to the handle of

12      that knife; am I right?

13                      MS. ABDI:  Objection.

14                      THE COURT:  Overruled.

15      A.      Again, there was reddish-brown staining present on

16      the blade and the handle, and that reddish-brown staining,

17      did the DNA profile generated from the reddish-brown

18      staining was a match to that of Armando Villatoro.  That is

19      correct.  Ulises Bonilla was not the contributor of the

20      blood on the knife, neither the handle nor the blade.

21      Q.      And you Ulises Bonilla was not the contributor of

22      anything that you tested or were able to test that was on

23      handle of the knife?

24      A.      That was on the handle of the knife?

25      Q.      Yes.

J.H.

1   A.    That is correct.

2   Q.    Or on the blade?

3   A.    Or the blade of the knife it, correct.

4           MR. MILLMAN:    Your Honor, the only other area

5   that I have left now is the area that I think would

6   require the witness --

7           THE COURT:    All right, now, you asked her

8   questions, one with regard to the tire iron and two,

9   with the yellow pipe, and she said they were not

10  accepted into the laboratory.  Consequently, they

11  weren't tested by this witness for DNA.  And now do you

12  want to ask her what she didn't test?

13          MR. MILLMAN:    I do have an area of inquiry

14  related to that, and I can approach and advise the

15  Court of why I need to do that.

16          THE COURT:    Please do.

17          (The following occurs at sidebar outside of

18  the hearing of the jurors.)

19          MR. MILLMAN:    Your Honor, it's my

20  understanding there were a number of items that were

21  not tested, and this is the reason why I seek to

22  inquire into it.  Obviously there's been no physical

23  evidence with respect to anything on the knife or a

24  number of the other evidence that connects my client to

25  it.  Now, the decisions that were not to not analyze

J.H.

E. Sima - People - Cross          871

1    certain things I think are very relevant as to why.

2              THE COURT:  Now, we have to establish the

3    relevancy.  I'm sure she didn't test my fingernail.

4    But what are you trying to show?  Are you trying to

5    show a shoddy investigation?  Is that what you are

6    trying to show?

7              MR. MILLMAN:  That's one of the things is

8    certainly significant, but it's not the only thing I am

9    looking at, your Honor.

10             What we have here and I use the example of

11   the fingernail, I am talking about a tire iron that the

12   witness is claiming that my client held.  I am

13   inquiring into whether or not --

14             THE COURT:  That was answered.  She didn't

15   test that tire iron.

16             MR. MILLMAN:  But I would like to know why,

17   because the decisions are made at their meeting, your

18   Honor.  The detective's at the meeting and makes

19   certain conclusions about this chose not to analyze

20   certainly things that could potentially lead to

21   evidence.  And they did not analyze it, and it's

22   entirely relevant, I believe, and they make the

23   decision.  They determine as to whether or not they are

24   going to test something that I believe could absolutely

25   have been tested and should have been tested.  And the

E. Sima - People - Cross        872

1    reasons for not doing that I would like to inquire

2    into.

3              Additionally, there were five stains taken

4    from the white cardboard box.  They chose to analyze

5    two.  My position is after the second one comes back

6    and it doesn't have any link to my client, it doesn't

7    help their case, they chose not to analyze the other

8    three.

9              MS. ABDI:  First of all, that doesn't require

10   you to go through every single thing she didn't test.

11   It's pretty clear here what was tested, what wasn't.

12   You can is ask her why didn't you test the tire iron?

13   She explained about the stains in the box.  You can ask

14   her about that.

15             MR. MILLMAN:  I didn't ask her about every

16   single thing she didn't test.

17             THE COURT:  We're trying to finish this

18   testimony this morning.  It may not be possible, and we

19   may have to go over to 2 o'clock.  If you have specific

20   items, ask her.

21             MR. MILLMAN:  She's indicated to me even if

22   I -- she would still need to review.  So --

23             THE COURT:  I don't know whether or not she

24   needs to review the pipe and the tire iron.  She said

25   she wasn't -- didn't test that.

E. Sima - People - Cross          873

1        MR. MILLMAN:  But I'm not asking about any

2    test results.  I'm asking what went behind the decision

3    not to test it, and I believe it's relevant.  I do

4    believe I am entitled to inquire into it.

5        THE COURT:  Let me just ask you you said you

6    were going to limit it to a few items.

7        MR. MILLMAN:  I can do what Miss Abdi

8    suggested, but I think we still will be in the same

9    boat.  I think she is going to review the meeting

10   notes.

11       MS. ABDI:  You can ask her, and if she does,

12   she does.  If she doesn't, she doesn't.

13       MR. MILLMAN:  Fine.  I understand we are

14   trying to move it along, but this is a highly relevant

15   area.

16       THE COURT:  Evidence at a trial is the result

17   of an investigation, and a trial jury analyzes the

18   evidence, not the investigation.  That's for the chief

19   of detectives.

20       MR. MILLMAN:  But as a defense attorney in

21   this case evaluating and inquiring about the absence of

22   evidence, certainly I believe I am entitled to do that.

23   This is a tire iron that their witness --

24       THE COURT:  Start in.  We will see what we

25   can do.  If necessary -- are you going to be busy at

E. Sima - People - Cross        874

1        lunch?  Okay.

2                 (The following takes place in open court.)

3    CROSS-EXAMINATION

4    BY MR. MILLMAN:  (CONTINUED)

5        Q.    You had indicated that the tire iron was rejected?

6        A.    Yes, that is correct.  However, on the list of

7    items, again, I have to review it, but I don't actually see

8    the word tire iron listed.  Is it possible that it was

9    collected under a different description?

10       Q.    Yes.

11       A.    A lug wrench?

12                 THE COURT:  Yes.

13       Q.    That's the item, yes.

14       A.    Yes, that is correct.  A lug wrench was not

15   accepted by my laboratory for DNA testing.

16       Q.    That was rejected?

17       A.    Yes.

18       Q.    And the decision to reject it was made by the

19   individuals you mentioned that were at the meeting?

