915

1    STATE OF NEW YORK  :  NASSAU COUNTY

2        SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5            -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                        Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                            December 12, 2011
                              262 Old Country Road
11                            Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
              Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
              Nassau County District Attorney
18            BY:  ZEENA ABDI, ESQ., of Counsel
              Assistant District Attorney
19                      For the People

20

21       DANIEL L. MILLMAN, ESQ.
              316A Main Street
22            Roslyn, New York  11576
                        For the Defendant
23
                        JOANNE HORROCKS, CSR
24                      Senior Court Reporter

25

J.H.

Proceedings                                916

1           THE CLERK:  Case on trial, People of the

2     State of New York versus Ulises Bonilla, Indictment

3     202N of 2011.  Let the record reflect all parties are

4     present, including the defendant and the Spanish

5     interpreter, Kimberly Hernandez.  There are no jurors

6     present at this time.

7           Are there any applications?

8           THE COURT:  Yes, at this particular time, the

9     record should reflect that references have been made

10    throughout this trial to an individual by the name of

11    Misael Berrios, M-I-S-A-E-L  B-E-R-R-I-O-S.  It is the

12    position of the People that during the altercation

13    between the defendant and the deceased that this

14    individual fired a weapon in the air to ensure that an

15    altercation between the deceased and the defendant was

16    a one-on-one confrontation.  Obviously if this is true,

17    the actions of the witness would be criminal, and as a

18    consequence, he could lawfully plead the fifth

19    amendment.

20          At this particular time the People have told

21    me they are going to offer him immunity pursuant to

22    Article 50 of the Criminal Procedure Law, and this

23    should be done before the Court alone before the jury

24    comes out, and then that fact can be made known to the

25    jury either on direct or on cross-examination.

J.H.

1          Are we all set to proceed in this action?

2          MS. ABDI:  Judge, I would just like to with

3    respect to what your Honor has just mentioned, I had

4    written a paragraph covering what we had spoken about.

5    I had given a copy of that immunity to defense counsel

6    this morning, something I had discussed with him

7    earlier.  But I would just like to read that into the

8    record.  I have also given copy to the Court.

9          THE COURT:  If you would like to read into

10   the record, fine.

11         MS. ABDI:  Thank you, Judge.  People -- with

12   respect to People versus Misael Berrios, on October

13   13th, 2010, Misael Berrios was interviewed by members

14   of the Nassau County Police Department as part -- as

15   part of the investigation into the death of Armando

16   Villatoro which occurred on September 28th, 2010 in the

17   vicinity of 180 Kinkel Street, Westbury, Nassau County,

18   New York.  During the interview, Misael Berrios stated

19   that he fired a handgun into the air and told people at

20   the scene to keep out of the fight between Armando

21   Villatoro and Ulises Bonilla.  Mr. Berrios' intention

22   was that it was to be a fair one-on-one fight between

23   Mr. Villatoro and Mr. Bonilla.  Misael Berrios has

24   agreed to testify truthfully at the trial of Ulises

25   Bonilla in exchange for a grant of immunity with

1      respect to his actions as described by him in his

2      October 13th, 2010 statement to the police.

3              This statement is signed by Misael Berrios,

4      and it's also signed by myself, Zeena Abdi, and dated

5      December 9th, 2011. And I have given defense counsel a

6      copy of that document.

7              THE COURT: All right, let's bring in the

8      proposed witness.

9              MR. MILLMAN: Before we do, your Honor, I did

10     want to also --

11             THE COURT: Just one second.

12             MR. MILLMAN: Your Honor, with respect to

13     what took place on the record, a discussion that we had

14     with the Assistant DA and your Honor concerning the

15     problem that arose with respect to one of the witnesses

16     I intend to call on behalf of the defendant, Diana

17     Bonilla, your Honor has just signed a subpoena which I

18     intend to have served on her as soon as possible,

19     immediately.

20             But as I indicated to your Honor, she has

21     advised that it is her intention to not respond to any

22     subpoena and not to appear in court. So while I will

23     follow the procedures necessary, I will be requesting a

24     material witness order through her. I am not asking

25     for a decision on that. I have to submit that through

writing. But I want to put on the record I have advised the Court of this and that we had a discussion about that.

THE COURT: All right, now, it's your position that she would provide alibi testimony to the defendant with regard to the incident in the woman's bathroom?

MR. MILLMAN: Yes, and there's also additional relevance to her testimony because she observes my client in the back seat of the vehicle, the Acura that's been the subject of much questioning that was seen leaving the scene of the incident. She observes my client in the back seat of that vehicle right before he went to the hospital as he was bleeding from his hand which obviously is quite relevant because it goes to why his bloods there. I know the Assistant DA has their position.

THE COURT: I have never witnessed in my experience a material witness order being sought for by the defense. This is the first for me.

MR. MILLMAN: Certainly for me, your Honor.

THE COURT: Obviously when I was a prosecutor, I used to secure them from time to time, and the police department would effectuate those orders.

Proceedings                                    920

1        Now, the statute specifically says that the

2    People or the defendant can seek a material witness

3    order.  And if I do sign that, a police officer,

4    according to the statute, must execute, because the

5    order gives the police officer the right to effect the

6    arrest.

7        Now, we just had an off-the-record discussion

8    with Detective Cereghino, the investigating detective

9    on this particular case, and he informed us that other

10    members of the Homicide Squad would attempt to execute

11    this order if signed.  In my experience, counsel, if

12    you want something done thoroughly, the Homicide Squad

13    is the one to do it.  So hopefully it didn't come to

14    pass, but that's the discussions on it.

15        MR. MILLMAN:  And just one more thing I would

16    just ask to approach about that concerning the other

17    matter we discussed, and it will be very briefly, your

18    Honor.  I think it would be best if we approached on it

19    if we could.  It is no not related to this issue of

20    Miss Bonilla but related to another issue we had just

21    discussed.

22        THE COURT:  I forgot.

23        MR. MILLMAN:  Mr. Berrios, that issue.  I did

24    want to approach on that briefly.

25        THE COURT:  Okay.

J.H.

Proceedings                               921

1            (A discussion was held off the record at the
2       bench.)

3            (Whereupon, Misael Berrios entered the
4       courtroom.)

5            THE COURT:  Mr. Berrios, sit down, please.
6       We have heard evidence in this particular case that you
7       fired a shot when the deceased and the defendant were
8       in an altercation.  That is a criminal action depending
9       upon your criminal intent at the time.  The culpability
10      remains to be seen.  I don't know whether or not your
11      conduct was limited to just firing a shot or was
12      expanded to actually helping in a serious assault or
13      homicide.

14           The District Attorney has offered to give you
15      immunity.  This is not a grand jury proceeding, and it
16      is the Court who will ultimately decide whether or not
17      you are to receive immunity.  If you are going to
18      receive immunity, then you simply can't plead the fifth
19      amendment; do you understand that?

20           MR. BERRIOS:  Yes.

21           THE COURT:  Why don't you look it over.  Have
22      you entered into some agreement that was placed on the
23      record before he came into court?

24           MS. ABDI:  Yes.  Mr. Berrios, you executed a
25      document with respect to the discussion about your

                                                        J.H.

Proceedings                              922

1    actions on September 28th of 2010 and our discussions

2    with respect to that the People will grant you immunity

3    for truthful testimony in this case; is that correct?

4                THE COURT:  The People don't grant immunity.

5    It is the Court that grants immunity upon the

6    recommendation of the People unless it's a grand jury

7    situation.

8                MS. ABDI:  Well, with respect to that,

9    Mr. Berrios, I'd like to ask did you execute an

10   agreement with our office?

11               MR. BERRIOS:  Yes.

12               MS. ABDI:  I would just like to ask this, I

13   guess, be marked and shown to the witness.

14               THE COURT:  That's Court Exhibit 4.  Just let

15   me have it.  All right, is this the agreement that you

16   entered into with the District Attorney?

17               MR. BERRIOS:  Yes.

18               THE COURT:  All right, now it's received in

19   evidence as Court Exhibit 4.  It will not be able to be

20   shown to the jury at this particular time, but at a

21   future time, it very well might be.

22               Okay, are you making an application to me,

23   People, pursuant to Article 50 of the Criminal

24   Procedure Law, specifically that article as well as the

25   specifics of Section 50.30 of the Criminal Procedure

1    Law?

2             MS. ABDI:  Yes.

3             THE COURT:  That's granted.  Bring in the

4    jury.  While the jury isn't here, come up here.

5             (A discussion was held off the record at the

6    bench.)

7             COURT OFFICER:  Jury entering.

8             (The jury enters the courtroom.)

9             THE CLERK:  Let the record reflect the

10   presence of the jury.  Both sides consent to the

11   seating and waive a reading of the roll?

12            MS. ABDI:  Yes.

13            MR. MILLMAN:  Yes.

14            THE COURT:  Just call the witness.  I know

15   he's sitting in the box, but call the witness.

16            MS. ABDI:  The People call Misael Berrios.

17            THE COURT:  Please raise your right hand.

18            THE CLERK:  Please rise, sir, please raise

19   your right hand.

20   M I S A E L  B E R R I O S, a witness called on behalf of

21   the People, after having been first duly sworn by the

22   Clerk of the Court, was examined and testified upon his

23   oath as follows:

24            THE CLERK:  In a loud, clear voice, please

25   state your name and spell your last name.

M. Berrios - People - Direct          924

1              THE WITNESS:  My name is Misael Berrios,

2        B-E--R-R-I-O-S.

3              THE CLERK:  And your county of residence?

4              THE WITNESS:  915 Railroad Avenue.

5              THE CLERK:  Just your --

6              THE WITNESS:  Westbury.

7              THE CLERK:  Just your county.

8              THE WITNESS:  Nassau.

9              THE COURT:  Ladies and gentlemen, before we

10       start, I have every expectation that the People will

11       finish their case today.  And again, you may not

12       realize it, we have gone at a much quicker pace than I

13       anticipated, and sometimes you simply can't shift gears

14       in the time allotted.  The upshot of it is there is

15       every likelihood that the defendant will start his case

16       if he has one on Wednesday, not tomorrow, and then you

17       have the day off tomorrow.  But I'll tell you more

18       later on that subject.  Proceed.

19              MS. ABDI:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. ABDI:

22       Q.   Good morning, Mr. Berrios.

23       A.   Good morning.

24       Q.   How old are you?

25       A.   Twenty-five.

M. Berrios - People - Direct       925

1        Q.   And you live in Westbury; is that correct?

2        A.   Yes.

3        Q.   Do you have any children?

4        A.   I got three.

5        Q.   Now, do you know an individual named Ulises

6    Bonilla?

7        A.   Yes.

8        Q.   And how long have you known Ulises Bonilla?

9        A.   During our whole school career.

10       Q.   You went to school with him?

11       A.   Yes.

12       Q.   When did you first meet him?  What grade are we

13   talking about?

14       A.   You could say like in middle school.

15       Q.   I didn't hear.

16       A.   Like in middle school, seventh, eighth.

17       Q.   And it's fair to say that you consider him your

18   friend?

19       A.   Yes.

20            THE COURT:  You went to school together.

21   Does that mean you're in the same grade?

22            THE WITNESS:  I'm like a year older than him.

23            THE COURT:  So you know him to be a year

24   younger than you?

25            THE WITNESS:  Something like that.  Basically

M. Berrios - People - Direct          926

1      I'm not sure, but we probably be in the same grade.

2                    THE COURT:  Okay.

3          Q.   And how often would you socialize with him as your

4      friend?

5          A.   During the past three years, four years, we been

6      close, you know, go play handball.  We are really kind of

7      close.  We do things together.

8          Q.   Would you hang out with him on the weekend?

9          A.   Yes.

10         Q.   And would you occasionally hang out with him

11     during the week?

12         A.   Yes.

13         Q.   I'm going to direct your attention to September

14     28th of 2010.  I'm going to direct your attention to

15     sometime in the vicinity of about a 5 p.m. or so.  What

16     happened at that time?

17         A.   I remember getting home from work.  I was home

18     like for say 20 minutes, got a phone call from Ulises

19     telling me to let's go to the hospital together.

20         Q.   And for what purpose?

21         A.   He had gotten hurt at work.

22         Q.   Do you know what his injury was?

23         A.   He had told me something about his finger being

24     jammed.

25         Q.   Now, do you know at that time, September 28th,

J.H.

M. Berrios - People - Direct        927

1      2010, where did you Ulises Bonilla work?

2          A.    At a factory in Urban.

3          Q.    Is that Urban Avenue?

4          A.    Urban Avenue.

5          Q.    Is that in Westbury?

6          A.    Yes, it is in Westbury, Nassau County.

7          Q.    Do you know how far away that factory was from

8      Ulises Bonilla's house?

9          A.    You could say like five minutes walk.

10         Q.    Was his place of employment within walking

11     distance of his house?

12         A.    Yes.

13         Q.    And are you familiar with Bunkyreid Park?

14         A.    Yes.

15         Q.    Would you have to walk past Bunkyreid Park from

16     the factory to get to Ulises Bonilla's house?

17         A.    Yes.

18         Q.    Now, you said he wanted to go to the hospital; is

19     that correct?

20         A.    Yes.

21         Q.    Did you go to the hospital with him?

22         A.    Yes.

23         Q.    Now, how did you get to the hospital?

24         A.    We -- we got picked up.  I got picked up.

25         Q.    And do you know who picked you up?

M. Berrios - People - Direct        928

1       A.      No.

2       Q.      Did you go to the hospital with Ulises Bonilla?

3       A.      Yes.

4       Q.      Did his sister drive you to the hospital?

5       A.      No.

6       Q.      Was his sister at the hospital?

7       A.      No.

8       Q.      Did his sister use her car to get you to the

9   hospital?

10       A.      No.

11       Q.      Now, you get to the hospital.  Do you recall who

12   is with you at the hospital?

13       A.      Yes, it was three of us.

14       Q.      Who were the three?

15       A.      It's me, Ulises and some other guy.

16       Q.      Was that other person a friend of yours?

17       A.      Yes.

18       Q.      Do you recall his name?

19       A.      No.  I just know him by his a/k/a.

20       Q.      When you say a/k/a, what does that mean?

21       A.      That's like a short.  We call him Nigger.

22       Q.      That's his nickname?

23       A.      Yeah, like a nickname.  I don't know his name.

24       Q.      Now, do you recall how long you had to stay at the

25   hospital?

J.H.

M. Berrios - People - Direct          929

1       A.    I would say approximately like two hours.

2       Q.    Did you see --

3       A.    -- or more.

4       Q.    Did you see where the injury to Mr. Bonilla was?

5       A.    I can't really remember where it was, but I know

6   it was one of his fingers.

7       Q.    Do you know what, if any, treatment he received

8   for that?

9       A.    I can't tell you because I wasn't in the hospital

10  during the time he was getting treated.

11      Q.    Okay.  You mean you didn't see any treatment?

12      A.    No, I didn't see no treatment get done.  But we

13  was there for him to get treatment.

14            THE COURT:  Was it bandaged?

15            THE WITNESS:  No, I really didn't see.  Like

16      I can't --

17            THE COURT:  You didn't see any bandage?

18            THE WITNESS:  No.

19      Q.    Did you ever see the finger bleeding?

20      A.    Yes, I did.

21      Q.    Before the hospital?

22      A.    Yeah, before we got to the hospital, I did see he

23  had an injury to his finger.

24      Q.    Now, how did you get from the hospital -- where

25  did you go from the hospital?

J.H.

M. Berrios - People - Direct        930

1      A.    From the hospital, we got picked up, and we

2    went -- I thought we were going home.  We ended up at the

3    deli.

4      Q.    Now, who picked you up from the hospital?

5      A.    The same person that picked us up.

6      Q.    Did Diana Bonilla pick you up from the hospital?

7      A.    No.

8      Q.    And you weren't picked up in Diana Bonilla's car?

9      A.    No.

10     Q.    So you go now -- you go to the deli?

11     A.    Yes.

12     Q.    Do you recall what deli you went to?

13     A.    It's in Brooklyn -- in Westbury.  It's Westbury

14   Deli.

15              THE COURT:  Excuse me, did you just say

16        Brooklyn?

17              THE WITNESS:  Yeah, Brooklyn Avenue, that's

18        the street name.

19              THE COURT:  Brooklyn Avenue in Westbury?

20              THE WITNESS:  Yeah.

21     Q.    Who was with you at the deli?

22     A.    It was me, Ulises and Nigger.

23     Q.    And do you know --

24     A.    We got dropped off at the deli.

25     Q.    And at the deli, what did you do at the deli?

M. Berrios - People - Direct        931

1       A.    We were standing there like for five minutes.  And

2   then Ulises decided to buy two beers.  Didn't see nothing

3   wrong with that.  So we got two beers.

4           I think when we got out the store -- when he was

5   getting out the store, he bumped into Armando's cousin, and

6   little words got exchanged.

7               THE INTERPRETER:  I'm sorry, I can't hear.

8       A.    When Ulises came out of the store, I think he

9   bumped into Armando's cousin, and words got, you know, they

10  got into a little argument.  So we just started walking to

11  Kinkel.

12      Q.    Now, what kind of beer did you buy at the deli?

13      A.    Coors Light.

14      Q.    Do you know --

15      A.    Forty ounce.

16      Q.    And from the deli, you went to Kinkel Street?

17      A.    Yes.

18      Q.    How did you get there?

19      A.    Walking.

20              THE COURT:  The Court takes judicial notice

21      that 40 ounces is a quart and a quarter.

22      Q.    These were big bottles?

23      A.    Yeah, big bottle, glass bottle.

24      Q.    Where did you go on Kinkel Street?

25      A.    We found this deli.  We started to walk to go to

1    Kinkel with the beers.  We got to my friend house.  That's I

2    think 169, 170 something Kinkel.

3          Q.   Where is the house located?

4          A.   It's located on Kinkel, Kinkel Street.

5          Q.   With you familiar with where the Villatoros lived?

6          A.   Yes.

7          Q.   Where is the house you went to in relation to

8    that?

9          A.   Oh, it's across the street.

10         Q.   So you went to the house across the street from

11   the Villatoros?

12         A.   Yes.  Because that would be like a hangout house.

13         Q.   You would often hang out across the street?

14         A.   Yes, yes.

15         Q.   And with Ulises Bonilla?

16         A.   Yes.

17         Q.   Now, where would you hang out across the street,

18   like what location?

19         A.   We were inside the yard.

20         Q.   And what were you doing?

21         A.   We were just having a normal night.  You know, we

22   had went to the -- came from the hospital, got beers, just

23   talking like a regular normal night.

24         Q.   What happened next?

25         A.   So we were there talking for like, you know, a

J.H.

1   couple of minutes.  Then all of a sudden Ulises gets a phone

2   call from somebody saying that Armando Villatoro was talking

3   stuff about him.  That's when he -- when Ulises made a phone

4   call to him.

5          Q.   Who did Ulises make a phone call to?

6          A.   To Armando.

7          Q.   So Ulises called Armando?

8          A.   Yes.

9          Q.   Could you hear anything about what Ulises was

10   saying?

11         A.   Yeah, that he want to fight him, that he want to

12   fight Armando.  And I think Armando agreed with it, and he

13   came.

14         Q.   So the part that you could hear was Ulises telling

15   Armando that he wanted to fight him?

16         A.   Yes.

17         Q.   Now, what happened next after that conversation?

18         A.   Then the conversation ended, and we stayed there

19   for five minutes.  I was hoping nothing would happen.

20              Then Jocelyn came to Armando's house.  She parked

21   in front of the house.  That's when Ulises went across the

22   street and started talking to her.

23         Q.   Where was Jocelyn?

24         A.   She was parked in front of Armando' house.

25         Q.   You saw Ulises go over to speak with Jocelyn?

M. Berrios - People - Direct        934

1        A.    Yes.

2        Q.    Could you hear anything about that conversation at

3    all?

4        A.    No.

5        Q.    And when Ulises walked over to Jocelyn's car,

6    where did you remain?

7        A.    In the yard.

8        Q.    What happened next?

9        A.    My friend Niggers, he went to go get the gun.

10             THE COURT:  I'm sorry?

11             THE WITNESS:  My friend Nigger went to go get

12   a gun.  So when he came with it, Ulises gave it to me.

13   So I grabbed it.

14       Q.    Now --

15             THE COURT:  I see, okay, go ahead.

16       A.    That's before he goes to Jocelyn's car.

17       Q.    Before he went to Jocelyn's car?

18       A.    Jocelyn's car.

19       Q.    Now, where -- what did you do with the gun?

20       A.    So I hold it, and I still remained in the yard of

21   my friend's.  Meanwhile he crosses the street to go talk to

22   Jocelyn.

23             THE COURT:  Who crosses the street?

24             THE WITNESS:  Ulises crosses street to go

25             talk to Jocelyn.

M. Berrios - People - Direct          935

1      Q.   And at this point you are still in the yard at
2   179?
3      A.   Yes.
4      Q.   What happens next?
5      A.   So we wait there.  He's talking to Jocelyn for say
6   five, ten minutes, and I am in the yard.
7                 THE COURT:  Who is talking to Jocelyn?
8                 THE WITNESS:  Ulises is talking to Jocelyn
9        for say five, ten minutes.  So I still remain myself in
10       the yard.  I turned around, and that's when I see
11       Armando Villatoro running towards Ulises.  That's when
12       I screamed to Ulises, Yo, bro, they are going to hit
13       you, they are going hit you.  That's when Ulises just
14       jumped and Armando just hit him, and they started
15       fighting.
16      Q.   Now, when they started fighting, what were they
17   doing?
18      A.   They were just punching each other, like grabbing,
19   wrestling.
20      Q.   So they were punching each other?
21      A.   Yeah.
22      Q.   And they were -- you said they were grabbing each
23   other?
24      A.   Um-hum, you could say.
25      Q.   When you say grabbed each other, how close were

M. Berrios - People - Direct        936

1    they to each other?

2         A.    Like a close distance.

3              THE COURT:  Like what?

4              THE WITNESS:  Right net to each other.  You

5         know how you bear hug somebody?  Like that close, very

6         close to each other.

7         Q.    Then what happened?

8         A.    And then they are fighting.  So I see one guy

9    trying to hit Ulises Bonilla from behind.  That's when I ran

10   out from the yard where my friend lives at, and I ran to the

11   guy, and I had the gun outside already.  So he seen the gun.

12   I told the guy, It's a one-on-one fight.  Let them fight.

13   They had problems amongst each other.  Let it be one-on-one,

14   nobody get in.  This is going to be settled.  It's a normal

15   fight, you know.  So they are fighting.

16             It was seven of them that came with Armando, seven

17   of them and three of us.  So when they are fighting, I am

18   walking away from the fight, from the scene.  I am walking

19   away.  So when I get to my friend house, I just shot the gun

20   to the air, to the air.

21        Q.    How many times did you fire the gun?

22        A.    Once to the air.

23        Q.    Now, you said somebody tried that you saw to get

24   to Ulises?

25        A.    No, they did not hit him.

M. Berrios - People - Direct          937

1            MR. MILLMAN:  Objection to the leading nature

2       of the question, your Honor.

3            THE COURT:  Overruled.

4       Q.   Who were the people that you saw fighting?

5       A.   Just Ulises and Armando.

6       Q.   Did anyone get in?

7       A.   No.

8       Q.   And that's because of you?

9       A.   Yes.

10      Q.   Now, what happened when -- well, where were you

11  when you fired the gun?

12      A.   I was in the yard.

13      Q.   The yard where?

14      A.   Of my friend house, across the street from

15  Armando's house.

16      Q.   That house that you were hanging out at?

17      A.   Yes, across the street from Armando' house.  I was

18  still hanging in the yard.

19      Q.   And what were you wearing on your face?

20      A.   At first I had a hat on and nothing on my face.

21  But then I pulled it down.  It was a hat made into a mask.

22      Q.   So is it fair to say at first your face was

23  exposed?

24      A.   Yes, it was exposed first.

25      Q.   And you pulled your hat down to make a mask?

M. Berrios - People - Direct          938

1        A.    Yeah.

2        Q.    Is that when you fired the shot?

3        A.    No.

4        Q.    When did you fire the shot?

5        A.    When I fired the shot was -- it had been it went

6    one -- when I went back to the yard, when I moved away from

7    the crowd, I went back to the yard. And then I wanted it to

8    stop. So I don't know, I just shot the gun to the air so

9    everybody could just scatter and go their way.

10       Q.    And why did you put the mask on your face?

11       A.    I don't know. It was just reflex. I don't know.

12       Q.    You didn't want anyone to see you?

13       A.    Yeah. I was just scared.

14       Q.    Now, was there anyone else with a mask that you

15   saw?

16       A.    No.

17       Q.    So you were the only one with a mask?

18       A.    Yes.

19       Q.    Now, what happened after you fired the shot?

20       A.    I fired the shot. That's when Ulises jumped,

21   jumped. And that's when we both started -- we bumped and

22   started heading the same direction.

23             After I shot the gun, I ran, because I was scared

24   for what I did. So he jumps.

25                 THE COURT:  Who jumps?

J.H.

M. Berrios - People - Direct      939

1           THE WITNESS:  Ulises jumps after the gunshot.

2     He jumps, and he look at me.  He go, Bro, bro, I just,

3     you know, blow his brain cells out.  I fucked up.

4           THE INTERPRETER:  I can't hear.

5           THE COURT:  Just one second.  Either can I,

6     so I cannot repeat to you what the witness said.

7     Q.    Let me just --

8           THE COURT:  The only thing I heard is, I

9     fucked up, unquote.  Did someone say is that?

10          THE WITNESS:  Yes.

11          THE COURT:  Who said that?

12          THE WITNESS:  Ulises Bonilla says, I fucked

13    up, I fucked up.  I stabbed him.  I got him.  You are

14    good.  You are good.  You are good.  I fucked up.  I

15    fucked up.  I'm done.  I'm done.  Those are the words

16    that came out after that, and I didn't know what he was

17    talking about.

18    Q.    Now, you said at first you didn't know what he was

19    talking about?

20    A.    No.

21    Q.    Now, when you fired the shot, was -- were Armando

22    and Ulises still fighting?

23    A.    No.

24    Q.    So after you fired the shot, they stopped

25    fighting?

J.H.

M. Berrios - People - Direct        940

1        A.    Yes.

2        Q.    Now, you said you and Ulises ran in the same

3   direction?

4        A.    Yes.

5        Q.    What direction was that?

6        A.    Towards Kinkel and Broadway.

7        Q.    Is that fair to say you were running down

8   towards --

9        A.    To his house, to his house.

10       Q.    Could you see if there was any blood on him?

11       A.    Yes.

12       Q.    Did you see any blood?

13       A.    Yes.

14       Q.    Where?

15       A.    The left ear.

16             THE COURT:  I'm sorry?

17             THE WITNESS:  Like his left ear, here, this

18   side right here.

19       Q.    Could you tell if there was any blood anywhere

20   else?

21       A.    No.

22       Q.    And why is that?

23       A.    It was dark.  We can't see nothing.

24       Q.    And did you see -- were you able to see if he had

25   any knife in his hand?

M. Berrios - People - Direct        941

1    A.    No, I couldn't see if he had a knife.

2    Q.    No, you're running down southbound on Kinkel

3  Street?

4    A.    Yes.

5    Q.    What happens next as you're running?

6    A.    So we running.  When we running through -- we

7  running almost at the same direction.  So I am trying to get

8  away from him.  So I just ran to the neighbor's house, and

9  he kept going straight.  So I went through the neighbor's

10  house.  That's when I ran into my friend Nigger.  That's

11  when I was just in shock, nervous, and I just threw the gun

12  at him.  I'm like, Bro, take it, do something with it, and I

13  left him with it and ran to my house.

14    Q.    So --

15    A.    Which is in shock.

16    Q.    You ran?

17    A.    Yeah, I ran.

18    Q.    Is that back to your house?

19    A.    Yes.

20    Q.    So you did not get in the car?

21    A.    No.

22    Q.    When you left, what direction did you see Ulises

23  Bonilla run?

24    A.    You could say to the park almost.

25    Q.    So he was running still towards his house?

Case 2:16-cv-03676-JFB Document 10-3 Filed 10/06/16 Page 28 of 433 PageID #: 1241

1        A.   Yeah, yeah.

2        Q.   And you don't know where Henry Hernandez was?

3        A.   No.

4        Q.   Or your friend Nigger?

5        A.   No.

6        Q.   Now, I would like to show you what's already in

7     evidence --

8              MS. ABDI:   Judge, if I may have the easel.

9              THE COURT:   Put the easel in a fashion by

10        which all the members of the jury can see it as well as

11        the witness, but you can get off the stand if you need

12        to.

13             THE WITNESS:   All right.

14        Q.   Mr. Berrios, I'm now showing you what is already

15     in evidence as People's, I'm sorry, I can't see the exhibit

16     sticker.

17             COURT OFFICER:   58.

18        Q.   58 which is already in evidence.   That's a sketch.

19     If you could please get off the witness stand, and if you

20     could just demonstrate to the jury where it was that you

21     turned off and ran towards your house?

22        A.   This way.

23             MS. ABDI:   Your Honor, may the record reflect

24        the witness is --

25             THE COURT:   Just one second.   I don't see

J.H.

M. Berrios - People - Direct          943

1    what he's doing, so let me see myself.  Okay.

2         Q.   If you could please just show the direction that

3    you ran in?

4         A.   We were around here.  So we ran this direction.

5              THE COURT:  That reflects --

6              THE WITNESS:  That's going like Broadway.

7              THE COURT:  Just one second, just one second.

8              THE WITNESS:  I'm sorry.

9              THE COURT:  That reflects a southerly

10             direction.  Go ahead.

11             THE WITNESS:  So I get into -- before I get

12        to his house, I got into his neighbor' house.  And

13        that's when me and Nigger, Nigger was already in his

14        house already.  So that's when me and him bump heads

15        together.  That's when I just threw him the gun to him

16        and just take it, I don't know what I just did, just

17        take it, and I just left.

18             THE COURT:  Does that reflect where you

19        turned in a westerly direction?  This is a legend.  You

20        just mentioned in a westerly direction.

21             THE WITNESS:  I made a right.

22             THE COURT:  Where?

23             THE WITNESS:  Oh, I don't know the house.  I

24        made a right the house before I got to his house.  I

25        don't understand the question.

J.H.

M. Berrios - People - Direct          944

1              THE COURT:  Where did you make the right?

2       You don't know?

3              THE WITNESS:  In the neighbor's house.

4              THE COURT:  Where is that?

5              THE WITNESS:  In Kinkel Street.

6              THE COURT:  168, 170?

7              THE WITNESS:  167.

8              MS. ABDI:  Thank you.

9              THE WITNESS:  Sorry about that.

10      Q.     Now, as you were running down southbound on Kinkel

11      Street, what was Ulises Bonilla saying to you?

12      A.     That he had messed up.  He fucked up.  He had

13      stabbed him and that he was done and I was good, and those

14      are the words that came out of his mouth.

15      Q.     Could you tell what his demeanor was at that

16      point?

17      A.     Hum?

18              THE COURT:  What did he look like?

19              THE WITNESS:  He was like in shock, you know,

20          like he was too high, like nervous.  You could tell he

21          had did something.  And I was in shock too for what I

22          did.  But you could tell he knew what he was talking

23          about.

24              MR. MILLMAN:  Objection.

25              THE COURT:  Do you know what the term lucid

M. Berrios - People - Direct          945

 1        means?

 2                    THE WITNESS:  No.

 3                    THE COURT:  It means with it.  It means aware

 4        of what's going on.

 5                    THE WITNESS:  Yeah.

 6                    THE COURT:  Did he appear to you to be aware

 7        of what was going on?

 8                    THE WITNESS:  In that moment, yes.

 9        Q.    Now, did you know at that point what had happened

10        to Armando Villatoro?

11        A.    No.

12        Q.    And when you ran somewhere by 167 Kinkel Street --

13        A.    Um-hum.

14        Q.    -- where did you go?

15        A.    Home.

16        Q.    When did you find out that Armando died?

17        A.    The next day when I went to work, a coworker told

18        me.

19        Q.    So that night, you did not know he had died?

20        A.    No.

21        Q.    And how did you feel after you learned that he had

22        died?

23        A.    I felt bad.

24                    MR. MILLMAN:  Objection.  Relevance.

25                    THE COURT:  Overruled.

J.H.

M. Berrios - People - Direct          946

1          A.    I felt bad.

2          Q.    Now, and you did not go speak to the police?

3          A.    No.

4          Q.    In fact, you only spoke to the police on October

5     13th?

6                      MR. MILLMAN:   I'm going to object to the

7          leading nature.

8                      THE COURT:   When was the first time you spoke

9          to the police?

10                     THE WITNESS:   October 13th, 2011.

11         Q.    2010?

12         A.    2010, yeah.   We're in '11 right now.

13         Q.    You only spoke to them for the first time October

14    13th?

15         A.    First time.

16         Q.    That's about, you know, approximately two weeks

17    later; is that correct?

18         A.    Um-hum, yes.

19         Q.    Did you go voluntary?

20         A.    Yes.

21         Q.    And you were not arrested in connection with this

22    case?

23         A.    No, no.

24         Q.    And the police never told you they were going to

25    arrest you; is that correct?

M. Berrios - People - Direct        947

1         A.   No.

2         Q.   And on October 13th, 2010, did they make you any

3    promises?

4         A.   No.

5         Q.   Did they tell you anything about what they were

6    going to do with you?

7         A.   No.

8         Q.   Now, it's fair to say that from approximately 2006

9    to 2009, you, yourself, had some trouble with the law,

10   correct?

11        A.   Yes.

12        Q.   And you have a criminal record; is that correct?

13        A.   Yes.

14        Q.   In fact, November 12th of 2009, you were convicted

15   of attempted burglary in the third degree?

16        A.   Yes.

17        Q.   That's a felony, correct?

18        A.   Yes.

19        Q.   And in August of 2008, you were convicted of

20   criminal mischief?

21        A.   Yes.

22        Q.   That's a misdemeanor?

23        A.   Yes.

24        Q.   And June 21st, 2007, you were convicted of petit

25   larceny and attempted identity theft?

J.H.

M. Berrios - People - Direct          948

1          A.    Yes.

2          Q.    Those are also misdemeanors, correct?

3          A.    Yes.

4          Q.    And in June -- July 20th of 2007, you were

5     convicted of operating a motor vehicle while impaired by

6     drugs; is that correct?

7          A.    Yes.

8          Q.    What drug was that?

9          A.    Marijuana.

10         Q.    And you were also convicted of reckless

11    endangerment?

12         A.    Yes.

13         Q.    Possession of a weapon?

14         A.    Yes.

15         Q.    And attempted menacing?

16         A.    Yes.

17         Q.    And that was for an incident with a box cutter?

18         A.    Yes.

19         Q.    Those were misdemeanors, correct?

20         A.    Yes.

21         Q.    And you pled guilty to those crimes?

22         A.    Yes.

23         Q.    And you were sentenced for them?

24         A.    Yes.

25         Q.    Now, you have spoken to the District Attorney

1   about this case, correct?

2        A.   Yes.

3        Q.   And that's me?

4        A.   Yes.

5        Q.   Do you recall how many times we have spoken about

6   this case?

7        A.   Yes, three times.

8        Q.   Three times.  Now, you were given a grant of

9   immunity --

10       A.   Yes.

11       Q.   -- for testifying truthfully in this case; is that

12  correct?

13       A.   Yes.

14       Q.   And that's -- that would cover your actions that

15  you committed on September 28th of 2010; is that correct?

16       A.   Yes.

17       Q.   And why are you saying what happened that night?

18       A.   I'm saying it because it's the truth.  It's the

19  only right thing I can do.  It's the truth.

20            I feel bad to the guy.  He didn't deserve what

21  happened to him.  I feel bad for him and his family.  I got

22  kids.  I'm a father.  He's a father.  He left family behind.

23  He was an innocent guy.  You know, nobody deserves something

24  like that.  So I feel like by me being here right now, I'm

25  doing the right thing.

M. Berrios - People - Cross          950

1         Q.    And you were friends with Ulises Bonilla?

2         A.    Yes, I was friends with both Armando and Ulises.

3         Q.    And this is not an easy thing for you to do here

4    today?

5         A.    It's hard for me.

6         Q.    Are you nervous?

7         A.    I'm nervous.

8         Q.    Now, it's fair to say that you were also concerned

9    about your own actions that night; is that correct?

10        A.    Yes.

11        Q.    You were afraid of getting into trouble yourself?

12        A.    Yes, I was afraid because for the action I did by

13   having the firearm on me that night.  I was afraid of that,

14   of getting arrested for the firearm.

15        Q.    Now, did you ever hit Armando Villatoro?

16        A.    No.

17        Q.    Did you ever shoot Armando Villatoro?

18        A.    No.

19        Q.    Did you see anyone else get in between the fight

20   with Armando Villatoro and Ulises Bonilla?

21        A.    No.

22              MS. ABDI:  I have no further questions.

23              THE COURT:  The District Attorney asked the

24        witness were you conferred immunity.  Between 10:00 and

25        10:30 this date, before you were seated, the District

1          Attorney asked the Court to confer immunity which upon

2          the recommendation of the District Attorney, the Court

3          granted.  Go ahead.

4     CROSS-EXAMINATION

5     BY MR. MILLMAN:

6          Q.   Mr. Berrios, you said that this is difficult for

7     you to do?

8          A.   Yes.

9          Q.   Let me ask you something.  On the night of

10    September 28th of 2010, after you fired the gun, you say

11    that you ran down Kinkel Street?

12         A.   Yes.

13         Q.   Tell me something, when was it that Ulises made

14    the statement that you say he made to you about stabbing

15    Armando; when was it?

16         A.   During the whole time we were leaving together,

17    he's leaving.  So all he was telling me the whole way, Oh, I

18    fucked up, I fucked up.  I stabbed him.  I fucked up.  You

19    good.  You good, during the whole time.

20         Q.   During the whole time that you were going down the

21    street?

22         A.   Yeah, that's all that would come out.  That's all

23    he would say the whole time.

24         Q.   And so you're saying that this conversation took

25    place even before you were at 163 Kinkel Street?

M. Berrios - People - Cross          952

1          A.    No, after.

2          Q.    After?  And when you passed 163 Kinkel Street, did

3     you see Ulises get into a vehicle in the driveway?

4          A.    No.

5          Q.    You didn't see that?  Did you see anybody get into

6     a vehicle in the driveway?

7          A.    No.

8          Q.    By the way, if someone was walking on Kinkel

9     Street away from Armando's and toward Broadway, would

10    Broadway be the first street they would hit?

11                    THE COURT:  Do you understand that?

12                    THE WITNESS:  No, I really don't.

13                    THE COURT:  Rephrase it.

14                    MR. MILLMAN:  Sure.

15         Q.    If you were to walk towards Broadway and Kinkel

16    Street, is there another street that you would hit before

17    Broadway, or is Broadway the first street?

18         A.    I think that's the first street.

19         Q.    Now, you were interviewed by the police in

20    connection with this, right?

21         A.    Yes.

22         Q.    And at that time -- that was on October 13th,

23    2010, right?

24         A.    Yes.

25         Q.    At that time you were asked a number of questions

1   about what happened, right?

2       A.   Yes.

3       Q.   And at that time didn't you tell them something

4   different than what you just told us concerning when that

5   statement was made?

6             MS. ABDI:  Objection.

7             MR. MILLMAN:  I'm laying a foundation, your

8        Honor.

9             THE COURT:  Overruled.

10      A.   Hum?

11      Q.   Didn't you tell them something different about

12  when Ulises made the statement that you say he made?

13      A.   He made, no.

14      Q.   No?  Did you tell them that he made the statement

15  to you when you got to the corner of Broadway and Kinkel?

16      A.   Before we get to the corner of Broadway and

17  Kinkel, he's already making the statement.  He's telling me

18  before we get to Broadway, corner of Broadway and Kinkel.

19      Q.   So it wasn't when you got to Kinkel, before?

20      A.   We were on Kinkel when he's already telling me

21  everything.  That's before we get to Broadway and Kinkel,

22  because I didn't get all the way to Broadway and Kinkel.

23      Q.   When you were interviewed by the police, didn't

24  you say the following words to them:  When we get to the

25  corner, Ulises is screaming at me like, Yo, fuck, fuck.  I

M. Berrios - People - Cross          954

1   fucked up, man.  I fuckin' killed him.  I know I did.  Did
2   you tell them that?

3        A.   Yes.

4        Q.   So you told them that the statement was made when
5   you got to the corner?

6        A.   Yes.

7        Q.   But you just told this jury a moment ago that he
8   was making the statement while you were on your way running
9   down the street before you got to the corner?

10       A.   Yes.

11       Q.   And by the way, when you were going down toward
12  Broadway with Ulises, you would have passed 154 Kinkel
13  Street, right?

14       A.   Yes.

15       Q.   You know who lives at 154 Kinkel Street?

16       A.   I don't know the numbers on Kinkel Street.

17       Q.   Were you on the right side or left side?

18       A.   I was on the right side.

19       Q.   Left side?

20       A.   Right side.

21       Q.   Right side?

22       A.   Right side.

23            THE COURT:  All right, you were going south;
24       is that correct?

25            THE WITNESS:  Um-hum, yes.

J.H.

M. Berrios - People - Cross          955

1          THE COURT:  And you were on the right side of

2     the street?

3               THE WITNESS:  On the same -- the same side,

4     right side.  Still the same side.  I never switched

5     sides.  Right side.

6               THE COURT:  That would be the west side?

7               THE WITNESS:  I have no idea.

8               THE COURT:  Something could be right and left

9     depending upon which way you are going.

10              Let me see that map.  Just one second.  All

11    right, using the map, tell the lawyer which side of the

12    street you were proceeding on.

13              THE WITNESS:  This side, right side.

14              THE COURT:  That would be the west side?

15              THE WITNESS:  Yes, on the sidewalk.

16    Q.    The west side, left side?

17    A.    The right side.

18    Q.    The left side?

19    A.    My right, you know how you walk on the right side.

20    Q.    Let me just ask it this way, Mr. Berrios --

21              THE COURT:  Just one second.  It's the left

22    side of the Exhibit F you are looking at it?

23              THE WITNESS:  Oh, yeah.

24              THE COURT:  But it's the right side of the

25    street when if you are proceeding southbound?

J.H.

Case 2:16-cv-03676-JFB Document 10-3 Filed 10/06/16 Page 42 of 433 PageID #: 1255

1                    THE WITNESS:  Yes.

2                    MR. MILLMAN:  I see.

3        Q.   Now, Mr. Berrios, you testified on direct

4   examination that when you saw Ulises, you noticed blood on

5   his left ear; is that what you said?

6        A.   Yes, I notice blood on his left ear.

7        Q.   And that's all you noticed?

8        A.   Yes.

9        Q.   But when the police interviewed you on October

10  13th of 2010, you didn't tell them that, did you?

11       A.   No.

12       Q.   You told them something else about where you saw a

13  blood on Ulises; isn't that right?

14       A.   No.  I recall, I don't recall, but -- I don't

15  know.  I don't remember.

16       Q.   Did you say the following words when they were

17  asking you questions about what happened:  Question, did

18  Ulises have any injuries?  Answer, all I seen if you put a

19  red shirt on me, and you motioned as if there was blood all

20  over the stomach.

21            Did you say that and do that when they were asking

22  you questions, Mr. Berrios?

23       A.   Yes.

24       Q.   But now you are telling us you remember just there

25  being blood on his left ear?

Case 2:16-cv-03676-JFB Document 10-3 Filed 10/06/16 Page 43 of 433 PageID #: 1256

1      A.    Yeah, because when I got interviewed the first

2   time, if you grab a red shirt and you put it right here and

3   you have blood, you can have a red shirt and put it like

4   this, you have blood on your ear.

5           Basically told them the first interview you have

6   blood on your ear, but I say if you grab a red shirt, it

7   look like they had blood on this area.

8      Q.    You didn't say that to them at that time?

9      A.    I told them I saw blood.

10     Q.    And you motioned to your stomach as if he had a

11  red shirt on?

12     A.    Yes, I said if you had a red shirt.

13     Q.    The fact that you are now telling us you only

14  noticed it on his left ear, that wouldn't have anything to

15  do with the fact that you were advised that Ulises was seen

16  going into the passenger seat, and no blood was found there?

17     A.    Hum?

18           MS. ABDI:  Objection.

19     Q.    The fact that you are telling us that you only saw

20  blood on his left ear, that wouldn't have anything to do

21  with the fact that you were advised that Ulises was seen

22  going into the passenger seat of this car and there was no

23  blood found there?

24           THE COURT:  Sustained.  Were you advised

25       that?

M. Berrios - People - Cross          958

1                    THE WITNESS:  No.

2          Q.    You never told them that?

3          A.    No.

4          Q.    Do you know Armando pretty well?

5          A.    Yes.

6          Q.    Miss Abdi didn't ask you about that.  How long

7    have you known Armando for?

8          A.    You could say like three, four years.

9          Q.    You consider yourself friends about friend with

10   him?

11         A.    Not very -- you know, friends, yeah.  We hanged

12   out not too close but friends.

13         Q.    Lets me ask you this:  You had a personal

14   relationship with him, didn't you, a friendly relationship?

15         A.    Yeah, we would talk once in awhile.

16         Q.    You bought cocaine from him and a number of

17   occasions, right?

18         A.    Yes.

19                    THE COURT:  Just one second.

20                    MS. ABDI:  Objection.

21                    THE COURT:  Overruled.

22         Q.    As a matter of fact, on a regular basis, you

23   bought cocaine from Armando; is that right?

24         A.    No.

25         Q.    No?  It was only once?

J.H.

M. Berrios - People - Cross          959

1        A.    Yes.

2        Q.    And let me ask you something:  At the time that

3    you heard Ulises talking on the phone, did you hear any

4    discussion about cocaine at that time?

5        A.    No.

6        Q.    No, you didn't hear anything about the fact that

7    Ulises owed Armando $600?

8        A.    No.

9        Q.    You don't know anything about that?

10       A.    No.

11       Q.    You don't know anything about the fact --

12       A.    No.

13       Q.    Let me finish.  You don't know anything about the

14   fact that Armando had sold cocaine to Ulises and others and

15   claimed that he was owed money?

16       A.    No.

17             THE COURT:  All right, ladies and gentlemen,

18        remember the instruction I gave you before, an

19        unanswered question is not evidence.

20       Q.    After you got to the corner, did you ever see

21   Ulises get into the vehicle?

22       A.    No.

23       Q.    At any time?

24       A.    No.

25             MR. MILLMAN:  Give me one moment, your Honor.

1        Q.    When you were speaking to the police on October

2   13th of 2010, you were asked a number of questions about

3   whether or not you saw Ulises get into a car, weren't you?

4        A.    Yes.

5        Q.    And at that time didn't you tell them that, quote,

6   Nigger, Ulises and the other one got into the car?

7        A.    Yes.

8        Q.    You did tell them that?

9        A.    Yes.

10       Q.    And but you just told this jury a moment ago that

11   you never saw him get into the car?

12       A.    Yes.

13       Q.    I see.    The individual who took you with Ulises

14   and Nigger to the hospital, is that a person whose a/k/a is

15   Snooby?

16       A.    I don't know.

17       Q.    Do you know if it's a person whose first name is

18   Merlin?

19       A.    I don't know.

20       Q.    You know it's not?

21       A.    I wouldn't know.

22       Q.    And at the time that you left the hospital with

23   Ulises, did you see a bandage on his finger?

24       A.    No.

25       Q.    Did you look for one?

J.H.

M. Berrios - People - Cross          961

1          A.    No.

2          Q.    And what about when you were at the deli with

3     Ulises just afterwards, did you see a bandage on his finger?

4          A.    No.

5          Q.    Did you look for one?

6          A.    No.

7          Q.    And the deli that you were at, by the way, with

8     him afterwards, where is that located?

9          A.    It's called Westbury Deli.  It's located on

10    Brooklyn Ave in Westbury on the corner of Prospect and

11    Brooklyn Ave.

12         Q.    You testified that Diana did not drive you to the

13    hospital, right?

14         A.    Yes.

15         Q.    Am I right in saying that you weren't with Ulises

16    when he was at his house before he left to go to the

17    hospital, were you?

18         A.    No, I wasn't.

19         Q.    When you saw Ulises approach Jocelyn's car just

20    before the fight happened, did Ulises have anything in his

21    hand?

22         A.    No.

23         Q.    You were hanging out with Ulises and Nigger just

24    prior to the time this happened, right?

25         A.    Yes.

M. Berrios - People - Cross          962

1     Q.    The person whose nickname you know as Nigger, is
2     his name Henry?
3     A.    I can't tell you. I don't know.
4     Q.    When you heard the telephone conversation between
5     Ulises and another individual while you were there, there
6     came a time when you knew that Armando was coming over
7     there, right?
8     A.    I kind of knew that he was coming over there over
9     the conversation that they had, yes.
10    Q.    You didn't just kind of know, you knew?
11    A.    I knew.
12    Q.    You knew exactly what was about to happen?
13    A.    Yeah, yeah.
14          THE COURT:  Did Ulises, when he was speaking
15    over the phone, mention the name Armando?
16          THE WITNESS:  No.
17          THE COURT:  You assumed it was Armando?
18          THE WITNESS:  Because the guy that was on the
19    phone told him who it was.
20          THE COURT:  So the phone was given --
21          THE WITNESS:  Yes, but hearing the
22    information, I knew who they were talking about.  I
23    already knew who they were talking about.
24    Q.    And so after Ulises got off the phone, you knew
25    Armando was on his way?

1        A.    Yes.

2        Q.    You knew he was going to fight Ulises?

3        A.    Yes.

4        Q.    And you wanted to help him out, right?

5              THE COURT:  Help who out?

6              MR. MILLMAN:  Help Ulises out.

7        A.    No.

8        Q.    Let me ask you this:  When you heard Ulises get

9   off the phone, it wasn't too long after that that you had a

10  gun in your hand, right?

11       A.    Say it took like five, ten minutes.

12       Q.    You kept that gun in your hand, didn't you?

13       A.    Yes.

14       Q.    Let me see if I have it right, the words I think

15  you used when you noticed that someone started to get in on

16  this, you said they have problems amongst each other; is

17  that what you said?

18       A.    Yes, they had a conflict amongst each other.

19       Q.    I see.  That's what you said to them when you had

20  the gun in your hand?

21       A.    Yeah.  I was like --

22       Q.    Did you say anything else?

23       A.    No.  I was like, Nobody get in.  Let them fight.

24  They got problems amongst each other.  Let them handle this

25  one-on-one.

M. Berrios - People - Cross          964

1          And that's what happened.  Nobody got in.  Nobody

2     touched them.  But I wasn't there to help him out or help

3     the other guy out.

4          Q.   I see.

5          A.   Know what I mean?

6          Q.   Did you say while you had the gun in your hand and

7     you had your finger on the trigger, did you say to anyone

8     that don't call the police; did you say those words?

9          A.   No.

10         Q.   You didn't say that?

11         A.   No.

12         Q.   And did you threaten to shoot anyone there if when

13    they tried to get in?

14         A.   Nobody get in.

15         Q.   Did you say, Mr. Berrios, that you would shoot

16    anyone who tried to get in?

17         A.   No.

18         Q.   And after you took the gun out and shot it in the

19    air, you kept gun out in your hand, didn't you?

20         A.   Yeah.  That's why I was trying to leave with it to

21    get rid of it.

22         Q.   But you had the gun out before that also, right?

23         A.   Yes.

24         Q.   While they were fighting?

25         A.   Yes.

J.H.

M. Berrios - People - Cross          965

1       Q.    The reason you had the gun out is because you
2    didn't want anyone to get in while they were fighting?
3       A.    Yes.
4       Q.    You're basically holding everyone at bay while the
5    two of them were fighting?
6       A.    I put it out because somebody had a stick and was
7    goings to his Ulises.  I ran to him, and that's the point
8    when the gun came out.  But my intention was never to hurt
9    nobody, if that's what you want to know.
10      Q.    Let me ask you this:  At the time was it Henry
11   that handed you the gun, by the way?
12                    THE COURT:  I'm sorry?
13      A.    Yes.
14      Q.    Was it Henry that handed you the gun?
15      A.    No.  Ulises did.
16      Q.    So at that time fair to say that Ulises knew that
17   you had a gun?
18      A.    Yes.
19      Q.    Ulises is a lot bigger than Armando, isn't he?
20      A.    Yes.
21      Q.    He knew you had a gun there?
22      A.    Yes.
23      Q.    You wouldn't even need a knife, would you?
24                    MS. ABDI:  Objection.
25                    THE COURT:  Sustained.

1     Q.    And when you saw Armando approaching Ulises, what

2   did Armando have in his hand?

3        A.    I couldn't see.  I couldn't see what he had in his

4   hands.  All I seen was him running to Ulises.  That's when I

5   screamed to Ulises, Bro, he's about to hit you.  And that's

6   when they started fighting.

7        Q.    Even if you can't explain it, did you see an

8   object in Armando's hands?

9        A.    No.

10       Q.    No?

11       A.    No, I can't -- I can't really recall.  I can't

12   really recall if I seen an object in his hands.

13            I seen him run with his fist like this.  But I

14   can't really remember if I seen an object.

15       Q.    You don't recall?

16       A.    No.

17       Q.    Let me see if I can help you.  When you spoke to

18   the police on October 13th of 2010, did you tell them that

19   Armando had a crowbar, kind of like a crowbar in his hand?

20       A.    Yes.

21       Q.    You did tell them that, right?

22       A.    Yes.

23       Q.    And Armando rushed Ulises and started hitting him?

24       A.    Yeah, I seen him hit him, and that's when they

25   started fighting.

M. Berrios - People - Cross          967

1          THE COURT:  Hit him with what?

2          THE WITNESS:  Like I said, I can't recall.

3    With his hands.  Like somebody rushing to you to hit

4    you right here with the side, and you started fighting.

5          THE COURT:  Come on up here.

6          (The following occurs at sidebar outside of

7    the hearing of the jurors.)

8          THE COURT:  This is the first time that any

9    testimony has come out which might justify the use of

10   deadly physical force when deadly physical force was

11   used against him.  At this particular time him him

12   telling me that you are imposing the defense of

13   justification?

14         MR. MILLMAN:  Well, at this time -- first

15   all, this is her witness.  However, let me just say

16   this:  I haven't decided yet if my client attempted

17   self-defense.  I do know when he gave the statement, he

18   indicated the same thing.  Armando came with the

19   crowbar.  I suspect that I may be asking the Court to

20   charge justification despite fact that I am aware that

21   it's inconsistent with the theory I am seeking.  But I

22   am permitted to argue the alternative, could be

23   consistent with the evidence.

24         In the event that a jury does find that he

25   stabbed him, if they conclude that, I think this

M. Berrios - People - Cross          968

1    evidence would support a justification charge.  I know

2    she is going to argue the number of stab wounds, but

3    that's why I believe the cocaine in his system could be

4    relevant.

5              THE COURT:  So basically you may ask me to

6    charge justification?

7              MR. MILLMAN:  I may.

8              THE COURT:  All right, now, do you have

9    anything to say at this point?

10             MS. ABDI:  Not at this point.

11             THE COURT:  You understand that the defense

12   of justification may not apply if it happens during a

13   confrontation which is not allowable by law?  In other

14   words, and I don't mean to be facetious, dueling is not

15   allowed in the State of New York.  Obviously swords are

16   not used, pistols are not used, but deadly physical

17   force can be considered an agreement to quote, unquote

18   duel.  Okay.

19             (The following takes place in open court.)

20   Q.   So Mr. Berrios --

21   A.   Yes.

22   Q.   -- Armando got the jump on Ulises?

23   A.   Hum?

24   Q.   Armando got the jump on Ulises?

25   A.   Yes.

J.H.

1    Q.    And he had a weapon in his hand even though you

2    don't know what it was, a weapon, right?

3         A.    Yes.

4         Q.    And he's hitting you repeatedly with?

5         A.    Hum?

6         Q.    He's hitting you repeatedly with it?

7         A.    I didn't see that.

8         Q.    You didn't see that?

9         A.    I seen him once when he rushed him the first time.

10        Q.    Did you see Ulises on the ground as he was hitting

11   him?

12        A.    I seen both of them just going to the ground

13   together.

14        Q.    Did you ever see the two of them separate and

15   start to talk?

16        A.    No.

17        Q.    This went on; it was very quick, right?

18        A.    Yes.

19        Q.    Did you see any opportunity for Ulises to have

20   grabbed anything?

21        A.    I can't see that much because it was too dark.

22        Q.    And when Armando came, by the way, he separated

23   himself from the crowd and ran at Ulises, right?

24        A.    Yes.  He was out of the crowd.  He was the main

25   one in front of everybody.

J.H.

M. Berrios - People - Cross        970

1      Q.   He was, wasn't he?

2      A.   Yeah.  He got to his house before the whole crowd

3  would have gotten there.

4      Q.   And by the way, out of everyone, he came there

5  with about seven guys, didn't he?

6      A.   Yes.

7      Q.   And they had weapons in their hands?

8      A.   Yes.  We were outnumbered.

9               THE COURT:  Just one second.  That's not what

10         the lawyer asked you.  Did the other seven have weapons

11         in their hands?

12              THE WITNESS:  Yes.

13              THE COURT:  Okay.

14              THE WITNESS:  Yes.

15     Q.   And, in fact, after they started fighting, more

16  people that were with Armando started coming out, right?

17     A.   Yes.

18     Q.   And more of Ulises' friends started coming out?

19     A.   No.

20     Q.   I'm sorry?

21     A.   Not at that moment.

22     Q.   Not at that moment, but at some point?

23     A.   After I shot the firearm, that's when I seen

24  people from his house coming.  But not when they were

25  fighting.  It was just us three and the crowd that was with

M. Berrios - People - Cross        971

1    Armando.

2        Q.    Certainly there were a number of Ulises' friends

3    there while this was going on, right?

4        A.    Not my friends.

5        Q.    I'm asking you --

6        A.    I don't know.

7        Q.    You know Ulises for a while?

8        A.    Yes.

9        Q.    You know who he hangs out with?

10       A.    Yes.

11       Q.    Did you see anyone there that you recognize as

12   being Ulises' friend?

13       A.    Just me and the other guy that was with us.

14       Q.    Armando's friends were there with sticks, right?

15       A.    Yes.

16       Q.    And your testimony is you just sat there and

17   didn't touch Armando during the time that Ulises and Armando

18   were fighting?

19       A.    Yes, nobody touched them.

20       Q.    You didn't try to get Armando off of Ulises?

21       A.    No.    If that would have been the case, I never

22   would have shot the firearm.

23       Q.    Isn't it true, Mr. Berrios, that after you shot

24   the gun, you saw Ulises get into a vehicle that was in the

25   driveway of his home at 163 Kinkel?

J.H.

M. Berrios - People - Cross          972

1     A.    I didn't see him get in the car.

2     Q.    You didn't see Diana get in the car?

3     A.    No.

4     Q.    And you didn't get in the car?

5     A.    No.

6     Q.    By the way, did any member of the Nassau County

7     Police Department ever ask you to give a blood sample?

8     A.    No.

9     Q.    How far away from Ulises and Armando were you at

10    the moment when they started fighting?

11    A.    At the moment, you could say like 20 feet.

12    Q.    I'm sorry?

13    A.    From my distance to your distance.

14          MR. MILLMAN:    I guess let the record reflect,

15    your Honor, from the witness stand to where I am

16    standing, the podium at the end of the jury seating.   I

17    don't know if --

18    A.    I don't know how long that, say 15, 20 feet.

19          THE COURT:    All right, as I said --

20          THE WITNESS:    It's --

21          THE COURT:    Just one second.

22          THE WITNESS:    Sorry.

23          THE COURT:    As I said, the distance between

24    the witness stand and the doorway is 50 feet.    That's

25    less than half.    So approximately 20 feet.

J.H.

M. Berrios - People - Cross        973

1            THE WITNESS:  Yeah.

2        Q.   And Mr. Berrios, at that time, we are talking

3    about when the fight first started and you were about 20

4    feet way from them, was there anything between you and where

5    Armando and Ulises were?

6        A.   No.

7        Q.   You had a clear view of them, right?

8        A.   Yes, at first I did.

9        Q.   At the time that you shot the gun up in the air,

10   how far were you from Ulises and Armando?

11       A.   Like, I mean, 30 feet.

12       Q.   Thirty feet?

13       A.   Like when I -- yeah, I'm way off.

14       Q.   So you were further away?

15       A.   Further a little.  Because when they were

16   fighting, they kept moving.  Now, when they fighting, they

17   keep moving.

18       Q.   When they first started fighting, did you have the

19   gun out?

20       A.   No.

21       Q.   But at the time that you shot it, certainly you

22   had the gun out?

23       A.   Yes.

24       Q.   But when you had the gun out, you were further

25   away from where they were?

J.H.

M. Berrios - People - Cross        974

1        A.    Yes.

2        Q.    Anything obstructing your view of them at that

3   time?

4        A.    No.

5        Q.    Nothing preventing you from seeing what was going

6   on, right?

7        A.    No.

8        Q.    Did you ever see Ulises stab Armando?

9        A.    No.

10       Q.    Did you ever see Ulises even touch a knife?

11       A.    No.

12       Q.    Did you ever hear Armando say any words to the

13  effect he has a knife?

14       A.    No.

15       Q.    Did you ever even see Ulises make a motion with

16  his arms that even resembled a stabbing motion?

17                  MS. ABDI:   Objection.

18       A.    No, I couldn't see nothing.  It was too dark.

19                  THE COURT:   Overruled.

20       Q.    Did you ever hear Armando cry out in pain?

21       A.    No.

22       Q.    Did you ever hear him scream?

23       A.    No.

24       Q.    So during the time that he was fighting with

25  Ulises, you never heard him scream or cry out in pain?

M. Berrios - People - Cross          975

1          A.    No.

2          Q.    Now, the individual that you said has the nickname

3     Nigger, was he wearing a Cincinnati Reds cap that night?

4          A.    Yes.

5          Q.    Did you see him get into the fight between Ulises

6     and Armando?

7                     THE COURT:    Did you see who?

8                     MR. MILLMAN:    His name is Nigger, your Honor,

9          the nickname that he identified this person --

10                    THE COURT:    Did you see this individual join

11         the fight?

12                    THE WITNESS:    No, no.

13         Q.    And you never saw him hit anybody with the yellow

14    stick?

15         A.    No.

16         Q.    Mr. Berrios, are you a member of the gang MS-13?

17         A.    No.

18         Q.    Were you ever a member of the gang MS-13?

19         A.    No.

20         Q.    Now, since you mentioned it, Mr. Berrios, you do

21    have a number of prior criminal convictions, correct?

22         A.    Yes.

23         Q.    And you were convicted on June 21st of 2007 of

24    petit larceny, correct?

25         A.    Yes.

M. Berrios - People - Cross          976

1       Q.    You were convicted of stealing, right?

2       A.    Yes.

3       Q.    And when you did that, you knew that it was wrong,

4    didn't you?

5       A.    Yes.

6       Q.    But you did it anyway, right?

7       A.    Yes.

8       Q.    Because it served your needs at the time, right?

9       A.    Yes.

10      Q.    For your conduct, you were sentenced initially to

11   three years probation, right?

12      A.    Yes.

13      Q.    That wasn't your ultimate sentence though, was it,

14   Mr. Berrios?

15      A.    I be on probation still.

16      Q.    You got probation, but did that change at

17   sometime?

18      A.    Huh?

19      Q.    Did that change, your probation sentence?

20      A.    No.

21      Q.    No?

22      A.    I don't understand.

23            THE COURT:   What he means is did the

24   Probation Department violate you while you were on

25   probation?

J.H.

M. Berrios - People - Cross          977

1            THE WITNESS:  Oh, yes.

2            THE INTERPRETER:  Judge, I can't hear you.

3            THE COURT:  Did the Probation Department

4       violate you while you were on probation.

5            THE WITNESS:  Yeah.

6       Q.   Is it coming back now, Mr. Berrios?

7       A.   Yes.

8       Q.   In fact, as a result of violating probation and

9   not following the terms of probation, you were resentenced

10  on that?

11      A.   Yes.

12      Q.   You were resentenced to 30 days in jail, correct?

13      A.   Yes.

14      Q.   On June 21st of 2007, you were also convicted of

15  attempted identity theft; isn't that a fact?

16      A.   Yes.

17      Q.   So you were convicted of knowingly and

18  intentionally defrauding another individual by assuming the

19  identity of another in order to obtain goods or services,

20  right?

21      A.   Yes.

22      Q.   When you did that, Mr. Berrios, you knew it was

23  wrong, didn't you?

24      A.   Yes.

25      Q.   You knew that you were hurting somebody else,

J.H.

M. Berrios - People - Cross        978

1    right?

2         A.    Yes.

3         Q.    But you did it anyway because it served your needs

4    at the time; isn't that right?

5         A.    Yes.

6         Q.    On July 20th of 2007, you were convicted of

7    attempted menacing in the second degree; isn't that right?

8         A.    Yes.

9         Q.    And that was in connection, correct me if I am

10   wrong, with using a box cutter to intentionally place

11   another person in reasonable fear of injury, right?

12        A.    Yes.

13        Q.    I take it you knew that that was wrong, right?

14        A.    Yes.

15        Q.    You were also convicted of reckless endangerment,

16   correct?

17        A.    Yes.

18        Q.    And so you were convicted of reckless endangerment

19   acting in act -- so you were convicted of reckless engaging

20   in conduct which creates a substantial risk of serious

21   physical injury to another; isn't that right?

22        A.    Yes.

23        Q.    You were also convicted of criminal possession of

24   a weapon in the fourth degree; isn't that true?

25        A.    Yes.

J.H.

M. Berrios - People - Cross          979

1        Q.    And that, again, was on July 20th, 2007?

2        A.    Yes.

3        Q.    And that was for possessing a dangerous or deadly

4    instrument with the intent to use the same unlawfully

5    against another, right?

6        A.    Um-hum.

7        Q.    I'm sorry, I didn't hear you.

8        A.    Yes.

9        Q.    You were also convicted on July 20th of 2000 --

10   withdrawn.

11          As a result of your act, placing another person in

12   fear of injury of a box cutter, you went to jail, didn't

13   you?

14       A.    What?

15       Q.    You went to jail as a result of conviction for

16   attempted menacing?

17       A.    You say July?

18       Q.    As a result of your conviction on July 20th of

19   2007 for attempted menacing, you were sentenced to jail,

20   correct?

21       A.    Yes.

22       Q.    Ninety days in jail, right?

23       A.    Yes.

24       Q.    By the way, on that same day, July 20th, 2007, you

25   were also convicted of operating a motor vehicle while under

J.H.

1   the influence of drugs, right?

2        A.    Yes.

3        Q.    And you did that, didn't you?

4        A.    Hum?  Yes.

5        Q.    You knew that was wrong too, right?

6        A.    Yes.

7        Q.    You got 90 days in jail for that, didn't you?

8        A.    Yes.

9               THE COURT:  Four edification, ladies and

10   gentlemen, under our law, a conviction occurs when a

11   verdict is announced, be that verdict from a court or

12   of a jury.  A sentence occurs ordinarily after that.

13       Q.    Mr. Berrios, August 6th, 2008, you were convicted

14   of criminal mischief in the fourth degree, correct?

15       A.    Yes.

16       Q.    You were convicted of intentionally damaging

17   property of another person, right?

18       A.    Yes.

19       Q.    Of course, you knew that that was wrong when you

20   did it, right?

21       A.    Yes.

22       Q.    But it didn't stop you, did it?

23       A.    No.

24       Q.    As a result of your conduct, you received a

25   sentence of three years probation, right?

J.H.

M. Berrios - People - Cross        981

1        A.    Yes.

2        Q.    Did you make it through the probation,

3   Mr. Berrios, without violating it?

4        A.    No.

5        Q.    No.  You got in trouble again, didn't you?

6        A.    Yeah, I did, because I stopped going to probation.

7        Q.    I'm sorry?

8        A.    Yes, I stopped going to probation.

9        Q.    Let's talk about that.  On November 12th of 2009,

10   isn't it fact that you were convicted of attempted burglary

11   in the third degree?

12        A.    Yes.

13        Q.    That's a felony, right?

14        A.    Yes.

15        Q.    So you were convicted of illegally entering or

16   remaining in a building with the intention of committing a

17   crime within, right?

18        A.    Yes.

19        Q.    And that was because you were in a deli in

20   Westbury, correct?

21        A.    Yes.

22        Q.    And it was about to close and you hid, right,

23   behind something when it closed and remained in there,

24   right?

25        A.    Yes.

M. Berrios - People - Cross          982

1     Q.   You knew you weren't supposed to be in there,

2  right?

3     A.   Yes.

4     Q.   But you didn't just remain in there, did you?

5     A.   No.

6     Q.   You did something else, right?

7     A.   Yes.

8     Q.   You stole, right?

9     A.   Yes.

10    Q.   Over $1,000 worth of stuff, right?

11    A.   No.

12    Q.   I'm sorry?

13    A.   Not over a thousand.

14    Q.   You stole hundreds of dollars of stuff?

15    A.   Not even hundreds.  Like $200.

16    Q.   I'm sorry?

17    A.   Like $200.

18    Q.   $200.  The $200 that you took, it didn't belong to

19  you, needless to say, right?

20    A.   Yes.

21    Q.   And for your act of attempted burglary in the

22  third degree, you were sentenced by a judge to eight months

23  in jail; isn't that right?

24    A.   Yes.

25    Q.   And that was while you were on probation for the

M. Berrios - People - Cross        983

1    criminal mischief we just talked about moments ago, right?

2        A.    Yes.

3        Q.    On March 12th of 2010, were you also convicted of

4    aggravated unlicensed operation in the second degree?

5        A.    Yes.

6        Q.    You went to jail for that too, didn't you?

7        A.    Yes.

8        Q.    And so on each of these occasions, Mr. Berrios,

9    you knew that what you were doing was wrong, right?

10       A.    Yes.

11       Q.    And you did it anyway, right?

12       A.    Yes.

13       Q.    Because it served your needs at the time, right?

14       A.    We all make mistakes in life, and I have learned

15   from my mistakes.

16       Q.    But you did it because it served your needs at the

17   time?

18       A.    Yes, at the moment it did.  I used to do a lot of

19   drugs.  Drugs were part of my life.

20       Q.    And isn't that why you are telling this jury that

21   Ulises made a statement to you that you say he made because

22   it's serving your needs at this time?

23       A.    Not really.

24       Q.    Not really?

25       A.    Because I'm only here to say the truth.

M. Berrios - People - Cross          984

1        Q.    You -- are you married?

2        A.    Yes.

3        Q.    And do you have children?

4        A.    Yes, three.

5        Q.    How many?

6        A.    Three.

7        Q.    How old are they?

8        A.    I got a six year old, a three year old and a one

9   year old.

10       Q.    Are they girls, boys?

11       A.    Two girls and one boy.

12       Q.    So you have three children that you care about a

13  great deal at home, right?

14       A.    Yes.

15       Q.    And you have three children at home that care

16  about you?

17       A.    Yes.

18       Q.    You have been sentenced to prison before as we

19  discussed, right?

20       A.    Yes.

21       Q.    Obviously you didn't like it?

22       A.    No.

23       Q.    I mean in prison, the guards control everything?

24       A.    Yes.

25       Q.    They control your movements?

M. Berrios - People - Cross        985

1    A.   Yes.

2    Q.   What you eat, right?

3    A.   Yes.

4    Q.   They also control when you eat, right?

5    A.   Yes.

6    Q.   When you watch TV?

7    A.   Yes.

8    Q.   They control when you sleep, right?

9    A.   Yes.

10   Q.   And when you go from one place to another?

11   A.   Yeah.

12   Q.   You like your freedom, Mr. Berrios?

13   A.   Everybody loves their freedom.

14   Q.   Yes, everybody likes their freedom.  And when you

15   are in prison, you don't have any privacy, do you?

16   A.   You got privacy.

17   Q.   Limited, right, not like when you're out?

18   A.   No, no, but, you know.

19   Q.   After you served your time on each of these

20   occasions, was the first thing you did to go back to your

21   family?

22   A.   Yes.

23   Q.   And after you served your time the last time that

24   you were in prison, you decided that you didn't want to go

25   to back to prison again, right?

M. Berrios - People - Cross          986

1        A.    No.

2        Q.    You wanted to make sure that you could avoid ever

3    having to go back?

4        A.    Yeah.   That's why I stopped doing what I was

5    doing.

6        Q.    And that's why you are testifying here against

7    Ulises about that statement, right?

8        A.    No, that's not why.

9        Q.    This is not the first time that you are

10   cooperating, being offered a deal to testify against

11   someone, is it?

12       A.    Yes, it is the first time.

13       Q.    This is the first time?

14       A.    Yes.

15       Q.    Well, after you last served your term in prison,

16   you decided -- withdrawn, withdrawn.

17             As we discussed, you were questioned by the police

18   on October 13th in connection with your role as to what

19   happened on September 28th, right?

20       A.    Um-hum.

21       Q.    When they were questioning you, you knew they had

22   witnesses, didn't you?

23       A.    Huh?

24       Q.    You knew they had witnesses when they were

25   questioning you, right?

M. Berrios - People - Cross        987

1            MS. ABDI:  Objection.

2        A.   No.

3            THE COURT:  Did you know that?

4            THE WITNESS:  No, I didn't know that.

5        Q.   When you had your hand on the gun, your finger on

6    the trigger and shot it into the air, you knew there were

7    other people around, right?

8        A.   Yeah.

9        Q.   So you knew there were witnesses?

10       A.   Yeah.

11       Q.   They didn't have to tell you?

12       A.   I knew that people seen me.  That's why I never

13   denied my part.

14       Q.   You knew that many people saw you with the gun?

15       A.   Yes.

16       Q.   You knew many people saw you fire it, right?

17       A.   Yes.

18       Q.   You knew that was illegal to do, right?

19       A.   Yes.

20       Q.   You knew that you could be charged with a crime,

21   criminal possession of a weapon, right?

22       A.   Yes.

23       Q.   You didn't have a permit for that gun,

24   Mr. Berrios?

25       A.   Not really.

J.H.

1      Q.   You were in a jam; is that right?

2      A.   Yes.

3      Q.   You remember what prison was like when they were

4   talking to you, and you didn't want to go back, right?

5      A.   No.

6      Q.   And so you just started thinking about your

7   daughters, right, your children?

8      A.   Yes.

9      Q.   And you started thinking about developing a plan

10  to talk about whatever they wanted to hear to make sure that

11  you wouldn't go back; isn't that right?

12      A.   No.  I was in fear for my action for having a

13  firearm.  I never had plans to talk to nobody or, you know,

14  try to save myself from anything.

15      Q.   You didn't have plans to talk about it until they

16  brought you in, right?

17      A.   Yeah.

18      Q.   You decided that you were going to do whatever you

19  had to do to make sure you didn't go back to prison; isn't

20  that right?

21      A.   Yes.

22      Q.   And telling a story about Ulises making a

23  statement to you is the best way, the only way to avoid

24  going to prison; isn't that right?

25      A.   No.  Because it's me telling you the truth.

Case 2:16-cv-03676-JFB   Document 10-3   Filed 10/06/16   Page 75 of 433 PageID #: 1288

1     Q.    I see.  Since you mention it, you entered into

2     this agreement with the District Attorney's office, right?

3          A.    Yes.

4          Q.    The agreement sets out a number things that you

5     have to do, right?

6          A.    Yes.

7          Q.    One of those things is testify truthfully, right?

8          A.    Yes, truthfully.

9          Q.    What if you don't testify truthfully, what

10    happens?

11         A.    Then I will be convicted, I think, charged.  But

12    I'm not here not to testify truthfully.  I'm here to say the

13    truth.

14         Q.    Now, basically as long as you testify and say that

15    you saw Ulises said something --

16              THE COURT:  Just one second.  Convicted of

17         what?

18              MR. MILLMAN:  I'm sorry, your Honor?

19              THE COURT:  Convicted of what?

20              MR. MILLMAN:  I'm not sure which portion --

21              THE COURT:  A couple sentences ago, you said

22         convicted.  Convicted of what?

23              MR. MILLMAN:  Criminal possession of a weapon

24         earlier.

25              THE COURT:  Ladies and gentlemen, if someone

M. Berrios - People - Cross          990

1    receives immunity, they receive immunity.  That's it,
2    except for perjury, okay?
3         Q.   And so, Mr. Berrios, ultimately in exchange for
4    your testimony, you have been promised freedom, right?
5         A.   Yes.
6              MS. ABDI:  Objection.
7              THE COURT:  Overruled.
8         Q.   And that freedom is more valuable to you than any
9    amount of money; isn't that right?
10        A.   Yes.
11        Q.   You are getting paid a guarantee of freedom from
12   prosecution of possible jail time for testifying here today,
13   right?
14        A.   Yes.
15        Q.   And you know that if you told the police that
16   Ulises never made the statements that you say he made, you
17   wouldn't be getting this deal; is that right?
18             THE COURT:  Do you understand that question?
19             THE WITNESS:  No, I don't understand what he
20        is saying, no.
21        Q.   You were aware when you spoke to the police for
22   the first time that if you told them you never heard Ulises
23   say anything, there would be no deal to you; isn't that
24   right?
25        A.   Yeah.  But I just needed to say the truth to

J.H.

M. Berrios - People - Cross          991

1   somebody.  I knew I didn't do nothing, so they were asking

2   me questions, and I was telling you the truth.

3        Q.   It's about the truth?

4        A.   Yeah, it's about the truth, you know.

5        Q.   Tell me something, Mr.  Berrios, you learned that

6   Armando died the day after this happened, right?

7        A.   Yes.

8        Q.   And so as of September 29th, 2010, you possessed

9   information that someone had confessed to you about killing

10  someone, right?

11       A.   Um-hum.

12       Q.   I'm sorry?

13       A.   Yes.

14       Q.   With this information, did you go to the police

15  with that information that day?

16       A.   No.

17       Q.   Did you go to them the next day?

18       A.   No.

19       Q.   In fact, Mr. Berrios, you never said a word to the

20  police about it until they brought you in for questioning;

21  isn't that right?

22       A.   Yes.

23       Q.   And you never said a word about it until they

24  questioned you about an incident in which you possessed a

25  loaded weapon and fired it into the air, right?

J.H.

M. Berrios - People - Cross          992

1        A.    Yes.

2        Q.    And I think I should mention you haven't and will

3    not be charged with anything in connection with this

4    incident, right?

5        A.    Yes.

6        Q.    But Mr. Berrios, you were concerned more than just

7    being charged with reckless endangerment and criminal

8    possession of a weapon; isn't that right?

9        A.    No.  My fear was getting charged for the weapon.

10       Q.    Now, after Armando attacked Ulises with the

11   crowbar, you were the first person to get in on this; isn't

12   that right?

13       A.    I went to the -- the two individuals that wanted

14   to hit Ulises.

15       Q.    I couldn't hear you.

16       A.    I stopped the guy from hitting Ulises from behind.

17       Q.    How did you stop him from hitting Ulises?

18       A.    I ran up to him and told him, Don't get in, and he

19   seen the gun I had.

20       Q.    You didn't do anything with your hands?

21       A.    He seen the gun, and he seen my face.

22       Q.    Before speaking to the police about this, you

23   became aware that a number of people in your neighborhood

24   were saying that you stabbed Armando; isn't that true?

25       A.    Those are rumors that were going by the streets.

J.H.

M. Berrios - People - Cross        993

1       Q.    In fact, your sister even told you about that,
2   right?

3       A.    Yeah, she heard rumors.

4       Q.    You were concerned that you might be charged with
5   murder; is that right?

6       A.    No, I was never concerned about that.  My fear was
7   the whole time was the weapon.

8       Q.    When you were interviewed on October 13th of 2001
9   by the police department, isn't it a fact that you said the
10  following words to them.  Quote:  They are going to look at
11  that time like this, all right?  If they can't catch Ulises,
12  if you can, know what I mean?  There ain't no way getting
13  away with murder.  He can do 25 to life.

14          Did you say those words to the police when they
15  interviewed you on October 13th?

16      A.    Yes.

17      Q.    So you were concerned about you possibly being
18  charged with murder?

19      A.    Oh, yes, yes.

20      Q.    Yes, it's coming back now?

21      A.    Yes.

22      Q.    Let me ask you this:  Didn't you also say that
23  quote, people were saying that I was the one that stabbed
24  the guy; do you remember saying that?

25      A.    Yes.

M. Berrios - People - Cross        994

1        Q.    Do you remember saying the following words when

2   they were talking to you about the gun that you used, quote,

3   I got to do what I got to do, you know what I mean?  My

4   freedom is in jeopardy too now?

5             Did you say those word?

6        A.    Yes, those words came out because of the gun.

7        Q.    Those words came out, you said it?

8        A.    I said it because -- I said it because of the gun.

9        Q.    You knew that the police were going to have to

10  arrest somebody for this; someone was killed, right?

11       A.    Yeah.

12             MS. ABDI:  Objection.

13             THE COURT:  Was that your understanding, the

14        police had to arrest somebody for this?

15             THE WITNESS:  No.

16             THE COURT:  All right.

17       Q.    Mr. Berrios, you never saw Ulises with a knife,

18  and you knew he didn't do it but you also knew that your

19  freedom was in jeopardy; isn't that true?

20             MS. ABDI:  Objection.  Compound question.

21             MR. MILLMAN:  It goes right towards bias and

22        motive.

23             THE COURT:  That's not the basis of the

24        objection.  It's a compound question.  Sustained.

25       Q.    You indicated you never saw Ulises with a knife?

M. Berrios - People - Redirect          995

1      A.    No.

2      Q.    You knew he didn't do this, didn't you?

3                  MS. ABDI:  Objection.

4                  THE COURT:  Overruled.

5      Q.    I'm waiting for answer, Mr. Berrios.

6      A.    No.

7      Q.    You knew that he didn't do it, right?

8      A.    Yeah, I can't answer the question because I know.

9      Q.    And you made sure that you were going to say

10   whatever you had to say to make sure that you got the

11   freedom that you so desperately need?

12     A.    No.  I was sure that I was going to say the truth.

13                 MR. MILLMAN:  I see.  I have nothing further.

14                 THE COURT:  Any redirect?

15                 MS. ABDI:  Yes.

16   REDIRECT EXAMINATION

17   BY MS. ABDI:

18     Q.    Mr. Berrios, you did not stab Armando Villatoro?

19     A.    No.

20     Q.    Now, when you were running down Kinkel Street with

21   Ulises Bonilla, at some point you left him; is that correct?

22     A.    Yes.

23     Q.    He continued to run down Kinkel Street towards his

24   house, correct?

25     A.    Yes.

M. Berrios - People - Redirect        996

1        Q.    So you didn't see what he did after you left him;
2    is that correct?
3        A.    No, no.
4        Q.    Meaning?
5        A.    Yes, no, I didn't see him what he did after that.
6        Q.    And according to your testimony, you branched off
7    from him at 167 Kinkel Street; is that correct?
8        A.    Yes.
9        Q.    That's before you get to his house, correct?
10       A.    Yes.
11       Q.    You didn't run past -- you didn't run past 163
12   Kinkel Street?
13       A.    No.
14       Q.    And when you were speaking to the police on
15   October 13th of 2010, they never told you they were going to
16   charge you with anything; is that correct?
17       A.    Yes.
18       Q.    They never said I'm going to charge you with
19   murder?
20       A.    No.
21       Q.    They never said I'm going to charge you with
22   possession of a gun?
23       A.    No.
24       Q.    And they let you go, correct?
25       A.    Yes.

1            MS. ABDI:  I have nothing further.

2            MR. MILLMAN:  Follow up if I may very

3       briefly, your Honor.

4            THE COURT:  On a very limited area, that

5       which is brought up on redirect.

6  RECROSS-EXAMINATION

7  BY MR. MILLMAN:

8       Q.   On redirect, Miss Abdi asked you if you passed 167

9  Kinkel Street.  I have a different question to you.  Did you

10  pass 154 Kinkel Street?

11       A.   I don't know the numbers of houses.

12       Q.   I see.  And you state that the police never told

13  you they were going to charge you with anything, right?

14       A.   Yes.

15       Q.   But again, you knew you were being questioned in

16  connection with this incident, right?

17       A.   Yes.  And I was happy because I got to say, say

18  what I thought.

19       Q.   You were happy?  I thought this is hard for you?

20       A.   At the moment, you know, I felt good, relieved

21  that at least I could say the right to, you know what I am

22  saying, I am telling truth.

23       Q.   You feel good that you have a deal that gives

24  freedom?

25       A.   I feel good that I am saying the truth, nothing

Det. J. Cereghino - People - Direct     998

1    about no freedom.

2            Q.    They did not tell you they were going to charge

3    you, but have been around the block that you knew that you

4    were in trouble, right?

5                  THE COURT:  All right, sustained.

6                  MR. MILLMAN:  Nothing further.

7                  THE COURT:  You can step down.

8                  (The witness was excused.)

9                  THE COURT:  Ladies and gentlemen, we are

10           going to take ten minutes right now.  I want to get

11           into the testimony of the People's perhaps last

12           witness.  So let's make the break short.

13                  (Whereupon, the jury exits the courtroom.)

14                  (A recess was taken.)

15                  COURT OFFICER:  Jury entering.

16                  (The jury enters the courtroom.)

17                  THE CLERK:  Recalling case on trial, People

18           of the State of New York versus Ulises Bonilla,

19           Indictment 202N of 2011.  All parties present,

20           including the Spanish interpreter and the defendant and

21           the jury.

22                  Let the record reflect the presence of all

23           jurors.  Both sides consent to the seating and waive a

24           reading of the roll?

25                  MS. ABDI:  Yes.

Det. J. Cereghino - People - Direct      999

1                MR. MILLMAN:  Yes.

2                THE CLERK:  Thank you.

3                THE COURT:  The next witness.

4                MS. ABDI:  People call Detective James

5        Cereghino.

6                THE COURT:  We will go for about 20 minutes,

7        ladies and gentlemen, and then we will break.

8    D E T .  J A M E S  C E R E G H I N O, Shield 561, a witness

9        called on behalf of the People, after having been first

10       duly sworn by the Clerk of the Court, was examined and

11       testified upon his oath as follows:

12               THE CLERK:  In a loud, clear voice, please

13       state your name and spell your last name and give your

14       shield and command.

15               THE WITNESS:  My first name is James.  My

16       last name is Cereghino, C-E-R-E-G-H-I-N-O.  My shield

17       number is 561, and I'm a detective assigned to the

18       Homicide Squad of the Nassau County Police Department.

19   DIRECT EXAMINATION

20   BY MS. ABDI:

21       Q.    Good afternoon, Detective.

22       A.    Good afternoon, counselor.

23       Q.    How long have you been employed as a police

24   officer in Nassau County?

25       A.    Just short of 35 years.

J.H.

Det. J. Cereghino - People - Direct      1000

1        Q.    And how long have you been a detective in Nassau
2    County?

3        A.    Twenty-four years.

4        Q.    And how long have you been assigned to the
5    Homicide Squad?

6        A.    Just short of 14 years.

7        Q.    I'm going to direct your attention to September
8    28th of 2010.  On that date, did you become involved in the
9    investigation of the death of Armando Villatoro?

10       A.    Yes, I did.

11       Q.    And how did you become involved in that
12   investigation?

13       A.    I was working a night tour, and at 11:15 p.m., I
14   received a phone call from Detective Vacchiano from the
15   Third Squad advising me that there had been --

16                  MR. MILLMAN:  Objection.

17                  THE COURT:  After you received this phone

18             call, what did you do?

19                  THE WITNESS:  I responded to 180 Kinkel

20             Street in New Cassel.

21       Q.    And it's fair to say, Detective, that you were the
22   lead investigator on this case; is that correct?

23       A.    Yes, ma'am.

24       Q.    And although you work in a team of investigators,
25   you were the investigating detective in this case; is that

Det. J. Cereghino - People - Direct    1001

1    correct?

2        A.    Yes, ma'am.

3        Q.    Now, once you responded to 180 Kinkel Street, what
4    did you do with respect to the scene at that point?

5        A.    I took an overall look at the scene with the
6    assistance of some Third Squad detectives and crime scene
7    detectives that were already at the scene.  I saw some
8    objects in the street.  I saw a tire iron.  I saw a yellow
9    metal stick.  And down the block it was pointed out to me in
10   front of 163 Kinkel, there was a knife, looked like a
11   kitchen knife to me with a bent -- that was bent, and it
12   appeared to have blood on it.

13       Q.    And those items were collected and processed by
14   crime scene detectives; is that correct?

15       A.    After being photographed, yes, ma'am.

16       Q.    And were you able to -- did you speak to witnesses
17   at the scene?

18       A.    Yes, I did.

19       Q.    And did you speak to a Jocelyn Gonzalez?

20       A.    Yes, I did.

21       Q.    Did you speak to a Nancy Villatoro?

22       A.    Yes, I did.

23       Q.    Did you speak to an Angel Leon with the assistance
24   of Spanish-speaking detectives?

25       A.    Very briefly that night, yes.

Det. J. Cereghino - People - Direct     1002

1    Q.    Did there come a time where you were looking for
2    any vehicles with respect to this case?
3    A.    Yes.
4    Q.    And what vehicle was that?
5    A.    It was a 1998 Acura that was I believe owned by
6    Diana Bonilla, the sister of Ulises Bonilla.
7    Q.    And you also spoke to Oscar Villatoro that night;
8    is that correct?
9    A.    Yes, I did.
10   Q.    And Susana Villatoro, correct?
11   A.    Very briefly, because I needed an interpreter for
12   her.
13   Q.    Now, at some point the vehicle of Diana Bonilla
14   was taken into, for lack of a better word, custody?
15   A.    Yes, it was impounded.
16   Q.    What does it mean to be impounded?
17   A.    It was located parked on Kinkel Street on the
18   public street.  It was impounded to our E building in
19   Bellmore so crime scene can process it as evidence.
20   Q.    The E building was where crime scene was given the
21   opportunity to view that car; is that correct?
22   A.    Yes, ma'am.
23   Q.    Is it fair to say that you were looking for Ulises
24   Bonilla that night?
25   A.    That night?

J.H.

Det. J. Cereghino - People - Direct     1003

1     Q.    Yes.

2     A.    Yes, ma'am.

3     Q.    And were you able to find him that night?

4     A.    No, ma'am.

5     Q.    Did there come a time when you were able to locate

6  him?

7     A.    Yes.

8     Q.    When did that come?

9     A.    We arrested him November 26th, 2010 in Penn

10 Station.

11    Q.    From September, approximately September 28th,

12 2010 -- withdrawn.

13          From approximately September 28th, 2010 until

14 November 26th of 2010, were you making attempts to ascertain

15 his whereabouts?

16    A.    As part of the investigation, yes, ma'am.

17    Q.    And what areas, where did you look for him?

18    A.    We put surveillance on his house at 163 Kinkel.

19 He had a girlfriend that lived at 27 James in Hicksville.

20 We conducted surveillance there, and we also followed her

21 around hoping that she might take us to him.

22          A confidential informant had called and stated

23 that he was up in the Boston area, so -- and the cousin of

24 the deceased had provided us with a My Space name that he

25 was using.  We did have him at an IP address once up in

Det. J. Cereghino - People - Direct      1004

1   Boston.  I was never able to locate it.  Subsequently the

2   confidential informant told us that he was back and

3   working --

4              MR. MILLMAN:  Objection what the informant

5        said, your Honor.  That's hearsay.

6              THE COURT:  All right, you spent a great deal

7        of time trying to locate the whereabouts for the

8        purpose of apprehending the defendant?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  And you were unsuccessful in two

11        months; is that correct?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  You were -- you completed this

14        task on November 26th?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Why don't you just go into what

17        immediately happened on November 26th or November 25th.

18             Now, ladies and gentlemen, I want to give you

19        an instruction in this regard.  You are here to

20        determine facts as testified to by a witness.  You are

21        not here to go over an investigation as conducted by

22        the police department.  You may be curious about that,

23        but it's beyond your function.

24   DIRECT EXAMINATION

25   BY MS. ABDI:  (CONTINUED)

Case 2:16-cv-03676-JFB   Document 10-3   Filed 10/06/16   Page 91 of 433 PageID #: 1304

1        Q.    Detective, you located the defendant or you

2    located Ulises Bonilla in Penn Station; is that correct?

3        A.    Yes, ma'am.

4        Q.    Do you see him in the courtroom today?

5        A.    Yes, I do.

6        Q.    Can you please point him out and identify an

7    article of clothing he's wearing?

8        A.    He's the gentleman, the male white Hispanic

9    sitting at the table in the blue shirt, long-sleeve collared

10   blue shirt.

11                  MS. ABDI:   Your Honor, may the record

12            identify the witness identified the defendant?

13                  THE COURT:   Yes.

14       Q.    And he was taken into custody at that point; is

15   that correct?

16       A.    Yes, ma'am.

17       Q.    What was his date of birth?

18       A.    July 29th, 1988.

19       Q.    What was his address?

20       A.    163 Kinkel Street in Westbury, New York.

21       Q.    Now, with respect to this investigation,

22   Detective, you also spoke to an individual named Misael

23   Berrios; is that correct?

24       A.    Yes, I did.

25       Q.    And that was on October 13th of 2010?

Case 2:16-cv-03676-JFB   Document 10-3   Filed 10/06/16   Page 92 of 433 PageID #: 1305

1        A.   Yes, ma'am.

2        Q.   And did he come with you voluntarily to the police

3    station?

4        A.   Plainclothes officers of the Third Precinct went

5    to his house, and he voluntarily responded with them to my

6    office where I was.

7        Q.   And did you make him any promises on that date?

8        A.   No, ma'am.

9             MS. ABDI:   I have no further questions.

10   CROSS-EXAMINATION

11   BY MR. MILLMAN:

12       Q.   Good afternoon, Detective Cereghino.

13       A.   Good afternoon, counselor.

14       Q.   Detective, on the day in which the plainclothes

15   officers went to Mr. Misael Berrios's place and asked him to

16   come in, what day was that?

17       A.   I believe it was October 13th.

18       Q.   Prior to that time, do you have any knowledge of

19   Misael Berrios ever contacting the police department to

20   advise that he had important information about a homicide?

21            THE COURT:   On this case.

22       A.   Not to my knowledge, no, sir.

23       Q.   And when he was asked to come in, how many

24   plainclothes officers went over his house?

25       A.   I believe it was two.

1          Q.    It was two?  Detective, this incident was

2     initially called in as a shooting, correct?

3          A.    Yes, sir.

4          Q.    In fact, several witnesses who were there called

5     this in as a shooting?

6          A.    Yes, sir.

7          Q.    We know that this is a stabbing.  But did any of

8     the 911 calls that came in by civilians ever report this as

9     a stabbing?

10                     MS. ABDI:  Objection.

11                     THE COURT:  I'm sorry?

12                     MR. MILLMAN:  Ever report it as a stabbing.

13                     MS. ABDI:  Objection.  Hearsay.

14                     THE COURT:  When you went to the scene for

15               the first time, was the scope of your investigation

16               centering around a stabbing or a shooting?

17                     THE WITNESS:  Both occurred, but prior to

18               arrival, I knew that the deceased had been stabbed

19               there.

20                     THE COURT:  Did the medical examiner arrive

21               at the scene?

22                     THE WITNESS:  Well, your Honor, he was

23               transported to the hospital, and he was pronounced dead

24               there.

25          Q.    And so before you arrived, Mr. Villatoro was

Det. J. Cereghino - People - Cross     1008

1    removed from the scene and taken by ambulance?

2         A.    Yes, sir.

3         Q.    You had learned, of course, that he had stab

4    wounds on him?

5         A.    Yes, sir.

6         Q.    And you saw the knife at the scene?

7         A.    Yes, sir.

8         Q.    But what I was asking more specifically is to your

9    knowledge, did any of the 911 calls that were made to the

10   police department make any reference to a stabbing?

11        A.    I don't believe so, no, sir.

12              MS. ABDI:  Objection.

13              THE COURT:  Overruled.

14        Q.    Did you conclude from that, Detective, that the

15   witness was present and not actually witnessed the act of

16   the stabbing itself?

17              MS. ABDI:  Objection.

18              THE COURT:  Sustained.  That's basically an

19        assumption of him based upon an assumption of someone

20        else.  That's sustained.

21        Q.    Would it be fair to say, Detective, that the

22   determination by the police that this was a stabbing was

23   made based upon the stab wounds themselves as opposed to

24   anything that any witness said?

25              MS. ABDI:  Objection.

1           THE COURT:   Overruled.

2       A.    Yes.

3       Q.    Now, how long did -- withdrawn.

4             Detective, how long were you at the scene that

5   night for?

6       A.    I'd have to check the time log.   Two or three

7   hours maybe.

8       Q.    And when you got there, there were already other

9   police there?

10      A.    Yes, sir.

11      Q.    And they were searching, looking through the

12  scene; would that be fair to say?

13      A.    They were safeguarding the scene, yes, sir.

14      Q.    Were they actively looking at any evidence from

15  what you could see when you arrived there?

16      A.    Uniform officers?

17      Q.    Or nonuniform, anybody from the Nassau County

18  Police Department.

19      A.    I believe crime scene was there before -- I

20  believe they were there before me, and they are very good at

21  what they do.   So --

22      Q.    And when you left, were there still police

23  personnel there at the scene?

24      A.    I believe so, yes.

25      Q.    I think you had testified that a tire iron had

Det. J. Cereghino - People - Cross     1010

1     been recovered from the scene?

2          A.   Yes, sir.

3          Q.   Was that ever tested for blood?

4          A.   I don't believe so.  Other than visually?

5          Q.   Tested for DNA.

6          A.   I don't believe so, no, sir.

7          Q.   There were other items that were tested in this

8     case --

9               THE COURT:  To your knowledge, it wasn't

10              tested for blood or DNA?

11              THE WITNESS:  Yes, sir, it was not tested.

12         Q.   Now, other items were tested for either blood or

13    DNA, right?

14         A.   Yes, sir.

15         Q.   Now, this was an object that a witness had

16    reported my client to have been holding at one point; is

17    that right?

18              THE COURT:  At that time.

19         A.   I believe the witness put the tire iron in both

20    the victim's hand at one point and the defendant's hand,

21    yes, sir.

22         Q.   And my client was charged with criminal possession

23    of a weapon in part for possessing that item?

24         A.   I believe the criminal possession of a weapon was

25    for the knife.

Det. J. Cereghino - People - Cross     1011

1        Q.   Okay.  But wasn't there also another charge with
2    respect to that iron?
3                   THE COURT:  Detective, we are not talking
4        about the police charges.  We are talking about the
5        grand jury charges.
6        A.   I'd have to review the charges.
7        Q.   Fair to say that -- withdrawn.
8                   THE COURT:  Ladies and gentlemen, there is a
9        weapons charge in the indictment pertaining to a tire
10       iron.
11       Q.   Detective, do you know who Erika Sims is?
12       A.   Erika Sims, yes.
13       Q.   Did you speak with her about this case?
14       A.   Yes.
15       Q.   On occasion, did you have one or more meetings
16   with her and somebody else about what items were tested for
17   DNA?
18       A.   Yes, we had one meeting with other members from
19   the DNA lab.
20       Q.   Do you remember how many members other than Miss
21   Sims were present?
22       A.   From the DNA lab?
23       Q.   Yes.
24       A.   I honestly don't recall.  There was some members
25   from the medical examiner's office, and there were, I think,

Det. J. Cereghino - People - Cross     1012

1   my sergeant, Sergeant Westmeister was there along with

2   myself.

3       Q.    And -- so other than yourself and Westmeister,

4   anybody else from the Nassau County Police Department there?

5       A.    I don't think so.

6       Q.    Would it be fair to say that yourself and

7   Westmeister would have been the two that had by far the most

8   knowledge about the actual investigation of the murder?

9       A.    Yes.

10      Q.    And a decision was made, am I correct, not to have

11  the tire iron tested for DNA?

12      A.    Yes, sir.

13      Q.    And was that a decision you made?

14      A.    It was a decision that was -- it was a request

15  that I made, and it was concurred with the DNA lab.

16      Q.    But that decision, am I right, had nothing to do

17  with not being able to test it but was rather a

18  discretionary decision that it was not important as other

19  items?

20      A.    It was evaluated as possible evidence, and it

21  didn't seem it to be necessary.

22      Q.    Did you also become aware of the fact a wristwatch

23  had been recovered from the scene?

24      A.    I believe there were two.

25      Q.    Yes.

Det. J. Cereghino - People - Cross     1013

1       A.   Which one are you referring to?

2       Q.   One of the wristwatches was determined to have

3    been worn by the victim, right?

4       A.   The one that was recovered in the street?

5       Q.   Yes.

6       A.   I believe so, yes, sir.

7       Q.   And did you become aware at some point that there

8    was a substance that had the appearance of blood on the face

9    and back of that watch?

10      A.   Yes, sir.

11      Q.   And was that tested for any DNA?

12      A.   I don't believe it was, no, sir.

13      Q.   And was that decision also made as a discretionary

14   decision unrelated to not being able to test it?

15      A.   It could have been tested.  It didn't seem

16   necessary.

17      Q.   So it's your choice not to test it?

18      A.   To preserve it but not to test it at that time.

19      Q.   Or at any time, right?

20      A.   It could still be tested.

21      Q.   But to date, it hasn't been; is that right?

22      A.   No, sir.

23      Q.   You were also aware of a white cardboard box that

24   was recovered from the back seat of the Acura, right?

25      A.   Yes, sir.

Det. J. Cereghino - People - Cross     1014

1      Q.    Did you become aware at some point that there were

2    five stains on that cardboard box?

3      A.    Bloodstains?  What appeared to be bloodstains?

4      Q.    Yes.

5      A.    Yes, sir.

6      Q.    Am I right in saying that two of those five were

7    tested?

8      A.    I don't recall the exact number.  If you say so.

9      Q.    But am I right in saying that there were --

10   whether it's two or three, there were some on that white

11   cardboard box that were not tested?

12     A.    Yes, sir.

13     Q.    Who made that decision?

14     A.    It might have been someone from the DNA lab.

15     Q.    And were you present when the decision was made?

16     A.    I don't recall that I was.

17     Q.    Now, these were stains that were on a white

18   cardboard box that had had been recovered from the back seat

19   of the vehicle that was seen fleeing the scene of this

20   incident; is that right?

21     A.    That's what we believed, yes, sir.

22     Q.    And there were reports of a number of people

23   getting into this vehicle before it fled the scene; is that

24   right?

25     A.    Yes, sir.

1      Q.    Don't you think that it would have been important

2   to find out what each of those stains that were on that

3   white cardboard box were?

4                  MS. ABDI:  Objection.

5                  THE COURT:  Overruled.

6      A.    Anything's possible, counselor.

7      Q.    Well, not just possible, but they all appeared to

8   be blood, right?

9      A.    Yes.

10     Q.    They weren't all tested though?

11     A.    No, sir.

12     Q.    And that was by choice?

13     A.    Yes, sir.

14     Q.    Did you also become aware of a clear plastic bag

15  with a red stain that was also recovered from the back seat

16  of this vehicle that had been seen fleeing the scene of this

17  homicide?

18     A.    Yes, sir.

19     Q.    Was that tested?

20     A.    I don't believe so.

21     Q.    And was that likewise a choice?

22     A.    It must have been, yes, sir.

23     Q.    It could have been tested?

24     A.    Yeah, of course, it could have been tested.

25     Q.    Wouldn't it also have been important to test it

Det. J. Cereghino – People – Cross     1016

1    given the fact that it was found in the back seat of a

2    vehicle that had been seen fleeing the scene?

3                    MS. ABDI:  Objection.

4                    THE COURT:  Overruled.

5         A.    Important as to the other many items that were

6    tested?

7         Q.    Important to the investigation.

8         A.    You're saying equally important, sir?

9         Q.    I'm sorry?

10        A.    Are you saying equally important as to the many

11   other items that were tested?

12        Q.    Just important, period.  Wouldn't that have been

13   important in your investigation of this crime?

14                   MS. ABDI:  Objection.

15                   THE COURT:  Did you believe based upon all

16        your experience there was investigative and evidentiary

17        significance in testing these items?

18                   THE WITNESS:  I believe sufficient testing

19        was done.

20        Q.    So you believed that testing two out of the five

21   stains was sufficient testing?

22        A.    Yes, sir.

23        Q.    When you made that decision, were you aware of the

24   fact that one of those two stains had been determined to

25   come from the victim?

J.H.

1      A.     The victim --

2              THE COURT:   The victim's blood.

3      A.     The victim's blood was recovered from the inside

4   of the defendant's sister's car.  I don't recall whether it

5   was from the headrest, from the back seat, from the box.  I

6   know it was recovered from inside the car, yes, sir.

7      Q.     But do you recall that the victim's blood was

8   found to be a match to one of the stains that was on the

9   white cardboard box?

10     A.     Yes, sir.

11     Q.     And did you also become aware at some point that

12  one of the stains that was found to be a match to the

13  victim's blood also had a second minor contributor that was

14  unknown?

15     A.     Yes, sir.

16     Q.     And that that minor contributor, it was excluded

17  to be my client?

18     A.     Yes, sir.

19     Q.     Knowing that, you still did not feel that it was

20  important to test the other stains on this box?

21     A.     We don't know where that minor contributor came

22  from.  That might have been on the box prior to the murder.

23     Q.     So wouldn't it have helped to see where these

24  additional stains came from?  I mean it's a murder

25  investigation, right?

J.H.

1    A.    Yes, sir.

2    Q.    Wouldn't it have helped?

3            MS. ABDI:  Objection.

4            THE COURT:  Sustained.

5    Q.    The body was examined, correct, the victim's body?

6    A.    Yes.

7    Q.    Is there a method or a technique that you are

8  aware of called taping the body that's done in connection

9  with a homicide?

10   A.    Taping it?

11   Q.    Yes, to preserve anything that might be, you know,

12 gotten from the body or attached to any item on the body?

13   A.    I am not aware of any taping.  They will put the

14 body in a clean sheet to preserve anything, whether it might

15 be hair or microscopic, and then they will examine the sheet

16 when the remove the body from the sheet.

17          I am not aware of any taping no.  If it occurs, I

18 am unaware of it.

19   Q.    I'm just asking.

20   A.    Okay.

21   Q.    But I also wanted to ask you was any of my

22 client's blood found mixed in with the victim's blood on his

23 body?

24          MS. ABDI:  Objection.

25          THE COURT:  If you are aware.

Det. J. Cereghino - People - Cross      1019

1       A.    No, I'm not aware.

2             Q.    Would it be fair to say that if that had been

3       tested and found to be a match that you would have been made

4       aware of that as the investigating detective, right?

5       A.    Yes, sir.

6                   THE COURT:   How long will you be?

7                   MR. MILLMAN:   You want to know for

8             scheduling, 15 to 20 minutes, I'm estimating.

9                   THE COURT:   Is this your last witness?

10                  MS. ABDI:   Yes.

11                  THE COURT:   Come on up here, counsel.

12                  (A discussion was held off the record at the

13            bench outside of the hearing of the jury.)

14                  THE COURT:   All right, ladies and gentlemen,

15            2 o'clock.   Don't discuss this case.   I think I'm going

16            to get you out early today, and we you not working

17            tomorrow.   So as far as tomorrow is concerned, you can

18            do whatever you want as long as it's legal.   We'll see

19            you at 2.

20                  (Whereupon, the jury exits the courtroom.)

21                  THE COURT:   All right, Mr. Millman, I want

22            you to know that my chambers will be open tomorrow to

23            you if you need me.

24                  MR. MILLMAN:   Judge, I appreciate that.

25            Thank you.

J.H.

Det. J. Cereghino - People - Cross          1020

1          THE COURT:  2 o'clock.

2          (Whereupon, a luncheon recess was taken.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Det. J. Cereghino - People - Cross     1021

1   AFTERNOON SESSION

2              THE CLERK:  Recalling case on trial, People

3        of the State of New York versus Ulises Bonilla,

4        Indictment 202N of 2011.  All parties are present

5        including the defendant and Spanish interpreter.  There

6        are no jurors present.

7              (Whereupon, the witness resumed the witness

8        stand.)

9              THE CLERK:  Let the record reflect the

10       witness is on the stand.  Sir, you are reminded you're

11       still under oath.

12             THE WITNESS:  Yes, sir.

13             COURT OFFICER:  Jury entering.

14             (The jury enters the courtroom.)

15             THE CLERK:  Let the record reflect the

16       presence of all jurors.  Both sides consent to the

17       seating and waive a reading of the roll?

18             MS. ABDI:  Yes.

19             THE CLERK:  Counsel?

20             MR. MILLMAN:  Yes.

21             THE COURT:  Okay, Mr. Millman, continue your

22       cross-examination.

23             MR. MILLMAN:  Certainly.

24   CROSS-EXAMINATION

25   BY MR. MILLMAN:  (CONTINUED)

J.H.

Det. J. Cereghino - People - Cross     1022

1      Q.    Good afternoon, Detective.

2      A.    Good afternoon, counsel.

3      Q.    Detective, I wanted to talk about the knife that

4   was tested, that was recovered from the scene.

5      A.    Yes.

6      Q.    That was sent over for testing of the blood or

7   what appeared to be blood on the knife?

8      A.    Yes, sir.

9      Q.    And the blood was tested, and it was found to be a

10  match for the victim; is that correct?

11     A.    Yes, sir.

12     Q.    And another part of the reason that you wanted

13  that knife tested was that you suspected that the defendant,

14  my client, may have been bleeding; is that fair to say?

15     A.    I'm sorry?

16              MS. ABDI:  Objection.

17              THE COURT:  That's sustained.

18     Q.    Detective, did you advise anyone over at the

19  forensic bureau that you suspected that my client may have

20  been bleeding at the time of the incident?

21              MS. ABDI:  Objection.

22              THE COURT:  Did you advise them that?

23              THE WITNESS:  No, I can't say I did, sir.

24              MR. MILLMAN:  I'm going to ask to have this

25        marked I think Defendant's F for identification.

Det. J. Cereghino - People - Cross      1023

1            (Defendant's Exhibit F is marked for

2      identification.)

3      Q.   Detective, you are being shown what's marked

4   Defendant's Exhibit F for identification.  I'm just going to

5   ask you to take a look at that.

6      A.   I haven't read the whole thing.  But yes,

7   counselor?

8      Q.   My question to you is does that reflect a meeting

9   that was held between yourself, Miss Sims and other members

10  of the forensic bureau?

11            MS. ABDI:  Objection.

12            THE COURT:  Does the written material

13      contained thereon have reference to your meeting with

14      the forensic bureau at the Nassau County Medical

15      Examiner's Office?

16            THE WITNESS:  Yes, it does.  But I don't even

17      know -- I'm not even certain who prepared this.

18            THE COURT:  Well, we are not asking.  He is

19      not asking you that.  Does it have reference to that

20      meeting?

21            THE WITNESS:  Yes, sir.

22      Q.   And does that indicate that you had advised the

23   forensic bureau --

24            THE COURT:  Objection sustained.

25      Q.   Detective, does that refresh your recollection as

J.H.

1    to whether or not you had advised the forensic bureau about

2    whether or not my client was bleeding?

3        A.    Just give me a moment to finish reading it,

4    please.

5        Q.    Please, take your time.

6        A.    Counsel --

7              THE COURT:  All he's asking you does it

8        refresh your recollection?

9              THE WITNESS:  Yes, it does.

10       Q.    And did you advise someone over in the forensics

11   bureau that you suspected my client may have been bleeding?

12       A.    Just that it's a possibility.

13       Q.    I said that, did you advise them that you

14   suspected he may be -- may have been bleeding?

15       A.    I don't see that anywhere on here, sir.  I may

16   have.  I may have.

17       Q.    I'm just directing your attention to the first

18   paragraph on that document.

19       A.    Okay, yes.

20       Q.    Now, Detective, other than what you testified

21   about, did you ever at any time learn that my client's

22   blood, skin fragments, sweat or saliva had been found on

23   anything else recovered from the scene other than what we

24   have talked about?

25             MS. ABDI:  Objection.

1        THE COURT:  All right, a lot of that is

2   hearsay.  I am going to let -- give a little leeway on

3   having the detective testify as to what's in his file.

4   But make it very, very simple, and separate the

5   sentences.

6        MR. MILLMAN:  Certainly, your Honor.

7   Q.   Detective, would it be fair to say that as the

8   investigating detective in the case, you were the person in

9   charge of the investigation?

10  A.   Yes, sir.

11  Q.   And would it also be fair to say that as the

12  investigating detective, any evidence obtained in the course

13  of the investigation would have been communicated to you in

14  one form or another?

15  A.   Yes.

16       THE COURT:  Did there come a time that you

17  were aware of certain forensics residues of the

18  evidence were found in this particular case; is that

19  true?

20       THE WITNESS:  Yes, sir.

21       THE COURT:  What were those residues?

22       THE WITNESS:  I believe there was blood found

23  in the car that came back to the defendant.

24       THE COURT:  Anything else?

25       THE WITNESS:  I believe --

Det. J. Cereghino - People - Cross     1026

1           THE COURT: If you know.

2           THE WITNESS: I don't believe there's

3      anything else, no.

4           THE COURT: Do you want to lead him on

5      anything else, counsel?

6           MR. MILLMAN: Just one moment, your Honor.

7      No, I actually -- that would satisfy me.

8      Q.   Detective, am I correct that you had learned in

9  the course of your investigation that one or more witnesses

10  had seen a number of people getting in on the fight between

11  Armando and my client?

12           MS. ABDI: Objection.

13           THE COURT: Sustained.

14      Q.   Am I correct in stating, Detective, that Nancy had

15  advised you that three other individuals had began to kick

16  and punch the victim Armando?

17           MS. ABDI: Objection.

18           THE COURT: Sustained.

19      Q.   Detective, when you went to the scene that night,

20  can you describe the lighting conditions?

21      A.   It was -- it was dark, but either before I got

22  there or right after I got there, we had the departmental

23  light truck come to illuminate a good portion of the area.

24  It didn't cover the entire area all the way down to 163, the

25  defendant's house where the knife was found against the

J.H.

1    curb.  It didn't go down that far.  But with the aid of the

2    light truck, it wasn't too bad.

3                    THE COURT:  What's a light truck?

4                    THE WITNESS:  A light truck has numerous

5         lights on it that would illuminate an area.

6                    THE COURT:  Spotlights?

7                    THE WITNESS:  Yes, sir.

8                    THE COURT:  Large spotlights?

9                    THE WITNESS:  Yes, sir.

10                   THE COURT:  Okay, go ahead.

11        Q.   Detective, did you have one or more light trucks

12   at the scene during the time that you were there?

13        A.   I believe we only had one, and it was there.

14        Q.   And was that parked on the north portion or

15   northern portion of 180 Kinkel Street?

16        A.   I believe it was, yes, sir.

17        Q.   Now, Detective, did you have an opportunity to

18   actually stand on the front lawn of 180 Kinkel Street while

19   you were there?

20        A.   Yes, sir.

21        Q.   Now, am I correct in stating that just south of

22   180 Kinkel Street, there is an overhead street light?

23        A.   Yes.

24        Q.   A structure?

25        A.   Right.

J.H.

Det. J. Cereghino - People - Cross     1028

1      Q.    Did you happen to notice if that was working when

2    you were there?

3      A.    I honestly don't recall.

4      Q.    And when you stood on the lawn of 180 Kinkel

5    Street, did you notice that the lights from 180 Kinkel

6    Street were set off and came on when you walked on the lawn?

7                 MS. ABDI:  Objection.

8                 MR. MILLMAN:  Judge, that goes right towards

9          the lighting conditions at the time.

10                THE COURT:  Are you aware of any activating

11         time device that sets off lighting on 180 Kinkel

12         Street?

13                THE WITNESS:  I don't recall whether there

14         were motion activated or timed.  I don't recall the

15         lights.

16     Q.    Do you recall seeing any lights coming from 180

17   Kinkel Street at any time?

18                MS. ABDI:  Objection.  What time?

19                MR. MILLMAN:  While he was there, your Honor.

20                MS. ABDI:  Objection.  Relevance.

21                MR. MILLMAN:  Relevance?  It's the lighting

22         conditions to the murder scene, your Honor.

23                THE COURT:  Just one second.  Was -- you are

24         going to have to -- I'm going to let you get into the

25         area, but you are going to have to rephrase it, and you

Det. J. Cereghino - People - Cross     1029

1        do have different time periods here.

2                    MR. MILLMAN:  Certainly, certainly.

3            Q.    Detective, when you were present at the scene on

4        the night of September 28th of 2010, approximately how many

5        times did you walk on the lawn of 180 Kinkel Street?

6            A.    Two or three times maybe.

7            Q.    On any of those occasions, did you notice a light,

8        and I'm excluding any lights that may have been inside the

9        house, a light shining on or illuminating the front yard of

10       that property?

11           A.    I vaguely recall there being a light by the front

12       of the house.

13           Q.    Now, you spoke to a number of witnesses --

14       withdrawn.

15                   You spoke to witnesses that advised you that

16       Misael had pointed a gun at members of the crowd; am I

17       right?

18                   MS. ABDI:  Objection.

19                   THE COURT:  Sustained.

20           Q.    Detective, did you ever investigate Misael for

21       aiding and abetting a murder in connection with this

22       incident?

23                   MS. ABDI:  Objection.

24                   MR. MILLMAN:  Your Honor, it goes directly

25               toward the detective's dealings with Misael and whether

J.H.

1    or not he would have had reason to look further into

2    other suspects. I do believe I am permitted to get

3    into this, Judge.

4         THE COURT: I'm going to read to you, ladies

5    and gentlemen, now a section of law. It says criminal

6    liability for the conduct of another. When one person

7    engages in conduct which constitutes an offense,

8    another person is criminally liability for such conduct

9    when, acting with the mental culpability required for

10   the commission thereof, he solicits, requests,

11   commands, importunes or intentionally aids such person

12   to engage in such conduct.

13        Now, this is your final judgment, because you

14   are the trier of the facts. But if you determine on

15   all of the evidence in this case that Berrios fired a

16   shot not simply to have a one-on-one confrontation but

17   fired a shot to prevent other people aiding the

18   deceased, then an inference may be drawn if he had the

19   intent to kill the deceased that he was aiding and

20   abetting the defendant in this case by not allowing

21   people to come to the aid of the deceased.

22        It's a very difficult concept, but one, you

23   must have the intent, you must act with the same mental

24   state as the primary actor and as a result of that

25   having that culpability, you solicit, request,

J.H.

1       importunes or intentionally aids such person to engage

2       in such conduct.

3               Is that where you are going, counsel?

4               MR. MILLMAN:  Yes, in part, your Honor.

5               THE COURT:  Then I'll let you get into it.

6   CROSS-EXAMINATION

7   BY MR. MILLMAN:  (CONTINUED)

8       Q.   Detective, from speaking with Mr. Berrios and the

9   other witnesses, did you conclude that Mr. Berrios had held

10  out a handgun and prevented others from entering into what

11  was happening between Armando Villatoro and my client?

12              MS. ABDI:  Objection.

13      A.   Yes, sir.

14              THE COURT:  Sustained.

15      Q.   And you never did --

16              THE COURT:  By the way, it's up to you to

17          conclude that if you do.  You're the finder of the

18          facts.

19      Q.   Detective, who was the lead detective on the rape

20  charge?

21              THE COURT:  If you know.

22      A.   Subsequently it was assigned to Detective Trujillo

23  from the Special Victim's Squad.

24      Q.   But initially would it be fair to say that you

25  were in charge of it?

Det. J. Cereghino - People - Cross     1032

1     A.    No, I wouldn't say that.

2           Q.    You were involved in the investigation of it to

3     some extent; would that be fair to say?

4           A.    When the possibility arose that 10 year old

5     Jennifer might have been sexually violated, I requested the

6     assistance of our Special Victims' Squad.  That's their

7     field of expertise.  And I was going to handle the homicide

8     end of it.

9           Q.    Now, how long after you were working on the

10    homicide matter did the possibility arise to your knowledge

11    that she may have been a victim of a sexual offense?

12          A.    The possibility arose almost immediately.

13          Q.    Now, Detective, my client was arrested on November

14    26th of 2010, right?

15          A.    Yes, sir.

16          Q.    Am I correct in stating that he was never charged

17    with the rape until late January of 2011, right?

18                THE COURT:  If you know.

19          A.    I don't recall.  I don't recall when the grand

20    jury was, no, sir.  I'm not sure exactly when he was charged

21    with that crime.

22          Q.    Would it be fair to say he was never charged with

23    the rape until it was presented to the grand jury?

24                THE COURT:  By you.

25          A.    Yes, I did not charge him with the rape.

J.H.

Det. J. Cereghino - People - Cross      1033

1      Q.    And to you knowledge, did anyone at the Nassau

2   County Police Department initiate a charge for it prior to

3   the time it was presented to the grand jury?

4      A.    No.

5                  MR. MILLMAN:  That's all I have.  Thank you.

6                  THE COURT:  Is that it?

7                  MS. ABDI:  I have nothing further.

8                  THE COURT:  You can step down.

9                  THE WITNESS:  Thank you, your Honor.

10                 (The witness was excused.)

11                 THE COURT:  Any further witnesses?

12                 MS. ABDI:  Judge, I would just like to mark

13       two items into evidence.

14                 THE COURT:  Any objection, counsel?

15                 MR. MILLMAN:  I suspect what they are, but I

16       need to hear formally what it is that they are.  I

17       don't think so.

18                 MS. ABDI:  I'll mark them for ID first.  I

19       would like to have this marked as People's Exhibit 79

20       for identification.  It's a registration record.

21                 THE COURT:  Have you seen that registration

22       record?

23                 MR. MILLMAN:  Yes, I have.

24                 THE COURT:  Any objection?

25                 MR. MILLMAN:  No.

J.H.

Proceedings                    1034

1          THE COURT:  That's received, marked without

2     objection.

3          (People's Exhibit 79 is received and marked

4     in evidence.)

5          THE COURT:  With more particularity, that

6     concerns the automobile that was towed to the E

7     building and subsequently tested?

8          MS. ABDI:  Yes, your Honor.  I would like to

9     actually -- I can read from it in pertinent part with

10    your Honor's permission.

11         THE COURT:  Let me see it.  Read it all.

12         MS. ABDI:  Do you want me to read the whole

13    front page, your Honor?

14         THE COURT:  It's only a paragraph.

15         MS. ABDI:  Okay.  I, Maryanne Klein, do

16    hereby certify and authenticate that provided by Rule

17    4518 Subdivision A or C of the Civil Practice Law and

18    Rules that the registration abstract annexed hereto is

19    an exact reproduction of the original electronic record

20    of the New York State Department of Motor Vehicles

21    which has been delegated to my possession, custody and

22    control by the commissioner of motor vehicles.  I

23    further certify that the original registration abstract

24    annexed hereto of plate EWB6427 was made in the regular

25    course of business of the New York State Department of

1     Motor Vehicles, that it is the regular course of

2     business for the Department of Motor Vehicles to make

3     such record and that the entries in such record are

4     made at the time of the reported act, transaction or

5     event or within a reasonable time thereafter.

6              With respect to the plate EWB6427, it's a '98

7     Acura, gray.  The registrant information is Diana

8     Bonilla with address of 163 Kinkel Street, Westbury,

9     New York.

10             THE COURT:  You have another exhibit that you

11    wish to introduce?

12             MS. ABDI:  Yes, your Honor.  I would also

13    like to have this item marked as People's Exhibit 80.

14    It's a certified transcript of birth, birth

15    certificate.

16             THE COURT:  I just want to know if there's

17    any objection.

18             MR. MILLMAN:  No objection, your Honor.

19             THE COURT:  Without objection, it's received.

20             (People's Exhibit 80 is received and marked

21    in evidence.)

22             THE COURT:  That's the birth certificate of

23    who?

24             MS. ABDI:  Jennifer Carolina Villatoro, in

25    part, date of birth, December 14th, 1999.

1        THE COURT: Any other witnesses by the

2    People?

3        MS. ABDI: Your Honor, the People rest.

4        THE COURT: People have rested their direct

5    case. As a consequence, as I said to you before, we

6    are going a little faster than I anticipated, and I

7    think it's to everybody's best interest that we adjourn

8    until Wednesday morning at which time we will continue

9    this particular case.

10        When I charge you, ladies and gentlemen, my

11    charge will be two parts. One is a general charge

12    concerning rules of law applicable to all criminal

13    cases. The second part is a charge containing the

14    rules of law applicable and pertinent to the counts in

15    this indictment which you are to deliberate on.

16        I don't know when I'm going to do this. I

17    don't know whether or not I can get all of this done by

18    Friday so that you may be able to start your

19    deliberations on Friday. A better course of action

20    would be to see how far we go, and if I can give you

21    these general rules of law on Friday and then the first

22    thing Monday morning, you can get the rules of law with

23    regard to the specifics of the indictment, that might

24    save a little time on Monday so you'll have more

25    deliberative time on Monday. I haven't decided what

J.H.

Proceedings                                    1037

1    I'm going to do yet except to say we are proceeding

2    faster than I thought.

3              Remember the admonitions I have given you,

4    and I'll see you Wednesday at 9:30.

5              Personally, I have been asked by the court

6    officer that some of you are a little bit confused as

7    to what you may do tomorrow.  You can do anything you

8    want.  All I want is you back here at 9:30 on

9    Wednesday.  It's as simple as that.

10             Is there a specific question anyone wants to

11   ask me?

12             A JUROR:  I spoke with the other jurors, and

13   we were just concerned when we have to bring a document

14   to our job normally to indicate we were at jury duty,

15   it normally states the start date and the end date, or

16   are you going give us certain dates and not put

17   tomorrow's date?  I would recommend --

18             THE COURT:  Just one second.  As far as I'm

19   concerned, I've continued this case until Wednesday,

20   and your jury service will be from the start of this

21   case until the end, including Tuesday.  That's as far

22   as I'm concerned.  Of course, someone else may scream

23   at me, but that's as far as I'm concerned.

24             (Whereupon, the jury exits the courtroom.)

25             MR. MILLMAN:  Your Honor, I do have a motion.

1      I don't know if you want to hear that now?

2                  THE COURT:  Why not?

3                  MR. MILLMAN:  Your Honor, I have an

4      application pursuant to Section 290.10 of the Criminal

5      Procedure Law for a trial order of dismissal.  I

6      believe that the District Attorney's office has failed

7      to make out a case demonstrating that my client was the

8      one who had actually stabbed the victim here.  There

9      was no -- not a single eyewitness was able to testify

10     to having seen the stabbing despite many people being

11     present.  Additionally, there is --

12                 THE COURT:  I remember watching a movie a

13     long time ago.

14                 MR. MILLMAN:  Yes.

15                 THE COURT:  With Henry Fonda.  He played

16     Abraham Lincoln in Lincoln's early days as a lawyer.

17     And Lincoln was saying he tried a case once, and he

18     asked a witness, did you see the victim's ear bitten

19     off?  He says, I know it was bitten off.  How do you

20     know it if you didn't see it?  Because I saw the guy

21     spit it out.

22                 Now, the answer seems to me this trial is

23     replete with testimony, if credited, that the defendant

24     and victim were fighting.  No one else was in that

25     particular fight.  The ability to be mobile would be

Proceedings                                    1039

1     limited to roughly a minute.  That testimony was from

2     the medical examiner after the major stab wounds.

3           Certainly the People have made out a prima

4     facie case, and your motion under the first count is

5     denied.

6           MR. MILLMAN:  And I do have a motion with

7     regard to on the rape charge as well.  I believe that

8     the evidence, particularly the evidence concerning

9     penetration, is insufficient as well.  I believe that

10    aside from the fact that I believe that the victim's

11    testimony may even rise to the level of not being

12    credible as a matter of law, additionally she indicated

13    that she did not see the defendant's penis, and also

14    she had given numerous inconsistent statements to the

15    police about what happened.

16          So I'm also asking for a trial order of

17    dismissal with regard to the rape charge and the

18    related sexual offenses.

19          THE COURT:  Well, the victim -- under the

20    law, sexual intercourse occurs upon penetration,

21    however slight.  The victim testified to this, and the

22    examining pediatrician testified to this.  Of course,

23    you can argue whether or not it was a penis or finger.

24    But that's up to the jury.  Anything else?

25          MR. MILLMAN:  No, your Honor.

J.H.

Proceedings                          1040

1          THE COURT:  All right, I know you have a

2     problem with one witness.

3          MR. MILLMAN:  Yes, your Honor.

4          THE COURT:  And my chambers will be open to

5     you to facilitate your affectation of your right of

6     composery process, and I will do whatever I can to help

7     you tomorrow.

8          MR. MILLMAN:  Would you mind if that be done

9     by order to show cause if I were to make that?

10          THE COURT:  Will you be available tomorrow?

11          MS. ABDI:  Yes.

12          THE COURT:  You don't have to make it an

13     order to show cause.  She's available tomorrow.  Once

14     you have the paperwork, come down.  We'll discuss it,

15     and if necessary, I'll sign it.

16          MR. MILLMAN:  Thank you.

17          (Whereupon, the trial is adjourned to

18     December 14th, 2011.)

19

20

21

22

23

24

25

1041

1    STATE OF NEW YORK  :  NASSAU COUNTY

2       SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5            -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                        Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                          December 14, 2011
                            262 Old Country Road
11                          Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice

14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                   For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                     For the Defendant
23
                          JOANNE HORROCKS, CSR
24                        Senior Court Reporter

25

Proceedings                              1042

1        THE CLERK:  Case on trial, People of the

2    State of New York versus Ulises Bonilla, Indictment

3    202N of 2011.  All parties present including the

4    defendant and the Spanish interpreter.  There are no

5    jurors present at this time.

6        THE COURT:  Does anyone want to put anything

7    on the record before we bring the jurors out?

8        MR. MILLMAN:  Yes, your Honor.  Just a couple

9    of things.  First, I just want the record to reflect

10   that I have provided counsel with two pages of Rosario

11   with regard to the witnesses that I will be calling.

12   The first page is notes that I made while speaking to a

13   witness, and my writing is illegible.

14       I spoke with counsel beforehand.  I advised

15   her of what it is I wrote.  I can place it on the

16   record if that helps too.

17       THE COURT:  Do you understand the notes?

18       MS. ABDI:  Counsel had interpreted them for

19   me.  I was just unclear as to the date that was being

20   spoken about in the notes.

21       MR. MILLMAN:  Oh, okay.  The date that was

22   being spoken about in the notes is the 28th.  So it's

23   the date of the incident, but it's the afternoon,

24   before he went to the hospital.  Let me just read --

25       THE COURT:  Just one second.  Is that

Proceedings                                    1043

1    acceptable?

2              MS. ABDI:  Yes.

3              THE COURT:  She understands the notes.  You

4    need not go any further.

5              MR. MILLMAN:  And the second page is a

6    statement of Evan Grover, G-R-O-V-E-R.

7              The other item I want to place on the record

8    is that I had served a subpoena on Nassau University

9    Medical Center for records pertaining to Jennifer

10   Villatoro, I believe, covering a two-month period.  I

11   have with counsel reviewed the records that were sent

12   in response to that subpoena, and they contain nothing

13   in addition to the records that were previously

14   provided by the District Attorney's office.  So I just

15   wanted to make that clear also.

16             And I was also offering into evidence the

17   medical records of my client.  I'll do that at the

18   appropriate time.  I don't know if you would prefer

19   that it be marked and stipulated to now?

20             THE COURT:  And you are talking about the

21   medical records allegedly occurring sometime before the

22   alleged altercation where he cut his finger?

23             MR. MILLMAN:  No, the medical records

24   actually are a visit my client made to the hospital

25   sometime after he had injured his finger at work that

Proceedings                    1044

1    day. It is before the incident occurred on the same

2    day --

3              THE COURT: But it's concerning a bruised

4    finger?

5              MR. MILLMAN: A cut, lacerated.

6              THE COURT: It has nothing to do with whether

7    or not he went to the hospital concerning any injuries

8    sustained in the altercation?

9              MR. MILLMAN: No. That's a different issue.

10   This pertains a visit to the hospital earlier. But

11   obviously in light of the issues with the handle having

12   his blood on it, that is the reason that I am

13   introducing it.

14             THE COURT: Okay.

15             MS. ABDI: And I have no objection as far as

16   the authenticity of those medical records.

17             COURT OFFICER: Jury entering.

18             (The jury enters the courtroom.)

19             THE CLERK: Let the record reflect the

20   presence of the jurors. Both sides consent to seating

21   and waive a reading of the roll?

22             MS. ABDI: Yes.

23             MR. MILLMAN: Yes.

24             THE CLERK: Thank you.

25             THE COURT: All right, ladies and gentlemen,

Proceedings                                    1045

1    I hope you had a pleasant day off. It won't -- I just

2    want to give you something now that would -- may affect

3    your schedules. It's not going to be too long from now

4    that you are going to be deliberating on this

5    particular case.

6              Now, during the course of the trial, we tried

7    to put no restrictions on your activity, which means if

8    you have a break and if you want to call your business,

9    if you want to do computer work or something like that,

10   we don't care. During deliberations, that will not be

11   the case. During deliberations, you will not have any

12   contact with the outside at all during deliberations.

13   And as an incident to that, our court officers will

14   take any cell phones that you might have. You will not

15   be in cognito. If there is an emergency, we will get

16   to you. Honey, when you come home tonight, bring the

17   dry cleaning is not an emergency.

18             Do you have any witnesses?

19             MR. MILLMAN: Yes, your Honor.

20             THE COURT: We're on the defendant's case

21   now.

22             MR. MILLMAN: At this time the defendant

23   calls Ferman Nunez.

24             THE COURT: Before we go any further, do you

25   speak English?

J.H.

Proceedings                              1046

1          THE WITNESS:  A little bit.  If you have a

2    translator, that's good.

3          THE COURT:  How long will it take to get your

4    equipment?

5          THE INTERPRETER:  I'm sorry?

6          THE COURT:  How long will it take to get your

7    equipment?

8          THE INTERPRETER:  I have to get to the office

9    and back.

10         THE COURT:  Go get it.

11         We are going to give you your oath now that

12    the interpreter here is.

13   F E R M A N  N U N E Z, a witness called on behalf of the

14    Defense, after having been first duly sworn by the

15    Clerk of the Court, was examined and testified upon his

16    oath through the interpreter as follows:

17         THE CLERK:  In a loud, clear voice, please

18    state your name, spell your last.

19         THE WITNESS:  Ferman Nunez.

20         THE CLERK:  Spell your last name.

21         THE WITNESS:  Nunez, N-U-N-E-Z.

22         THE CLERK:  And county of residence?

23         THE WITNESS:  Nassau.

24   DIRECT EXAMINATION

25   BY MR. MILLMAN:

F. Nunez - Defense - Direct        1047

1        Q.   Good morning, Mr. Nunez.  Mr. Nunez, where do you

2    currently work?

3                  THE INTERPRETER:  I didn't hear that.

4        Q.   Where do you currently work?

5        A.   994 Prospect Avenue, Westbury, New York.

6        Q.   And what is the name of the business there?

7        A.   Westbury Deli, Inc.

8        Q.   Are you the owner?

9        A.   Yes.

10        Q.   Were you the owner on September 28th of 2010?

11        A.   Yes.

12        Q.   Does the -- withdrawn.

13             On September 28th, 2010, did your deli contain a

14    video camera?

15        A.   Yes.

16        Q.   And are you the one who has worked that video

17    camera?

18        A.   Yes.

19        Q.   And was it in operating condition on September

20    28th of 2010?

21        A.   Yes.

22        Q.   And you have used that video camera to record

23    images within the deli?

24        A.   Yes.

25        Q.   And have you seen on prior occasions that the

J.H.

F. Nunez - Defense - Direct          1048

1  | video camera accurately depicts the deli and what's taking

2  | place within the deli at the time?

3  |      A.    Yes.

4  |      Q.    And the video created a tape or recording from

5  | what is recorded; is that correct?

6  |      A.    Yes.

7  |      Q.    And does the tape itself or the result, the

8  | recording itself, contain an image of the date and time?

9  |      A.    Yes.

10 |      Q.    And have you determined that the recording

11 | accurately depicts the date and time that are reflected on

12 | the recording compared to the time that it's being recorded?

13 |      A.    Yes.

14 |                MR. MILLMAN:  Your Honor, may we approach

15 |           just for a moment?

16 |                THE COURT:  You don't have to approach.  At

17 |           this particular time, do you wish to introduce a tape?

18 |                MR. MILLMAN:  Yes.

19 |                THE COURT:  Have you consented to this, or do

20 |           you need to have the witness view the tape to

21 |           authenticate it?

22 |                MR. MILLMAN:  My understanding, Miss Abdi

23 |           will let me know if I am wrong, we had stipulated, but

24 |           I will let her speak.

25 |                THE COURT:  If you want to introduce the tape

J.H.

F. Nunez - Defense - Direct          1049

1     by consent, fine.  If you want the witness to

2     authenticate the tape, that's fine too.  Show it to the

3     witness.  Turn the TV monitor around so it cannot be

4     shown to the jury.  There's no audio on that, I assume?

5               MR. MILLMAN:  That's correct.  But first I

6     would inquire as to whether or not counsel would

7     stipulate this into evidence.

8               MS. ABDI:  Judge, I would just like him to

9     just make sure we're talking about the same video.  I

10    would like him to just look at the video.

11              THE COURT:  How long did that take?

12              MR. MILLMAN:  I believe a minute.

13              THE COURT:  Okay.  Mark the tape for

14    identification.

15              (Defendant's Exhibit G is marked for

16    identification.)

17              THE COURT:  I don't want to excuse the jury

18    unless it's absolutely necessary.  Have him view the

19    tape and turn the monitor around.  Do you know what I

20    am talking about?  So the jury can't see.

21              MS. ABDI:  I know what you are talking about.

22              THE COURT:  Or turn the TV off.

23              MS. ABDI:  I'll have him watch on the laptop.

24              THE COURT:  I want you to go over there.

25              THE WITNESS:  To see if that's my deli?

J.H.

1        THE COURT:  Well, yes.

2        Q.    I'm going to ask you to take a look at what's been

3    marked as, I believe, it's Defendant's G for identification.

4    Do you see pretty much what's depicted there?

5        A.    Yes.

6        Q.    Without talking about what's depicted within the

7    image, do you recognize the image?

8        A.    The image is of the store, yes, but not the

9    people.

10       Q.    And that a fair and accurate representation of the

11   recording that is made from the surveillance camera that you

12   have within the deli?

13       A.    Can you repeat that?

14       Q.    Certainly.  Is that a fair and accurate

15   representation of the recording made from your surveillance

16   camera in the deli?

17       A.    Yes.

18       Q.    And is the date and time depicted on that?

19       A.    Yes.

20       Q.    And is that the way the date and time appears on

21   recordings that you have reviewed of recordings made at your

22   deli?

23       A.    Yes.

24       Q.    And what is the time period that -- withdrawn.

25             What is the date that's indicated?

F. Nunez - Defense - Direct        1051

1        A.    9-28.

2        Q.    Do you see a year?

3        A.    2010.

4        Q.    And what is the time stamped that's depicted on

5    that tape as of the time?

6        A.    21 would be -- what time would that be?

7               THE COURT:    21?  9 p.m.

8        Q.    And that's 21:00; is that correct?

9        A.    Yes.

10       Q.    And what is the time depicted -- first, what is

11   the date depicted at the end of this recording?

12       A.    9-29.

13       Q.    Of 2010?

14       A.    Yes.

15       Q.    And the recording contains that entire period of

16   time?

17       A.    Yes.

18               MR. MILLMAN:    Your Honor, at this time I

19           would move it into evidence.

20               THE COURT:    People?

21               MS. ABDI:    Just one question.

22   VOIR DIRE EXAMINATION

23   BY MS. ABDI:

24       Q.    The last time period on that tape is 12:28 a.m. on

25   9-29; is that correct?

J.H.

F. Nunez - Defense - Direct        1052

1    A.    Yes.

2              MS. ABDI:  I have no objection.

3              THE COURT:  All right, it is received without

4    objection.

5              Now, what is the purpose of introducing the

6    tape at this particular time?

7              MR. MILLMAN:  Your Honor, the purpose is

8    related and subject to connection through another

9    witness.

10             THE COURT:  That's what I wanted to get.

11   It's subject to connection through another witness.

12   Okay.  Do you have anything else of this witness?

13             MR. MILLMAN:  No.

14             THE COURT:  Do you have any cross?

15             MS. ABDI:  No.

16             THE COURT:  Thank you, sir.

17             THE WITNESS:  Okay, thank you.

18             (Defendant's Exhibit G, previously marked for

19   identification, is received and marked in evidence.)

20             THE COURT:  Next witness.

21             MS. ABDI:  Defendant calls Diana Bonilla.

22             THE WITNESS:  Hello.

23

24

25

D. Bonilla - Defense - Direct      1053

1   D I A N A   B O N I L L A, a witness called on behalf of the

2         Defense, after having been first duly sworn by the

3         Clerk of the Court, was examined and testified upon her

4         oath as follows:

5               THE CLERK:  In a loud, clear voice, please

6         state your name and spell your last.

7               THE WITNESS:  Diana Bonilla, B-O-N-I-L-L-A.

8               THE CLERK:  And your county residence?

9               THE WITNESS:  163 Kinkel Street.

10              THE CLERK:  Just your county residence.

11              THE WITNESS:  Nassau.

12              THE COURT:  Based upon what I've heard so

13        far, I assume you have no trouble understanding

14        conversational English; is that true?

15              THE WITNESS:  Yes.

16              THE COURT:  Good.

17   DIRECT EXAMINATION

18   BY MR. MILLMAN:

19        Q.   Good morning, Miss Bonilla.

20        A.   Good morning.

21        Q.   Miss Bonilla, where do you currently reside?

22   Where do you live?

23        A.   163 Kinkel Street in Westbury, New York.

24        Q.   And with whom do you reside there?

25        A.   With my father, my father, my sister-in-law and

J.H.

D. Bonilla - Defense - Direct      1054

1    her kids.

2        Q.   Who is your sister-in-law?

3        A.   My brother's girlfriend.

4        Q.   And what is her name?

5        A.   Zeida.

6        Q.   What is her last name?

7        A.   Bonilla.

8        Q.   And even though her last name is Bonilla, no

9    relation; is that correct?

10       A.   Yes.

11       Q.   And you said and her children?

12       A.   Yes.

13       Q.   What are their names?

14       A.   Abbey, Lisa, Dora and Andrea.

15       Q.   Who is Andrea's father?

16       A.   Ulises.

17       Q.   Ulises?

18       A.   Yes.

19       Q.   And how old is Andrea?

20       A.   Five.

21       Q.   Ulises Bonilla is your brother; is that correct?

22       A.   Yes.

23       Q.   And just, now, a formality, but can you just point

24   him out and identify him?

25       A.   Right there, the blue shirt.

D. Bonilla - Defense - Direct        1055

1            MR. MILLMAN:  I ask the record to reflect the
2      identification of the defendant.
3            THE COURT:  Yes.
4      Q.    How long have you lived at 163 Kinkel Street?
5      A.    I don't know exactly.  Maybe like 12 or 13 years.
6      Q.    And do you know somebody named Jennifer Villatoro?
7      A.    Yes, I do.
8      Q.    And how do you know her?
9      A.    She lives up the block from me, like five houses
10     down.
11     Q.    And do you know how old she is?
12     A.    Not exactly.
13     Q.    Do you also know Nancy?
14     A.    Yes, I do.
15     Q.    And where -- do you know Jennifer Villatoro's
16     address?
17     A.    No, I don't, not exactly the address.
18     Q.    How many houses from you is her house located?
19     A.    About five.
20     Q.    During the summer of 2010, how often did you see
21     Jennifer Villatoro?
22     A.    Well, I always used to see her outside.  She will
23     be outside playing or riding a bike or something.
24     Q.    With whom would she be playing?
25     A.    I believe it's her brother and some other kid.  I

D. Bonilla - Defense - Direct      1056

1    don't know his name.

2         Q.   Anybody else?

3         A.   Um-um.

4              THE COURT:   Is that a no?

5              THE WITNESS:   No, yes.

6              THE COURT:   Yes, it's a no?

7              THE WITNESS:   Yes, it's a no.

8         Q.   Where do you see her playing?

9         A.   By in front of her house down the block.

10        Q.   Anywhere else?

11        A.   No.

12        Q.   And when generally did you see her playing around

13   the block near her house during the summer of 2010?

14        A.   When?

15        Q.   Yes, what time of day?

16        A.   In the daytime, afternoon.

17        Q.   And what, if any, interaction did you observe

18   between your brother Ulises and Jennifer Villatoro during

19   the summer of 2010?

20        A.   None.

21        Q.   Did you see them say hi to each other from time to

22   time?

23        A.   Once in awhile hi or bye, you know, if we see her

24   pass by the house or something.

25        Q.   Did you ever observe her speaking to your brother

D. Bonilla - Defense - Direct      1057

1     in any extended conversation, and by extended, I mean more

2     than five minutes long?

3          A.   No, I never seen them.

4               THE COURT:  How old are you?

5               THE WITNESS:  How old am I?  Nineteen.

6               THE COURT:  In the summer of 2010, did you

7          have an occupation, or did you go to school?

8               THE WITNESS:  Yes, I did.

9               THE COURT:  Which one?

10              THE WITNESS:  I went to BOCES for

11         cosmetology.

12         Q.   Miss Bonilla, I want to direct your attention to

13    September 24th of 2010.

14         A.   Okay.

15         Q.   Where were you at 4:30 p.m. on that day?

16         A.   I believe I was home.

17         Q.   Let me just take you back.  Ten minutes prior to

18    that time, 20 after 4, where were you?

19         A.   I was going to pick up one of my friends.

20         Q.   Now, at 4:30 --

21              THE COURT:  When he asked you where were you

22         at 4:30.  You said, I believe I was home.  Believe is a

23         common term.  Are you sure?

24              THE WITNESS:  I wasn't sure if I was home,

25         but from what I remember, I think I was home.

J.H.

D. Bonilla - Defense - Direct      1058

1          THE COURT:  Okay.

2     Q.   And who was there with you at 4:30 p.m. on

3    September 24th?

4     A.   My brother was home.

5     Q.   Did you observe how he got home?

6     A.   Yes, I did.

7     Q.   What did you observe?

8     A.   Um, Zeida dropped him off.

9     Q.   And how did Zeida drop him off?

10    A.   In her car.

11    Q.   What kind of car does she have?

12    A.   She drives a Honda.  It's like a van.

13    Q.   And where were you at the time that you observed

14   her dropping him off?

15    A.   In my living room in the computer.

16    Q.   And does that living room have a window?

17    A.   Yes, it does.

18    Q.   Does that window face out to the front, from the

19   street?

20    A.   Yes, it does.

21    Q.   At that time before -- immediately before you

22   observed your brother being dropped off, who was home with

23   you?

24    A.   Just myself.

25    Q.   What happened next?

J.H.

D. Bonilla - Defense - Direct      1059

1    A.    Um, he went upstairs to his room to change, and we
2    was going to go to the tattoo shop.

3    Q.    Let me just stop you for a moment.  His room is on
4    what floor of the house?

5    A.    Second floor.

6    Q.    Where the living room is, is that on the first
7    floor?

8    A.    Yes, it was.  Yes, it is.

9    Q.    Now, if someone were to walk from Ulises' bedroom
10   and leave the house, how many different exits can someone
11   take to do that?

12   A.    Two.

13   Q.    Can you tell me where they are?

14   A.    One's through the kitchen and one's through the
15   front door.  But in order for him to leave out either one,
16   he has to pass through the living room.

17   Q.    That's what I was going to ask you.  In order for
18   him to exit through the kitchen door, where would he have to
19   pass in relation to where you were?

20   A.    Right in front of me.

21   Q.    And when you say in front of you, where you were
22   facing?

23   A.    Yeah.

24   Q.    In order for him to exit through the front door
25   leaving from his bedroom, where would he have to pass in

D. Bonilla - Defense - Direct      1060

1    relation to where you were?

2         A.   Through the living room.

3         Q.   Where you were facing?

4         A.   Yeah.

5         Q.   Now, did there come a time when you left your

6    home?

7         A.   No.

8         Q.   Well, I'm referring to --

9         A.   Talking about after?

10        Q.   Yes.

11        A.   Okay, yes.

12        Q.   What time was it that you left?

13        A.   Around 4:35, 4:36, at that time I left my home, he

14   went with me.

15             THE COURT:   All right, so you are using you

16        in the plural?

17             MR. MILLMAN:   Well, originally I was asking

18        just her.

19             THE COURT:   Are you using you in the plural?

20             MR. MILLMAN:   Yes, your Honor.

21             THE COURT:   Okay.

22        Q.   So you and Ulises left at that time?

23        A.   Yes.

24        Q.   In between the time that you observed Ulises

25   arrive home and the time that you left with Ulises, did you

J.H.

D. Bonilla - Defense - Direct        1061

1      ever see Ulises pass in front of you?

2           A.    No.

3           Q.    And did you ever see him leave the house?

4           A.    No.

5           Q.    And how was it that you left the house with

6      Ulises?

7           A.    What do you mean how was it?

8           Q.    By what means did you leave the area of your home,

9      car, by foot?

10          A.    Oh, in a car, my car.

11          Q.    And what kind of car did you have?

12          A.    Acura Integra.

13          Q.    What color?

14          A.    Gray.

15          Q.    Are you familiar with New Cassel park?

16          A.    Yes, I am.

17          Q.    Is that also known as Bunkyreid Park?

18          A.    Yeah, I think that's the name of it.  I know it by

19     New Cassel park.

20          Q.    Where is it located?

21          A.    Like a block away from our house.

22          Q.    What streets border it; do you know?

23          A.    Broadway and Railroad.

24          Q.    How far would it take someone to walk from 163

25     Kinkel Street to the closest portion of New Cassel park?

J.H.

D. Bonilla - Defense - Direct      1062

1      A.    Less than five minutes maybe.

2      Q.    And have you, yourself, been there before?

3      A.    Yes, I have.

4      Q.    And many occasions?

5      A.    Yeah, all the time in the summertime.

6      Q.    And have you been there on many occasions on

7   Friday afternoons?

8      A.    Yes, I have.

9      Q.    What, if any, security have you observed when you

10   have gone there on Friday afternoons?

11               THE COURT:  What do you mean by that?

12               MR. MILLMAN:  Security personnel.

13               THE COURT:  Okay.

14      A.    There's a couple.

15      Q.    How many security personnel?

16      A.    About maybe four.

17      Q.    And are these security personnel uniformed?

18      A.    Yes, they have light blue T-shirts they always

19   wear.

20      Q.    And did you observe this uniform security

21   personnel, you know, between the hours of 4 p.m. and 7 p.m.

22   on Friday nights from time to time?

23      A.    Yeah.  They are always there.

24               MS. ABDI:  Objection.

25               THE COURT:  Basically what you are saying on

J.H.

D. Bonilla - Defense - Direct       1063

1     prior occasions, you observed security personnel at the

2     park during that particular time?

3            THE WITNESS:  Yes.

4     Q.   And Miss Bonilla, you said about four.  I take it

5     they weren't all in the same immediate area?

6     A.   I know they are always there because usually when

7     I used to go to the park, I would see them there.  And they

8     were my security guards from my school that I attended

9     before.

10    Q.   What I was asking specifically before is the

11    security guards that you observed on these occasions, were

12    they spread out throughout --

13    A.   Yes.

14    Q.   Let me finish the question.  Were they spread out

15    throughout the park, altogether or something else?

16    A.   No, spread out through the whole park.

17    Q.   Were they walking around or just standing?

18    A.   No, walking around.

19    Q.   When you exited your home, and I'm taking you back

20    to the time you left your home with Ulises --

21    A.   Okay.

22    Q.   -- did you both get in the car?

23    A.   Yes, we did.

24    Q.   Where were you going at that time?

25    A.   I was going to pick up a friend.  Her name is

J.H.

Case 2:16-cv-03676-JFB  Document 10-3  Filed 10/06/16  Page 150 of 433 PageID #: 1363

1    Xiomara.

2        Q.   That Xiomara Tursio?

3        A.   Yes.

4        Q.   And did there come a time where you arrive at

5    Xiomara Tursio's home?

6        A.   Yes.

7        Q.   In between the time that you left your home in the

8    vehicle with Ulises and the time that you arrive at Xiomara

9    Tursio's home, did you make any stops?

10       A.   No, I did not.

11       Q.   What happened when you arrived at Xiomara's home?

12       A.   Just called her, told her I was there, and she got

13   into the car, and we left.

14       Q.   And when you say we left, you are talking about

15   yourself, Ulises and Xiomara?

16       A.   Xiomara, yes.

17       Q.   Where did you go?

18       A.   We went to the tattoo shop.

19       Q.   Did you make any stops along the way?

20       A.   No, we didn't.

21       Q.   About what time did you arrive at the tattoo shop?

22       A.   Around maybe 5, 5:10, around that time.

23       Q.   And by the way, what is the name of the tattoo

24   shop?

25       A.   Tattoo You.

D. Bonilla - Defense - Direct          1065

1                    THE COURT:  Tattoo You?

2                    THE WITNESS:  Yeah, like Y-O-U.

3          Q.    Do you know the address?

4          A.    No, I do not.  I know it's located in Carle Place.

5          Q.    Carle Place?

6          A.    Um-hum.

7          Q.    And when you arrived there, did you enter Tattoo

8     You?

9          A.    Yes, I did.

10         Q.    Who did you enter Tattoo You with?

11         A.    With Xiomara and my brother.

12         Q.    Did you, Xiomara or your brother go anywhere from

13    the time that you exited the vehicle to the time that you

14    entered Tattoo You?

15         A.    No.

16                   THE COURT:  So all three of you stayed there?

17                   THE WITNESS:  Yeah, we stood there.  We were

18         all supposed to get a tattoo that day.  We wasn't able

19         to.

20         Q.    Had you been to Tattoo You before that time?

21         A.    Yes.

22         Q.    Had you ever been there with your brother before

23    that time?

24         A.    No.  That was my first time.  I actually

25    introduced him to Evans.

J.H.

D. Bonilla - Defense - Direct        1066

1      Q.    And since that time, have you ever been there with
2  your brother?
3      A.    No.
4      Q.    So this is the only time?
5      A.    That was the only time that he ever.
6      Q.    Can you describe the conditions at Tattoo You?
7      A.    Well, it's a very busy place, and especially on
8  Fridays or Saturdays or Sundays and weekdays, really it's
9  very packed in there.
10     Q.    You made reference to someone named Evan?
11     A.    Yes.
12     Q.    Do you know Evan?
13     A.    Yes.  He's my tattoo artist.
14     Q.    Do you actually know his last name?
15     A.    No, I do not know.
16     Q.    Can you describe him?
17     A.    Like how he looks?
18     Q.    His appearance.
19     A.    He's light skin, tall, skinny.  He has dreads.
20     Q.    He has dreads?
21     A.    Um-hum.
22     Q.    And you made reference to speaking to Evan.  What
23  did you discuss with Evan?
24     A.    Well, we all wanted to get a tattoo, and my
25  brother wanted to finish one of his arms.  So I introduce

1    him to him, and I told him, you know, he want to get

2    something done.  So he told us we could hang out for a

3    little bit.  He was trying to see if he could tattoo us.  So

4    we look around for little.  We look at he has on the wall

5    some picture frames that we can go through.  We were looking

6    at it for a little bit, and unfortunately, he wasn't --

7    couldn't tattoo us.

8              THE COURT:  I'm sorry, unfortunately what?

9              THE WITNESS:  He wasn't able to tattoo us.

10        Q.   How long have you known Evan for?

11        A.   I know him for a while now, maybe like three or

12   four years.

13        Q.   What is his position at Tattoo You?

14        A.   He tattoos.

15        Q.   He is a tattoo artist?

16        A.   Yeah.

17        Q.   And at the time that you spoke with Evan, where

18   was Ulises?

19        A.   Right next to me.

20        Q.   Where was Xiomara?

21        A.   Right next to me.

22        Q.   What, if any, conversation took place at that time

23   between Ulises and Evan?

24        A.   Well, I just introduced them and introduced each

25   other.  Evan said what his name is, and he showed him his

D. Bonilla - Defense - Direct      1068

1    arm and told him he wanted to finish something.  And Evan

2    started looking at the tattoos, and that was it.

3       Q.    When you say he showed him his arm, correct me if

4    I am wrong, do you mean that Ulises showed Evan Ulises' arm?

5       A.    Yeah.

6       Q.    Do you recall Evan making any comment about

7    Ulises' tattoo?

8       A.    I believe he did say something, but I don't

9    remember exactly the words what he said about the arm or

10   something.

11      Q.    While you were at Tattoo You, what were you doing?

12      A.    I'm sorry?

13      Q.    While you were at Tattoo You that night, what were

14   you doing?

15      A.    We was looking at the picture frames that he had

16   on the wall.

17      Q.    What was Ulises doing?

18      A.    He was with me and Xiomara, both of us.

19      Q.    What was Xiomara doing?

20      A.    We was all looking at the picture frames that he

21   has.

22      Q.    Did there come a time that you left Tattoo You

23   that night?

24      A.    Yeah.

25      Q.    How would that come about?

D. Bonilla - Defense - Direct        1069

1        A.    Well, Evans let us know that he wasn't gonna be

2    able to tattoo us that day.

3        Q.    Did he say why?

4        A.    Actually when we walk in, he was actually in the

5    middle of doing a tattoo.  He said we could hang for a

6    little while and if he was able to tattoo us, but

7    unfortunately, he wasn't.  So he let us know.

8        Q.    What I was asking more specifically is at the time

9    that he indicated to you that he would not be able to tattoo

10   you, did he tell you why?

11       A.    Yes, he did.

12       Q.    And what was the reason?

13       A.    Because he wasn't gonna be done with the tattoo

14   that he was doing any time soon.

15       Q.    And what did you do at that time?

16       A.    We left.

17       Q.    When you say we, who?

18       A.    Me, my brother and Xiomara.

19       Q.    How long were you there for?

20       A.    About two hours.

21             THE COURT:  About two hours?

22             THE WITNESS:  Yes.

23       Q.    About what time was it when you left with Ulises

24   and Xiomara?

25       A.    Around like 7, 7:05, 7:10, close.

J.H.

D. Bonilla - Defense - Direct        1070

1    Q.   During the time that you were there, did Ulises

2  ever leave your sight?

3    A.   No, he did not.

4    Q.   After you left tattoo you, where did you go?

5    A.   Home.

6    Q.   And who went with you?

7    A.   My brother and Xiomara.  We all went to my house.

8    Q.   Did you make any stops along the way?

9    A.   No.

10   Q.   I want to direct your attention to the afternoon

11  of September 28th of 2010, and more specifically,

12  approximately 5 o'clock p.m. or around that time.  What were

13  you doing?

14   A.   I was getting ready to go to school.

15   Q.   Who do you go to school with?

16   A.   Xiomara.

17   Q.   And do you pick her up?

18   A.   Yes, I used to pick her up.

19   Q.   Where does Xiomara sit?  Where did Xiomara sit

20  when you would pick her up for school?

21   A.   Front seat.

22   Q.   Had she spoken with Ulises about that on prior

23  occasions?

24              MS. ABDI:  Objection.

25              THE COURT:  Did the three of you ever get in

D. Bonilla - Defense - Direct      1071

1       the car together?

2                   THE WITNESS:  Yes.

3                   THE COURT:  Who sat where?

4                   THE WITNESS:  Xiomara always sat in the front

5           seat.

6                   THE COURT:  And your brother?

7                   THE WITNESS:  Back.

8                   THE COURT:  Okay.

9       Q.    And those were on occasions that you drove

10   Xiomara?

11      A.    Yeah.

12      Q.    Did you have a conversation with your brother

13   Ulises around that time?

14      A.    Yes, I did.

15      Q.    Where did that conversation take place?

16      A.    Right in front of my step by the door.

17      Q.    When you say the step, this is your home, 163

18   Kinkel Street?

19      A.    My house, um-hum.

20      Q.    At the time that you had the conversation with

21   your brother, what, if anything, did you notice about his

22   physical condition or appearance?

23      A.    Um, he was actually bleeding from his hand.

24      Q.    He was bleeding from his hand?

25      A.    Yes.

J.H.

D. Bonilla - Defense - Direct        1072

1    Q.   Do you recall which hand it was?

2    A.   No, I don't remember.

3    Q.   Do you recall how much blood there was?

4    A.   A lot, but I don't remember which hand.

5    Q.   And what conversation did you have with Ulises at

6    that time?

7    A.   He actually wanted me to take him to the hospital.

8    So I gave him my car keys for him to get into the car, and I

9    told him to wait for me.  And he was outside for about five

10   or six minutes.

11   Q.   Let me just stop you for a moment.  After you gave

12   him the keys to your car, did you observe him do anything?

13   A.   Yeah.  He got into the car.

14   Q.   Did you observe that?

15   A.   Yes, I did.

16   Q.   Where were you when you observed that?

17   A.   I was in the front of the door of my house.

18   Q.   Where in the car did Ulises get in?

19   A.   He sat in the back seat from the passenger.

20   Q.   The rear passenger?

21   A.   Yeah, not where I drive, the one on the side.

22   Q.   Where was the car parked at that time?

23   A.   My driveway.

24   Q.   Facing in which direction?

25   A.   Um, facing the front to the back of my house.

D. Bonilla - Defense - Direct        1073

1    Q.    So in other words, just to be clear for the jury,

2    the back of the car would be closer to the street, and the

3    front of the car would be closer to your house?

4        A.    Yeah, um-hum.

5        Q.    What, if any, sounds did you hear coming from the

6    car after that?

7        A.    Well, he was beeping because he was trying to rush

8    me, and I wasn't ready.

9        Q.    And how many times did you hear him honk?

10       A.    About twice.

11       Q.    And at that time, when you heard the honking, you

12   weren't looking at him at that time?

13       A.    Was I looking at him?

14       Q.    At that particular time, could you see if he was

15   reaching through to honk?

16       A.    No, I didn't see.  But I did come out, and I told

17   him to hold on.

18       Q.    You are smiling.  What was it that you said to

19   him, if you recall?

20       A.    I mean I don't want to -- I told him just to hold

21   on, that I was gonna be out.

22       Q.    Those were the words that you used?

23       A.    Not exactly but --

24       Q.    We're all grown-ups here.  Just to the extent that

25   you recall.

J.H.

D. Bonilla - Defense - Direct        1074

1    A.    I told him to hold the fuck up, excuse my

2    language.

3    Q.    What happened next?

4    A.    I'm sorry?

5    Q.    What happened next?

6    A.    Um, he was honking that he wanted me to rush me to

7    come out.  When I came out, he wasn't there anymore.

8    Q.    And what did you do at that time?

9    A.    I went to pick up Xiomara, and I went to school.

10   Q.    Now --

11            THE COURT:  He wasn't there at that time?

12            THE WITNESS:  When I picked him up?

13            THE COURT:  Did you take your car to pick up

14   Xiomara?

15            THE WITNESS:  Yes.

16            THE COURT:  So if he left, he left in another

17   vehicle?

18            THE WITNESS:  I didn't see if he left in

19   another vehicle.

20   Q.    When you saw Ulises -- withdrawn.

21         Is Ulises right-handed?

22   A.    Huh?

23   Q.    Is Ulises right-handed?

24   A.    I don't know if he is.  Never really paid

25   attention to what hand he writes with.

D. Bonilla - Defense - Direct        1075

1        Q.    I just want to ask you to take a look at what's
2    been marked as Defendant's G into evidence.
3               THE COURT:    You can now put that on the
4         screen.
5               MR. MILLMAN:    Yes, your Honor.    I just want
6         to find the spot that I will be asking her about.
7               Your Honor, I ask if the witness could step
8         down.
9               THE COURT:    Step down.
10              THE WITNESS:    Sure.
11       Q.    I'm just going to ask you to stand just about here
12   because I'm going to ask you to look at the screen.    Now,
13   Miss Bonilla, I'm going to play this exhibit.    I'm going to
14   ask you to look at the top left screen, and I'm going to ask
15   you if you recognize anyone.
16              THE COURT:    Now, can you isolate what you
17        play?
18              MR. MILLMAN:    Only in terms of the time.    I
19        cannot isolate the screen, the actual screen.
20              THE COURT:    So isolate it with regard to
21        time.
22              MR. MILLMAN:    Yes, that's what I'm doing,
23        your Honor.
24       Q.    I'm going to ask you if you recognize the
25   individual --

J.H.

D. Bonilla - Defense - Direct       1076

1        THE COURT:  Just, please, isolate as to time.

2            MR. MILLMAN:  I'm not sure if I'm following

3    exactly --

4            THE COURT:  If this jury wants to have this

5    read back during deliberations, I'm not going to have

6    them go through hours worth of tape.  Isolate it as to

7    time.

8            MR. MILLMAN:  Okay.

9    Q.   I'm going to ask you just tell us can you see the

10   time in the top right of the screen?

11   A.   Yes.

12   Q.   What does that indicate?

13           THE COURT:  Counsel, what does it indicate?

14           MR. MILLMAN:  21:06:18.

15   A.   Yes.

16   Q.   And the date is December 28th, 2010?

17   A.   Yes.

18           THE COURT:  That's 9:06 p.m. and some

19   seconds, correct?

20           MR. MILLMAN:  Yes.

21   Q.   Miss Bonilla, the individual wearing something on

22   his head at the bottom left, do you recognize that person?

23   A.   Yes.  That's my brother.

24   Q.   That's your brother?

25   A.   Yes.

J.H.

D. Bonilla - Defense - Direct        1077

1        Q.    What is he wearing on his head?

2        A.    A do-rag.

3        Q.    And is that the individual that just entered the

4    deli?

5        A.    Yes.

6              THE COURT:  All right, you recognized him as

7    your brother.  He was wearing a do-rag?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.

10       Q.    I'm going to ask you just watch this a little --

11   I'm going to ask you to watch the bottom right.

12             THE COURT:  Can everybody see?

13             A JUROR:  No.

14             THE COURT:  Counsel, you have to position

15   yourself so the jury can see.

16             MR. MILLMAN:  My apologies.

17       Q.    I'm going to ask you to look at the bottom right.

18   Do you recognize anyone in the bottom right portion?

19       A.    Yes, that's my brother.

20       Q.    Do you see anything on his right hand?

21       A.    Yes, I do.

22       Q.    What is that?

23       A.    Like a bandage.

24       Q.    It's on his whole hand?

25       A.    One of his fingers.

D. Bonilla - Defense - Direct      1078

1    Q.   And this is at the time is 21:08:11?

2    A.   Yes.

3    Q.   I'm going to ask you to look again at the bottom

4    right, the individual?

5    A.   My brother.

6    Q.   And do you see something on his right hand?

7    A.   Yes, I do.

8    Q.   Is that the same bandage you were referring to?

9    A.   Yes.

10   Q.   I'm just going to ask you to look at the bottom

11   left and tell me if you see anyone you recognize.  Do you

12   recognize anyone at the bottom left?

13   A.   My brother.

14   Q.   Do you see the individual -- point to where he is.

15            (The witness complied.)

16            MR. MILLMAN:  Let the record reflect the

17       individual to the left of two individuals on the top of

18       the image that is on the bottom left.

19            THE COURT:  She's identified her brother in

20       three or four different shots, correct?

21            MR. MILLMAN:  Yes, your Honor.  I just have

22       one more question before I have the witness step back

23       onto the stand.

24   Q.   Do you recognize the individual in the red sweat

25   shirt on the bottom left?

D. Bonilla - Defense - Direct        1079

1           THE COURT:  Who was the person in the red

2      shirt?

3           THE WITNESS:  His name is Henry.

4      Q.   Does he have a nickname?

5      A.   Yes, he does.

6      Q.   Can you tell us what that is?

7      A.   We called him Nigger.

8      Q.   You may step back onto the stand.

9           Miss Bonilla, I am now going to direct your

10     attention to that same day, September 28th of 2010 but later

11     on at approximately 10:20 p.m.

12     A.   Okay.

13     Q.   Where were you at that time?

14     A.   Um, I was going -- I was getting home.

15     Q.   And how were you getting home?

16     A.   With my car.

17     Q.   Same car you talked about before?

18     A.   Yes.

19     Q.   The Acura?

20     A.   Yes.

21     Q.   And what did you do with the car at that time?

22     A.   I parked it in the driveway.

23     Q.   And what did you do next?

24     A.   When I got off the car, my mother was in front of

25     the house, and I usually take a luggage to school.  So I

J.H.

D. Bonilla - Defense - Direct      1080

1    took the luggage out of my car.  And I heard screaming and

2    all whole commotion down the block.

3         Q.    Let me stop you for a moment.  You say you saw

4    your mother?

5         A.    Um-hum.

6         Q.    Where did you see your mother?

7         A.    She was in front of my steps.

8         Q.    What, if any, conversation did you have with her

9    at that time?

10        She just told me did I hear what was going on down

11   the block.

12        Q.    You described a commotion.  For the members of the

13   jury, tell us what you heard.

14        A.    Screaming.  They were banging something.

15        Q.    When you say banging, any other way you could

16   describe that?

17        A.    I don't know what they were banging, but maybe a

18   beer bottle from far.

19             THE COURT:  That's just speculation on your

20        part at this particular time; is that correct?  You

21        heard noises?

22             THE WITNESS:  Yes.

23             THE COURT:  You don't know what caused the

24        noises?

25             THE WITNESS:  No, I do not know.

D. Bonilla - Defense - Direct     1081

1      Q.   What did you do at that time?

2      A.   I went up the block to see what was going on.

3      Q.   When you say up the block, proceeding from 163

4   Kinkel Street --

5      A.   Going towards --

6      Q.   You have to wait until I finish.  Proceeding from

7   163 Kinkel Street, were you heading towards Prospect Avenue

8   or towards Broadway?

9      A.   Prospect Avenue.

10     Q.   Is that in the direction of Jennifer Villatoro's

11  house?

12     A.   Yes, it is.

13     Q.   Tell us what you observed when you head up the

14  street.

15     A.   I headed up the street, and when I got there,

16  there was a lot people fighting.  There was people against

17  the car.

18     Q.   Who did you see against the car?

19     A.   I saw Henry.

20     Q.   What was he doing?

21     A.   He had someone against the car fighting.

22     Q.   He was fighting with someone?

23     A.   Yes.

24     Q.   And did you see anybody else by the car?

25     A.   I also see Misael.

J.H.

D. Bonilla - Defense - Direct          1082

1    Q.   What was Misael doing?

2    A.   He was also fighting.

3    Q.   Do you know the person he was fighting?

4    A.   No, I do not know.

5    Q.   Did Misael have a gun in his hand at that time?

6    A.   No, he did not.

7    Q.   Did he have anything in his hand?

8    A.   No, I didn't see anything in his hand.

9    Q.   What else did you observe?

10   A.   I seen Armando hitting someone.

11   Q.   He was hitting someone?

12   A.   He had someone by the hair.  He was kneeing him in

13   the face.

14   Q.   So he got someone by the hair, and he was kneeing

15   him in the face?

16   A.   Yes.

17   Q.   At that time could you see who that individual

18   was?

19   A.   No, I wasn't able to recognize who it was.

20   Q.   What did you do at that time?

21   A.   I -- at the time I screamed for them to stop

22   fighting, and I also screamed at Armando's wife and told her

23   to call the cops.  I did not have my cell phone on me at the

24   moment, so I wasn't able to make a phone call.

25   Q.   About how many people would you say were there at

D. Bonilla - Defense - Direct      1083

1    that time?

2        A.    About seven.

3        Q.    And did any of them have weapons?

4        A.    Yes, they did have weapons.

5        Q.    What weapons?

6        A.    Um, I believe a pipe.  You could say it's called a

7    pipe.  And I saw bats, beer, beer bottles.  Anything else

8    besides that?

9        Q.    Did you observe people using these things?

10       A.    Yes.

11       Q.    On other people?

12       A.    Yes.

13       Q.    Did there come a time that you heard a loud sound?

14       A.    Yes.

15       Q.    What was that?

16       A.    A gunshot.

17       Q.    Where were you in relation to where you heard the

18   gunshot?

19       A.    Um, I don't know, like facing --

20             THE COURT:  Excuse me, where were you --

21       where was the gunshot emanating from when you heard it?

22             THE WITNESS:  Like towards Prospect way.  I

23       don't know how to explain it.

24       Q.    And at the time that you heard the gunshot, what,

25   if anything, did you see Armando do?

J.H.

D. Bonilla - Defense - Direct       1084

1       A.   Well, when I heard the gunshot, everybody ran, and

2   I did see Armando walk to in front of his house.

3       Q.   Now, when you heard the gunshot, did Armando and

4   this other individual stop fighting?

5       A.   Yes, they did.

6       Q.   What, if anything, did you notice about that other

7   individual at that time?

8       A.   Of the individual Armando was --

9       Q.   Yes.

10      A.   What do you mean?

11      Q.   Did you at that time see who it was that Armando

12   was fighting?

13      A.   No.

14      Q.   And after you heard the gunshot, what did you do?

15      A.   I walked towards my house.

16      Q.   When you say walked, what was the pace at which

17   you walked?  Was it a walk, a run?

18      A.   No, it was like I was speeding towards my house,

19   like speed walking towards my house.  I wasn't like running,

20   but I was speeding towards.

21      Q.   And was anybody else running or speed walking or

22   going with you as you were --

23      A.   Misael was behind me and Henry.

24      Q.   And where was Henry in relation to you?

25      A.   He was behind me.

D. Bonilla - Defense - Direct      1085

1    Q.    Did you see your brother at that time?

2    A.    Yes, I did.  He was in front of me.  He had

3    already walked past like in front of me and over Misael and

4    Henry with some other guys which I didn't recognize who they

5    were.

6    Q.    Did there come a time that you got to your house?

7    A.    Yes.

8    Q.    Now, when you were halfway between where the

9    fighting was and where the house is, what, if anything, did

10   you observe at that time?

11                THE COURT:  Is this going to or coming from?

12                MR. MILLMAN:  Coming from.

13   A.    Can you repeat that for me?

14   Q.    Sure.  When you were halfway between the area in

15   which you saw the fighting and where your house is, what, if

16   anything, did you observe?

17   A.    There were still people behind.

18   Q.    At that time did you observe Armando?

19   A.    He was in front of his house already when I

20   observed him.

21   Q.    And what was he doing at that time?

22   A.    Well, I seen him walk to his house and then just

23   seen him like dropped.

24   Q.    At the time at which you saw him walking, was that

25   when you were halfway between where the fighting was?

D. Bonilla - Defense - Direct        1086

1       A.    Yeah.

2       Q.    And you say saw him drop?

3       A.    Yes, I did.

4       Q.    From the time that you heard the gunshot to the
5    time that you look back and saw Armando walking on the lawn
6    when you were halfway to your house, did you see anything
7    that was happening back at Armando's house during that time?

8       A.    There was still people there.  I don't know if
9    they were fighting.  But there was still a lot of people at
10   the same spot where we had been before.

11      Q.    But what I'm asking more specifically is between
12   the time that you began to head in the direction of your
13   house and the time that you were halfway there and turned
14   around, between that time, were you looking ahead of you, or
15   were you looking behind you?

16      A.    I looked behind me for a little bit to see what
17   was going on before, and then I just kept going away
18   straight home.

19      Q.    And would it be fair to say that much of the time
20   that you were walking, you weren't looking where you were
21   going?

22      A.    Yes.

23      Q.    And would it be fair to say that you didn't see
24   everything that was happening?

25      A.    Yes.

J.H.

D. Bonilla - Defense - Direct        1087

1      Q.   What happened next?

2      A.   What happened next when I got to the house?

3      Q.   Yes.

4      A.   Well, my mother was screaming.  She wanted to know

5   what was going on.  And, you know, she told my brother to

6   get into the house.

7                  THE COURT:  She told what?

8                  THE WITNESS:  My brother to get into the

9        house, told me and my brother to get in the house.

10     Q.   Did your brother listen?

11     A.   No, we never listen to her, so we didn't listen to

12   her.

13     Q.   Where did you go at that time?

14     A.   My house.

15     Q.   And what did you?

16     A.   I got into my car.

17     Q.   Where in your car?

18     A.   Where in my car?

19     Q.   Which seat?

20     A.   The driver's seat.

21     Q.   Was there anyone else that got into your car at

22   that time?

23     A.   Yes.

24     Q.   Who?

25     A.   My brother.

J.H.

D. Bonilla - Defense - Direct          1088

1       Q.     Where did he get into your car?

2       A.     He got in the front seat.

3       Q.     Front passenger?

4       A.     Yes.

5       Q.     Who else got into your car?

6       A.     Misael.

7       Q.     Where did he get into the car?

8       A.     He got behind the passenger seat, behind not where

9    I drive, but the next one behind it.

10      Q.     The back seat?

11      A.     The back seat, yes.

12      Q.     Who, if anyone else, got into your car?

13      A.     Henry got into my car and two other persons which

14   I don't know them.

15      Q.     Where did Henry and the two other persons get into

16   your car?

17      A.     Where did they?

18      Q.     Yeah, where in the car did they go?

19      A.     In the back seat.

20             THE COURT:  What kind of a car do you have?

21             THE WITNESS:  I have an Acura Integra.  It's

22      a four door.

23             THE COURT:  And you have four adult males in

24      the back seat?

25             THE WITNESS:  Yeah.

J.H.

D. Bonilla - Defense - Direct          1089

1    Q.    And at that time did you notice whether or not

2    your brother Ulises had any blood on him?

3        A.    I did notice that he was bleeding from his ear.

4        Q.    Anywhere else?

5        A.    No, that's about it, I think, yeah, that was about

6    it.    That's all I seen.

7        Q.    And did you observe -- withdrawn.

8             On your way to your house, did you pass in front

9    of your house in the street?

10        A.    Yes.

11        Q.    Did Misael pass that area?

12        A.    Yes.

13        Q.    And did Henry pass that area?

14        A.    We all did.

15        Q.    You all did.   And that would include your brother

16    too?

17        A.    Yes.

18        Q.    What happened after you enter the car?

19        A.    I took off.   I dropped off Misael in front of his

20    house with everybody else, and my brother was the last one

21    to drop off at his girlfriend's house, Zeida.

22        Q.    Let's take it one step at a time.   You said you

23    dropped Misael off at his house?

24        A.    Yes.

25        Q.    Where is that located?

J.H.

D. Bonilla - Defense - Direct       1090

1    A.    Railroad.  I don't know exactly the address, but
2    on Railroad.

3    Q.    And at the time that you dropped Misael off at his
4    house, did you drop anybody else off the Misael's house with
5    him?

6    A.    Henry got off with him and the other three guys
7    that were in the car, well, two, because Misael's the third.

8    Q.    After that, am I correct in saying it was you and
9    your brother in the car?

10   A.    Yes.

11   Q.    Now, tell us where you went at that time.

12   A.    I went to drop him off at his girlfriend's house
13   which is located in Hicksville.  I don't know exactly the
14   address.

15   Q.    And did you go in with him?

16   A.    No, I did not.

17   Q.    So you dropped him off?

18   A.    Dropped him off.  And then on my way back, I made
19   a stop at the deli, and then I went home.

20   Q.    During time that you have lived at 163 Kinkel
21   Street, would it be fair to say that you have become
22   familiar with the property at 180 where Jennifer Villatoro
23   lives?

24   A.    Yes.

25   Q.    And have you stood at the curb of that property in

J.H.

D. Bonilla - Defense - Direct      1091

1   front of the house at night?

2        A.   Yes, I have.

3        Q.   And have you done that at numerous times in the

4   past?

5        A.   Yeah.

6        Q.   And would it be fair to say that you have done

7   that both prior to and subsequent to September 28th, 2010?

8        A.   Um-hum.

9        Q.   What, if anything, did you observe about the

10  lights at the time that you stood in the curb area in front

11  of the house?

12             MS. ABDI:  Objection.

13       A.   Well, it goes on.  I mean if a car drives past it,

14  the lights turn on.

15             THE COURT:  Just one second.  Overruled.  Do

16        you know how the lights were activated?

17             THE WITNESS:  Well, I don't know.  I do know

18        if someone pass in front of the house, the light will

19        turn on, and if a car passes by, it will also turn on.

20       Q.   At the time that you arrived at the scene of the

21  fighting, would it be fair to say that there were people on

22  the front lawn?

23       A.   There was people on the front lawn?

24       Q.   On the front lawn when you arrived at the scene

25  the first time that night.

J.H.

D. Bonilla - Defense - Direct        1092

1      A.    They weren't on the front lawn but on the

2    sidewalk.   I don't mean front inside the house.

3      Q.    And would it be fair to say were they where the

4    curb is?

5      A.    Yes.

6      Q.    And what you observed about the lights going on on

7    those occasions you observed that both before and after

8    September --

9      A.    Yes.

10     Q.    With everything that was going on that particular

11   night, did you have a specific recollection as to whether or

12   not the light was on?

13     A.    Um, she does have a big -- she has a truck.  His

14   wife does have a truck.  So what I remember was that the

15   truck was in the driveway.  So I don't remember if it would

16   have been blocking the light because it's on top of the

17   driveways.

18     Q.    Only if you remember.

19           THE COURT:  The lawyer asked you if you had a

20        specific recollection.

21           THE WITNESS:  Okay, no.

22           THE COURT:  So the answer is no?

23           THE WITNESS:  No.

24     Q.    Am I correct -- well, withdrawn.

25           Did you ever see anyone stab Armando?

D. Bonilla - Defense - Cross        1093

1      A.    No.

2      Q.    Did you ever see your brother with a knife?

3      A.    No.

4                  MR. MILLMAN:  Thank you.

5                  THE COURT:  All right, let's take five

6      minutes, ladies and gentlemen, and continue with

7      cross-examination.  Be back as soon as you can.

8                  (Whereupon, the jury exits the courtroom.)

9                  (A recess was taken.)

10                 COURT OFFICER:  Jury entering.

11                 (The jury enters the courtroom.)

12                 THE COURT:  Do you want to bring back the

13     witness.

14                 THE CLERK:  Case on trial recalled, People of

15     the State of New York versus Ulises Bonilla, Indictment

16     202N of 2011.  All parties are present, including the

17     defendant and the Spanish interpreter and the witness

18     and the jurors.

19                 Both sides waive a reading of the roll and

20     consent to the seating of the jurors?

21                 MR. MILLMAN:  Yes.

22                 MS. ABDI:  Yes.

23                 THE COURT:  Cross-examination.

24     CROSS-EXAMINATION

25     BY MS. ABDI:

J.H.

D. Bonilla - Defense - Cross     1094

1          Q.   Now, Miss Bonilla, you reside at 163 Kinkel

2    Street; is that correct?

3          A.   Yes.

4          Q.   And when you came into court here today, you knew

5    that your brother was charged with murder in the second

6    degree, correct?

7          A.   Yes, I did.

8          Q.   And when you came in here today, you knew that

9    your brother was charged with rape for an incident that

10   happened Friday afternoon, you knew that as well?

11         A.   Yes.

12         Q.   Zeida Bonilla, that's the defendant's girlfriend;

13   is that correct?

14         A.   Yes.

15         Q.   And you said she now resides at 163 Kinkel Street?

16         A.   Yes.

17         Q.   She did not always reside at 163 Kinkel Street; is

18   that correct?

19         A.   Yes.

20         Q.   In fact, she resided at 27 James Street in

21   Hicksville?

22         A.   I don't know exactly the address, but I do know

23   it's in Hicksville.

24         Q.   When did she move into your house?

25         A.   Maybe about a year, year-and-a-half, two.

J.H.

D. Bonilla - Defense - Cross          1095

1         Q.    After September 28th, 2010?

2         A.    Yes.

3         Q.    And now she resides with you?

4         A.    Yes.

5         Q.    And this individual you know as Henry Hernandez,

6    he has a nickname?

7         A.    Yes.

8         Q.    He was your boyfriend?

9         A.    No.

10        Q.    You never dated him?

11        A.    No.

12        Q.    You were friends with him?

13        A.    Yes, I was.

14        Q.    You used to hang out with him?

15        A.    Yes.

16        Q.    On September 24th of 2010, you said you were going

17   to get a tattoo that day?

18        A.    Yes.

19        Q.    You were going to get a tattoo?

20        A.    Yes.

21        Q.    Ulises Bonilla was going to get a tattoo?

22        A.    Yes.

23        Q.    And your friend Xiomara --

24        A.    Yes.

25        Q.    -- Tursios, she was going to get a tattoo as well?

D. Bonilla - Defense - Cross          1096

1       A.    Um-hum.

2       Q.    Have you gotten a tattoo before?

3       A.    Yes.

4       Q.    How many tattoos do you have?

5       A.    Nine.

6       Q.    And where have you got your tattoos?

7       A.    At Tattoo You.

8             THE COURT:  At the place.  Not on your body?

9       Q.    At what place?

10      A.    You want me to name all --

11      Q.    I mean the location of the tattoo place, not on

12      your body.

13      A.    Carle Place.

14      Q.    The same tattoo shop?

15      A.    Tattoo You, Carle Place.

16      Q.    How long does it take to get a tattoo?

17      A.    Depending on how big the tattoo is.

18      Q.    What's the longest it takes to get a tattoo?

19            THE COURT:  What was the longest that you

20      have ever experienced?

21            THE WITNESS:  About six hours.

22      Q.    And what's the shortest time you have ever gotten

23      a tattoo?

24      A.    Fifteen minutes.

25      Q.    And that would be a very -- 15 minutes for a

J.H.

1  tattoo would be a very --

2       A.   -- tiny, small tattoo.

3       Q.   Tattoo You, Carle Place it's very busy on Fridays

4  and Saturdays; is that correct?

5       A.   Yes.

6       Q.   Did you make an appointment?

7       A.   No, I didn't.  I usually never make an

8  appointment.  I usually just walk in.

9       Q.   So on that date, according to you, you walked in

10  sometime around 5, 5:30 with the expectation that all three

11  of you were going to get tattoos that day?

12       A.   Yes, because I had spoken to Evans before, but I

13  didn't give him exactly the date that I was gonna go in.

14       Q.   So now you had spoken to him before?

15       A.   Well, I always speak to him.  He's my tattoo

16  artist.  He knew I wanted get a new tattoo, but I didn't

17  tell him I was gonna go in on a certain day.

18       Q.   You did not tell him you were coming at certain

19  time or certain date?

20       A.   No.

21       Q.   It's your testimony that you went with the

22  expectation of getting three tattoos?

23       A.   Yes.

24       Q.   With the knowledge that depending on what tattoos

25  people got, it could take as much as 18 hours to get a

J.H.

D. Bonilla - Defense - Cross      1098

1    tattoo?

2        A.    Yes.   But he is not the only one does tattoos

3    there.   There's other people also that do it.   He's my

4    tattoo artist.

5        Q.    Who is else was working there that day?

6        A.    His name is Menace.

7        Q.    Do you know if for a fact he was working that day?

8        A.    Yeah, he was there.   And some other guy who does

9    piercings.

10       Q.    He does not do tattoos though?

11       A.    No.

12       Q.    So there was only according to you --

13       A.    Evans and Menace.

14       Q.    -- two people maybe that would do tattoos?

15       A.    Um-hum.

16       Q.    And it was pretty busy?

17       A.    Yes.

18       Q.    How many people were in the shop?

19       A.    About like four, four or five.

20       Q.    For a tattoo place, that's considered busy?

21       A.    Well, if you want to wait.   I mean they close

22   until they are finished whatever tattoo they are finished

23   doing.

24       Q.    So how big is the tattoo parlor?

25       A.    It's kind of big.   It's not so small.

D. Bonilla - Defense - Cross        1099

1    Q.    Are there individual rooms to get tattoos?

2    A.    No, it's like a whole open space.  They just have

3    the beddings and whatever to --

4    Q.    Is there a waiting area?

5    A.    Yes, there is.

6    Q.    Is it separate from the rest of the tattoo parlor?

7    A.    Not so much.  But there's something between to

8    separate.  There's like a counter of things they sell, and

9    there's a little waiting spot and where they do the tattoos.

10   Q.    So it's a separate room?

11   A.    No.

12   Q.    You are basically waiting in the store?

13   A.    Yeah.

14   Q.    And the four people that were there, that was in

15   addition to you three; is that correct?

16   A.    Yes.

17   Q.    And it's your testimony that you were there for

18   two hours?

19   A.    Yes.

20   Q.    And you were looking at pictures on the wall for

21   two hours?

22   A.    Not exactly two hours.  I mean we were hanging out

23   to see to see if they were gonna tattoo us.

24   Q.    Once they told you that they couldn't tattoo you,

25   that's when you left; is that correct?

J.H.

D. Bonilla - Defense - Cross        1100

1       A.    Yes.

2             Q.    It's your testimony that they didn't tell you that

3       they couldn't get to you until two hours later?

4       A.    Well, we was just hanging around.  I mean me and

5       Pippi, Xiomara, I call her Pippi, we usually always used to

6       go in and just hang out at the tattoo shop.

7             Q.    So you and Xiomara would hang out at the tattoo

8       shop?

9       A.    Um-hum.

10            Q.    All the time?

11      A.    Not all the time, but most of the time we would go

12      in.  We are really close to Evans, so we would really just

13      hang around.

14            Q.    But not Ulises?

15      A.    No, Ulises, that was his first time going there.

16            Q.    And but still it's your testimony that at 7 p.m.

17      after you had been there for two hours, that's when he

18      says -- Evan Grover says, I'm sorry, I can't get to you;

19      that's your testimony?

20      A.    Yes.

21            Q.    September 28th, 2010, what time did you get home?

22      A.    What time did I get home?

23                  THE COURT:    From where?

24            Q.    Let me back up.    Where were you on January 28th?

25      A.    I was home.

J.H.

D. Bonilla - Defense - Cross       1101

1    Q.    When were you home?

2    A.    When was I home?  What time did I get home?

3    Q.    Yes, what time did you get home?

4    A.    I went to work that day, so I got off work around

5    3 o'clock, and I was home.

6    Q.    So what time did you get home?

7    A.    3 o'clock.

8              THE COURT:  From work?

9              THE WITNESS:  3 o'clock.

10   Q.    And where do you work?

11   A.    I work at as a receptionist in an assisted living.

12   Q.    And what time do you get to work?

13   A.    7 in the morning.  I work 7 to 3.

14   Q.    And when you got home, there was nobody else home?

15   A.    No.

16   Q.    What did you do when you got home?

17   A.    I went on the computer.

18   Q.    And what were you doing on the computer?

19   A.    I was on the internet.

20   Q.    What were you doing on internet?

21   A.    I don't remember specifically what I was doing on

22   internet, but I do remember I was using the computer.

23   Q.    And what time was it that you started using the

24   computer?

25   A.    Well, I got home.  I probably grabbed something to

J.H.

D. Bonilla - Defense - Cross        1102

1   eat because that's what I usually do.  Around 3:10, 3:15, I
2   was usually using the computer.
3       Q.   How do you know it was 3:10, 3:15?
4       A.   Because I looked at the time.
5       Q.   What time did you look at?
6       A.   3:10, 3:15, around that time it was 3:10, 3:15.
7       Q.   Where did you see it?
8       A.   In my cable box.
9       Q.   Where is your cable box?
10      A.   In my living room.
11      Q.   Where is your computer compared to your cable box?
12      A.   Right next to each other.  We have the TV and
13  computer right next to each other.
14      Q.   So before you got on the computer, you made note
15  of the time?
16      A.   Well, I have to pass the TV before I go onto the
17  computer.
18      Q.   I thought it was right next to the computer?
19      A.   Well, yeah.  It's right next to it.  I have to
20  pass the TV first to get to the computer.
21      Q.   So it's your testimony that you got to the
22  computer, checked the time of the cable box?
23      A.   Before I got to the computer, I checked the time.
24      Q.   Now, how long were you on the computer?
25      A.   About hour an hour, an hour and something.

J.H.

D. Bonilla - Defense - Cross          1103

1    Q.   And nobody else was home?

2    A.   No.

3    Q.   At some point you said Ulises Bonilla came home?

4    A.   Yes.

5    Q.   Who is your brother?

6    A.   Um-hum.

7    Q.   And at that time he was living at 163 Kinkel

8    Street?

9    A.   Yes.

10         THE COURT:   Now, the testimony was you were

11   at your computer for an hour and something?

12         THE WITNESS:   Yeah, hour-and-a-half.

13         THE COURT:   Is that what the something means,

14   an hour-and-a-half?

15         THE WITNESS:   Yeah, because I'm not so sure.

16   I know I was there more than an hour, but I'm not so

17   sure how many minutes more it was.

18   Q.   So are you sure what time he got home?

19   A.   Hum?

20   Q.   Are you sure what time he got home?

21   A.   Am I sure what time I got home?

22   Q.   What time he got home.

23   A.   Yeah.

24   Q.   How are you sure?

25   A.   Because I looked at the time again.

D. Bonilla - Defense - Cross          1104

1       Q.   So he comes home --

2       A.   He usually gets out of work --

3       Q.   I am not asking what he usually does.  I'm asking

4    what you observed that day.

5       A.   Okay, it was around --

6       Q.   What time did he get home?

7       A.   4:30.

8       Q.   How do you know that?

9       A.   Because I looked at the cable box again.

10      Q.   Ow, what door did he come home through?

11      A.   The front door.

12      Q.   Your testimony when he came home, you looked at

13   the cable box?

14      A.   Yes.

15      Q.   Where was he?

16      A.   Where was he?

17      Q.   Where was he coming from?

18      A.   I don't know where he was coming from.  I do know

19   he was coming with his girlfriend.

20      Q.   But you don't know where he was?

21      A.   No, I didn't question him about.

22      Q.   And you said he came home, and he went to change?

23      A.   Yes.

24      Q.   Change his clothes.  Do you know why?

25      A.   He was dirty.  He was coming from work.

J.H.

D. Bonilla - Defense - Cross          1105

1    Q.   Do you know where he was coming from?

2    A.   Well, he was coming from work.

3    Q.   How do you know he was coming from work?

4    A.   Because he was dirty.

5    Q.   Is that an assumption that he was coming from

6    work?

7    A.   Yeah, because he had his working clothes on.

8    Q.   But you don't know that that's where he was coming

9    from?

10   A.   Well, I believe that's where he was coming from.

11   Q.   Okay.

12   A.   He works.

13   Q.   He goes home, and he changes his clothes?

14   A.   Um-hum.

15   Q.   Now, then you decide you're going to get tattoos?

16   A.   No.   We were supposed to go to the tattoo shop.

17   Me and Xiomara were supposed to go there, and I don't know

18   if he questioned me if I was going to go out or something.

19   I told him I was gonna go.  He said he wanted to go.  I

20   said, Fine.

21   Q.   Originally he was not part of tattoo plan?

22   A.   No.

23   Q.   That was the spur of the moment?

24   A.   Yeah, just happened there.

25   Q.   It just happened that day?

J.H.

1     A.   Um-hum.

2     Q.   He decided he wanted get a tattoo?

3     A.   Not that he wanted to get a tattoo.  We were

4  supposed to get a tattoo.  He decided he'll come with us to

5  see if he was able to get one.

6     Q.   To get a tattoo?

7     A.   Yes.

8     Q.   He decided he would come with you to get a tattoo?

9     A.   Yes.  Maybe if he was able to.  We were supposed

10  to get one, me and her.

11    Q.   What time did you leave your house?

12    A.   I left my house around 4 something, 4:35, 4:36,

13  something like that.  Not really so sure exactly what time.

14    Q.   And if you are not sure exactly what time, why are

15  you giving a time?  Where did you get that time from?

16    A.   Well, it was around that time because I went to

17  pick up Xiomara, and I saw the time.  It was like 5:10 or

18  something when I got to her house.

19    Q.   And how did you see the time at 5:10?

20    A.   My cell phone, because I had to call her to come

21  out the house.

22    Q.   Where was your cell phone with you that day?

23    A.   Where is was I?  Probably charging.

24    Q.   Do you recall where it was?

25    A.   No, I don't.

D. Bonilla - Defense - Cross      1107

1      Q.    But your cell phone has the time on it?

2      A.    Yeah.

3      Q.    Now, when you get to her house, what time is it?

4      A.    It was like 5:10, I believe it was 5:10.

5      Q.    How do you know what time it was that day?

6      A.    Because I had to call her to tell her to come out,

7    that I was outside.

8      Q.    And you made -- you paid careful attention to the

9    time; is that correct?

10     A.    Yeah.

11     Q.    Now --

12     A.    Well, I have a big clock in front of my phone that

13   shows the time.

14     Q.    Now, when you leave, you say you went to the

15   tattoo parlor?

16     A.    Yes.

17     Q.    You said you were there for approximately two

18   hours?

19     A.    Yes.

20     Q.    And you stayed, all three of you stayed together

21   two hours in the tattoo parlor?

22     A.    Yes.

23     Q.    Where did you go when you left the tattoo parlor?

24     A.    We went home to my house.

25     Q.    Who went home?

J.H.

D. Bonilla - Defense - Cross        1108

1       A.     My brother and Xiomara.  We all went to my house.

2       Q.     And what time did you get home?

3       A.     Like around 7:20 maybe.

4       Q.     How do you know it was 7:20?

5       A.     I'm guessing what time because it doesn't take

6       me -- it's not that far from Carle Place to Westbury.

7              THE COURT:  I don't want you to guess.  Don't

8       guess.

9              THE WITNESS:  Okay.

10             THE COURT:  You can give your best estimate

11      if you want to, but don't guess.

12             THE WITNESS:  Okay, so I'm estimating it was

13      7:20.  I don't really know.

14      Q.     And when you got home, what did you do when you

15      got home?

16      A.     Nothing.  I don't remember.

17      Q.     Do you remember what you did when you got home?

18      A.     No, I don't remember.  I know I went home, but I

19      don't remember what I did.  Probably got back on the

20      computer.

21      Q.     Well, do you know if you went back on the

22      computer?

23      A.     No, I don't know.

24      Q.     Do you know if you left the house again?

25      A.     No, I didn't go out.

D. Bonilla - Defense - Cross          1109

1    Q.    So you stayed home?

2    A.    Yes.

3    Q.    And where did your brother go?

4    A.    He went up to his room.

5    Q.    Did you see where he went after that?

6    A.    No, I did not.

7    Q.    So you don't know if he left?

8    A.    No, I don't know if he left or not.

9    Q.    Or went somewhere else?

10   A.    No, I don't.

11   Q.    What did you do on September 25th, 2010?

12   A.    September 25th?

13   Q.    Yes.

14            THE COURT:    That's a Saturday.

15   A.    That's a Saturday.  I don't know what did I do.

16   Q.    You don't recall what you did that day?

17   A.    No, I don't recall.

18   Q.    What about September 23rd, 2010, what did you do

19   on that date?

20   A.    Probably went to school and worked.

21   Q.    Do you recall?

22   A.    Yeah, it had to be school and work, because I was

23   going to school and working.

24   Q.    But do you have an independent recollection of

25   what you did that day?

J.H.

D. Bonilla - Defense - Cross        1110

1    A.   No.

2         Q.   Now, I'm going to take you back now to September

3    28th of 2010.  On this date, you drove your brother away

4    from a homicide scene?

5         A.   At the night, you mean?

6         Q.   September 28th of 2010; isn't that true?

7         A.   Yes.

8         Q.   You got in your car, and you drove away from your

9    house?

10        A.   Yes.

11        Q.   And you took him to his girlfriend's house?

12        A.   Yes.

13        Q.   And when the police were looking for him, you told

14   them, I haven't seen him at all; that's what you told the

15   police?

16        A.   Well, I don't recall the police looking for him or

17   their asking me where was my brother at.

18        Q.   On September 29th of 2010 when you spoke with the

19   police, you told them, I haven't seen him?

20        A.   Well, that's when they came to get me.  That's

21   when they took me and they asked me for him.

22        Q.   You said, I haven't seen my brother?

23        A.   Well, I didn't see him.  I saw him the day before

24   at night.

25        Q.   You never told them that you drove him from the

D. Bonilla - Defense - Cross        1111

1  scene to his girlfriend's; isn't that true?

2       A.   Yes, that's true.

3       Q.   You never told them that?

4       A.   Yes.

5       Q.   When the police talked to you on September 29th of

6  2010, in fact, you told them you hadn't seen him at all that

7  night; that's what you told them?

8       A.   I don't recall them -- telling them that.

9       Q.   You never told them that you saw him anywhere near

10 180 Kinkel Street that night; isn't that true?

11      A.   That's not correct.

12      Q.   You never told them you saw him fighting with

13 anyone at the scene?

14      A.   I did tell them that.

15      Q.   You never told them that you drove him away from

16 the scene?

17      A.   I didn't tell them that.

18      Q.   You never told them that he was running in front

19 of you towards your car, you never told them that either?

20      A.   I know.

21      Q.   I didn't hear what you said.

22      A.   I said I know, I agreed to that I didn't tell them

23 that.

24      Q.   In fact, you didn't tell them that you saw Misael

25 Berrios fighting with anyone that night either, you never

D. Bonilla - Defense - Cross        1112

1      told them that?

2           A.   Yes, I did.

3           Q.   You never told them that you saw Henry Hernandez

4      fighting with anyone that date?

5           A.   Yes, I did tell them.

6           Q.   You never told them that.  In fact, you told them,

7      I didn't see anyone who was fighting because they all had

8      masks on; didn't you tell them that?

9           A.   I didn't say that the people -- didn't say that

10     Misael and Henry had a mask on.  I said the other people,

11     some of the other people had masks on.

12          Q.   You said you saw five people with masks that

13     night, you told them that; isn't that true?

14          A.   I wasn't gonna be able to say I saw five people

15     because I wasn't gonna stand there and count them all.

16          Q.   In fact, you told the only face you saw was Nancy,

17     Armando and his wife, those were the only people you could

18     recognize?

19          A.   And Jocelyn also, Jocelyn too.

20          Q.   You never told them that?

21          A.   I did tell them that.

22          Q.   In fact, you said that when they asked you did you

23     recognize any of the guys fighting, you said, No, they all

24     had masks on.  I didn't see anyone's face?

25          A.   I couldn't tell them they all had the masks on

D. Bonilla - Defense - Cross        1113

1    because I was recognizing Henry and Misael.

2         Q.    You never told them that?

3         A.    Did I tell them?

4         Q.    When they asked you, that's not what you told?

5         A.    I did tell them that.

6         Q.    You told them you didn't recognize anybody?

7         A.    How could I tell them that when I did recognize

8    Henry and Misael?

9         Q.    And you never told them that you saw your brother

10   involved in any fight with Armando; isn't that correct?

11        A.    I did tell them that I seen them there.

12        Q.    You never told them that you saw Armando fighting

13   with the defendant?

14             THE COURT:   She said involved in a fight,

15        those were her words.   And you answered, I did tell

16        them I saw him there.   Answer the question specifically

17        with regard to a fight.

18             THE WITNESS:   Okay.

19        Q.    Did you tell them that you saw your brother

20   fighting with Armando?

21        A.    No, I did not tell them that.

22        Q.    In fact, you told them you saw Armando fighting

23   with some other guy that you had no idea who he is?

24        A.    Yes, and that he was kneeing him.

25        Q.    And that Armando was kneeing this other guy?

J.H.

D. Bonilla - Defense - Cross        1114

1       A.    Yes.

2       Q.    That you did not recognize?

3       A.    Yes.

4       Q.    You never told them anything about your brother

5    being involved in a fight that night?

6       A.    I didn't tell them that I seen my brother being

7    involved in the fight.  But I did tell them that my brother

8    was there at the moment that everything was happening.

9       Q.    And that's because you're trying to protect your

10   brother; isn't that right?

11      A.    I'm not trying to protect him.  I'm saying what

12   really happened.

13      Q.    In fact, you don't want to see him convicted of

14   anything; isn't that right?

15      A.    Of course I don't.  But that doesn't mean that I'm

16   going to sit here and lie.

17      Q.    You already stated that there are several things

18   that you did not tell the police that night?

19      A.    I agree that I did lie.  But I agreed to that

20   because I was scared.  I didn't know what was going on.  I

21   didn't know it was someone that died.  I didn't know what it

22   was.  I got there in the end.

23      Q.    You never told the police that you were -- that he

24   was involved in a fight with Armando, that's true, correct?

25      A.    Because I didn't see him.  I know he was there,

J.H.

D. Bonilla - Defense - Cross     1115

1    but I did not see him.

2         Q.   You did not see that, correct?

3         A.   Um-hum.

4         Q.   You did not say to the police, by the way, I also

5    drove him away from the scene and took him to his

6    girlfriend's house; you didn't tell them that?

7         A.   No, I did not tell them that because I was scared.

8    I did not know what was going to happen.  I didn't know what

9    had happened there at the moment.

10        Q.   You didn't tell them because you were trying to

11   prevent him from getting into trouble; isn't that right?

12        A.   I wasn't trying to prevent him from anything

13   because I didn't know what had happened.  If there was

14   someone dead, I did not know.

15             THE COURT:  Earlier in the cross-examination,

16        Miss Abdi asked you you drove your brother away from a

17        homicide scene, and you said, Yes.

18             THE WITNESS:  Well, now I know that someone

19        passed away.

20             THE COURT:  When did you first find out that

21        someone died?

22             THE WITNESS:  When they came to pick me up,

23        when they came to get me and they told me that this

24        person had passed away because he had got stabbed.

25        Q.   And that was the day after?

D. Bonilla - Defense - Cross        1116

1        A.    Yes.

2              THE COURT:  Now, did you know anyone was

3        stabbed?

4              THE WITNESS:  No, before that, I did not

5        know.

6              THE COURT:  Then what were you afraid of?

7              THE WITNESS:  Well, I didn't know what had

8        happened.  I know there was a whole big fight, and I

9        did hear a gunshot, so what was I supposed to think?

10       Q.    Now, you never drove your brother to the hospital

11   on September 28th, 2010?

12       A.    No, I did not.

13       Q.    And you didn't pick him up from the hospital?

14       A.    No.  I was in school.

15       Q.    And how long -- how long were you in school that

16   day?

17       A.    I was there from -- I was supposed to be there

18   from 4 to 5:30 until like 10 something.  They usually let us

19   out earlier.  About 9:50, 9:45 we are out of school.

20       Q.    You have talked to Zeida Bonilla about this case,

21   correct?

22       A.    Have I ever talked about it?

23       Q.    Yes.

24       A.    Not on something that we was to sit down and speak

25   about it, no, not really.

J.H.

D. Bonilla - Defense - Cross        1117

1      Q.   You have talked to her about the tattoo parlor,

2   correct?

3      A.   Yeah.

4      Q.   And you talked to her about what happened on

5   September 28th of 2010?

6      A.   Not -- a little bit about it.  Not really, you

7   know.

8      Q.   You have talked to her?

9      A.   Yeah.

10     Q.   How many times would you say you talked to her

11  about it?

12     A.   Probably like once or twice.

13     Q.   And how many times would you say you have talked

14  to her about the tattoo parlor?

15     A.   That we had went to the tattoo parlor?

16     Q.   Yes.

17     A.   Probably once.  It's not important really to talk

18  about it.

19     Q.   You also talked to Xiomara Tursios?

20     A.   She's my best friend.

21     Q.   And how long have you known her?

22     A.   Since I been a little girl.

23     Q.   And you've talked to her about the tattoo parlor?

24     A.   Yeah, we both used to go there.

25     Q.   And how many times would you say you have talked

D. Bonilla - Defense - Cross         1118

1    to her about that day, the tattoo parlor?

2         A.   Well, I don't remember really talking to her that

3    day about that day.

4         Q.   Not that day.  After that day, have you talked to

5    her about going to the tattoo parlor?

6         A.   No.

7         Q.   You never talked to her?

8         A.   Actually we are not friends no more at this moment

9    so.  She moved from here.

10        Q.   When did that happen?

11        A.   Why did it happen?

12        Q.   When?

13        A.   Probably a couple months ago.

14        Q.   You have talked to defense counsel about this

15   case?

16        A.   To who?

17        Q.   Defense counsel.

18        A.   To my attorney?

19        Q.   Yes.

20        A.   Yes.

21        Q.   Well, he's not your attorney, is he?

22        A.   My brother's attorney, yes.

23        Q.   And how often would you say you have talked to

24   defense counsel about this case?

25        A.   Well, a couple of times I will get updated and

J.H.

D. Bonilla - Defense - Cross        1119

1   everything when he comes to court, how is everything going

2   with the case.

3        Q.   So you get updated on the goings on of court?

4        A.   Yes.

5        Q.   You get updated on what happens in court?

6        A.   Yes.

7        Q.   He tells you what's happening in court?

8        A.   Yes.

9        Q.   Does he tell you what witnesses have been saying

10   in court?

11        A.   Not all of them, but he told me -- he spoke to me

12   about some of them.

13        Q.   So you're aware of what people have been saying in

14   this courtroom?

15        A.   Some of them.

16        Q.   And how often -- when was it that you first

17   learned that your brother was charged with murder?

18        A.   When he got arrested.

19        Q.   And when was it that you first learned that your

20   brother was charged with rape?

21        A.   When my -- his attorney let me know that he was --

22   he had an additional case on him.

23        Q.   And when was that?

24        A.   When was it?

25        Q.   When did you learn that?

J.H.

D. Bonilla - Defense - Cross          1120

1       A.    I don't remember.

2       Q.    Was it after?  What year was it?

3       A.    Last year.

4       Q.    Do you remember the date?

5       A.    No, I do not.

6       Q.    Do you recall the month you found out?

7       A.    No.

8       Q.    Now, when you saw your brother on September 28th

9    of 2010, you said you saw him bleeding?

10      A.    Yes.

11      Q.    And now I'm talking about sometime after 10:30

12   p.m.

13      A.    Yes.

14      Q.    Where was he bleeding?

15      A.    From his ear.

16      Q.    The face area?

17      A.    From right here, from the back of his ear.

18      Q.    Did you notice if he was bleeding from anywhere

19   else?

20      A.    No, I did not notice.

21      Q.    And did you notice whether or not he had a bandage

22   on?

23      A.    No, I did not notice.

24      Q.    When you saw him, that's at around 10:30 at night?

25      A.    No, I didn't notice if he had something on his

D. Bonilla - Defense - Redirect        1121

1   finger.

2       Q.   When you saw him, could you tell if he was

3   bleeding from his hands or not?

4       A.   No.

5       Q.   Now, when you drove away from the scene of the

6   fight, where did you take him?

7       A.   I stopped first to drop off Misael, Henry and the

8   other guy at his house, and then I dropped him off at his

9   girlfriend's house.

10      Q.   And did you see him again after that?

11      A.   No.

12      Q.   Did he ever come back home after that?

13      A.   Well, he's the type of brother that was never to

14  be home.  He would always sleep there one night and sleep at

15  his girlfriend's house or be outside.  I barely seen him.  I

16  would go to school and work, so I really didn't see him as

17  much.

18      Q.   So it's fair to say that you don't keep tabs on

19  your brother?

20      A.   No.

21      Q.   And you don't account for his whereabouts all the

22  time?

23      A.   He's a grown man.  I don't need to --

24      Q.   And you don't pay attention to where he is?

25      A.   I really don't need to know what he does with his

J.H.

D. Bonilla - Defense - Redirect        1122

1   life.  That's him.  He's my brother, and I'm here for him

2   but I don't need to --

3                   MS. ABDI:  I have no further questions.

4                   THE COURT:  Any redirect?

5                   MR. MILLMAN:  Yes, briefly.

6   REDIRECT EXAMINATION

7   BY MR. MILLMAN:

8       Q.  Miss Bonilla, why is it that you did not tell the

9   police when they spoke with you about the fact that you

10  drove your brother from the scene?

11      A.  Well, I was nervous.  I was scared.  I had been

12  there for a long time.  They kept me in a room for a while.

13      Q.  And Miss Abdi had asked you during

14  cross-examination -- well, withdrawn.

15                  Miss Abdi had asked you about what you were doing

16  the day before September 24th and the day after.  Do you

17  recall that?

18      A.  I don't recall.  Probably, like I said, probably

19  work --

20                  THE COURT:  Now, when he said do you recall

21          her asking you --

22                  THE WITNESS:  Oh, do I recall, yes.

23      Q.  Does the date of September 24th, 2010 though have

24  a certain significance?

25      A.  Yes.  Because that day was his first time going

                                                        J.H.

Proceedings                              1123

1    with me to the tattoo shop and I introduce him to Evans.   He
2    hadn't been there before.  So of course I am going to
3    remember that's the day I introduce them.
4         Q.    And also you did learn at some point that your
5    brother was being charged with a rape, for something that
6    allegedly took place on September 24th?
7         A.    I found after when I found out that the case was
8    added onto him.  I found out that they were accusing him.
9         Q.    On September 24th?
10        A.    Yes.
11        Q.    Does that also lend significance to this date of
12   September 24th?
13        A.    Yes.
14                   MR. MILLMAN:  That's all I have.  Thank you.
15                   THE COURT:  Thank you.  You can step down.
16                   THE WITNESS:  You're welcome.
17                   (The witness was excused.)
18                   THE COURT:  Do you have another witness?
19                   MR. MILLMAN:  Yes, I do, your Honor, Zeida
20        Bonilla.
21                   THE COURT:  I'm sorry?
22                   MR. MILLMAN:  Zeida Bonilla, and we do need
23        an interpreter.
24                   THE COURT:  All right, ladies and gentlemen,
25        2 o'clock.

J.H.

Proceedings                                    1124

1           Remember the admonitions that I have given

2    you.

3                (Whereupon, the jury exits the courtroom.)

4                THE COURT:  All right, are you going to

5    introduce justification as a defense?

6                MR. MILLMAN:  I will just take half a minute,

7    your Honor, and I will give you an answer on that.

8                THE COURT:  Because it may indicate how much

9    leeway I have to give, if any, to the prosecutor on

10   rebuttal.

11               MR. MILLMAN:  Certainly, your Honor.

12               THE COURT:  And obviously on the evidence in

13   this particular case, you have evidence that at least

14   from a circumstantial basis that the defendant

15   possessed a knife and perhaps a crowbar.  You also have

16   evidence indicating that the deceased possessed a

17   crowbar.

18               If I give the defense of when and under what

19   circumstances you can use deadly physical force, I

20   would also have to give a charge that the defenses of

21   justification and the use of deadly physical force is

22   not available to a planned combat with deadly weapons.

23   You don't see this too often in cases like this, but

24   simply put, dueling not allowed in the State of New

25   York whether or not it's through swords, pistols or

J.H.

Proceedings                                    1125

1       baseballs.

2                    And I assume the witness you put on at 2

3       o'clock will be your last witness?

4                    MR. MILLMAN:  No, actually, your Honor, I

5       have two more.

6                    THE COURT:  Do you?

7                    MR. MILLMAN:  Yes, I do.  And I also intend

8       to introduce the medical records.

9                    The first witness is going to be Zeida

10      Bonilla, and the other one will be Evan Grover, the

11      tattoo artist.

12                   Now, your Honor, I'm not 100 percent sure of

13      the order.  I have to find out --

14                   THE COURT:  I understand.  I am concerned

15      about when I have to start this jury in deliberations.

16      That is my concern.  Ordinarily I wouldn't do this to

17      you, but if you people are through, I'm going to have

18      you sum up tomorrow.

19                   MR. MILLMAN:  Well, your Honor, I would ask

20      if we could have until Friday to do that.  We have gone

21      at a very fast pace.  Nevertheless, it's been over 24,

22      25 witnesses.

23                   THE COURT:  I understand that.  And there was

24      a jury right across the hall that just spent four days

25      trying to reach a verdict, and we are going to have a

Proceedings                    1126

1    week's holiday.  If I sum up -- if you sum up on Friday

2    on this case, they are not going to be able to

3    deliberate until Monday afternoon.  I'm concerned about

4    that.

5              MS. ABDI:  I mean we can sum and charge on

6    the same day, Judge.

7              MR. MILLMAN:  Just there has been a number of

8    witnesses given the seriousness of the charges and the

9    pace at which we have gone, you know, I just would ask

10   for an a Friday to sum up.

11             THE COURT:  When you say we could sum up and

12   charge on Friday, do you include me in that we?

13             MS. ABDI:  I wouldn't charge.

14             THE COURT:  If we sum up and charge on Friday

15   and we don't get a verdict next week, I'm going to

16   bring them back after the holidays.  Consent?

17             MS. ABDI:  Yes.

18             THE COURT:  Consent?

19             MR. MILLMAN:  Consent, your Honor.

20             THE COURT:  And if I bring them back after

21   the holidays and I don't have a full jury, would you

22   consent to substitute an alternate?  That's a very

23   important answer you are going to give me.  If you are

24   not going to consent to substitute an alternate, that

25   puts me under tremendous pressure, and I'm going to

J.H.

Proceedings                                                      1127

1    have you sum up as soon as possible.  Think about it.

2                  (Whereupon, a luncheon recess was taken.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

Proceedings                                        1128

1    AFTERNOON  SESSION

2              THE CLERK:  Recalling case on trial,

3         Indictment 202N of 2011, People of the State of New

4         York versus Ulises Bonilla.  All parties present,

5         including the defendant and Spanish interpreter.  There

6         are no jurors present at this time.

7              THE COURT:  It is a little bit premature, but

8         at this particular time, are you going to assert the

9         defense of self-defense?

10              MR. MILLMAN:  No, your Honor.

11              THE COURT:  No?

12              MR. MILLMAN:  No.

13              THE COURT:  Okay.  Then I will not charge it,

14        and as a consequence, the defendant does not have to

15        impliedly admit that he possessed a dangerous

16        instrument.

17              Can you tell me at this particular time

18        whether or not you will have any rebuttal?  You may not

19        be able to tell me.

20              MS. ABDI:  I think there will be.

21              THE COURT:  Let's get the jury, and bring in

22        the next witness.

23              Can you tell me at this particular time do

24        you want me to charge manslaughter?

25              MR. MILLMAN:  I'm inclined to say yes, but I

1    am not 100 percent sure, but my inclination is to say

2    yes.

3              THE COURT:  I don't see if there's any

4    lessers with regard to any other crime charged.  Do

5    you, People?

6              MS. ABDI:  No.

7              THE COURT:  Do you?

8              MR. MILLMAN:  I will double-check, but I

9    don't think so because they indicted him on the other

10   sexual offenses also.

11             THE COURT:  As far as specific charges are

12   concerned, obviously you are going to get the boiler

13   plate.  People, do you want a flight charge?

14             MS. ABDI:  No.  I'm going to mention it in my

15   summation, but I don't need the charge.

16             MR. MILLMAN:  Judge, if she is going to

17   mention it, then I would certainly want to be heard --

18             THE COURT:  Do you want a flight charge?

19             MR. MILLMAN:  I will want a charge on flight

20   if she's going to make mention of it in her summation.

21   But I want to know -- I know there's a standard, a

22   couple different standards.

23             THE COURT:  You want an alibi charge?

24             MR. MILLMAN:  Yes, your Honor.

25             THE COURT:  Do you want an expanded charge on

Proceedings                                    1130

1    intent?

2              MR. MILLMAN:  I also think there's a couple

3    of different versions of the expanded charge on intent.

4              THE COURT:  If you want to give me a proposed

5    charge on intent, fine.  Basically the simple charge is

6    conscious objective.  If you want to expand it, you can

7    certainly expand it by any number of factors.

8              MR. MILLMAN:  I'm not sure that I would

9    necessarily want, to.  But I would like to at least

10   have tomorrow if I could.

11             THE COURT:  Do you want a charge of

12   accessorial liability?  That's the most difficult one

13   that you might have to consider.  There is a potential

14   view of the evidence that this might be appropriate.

15   It might cause an awful lot of confusion.  It might be

16   helpful to your client.  It might be hurtful to him.

17             MR. MILLMAN:  I agree it's tricky.  I need to

18   give it a little bit more thought.

19             THE COURT:  Fine.  I am just bringing it up.

20             MS. ABDI:  Judge, obviously I know if this is

21   included in the standard, but the charge on

22   circumstantial evidence.

23             THE COURT:  Oh, yes.

24             COURT OFFICER:  Jury entering.

25             (The jury enters the courtroom.)

J.H.

Proceedings                                    1131

1            THE CLERK:  Let the record reflect the

2     presence of all jurors.  Do both sides consent to the

3     seating and waive a reading of the roll?

4               MS. ABDI:  Yes.

5               MR. MILLMAN:  Yes.

6               THE CLERK:  Thank you.

7               THE COURT:  Next witness.

8               MR. MILLMAN:  Yes, your Honor.  Before the

9     next witness, I have an application to move into

10    evidence the medical records of Ulises Bonilla.  I ask

11    that be marked.

12              THE COURT:  Now, this concerns medical

13    records to and regarding the injury to his finger?

14              MR. MILLMAN:  That happened at work, yes,

15    your Honor.

16              THE COURT:  Okay.  Any objection, People?

17              MS. ABDI:  No.

18              THE COURT:  They are received without

19    objection.

20              (Defendant's Exhibit H is received and marked

21    in evidence.)

22              MR. MILLMAN:  Your Honor, at this time

23    defense calls Zeida Bonilla.

24

25

J.H.

Z. Bonilla - Defense - Direct       1132

1    Z E I D A  B O N I L L A, a witness called on behalf of the

2         Defense, after having been first duly sworn by the

3         Clerk of the Court, was examined and testified upon her

4         oath through the interpreter as follows:

5              THE CLERK:  In a loud, clear voice, please

6         state your name, spell your last.

7              THE WITNESS:  Zeida Bonilla, B-O-N-I-L-L-A.

8              THE CLERK:  And your county of residence?

9              THE WITNESS:  Nassau.

10             THE CLERK:  Thank you.

11   DIRECT EXAMINATION

12   BY MR. MILLMAN:

13        Q.   Good afternoon, Miss Bonilla.

14        A.   Good afternoon.

15        Q.   Miss Bonilla, where do you currently live?

16        A.   At 163 Kinkel Street in Westbury.

17        Q.   Who do you live there with?

18        A.   With my mother-in-law, my father-in-law and my

19   sister-in-law.

20        Q.   And who else do you live with?

21        A.   And my children.

22        Q.   What are the children's names?

23        A.   Ava Marino, Dora Gomez, a Lisa Gomez, Andrea

24   Bonilla.

25        Q.   Andrea is the five year old daughter of Ulises

Z. Bonilla - Defense - Direct          1133

1   Bonilla?

2        A.   Yes.

3        Q.   And what is your relationship to Ulises Bonilla?

4        A.   His girlfriend.

5        Q.   How long have you been his girlfriend for?

6        A.   Six years.

7        Q.   And if you would, just --

8             THE COURT:   How old are you?

9             THE WITNESS:   Thirty-one.

10       Q.   You're 31 years old.  Could you identify Ulises

11  Bonilla if you see in the courtroom?

12       A.   Yes.

13       Q.   Can you point him out?

14       A.   He's right there.

15            MR. MILLMAN:   Although she didn't identify

16       clothing --

17            THE COURT:   Let the record reflect she

18       identifies the defendant.

19       Q.   You have the same last names with no relation; is

20  that correct?

21       A.   No.

22            THE COURT:   You have the same last names,

23       correct?

24            THE WITNESS:   Yes.

25            THE COURT:   Do you have a common parent or

Z. Bonilla - Defense - Direct      1134

1        grandparent?

2                     THE WITNESS:  No.

3                     THE COURT:  Okay.

4        Q.   Miss Bonilla, I'm going to direct your attention

5   to Friday, September 24th of 2010.  Where were you at 4

6   o'clock in the afternoon?

7        A.   At my job.

8        Q.   And where is that?

9        A.   It's on 65 Kinkel Street in Westbury.

10       Q.   And what is the name of the company?

11       A.   Parfields Corporation.

12       Q.   Who do you work there with?

13       A.   I worked with Ulises.

14       Q.   On that day, you were working at the same place as

15  Ulises Bonilla?

16       A.   Yes.

17       Q.   And what happened at 4 o'clock?

18       A.   When we finished work, I went to pick up my

19  daughters at the daycare.

20       Q.   Let me stop you for a moment if I could.  How did

21  you get to the daycare center?

22       A.   In my car.

23       Q.   And who went with you in your car?

24       A.   Ulises.

25       Q.   Where is the daycare center located?

Z. Bonilla - Defense - Direct        1135

1       A.    In Westbury.

2       Q.    Did you make any stops on the way?

3       A.    After I picked up my daughters, yes.

4       Q.    And was Ulises in the car the entire time from the

5    time you left work to the time that you got to the daycare

6    center?

7       A.    I didn't understand.

8       Q.    Okay.  From the time that you left work with

9    Ulises to the time that you got to the daycare center, was

10   Ulises in the car the entire time?

11      A.    Yes.

12      Q.    And what happened when you got to the daycare

13   center?

14      A.    I picked up the girls.  Then I drove by the deli,

15   and I picked some things up.

16      Q.    Now, when you got to the daycare center, did

17   Ulises get out of the car at that time?

18      A.    No.

19      Q.    Where is the deli located that you went to?

20      A.    It's on Prospect.

21      Q.    That's in Westbury, correct?

22      A.    In Westbury, yes.

23              THE COURT:  What do you do at work?  What are

24        your duties?

25              THE WITNESS:  I do debrace and ensembles,

J.H.

Z. Bonilla - Defense - Direct      1136

1     assembles.  I don't know how you say it.

2                    THE COURT:  What does Ulises do?

3                    THE WITNESS:  He did denching to the pieces.

4                    THE COURT:  Is his work station by your work

5     station?

6                    THE WITNESS:  We work together.

7                    THE COURT:  Like next to each other?

8                    THE WITNESS:  No, different tables.

9                    THE COURT:  But you see him while you are

10    working?

11                   THE WITNESS:  Yes.

12                   THE COURT:  Okay.

13    Q.    When you got to the deli, what did you do?

14    A.    I bought something for the girls.

15    Q.    At the time that you did this, where was Ulises?

16    A.    He was taking care of my girls.

17    Q.    Where?

18    A.    In the car.

19    Q.    Did he stay in the car?

20    A.    Yes.

21    Q.    And again, I'm sorry if you told me, but I just

22    want to be sure, how old are the kids?

23    A.    Andrea's five.  Dora and a Lisa are eight.  Ava's

24    11.

25    Q.    Now, what happened when you exited the deli?

Z. Bonilla - Defense - Direct        1137

1       A.    I went to drop him off at his house.

2       Q.    At 163 Kinkel Street?

3       A.    Yes.

4       Q.    At what time did you drop him off at his house?

5       A.    At 4:30.

6       Q.    And what kind of a vehicle were you driving?

7       A.    A Honda van.

8       Q.    I want to direct your attention to -- withdrawn.

9             You indicated that you left work with Ulises at 4

10   o'clock?

11      A.    Yes.

12      Q.    Is that the time that you all got out of work at

13   that time?

14      A.    Yes.

15      Q.    I'm going to direct your attention following to

16   September 28th of 2010, Tuesday, September 28th.  Were you

17   working that day?

18      A.    Yes.

19      Q.    And was Ulises working?

20      A.    Yes.

21      Q.    This is at the same place that you identified

22   before?

23      A.    Yes.

24      Q.    What, if anything, happened with regard to Ulises

25   during the workday?

Z. Bonilla - Defense - Direct      1138

1      A.    He was doing something to a certain pieces, and he

2   got hurt.

3      Q.    At the time that he got hurt, where were you?

4      A.    I was giving him my back.

5      Q.    I think -- I'm not sure exactly.  Let me just ask

6   you this:  At the time that he got hurt, were you in the

7   same room with him?

8      A.    Yes.

9      Q.    Were you looking towards him or away from him or

10   something else?

11      A.    I wasn't looking in his direction.

12      Q.    Did you hear something that brought your attention

13   to his direction?

14            MS. ABDI:  Objection.

15      A.    Yes.

16            THE COURT:  All right, that's fine.  You can

17      answer that.

18      A.    Can you repeat the question?

19      Q.    Yes.  You indicated that you were looking away

20   from Ulises.  My question is did you hear something that

21   caused you to look at in Ulises' direction?

22      A.    Yes.

23      Q.    What did you hear?

24      A.    He said a curse word.

25      Q.    What did you hear him say?

Z. Bonilla - Defense - Direct      1139

1       A.   Oh, shit.

2       Q.   And did you look at Ulises at that time?

3       A.   Yes.

4       Q.   What did you see?

5       A.   I saw that his finger was bleeding.

6       Q.   Did there come a time that day, September 28th,

7   2010, that you saw Ulises again afterwards?

8       A.   Yes.

9       Q.   What time was that, to the best that you recall?

10      A.   I don't remember because I was asleep when he

11  came.

12      Q.   You say you were asleep.  Am I correct in stating

13  that you were at home?

14      A.   Yes.

15      Q.   And where was home at that time?

16      A.   27 James Street in Hicksville.

17      Q.   And did there come a time that something woke you

18  up?

19      A.   When someone knocked on my door.  That was it.

20      Q.   Tell us what happened at that time.

21      A.   When he came in, he had an injury to his ear.

22      Q.   Let me stop you for a moment.  You said he.  Who?

23      A.   Ulises.

24      Q.   Did you observe an injury to his ear?

25      A.   Yes.

J.H.

Z. Bonilla - Defense - Cross        1140

1       Q.    What did you observe?

2       A.    It was cut.

3       Q.    Did you see blood?

4       A.    Yes.

5       Q.    Did you observe blood anywhere else at that time?

6       A.    No.

7       Q.    Was this sometime after 10:30 p.m.; would that be

8    fair to say?

9       A.    I don't really remember.  I was asleep.

10      Q.    Fair enough.  Okay.  Miss Adbi's now going to ask

11   you some questions.

12      A.    Okay.

13                  THE COURT:  Do you have any cross?

14                  MS. ABDI:  Yes, your Honor.

15   CROSS-EXAMINATION

16   BY MS. ABDI:

17      Q.    Miss Bonilla, how do you financially support

18   yourself?

19      A.    I work.

20      Q.    And in September, 2010, were you also being

21   supported by Ulises Bonilla?

22      A.    Yes.

23      Q.    When you lived in Hicksville, 27 James Street, did

24   you live with your parents?

25      A.    No.

J.H.

Z. Bonilla - Defense - Cross       1141

1        Q.    Who else lived in Hicksville with you?

2        A.    My sisters.

3        Q.    And your children as well?

4        A.    And my children, yes.

5        Q.    Did you rent a room from your sister, or did you

6    have all different rooms?

7        A.    I rent a room.

8        Q.    Do you know who owned the house?

9        A.    No.

10       Q.    Your sister's helped with the rent, right?

11       A.    No.

12       Q.    Did you pay the rent for everyone?

13       A.    Yes.

14       Q.    Now, at some point you moved into 163 Kinkel

15   Street; is that correct?

16       A.    Yes.

17       Q.    And when did you do that?

18       A.    It was a year ago.

19       Q.    A year ago this month?  What month?

20       A.    In November.

21       Q.    So that would be November of 2010?

22       A.    Yes.

23       Q.    And you live now with Ulises Bonilla's sister and

24   his parents?

25       A.    Yes.

J.H.

Z. Bonilla - Defense - Cross          1142

1      Q.   And do they also help you out financially?

2      A.   No.

3      Q.   Did they help you watch the kids?

4      A.   No.

5      Q.   Now, you said that your children were at daycare

6  on --

7      A.   Yes.

8      Q.   -- on September 24th.

9      A.   Yes.

10     Q.   How often do they go to daycare?

11     A.   Every day.

12     Q.   What times do they go to daycare?

13     A.   At 7:10 until 4.

14     Q.   Now, what's your work schedule?

15     A.   7:30 to 4.

16     Q.   Now, how many people work in your company?

17     A.   I don't know.

18     Q.   Is it more than 10 people?

19     A.   Yes.

20     Q.   Is it more 50 people?

21     A.   No.

22     Q.   What kind of work do they do in the company?

23     A.   We assemble pieces for airplanes.

24     Q.   And do you work in one big room?

25     A.   We all work together.

Z. Bonilla - Defense - Cross          1143

1       Q.    In one room?

2       A.    Yes.

3       Q.    Are or there several rooms?

4       A.    There are other rooms.

5       Q.    Now, do you have a sign-in and sign-out sheet?

6       A.    Yes.

7       Q.    Now, directing your attention now to September

8    14th, 2010, where was the daycare?

9       A.    In Westbury.

10      Q.    What streets?

11      A.    The garden, Garden Street.

12      Q.    Do you recall what the cross streets were?

13      A.    No.

14      Q.    Is that Garden Street north of Prospect or south

15   of Prospect?

16      A.    I don't know.

17      Q.    It's fair to say that it's not very far from 163

18   Kinkel Street?

19      A.    But I stop by deli.

20      Q.    Well, my question is:  The daycare is not far from

21   163 Kinkel Street, correct?

22      A.    Um-hum.

23      Q.    You could walk there?

24      A.    Yes.

25      Q.    The place where you work, what's the address of

Z. Bonilla - Defense - Cross          1144

1    that place?

2          A.    65 Kinkel Street in Westbury.

3          Q.    Is that close to Urban Avenue?

4          A.    Yes.

5          Q.    And it's fair to say that that location, the work

6    location, is not far from 163 Kinkel Street?

7          A.    No.

8          Q.    Meaning it's close?

9          A.    Yes.

10         Q.    And you can walk home to 163 Kinkel Street from

11   work; is that correct?

12         A.    Yes.

13         Q.    Now, do you recall what time you got to the

14   daycare center?

15         A.    No.

16         Q.    Do you recall what time you left the daycare

17   center?

18         A.    I don't.

19         Q.    Do you recall what time you dropped Ulises Bonilla

20   at home?

21         A.    About 4:30, I believe.

22         Q.    Are you sure?

23         A.    Yes.

24         Q.    How do you know the time?

25         A.    Because I look at my clock in the car.

J.H.

Z. Bonilla - Defense - Cross          1145

1     Q.   Now, how often would Ulises Bonilla come with you

2     to pick up your kids?

3     A.   Every day.

4     Q.   So every day, he would leave work with you?

5     A.   Yes.

6     Q.   Get in your car, drive to daycare and wait in the

7     car?

8     A.   Yes.

9     Q.   And then you would drop him off home?

10    A.   Yes.

11    Q.   But it's fair to say that you did not live at 163

12    Kinkel Street at that time?

13    A.   No.

14    Q.   In fact, at that time, you lived all the way in

15    Hicksville?

16    A.   Yes.

17    Q.   And it's fair to say, Miss Bonilla, that the car

18    ride, if you took a car from your work to the daycare, it

19    would take less than ten minutes?

20    A.   Sometimes it's like, you know, they have the

21    sanitation trucks, and sometimes they obstruct traffic.

22    Q.   Well, did a sanitation truck obstruct traffic that

23    date?

24    A.   No.   That's where they dump all the handwriting

25    material.

J.H.

Z. Bonilla - Defense - Redirect      1146

1    Q.   So if there wasn't a sanitation truck, which you
2    said there wasn't that day, it's fair to say it would only
3    take you ten minutes by car to get from work to the daycare?
4              THE COURT:  Is that true?
5         A.   Yes.
6              MS. ABDI:  I have no further questions.
7              MR. MILLMAN:  Very briefly.
8    REDIRECT EXAMINATION
9    BY MR. MILLMAN:
10        Q.   You were asked about the location of the workplace
11   in relation to the daycare center by Miss Abdi.  My question
12   is is Ulises right-handed?
13             THE COURT:  Just one second.  I think there's
14        testimony that hasn't been recorded.
15        A.   I did not understand the question.
16             THE COURT:  Okay.  What did the witness stay?
17        A.   I did not understand question.
18        Q.   Is Ulises right-handed?
19             MS. ABDI:  Objection.  Outside the scope.
20             MR. MILLMAN:  I would to ask for some leeway.
21             THE COURT:  Is he right-handed or left-handed
22        or ambidextrous?
23             THE WITNESS:  With the right.
24             MR. MILLMAN:  Thank you.
25             THE COURT:  Step down.  Thank you.

J.H.

E. Grover - Defense - Direct          1147

1            (The witness was excused.)

2            THE COURT:  Do you have another witness?

3            MR. MILLMAN:  Yes, your Honor.  At this time

4       the defense calls Evan Grover.

5    E V A N  G R O V E R , a witness called on behalf of the

6       Defense, after having been first duly sworn by the

7       Clerk of the Court, was examined and testified upon his

8       oath as follows:

9            THE CLERK:  In a loud, clear voice, please

10      state your name and spell your last.

11           THE WITNESS:  Evan Grover, G-R-O-V-E-R.

12           THE CLERK:  And your county of residence?

13           THE WITNESS:  Suffolk.

14           THE CLERK:  Thank you.

15           THE COURT:  Do me a favor and remove your

16      gum.

17   DIRECT EXAMINATION

18   BY MR. MILLMAN:

19      Q.   Good afternoon, Mr. Grover.  Mr. Grover, are you

20   here pursuant to subpoena?

21      A.   Excuse me?

22      Q.   Are you here pursuant to subpoena?

23      A.   Yes.

24      Q.   Where do you currently live?

25      A.   I live in Deer Park.

E. Grover - Defense - Direct        1148

1    Q.   And for how long have you lived in Deer Park?

2    A.   I've lived there about eight years.

3    Q.   And where do you work?

4    A.   I work at Tattoo You in Carle Place.

5    Q.   What is the address there?

6    A.   524 Westbury Ave.

7    Q.   How long have you worked there for?

8    A.   I've worked there for about three years.

9    Q.   And what is your position at Tattoo You?

10   A.   A tattoo artist.

11   Q.   And is that your position or was that your

12   position on September 24th, 2010?

13   A.   Yes.

14   Q.   Do you know somebody named Diana Bonilla?

15   A.   Yes.

16   Q.   How do you know her?

17   A.   She's a client.

18   Q.   I want to direct your attention to a Friday,

19   September 24th of 2010.  Were you working on that day?

20   A.   I believe so.

21   Q.   Did there come a time that day that you saw Diana

22   Bonilla?

23   A.   She's been to the shop many times.

24   Q.   On that particular day, September 24th of 2010,

25   Friday, September 24th, did there come a time that you saw

E. Grover - Defense - Direct        1149

1    her on that day?

2                THE COURT:  Do you have a recollection of

3          seeing her on that specific date?

4                THE WITNESS:  I can't specifically recall

5          every date that I saw her.  She's been to the shop many

6          times.

7          Q.   And Mr. Grover, did you -- I'm just going to ask

8    you to take a look at --

9                MR. MILLMAN:  I ask to have this marked I

10         believe it's Defendant's I for identification.

11               (Defendant's Exhibit I is marked for

12         identification.)

13         Q.   I ask you to take a look at what's been marked as

14   Defendant's I for identification.  I'm going to ask you does

15   that refresh your recollection as to whether or not you saw

16   Miss Bonilla on Friday, September 24th?

17         A.   Yes.

18         Q.   And did you see her on that date?

19         A.   Yes, I did.

20         Q.   What time was it that you saw her?

21         A.   It was the afternoon, late afternoon.

22         Q.   And who was she with when you saw her?

23         A.   She was with a girlfriend of hers and her older

24   brother.

25         Q.   Do you know her older brother's name?

J.H.

E. Grover - Defense - Direct          1150

1    A.    Ulises.

2    Q.    Had you met Ulises before that day?

3    A.    No.

4    Q.    Have you seen him since that day?

5    A.    No, not until today.

6    Q.    And you said not until today.  Do you see him here

7    in the courtroom with us?

8    A.    Yes.

9    Q.    Can you just identify and point out an article of

10   clothing that he's wearing?

11   A.    The gentleman in the table in the middle with the

12   blue shirt.

13                   THE COURT:  Yes.

14   Q.    When you saw Diana Bonilla, Ulises and her friend,

15   what, if any, conversation happened at that time?

16   A.    He was interested in getting some tattoo work

17   done.  I was busy.  We -- he showed me some work he already

18   had done on his arm, and he wanted me to finish the rest of

19   his arm.

20   Q.    Do you recall any other conversation that you had

21   with either Ulises, Diana or the friend?

22   A.    We spoke about -- we just threw some ideas back

23   and forth.  I was busy again, so I didn't really have time

24   to actually have a real consultation with him and really

25   figure out anything to do on him.  So we spoke about him

E. Grover - Defense - Direct        1151

1   coming back and hopefully getting the work done.

2       Q.   And let me just ask you at the time that you spoke

3   about possibly coming back, was that just prior to them

4   leaving?

5       A.   No, I think they stayed a little while looking at

6   some pictures. We have tattoo frames, told him to look the

7   some, maybe could get some ideas.

8       Q.   And did there come a time when they left Tattoo

9   You?

10      A.   Did there come a time when they left?

11      Q.   Yes.

12      A.   Yes.

13      Q.   And about what time was that?

14      A.   I don't know.  They were there for maybe longer

15  than an hour.  I'm not sure what time they came in.  I'm not

16  sure what time they left.

17      Q.   And correct me if I am wrong, you indicated it was

18  late afternoon that they arrived?

19      A.   Yes.

20      Q.   And during the time that they were there, while

21  your weren't speaking to them constantly, did you see Ulises

22  from time to time during the time they were there?

23      A.   Yes.

24      Q.   And do you recall any conversation that you had

25  with them, and by them I mean Ulises, Diana or her friend

J.H.

E. Grover - Defense - Direct     1152

1     before they left?

2            THE COURT:  Other than tattooing.

3        A.    No.

4        Q.    Now, in terms of the time that they left, I'm just

5     going to ask you again to take look at -- well, you

6     indicated you don't recall what time that they left?

7            THE COURT:  He said he didn't know when they

8        came or when they left.

9        Q.    When you say you didn't know, do you mean that you

10    don't recall because of lot of time has passed?

11       A.    Yes.

12       Q.    I am just going to ask you looking at Defendant's

13    I for identification in front of you, and I'm just going to

14    ask if that refreshes your recollection as to when they

15    left.

16            THE COURT:  What he means is does it bring

17        back a memory, that's what he means.

18       A.    Yes.

19       Q.    What time it was that they left?

20       A.    Seven.

21       Q.    And I'm also going to ask if I Defendant's I for

22    identification refreshes your recollection as to when it was

23    they arrived.

24       A.    Yes.

25       Q.    What time?

1    A.   Five.

2              MR. MILLMAN:  Nothing further, thank you.

3              THE COURT:  Any questions?

4              MS. ABDI:  Yes.

5    CROSS-EXAMINATION

6    BY MS. ABDI:

7        Q.   Now, Mr. Grover --

8        A.   Yes.

9        Q.   -- do you recall when you gave the statement that

10   you have been provided with?

11       A.   Yes.

12       Q.   When was that?

13       A.   It was several months ago this year.  It was

14   during 2011.  It was months ago.

15       Q.   Would looking at the statement help to have you

16   tell us when you gave that statement?

17       A.   Yes.

18       Q.   Please look at that.

19       A.   March 7th, 2011.

20       Q.   So you gave that statement in March of 2011?

21       A.   Yes.

22       Q.   Now, do you know who you gave that statement to?

23       A.   I don't remember his name.  It was a gentleman

24   that came in.  He was an investigator for the case, I

25   believe.  I don't remember his name.

E. Grover - Defense - Cross          1154

1        Q.    He was an investigator --

2        A.    Matthew Sphere.  He notarized it.

3        Q.    He was an investigator from the defense; is that

4    correct?

5        A.    Yes.

6        Q.    Do you know what the charges are in this case?

7        A.    Yes.

8        Q.    You know there's a charge of murder?

9        A.    Yes.

10       Q.    And you know there's a charge of rape?

11       A.    Yes.

12       Q.    Now, it's fair so say, Mr. Grover, that you don't

13   specifically recall the date of September 24, 2010?

14             THE COURT:  Is that true?

15             THE WITNESS:  Yes.

16       Q.    So as you here today, you don't know what date you

17   saw Ulises Bonilla in Tattoo You?

18       A.    I'm getting confused.

19             THE COURT:  She's asking you about specific

20       dates and do you have a specific memory that September

21       24th was the first time you saw the defendant.  That's

22       what she is asking you with respect to the paper.

23       A.    No.

24       Q.    So you don't know?

25       A.    No.

J.H.

E. Grover - Defense - Cross        1155

1    Q.    They came in on September 24th of 2010?

2    A.    No.

3    Q.    And it's fair to say you also don't recall what

4    time they came in, if they came in?

5    A.    Yes, it is fair to say that.

6    Q.    And how many days a week do you work?

7    A.    I work five days a week.

8    Q.    And how many hours do you work?

9    A.    I work --

10              THE COURT:  Does it vary?

11              THE WITNESS:  Yeah, it does vary.  Sixty

12    hours about.

13    Q.    Is it fair to say you work a lot of hours in the

14    tattoo shop?

15    A.    Yes, I do.

16    Q.    And it's fair to say that when you're working,

17    you're not continuously paying attention to a clock?

18    A.    True, yes.

19    Q.    And when you're working, unless you have an

20    appointment, you don't make specific mention of the date?

21    A.    Correct.

22              MS. ABDI:  I have no further questions.

23              THE COURT:  Do you have anything?

24              MR. MILLMAN:  I have, your Honor.

25

J.H.

E. Grover - Defense - Redirect        1156

1    REDIRECT EXAMINATION

2    BY MR. MILLMAN:

3         Q.    So as you sit here, Mr. Grover, given the amount

4    of time that's passed, you don't recall a specific date?

5         A.    Yes.

6         Q.    Can we agree that at the time you gave the

7    statement to my investigator, it was certainly much closer

8    in time --

9         A.    Yes.

10        Q.    -- than it is today, correct?

11        A.    Yes.

12        Q.    Your memory would have been much better?

13        A.    Yes.

14        Q.    And you signed that statement, right?

15        A.    Yes.

16        Q.    Under penalty of perjury, right?

17        A.    Yes.

18        Q.    And you indicated in the statement that they were

19   there September 24th between 5 and 7, right?

20              MS. ABDI:   Objection.

21        A.    Yes.

22              THE COURT:   Overruled.

23        Q.    And when you say you don't recall -- withdrawn,

24   withdrawn.

25              Other than the time you told us about that you

J.H.

E. Grover - Defense - Redirect      1157

1  testified about when you spoke with Ulises, have you ever

2  spoken to him or met him other than that night?

3                  MS. ABDI:  Objection.

4       A.   No.

5                  THE COURT:  Overruled.

6                  MR. MILLMAN:  Nothing further.  Thank you.

7                  THE COURT:  You can step down.

8                  THE WITNESS:  Thank you.

9                  (The witness was excused.)

10                  THE COURT:  Any other witnesses?

11                  MS. ABDI:  No, your Honor.

12                  THE COURT:  Defense rests his case?

13                  MR. MILLMAN:  Defense does rest, your Honor.

14                  THE COURT:  Do the People rest?

15                  MS. ABDI:  Judge, may I just approach?

16                  THE COURT:  You don't have to approach.  Do

17       you wish to offer any testimony in rebuttal?

18                  MS. ABDI:  Yes.

19                  THE COURT:  Okay.  Now, ladies and gentlemen,

20       the People have rested their direct case.  The defense

21       has rested its direct case.

22                  Now, the People wish to introduce evidence in

23       rebuttal.  The purpose of rebuttal testimony is not to

24       rehash the direct case.  It's to rebut that which was

25       brought up on the defendant's case, and for that

J.H.

E. Grover - Defense - Redirect          1158

1     purpose alone.

2                    Let me give you an example of this which you

3     can accept or reject.  Suppose witness A is accused of

4     a crime that takes place January 1st in Garden City at

5     noontime.  Witness B says that the defendant was with

6     me at that specific time, and we were in Gurney's Inn

7     in Montauk Point.  Rebuttal to that, and I don't know

8     anything about Garden City.  Rebuttal to that would be

9     witness C who says I don't know anything about Garden

10    City.  I don't know anything about Gurney's Inn.  But I

11    do know that witness B who places the individual at

12    Gurney's Inn, that witness was with me in Mount Airy

13    Lodge in the Poconos.  That's true rebuttal, and it's

14    ordinarily of a very limited nature.

15                   The People will present what they have

16    tomorrow.  We will see you tomorrow at 9:30.

17                   Remember the admonitions I have given you.

18                   There is a possibility, I haven't decided

19    yet, but there is a possibility you will be breaking

20    early tomorrow.  There's also a possibility that I may

21    require the parties to sum up tomorrow afternoon, and I

22    will charge you on Friday.  I'm getting a lot of flak

23    from the attorneys on that issue, and maybe rightfully

24    so.  But the last thing I want you to do is -- well, I

25    really would like -- I don't want you to go into the

J.H.

E. Grover - Defense - Redirect        1159

1    Christmas holidays on in particular case if it can be
2    helped.

3              (Whereupon, the jury exits the courtroom.)

4              THE COURT:  What is the nature of your
5    rebuttal testimony?

6              MS. ABDI:  Judge, this is why I wanted to
7    kind of approach before, you know, I say I may have
8    something in front of jury because I'm not sure if your
9    Honor will allow me to do this.  But I was going to
10   call -- Diana Bonilla had testified that she had told
11   the police certain bits of information regarding
12   specifically who she saw in the fight.  And I was going
13   to call Detective Cereghino to get into just that
14   limited area of whether or not these, indeed, were
15   other people that she saw at the scene.

16             THE INTERPRETER:  I can't hear you.

17             MS. ABDI:  To get into whether or not, the
18   limited issue whether or not she had indicated to him
19   about those people that she had seen.

20             THE COURT:  All right, she said that she did
21   tell an untruth in certain areas.  She did say that.
22   Now, if that's the case, then you will not be able to
23   introduce any further evidence of that specific untruth
24   because she admits it.

25             If, however, she denies saying to Cereghino

E. Grover - Defense - Redirect        1160

1    certain statements and they are material, then you

2    could put Cereghino on the stand and say that she said

3    certain things to him.

4             MS. ABDI:  And that's yes, your Honor, I

5    believe there's just that one aspect.  Because there

6    were other things that she admitted that she did not

7    tell them that she lied will about.  Obviously I

8    wouldn't be getting into those issues because she

9    answered.  It's just the two specific questions that

10   she said she told the police she saw Misael and she saw

11   Henry Hernandez getting involved in the fight.

12            THE COURT:  I'll let you do that.

13            MS. ABDI:  Judge, will you be expecting us to

14   sum up tomorrow or Friday?

15            THE COURT:  Well, if I were in your position,

16   and after a two-week case, some judge didn't let me

17   prepare my summation, I would be pretty damn mad.  You

18   can sum up on Friday.

19            MS. ABDI:  Thank you, Judge.

20            MR. MILLMAN:  Thank you, Judge.

21            THE COURT:  Okay, we'll see you tomorrow.

22            (Whereupon, the trial is adjourned to

23   December 15th, 2011.)

24

25

1161

1    STATE OF NEW YORK  :  NASSAU COUNTY

2        SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5            -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                        Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                          December 15, 2011
                            262 Old Country Road
11                          Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                     For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                       For the Defendant
23
                          JOANNE HORROCKS, CSR
24                        Senior Court Reporter

25

J.H.

Proceedings                              1162

1        COURT OFFICER: Jury entering.

2            (The jury enters the courtroom.)

3        THE CLERK: Case on trial, People of the

4    State of New York versus Ulises Bonilla, Indictment

5    202N of 2011. All parties are present, including the

6    defendant and Spanish interpreter and all jurors.

7        Do both sides waive a reading of the roll,

8    consent to the seating?

9        MS. ABDI: Yes.

10       MR. MILLMAN: Yes.

11       THE COURT: All right, ladies and gentlemen,

12   we're fastly coming to a point where the evidence is

13   concluded in this particular case. It hasn't been an

14   overly long case. You may think so. But there is a

15   lot of material in here.

16       I told you yesterday we would proceed with

17   summations today. After you left yesterday, I had

18   discussions with the attorneys on issues of law, and I

19   acceded to their plea that they have a little time to

20   prepare for their summations. So we're going to do the

21   summations tomorrow.

22       You will have some more testimony in rebuttal

23   case, in the rebuttal case today which won't be too

24   long. The good news is you are going to get out soon,

25   and since you are here and heard testimony, you are

1    going to get paid.  But the bad news -- actually the

2    bad news is we will be delayed somewhat but not that

3    much.

4                 Now, tomorrow, you will hear the summations,

5    and I expect to give you the case for deliberation

6    tomorrow afternoon.  You will probably not have too

7    much time to deliberate tomorrow afternoon.  And if the

8    case goes into Monday, this is what I want to tell you.

9    I have been telling you to get here at 9:30 because we

10   can't proceed until everybody is here.  And you know

11   that many times we don't start until 10:30.  There are

12   reasons for this.  However, when you are deliberating,

13   once all 12 of you are here, you can start

14   deliberating, you don't have to come back to the

15   courtroom.  So as of Monday, I really want you here 9

16   o'clock so you can immediately start deliberating.

17   Also -- and you can do that when all 12 of you are

18   here.

19                Also, I want to know tomorrow from any juror

20   if any problems have developed, such as a grandmother

21   in extremis or something like that that you might have

22   a problem with being on this case all of next week or a

23   good portion of next week.  Just let me know tomorrow.

24                And lastly, I haven't made a decision on this

25   yet, but I may seek approval from the Administrative

1    Judge to work a little later, like 5:30 until 6

2    o'clock.  So just be prepared with the proper notice

3    upon my part to you that on some days next week, we may

4    be working later.  It may not be necessary.

5                We're now on the People's rebuttal case.

6                MS. ABDI:  People call Detective James

7    Cereghino.

8                THE COURT:  As I said to you, I believe it

9    was yesterday, the purpose of a rebuttal case is not to

10   rehash the People's direct case.  It's simply to deal

11   with a matter that was first brought up in the

12   defendant's case.

13               MS. ABDI:  Thank you.

14               THE CLERK:  Detective, please just state your

15   name for the record.

16               THE WITNESS:  First name is James, last name

17   Cereghino, C-E-R-E-G-H-I-N-O.

18               THE CLERK:  Please be reminded you're still

19   under oath.

20               THE WITNESS:  Yes, sir.

21

22

23

24

25

1    D E T .   J A M E S   C E R E G H I N O, a witness called on

2         behalf of the People, after having been previously duly

3         sworn by the Clerk of the Court, was examined and

4         testified upon his oath as follows:

5    DIRECT EXAMINATION

6    BY MS. ABDI:

7         Q.    Good morning, Detective.

8         A.    Good morning, counsel.

9         Q.    I'm going to direct your attention to September

10   29th of 2010.  As part of your investigation, did you have a

11   conversation with a Diana Bonilla?

12        A.    Yes, I did.

13        Q.    And as part of your conversation, did you ask her

14   about the events of September 28th, 2010 in front of 180

15   Kinkel Street?

16        A.    Yes, I did.

17        Q.    Did she ever tell you that Misael Berrios was

18   involved in a fight in front of 180 Kinkel Street?

19        A.    No, no, she didn't.

20        Q.    Did she ever tell you that Henry Hernandez was

21   involved in the fight in front of 180 Kinkel Street?

22        A.    No, she didn't.

23        Q.    And did she ever tell you that her brother was

24   there at the time of the fight at 180 Kinkel Street?

25        A.    I specifically asked her if her brother was there,

J.H.

Det. J. Cereghino - People - Direct    1166

1   and she said no, she had not seen him since the previous day

2   when he had injured his finger at work and he was going to

3   the hospital to have it tended to.

4              MS. ABDI:  I have nothing further.

5              THE COURT:  Any cross?

6              MR. MILLMAN:  No questions.

7              THE COURT:  Okay.  Step down.

8              THE WITNESS:  Yes, sir.

9              (The witness was excused.)

10             THE COURT:  People rest their rebuttal case?

11             MS. ABDI:  Yes, your Honor.

12             THE COURT:  Defendant rests?

13             MR. MILLMAN:  Yes, your Honor.

14             THE COURT:  Ladies and gentlemen, remember

15        the admonitions I have given you.  We'll see you

16        tomorrow at 9:30, and I guarantee you you are going to

17        be working a whole lot harder tomorrow than you did

18        today.  Have a pleasant day and evening.

19             (Whereupon, the jury exits the courtroom.)

20             THE COURT:  Both sides having rested, are

21        there any motions at this time?

22             MR. MILLMAN:  Just one minute.  Yes, your

23        Honor.  At this time defense moves for trial order of

24        dismissal with regard to both the murder and related

25        charges and the rape and related charges.

1        Particularly with regard to the murder

2   charges on the defendant's case, evidence was brought

3   out to explain the presence of defendant's blood on the

4   rear seat of the vehicle seen leaving the scene

5   basically in total of the evidence.  It's our position

6   they did not make out a case.

7        With regard to the rape and sexual related

8   charges, including the endangering, all charges related

9   to that incident, I think particularly the evidence

10  presented during the defendant's case establishes an

11  alibi.  I understand to some extent it's a question of

12  fact there.  But our understanding is based on totality

13  of the evidence there is insufficient evidence, and I

14  ask for a trial order of dismissal.

15        THE COURT:  People, just refresh me on the

16  evidence that you presented with regard to the crowbar

17  as a possession of a dangerous instrument with intent

18  to use the same unlawfully.

19        MS. ABDI:  Your Honor, that was -- there was

20  testimony by Nancy Villatoro that she had seen the

21  defendant with what's charged as a blunt instrument,

22  what appeared to her to be a tire iron, take it and

23  strike her father, Armando Villatoro.

24        THE COURT:  Okay, I remember that now.

25  Counsel, all of the issues that you raised are factual

J.H.

1    issues that must be decided by a jury.  Your motions

2    are denied.

3         Now, what I must do now is inform you of any

4    lesser included charges that I might submit to the jury

5    and is there any argument on that.  I think

6    manslaughter in the first degree is an appropriate

7    lesser included charge of murder.  Do you request that,

8    counsel?

9         MR. MILLMAN:  Yes, I certainly do.  I do

10   think it's appropriate, and we are asking for that.

11        THE COURT:  People, you oppose?

12        MS. ABDI:  Yes, your Honor.

13        THE COURT:  I am going to grant it.  I will

14   charge manslaughter in the first degree under the

15   theory of the tend to cause serious physical injury and

16   death is caused.  I don't see with regard to the

17   remainder of the counts in the indictment any

18   appropriate lesser included.  Does anyone disagree with

19   me?

20        MR. MILLMAN:  Your Honor, I don't disagree.

21   The only lesser included I'm asking for is

22   manslaughter.

23        MS. ABDI:  I don't disagree, meaning I agree.

24        THE COURT:  All right, we will do that.  We

25   did talk about some of the things I would charge.

1    Nothing is brought up which is novel except the defense

2    counsel in an off-the-record discussion asked me to

3    include in assessing the credibility of a witness

4    whether or not a timely outcry was made, and I will do

5    that.  I'll charge everything that was requested off

6    the record.  That includes flight charge, motive

7    charge, circumstantial evidence charge.  And you want

8    me to charge the -- on the defendant's failure to

9    testify?

10                MR. MILLMAN:  Yes, your Honor.  I have

11   submitted to you a charge which I copied to counsel

12   also.  With the exception of the extreme emotional

13   disturbance and the manslaughter in the first degree

14   section pertaining to extreme emotional disturbance, I

15   am asking for everything else in there, most of which

16   are standard, but the language is in there.

17                With regard to the prompt outcry, the issue

18   of the credibility and the effect that any delay in

19   reporting might have did include the specific language

20   in there as well.  It was taken from the CJI, so I

21   believe it is standard language.  And as far as the

22   charge of flight, your Honor, I would just want to, I

23   don't know if the Court has handy exactly what it

24   intends to charge.  I think I have the standard charge,

25   but I think there is more than one standard charge to

1  that, so I just want to inquire whether or not the

2  Court had the language that it intended to charge on

3  the flight issue.

4           THE COURT:  I don't have it with me, but it's

5  pretty much standard.

6           MR. MILLMAN:  Okay, all right.  I thought I

7  saw two different -- I'll double-check that, Judge.

8           THE COURT:  Do you want me to include your

9  requests to charge as a court exhibit?

10          MR. MILLMAN:  Yes, as a court exhibit.

11  Obviously it won't go going to the jury.  Yes, as a

12  court exhibit, that's fine.

13          THE COURT:  Because that preserves what you

14  have to say.

15          Now, obviously you are withdrawing your

16  request as to emotional disturbance and manslaughter.

17  You did make reference to the People's failure to call

18  a witness.  I'm not giving you a missing witness charge

19  because it was not brought up in the People's case.  In

20  other words, it's untimely.  That doesn't mean you

21  can't comment on it in summation.  Feel free to do

22  whatever you wish on that.

23          Okay, do you want to mark this as a court's

24  exhibit.  Other than that, we'll see you tomorrow.

25          MR. MILLMAN:  Thank you, your Honor.

Proceedings                                1171

1        (Whereupon, the trial is adjourned to

2    December 16th, 2011.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     STATE OF NEW YORK : NASSAU COUNTY

2        SUPREME COURT : PART 39

3     ----------------------------------------X

4     THE PEOPLE OF THE STATE OF NEW YORK,

5          -against-                Ind. No. 202N-11

6     ULISES BONILLA,

7                    Defendant.

8     ----------------------------------------X

9     JURY TRIAL

10                   December 16, 2011

                     262 Old Country Road

11                   Mineola, New York

12     B E F O R E :

13        HON. GEORGE R. PECK,

           Acting Supreme Court Justice

14

15

16     A P P E A R A N C E S :

17        HON. KATHLEEN M. RICE

          Nassau County District Attorney

18          BY: ZEENA ABDI, ESQ., of Counsel

          Assistant District Attorney

19                For the People

20

21        DANIEL L. MILLMAN, ESQ.

          316A Main Street

22          Roslyn, New York 11576

              For the Defendant

23

                JOANNE HORROCKS, CSR

24                Senior Court Reporter

25

1        THE CLERK:  Case on trial, People of the

2   State of New York versus Ulises Bonilla, Indictment

3   202N of 2011.  All parties present including the

4   defendant and the Spanish interpreter.  There are no

5   jurors present at this time.  Any applications?

6        THE COURT:  All right, the jurors are in

7   route.  Does anyone want to place anything on the

8   record before summations begin?

9             MR. MILLMAN:  No, your Honor.

10             MS. ABDI:  No, your Honor.

11        THE COURT:  I thought you wanted to do

12   something with the 911 tape?

13             MS. ABDI:  Yes, your Honor.  I believe

14   defense counsel's Exhibit D is in evidence.  One

15   particular 911 call is the only thing that's in

16   evidence.  The tape contains other 911 calls and police

17   radio transmissions.  So what I have done is I have

18   taken out that one call and placed it on a separate

19   disk which I believe defense counsel can have it marked

20   D-1, and that should be the disk that should the jury

21   require evidence that that will be the disk that will

22   be forwarded with the jury.

23        THE COURT:  Why don't we just substitute the

24   exhibits?

25             MS. ABDI:  Judge, as far -- I believe just

Proceedings                                    1174

1    for the clarity of the record that we should have those

2    two exhibits and then that one exhibit can be

3    substituted as far as giving the jury that exhibit.

4    But as far as the record --

5              THE COURT:  All right, by consent, we will

6    introduce a redacted tape as D-1.

7              MR. MILLMAN:  And I'll just ask to have this

8    marked.  And this is in the highly, highly unlikely

9    event that we listen to what didn't come out.

10             (Defendant's Exhibit D-1 is received and

11   marked in evidence.)

12             COURT OFFICER:  Jury entering.

13             (The jury enters the courtroom.)

14             THE CLERK:  Let the record reflect the

15   presence of all jurors.  Do both sides waive a reading

16   of the roll and consent to the seating?

17             MS. ABDI:  Yes.

18             MR. MILLMAN:  Yes.

19             THE CLERK:  Thank you.

20             THE COURT:  All right, ladies and gentlemen,

21   we are about to commence summations.  Under our system

22   of law, the defense goes first, the People go second.

23             Remember what I said to you previously,

24   summations are not evidence.  If you desire, you are

25   free to adopt all or part of anyone's arguments as your

J.H.

1    own.  You are not required to.  But they are not

2    evidence.  Proceed.

3              MR. MILLMAN:  Good morning, your Honor,

4    counsel, ladies and gentlemen of the jury.  Before I

5    begin, I want to, again, thank you for the attention

6    and patience that you have had throughout this trial.

7              As we discussed during jury selection, you

8    have a very important job.  You have now heard the

9    evidence and will be called upon to make decisions

10   about which evidence you believe and to what extent and

11   which evidence you choose to not believe.  And I will

12   now review that evidence with you, and it's a purpose

13   of closing statement.  And I will tell you that I

14   firmly believe that the evidence has failed to prove my

15   client's guilt with respect to any of the charges

16   before you.

17             I submit to you that regardless of how you

18   look at the evidence, it all adds up to the same thing,

19   reasonable doubt.  If you look at the People's

20   evidence, it's clear they have not met their burden.

21             First, I want to address the allegations of

22   rape and the other charges related to Jennifer

23   Villatoro.  The evidence presented by the District

24   Attorney in an effort to prove my client's guilt

25   consists of unreliable witness testimony and not a

1    shred of physical evidence connecting my client to the

2    allegations made by Jennifer Villatoro.

3              Now, you heard testimony from Dr. Yasmine

4    Pompey, and she did tell you that based upon her

5    examination and based upon the existence of what she --

6    you know, what she termed as a B cleft in her

7    examination that she conceded that it was consistent

8    with either digital penetration, fingers, or penile

9    penetration.  She did indicate in her report that it

10   was consistent with digital penetration.  You do have

11   those records in evidence to review.

12             However, Dr. Pompey significantly was unable

13   to identify when this would have happened, any such

14   penetration, and the person that is the source of the

15   penetration.  And there is no physical evidence linking

16   my client to any such penetration even if you conclude

17   that it did happen.

18             The examination Dr. Pompey told you revealed

19   no evidence of external trauma and no tears in the

20   vaginal area.  And Dr. Pompey did tell you that

21   Jennifer, once again, did not report any penetration by

22   a penis.

23             Now, the judge will tell you about what

24   factors that you can consider in evaluating the

25   testimony of a witness.  There are two such factors

1    that I submit to you that are particularly important

2    here when you consider the testimony of the witnesses,

3    the children witnesses with regard to the rape

4    allegations.  One such factor is whether or not the

5    testimony is plausible and likely to be true.

6              You bring your common sense and experience

7    with you.  Use that to make judgments.  Use your common

8    sense.

9              The second factor that I want you to keep in

10   mind in evaluating the credibility of these witnesses

11   is whether it is consistent with other evidence in the

12   case, because I submit to you that the testimony, first

13   of all, the two children that are close friends with

14   Jennifer, and I am talking about Steven Destina and

15   Ivan Alcantara, is unreliable and unworthy of belief.

16   The testimony of Steven Destina and Ivan Alcantara is

17   implausible on its face.  They would have you believe

18   that my client approached Jennifer Villatoro in broad

19   daylight at a public park that was crowded and that

20   routinely has at least four uniform patrol officers

21   walking the area and that right out in the open, he was

22   kissing and touching a 10 year old girl.  I submit to

23   you that's implausible on its face.  And Steven

24   Destina's testimony is entirely inconsistent with other

25   more objective and more reliable evidence in that case,

Proceedings                        1178

1    and that's significant.  Steven Destina told you that

2    he observed Jennifer and she had swollen and bruised

3    lips right after the incident.  He told you that two

4    weeks later, that bruising was still there, although it

5    was less pronounced.

6              Well, we heard from Police Officer Bendetto.

7    He testified that he responded to the home on the date

8    that Jennifer claims that this took place.  And he told

9    you that he spoke to her, and he spoke with Steven, and

10   he spoke with Ivan.  And do you remember what he told

11   you?  He didn't see any indication of any bruising or

12   swelling on the lips.

13             Again, he spoke to the children, all three of

14   them, spoke to the mother.  He knew what it was about.

15   He knew what he was responding to, a trained police

16   officer with many years of experience, and he doesn't

17   see this swelling and bruising despite the fact that

18   Jennifer Villatoro told you that she was actually

19   putting ice it on right in front of the police officer

20   when she was talking to him.  She told you that.

21             The testimony of Steven Destina in this

22   regard with regard to the swelling and bruising on the

23   lips is also inconsistent with the medical records of

24   Jennifer Villatoro.  They don't indicate this bruising

25   and swelling, and that was a week later.  But Steven

J.H.

1    Destina told you that two weeks later, it was still

2    there.  It was just less pronounced.

3              Additionally, there's a wide discrepancy in

4    time offered by the children witnesses that only

5    further accents why their testimony is not reliable.

6    Steven, he indicated that he, Ivan and Jennifer arrived

7    at the park either 3 or 4, and he was clearly uncertain

8    about that.  The only one that was certain about the

9    timing was as Oscar.  He told you that he returned home

10   from soccer practice at about 5:30 p.m.  This is on

11   September 24th of 2010.  He knew it was 5:30 or a

12   little after because that is when he gets home from

13   soccer practice every day or whenever he has soccer

14   practice.  He told you that that time, a little after

15   5:30, he observed Steven, Ivan and Jennifer walking

16   toward the park.  They were on their way toward the

17   park.

18             I submit to you that the testimony of

19   Jennifer Villatoro is entirely implausible on its face.

20             THE COURT:  I didn't hear that.  Did you say

21   plausible?

22             MR. MILLMAN:  Implausible, your Honor.

23   During the summer of 2010, she told that you on a

24   number of occasions my client, Ulises Bonilla who the

25   evidence showed has had a serious girlfriend, 31 years

Proceedings                                    1180

1    old and a five year old child, approached her, fondled

2    her, kissed her, touched her breasts, touched her

3    vaginal area in broad daylight in front of his own

4    house with other individuals around.  Does anybody

5    really believe that that's even plausible?  Think about

6    it.  That's what she told you.  And you can have it

7    read back if you have any question about what it is

8    that she said.  Then she testifies that she knew that

9    this was all wrong, and she never said a word about it

10   to her mother, the police or anybody else.

11             Jennifer Villatoro's testimony significantly

12   is also inconsistent with other evidence, a number of

13   items, other evidence in the case, and also which is

14   also significant in evaluating her credibility.  First

15   it is inconsistent with the medical records from Nassau

16   University Medical Center.  The history indicates

17   nothing about penile penetration.  Additionally,

18   there's no notation about any bruising or swollen lips.

19             Her testimony is also inconsistent with the

20   report that she gave to the police on the day of the

21   alleged incident where she said nothing happened.  The

22   report she gave to the police five days after she

23   claims this happened, September 29th, 2010, she

24   specifically stated at that time that Ulises never

25   placed his penis inside of her.

1        Again, her testimony for the reasons I stated

2   is also inconsistent with the testimony of Police

3   Officer Bendetto with regard to the bruised and swollen

4   lips like I mentioned before.  He was there that day.

5   He saw no indication.

6        Now, Steven and Ivan, her testimony is also

7   inconsistent with her friends, Steven and Ivan.  She

8   never ever said at any time that Ulises kissed her or

9   did anything before they got into the stall.  Steven

10  and Ivan are telling you that they saw it happened

11  before they got into the stall.

12       Jennifer Villatoro also on cross-examination

13  attempted to explain why she did not tell the police

14  everything on the day of the incident and several days

15  later when she was spoken to.  And I submit to you that

16  her explanation as to why she didn't is far from

17  convincing to put it charitably.  She said she didn't

18  tell the police what happened because she was worried

19  that she would get in trouble with her mother.  That

20  was on the day that the police asked her about it.  Yet

21  she did acknowledge on cross-examination that both the

22  police and her mother told her that she should tell

23  everything that happened, that she would not get in

24  trouble.  They were both -- and she told you, her

25  mother and the police were both asking her to tell

Proceedings                          1182

1    everything that happened that time.

2              Additionally, when Jennifer was at the police

3    station five days later as I mentioned, she told them

4    that Ulises never placed his penis inside of her.  Her

5    mother wasn't with her at that time.  She wasn't there.

6              But more significantly the testimony of

7    Jennifer, Steven and Ivan completely contradicts three

8    alibi witnesses presented by the defense, one of whom I

9    submit to you is an entirely objective witness not

10   affiliated with anyone in this case.  Zeida Bonilla

11   testified she told you that on September 24th of 2010

12   at 4 p.m., she left work with her boyfriend, the

13   defendant, Ulises Bonilla.  She told you that she

14   dropped him off at his house at 163 Kinkel Street at

15   4:30 p.m., and she was sure of the time because she

16   leaves work the same time every day.  She was working

17   with Ulises.  She left work at 4 o'clock, dropped him

18   off at 4:30 at his home.

19             You heard testimony from Diana Bonilla.  She

20   told you that at about 4:30, she was at home on the

21   computer at which time she observed Zeida's car pull

22   up, and she observed Ulises get out and enter the

23   house.  She told you that after Ulises entered the

24   house that where she was, the position she was in that

25   in order for Ulises to have left that house, there are

J.H.

1    only two ways he could have left, and both ways he

2    would have had to pass right in front of her, and she

3    told you that he stayed there.  She also told you that

4    she then drove with him to pick up her friend, Xiomara,

5    and they went to Tattoo You and arrived there about

6    5:15, 5:30 p.m.  She told you that they stayed there

7    until about 7 p.m.

8              Now, Miss Abdi will undoubtedly speak to you

9    about the close affiliation that Diana Bonilla and

10   Zeida Bonilla have with my client.  To be fair, they

11   are both people who are close to the defendant.  I mean

12   Diana Bonilla is his sister, and Zeida Bonilla is his

13   girlfriend, and they do care about him.  Is that a

14   factor that should be taken into account?  Sure, it's

15   only fair.  But does that mean in and of itself that

16   they are being less than truthful?  Absolutely not.

17   You need to look at the totality of the circumstances,

18   ladies and gentlemen, and evaluate the credibility, and

19   in doing so, I would ask you to consider two things:

20   Number one, if one is falsely accused of a crime, they

21   have to account where their whereabouts are at a

22   particular time, isn't there a pretty good chance that

23   the people they were with are people who care about

24   them and that they care about?  Probably not going to

25   be strangers.

Proceedings                              1184

1      Second of all, and more importantly, I want

2   you to consider the fact that the testimony of Miss

3   Bonilla, Diana Bonilla is corroborated by Evan Grover

4   who is an entirely impartial and objective witness in

5   this case.  I mean you heard during his testimony he

6   was subpoenaed to be here.  He didn't even want to be

7   here.  He is not closely affiliated with anyone in this

8   case.  He only met the defendant on one occasion he

9   told you, the night in question that he testified

10   about.

11      Now, you did hear Evan Grover become mixed up

12   on the stand during cross-examination.  We heard it.

13   He became confused about the date, and he said a lot of

14   time has passed.  That's understandable.  It was some

15   time ago.  However, it's also clear, and you can have

16   this read back as well, that he reviewed a statement

17   that he gave to my investigator fairly close in time to

18   the night in question, his sworn statement, reviewed

19   it, and after he reviewed it, he was very clear in

20   stating to you that it refreshes his recollection and

21   that on the 24th of September, between 5 and 7 p.m., my

22   client was at Tattoo You.

23      Now, Miss Abdi will also I expect point to

24   testimony on cross-examination by Diana and Zeida

25   Bonilla wherein they didn't recall specifically where

J.H.

1   they were the day before September 24th and the day

2   after.  This, however, September 24th, was not just

3   another day.  I think that's clear.  Within a certain

4   period of time after the allegations were made by

5   Jennifer Villatoro, Diana, Zeida, they became aware of

6   it within a short time after.  At that time they are

7   actually going to say to them the 24th, that night we

8   were at the tattoo place, and they are going to

9   remember that as time goes on because it has a

10  significance.

11          It's not surprise that these witnesses don't

12  remember where they were the day before or the day

13  after.  Again, it doesn't have a significance.  We all

14  can look back, and there are certain dates we don't

15  remember anything about.  There's other dates that are

16  significant.

17          Now, it didn't have any significance to Evan

18  Grover because he is not personally involved, and

19  that's why he didn't initially recall it when he was

20  asked.  And that is why he reviewed a statement given

21  much closer in time and why he was able to tell you

22  that on the 24th, between 5 and 7, my client was at

23  Tattoo You.

24          Now, I also want you to consider the

25  testimony of Angel Leon.  And we know he is a friend of

Proceedings                          1186

1    the victim, Armando Villatoro.  He told you that on the
2    evening of September 24th, 2010 that Armando was
3    drinking at the deli and was with him and that Ulises
4    came in after Armando.  Now, think about this for a
5    moment.  If Ulises had raped Armando's daughter like
6    the DA would have you believe, why would Ulises be the
7    one approaching Armando?  Why would Ulises say to
8    Armando, quote, I want to fix things man to man?  Why
9    would Ulises be the one always coming after Armando the
10   day of the incident, the night of the stabbing a few
11   days before this happened at the deli, why?  I submit
12   to you that the District Attorney's case with regard to
13   the allegations made by Jennifer Villatoro is replete
14   with unreliable testimony, unreliable testimony that is
15   completely inconsistent with the objective and more
16   reliable evidence, her medical records, from Police
17   Officer Bendetto.  It's very consistent and it's always
18   entirely consistent with the three alibi witness, most
19   notably Evan Grover.

20             The District Attorney has failed to prove
21   beyond a reasonable doubt that anything inappropriate
22   or sexual ever happened between my client and Jennifer
23   Villatoro.  And the only proper verdict with regard to
24   all the charges relating to the allegations made by
25   Jennifer Villatoro is a verdict of not guilty, and that

J.H.

1    includes the rape charge, that includes the sexual

2    abuse charge and the endangerment charge.

3         I want to talk to you about the charges

4    related to the night of September 28th, 2010, the

5    murder charge and the related charges as well.  And as

6    the Assistant DA speaks to you during her closing

7    statement, I want you to ask yourself does the evidence

8    she is talking about just prove his presence there?

9    Does it just prove that he was in a fight with Armando

10   that night?  Does it just prove that Armando died of

11   stab wounds?  Because the defense doesn't dispute any

12   of those facts.

13        I can make it easier for you, we are not

14   disputing that he was there.  We are not disputing

15   there was a fight.  We were not disputing Armando died

16   of stab wounds.  The issue here is whether or not my

17   client stabbed her and what evidence they have to show

18   that my client stabbed her.  We know that Armando was

19   stabbed.  I mean there was a mistake.  Some people

20   thought he was shot because of the chaos and everything

21   else, but I have never disputed that he was stabbed.  I

22   told you that in the opening statement.  I think the

23   evidence is clear about that.

24        But the Assistant DA presents witnesses to

25   you who were there at the time, right there when it was

1    happening, and none of them saw my client stabbed.

2    None of them saw my client touch a knife.  None of them

3    saw my client make a stabbing motion, and none of them

4    hear Armando cry out in pain while he's fighting with

5    my client.  Those facts are undisputed.

6              I submit to you, ladies and gentlemen, that

7    the evidence in this case does not reflect what the

8    Assistant DA told you was a one-on-one fight with

9    everyone else just watching passively.  Use your common

10   sense.  The police recovered pipes and sticks from the

11   scene, okay, and broken bottles.  Do you really think

12   for a second that this is a one-on-one and no one else

13   got involved?  Think about it for a moment.

14             And a number of people were even observed

15   getting involved in this from some of the witnesses who

16   testified.  We have heard a number of times when a

17   gentleman with a Cincinnati Reds cap who was hitting

18   Armando with a stick who got into it.  We also heard

19   testimony about someone wearing a Yankee cap, and there

20   was also testimony that Diana also had gotten in to

21   defend her brother.  There was also testimony about

22   Misael seen fighting with someone by a car.  He didn't

23   have a gun out at that time.  And we also heard

24   testimony of Henry fighting by the car with someone as

25   well.

J.H.

1        So the very existence of the items that were

2    recovered by the police in this case, I submit to you,

3    belies the motion that this is a situation where

4    everyone is sitting around watching a fight as if they

5    were watching a one act two-man play front row center

6    seat.  They all brought weapons with them to inflict

7    injury.  The weapons were recovered from the scene.

8        Counsel would have you believe that all these

9    people just sat there and watched.  We know a number of

10   these people were friends with Armando.  We know a

11   number of the people were friends with my client.  Do

12   you really think they just sat around and watched?  Do

13   you really think for a single second that if what the

14   DA is telling you is true that my client stabbed

15   Armando 12 times while everyone's just there and they

16   had weapons and no one else would have gotten in and

17   start hitting him?  Do you really think they would have

18   just sat around and watched?

19       And you know what, ladies and gentlemen, if

20   you do believe that this was a one-on-one, it only

21   further proves that my client could not have possibly

22   done this.  Think about it, no one ever saw him stab

23   Armando.  No one ever saw him with a knife.

24       My client, I submit to you, could not

25   possibly have done this without them having seen it or

Proceedings                          1190

1    seen something.  Think about it.  You saw the knife.

2    It was introduced into evidence.  It's not a machete,

3    but it's certainly not small.  It's got a seven-inch

4    blade.  You can look at it.  How could they not see it?

5    The house at 180 Kinkel Street the evidence showed has

6    a motion detector that that goes on when anybody is

7    right in front.  The evidence shows you a number of

8    people right in front of it, that light would have been

9    there.

10            Dr. Catanese testified that two of the stab

11   wounds were five inches in depth.  They perforated

12   organs, rather, including the right ventricle of the

13   heart.  Do you really think that the kind of motion,

14   the kind of action that it takes for that, someone

15   doing that is going to be doing that right in front of

16   10 people watching and no one's going to see it?  Think

17   about it for a moment.  Had my client stabbed Armando

18   while he was fighting with him, I submit to you that it

19   was clear someone would have seen something more than

20   what we've heard.

21            Now, the events of that night and the fight,

22   we know it culminated in a gunshot.  I think all the

23   witnesses agree on that.  The gunshot caused chaos and

24   confusion which was followed by numerous individuals

25   dropping weapons, running from the scene, and witnesses

J.H.

1    thereafter observed Armando walking on his front lawn

2    bleeding.  Now, we do know Armando was stabbed to

3    death.  No one is disputing that.  For one reason or

4    another no one sees Armando get stabbed.

5           But what we do know everyone who was watching

6    my client fight with Armando, if you want to believe

7    what the DA's witnesses said and no one saw anyone

8    stabbing at that time.

9           We also know the witnesses gave us various

10   accounts as to when the gunshot went off and what they

11   observed at that time.  But the witnesses are all

12   consistent on one thing, after watching Ulises fight

13   Armando during which time again no one sees him get

14   stabbed, they observed Armando walking on the front

15   lawn bleeding after the gunshot.  After the gunshot

16   when everyone went running, weapons were dropped, and

17   there was lot of chaos at that time.

18          Now, numerous people called 911 we know,

19   Detective Cereghino testified, and they all called it

20   in as a shooting.  Clearly the witnesses there did not

21   know exactly what happened.  Clearly they didn't see

22   any stabbing.  Detective Cereghino also testified that

23   the police learned it was a stabbing only because of

24   the wounds in the body.  It's a good reason to conclude

25   it was a stabbing, but my point is that they didn't

1    learn it was a stabbing from talking to the witnesses,

2    from a witness saying that it was a stabbing.  They

3    knew it was a stabbing from wounds in the body.

4              The fact that everyone thought it was a

5    shooting as a result of the fact that if you think

6    about the testimony of the witnesses, it's clear that

7    the blood on Armando is seen when he's walking onto the

8    front lawn after the gunshot, and the witnesses all say

9    at the time of the gunshot, my client went running with

10   a number of other people.  No one sees exactly what

11   happens at that time after the gunshot when they went

12   running.

13             And I submit to you the evidence is much more

14   consistent with the stabbing having taken place

15   immediately after that gunshot.  After all, Dr.

16   Catanese even testified that someone would not be able

17   to fight very long with these stab wounds and the

18   amount of blood that was lost.

19             But there are more significant reasons why we

20   know that stabbing did not occur as a result of

21   fighting with my client, and I will talk about those in

22   a moment.  No one hears Armando cry out while he was

23   fighting with my client, but they do hear him cry out

24   afterwards when he is on the front lawn.

25             No one sees blood during the time he is

J.H.

1    fighting with my client.  Testimony about seeing blood

2    is after when he is on the front lawn.  That's why

3    everyone thought it was a shooting, ladies and

4    gentlemen, because they saw that blood after the

5    gunshot.

6         Now, there was testimony to be fair from

7    Susana Villatoro who indicated at different times that

8    she saw blood.  She went back and forth.  At one point

9    she said she did see blood before, then she indicated

10   she didn't see blood until afterwards.  I submit to you

11   that that testimony is inaccurate whether it's because

12   she's lying or whether or not because she's mistaken.

13   Either way, that testimony is inaccurate.  And the

14   reason we know that is all the other witnesses

15   including the Villatoros were very clear in stating

16   that Susana Villatoro did not come out until after the

17   gunshot.  She wasn't there until after the gunshot.

18        Oscar told you that he exited at the same

19   time as his mother.  As a matter of fact, she told him

20   something's going on out there, and they both went out

21   at the same time.

22        Jocelyn Gonzalez testified that after the

23   fight, the wife came out, and she observed blood on

24   Armando.

25        Oscar Villatoro said that he heard the

J.H.

1    gunshot, the fighting stopped, and he then saw Armando

2    walk onto the lawn.  It was only at that time that he

3    saw blood.

4              Even Angel Leon testified that he never

5    realized Armando was bleeding and never saw it until he

6    was on the lawn, and Armando's wife had not yet

7    arrived.  So for whatever reason, I submit to you that

8    any testimony from her that she saw blood beforehand is

9    inaccurate.  I think it's clear from the evidence.

10             Now, Nancy Villatoro testified that she was

11   in the car with Jocelyn and that right after the

12   fighting started, Jocelyn pulled the car up in the

13   driveway.  She told you at that time she wasn't looking

14   at what was going on behind her.  She also told you

15   that when she did turn around at that moment, everyone

16   was fighting.  She told you that they all came out from

17   different directions, and they were fighting, and she

18   also told you that a person with a Cincinnati Reds cap

19   threw her on the ground.  Do you remember that

20   testimony?  Threw her on the ground and held her there.

21   And she said on cross-examination during that time, I

22   didn't see what was going on with Armando.  And you

23   remember what else she said?  She said right after

24   that, she saw her father in the front of the yard, and

25   at that time she noticed a lot of blood.  Because after

1          the gunshot, she could possibly have not seen what

2          happened based on her own testimony.

3                     You heard testimony from Jocelyn Gonzalez.

4          She told you that when she saw Armando walking towards

5          the lawn of 180 Kinkel Street that he was walking away

6          from not just Ulises but also Misael and someone called

7          Johnny.  And it was only then she told you that she saw

8          for the first time that Armando was bleeding.  And she

9          was unable to tell you exactly what happened

10         immediately before that.  She was unable to tell you

11         exactly how Armando got to that front lawn.

12                    Susana Villatoro had testified that she saw

13         Ulises take off his shirt.  But she told you she heard

14         nothing drop to the ground.  She saw nothing fall out.

15                    And Susana and Jocelyn Gonzalez both

16         testified that Diana was hitting Armando.  Well, if,

17         first of all, Diana was hitting Armando and they both

18         said it was to defend her brother, why would he need to

19         be defended if he was stabbing Armando?  I mean if this

20         really happened the way they say it did, why would he

21         need to be defended?  Their witnesses told you, two of

22         them told you that she came in and she was hitting him.

23         Now, as to which portion of it you choose to believe

24         and reject, that is up to you.  However, clearly this

25         could not have been done during the time that my client

J.H.

1   was fighting Armando. And there's scientific evidence

2   that makes that clear which I will talk about in a

3   moment.

4          But I would like to talk about the one

5   witness and the only witness who creates a link between

6   my client and the stabbing itself, and that's Misael

7   Berrios. I think it says something about a case when

8   the government is relying upon an individual with a

9   character such as this to make out their case. I mean

10  Misael's testimony is entirely unworthy of belief.

11  There's a number of reasons for that. First of all,

12  his testimony directly contradicts the testimony of

13  just about every single witness in this case who that

14  told you they saw Ulises get into Diana's car. They

15  all said that except him. You know what he says? He

16  says no, Ulises didn't get into the car. They ran past

17  Ulises' house, and they both ran to the corner of

18  Broadway and Kinkel. No one else, no one else saw

19  that. Everyone else said they got right into the car.

20  Nancy, Oscar, Susana, Jocelyn and Angel Leon all saw

21  Ulises get into that car with the other individuals and

22  Diana. Yet Misael says no, they didn't get into the

23  car, and they went right to the corner.

24          And then his testimony completely contradicts

25  the DNA evidence collected by the Nassau County Police

J.H.

1   Department, because he admitted that he initially told

2   the police that when he saw Ulises, he had blood all

3   over his shirt, all over him.  But we know that Ulises

4   was seen getting into the front passenger seat of the

5   Acura minutes after the DA tells you that he stabbed

6   Armando 12 times.  There's not an ounce of blood, not a

7   shred of blood in the front passenger seat.

8            The prosecution may argue that my client

9   could have removed his shirt or changed his shirt.  And

10  that is completely without merit.  First, only one of

11  the witnesses, Susana, testified that my client had no

12  shirt on.  And if my client did remove his shirt, where

13  did it go?  Not a single witness says that he ever went

14  back in his house.  They all have him going directly to

15  the car.  We know he didn't leave it at the scene.  I

16  mean they combed the scene for hours, at least three,

17  four police officers for hours.  They would have found

18  the shirt.  So where did it go?  If he threw it in the

19  car, where is it?  There would be more indication of

20  blood in the car.  Supposedly he got into the front

21  passenger seat.

22           Additionally, Zeida Bonilla testified that at

23  the end of the evening when Ulises came to her house

24  after this occurred that he was wearing a black shirt,

25  the same black shirt that Nancy told you he was wearing

J.H.

Proceedings                           1198

1     at the beginning of the confrontation, same black shirt

2     that Diana told you he was wearing.  Additionally, even

3     if he took off his shirt, how in the world could there

4     be no blood on his body, on his pants, on his shoes?

5     Again, 12 stab wounds, two of them perforated organs,

6     two of them went five inches in-depth.  He bled to

7     death.

8             Now, as for this submission that Misael tells

9     you that my client came up to him and admitted to

10    having stabbed Armando, again he claims it took place

11    at the corner of Broadway and Kinkel.  Not a single

12    witness sees that.  They don't even see them go to that

13    area.  They see Ulises get into the car.

14            And Misael's timing certainly has to be

15    questioned.  By his own testimony, he had knowledge,

16    relevant knowledge that someone had admitted to killing

17    someone, a homicide.  He doesn't say anything to the

18    police that day, the next day.  He says nothing to them

19    until October 13.  Do you remember what happened on

20    October 13th?  Two officers came to his home and

21    requested, asked him to come with them to the police

22    station.  And that is the first time that he ever said

23    anything about this.

24            Significantly, the case, they don't even

25    investigate him in connection with the stabbing itself

Proceedings                           1199

1    notwithstanding the fact that Misael is seen by a

2    number of witnesses, including two who were presented

3    by the DA during this trial getting into the back seat

4    of the car with where the blood is found. They never

5    take a blood sample from him. Instead what they do,

6    they give him immunity, offer him a deal, testify

7    against my client.

8          But Misael has a number of reasons to lie to

9    you about what happened that night, and I think they

10   were clear during my cross-examination. First of all,

11   he acknowledged people were saying that he stabbed

12   Armando. He previously told the police that he knew

13   his freedom was in jeopardy. He certainly has a

14   significant reason to be less than candid with you.

15         And with regard to credibility, I ask you to

16   consider the fact that Misael Berrios has a string of

17   prior criminal convictions. Those convictions include

18   offenses that are violent such as menacing someone with

19   a box cutter and significantly numerous offenses that

20   go right to credibility, petit larceny, identity theft,

21   fraud. He admitted on the stand when I cross-examined

22   him that he knew when he engaged in these acts they

23   were illegal and they were wrong, and he told you he

24   did them anyway because it served his needs at the

25   time. He told you on the stand that on a number of

J.H.

1    occasions, knowing something was illegal, he did it

2    anyway because it served his needs at the time.

3              Might he have done that when he testified

4    before you during this trial and told you that my

5    client said, I stabbed him?

6              When you consider Misael's testimony, I want

7    you to ask yourself something. If you were going away

8    for a week, would you give Misael the keys to your home

9    to water your plants while you were away? The answer

10   is clearly no, because this is not someone who can be

11   trusted. Well, the DA is asking you to rely upon the

12   word of this man to make one of the most important

13   decisions that you will ever have to make. And so what

14   you have to ask yourself is can I believe that person,

15   is that person sufficiently trustworthy that I would

16   base an important decision of my life on the quality of

17   that kind of testimony? The fact that person with a

18   criminal record signs a piece of paper to tell the

19   truth, that doesn't mean that he is capable of telling

20   the truth, it doesn't mean that he is telling the

21   truth, because look at all of the things he has done in

22   the past.

23             See, what it comes down to, ladies and

24   gentlemen, is even the other witnesses, there is always

25   a problem with witnesses, human error. That doesn't

Case 2:16-cv-03676-JFB  Document 10-3  Filed 10/06/16  Page 288 of 433 PageID #: 1501

1    mean that everything every witness says is inaccurate.

2    My point is that when we hear witness testimony, it can

3    be accurate, or it can be inaccurate.  And if it's

4    inaccurate, it can be inaccurate either because of a

5    problem with perception, a problem in memory, lying or

6    perhaps just not accurately recalling something.

7    There's a number of reasons, human error.

8              Ladies and gentlemen, science doesn't lie.

9    Scientific evidence can resolve witness conflicts,

10   corroborate witness accounts, and most importantly, it

11   doesn't lie.  No human error, no axe to grind.  Science

12   doesn't have an axe to grind.  Science doesn't have

13   emotional influences.  Science doesn't have motive.

14   Science doesn't lie.  And the scientific evidence in

15   this case by the DA supports the position of the

16   defense, not the position of the prosecution.

17             See, ladies and gentlemen, witnesses can say

18   whatever they wish to say to serve their needs.  But

19   there's something that can't lie.  Forensic evidence in

20   the form of DNA, and the DNA that's introduced in this

21   case told you something that no witness can change.

22             Let's talk about that.  Erika Sims testified

23   in meticulous detail about the process and the

24   reliability of a form of science known as DNA.  Three

25   witnesses testify about where each of the individuals

1    got into Diana's car right after this happened, three.

2    All three said the same thing, and two of them were

3    prosecution's witnesses.  All three said my client got

4    in the front passenger seat of the Acura.  And all

5    three said that Misael, Henry and either one or two

6    other individuals got in the back seat of that vehicle

7    where the victim's blood was found.

8              Now, the victim's blood we know was found in

9    two places.  One was on the back seat, back seat rest,

10   and the other was on a white cardboard box.  And so the

11   victim's blood is found where the other individuals

12   entered the car, not where my client was.  And no blood

13   significantly of the victim, no blood of any kind is

14   found on the front passenger seat.

15             Ladies and gentlemen, don't miss that for a

16   second.  The DA's claiming that my client had just

17   stabbed Armando 12 times.  Again, I don't mean to be

18   repetitive but it's important.  Two of those stab

19   wounds went five inches in, five inches in depth

20   perforating organs, perforating the right ventricle of

21   the heart.  He bled to death.  The amount of the blood,

22   12 times.  It's not as if he could have stabbed him and

23   no blood would have started to come out.  And after the

24   first or second stab, blood's going to start coming

25   out, and they're saying he did it 12 times.  Yet

1       there's not an ounce, a shred of blood on the front

2       passenger seat. That in and of itself, ladies and

3       gentlemen, constitutes reasonable doubt.

4                My client stabs Armando 12 times like they

5       say he did, how could there be no blood in the front

6       passenger seat of that car? That has not been

7       explained to you by the prosecution. And Detective

8       Mazzie testified that there was no sign of any kind

9       that anyone had wiped anything off the seats. So why

10      is the victim's blood in the back seat where the other

11      individuals were? That has not been explained to you

12      either.

13               The prosecution will try and tell you that

14      the presence of Ulises' blood, my client's blood in the

15      rear passenger seat places him in the rear passenger

16      seat and shows that he got into that rear passenger

17      seat, and that's where the victim's blood is, and they

18      will try to make the connection there. But that's not

19      supportive of any of the evidence. That's not

20      supportive of their evidence.

21               One of the problems with that position is

22      that there's an explanation as to why my client's blood

23      is in the back seat, and it's supported by the evidence

24      in this case. It's undisputed that my client injured

25      his finger at work. Zeida Bonilla told you she was

Proceedings                     1204

1    there when it happened.  She saw blood.  Diana Bonilla

2    told you that she saw blood earlier that day

3    approximately 5 o'clock or so when Ulises asked her to

4    take him to the hospital.  She saw blood.  She gave him

5    the keys.  She watched him enter the rear passenger

6    seat.

7            Also even Misael Berrios told you that he

8    observed blood.  He went to the hospital with my client

9    and another individual, and he saw blood.  The medical

10   records introduced into evidence of my client from

11   Nassau University Medical Center show that he had a

12   laceration, that he was seen there for a laceration.

13           And also the deli video which you saw shows

14   that my client had a bandage on his right hand and the

15   testimony established that my client is right-handed.

16   We will talk about whether it's significant in a

17   moment.

18           Also, the reason that any argument by the

19   Assistant DA that my client got into the rear passenger

20   seat cannot possibly work is that not a single witness

21   ever saw my client get into the back seat.  They all

22   saw him get into the front passenger seat, and that

23   includes two of their witnesses.

24           Now, we know that the victim's blood was

25   found on a white cardboard box that was in the back

Proceedings                    1205

1    seat of this Acura and that the victim's blood was

2    mixed in with the DNA of another individual.

3         By the way, the police never bothered, even

4    though it's unidentified DNA mixed in with the

5    defendant's blood and even though Misael and Henry are

6    in the back seat of this car right after this happens,

7    never asked for a blood sample to compare it with this

8    unidentified DNA.  We don't know who the unidentified

9    person is other than the testimony from Miss Sims being

10   we do know it's not my client's.  They did exclude him,

11   and they testified to that.

12        Now, the Assistant DA will attempt to

13   downplay the significance of this.  They will -- and

14   there was evidence, and there was testimony that this

15   second contributor of the DNA to the sample could be

16   from skin or sweat that was already on the box.  There

17   was testimony to that effect.  But number one, they

18   don't know that.  She just said it could be.  They also

19   said and Miss Sims also said it just as well could have

20   been placed there at the time and could have been

21   someone else's blood.  They do say they don't know.

22   But think about this, whether it's blood or sweat or

23   skin fragments, whatever it may, we do know this, an

24   unidentified person's DNA is mixed in with the victim's

25   blood, and this is found on a white cardboard box in

J.H.

1    the back seat of the car seen fleeing the scene right

2    after the incident.  And the fact that they don't know

3    whether the minor contributor's DNA was placed there

4    before or at the same time, even that's all the more

5    reason to test the three additional bloodstains on this

6    same white cardboard box that they never bothered to

7    test.

8         Now, you heard DNA evidence concerning a

9    buccal swab, you know, sample taken from my client

10   matched with -- which came back as a match to the DNA

11   on a beer bottle at the scene and also came back as a

12   match to the do-rag.  Ladies and gentlemen, this does

13   nothing more than just establish my client's presence

14   at the scene which is something that we don't dispute.

15        Again, focus on the issue here.  It's not

16   about whether or not Armando died of stab wounds.  No

17   one disputes that.  It's not about whether or not my

18   client was present.  It's not about whether or not he

19   had a fight with the victim.  It's about whether or not

20   he stabbed him, and that's what they don't have any

21   evidence of.

22        Now, there are a number of items that the

23   police decided not to test, but I want to start with

24   these three remaining bloodstains on the white

25   cardboard box.  Erika Sims tells that there was a total

J.H.

1    of five bloodstains on the box.  Two were tested.  One

2    came back to just the victim.  The other came back to

3    the victim and the unidentified individual.

4         Now, Miss Abdi will tell you that they can't

5    test everything.  But you know what, this case is not a

6    matter of low priority, and it was not treated by

7    Nassau homicide as low priority.  They combed the scene

8    for hours and hours.  They took numerous items.  They

9    tested numerous item.  They tested blood that was

10   found.  They tested blood samples in the street.  They

11   tested blood from the knife.  They recovered numerous

12   items.  Yet when they come to the white cardboard box

13   and there's a sample on that same box that's from two

14   individuals, one whom is identified but we know it's

15   not my client, then they just decide that they are not

16   going to test the other three bloodstains on that white

17   box.  They don't bother to test it.  And why?  Because

18   it's not important enough.  Well, ladies and gentlemen,

19   I can tell you one person that it's important enough

20   to, my client.

21        And there was also a plastic bag in the back

22   seat of that same car with a red stain on it, that same

23   car, back seat.  They don't bother to test that.

24        There was a watch there found at the scene

25   which had what the detective said appeared to be blood

1    on the face and back of the watch.  They don't test

2    that.  Now, we do know that that was Armando's watch.

3    That's what Oscar Villatoro testified to.  But the fact

4    that it Armando's watch doesn't mean that's only his

5    blood on it and that it can't be blood from somebody

6    else.  They didn't bother to test the tire iron either.

7              I mean it is not nit-picking, ladies and

8    gentlemen.  This is not Monday morning quarterbacking.

9    These are major evidentiary items that the police

10   recovered apparently because they deemed to be

11   important, because they deemed that it could be

12   evidence, and they don't test it.  What would have

13   happened since the time they recovered it and

14   determined that it could be evidence and the time that

15   they made the decision to not test it?  If anything,

16   they had more reason to test it now.

17             Now, the white cardboard box, it showed the

18   victim's blood in a place where other individuals were

19   seen, not where my client was seen.

20             I do want to also make something else clear.

21   When I talk about what wasn't tested, what should have

22   been, no one here is claiming a conspiracy.  No one is

23   claiming that the police are entering into something

24   sort of intentional.  What I'm saying that there was a

25   lapse of judgment and there were certain things that

J.H.

Proceedings                    1209

1  │  were not tested that should have been tested.  But

2  │  either way, you now don't have that information as to

3  │  what that blood could be.  But we do know that the

4  │  blood they do have supports the position of the

5  │  defense, not the position of the prosecution.  Science

6  │  doesn't lie.

7  │          Erika Sims explained in detail how they can

8  │  test an item to determine if someone deposited their

9  │  DNA on a surface which can occur when someone comes in

10 │  contact with a surface.  How can it not be necessary to

11 │  test these items given the nature of the case, the

12 │  importance of the case?  How can it not be necessary?

13 │          And by the way, if Ulises had a knife and did

14 │  stab Armando, would Henry need to be helping him

15 │  hitting Armando with a stick?  Why would Diana need to

16 │  get involved?  According to the testimony, Ulises was

17 │  never free when the fight started.  Not a single

18 │  witness ever observed a break away or ever observed a

19 │  hand-to-hand exchange from my client and someone else

20 │  who could hand a knife to him, no one observed anything

21 │  like it.

22 │          You may also want to ask yourself why was the

23 │  one who stabbed him, the fact that the knife is found

24 │  in front of his house, the witnesses all told you that

25 │  numerous people ran right past that area including

J.H.

1    everyone who got into the car, including Misael and

2    Henry who were seen by all three witnesses that

3    testified about the Acura and who got in, getting into

4    the back seat of the car where the victim's blood was

5    found.

6              I also want to talk now about what I think we

7    all know now, but I want to talk about its importance.

8    There was no blood from my client found on the knife.

9    We know that there was a lot of blood found on the

10   knife, but it was all the victim's. Now, in certain

11   cases that might not be as significant, but here again,

12   it's undisputed that my client suffered a laceration of

13   his finger on his right hand. We know he's

14   right-handed. My client had just returned from the

15   hospital being seen in the emergency room for a

16   laceration, and according to the prosecution, they

17   would have you believe that he grabbed the knife, held

18   the handle hard enough to plunge it into the victim 12

19   times, including, again, I don't mean to be repetitive

20   but it is very important, ladies and gentlemen, two

21   stab wounds that perforate five inches and perforated

22   organs and the right ventricle of the heart. Yet you

23   don't think that would have caused him to bleed?

24             He had a bandage on the finger. You saw it

25   in the deli video, and you can look at it any time you

Proceedings                                 1211

1    want.  It's in evidence.  He had a bandage on it

2    because he was bleeding, and this was just less than an

3    hour-and-a-half before this incident occurred.  There

4    is not a scintilla of my client's blood on the handle

5    of that knife.  There's no cloth that would come from a

6    bandage or a gauze pad, nothing, no cloth, no fibers,

7    anything found in the handle of that knife.

8                And also, quite significantly, not a single

9    speck of my client's blood is found mixed in with the

10   victim's blood on his body, not mixed in with the

11   victim's blood that was on his clothes, that was in his

12   hair.  Think about it.  If my client was bleeding,

13   which is what they would have you believe because if

14   they are contending my client entered the back

15   passenger seat of an Acura where the victim's blood is

16   which I submit there's no evidence to support, but if

17   they are contending that my client entered the back

18   passenger seat of an Acura and puts the blood there

19   that came back to him at that time, my client had to

20   have been bleeding during the fight.  If my client was

21   bleeding during the fight and fighting with Armando at

22   a time when Armando was being stabbed and my client had

23   stabbed Armando like they tell you he did, how could

24   the blood not get mixed in?

25                If my client is bleeding and Armando is

Proceedings                                    1212

1    bleeding and they are fighting like that and stabbing

2    him 12 times, how is there blood not mixed in anywhere?

3            All of the pieces of evidence that you would

4    expect to see if my client did, in fact, stab the

5    victim, they are not there.  Nothing from my client is

6    found mixed with Armando's blood, no skin fragment,

7    body fluid, sweat, saliva, nothing.  Nothing from my

8    client is found on the knife, no remains, nothing from

9    the shirt that Susana Villatoro says she saw him

10   holding.

11           And I want you to think about something else

12   when you consider the fact that the DA's office is

13   unable to present to you a shred of evidence, a shred

14   of physical evidence linking my client to the knife of

15   the stabbing.  Think about this:  The police arrived on

16   this scene almost right after it happened, okay?  And,

17   you know, you don't get to Nassau homicide unless you

18   know what are doing, unless you have experience.  Now,

19   mistakes may have been made.  Things maybe overlooked,

20   but make no mistake about it, you don't get to Nassau

21   Homicide unless you know what you are doing and you

22   know how to obtain evidence.

23           And they were there for at least four hours,

24   three to four police officers during that whole time.

25   They combed the entire scene, ladies and gentlemen.

J.H.

Proceedings                        1213

1    They took everything that they deemed to be relevant.

2    And you know what?  They didn't recover a shred of

3    evidence linking my client to the knife, a shred of

4    physical evidence linking my client to the stabbing,

5    nothing.

6         What's more, this wasn't a scene that the

7    witnesses could have altered, that the defendant could

8    have altered, that someone could have changed around.

9    This is a scene that was left because there was a

10   gunshot.  Everybody scattered, and that was it.  So

11   this scene was left intact, and they got there, and

12   they found nothing.

13        How come my client left not a shred of

14   evidence, no blood in the front passenger seat of the

15   car?  Think about it for a moment.

16        The Assistant DA cross-examined a number --

17   withdrawn.  Assistant DA asked a number of the

18   witnesses she called about where my client was seen

19   punching Armando.  She kept talking about the fact my

20   client's punching Armando in the chest and in the face.

21   I suspect that she will argue do you think his hands

22   were going in generally the same location where the

23   stab wounds are, that that's evidence that my client

24   stabbed him.

25        Don't be fooled for a second, ladies and

J.H.

Proceedings                              1214

1    gentlemen.  Think about it, these witnesses said they

2    saw a fistfight where they were watching my client

3    fight with Armando.  They all said that.  No one

4    wavered on it.  No one saw a stabbing motion.  No one

5    saw a knife.  When people have fist fights, that's

6    generally where they are punching, upper chest, face.

7    I mean the witnesses told you they saw a fistfight.

8              Additionally, the witnesses described nothing

9    different about the way in which my client was hitting

10   Armando versus how Armando was hitting my client.  We

11   know -- that we know Armando didn't stab my client.

12   There was no difference between the movements of each

13   of them that was described by these witnesses.  What

14   these witnesses saw that the District Attorney's office

15   called is my clients in close proximity to Armando

16   Villatoro, my client punching Armando Villatoro, my

17   client in a fight.  That's the entire case that the DA

18   has on the sole issue of my client stabbing Armando

19   Villatoro.

20             I also want to talk to you about the charge

21   of criminal possession of a weapon for the same reasons

22   that I talked to you about.  Clearly the evidence of

23   possession of a knife is completely insufficient.

24   There's no evidence of it for the reasons I spoke to

25   you about, and that charge likewise, the only

J.H.

1    appropriate verdict is not guilty.

2               As for the tire iron, that was another count

3    of weapons possession that was charged here, I submit

4    to you that there is only one witness who even

5    testified that my client ever had possession of a tire

6    iron.  And I submit to you that that testimony is

7    entire unreliable for a couple of reasons.  Nancy

8    Villatoro is the witness who testifies about my client

9    having possession of that.  Yet Jocelyn Gonzalez, she

10   never sees my client touch the tire iron.  According to

11   Nancy, my client has this tire iron when he is standing

12   outside of Jocelyn's car outside the driver's, front

13   driver's seat talking to Jocelyn.  Jocelyn never sees

14   it.  Nancy who is in the passenger seat, she sees it.

15              Second of all, I think that a very

16   significant point was made about Nancy Villatoro's

17   credibility, and there's an exhibit that can remind you

18   of that should you wish to review it, and that's the

19   911 call.  And the purpose of that line of

20   cross-examination, ladies and gentlemen, again, had

21   nothing to do with the suggestion that there was a

22   shot, and no one disputes it's a stabbing.  What's

23   important about that it's not even the fact that she

24   may have thought it was a shooting.  Everybody did.

25   She didn't call in and say my father was sot and leave

1    it at that.  Listen to the tape.  She called in and

2    said, My father was shot, I know who did it.  It was

3    Ulises Bonilla.  And I know exactly where he lives.

4    She said that.  It's one thing to be mistaken about

5    whether he was shot or stabbed.  It's another thing

6    knowing that Ulises Bonilla could not possibly have

7    shot him to say that to the police, My father was shot,

8    Ulises Bonilla did it.

9            She told you on that stand, and I think it

10   was obvious, that she knew when she made the call that

11   there was no way Ulises shot Armando Villatoro.  She

12   told you that.  She told you that she never saw Ulises

13   with the gun.  What's important here is it shows that

14   she is willing to say anything she can to try and pin

15   something on someone that she believes for whatever

16   reason is responsible for her father's death.

17           And even if it's not intentional, ladies and

18   gentlemen, even if you do somehow conclude that there

19   was a mistake, how reliable is her testimony?  Can you

20   rely on anything she says about what she saw given that

21   call?

22           Now, soon the Assistant DA will be speaking

23   to you.  She will have the opportunity to address the

24   arguments I am making to you.  She will have an

25   opportunity to respond to the points that I have made.

J.H.

1     And because of the way our system is set up, the

2     prosecution goes last, and I do not get an opportunity

3     to respond to the arguments that she makes.  Now, I

4     assure you I have a response to each and every argument

5     and point that she is going to raise.  But like you, I

6     have to play by the rules.  There are certain

7     procedures that have to be followed, and, you know, the

8     prosecution goes last.

9          All I ask though is that when she does raise

10    these arguments, I want you to consider the other side

11    of her argument as well and consider what you might say

12    if you were in my shoes, because it is always important

13    to recognize both sides.  And additionally, when she

14    talks, I want you to be sure that you are thinking in

15    your mind whether or not that is consistent with what

16    the evidence is and what the witnesses said.

17         Now, there's a tendency to say to yourself,

18    you know, what if, you know, what if someone gets away

19    with something?  These allegations are very serious,

20    and there's a concern about that.  But you know what,

21    these allegations are extremely serious.  They couldn't

22    be more serious, and that's all the more reason to be

23    sure you follow the instructions of the judge and that

24    you hold the prosecution to their burden of proof.

25         You have rules in the system, ladies and

1    gentlemen, and the rules have to be followed, and

2    there's a reason that the prosecution is required to

3    prove beyond a reasonable doubt.  Because I submit to

4    you that this is not the quality of evidence that you

5    have to sustain a guilty verdict.  There can be little

6    question of evidence or lack of evidence here creates a

7    doubt that a reasonable person acting in matter of this

8    importance would entertain.  Can you honestly say for a

9    single solitary I second that you don't have a

10   reasonable doubt about my client's guilt?  Their

11   scientific evidence that they presented supports the

12   defense position.  And I'll go further than that,

13   ladies and gentlemen, if it doesn't just support

14   defense position, the absence of any blood on that

15   front passenger seat under these circumstances I submit

16   to you proves not only that the prosecution has not

17   proven guilt beyond a reasonable doubt, it demonstrates

18   that my client could not possibly have done this.  My

19   client could not possibly have done this.  Nothing was

20   in the front passenger seat.  Three witnesses see him

21   get in there.  What is he, a magician, he stabs someone

22   12 times, perforates the right ventricle of the heart

23   and minutes later, he gets into the right passenger

24   seat and there's not a spec of blood?  How does that

25   happen?

1        Science doesn't lie.  No eyewitness prove my

2   client is stabbing or even holding a knife, no physical

3   evidence or DNA evidence connecting him, no connection

4   between my client and the murder weapon which is

5   recovered from the scene without anyone having an

6   opportunity to clean it off, remove it or do anything

7   else.   The DA has offered no proof of my client's use

8   of a knife much less proof beyond a reasonable doubt.

9        And so, ladies and gentlemen, I ask that you

10  return the only verdict consistent with the competent

11  and credible evidence, the only verdict consistent with

12  the scientific evidence produced by the District

13  Attorney, and the only verdict consistent with justice,

14  and that is a verdict of not guilty on all of these

15  charges.  I thank you for your attention.

16        THE COURT:  All right, ladies and gentlemen,

17  the prosecution will sum up next, but we'll take ten

18  minutes at this particular time.

19        (Whereupon, the jury exits the courtroom.)

20        (A recess was taken.)

21        THE COURT:  I neglected to ask you, and I'm

22  required to do so by the statute, but if I ever accede

23  to anyone's request on this, I'm sure Judge Marano will

24  relegate me to the family court for the rest of my

25  judicial career, do you have a position as to whether

Proceedings                                    1220

1    or not the jury should be sequestered, People?

2                 MS. ABDI:  No.

3                 THE COURT:  Defendant?

4                 MR. MILLMAN:  No, your Honor.  The only thing

5    I would ask is I don't know if any -- I don't have a

6    position on it, but does any portion of the charge

7    intend to give the jury any press coverage, anything to

8    that effect?  I don't know if there is going to be

9    further press coverage.

10                THE COURT:  That's part of the charge.  They

11   are not to view anything.

12                MR. MILLMAN:  I just wanted to be sure, thank

13   you.

14                THE COURT:  Bearing in mind that no side has

15   a position, then I'm going to not order sequestration

16   and advise the jury they can go home at the end of the

17   business day.

18                COURT OFFICER:  Jury entering.

19                (The jury enters the courtroom.)

20                THE CLERK:  Recalling case on trial, People

21   of the State of New York versus Ulises Bonilla,

22   Indictment 202N-2011.  Let the record reflect all

23   parties are present, defendant and Spanish interpreter

24   and all jurors.

25                Do both sides consent to the seating and

J.H.

Proceedings                1221

1    waive a reading of the roll?

2            MS. ABDI:  Yes.

3            MR. MILLMAN:  Yes.

4            THE CLERK:  Thank you.

5            THE COURT:  All right, People.  Now, it's the

6    District Attorney's turn to give her summation.

7            MS. ABDI:  Ladies and gentlemen, first I too

8    want to thank you for the careful care and attention

9    that you have paid to this case.  I know you all have

10   lives, all have families, you all have friends.  You

11   all have had to put that on hold to do a very important

12   task, and that is to listen to the evidence in this

13   case.  And on behalf of the District Attorney's office,

14   I, too, thank you.

15           Because ladies and gentlemen, this is the

16   time now when you use your common sense to evaluate the

17   evidence in this case.  You were all selected as jurors

18   because you have it.  You are all intelligent people.

19   Use the same common sense that you use every day in

20   evaluating the evidence in this case.  Because that's

21   what you are going to decide this case on, the evidence

22   that you heard in this courtroom.

23           You do not decide this case on speculation.

24   You do not decide this case on guesswork.  Don't be

25   intimidated by the formal surroundings of the

1       courtroom.  If something doesn't make sense to you, if

2       you heard it sitting in your kitchen or sitting in your

3       living room, it doesn't magically make sense when you

4       hear it inside this courtroom.  You don't become naive.

5       You don't become gullible just because you are sitting

6       in this courtroom.  So use the same common sense that

7       you use in your every day life.  And when you do that,

8       you will see that nothing that defense counsel has said

9       makes any sense when you compare it to the evidence in

10      this case, the evidence you heard in this courtroom.

11              There is no question that Armando Villatoro

12      was stabbed to death on September 28th of 2010 in front

13      of his house at 180 Kinkel Street.  There is no

14      question.  He was not shot.  That has been brought up a

15      lot.  But ladies and gentlemen, you knew that from day

16      one he was not shot.  The only question is was Ulises

17      Bonilla the one who killed him, and the answer to that

18      question, ladies and gentlemen, is yes.  That's what

19      the evidence has shown.

20              Did Ulises Bonilla go into that bathroom at

21      Bunkyreid Park on September 24th of 2010 with Jennifer

22      Villatoro?  The answer to that question, ladies and

23      gentlemen, is yes, that's what the evidence has shown.

24      And once he got into that bathroom, he had sex with

25      her.  That's what the evidence has shown as well,

1    ladies and gentlemen.  There is no mystery here.

2    There's no mystery.

3          You've heard a lot of witnesses.  You have

4    seen a lot of evidence, and every witness that you have

5    heard gives you one more piece to the case.  You take

6    pieces from each witness, and you put it together and

7    when you put it together, a profile emerges, a profile

8    of a killer, ladies and gentlemen.  And that's him

9    seated right there, Ulises Bonilla.

10         And the evidence has shown that four days of

11   torment for the Villatoro family, from the rape on

12   Friday all the way to the murder on Tuesday, that is

13   what has emerged from the evidence in this case.  He

14   raped Jennifer Villatoro, and then when her father had

15   the nerve to confront him about it, he killed her

16   father.  He did.

17         Now, I have the burden of proof in this case.

18   That never shifts.  Defense counsel doesn't have to do

19   anything.  It's my burden.  However, they made some

20   arguments, and they put on a case.  And when they put

21   on a case and they put witnesses on, then you should

22   look at those witnesses just as you would my witness.

23   You should scrutinize what their witnesses said.

24         Now, it should come as no surprise to you,

25   ladies and gentlemen, that defense counsel's arguments

J.H.

Proceedings                                    1224

1    are centered around one theme which is look at all the

2    things that are not in evidence.  Well, what about the

3    match?  What about this mystery DNA on the box?  What

4    about this, what about that?  It should come as no

5    surprise to you that he wants you to focus on the

6    things that are not in evidence, because when you look

7    at what's in evidence, it's devastating.  It's

8    devastating evidence against his client.  The trail of

9    evidence leads right back to him.

10              Now, defense spent a lot of time talking

11   about this injury to his finger, the injury to the

12   finger, the bandage, this video.  Ladies and gentlemen,

13   so what?  His finger was injured.  I told you about

14   that on my case.  We put a witness on, Misael Berrios,

15   who said, Oh, by the way, he had an injured finger.  So

16   what?  What you also know is that witnesses said he had

17   blood on his face area.  So now what does that mean,

18   ladies and gentlemen?  What does that mean that he has

19   this injury to the finger?  Well, the video that they

20   put in, that video actually corroborates what my

21   witnesses have said, because if you look at the video

22   that's in the bodega, you see clearly the defendant on

23   camera wearing a black do-rag, what he was wearing that

24   night.  You see him clearly purchasing Coors Light,

25   which Misael Berrios told you they went to the to deli,

J.H.

1    they purchased Coors Light, and they went back to the

2    house.  It corroborates what my witnesses have told

3    you.

4              Now, did the defendant's blood get in Diana

5    Bonilla's car earlier that day from the injury on his

6    finger?  Is that where his blood came from?  No.  You

7    heard it from Diana Bonilla.  She did not drive him to

8    the hospital.  She did not pick him up from the

9    hospital.  Misael Berrios said he was not driven to the

10   hospital in Diana Bonilla's car.  So his blood did not

11   get into that car before the murder.  The reason why

12   that blood is in the car is because it was there when

13   he got into that car after the murder.

14             And let's leave for a minute the fact that

15   his blood is in Diana Bonilla's car, because that's not

16   the most important piece of DNA evidence in this case.

17   The most important piece of DNA evidence is the fact

18   that Armando Villatoro's blood is in Diana Bonilla's

19   car.  What is it doing there, ladies and gentlemen?  It

20   would have no reasonable explanation of being in her

21   car.  That's the most important piece of DNA evidence.

22   And the reason why it's so important is because the

23   only way that Armando Villatoro's blood gets in Diana

24   Bonilla's car is if the killer got in that car.  And

25   now from all the evidence, ladies and gentlemen, that's

1   Ulises Bonilla's, because the only other blood in the

2   car is Ulises Bonilla's blood.

3           Now, Misael Berrios was not bleeding.

4   There's no witnesses that say he had any blood on him.

5   Diana Bonilla didn't say she was bleeding.  Henry

6   Hernandez, no evidence that he was bleeding.  The only

7   two people that any of the evidence has said that were

8   bleeding that night is Armando Villatoro and Ulises

9   Bonilla, and that's the blood that was found in Diana

10  Bonilla's car.  There's no other explanation for why

11  Armando Villatoro's blood was in that car, and the

12  reason why it was in that car is because it was

13  transferred into the car by the killer when he got in.

14          Now, let me just talk to you a little bit

15  about this supposed mystery DNA.  We know there's a

16  major contributor on the box and a minor contributor,

17  and there's a reason why it's called a minor

18  contributor.  You can't even test it to anything.  But

19  it was tested to Ulises Bonilla, and it said no, that's

20  not him.

21          But we had gone through this in the direct

22  case, ladies and gentlemen.  Erika Sima from the DNA

23  lab said that could have been DNA that was on the box

24  mingled with then Armando Villatoro's blood.  That's

25  not DNA of the real killer, ladies and gentlemen,

1    because that's not just the evidence you have in this

2    case.  You have all of the other witnesses who help to

3    corroborate that the defendant is the killer.

4             Now, what you also heard is that the minor

5    contributor could have been a female.  It could have

6    been Diana Bonilla's DNA in that box.  It's in her car.

7             What you should look at, ladies and

8    gentlemen, is also the location of the DNA.  Defense

9    counsel made much about this location.  Well, it

10   clearly proves my guy's not the guy.  Meanwhile this

11   discounts all of the other witnesses that said he is

12   the guy.  But you have now the DNA, so where was the

13   DNA located?  Well, the DNA was located in the back

14   seat of the car.  You have Armando's DNA on the back

15   seat of the car.  You have his DNA on the box which is

16   next to the back seat of the car, and you also have

17   Ulises Bonilla's DNA on the rear panel of the door and

18   also on the ceiling.  You have his DNA on the rear

19   ceiling of the car.

20            Now, what is the significance of that?  Well,

21   Diana Bonilla, and I'll get to her in a minute in a

22   little bit more detail, but Diana Bonilla told you a

23   story about how possibly her brother's DNA could have

24   gotten in the car.  Remember she told you that story

25   how well she saw him that day earlier, and she, you

1    know, she gave him the keys and he was in the car and

2    she didn't know what he was doing, and then all of a

3    sudden she looked out and he had disappeared.  She was

4    going to drive him to the hospital and then

5    disappeared.  So what's implication there, ladies and

6    gentlemen?  Well, defense put that on so that they

7    could say well, clearly that's where his DNA must have

8    come from, this weird minute-long session in the car,

9    and then he just disappeared.  Now, does that make

10   sense, ladies and gentlemen?  If your finger is

11   bleeding and you -- your sister's going to drive you to

12   the hospital, when you get in the car, what are you

13   doing?  Are you smearing your finger all over the place

14   in your sister's car?  No.  You're holding it, you're

15   hoping it doesn't bleed because you know your sister's

16   going to get mad.  That's not something you do in the

17   car on the way to the hospital.  Why would you smear it

18   on two specific locations, the back rear panel and the

19   ceiling?  It's not something accidental.  What's that

20   consistent with, ladies and gentlemen?

21             Well, what's consistent with that is if

22   you're running away from just stabbing someone, you

23   drop the knife, you run to get into the car, you grab

24   the top to push yourself into the car, get DNA on the

25   top.  You get DNA of the person you just killed in the

J.H.

Proceedings                      1229

1    back seat.  That's more consistent, that frantic

2    running.  That's what most consistent with the way the

3    DNA was left in this case, not the way that Diana

4    Bonilla says.

5              And let me talk to you a little about the

6    witnesses that see him getting in the car.  It doesn't

7    matter where they saw him get into the car.  It matters

8    that they saw him get into the car.  He got into Diana

9    Bonilla's car.  It doesn't matter if they say he got

10   into the front passenger seat or the rear passenger

11   seat.  They saw him get into the car, and they saw him

12   get into the passenger side.

13             Remember Oscar testified and Nancy testified.

14   They were far away.  They were far away from what they

15   were looking at.  But what they can say is that they

16   got into the passenger side of the car.  And maybe they

17   said it wrong.  Maybe it wasn't the front.  Maybe it

18   was the rear.  Doesn't matter.  He got into the car.

19   Plus, ladies and gentlemen --

20             MR. MILLMAN:  Just note my objection to the

21   mischaracterization.  They didn't say the passenger

22   side.  They said passenger rear.  That's the basis of

23   my objection.

24             THE COURT:  Ladies and gentlemen, your

25   recollection of the facts will govern.

J.H.

1          MS. ABDI:  So it doesn't matter where he got

2     into the car.  It matters that it was the passenger

3     side of the car.  But really it only matters that he

4     got into that car.

5          Now, ladies and gentlemen, it also doesn't

6     matter that they saw him get into that side of the car,

7     because the important part is that once he got into

8     that car, that's where he initially got into the car.

9     Remember, he was driven away, driven away from the

10    scene.  He could have easily changed his position upon

11    leaving the scene.

12         Now, let's talk about Diana Bonilla.  That's

13    part of the defense case, Diana Bonilla.  Now, you

14    should look at her testimony through a prism, ladies

15    and gentlemen, because she is clearly a biased witness,

16    and she is clearly an interested witness.  And you

17    should look at her testimony and evaluate it through a

18    prism, ladies and gentlemen, because she has an extreme

19    motivation to exonerate her brother.  She has a motive

20    to be untruthful because everything she says is with

21    this motivation to exonerate her brother.  That's what

22    she wants to do.

23         Her testimony about the events of September

24    28th, I'm just talking about September 28th now, her

25    testimony about the events of September 28th of 2010 do

1    not and are not consistent with any other witness in

2    this case, and, in fact, they are not consistent with

3    her brother of statements about what she told the

4    police.  She says she didn't even see her brother there

5    until later on when she was driving him away from the

6    scene.  She doesn't even see him even while every other

7    person said he was there and he was fighting with

8    Armando.  But she says, I didn't even see him there.

9    Once again, she was coming from a place of motivation

10   to exonerate her brother.  She is trying to help him

11   out.

12          What else does she say?  Oh, I saw five

13   people with masks.  Everyone was wearing a mask.  You

14   know from the evidence that that's not true.  Why would

15   she say that?  Once again, trying to exonerate her

16   brother.  What else does she say?  And this is the only

17   witness that this comes from.  She says, Well, Misael

18   Berrios, I saw him, and he was fighting with somebody

19   by a car.  No other witness says that.  And then she

20   says, And I also saw Henry Hernandez.  He was there

21   too, and he was also fighting with somebody.  Now, no

22   other witness saw that either.

23          Why is she doing that?  Why is she saying

24   this?  Well, ladies and gentlemen, she did not tell the

25   police that when she spoke with them the day after the

1    murder on September 29th.  She did not mention Misael

2    Berrios.  She did not mention Henry Hernandez, and she

3    did not say her brother was anywhere near that fight.

4    She admitted one incident on the stand.  Why all of a

5    sudden is she throwing in Misael Berrios and Henry

6    Hernandez?  It should become obvious to you now, ladies

7    and gentlemen, if you are looking at it with this prism

8    of motivation to exonerate her brother, she's throwing

9    in other suspects.  Oh, by the way, yeah, Misael

10   Berrios was there.  He was fighting.  And Henry

11   Hernandez was there.  She's throwing in suspects to

12   distract attention away from her brother.  But you

13   know, ladies and gentlemen, from all the evidence in

14   this case that nobody else saw anyone fighting with

15   Armando but Ulises Bonilla.  That is clear from all the

16   evidence in this case.

17          Now, her testimony with respect to September

18   24th of 2010, once again, ladies and gentlemen, it

19   falls away once you look at it through this prism, that

20   she has this motivation to exonerate her brother.  So

21   she creates a fake alibi for him, ladies and gentlemen.

22   The most telling part about her story -- well, there's

23   two telling parts.  Now, if everyone has had siblings

24   or everyone has children, more than one children, you

25   know, she's 19 years old, 22 years old, you don't pay

J.H.

1    attention to when your sibling comes home.  You don't

2    pay attention to anything that they do in the house

3    especially if it's a boy and girl.

4            She's sitting -- she is sitting at her

5    computer.  She pays careful attention to the time that

6    he comes in, pays careful attention outside the window

7    to see how he came in.  That is not reasonable, ladies

8    and gentlemen, for anyone, their common sense.  If

9    you're in the house with your sister, you don't know

10   when they come in, you don't know when they leave.  You

11   don't care.  You really don't.  And unless you're given

12   a reason to care, unless you're like, well, I have to

13   come up with a fake alibi.

14           The other thing which she said which really

15   should clearly tell you that she is motivated to be

16   untruthful, ladies and gentlemen, there are plenty of

17   times in our life when we have milestones, when we have

18   things that we really remember, the date of your

19   birthday.  You may remember the date of your marriage.

20   I'm sure Jennifer Villatoro is going to remember the

21   date her father died.  That's a date that you remember.

22   I don't think that a milestone date in anyone's life is

23   the day they introduce their brother to their tattoo

24   artist for the first time.  That's not a milestone that

25   you remember.  That's not something that you embroider

J.H.

1    on a pillow as, ah, I remember that date.

2                  Remember that's what she said.  She said I

3    don't keep tabs on my brother at all.  I don't know

4    anything he does.  Oh, but that day, September 24th,

5    yes, that was the date I introduced him to Evan Grover

6    for the first time, ladies and gentlemen.  If he would

7    have been charged with rape for September 26th, that's

8    the date she would have been up here telling you about.

9    I remember September 26th because that was the day I

10   introduced my brother to my tattoo artist.  Ladies and

11   gentlemen, that is completely false.  She picked that

12   date because that's the date she had to.

13                  And her alibi for him falls apart.  It falls

14   apart the minute that Evan Grover hits the stand,

15   ladies and gentlemen.  Because contrary to what defense

16   counsel told you, he did not remember anything.  He

17   said, I really can't be sure of the date.  Of course,

18   why would he pay attention to that date?  He had no

19   idea what date it was.  And he had no idea what time it

20   was.  They could have been -- if they were in that

21   tattoo parlor, he could not tell you for sure that it

22   was September 24th.  He could not tell you for sure

23   that it was 5 p.m. to 7 p.m.  That statement that he

24   was shown was to refresh his recollection, that's not

25   in evidence.  It's what he says in this courtroom that

Proceedings                              1235

1    is evidence.  It's clear the minute he hit the stand,

2    he said, No, I am not sure.  I am not sure that they

3    were there at that time.  It falls away, ladies and

4    gentlemen.

5            Zeida Bonilla, clearly the mother, she is the

6    mother of his child, she's an interested witness in

7    this case as well.  What she said is she knows for sure

8    that she dropped him off at 4:30.  Once again, ladies

9    and gentlemen, there's no reason for her to pay

10   attention to that time.  And further questioning, she

11   didn't remember when she got to the daycare, where the

12   daycare was, when she left the daycare.

13           Ladies and gentlemen, it's -- there's been

14   ample evidence that everything that happened in this

15   case is in short, short distance.  This is 163 Kinkel

16   Street.  This is Bunkyreid Park.  This is going down to

17   163 Kinkel Street and Urban Avenue, and that's where

18   they were.  Many witnesses have told you, she told you

19   that that's minutes away.  You can walk.  You can walk

20   to his house from work, walking distance.  And, in

21   fact, the daycare is right here, Garden Street.  Once

22   again, close proximity, close proximity.

23           What makes more sense, ladies and gentlemen,

24   that he left work and walked home or that he went in

25   the car, drove with her to Garden Street, waited in the

Proceedings                                  1236

1       car, sat there, drove all the way back to go minutes

2       distance away.  But now let's say, ladies and

3       gentlemen, let's say you even believe any of them.  It

4       still doesn't mean that he wasn't in that park with

5       Jennifer Villatoro that day, because as you know, they

6       said it was after school, sometime in the vicinity of 4

7       to when the police were called, and he lives about five

8       minutes away from that park by walking distance.  Any

9       of those witnesses could have been off by 10, 15

10      minutes.  That still would have given him enough time

11      to be in that park, because everything is in such close

12      proximity together.  We are not talking about

13      Huntington and Westbury.  We are talking about walking

14      distance, minutes away.

15                So I suggest to you that Zeida Bonilla, Diana

16      Bonilla and Evan Grover clearly are not reliable

17      witnesses in this case, and they do not in any way

18      establish a reliable alibi for the defendant, because

19      there are two witnesses who I submit to you were very

20      reliable in this case that told you exactly what

21      happened, and that's Ivan and Steven.  And they are

22      children.  And I remember when I talked to you about

23      them before in jury selection, children witnesses.

24                And they saw something.  They went into that

25      park on Friday, and they saw something.  They saw

J.H.

1    Jennifer and Ulises Bonilla coming from the bathroom.

2    They saw something.  And you know what they did.  They

3    said something about it.  Because when the minute they

4    saw it, they realized something was wrong.  Something

5    was wrong.  They didn't even know anything really about

6    what happened in the bathroom.  They just knew that

7    what they saw, that was not right, and that was on

8    September 24th of 2010.

9              And what did they do?  They went right back

10   home and told Jennifer's parents.  They told her mother

11   and told her father.  They said something.  They knew

12   enough to know something's not right here.

13             And how else do you know that that's

14   definitely the date?  Because the police were called.

15   The police were called on this date.  And they told you

16   that was the date they were called.  They said it

17   happened this date, and they responded.  And they

18   responded, and they talked to Ivan and Steven.  That's

19   how you know that it's the date something happened.

20   They didn't just make it up on a random date.  You have

21   the police officers who corroborate that they saw

22   something in that park and were called to the house.

23   That's how you know that something happened that date.

24             These are two little boys, and they have no

25   motivation to be untruthful in this case.  They are not

1       going to get up there and make up a story about

2       something that they saw.  They did not want to be here.

3       They were nervous.  This is something that's not easy

4       at all to do for any witnesses, especially children.

5               And I had a lot of children who testified in

6       this case, and one of them was Jennifer Villatoro.

7       Now, she's an 11 year old now, and I asked you in jury

8       selection, talked to you about the fact that children

9       could have a lot of different responses to things, a

10      lot of difference reactions.  Testifying is hard to do.

11      It's hard to do when you are an adult and especially

12      hard to do when you are a child.

13              When she came in here, ladies and gentlemen,

14      she told you what happened to her.  She told you, and

15      you heard it from the witness stand.  Now, she may have

16      not had the right demeanor at all times.  She may have

17      laughed inappropriately.  But make no mistake about it,

18      ladies and gentlemen, she is not emotionally mature.

19      She is not a professional witness.  She maybe is not as

20      sheltered as other girls her age.  Maybe she is not

21      like any other 10 year old girl you know.  But make no

22      mistake, ladies and gentlemen, there's one thing about

23      her that you cannot deny was that she was 10 years old

24      on September 24th of 2010, 10 years old, and he was 22.

25      And now she's an 11 year old girl without a father

1    because of the defendant, Ulises Bonilla.

2            So when you talk now about believing Jennifer

3    Villatoro and you heard about she was not forthcoming

4    when the police came to her house and she gave an

5    initial statement to the police right after her dad's

6    death that was not as complete as she told you on the

7    stand, and then she gave another statement to the

8    police which was the complete story, and that was a

9    month later.  And defense counsel said, well, clearly

10   she's not capable of belief because she didn't spill

11   her guts from day one.  Ladies and gentlemen, I'm sure

12   you can imagine the trauma that she has gone through,

13   the shame that she feels about what happened to her,

14   the embarrassment that she feels about coming into

15   court and having to say what happened to her, having to

16   look at the man that raped her and then killed her

17   father.  Can you imagine the guilt that she feels?  Can

18   you imagine how she must blame herself for her father's

19   death?

20           So when the police came to her house and she

21   knew she did something wrong, she said I don't want to

22   deal with it, and she didn't.  And what prompted her to

23   start speaking?  What was the impetus for her to start

24   speaking?  It was her father's death.  That's maybe

25   when it kicked some sense into her and she said

1   something.  But it's a process, ladies and gentlemen,

2   it's a process.  And she didn't say everything that

3   happened until a month later.  But she told you about

4   it on the stand, and she told you exactly what

5   happened.

6            You know what else jarred you?  On October

7   1st, 2010 when she went to the doctor and the doctor,

8   Dr. Pompey, corroborates what she said, said that yes,

9   there is evidence of penetration.  Now, she did go to

10  the doctor a week later, but there's no evidence that

11  there was any ejaculation, ladies and gentlemen, so it

12  should come to no shock there's no rape kit done.  The

13  doctor said that is not protocol.  That's not unusual.

14  There's no evidence that he punched her and kicked her.

15  So yes, there are going to be no external injuries.

16  What she told you on the stand is completely consistent

17  with Dr. Pompey.  She said, yes, there's digital

18  penetration and yes, that could be partial penile

19  penetration.  It's corroborated by the doctor.

20            And maybe, ladies and gentlemen, that's what

21  also kicked her into gear, that also said to her, yes,

22  something did happen to me and I have to be more

23  truthful about it now, and that's why she gave the

24  statement.  She is not making this up.  There is no way

25  that anyone would want to make up this story so they

J.H.

1      can go on the witness stand as an 11 year old girl and

2      talk to strangers about this.

3                  Defense counsel said, well, maybe Jennifer

4      clearly her parents -- well, not her parents, her mom

5      told her that she wouldn't get in trouble.  The police

6      told her that she wouldn't get in trouble.  Ladies and

7      gentlemen, you know from your every day life sometimes

8      it doesn't matter what people tell you.  It matters

9      what you feel inside.  And if you think that you are

10     going to be judged and if you feel bad about yourself,

11     it doesn't matter that somebody else, authority

12     figurers are telling you that don't worry, we won't

13     think anything less of you, because if you think less

14     of yourself inside, that doesn't go away just because

15     somebody said that to you.

16                 She also told you that her relationship with

17     Ulises Bonilla started off slowly.  The summer of 2010,

18     end of June to right after Labor Day, that's when they

19     kissed she said several times in front of her house.

20     He would fondle her, touched her breast, touched her

21     butt, touched her vagina.  That's what she said, and

22     that's how it started until finally it came to that

23     day, Friday, Bunkyreid Park when he took her into the

24     bathroom and led her into the bathroom.  They went into

25     the women's room and into the stall.  And it's then

Proceedings                                      1242

1    that she said they were kissing.

2         Now, remember, she may have thought that he

3    was her boyfriend or something.  So she was kissing

4    him.  And then she said that he pulled down her pants,

5    her underwear and he put his finger inside her, and she

6    knew that because could feel it.  And then she said

7    that he tried to put his penis inside her, and he did

8    put it inside her.  It didn't go all the way, but it

9    did go inside her.  She felt it.  She knew it was there

10   because it hurt.  And she pushed him away, and she

11   left.  Like I said, she probably would not have wanted

12   to talk about this at all except Ivan and Steven were

13   there, and they saw what happened, and they said

14   something, ladies and gentlemen.  That's how you know

15   that something happened that day.  You have Ivan and

16   Steven who corroborate Jennifer, and you have Dr.

17   Pompey who corroborated Jennifer.

18        Now, you know the rest of the sad tale from

19   the evidence we heard.  Because once Steven and Ivan

20   went back, that's when the spiral began.  Because

21   that's when Armando Villatoro found out about it.  He

22   went to the deli.  He was there.  He was with his

23   friend Angel.  He had a confrontation with Ulises

24   Bonilla in the deli.

25        Now, obviously you've heard evidence there's

J.H.

1   obviously some deli on Prospect that everybody in the

2   neighborhood hangs out in.  So they encounter

3   themselves there, and that's when they first got into

4   the fight.  They got into the fight there.  And that's

5   where it started, ladies and gentlemen, because as you

6   know, the defendant was upset about that.  He was upset

7   about being confronted.  And you now this from Jocelyn

8   Gonzalez, because Jocelyn Gonzalez said, Yeah, on

9   Sunday, he called me, and he said did you hear about

10   what happened at the deli?  The father jumped me.  I'm

11   going to get him back for that.  Right away, that's the

12   conflict, right away, the fight and the conflict, two

13   people who have this conflict.  Nobody else has this

14   conflict with Armando.  It's Armando and Ulises.

15          And then what do you also know?  What you do

16   also know is that Tuesday, Ulises Bonilla is hanging

17   out across the street drinking with his friends.

18   Misael Berrios is one of them.  And what do you know?

19   Well, you know from Angel, you know this and you also

20   know from Misael that Ulises Bonilla calls Armando.  He

21   calls him, and that's why Armando comes back to his

22   house.

23          So once again, you have this conflict, and

24   now you have Ulises continuing it, continuing it by

25   calling Armando while he is waiting right across the

1   street from her. And once -- and you also know that

2   you Ulises doesn't just leave it there. He went over

3   to Jocelyn and Nancy who were in the car, and he

4   continued to make threats saying to Jocelyn, Would it

5   be okay if I killed your father? Would it be okay if I

6   punched your father? And Nancy heard he wanted to

7   fight the father. Once again, continuing this

8   conflict, continuing this aggression towards Armando

9   Villatoro. There's not one shred of evidence that

10  anyone else had this conflict with Ulises Bonilla.

11           Misael Berrios corroborates what the other

12  witnesses have told you that he was with Ulises Bonilla

13  across the street, and he saw him go over and talk to

14  Jocelyn and Nancy, corroborated.

15           Now, let's talk about the fight, ladies and

16  gentlemen, because there's been a lot of talk about the

17  fact that there's no knife, that nobody saw a knife in

18  his hands. Well, ladies and gentlemen, there is no

19  mystery killer here. There's no mystery killer.

20  There's no mystery DNA, no mystery killer. Nobody else

21  was fighting with Armando Villatoro. Every single

22  witness has told you it was a one-on-one fight. Nobody

23  else got in. They were chest-to-chest. They were

24  face-to-face. They were hugging each other. They were

25  grappling with each other. They were close to each

1       other.   Nobody else was fighting with them, one-on-one.

2                Does it matter that nobody saw a knife in his

3       hands?   No, and I'll tell you why.  The judge is going

4       to tell you about something called circumstantial

5       evidence.   It's a charge.  What he is going to say is,

6       obviously the judge will have the exact wording of the

7       law, circumstantial evidence is just as good as direct

8       evidence.   And with circumstantial evidence, what you

9       should look at it as is think of it as independent

10      little pieces of evidence that when you put together,

11      they are little strands, and you tie them together and

12      you tie them together and you tie them together and

13      they create a knot, and you can't get out of it.

14               And that's exactly what the significance of

15      the knife is in this case.  If you look at the

16      circumstantial evidence surrounding that, you will see

17      it's clear that he stabbed him.  How do you know that?

18      Well, because all the witnesses said, once again,

19      nobody else was fighting with Ulises Bonilla.  It was

20      just Armando Villatoro face-to-face, chest-to-chest

21      grappling, hugging.  Nobody else got in.  That's what

22      you know.

23               You also know that he had a conflict with

24      Armando Villatoro.  He had found out what happened in

25      the park, and they had already had a fight about it.

Proceedings                    1246

1    And Ulises Bonilla had just been making threats about

2    it.  So once again, another strand of independent

3    evidence circumstantially that ties it all together.

4              The witnesses also said they are making

5    punching motions, punching motions.  Nancy said she

6    could see his arm moving back and forth.  Now, ladies

7    and gentlemen, if I'm right-handed, and Armando

8    Villatoro obviously was stabbed several times, 12 times

9    on the left-hand side, if you're close to close, if

10   you're close facing and Armando Villatoro was here and

11   he's obviously stabbed in the heart which is on this

12   side, if you're grappling and you're together, you

13   clearly easily with your right hand punching, looked

14   like a punch.  Witnesses were in all different

15   locations.

16             If you're so close together and it's dark,

17   it's dark out, if you're close together, and they are

18   fighting, they are moving and they are struggling and

19   you're seeing punching, that's exactly what it looks

20   like to stab somebody 12 times at close range.  That's

21   exactly what it looks like.  Nobody stabs somebody like

22   this.  That just doesn't happen especially when you are

23   stabbing them in their torso and in their abdomen.

24   That's exactly what a stab motion is.  It looks exactly

25   like a punch.  It's completely consistent with the

Proceedings                    1247

1     evidence in this case.

2               You also know another piece of circumstantial

3     evidence that shows you that he had a knife in his hand

4     is that he said to Misael Berrios, I fucked up, I

5     stabbed him, I killed him.

6               Another piece of circumstantial evidence that

7     shows you that he had a knife in his hand is Dr.

8     Catanese, the doctor who said, by the way, yes, he was

9     stabbed 12 times.  Twelve times is a lot, ladies and

10    gentlemen, a lot.  Do you think somebody else broke in

11    and stabbed him 12 times really quickly?  No.  It has

12    to be the only one he was fighting with.  And you know

13    this because the doctor said you only live -- you could

14    only live untreated a few minutes after you are

15    stabbed.  He was stabbed in the heart.  You could only

16    live a few minutes.

17              So what does the evidence show?  The evidence

18    shows that there was a fight.  It was one-on-one.

19    Misael Berrios fires a gun in the air.  He then

20    separates from Armando, walks away bleeding, dies.

21    That's the evidence.  There is no room for anyone else

22    to get in.

23              And ladies and gentlemen, don't forget this

24    other crucial piece of evidence is that he ran away.

25    He ran towards the car.  And guess what?  The car is

1    parked by 163 Kinkel Street, and that's exactly where

2    the knife is dropped, right by his house, not by Misael

3    Berrios' house, not by Henry Hernandez' house, not by

4    the mystery killer's house, right by his house. It's

5    clear, why? He drops the knife and gets into the car

6    and goes away.

7         By the way, he didn't come back. He went

8    away. He was -- the police had to look for him. He

9    didn't stay behind to clear anything up. He left.

10   They had to search for him, and they finally caught up

11   with him in Penn Station. Why is that important?

12   Circumstantial evidence, another piece to that knot

13   that ties him to this case. If you didn't stab him,

14   why are you leaving?

15        Somebody who stayed behind, albeit did not

16   come forward right away, is Misael Berrios. It's clear

17   he did some bad things that night. That's not in

18   dispute. I am not condoning his actions. He fired a

19   shot in the air, yes. He gets immunity for that

20   testifying in court. But he spoke to the police

21   October 13th of 2010. He did not have a meeting then.

22   He told the police that Ulises Bonilla told him that I

23   stabbed him, killed him then. That was brought out on

24   cross-examination. He told the police then they didn't

25   threaten him. They did not arrest him. They didn't

1    promise him anything.  That's what he told the police

2    then, and that's what he told you now on the stand.  Is

3    he the real killer?  No.  He had a gun, ladies and

4    gentlemen.  If he wanted to kill Ulises Bonilla, he

5    would have shot him.  He didn't need to stab him with a

6    gun.  That doesn't make any sense whatsoever.

7                And how do you know that this was a

8    one-on-one fight with Armando?  Defense counsel wants

9    you to believe this is a melee, free-for-all, but it

10   wasn't.  And the reason you know it wasn't came from

11   Misael Berrios' own lips.  He made sure it was

12   one-on-one.  He's the guy with the gun.  He made sure

13   that nobody else got in.  That's how you know that it

14   was Ulises Bonilla and Armando Villatoro.

15               You are going to hear the law, ladies and

16   gentlemen, the charge of murder in the second degree.

17   There's a component called intent to kill.  That's

18   intent.  And that's one thing you are going to have to

19   determine whether or not somebody had intent to do

20   something.  And you may say, well, I can't determine

21   that.  How do I do that?  Well, you do it every day in

22   your own life.  You determine someone's intent from

23   their actions all the time.  Folks, a fly goes by your

24   face, you put your hand up and smack it.  What was your

25   intent?  Your intent was to smack the fly.  That's

Proceedings                                    1250

1    intent.

2              Intent can be formed very quickly, very

3    quickly.  It doesn't mean premeditation.  It doesn't

4    mean that when you wake up in the morning, you have to

5    make a list today I am going to kill blah, blah, blah.

6    That's not it.  Intent is formed very, very quickly.

7    If I have a pen and I go like this, what was my intent?

8    My intent was to drop the pen.  That's formed quickly,

9    and that's how you can determine someone's intention

10   from their action.

11             And the one thing you are going to have to

12   determine is whether or not Ulises Bonilla had the

13   intent to kill.  And the evidence shows that he clearly

14   did, he clearly did.  He threatened him.  He stabbed

15   him 12 times.  He stabbed him so hard that he bent the

16   knife.  He stabbed him in the heart, in the stomach.

17   He said, I killed him, to his friend.  He said to

18   people at the scene, Jocelyn, Nancy, I'm going to fight

19   your father.  Would it be okay if I kill your father?

20   He called him over from the scene, and he had this

21   conflict with him.  That's intent to kill.

22             You may hear evidence -- a law on a lesser

23   charge, manslaughter in the first degree.  That's

24   intent to cause serious physical injury that you cause

25   the death of somebody.  That's not in this case, ladies

J.H.

1    and gentlemen.  Because make no mistake, when you stab

2    somebody 12 times -- some of the wounds were five

3    inches deep, wounds in the heart, close quarters.  When

4    you stab somebody that you had a conflict with that you

5    wanted to get back at, that's not just intent to cause

6    serious physical injury.  That's intent to kill.

7            You're also going to hear the law on rape in

8    the first degree.  That's for what he did to Jennifer

9    Villatoro in the bathroom.  He took his penis, and he

10   penetrated her vagina with his penis.  That comes from

11   her testimony.  It also comes from the corroboration by

12   Dr. Pompey.  And the judge is going to tell you it

13   doesn't matter if it didn't go all the way in.  Any

14   penetration however slight is penetration.

15           You are going to hear about two counts of

16   sexual abuse in the first degree.  That's also for the

17   bathroom.  One count is for touching Jennifer Villatoro

18   with his finger.  The other count is for touching her

19   vagina with his penis.

20           You are also going to hear two counts of

21   criminal possession of a weapon.  One is for the knife.

22   One is for the blunt instrument, which is a tire iron

23   that Nancy Villatoro saw Ulises Bonilla hit her father

24   with.  And then if you recall, she said she saw her

25   father grab it away, try to hit Ulises with it, and

1    then it was dropped to the ground.  That's for that

2    count.

3                Now, does it matter that there was no DNA or

4    fingerprints on the knife?  No, ladies and gentlemen.

5    Because contrary to what defense counsel says about no

6    shred of evidence linking him to the knife, you have

7    what we talked about, circumstantial evidence.  You

8    have evidence linking him to the murder.  They tested

9    for fingerprints.  They couldn't find anyone's

10   fingerprints on the knife.  He wasn't excluded.  They

11   just couldn't find anything to test anything about.

12   DNA evidence, they couldn't find an uncontaminated part

13   of the handle to swab.  So they didn't have a clean

14   swab to compare any touch DNA to.  So there was no

15   comparison for that.

16               Endangering the welfare of a child, you are

17   going to hear that charge.  And that is for the conduct

18   committed from the end of June to the beginning of

19   September, that summer of 2010 that we were talking

20   about when he kissed her and fondled her outside of his

21   house on several occasions.  That's where that comes.

22   Those are the charges.

23               Ladies and gentlemen, the judge is going to

24   tell you what the law is.  I want you to go back.  I

25   want you to deliberate.  I want you to review the

Proceedings                              1253

1    evidence.  I want you to follow the evidence, follow

2    the trail, because it goes right back to the defendant,

3    right back to the defendant.  And I'm going to ask you

4    to come back.  Defense counsel asked you to do that,

5    but I'm going to ask you to do it, ladies and

6    gentlemen, because you heard the evidence in this case,

7    and you know it's credible, and you know it's long.

8    And I'm going to come back and ask you to only return a

9    verdict that's consistent with justice in this case,

10   and that's guilty of murder, guilty of rape, guilty of

11   two counts of criminal possession of a weapon in the

12   fourth degree, two counts of sexual abuse in the first

13   degree, one count of endangering the welfare of a

14   child.  Thank you.

15              THE COURT:  Ladies and gentlemen, as I said

16   to you the other day, my charge will be in two parts,

17   one concerning general rules of law applicable to all

18   criminal cases, and the other, the rules of law

19   applicable to the counts in the indictment.  What I'm

20   going to do now is I think I have enough time to give

21   you the first part of that charge, then we will break

22   for lunch, and when you come back, I'll give you the

23   law with regard to the counts of the indictment.

24              Members of the jury:  It is now my duty to

25   instruct you on the law applicable to this case.

Proceedings                    1254

1    Before doing so, however, I would like to commend you

2    for your attention, patience and devotion to your duty

3    as citizens of the community.  I would also like to

4    commend the lawyers for all sides for the very able

5    manner which they have carried out their function.

6              We are fast approaching the part of the trial

7    in which you are to take a more active role.  Up until

8    this point, you have listened to the evidence as it has

9    been presented.  At the conclusion of my instructions

10   on the law, it will become your duty to weigh that

11   evidence and decide what the facts are.

12             Trial by jury in criminal cases forms the

13   very basis of the true administration of justice.  It

14   is the procedure by which we calmly, rationally and

15   dispassionately endeavor to ascertain the truth.  It is

16   a duty which requires the utmost fairness, honesty and

17   courage.  You as jurors and I as the Court have a heavy

18   responsibility to ensure that just result is reached

19   both on the law and the facts.

20             I charge you that the bringing of an

21   indictment by a grand jury does not in any way either

22   prove or tend to prove the defendant's guilt.  The

23   indictment cannot be considered by you as any proof

24   whatsoever of the defendant's guilt or any fact tending

25   to prove his guilt.  The indictment is only an

J.H.

1    accusation.  It is a charge of criminal activity

2    brought against the defendant brought by the grand jury

3    and served only as the mechanism for bringing the

4    defendant to trial.

5           The fundamental duty of a jury to is

6    determine the facts.  You are the fact-finding body,

7    and it is for you and you alone to ascertain where the

8    truth lies.  Indeed, you are the sole and exclusive

9    judges of the facts, and in that field, you're supreme.

10          On the other hand and with equal emphasis, I

11   charge you you must accept the law as I give it to you.

12   Whether or not you agree with the law as I give it to

13   you, you are still bound by it.

14          The process by which you will arrive at your

15   verdict requires two steps.  First, you must determine

16   from all the evidence, including the exhibits, what the

17   facts are.  Second, you must apply the law I give you

18   to the facts as you have determined them to be.  The

19   conclusion you then reach will be your verdict.

20          Whatever your verdict may be in this case, it

21   must be by a unanimous vote of the jury.  In other

22   words, all 12 of the deliberating jurors must agree on

23   that verdict, be that verdict guilty or not guilty.  It

24   is essential that you base your verdict upon the

25   evidence and the evidence alone as you have heard it

J.H.

Proceedings                          1256

1    from the mouths of the witnesses and from the various

2    exhibits which were admitted into evidence.

3          Under no circumstances are you to indulge in

4    speculation or guesswork.  You are not to consider

5    anything outside of the evidence.

6          You are not to be affected by sympathy or

7    other considerations outside of the evidence or what

8    the reaction to your verdict may be, whether it be

9    popular or unpopular or whether it pleases or

10   displeases anyone.  You must decide the case solely

11   upon the evidence and render a fair and impartial

12   verdict without fear, favor and without sympathy.

13         You may not consider or speculate about

14   matters related to sentence or punishment.  That is a

15   matter I alone must determine under our rules of law.

16         I further charge you that you are not to

17   consider or discuss any matters relating to sentence or

18   punishment during your deliberations.

19         As I have said, your verdict is based upon

20   the evidence and the evidence alone.  The openings,

21   summations and arguments of counsel are not evidence

22   and may not be considered by you as evidence.  They are

23   merely arguments put forth by the respective lawyers in

24   which they are telling you what they believe to be the

25   conclusions you should draw.

J.H.

Proceedings                              1257

1    　　　　　If the attorneys during the course of their

2    summation should allude to any facts and your

3    recollection of those facts disagrees with the

4    attorneys or my recital of them, disregard what we say.

5    It is your recollection, understanding and evaluation

6    of the facts which governs.  You are the sole judges of

7    the facts.

8    　　　　　At times during the trial I have sustained

9    objections to questions asked without permitting the

10   witness to answer, or where the answer was made,

11   instructed that it be stricken.  You may not draw any

12   inference from an unanswered question, nor may you

13   consider testimony which has been stricken in reaching

14   a decision.

15   　　　　　There are two types of evidence, direct

16   evidence and circumstantial evidence.  Evidence is

17   direct when a witness testifies to a fact from his own

18   knowledge or that through one of his five senses,

19   sight, sound, taste, touch and smell.  That is direct

20   evidence.  Circumstantial evidence is evidence of facts

21   which are inferred, deduced or which otherwise flow

22   from other evidence.

23   　　　　　There is no distinction between the value or

24   weight of direct and circumstantial evidence.  A

25   fingerprint is circumstantial evidence.  The testimony

J.H.

1    of a half blind man or woman is direct evidence. So

2    you have to judge the value of the evidence, be it

3    direct or circumstantial.

4              Let me give you an example of direct and

5    circumstantial evidence. Let's just assume you are a

6    commuter, and you take a train from Penn Station to

7    Massapequa Park, for instance. And while you're going

8    up the platform, you see an individual with --

9    distinguished-looking individual with a white beard,

10   and he looks a lot like Colonel Sanders. Now, I know

11   he's dead, but let's just assume he's alive for this

12   example. And you get on the train with the colonel and

13   talk to him about whether or not you like original

14   recipe or extra crispy, and you talk to him and he

15   talks to you. And if you were asked about that, you

16   could give direct evidence that the colonel was on the

17   train because you spoke to him and saw him.

18             Now, let's just assume that you're walking up

19   the platform and you pass this individual in the white

20   suit, white beard, and you go up to a car and enter a

21   different car. You take the train from Penn Station to

22   Massapequa Park. You get off the train and go to your

23   car.  During the time you go to the car at that

24   particular time, you see the same individual you saw on

25   the platform in Penn Station. Now, what is the only

1    logical and reasonable deduction you can make from

2    those circumstances? That the colonel took the train.

3    Is it possible that just after you passed him, he had a

4    second thought, went back to his office, got some

5    papers and drove to Massapequa Park? Maybe it's

6    possible. But is it reasonable? And your job is to

7    deduce reasonable inferences from the circumstances.

8           Once you draw a reasonable inference, you

9    cannot draw a further inference from that inference.

10   In other words, from the circumstances that I've given

11   you, you could deduce that the colonel took the train.

12   You can't further deduce that he had a window seat or

13   an aisle seat or if it's in the middle of the rush

14   hour, even if he had a seat at all.

15          Now, I just gave you an example where a fact

16   can be proved circumstantially by one witness. I don't

17   want to leave you with the assumption that that's

18   always the case. A fact can be proved from the

19   testimony of many witnesses.

20          Let's just assume there is some robbery of a

21   convenience store say in Port Washington, and the

22   police come, and the store clerk, he asks the store

23   clerk, Who robbed you? The store clerk says, I don't

24   know, I was just so scared, I didn't know. The only

25   thing I can tell you is that he had a chipped tooth and

J.H.

1    a silver gun. That's what I saw. I had my eyes fixed

2    on that silver gun. Another witness says, I can't tell

3    you what he looked like, but I know I saw his hand, and

4    he had a tattoo on the hand, and the gun was a

5    revolver. Another witness says, I don't know what he

6    looked like, but I know when he walked out of the

7    store, he had a slight limp. And another witness might

8    say, I saw him get into blue Chevy with the first three

9    letters of the license plate. Now, ladies and

10   gentlemen, each one of those individual circumstances

11   may not be sufficient to establish the fact of identity

12   beyond a reasonable doubt. But when you examine them

13   together and accumulate them and accumulate them, that

14   the totality of the circumstantial evidence may be

15   sufficient for you to establish a fact beyond a

16   reasonable doubt by circumstantial evidence.

17          Although you may consider only the testimony

18   of witnesses as you have heard in this courtroom and

19   the exhibits which have been admitted in evidence, the

20   law does not require you to accept all of the evidence

21   I have admitted even though it is competent.  In

22   determining what evidence you will accept, you must

23   make your own evaluation of the testimony given by each

24   of the witnesses and determine the degree or weight you

25   choose to give to that testimony.

J.H.

1           There is no magic formula for doing this.

2     Each of you bring to this courtroom all of the

3     knowledge, experience and background you have acquired

4     in your everyday lives of sizing up people and deciding

5     whether or not they are telling the truth.  These same

6     tests that you use in your you everyday affairs are the

7     tests you should apply to your deliberations.

8           In reaching your conclusions as to what

9     weight you will give to the testimony of any witness,

10    you may take into the consideration that witness's

11    demeanor on the stand and manner of testifying, the

12    witness's relationship to the case, the interest in the

13    outcome of the case, the motive, if any, the witness

14    may have for testifying truthfully or falsely, the

15    probability of the story told by the witness, any prior

16    acts of misconduct or crimes committed by the witness,

17    any prior inconsistent statements made by the witness,

18    the physical condition of the witness at the time that

19    the alleged incidents and any other factor which you

20    think in your judgment assists you in arriving at a

21    witness's credibility including whether or not a

22    witness made a timely complaint or made an early

23    outcry.

24          We went over this in voir dire at length.

25    Police officers testified in this case.  You should use

1    the same tests in evaluating their testimony as you

2    will use in evaluating the testimony of any other

3    witness.  In other words, the mere fact that a witness

4    is a police officer does not require that their

5    testimony be given any greater or lesser credibility.

6    However, evidence of training or experience may be

7    considered by you in reaching your determination.

8          You must keep in mind that the weight you

9    give to the evidence is not dependent upon the number

10   of witnesses to a given fact but rather upon the

11   credibility you give to the testimony of each witness

12   to that fact.  If you find any witness has willfully

13   testified falsely as to any material fact, you may

14   completely disregard that testimony, or you may, if you

15   wish, give credence to so much of that testimony as you

16   find supported by the other credible testimony given by

17   such witness.  You may accept all of the witness's

18   testimony, accept that which you have found he has

19   testified falsely to or none of it or part of it.  That

20   is entirely for you to determine.

21         Questions are not evidence.  It is the

22   answers given to the questions that constitute

23   evidence.

24         An inference or suggestion contained in the

25   question does not render such a fact when the answer

1    negates the inference or suggestion.

2            If you find you're unable to agree as to what

3    the testimony of any particular witness was or an

4    explanation as to the law, you can write me a note, and

5    I will reread the testimony or further give you

6    explanations in this regard.

7            If you wish to see any of the exhibits

8    introduced into evidence, just write a note, and they

9    will be given to you in your deliberation room.

10           I want to tell you a little bit now about

11   procedure.  If you write me a note, there are times

12   when I can give you an immediate answer.  There may not

13   be times -- there may be times when I cannot give you

14   an immediate answer.  By due process of law, your notes

15   must be shown to counsel, and they have to have -- they

16   may have an input as to what it means in your note, and

17   I may have to rule on it.

18           Let me give you an example.  Suppose an

19   incident happens today, and the time of the incident

20   today is 4:30 p.m. in a parking lot which has no

21   unnatural lighting.  So the jury asks a question can we

22   have the testimony with regard to the lighting

23   conditions read back?  So we go through the record, and

24   there is a portion of the testimony that says it was

25   cloudy out.  Now, cloudy at 4:30 in June may not have a

Proceedings                    1264

1    bearing on lighting conditions.  Cloudy at 4:30 in

2    December may have a bearing on lighting conditions.

3    And I would have to rule on that, ladies and gentlemen.

4    So there may not always be an immediate answer to your

5    question.  Sometimes it takes some time.  Sometimes it

6    takes the reporter quite some time to cull through the

7    record to see if a specific question is asked.

8           We now turn to some constitutional safeguards

9    that surround every person accused of a crime, the

10   defendant has pleaded not guilty, and by that plea of

11   not guilty, puts in issue each and every allegation

12   charged in the indictment.

13          A fundamental legal principle which is

14   applicable in every criminal case is known as the

15   presumption of innocence.  The law provides that the

16   defendant starts this trial with the presumption in his

17   favor that he is innocent of the crimes alleged.  This

18   presumption of innocence follows him throughout the

19   entire trial and remains with him until such time that

20   you found that it has been overcome by proof of guilt

21   beyond a reasonable doubt.

22          The trial began with no evidence against the

23   defendant, and the presumption of innocence standing

24   alone would require you to find the defendant not

25   guilty unless you find that the People have proven

J.H.

1    beyond a reasonable doubt that the defendant is guilty

2    of the crimes charged.

3            A plea of not guilty is a denial of each and

4    every material allegation in the indictment.  Under our

5    system of law, the People have the burden of proving to

6    your satisfaction beyond a reasonable doubt each and

7    every element of the crimes which the defendant is

8    charged.  No defendant is required to prove his

9    innocence.  The defendant does not have to prove

10   anything.

11           The defendant did not testify in this case.

12   I charge you that the fact that he did not testify is

13   not a factor from which any inference unfavorable to

14   the defendant may be drawn.

15           The standard of proof required in every

16   case -- in every criminal case is proof of guilt beyond

17   a reasonable doubt.  That does not require the People

18   to prove the defendant guilty beyond all possibility of

19   doubt or beyond a shadow of a doubt.  It requires the

20   People to establish the defendant's guilt only beyond a

21   reasonable doubt.

22           Therefore, before you may convict the

23   defendant, each of you must be satisfied that the

24   credibility of evidence is sufficient to convince you

25   beyond a reasonable doubt that the defendant is, in

1    fact, guilty and the defendant is, in fact, the person
2    who committed the crimes charged.

3              A doubt of the defendant's guilt to be a
4    reasonable doubt must be a doubt for which some reason
5    can be given.  The doubt to be reasonable, therefore,
6    must arise because of the nature and quality of the
7    evidence in the case or from the lack or insufficiency
8    of the evidence in the case.  The doubt to be a
9    reasonable doubt should be one that a reasonable
10   person, acting in a matter of this importance, would be
11   likely to entertain because of the evidence or because
12   of the lack or insufficiency of the evidence in the
13   case.

14             A reasonable doubt, our law says, is an
15   actual doubt, one which you are conscious of having in
16   your mind after you have considered all of the evidence
17   or lack of evidence.

18             If, after doing so, you then feel uncertain
19   and are not fully convinced of the defendant's guilt
20   and you are also satisfied that you are entertaining
21   such a doubt as a reasonable person should in a matter
22   of this importance, then that is a reasonable doubt of
23   which the defendant is entitled to the benefit.

24             Therefore, the first duty of each juror is to
25   consider and weigh all the evidence in the case and

1    decide which evidence you believe is credible and

2    worthy of consideration. The next duty of each juror

3    is to determine whether or not he, in fact, or he or

4    she, in fact, has a reasonable doubt of the defendant's

5    guilt. If in so doing you find the People have not

6    proven the defendant's guilt beyond a reasonable doubt,

7    you must find the defendant not guilty. On the other

8    hand, if you are satisfied that the People have proven

9    the defendant's guilt beyond a reasonable doubt, it is

10   equally your duty to find the defendant guilty.

11            You have heard testimony about the attorneys,

12   both the prosecutor and the defense, speaking to

13   various witnesses on this particular case and preparing

14   them for their testimony. The law does not prohibit

15   that, and there's nothing wrong in doing so. In fact,

16   in certain instances it may be wrong if you don't do

17   it, but there's nothing wrong with that.

18            Now, with regard to the September 24th

19   allegation, the sexual incidents, the defendant has

20   raised an alibi. He contends that he could not have

21   committed the crime charged because he was elsewhere at

22   the time of commission. Although the defendant raised

23   the alibi, the defendant has no burden to prove it. In

24   fact, even if you find that the alibi is false, you

25   must not for that reason alone find the defendant

J.H.

1    guilty.  To do that would be to shift the burden of

2    proof from the People to the defendant.  The People are

3    required to prove beyond a reasonable doubt all of the

4    evidence -- on all of the evidence presented that the

5    defendant was the person who committed the crime, and

6    therefore, was not elsewhere at the time of the

7    commission.  To prove that, the People may rely upon

8    the evidence they have offered to establish beyond a

9    reasonable doubt that the defendant committed the

10   crime.  The People are not required to present

11   additional evidence that independently proves that the

12   defendant was not where he or she claims to have been

13   at the time of the crime.

14          Thus, if you find from the evidence that the

15   People have proven beyond a reasonable doubt that the

16   defendant committed the crime charged, you may find

17   from that same evidence that the People have proven

18   beyond a reasonable doubt that the defendant was not

19   elsewhere at the time of the commission of the crime.

20   If you are not so satisfied that the People have proven

21   beyond a reasonable doubt that the defendant was the

22   person who committed the crime, you must find the

23   defendant not guilty.

24          This is the last thing I will read before we

25   break for lunch.  In this case, the People contend that

1     the defendant fled the scene and the jurisdiction after
2     the commission of the event, and as such, contend that
3     that conduct demonstrates a consciousness of guilt.
4     You must decide first whether or not you believe that
5     the conduct took place, and second, if it did take
6     place, whether it demonstrates consciousness of guilt
7     upon the part of the defendant.

8              In determining whether or not the conduct
9     demonstrates consciousness of guilt, you must consider
10    whether the conduct has an innocent explanation.
11    Common experience shows that an innocent person who
12    finds himself under suspicion may resort to conduct
13    which gives the appearance of guilt. The weight and
14    the importance you give to evidence offered to show
15    consciousness of guilt depends upon the facts of the
16    case. Sometimes such evidence is only of slight value,
17    and standing alone, it may never be the basis for a
18    finding of guilt.

19             Okay. We are now going to break for lunch,
20    and we will resume at 2 o'clock at which time I will
21    give you the law with regard to the charges contained
22    in the indictment.

23             Remember all of the admonitions I have given
24    you. They are especially of importance now, but you
25    are bound by those admonitions.

Proceedings                          1270

1          Don't talk to anybody about this case.

2          Don't read anything about it.

3          Don't let anybody talk to you about it, and

4     keep an open mind until the case has been given to you

5     for deliberation which, I believe, will be by 3 o'clock

6     this afternoon.

7          (Whereupon, the jury exits the courtroom.)

8          THE COURT:  After I get through with the

9     charge, I will ask the People and the defendant if they

10    have any exceptions or if they have any further

11    requests.  If the answer to that -- those questions is

12    in any way yes, we'll discuss them over there at the

13    side.  And if they need additional discussion on a more

14    lengthy basis, I'll have to excuse the jury.

15         (Whereupon, a luncheon recess was taken.)

16

17

18

19

20

21

22

23

24

25

Proceedings                                  1271

1    A F T E R N O O N   S E S S I O N

2              THE CLERK:  Recalling case on trial, People

3    of the State of New York verse Ulises Bonilla,

4    Indictment 202N of 2011.  All parties present including

5    the defendant and Spanish interpreter.  There are no

6    jurors present at this time.

7              THE COURT:  The record should reflect that I

8    neglected to give an expert witness charge.  I will do

9    that first right now.

10             MR. MILLMAN:  But you still wanted us to wait

11   until you were done if there were any exceptions?

12             THE COURT:  That's correct.

13             MR. MILLMAN:  That's fine.

14             COURT OFFICER:  Jury entering.

15             (The jury enters the courtroom.)

16             THE CLERK:  Let the record reflect the

17   presentation of all jurors.  Do both sides waive a

18   reading of the roll and consent to the seating?

19             MS. ABDI:  Yes.

20             MR. MILLMAN:  Yes.

21             THE COURT:  Ladies and gentlemen, I neglected

22   to give you an expert witness charge as part of the

23   general precharge.  I'm going to do that now.

24             You will recall that certain witnesses

25   testified and gave an opinion on their fields of

J.H.

1    expertise.  Ordinarily a witness is limited to

2    testifying about facts and is not permitted to give an

3    opinion.  Where, however, scientific, medical,

4    technical or other specialized knowledge will help the

5    jury understand the evidence or to determine a fact in

6    issue, a witness with expertise in a specialized field

7    may render opinions about such matters.  You should

8    evaluate the testimony of any such witness just as you

9    would the testimony of any other witness.  You may

10   accept or reject such testimony in whole or in part

11   just as you may with respect to the testimony of any

12   other witness.

13            In deciding whether or not to accept such

14   testimony, you should consider the following, and this

15   is not all inclusive:  The qualifications and

16   believability of the witness, the facts and other

17   circumstances upon which the witness's opinion was

18   based, the accuracy or inaccuracy of any assumed or

19   hypothetical fact upon which the opinion was based, the

20   reasons given for the witness's opinion and whether or

21   not the witness's opinion is consistent or inconsistent

22   with the other evidence in the case.

23            Now, I'm going to get into the specific

24   charges with regard to which the defendant is accused.

25   There are a number of charges which require a specific

J.H.

1   intent.  Before I get into those charges, I would like

2   to give you a charge on intent.  Intent does not

3   require premeditation.  In other words, intent does not

4   require advanced planning nor is it necessary that the

5   intent be in the person's mind for any particular

6   period of time.  The intent can be formed and need only

7   exist at the very moment the person engages in the

8   prohibited conduct or acts to cause the prohibited

9   result and not at an earlier time.

10          The question naturally arises as to how to

11   determine whether or not the defendant had the intent

12   required for the commission of a crime.  To make that

13   determination in this case, you must decide if the

14   required intent can be inferred beyond a reasonable

15   doubt from the proven facts.  In doing so, you may

16   consider the person's conduct and all of the

17   circumstances surrounding that conduct, including but

18   not limited to the facts, what, if anything, did the

19   person do or say, what result, if any, followed from

20   the person's conduct, was that result the natural,

21   necessary and probable consequence of that conduct.

22          Therefore, in this case -- all right, now,

23   you also are permitted but not required to draw the

24   inference that a person intends the reasonable and

25   logical consequence of his actions.  Therefore, in this

J.H.

1  case from the facts you find to have been proven you

2  decide whether or not you can infer beyond a reasonable

3  doubt that the defendant had the intent required for

4  the commission of the crime.

5  Now, let me explain motive and the difference

6  between intent and motive. Intent means a conscious

7  objective or purpose. A person commits a criminal act

8  with intent when that person's conscious objective or

9  purpose is to engage in the act which the law forbids

10  or to bring about a unlawful result. Motive, on the

11  other hand, is the reason why a person chooses to

12  engage in criminal conduct. If intent is an element of

13  the crime charged, that element must be proved by the

14  People beyond a reasonable doubt. Motive, however, is

15  not an element of the crime charged. Therefore, the

16  People are not required to prove a motive for the

17  commission of the crimes charged. Nevertheless,

18  evidence of a motive of lack of motive can and may be

19  considered by jury.

20  For example, if you find from the evidence

21  that the defendant had a motive to commit the crime

22  charged, that is a circumstance, remember

23  circumstantial evidence? That is a circumstance you

24  may wish to consider as tending to support a finding of

25  guilt. On the other hand, if the proof established

1    that the defendant had no motive to commit the crime

2    charged, this is called a circumstance you may wish to

3    consider in deciding whether the defendant is guilty or

4    is not guilty of the crime charged.

5         The first count of the indictment is murder

6    in the second degree.  Under our law, a person is

7    guilty of murder in the second degree when, with intent

8    to cause the death of another person, he causes the

9    death of such person.

10        I have already defined intent to you, but it

11   basically means a conscious objective or purpose.

12   Thus, a persons acts with intent to cause the death of

13   another when that person's conduct or objective is to

14   cause the death of another.

15        In order for you to find the defendant guilty

16   of this crime, the People are required to prove from

17   all of the evidence in the case beyond a reasonable

18   doubt both of the following two elements:  That on or

19   about September 28th, 2010, in the County of Nassau,

20   Ulises Bonilla caused the death Armando Villatoro, and

21   two, the defendant did so with the intent to cause the

22   death of Armando Villatoro.

23        Therefore, if you find the People have not

24   proven beyond a reasonable doubt either one or both of

25   these elements, you must find the defendant not guilty

Proceedings                    1276

1    of the crime of murder in the second degree charged in

2    the first count.  On the other hand, if you find that

3    the People have proved beyond a reasonable doubt both

4    of those elements, it is equally your duty to find the

5    defendant guilty of the crime of murder the second

6    degree as charged in the first count.

7         Now, I'm going to give you under the first

8    count the lesser included charge of manslaughter in the

9    first degree for your consideration only if you find

10   the defendant not guilty of murder in the second

11   degree.

12        I want you to know I am going to give you a

13   possible verdict sheet to help you with your process.

14   It will make it easier.

15        Let me define for you manslaughter in the

16   first degree.  Under our law, a person is guilty

17   manslaughter in the first degree when, with intent to

18   cause serious physical injury to another person, he

19   causes the death of such person.

20        I have previously defined intent.  What is

21   serious physical injury?  Serious physical injury means

22   impairment of a person's physical condition which

23   creates a substantial risk of death or serious and

24   protracted disfigurement, impairment of health or

25   protracted loss or impairment of any bodily organ.

J.H.

1        Well, you can see that the difference between
2    murder in the second degree and manslaughter in the
3    first degree is the element of intent.  Murder in the
4    second degree requires intent to kill or cause the
5    death, and manslaughter in the first degree requires an
6    intent to cause serious physial injury to.

7        In order for you to find the defendant guilty
8    of this crime, the People are required to prove from
9    all the evidence in the case beyond a reasonable doubt
10   both of the following two elements:  That on or about
11   September 28th, 2010, in the County of Nassau, the
12   defendant, Ulises Bonilla, caused the death of Armando
13   Villatoro, and two, the defendant did so with the
14   intent to cause serious physical injury to Armando
15   Villatoro.

16       Therefore, if you find the People have not
17   proven beyond a reasonable doubt either one or both of
18   those elements, you must find the defendant not guilty
19   of the crime of manslaughter in the first degree.  On
20   the other hand, if you find that the People have proven
21   beyond a reasonable doubt both of these elements, it is
22   equally your duty to find the defendant guilty of the
23   crime of manslaughter in the first degree.

24       Under the second count, second count is rape
25   in the first degree.  Under our law, a person is guilty

Proceedings                          1278

1     of rape in the first degree when he engages in sexual

2     intercourse with another person who is less than 11

3     years old.

4              Under our law, it is also an element of this

5     offense that the sexual intercourse was committed

6     without the consent of that other person.  Sexual

7     intercourse takes place without a person's consent when

8     that person is deemed by law to have been incapable of

9     consent.  Under our law, a person is deemed incapable

10    of consenting to sexual intercourse when she is less

11    than 11 years old.  Thus, sexual intercourse with such

12    person is always deemed to be without the person's

13    consent, even if, in fact, that person did consent.

14             It is not a defense to this charge that the

15    actor or did not know that the person whom the actor

16    had sexual intercourse was less than 11 years old or

17    that the actor believed that such person was 11 years

18    old more on the date of the crime.

19             The term sexual intercourse used in the

20    definition of this crime has its own special meaning.

21    Sexual intercourse means any penetration, however

22    slight, of the penis into the vaginal opening.  In

23    other words, any penetration of the penis into the

24    vaginal opening regardless of the distance of

25    penetration constitutes sexual intercourse.  Sexual

J.H.

1      intercourse does not necessarily require erection of

2      the penis, emission or orgasm.

3              In order for you to find the defendant guilty

4      of this crime, the People are required to prove from

5      all of the evidence in the case beyond a reasonable

6      doubt both of the following two elements, that on or

7      about September 24th, 2010, in the County of Nassau,

8      the defendant, Ulises Bonilla, engaged in sexual

9      intercourse with Jennifer Villatoro and Jennifer

10     Villatoro was less than 11 years old.

11             Therefore, if you find that the People have

12     not proven beyond a reasonable doubt either one or both

13     of those elements, you must find the defendant not

14     guilty of the crime of rape in the first degree as

15     charged in the second count.  On the other hand, if you

16     find the People have proven beyond a reasonable doubt

17     both of those elements, you must find the defendant

18     guilty of the crime of rape in the first degree as

19     charged in the second count.  I don't want you to leave

20     this courtroom thinking that the age of consent in the

21     State of New York is 11 years old.  It is not.  It's

22     17.  But there are certain degrees of crimes as to the

23     age of the victim.

24             Third count, this count is sexual abuse in

25     the first degree.  Under our law, a person is guilty of

Proceedings                    1280

1    sexual abuse in the first degree when he subjects

2    another person to sexual contact when that other person

3    is less than 11 years old.

4              Under our law, it is also an element of this

5    crime that the sexual contact was committed without the

6    consent of that other person.  Sexual contact takes

7    place without a person's consent when that person is

8    deemed by law to be incapable of consent.  As stated

9    above, under our law, a person is deemed incapable of

10   consenting to sexual contact when she is less than 11

11   years.  Thus, sexual contact with such a person is

12   always deemed to be without that person's consent even

13   if, in fact, that person did consent.

14             The term sexual contact used in the

15   definition of this crime has its own special meaning in

16   our law.  Sexual contact means any touching of the

17   sexual or other intimate parts of a person for the

18   purpose of gratifying the sexual desire of either

19   party.  It includes the touching of the actor by the

20   victim as well as the touching of the victim by the

21   actor, whether directly or through clothing as well as

22   the emission of ejaculate by the actor upon any part of

23   the victim clothed or unclothed.

24             In order for you to find the defendant guilty

25   of this crime, the People are required to prove from

Proceedings                                    1281

1   all of the evidence in the case beyond a reasonable

2   doubt both of the follow two elements:  That on or

3   about September 24, 2010, in the County of Nassau, the

4   defendant, Ulises Bonilla, subjected Jennifer Villatoro

5   to sexual contact and Jennifer Villatoro was less than

6   11 years old.

7            Therefore, if you find the People have not

8   proven beyond a reasonable doubt either one or both of

9   these elements, you must find the defendant not guilty

10   of the crime of sexual abuse in the first degree as

11   charged in the third count.  On the other hand, if you

12   find the People have proven beyond a reasonable doubt

13   both of these elements, it is equally your duty to find

14   the defendant guilty of the crime of sexual abuse in

15   the first degree as charged in the third count.

16            The fourth count is sexual abuse in the first

17   degree.  Under our law, a person is guilty of sexual

18   abuse in the first degree when he subjects another

19   person to sexual conduct when the other person is less

20   than 11 years old.

21            Under our law, it is also an element of this

22   offense that the sexual conduct was committed without

23   the consent of that other person.  Sexual contact takes

24   place without the person's consent when that person is

25   deemed by law to be incapable of consent.  As stated

J.H.

Proceedings                                    1282

1      above, under our law, a person is deemed incapable of

2      consenting to sexual conduct when she is less than 11

3      years old.

4             Thus, sexual contact with such person is

5      always deemed to be without consent even, in fact, if

6      the person did consent.  It is not a defense to this

7      charge that the actor did not know the person with whom

8      the actor had sexual contact was less than 11 years old

9      or the actor believed such person was 11 years old or

10     more on the day of incident.

11            In order for you to find the defendant guilty

12     of this crime, the People are required to prove from

13     all of the evidence in the case beyond a reasonable

14     doubt both of the following two elements:  That on or

15     about September 24th, 2010, the defendant, Ulises

16     Bonilla, subjected Jennifer Villatoro to sexual contact

17     and Jennifer Villatoro is less than 11 years old.

18            Therefore, if you find the People have not

19     proven beyond a reasonable doubt either one or both of

20     these elements, you must find the defendant not guilty

21     of the crime of sexual abuse in the first degree as

22     charged in the fourth count.  On the other hand, if you

23     find the People have proven beyond a reasonable doubt

24     both of those elements, you must -- it is equally your

25     duty to find the defendant guilty of the crime of

J.H.

1    sexual abuse in the first degree as charged in the

2    fourth count.

3              Now, the fifth count and the sixth count

4    concern possession of weapons with the intent to use

5    unlawfully.  Under the fifth count, that weapon is a

6    sharp object which in this case has been referenced to

7    a knife.  Under the sixth count, that reference is in

8    regard to a blunt instrument which is referenced to a

9    tire iron.  So I am not going to go through this twice,

10   but you will see the logic of it when comes out.

11             The fifth count of the indictment is criminal

12   possession of a weapon in the fourth degree.  Under our

13   law, a person is guilty of criminal possession of a

14   weapon in the fourth degree when that person knowingly

15   possesses a dagger or dangerous knife, dirk, razor,

16   stiletto, imitation pistol or other dangerous or deadly

17   instrument or weapon with the intent to use the same

18   against -- unlawfully against another.

19             I already defined the term intent to you.

20   Possess means to have physical possession or otherwise

21   to exercise dominion or control over tangible property.

22             Knowingly.  Knowingly means when that person

23   is aware that he or she is in possession of such

24   property.

25             In order for you to find the defendant guilty

Proceedings                              1284

1   of this crime, the People are required to prove from

2   all of the evidence in the case beyond a reasonable

3   doubt that on or about September 28th, 2010, in the

4   County of Nassau, the defendant, Ulises Bonilla,

5   possessed a knife, that the defendant did so knowingly

6   and the defendant did so with intent to use that knife

7   unlawfully against another party.

8       Therefore, if you find the People have not

9   proven beyond a reasonable doubt any one or more of

10  those elements, you must find the defendant not guilty

11  of the crime of criminal possession of a weapon in the

12  fourth degree as charged in the fifth count.  On other

13  hand, if you find the People have proven beyond a

14  reasonable doubt each of those elements, it is equally

15  your duty to find the defendant guilty of the crime of

16  criminal possession of a weapon in the fourth degree as

17  charged in the fifth count.

18      The charge I just gave you on the fifth count

19  is the same charge I would give you under the sixth

20  count except under the sixth count, the instrument

21  involved is allegedly a tire iron or lug wrench.

22      Under the seventh count, the seventh is

23  endangering the welfare of a child.  Under our law, a

24  person is guilty of endangering the welfare of a child

25  when that person knowingly acts in a manner unlikely to

J.H.

1    be injurious to the physical, mental or moral welfare

2    of a child less than 17 years old.

3         Knowingly, a person acts knowingly in a

4    manner likely to be injurious to the physical, mental

5    or moral welfare of a child when that person is aware

6    that he is acting in such a manner.  Actual harm to the

7    child need not result.

8         The defendant must act in a manner which is

9    likely to be injurious to the moral welfare of the

10   victim knowing the likelihood of such injury.  The age

11   of the victim is not an element of this crime, and it

12   is not defense to this charge that the defendant did

13   not know the age of the child or believed the age of

14   the child more than 17 years of age.

15        In order for you to find the defendant guilty

16   of this particular crime, the People are required to

17   prove from all of the evidence in this case beyond a

18   reasonable doubt each of the following three elements:

19   And you will note, ladies and gentlemen, there is a

20   different time period, that on or about and between

21   June 7th, 2010 and September 7th, 2010, in the County

22   of Nassau, the defendant acted in a manner likely to be

23   injurious to the physical, mental or moral welfare of

24   Jennifer Villatoro, two, the defendant did so

25   knowingly, and Jennifer Villatoro was less than 17

Proceedings                    1286

1    years of age.

2             Therefore, if you find that the People have

3    not proven beyond a reasonable doubt any one or more of

4    these elements, you must find the defendant not guilty

5    of the crime of endangering the welfare of a child.  On

6    the other hand, if you find the People have proven

7    beyond a reasonable doubt each of the these elements,

8    it is equally your duty find the defendant guilty of

9    the crime of endangering the welfare of a child.

10            And as I said to you before, ladies and

11   gentlemen, I don't expect you to memorize this stuff.

12   If, during the course of your deliberations, you want a

13   repeating or re-explanation of these offenses, I would

14   be glad to give it to you.

15            Okay, People, any further requests, just yes

16   or no?

17            MS. ABDI:  No.

18            THE COURT:  Defendant, any further requests,

19   yes or no?

20            MR. MILLMAN:  Yes.

21            THE COURT:  People, any objections,

22   exceptions, yes or no?

23            MS. ABDI:  No.

24            THE COURT:  Defendant, any objections,

25   exceptions?

J.H.

Proceedings                                    1287

1        MR. MILLMAN: No.

2            THE COURT: I'll take these over here.

3            (The following occurs at sidebar outside of

4        the hearing of the jurors.)

5            MR. MILLMAN: I had a request to charge on

6        inconsistent statements. I know you did touch on it,

7        but there was some additional language that I was

8        requesting.

9            THE COURT: I thought I charged on that. As

10       a matter of fact, I know I did.

11           MR. MILLMAN: I don't know if it was -- I

12       mean the one that I had, Judge, had language that I

13       know was not --

14           THE COURT: Let me see it.

15           MR. MILLMAN: Sure. Both that and what's on

16       the bottom as well.

17           THE COURT: All right, I charged them this.

18       If you want an expanded charge on inconsistent

19       statements --

20           MR. MILLMAN: The other thing, Judge, this

21       was not the motive part but the benefit and interest.

22       I think you may have touched on that.

23           THE COURT: I did those.

24           MR. MILLMAN: But the benefit, I don't know

25       if you did that, that you could consider whether a

J.H.

Proceedings                        1288

1    witness hopes or receives a benefit.  You know who that
2    would refer to.
3              THE COURT:  No, I don't.  Who would that be?
4    No, I don't.
5              MS. ABDI:  He is talking about Misael
6    Berrios.
7              MR. MILLMAN:  Misael Berrios, the benefit
8    that he was offered, expects to receive a benefit for
9    testifying.
10             THE COURT:  All right, I will charge that.
11             MR. MILLMAN:  Also that you can consider
12   whether a witness had been convicted of a crime.
13             THE COURT:  I did that.
14             MR. MILLMAN:  I'm sorry, Judge.  Judge, I
15   apologize, last one, it's just this one paragraph
16   standard charge.  I don't think that was part of it.
17   It was just that paragraph.
18             THE COURT:  Okay, I will charge it.
19             (The following takes place in open court.)
20             THE COURT:  Okay, ladies and gentlemen, I
21   gave you a number of factors which you could assess in
22   determining a witness's credibility and said at that
23   particular time the list was not inclusive.  Another
24   thing you can consider in assessing a witness's
25   credibility is whether or not that witness hopes for or

J.H.

Proceedings                                              1289

1    expects to receive a benefit for testifying.  If so,

2    you may consider whether and to what extent it affected

3    the truthfulness of the witness's testimony.  Ladies

4    and gentlemen, this has specific reference to -- you

5    have to give me the name.

6              MR. MILLMAN:  Mr. Berrios, Mr. Misael

7    Berrios.

8              THE COURT:  Yes, in receiving the immunity

9    that he received for his testimony.

10             Okay, I gave you how an inconsistent

11   statement can be used to affect a witness's

12   credibility.  I thought I made it clear a number of

13   times, but I'm going to sacrifice redundancy for the

14   sake of clarity and read you the following:  You may

15   consider whether a witness made statements at this

16   trial that are inconsistent with each other.  You may

17   also consider whether a witness made previous

18   statements that are inconsistent with his or her

19   testimony at trial.  You may consider whether a witness

20   testified to a fact here at trial that a witness

21   omitted to state at a prior time when it would have

22   been reasonable and logical for a witness to have

23   stated the fact.

24             In determining whether it would have been

25   reasonable and logical for a witness to have stated the

Proceedings                    1290

1    omitted fact, you may consider whether the witness's

2    attention was called to the matter and whether the

3    witness was specifically asked about it.  If a witness

4    has made inconsistent statements or omissions, you may

5    consider whether and to what extent they affect the

6    truthfulness or accuracy of the witness's testimony

7    here at trial.  The contents of the prior inconsistent

8    statements are not proof of what happened.  You may use

9    the evidence of a prior inconsistent statement only to

10   evaluate the truthfulness or accuracy of the witness's

11   testimony here at trial.

12           Very, very simply put, I told you this once

13   before, if a witness testifies the house was red, did

14   you testify the previous occasion the house was green

15   and the witness says yes, that's not proof the house

16   was green.  It only affects whether or not the witness

17   is telling the truth as to whether or not the house was

18   red.

19           Lastly, I gave you a charge on proof beyond a

20   reasonable doubt.  I may expand that now a little, but

21   you have to follow this also.  The law uses the term

22   proof beyond a reasonable doubt to tell you how

23   convincing the evidence of guilt must be to permit a

24   verdict of guilty.  The law recognizes that in dealing

25   with human affairs, there are very few things in this

Proceedings                                    1291

1    world we know with absolute certainty. Therefore, the

2    law does not require the People to prove the defendant

3    guilty beyond all possible doubt. On the other hand,

4    it not sufficient to prove the defendant -- that the

5    defendant is probably guilty. In a criminal case, the

6    proof of guilt must be stronger than that. It must be

7    beyond a reasonable doubt.

8              As I previously charged you, your verdict

9    must be unanimous. That is, all 12 of the deliberating

10   jurors must agree on the verdict on each count.

11             Miss Woessner, since you are the first juror

12   sworn, you are designated the foreperson of this

13   particular jury. It's your duty of seeing that your

14   deliberations are conducted in an orderly fashion and

15   to report to the Court your questions, requests and

16   final determination.

17             It is your duty as jurors to consult with one

18   another and to deliberate with a view of reaching an

19   agreement if you can do so without violence to your

20   individual judgment. Each of you must decide the case

21   for yourself but must do so only after impartially

22   considering the evidence along with your fellow jurors.

23             In the course of your deliberations, do not

24   hesitate to reexamine your own views and change your

25   opinion if you're honestly convinced that it is

J.H.

1   erroneous.  Simply put, my mind is made up, don't let

2   me know what the facts are.  I will repeat this:  Do

3   not hesitate to reexamine your own views and change

4   your opinion if you are honestly convinced it is

5   erroneous, but do not surrender your honest conviction

6   as to the weight or the effect of the evidence solely

7   because of the opinions of your fellow jurors or for

8   the mere purpose of returning a verdict.

9              There is no fixed procedure for you to follow

10  in your deliberations.  However, you should proceed in

11  such a way that each juror has an equal opportunity to

12  express his or her own views.

13             Your attitude at the outset of deliberations

14  is important.  It is seldom helpful for a juror upon

15  entering the jury room to announce an emphatic opinion

16  on the case or to a determination to stand for a

17  certain verdict.  When a juror does that, individual

18  pride may become involved, and the juror may later

19  hesitate to recede from an announced position.

20             The case is important.  It is important to

21  the defendant.  It is important to the People, and it

22  is important that justice be done.

23             Make sure your verdict is free from passion,

24  prejudice, sympathy or other -- any other improper

25  motive.

J.H.

Proceedings                    1293

1        Again, you must not during the course of your

2    deliberations converse among yourselves or with anyone

3    else upon any subject connected with this trial.

4        You must not read or listen to any account or

5    discussion of the case in the event it is reported by

6    the newspapers.

7        You must not visit or view the premises or

8    place where the offenses charged were committed or any

9    other premise or place connected with this case.

10       Prior to your being discharged, you must not

11   request, agree to accept or discuss with any person the

12   receiving or accepting of any payment in consideration

13   for supplying any information.

14       You must promptly report to the Court any

15   incidents within your knowledge involving an attempt by

16   any person improperly to influence you.

17       Don't access the internet or World Wide Web.

18       Members of the jury, I'm now going to give

19   you a verdict sheet, and you can retire for your

20   deliberations.

21       One further thing.  The deliberations that

22   you are going to be engaged in must happen with 12 of

23   the jurors present.  To give you an example, let's just

24   say you don't reach your verdict immediately and you go

25   home and there are two sides to an issue.  And in the

Proceedings                    1294

1    interest of efficiency, one juror calls another juror

2    in the nighttime and says, you know, maybe we can work

3    this out between ourselves so we can save time

4    tomorrow.  That might be proper in a business meeting.

5    It might even be efficient.  But if you do that, you're

6    in my contempt, and I don't want you to do that.  You

7    can retire to deliberate.

8              (Whereupon, the jury exits the courtroom.)

9              (Whereupon, the jury deliberates.)

10             THE COURT:  May I have a stipulation between

11   parties that if they want any evidence, it can go in

12   without the parties coming back?

13             MS. ABDI:  Yes.

14             MR. MILLMAN:  Yes, your Honor.

15             (Whereupon, a recess was taken during

16   deliberations.)

17             COURT OFFICER:  Jury entering.

18             (The jury enters the courtroom.)

19             THE COURT:  We just have to wait for the

20   interpreter.  It will only be a moment.

21             THE CLERK:  Recalling case on trial, People

22   of the State of New York versus Ulises Bonilla,

23   Indictment 202N of 2011.  All parties present including

24   the defendant, Spanish interpreter and all jurors.  Do

25   both sides waive a reading of the roll and consent to

1    the seating of the jury?

2              MS. ABDI:  Yes.

3              MR. MILLMAN:  Yes.

4              THE CLERK:  Thank you.

5              THE COURT:  All right, ladies and gentlemen,

6    you have had an awful lot today.  You've had two

7    summations, my charge and an hour and ten minutes worth

8    of deliberations.  I'm going to break for the day.

9              You've experienced the summations.  You've

10   experienced the charge, and you also experienced the

11   deliberations.  That's a lot.  So we'll break until

12   Monday.

13             As I said to you before, we all have to be

14   here together to have anything go on in the courtroom.

15   However, if you are here on Monday at 9 o'clock, you

16   can start deliberating, and that would give you some

17   more time in deliberations.  So I'm going to ask you to

18   be here at 9 o'clock, and as soon as we get the 12, you

19   can start deliberations without coming back into court.

20             As far as the alternates are concerned, you

21   have to appear back here on Monday.  I may have some

22   different news for you on Monday.  I know it's very,

23   very difficult to be here and not deliberate.  So if

24   you want to bring something to amuse yourself, do it, a

25   book, a crossword puzzle, a TV, anything like that,

Proceedings                                    1296

1    just do it.  But there's nothing I can do at this

2    particular time.

3               So remember all of the admonitions I have

4    given you.  We'll see you -- especially the one about

5    the 52 year old principal, and we'll see you all here

6    on Monday at 9 o'clock.

7               (Whereupon, the jury exits the courtroom.)

8               THE COURT:  Okay, have a pleasant weekend.

9               MS. ABDI:  Thank you, your Honor.

10              MR. MILLMAN:  Thank you, your Honor.

11              (Whereupon, the trial is adjourned to

12   December 19th, 2011.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

1297

1    STATE OF NEW YORK  :  NASSAU COUNTY

2         SUPREME COURT  :  PART 39

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5              -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                        Defendant.

8    ----------------------------------------X

9    JURY TRIAL

10                          December 19, 2011
                           262 Old Country Road
11                          Mineola, New York

12   B E F O R E :

13        HON. GEORGE R. PECK,
               Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17        HON. KATHLEEN M. RICE
               Nassau County District Attorney
18             BY:  ZEENA ABDI, ESQ., of Counsel
               Assistant District Attorney
19                     For the People

20

21        DANIEL L. MILLMAN, ESQ.
               316A Main Street
22             Roslyn, New York  11576
                    For the Defendant
23
                         JOANNE HORROCKS, CSR
24                       Senior Court Reporter

25

Proceedings                    1298

1    THE CLERK:  Case on trial, Indictment 202N of

2    2011, People of the State of New York versus Ulises

3    Bonilla.  Let the record reflect all parties are

4    present, including the defendant and the Spanish

5    interpreter.  There are no jurors present.

6    THE COURT:  All right, counsel, we have two

7    notes.  One is marked Exhibit 7, Court Exhibit 7.  The

8    other is marked Court Exhibit 8.

9    Court Exhibit 7 says, We, the jury, would

10    like the definition of reasonable doubt, Oscar's

11    timeline of events on Friday, September 24th,

12    definitions of charges, medical records of Ulises in

13    hospital on 9-28.

14    And then on number 8 says, We, the jury, it

15    says photo of the blood spatter on the car, photos

16    three of stab wounds and Armando.  Well, obviously,

17    have you agreed concerning the photo of the blood

18    spatter on the car?

19    MS. ABDI:  Yes, your Honor.

20    MR. MILLMAN:  Yes, we have.

21    THE COURT:  Then that will be done.  And we

22    will give them the photographs of the wounds on

23    Armando.  With regard to Number 7, Court Exhibit 7, We

24    would like the definition of reasonable doubt.  I'm

25    just going to reread what I read to my main charge with

Proceedings                                    1299

1      your addition, counsel.

2                  Then it says, Oscar's timeline of the events

3      on September 24th.  I spoke with counsel off the record

4      on this subject, and am I correct in saying that

5      because Oscar was a short witness, we should just

6      reread his entire testimony, People?

7                  MS. ABDI:  Yes.

8                  MR. MILLMAN:  Yes, your Honor.

9                  THE COURT:  I think that's wise.  Think it

10     would create more problems culling the testimony than

11     just rereading the testimony.

12                 And then it says, Definitions of charges.

13     What I intend to do here, without objection, is simply

14     read the charges in the indictment, say that the

15     indictment is not evidence and then back up the charge

16     in the indictment with the statute defining the

17     offense.  People?

18                 MS. ABDI:  That's fine, Judge.

19                 THE COURT:  Defendant?

20                 MR. MILLMAN:  Yes, your Honor.

21                 THE COURT:  Okay.  And then it says, The

22     hospital records.  We will just give them to them.

23     Okay, let's bring in the jury.

24                 Do I have counsel's consent to have the clerk

25     tell the officers excuse the jury at a quarter to 1 and

1          order them to return at 2 o'clock if they haven't

2          reached a verdict?  I don't like the way we do things

3          today.  We know longer buy lunches for the jury because

4          of budgetary means.  But that's my instructions from

5          the higher administration.  So I either bring them in

6          and excuse them or have the court officers excuse them.

7          People?

8                   MS. ABDI:  Judge, I would rather bring them

9          in before excusing so they can be admonished that they

10         are not supposed to --

11                  THE COURT:  I can admonish them right now.  I

12         can admonish them right now.  But if you want me to

13         bring them in, I'll bring them in.  I can admonish them

14         before they leave on this instruction.  Defendant?

15                  MR. MILLMAN:  Just one quick moment.  I have

16         no position on it, your Honor.

17                  THE COURT:  People?

18                  MS. ABDI:  Judge, I just rather they be

19         brought in before they are excused for lunch.

20                  THE COURT:  All right, she wants them brought

21         in, and I will exceed to that.

22                  COURT OFFICER:  Jury entering.

23                  (The jury enters the courtroom.)

24                  THE CLERK:  Let the record reflect the

25         presence of all jurors.  Do both sides waive a reading

Proceedings                              1301

1       of the roll and consent to the seating?

2                   MS. ABDI:  Yes.

3                   MR. MILLMAN:  Yes.

4                   THE COURT:  Okay, I have your two original

5       notes, and I'm prepared to handle them at this

6       particular time.

7                   Your last note that you gave me literally

8       about a minute or ago so reads as follows:  Nancy's

9       testimony regarding tire iron.  I'm not at this

10      particular time prepared to do anything with regard to

11      that.  That has to be discussed with counsel.

12                  All right, We, the jury, would like the

13      definition of reasonable doubt.  I will reread my

14      definition of reasonable doubt.

15                  Oscar's timeline of the events on

16      September -- on Friday, September 24th.  I discussed

17      this with counsel, and the testimony of Oscar was

18      brief.  Therefore, rather than going through the record

19      and cull out that which pertains temporally to your

20      question, we are just going to reread his entire

21      testimony.

22                  Definition of charges.  I will read that to

23      you.

24                  Medical records will be provided for you.

25                  The blood spatter on the car will be provided

                                                         J.H.

Case 2:16-cv-03676-JFB  Document 10-3  Filed 10/06/16  Page 389 of 433 PageID #: 1602

1    to you, and the photographs of the deceased's stab

2    wounds will be provided for you.

3         Reasonable doubt.  The standard of proof

4    required in every criminal case is proof of guilt

5    beyond a reasonable doubt.  That does not require the

6    People to prove the defendant guilty beyond all

7    possibility of doubt or beyond a shadow of a doubt.  It

8    requires the People to establish the defendant's guilt

9    only beyond a reasonable doubt.

10        Therefore, before you may convict the

11   defendant, each of you must be satisfied that the

12   credible evidence is sufficient to convince you beyond

13   a reasonable doubt that the defendant is, in fact,

14   guilty and that the defendant is, in fact, the person

15   who committed the crime or crimes charged.

16        A doubt of the defendant's guilt to be a

17   reasonable doubt must be a doubt for which some reason

18   can be given.  The doubt to be reasonable must,

19   therefore, arise from the nature and quality of the

20   evidence in the case or from the lack or insufficiency

21   of the evidence in the case.  The doubt to be a

22   reasonable doubt should be one that a reasonable

23   person, acting a matter of this importance, would be

24   likely to entertain because of the evidence or because

25   of the lack or insufficiency of the evidence in the

J.H.

1    case.

2              A reasonable doubt, our law says, is an

3    actual doubt, one which you are conscious of having in

4    your mind after you have considered all the evidence in

5    the case or lack of evidence in the case.  If, after

6    doing so, you then feel uncertain and not fully

7    convinced of the defendant's guilt and you are also

8    satisfied that in entertaining such a doubt you are

9    acting as a reasonable person should act in a matter of

10   this importance, then that is a reasonable doubt of

11   which the defendant is entitled to the benefit.

12             Therefore, the first duty of the jury is to

13   consider and weigh all the evidence in the case and

14   decide which evidence you believe is credible and

15   worthy of your consideration.  The next duty of each

16   juror is to determine whether he or she has, in fact, a

17   reasonable doubt of the defendant's guilt as I have

18   defined that term for you.

19             If, in doing so, you find the People have not

20   proven the defendant's guilt beyond a reasonable doubt,

21   you must find the defendant not guilty.  On the other

22   hand, if you are satisfied that the People have proven

23   the defendant's guilt beyond a reasonable doubt, it is

24   equally your duty to find the defendant guilty.

25             And then I gave you a supplemental charge on

1    reasonable doubt.  The law uses the term proof beyond a

2    reasonable doubt to tell you how convincing the

3    evidence of guilt must be to permit a verdict of

4    guilty.  The law recognizes that in dealing with human

5    affairs, there are very few things in this world that

6    we know with absolute certainty.  Therefore, the law

7    does not require the People to prove a defendant's

8    guilt beyond all possible doubt.  On the other hand,

9    it's not sufficient to prove that the defendant is

10   probably guilty.  In a criminal case, proof of guilt

11   must be stronger than that.  It must be beyond a

12   reasonable doubt.

13            A reasonable doubt is an honest doubt of the

14   defendant's guilt for which a reason exists based upon

15   the nature and quality of the evidence.  It is an

16   actual doubt, not an imaginary doubt.  It is a doubt

17   that a reasonable person acting in a matter of this

18   importance would be likely to entertain because of the

19   evidence that was presented or because of the lack of

20   convincing evidence.

21            Proof of guilt beyond a reasonable doubt is

22   proof that leaves you so firmly convinced of the

23   defendant's guilt that you have no reasonable doubt as

24   to the existence of any element of the crime or of the

25   defendant's identity as to the person who committed the

1    crime.

2              Now, can you read Oscar's testimony.

3              (The requested portion was read.)

4              THE COURT:  I'm now going to answer that part

5    of the note indicating the definition of charges, but I

6    do want to give you a little instruction.  If you want

7    the definition of reasonable doubt reread, if you want

8    Oscar's testimony reread, and if you want the charges

9    reread again, don't be hesitant to ask for them.  I

10   don't want you to go back into that jury room and say,

11   We've already asked him once, how can we ask him again.

12   Disabuse yourself of that.  It's our job to make you

13   understand.  If you don't understand, it's not that

14   you're not doing your job, I'm not doing mine.

15             Now, I'm going to read the allegations

16   contained in the counts of the indictment, and then I'm

17   going to read the statute that has reference to that

18   particular indictment.  That's what you asked for, and

19   that's what I'm going to do.  Bear in mind, an

20   indictment is not evidence.

21             Count one, the grand jury of the County of

22   Nassau by this indictment accuses the defendant of the

23   crime of murder in the second degree in violation of

24   Section 125.25 Subdivision 1 of the Penal Law of the

25   State of New York committed as follows:  The defendant,

1   Ulises Bonilla, on or about the 28th day of September,

2   2010, in the County of Nassau, State of New York, with

3   intent to cause the death of Armando Villatoro, did

4   cause the death of Armando Villatoro.

5                Section 125.25 Subdivision 1 of the Penal Law

6   states a person is guilty of murder in the second

7   degree when, with intent to cause the death of another

8   point, he causes the death of such person or of a third

9   person.  It's a very simple statute.  You have the

10  intent to kill, and you kill.

11               I've already given you expanded definitions

12  of intent.  You didn't ask for it under this particular

13  note.  I'm not going to give it to you.  However, if

14  you want them, just give me a supplementary note, and I

15  will.

16               Under the first count of the indictment, I

17  gave you a lesser included charge to consider of

18  manslaughter in the first degree if you find the

19  defendant not guilty of murder in the second.

20  Manslaughter in the first degree, 125.20 Subdivision 1

21  of our Penal Law.  A person is guilty of manslaughter

22  in the first degree when, with intent to cause serious

23  physical injury to another person, he causes the death

24  of such person or a third person.

25               So murder in the second degree requires an

1    intent to kill. Manslaughter in the first degree

2    requires an intent to cause serious physical injury.

3         Under the second count of the indictment, And

4    the grand jury of the County of Nassau by this

5    indictment further accuse the defendant of the crime of

6    rape in the first degree in violation of Section 130.35

7    Subdivision 3 of the Penal Law of the State of New York

8    committed as follows: The defendant, Ulises Bonilla,

9    on or about the 24th day of September, 2010, in the

10   County of Nassau, State of New York, did engage in

11   sexual intercourse with a person who was less than 11

12   years old, to wit: The defendant had sexual

13   intercourse with a minor aged 10.

14        Section 130.35 of our Penal Law Subdivision 3

15   states a person is guilty of rape in the first degree

16   when he or she engages in sexual intercourse with

17   another person who is less than 11 years old.

18        The third count, And the grand jury of the

19   County of Nassau by this indictment further accuse the

20   defendant of the crime of sexual abuse in the first

21   degree in violation of Section 130.65 Subdivision 3 of

22   the Penal Law of the State of New York committed as

23   follows:  The defendant, Ulises Bonilla, on or about

24   the 24th day of September, 2010, in the County of

25   Nassau, State of New York, did subject another person

1        to sexual conduct, and the other person was less than

2        11 years old, to wit:  The defendant touched the sexual

3        or intimate parts of a minor aged 10 with his penis.

4                   Section 130.65 Subdivision 3 states a person

5        is guilty of sexual abuse in the first degree when he

6        or she subjects another person to sexual contact and

7        the other person is less than 11 years old.

8                   Fourth count, And the grand jury of the

9        County of Nassau by this indictment further accuse the

10       defendant of the crime of sexual abuse in the first

11       degree in violation of Section 130.65 Subdivision 3 of

12       the Penal Law of the State of New York committed as

13       follows:   The defendant, Ulises Bonilla, on or about

14       the 24th day of September, 2010, in the County of

15       Nassau, State of New York, subjected another person to

16       sexual contact and the other person was less than 11

17       years old, to wit:  The defendant touched the sexual or

18       intimate parts of a minor age 10 with his hands.

19                  Again, sexual abuse in the first degree.  A

20       person is guilty of sexual abuse in the first degree

21       when he or she subjects another person to sexual

22       contact and the other person is less than 11 years old.

23       There are two methods by which the People are alleging

24       this crime was committed, under the third count, with a

25       penis, with under the fourth count, with hands.

J.H.

1       Under the fifth count, The grand jury of the

2   County of Nassau by this indictment further accuse the

3   defendant of crime of criminal possession of a weapon

4   in the fourth degree in violation of Section 265.01

5   Subdivision 2 of the Penal Law of the State of New York

6   committed as follows:  The defendant, Ulises Bonilla,

7   on or about the 28th day of September, 2010, in the

8   County of Nassau, State of New York, did possess a

9   dagger, dangerous knife, dirk, razor, stiletto,

10   imitation pistol or any other deadly or -- dangerous or

11   deadly instrument or weapon with the intent to use the

12   same unlawfully against another, to wit:  A sharp

13   object.  And in this case, as I said before, the People

14   allege the sharp object was a knife.

15       Section 265.01 Subdivision 2, a person is

16   guilty of criminal possession in the fourth degree when

17   he possesses any dagger, dangerous knife, dirk, razor,

18   stiletto, imitation pistol or any other dangerous or

19   deadly instrument or weapon with intent to use the same

20   unlawfully against another.

21       The fifth count and the sixth count are the

22   same sections of the criminal law, and apply the fifth

23   count definitions to the sixth count definitions except

24   the allegation in the sixth count is a blunt instrument

25   which the People allege was the tire iron or a lug

Proceedings                                   1310

1     wrench.

2              The last count, the grand jury of the County

3     of Nassau by this indictment further accuses the

4     defendant of the crime of endangering the welfare of a

5     child in violation of Section 260.10 Subdivision 1 of

6     the Penal Law of the State of New York.  The defendant,

7     Ulises Bonilla, between on or about the 27th day of

8     June, 2010 to on or about the 7th day of September,

9     2010, in the County of Nassau, did knowingly act in a

10    manner likely to be injurious to the physical, mental

11    or moral welfare of a child less than 17 years old or

12    directed or authorized such child to engage in an

13    occupation involving a substantial risk of danger to

14    her life or health, to wit:  The defendant touched the

15    sexual or intimate parts of a minor aged 10 with his

16    hands.

17             Section 260.10 Subdivision 1 of the New York

18    State Penal Law reads as follows:  A person is guilty

19    of engaging -- a person is guilty of endangering the

20    welfare of a child when he knowingly acts in a manner

21    likely to be injurious to the physical, mental or moral

22    welfare of a child less than 17 years of age or directs

23    or authorizes such child to engage in an occupation

24    involving a substantial risk of danger to his life or

25    health.

J.H.

Proceedings                                1311

1     Okay, I have answered the questions you have

2     asked me.  If you need anything else answered or

3     clarified, let me know.

4              Now, what we're going to have do now while

5     you go back into the jury room and deliberate, the

6     lawyers and the reporter have to try to attempt your

7     last note to answer it, Nancy's testimony regarding the

8     tire iron.  That record may have to be culled out to

9     isolate the area in that specific question.  Retire to

10     deliberate.

11              (Whereupon, the jury exists the courtroom.)

12              (Whereupon, the jury deliberates.)

13              THE COURT:  Okay, I don't remember too much

14     about the tire iron testimony, so in this particular

15     case, I think it might be best to if you go through the

16     record and cull out that testimony pertaining to a tire

17     iron.

18              MS. ABDI:  And I think that that testimony

19     was pretty brief.

20              THE COURT:  I remember it to be rather brief,

21     because I wouldn't have asked you the question.  Okay.

22              MR. MILLMAN:  And judge, that will be the

23     direct and cross because I touched on the cross.

24              THE COURT:  Oh, yes, absolutely.

25              (A recess was taken.)

1            THE CLERK:  Recalling case on trial, People

2      of the State of New York versus Ulises Bonilla,

3      Indictment Number 202N of 2011.  All parties present,

4      including the defendant and Spanish interpreter.  There

5      are no jurors present at this time.

6            THE COURT:  All right, counsel, I have had a

7      conversation with our reporter.  She's located the

8      pertinent parts of Nancy's testimony regarding the tire

9      iron or lug wrench.  She is prepared to read it to the

10     jury.  Do you want her to read it to you this first, or

11     do you want her just to read it to the jury?

12           MR. MILLMAN:  Just one moment.  I'm fine with

13     her just reading it.

14           THE COURT:  People?

15           MS. ABDI:  That's fine.

16           THE COURT:  All right, let's bring in the

17     jury.

18           COURT OFFICER:  Jury entering.

19           (The jury enters the courtroom.)

20           THE CLERK:  Let the record reflect the

21     presence of all jurors.  Do both sides consent to the

22     seating of the jurors, waive a reading of the roll?

23           MS. ABDI:  Yes.

24           MR. MILLMAN:  Yes.

25           THE COURT:  Ladies and gentlemen, with

Proceedings                          1313

1    consent of counsel, we thought it would be better with

2    regard to this particular note of yours to cull the

3    record and advise you as to what parts of the testimony

4    of Nancy Villatoro had to do with a tire iron or lug

5    wrench, and she's about to give you this testimony.

6              (The requested portion was read.)

7              THE COURT:  Okay, resume your deliberations,

8    ladies and gentlemen.  Mr. Molczan, just stay here for

9    a second.

10             (Whereupon, the jury exits the courtroom.)

11             THE COURT:  Mr. Molczan, I'm informed by our

12   court officers you had a tragedy.

13             A JUROR:  Yeah.  A good friend of mine passed

14   away this weekend, and the funeral is going to be this

15   Wednesday.

16             THE COURT:  You are alternate number four,

17   and with consent of counsel, at your request, we will

18   excuse you now.

19             A JUROR:  Finish the case?

20             THE COURT:  Yes.  Is that acceptable.

21             A JUROR:  Yeah, that's fine, your Honor.

22             THE COURT:  Is that acceptable?

23             MR. MILLMAN:  Yes.

24             MS. ABDI:  Yes.

25             THE COURT:  Thank you for your service.

Proceedings                          1314

1              A JUROR:  All right, thank you very much,

2       your Honor.

3                   (The juror was excused.)

4                   (Whereupon, the jury deliberates.)

5                   (A recess was taken.)

6                   COURT OFFICER:  Jury entering.

7                   (The jury enters the courtroom.)

8                   THE CLERK:  Case on trial recall, all parties

9       present including the Spanish interpreter and the

10      jurors.  Both sides waive a reading of the roll and

11      consent to the seating of the jury?

12                  MS. ABDI:  Yes.

13                  MR. MILLMAN:  Yes.

14                  THE CLERK:  Thank you.

15                  THE COURT:  All right, ladies and gentlemen,

16      I'm going to at this particular time break for lunch.

17                  During the lunch our recess, you are not to

18      discuss this case among yourselves.  You are only to

19      discuss this case when the 12 jurors are present.  And

20      as with my instruction this morning, at 2 o'clock you

21      come back, and as soon as all 12 of you are here, you

22      can start deliberating.  You do not have to come back

23      to the courtroom.

24                  Now, I don't know when it was, but it was

25      about a year or so ago that because of budgetary

J.H.

Proceedings                                    1315

1    restrictions, the office of court administration cut

2    out jurors' lunches.  We used to have that last year.

3    I wish we had it this year, but we don't.  So you are

4    going to have to brown bag it.  We'll see you at 2

5    o'clock.

6                 (Whereupon, the jury exits the courtroom.)

7                 THE COURT:  Have a nice lunch.

8                 (Whereupon, a luncheon recess was taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                1316

1    AFTERNOON SESSION

2              THE CLERK:  Recalling case on trial,

3         Indictment 202N of 2011, People of the State of New

4         York versus Ulises Bonilla.  All parties present,

5         including the defendant and Spanish interpreter.  There

6         are no jurors present at this time.

7              THE COURT:  Okay, counsel, we have a note.

8         It's been introduced as People's Exhibit 10.  It says,

9         We, the jury, want definitions of rape charge,

10        parentheses, count two, end parentheses, Angel's

11        testimony regarding the tire iron, and it says, Define

12        intention and circumstantial.

13             What I intend to do is reread my charge

14        concerning count number two.  The reporter has culled

15        the testimony of Angel, and she indicates that there is

16        no testimony regarding the tire iron, a tire iron.

17        Consequently, I'm going to tell them exactly that,

18        there is no testimony concerning a tire iron emanating

19        from Angel.  Does anyone disagree on that?

20             MS. ABDI:  No.

21             MR. MILLMAN:  No.

22             THE COURT:  And then it says, Define

23        intentionally, circumstantial, and basically I'll go

24        over the same things that I have testified before, that

25        I ruled before.  Anyone else have any suggestions?

J.H.

Proceedings                                    1317

1          MS. ABDI: No.

2          MR. MILLMAN: No, your Honor.

3          THE COURT: Okay, let's bring in the jury.

4          COURT OFFICER: Jury entering.

5          (The jury enters the courtroom.)

6          THE CLERK: Let the record reflect the

7     presence of all jurors. Do both sides waive a reading

8     of the roll, consent to the seating?

9          MS. ABDI: Yes.

10          MR. MILLMAN: Yes.

11          THE CLERK: Thank you.

12          THE COURT: All right, ladies and gentlemen,

13     I received your note which was marked Court's Exhibit 8

14     and discussed it with counsel. It says, We, the jury,

15     want definitions of rape charge, count two. I will

16     give you that in substantially the same form as I gave

17     it to you before. Then it says, Angel's testimony

18     regarding the tire iron. The reporter culled through

19     Angel's testimony, and there is no reference in his

20     testimony concerning a tire iron. That was consented

21     to and stipulated to by counsel. So we can't read

22     anything back to you that's not in the record. Just

23     one second. If you wish any further clarification, you

24     have to do it by note. I cannot engage in colloquy

25     with you at this particular time because it just messes

J.H.

1     up the works. If you need a clarification, just give

2     me another note, and we will do it. But none of

3     Angel's testimony will be read back to you, because you

4     limited it to a tire iron, and there is no reference to

5     tire irons.

6              And then says, Define intentional and

7     circumstantial. I'll do that.

8              Now, the second count is rape in the first

9     degree. The indictment alleges -- again, the

10    indictment is not evidence, The grand jury of the

11    County of Nassau by this indictment further accuse the

12    defendant of the crime of rape in the first degree in

13    violation of Section 130.35 Subdivision 3 of the Penal

14    Law committed as follows: The defendant, Ulises

15    Bonilla, on or about the 24th day of September, 2010,

16    in the County of Nassau, did engage in sexual

17    intercourse with a person who is less than 11 years

18    old, to wit, the defendant had sexual intercourse with

19    a minor age 10, and in this case, it's Jennifer

20    Villatoro.

21             Okay, under our law, a person is guilty of

22    rape in the first degree when he engages in sexual

23    intercourse with another person who is less than 11

24    years old. Under our law, it is also an element of

25    this offense that the sexual intercourse was committed

J.H.

1    without the consent of the other person.  Sexual

2    intercourse takes place without a person's consent when

3    that person is deemed by law to be incapable of

4    consent.  Under our law, a person is deemed incapable

5    of consenting to sexual intercourse when she is less

6    than 11 years old.  Thus, sexual intercourse with such

7    a person is always deemed to be without that person's

8    consent even if, in fact, the person did consent.

9              It is not a defense to this charge that the

10   actor did not know that the person with whom the actor

11   had sexual intercourse was 11 years old or less -- was

12   less than 11 years old or that the actor believed that

13   such person was 11 years old or more on the date of the

14   offense.

15             The term sexual intercourse used in this

16   definition of the crime has its own meaning, and I will

17   define that to you.  Sexual intercourse means any

18   penetration, however slight, of the penis into the

19   vaginal opening.  In other words, any penetration of

20   the penis into the vaginal opening regardless of the

21   distance of penetration constitutes an act of sexual

22   intercourse.  Sexual intercourse does not necessarily

23   require erection of the penis, emission or orgasm.

24             Therefore, in order for you to find the

25   defendant guilty of this crime, the People are required

J.H.

1     to prove from all of the evidence in the case beyond a

2     reasonable doubt both of the following two elements:

3     That on or about September 24th, 2010, in the County of

4     Nassau, the defendant, Ulises Bonilla, engaged in

5     sexual intercourse with Jennifer Villatoro and Jennifer

6     Villatoro was less than 11 years old.  Therefore, if

7     you find the People have not proven beyond a reasonable

8     doubt either one or both of these elements, you must

9     find the defendant not guilty of the crime of rape in

10    the first degree as charged in the second count.  On

11    the other hand, if you find that the People have proven

12    beyond a reasonable doubt both of those elements, it is

13    equally your duty to find the defendant guilty of the

14    crime of rape in the first degree as charged in the

15    second count.

16              Define intentional and circumstantial

17    evidence.  Section 15.05 of the Penal Law states

18    culpability, definitions of culpable mental states,

19    Subdivision 1, intentionally.  A person acts

20    intentionally with respect to a result or to conduct

21    described by a statute defining an offense when his

22    conscious objective is to cause such result or to

23    engage in such conduct.

24              Conscious objective are the operative words.

25    Intent is different than motive.  You didn't ask for

1   motive, but if you want it, I will read it back to you.

2   Simply put, intent is conscious objective.  Motive is

3   the reason behind that conscious objective.

4           Intent does not require premeditation.  In

5   other words, intent does not require advance planning

6   nor is it necessary that the intent be in a person's

7   mind for any particular period of time.  The intent can

8   be formed and need only exist at the very moment the

9   person engaged in the prohibited conduct or acts to

10  cause the prohibited result and not any earlier time.

11          The question naturally arises as to how to

12  determine whether or not a defendant had the intent

13  required for the commission of the crime.  To make a

14  determination in this case, you must decide if the

15  required intent can be inferred beyond a reasonable

16  doubt from the proven facts.  In doing so, you may

17  consider the person's conduct and all of the

18  circumstances surrounding the conduct, including but

19  not limited to the following:  What, if anything, did

20  the person say or do at or about the time of the

21  conduct, what result, if any, followed the person's

22  conduct, and was the result a natural necessary,

23  logical and probable consequence of that conduct, and

24  whether or not there was a presence or absence of

25  motive.

1       Therefore, in this case from the facts if you

2  find to have been proven you decide whether or not you

3  can infer beyond a reasonable doubt that the defendant

4  had the intent required for the commission of the

5  crime.

6       Okay, let me give you an example which you

7  can accept or reject.  I'm sitting here giving you an

8  instruction, and I'm waiving my hands to add emphasis

9  to the instruction.  And while I'm doing this, my hand

10  comes in contact with Charlie Elmore's nose.  Now, in

11  that particular case, do you infer that I had the

12  intent to punch Charlie Elmore in the nose?

13       However, if during the course of that

14  explanation, I stop, grimace my teeth, make a fist,

15  raise it and come down hard on his nose, you might

16  infer from that particular conduct that I had a

17  different intent.  There's nothing mysterious about it.

18  You can forget what you learned in psychology one.

19  It's a conscious objective.

20       Okay, now, circumstantial evidence.  There

21  are two types of evidence, direct evidence and

22  circumstantial evidence.  Evidence is direct when a

23  witness testifies to a fact from his own knowledge or

24  of a fact through one of his five senses.  That is

25  sight, sound, smell, taste, touch.  If you wanted to

1    know that someone was served scotch whisky and the

2    person was under 21, you could have the police officer

3    testify that he observed a bartender pour some whisky

4    out of a Johnny Walker bottle, and that's

5    circumstantial evidence of the liquor that it came from

6    a liquor bottle.  And the direct evidence could be that

7    the officer tasted it, and he knows what scotch whisky

8    tasted like, and that's proof of that particular

9    element directly through the senses.  And to show that

10   person was 21 or less at the time, you could do that by

11   things that are either circumstantial or direct.

12   Circumstantial would mean a birth certificate, perhaps,

13   and direct would be testimony of the person's

14   biological mother.

15             Now, circumstantial evidence is evidence of

16   facts which are inferred, deduced or otherwise flow

17   from the other evidence.  There is no distinction

18   between the value or weight of the direct and

19   circumstantial evidence.  And I think I gave you an

20   example that a fingerprint is circumstantial evidence,

21   but testimony from a half-blind individual is direct

22   evidence.  Then I gave you the example of Colonel

23   Sanders and the Kentucky Fried Chicken wherein if you

24   actually rode with Colonel Sanders on the train and

25   spoke to him and saw him on the train, you could show

1    by direct evidence that Colonel Sanders was on the

2    train through your senses of sound and sight.  But if

3    you went past the colonel on the platform, went into

4    your own car, took the train to Massapequa Park, got

5    off the train, went into your car, and as you were

6    getting into your car, you saw the colonel getting into

7    his car, what is the only natural and logical deduction

8    you can make from those proven facts by direct

9    evidence?  That the colonel took the train.  That's a

10   reasonable inference even though you didn't see him get

11   on the train, you didn't see him on the train and you

12   didn't see him get off the train.  You are to deduce

13   reasonable inferences from circumstantial evidence, not

14   possible inferences from circumstantial evidence.

15          And then I gave you the example of the

16   colonel after you passed him on the platform, had a

17   change of mind, went back to his office and got some

18   paperwork and then took a taxi from midtown Manhattan

19   to Massapequa Park.  Now, is that possible?  I guess

20   it's possible, traffic conditions permitting.  But is

21   it reasonable?  And then I said you have to draw

22   reasonable inferences from the circumstantial evidence.

23          And then I said once a fact is deduced by

24   circumstantial evidence, you cannot make a further

25   inference, which is called an inference on an

1          inference.  In other words, you could show by means of

2          circumstantial evidence that the colonel took the

3          train, but you could not jump and make a further

4          inference that he had a window seat or an aisle seat or

5          even if he had a seat at all.

6                     And then I gave you an example to clarify the

7          fact that a fact can be proven through circumstantial

8          evidence, not necessarily through one witness, but

9          through the testimony of many witnesses testifying as

10         to facts.  And although one fact may not prove a

11         situation, they collectively when they all are looked

12         at together are of such weight and persuasiveness as to

13         allow a fact to be proven by circumstantial evidence.

14                     I hope I've clarified it for you.  Resume

15         deliberations.

16                     (Whereupon, the jury exits the courtroom.)

17                     (Whereupon, the jury deliberates.)

18                     (A recess was taken.)

19                     COURT OFFICER:  Jury entering.

20                     (The jury enters the courtroom.)

21                     THE CLERK:  Recalling case on trial,

22         Indictment 202N of 2011, People of the State of New

23         York versus Ulises Bonilla.  All parties present

24         including the defendant and Spanish interpreter and all

25         jurors.  Do both sides waive a reading of the roll and

Proceedings                                1326

1    consent to the seating of the jury?

2              MS. ABDI:  Yes.

3              MR. MILLMAN:  Yes.

4              THE CLERK:  Thank you.

5              THE COURT:  All right, ladies and gentlemen,

6    it is my judgment that you've deliberated long enough

7    today, and I'm going to excuse you until tomorrow

8    morning at 9 o'clock.  This is your first full day of

9    deliberations.  It must have been an experience for

10   you.

11             I don't know what you're going to do when you

12   are home, but I'm having to have a very, very dry

13   Tanqueray martini.  We'll see you tomorrow.  Remember

14   the admonitions I have given you.

15             (Whereupon, the jury exits the courtroom.)

16             THE COURT:  See you tomorrow, people.

17             (Whereupon, the trial is adjourned to

18   December 20th, 2011.)

19

20

21

22

23

24

25

J.H.

1327

1    STATE OF NEW YORK  :  NASSAU COUNTY

2       SUPREME COURT  :  PART 39

3    ---------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5            -against-                    Ind. No. 202N-11

6    ULISES BONILLA,

7                          Defendant.

8    ---------------------------------------X

9    JURY TRIAL

10                            December 20, 2011
                              262 Old Country Road
11                            Mineola, New York

12   B E F O R E :

13       HON. GEORGE R. PECK,
             Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:   ZEENA ABDI, ESQ., of Counsel
             Assistant District Attorney
19                      For the People

20

21       DANIEL L. MILLMAN, ESQ.
             316A Main Street
22           Roslyn, New York  11576
                      For the Defendant
23
                          JOANNE HORROCKS, CSR
24                        Senior Court Reporter

25

J.H.

Proceedings                          1328

1    THE CLERK: Case on trial, People of the

2    State of New York versus Ulises Bonilla, Indictment

3    202N of 2011. All parties present including the

4    Spanish interpreter and defendant. There are no jurors

5    present at this time.

6    THE COURT: All right, we have a note that's

7    been marked Court's Exhibit 13. We, the jury, would

8    like to see all pictures in evidence of the crime

9    scene, large map of Kinkel Street. That's been

10   provided to them. Nancy and Jocelyn's testimony in BMW

11   car. That has been gone through by the reporter, and

12   the sides have agreed which part would be read,

13   correct?

14   MS. ABDI: Yes.

15   MR. MILLMAN: Yes, your Honor.

16   THE COURT: Misael's testimony of what Ulises

17   said as they ran down the block. That has been gone

18   through, and the parties have agreed as to that area of

19   testimony?

20   MS. ABDI: Yes.

21   MR. MILLMAN: Yes, your Honor.

22   THE COURT: Let's bring in the jury.

23   COURT OFFICER: Jury entering.

24   (The jury enters the courtroom.)

25   THE CLERK: Let the record reflect the

J.H.

Proceedings                    1329

1        presence of all jurors.  Both sides consent to the

2        seating and waive a reading of the roll?

3                    MS. ABDI:  Yes.

4                    MR. MILLMAN:  Yes.

5                    THE CLERK:  Thank you.

6                    THE COURT:  All right, we have your note.

7        We, the jury, would like to see all pictures in

8        evidence of crime scene, large evidence map of Kinkel

9        Street, Nancy and Jocelyn's testimony in BMW,

10       parentheses, car, end parentheses, Misael's testimony

11       of what Ulises said as they ran down the block.

12                    Since you asked for excerpts, ladies and

13       gentlemen, for the last 50 minutes, Joanne has been

14       culling through the record to locate with a degree of

15       precision the actual place and the testimony so that

16       your question could be answered.  Sometimes this

17       happens, and I think I explained to you that situation

18       before you left for deliberations.  So there was a

19       reason for the delay.  That's the reason.

20                    Okay, the pictures have been provided to you.

21       The maps have been provided to you.  Let's answer the

22       juror's questions.

23                    (The requested portion was read.)

24                    THE COURT:  All right, ladies and gentlemen,

25       you can resume deliberations.  Miss Washington, I want

J.H.

Case 2:16-cv-03676-JFB  Document 10-3  Filed 10/06/16  Page 418 of 433 PageID #: 1631

1      to speak to you for a second.  She will be rejoining

2      you in a very, very short time.  Do not commence any

3      deliberations until all 12 of you are together.

4                  (Whereupon, the jury exits the courtroom.)

5                  THE COURT:  Miss Washington, you gave me a

6      note indicating that either a friend or relative had

7      died?

8                  A JUROR:  Yes.

9                  THE COURT:  Who was that?

10                 A JUROR:  It was a very close friend of my

11     husband's.  I've known him 30 years.

12                 THE COURT:  All right, now, when are the

13     funeral arrangements?

14                 A JUROR:  It's for Thursday morning.

15                 THE COURT:  Thursday morning?

16                 A JUROR:  Yes.

17                 THE COURT:  You wish to attend?

18                 A JUROR:  Yes.

19                 THE COURT:  Now, does it have to be on

20     Thursday morning?  Because many times funeral

21     arrangements are in the night, in the afternoon, in the

22     morning.

23                 A JUROR:  Right, well, they have already made

24     the arrangements.

25                 THE COURT:  And what do you mean by Thursday

Proceedings                                1331

1    morning?

2                A JUROR:  Well, the service is scheduled to

3    start at 10.

4                THE COURT:  Thank you.  You can resume

5    deliberations.

6                A JUROR:  Thank you.

7                (Whereupon, the juror exits the courtroom.)

8                (Whereupon, the jury deliberates.)

9                THE COURT:  All right, counsel, we have a

10   day-and-a-half left of deliberations before we are

11   faced with this particular problem.  But my gut

12   reaction is I don't see how I can deny her to go to the

13   funeral.  It was unexpected, and if necessary, we will

14   just continue this thing on Thursday afternoon.  But

15   I'll hear more from you at a later time.

16               (A recess was taken.)

17               THE COURT:  On the record.

18               THE CLERK:  Recalling case on trial, People

19   of the State of New York versus Ulises Bonilla,

20   Indictment 202N of 2011.  All parties present including

21   the defendant and Spanish interpreter.  There are no

22   jurors present at this time.

23               THE COURT:  All right, I have a note.  It's

24   to be marked as a court exhibit.  We have reached a

25   verdict.  Mark it as a court exhibit, and bring in the

J.H.

Proceedings                                          1332

1   jury.

2                   COURT OFFICER:   Jury entering.

3                   (The jury enters the courtroom.)

4                   THE CLERK:   Let the record reflect the

5   presence of all jurors.  Do both sides waive a reading

6   of the roll and consent to the seating of the jury?

7                   MS. ABDI:   Yes.

8                   MR. MILLMAN:   Yes.

9                   THE COURT:   All right, we received a note.

10  It's dated 12-20 at 12:36.  We, the jury, have reached

11  a verdict.  Mr. Elmore, take the verdict.

12                  THE CLERK:   Will the jury please rise.  Madam

13  Foreperson, has the jury reached a verdict?

14                  THE FOREPERSON:   Yes.

15                  THE CLERK:   Madam Foreperson, as to count

16  one, murder in the second degree, how do you find the

17  defendant, guilty or not guilty?

18                  THE FOREPERSON:   Guilty.

19                  THE CLERK:   As to count two, rape in the

20  first degree, how do you find the defendant, guilty or

21  not guilty?

22                  THE FOREPERSON:   Guilty.

23                  THE CLERK:   As to count three, sexual abuse

24  in the first degree, how do you find the defendant,

25  guilty or not guilty?

J.H.

Proceedings                                    1333

1            THE FOREPERSON:  Guilty.

2            THE CLERK:  As to the fourth count, sexual

3    abuse in the first degree, how do you find the

4    defendant, guilty or not guilty?

5            THE FOREPERSON:  Guilty.

6            THE CLERK:  As to the fifth count, criminal

7    possession of a weapon fourth degree, how do you find

8    the defendant, guilty or not guilty?

9            THE FOREPERSON:  Guilty.

10           THE CLERK:  As to the sixth count, criminal

11   possession of a weapon in the fourth degree, how do you

12   find the defendant, guilty or not guilty?

13           THE FOREPERSON:  Not guilty.

14           THE CLERK:  As to the seventh count,

15   endangering the welfare of a child, how do you find the

16   defendant, guilty or not guilty?

17           THE FOREPERSON:  Guilty.

18           THE CLERK:  Ladies and gentlemen, you heard

19   the verdict as read by the foreperson.  As to count

20   one, murder in the second, you find the defendant

21   guilty.  As to count two, rape in the first degree, you

22   find the defendant guilty.  As to the third count,

23   sexual abuse in the first degree, you find the

24   defendant guilty.  As to the fourth count, sexual abuse

25   in the first degree, you find the defendant guilty.  As

                                                    J.H.

1    to the fifth count, criminal possession of a weapon in

2    the fourth degree, you find the defendant guilty.  As

3    to the sixth count, criminal possession of a weapon in

4    the fourth degree, find the defendant not guilty.  As

5    to the seventh count, endangering the welfare of a

6    child, you find the defendant guilty.  Is that your

7    verdict as you have it?

8              THE FOREPERSON:  Yes.

9              THE COURT:  I assume you want this jury

10   polled?

11             MR. MILLMAN:  That's correct, your Honor.

12             THE COURT:  Poll the jury.  Polling the jury

13   is asking for your individual votes, ladies and

14   gentlemen.

15             THE CLERK:  Ladies and gentlemen of the jury,

16   I will now ask you individually if that is your

17   verdict.  As to count one, murder in the second degree,

18   guilty; count two, rape in the first degree, guilty;

19   third count, sexual abuse in the first degree, guilty;

20   count four, sexual abuse the in first degree, guilty;

21   count five, criminal possession of a weapon in the

22   fourth degree, guilty; and endangering the welfare of a

23   child, count seven, guilty.

24             Juror number one, is that your verdict?

25             THE FOREPERSON:  Yes.

Proceedings                               1335

1          THE CLERK:  Juror number two, is that your

2      verdict?

3          A JUROR:  Yes.

4          THE COURT:  I can't hear.

5          A JUROR:  Yes.

6          THE CLERK:  Juror number three, is that your

7      verdict?

8          A JUROR:  Yes.

9          THE CLERK:  Juror number four, is that your

10     verdict?

11         A JUROR:  Yes.

12         THE CLERK:  Juror number five, is that your

13     verdict?

14         A JUROR:  Yes.

15         THE CLERK:  Juror number six, is that your

16     verdict?

17         A JUROR:  Yes.

18         THE CLERK:  Juror number seven, is that your

19     verdict?

20         A JUROR:  Yes.

21         THE CLERK:  Juror number eight, is that your

22     verdict?

23         A JUROR:  Yes.

24         THE CLERK:  Juror number nine, is that your

25     verdict?

J.H.

Proceedings                          1336

 1                  A JUROR:  Yes.

 2                  THE CLERK:  Juror number 10, is that your

 3        verdict?

 4                  A JUROR:  Yes.

 5                  THE CLERK:  Juror number 11, is that your

 6        verdict?

 7                  A JUROR:  Yes.

 8                  THE CLERK:  Juror number 12, is that your

 9        verdict?

10                  A JUROR:  Yes.

11                  THE CLERK:  Your Honor, the polling is

12        unanimous.

13                  THE COURT:  Members of the jury, I would like

14        to thank you for your service, and I would like to say

15        a few words to you in my chambers before you're

16        excused.  I'll be about three or four minutes here.  I

17        still have some business to attend to here.  I'll see

18        you in my chambers.

19                  (Whereupon, the jury is excused.)

20                  THE COURT:  All right, do you want to make

21        motions now, or do you wish reserve them?

22                  MR. MILLMAN:  I have a motion at this time,

23        your Honor.  I have a motion to -- I'm asking the Court

24        to set aside the verdict pursuant to Section 330.30 of

25        the Criminal Procedure Law on the ground that the trial

1    evidence was not legally sufficient to sustain each

2    charge.  Not a single witness had actually observed the

3    stabbing, had not observed my client with a knife, no

4    physical evidence connecting my client to the knife or

5    the stabbing.

6              And I would submit that on the rape charge

7    and related counts related to Jennifer Villatoro that

8    the testimony of the witnesses was incredible as a

9    matter of law in light of the significant, not minor,

10   significant inconsistencies and omissions that were

11   brought out.  I'm asking that the Court set aside the

12   verdict with regard to all of the counts in which the

13   jury finds my client guilty.

14              THE COURT:  People?

15              MS. ABDI:  People oppose.

16              THE COURT:  Do you want to be any more

17   specific?

18              MS. ABDI:  Your Honor, the evidence was

19   legally sufficient on all grounds, and I do believe

20   there's any reason to discern the jury's verdict.

21              THE COURT:  The evidence was certainly

22   legally sufficient in my judgment.  It certainly

23   established proof of guilt beyond a reasonable doubt,

24   and there is nothing in the record which would

25   implicate in any way that a reversal or a modification

J.H.

Proceedings                              1338

1        of the judgment by an appellate court would be

2        warranted.  And consequently, your motion is denied.

3                   Counsel, this was a difficult trial for all.

4        I know that.  And if you want to re-advance your motion

5        at another time before sentence, you certainly have my

6        permission on notice to the District Attorney.

7                   Presentence report ordered.  Date for

8        sentence about six weeks.  How about February 1st?

9                   THE CLERK:  That's a little short.

10                  THE COURT:  How about February 8th?

11                  THE CLERK:  The week of the 13th.

12                  THE COURT:  I'm sorry, I'm giving you bad

13       dates.  How about February 16th?

14                  MR. MILLMAN:  Judge, I just want to check.

15       What was the date, Judge?

16                  THE COURT:  16th.

17                  MR. MILLMAN:  Yes.

18                  (Continued on the following page.)

19

20

21

22

23

24

25

Proceedings                    1339

1              THE COURT:   February 16th.   I did say

2        presentence report ordered.   Any bail in existence is

3        exonerated, and the defendant is remanded.

4    *          *          *          *          *          *

5    This is certified to be a true and accurate transcript of my

6    stenographic notes taken in the above-captioned matter.

7

8                                    _____
                                     Joanne Horrocks, CSR
9                                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

Index                                      1340

INDEX TO WITNESSES

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the People: | | | | |
| Stevens Destina | 431 | 440 | | |
| Alex Alcantara | 451 | 456 | | |
| P.O. Christopher Bendetto | 465 | 468 | | |
| Angel Leon | 471 | 491 | | |
| Susana Villatoro | 503 | 525 | | |
| P.O. James Monroe | 538 | 548 | | |
| A.M.T. Michael Schwartz | 552 | | | |
| Det. Kenneth Mazzie | 560 | 614 | | |
| Det. Patrick Byrne | 624 | 632 | 633 | |
| Jocelyn Gonzalez | 635 | 651 | | |
| Det. Scott McLaughlin | 663 | | | |
| Jennifer Villatoro | 669 | 696 | | |
| Dr. Yasmine Pompey | 746 | 756 | | |
| Nancy Villatoro | 767 | 783 | 800 | 801 |
| Oscar Villatoro | 803 | 818 | | |
| Erika Sima | 829 | 885 | 889 | 893 |
| Dr. Gerard Catanese | 896 | 910 | | |
| Misael Berrios | 924 | 951 | 995 | 997 |
| Det James Cereghino | 999, 1165 | 1006 | | |
| | | | | |
| For the Defendant: | | | | |
| Feiman Nunez | 1047 | | | |
| Diana Bonilla | 1053 | 1093 | 1122 | |

Index                                                        1341

|     |                              | Direct | Cross | Redirect | Recross |
|-----|------------------------------|--------|-------|----------|---------|
| 1   |                              |        |       |          |         |
| 2   | For the Defendant cont'd     |        |       |          |         |
| 3   | Zeida Bonilla                | 1132   | 1140  | 1146     |         |
| 4   | Evan Grover                  | 1147   | 1153  | 1156     |         |

5

6                    INDEX TO EXHIBITS

7

| 8   |                                    | ID  | EVD |
|-----|------------------------------------|-----|-----|
|     | For the People:                    |     |     |
| 9   | 1  - Photograph                    | 543 | 543 |
| 10  | 2  - Map                           | 545 | 546 |
| 11  | 3  - Memo book entries, 5 pgs.     | 554 |     |
| 12  | 4  - EMS report, 6 pgs.            | 556 |     |
| 13  | 5  - Photograph                    |     | 560 |
| 14  | 6  - Photograph                    |     | 560 |
| 15  | 7  - Photograph                    |     | 560 |
| 16  | 8  - Photograph                    |     | 560 |
| 17  | 9  - Photograph                    |     | 560 |
| 18  | 10 - Photograph                    |     | 560 |
| 19  | 11 - Photograph                    |     | 560 |
| 20  | 12 - Photograph                    |     | 560 |
| 21  | 13 - Photograph                    |     | 560 |
| 22  | 15 - Photograph                    |     | 560 |
| 23  | 16 - Photograph                    |     | 560 |
| 24  | 17 - Photograph                    |     | 560 |
| 25  | 18 - Photograph                    |     | 560 |

J.H.

Index                                              1342

| | People's Exhibits Continued | ID | EVD |
|---|---|---|---|
| 1 | | | |
| 2 | 19 - Photograph | | 560 |
| 3 | 20 - Photograph | | 560 |
| 4 | 21 - Photograph | | 560 |
| 5 | 22 - Photograph | | 560 |
| 6 | 23 - Photograph | | 560 |
| 7 | 24 - Photograph | | 560 |
| 8 | 25 - Photograph | | 560 |
| 9 | 26 - Photograph | | 560 |
| 10 | 27 - Photograph | | 560 |
| 11 | 28 - Photograph | | 560 |
| 12 | 29 - Photograph | | 560 |
| 13 | 30 - Photograph | | 560 |
| 14 | 31 - Photograph | | 560 |
| 15 | 32 - Photograph | | 560 |
| 16 | 33 - Photograph | | 560 |
| 17 | 34 - Photograph | | 560 |
| 18 | 35 - Photograph | | 560 |
| 19 | 36 - Photograph | | 560 |
| 20 | 37 - Photograph | | 560 |
| 21 | 38 - Photograph | | 560 |
| 22 | 39 - Photograph | | 560 |
| 23 | 40 - Photograph | | 560 |
| 24 | 41 - Photograph | | 560 |
| 25 | 42 - Photograph | | 560 |

Index                                          1343

| 1 | People's Exhibits Continued | ID | EVD |
|---|---|---|---|
| 2 | 43 - Photograph | | 560 |
| 3 | 44 - Photograph | | 560 |
| 4 | 45 - Photograph | | 560 |
| 5 | 46 - Photograph | | 560 |
| 6 | 47 - Photograph | | 560 |
| 7 | 48 - Photograph | | 560 |
| 8 | 49 - Photograph | | 560 |
| 9 | 50 - Photograph | | 560 |
| 10 | 51 - Photograph | | 560 |
| 11 | 52 - Photograph | | 560 |
| 12 | 53 - Photograph | | 560 |
| 13 | 54 - Photograph | | 560 |
| 14 | 55 - Photograph | | 560 |
| 15 | 56 - Photograph | | 560 |
| 16 | 57 - Crime Scene report, 2 pgs | 577 | 583 |
| 17 | 58 - Sketch | 579 | 581 |
| 18 | 59 - Crime Scene report from car | 591 | |
| 19 | 60 - Box containing knife | 591 | 593 |
| 20 | 61 - Bags | 600 | 610 |
| 21 | 62 - Bags | 600 | 613 |
| 22 | 63 - Bags | 600 | 613 |
| 23 | 64 - Envelope | 600 | 613 |
| 24 | 65 - Envelope | 600 | 613 |
| 25 | 66 - Envelope | 600 | 613 |

J.H.

Index                                        1344

| | People's Exhibits Continued | ID | EVD |
|---|---|---|---|
| 1 | | | |
| 2 | 67  – Envelope | 600 | 613 |
| 3 | 68  – Envelope | 600 | 613 |
| 4 | 69  – Envelope | 600 | 613 |
| 5 | 70  – Envelope | 600 | 613 |
| 6 | 71  – Buccal Swab Kit | | |
| 7 | 72  – N.U.M.C. Records | | 754 |
| 8 | 73  – DNA Chart | | 849 |
| 9 | 74  – DNA Chart | | 849 |
| 10 | 75  – DNA Chart | | 849 |
| 11 | 76  – Photograph | 906 | 907 |
| 12 | 77  – Photograph | 906 | 907 |
| 13 | 78  – Photograph | 906 | 907 |
| 14 | 79  – Registration Record | | 1034 |
| 15 | 80  – Birth Certificate | | 1035 |
| 16 | Defendant's Exhibits | | |
| 17 | A  – Grand Jury Testimony, 34 pgs. | 701 | |
| 18 | | | |
| 19 | B  – Statement, 3 pgs. | 717 | |
| 20 | C  – Fingerprint form | 741 | |
| 21 | D  – CD | 791 | 797 |
| 22 | D1 – Redacted CD | | 1174 |
| 23 | E  – Statement of Oscar Villatoro | 826 | |
| 24 | F  – Lab results | 1023 | |
| 25 | G  – DVD | 1049 | 1052 |

J.H.

Index                                    1345

1    Defendant's Exhibits cont'd

2    H  - Medical Report for Deft.            1131

3    I  - One-page Statement        1149

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.