To be argued by:
Laurie K. Gibbons
10 minutes

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

---

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

A.D. No.:
2012-05037
IND. No.:
202N/2011

ULISES BONILLA,

Defendant-Appellant.

---

# RESPONDENT'S BRIEF

---

KATHLEEN M. RICE
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Laurie K. Gibbons
  Assistant District Attorneys
  of Counsel

**CONFIDENTIAL PURSUANT TO CIV. RIGHTS LAW § 50-b**

TABLE   OF   CONTENTS

Page

Preliminary Statement ........................................ i

Statement of Facts
    Introduction .............................................. 1
    The Pretrial Hearing
        The People's Case ..................................... 3
        Defendant's Case ...................................... 8
        The Hearing Court's Decision .......................... 8
    The Trial
        The People's Case ..................................... 9
        Defendant's Case ..................................... 22
        The People's Rebuttal Case ........................... 27
        The Verdict and Sentence ............................. 28

Point I
    The  Evidence  Was  Legaly  Sufficient  To  Support
    Defendant's Convictions Of Second-Degree Murder
    And   Fourth-Degree   Criminal   Possession   Of   A
    Weapon; Moreover, The Jury's Verdict As To Those
    Charges  Was  Not  Against  The  Weight  Of  The
    Evidence. ................................................ 29

        A.   The   People's   Evidence   Established   That
             Defendant   Intended   To,   And   Did,   Stab
             Armando Villatoro With a Knife ................... 29

        B.   The   Jury's   Finding,   That   Defendant   Was
             Guilty Of Second-Degree Murder And Fourth-
             Degree Criminal Possession Of A Weapon, Was
             Reasonable ....................................... 38

Point II
    The Jury's Finding That Defendant Was Guilty Of
    First-Degree Rape And First-Degree Sexual Assault
    Was Not Against The Weight Of The Evidence ............. 46

Point III
    The   Hearing   Court   Properly   Determined   That
    Defendant Had Not Made An Unequivocal Request For
    Counsel   Prior   To   Giving   A   Videorecorded
    Statement. .............................................. 57

A.  The  Hearing  Evidence  Demonstrated  That
    Defendant  Did  Not  Make  An  Unequivocal
    Invocation Of His Right To Counsel ............... 58

B.  Even If The Hearing Court Erred In Denying
    Defendant's    Motion    To    Suppress    The
    Videotaped    Statement,    The    Error    Was
    Harmless Beyond A Reasonable Doubt ............... 63

Point IV
    The  Trial  Court  Properly  Declined  To  Sever  The
    Assault And Sexual Assault Charges ...................... 69

Conclusion ................................................... 78

Certificate of Compliance

# NEW YORK SUPREME COURT
## Appellate Division - Second Department



### THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

### ULISES BONILLA,

Defendant-Appellant.

## RESPONDENT'S BRIEF

### Preliminary Statement

Defendant appeals from a judgment of the Supreme Court, Nassau County, entered on June 15, 2012, convicting him, after a jury trial, of one count of murder in the second degree (Penal Law § 125.25[1]), one count of rape in the first degree (Penal Law § 130.35[3]), two counts of sexual abuse in the first degree (Penal Law § 130.65[3]), one count of criminal possession of a weapon in the fourth degree (Penal Law § 265.01[2]), and one

i

count of endangering the welfare of a child (Penal Law § 260.10[1]). Defendant was sentenced to an indeterminate term of imprisonment of twenty-five years to life for his murder conviction, a determinate prison term of seven and one-half years to be followed by twenty years' post-release supervision for his rape conviction, two determinate prison terms of four years to be followed by ten years' post-release supervision for his sexual abuse convictions, and two definite one-year terms for his convictions of criminal possession of a weapon and endangering the welfare of a child. The murder and rape sentences were ordered to run consecutively to each other and concurrently with the remaining sentences (Honorof, J., at hearing; Peck, J., at trial and sentence).

There were no co-defendants in this case. Defendant is incarcerated pursuant to the judgment of conviction.

ii

S T A T E M E N T   O F   F A C T S

Introduction

During the summer of 2010, defendant pursued J.V.,[1] his ten-year-old neighbor.  At various times, and in front of his house at 163 Kinkel Street in Westbury, Nassau County, defendant kissed J.V. and fondled her breasts, vagina, and buttocks.  J.V. did not tell her parents or anyone else for fear of getting into trouble.    Then,  on  the  afternoon  of  September  24,  2010, defendant took J.V. into a bathroom at a Westbury park.  In one of the stalls, defendant placed first his finger, and then his penis, in J.V.'s vagina.  J.V. pushed defendant away and went home.   Two of J.V.'s friends, who were also in the park, saw J.V. and defendant exit the bathroom.  They told J.V.'s parents, Susana and Armando Villatoro, what they had seen.  A Nassau County Police Officer took a report but took no further action.

That evening, Armando confronted defendant at a local deli. The two men had a brief physical altercation.  Four days later, on September 28, 2010, defendant and Armando clashed again.  In front  of  several  onlookers,  defendant  and  Armando  punched  and struggled  with  each  other.    When  someone  tried  to  enter  the fight, defendant's friend fired a gun into the air.  After the

---

[1] To ensure privacy, this brief will refer to the rape victim as "J.V."

1

gunshot, defendant and his friends ran away, ultimately leaving the area in a vehicle driven by defendant's sister. Armando attempted to walk to his house but collapsed, bleeding from twelve stab wounds to his torso, on his front lawn. He later died from his injuries. A knife bearing Armando's blood was discovered in the street in front of defendant's house.

Police searched for defendant for nearly two months. He was arrested on November 26, 2010, at Pennsylvania Station in New York City. He was charged with one count of second-degree murder, one count of first-degree rape, two counts of first-degree sexual abuse, two counts of fourth-degree criminal possession of a weapon, and one count of endangering the welfare of a child. On December 20, 2011, the jury acquitted defendant of one of the weapon-possession counts and convicted defendant of the remaining charges.

On June 15, 2012, the court sentenced defendant to an indeterminate term of imprisonment of twenty-five years to life for his murder conviction, a determinate prison term of seven and one-half years to be followed by twenty years' post-release supervision for his rape conviction, two determinate prison terms of four years to be followed by ten years' post-release supervision for his sexual abuse convictions, and two definite one-year terms for his convictions of weapon possession and

2

endangering. The murder and rape sentences were ordered to run consecutively to each other and concurrently with the remaining sentences.

## The Pretrial Hearing[2]

### The People's Case

At approximately 11:40 p.m. on September 28, 2010, Nassau County Homicide Detective JAMES CEREGHINO responded to 180 Kinkel Street in Westbury, Nassau County, after receiving a call regarding a fatal stabbing (Cereghino: H7). Cereghino spoke with Third Precinct detectives and several witnesses who told him that defendant and the victim, Armando Villatoro, had engaged in a physical altercation that evening. Witnesses stated that defendant lived down the road at 163 Kinkel Street (Cereghino: H7-9).

Cereghino was informed that, a few days before the fight, Armando learned that defendant had had sexual contact with Armando's ten-year-old daughter, J.V. (Cereghino: H14). On the day of the fight, defendant approached Armando's daughter Nancy

---

[2] Numbers in parentheses preceded by "H" refer to the minutes of the hearing, those preceded by "T" refer to the minutes of the trial, and those preceded by "S" refer to the minutes of the sentencing. Names preceding numerical references refer to the witnesses who provided the recounted testimony.

in front of the Villatoro home and said that he "wanted to fuck [Armando] up" (Cereghino: H9).   Soon after, Armando appeared. He and defendant began to fight in the street (Cereghino: T10). Witnesses told Cereghino that the fight was primarily between defendant and Armando, with the two men "squar[ing] off" chest to chest (Cereghino: H10, 12, 37, 42-43, 67-69).

When the fight was over, Armando's wife Susana tried to walk Armando to the house, but he collapsed on the front lawn, bleeding extensively from his chest (Cereghino: H10).   Cereghino later learned that Armando had sustained twelve stab wounds (Cereghino: H11).

Nancy and Oscar told Cereghino that they saw defendant and others head toward defendant's house.   Defendant left the scene in his sister's vehicle.   Subsequently, police seized the vehicle and defendant's blood was found inside (Cereghino: H11, 43-45).

After speaking with witnesses, Cereghino canvassed the area.   He observed a bloody knife in the street near the curb in front of defendant's house.   Although no fingerprints were found on the knife, the blood was matched to Armando (Cereghino: H11, 39-41).

In the days following September 28, 2010, the police made many  efforts  to  locate  defendant,  conducting  surveillance,

4

monitoring social media, and receiving tips both that he had fled to Boston, Massachusetts, and that he was staying at a horse farm in Suffolk County. When Cereghino responded to the farm, he discovered some paperwork at the farm indicating that defendant had a new cell phone (Cereghino: H12-14, 39).

On November 26, 2010, after monitoring defendant's activity on the new cell phone, Cereghino located defendant at Pennsylvania Station in Manhattan. Cereghino noted that defendant appeared to have cut his long hair short. At approximately 11:30 p.m., Cereghino placed defendant under arrest and transported him to the Nassau County Homicide Squad in Mineola (Cereghino: H15-16, 18-19, 46).

On the way to Mineola, Cereghino stated that he wanted to talk to defendant, but they would wait until they arrived at the police station so that Cereghino could advise defendant of his rights (Cereghino: H17). Also on the way, defendant stated, "I wanted to be out for Christmas"; defendant also told Cereghino that he was hungry and had not eaten in four days. Cereghino made no promises or threats during the ride to Mineola (Cereghino: H17-18).

At approximately 12:30 a.m. on November 27, 2010, Cereghino brought defendant into an interview room at the Homicide Squad. Everything that occurred in the interview room was videorecorded

5

(Cereghino: H19-20, 64).[3]   Cereghino, joined by fellow Homicide Detective Milton Aponte, read defendant his rights.   Cereghino, Aponte (who was fluent in Spanish), and defendant spoke in English.   They were able to communicate clearly (Cereghino: H20-21, 23, 59-60, People's Exhibit 1 [rights card]).[4]

After Cereghino read defendant his rights, the following conversation occurred:

> DETECTIVE CEREGHINO: Now that I have advised you of your rights, are you willing to answer questions?
>
> ULISES BONILLA: I don't know if I could call a lawyer or something.

(Cereghino: H60; People's Exhibit 3 at 6-7).   Cereghino was not sure what defendant was referring to, so he attempted to clarify:

---

[3] A DVD depicting the entire time that defendant was in the interview room and a transcript of the interview were entered into evidence (H23-24, 27-28; People's Exhibit 2 [DVD]; People's Exhibit 3 [transcript]).   A copy of the DVD and transcript will be provided to the Court upon request.

[4] During the interview, defendant spoke in English.   At times, he spoke Spanish and translated his words for the detectives (People's Exhibit 3 at 35, 108).   When Aponte, in English, challenged defendant's claim that he did not stab Armando, defendant asked for "somebody to speak Spanish."   Aponte noted that defendant was "talking fine"; when defendant claimed that he was confused, Aponte responded, "You get confused when your story doesn't make sense.   That's different from language" (Cereghino: H34-35, 66; People's Exhibit 3 at 68).   The conversation then continued in English.   At no time did defendant ask to speak with Aponte in Spanish, or otherwise request an interpreter (Cereghino: H66).

> DETECTIVE CEREGHINO: I'm sorry, could you speak up?
>
> ULISES BONILLA: I don't know if I could call somebody to call me a lawyer or something.
>
> DETECTIVE CEREGHINO: That's up to you, whatever it is that you want to do.
>
> ULISES BONILLA: I can't make any phone calls (inaudible)?[5]
>
> DETECTIVE CEREGHINO: Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak to me without a lawyer being present.

Defendant thought for a moment, and then said:

> ULISES BONILLA: I could speak to you.
>
> DETECTIVE CEREGHINO: You will speak to me?
>
> ULISES BONILLA: Yeah.

(Cereghino: H60-62; People's Exhibit 3 at 7).

