# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 16-CV-3676 (JFB)
_____

ULISES BONILLA,

Petitioner,

VERSUS

THOMAS GRIFFIN,

Respondent.

_____

**MEMORANDUM AND ORDER**
August 15, 2019

_____

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On June 24, 2016, Ulises Bonilla ("petitioner" or "Bonilla") petitioned this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in New York State Court. (See Pet., ECF No. 1.)[1] On December 20, 2011, following a jury trial, petitioner was convicted of one count of murder in the second degree, in violation of N.Y. Penal Law § 120.25(1); one count of rape in the first degree, in violation of N.Y. Penal Law § 130.35(3); two counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65(3); one count of criminal possession of a weapon in the fourth degree, in violation of N.Y. Penal Law § 265.01(2); and one count of endangering the welfare of a child, in violation of N.Y. Penal Law § 260.10(1). (T. 1332-33.)[2] On June 15, 2012, petitioner was sentenced to an indeterminate period of incarceration of twenty-five years to life for the murder charge, and a determinate seven and one-half year period of incarceration for the rape charge followed by twenty years of post-release supervision. (S. 19-20)[3] The sentence for the rape conviction was imposed to run consecutively to the sentence imposed for the murder conviction. (S. at 20.) Regarding the remaining counts, the court ordered concurrent sentences to the indeterminate twenty-five years to life and determinate seven and one-half year sentences. (S. at 20-21.)

---

[1] The Court uses the pagination assigned by the electronic case filing system when citing to the petition and its accompanying memoranda of law. (ECF Nos. 1, 1-1, and 1-2.)

[2] "T." refers to the trial transcript. (ECF Nos. 10-2 and 10-3.

[3] "S." refers to the sentencing transcript. (ECF No. 10-4.)

In the instant habeas action, petitioner challenges his conviction on the following grounds: (1) "[t]he Appellate Division rendered a decision that was an unreasonable application of clearly established federal law, when it found that it was legally sufficient to establish petitioner's guilt" for the second-degree murder and first-degree rape convictions; and (2) "[t]he Appellate Division rendered a decision that was an unreasonable application of clearly established federal law, when it found that petitioner did not unequivocally request the assistance of counsel before making statements to law enforcement officials." (Pet. 5-7.) For the reasons discussed below, the petition is denied in its entirety.

I. BACKGROUND

A. Facts

The following facts are adduced from the underlying record and the instant petition.

During the summer of 2010, ten-year-old Juvenile Victim ("J.V.") lived with her mother Susana V.[4], her father Armando V., her sister N.V., and her brother O.V. at 180 Kinkel Street in Westbury, New York; petitioner lived down the block. (T. at 503-05, 670-71.) At the time, J.V. and petitioner frequently saw each other and kissed. (T. at 674-75.) This contact escalated and petitioner would touch J.V.'s breasts, vagina, and buttocks. (T. at 675.) On September 24, 2010, in the afternoon, ten-year-old J.V. was playing in Bunkyreid Park in Westbury, New York, with her two minor friends, ten-year-old I.A. and eleven-year-old S.D., when petitioner approached them. (T. at 431-35, 673.) J.V.'s two friends recognized petitioner because he lived down the block from J.V. and often spent time at the house across the street from J.V.'s. (T. at 433, 670-73.)

Despite J.V.'s initial refusal, petitioner lead J.V. to a handicapped stall in the ladies restroom in the park where they started kissing. (T. at 680-83.) Shortly thereafter, petitioner began biting J.V.'s lip and removing her skirt and underwear to digitally and sexually penetrate her. (T. at 684-86.) Uncomfortable and scared, J.V. pushed petitioner off, left the bathroom, and began walking to her home. (T. at 687-88.) I.A. and S.D. saw J.V. and petitioner kissing, and then walk into the bathroom, and observed her hiking up her skirt when she exited the bathroom followed by petitioner. (T. at 436, 455.) I.A. and S.D. then left the park and headed to J.V.'s home and told J.V.'s parents what they saw. (T. at 436-37, 455.) J.V.'s father, Armando, immediately called the police to report the incident and then left the house in an upset state, heading to the nearby deli. (T. at 516-17.)

When J.V. arrived home, fearing she would be punished, she did not tell her family what happened in the park. (T. at 689-90.) P.O. Christopher Bendetto of the Nassau County Police Department responded to the V. family home in response to Armando's 911 call. (T. at 466.) P.O. Bendetto spoke with I.A., S.D., and J.V. (T. at 467-68.) At this time, J.V. did not tell P.O. Bendetto about what transpired in the park and no arrests were made. (T. at 469, 690.)