20       A.    Correct.

21       Q.    Including Detective Cereghino?

22       A.    Correct.

23       Q.    Was the fact that there was a witness who claims

24   my client held that tire iron, was that discussed during the

25   meeting?

E. Sima - People - Cross          875

1      A.    No, it was not.

2      Q.    And what was the reason, if you know, that the lug
3  wrench was rejected?

4      A.    There was no conversation that explained the
5  possible holding of the tire iron by Ulises Bonilla in that
6  conversation.

7            However, if there had been either, again, the
8  probative nature of that sample would have been called into
9  question as to what are we showing by showing -- what is it
10  saying by finding someone's DNA on that tire iron, we would
11  have to have shown that there was good probative evidentiary
12  nature to that item in order for it to have been tested by
13  my laboratory.

14     Q.    And Detective Cereghino, again, was present at
15  that time, right?

16     A.    Yes.

17     Q.    Did he mention the fact that witnesses at
18  different times had seen my client and the victim in
19  possession of that lug wrench?

20     A.    He did not make any indication as to wanting that
21  particular item tested, and therefore, there was no
22  discussion as to who may have held it.

23     Q.    So Detective Cereghino didn't want to test it?

24           MS. ABDI:  Objection.

25           THE COURT:  Just one second, just one second.

E. Sima - People - Cross            876

1    When did this meeting take place?

2            THE WITNESS:  Our meeting was on October 7th,

3    2010.

4            THE COURT:  I will tell you, and I will tell

5    this jury, that the indictment is dated February 3rd,

6    2011.  And the sixth count of the indictment is

7    criminal possession of a weapon with intent to use it

8    unlawfully, and the weapon named in the indictment is a

9    blunt instrument which the People's position is is the

10   lug wrench or tire iron.  So there is a count in the

11   indictment concerning this particular instrument.

12           Wouldn't it be probative to see if there were

13   any DNA on an instrument contained in the count in the

14   indictment, albeit you may not have known that at the

15   time because the indictment is months after your

16   meeting?

17           THE WITNESS:  Can I answer?

18           THE COURT:  Go ahead.

19           THE WITNESS:  Yes, obviously with this

20   information I would deem something that probative.

21   However, that was not information provided to the

22   laboratory.

23           But that being said, all of the items for

24   this particular reason are contained in the property

25   clerk indefinitely and are available for any sort of

J.H.

1       testing at any time by request of anyone, defense
2       counsel or the prosecutor's office.
3       Q.    They are available for testing at any time, right?
4       A.    Correct.  They are at the property clerk.
5       Q.    Since the date of the time as the judge just read
6       it to you, did Detective Cereghino ask you to test it?
7       A.    No, no request was made to our office.
8       Q.    And Detective Cereghino at the first meeting, he
9       didn't want to test it; is that right?
10                  MS. ABDI:  Objection as to form.
11                  THE COURT:  Sustained.
12      Q.    What about the watch that I asked you about
13      earlier, was that discussed at the meeting?
14      A.    No, it was not an item that we agreed to do
15      testing on.  I don't know if it was physically discussed.
16      Again, I don't have an exact transcript of the entire
17      conversation.  But no, it was not one of the items mentioned
18      that they were -- that they had requested testing on.
19      Q.    Do you recall Detective Cereghino indicating that
20      he didn't want that tested either?
21                  MS. ABDI:  Objection.
22                  THE COURT:  Objection to the word either.
23                  MR. MILLMAN:  To the word, I'm sorry?
24                  THE COURT:  Either.
25                  MS. ABDI:  As to the word want.

J.H.

Case 2:16-cv-03676-JFB   Document 10-2   Filed 10/06/16   Page 878 of 913 PageID #: 1178

1          THE COURT:  Objection to the word either.  In

2     other words, it had reference to a sustained question

3     before.

4          MR. MILLMAN:  I see, your Honor.

5     Q.   Do you remember Detective Cereghino indicating

6     that he didn't want the watch tested?

7     A.   I have no specific memory of us having a

8     discussion specifically about the watch and him saying he

9     didn't want it tested.

10         However, it was not one of the items that we

11    agreed to test in the conversation.  I don't remember him

12    specifically mentioning the watch.

13    Q.   And I understand he didn't agree to test it.  I'm

14    just asking about the conversation as you remember it if you

15    do pertaining to the watch, and you are saying that you

16    don't recall?

17    A.   I don't recall having a conversation regarding the

18    watch.

19    Q.   Would it be fair to say that Detective Cereghino

20    though as the lead investigating detective in this homicide

21    would be the one to ultimately have the most say as to

22    whether or not something should be tested?

23    A.   I can't agree to that sentence, no.  The DA's

24    office as well as Detective Cereghino as well as anyone

25    higher up the chain from Detective Cereghino, I wouldn't say

1   that he has the most, I forget the word that you used --

2                THE COURT:  He's a representing force.

3                THE WITNESS:  Yes, correct.  But he's not the

4        only person who makes these sorts requests.

5        Q.   You made mention the District Attorney's office.

6   No one from the District Attorney's office was at this

7   meeting, right?

8        A.   That is correct.

9        Q.   Of the people of the meeting, would it be fair to

10  say that Detective Cereghino is the one who has by far the

11  most knowledge of the evidence in the case and the witnesses

12  and what they indicated; would that be fair to say?

13       A.   Yes, that is fair to say.

14               THE COURT:  How long are you going to be?

15       And I'm not --

16               MR. MILLMAN:  I don't have much more, your

17       Honor.

18               THE COURT:  All right.  Because I do have

19       other matters on my calendar.  But if you wanted to

20       break, I would give it to you so that a more thorough

21       analysis of the report can be made.  Or if you want to

22       go for another ten minutes, it's up to you.

23               MR. MILLMAN:  I don't know if I can finish.

24       Maybe it would be prudent to break at this time and

25       then continue.

E. Sima - People - Cross          880

1          THE COURT:  Ladies and gentlemen, we'll see

2      you at 2 o'clock.

3          Don't discuss this case with any other

4      potential witness in the case.  That does not include

5      the attorneys for either side.