Defendant, Cereghino, and Aponte proceeded to have a conversation regarding the events of September 24 and 28, 2010. Defendant admitted that he knew J.V. but denied assaulting her (People's Exhibit 3 at 41, 51, 100). Moreover, defendant conceded that he had fought with Armando on September 28; however, defendant insisted that he did not remember exactly what happened and further stated that he was "trying" to remember whether someone had given him a knife (People's

---

[5] Defendant mumbled throughout the interview.

7

Exhibit 3 at 23, 33, 72-76, 83, 86, 94, 110, 112, 135-36, 138, 161, 173).  During the interview, defendant was given food and an opportunity to use the bathroom.  At one point, the detectives left the room, and defendant appeared to sleep. After defendant indicated that he wanted to call his mother, he was permitted to make three phone calls (Cereghino: H63-65; People's Exhibit 3 at 175, 177).  At 5:10 a.m., defendant was taken to the detention area (Cereghino: H33).

Defendant's Case

Defendant did not call any witnesses or present any evidence at the hearing (H70).

The Hearing Court's Decision

Following the close of the evidence, the court announced that it wished the parties to submit written argument regarding whether: 1) defendant knowingly, intelligently, and voluntarily waived his right to counsel; and (2) defendant should have been provided a Spanish interpreter (H70-71).  The court stated its intent to re-watch the videotaped interview and re-read the transcript (H72).  After the parties submitted papers, the court permitted them to make additional argument (H85-99).

In an oral decision dated October 19, 2011, the hearing court denied defendant's motion to suppress the videotaped statement.  The court first ruled that the hearing evidence

8

established that "defendant speaks and understands English
perfectly well." The court then held that "defendant did not
make an unequivocal invocation of his right to counsel."
Accordingly, his videotaped statement was admissible at trial on
the People's direct case (H99).

## The Trial

### The People's Case

On Friday afternoon, September 24, 2010, ten-year-old J.V.,
eleven-year-old STEVEN DESTINA, and ten-year-old IVAN ALCANTARA
walked from J.V.'s home, at 180 Kinkel Street in Westbury,
Nassau County, to nearby Bunkyreid Park. They went to a
playground near a handball court (Destina: T433-34; Alcantara:
T453-54; J.V.: T677-79, 723-26). Presently, defendant, who was
playing handball, approached the playground to retrieve an
errant ball (Destina: T434). The kids knew defendant because he
lived on Kinkel Street, down the block from J.V. (Destina: T433;
Alcantara: T453; J.V.: T669-73).

J.V. was also familiar with defendant because she
considered him her boyfriend. In the summer weeks leading up to
September 24, 2010, defendant and J.V. met up several times by
defendant's house. They talked and kissed, and sometimes
defendant touched J.V.'s breasts, vagina, and buttocks. J.V.

9

hid these encounters from her parents because she did not want to get in trouble (J.V.: T674-75, 727-29, 733).

When defendant appeared at the playground that Friday, he asked J.V. to go to the nearby girls' bathroom with him. J.V. initially refused, but defendant took her wrist and led her into the bathroom. J.V. did not resist, and the two entered one of the stalls (J.V.: T680, 722). Destina and Alcantara saw defendant kiss J.V. prior to entering the bathroom; they decided to run to 180 Kinkel Street to tell J.V.'s parents (Destina: T435-35, 441; Alcantara: T454-55, 458).

In the bathroom stall, defendant pushed J.V. against the wall. As they kissed, defendant bit her lip. He then put his finger in her vagina. Defendant pulled down J.V.'s underwear, and J.V. felt his penis enter her vagina. Scared and in pain, J.V. pushed defendant away (J.V.: T681-87, 698, 702, 705). Her phone started to ring as she left the bathroom; J.V. saw that her thirteen-year-old brother OSCAR VILLATORO was calling, but she did not answer (J.V.: T687, 697; O.Villatoro: T803, 817, 822).

Destina and Alcantara, who had seen Oscar at 180 Kinkel Street and told him of J.V.'s encounter with defendant, returned to the park in time to see J.V. leave the bathroom. Defendant was behind her. J.V.'s lip looked swollen, and she was pulling

10

up her skirt (Destina: T436, 438; Alcantara: T455; O.Villatoro: T816-17, 819, 822-23).

Upon reuniting at the park, J.V., Destina, and Alcantara began to walk back to 180 Kinkel Street. At one point J.V. separated from the boys and they arrived at the house without her. J.V.'s parents, Armando and SUSANA VILLATORO, were there. The boys relayed what happened and Armando called the police (Destina: T436-37, 442; Alcantara: T455; S.Villatoro: T516, 525-26). J.V. arrived at the house soon after, at approximately 6:00 p.m. (Destina: T448; J.V.: T732; O.Villatoro: T817, 822).

J.V. did not tell her parents what happened with defendant because she did not want to get in trouble (J.V.: T689, 712). Indeed, Armando was very upset after speaking with Destina and Alcantara, and left the house after calling the police (S.Villatoro: T517). And, because she was afraid, J.V. told responding Nassau County Police Officer CHRISTOPHER BENDITTO only that she and defendant had kissed (Benditto: T469; J.V.: T690, 703, 706). Benditto also spoke to Destina and Alcantara and took a report, but made no arrests (Destina: T445-46; Alcantara: T455, 460, 463; Benditto: T467-68; S.Villatoro: T526).

Later that day, Susana received a call from Armando, who had gone to a Westbury deli. Susana told Armando that the

11

police had not taken any action (S.Villatoro: T517). Armando spent the evening at the deli with a few friends, including ANGEL LEON. Armando was drinking and "not doing well" (Leon: T472-73, 494). He decided to call the police to again report defendant's encounter with J.V. (Leon: T475, 493).

Subsequently, defendant entered the deli. Defendant was angry that Armando had called the police and told Armando, "I want to fix this man-to-man" (Leon: T476-78). The two men then briefly threw punches at one another before being separated (Leon: T478). Defendant left, and Armando and Leon remained in the deli. Ten minutes later, defendant reappeared with some friends, holding bats and sticks. Armando hid, and defendant and his friends left (Leon: T478-80, 498). Armando went home in a taxi, followed by the police for security (Leon: T480-81). When Armando arrived at 180 Kinkel Street, he told Susana that he had an argument at the deli (S.Villatoro: T517).

Two days later, defendant spoke with his friend JOCELYN GONZALEZ, who was also friendly with the Villatoros. Defendant told Gonzalez that Armando had "jumped" him at the deli. Defendant said that he was "going to get back at [Armando] for what he did to me" (Gonzalez: T635-38).

At 5:00 p.m. on September 28, 2010, defendant called his friend MISAEL BERRIOS. Defendant stated that he had cut his

12

finger at work and wanted Berrios to accompany him to the hospital (Berrios: T926-27). Defendant, Berrios, and another individual nicknamed "Nigger" went to the hospital for approximately two hours. Afterward, they went to the Westbury deli (Berrios: T927-30).

At the deli, defendant bought a couple of forty-ounce bottles of Coors Light. As the men were leaving, defendant had an argument with one of Armando's cousins (Berrios: T930-31, 961). Afterward, the men walked to a house located at 179 Kinkel Street, across from Armando's house, where they hung out often (Berrios: T931-32).

At approximately 10:00 p.m., the men were drinking their beer in the yard of 179 Kinkel Street when defendant was told that Armando was talking to others about defendant. Defendant then called Armando, who was at the Westbury deli with Leon. Defendant and Armando agreed to fight; defendant told Armando, "I'm waiting for you" (Leon: T481-82, 491-92, 495-96; Berrios: T933, 962-63). Armando left the deli with Leon and a few others (Leon: T483-84). Meanwhile, Nigger gave defendant a gun, which defendant handed to Berrios (Berrios: T934, 963, 965).

Shortly thereafter, Gonzalez parked her car in front of 180 Kinkel Street. Armando's fifteen-year-old daughter NANCY VILLATORO was sitting in the front passenger seat. Defendant

13

approached the car, wearing a black do rag and holding a beer bottle (Gonzalez: T638-40, 654; N.Villatoro: T770-71, 773; Berrios: T933, 961). Defendant told the girls that he was looking to have a one-on-one fight with Armando. He stated, "[W]hen I see him, I'm gonna punch him in the face" (Gonzalez: T640; N.Villatoro: T772). Then he said to Nancy, "Would it be okay if I kill your father?" (Gonzalez: T640-41, 652). Nancy ignored him (Gonzalez: T641).

At that moment, Armando appeared, walking toward 180 Kinkel Street (Gonzalez: T641; N.Villatoro: T773; Berrios: T935, 968). Defendant backed up into the street and said, "What's up?" (Gonzalez: T642). He and Armando argued about J.V., with Armando contending that defendant had disrespected his daughter (N.Villatoro: T774-75).

As Leon and his companions approached, defendant and Armando began to fight in the street. Defendant hit Armando with a metal pipe. Armando took the pipe away and hit defendant with it. The pipe fell to the ground, and the men fought with their fists. They were very close together; because the evening had grown dark, their proximity to one another made them look as if they were in a "bear hug" (Leon: T484, 492-93, 496; Gonzalez: T643-44; N.Villatoro: T775-77; Berrios: T935-36, 966-69). Defendant hit Armando in his side and back, near his left armpit

14

(Leon: T484-85, 496, 499; Gonzalez: T644, 647; N.Villatoro: T776-77, 780-85; Berrios: T937).

At the start of the fight, Gonzalez moved her car to the driveway of 180 Kinkel Street.  Nancy saw defendant's friend Johnny hit Armando on the legs with a stick.  She got out of Gonzalez's car to intervene.  Johnny pushed her to the ground and held her there (S.Villatoro: T531; Gonzalez: T646, 647-48, 656; N.Villatoro: T777-78, 786).

Hearing several voices outside, Susana looked out the window of her bedroom at 180 Kinkel Street and saw two men fighting (S.Villatoro: T506, 532).  Susana told Oscar, who was in his own room, and the two rushed outside.  They saw that the fighting men were defendant and Armando (S.Villatoro: T507; O.Villatoro: T803-04, 823). Susana screamed for someone to call the police.  When no one responded, Susana tried to step in between defendant and Armando (S.Villatoro: T507-08, 570). Berrios ran towards her and yelled, "It's a one-on-one fight. Nobody get in."  He pulled out the gun that Nigger had given him and fired a shot into the air (Leon: T486; S.Villatoro: T508, 528, 530, 570; Gonzalez: T646, 649, 655; N.Villatoro: T780, 787-89, 800-01; O.Villatoro: T805-06, 824; Berrios: T936, 938, 962-65, 992).

After the gunshot, defendant and Berrios, who had pulled a mask over his face, ran away. Defendant's sister Diana Bonilla, who also was present, hit Armando in the back with her hands before running away as well (S.Villatoro: T509, 512-13; Gonzalez: T649-50; N.Villatoro: T779, 781; O.Villatoro: T807-08; Berrios: T938). As they ran toward defendant's house at 169 Kinkel Street, defendant told Berrios, "I fucked up. I stabbed him. I got him. You are good. I fucked up. I'm done." Berrios had no idea what defendant was talking about; he had not seen defendant with a knife (Berrios: T939, 941, 951, 953-54).[6] Defendant, Diana, and others got into Diana's car, which was parked at 169 Kinkel Street, and drove away (Leon: T489-91, 500; S.Villatoro: T513; N.Villatoro: T781-83; O.Villatoro: T809, 828). Berrios kept running until he reached Nigger's house, at 167 Kinkel Street, where Berrios left the gun before continuing to his own house on foot (Berrios: T941).[7]

Armando's friends and family realized that he was bleeding heavily from his torso. Susana tried to help Armando into their house, but he took only a few steps before collapsing to the

---

[6] Leon, Susana, and Oscar also testified that they did not see defendant holding a knife that night (Leon: T485; S.Villatoro: T514; O.Villatoro: T829).

[7] While Leon and Susana testified that defendant got into Diana's car with a few friends, Nancy and Oscar testified that one of those friends was Berrios (Leon: T489-90; S.Villatoro: T513; N.Villatoro: T783; O.Villatoro: T828).