Later that evening, Armando was still at the nearby deli and his friend, Angel Leon ("Leon"), spoke with him and observed him to be visibly upset. (T. at 473-74.) While still at the deli, Armando again called the police

---

[4] "V." is used in lieu of the victim and his family's complete last name in order to protect the identity of the victim's minor children involved in this incident.

2

to report the incident between petitioner and his daughter. (T. at 493.)

Shortly thereafter, petitioner entered the deli and confronted Armando about calling the police. (T. at 476-78.) Petitioner told Armando, "I want to fix this man-to-man." (*Id.*) A brief altercation between Armando and petitioner ensued, but other patrons intervened to stop the fight, and petitioner left. (*Id.*) Approximately ten minutes later, petitioner returned to the deli with a few friends carrying bats and sticks, prompting Armando to hide behind the counter. (T. at 478-79.) Unable to locate Armando, petitioner and his friends left the deli. (T. at 480.) Police then responded to the deli and, with their escort, Armando returned home where he informed Susana of the argument with petitioner. (T. at 480-81, 517.) Two days later, petitioner told Jocelyn Gonzalez ("Gonzalez"), a friend of his, that Armando jumped him at the deli and that he was going to get revenge. (T. at 636-38.)

On September 28, 2010, at approximately 5:00 p.m., petitioner's friend Misael Berrios ("Berrios") and a third individual ("John Doe")[5] went to the hospital with petitioner as he had injured his hand at work. (T. at 926-29.) After two hours at the hospital, the group went to Westbury Deli and purchased beers. (T. at 929-31.) Eventually, they proceeded to 169 Kinkel Street, where they usually spent time, to drink beer.[6] (T. at 932.)

At approximately 10:00 p.m., still drinking in the backyard at 169 Kinkel Street, petitioner received a phone call informing him that Armando was talking to others about him. (T. at 933.) In response, petitioner called Armando to tell him that he wanted to fight him. (*Id.*) After the call, Armando headed to his house with Leon and a few others. (T. at 483-84.) Moments later, petitioner, wearing a black do-rag and holding a beer bottle, approached Armando's daughter N.V. and others who were seated together in a car parked outside the V. family home. (T. at 638-40.) Petitioner told them he wanted to fight Armando and asked N.V., "Would it be okay if I kill your father?" (T. at 640-41.)

Thereafter, Armando arrived at his house and petitioner and Armando began fighting. (T. at 774-75.) N.V. saw petitioner strike Armando with a "little metal pipe," but Armando took it from petitioner and struck petitioner with the pipe before dropping it. (T. at 775-76.) Armando and petitioner then started punching each other repeatedly. (T. at 776.) While they were fighting there were multiple witnesses present and they remarked that the two were fighting face-to-face, so close to each other that at times it looked like they were hugging. (T. at 481-85.) Although it was dark outside, witnesses observed petitioner punch Armando in the left torso, side, and back multiple times. (T. at 484-85.)

At the outset of the fight, N.V. saw one of petitioner's friends, Johnny, strike Armando in the leg with a stick. (T. at 777-78.) N.V. tried to intervene in the fight, but Johnny pushed her to the ground and held her there. (T. at 646.) Momentarily, during the fight, petitioner's sister (Diana Bonilla) hit Armando twice in the back with her hand. (T. at 778-79.) Otherwise, the fight was exclusively between petitioner and Armando. (T. at 485, 507, 646, 935.)

Armando's wife Susana, hearing noises outside, noticed the fight and tried to intervene, but Berrios took out a firearm,

---

[5] The individual was only identified by a nickname at trial. (T. at 928.)

[6] The house at 169 Kinkel Street is across the street from the V. family home. (T. at 932.)

3

shot it in the air, and declared that it was a fight between petitioner and Armando only. (T. at 486, 507-08, 805-06.) After the gunshot, people began running away from the scene. (T. at 646.)

Petitioner, along with Berrios, fled towards petitioner's home. (T. at 939-40.) Although no one saw petitioner wielding a knife during the fight (T. at 485, 514, 828-29), Berrios testified that petitioner said to him, during their flight from the scene, "I fucked up. I stabbed him. I got him . . . You are good. I fucked up. I'm done." (T. at 939-45.) Subsequently, petitioner got into the front passenger seat of an Acura that belonged to his sister and immediately drove off. (T. at 489-90, 513, 781-83.)

Meanwhile, Armando's family and friends noticed that Armando was bleeding heavily from his torso. (T. at 487-89.) After taking a few steps towards his house with his wife's aid, Armando collapsed unresponsive on the front lawn. (T. at 484-89.)