6          THE WITNESS:  Thank you.

7          (Whereupon, the jury exits the courtroom.)

8          (Whereupon, a luncheon recess was taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

 1  A F T E R N O O N   S E S S I O N
 2          THE CLERK:  Recalling case on trial, People
 3  of the State of New York versus Ulises Bonilla,
 4  Indictment 202N of 2011.  All parties present including
 5  Spanish interpreter and defendant.  There are no jurors
 6  present.
 7          THE COURT:  Are you going to ask anymore
 8  questions of the witness?
 9          MR. MILLMAN:  I just have a few.
10          THE COURT:  Then let's bring her in.
11          (Whereupon, the witness resumed the witness
12  stand.)
13          THE CLERK:  Let the record reflect the
14  witness is back on the stand.  You are reminded, ma'am,
15  your still under oath.
16          THE WITNESS:  Yes.
17          COURT OFFICER:  Jury entering.
18          (The jury enters the courtroom.)
19          THE CLERK:  Let the record reflect the
20  presence of all jurors.  Do both sides consent to the
21  seating and waive a reading of the roll?
22          MS. ABDI:  Yes.
23          THE CLERK:  Counsel?
24          MR. MILLMAN:  Yes.
25          THE COURT:  Mr. Millman, do you have any

E. Sima - People - Cross          882

1     further cross?

2              MR. MILLMAN:  I do, a few.

3     CROSS-EXAMINATION

4     BY MR. MILLMAN:  (CONTINUED)

5         Q.   Good afternoon.

6         A.   Good afternoon.

7         Q.   During your work on this case, did you have the

8     opportunity to evaluate an item listed as a clear plastic

9     bag with a red stain?

10             THE COURT:  A clear plastic bag with a red

11        stain?

12             MR. MILLMAN:  Yes.

13             THE COURT:  A single item?

14             MR. MILLMAN:  Yes.

15             THE COURT:  Do you understand it?

16             THE WITNESS:  No.  Are you asking if our

17        office accepted that item into the laboratory for

18        testing?

19        Q.   An even better question, yes.

20        A.   No, we did not.

21        Q.   You are familiar with the fact that that was one

22    of the items recovered though?

23        A.   No, I'm not specifically.  Again, I would have to

24    check the list to see all of the items that were recovered.

25    But I'm not aware of it particularly, no.

1    Q.   Now, do you have that list with you, the items

2    recovered?

3    A.   It's within my case file.

4    Q.   Could you review that?

5    A.   I see an item listed as a clear plastic bag with

6    red stain at arrow recovered from MV rear floor area being

7    listed as item number 28.

8    Q.   Now, am I correct in stating that that was not

9    accepted?

10   A.   Correct.

11   Q.   So it was rejected?

12   A.   Yes.

13   Q.   And that decision to reject would have also been

14   made at the meeting that you referred to?

15   A.   Yes, it would.

16   Q.   The white cardboard box that you testified about

17   which had the stain with the two contributors --

18   A.   Correct.  There are five stains on it, two of

19   which had DNA testing done, and the one that had two

20   contributors was specifically stain 11D.

21   Q.   Now, there is a notation of capital KM, a plus

22   sign next to it with a circle that you are aware that that

23   would be used in evaluating or describing certain evidence?

24   A.   When you say a notation, do you mean on the item

25   or on the notes or --

1      Q.    On the notes.

2      A.    Yes, within the notes, the letters KM positive

3  refers to the Kastle-Meyer or KM test that tested

4  presumptively positive, hence the plus sign circle around it

5  that I testified earlier.  All the stains that were KM

6  positive meaning they were presumptively positive for blood.

7      Q.    The item that had the two contributors, wasn't

8  that marked KM with a plus sign next to it and a circle?

9      A.    The stain D, in other words, 11D was, in fact, KM

10  positive meaning having a reddish-brown substance and could,

11  in fact, be blood, correct.

12     Q.    And was that the stain that had the two

13  contributors?

14     A.    Yes, it was.

15     Q.    And would that indicate that the -- both of the

16  contributors had contributed blood to that?

17     A.    Again, like I said earlier, there's no way of

18  knowing if it's two blood contributors in that stain or one

19  blood contributor and one skin cell contributor or if it was

20  two blood contributors with that one contributor was there

21  before the other, if they contributed at the same time, if

22  it was skin cells contracted and then later the blood.

23  There's no way for that sort of determination to be made.

24     Q.    So this KM plus notation would not necessarily

25  pertain to both of the individual contributors but rather

J.H.

Case 2:16-cv-03676-JFB  Document 10-2  Filed 10/06/16  Page 885 of 913 PageID #: 1185

E. Sima - People - Cross        885

1   the sample itself; would that be fair to say?

2               THE COURT:  She's not saying that there were

3         two contributors.  She's saying there could be two

4         contributors.  Am right in that?

5               THE WITNESS:  No.  There are actually are two

6         contributors, a minimum of two contributors.

7               THE COURT:  Excluded one from the other?

8               THE WITNESS:  Correct.

9               THE COURT:  I'm sorry.

10              THE WITNESS:  That's okay.  All that -- the

11        KM positive means that I physically saw reddish-brown

12        staining, and it's a color change test that indicates

13        presumptively that blood could be present.  That test

14        was positive.  That's correct.

15              I don't know if the blood from one

16        contributor tested positive and the skin cells again

17        were there also or if there are two blood contributors

18        and they are both testing KM positive.  All I know that

19        there was a dark reddish-brown stain that tested

20        positive.  When DNA typing was performed, we saw that

21        there were two contributors to that stain.

22        Q.   And correct me if I am wrong, we know that the

23   major contributor was the victim, Armando Villatoro?

24        A.   Correct.

25        Q.   And as far as the minor contributor; am I correct

J.H.

E. Sima - People - Cross          886

1    in saying that Ulises Bonilla was excluded?

2         A.    That is correct, Ulises Bonilla is excluded as

3    being that second contributor.