16

lawn (Leon: T487-89, 497; S.Villatoro: T508, 511-13, 515; Gonzalez: T646, 658; N.Villatoro: T787, 789; O.Villatoro: T807, 809). J.V., having heard the gunshot while she was inside her house, came out and saw Armando on the lawn (J.V.: T690-91). Nancy called the police (N.Villatoro: T787).[8]

At approximately 10:27 p.m., Nassau County Police Officer JAMES MONROE responded to 180 Kinkel Street. He observed debris in the street, several people on the front lawn, and Armando lying on the ground. Armando was on his side, bleeding heavily from his right torso. He was unresponsive and his breathing was labored. Monroe called for an ambulance (Monroe: T538-42). Shortly thereafter, Ambulance Medical Technician MICHAEL SCHWARTZ arrived. Schwartz noted that Armando, who had several major stab wounds in his chest and abdomen, was not breathing and had no pulse (Schwartz: T553-56). Schwartz transported Armando via ambulance to the Nassau University Medical Center (Schwartz: T557-58). Susana accompanied Armando to the hospital, where he later died (S.Villatoro: T514).

At approximately 11:30 p.m., Nassau County Detective KENNETH MAZZIE of the Crime Scene Unit arrived at the scene. Over the next five hours, Mazzie secured the crime scene,

---

[8] Nancy, who was distraught, told the 911 dispatcher that defendant had shot Armando (N.Villatoro: T787, 800).

17

conducted a walkthrough, took video and pictures, and secured potential evidence. Mazzie recovered a do-rag, a couple of watches, metal pipes, a wooden stick, forty-ounce Coors Light bottles, and clothing, and took swabs of blood found throughout the scene (Mazzie: T563-67). He also recovered a bloody knife from the street in front of 163 Kinkel Street (Mazzie: T567-69).

When Nassau County Homicide Detective JAMES CEREGHINO arrived, he examined the scene, observed the evidence that had been collected, and spoke to witnesses (Cereghino: T1000-01, 1009). Cereghino then began looking for Diana Bonilla's Acura (Cereghino: T1002). Eventually, police found it parked on Kinkel Street and brought it to a police processing facility in Bellmore (Mazzie: T585; Cereghino: T1002). Mazzie took pictures of the car and extracted blood samples. He observed bloodstains on the vehicle's rear passenger door, the rear passenger seatback, and the rear passenger ceiling. He also saw a white bloodstained box in the vehicle's backseat. Mazzie took swabs of blood from five different areas of the box (Mazzie: T586-89). The blood samples, along with the other evidence taken from the scene and the Acura, were forwarded to the police lab for testing (Mazzie: T592-613).

On September 29, 2010, Nassau County Deputy Medical Examiner GERARD CATANESE conducted an autopsy on Bonilla's body.

18

Catanese observed twelve stab wounds of varying depths, the majority of which were in the left chest, torso, and abdomen (Catanese: T899-902, 909). Catanese determined that Armando died from two five-inch stab wounds in his left chest that perforated his heart, stomach, pancreas, and diaphragm (Catanese: T901, 903-04). Catanese collected samples of Armando's blood and sent them to the police lab for toxicology and DNA analysis (Catanese: T909-10).

Nassau County Detective PATRICK BYRNE, a fingerprint identification expert, received and examined several pieces of evidence, including the knife, the Coors Light bottles, two wristwatches, a tire iron, two metal pipes, and a liquor bottle. He was unable to retrieve identifiable fingerprints from any of the evidence (Byrne: T628-33, 742-43).[9]

ERIKA SIMA, of the Nassau County Medical Examiner's Department of Forensic Genetics, received several pieces of evidence. After meeting with Detective Cereghino, as well as

---

[9] Byrne testified that many factors could prevent the placement of an identifiable print on an object, including the presence of heat, cold, rain, snow, and sweat. Byrne also testified that knives were usually not conducive to retaining a bearer's print (Byrne: T628, 632).

19

other members of her department,[10] Sima conducted DNA testing on the black do-rag, blood swabs taken from the scene and from the Acura, the knife, a Coors Light bottle, and two of the five samples extracted from the white cardboard box found in the Acura. Sima also tested the sample of blood taken from Armando during the autopsy and a buccal swab that Nassau County Detective SCOTT MCLAUGHLIN took from defendant (McLaughlin: T664-67; Sima: T833-47; 859-60, 862-63; Cereghino: T1011-15).

Based on her analysis, Sima determined that defendant's DNA was on the do-rag, the Coors Light bottle, and blood swabs taken from the Acura's rear passenger door and ceiling. Armando's DNA was on blood swabs taken from the scene, swabs taken from the rear passenger door and seatback of the Acura, the knife handle and blade, and the cardboard box (Sima: T849-52). Sima also determined that defendant's DNA was not on the tested samples taken from the cardboard box (Sima: T852-53).

The day after Armando died, J.V. spoke to detectives but did not divulge what had transpired with defendant on

---

[10] Sima testified that, although many pieces of evidence were recovered from the crime scene, the lab only tested items that were "evidentially relevant," which depended on several factors, including the nature and condition of the item and whether one or more individuals had handled it. Sima could not recall a case where every piece of evidence was tested (Sima: T859-60, 862-63, 874-79, 883, 889, 891, 893, 895). Cereghino testified that, in his opinion, sufficient testing was done (Cereghino: T1016-18).

September 24 because she was scared (J.V.: T692-93, 707-10, 712, 715, 719, 734). About one month later, J.V. again spoke with detectives and revealed that defendant had assaulted her in Bunkyreid Park. J.V. did so because she felt she "needed to" tell the truth (J.V.: T694, 721-22).

On October 1, 2010, Susana took J.V. to the Child Advocacy Center, where Doctor YASMINE POMPEY examined her (S.Villatoro: T518, 527; J.V.: T693; Pompey: T751). Pompey determined that J.V.'s genitals exhibited signs of hymenal trauma; specifically, Pompey observed an "interruption of the hymenal edge" (Pompey: T751-52). Pompey believed, to a "reasonable degree of medical certainty," that J.V.'s injury was consistent with digital or penile penetration (Pompey: T753-54; People's Exhibit 72 [J.V.'s medical record]).

On October 13, 2010, Detective Cereghino spoke with Misael Berrios about the events of September 28, 2010. Berrios had learned, the day after defendant's fight with Armando, that Armando had died. Berrios, who had a criminal record, did not immediately go to the police because he was scared there would be consequences from his firing of an illegal gun (Berrios: T945, 950, 987-94; Cereghino: T1006). After speaking with the police on October 13, Berrios was able to leave. Ultimately, in exchange for his truthful testimony against defendant, Berrios

21

was given immunity for his illegal possession of the gun (Berrios: T949, 983, 988-91, 995-97).

Between September 28 and November 26, 2010, Cereghino searched for defendant. Aside from speaking to various individuals, Cereghino conducted surveillance at defendant's home and the home of his girlfriend. He also monitored defendant's social media activity. Cereghino received a tip that defendant was in Boston but was unable to locate defendant there (Cereghino: T1003-04). Finally, on November 26, Cereghino arrested defendant at Pennsylvania Station in New York City (Cereghino: T1005).

Defendant's Case

FERMAN NUNEZ, the owner of the Westbury Deli in Westbury, testified for defendant. Nunez stated that, on September 28, 2010, the deli was equipped with a surveillance video system that was in operation (Nunez: T1047-52; Defendant's Exhibit G [video recording]).

Defendant's sister DIANA BONILLA also testified for defendant. Diana claimed that, during the summer of 2010, she never saw defendant with J.V., other than offering a brief greeting as defendant walked by 180 Kinkel Street (D.Bonilla: T1055-56).

22

Diana further claimed that, at 4:30 p.m. on September 24, 2010, she was home when defendant's girlfriend, Zeida Bonilla, dropped defendant off (D.Bonilla: T1057-58, 1104).   Defendant went upstairs to change.   At approximately 4:35 p.m., he and Diana left the house in Diana's Acura.   Diana picked up her friend Xiomara Tursio before arriving at Tattoo You, a tattoo shop in Carle Place, at approximately 5:10 p.m. (D.Bonilla: T1059-65, 1095-96, 1105-07).

According to Diana, the shop was very busy.   The trio waited and looked at tattoo designs for approximately two hours. During that time, Diana introduced defendant to Evan, her tattoo artist.   Diana testified that defendant wanted to get a tattoo; ultimately, however, Evan was too busy.   The trio left the store at approximately 7:10 p.m. (D.Bonilla: T1065-69, 1068, 1097-98, 1100).   Diana claimed that she and defendant arrived home at approximately 7:20 p.m., whereupon defendant went up to his room for the evening (D.Bonilla: T1070, 1107-09).

Diana testified that, on September 28, 2010, she was again at home.   At approximately 5:00 p.m., she was getting ready to go to school when defendant asked her for a ride to the hospital.   Diana claimed that defendant's hand was bleeding heavily (D.Bonilla: T1070-72).   Diana gave defendant her keys and told him to wait in the Acura.   She testified that defendant

23

got into the backseat of the car. Shortly thereafter, Diana heard defendant honk. Diana asked defendant to wait, but defendant continued to honk (D.Bonilla: T1072-74). According to Diana, when she came out of the house, she saw that defendant was no longer there (D.Bonilla: T1074, 1116).

Diana testified that she got home from school at approximately 10:20 p.m. She parked her car in the driveway of 163 Kinkel Street. As she got out of the car, she heard screaming and banging noises coming from down the block (D.Bonilla: T1079-80). Diana claimed that she walked toward -180 Kinkel Street and saw approximately seven people fighting with pipes, bats, and beer bottles. She testified that she saw Misael Berrios and Nigger fighting with people; however, she did not see Berrios holding a gun. Diana claimed that she also saw Armando hitting someone but she did not recognize that person. She testified that she did not see anyone stab Armando; she further claimed that she did not see defendant with a knife (D.Bonilla: T1081-83, 1093, 1113-14). Diana testified that she yelled for everyone to stop fighting and told Susana, who was standing nearby, to call the police (D.Bonilla: T1082).

According to Diana, at that moment, she heard a gunshot. Everyone at the scene ran away. Diana testified that she saw Armando walk to the front of his house (D.Bonilla: T1083-84).

24

Diana testified that she began to "speedwalk[]" back to her house. Defendant was in front of her and Berrios and another individual were behind her. Diana claimed that, halfway to her house, she turned back and saw Armando fall to the ground in front of his house (D.Bonilla: T1084-86).

Diana testified that, back at 163 Kinkel Street, she, defendant, Berrios, and three others got into her car. Diana claimed that defendant, who was bleeding from his ear, got into the front passenger seat, with Berrios and the others in the backseat. Diana testified that she drove defendant to his girlfriend's house in Hicksville and dropped everyone else off at Berrios's house (D.Bonilla: T1087-90, 1110, 1120-21).

Diana claimed that she did not recall the police looking for defendant or asking her for defendant's location. She acknowledged, however, that the police did speak to her on September 29, 2010. She admitted that she told them she had not seen defendant. Diana also conceded that she never told the police that she had driven defendant to his girlfriend's house the night before, or that she had seen him run away from the scene after the fight (D.Bonilla: T1110-11). Diana claimed that she had lied to the police because she was scared, even though she did not know that someone had died until she talked to the police (D.Bonilla: T1112, 1114-15).

25

Defendant's girlfriend of six years, ZEIDA BONILLA, also testified on his behalf. She stated that, at the time of Armando's death, she lived on James Street in Hicksville; however, approximately one year before the instant trial, she moved to defendant's home at 163 Kinkel Street. She currently lived with defendant's family and her four daughters, one of whom was defendant's child (Z.Bonilla: T1132-33, 1139, 1141). Zeida testified that, on September 24, 2010, she and defendant were working at a company located at 65 Kinkel Street. According to Zeida, at approximately 4:00 p.m., she and defendant left work and picked up Zeida's daughters at a nearby daycare. On the way home, they stopped at the Westbury deli. Zeida testified that she left defendant at 163 Kinkel Street at approximately 4:30 p.m. (Z.Bonilla: T1134-37, 1142-46).