At approximately 10:27 p.m., P.O. James Monroe of the Nassau County Police Department, responded to 180 Kinkel Street to find a street littered in debris, and Armando lying unresponsive on the ground. (T. at 538-42.) An ambulance was called and Armando was transported to Nassau University Medical Center. (T. at 553-58.) During an autopsy performed on Armando, it was discovered that Armando sustained twelve stab wounds in the side of his neck, chest, and abdomen during the incident. (T. at 900-02.) Following an autopsy, the Nassau County Deputy Medical Examiner confirmed that the majority of the wounds were on Armando's left chest, torso, and abdomen. (T. at 899-902.) It was determined that Armando's cause of death was "[m]ultiple stab wounds to [his] chest and abdomen with perforation of heart, stomach and pancreas." (T. at 904.)

Members of the Nassau County Crime Scene Unit investigated the scene that night and discovered a black do-rag, metal pipes, wooden sticks, and beer bottles. (T. at 562-67.) In addition, a bloody knife was discovered in the street in front of petitioner's home. (T. at 567-69.) Further, Diana Bonilla's Acura was parked in the vicinity of the scene, and had bloodstains on the rear passenger door, seatback, and ceiling. (T. at 585-86.) Swabs of the blood on both the knife and the Acura were taken for DNA testing and a DNA mixture was obtained, with the major contributor being the deceased. (T. at 850-53.)

On November 26, 2010, two months after the incident, following a lengthy investigation involving anonymous tips and tracking petitioner's online activity, petitioner was apprehended at Pennsylvania Station in New York City. (H. at 15-16.)[7] The arresting officer, Detective James Cereghino ("Detective Cereghino"), apprehended petitioner and transported him to the Nassau County Homicide Squad ("Homicide Squad") in Mineola, New York. (H. at 16.) During the trip, petitioner told Cereghino, "I wanted to be out for Christmas." (H. at 17.)

Once they arrived at the Homicide Squad, Detective Cereghino took petitioner to an interview room where he was read his *Miranda* rights and then the following exchange took place:

---

[7] "H." refers to the transcript of the suppression hearing held before the trial court on August 17, 2011. (ECF No. 10-1.)

4

Q: Okay. Now that I have advised you of your rights, are you willing to answer questions?

A: I don't know if I could call a lawyer or something.

Q: I'm sorry, could you speak up?

A: I don't know if I could call somebody to call me a lawyer or something.

Q: That's up to you, whatever it is that you want to do.

A: I can't make any phone calls (inaudible)?

Q: Ultimately, yes, you'll be able to make a phone call, but I'm asking you now if you want to speak to me without a lawyer being present.

A: I could speak to you.

Q: You will speak to me?

A: Yeah.

(Transcript of Post-Arrest Interview 6-7.)[8] Petitioner then spoke with the police and the entire interview, including this exchange, was recorded by video.

---

[8] The transcript and DVD recording of the post-arrest interview were not electronically filed on the docket for this case, but have been provided to the Court.

B. Procedural History

1. State Court Proceedings

a. Suppression Hearing

On August 17, 2011, a suppression hearing was held in Nassau County Supreme Court, during which Detective Cereghino testified regarding the circumstances surrounding petitioner's arrest and petitioner's post-arrest statements. (H. at 6-70.) At the close of testimony, the hearing court requested written submissions regarding whether: (1) defendant knowingly, intelligently, and voluntarily waived his right to counsel before making statements to Detective Cereghino and (2) defendant should have been provided a Spanish interpreter during his interactions with the police. (H. at 71.)

Ultimately, the court concluded that petitioner did not make "an unequivocal invocation of his right to counsel" during the exchange with Detective Cereghino and that petitioner speaks and understands English "perfectly well." (H. at 101.) Therefore, the court concluded that the lack of an interpreter was not problematic. (H. at 101.) The court denied petitioner's suppression motion and his statements were deemed admissible. (*Id.*)

b. Trial and Sentencing

Petitioner was tried in Nassau County Supreme Court starting on December 1, 2011. During the trial, the prosecution presented evidence, including the following: the testimony of J.V., eyewitnesses, and members of Armando's family; members of the Nassau County Police Department; and

expert witnesses involved in the investigation. (T. at 430-1036.) In addition, defense counsel presented a case, during which petitioner's sister Diana Bonilla testified as an alibi witness, stating that on September 24, 2010, petitioner was at home by 4:30 p.m., then they went together to a tattoo parlor where they stayed until approximately 7:10 p.m., until they returned home for the rest of the evening. (T. at 1057-70, 1095-98, 1100-09.) After both sides rested, defense counsel moved for a trial order of dismissal based on the sufficiency of the evidence for "the murder and related charges and the rape and related charges." (T. at 1166-68.) The court denied the motion, but granted a motion to submit manslaughter, as a lesser charge, to the jury. (T. at 1167-68.)