4         Q.    And that second contributor is unknown?

5         A.    Correct.

6         Q.    Do you know whether or not the detectives in this

7    case had compared the blood of any other individual other

8    than Ulises Bonilla and Armando Villatoro to compare with

9    the blood on the minor contributor?

10               THE COURT:    Were you submitting any other

11        blood samples?

12               THE WITNESS:    The detective wouldn't be

13        making the comparison.    The comparison would be made in

14        my laboratory.    And no, no other buccal swabs from any

15        other suspects were submitted to our laboratory for

16        testing for comparison purposes.

17               But again, just as aside, to make sure we

18        understand, the only thing I could do with another

19        comparison sample is tell you whether that person would

20        have contributed or is excluded as a contributor.    I

21        wouldn't be able to tell you this person contributed to

22        this stain to the degree that it was a minor

23        contributor that is so minor, I am unable to tell you

24        his entire DNA profile or her technically.

25        Q.    There were five stains though on the white

J.H.

E. Sima - People - Cross          887

1    cardboard box, correct?

2         A.   Correct.

3         Q.   Two were tested?

4         A.   That is correct.

5         Q.   Now, the decision to test two of the five as

6    opposed to all five, who was that made by?

7         A.   That decision was made by me, because I was the

8    person who was analyzing that evidence.  It was my case.

9         Q.   And you were aware when you had the white

10   cardboard box that it's recovered from the motor vehicle

11   believed to have been used to flee from the scene?

12        A.   Correct.

13        Q.   And you chose not to analyze the other three

14   bloodstains?

15        A.   That is correct.

16        Q.   Now, those other three bloodstains were noted to

17   be KM positive; is that correct?

18        A.   That is correct.

19        Q.   In other words, those are the other three stains

20   were presumptively blood?

21        A.   They tested presumptively positive for blood,

22   correct.

23        Q.   And they were not tested?

24        A.   No DNA test was performed on those three stains.

25        Q.   Did Detective Cereghino advise you in any way

J.H.

E. Sima - People - Cross          888

1    after the results of the first two tests not to test the
2    remaining three?
3         A.    I want to make sure I understand your question.
4         Q.    Sure.
5         A.    In other words, when Detective Cereghino was
6    issued the record and had a summary of all the testing that
7    was performed, did he -- and I'm sorry, the last part was
8    did he then --
9         Q.    -- request that you test the other three stains?
10        A.    No request was made.
11        Q.    He did not?
12        A.    No.
13        Q.    I see.
14              THE COURT:    That's not within his authority,
15        is it?  Could he make the request?
16              THE WITNESS:    He could request.
17              THE COURT:    But it's not within his authority
18        to decide whether or not it should be tested?
19              THE WITNESS:    No, yes, that's correct, it
20        wouldn't be his decision to have the test, but he could
21        have made the request.
22        Q.    I wanted to just ask so the other items that I had
23    asked you about, I am talking about the tire iron or lug
24    wrench, the clear plastic bag with a red stain, the
25    additional three stains on that white cardboard box, am I

J.H.

E. Sima - People - Redirect        889

1    correct in saying that they could have been tested?

2        A.    Yes.

3        Q.    There's nothing you are aware of from a scientific

4    or DNA perspective that would prevent them from being

5    tested?

6        A.    No, not that I'm aware of.

7        Q.    A choice was made not to test them; would that be

8    fair to say?

9        A.    That's correct.

10               MR. MILLMAN:  Nothing further.

11               THE COURT:  Any redirect?

12   REDIRECT EXAMINATION

13   BY MS. ABDI:

14       Q.    Miss Sima, it's fair to say that in cases such as

15   homicide cases, there's a large quantity of evidence that's

16   collected at the scene; is that correct?

17       A.    That is correct.

18       Q.    And you don't test every piece of item as a matter

19   of course that's found at a homicide scene; is that correct?

20       A.    That is correct.

21       Q.    Part of the DNA lab protocol is to test items that

22   are the most probative; is that correct?

23               MR. MILLMAN:  I'm going to object only

24           because Miss Abdi is testifying.  The questions are

25           leading, and this is redirect.

J.H.

E. Sima - People - Redirect        890

1          THE COURT:  You are technically right, but
2     she is not being led.  Don't give an answer just
3     because she includes it in the question.
4          THE WITNESS:  Okay.
5     Q.   As part of the DNA protocol, you look to test
6     items that you believe are most probative; is that correct?
7     A.   Yes.  We are provided are a list of all of the
8     items that are collected in a case, and it is our job at the
9     DNA laboratory to have a conversation with the case
10    detective and decide which items are deemed the most
11    probative so that we can do testing on those items.
12         And I honestly can't think of off the top of my
13    head of a single case where every single item that was
14    collected was tested.
15    Q.   In fact, it's fair to say that just because a case
16    may have witnesses that see somebody holding a certain
17    object, that does not mean that you would, in fact, test
18    that object for DNA; isn't that correct?
19    A.   It would depend on the object.  No.  The mere fact
20    that someone handled an object would not necessarily make it
21    probative.  It would depend what was the object, did that
22    person own the object.  If it's your object and you're
23    holding it, finding your DNA profile on it is not very
24    probative.
25         It would depend the condition of the object.  Was

1   it held and then left out in the rain for month?  In that
2   case, we would not accept an item because it was unlikely
3   that a DNA profile would appear.  Being subject to exposure
4   and weather conditions would deem it not eligible for DNA
5   testing.  I could go on.  I'm sure could I think of more
6   reasons.

7          Just because an item was physically handled
8   doesn't make it in and of itself make it probative.

9          Q.   And I just want to go back now to the stain on the
10  box, 11D, that had a major and minor contributor.  It's fair
11  to say, Miss Sima, for example, if I was carrying this box
12  around for a few weeks and somebody else nicked their finger
13  and bled on the box, it's possible that if you did DNA
14  testing on that bloodstain, you could find the major
15  contributor in --

16              MR. MILLMAN:  Objection to the word possible.
17              THE COURT:  Don't answer that question in
18          that form.  Anything is possible, ladies and gentlemen.
19          Is it reasonable?