Zeida testified that, on September 28, 2010, defendant injured his finger at work. She saw that defendant's finger was bleeding. Later that day, she was sleeping at her home in Hicksville when she heard a knock. Zeida claimed that defendant entered the house, bleeding from the ear (Z.Bonilla: T1139-40).

EVAN GROVER, a tattoo artist at Tattoo You in Carle Place, testified for defendant (Grover: T1148). He testified that Diana Bonilla was a client and had been to the shop many times. Grover stated that, in March of 2011, he had given a statement

26

regarding the events of September 24, 2010, to defendant's investigator. However, Grover had no specific memory of the events of that day, and had to rely on the March 2011 statement to refresh his recollection (Grover: T1154-56).

Grover testified that, on September 24, 2010, Diana, her friend, and defendant came into the shop. Defendant was interested in getting a tattoo, but Grover was busy, so they discussed the possibility of defendant returning another time. Grover testified that defendant looked at pictures for a while. Grover initially was unable to recall when defendant left, but upon looking at his March 2011 statement, Grover testified that defendant arrived at 5:00 p.m. and left at 7:00 p.m. (Grover: T1148-53). Grover acknowledged that he worked several hours a week, and did not continually pay attention to the clock (Grover: T1155).

### The People's Rebuttal Case

The People recalled Detective Cereghino, who testified that he interviewed Diana Bonilla the day after Armando's death. Diana did not tell Cereghino that she saw Berrios or Nigger involved in the previous night's fight. Diana also told Cereghino that defendant was not at the scene of the fight; she further told Cereghino that she had not seen defendant since

27

earlier the previous day when he hurt his finger (Cereghino: T1165-66).

### The Verdict and Sentence

On December 20, 2011, defendant was convicted of second-degree murder, first-degree rape, two counts of first-degree sexual abuse, one count of fourth-degree criminal possession of a weapon, and endangering the welfare of a child. Defendant was acquitted of the remaining weapon-possession count (T1332-35).

On June 15, 2012, the court sentenced defendant to an indeterminate term of imprisonment of twenty-five years to life for his murder conviction, a determinate prison term of seven and one-half years to be followed by twenty years' post-release supervision for his rape conviction, two determinate prison terms of four years to be followed by ten years' post-release supervision for his sexual abuse convictions, and two definite one-year terms for his convictions of weapon possession and endangering.  The murder and rape sentences were ordered to run consecutively to each other and concurrently with the remaining sentences (S19-21).

POINT I

THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT DEFENDANT'S
CONVICTIONS OF SECOND-DEGREE MURDER AND FOURTH-DEGREE CRIMINAL
POSSESSION OF A WEAPON; MOREOVER, THE JURY'S VERDICT AS TO THOSE
CHARGES WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE (answering
Defendant's Brief, Point I).

Defendant argues that the People offered insufficient
evidence that he stabbed Armando or that he possessed the knife
used in the stabbing. Specifically, defendant claims that the
only direct evidence of his involvement came from Misael
Berrios, whose testimony should be considered incredible as a
matter of law. See Defendant's Brief ("Def. Br.") at 11, 13.
According to defendant, without Berrios's testimony, the
People's evidence that defendant stabbed Armando "was
effectively circumstantial" (id. at 13); and, because it did not
"exclude to a moral certainty every hypothesis other than
guilt," it was insufficient to support defendant's convictions
of second-degree murder and fourth-degree weapon possession. Id.
at 18. In the alternative, defendant claims that the jury's
verdict as to those charges was against the weight of the
evidence. See id. at 20. Defendant's claims are meritless.

A. The People's Evidence Established That Defendant Intended
   To, And Did, Stab Armando Villatoro With A Knife.

"A verdict is legally sufficient if there is any valid line
of reasoning and permissible inferences that could lead a
rational person to conclude that every element of the charged

29

crime has been proven beyond a reasonable doubt." People v. Delamota, 18 N.Y.3d 107, 113 (2011); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); People v. Cabey, 85 N.Y.2d 417, 420 (1995).   In evaluating such inferences, a reviewing court must "view[] the evidence in the light most favorable to the prosecutor." People v. Contes, 60 N.Y.2d 620, 621 (1983); see also People v. Gomez, 46 A.D.3d 836, 836 (2d Dept. 2007); People v. DuPont, 283 A.D.2d 587 (2d Dept. 2001).   The People are entitled to every reasonable inference that can be drawn from the evidence.  See People v. Ford, 66 N.Y.2d 428, 437 (1985); People v. Person, 74 A.D.3d 1239, 1240 (2d Dept. 2010). Significantly, "the standard of appellate review in determining whether the evidence before the jury was legally sufficient to support a finding of guilt beyond a reasonable doubt is the same for circumstantial and non-circumstantial cases." See People v. Reed, 22 N.Y.3d 530, 534 (2014).

As relevant here, "[a] person is guilty of second-degree murder when . . . [w]ith intent to cause the death of another person, he causes the death of that person or of a third person." Penal Law § 125.25(1).  And, "[a] person is guilty of criminal possession of a weapon in the fourth degree when . . . [h]e possesses any dagger, dangerous knife . . . or any other

30

dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." Penal Law § 265.01(2).

The People's evidence was legally sufficient to prove that defendant was guilty of second-degree murder and fourth-degree criminal possession of a weapon. J.V. testified that defendant assaulted her in Bunkyreid Park on September 24, 2010. Stephen Destina and Ivan Alcantara supported her account by testifying that they saw defendant take J.V. into the bathroom at the park, and that J.V. was adjusting her skirt as she and defendant exited a short while later (Destina: T433-36, 436, 441; Alcantara: T453-55; J.V.: T677-89, 698, 705). Moreover, Angel Leon, Susana Villatoro, and Nancy Villatoro testified that Armando was very upset with defendant as a result of the assault (Leon: T473-75, 493-94; S.Villatoro: T516-17, 525; N.Villatoro: T774-75). These witnesses, along with Jocelyn Gonzalez and Misael Berrios, further testified that defendant was angry at Armando for talking about him to others and confronting him at the deli, and that defendant wanted to fight Armando "one-on-one" (Leon: T477-78, 482, 491-96; Gonzalez: T637-41, 653-54; N.Villatoro: T772; Berrios: T932-33, 962-63).

Then, on September 28, 2010, witnesses saw defendant and Armando fighting one another, with defendant aiming his blows at Armando's left torso. These witnesses testified the two men

31

were fighting very close to one another; indeed, because there was very little light, it almost appeared as if defendant and Armando were hugging (Leon: T485; S.Villatoro: T515; Gonzalez: T644; N.Villatoro: T776; O.Villatoro: T805; Berrios: T936). The witnesses further testified that no one else fought with defendant and Armando. They heard Berrios announce, when Susana tried to intercede, that the fight was between the two men (Leon: T486; S.Villatoro: T508, 510; Gonzalez: T646; N.Villatoro: T779; O.Villatoro: T805-06; Berrios: T936, 965, 992).

Armando's family, along with the responding emergency personnel, testified that, following the fight, Armando was bleeding heavily from his torso (S.Villatoro: T508, 511-12; Monroe: T541; Schwartz: T556; O.Villatoro: T807). And, the medical examiner testified that Armando had sustained twelve stab wounds in his left neck, chest, and abdomen (Catanese: T900-02). And, of course, Berrios testified that, as he and defendant ran from the scene, defendant said, "I fucked up. I stabbed him. I got him. You are good. I fucked up. I'm done" (Berrios: T939, 944-45, 951-54).

Armando's family also testified that they saw defendant run away in the direction of his house, at 163 Kinkel Street, and get into Diana Bonilla's Acura (Leon: T489-91; S.Villatoro:

32

T513-14; Gonzalez: T649; N.Villatoro: T781-82; O.Villatoro: T809). Detective Kenneth Mazzie testified that he recovered a bloody knife from the street in front of 163 Kinkel Street (Mazzie: T567). Forensic geneticist Erika Sima testified that Armando's blood was on the knife (Sima: T852). Sima also testified that Armando's blood was on swabs taken from the rear seat back and rear door of the Acura, as well as those taken from a box found in the backseat (Sima: T851-52). Defendant's blood was found on the swabs taken from the Acura's rear door panel and rear ceiling (Sima: T851).

Finally, Detective Cereghino detailed his weeks-long campaign to find defendant, including the receipt of anonymous tips, corroborated by defendant's online activity, that defendant had fled to Boston (Cereghino: T1003-04). Cereghino testified that he finally apprehended defendant at Pennsylvania Station in New York City on November 26, 2010, nearly two months after the stabbing (Cereghino: T1005).

Viewing this evidence in the light most favorable to the People, a rational jury clearly could have concluded that defendant intended to and did in fact murder Armando by stabbing him with a knife. Nonetheless, defendant contends that the evidence was not legally sufficient because Berrios was not a credible witness. A finding of legal insufficiency based on

33

testimony that is incredible as a matter of law, however, is limited to cases where one prosecution witness is the sole source of the evidence of guilt. Even then, reversal is warranted only in the "rare instance[]" in which the sole prosecution witness "'gives irreconcilable testimony pointing to both guilt and innocence,'" such that "'the jury is left without basis, other than impermissible speculation, for its determination of either [guilt or innocence].'" People v. Calabria, 3 N.Y.3d 80, 82 (2004) (quoting People v. Jackson, 65 N.Y.2d 265, 272 [1985]) (internal citation omitted).

Clearly, given the myriad witnesses who gave testimony in support of defendant's guilt, "[t]hat in no way happened here." Calabria, 3 N.Y.3d at 82. And, Berrios's testimony, rather than being incredible, was both consistent and corroborated by several witnesses. Berrios testified consistently, on direct and cross-examination, regarding several details -- including that he shot the gun because he wanted to keep others out of the fight between defendant and Armando (Berrios: T936, 965, 992); that defendant, and not their friend Nigger, gave Berrios the gun before the fight (Berrios: T934, 965); and that Berrios alerted defendant to Armando's presence prior to the fight (Berrios: T935, 966). Moreover, many aspects of Berrios's testimony -- including that he fired a gun into the air

34

(Berrios: T936); that defendant approached Gonzalez's car to speak to Gonzalez and Nancy prior to the fight (Berrios: T933-34); that Armando arrived at the scene of the fight followed by friends (Berrios: T970); that defendant and Armando were fighting very close together (Berrios: T936); and that Berrios donned a mask toward the end of the fight (Berrios: T937) -- were corroborated by other witnesses (Leon: T485, 486; S.Villatoro: T508, 510, 515; Gonzalez: T638-44, 646, 655; N.Villatoro: T776, 788; O.Villatoro: T805, 806).

The complaints that defendant now makes regarding Berrios as a witness -- that he testified in exchange for immunity from prosecution for his possession of the gun; that he had a criminal history; that he did not speak to police immediately after the stabbing; and that there were contradictions in his testimony (see Def. Br. at 11-13) -- constitute issues of credibility, within the jury's province, that fall under weight-of-the-evidence review rather than legal sufficiency. See Ford, 66 N.Y.2d at 439 (discrepancies in witness testimony "create[] a credibility question for the jury to be determined by them in the context of the entire body of evidence before them") (citation omitted); People v. Kennedy, 47 N.Y.2d 196, 201 (1979) ("[A] jury faced with conflicting evidence may accept some and reject other items of evidence."); People v. Cole, 196 A.D.2d

35

634, 635 (2d Dept. 1993) (whether witness testimony is to be disregarded because it is inconsistent or otherwise unworthy of belief is a decision for the jury).