Following deliberations, on December 20, 2011, the jury found petitioner guilty of one count of murder in the second degree, one count of rape in the first degree, two counts of sexual abuse in the first degree, one count of criminal possession of a weapon in the fourth degree, and one count of endangering the welfare of a child. (T. at 1132-33.) The jury acquitted petitioner of one count of criminal possession of a weapon in the fourth degree. (T. at 1333.) After the jury was excused, defense counsel moved to set aside the verdict pursuant to N.Y. Crim. Pro. § 330.30. (T. at 1336-37.) The motion was denied. (T. at 1337-38.)

On May 15, 2012, petitioner was sentenced to an indeterminate term of incarceration of twenty-five years to life for the murder charge and a determinate term of seven and one-half years of incarceration for the rape charge followed by twenty years of post-release supervision. (S. at 19-20.) The sentence for the rape conviction was imposed to run consecutively to the sentence imposed for the murder conviction. (S. at 20.) Regarding the remaining counts, the court ordered they be served concurrent to the indeterminate twenty-five years to life and determinate seven and one-half year sentences.[9] (S. at 21.)

c. Appeals

On April 16, 2014, petitioner appealed his conviction to the Second Department of the New York State Appellate Division, arguing that: (1) the evidence was legally insufficient to find petitioner guilty of murder in the second degree and the weapons-related charge; (2) the prosecution did not prove that petitioner committed rape in the first degree beyond a reasonable doubt; (3) the court erred in failing to sever the sexual assault counts from the murder and weapons-related counts; and (4) petitioner did not receive a fair trial as the hearing court erroneously denied the suppression of petitioner's post-arrest videotaped statement. (*See* App. Div. Br. at 19-60, ECF No. 10-5.)[10]

---

[9] The specifics of the imposed sentence are as follows: (1) count of murder in the second degree, twenty-five years of incarceration to life; (2) count of rape in the first degree, seven and one-half years of incarceration followed by twenty years of post-release supervision to be served consecutively to the murder count; (3) counts of sexual abuse in the first degree, four years of incarceration followed by ten years of post-release supervision to be served concurrently; (4) count of criminal possession of a weapon in the fourth degree, one year of incarceration to be served concurrently; and (5) count of endangering the welfare of a child, one year of incarceration to be served concurrently. (S. at 19-21.)

[10] The Court uses the pagination assigned by the electronic case filing system when citing to petitioner's Appellate Division brief. (ECF No. 10-5.)

On April 15, 2015, the Second Department affirmed petitioner's conviction. *People v. Bonilla,* 127 A.D.3d 985, 985 (N.Y. App. Div. 2d Dep't 2015.) The Second Department rejected petitioner's arguments regarding insufficiency of the evidence for the conviction, emphasizing that during their review of the underlying record, they "accord[ed] great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor." *Id.* at 986. In addition, the Second Department found that the severance of specific counts was not required as "the nature of the proof for each of the offenses was material and admissible as evidence upon the trial of the other counts." *Id.* at 985-86. Finally, the Second Department rejected petitioner's arguments regarding suppression of his statement as "the record supports the . . . finding that the [petitioner] did not unequivocally request the assistance of counsel before making statements to law enforcement." *Id*. at 985. Petitioner sought leave to appeal to the New York State Court of Appeals, arguing that the Second Department erred in affirming the hearing court's denial of petitioner's motion to suppress the statements. *See People v. Bonilla*, 25 N.Y.2d 1198 (2015). The court denied leave to appeal on July 29, 2015. *Id.*

2. The Instant Petition

On June 24, 2016, petitioner moved before this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner raises two issues: (1) "[t]he Appellate Division rendered a decision that was an unreasonable application of clearly established federal law, when it found that it was legally sufficient to establish petitioner's guilt" for the second-degree murder and first-degree rape convictions; and (2) "[t]he Appellate Division rendered a decision that was an unreasonable application of clearly established federal law, when it found that petitioner did not unequivocally request the assistance of counsel before making statements to law enforcement officials." (Pet'r's Memo. of Law, ECF No. 1-1.) Respondent filed a response in opposition to the petition on October 6, 2016. (Resp.'s Br., ECF No. 10.) Petitioner submitted a reply to the opposition on June 23, 2016. (Pet'r's Reply, ECF No. 13.) The Court has fully considered the submissions and arguments of the parties, as well as the underlying record.