20          Q.   Well, is it reasonable then, Miss Sima if you
21  tested the bloodstain you could find a major contributor and
22  minor contributor in that situation?

23          A.   It's reasonable.  But I have to clarify that with
24  it would depend, again, obviously if there's blood on it,
25  you would find -- you would find it likely to find the DNA

J.H.

E. Sima - People - Redirect          892

1   profile from the blood donor.  However, the skin cells being

2   left on the box, that's a whole different story.

3        Again, there are so many factors that play a role

4   into it.  How long was it held?  Was it held and was the

5   person running and sweating?  Were they in a hot environment

6   that made them sweat even more?  Did they wash their hands

7   frequently in which case they would have less skin cells to

8   deposit on it.  These are all things that would come into

9   combination as to finding mixture on that particular box

10  where someone held it and someone else bled on top of it.

11       And again, unless I went back to the lab and

12  conducted multiple tests in which I tried all theories, I

13  couldn't concretely say.  But yes, I think it's a reasonable

14  explanation or theory.

15       Q.   And it's reasonable that in that situation, my DNA

16  could come up as a minor contributor from handling the box?

17            THE COURT:  She's giving you the box example,

18       not your situation.

19       Q.   From handling the box.

20       A.   Yes, it's possible.

21       Q.   Now, and you said in this case, you could not tell

22  whether or not the minor contributor was a male or a female?

23       A.   That is correct.  Only to the event if you have

24  only an X and a Y for your sex determining chromosomes.  A

25  male has an X and a Y, and a female has just an X.  In this

J.H.

1    mixture, there was an X and a Y.  If there was a only a male

2    component, then that X and Y would be a certain proportion

3    to one another.  And if the other contributor was a female,

4    they would be at a different proportion to one another.  And

5    the minor contributor was so minor, the fact that you can't

6    really determine what proportion they are to one another.

7    So technically it could be a female contributor.  I can't

8    say for sure.

9              MS. ABDI:  Thank you.  I have no further

10        questions.

11   RECROSS-EXAMINATION

12   BY MR. MILLMAN:

13        Q.    Of course, you don't test everything.  But let me

14   ask you this:  Seeing someone holding something, would that

15   in and of itself not indicate that it's probative?

16        A.    I didn't hear the beginning of the sent000ence.

17        Q.    Let me start again.  You can't test everything; is

18   that right?

19        A.    That's correct.  We don't test everything.

20        Q.    A decision has to be made as to whether or not

21   it's probative?

22        A.    Correct.

23        Q.    And am I correct in saying that you would

24   communicate to Detective Cereghino in one form or another

25   that you have the drops of blood in the back seat, you had

1   three additional untested stains and that there was also a

2   contributor that was unknown that were all found in the car

3   that was seen fleeing the scene.  Would it be fair to say

4   you made Detective Cereghino aware of that at one point?

5       A.    Yes, all of that information is contained within

6   the DNA property which was given to Detective Cereghino,

7   yes.

8       Q.    Would you consider it probative that these three

9   additional stains existed which were not tested, wouldn't

10  that be important to test?

11      A.    Do I find it probative that the three stains

12  exist?

13      Q.    Yes.

14      A.    No.  Obviously I made the decision to only do

15  testing on the two stains that I selected as being

16  representative stains from that box.

17      Q.    Was that because Detective Cereghino didn't want

18  it to be known who might own to the other three stains?

19              THE COURT:  Sustained.

20              MR. MILLMAN:  Okay.

21      Q.    And you were asked whether or not just seeing

22  someone holding something that testing would be probative,

23  it would not be, correct?

24      A.    Not necessarily.

25      Q.    However, if someone was seen holding a weapon for

1   which they were charged criminal possession of a weapon, do

2   you think that would be something that would be probative to

3   test?

4        A.   Again, I would find that as useful information,

5   but I would need to know more information.  Like I said

6   before, it would depend on what the item is and what the

7   circumstance is.  That's why the need for discussion.

8             Even an item like a tire iron, if you found my DNA

9   on my tire iron, I would question the probative nature of

10  that DNA profile.  If you found my DNA or profile on someone

11  else's tire iron, then perhaps a more probative nature would

12  be added.  But again, this is all hypothetical, and I would

13  need all of the information I could possibly gather before I

14  deem something probative.

15       Q.   Now, you don't know whether or not the unknown

16  contributor to the stain that we have been talking about,

17  the two contributors, whether that was from blood or

18  something else; is that correct?

19       A.   That is correct.

20       Q.   You don't know one way or another?

21       A.   Right, that is correct.

22             THE COURT:  Now, again, we are getting far

23        afield of recross examination.

24             MR. MILLMAN:  Well, on redirect she did bring

25        up this.

J.H.

 1              THE COURT:  No, she didn't.  Get to the

 2        point.

 3              MR. MILLMAN:  Okay.  That was my last

 4        inquiry.  Thank you.

 5              THE COURT:  Thank you.

 6              THE WITNESS:  Thank you.

 7              (The witness was excused.)

 8              THE COURT:  Next witness.

 9              MS. ABDI:  The People call Dr. Gerard

10        Catanese.

11   D R .  G E R A R D   C A T A N E S E, a witness called on

12        behalf of the People, after having been first duly

13        sworn by the Clerk of the Court, was examined and

14        testified upon his oath as follows:

15              THE CLERK:  In a loud, clear voice, please

16        state your name.

17              THE WITNESS:  My name is Gerard Catanese,

18        last name is C-A-T-A-N-E-S-E.

19              THE CLERK:  And your place of employment?

20              THE WITNESS:  The Nassau County Medical

21        Examiner's Office.

22              THE CLERK:  Thank you.

23   DIRECT EXAMINATION

24   BY MS. ABDI:

25        Q.   Good afternoon, Doctor.

1          A.    Good afternoon.

2          Q.    What is your position and title at the medical

3    examiner's office?

4          A.    Deputy medical examiner.

5          Q.    And how long have you been employed by the Nassau

6    County Medical Examiner's Office?

7          A.    I think it's 18 years now.

8          Q.    And what do you do as deputy medical examiner?

9          A.    I perform autopsies, and I certify the cause of

10   individuals' deaths.