Accordingly, there was both direct and circumstantial evidence of defendant's guilt, and defendant's current claim that the People's case was "effectively circumstantial" (Def. Br. at 13-14), is without merit. Nevertheless, even if this Court were to disregard Berrios's testimony, there would be sufficient evidence of defendant's guilt of murder and weapon possession. Based solely on the evidence regarding the impetus for the fight between defendant and Armando, the logistics of the fight itself, the physical evidence recovered from the scene, and defendant's own actions in absconding after Armando's death, a rational jury could have inferred that defendant intended to kill Armando and used the recovered knife to do so. This proof "established a well-connected chain of facts and circumstances leading reasonably to a conclusion of guilt and excluding to a moral certainty any reasonable hypothesis of innocence." People v. Main, 179 A.D.2d 953, 955 (3d Dept. 1992) (affirming defendant's conviction of second-degree criminal possession of a weapon where there was no ballistics analysis linking the defendant to the crime); see also People v. Carver, 183 A.D.2d 907 (2d Dept. 1992) (ruling that circumstantial

36

evidence of the defendant's prior threats and assaults against the victim was sufficient evidence of motive and intent); People v. Villalona, 162 A.D.2d 565, 566 (2d Dept. 1990) (affirming second-degree murder conviction based entirely on circumstantial evidence where a witness saw an unidentified man shoot the victim and then get into a car that was later connected to the defendant, the victim's blood was found on the car, and the defendant absconded for two years).

Contrary to People v. Marin, 102 A.D.2d 14 (2d Dept. 1984), cited by defendant (see Def. Br. at 19), the jurors here did not "leap[] logical gaps in the proof offered and [draw] unwarranted conclusions based on probabilities of low degree." Id. at 32 (citation omitted). In Marin, the defendant was convicted of murder and arson; this Court found that there was insufficient evidence supporting the People's theory regarding the defendant's "alleged opportunity to start the fire, the manner in which he did so, and the means that were available to him." Id. at 30. Thus, the Court held, "[t]he hypothesis of defendant's guilt does not flow naturally from the facts proved." Id. at 31.

Here, in contrast, the People's evidence established that defendant had means, motive, and opportunity to kill Armando, and the only reasonable inference to be drawn from that evidence

was that defendant did, in fact, kill Armando. Indeed, "when one attentively reviews and critically assesses all the circumstantial evidence, cast in its aggregated and interwoven symmetry, and after applying all natural and reasonable inferences, the conclusion that defendant murdered [Armando] becomes inescapable, and the evidence excludes beyond a reasonable doubt any reasonable hypothesis of innocence." People v. Bierenbaum, 301 A.D.2d 119, 132-33 (1st Dept. 2002).

B. The Jury's Finding, That Defendant Was Guilty Of Second-Degree Murder And Fourth-Degree Criminal Possession Of A Weapon, Was Reasonable.

Again, defendant's complaints, that Berrios was not credible, and that there were inconsistencies in the remaining evidence (see Def. Br. at 13, 15-18), do not support a legal sufficiency claim, but "in fact reflect [his] belief that the jury got it wrong." Calabria, 3 N.Y.3d at 83. Accordingly, his claim is, in reality, a challenge to his conviction on weight of the evidence grounds. See People v. Danielson, 40 A.D.3d 174, 177 (1st Dept.), aff'd, 9 N.Y.3d 342 (2007) ("Thus, the arguments raised by defendant reflect a traditional notion of a weight of the evidence inquiry -- i.e., one which asks the court to evaluate the weight of the witnesses' testimony and the permissible inferences to be drawn therefrom in order to determine the facts of the case.").

38

In reviewing a weight-of-the-evidence claim, "the appellate court must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." People v. Bleakley, 69 N.Y.2d 490, 495 (1987) (citation omitted). Although the verdict may be set aside if the jury did not weigh the evidence properly, "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor." Id.; see also People v. Parks, 67 A.D.3d 931, 932 (2d Dept. 2009); People v. Silberzweig, 58 A.D.3d 762 (2d Dept. 2009). Indeed, as noted above, it is well settled that issues of credibility are to be resolved by the jury, which saw and heard the witnesses. See People v. Regan, 11 A.D.3d 640 (2d Dept. 2004).

Here, none of defendant's allegations regarding the People's evidence warrants a finding that the jury's verdict as to second-degree murder and fourth-degree criminal possession of a weapon was unreasonable. First, again, defendant's complaints about Berrios -- that Berrios contradicted himself in his testimony, testified in exchange for immunity from prosecution for his possession of the gun, had a criminal history, and did not speak to police immediately after the stabbing -- all raised issues of credibility that the jury was entitled to resolve in

39

the People's favor.    This is particularly so given the fact
that, as established herein, Berrios's testimony was otherwise
internally consistent and corroborated by that of the other
witnesses.

Second, defendant contends that none of the witnesses saw
him with a knife, and instead testified that defendant and
Armando were engaged in a fist fight. See Def. Br. at 15.    There
was other evidence, however, that supported the inference that,
rather than hitting Armando's body with his fist, defendant used
a knife.    The witnesses saw defendant hitting Armando about the
chest and torso, in the same area that the medical examiner
later discovered Armando's stab wounds.    A bloody knife, bearing
Armando's blood, was recovered from the street in front of
defendant's house, and several witnesses testified to seeing
defendant run to his house after the fight.    And, the witnesses
testified that, at approximately 10:00 p.m. at night, there was
minimal lighting, thus accounting for their failure to see the
knife in defendant's hand.    Clearly, the jury reasonably
inferred that defendant had stabbed Armando with the knife.

Third, defendant's complaint, that his fingerprints were
not found on the bloody knife, is unavailing. See Def. Br. at
16.    The People's fingerprint identification expert, Detective
Byrne, testified that the lack of fingerprints was not unusual.

40

Byrne explained that knives are not conducive to retaining fingerprints, and weather or the presence of liquids such as sweat could prevent a fingerprint from appearing on an object (Byrne: T628, 632). And, as forensic geneticist Erika Sima testified, the recovered knife was covered in blood (Sima: T842); thus, there was no reason for the jury to conclude, based on the lack of fingerprints on the knife, that defendant did not possess it.

Fourth, defendant notes that the blood of an "unknown person" was found in Diana Bonilla's Acura. Defendant appears to suggest that, because the blood was not his, and further because Berrios's DNA was not taken, the jury should somehow have concluded that the unknown DNA belonged to the real killer, who was not defendant. See Def. Br. at 17. However, as Sima testified, several factors -- including the condition of an item, where it was found, and who might have touched it -- could render the item "evidentially [ir]relevant"; that is, the testing of that item would not be of use to an investigation (Sima: T863, 874-79, 883, 889-95). Indeed, the People offered testimony that the box was found in the backseat of a vehicle belonging to someone other than defendant (Mazzie: T585, 587); moreover, defendant himself offered evidence, via his sister Diana, not only that the vehicle was used fairly regularly

41

(D.Bonilla: T1057, 1061, 1064, 1071, 1074), but that, after the fight, no less than four people -- two of whom Diana did not know -- got into the backseat (D.Bonilla: T1088). In light of this evidence, as well as the ample other evidence offered by the People demonstrating that defendant did, in fact, stab Armando to death, the failure of the police to test the unknown DNA should not undermine the jury's verdict.

To further support his nebulous claim that someone else killed Armando, defendant argues that several witnesses testified to seeing defendant enter the front seat of the Acura, but no blood was found there. See Def. Br. at 18. That defendant may not have bled profusely while in the Acura is unsurprising: Berrios testified that, following the fight, he observed defendant bleeding only from his ear (Berrios: T940). This testimony was supported by defendant's own witness; Zeida Bonilla testified that, when she saw defendant late on September 28, 2010, he was bleeding from his ear and nowhere else (Z.Bonilla: T1139-40).

Regardless, only Nancy and Oscar Villatoro testified that defendant entered the Acura's front passenger seat (N.Villatoro: T782; O.Villatoro: T809); Angel Leon and Susana Villatoro testified merely that defendant got into a car and left the scene (Leon: T489-90; S.Villatoro: T513), and Jocelyn Gonzalez

42

testified simply that defendant ran toward his house (Gonzalez: T649). Moreover, Nancy and Oscar testified that they were standing, respectively, "three houses" and more than fifty feet away from defendant when he got into the Acura (N.Villatoro: T782; O.Villatoro: T809-10). Given this distance, the lack of bright light, and the not-insignificant trauma of watching their father assaulted and bleeding on their front lawn (Nancy, in particular, testified that she was "distraught" [N.Villatoro: T800]), the jury was entitled to conclude that their observations were skewed, and that defendant had actually entered the rear passenger seat, where his blood was found (Sima: T850-51).

Defendant tries to explain the presence of his blood in the back passenger seat by noting that he had cut his finger earlier in the day, and briefly sat in the back of the Acura before leaving for the hospital. See Def. Br. at 18 n.1. Interestingly, however, Diana Bonilla -- defendant's own witness -- testified that, while waiting in her car, defendant honked her horn several times (D.Bonilla: T1073-74). If defendant was bleeding as copiously as he and Diana claimed (D.Bonilla: T1071-72), then surely blood would have been discovered near the horn on the steering wheel; however, no blood was found there. The more likely scenario, as reasonably inferred by the jury, was

43

that defendant did, in fact, flee from the scene in the Acura's rear passenger seat, and in so doing left traces of his and Armando's blood.[11]

Ultimately, the court below instructed the jury that they should use "all of the knowledge, experience and background [they had] acquired in [their] everyday lives of sizing up people and deciding whether or not they are telling the truth" (T1259-60). Thus, the jurors, using their "common sense and experience," were in a position to "best determine" that the People's evidence was credible. People v. Herring, 83 N.Y.2d 780, 784 (1994); People v. Lam Lek Chong, 45 N.Y.2d 64, 75 (1978) ("[T]he jury must rely on its own common sense and experience . . . ."). The jury rightly credited the People's witnesses, and the alleged inconsistencies to which defendant now points do not warrant a finding that the verdict was against the weight of the evidence.

Significantly, during the trial, defendant raised all of the arguments that he now makes concerning the inconsistencies in the People's proof (T1188-1219). This Court must "assume that the jury credited the prosecution witnesses and gave the

---

[11] The jury was entitled to reject Diana's testimony that defendant entered the front seat during his flight; indeed, as more thoroughly discussed in Point II, infra, the jurors were entitled to find that Diana lied in her testimony and thus disregard it completely.

44

prosecution's evidence the full weight that might reasonably be accorded it." People v. Benzinger, 36 N.Y.2d 29, 32 (1974). Indeed, the jurors asked for, and received, several readbacks of both testimony and charges (T1298, 1302, 1305, 1313, 1317, 1318, 1320), and moreover acquitted defendant of one of the counts of fourth-degree criminal possession of a weapon (T1333), demonstrating their careful consideration of the evidence and the court's instructions. Accordingly, this Court should defer to the jury's determination.

## POINT II

THE JURY'S FINDING THAT DEFENDANT WAS GUILTY OF FIRST-DEGREE RAPE AND FIRST-DEGREE SEXUAL ASSAULT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE (answering Defendant's Brief, Point II).

Defendant argues that the jurors should have found, based on the evidence, that he did not engage in sexual intercourse with J.V., and thus their verdict as to first-degree rape was against the weight of the evidence. Specifically, defendant contends that both the medical evidence and J.V.'s testimony were ambiguous regarding whether defendant had put his penis inside J.V.'s vagina. See Def. Br. at 25-30. Moreover, defendant states that, because the testimony of Diana Bonilla "indicates" that defendant was not at the scene of the assault, "this Court should consider also whether [his] guilt of [two counts of first-degree sexual assault] was established by a reasonable doubt." Id. at 30-31. Contrary to defendant's contentions, the jury gave the evidence its proper weight and his convictions of first-degree rape and first-degree sexual assault should be affirmed.

As set forth in Point I, supra, a weight-of-the-evidence review requires the Court to "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." Bleakley, 69 N.Y.2d at 495. Significantly, this review is not

46

an "open invitation" for the Court to substitute its judgment

for that of the trier of fact. People v. Cahill, 2 N.Y.3d 14, 58

(2003). Again, the jurors' ability to "view the witnesses, hear

the testimony and observe demeanor" must be afforded "great

deference." Bleakley, 69 N.Y.2d at 495; see also Parks, 67

A.D.3d at 932; Silberzweig, 58 A.D.3d 762. The reversal of a

conviction following a weight-of-the-evidence review is thus

"far from commonplace." Cahill, 2 N.Y.3d at 59 n.26.