II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the

7

relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### III. DISCUSSION

Petitioner argues that he is entitled to habeas relief as the state court unreasonably applied federal law in concluding that: (1) the evidence at trial was sufficient to establish his guilt of murder in the second degree and rape in the first degree; and (2) petitioner did not unequivocally request assistance of counsel before making statements to law enforcement officers. (Pet. at 5-7.) For the reasons discussed below, the Court denies petitioner's request for habeas relief. Petitioner's insufficiency of the evidence claim is procedurally barred, and, in any event, the Court concludes that it lacks merit. The suppression of evidence claim, though adequately exhausted, fails on the merits.

A. Procedural Requirements

1. Exhaustion

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333 (2007), he still must fairly present his federal constitutional claims to the highest state court having jurisdiction over them, *see Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 n.3 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365

(1995) (alteration in original) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

However, "it is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard*, 404 U.S. at 275-76. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claims in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Duncan*, 513 U.S. at 365-66. "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition." *Daye*, 696 F.2d at 191-92 (first citing *Picard*, 404 U.S. at 276; then citing *United States ex rel. Cleveland v. Casscles*, 479 F.2d 15, 19-20 (2d Cir. 1973)). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 192 (footnote omitted).

2. Procedural Bar

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claims. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (emphasis omitted) (quoting *Coleman*, 501 U.S. at 735).

Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are now to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (first citing *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989); then citing *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). Therefore, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Reyes*, 118 F.3d at 139 (quoting *Grey*, 933 F.2d at 120).

However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted [on] those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (first citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996); then citing *Coleman*, 501 U.S. at 744-51).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect that state judgments must be accorded. *See House v. Bell*, 547 U.S. 518, 536 (2006). Petitioner's federal claims also may be procedurally

barred from habeas corpus review if they were decided at the state level on adequate and independent grounds. *See Coleman*, 501 U.S. at 729-33.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

3. Application

First, as to petitioner's claim that the hearing court erroneously found petitioner's statements admissible even though he invoked his right to counsel, the Court finds this claim adequately exhausted. This claim appeared in petitioner's direct appeal and in his brief seeking leave to appeal to the New York State Court of Appeals. Further, the Second Department denied this claim on the merits. Accordingly, this Court will address the substance of this claim, applying AEDPA deference.

Next, as to petitioner's insufficiency of the evidence claim, the Court finds that this claim was not adequately exhausted as petitioner failed to include this claim in his brief seeking leave to appeal to the New York State Court of Appeals. In his reply brief, petitioner argues that *Meatley v. Artuz*, 886 F. Supp. 1009, 1014 (E.D.N.Y. 1995) permits his claim to be deemed exhausted. (*See* Pet'r's Reply Br. at 1.) In *Meatley*, it was determined that a petitioner adequately exhausted his claims when his letter seeking leave to appeal included no substantive issues and simply attached his Appellate Division brief to the submission instead. *Meatley*, 886 F. Supp. at 1013-14. However, the instant matter is distinguishable because petitioner did submit an issue in his letter application to the Court of Appeals. Therefore, by presenting only the motion to suppress claim in his application to the Court of Appeals, petitioner abandoned the other issues, including the insufficiency of the evidence claims. *See Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned.") Because petitioner did not fairly present this claim to the appropriate state courts "in order to give the state the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights," this claim is unexhausted. *Duncan*, 513 U.S. at 365 (quoting *Picard*, 404 U.S. at 275).

Here, petitioner no longer has any state court remedies available to him because of New York State's procedural rules, and so the insufficiency of the evidence claim is deemed procedurally defaulted. *See Moss v. New York*, 10-CV-5840 (SJF), 2014 WL 585928, at *9 (E.D.N.Y. Feb. 12, 2014). In addition, petitioner is unable to overcome this procedural bar as he has not demonstrated cause or prejudice resulting from the default, nor a miscarriage of justice if this claim is not reviewed. Notwithstanding the aforementioned, the Court, in an abundance of caution, will proceed to address the merits of this claim.

B. Merits

1. Insufficiency of the Evidence

Petitioner argues that there was insufficient evidence to support his convictions for murder in the second degree and rape in the first degree. (*See* Pet'r's Memo. of Law at 1-14.) This claim is without merit.