11         Q.    Are you also a doctor licensed to practice

12   medicine in the State of New York?

13         A.    Yes, I am.

14         Q.    How long have you been licensed to practice in the

15   State of New York?

16         A.    Since 1988.

17         Q.    What is your specialty?

18         A.    Forensic pathology.

19         Q.    And what is forensic pathology?

20         A.    A pathologist is a doctor who specializes in

21   making diagnoses by examining body tissue and fluids.  A

22   forensic pathologist is a subspecialist in the area of

23   pathology.  He specializes in examining injuries and wound

24   patterns and drawing conclusions about them.

25         Q.    And Doctor, can you tell the jury your educational

1   background?

2       A.    Certainly.  I have a BS in biology from St. John's

3   University in Queens.  I have a doctor of medicine from SUNY

4   Downstate in Brooklyn.  I have two-year residency anatomic

5   science from SUNY Downstate Brooklyn.  I have a one-year

6   internship in pediatrics from Winthrop Hospital in Mineola.

7   I have two-year residency in clinical pathology from Kings

8   County Hospital in Brooklyn.  I have one year specialized

9   training in forensic pathology from the New York City

10  Medical Examiner's office.

11      Q.    With respect to your position at the medical

12  examiner's office, do you perform autopsies?

13      A.    Yes, I do.

14      Q.    And what is an autopsy?

15      A.    An autopsy is a complete examination of the body.

16  It starts with an examination of the external surface of the

17  body, then involves opening the body cavity, examining all

18  of the organs in their normal anatomic position and involves

19  removing each organ and examining it individually.

20      Q.    Doctor, approximately how many autopsies have you

21  performed or assisted in during the course of your career?

22      A.    With my own hands, maybe four or 5,000 and

23  assisted on many others.

24      Q.    And have you ever been involved in court before as

25  an expert in field forensic pathology?

Case 2:16-cv-03676-JFB Document 10-2 Filed 10/06/16 Page 899 of 913 PageID #: 1199

1        A.    Yes.

2        Q.    Have you testified in court before as expert in

3    the field of forensic pathology?

4        A.    Yes.

5        Q.    Approximately how many times have you testified in

6    the field of forensic pathology?

7        A.    More than 100 times.

8        Q.    In what jurisdictions?

9        A.    Certainly in Nassau County, in Suffolk County, in

10   Queens, Manhattan, the Bronx, Brooklyn, some upstate courts

11   and some out of state courts and federal court.

12             MS. ABDI:   Your Honor, at this time I offer

13        Dr. Catanese as an expert in the field of forensic

14        pathology.

15             MR. MILLMAN:   No objection.

16             THE COURT:   All right, same ruling, ladies

17        and gentlemen.

18        Q.    Doctor, I would like to direct your attention to

19   September 29th of 2010.  Did you perform an autopsy on an

20   individual named Armando Villatoro?

21        A.    Yes, I did.

22        Q.    Can you please describe Armando Villatoro?

23        A.    Sure.  The deceased was a 41 year old male.  His

24   body measured 67 inches.  It weighed 180 pounds.  He had

25   brown hair and a slight beard and mustache.

Dr. G. Catanese - People - Direct      900

1        I guess what was most notable to the body were

2   that there were injuries present.

3        Q.   Did you do an external examination of Armando

4   Villatoro?

5        A.   Yes, I did.

6        Q.   Can you please describe what observations you made

7   while examining Armando Villatoro?

8        A.   Yes.   I noticed that there were a number of stab

9   wounds present to the body.  By stab wounds, I mean wounds

10  that are produced by a sharp instrument whose depth is

11  greater than its length.

12       Q.   How many stab wounds did you notice?

13       A.   I noted 12 stab wounds and labeled them one to 12

14  to describe them.

15       Q.   And how deep were the stab wounds?

16            THE COURT:   Were they all the same depth?

17            THE WITNESS:   No, they weren't.

18            THE COURT:   Well, you are going to have to

19       get into that a little more detailed.

20       Q.   Can you describe the difference in stab wounds

21  that you noticed during your external examination?

22            THE COURT:   Pick out each one and tell the

23       jury its depth.

24            THE WITNESS:   Certainly.   Can I refer to my

25       notes?

Dr. G. Catanese - People - Direct      901

1       THE COURT:  Sure.

2       THE WITNESS:  I should state the location

3   maybe of the stab wound at the same time?

4       THE COURT:  However you want to explain it,

5   it's fine.

6       THE WITNESS:  I labeled the stab wounds one

7   to 12.  It doesn't mean that that's the sequence in

8   which they occurred.

9       Stab wound number one was to the left cheek

10  area, and that depth was approximately one inch.  Stab

11  wound number two was to the left anterior neck area,

12  and the depth of that was approximately one inch.

13      Stab wound number three was to the right neck

14  area, and it's depth was approximately a half an inch.

15  Stab wound number four was to the left chest area, and

16  its depth was approximately five inches.

17      Stab wound number five was to the left chest

18  area, and its depth was approximately five inches.

19  Stab wound number six was to just where the chest meets

20  the abdomen on the left side.  Its depth was

21  approximately one inch.

22      Stab wound number seven was to the left upper

23  abdomen, and its depth was approximately one inch.

24  Stab wound number eight was to the left abdomen, and

25  it's depth was approximately a half an inch.

J.H.

1    Stab wound number nine was to the left lower

2    abdomen, and this wound entered the abdominal cavity.

3    But because it didn't hit a lot of structures, I was

4    unable to estimate its depth because there was a chance

5    for it to move.  But it was at least an inch, but I

6    didn't have a way to measure it exactly.

7    Stab wound number 10 was to the left lateral

8    chest, and its depth was approximately two inches.

9    Stab wound number 11 was to the back of the left chest,

10   and I didn't -- and that one wasn't very deep either.

11   I didn't have a specific way to measure it.

12   Stab wound number 12 was to the back of the

13   shoulder, and it's depth was approximately three

14   inches.  So we have stab wounds ranging in depth up to

15   five inches.