Here, the jury properly convicted defendant of first-degree

rape and first-degree sexual abuse. As defendant notes, first-

degree rape occurs where the defendant engaged in "sexual

intercourse with another person." Penal Law § 130.35. "[S]exual

intercourse" is defined as "any penetration, however slight."

Penal Law § 130.00(1). Defendant's main contention, that the

evidence of sexual intercourse was too equivocal for the jury to

have found that defendant raped J.V., is incorrect.

During her testimony, J.V. and the prosecutor engaged in

the following colloquy:

```
Q.    What happened with his finger?
A.    He put it in my vagina.
Q.    And what happened after that?
A.    He tried to put his penis in my vagina.
Q.    How did he try to do that?
A.    What do you mean?
Q.    What did he do?
A.    I don't know.
Q.    You said that he used his finger and
      put it in your vagina?
```

47

```
A.    Yes.
Q.    You said he put something else in your
      vagina?
A.    Yes.
Q.    What was that?
A.    His penis.
Q.    And what did he do?
A.    He tried to put it in my vagina.
Q.    Was he able -- how do you know he tried
      to do that?
A.    Because I felt it.
Q.    And what happened next?
A.    Hum?
Q.    Was he able to get it fully in?
A.    No.
Q.    How much -- what did it feel like?
A.    It hurt.
Q.    Could you feel he was able to get it in
      a little bit?
A.    Huh?
Q.    Could you feel he was able to get it in
      a little bit?
A.    Yes.
```

(J.V.: T685-86).

Accordingly, J.V. testified, unequivocally, that defendant put his penis inside her vagina.  Although she stated that defendant did not fully "get it in," she was clear that she felt his penis inside her vagina (J.V.: T685-86), thus satisfying the Penal Law's definition of sexual intercourse: "any penetration, however slight."

Defendant's complaints -- that J.V.'s testimony was ambiguous because she initially testified that defendant "tried" to put his penis in her vagina, and also because the prosecutor, "arguably," led J.V. by "mischaracterize[ing] a previous answer

48

given by the witness" (Def. Br. at 26-27) -- are unavailing. Initially, the trial court repeatedly told the jurors that "[i]t's the question coupled with the answer that constitutes the evidence" (T391, 1262). That J.V. might have recounted the rape by answering leading questions in no way negated the evidentiary value of her account.

Moreover, the halting nature of J.V.'s testimony is exactly what a reasonable person would expect from an eleven-year-old witness who was reliving a traumatic event and was admittedly "embarrassed" and "very nervous" (J.V.: T675, 694). And, because of J.V.'s age and anxiety, the nature of the crimes, and J.V.'s tentative statements, the prosecutor reasonably asked leading questions in order to "clarif[y]" J.V.'s testimony. People v. Cuttler, 270 A.D.2d 654, 655 (3d Dept. 2000); see also People v. Gregory, 78 A.D.3d 1246, 1248-49 (3d Dept. 2010) ("Given the young age of the victim and the nature of the acts perpetrated upon her, County Court acted within its discretion in permitting the prosecutor leeway to frame some questions in a leading fashion."); People v. Martina, 48 A.D.3d 1271, 1272 (4th Dept. 2008) ("In view of the intimate and embarrassing nature of the crimes, we conclude that the court did not abuse its discretion in allowing the prosecutor to ask the child victim

49

leading questions in this sexual abuse case.") (quotations omitted).

Unsurprisingly, defendant glosses over J.V.'s clear -- and unprompted -- statement that she felt defendant put his penis in her vagina (J.V.: T685-86) by confusingly deeming it an expression of J.V. "feeling what she thought [defendant] was doing." Def. Br. at 27.  However, when viewed with the rest of her testimony, including that "it hurt" when defendant put his penis in her vagina (J.V.: T686), J.V.'s description of defendant's acts as rape was evident, and reasonably inferred by the jury.

Defendant also ignores the fact that the trial court, too, asked J.V. a leading question:

>           THE COURT:      She asked you to tell if he
>                           got it in a little bit, and
>                           you stated yes?
>           THE WITNESS:    Yes.

(J.V.: T686).  The court thereby took an appropriate measure to ensure that the witness understood the question and answer, and in doing so the witness again acknowledged that defendant put his penis inside her vagina "a little bit."

Defendant's contention that the medical evidence was also too vague to establish the element of sexual intercourse (see Def. Br. at 25) is groundless.  Dr. Yasmine Pompey firmly stated that, "within a reasonable degree of medical certainty," J.V.'s

50

hymenal injury was consistent with penetration, including penile penetration (Pompey: T753-54). Moreover, she excluded, as the source of J.V.'s injury, masturbation as well as any non-sexual penetration (Pompey: T757, 761, 762). Consequently, while Pompey noted that J.V.'s injury also was consistent with digital penetration (Pompey: T753-54), and thus her testimony did not, by itself, definitively establish that defendant put his penis in J.V.'s vagina, it certainly supported J.V.'s testimony that he did. The jury was entitled to conclude, based on a consideration of all of this evidence, that defendant raped J.V.

That J.V. was traumatized and embarrassed by defendant's assault also repudiates defendant's contention that her testimony was incredible because she failed, initially, to tell her parents or the police what defendant had done to her. See Def. Br. at 29-30. Throughout her testimony, J.V. stated that she was scared and upset -- both when defendant was raping her and after, when she spoke to her family and the police (J.V.: T686-87, 689-90, 703, 710). That J.V., who was ten years old at the time of the rape, would be embarrassed and afraid to admit that an older man pushed her up against a bathroom stall and forced his fingers and penis inside her vagina, was entirely understandable. J.V.'s disinclination to reveal the assault was no doubt intensified by the fact that her brother Oscar yelled

51

at her after Stephen Destina and Ivan Alcantara told him what they saw at the park (Destina: T448). The jurors, instructed by the trial court to use their "knowledge, experience and background" to evaluate witness testimony (T1259-60), reasonably concluded that J.V.'s embarrassment was a rational cause for her initial silence.

Defendant's assumption that his own evidence "indicate[d]" that he was not at Bunkyreid Park at the time of the rape, and thus that the jury should not have convicted him of rape or sexual assault (Def. Br. at 30-31), is unfounded. J.V., Destina, and Alcantara all testified that they went to Bunkyreid Park together on the afternoon of September 24, 2010 (Destina: T433; Alcantara: T453; J.V.: T678). Their presence at the park was reinforced by J.V.'s brother Oscar, who testified that he saw them enter the park at approximately 5:30 p.m. on September 24 (O.Villatoro: T816-17). The three children also testified that defendant was at the park playing handball, that he left the handball court and approached J.V., and that he and J.V. went together to the girls' bathroom for a time before exiting together as well (Destina: T433-36, 441; Alcantara: T453-55; J.V.: T678-81). Destina and Alcantara further testified that, when defendant and J.V. left the girls' bathroom, J.V. was pulling up her skirt (Destina: T436; Alcantara: T455), which was

consistent with J.V.'s testimony that, in the bathroom, defendant put his hand inside her skirt and pulled down her underwear (J.V.: T684-85). Significantly, Destina and Alcantara reported what they saw immediately to J.V.'s family (Destina: T436; Alcantara: T455). The testimony of these children, who had no discernable reason to lie, was credible, consistent, and logical, and the jurors, from their unique position of observing them testify, rightly credited it.

Likewise, the jurors properly disregarded Diana Bonilla's claim that defendant was with her on the afternoon of September 24. Her testimony was inconsistent, self-serving, and unworthy of belief. Diana initially stated that, on September 24, 2010, at 4:30 p.m., she "believed" that she was at home at 163 Kinkel Street, but "wasn't sure." She also testified that, at 4:20 p.m. that day, she was going to pick up one of her friends (D.Bonilla: T1057), but did not explain how, then, she was home alone ten minutes later, when Zeida Bonilla allegedly dropped defendant off (D.Bonilla: T1058). Diana showed similar indefiniteness by testifying, at first, that she did not know where defendant was prior to Zeida dropping him off, but then stating that he was coming home from work (D.Bonilla: T1104-05).

53

Diana testified that, at approximately 5:10 p.m., she, defendant, and Xiomara Tursio arrived at a "very packed" Tattoo You in Carle Place (D.Bonilla: T1064, 1066). She testified that she expected the three of them to get tattoos that day, but she also said that the application of a tattoo could take up to six hours (D.Bonilla: T1096-97). The jury could have viewed with incredulity her statement that each of them expected to get a tattoo, in a crowded tattoo shop, after arriving past 5:00 p.m. Diana then again contradicted herself, stating initially that the trio was at the tattoo shop for two hours but then hedging that it was "not exactly two hours" (D.Bonilla: T1069, 1099).

Based on the above inconsistencies, the jury could have reasonably disregarded Diana's account of the events of September 24, 2010. And, the jury's conclusion would only be fortified by the nature of Diana's later testimony. Diana came very close to perjury when she stated, on the stand, that she did not recall the police either looking for defendant after his fight with Armando or asking her for information regarding defendant's whereabouts. Indeed, she then admitted that the police had, in fact, interviewed her and asked her for defendant's location (D.Bonilla: T1110). Moreover, Diana denied telling the police, during the interview, that she had not seen defendant since before the fight (D.Bonilla: T1111), but

54

Detective Cereghino, when recalled to the stand, testified that Diana had told him that very thing (Cereghino: T1165-66). In addition, Diana admitted that, when she spoke to the police on September 29, she lied to them regarding her recent contact with defendant (D.Bonilla: T1114).

The trial court advised the jurors, in its charge, that, if they found that a witness "has willfully testified falsely as to any material fact," they were entitled to "completely disregard that testimony" (T1262). Diana not only admitted, during her testimony, that she lied to the police, but her testimony was also directly refuted by Cereghino. Accordingly, the jury was entitled to disregard her entire account, including her claim that defendant was with her on the afternoon of September 24. Her testimony therefore does not require a finding that the jury's first-degree rape and first-degree sexual abuse verdicts were against the weight of the evidence.

The testimony of Evan Grover, a tattoo artist at Tattoo You, does not militate otherwise. Grover's testimony was based entirely on a statement that he had given to defendant's investigator several months before (Grover: T1153-54). He had no independent recollection of the date or time that defendant, Diana, and Tursio came into the shop (Grover: T1154, 1156). Moreover, he testified that he worked many hours each week and

did not regularly pay attention to the time (Grover: T1155). Viewed in conjunction with Diana's discredited testimony, Grover's testimony was sufficiently unsure and unspecific to justify the jurors' decision to credit the consistent and supported testimony of J.V., Destina, and Alcantara, and find that defendant had, indeed, been in Bunkyreid Park in the afternoon of September 24, 2010.

Notably, defendant argued these issues in his closing statement to the jury (T1175-87). Moreover, as noted above, the jury was thoroughly instructed as to its obligation to analyze the witnesses' credibility (T1260-62, 1288-90), as well as the People's burden of proving defendant's guilt beyond a reasonable doubt (T1265-68, 1302). The Court should presume that the jury followed those instructions. See People v. Davis, 58 N.Y.2d 1102 (1983); People v. Garcia, 4 A.D.3d 374 (2d Dept. 2004). There is no basis to upset the jury's findings.

## POINT III

THE HEARING COURT PROPERLY DETERMINED THAT DEFENDANT HAD NOT MADE AN UNEQUIVOCAL REQUEST FOR COUNSEL PRIOR TO GIVING A VIDEORECORDED STATEMENT (answering Defendant's Brief, Point IV).

Defendant argues that the hearing court erred in denying his motion to suppress his videotaped statement. Specifically, defendant claims that he invoked his right to counsel after Detective Cereghino read the Miranda warnings, and that Cereghino therefore should have ceased questioning and permitted defendant to consult with an attorney. See Def. Br. at 51-53. Defendant concludes that he was prejudiced by the hearing court's decision because it prevented him from testifying at trial. See id. at 54-56.