A petitioner 'bears a very heavy burden' when challenging evidentiary sufficiency in a writ of habeas corpus. *Einaugler v. Supreme Court of New York*, 109 F.3d 836, 840 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)). A criminal conviction in state court will not be overturned if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 … the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (internal quotation marks omitted) (quoting *Jackson*, 443 U.S. at 324)). Even when 'faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (internal quotation marks omitted) (quoting *Jackson*, 443 U.S. at 326). Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Sanford v. Burge*, 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994)). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

a. Second Degree Murder

Petitioner claims that the evidence presented at trial was legally insufficient to support his conviction of second degree murder because (1) no direct evidence – whether physical evidence or testimonial evidence – conclusively linked him to the murder weapon (*i.e.*, the knife); (2) the government's witness, Berrios, was not credible, as evidenced by his inconsistent statements and receipt of immunity from prosecution; and (3) there is no explanation for why, although petitioner was seen in the front seat of his sister's car, his blood was not found in the backseat where the victim's blood was discovered. (*See* Pet'r's Memo. of Law at 1-8.)

In New York, "[a] person is guilty of murder in the second degree when, with intent to cause the death of another, he causes the death of such person . . . ." N.Y. Penal Law § 125.25[1]. The New York Court of Appeals has consistently held that the intent to kill can be inferred from both the defendant's conduct and surrounding circumstances. *See People v. Bracey*, 41 N.Y.2d 296, 301 (1977); *see also Bossett*, 41 F.3d at 830 ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness' credibility.")

11

Viewing the facts in the light most favorable to the prosecution, the Court concludes that, based on the evidence in the underlying record, a rational trier of fact could have certainly found proof beyond a reasonable doubt that petitioner was guilty of murder in the second degree. In particular, the Court finds that the following evidence adduced at trial rationally supports the jury's decision to find petitioner guilty and the Appellate Division's affirmation of that finding: J.V. testified that petitioner had sexual relations with her, which (upon her father learning about such relations) provoked an altercation between her father and petitioner at the Westbury Deli days before the fatal fight (T. at 476-78, 635-38, 517); between the time of the altercation at the deli and the fatal fight, petitioner told people he wanted to fight Armando (T. at 481-82, 638, 772, 933); immediately prior to the fatal fight, petitioner asked Armando's daughter, N.V., if she would mind if he killed her father (T. at 640, 652); multiple witnesses testified that the fatal fight was exclusively between petitioner and Armando (T. at 485, 646-47, 506-07, 935); petitioner was seen repeatedly striking Armando in the left torso, side, and back (T. at 484-85, 644, 776-77); the twelve fatal stab wounds sustained by Armando, according to medical testimony, corroborates witness testimony that petitioner struck Armando on the left side of his chest and abdomen (T. at 484-85, 644, 776-77, 900-02); following the fight, petitioner said to Berrios, "I fucked up. I stabbed him. I got him. You are good. I fucked up. I'm done." (T. at 939).

Therefore, although no one testified that they saw petitioner wield a knife, the surrounding circumstances, the fact that the murder weapon was recovered outside petitioner's residence, and petitioner's statements, rationally support the jury's finding that petitioner was the individual who repeatedly stabbed Armando, causing his death. *See Bossett*, 41 F.3d at 830.

The Court likewise rejects petitioner's claim that there was insufficient evidence to establish his guilt of second-degree murder because Berrios was not a credible witness. Regarding the evaluation of witness testimony, "[a]ll issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict." *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008).

Petitioner refers to *People v. Garafolo*, 44 A.D.2d 86 (N.Y. App. Div. 2d Dep't 1974) to argue that Berrios' testimony was not credible, entitling him to relief. (Pet'r's Mem. of Law at 4-6.) In *Garafolo*, a police officer testified that he observed unlawful untaxed cigarettes through a bag, which the court observed was not possible. *Id*. at 88-89. The court found that this testimony was patently incredible and necessary to support the conviction; therefore, the Second Department reversed the conviction. *Id*. By contrast, here, the jury heard an abundance of evidence aside from Berrios' alleged inconsistent statements, to conclude petitioner was guilty of the crimes. *See United States v. Diaz*, 176 F.3d 52, 107 (2d Cir. 1999) (although cooperating witness for the prosecution was suspected of perjury, the court found "there was an abundance of evidence that corroborated [the witness's] description of these events"). Moreover, petitioner's defense counsel thoroughly questioned Berrios regarding his inconsistent statements about seeing petitioner get in the car and petitioner's statements. (T. at 952-53.) Further, Berrios' cooperation agreement was made known to the jury prior to the People's direct examination. (T. at 921-24.) Accordingly, because there was an abundance of independent evidence to

convict petitioner of murder in the second degree and the jury had adequate opportunity to decide whether Berrios was a credible witness, the Court rejects petitioner's claim that there was insufficient evidence to find him guilty of murder in the second degree.