16   Q.    Is it fair to say that some of the stab wounds

17   were superficial?

18   A.    Yes.

19   Q.    Now --

20   THE COURT:   Now, what do you mean by

21   superficial?

22   THE WITNESS:   Some of them were deeper than

23   others, and some of them didn't penetrate any great

24   depth.

25   THE COURT:   Superficial means non-mortal,

Dr. G. Catanese - People - Direct       903

1    correct?

2                THE WITNESS:  Some of them wouldn't cause

3         death in a normal individual and some would, yes.

4                THE COURT:  You can have a razor sliced on

5         your face causing 100 stitches; that would be

6         superficial, would it not?

7                THE WITNESS:  I guess superficially if it's

8         not deep, it generally wouldn't kill a normal person.

9         I guess it could get infected and result in death

10        later, but that's a different story.

11        Q.    And did you also do an internal examination of

12   Armando Villatoro?

13        A.    Yes, I did.

14        Q.    And what observations did you make internally?

15        A.    The observations made were that some of the stab

16   wounds, the ones that I described with a greater depth,

17   injured internal organs.

18        Q.    Specifically what injuries?

19        A.    Specifically the stab wound that I called number

20   five which was to the left chest, the one that perforated to

21   a depth of five inches.  This one perforated the stomach,

22   the pancreas and the diaphragm.  So it perforated through

23   the chest and into some abdominal organs.

24                And the stab wound that I called number four which

25   was higher up on the left chest which also perforated to a

J.H.

Dr. G. Catanese - People - Direct       904

1  depth of approximately five inches, this perforated the

2  right ventricle of the heart.  So the right side of the

3  heart it perforated.  That also perforated internal organs.

4      Q.   And based on your training and your experience and

5  based on your examination of Armando Villatoro, did you form

6  an opinion within a reasonable degree of scientific

7  certainty as to a cause of death?

8      A.   Yes, I did.

9      Q.   What was that?

10      A.   Multiple stab wounds to chest and abdomen with

11  perforation of heart, stomach and pancreas.

12      Q.   Did you notice any gunshot wounds?

13      A.   No.

14           THE COURT:  You can exclude that?

15           THE WITNESS:  Yes, yes.

16      Q.   And with respect to the stab wound to the heart,

17  how long would you expect to survive untreated with that

18  wound?

19      A.   You know, the mechanism of death in a stab wound

20  to the heart is hemorrhage.  It could take up to a couple of

21  minutes to bleed from that.

22      Q.   We are talking about a matter of minutes?

23      A.   Minutes, yes.

24           THE COURT:  It affects mobility in less time,

25      correct?

J.H.

Dr. G. Catanese - People - Direct     905

1            THE WITNESS:  Yes.  Someone would be able to

2       move around fairly normal at the start, but then they

3       would lose mobility.

4       Q.   You mean they would fall?

5       A.   Eventually they would collapse, yes, from blood

6   loss.

7       Q.   And how does the injuries that you noticed, how

8   does that cause death?

9       A.   By hemorrhage, by bleeding.

10      Q.   Bleed to death?

11      A.   Yes.

12      Q.   Now, did you take photographs during the autopsy?

13      A.   Yes, I did.

14           MS. ABDI:  I'd like to have these marked as

15      People's Exhibits 76, 77 and 78 for identification.

16           THE COURT:  Before you get into that, did

17      you -- prior to the time that you received the body or

18      the remains, did you notice any medical intervention

19      from another source?

20           THE WITNESS:  Yes.

21           THE COURT:  Would you explain that to the

22      jury, please?

23           THE WITNESS:  Sure.  The body before coming

24      to us at the medical examiner's office went to a

25      hospital where they performed something called a

J.H.

1    thoracotomy.  That is that they made an incision on the

2    deceased's chest to open the chest to see if they had

3    an opportunity to, you know, to try to repair the wound

4    and save his life.  So the left chest had been opened

5    which involved the heart.  That also was opened, I

6    believe.

7    Q.   I would like to show you what's been marked as --

8         MS. ABDI:  I would like to have those items

9    marked as 76 through 78.

10        (People's Exhibits 76, 77 and 78 are marked

11   for identification.)

12   Q.   Doctor, I ask that you take a look at those items.

13   Do you recognize those items?

14   A.   Yes.  These are photographs taken at the time of

15   autopsy under my direction at the medical examiner's office.

16   Q.   Is that a fair and accurate depiction of some of

17   the injuries that you observed during the autopsy?

18   A.   Yes.

19   Q.   Of Armando Villatoro?

20   A.   Yes.

21        MS. ABDI:  At this time, your Honor, I offer

22   those into evidence.

23        THE COURT:  Any objection?

24        MR. MILLMAN:  No objection.

25        THE COURT:  Received.

1          (People's Exhibits 76, 77 and 78, previously

2     marked for identification, are received and marked in

3     evidence.)

4          MS. ABDI:  Your Honor, I would like it put

5     them on the presenter.  I would like to have the doctor

6     step down.

7          THE COURT:  There are different angles that

8     are involved here.  Show them to the jury.  Then the

9     doctor can testify to them.

10         (Whereupon, People's Exhibits 76, 77 and 78

11    are passed among the jury.)

12         THE COURT:  You want the doctor to get off

13    the stand?

14         MS. ABDI:  Yes.

15    Q.   Doctor, if you could stand there.  I'm displaying

16    what is marked as People's Exhibit 78 in evidence.  Doctor,

17    what's depicted in this photograph?

18    A.   This is a photograph of the chest is here, the

19    abdomen is here.  There's the umbilicus and stab wound, stab

20    wound, stab wound, stab wound.  I think this is five, six,

21    seven, eight, nine as I labeled.

22         THE COURT:  Now, on that particular

23    photograph, Dr. Catanese, what is the right side of the

24    body and what is the left side of the body?

25         THE WITNESS:  The left side is here, and the

Dr. G. Catanese - People - Direct      908

1       right side is towards the back and the head this way.

2                   THE COURT:  So the left side is towards the

3           bottom, and the right side is the top?