Defendant's claim should be rejected. Defendant did not unequivocally invoke his right to counsel; accordingly, the police did not violate that right by continuing to speak with him, and the hearing court properly denied his suppression motion. Even if the court should have suppressed defendant's videotaped statement, however, defendant has failed to establish that he was harmed thereby. Defendant's contention that he did not testify due to a fear that he would be impeached with the statement is insufficient to demonstrate prejudice.

57

### A. The Hearing Evidence Demonstrated That Defendant Did Not Make An Unequivocal Invocation Of His Right To Counsel.

It is well settled that, when a defendant in custody "unequivocally requests the assistance of counsel," he may not be questioned further without an attorney. People v. Glover, 87 N.Y.2d 838, 839 (1995); see also People v. Porter, 9 N.Y.3d 966, 967 (2007); People v. Jackson, 43 A.D.3d 1181, 1181-82 (2d Dept. 2007). And, following an unequivocal request for counsel, the defendant cannot thereafter validly waive his right to counsel (see People v. Cunningham, 49 N.Y.2d 203, 210 [1980]); "[h]owever, "when the defendant's request is not unequivocal, the right to counsel does not attach." Glover, 87 N.Y.2d at 839. Whether a request for counsel is unequivocal "must be determined with reference to the circumstances surrounding the request, including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant." Id.; People v. Harris, 93 A.D.3d 58, 67 (2d Dept. 2012). The request, "viewed in context," must be "such that a reasonable police officer should have understood that [the defendant] was requesting an attorney." People v. Jones, 21 A.D.3d 429 (2d Dept. 2005).

Here, following Detective Cereghino's reading of defendant's rights, Cereghino asked, "[A]re you willing to answer questions?" Defendant responded, "I don't know if I

58

could call a lawyer or something." At the pretrial hearing, Cereghino stated that he was not sure what defendant meant by that statement, so the detective asked defendant to repeat himself, at which point defendant said, "I don't know if I could call somebody to call me a lawyer or something." Cereghino assured defendant that the decision was his. Defendant then asked whether he could make a phone call. Cereghino replied, "Ultimately, yes . . . but I'm asking you now if you want to speak to me without a lawyer being present." At the hearing, Cereghino testified that defendant thought for a moment. Defendant then said, twice, that he would speak to the detective (Cereghino: H60-62; People's Exhibit 3 at 7).

The hearing court correctly determined that defendant's references to a lawyer fell short of an unequivocal invocation of his right to counsel. Contrary to defendant's current implication (see Def. Br. at 50-51), defendant's reference to calling an attorney did not automatically invoke his right to counsel. See, e.g., Glover, 87 N.Y.2d at 839 (holding that defendant's statement, that "he wanted to call a friend to get a lawyer," was not an unequivocal request for counsel); People v. Dehmler, 188 A.D.2d 1056 (4th Dept. 1992) ("Under the circumstances, defendant's inquiry 'can I call a lawyer?' did

not unequivocally inform police of his intention to retain counsel.").

Instead, given the circumstances, including defendant's subsequent dialogue with Cereghino, "defendant's comment about calling a lawyer . . . was not an assertion of a desire not to respond to questions without counsel and at most manifested a desire to consult with an attorney." People v. Hayes, 127 A.D.2d 608, 609 (2d Dept. 1987) (quotation omitted). And, defendant "clearly and unambiguously negated" that desire by subsequently agreeing to talk to Cereghino. Glover, 87 N.Y.2d at 839; People v. Pinkney, 48 A.D.3d 707, 708 (2d Dept. 2008) (holding that defendant, by "merely inquir[ing] as to whether he should retain or consult with a lawyer," and thereafter negating his inquiry, did not unequivocally invoke his right to counsel); People v. Powell, 304 A.D.2d 410, 411 (1st Dept. 2003) (finding that defendant had not invoked his right to counsel, despite stating that he would "wait" for his attorney, when he then "initiated a conversation with a detective, telling the detective that he wanted to talk to a [prosecutor]").

At the very least, defendant's statements to Cereghino were "consistent with a variety of interpretations." People v. Mitchell, 2 N.Y.3d 272, 276 (2004). This case is therefore unlike Porter, 9 N.Y.3d 966; there, the defendant stated, "I

think I need an attorney," and the interviewing police officer wrote down that the defendant had asked for an attorney. The Court of Appeals determined that the defendant had invoked his right to counsel, because "there were no additional facts upon which a contrary inference could be drawn." Id. at 967. Here, defendant's initial unclear statements, Cereghino's clarifying responses, and defendant's repeated consent to speak were additional facts permitting the inference that defendant was making, perhaps, "[a] suggestion that counsel might be desired, a notification that counsel exist[ed], or a query as to whether counsel ought to be obtained." Mitchell, 2 N.Y.3d at 276. Those intentions "will not suffice" to unambiguously invoke the right to counsel. Id.

More likely, defendant's questions regarding phone calls constituted an inquiry about his ability to make a phone call generally. Again, when Cereghino advised defendant that it was "up to you" whether to call an attorney, defendant amended his statement and asked, simply, whether he could make a phone call. When subsequently permitted to make a call, defendant chose to call his mother, rather than an attorney (People's Exhibit 3 at 177). See People v. Bacalocostantis, 121 A.D.2d 812, 814 (3d Dept. 1986) ("It is significant that the call ultimately made was to [the defendant's] brother, not to an attorney.").

61

Moreover, defendant later confirmed that he had deliberately waived his right to counsel; during the interview, he advised Detectives Cereghino and Aponte of the basis for his decision "to talk to you guys not even with a lawyer over here," which was "[j]ust to explain to you guys, you know?" (People's Exhibit 3 at 77).

Notably, in his brief, defendant implicitly acknowledges that his statements were ambiguous, as he insists that Cereghino should have "clarif[ied] 'what [defendant] wanted or what he was referring to.'" Def. Br. at 50. Cereghino did just that, first asking defendant to repeat himself, then reminding defendant that he could speak to an attorney, and finally asking, again, whether defendant was willing to speak without an attorney present. Cereghino's response to defendant's equivocation was appropriate. See, e.g., People v. Cotton, 277 A.D.2d 461, 462 (2d Dept. 2000) (after the defendant stated, "I have counsel," the investigator responded by re-reading the defendant's rights and the defendant stated that he wanted to answer questions); People v. Diaz, 161 A.D.2d 789 (2d Dept. 1990) (the interviewing police officer clarified the defendant's initial reference to counsel and responded to the defendant's question of, "Do you think I need a lawyer?" by referring to the defendant's rights, after which the defendant gave a statement); People v. Santiago,

133 A.D.2d 429, 430 (2d Dept. 1987) (after the defendant asked the prosecutor to provide an attorney "so that I may ask him should I continue with this interview at this moment," the prosecutor reminded the defendant that he was entitled to an attorney, and the defendant concluded that he would proceed without one).

Under all the circumstances, the hearing court's determination that defendant did not make an unequivocal request for counsel was proper and should be upheld. Notably, the hearing court not only observed Cereghino's testimony, but it repeatedly watched the videotaped interview and read the transcript (H60-61, 72), and its informed decision should be accorded deference. See People v. Prochilo, 41 N.Y.2d 759, 761 (1977). As established above, there is support in the record for the hearing court's determination that defendant did not unequivocally invoke his right to counsel, and that finding should not be disturbed.

B. Even If The Hearing Court Erred In Denying Defendant's Motion To Suppress The Videotaped Statement, That Error Was Harmless Beyond A Reasonable Doubt.

If this Court determines that defendant made an unequivocal invocation of his right to counsel, and thus the hearing court should have granted his motion to suppress the videotaped statement, the Court should nevertheless reject defendant's

63

claim of error, as he was not harmed thereby. The error, if made, is constitutional, and thus is harmless "if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction." Harris, 93 A.D.3d at 71.

Here, there is no reasonable possibility that the hearing court's determination that defendant's videotaped statement was admissible at trial contributed to defendant's conviction. Initially, defendant acknowledges, as he must, that the People did not offer the videotaped statement on their direct case. See Def. Br. at 43. Accordingly, defendant cannot allege that he was "damned" by his "admission of guilt." People v. Jones, 61 A.D.2d 264, 268 (2d Dept. 1978) (concluding that the hearing court's error, resulting in the admission at trial of statements made without Miranda warnings, was not harmless); see also Harris, 93 A.D.3d at 72 (holding that the hearing court's failure to suppress the defendant's statements after the unequivocal invocation of the right to counsel was not harmless; "nothing could have been more compelling than the details provided in his increasingly inculpatory statements, because they came from the defendant and because they corroborated the testimony of the prosecution's other witnesses.").

Faced with this utter lack of demonstrable prejudice, defendant attempts to conjure constitutional error by asserting that the hearing court's decision would have permitted the People to improperly impeach him with the statement if he had chosen to testify. See Def. Br. at 54-56.  Defendant's argument is entirely unfounded.

Defendant correctly states that, if involuntarily made, a defendant's statement may not be used to impeach him if he chooses to testify. See Def. Br. at 43-44 (quoting People v. Maerling, 64 N.Y.2d 134 [1984]).  However, where there has been a violation of the right to counsel, the statement is not deemed involuntary but rather "illegally obtained." Maerling, 64 N.Y.2d at 140; see also Diaz, 161 A.D.2d at 789-90 (holding that the defendant did not unequivocally invoke his right to counsel, and separately finding that his statement was not rendered involuntary by the circumstances surrounding the subsequent interview).

And, an illegally-obtained statement, while inadmissible on the People's direct case, may be used to impeach the defendant on cross-examination. See People v. Ricco, 56 N.Y.2d 320, 326 (1982) (quoting Oregon v. Hass, 420 U.S. 714, 722 [1975]) ("A shield provided by [failure to respect the right to counsel] is not to be perverted to a license to testify inconsistently, or

even perjuriously, free from the risk of confrontation with prior inconsistent utterances."); see also People v. Sease, 245 A.D.2d 396, 397 (2d Dept. 1997) ("Statements obtained in violation of a defendant's right to counsel, although not admissible as evidence-in-chief, may be used for impeachment purposes should the defendant choose to testify."). Thus, defendant's protestations of prejudice from the hearing court's allegedly improper refusal to suppress the statement should be rejected.[12]

Having no basis upon which to claim either that the People admitted an allegedly illegally-obtained statement on their direct case, or that the use of that statement for impeachment purposes would have been improper, defendant may only establish prejudice by demonstrating that his decision not to testify, based as it apparently was upon the hearing court's suppression ruling, contributed to his conviction. He has not done so here.

---

[12] While defendant alleges, on appeal, that Detectives Cereghino and Aponte made accusations that "also would have dissuaded [him] from testifying in his own defense" (Def. Br. at 55-56), he does not claim, separately, that these accusations rendered his videotaped statement involuntary. And, while defendant contends that the video depicts him as "confused and, at times, dazed and near exhaustion," which are "indicia of involuntariness" (Def. Br. at 54), he neither provides support for this conclusory statement nor acknowledges the fact that the video actually portrays him engaging in spirited discourse with the detectives.

The evidence against defendant, as laid out in Points I and
II, supra, was overwhelming.    There was ample testimony
establishing that defendant intended to, and did, stab Armando
Villatoro with a knife.    The People's evidence also decisively
established that defendant raped and sexually assaulted J.V.

Unsurprisingly, then, defendant's brief utterly fails to
explain how his own testimony could have refuted the People's
evidence.    He does not provide even a single detail to which he
would have testified, other than suggesting that, because
testifying would have exposed him to impeachment, he would have
disputed the information in his videotaped statement.    Defendant
has therefore made absolutely no showing -- much less that there
is a reasonable possibility -- that, had he testified, the
outcome of the trial would have been different.    Significantly,
because of the overwhelming evidence against him (which, again,
did not include his videotaped statement), defendant might have
had reasons unrelated to the court's suppression ruling for
choosing not to testify. See, e.g., People v. Shields, 58 A.D.2d
94, 98 (2d Dept. 1977) (holding that, because of the ample
evidence of his guilt, defendant likely decided not to testify
regardless of Sandoval ruling).