Finally, petitioner's contention that there was insufficient evidence of guilt because petitioner's blood was not found in the car he entered following the fatal incident also fails. First, the Court notes that, although petitioner's blood was not discovered in the aforementioned car, Armando's blood was. (T. at 869-70.) In any event, as discussed *supra*, given the totality of the evidence presented to the jury, the absence of petitioner's blood in the car certainly does not lead to a determination that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

b. First Degree Rape

Petitioner also asserts that the Appellate Division unreasonably applied federal law in affirming that there was sufficient evidence to establish petitioner's guilt of rape in the first degree, arguing that the evidence was insufficient because there was "questionable witness testimony" and "equivocal medical evidence in support thereof." (Pet'r's Mem. of Law at 9.) Specifically, petitioner claims that the evidence adduced at trial was insufficient to support a finding of rape in the first degree because (1) J.V. only testified to penile penetration in response to leading questions by the prosecutor that arguably mischaracterized J.V.'s prior testimony, and (2) Dr. Pompey testified that the only abnormal finding in J.V.'s examination was a "V-shaped cleft at the 5 o'clock position" which could be consistent with both digital penetration or partial penile penetration. (*Id.* at 10-13). For the reasons set forth below, the Court finds petitioner's arguments to be without merit.[11]

In New York, "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [w]ho is less than eleven years old." N.Y. Penal Law § 130.35(3). The New York State Court of Appeals has held that "[s]exual intercourse 'has its ordinary meaning and occurs upon any penetration, however slight.'" *People v. Carroll*, 95 N.Y.2d 375, 383 (2000) (citing N.Y. Penal Law § 130.00(1)). Moreover, "the testimony of a child victim alone is sufficient" to establish rape in the first degree. *Id.* (stating that corroboration is only required when victim is deemed unable to consent due to mental defect or mental incapacity).

Here, after careful review of the record, the Court concludes that J.V.'s testimony (T. at 684-87) was sufficient for a rational trier of fact to find that the requisite elements of rape in the first degree were proven beyond a reasonable doubt. *See People v. Wyre*, 97 A.D.3d 976, 977 (N.Y. App. Div. 3d Dep't 2012) (rejecting a defendant's arguments that though a victim stated that sexual intercourse took place, without a specific

---

[11] The Court notes that respondent urges the Court to characterize petitioner's arguments regarding the evidence surrounding the rape in the first degree conviction as a weight of the evidence claim. To the extent that petitioner makes a weight of the evidence claim, such a claim is not cognizable on habeas corpus review as it exclusively implicates issues of state law. *See Pitre v. Griffin*, No. 16 CIV 6258 (BMC), 2016 WL 7442653, at *12 (E.D.N.Y. Dec. 26, 2016*);* *Correa v. Duncan*, 172 F. Supp. 2d 378, 281 (E.D.N.Y. 2001) (stating that a weight of the evidence claim "is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles . . . Accordingly, the Court is precluded from considering the claim."). The Court, due to petitioner's *pro se* status, liberally construes this claim as a legal sufficiency claim.

statement that penetration occurred and a lack of physical evidence, a conviction should be overturned). In addition to J.V.'s testimony, the medical testimony that J.V.'s injuries could be consistent with partial penile penetration (T. at 754) further corroborates J.V.'s testimony. *See People v. Green*, 239 A.D.2d 248, 249 (N.Y. App. Div. 1st Dep't 1997) (finding that, though there was not conclusive medical evidence of rape, it did not negate the credible testimony of a child victim, where victim's testimony was consistent with slight penetration). Moreover, to the extent petitioner questions J.V.'s credibility, as noted above, "a habeas court 'must defer to the jury's assessment of the credibility of witnesses.'" *Martin v. Smith*, No. 09-CV-5515 (SLT), 2013 WL 420102, at *10 (E.D.N.Y. Feb. 1, 2013) (quoting *Taylor v. Napoli*, No. 09-CV-2511 (NGG), 2011 WL 3648228, at *6 (E.D.N.Y. Aug. 16, 2011)).

In sum, the Court finds that petitioner's sufficiency of the evidence claim (as to both the murder and rape convictions) is without merit, and thus, the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law.

2. Request for Counsel

Petitioner also claims that the Second Department "rendered a decision that was an unreasonable application of clearly established federal law, when it found that petitioner did not unequivocally request the assistance of counsel before making statements to law enforcement." (Pet'r's Memo. of Law at 15.) In response, respondent argues that the state court's decision was correct and, even if statements should have been suppressed, any error would be harmless as they were never introduced at trial. (Resp's Br. at 16-23.)