4                   THE WITNESS:  Yes.  So we are looking at

5           essentially the chest and left abdomen.

6           Q.    And I'd like to display what is now People's 76.

7       Doctor, can you describe this photo?

8           A.    Sure, this is -- the last photograph was showing

9       us down.  This is showing up further.  This is the head

10      would be this way.  The feet would be this way.  The right

11      side would be here.  So we are looking at the left side.

12      And this is the chest, and this is an incision of the

13      thoracotomy I discussed which was made by the hospital.

14                  There's a stab wound here.  This was the one that

15      I called number four.  This is the one that I called number

16      five.  We described those already.  And then this is 10 and

17      11.  We are just seeing more at the side.  This is some of

18      these are repeated.

19          Q.    And I'm now showing what is marked as Exhibit 77.

20      What is depicted in this photograph?

21          A.    In this photograph, we have the head, the feet.

22      This on the upper part here is the left side of the body.

23      And this is showing the 10 and 11.  We saw them earlier from

24      a different angle.  This is number 12, the stab wound I

25      called number 12.

Dr. G. Catanese - People - Cross        909

1        THE COURT:  All those red marks on his back,

2     Doctor, is that trauma or something else?

3        THE WITNESS:  This is lividity.  It's the

4     gradual settling of blood.  The red here isn't meant to

5     be taken as anything.

6     Q.   And do you see any wounds to his face in that

7  photograph?

8     A.   I believe we can see one here.  That was what I

9  called number one.

10    Q.   Thank you.  And Dr, Mr. Villatoro was pronounced

11  dead at the hospital; is that correct?

12    A.   Yes.

13    Q.   And then he was brought to the medical examiner's

14  office for an autopsy; is that correct?

15    A.   Yes.

16    Q.   Now, as part of the autopsy, do you also collect a

17  sample of Mr. Villatoro's blood?

18    A.   Yes, we collect samples of blood.

19    Q.   And did you do that in this case?

20    A.   Yes.

21    Q.   And where was that stored?

22    A.   Well, certainly it would be placed into our

23  refrigerator and then picked up by the various agencies.  We

24  sent blood for toxicology analysis and blood for DNA status.

25    Q.   And where is that kept in your office?

1           THE WITNESS:  It's the function of our

2      department to certify the cause of death.

3      Q.    And you are required by law to give copies of that

4  to the District Attorney, correct?

5      A.    That's correct, yes.

6      Q.    But you do it on your own, right?

7      A.    No, we don't work for the District Attorney,

8  that's correct.

9      Q.    And so your autopsies though are regularly relied

10  upon in the District Attorney's office?

11           MS. ABDI:  Objection.

12           THE COURT:  You hope that to be the case,

13      correct?

14           THE WITNESS:  Um, I guess so, yes, I guess

15      so.

16      Q.    And over the years, would it be fair to say that

17  you become familiar with the different types of puncture

18  wounds and appearance that would result from the use of

19  different types of sharp knives?

20      A.    Yes.

21      Q.    And let me ask you based upon your examination of

22  Mr. Villatoro, the number of the stab wounds, would it be

23  fair to conclude an amount of force had to have been used to

24  inflict these injuries?

25      A.    Now, depends on how sharp the knife is.  A very

Dr. G. Catanese - People - Cross     912

1   sharp knife would require less force.  A dull knife would
2   require more force.  I don't think I was told the amount
3   force, no.
4        Q.   Would I be correct in saying that someone would
5   have grabbed the handle of the knife with a good amount of
6   force?
7                  THE COURT:  Are you qualified in this field?
8                  THE WITNESS:  No.
9                  MR. MILLMAN:  I will certainly move on then,
10       your Honor.
11       Q.   The large gaping cut that was in one of the
12   photographs reviewed that was long and clearly the largest
13   that had the stitches across is it?
14       A.   Yes.
15       Q.   Am I right that that had nothing to do with that
16   stabbing, that that was done by the hospital?
17       A.   Yes.
18                  MR. MILLMAN:  Thank you.
19                  THE COURT:  That's it.
20                  MR. MILLMAN:  Yes, that's it.
21                  THE COURT:  Good to see you again.
22                  THE WITNESS:  Have a good weekend, good
23       holidays.
24                  (The witness was excused.)
25                  THE COURT:  Well, Miss Abdi says we are going

1    to have a full day Monday, and on Monday, she said it

2    to me and I want to say it to you to hope to keep her

3    at her word.  We are going to have a full day on

4    Monday, and I think bearing some unforeseeable event,

5    she will complete her case on Monday.

6              So that's it for today.  We are proceeding

7    faster than we thought.

8              Remember the admonitions I have given you.

9    Have a nice weekend, and we'll see you Monday at 9:30.

10             (Whereupon, the jury exits the courtroom.)

11             THE COURT:  All right, we'll see you Monday.

12             MR. MILLMAN:  Your Honor, I do have one

13   more --

14             THE COURT:  Let me let jury pass down the

15   hallway.

16             MR. MILLMAN:  I did mean to have court

17   address the difficulty I am having in seeing my client

18   at the jail.  Repeatedly, they have either not received

19   court orders, and it has made it very difficult for me

20   to engage a defense with Mr. Bonilla.

21             This weekend, I'm going to need to see him as

22   well.  I don't know exactly what the problem is over

23   there.  I've asked them.  They all throw their hands

24   up.

25             THE COURT:  I'm not surprised they do that.

Proceedings                          914

1    I'll put on the commitment slip again defendant to see

2    attorney between 5 and 7?

3              MR. MILLMAN:  Well, actually, what I was

4    going to ask is if it could be Saturday between 12 and

5    3 and Sunday between 12 and 3.

6              THE COURT:  I just received an okay from the

7    sergeant that you will be able to talk to him until a

8    quarter to 4 here.

9              MR. MILLMAN:  Oh, here, oh, that helps,

10   Judge.  Thank you.

11             (Whereupon, the trial is adjourned to

12   December 12th, 2011.)

13

14

15

16

17

18

19

20

21

22

23

24

25