Finally, the trial court effectively prevented the jurors
from drawing conclusions regarding defendant's decision not to

testify.    The court admonished the jurors that defendant was not required to prove or disprove any of the People's evidence, and further that they should draw no unfavorable inference from his failure to testify (T1265, 1267-68).    They are presumed to have followed these instructions. See People v. Berg, 59 N.Y.2d 294, 299 (1983) (jurors presumed to have followed court's instruction not to speculate about defendant's reasons for not testifying).

In    sum,    the    hearing    court    properly    determined    that defendant had not made an unequivocal request for counsel, and thus that his videotaped statement was admissible at trial. Regardless, even if that determination was error, defendant was not harmed beyond a reasonable doubt.

## POINT IV

### THE TRIAL COURT PROPERLY DECLINED TO SEVER THE HOMICIDE AND SEXUAL ASSAULT CHARGES (answering Defendant's Brief, Point III).

Defendant argues that the trial court should have granted his motion to sever the counts in the indictment relating to the sexual assault of J.V. from those relating to the homicide of Armando Villatoro. According to defendant, the charges "encompass[ed] two distinct incidents involving separate victims on two separate dates" (Def. Br. at 35) and did not fall within any of the provisions of C.P.L. § 200.20(2) for permitting joinder offenses. Id. at 41. Defendant also contends that, should this Court find that the charges were properly joinable pursuant to C.P.L. § 200.20(2), it should nevertheless "reverse [his] conviction and order separate trials, invoking the discretionary severance [provision of] C.P.L. § 200.20(3)." Id. at 40.

Defendant's claim is without merit. Because the charges were such that proof of those relating to the sexual assault would be material and admissible as evidence in a trial of those relating to the homicide, the trial court properly denied defendant's severance motion. Moreover, this Court should decline to affirmatively order separate re-trials under the discretionary provision of C.P.L. 200.20(3), as this case is not appropriate for discretionary severance.

69

Here, the grand jury charged defendant, in one indictment, with one count of second-degree murder, one count of first-degree rape, two counts of first-degree sexual abuse, two counts of fourth-degree criminal possession of a weapon, and one count of endangering the welfare of a child. Prior to trial, defendant made an omnibus motion for, inter alia, severance of the charges of rape, sexual abuse, and endangering the welfare of a child from the murder and weapon-possession charges.

In his severance argument, defendant contended that the charges, as a whole, did not "fall under any of the categories of joinable offenses set forth in [section] 200.20 of the C.P.L." Affirmation in Support of Defendant's Omnibus Motion, February 27, 2011, at 9-10. In response, the People argued that the sexual assault charges were "the impetus for" the homicide charges and thus were "relevant to motive, identity, and intent." Affirmation in Opposition to Defendant's Omnibus Motion, April 20, 2011, at 4-5. The People concluded that "[t]he charges were properly joined pursuant to C.P.L. § 200.20(2)(b)." Id. at 5. The trial court denied defendant's request for severance, noting that multiple witnesses would testify at trial to facts underlying both sets of charges, and further that, "if believed, testimony regarding the rape is both relevant and admissible regarding the motive for murder." People

v. Bonilla, Ind. No. 202N/2011, Motion Nos. 002 & 003 (Sup. Court Nassau County 2011) (Honorof, J.) at 2.

The trial court's decision was correct. Joinder is permitted if offenses "based on separate and distinct criminal transactions . . . are of such a nature that proof of either offense would be material and admissible as evidence-in-chief upon the trial of the other." People v. Bongarzone, 69 N.Y.2d 892, 895 (1987); see also C.P.L. § 200.20(2)(b). Materiality exists where, for example, the prosecution based the second offense on evidence that also supported the first offense (see People v. Cahill, 2 N.Y.3d 14, 43 [2003]); the proof of the first offense "tend[s] to establish a motive for the commission of" the second offense (People v. Jackson, 144 A.D.2d 488, 489 [2d Dept. 1987]); or the second offense "occurred directly as a result of, and in reaction to" the first offense (People v. Crutchfield, 134 A.D.2d 508, 509 [2d Dept. 1987]).

As the People explained in an affirmation in opposition to defendant's omnibus motion, the charges here were properly joined pursuant to C.P.L. § 200.20(2)(b). The counts relating to the sexual assault and those relating to the homicide were intertwined such that proof of the former was material as evidence-in-chief of the latter. Initially, J.V., who supplied the bulk of the testimony regarding the sexual assault, also

71

provided details regarding the aftermath of the fight between defendant and Armando (J.V.: T690-92).

Moreover, Angel Leon, Susana Villatoro, Jocelyn Gonzalez, Nancy Villatoro, Oscar Villatoro, and Misael Berrios, who all witnessed and provided details of the fight, also gave evidence establishing that the sexual assault was the impetus for that fight -- and, thus, Armando's murder. Leon testified that Armando had confronted defendant a few nights earlier after finding out that defendant had assaulted J.V. (Leon: T475). Susana testified that Armando was very upset after hearing of the assault (S.Villatoro: T517). Gonzalez testified that defendant told her that he was going to "get back" at Armando for their altercation on September 24, 2010 (Gonzalez: T637). Nancy testified that defendant told her he wanted to fight Armando, and that defendant and Armando fought about J.V. prior to the fight (N.Villatoro: T772). Oscar testified that, on September 24, 2010, he saw J.V., Stephen Destina, and Ivan Alcantara enter Bunkyreid Park, and that, later, he (Oscar) told Destina and Alcantara to notify Armando of what they saw there (O.Villatoro: T816-23). Finally, Berrios testified that, the night of the fight, someone told defendant that Armando was talking about him; Berrios stated that defendant then called Armando and challenged him to fight (Berrios: T933, 962-63).

Based on this evidence, on summation, the prosecutor argued that defendant had killed Armando after Armando had confronted him regarding his rape of J.V. (T1223). The prosecutor noted that J.V. felt guilty, knowing that defendant's crime against her was the cause of Armando's death (T1239). The prosecutor also argued that Armando's murder was the impetus for J.V.'s decision to finally speak to the police regarding the rape (T1239). Finally, the prosecutor stated that, once Destina and Alcantara told Armando about the rape, events began to spiral out of control: Armando confronted defendant, leading to Armando's death (T1242, 1245-46).

Clearly, then, evidence of defendant's sexual assault of J.V. was relevant as evidence of his murder of Armando, thus rendering the charges joinable pursuant to C.P.L. § 200.20(2)(b).[13]   The testimony of the above-discussed witnesses

---

[13]   Indeed, during the trial, defendant extracted evidence regarding both events from the same witnesses. On cross-examination, defendant questioned Officer Monroe, the first officer on the scene on September 28, 2010, regarding the relative distance between Bunkyreid Park, where the assault occurred, and 183 Kinkel Street, where the Villatoros lived (Monroe: T547, 550-51). While questioning Detective Cereghino, the lead detective in the investigation into Armando's murder, defendant asked about Cereghino's investigation into the rape charge (Cereghino: T1031-32). And, on his direct case, defendant questioned Diana Bonilla and Zeida Bonilla not only regarding his whereabouts on September 24, 2010, but also as to the events of September 28, 2010 (D.Bonilla: T1058; Z.Bonilla: T1136-37).

73

manifestly demonstrated that the murder of Armando "occurred directly as a result of, and in reaction to," the sexual assault of J.V. Crutchfield, 134 A.D.2d at 509; see also People v. Blalock, 36 A.D.3d 540, 540-41 (1st Dept. 2007) ("The counts were properly joined because the drug-related evidence provided the motive for the acts of violence."); Jackson, 144 A.D.2d at 489 ("[P]roof that the defendant committed the robbery tended to establish a motive for the commission of the alleged kidnapping."); People v. Ivy, 217 A.D.2d 948 (4th Dept. 1995) ("[E]vidence of the kidnapping was material and necessary to prove motive upon a trial of the charges arising from the Brown shooting."). Further indication that evidence of motive was relevant to Armando's murder is the trial court's instruction to the jurors that they could consider whether defendant, in fact, had a motive in committing the crimes charged (T1274).

And, because the two sets of offenses "were properly joined in one indictment from the outset, the court lacked the statutory authority to sever them." People v. Kirksey, 107 A.D.3d 825 (2d Dept. 2013) (citing C.P.L. § 200.20[3]); see also People v. Selnave, 41 A.D.3d 872, 873 (2d Dept. 2007) (same). Thus constrained, the trial court correctly denied defendant's severance application.

Defendant, in his brief, fails to demonstrate otherwise. Indeed -- other than relaying the (incorrect) assertion, made in his omnibus motion, that C.P.L. § 200.20(2)(b) did not allow for joinder because "[n]one of the evidence that would be offered to prove one of these offenses would be material and admissible in connection with the other offense"(Def. Br. at 35-36 [emphasis omitted]) -- defendant bases his claim almost entirely on the fact that C.P.L. § 200.20(2)(c) does not permit joinder here. Id. at 36-38.   Again, however, the instant offenses were properly joined pursuant to C.P.L. § 200.20(2)(b), as not only stated by the People in their affirmation in opposition to defendant's severance request, but also as demonstrated herein. Thus, defendant's contentions are both incorrect and immaterial to this Court's analysis of his joinder claim.

In any event, defendant has not established that he was prejudiced by the joinder of the charges.   (Indeed, defendant made no reference at all to being harmed by the joinder in his omnibus motion.)   The facts supporting both sets of charges were not only overwhelming (see People v. Singson, 40 A.D.3d 1015, 1016 [2d Dept. 2007]), but also "easily segregable in the minds of the jurors." People v. Reyes, 60 A.D.3d 873, 874 (2d Dept. 2009).   Moreover, the trial court advised the jurors that the People had the burden of proving "beyond a reasonable doubt each

and every element of the crimes [with] which the defendant [was] charged (T1265)," thereby reminding them of their duty to consider each element, and each count, separately. See People v. Caparella, 83 A.D.3d 730 (2d Dept. 2011); Reyes, 60 A.D.3d at 874. And, that the jurors acquitted defendant of one of the weapon-possession charges (T1333) shows that they followed the court's instructions and gave careful consideration to each charge separately. See People v. Rodriguez, 68 A.D.3d 1351, 1353 (3d Dept. 2009); People v. Johnson, 46 A.D.3d 415, 417 (1st Dept. 2007).

Defendant's request that this Court employ the discretionary severance provision of C.P.L. § 200.20(3) -- relief that defendant did not seek below -- should also be rejected. "Discretionary severance is authorized only when two offenses are joined pursuant to C.P.L. 200.20(2)(c)." People v. Williams, 155 A.D.2d 568 (2d Dept. 1989). Since, as established above, the offenses were properly joined under C.P.L. § 200.20(2)(b), "the [C]ourt [is] without discretion to sever [them]." Id.

Accordingly, the trial court properly denied defendant's severance motion as proof of the charges relating to the sexual assault were material and admissible as evidence in a trial of those relating to the homicide. And, because the offenses were

properly and originally joined in one indictment pursuant to C.P.L. § 200.20(2)(b), this Court may not invoke the discretionary severance provision of C.P.L. 200.20(3) to reverse and order separate re-trials. Defendant's severance claim is in all respects meritless.

## CONCLUSION

### THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:   Mineola, New York
         July 7, 2014

Respectfully submitted,

Kathleen M. Rice
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516)571-3800

Tammy J. Smiley
Laurie K. Gibbons
  Assistant District Attorneys
    of Counsel

78

**CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)**

LAURIE K. GIBBONS does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a monospaced typeface (Dark Courier) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (Microsoft Word 2010), the brief contains 16,164 words, exclusive of the cover, table of contents, proof of service, and certificate of compliance.

Dated: Mineola, New York
       July 7, 2014

                                        LAURIE K. GIBBONS
                                        Assistant District Attorney