Before police question a suspect in police custody, the suspect must first be advised of certain rights, which include the right not to be questioned without an attorney. *Miranda v. Arizona*, 384 U.S. 436 (1966). If this right is invoked, police officers must immediately discontinue questioning the suspect. *Davis v. United States*, 512 U.S. 452, 457-58 (1994). However, the suspect invoking the right to counsel "must at a minimum make 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation.*'" *United States v. Oehne*, 698 F.3d 119, 122-23 (2d Cir. 2012) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). In other words, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461-62. Accordingly, officers are not required to cease questioning a suspect who only "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Id*. at 459. Of particular relevance here, the bare reference to a lawyer is not sufficient to invoke the right to counsel. *Id.* at 462 ("[m]aybe I should talk to a lawyer" was "not a request for counsel").

In the instant matter, petitioner was read his *Miranda* rights by Detective Cereghino and responded with "I don't know if I could call a lawyer or something?" and "I don't know if I could call somebody to call a lawyer or something." (H. at 60-62; Pet'r's Memo. of Law at 18.) Detective Cereghino informed petitioner that it was up to him, and petitioner proceeded to ask "I can't make any phone calls?" (H. at 60-62; Pet'r's Mem. of Law at 18.) Detective Cereghino told petitioner that ultimately he could make a phone call and asked if he was still willing to

speak to him without a lawyer present and petitioner proceeded to do so.[12] (H. at 60-62; Pet'r's Memo. of Law at 18.)

After conducting a hearing, the state court found that, although petitioner may have questioned whether he could have a lawyer present, he did not unequivocally invoke his right to counsel, and Detective Cereghino was under no duty to discontinue questioning as a result of petitioner's statements. Numerous federal courts, including the Second Circuit, have reached the same conclusion under similar circumstances. For example, in *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001), the Eighth Circuit held: "We conclude that the state court was not unreasonable in determining that Wilkinson's question 'Could I call my lawyer?' was not an unambiguous request for counsel." *See also Diaz v. Senkowski*, 76 F.3d 61, 64-65 (2d Cir. 1996) ("Do you think I need a lawyer?" was not a "clear statement" of suspect's desire to invoke counsel); *accord United States v. Zamora*, 222 F.3d 756, 766 (10th Cir. 2000) (statement that "I might want to talk to an attorney" was not "an unequivocal request for counsel"); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (defendant's question "What time will I see a lawyer?" was not a clear invocation of right to counsel and did not require questioning to cease); *United States v. Degaule*, 797 F. Supp. 2d 1332, 1381 n.56 (N.D. Ga. 2011) (asking "Do I call my attorney now?" at end of interview was insufficient to invoke right to counsel); *United States v. Cook*, No. 07-CR-6195 CJS, 2008 WL 728883, at *14 (W.D.N.Y. Mar. 17, 2008) ("The Court also rejects the defendant's argument that any statements he made to [the law enforcement officer] must be suppressed, since prior to making any such statements, while still inside Rochester General Hospital, he invoked his right to counsel, when he asked [the officer], 'if he would be able to call an attorney.' The Court finds that this inquiry on the part of the defendant amounted only to an equivocal assertion of the right to counsel, which did not require cessation of questioning. The defendant's question lacked the clear implication of a present desire to consult with counsel."); *United States v. Jesus Abarca*, No. 1:05CR175 JCH, 2006 WL 1300604, at *15 (E.D. Mo. 2006) ("Considering the question in context, it is not clear that Wilkinson was actually requesting the presence of an attorney when he asked 'Could I call my lawyer?' . . . [The officer] could have reasonably believed in these circumstances that Wilkinson was merely inquiring whether he had the right to call a lawyer, rather than believing that Wilkinson was actually requesting counsel.").

In sum, the question of whether petitioner's statements invoked his right to counsel was thoroughly presented to the hearing court and petitioner has not shown that the state court's decision to uphold the admissibility of the statement was contrary to, or an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.

In any event, because the post-arrest statement was not presented at trial, any error was harmless. *See, e.g.*, *Gordon v. Mantello*, 155 F. App'x 562, 565 (2d Cir. 2005) ("Preliminarily, we observe that, because these initial statements were not introduced into evidence at Gordon's trial, any error in the trial court's judgment that the statements were not custodial was necessarily harmless.)

---

[12] The Court has reviewed the relevant portions of the DVD and transcript.

Accordingly, petitioner's suppression claim fails on the merits and does not provide a basis for habeas relief.

IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court shall close this case.

SO ORDERED.

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: August 15, 2019
Central Islip, New York

\*\*\*

Petitioner proceeds *pro se*. Respondent is represented by Cristin Connell, Assistant District Attorney, Nassau County District Attorney's Office, 262 Old Country Road, Mineola, NY 11501.